IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| JOSEPH MANTHA on behalf of themselves and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>QUOTEWIZARD.COM, LLC<br><br>Defendant. | Case No. 1:19-cv-12235-LTS |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO STRIKE AND DISMISS (ECF Dkt. #15)**

## I.  INTRODUCTION

Plaintiff Joseph Mantha ("Mr. Mantha") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012). Mr. Mantha alleges that the defendant, QuoteWizard.com, LLC ("QuoteWizard" or "Defendant")[1] sent automated text message telemarketing calls to cellular

---

[1] QuoteWizard is no stranger to TCPA litigation. Indeed, QuoteWizard was sued just last month in another putative class action lawsuit alleging violations of the TCPA. *See Thompson v. QuoteWizard.com LLC*, 2:19-cv-02004 (W.D. Wa.).

telephone numbers of all class members in violation of the TCPA, in an effort to sell auto insurance on behalf of its insurance company clients.[2]

In an early effort to escape responsibility for what is likely a massive campaign of illegal telemarketing, QuoteWizard has moved to dismiss or, alternatively, to strike the class claims. *See* ECF Dkt. #15. In this Motion to Dismiss, QuoteWizard contends this Court does not have jurisdiction over putative class members who reside outside of the Commonwealth. In support, QuoteWizard claims that the decision of the Supreme Court in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017) controls and requires dismissal. *Bristol-Myers*, however, is inapplicable as it applied to a state law mass tort fact pattern and does not apply to federal class actions. In federal class actions, the existence of personal jurisdiction over a defendant regarding a nationwide putative class is based exclusively on the existence of personal jurisdiction over the defendant in connection with the named plaintiff's claims.

QuoteWizard does not contest that this Court may exert jurisdiction over Mr. Mantha's individual claims in this case. Mr. Mantha is a Massachusetts resident seeking to enforce a federal statutory right in federal court for texts received in Massachusetts. *See* ECF Dkt. #1. Because QuoteWizard is mistaken that absent class members are relevant for a personal jurisdiction analysis, and Mr. Mantha is resident of this forum, the Court may exercise personal jurisdiction over QuoteWizard as to Mr. Mantha, and the nationwide putative class claims, and need not arbitrarily limit the class to Massachusetts residents.

---

[2] QuoteWizard is a telemarketer hired by insurance companies to telemarket to consumers and to then "live transfer" over to the insurance company client consumers interested in purchasing insurance goods or services. *See* https://quotewizard.com/marketing. Mr. Mantha explicitly alleged in his Complaint that QuoteWizard was in the business of selling its services to insurance agents, and providing those agents with potential customers and new business. *See* ECF Dkt. #1 at ¶23. QuoteWizard's texting platform promotes that it has the capacity to send text messages to "millions" of consumers. *See* https://www.bandwidth.com/messaging/toll-free-sms/.

QuoteWizard's Motion to Strike Class Claims similarly falls short. The classes as defined are not "fail safe" and QuoteWizard's claim that individual consent issues will predominate and result in an undefined class are grossly premature and ignores that it is QuoteWizard's burden to prove consent and, to date, it has failed to do so. Ultimately, if QuoteWizard's argument was adopted, no TCPA action could be certified if the defendant vaguely alluded to a possible consent defense at the start of the litigation. But this is simply not the case as "[c]lass certification is normal in litigation under [the TCPA], because the main questions . . . are common to all recipients." *Ira Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013); *see also Chapman v. Wagener Equities, Inc.*, No. 09-c-07299, 2014 WL 540250, at *15, n. 11 (N.D. Ill. 2014) ("*Chapman I*"), *leave to appeal denied* 747 F.3d 489 (7th Cir. 2014) ("*Chapman II*") (Posner, J.) (discussing "the many cases decided during and since 2011 in which TCPA classes have been certified, as well as the Seventh Circuit's observation in *Turza* that class certification is the norm in TCPA cases").

## II.    BACKGROUND OF THE TCPA

The TCPA strictly regulates various forms of automated telemarketing- including telemarketing to cell phones via text message. Such calls are illegal and people hate them. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman). "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016).

Industry data confirms that the number of robocalls made each month increased from 831 million in September 2015 to 4.7 billion in December 2018—a 466% increase in three years. According to online robocall tracking service "YouMail," 4.5 billion robocalls were placed in September of 2019 at a rate of 150.8 million per day. www.robocallindex.com (last visited October 18, 2019). YouMail estimates that 2019 robocall totals will exceed 60 billion. *See id.* The FCC also has received an increasing number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, and 232,000 complaints in 2018. FCC, Consumer Complaint Data Center, www.fcc.gov/consumer-help-center-data (last visited October 18, 2019). In fiscal year 2019, the FTC received 5.4 million complaints about unwanted telemarketing calls. Of those complaints, 71 percent were about robocalls. Federal Trade Commission, *FTC Releases FY 2019 National Do Not Call Registry Data Book* (October 18, 2019), https://www.ftc.gov/news-events/press-releases/2019/10/ftc-releases-fy-2019-national-do-not-call-registry-data-book?utm_source=govdelivery.

The TCPA does not prohibit all telemarketing via text message. Such calls are legal if the texts are not delivered via an Automatic Telephone Dialing System ("ATDS") and where the recipient has explicitly consented to receive such calls. In this regard, the Federal Communications Commission has further explained:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012).

4

### III.   FACTS

Mr. Mantha alleges that on August 12 and 13, 2019, he received text telemarketing solicitation on his cellular telephone number that was listed on the National Do Not Call Registry.[3] *See* ECF Dkt. #1 at ¶5, 31. The text telemarketing messages read:

> Hey, it's Amanda following up. When's a good day for us to talk Joe? You requested a quote on auto insurance. Message me if you're still interested!
>
> Tuesday 3:15 PM
>
> Hi this is Amanda! Are you looking for an accurate estimate, Joe? We can review your options together. Call me when you're free, it won't take long!

*Id.* at ¶38.

Mr. Mantha denies ever consenting to receive the above texts. *Id.* at ¶42-43. Mr. Mantha alleges that in sending the above unsolicited text messages, QuoteWizard employed the use of an ATDS. *Id.* at ¶*39.* Mr. Mantha further alleges that the use of an ATDS to send the text solicitations at issue was evidenced from the circumstances surrounding the text messages, including the text message's commercial content, that they were transmitted without his consent,

---

[3] The DNC allows consumers to register their personal telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

and that they were sent from an SMS code consistent with the use of an automatic telephone dialing system to send text messages. *Id.* at *¶38-39*. In fact, the telephone number used to send the text messages to Plaintiff is registered to Bandwidth.com, a cloud-based telecom company that provides mass text messaging services. *See* http://www.watchyourdirt.com/w-y/904-440/t-3 (last visited October 18, 2019). Dkt. 1 at 8, fn 1.

The classes of persons Mr. Mantha seeks to represent are tentatively defined as:

Class 1

> All persons within the United States to whom: (a) Defendant and/or a third party acting on their behalf, made one or more non-emergency telephone calls; (b) to their cellular telephone number; (c) using the telephone system(s) used in calling Plaintiff cellular telephone number; and (d) at any time in the period that begins four years before the date of the filing of this Complaint to trial.

Class 2

> All persons in the United States who, from four years prior to the filing of this action: (1) Defendant (or an agent acting on behalf of Defendant) made (2) two or more telemarketing calls (3) promoting Defendant's products or services; (4) to a residential phone number that was listed on the National Do Not Call Registry for at least 30 days before the first call; and (5) within any twelve-month period.

*Id.* at *¶50*.

## IV.    ARGUMENT

### A. This Court Has Personal Jurisdiction Over QuoteWizard as to Class Claims

Mr. Mantha is a Massachusetts resident who alleges he received illegal telemarketing texts from QuoteWizard in violation of the TCPA, a federal statute. *See* ECF Dkt. #1. Mr. Mantha seeks to enforce his privacy rights, and the rights of those similarly situated, here in Massachusetts federal court. *Id.* QuoteWizard claims that Mr. Mantha cannot enforce the TCPA on behalf of out of state class members, as this Court lacks personal jurisdiction over such claims. *See* ECF Dkt. #15. It has long been recognized, however, that the claims of unnamed

putative class members are irrelevant as the issue of specific jurisdiction. *See e.g., In re Morning Song Bird Food Litig.*, 2018 U.S. Dist. LEXIS 44825 (S.D. Cal. Mar. 19, 2018) ("claims of unnamed class members are irrelevant to the question of specific jurisdiction"); *Molock v. Whole Foods Market, Inc.*, No. 16-cv-02483, 2018 U.S. Dist. LEXIS 42582 (D.D.C. Mar. 15, 2018) ("These additional [Rule 23] elements of a class action supply due process safeguards not applicable in the mass tort context."); *In re Chinese-Manufactured Dry Wall Prods. Liab. Litig.*, MDL No. 09-2047, 2017 U.S. Dist. LEXIS 197612 (E.D. La. Nov. 30, 2017) ("a class action has different due process safeguards").

QuoteWizard, however, contends this long recognized principal was changed by the recent Supreme Court decision in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017). This is a false premise as *Bristol-Myers* had nothing to do with federal court personal jurisdiction or class action jurisprudence. Rather, at issue in *Bristol-Myers* was the application of California mass tort law, in California state court, to out of state consumers. *Bristol-Myers* itself makes this clear. There, the Court considered the exercise of personal jurisdiction by California state courts over claims brought by out-of-state plaintiffs even in the absence of "any adequate link between the State and the nonresidents' claims." *Id.* at 1787. That approach implicated the Fourteenth Amendment's Due Process Clause—which the Supreme Court noted "limits the personal jurisdiction of state courts." *Id.* at 1779. As the Court explained, because "a state court's assertion of jurisdiction exposes defendants to the State's coercive power," the "power of a state court to render a valid personal judgment against a nonresident defendant" is "subject to" the constraints imposed by the Due Process Clause contained in the Fourteenth Amendment. *Id.* (internal quotation marks and citations omitted).

By its own reckoning, the ruling in *Bristol-Myers* was narrow—nothing more than a straightforward application . . . of settled principles of personal jurisdiction." *Id.* at 1783; *see id.* at 1781 ("Our settled principles regarding specific jurisdiction control this case."). And the Court was careful to cabin the scope of its decision. Because the decision "concern[ed] the due process limits on the exercise of specific jurisdiction by a State," the Court took pains to note, the opinion did not touch "on the exercise of personal jurisdiction by a federal court." *Id.* at 1783–84.

Under these narrow circumstances, the Supreme Court held that California's approach to personal jurisdiction was incompatible with the due process limitations contained in the Fourteenth Amendment. As the Court explained, because the "States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts," the "sovereignty of each State" implies "a limitation on the sovereignty of all its sister States." *Id.* (quoting *World–Wide Volkswagen*, 444 U.S. at 293). In other words, the Fourteenth Amendment's "restrictions on personal jurisdiction" offer "more than a guarantee of immunity from inconvenient or distant litigation," they also "are a consequence of territorial limitations on the power of the respective States." *Id.* (internal quotation marks omitted).

In *Bristol-Myers*, this "federalism interest" proved "decisive." *Id.*; *see also id.* at 1788 (Sotomayor, J., dissenting) (explaining that the "majority's animating concern, in the end, appears to be federalism"). California's exercise of sovereign power over the claims of, say, Ohio plaintiffs would have encroached on the interests of Ohio courts to hear their residents' cases and apply their own procedural rules. *See World-Wide Volkswagen*, 444 U.S. at 292–93 (explaining that the "principles of interstate federalism" embodied in the Due Process Clause of

the Fourteenth Amendment "ensure that the States[,] through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system"). As a result, the Supreme Court concluded that "even if" California's exercise of personal jurisdiction over nonresidents' claims would expose Bristol- Myers to "minimal or no inconvenience," and "even if" California was "the most convenient location for litigation," California's exercise of personal jurisdiction was incompatible with the Fourteenth Amendment's Due Process Clause. *Bristol-Myers*, 137 S. Ct. at 1780–81.

But whatever federalism concerns limit the exercise of a state's power to decide state-law claims of nonresidents, no similar concerns apply to a federal court's exercise of its own authority over a federal law cause of action- such as to TCPA. Put simply: When it comes to federal-question claims located in federal court, "the federalism concerns which hover over the jurisdictional equation" are "absent." *SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997) (quoting *United Elec. Radio, and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992)). That is why the Court in *Bristol-Myers* made clear that its holding applied only to "the due process limits on the exercise of specific jurisdiction ***by a State,***" and did not touch "on the exercise of personal jurisdiction by a federal court." *Id.* at 1783–84 (emphasis added). And it is why post-*Bristol-Myers* courts considering the constitutional limitations on personal jurisdiction in nationwide federal class actions have held that "the due process right does not obtain . . . in the same manner because all federal courts, regardless of where they sit, represent the same federal sovereign, not the sovereignty of a foreign state government." *Sloan*, 287 F. Supp. 3d at 858–59; *see also In re Chinese-Manufactured Drywall Prods. Liability Litig.*, 2017 WL 5971622 at *20 (E.D. La. Nov. 30, 2017) (explaining that "federalism concerns are not present" in federal class actions). For those cases in federal court

that involve federal claims, there is "no risk of a state court exceeding the bounds of its state's sovereignty and subjecting residents of another state to the coercing power of its courts." *See, e.g.*, *Sloan v. General Motors LLC*, 287 F. Supp. 3d 840, 859 (N.D. Cal. 2018).

The upshot for this case—which involves only federal claims in federal court—is that *Bristol-Myers*'s "federalism concerns do not apply." *In re Chinese-Manufactured Drywall*, 2017 WL 5971622 at *20 (considering this issue in the context of multidistrict litigation in federal court). *Bristol-Myers* was concerned with "limiting a state court's jurisdiction when it tried to reach out-of-state defendants," a "scenario [that] is inapplicable to nationwide class actions in federal court" like this one. *Id.* Because the claims here are entirely federal, QuoteWizard's invocation of *Bristol-Myers*'s constitutional standard for ascertaining personal jurisdiction in state court cases relating to state court claims and out of state plaintiffs cannot justify the dismissal of the claims of out of state class members in this case.

In the wake of *Bristol-Myers*, multiple federal district courts have reached this very conclusion. As these courts have explained, even after *Bristol-Myers*, federal courts remain free to exercise personal jurisdiction over out-of-state named plaintiffs in nationwide federal-question class actions even where there is no "independent connection" between their claims and the defendant's contacts with the underlying forum. *See, e.g.*, *Sloan*, 287 F. Supp. 3d at 863; *In re Chinese-Manufactured Drywall Prods. Liability Litig.*, 2017 WL 5971622 at *20. Because doing so raises no constitutional due-process concerns, "judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties" step in to justify hearing the claims of all plaintiffs in one forum. *Sloan*, 287 F. Supp. 3d at 863. *See e.g. Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 815, 820 (N.D. Ill. 2018) (declining to extend the logic of *BMS* to prohibit a district court from exercising specific jurisdiction over a defendant to resolve the class action claims of non-

Illinois residents and examining current precedent); *Curran v. Bayer Healthcare LLC*, 2019 U.S. Dist. LEXIS 15362, 2019 WL 398685, at *3 (N.D. Ill. Jan. 31, 2019) (same); *Casso's Wellness Store & Gym LLC v. Spectrum Lab Prods., Inc.*, No. 17-2161, 2018 U.S. Dist. LEXIS 43974 (E.D. La. Mar. 19, 2018) ("material differences between mass tort actions and class actions further support the finding that Bristol-Myers is inapplicable to the instant case, a purported class action invoking federal question subject matter jurisdiction"); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-cv-00564, 2017 U.S. Dist. LEXIS 155654 (N.D. Cal. Sept. 22, 2017) ("*Bristol-Myers* is meaningfully distinguishable based on that case concerning a mass tort action"); *Hicks v. Houston Baptist Univ.*, No. 5:17-CV-629-FL, 2019 U.S. Dist. LEXIS 664, at *15-18 (E.D.N.C. Jan. 3, 2019) (court rejects *Bristol-Myers* jurisdiction motion to dismiss in context of a TCPA class action and explaining the differences between class action and mass-tort actions); *Knotts v. Nissan N. Am., Inc.*, 346 F. Supp. 3d 1311, 1332 n.6 (D. Minn. Oct. 10, 2018) (noting that "outside of Illinois, district courts have largely declined to extend *BMS* to the class action context. Indeed, 'most of the courts that have encountered this issue have found that *Bristol-Myers* does not apply in the federal class action context.' * * * District courts in California, Louisiana, Florida, South Carolina, Virginia, Texas, the District of Columbia, and even Illinois have concluded that there are valid reasons for limiting *BMS* to named parties— particularly due to the material distinctions between mass tort actions and class actions, as discussed below").[4]

---

[4] *See Did Bristol-Myers Squibb Kill The Nationwide Class Action? The Yale Law Journal, V. 129 Daniel Wilf-Townsend (2019)* (collecting cases and noting that a supermajority of cases (50 out of 64 rulings) reject the argument that Bristol-Myers Squibb constrains courts' jurisdiction over defendants with respect to unnamed class members in class actions).

So it is here. Exercising personal jurisdiction over QuoteWizard with respect to the in-state and out-of-state plaintiffs' claims in this case poses no threat to due process and, equally important, ensures that common claims can be resolved efficiently in a single forum. Because QuoteWizard must already come to this forum to litigate the claims of Mr. Mantha, there is little hardship, as a jurisdictional matter, for it to also litigate the nationwide class claims. Therefore, it promotes efficiency and expediency to litigate all claims at once rather than to separate the nationwide class. *See Sanchez v. Launch Tech. Workforce Sols, LLC*, 297 F. Supp. 3d 1360 (N.D. Ga. 2018) ("Because of the unitary nature of that class claim, the Court perceives no unfairness in haling the defendant into court to answer to it in a forum that has specific jurisdiction over the defendant based on the representative's claim."). To the contrary, an alternative ruling would disable the class action as an efficient mechanism for prospective plaintiffs to seek redress of their claims. The efficient administration of class actions would be compromised by requiring the Court to make personal jurisdiction determinations for every named and potential unnamed plaintiff, particularly at the outset of the litigation. Such an unwieldy process would defeat the purpose of the class action mechanism.

Accordingly, the Motion to Dismiss for lack of personal jurisdiction should be DENIED.

B. **The Class As Defined Is Not "Fail Safe."**

QuoteWizard alternatively argues that Mr. Mantha's class claims should be stricken as they are "fail safe." *See* ECF Dkt. #15 at pg. 12.[5] QuoteWizard correctly notes that a "fail safe"

---

[5] District Courts are to "exercise caution when striking class action allegations based solely on the pleadings." *See Manning v. Boston Medical Center Corp.*, 725 F.3d 34, 59 (1st Cir. 2013). *See Bais Yaakov of Spring Valley v. ACT, Inc.,* 328 F.R.D. 6 (D. Mass. 2018) (denying motion to strike class allegations in TCPA case); *see also Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 93-95 & n.30 (3d Cir. 2011) (holding that a court may deny class certification before discovery only if the "complaint itself demonstrates that the requirements for maintaining a class action cannot be met,"

class is one in which the class is so defined so as to only include those with valid claims quoting *Bais Yaakov of Spring Valley v. ACT, Inc.*, 328 F.R.D. 6, 13 (D. Mass. 2018). On their face, however, neither class definition is "fail safe." Class 1, for example, is defined as:

> All persons within the United States to whom: (a) Defendant and/or a third party acting on their behalf, made one or more non-emergency telephone calls; (b) to their cellular telephone number; (c) using the telephone system(s) used in calling Plaintiff cellular telephone number; and (d) at any time in the period that begins four years before the date of the filing of this Complaint to trial.

*See* ECF Dkt. #1 at ¶50. This class is not "fail safe" because, in addition to satisfying the elements set forth in this definition, Mr. Mantha would still have to prove at trial that the text calls to class members' were (1) delivered via an Automatic Telephone Dialing System, and (2) without class members' prior express written TCPA compliant consent, all claims which Quote Wizard denies in its briefing. Similarly, Class 2 is defined as including:

> All persons in the United States who, from four years prior to the filing of this action: (1) Defendant (or an agent acting on behalf of Defendant) made (2) two or more telemarketing calls (3) promoting Defendant's products or services; (4) to a residential phone number that was listed on the National Do Not Call Registry for at least 30 days before the first call; and (5) within any twelve-month period.

*Id.* Similarly, in addition to the above elements, before a class member could establish a TCPA violation for illegal calls to a DNC listed residential phone number, they would also have to establish that they did not provide QuoteWizard with their prior express written TCPA compliant

---

and explaining that "in the specific context of claims filed under the TCPA statute, it is difficult to resolve without discovery whether there are factual issues regarding class members' business relationships with defendants or whether they consented"); *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1126 (6th Cir. 2016) (holding in a TCPA case that "the mere mention of a defense is not enough to defeat the predominance requirement of Rule 23(b)(3)" and that "allowing such speculation to dictate the outcome of a class-certification decision would afford litigants in future cases wide latitude to inject frivolous issues to bolster or undermine a finding of predominance.").

consent to receive such calls. As neither class is "fail safe" the Motion to Strike should be DENIED.

## C. The Class As Defined Is Ascertainable and Consent Issues Do Not Predominate

QuoteWizard next claims that the class claims should be stricken as individual issues relating to consent will allegedly predominate over common questions. *See* ECF Dkt. #15 at pg. 14-18. Notably, despite its claim that proving consent on a common basis will be unwieldy and complicated, QuoteWizard offers zero evidence that a single recipient of its telemarketing texts consented in a signed writing to receive such texts.

Fortunately, for consumers bombarded with illegal telemarketing calls, it is not enough for a telemarketing to allege consent- it must prove it. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 03-153 at ¶112, -- FCC Rcd. --, 2003 WL 2157853, 2003 FCC LEXIS 3673 at ¶46 (July 3, 2003) (emphasis added) (A telemarketer claiming consent **"must be prepared to provide clear and convincing evidence of the existence of such a relationship"**); *see In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd 1830 at ¶112; 2012 FCC LEXIS 794 (Feb. 12, 2012) (should any question about the consent arise, the seller will bear the burden of demonstrating that unambiguous consent was obtained). Further, the prior express consent required by 47 U.S.C. § 227 is "prior express written consent." *Larson v. Harman Mgmt. Corp.*, No. 1:16-cv-00219-DAD-SKO, 2016 U.S. Dist. LEXIS 149267, at *10-11 (E.D. Cal. Oct. 26, 2016); 47 C.F.R. § 64.1200(a)(2); 47 C.F.R. § 64.1200(f)(8). The written agreement must also include a clear and conspicuous disclosure informing the consumer that he or she is thereby consenting to receive telemarketing calls from or on behalf of a *specific seller. In re Rules and Regulations Implementing the Telephone Consumer Protection Act of*

*1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012). Finally, if a telemarketer lacks a consumer's actual signature, it must comply with the requirements of the E-SIGN Act. *Id.* at 1844 ¶ 34. The specific disclosures that must made to a consumer to satisfy E-Sign are set forth at 15 U.S.C. § 7001(c)(B)(i-iv); § 7001(c)(C)ii) and § 7001(c)(D)(i).

Courts facing similar pleas from telemarketers who claim consent- but can't prove it- have routinely recognized that a telemarketer cannot escape responsibility for its misconduct by claiming proof of consent defeats commonality or predominance, where it has failed to come forth with any evidence of consent whatsoever. *See e.g. Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, 2010 U.S. Dist. LEXIS 125842, 5-7 (N.D. Ill. Nov. 29, 2010) (Rule 23(b)(3) satisfied in TCPA case because method by which defendant obtained and telephone numbers made individualized consent unlikely, and further noting that "evidence regarding consent would be in [defendant's] hands if it is anywhere, yet [defendant] has offered nothing to suggest that any of the recipients might have consented"); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (mere possibility of consent does not preclude class certification); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 570 (W.D. Wash. 2012) (rejecting "individualized issues" argument based on TCPA consent) (citations omitted); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 648 (W.D. Wash. 2007) (same); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07-5953, 2009 WL 2581324, at *5 (N.D. Ill. Aug. 20, 2009) (TCPA defendant "cannot defeat class certification by asserting the vague possibility that some of the individuals may have perchance consented to receiving the fax.") (citations omitted); *Balbarin v. N. Star*, No. 10-1846, 2011 WL 211013, at *1 (N.D. Ill. Jan. 21, 2011) ("[T]hat a 'sampling' of putative [TCPA] class members is ongoing and may ultimately reveal individualized issues, does not preclude class certification."); *Kaye v. Amicus Mediation & Arbitration Grp., Inc.*, 300 F.R.D. 67, 81 (D. Conn.

2014) ("the mere possibility that some class members have claims subject to separate defenses is not a reason to deny certification") (citing *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008).

Without evidence, it is clear then that QuoteWizard's consent defense is based on sheer speculation. Of course, permitting mere speculation about the possibility of consent to defeat class certification "would wipe away the ability to bring a class action under the TCPA or any statute in which a defendant might raise the issue of the plaintiffs' consent." *Green v. Serv. Master on Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769, at *2 (N.D. Ill. June 22, 2009); *see also Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 95 (3d Cir. 2011) ("The possibility that some of the individuals on the list may separately have consented to the transmissions at issue is an insufficient basis for denying certification.").

As QuoteWizard has failed to produce any authentic or admissible evidence of consent, purely speculative contentions that some consumers ***might*** have consented to the texts does not create individualized issues that predominate over common issues. The Motion to Strike Class Claims on this basis should be DENIED.

## V. CONCLUSION

For the foregoing reasons, QuoteWizard's Motion to Dismiss and to Strike Class Claims (ECF Dkt. #15) must be DENIED.

PLAINTIFF,

By their attorneys

*/s/ Matthew P. McCue*

Matthew P. McCue
THE LAW OFFICE OF MATTHEW P. MCCUE
1 South Avenue, Suite 3
Natick, MA 01760
Telephone: (508) 655-1415

mmccue@massattorneys.net

Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

Alex M. Washkowitz
Jeremy Cohen
CW LAW GROUP, P.C.
188 Oaks Road Framingham, MA 01701
alex@cwlawgrouppc.com

Edward A. Broderick
BRODERICK LAW, P.C.
99 High St., Suite 304
Boston, MA 02110
Telephone: (617) 738-7080
ted@broderick-law.com

Dated: January 3, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2020, I electronically transmitted the foregoing to all counsel of record via the electronic filing system.

By: */s/ Matthew P. McCue*
Matthew McCue