IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH MANTHA on behalf of
themselves and others similarly situated,

 Plaintiff,

v.

QUOTEWIZARD.COM, LLC

 Defendant.

Case No. 1:19-cv-12235-LTS

## PLAINTIFF'S MEMORANDUM OF LAW SUPPORT OF
## MOTION TO AMEND THE COMPLAINT

Pursuant to Rule 15(a)(2), the Plaintiff, Joseph Mantha ("Mr. Mantha") petitions this Court to allow his Motion to Amend the Complaint to re-allege that the telemarketing texts at issue in this case were initiated via an automatic telephone dialing system ("ATDS").[1] For the following reasons, the Motion to Amend should be GRANTED.

### 1.   RELEVANT FACTS

Mr. Mantha alleges that on August 12 and 13, 2019, he received text telemarketing solicitations on his cellular telephone number that was listed on the National Do Not Call Registry.[2] *See* ECF Dkt. #1 at ¶5, 31. The text telemarketing messages read:

---

[1] A copy of the draft Amended Complaint is attached at <u>Exhibit 1.</u>

[2] The DNC allows consumers to register their personal telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

> Hey, it's Amanda following up. When's a good day for us to talk Joe? You requested a quote on auto insurance. Message me if you're still interested!
>
> Tuesday 3:15 PM
>
> Hi this is Amanda! Are you looking for an accurate estimate, Joe? We can review your options together. Call me when you're free, it won't take long!

*Id.* at ¶38.

      Mr. Mantha denied ever consenting to receive the above texts. *Id.* at ¶42-43. Mr. Mantha brought this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012). Mr. Mantha alleges that the defendant, QuoteWizard.com, LLC ("QuoteWizard" or "Defendant") sent automated text message telemarketing calls to cellular telephone numbers of all class members in violation of the TCPA, in an effort to sell auto insurance on behalf of its insurance company clients. In his original complaint, Mr. Mantha alleged the spam texts were illegal both because they were delivered via an ATDS, as defined by the TCPA, and because multiple spam texts were sent to his personal cell phone that has long been listed on the National Do Not Call Registry. *See generally* ECF Dkt. #1

      Thereafter, QuoteWizard moved to dismiss, in relevant part, claiming that Mr. Mantha had failed to plead sufficient facts to allege that the texts were delivered by an ATDS. *See* ECF

#17. In support, QuoteWizard noted that the texts at issue were personalized- mentioning the sales representative ("Amanda") and the Plaintiff ("Joe") by their names, and claimed that such personal interactions between two people was indicative that an ATDS was not used to make the call. Specifically, QuoteWizard represented to the Court that "the text messages were part of an interactive conversation between Plaintiff and QuoteWizard" and argued that the fact the texts contained "personalized content" was ***not*** indicative of ATDS use. *See* ECF #17 at page 7.[3] In other words, counsel for QuoteWizard argued that since the texts were sent by one human being (Amanda) to another (Joe), it should be inferred that the texts were not sent via some automated computer driven process that would have delivered the texts via an ATDS without individual human intervention as to each text communication. To drive home that point and its affirmative representation to the Court in this regard, QuoteWizard's counsel claimed:

> ***"These messages do not plausibly suggest the use of an ATDS but, quite the opposite, plausibly suggest if not outright prove that an ATDS was not used.***

*See* ECF #17 at page 8.

On March 16, 2020, the Court accepted these arguments and granted QuoteWizard's Motion to Dismiss as to Count I of the Class Action Complaint and agreed with QuoteWizard that the Plaintiff had failed to plead sufficient facts to indicate that the telemarketing at issue utilized an ATDS. *See* ECF #30. This case was allowed, however, to proceed as to Count II of the Class Action Complaint that alleged the text spam at issue were sent to consumers in violation of the TCPA's prohibition against telemarketing to numbers listed on the National Do Not Call Registry. *Id.*

---

[3] Of course, QuoteWizard and its counsel were well aware that the third party that sent the texts at issue was Drips, and was well aware of the nature of the automated text bot technology used by Drips and described infra.- information that was not available to Plaintiff.

Thereafter, the parties proceeded to meet and confer in preparation to make Initial Disclosures and to proceed forward to the Case Management Conference with the Court. Only at that time, did QuoteWizard finally identify Drips, LLC ("Drips") as the third party vendor used by QuoteWizard to send the texts at issue.[4]

Knowing Drips' identity, Mr. Mantha's counsel then reviewed Drips' web-site (www.drips.com), and other publically available information, to understand Drips' texting technology and learned that: Drips provides automated text telemarketing services to businesses, such as QuoteWizard, using artificial intelligence and computer bots to interact with consumers via text message. Drips refers to this technology interchangeably as "Conversational Texting," "Conversational AI" or "Conversational Messaging." *See* www.drips.com. Consumers who receive "Conversational Message" texts from Drips, are not interacting with a human being. Rather, they are interacting via text message with a bot designed to look like a human being. As Drips' founder, AC Evans, explained in an interview with MixEnergy.com:

> It has to be humanized because nobody wants to talk to a chatbot. That's one big difference between our system and any chatbot out there is ***you can't tell it's a bot. It is completely humanized.***

*See* https://mixergy.com/interviews/drips-with-ac-evans/ (AC Evans- founder of Drips- is interviewed in regards to "Conversational Messaging" and how it works) (emphasis added). Mr. Evans further noted that he has "always had that kind of spammer marketer, you know, scale mentality" and noted that "millions and millions" of "concurrent conversations" are happening at Drips and most of the process is ***"completely automated."*** *Id.* (emphasis added). Drips' website

---

[4] Prior to QuoteWizard's filing of its original Motion to Dismiss, the undersigned counsel had requested the identity of the vendor who initiated the texts at issue from counsel for QuoteWizard so a spoliation letter could be transmitted to ensure class calling records and other evidence was preserved. Counsel for QuoteWizard declined claiming he was under no obligation to disclose the identity of its text vendor at that time.

further boasts that using its "Conversational AI" technology, 2.5 billion touchpoints have been made utilizing Drips' ***"human approved auto responders."*** *Id.* (emphasis added). *See* https://finance.yahoo.com/news/drips-com-replacing-telemarketers-artificial-124700760.html (financial press noting that Drips.com "is replacing telemarketers with artificial intelligence and customers are loving it." (last visited 6.3.20). Drips further notes on its web site that because consumers were so annoyed and saturated with robocall telemarketing calls, they would welcome "humanized AI campaigns" delivered via text message, because its "AI is extremely human-like in that it can answer questions, respond to messages and hold actual conversation with customers *See* https://www.drips.com/blog/how-drips-is-leading-the-way-in-humanizing-ai-driven-marketing-campaigns/ (last visited 6.3.20). "On a daily basis, Drips engages in millions of completely humanized conversations with ***zero client side operators."*** *Id.* (About Drips).

In addition, counsel for the Plaintiff recently learned from other TCPA litigation filed against Drips, that Drips sends texts to consumers using the telecommunication and dialing systems of an entity called Ytel. *See* www.ytel.com. Ytel itself is no stranger to TCPA litigation as its telecommunications dialing system is a favorite of telemarketers.[5] *See e.g., Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.,* No. 15-cv-06314-YGR, 2018 U.S. Dist. LEXIS 132078, at *17-18 (N.D. Cal. Aug. 3, 2018) (denying joint Motions for Summary Judgment as to whether the Ytel dialer was subject to the TCPA ); *De la Cabada v. Ytel, Inc.*, No. 19-cv-07178-JSC, 2020 U.S. Dist. LEXIS 41439 (N.D. Cal. Mar. 10, 2020) (discussing the Ytel text

---

[5] Of course, the telecommunications entity that sent the telemarketing texts at issue to Mr. Mantha should have been disclosed automatically as part of Initial Disclosures as an entity with knowledge and with access to evidence (the text records sent to Mantha). Not only could Ytel be a key witness to this case, but without doubt it is possession of evidence of text calls made to Plaintiff and the putative class. Ytel was not so disclosed. After learning that Drips uses Ytel to transmit telemarketing calls and texts to consumers, Plaintiff's counsel sought to meet and confer with counsel for QuoteWizard to confirm Ytel's involvement. Counsel for QuoteWizard refused to confirm or deny Ytel's involvement and challenged the relevance of Ytel's involvement. On June 5, 2020, Plaintiff's counsel served Ytel with a preservation letter instructing Ytel to preserve all call records relating to Drips and to this class litigation. Ytel responded and confirmed that Drips indeed is a client of Ytel.

communications platform and how it was allegedly used to send millions of unsolicited "robotexts" via ATDS).

## II. ARGUMENT

Plaintiff petitions this Court, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure to allow him to amend his Class Action Complaint to re-allege that the telemarketing at issue was conducted via an ATDS that is subject to regulation by the TCPA. As previously recognized by this Court, Fed. R. Civ. P. 15(a)(2) provides that where "good cause" to amend is demonstrated, leave to amend a pleading should be freely given when justice so requires, and where the plaintiff has not engaged in undue delay, bad faith, dilatory motive, repeated failure to cure, undue prejudice or where the amendment would be futile. *See Wickman v. Makita U.S.A., Inc.,* Civil Action No. 09-10890-MLW, 2011 U.S. Dist. LEXIS 130423, at *1-3 (D. Mass. Nov. 9, 2011).

Good cause to amend exists here. The Plaintiff is now in possession of the identity of the vendor who sent the spam texts at issue (Drips) and has accessed the above described publically available information that describes the automated manner in which the spam texts at issue were sent to the Plaintiff by Drips acting on behalf of QuoteWizard. The texts sent to Mr. Mantha were not sent by a human being, as originally insinuated by QuoteWizard and its counsel. Rather, they were sent by computer bot, utilizing artificial intelligence to interact with a consumer in a manner that made the consumer falsely believe they were interacting with a human being- when they were not.

### A. Mr. Mantha Has Adequately Pled Text Telemarketing Via ATDS

The TCPA defines an ATDS as "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B)

to dial such numbers." 47 U.S.C. § 227(a)(1). *See Gonzalez v. Hosopo Corp.*, 371 F. Supp. 3d 26, 29-34 (D. Mass. 2019) (to qualify as an ATDS under the TCPA, a device need only have the capacity to do one of the following: either (1) "store . . . telephone numbers to be called" and "dial such numbers," *or* (2) "produce telephone numbers to be called, using a random or sequential number generator" and "dial such numbers"). As noted above, the proposed Amended Complaint alleges:

- QuoteWizard employs a strategy of generating new customers by sending text messages via ATDS. *See Exhibit 1* at ¶25.

- QuoteWizard engaged Drips to send automated texts to consumers utilizing technology that uses computers and artificial intelligence to interact with consumers via text message. *Id.* at ¶26.

- Drips' technology allows a computer to automatically interact via text with a consumer in a feigned personalized manner that makes it appear to a consumer they are texting with a human being. They are not. The entire text experience is automated by computer, utilizing artificial intelligence in a manner that allows a computer to interact and respond with the text recipient without human intervention. *Id.* at ¶27.

- Using this automated technology, Drips holds over 1,000,000 **humanized automated engagements per day**…" *Id.* at ¶28.

- Drips "completely humanized" its text technology to make it look like a recipient consumer was texting with a real human being, because "nobody wants to talk to a chatbot." *Id.* at ¶29.

- The text telemarketing technology employed by Drips on behalf of QuoteWizard was "completely automated" and utilized "human approved auto responders." *Id.* at *¶30-31.*

- Consumers who receive text spam solicitations from Drips, are not interacting with a human being. They are interacting with a bot designed to look like a human being that uses artificial intelligence to respond to consumers in a human like manner. *Id.* at *¶32*.

- Using Drips' automated text technology, QuoteWizard could engage with consumers with "zero client side operators." In other words, computers engaged in text conversations with consumers spammed by QuoteWizard- not real human operators or sales representatives. *Id.* at ¶33.

7

- For a telemarketing process to be "completely automated" and to require "zero client side operators" the dialing system used must have the capacity to either store telephone numbers and to text those numbers, or to produce telephone numbers using a random or sequential number generator and to dial such numbers. *Id.* at ¶34.

- To send telemarketing texts *en masse* to consumers automatically and without human intervention, Drips utilized the telecommunications systems and technology of Ytel ("Ytel Dialer"). *Id.* at ¶35-36.

- The Ytel Dialer has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers, and to dial such numbers without human intervention. *Id.* at ¶37

In its prior Order on QuoteWizard's Motion to Dismiss, the Court noted that the Plaintiff's prior allegations as to the use of an ATDS were "conclusory." *See* #ECF30 at pg. 2. Specifically, the Court noted that the commercial content of the texts themselves, or the specific nature of the SMS code used to send the texts, was not sufficient to plausibly allege the use of an ATDS. *Id.* Of course, when he filed the original Complaint, Mr. Mantha had no idea as to the specific technology that was used by QuoteWizard and Drips to send spam text to his cell phone. In fact, the involvement of Drips was withheld from counsel while, at the same time, QuoteWizard was representing to the Court that an ATDS was not used because the texts at issue were "personalized" texts between "Amanda" and "Joe." *See* ECF #17 at page 7-8. The suspected role of Ytel in this text telemarketing campaign was **never disclosed** by QuoteWizard.

Mr. Mantha and the Court now know, what QuoteWizard has known all along. The spam texts sent to Mr. Mantha were part of a "completely automated" telemarketing text campaign that utilized the Ytel Dialer and Drips' artificial intelligence to make it appear to recipients they were interacting with a real person. They were not. The technology employed by Drips and Ytel on behalf of QuoteWizard allowed texts to be sent (or dialed) to consumers *en masse,* automatically, via the Ytel Dialer that had the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers,

and to dial such numbers without human intervention. Not a single live operator human being from QuoteWizard was involved in the text bot solicitations to class members. The entire process was automated, allowing Drips to engage in a massive number of text bot conversations with consumers each day on behalf of its insurance clients whose goods or services it sought to sell. Automated telemarketing to consumers *en masse* utilizing sophisticated technology and dialing systems was the ***exact type*** of telemarketing Congress intended to regulate when it enacted the TCPA, and specifically its strict regulation of automated telemarketing conducted via ATDS.

### III. CONCLUSION

In its prior Order, this Court noted that at the motion to dismiss stage, Mantha bore the burden of "nudging his claims across the line from conceivable to plausible." ECF#30 at pg. 3. The above facts amply support a plausible inference that the text bot campaign at issue was employed with the use of an ATDS. For the foregoing reasons, Mr. Mantha's Motion to Amend should be GRANTED.

PLAINTIFF,

By their attorneys

*/s/ Matthew P. McCue*
Matthew P. McCue
THE LAW OFFICE OF MATTHEW P. MCCUE
1 South Avenue, Suite 3
Natick, MA 01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

> Alex M. Washkowitz
> Jeremy Cohen
> CW LAW GROUP, P.C.
> 188 Oaks Road Framingham, MA 01701
> alex@cwlawgrouppc.com
>
> Edward A. Broderick
> BRODERICK LAW, P.C.
> 99 High St., Suite 304
> Boston, MA 02110
> Telephone: (617) 738-7080
> ted@broderick-law.com

Dated: June 7, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2020, I electronically transmitted the foregoing to all counsel of record via the electronic filing system.

> By: */s/ Matthew P. McCue*
> Matthew McCue