# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH MANTHA on behalf of themselves and others similarly situated, | : : : : | Case No. 1:19-cv-12235-LTS |
| Plaintiff, | : : | |
| v. | : : | **JURY TRIAL DEMANDED** |
| QUOTEWIZARD.COM, LLC | : : : | |
| Defendant. | : : : | |

## FIRST AMENDED CLASS ACTION COMPLAINT

### Preliminary Statement

1. Plaintiff Joseph Mantha ("Plaintiff" or "Mr. Mantha") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

2. Quotewizard.com, LLC ("QuoteWizard" or "Defendant") caused automated text message calls to be sent to cellular telephone numbers, including the Plaintiff, which is prohibited by the TCPA. The text calls were also made to some individuals despite their presence on the National Do Not Call Registry, such as the Plaintiff.

3. The Plaintiff never consented to receive the text calls, which were placed to him for telemarketing purposes. Because telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse*, the Plaintiff brings this action on

behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendant.

4. A class action is the best means of obtaining redress for the Defendant's wide scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

### Parties

5. Plaintiff Joseph Mantha is a Massachusetts resident located in this District.

6. Defendant QuoteWizard.com, LLC is a Delaware corporation with its principal place of business in Seattle, WA. The Defendant has a registered agent of Incorp. Services, Inc., 44 School St., Suite 325, Boston, MA 02108. The Defendant engages in telemarketing into this District, as it did with the Plaintiff.

### Jurisdiction & Venue

7. The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

8. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the telemarketing call to the Plaintiff was placed into this District.

### The Telephone Consumer Protection Act

9. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

10. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

The National Do Not Call Registry

11. The TCPA specifically required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

12. The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific 'do not call systems …)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

13. Pursuant to this statutory mandate, the FCC established a national "do not call" database. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014* ("DNC Order").

The TCPA Prohibits Automated Telemarketing Calls

14. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a paging service, cellular telephone service…." *See* 47 U.S.C. § 227(b)(1)(A)(iii),

15. The TCPA provides a private cause of action to persons who receive such calls. *See* 47 U.S.C. § 227(b)(3).

16. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

The Growing Problem of Automated Telemarketing

17. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

18. "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/system/files/documents/advocacy_documents/commentstaff-ftc-bureau-consumer-protection-federal-communications-commission-rulesregulations/160616robocallscomment.pdf.

19. Industry data shows that the number of robocalls made each month increased from 831 million in September 2015 to 4.7 billion in December 2018—a 466% increase in three years.

20. According to online robocall tracking service "YouMail," 4.5 billion robocalls were placed in September of 2019 at a rate of 150.8 million per day. www.robocallindex.com (last visited October 18, 2019). YouMail estimates that 2019 robocall totals will exceed 60 billion. *See id.*

21. The FCC also has received an increasing number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, and 232,000 complaints in 2018. FCC, Consumer Complaint Data Center, www.fcc.gov/consumer-help-center-data (last visited October 18, 2019).

22. In fiscal year 2019, the FTC received 5.4 million complaints about unwanted telemarketing calls. Of those complaints, 71 percent were about robocalls. Federal Trade Commission, *FTC Releases FY 2019 National Do Not Call Registry Data Book* (October 18, 2019), https://www.ftc.gov/news-events/press-releases/2019/10/ftc-releases-fy-2019-national-do-not-call-registry-data-book?utm_source=govdelivery.

**Factual Allegations**

23. Defendant is in the business of selling its services to insurance agents, and providing those agents with potential customers and new business.

24. One of Defendant's strategies for generating new business is through telemarketing by automated text message initiated via a third party vendor.

25. Defendant's strategy for generating new customers involves the use of an automatic telephone dialing system ("ATDS") to send automated text messages.

26. To send automated texts to consumers, Defendant retained Drips, LLC ("Drips"), a company that developed and utilized technology that uses computers and artificial intelligence to interact with consumers via text message.

27. The technology allows a computer to automatically interact via text with a consumer in a feigned personalized manner that makes it appear to a consumer they are texting with a human being. They are not. The entire text experience is automated by computer utilizing artificial intelligence in a manner that allows a computer to interact and respond with the text recipient without human intervention.

28. On its web site, Drips explains that its automated texting platform "holds over 1,000,000 **humanized automated engagements per day**…" *See* www.drips.com.

29. Consumers who receive these automated spam texts from Drips, are not interacting with a human being. They are interacting with a bot designed to look like a human being. As Drips' founder, AC Evans, explained in an interview with MixEnergy.com:

> It has to be humanized because nobody wants to talk to a chatbot. That's one big difference between our system and any chatbot our there is you can't tell it's a bot. It is completely humanized. And when you may be able to trip it up to the point where you would be able to tell a bot, it actually still gets flipped back to a human to respond with empathy and context.

*See* https://mixergy.com/interviews/drips-with-ac-evans/ (AC Evans- founder of Drips- is interviewed in regards to "Conversational Messaging" and how it works).

30. Mr. Evans further noted that he has "always had that kind of spammer marketer, you know, scale mentality and noted that "millions and millions" of concurrent conversations are happening at Drips" and most of the process is "completely automated." *Id*.

31. Drips' website further boasts that using its "Conversational AI" technology, 2.5 billion touchpoints have been made using Drips' platform utilizing Drips' *"human approved auto responders." Id. See* https://finance.yahoo.com/news/drips-com-replacing-telemarketers-artificial-124700760.html (financial press noting that Drips.com "is replacing telemarketers with artificial intelligence and customers are loving it." (last visited 6.3.20).

32. On its web-site, Drips further explained that because consumers were so annoyed and saturated with robocall telemarketing calls, they would welcome "humanized AI campaigns" delivered via text message, because its "AI is extremely human-like in that it can answer questions, respond to messages and hold actual conversation with customers *See* https://www.drips.com/blog/how-drips-is-leading-the-way-in-humanizing-ai-driven-marketing-campaigns/ (last visited 6.3.20).

33. "On a daily basis, Drips engages in millions of completely humanized conversations with ***zero client side operators.***" *Id.* (About Drips).

34. For a telemarketing process to be "completely automated" and to require "zero client side operators" the dialing system used must have the capacity to either store telephone numbers and to text those numbers, or to produce telephone numbers using a random or sequential number generator and to dial such numbers.

35. Upon information and belief, the texts to Mr. Mantha utilized Drips AI technology to make it look like the texts were coming from a real person, and the texts were transmitted to consumers via the telecommunications systems and technology of Ytel ("Ytel Dialer"). *See www.ytel.com*.

36. The Ytel Dialer allows for millions of texts to be transmitted to consumers automatically without human intervention.

37. The Ytel Dialer has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, or from a list or database of numbers, and to dial such numbers without human intervention.

38. Recipients of these calls, including Plaintiff, did not consent to receive them.

39. The Defendant caused automated texts to be sent to consumers cell phones

7

40. The Defendant and its vendor used Drips text bot technology and the Ytel Dialer because this technology and equipment it allows for millions of automated text calls to be placed every single day, but the Defendant's sales representatives only ultimately talk to individuals who respond to the automated text contact and express an interest in the product offered.

41. Through this method, the Defendant shifts the burden of wasted time to the consumers it calls via text.

Calls to Plaintiff

42. Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

43. In August of 2019, the Plaintiff received multiple automated text calls from the Defendant.

44. The Plaintiff received at least one text message on August 12 and 13, 2019.

45. The calls were made to Mr. Mantha's cellular telephone number, (508) 353-XXXX.

46. Mr. Mantha's cellular telephone number is used for residential purposes.

47. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

48. Mr. Mantha's cellular telephone number was on the National Do Not Call Registry for more than 31 days prior to the first call sent by the Defendant.

49. A listing on the Registry must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator.

50. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

51. Some of the text messages sent to Mr. Mantha are below:

> Hey, it's Amanda following up. When's a good day for us to talk Joe? You requested a quote on auto insurance. Message me if you're still interested!

Tuesday 3:15 PM

> Hi this is Amanda! Are you looking for an accurate estimate, Joe? We can review your options together. Call me when you're free, it won't take long!

52. In sending the unsolicited text messages at issue, the Defendant and its vendor Drips, employed the use the Ytel Dialer, an automatic telephone dialing system; hardware and/or software with the capacity to store or produce cellular telephone numbers to text, using a random or sequential number generator.

53. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

54. The Defendant did not have the required prior express written consent to make the telemarketing calls at issue.

55. Defendant's purpose in causing the texts to be sent via Drips' automated text bots via the Ytel Dialer, was to sell auto insurance to Plaintiff on behalf of its insurance clients who retained Defendant to generate new business.

56. Plaintiff never provided his prior express written consent to receive the calls at issue.

57. The calls were not necessitated by an emergency.

58. Plaintiff's privacy has been violated by the above-described telemarketing text robocalls from, or on behalf of, Defendant. The text robocalls were an annoying, harassing nuisance.

59. Plaintiff and all members of the Class, defined below, have been harmed by the acts of Defendant because their privacy has been violated, they were annoyed and harassed, and, in some instances, they were charged for incoming calls. The calls occupied their cellular telephone lines.

## Class Action Allegations

60. As authorized by Rule 23(b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

61. The classes of persons Plaintiff proposes to represent is tentatively defined as:

Class 1

>All persons within the United States to whom: (a) text solicitations were sent via Drips on behalf of QuoteWizard; (b) to their cellular telephone number; (c) via the same telephone dialing system used in calling Plaintiff's cellular telephone number; (d) at any time in the period that begins four years before the date of the filing of this Complaint to trial.

Class 2

>All persons within the United States to whom: (a) two or more text telemarketing calls were sent via Drips; (b) promoting QuoteWizard's goods or services; (c) to a residential phone number that was listed on the National Do Not Call Registry for at least 30 days before the first call; (d) within any twelve-month period.

62. Excluded from the classes are the Defendant, and any entities in which the Defendant has a controlling interest, the Defendant's agents and employees, any judge to whom this action is assigned and any member of such judge's staff and immediate family.

63. The class as defined above is identifiable through phone records and phone number databases.

64. The potential class members number at least in the thousands, since automated telemarketing campaigns make calls to up to millions of consumers a day. Individual joinder of these persons is impracticable.

65. Plaintiff Mantha is a member of both classes.

66. There are questions of law and fact common to Plaintiff and to the proposed classes, including but not limited to the following:

      a.      Whether Defendant violated the TCPA by using an automatic telephone dialing system to send text solicitations to class members' cellular telephones;

      b.      Whether Defendant placed calls without obtaining the recipients' prior express written consent for the call;

      c.      Whether the numbers of the recipients of Defendant's text calls were listed at the time on the National Do Not Call Registry;

      d.      Whether the Plaintiff and the class members are entitled to statutory damages because of Defendant's actions.

      e.      Whether Defendant's actions were knowing or willful.

67. Plaintiff's claims are typical of the claims of class members. Plaintiff's claims, like the claims of the Class arise out of the same common course of conduct by Defendant and are based on the same legal and remedial theories.

68. Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the classes, he will fairly and adequately protect the interests of the classes, and he is represented by counsel skilled and experienced in class actions, including TCPA class actions.

69. Common questions of law and fact predominate over questions affecting only individual class members. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendant and/or its agents.

70. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for

small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action.

71. The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

72. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

**Legal Claims**

**Count One:**
**Violation of the TCPA's Automated Calling provisions**
**(On behalf of Plaintiff and Class 1)**

73. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

74. The foregoing acts and omissions of Defendant and/or its affiliates, agents, and/or other persons or entities acting on Defendant's behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making text calls, except for emergency purposes, to the cellular telephone numbers of Plaintiff and members of the Class using an ATDS and/or artificial or prerecorded voice.

75. As a result of Defendant's and/or its affiliates, agents, and/or other persons or entities acting on Defendant's behalf's violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the Class presumptively are entitled to an award of $500 in damages for each and every text call made to their cellular telephone numbers using an ATDS and/or artificial or prerecorded voice in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

76. Plaintiff and members of the Class are also entitled to and do seek injunctive relief prohibiting Defendant and/or its affiliates, agents, and/or other persons or entities acting on

Defendant's behalf from violating the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to any cellular telephone numbers using an ATDS and/or artificial or prerecorded voice in the future.

77. The Defendant's violations were negligent and/or knowing.

### Legal Claims
### Violation of the TCPA's DNC provisions
### (On behalf of Plaintiff Mantha and Class 2)

78. Plaintiff Mantha incorporates the allegations from all previous paragraphs as if fully set forth herein.

79. The Defendant violated the TCPA by (a) initiating text telephone solicitations to persons and entities whose telephone numbers were listed on the Do Not Call Registry, or (b) by the fact that others made those calls on its behalf. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

80. The Defendant's violations were negligent and/or knowing.

81. As a result of the Defendant's violations of the TCPA, 47 U.S.C. § 227(c)(5), Plaintiff and members of the Class are entitled of an award of up to $500 in damages for each call made in violation of this section. The Court may award up to $1,500 if the violation was found to be "willful or knowing".

82. Plaintiff and members of the Class are also entitled to and do seek injunctive relief prohibiting Defendant and/or its affiliates, agents, and/or other persons or entities acting on Defendant' behalf from making calls advertising their goods or services, except for emergency purposes, to any number on the National Do Not Call Registry.

### Relief Sought

WHEREFORE, for himself and all class members, Plaintiff request the following relief:

      A.      Injunctive relief prohibiting Defendant from calling telephone numbers advertising their goods or services, except for emergency purposes, to any number on the National Do Not Call Registry or to any cellular telephone numbers using an ATDS and/or artificial or prerecorded voice in the future.

      C.      Because of Defendant's violations of the TCPA, Plaintiff seeks for himself and the other putative Class members $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3) and (c)(5).

      D.      An order certifying this action to be a proper class action under Federal Rule of Civil Procedure 23, establishing any appropriate classes the Court deems appropriate, finding that Plaintiff is proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class;

      E.      Such other relief as the Court deems just and proper.

**Plaintiff request a jury trial as to all claims of the complaint so triable.**

PLAINTIFF,

By their attorneys

*/s/DRAFT AMENDED COMPLAINT*

Matthew P. McCue
THE LAW OFFICE OF MATTHEW P. MCCUE
1 South Avenue, Suite 3
Natick, MA 01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043

(508) 221-1510
anthony@paronichlaw.com

Alex M. Washkowitz
Jeremy Cohen
CW LAW GROUP, P.C.
188 Oaks Road Framingham, MA 01701
alex@cwlawgrouppc.com

Edward A. Broderick
BRODERICK LAW, P.C.
99 High St., Suite 304
Boston, MA 02110
Telephone: (617) 738-7080
ted@broderick-law.com

Dated:

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2020, I electronically transmitted the foregoing to all counsel of record via the electronic filing system.

By: */DRAFT*
Matthew McCue