UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - x

JOSEPH MANTHA, on behalf of himself and others similarly situated, :

Plaintiff, : Civil Action No. 1:19-cv-12235-LTS

v. :

QUOTEWIZARD.COM, LLC, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - x

BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

SCHEDULING CONFERENCE
VIDEOCONFERENCE

Tuesday, April 7, 2020
10:12 a.m.

John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiff:

LAW OFFICE OF MATTHEW P. MCCUE
BY: MATTHEW P. MCCUE
One South Avenue
Third Floor
Natick, Massachusetts 01760
(508) 655-1415
mmccue@massattorneys.net

On behalf of the Defendant:

NELSON MULLINS RILEY & SCARBOROUGH, LLP
BY: KEVIN P. POLANSKY
One Post Office Square
30th Floor
Boston, Massachusetts 02109
(617) 573-4700
kevin.polansky@nelsonmullins.com

**P R O C E E D I N G S**

(In open court via videoconference.)

THE DEPUTY CLERK: Today is April 7th, the case of Mantha v. QuoteWizard, civil action 19-12235, will now appear before this Court.

Counsel, please identify themselves for the record.

MR. POLANSKY: Good morning, Your Honor. This is Kevin Polansky, on behalf of the defendant, QuoteWizard, LLC -- .com, LLC.

THE COURT: Good morning.

Who do we have for the plaintiff? Sorry, I missed it if you said your name.

THE DEPUTY CLERK: I'm trying to unmute him. He keeps going back to mute -- okay.

MR. MCCUE: Matthew McCue, Your Honor.

Can you hear me now?

THE COURT: Yes, I can hear you now. Great.

MR. MCCUE: I apologize.

THE COURT: No problem. We're all getting used to this brave, new world.

Okay. So thanks for coming, first of all. I hope you're all healthy and -- I have a question, couple of questions, just going over all of this and thinking about it.

First, explain to me, Mr. Polansky, you have this consent defense you assert, right?

MR. POLANSKY: Yes, Your Honor.

THE COURT: So what is the discovery you need for that?

MR. POLANSKY: So it's our understanding, the plaintiff is going to allege that the consent is fraudulent, and we will seek pointed discovery with respect to plaintiff's going on to the website, in which he provide the consent; his date around -- or his use of his computer with telephone during that period of time to show that he did actually provide consent or one of his agents or affiliates did.

THE COURT: So maybe -- I mean a little more granular detail. Your client has relationship with this company, Drip, LLC?

MR. POLANSKY: Yes.

THE COURT: And Drip -- like, the plaintiff went on what website, run by whom, doing what, according to what you think?

MR. POLANSKY: They went onto an insurance website to obtain auto insurance quotes.

THE COURT: Okay. And who runs that website?

MR. POLANSKY: Who -- I'm not sure.

THE COURT: Would that be Drip or somebody else?

MR. POLANSKY: It would be somebody else.

THE COURT: I see. So your understanding is he

went on some website, said, "I want some information on insurance quotes," and provided his cell phone number?

MR. POLANSKY: Yes, his consent, and opted in to receiving communications.

THE COURT: Okay. And that conduct is the conduct that you -- is what you view as the consent?

MR. POLANSKY: Yes, Your Honor.

THE COURT: And then where does -- so that insurance website, not run by -- that's not a QuoteWizard website?

MR. POLANSKY: It is not.

THE COURT: Somehow that information gets passed on to your client.

MR. POLANSKY: Yes. So that -- that -- in the industry, it's called a lead. That lead would be sold to a company like my client.

THE COURT: I see. So the -- so it may have been the website might have been auto rates -- insuranceautorates.com, and they might run on a website and attract traffic, let's just say. And then according to your information, the plaintiff went on that website and said, "Yes, send me some quotes. Here's my cell phone number. I agree," whatever.

And then your client purchased, probably not in an individual negotiated transaction, but some Internet auction

or en masse, purchased that lead, among others, and then sent the two text messages?

MR. POLANSKY: Yes, Your Honor.

THE COURT: Okay. And so the -- and where does Drip fit into this?

MR. POLANSKY: Drips is a vendor that my client uses to send text messages to consumers who have provided consent.

THE COURT: So once your client got the lead, it uses Drip to do the actual work?

MR. POLANSKY: Yes.

THE COURT: Okay. So for your -- so what you -- now I understand just sort of how it works. I appreciate that.

So now coming back, the discovery that you need to assert your defense is what? Before you get to the question of fraud.

MR. POLANSKY: So we already have the consent information. We've provided that to plaintiff's counsel. So we have what we believe is enough to prove our case.

THE COURT: So you could move for summary judgment today on the consent defense. And the reason you need discovery is because you anticipate, based on your conversation with plaintiff's counsel, that they're going to assert that the consent was fraudulent?

MR. POLANSKY: That's correct, Your Honor.

THE COURT: And so what is the discovery that you need with respect to that?

MR. POLANSKY: We would seek discovery as to the plaintiff's call records, use of his computer on or around the date the consent was provided, his whereabouts that date. We anticipate that they're going to allege that the plaintiff couldn't have provided the consent on that day, or something like that. I don't know the actual details, but it would be involved -- it would be very directed at the day the consent was provided.

THE COURT: Okay. So for the plaintiff, is the fraudulent consent argument that he never went on the website at all, he didn't provide it? Or is it a fraud in what was -- like the way that the number was obtained?

MR. MCCUE: No, Your Honor. The intention is that the entire lead process is fraudulent. My client --

(Internet connection drops.)

THE COURT: I'm sorry, you broke up for one second. Your client did what?

MR. MCCUE: My client did not go on any website, did not ask for these calls, did not consent. And our contention is that the entity that QuoteWizard is buying these leads from is selling them fake leads. These are made up.

THE COURT: Okay. So this is not the case where you're going to say Mr. Mantha went on the website and they -- there was something about what was said on the website that lied to him about getting his number, or something like that. This is, "I didn't go on the website at all. I didn't ever go on that website. I didn't ever agree to that. And to the extent these -- this -- this third party company says that I did, that's not true."

MR. MCCUE: That's correct, Your Honor. And then there's an alternative argument that even if he did go on this website, which he didn't, the consent that they claim they obtained is not TCPA compliant. The TCPA is very specific about what is consent. It has to be prior, express consent, signed in writing, and it has to specifically mention the entity who's going to call. So even if, theoretically, QuoteWizard gets a bench of leads from people who say they're interested in auto insurance, that's not consent to send them text messages or robo calls. That could be a consent to send them a letter or an e-mail, but not a telemarketing call.

THE COURT: So you have two arguments, then.

MR. MCCUE: Right.

THE COURT: One is, he didn't go on the website, and it didn't -- and second, it doesn't matter if he did, because if he did, the documents upon which defendant relies

is said, "This is the consent," aren't good enough to establish, as a matter of law, consent.

MR. MCCUE: That's correct, Your Honor. And we expect that to be the same on a common basis to all class members.

THE COURT: So I guess my question for the two of you, then -- and so the discovery as to the -- whether he went on the website or not, that seems pretty focused and narrow, right? That's like you have a --

You, Mr. Polansky, have an idea of when you think he went on the website, like a given day, right?

MR. POLANSKY: Yes, Your Honor.

THE COURT: And is it just one day, one time?

MR. POLANSKY: Yes.

THE COURT: So what you're looking for is like records from the third party as to the IP address as to whoever gave -- if they have it, whoever gave -- whoever signed in and did, said -- handed over Mr. Mantha's cell phone number.

MR. POLANSKY: That's correct.

THE COURT: If they have such records.

And from Mr. Mantha, records like his Internet access records and his cell phone location records for like the day before, the day of, and the day after. And then possibly a brief -- a targeted deposition.

MR. POLANSKY: Yes, Your Honor.

THE COURT: And then with respect to the scope of the consent, did the -- does the third party provide you, when they give your client the number, they provide some, like, form that the person signed?

MR. POLANSKY: Yes, Your Honor. There's a TCPA disclosure.

THE COURT: Okay. And I take it that's probably the same -- like this isn't the only lead your client bought from this company.

MR. POLANSKY: No. No.

THE COURT: And the TCPA disclosure is presumably the same for lots of people. Maybe it gets revised periodically, but other than that, it's the same.

MR. POLANSKY: It may be the same for certain class members, but not all. I mean, there are different leads purchased from different lead generating companies of partners. So --

THE COURT: From this partner.

MR. POLANSKY: From this partner, they may be similar, yes.

THE COURT: Okay. All right. So it -- so it seems like they're -- and I take it, for the plaintiff, the discovery you would want with respect to whether he went online and signed up or not, is it any different than what

Mr. Polansky described?

MR. MCCUE: No, Your Honor. I agree, it's really simple. And I think a lot of it would focus on the IP address, which is a subpoena to the telecommunications carrier, which we --

THE COURT: Okay. And then with respect to the disclosure, whether the disclosure or consent, to the extent it was actually given, is sufficient, first, as to your client, Mr. Mantha, what, if anything, do you need beyond what you have?

MR. MCCUE: Nothing, Your Honor. This argument is defendant's burden, so it's up to them to come forward with valid consent.

THE COURT: So if they came forward -- if they move for summary judgment today and said, "Here's the document, the TCPA disclosure that Mr. Mantha signed," putting aside the question -- let's say for the moment it was assumed or given that he had gone online, and he had given a cell phone number in the face of that disclosure, what -- and they said, "Summary judgment, this disclosure is good enough," is your response, "Judge, as a matter of law, it loses"? Or do you want any discovery before you respond to that?

MR. MCCUE: Well, number one, matter of law loses, because we submit an affidavit from Mr. Mantha, which we're prepared to do, that says he never went on this website.

THE COURT: I understand. But that doesn't have to do with whether the disclosure is good enough. That has to do with whether he agreed to the disclosure.

MR. MCCUE: Right.

THE COURT: Assume he agreed. Let's just say that it were determined that he went on the website, and he signed that form that Mr. Polansky is giving you.

MR. MCCUE: Right.

THE COURT: Okay. Then I understand you to be saying that you have a second argument, even if you lose the argument that he didn't go online.

MR. MCCUE: Sure.

THE COURT: And that argument is: That form is no good. It doesn't matter if he signed it.

MR. MCCUE: Yeah. And that's the number-one argument. I guess the only discovery that I would want is some type of basis to verify that the information that I'm getting is legitimate. Saying we got this consent document from a third party, I would want to send a subpoena to that third party to confirm what's being produced is accurate.

THE COURT: Sure. Okay. So my -- I guess my question, then, having read over -- and let me -- is there more than --

I read over docket number 36, defendant's statement. Was there a statement that another one --

MR. MCCUE: Yes, Your Honor. There's a plaintiff's statement that's document 34.

THE COURT: All right. Give me one second, because -- and I apologize, I need one minute.

MR. MCCUE: Sure.

THE COURT: Okay. So I guess maybe this is for you, Mr. Polansky, but my question is, really, why shouldn't we first -- it seems in line with what plaintiff was proposing, but why shouldn't we first have a very brief period for the consent question -- really two questions, the consent question, like did he go online or not, and did he -- is the -- are the forms you have, assuming he went online, good enough?

It seems like the discovery you both need for that is very narrow; that you can get that -- putting aside corona for the moment. Imagine that. It's kind of a sweet image -- and it wouldn't take that long. And then one or two things happens. You either both look at it, and you're like, "You know what? He went online." Or he didn't go online, or -- in which case, you could agree to resolve it among yourselves. Or you can't agree. Like you think you got a good argument that he went online, Mr. Polansky, and plaintiff thinks he has a good argument that he didn't. And you submit it for summary judgment.

But if, in fact, he went online and signed the

form, and if the form is a valid form, which is the other question -- which seems like there's not a lot of facts and it's more of a legal question -- on the one hand, if you're right, Mr. Polansky, you win. Probably case over. And on the other hand, it clarifies things, to some degree, because, first of all, if you lose, it gets rid of the question of whether this individual plaintiff can go forward or not. If you win -- and it also --

So I guess it clarifies a number of junction points in the litigation. Because if they sold you a lead that -- where the guy didn't go online, then it raises all sorts of questions about are you going to be suing them for breach of contract? You might be wondering, "Is this the only lead like this that they sold us," and, "What's the scope of this?" and that might impact your client's position about what they're doing.

If he went online, and there's the question about the disclosure, so I'm just wondering why we don't do that first. Resolve those questions, and then figure out how to proceed next.

MR. POLANSKY: Your Honor, I think that's exactly what we proposed, which is going forward with the consent issue, filing a motion for summary judgment on that issue, and resolving it, before we get into class discovery, class records. The plaintiff proposes doing those simultaneously.

THE COURT: I see. So the difference -- the way you see it is in their -- I was going to get to that. So the real difference between the two of you is over whether to look at call dialing records now or not?

MR. POLANSKY: Yes.

THE COURT: So first, before we get to that, how much time do each of you, starting with plaintiff's counsel, do you think you need to take the discovery you need in order to look at the question of whether Mr. Mantha went online, and whatever you need about whether the disclosure, quote, he got, the one that the defendant relies on, asserting it's the one he got, until those two questions are ready to be someone to start writing a summary judgment motion?

MR. MCCUE: Your Honor, from plaintiff's perspective, we set out in a -- on docket 34 what our dates would be for that. And we -- I envisioned doing that in a few months and being ready to file dispositive motion as to consent on July 31, 2020.

THE COURT: Okay. What do you think about that, Mr. Polansky, time-wise?

MR. POLANSKY: Your Honor, on just the issue of consent, I think that would be perfectly fine.

THE COURT: Consent and the viability of the notice that you're relying on as to Mr. Mantha.

MR. POLANSKY: Sure, yeah, that's just the legal

argument, so we could brief that at the same time.

THE COURT: Yeah. Okay. So then that would mean initial strike 4/15 disclosures.

And I don't see the July 31st date in the chart on docket number 34.

MR. MCCUE: It says, "Deadline to file dispositive motion as to consent," the fourth or fifth box down on page 5.

THE COURT: Oh. Okay. Maybe I'm on the wrong page. Sorry.

MR. MCCUE: I submitted two tables, Your Honor. One was --

THE COURT: I see. Yes. Sorry.

Okay. Who goes first on the dispositive motion on the -- there are two aspects of consent, one is fraud, and one is -- this is your burden. It's an affirmative defense, right, Mr. Polansky?

MR. POLANSKY: Yes.

THE COURT: So why don't you go first.

MR. POLANSKY: Okay.

THE COURT: And say by July 31st, why he did consent, and why the -- and why the form of consent suffices.

MR. POLANSKY: Yes, Your Honor.

THE COURT: And then do you want 30 days for an opposition?

MR. MCCUE: That would be fine, Your Honor.

THE COURT: All right. So we'll say 8/30.

And I think that's really an opposition and cross-motion on those issues.

MR. MCCUE: Correct.

THE COURT: But I'm going to just say 20 pages for each of you, because it's not like your -- your opposition is not encompassing new issues. It's the same two questions.

And then a reply -- is two weeks enough for the reply? You want a little more.

MR. POLANSKY: Yeah. Could we make it 21 days, Your Honor?

THE COURT: Sure. 9/21 for the reply. It's a reply opposition. I'm going to say it's a little bit -- normally, I would say for cross-motions 20 pages, 30 pages for the memo in support of the cross-motion opposition; 20 pages for the reply, 10 pages for the sur-reply. This doesn't seem like it's that kind of issue, because it seems like you're both moving -- you're really moving on the same issue. So I'm going to say 20 pages for the opening brief, 20 pages for the opposition, seven pages for the reply. If you think it really merits more, you can ask for more pages.

MR. POLANSKY: Yes, Your Honor.

MR. MCCUE: That should be fine, Your Honor.

THE COURT: All right. And it doesn't seem like a

sur-reply thing, but if you want a sur-reply -- if you want a sur-reply, I'll build it in now. If you're going to do one, we'll say by 9/28, five pages.

MR. POLANSKY: Sure.

MR. MCCUE: I'll only use it if I need to.

THE COURT: All right. So that's -- and I don't see any amendment of the pleadings out of this.

MR. MCCUE: Your Honor, if I could address that, just briefly.

THE COURT: Yeah. Sure.

MR. MCCUE: As you recall, the initial complaint also alleges use of an autodialer, ATDS. And you granted the motion to dismiss on the basis that there's specific facts sufficiently alleged.

THE COURT: Right.

MR. MCCUE: Since that motion to dismiss was granted in part, QuoteWizard did disclose Drips. I had asked them to disclose Drips before that, but they declined to do so.

So if you look at paragraph 2, Your Honor, of document 34, I lay out -- excuse me, Drips sends texts via what are called --

THE COURT: Page 2 or paragraph 2?

MR. MCCUE: It's footnote 2 on page 2.

THE COURT: Oh, I see. Yeah.

MR. MCCUE: It might just be more efficient, Your Honor, if you just take a moment to read that.

THE COURT: Yes. Hold on one second.

(The Court reviews the document.)

THE COURT: Okay. I read it.

MR. MCCUE: So that issue raises an amendment to the pleadings to get back in the ATDS, because we do suspect that now we have a more specific facts to allege an ATDS use. And I would not just like to rely upon Drips' website. I would like to take some discovery on that point and then be able to amend to get the count back in.

THE COURT: So is the idea -- well, it seems like two different things. One is, if you want to amend, based on that, (a), you're absolutely entitled to try to amend based on that. As to whether that's sufficient or not, I have no idea. I would have to think about that and see what you all said to me about it.

If what you want to do is take discovery, how -- what is the basis to take discovery on that topic?

MR. MCCUE: So the basis, it dovetails with the call records, Your Honor. But let me first focus on the ATDS issue. I mean, obviously, the complaint is still alive, just based upon the do-not-call allegation. As part of my duty to the class, I need to investigate other causes of action that could be alleged.

These are two distinct violations of the TCPA. Autodialer is under 227(b), and the do not call is under 227(c). So they're completely separate, and you can stack TCPA violations. So my position would be I have a duty to investigate all potential claims that arise from these calls, and ATDS use is certainly one of them.

So I would seek discovery from Drips as to what is the machine that makes these calls? I would want the manual. I would want to know how these calls are delivered. You know, what Drips seems to say is these are chatbots. So that's completely different from individual sales rep at QuoteWizard sending a text to a consumer. It's completely different.

THE COURT: So what you would want is discovery from Drips about how Drips did these two text messages.

MR. MCCUE: That's correct, Your Honor.

THE COURT: And that would be -- so what kind of discovery would that be? Document requests? 30(b)(6)?

MR. MCCUE: That would be a subpoena to Drips and potentially a follow-up deposition. And then, you know, frankly, this issue dovetails with the call records, is that it's much more efficient just to find out -- not limit the inquiry to the two texts, but find out how did Drips send text messages for QuoteWizard, generally. And that's the same as for the call records.

I mean, when we talk about efficiency, Your Honor, I think we're -- it's proper to focus on consent, because if there's a valid consent defense, the case goes away. It's the same issue with call records. I need to know at the outset, or as early as possible, what's the scope of the case? What's the size of the case? Is this a class action that's worth spending the resources on to go all the way through? I don't know without the call records. And the call records are now in possession of a third party. We could get them via --

THE COURT: When you say the "call records," what does that mean?

MR. MCCUE: Text records. So they're similar to call detail records that you would see from a cell phone or from a landline.

THE COURT: About what? These are the -- you mean the records that Drips would have of every call they ever made for what? In the four years?

MR. MCCUE: Right. Every text solicitation -- we're talking telemarketing calls. Every telemarking text that Drips sent for QuoteWizard, going back four years. Now, that might mean -- it depends on how long the relationship has been going on and how extensive it is. The statute of limitations goes back four years.

And these are electronic records, Your Honor. This

is like a simple subpoena and a -- these are produced electronically. So it would be getting the text records for the text campaigns at issue and then also discovery about how the calls were sent.

THE COURT: All right. And you're -- the reason to do that now is, one, you say that given your duties that you described, you say this would be relevant to determining early on whether or not you have a viable basis to replead Count 1; and, two, it allows you to assess the scope of the case as in did Drips do 42 phone solicitations for QuoteWizard, or 42 million, and the how --

You want to look at the how for these two or the how for all of them?

MR. MCCUE: The how for all of them, Your Honor. I suspect it's the same exact, but I -- it's so inefficient to get the information as to two, and then a year later have to go back and get the same information as to the others.

THE COURT: All right. What do you say about all of that, Mr. Polansky?

MR. POLANSKY: Well, Your Honor, I think it would be improper at this point to allow the plaintiff to conduct discovery on a dismissed claim. I think that it would be outside of the procedure under Rule 26, the relevance procedure, and that now we're seeking discovery to replead and discover things that otherwise have been dismissed. I

think that's completely improper. And I'm not aware of any case law that would allow plaintiff to go in, seek discovery, in order to attempt to revive a claim that's already been dismissed.

In addition, there's no benefit. I mean, certainly plaintiff doesn't need the call records to establish any potential size or scope of a class action, and they certainly wouldn't need the information relating to any putative class member for any other basis than to know what the potential, you know, class size or settlement value would be in this case. And on that basis alone, you know, it's our position that every individual that was called had provided consent, and so it would be an individualized assessment on every individual and it would be a futile effort.

But the burden and expense at this stage in the litigation would outweigh the necessity to obtain those records, when the plaintiff still has to get past, you know, a summary judgment motion on its individual claims. I mean, it's not as simple as just transferring over the call records from Drips.

And by the way, Drips is a nonparty. So we have to look at it under a Rule 45, you know, burden standpoint.

The information would also be available like from QuoteWizard. These are QuoteWizard's records. So QuoteWizard would have a say in, you know, reviewing the

information. It doesn't relate to every single person or text message that was sent by Drips. I mean, the potential class only relates to individuals that were set to receive the text two times or more, that were on the do-not-call registry. That would not be as simple as just turning over all the records, because, again, it's QuoteWizard's position and business practice to only call individuals with consent. They would have to obtain and determine who of that list was on the do-not-call registry. That would be a significant expense and burden.

THE COURT: What do you say, counsel, as to the question of whether you can take discovery on a claim that's been dismissed?

MR. MCCUE: Your Honor, I -- Attorney Polansky thinks it's outrageous. I feel exactly the other way. All the time in cases, at the beginning, you don't know the scope of violations or theories of allegations, and that's why you amend complaints. You get into discovery; you find out exactly what happened; you learn more than you new at the very beginning. And that's particularly true with ATDS use, because the consumer has no idea what the machinery is at the end.

And I would submit to Your Honor, if you take a look at paragraph 2, just based upon that, we have a good-faith basis to allege ATDS use when they are using

AI-driven chatbots to send text messages. So I submit, Your Honor, you dismissed out this count at the outset. And now, even today, the facts have changed, based upon Drips' disclosures on its website.

And as to burden, Your Honor, this is a -- I do telemarketing cases all over the country. There is no burden to QuoteWizard, whatsoever, to send a subpoena to Drips citing, "Send us these text records." There's nothing. So that's Drips' battle to fight.

And I have to submit, Your Honor, it is so important to get these call records not just preserved, but in our possession, because who knows what is going to happen going forward. I've had situations where third parties say, "Oh, I preserved what I thought you wanted," which was like the call to the plaintiff, but not calls to the class members. You get caught up in situations where there's a miscommunication. I've had cases where the data was, quote, preserved, and then I found out it was in a drive in the telemarketer's garage.

I don't want to risk those situations. I want to preserve this evidence and analyze it to figure out if this is a case that's worth pursuing or not. And I'm happy to do so under protective order, whatever.

And another issue that is absolutely fair game is if QuoteWizard is saying all of these consumers consented,

I'm entitled to challenge that. I'm entitled to contact consumers who got these calls and say, "Did you really consent?" How valid is that defense?

So there's a whole host of reasons why obtaining this data right now is important. And I submit to you, as I said in my statement, that if we focus on consent and we get call records produced and analyzed, we will know, with virtually no discovery, if this is a meritorious case that's worth pursuing, and I would just respectfully submit that we go along those lines.

THE COURT: Okay. This is what I'm going to do. I want to think about this question a little bit. I'm going to set the following -- the schedule we did talk about for sure, because you both agree to that, and I do think it makes a lot of sense to resolve that early on, which is initial disclosures by April 15th. The consent question discovery commences now, or commences on April 15th.

And by "consent discovery," what I mean is did Mr. Mantha sign the forms or give his cell phone number, number one; and number two, whatever it is that defendant is relying on, to assert that he agreed, then, like, the disclosure or the document that he e-signed on the Internet, whatever it is, any discovery about that, with discovery on those topics closing June 30th.

Defendant move for summary judgment on those two

issues July 31. Opposition by August 30th. Reply by September 21st. Sur-reply, September 28th.

I'm neither rejecting or allowing, at the moment, the question of this other discovery about the call records. I want to think about that a little bit and whether it's appropriate; and if it is appropriate, what would be appropriate. And so I just want to think about it. And I will either issue an order pretty soon addressing it, or if I have more questions about it, I might set up another status conference to talk to you about it.

MR. POLANSKY: Your Honor, we would also be happy to brief, you know, file a motion to bifurcate, if that would be, you know, the Court's wish, as well.

THE COURT: I don't think -- I mean, I think I know -- I don't think I need a brief on bifurcation. Neither of you question, and I think I have the authority to structure the discovery however it makes sense under Rule 26. So I don't think like -- essentially, in the one sense, I bifurcated the discovery right here. We're doing this consent question. If we don't do anything else, we're doing that. And we'll do everything else later. Not discovery about other things.

So just to clarify, so you don't get into fights, I could see a deposition in this initial period about plaintiff, about this -- these narrow issues, and I guess I

would say to all of you, be reasonable. In other words, it's not the opportunity -- it's not like one and done. On the other hand, it's not like -- we're not going to subject him to multiple seriatim depositions to go over the same thing. So if you want his deposition about this, I could see why you might, take a deposition about this, and see if you can't reach an agreement on how you deal with -- if he needs to be deposed again later, how you would do that. And be practical about that, both of you.

So I think the real question comes down to whether -- whether there should be this discovery about the automatic -- the call records from Drips, and if so, what's the scope of it. I want to think about that a little bit. And I don't think it's really a question, at the moment, for briefing. But if it is, I think it would be less a question of legal briefing and more a question of, like, more specifically what exactly does plaintiff want, more specifically what do you object to or how do we do it, and then we get into that. So I want to think about the whole range of issues, and so I'm going to reserve on that.

I don't think I'm going to issue a written scheduling order. The clerk's notes will reflect these dates, unless you -- I don't think you need one.

Do you?

MR. POLANSKY: I don't think so, Your Honor. As

long as the clerk's notes reflect the dates, I think we should be fine.

THE COURT: All right. And I would say, if there are any motions to compel that arise out of this -- the two things I would just say, so we're clear, one is, given that the discovery ends on July 30th -- this is probably obvious -- but you can't, on June 30th, you can't serve a discovery request on June 29th for documents that would be due July 29th. You have to serve your requests in time that they're done by June 30th.

And second, if there are motions to compel that arise out of this discovery, then they have to be filed by July 7th.

And in order to keep this moving, and frankly, just to do discovery motions more efficiently, do the following: Don't file a normal discovery motion. If you have a discovery dispute and you confer, you can't work it out and you're ready to file a motion to compel or motion to quash, or whatever, if you can work together reasonably, my suggestion is you do this: You file a joint status report, where, let's say, plaintiff wants an answer to an interrogatory, and you say, "No, you don't get that."

Plaintiff, you say, "Here's the interrogatory. Here's the answer that was given to us. Here's our explanation of why we get more."

You, Mr. Polansky, stick into it why they don't get more, why what you gave them is enough.

You can do whatever back and forth until you're satisfied with each of your two paragraphs, and then you give me that document. And if there's more than one request, just repeat that for the other request.

My experience is, if you do that, (a), it's way quicker than filing the brief and two weeks for the opposition and then potentially a reply. It's focused. The question is what's the -- I don't really need a long, legal brief on the law of discovery. I really need to know what do you want; what does the other side not want to give you; why do you want it or think you get it; and why don't you think I have to turn it over. And then with that, I'll read it, and maybe have a conference with you on the phone, like this, and we'll work it out. And my experience is that's the faster, cheaper, and you get a better answer.

So do that. Do that by July 7th, if you have a dispute. You can do it earlier. I don't have any problem if it comes up earlier, and it makes sense to do it earlier, just do it earlier. But July 7th, for sure, unless you continue that. Because otherwise then I'm going to assume that the discovery issues as to this issue are resolved.

As to the call dialing records, and the like, I want to think about that, and I will circle back to you in

one form or another about it.

Is there anything else from the plaintiff?

MR. MCCUE: Just quick, Your Honor, as to the call records, we, of course, would be agreeable or amenable to accept those under protective order, if the Court were so inclined. The follow-up question is does the Court have a form protective order that it generally wants us to use?

THE COURT: Your question is a great one. I don't have, at the moment, a -- I don't -- you can look on -- there is a -- on my website, on the Court's website, under my name, there is a form protective order, but that's to address a very narrow circumstance. I don't think it's what you're talking about here. So the short answer is, no, I don't have one. The longer answer, since you raised the topic, is I have thought for a long time that a really useful thing to save me a lot of work and all of you a lot of money would be to have a form -- and really, the court, not just for me, it would really be better if it were court-wide, a form protective order with a rule that said, "This is the protective order" -- "if you want a protective order, this is the protective order." Or you submit it, red line, just, "We want this extra paragraph because we have a special issue," or, "We want to delete that paragraph," for some reason, and then that's all you have to address. But I have never found time on a Saturday afternoon to write that or --

MR. MCCUE: There are other judicial districts that have them, so I'll probably pull the one from Northern District of Illinois, it's the one I typically use, and we'll start from there. But, of course, I'm open.

THE COURT: That's fine with me. I'd like to conclude that means that I have more of a life than the judges in the Northern District of Illinois, but I don't know if that's true.

MR. MCCUE: Especially these days.

THE COURT: Yes. Right. Exactly.

But if you -- one thing, like, if you do -- if we get to that and you do that, that's fine to pull that. If you know, off the top of your head, without doing any research or work, districts beyond the Northern District of Illinois that have on their website the form protective orders, send Maria an e-mail that just says, "Hey, here's the couple districts that I know of that have it."

MR. MCCUE: Sure.

THE COURT: Because it is something that I think that would be useful for us to have, because there's so many cases with protective orders, and there's no reason to rewrite them or judges to reread them, and they're mostly boilerplate.

MR. MCCUE: I can do that, Your Honor.

THE COURT: Great. Okay. Anything else for the

defendant?

MR. POLANSKY: No, Your Honor. Thank you very much for your time today.

THE COURT: Okay. Have a good day. Stay healthy, all of you. We're adjourned.

THE DEPUTY CLERK: This matter is adjourned.

(Court in recess at 11:00 a.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Rachel M. Lopez, Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of June, 2020.

/s/ RACHEL M. LOPEZ

______________________________________

Rachel M. Lopez, CRR
Official Court Reporter