# In the Matter of:

*Joseph Mantha vs*

*QuoteWizard.com, LLC*

---

*Adam Brown*

*September 18, 2020*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020



**Page 3**

1        UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
2   ------------------------------------X
    JOSEPH MANTHA,
3
              Plaintiff,
4
    V.       C.A. No. 1:19CV12235-LTS
5
    QUOTEWIZARD.COM, LLC,
6
              Defendant.
7   ------------------------------------X
8
9
10       DEPOSITION OF ADAM BROWN,
11  Conducted Remotely, 10976 Crescendo Circle,
12  Boca Raton, Florida 33498, a witness called
13  by and on behalf of the Defendant, taken
14  pursuant to Massachusetts Rules of Civil
15  Procedure, before Hannah Bea Lorber, Notary
16  Public in and for the Commonwealth of
17  Massachusetts, on September 18th, 2020,
18  commencing at 1:06 P.M.
19
20
21
22
23
24

**Page 3**

1            E X H I B I T S
2
3   BROWN EXHIBITS
4
5   EXHIBIT   EXHIBIT            PAGE
6   NUMBER    DESCRIPTION
7   1      Subpoena to Testify at      6
          Deposition in a Civil
8          Action, Adam Brown
9   2      Snappy Lead Page Screenshot 6
10  3      Snappy Screenshot Terms     6
          of Use
11
    4      Snappy Screenshot Privacy   6
12         Policy
13  5      Subpoena to Produce         6
          Documents, Information, or
14         Objects or to Permit
          Inspection of Premises in
15         a Civil Action, Mailgun
          Technologies, Inc.
16
    6      Mailgun Technologies        7
17         Subpoena Response
18  7      Mailgun Technologies        7
          Subpoena Response E-mail
19         Chain
20  8      Subpoena to Produce         7
          Documents, Information,
21         or Objects or to Permit
          Inspection of Premises
22         in a Civil Action,
          GoDaddy.com
23
24      (INDEX CONTINUED ON FOLLOWING PAGE.)

**Page 2**

1   A P P E A R A N C E S :
2
3   THE LAW OFFICE OF EDWARD A. BRODERICK
        Attorneys for the Plaintiff
4     JOSEPH MANTHA
      99 High Street, Suite 304
5     Boston, Massachusetts 02110
      BY: EDWARD A. BRODERICK, ESQ., Via Zoom
6     Telephone: (617)738-7080
      Facsimile: (617)830-0327
7     ted@broderick-law.com
8
    NELSON MULLINS RILEY & SCARBOROUGH LLP
9     Attorneys for the Defendant
      QUOTEWIZARD.COM, LLC
10    One Post Office Square, 30th Floor
      Boston, Massachusetts 02109
11    BY: CHRISTINE M. KINGSTON, ESQ., Via Zoom
      Telephone: (617)217-4794
12    christine.kingston@nelsonmullins.com
13          *     *     *
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1   BROWN EXHIBITS
2
3   EXHIBIT   EXHIBIT            PAGE
4   NUMBER    DESCRIPTION
5   9      GoDaddy Subpoena Response   7
6   10     Adam Brown E-mail Chain     7
7   11     Justin Cohen E-mail Chain   8
8   12     September, 2019 E-mail      8
          from Dario Osmancevic
13         July 28, 2020 E-mail from   8
10         Dario Osmancevic
11  14     Plural Marketing Subpoena   8
          Response
12
    15     RevPoint Subpoena Response  8
13
    16     Seal Dog Media Complaint    8
14
    17     Justin Cohen and Adam       9
15         Brown E-mail Chain
16  18     Adam Brown September 2,     9
          2020 E-mail Chain
17
    19     Screenshot                  74
18
       (Exhibits retained by Counsel.)
19
20          I N D E X
21
22  EXAMINATION BY                     PAGE
23  MS. KINGSTON                       11
24

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 5

1   INFORMATION AND/OR DOCUMENTS REQUESTED
2   INFORMATION AND/OR DOCUMENTS        PAGE
3   Screenshots of Kapeo searching      18
    database.
4
    April 8, 2015 article.      22
5
    Copy of the sale of Snappy Auto     23
6   Insurance network pursuant to a
    written contract.
7
    Copy of removal of Snappy Auto      68
8   Insurance website from GoDaddy.
9   List of publishers and advertisers.  125
10
11
12        QUESTIONS MARKED FOR RULINGS
13  PAGE LINE QUESTION
14  (None)
15
16
17
18
19
20
21
22
23
24

Page 6

1       (Whereupon, Subpoena to Testify
2   at Deposition in a Civil Action, Adam
3   Brown was premarked as Brown Exhibit
4   1 for identification as of this date
5   by the Reporter.)
6       (Whereupon, a Snappy Lead Page
7   Screenshot was premarked as Brown
8   Exhibit 2 for identification as of
9   this date by the Reporter.)
10      (Whereupon, a Snappy Screenshot
11  Terms of Use was premarked as Brown
12  Exhibit 3 for identification as of
13  this date by the Reporter.)
14      (Whereupon, a Snappy Screenshot
15  Privacy Policy was premarked as Brown
16  Exhibit 4 for identification as of
17  this date by the Reporter.)
18      (Whereupon, Subpoena to Produce
19  Documents, Information, or Objects or
20  to Permit Inspection of Premises in a
21  Civil Action, Mailgun Technologies,
22  Inc. Was premarked as Brown Exhibit 5
23  for identification as of this date by
24  the Reporter.)

Page 7

1       (Whereupon, Mailgun
2   Technologies Subpoena Response was
3   premarked as Brown Exhibit 6 for
4   identification as of this date by the
5   Reporter.)
6       (Whereupon, Mailgun
7   Technologies Subpoena Response E-mail
8   Chain was premarked as Brown Exhibit
9   7 for identification as of this date
10  by the Reporter.)
11      (Whereupon, Subpoena to Produce
12  Documents, Information, or Objects or
13  to Permit Inspection of Premises in a
14  Civil Action, GoDaddy.com was
15  premarked as Brown Exhibit 8 for
16  identification as of this date by the
17  Reporter.)
18      (Whereupon, GoDaddy Subpoena
19  Response  was premarked as Brown
20  Exhibit 9 for identification as of
21  this date by the Reporter.)
22      (Whereupon, Adam Brown E-mail
23  Chain was premarked as Brown Exhibit
24  10 for identification as of this date

Page 8

1   by the Reporter.)
2       (Whereupon, Justin Cohen E-mail
3   Chain was premarked as Brown Exhibit
4   11 for identification as of this date
5   by the Reporter.)
6       (Whereupon, September, 2019
7   E-mail from Dario Osmancevic was
8   premarked as Brown Exhibit 12 for
9   identification as of this date by the
10  Reporter.)
11      (Whereupon, July 28, 2020
12  E-mail from Dario Osmancevic was
13  premarked as Brown Exhibit 13 for
14  identification as of this date by the
15  Reporter.)
16      (Whereupon, Plural Marketing
17  Subpoena Response was premarked as
18  Brown Exhibit 14 for identification
19  as of this date by the Reporter.)
20      (Whereupon, RevPoint Subpoena
21  Response was premarked as Brown
22  Exhibit 15 for identification as of
23  this date by the Reporter.)
24      (Whereupon, Seal Dog Media

Page 9

1  Complaint was premarked as Brown
2  Exhibit 16 for identification as of
3  this date by the Reporter.)
4      (Whereupon, Justin Cohen and
5  Adam Brown E-mail Chain was
6  premarked as Brown Exhibit 17 for
7  identification as of this date by the
8  Reporter.)
9      (Whereupon, Adam Brown
10  September 2, 2020 E-mail Chain was
11  premarked as Brown Exhibit 18 for
12  identification as of this date by the
13  Reporter.)
14    THE COURT REPORTER:  This is
15  Hannah Lorber.  I am a Court Reporter
16  and notary public in the Commonwealth
17  of Massachusetts.
18    This deposition is being taken
19  remotely.  This witness is appearing
20  remotely from: 10976 Crescendo
21  Circle, Boca Raton, Florida 33498.
22    The attorneys participating in
23  this proceeding acknowledge their
24  understanding that I am not

Page 10

1  physically present in the proceeding
2  room, nor am I physically present
3  with the witness and that I will be
4  reporting this proceeding remotely.
5      They further acknowledge that
6  in lieu of an oath administered in
7  person, the witness will verbally
8  declare his testimony in this matter
9  under the pains and penalties of
10  perjury.  The parties and their
11  counsel consent to this arrangement
12  and waive any objections to this
13  manner of proceeding.
14      Please indicate your agreement
15  by stating your name and your
16  agreement on the record, after which
17  I will swear in the witness and we
18  may begin.
19    MS. KINGSTON:  Christine
20  Kingston on behalf of
21  Quotewizard.com, and we agree.
22    MR. BRODERICK:  Ed Broderick on
23  behalf of the plaintiff, Joseph
24  Mantha, and we also agree.

Page 11

1  A D A M   B R O W N, called as a witness,
2  having been first duly sworn by a Notary
3  Public of the Commonwealth of
4  Massachusetts, was examined and testified
5  as follows:
6  EXAMINATION BY
7  MS. KINGSTON:
8      MS. KINGSTON:  Thank you.  Just
9  before we get started, Ted, just to
10  put the usual stips on the record,
11  which I assume you're still in
12  agreement with?
13    MR. BRODERICK:  Yes.
14    MS. KINGSTON:  All objections
15  besides as to form reserved until the
16  time of trial, as are motions to
17  strike.  Witness will have 30 days to
18  read and sign, and we're going to
19  request notarization.
20    MR. BRODERICK:  Okay.  Agreed.
21    Q.  So Mr. Brown, as I mentioned,
22  my name is Christine Kingston, and I
23  represent the defendant, Quotewizard.com,
24  LLC.  I'll be taking your deposition today.

Page 12

1  Just a couple of ground rules before we get
2  started.  If you don't understand my
3  question, just let me know.  I'm happy to
4  rephrase.
5      A.  Sure.  No problem.
6      Q.  If at any point you need a
7  break, I'm happy to accommodate you.  So
8  just let me know.
9      A.  Okay.
10      Q.  For the benefit of the court
11  reporter, just try to keep your answers
12  oral and audible.  So no shaking of the
13  head.  Just make sure you're speaking into
14  the record.
15      A.  You got it.
16      Q.  Finally because we are virtual,
17  if you're experiencing any technological
18  problems, or you can't hear me or see me,
19  just let me know and we'll handle that.
20      A.  No problem.
21      Q.  Could you state your full name
22  for the record?
23      A.  Adam Mitchell Brown.
24      Q.  Do you understand that you're

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 13

1  under oath here today?
2      A.   Yes.
3      Q.   That means that you're
4  obligated to answer my questions fully and
5  truthfully?
6      A.   Yes.
7      Q.   Are you on any medication that
8  would affect your ability to accurately
9  testify?
10     A.   No.
11     Q.   Do you have any medical
12  conditions that would affect your ability
13  to accurately testify?
14     A.   No.
15     Q.   Do you have any memory problems
16  that would affect your ability to recall
17  the events?
18     A.   No.
19     Q.   Have you ever been deposed
20  before?
21     A.   I'm sorry.  Have I ever been
22  what?
23     Q.   Deposed?
24     A.   What's that mean?

---

Page 14

1      Q.   So we're here today for a
2  deposition --
3      A.   No, I have never.
4      Q.   Did you do anything to prepare
5  for your deposition today?
6      A.   I pulled a couple documents
7  that I could find from the database.
8  That's about it.
9      Q.   Can you tell me what those
10  documents are?
11     A.   One that shows that we looked
12  up the e-mail address that was on for the,
13  I guess the person that's saying that they
14  had a lead submit or whatnot.  I'm assuming
15  that's what this is all about.
16     Q.   Are you talking about the
17  plaintiff, Joseph Mantha?
18     A.   Correct.  I show that we do not
19  have that e-mail address in our system.  I
20  looked up a couple, Quotewizard and Fenix
21  Media that were also on the sheet, looking
22  to see if we ever worked with them before.
23  We do not show them in our database, as
24  well.

---

Page 15

1      Q.   When you said e-mail, are you
2  talking about the plaintiff's personal
3  e-mail?
4      A.   Yeah.  So I'm going to pull up
5  the file here.  I guess the e-mail,
6  jmantha7@yahoo.com.
7      Q.   Okay.  You said you searched
8  the database?
9      A.   Correct.
10     Q.   What database is that?
11     A.   The database that we had for
12  Snappy insurance from back in the day.
13  It's still, the database is still current
14  from the point that the site was still
15  active.  Obviously there has been no
16  traffic sent to it because we, I stopped
17  doing business on that URL.  I didn't even
18  actually know that that URL was still
19  active until this came about.  So --
20     Q.   Okay.  Where is the database
21  stored?
22     A.   I would have to ask my tech
23  where it's stored.  He sent me screenshots.
24     Q.   Who's he?

---

Page 16

1      A.   Someone I hire from Elance.
2      Q.   From where?
3      A.   Someone I hire.  Well, it's not
4  Elance anymore.  I guess it's called Upwork
5  now.
6      Q.   Do you know his name?
7      A.   I just know his, yeah.  His
8  name is Kapeo (phonetic).  I don't know his
9  last name.
10     Q.   Do you work with him for all of
11  your companies, or just for Snappy?
12     A.   Just back in the day when I was
13  running the auto insurance.  I reached back
14  out to him to see what he could find for
15  me.
16     Q.   Do you have access to this
17  database?
18     A.   I'm sure he can give me access.
19  I don't necessarily have anything because I
20  really never stayed in that point of the
21  business.  I was more the front end of the
22  business, getting the leads to the sites.
23  Like I said, we have stopped running
24  traffic to this site I would say probably

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 17

1  back in 2015, '16-ish.
2      Q.   Just to get back to the
3  database, is this like a cloud, or do you
4  know anything at all about what it is?
5      A.   Honestly I don't know.  I'm not
6  a tech person.
7      Q.   Okay.  And --
8      A.   I could show you the
9  screenshots that he sent me.  That's all I
10  have right now.
11     Q.   Who set up the database for
12  you?  Was it this Kapeo?
13     A.   Correct.
14     Q.   Do you remember when he set it
15  up for you?
16     A.   I would have to say, let's see.
17  I have screenshots of when the site was
18  last changed.  Let's see here.  So that
19  should tell me roughly when that was done.
20  Where is it in manager, manager,
21  screenshot.  Here we go.  So it looks like
22  it was set up back in 2013.
23     Q.   You're talking about the
24  database?

---

Page 18

1      A.   Yes.  'Cause if the website was
2  created, where is my mouse?  Yeah.  If the
3  website was created roughly around then,
4  then the database should have been created
5  then, as well.
6      Q.   When we take a break at some
7  point, I'm just going to ask that you
8  e-mail those screenshots.
9      A.   Sure.  Not a problem.
10     Q.   So can you describe to me just
11  generally what the screenshots are of that
12  you received?
13     A.   So, yes.  So like I said, I
14  received the screenshot of him entering
15  that e-mail address into the search to see
16  if we have that record of that user in our
17  system.  And that screen, that particular
18  screenshot shows that he's searching for
19  that e-mail address, what URL he's
20  searching for, and then it shows the
21  results that MSMMYSQL returned empty result
22  set as zero rows, meaning that that e-mail
23  address is not in the database.
24     Q.   When you said URL, is that the

---

Page 19

1  website URL, Snappy --
2      A.   The website that we have in
3  question here.  Yes.
4      Q.   So does the database cover more
5  than just Snappy Auto Insurance?
6      A.   I'm assuming.  I don't know how
7  he set it up.
8      Q.   Do you know if a search was
9  made by the plaintiff's name?
10     A.   We don't collect first name and
11  last name.  We're phone.  We never have.
12  Our websites were only e-mail and ZIP.  On
13  page two, we had what's called an iframe.
14  The iframe is a code from, the two
15  providers that we ever worked with were
16  Leadnomics and All Web Leads.  They
17  provided a code that we put on page two.
18  That's technically in theory their page
19  hosted by them.  So, but on our page.  So
20  anything that was entered on that
21  particular form, which is where the address
22  would be, the phone number would be, would
23  go directly into their system.  Not ours.
24  We only stored e-mail and ZIP code.

---

Page 20

1      Q.   When you say that those are the
2  only two you worked with, are you talking
3  about Snappy, or just your auto insurance
4  websites generally?
5      A.   Auto insurance websites in
6  general.
7      Q.   Do you have any way of
8  discerning whether you used these two
9  companies for Snappy?
10     A.   I mean, I don't have any
11  e-mails regarding that.  I just have
12  e-mails showing that we were in
13  communication during, you know, the 2015,
14  2016 timeframe.  Like I mentioned, that's
15  when we were working with the auto
16  insurance sites.  After 2016, we have, we
17  stopped running any traffic to any of our
18  auto insurance sites and paused all
19  iframes.  The websites might have still
20  been live, but there was no way of
21  generating any leads at that point.
22     Q.   When you say iframe, what does
23  that mean?
24     A.   Again I'm not a tech person.

---

Joseph Mantha vs                                                                                Adam Brown
QuoteWizard.com, LLC                                                              September 18, 2020

---

Page 21

1  So I'll try to explain it to you as best as
2  I can.  So an iframe is a line of code
3  supplied to me by whichever advertiser
4  company I'm working with.  So example,
5  Leadnomics would send me an iframe code.
6  We would put that on our page where we want
7  the form to show.  At that point, the user
8  would enter their information on that form.
9  That form is hosted by the company that
10  provided us the code.  So we do not store
11  any of those informations.  Those companies
12  do.  Like I said, we, on our page one of
13  our landing page, only collect e-mail and
14  ZIP code.
15      Q.   We'll get into this a little
16  bit later.  Is it possible for some of the
17  leads that you had in this timeframe, that
18  it came from affiliates?
19      A.   We did have affiliate traffic,
20  but I don't, I stopped affiliate traffic
21  after I sold the network to Affiliate
22  Crossing.  At that point, we stopped pretty
23  much all auto insurance traffic and moved
24  to surveys, which has nothing to do with

---

Page 22

1  auto insurance.
2      Q.   So when you say you sold the
3  network, are you referring to all of your
4  auto insurance websites, or are you
5  referring to something else?
6      A.   So the network, itself.  So we
7  technically sold the, to Affiliate Crossing
8  our list of affiliates, our resources,
9  where we generate, where we get the auto
10  insurance forms from everything related to
11  the auto insurance sites.  They kept, they
12  created their own websites.  We kept our
13  own websites.  We just at that point paused
14  everything and put it on the backside.
15      Q.   When did this happen?
16      A.   Let's see here.  I have the
17  article up here.  So the article is written
18  and published on 4/8/2015.
19      Q.   Can you also send us a copy of
20  that article?
21      A.   Yup.  I actually think I even
22  have the PDF version, as well.
23      Q.   Was that pursuant to a written
24  contract?

---

Page 23

1      A.   What was that?  I'm sorry.
2      Q.   Was the sale of the network
3  pursuant to a written contract?
4      A.   It was.  I honestly do not have
5  the signed copies.  I just have the blank
6  copy.
7      Q.   Can you also send us a copy of
8  that?
9      A.   Sure.
10      Q.   So this was in 2015?
11      A.   Yup.  The exact date that the
12  article was posted online on a big
13  industry, like, news site, that was written
14  on like I said, 4/8/2015.  If I quickly go
15  to my other screen here and go to
16  documents.  Give me one second.  I can tell
17  you when that other article was actually
18  typed up.  Documents.  Author Vision.
19  Author Vision buyout.  This article was
20  written or date modified or whatnot, it's,
21  I show April 10th, 2015.
22      Q.   Okay.  And were you selling the
23  network individually, or was this through a
24  company?

---

Page 24

1      A.   It was to a client that I
2  actually worked with.  They were buying my
3  assets.
4      Q.   You're referring to Affiliate
5  Crossing?
6      A.   Yes.
7      Q.   But in terms of who was
8  selling, was it you, individually, or was a
9  company?
10      A.   It was me, individually,
11  selling to it their owner.
12      Q.   I mean, would you say that you
13  owned the website, snappyautoinsurance.com?
14      A.   I definitely did, yes.  Like I
15  said, my websites did not sell in the sale.
16      Q.   Okay.
17      A.   We just sold the network, the
18  assets, where we get the, where are we
19  getting the iframes from, we get affiliates
20  that were running all the traffic to it.
21  Anything associated on those lines.  The
22  only thing we kept was the actual domain.
23      Q.   Why did you keep them?
24      A.   Because they wanted to, all

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 25

1  they wanted was the assets.
2      Q.   In terms of from Affiliate
3  Crossing's viewpoint, what were they
4  buying?  Can you kind of break that down
5  for us?
6      A.   Sure.  They were buying my
7  knowledge of the auto industry, like, on
8  the affiliate side, generating leads.  So
9  where I was generating the leads from, who
10  are my affiliates, who was my back end
11  providers, meaning the Leadnomics forms,
12  the All Web Leads forms.  I had a company
13  called, they're out of business now.  But I
14  had a company called SureHits as my exit
15  traffic, and that was like a click page.  I
16  got paid on a penny per click on exit
17  traffic.  So they bought that knowledge
18  from what I was doing with that company.
19  So they can basically go ahead and, you
20  know, replicate what I was doing.
21      Q.   Okay.  Did they buy the right
22  to use any of your websites?
23      A.   No.  None of my websites, like
24  I said, had anything to do with that.  They

Page 26

1  were just buying basically the back end of
2  everything.
3      Q.   And --
4      A.   And then like I said, at that
5  point forward, we stopped running auto
6  insurance altogether.
7      Q.   When you say we, who are you
8  referring to?
9      A.   My company.
10      Q.   Is that Author Vision?
11      A.   Well, Author Vision, right, was
12  basically terminated at that point.  You
13  can look at sunbiz.com.  You can see it was
14  basically terminated around that time, as
15  well.  I started Seal Dog Media, and that
16  is strictly basically a coregistration
17  company for survey registrations.
18      Q.   So you moved from auto
19  insurance to survey?
20      A.   Surveys and sweepstakes, yes.
21      Q.   Survey and sweepstakes?
22      A.   As you can see on the Seal Dog
23  website, those are the properties that we
24  were running.

Page 27

1      Q.   Is that when you started
2  snappysurveys.net?
3      A.   That's correct.
4      Q.   What other websites did you
5  have for auto insurance besides Snappy Auto
6  Insurance?
7      A.   Let's see.  If I can find them.
8  I don't even remember.  I would have to
9  maybe, I believe it's this one here.  Is
10  this one mine?  I can tell by the page.
11  Let's see.  So zippyinsurance.net.  This
12  one is still live actually.  And you can
13  see what I'm talking about if you actually
14  go to this website.  Really, it's an All
15  Web Leads form.
16      Q.   So you're saying when you look
17  at a website, you can tell whether there's
18  an All Web Leads form used?
19      A.   If it's still active, yeah.
20      Q.   What would signify that?
21      A.   Well, I just go on the terms.
22      Q.   Terms of --
23      A.   When I went to the website,
24  when I went to page two, you can see on the

Page 28

1  terms that because it's not my terms, that
2  it said the company's name.
3      Q.   I see.  So if a website's no
4  longer operational, you couldn't navigate
5  to page two, right?
6      A.   That's correct.
7      Q.   So you said you sold your
8  network and stopped doing the auto
9  insurance stuff, and you believe it was
10  April of 2015, right?
11      A.   That sounds about right.
12      Q.   Do you recall using the
13  services of LeadVision Media, LLC, D/B/A,
14  Revenue Ads?
15      A.   I do know that company, yes.
16  The Revenue Ads.  I didn't know the other
17  name.
18      Q.   That's just kind of their
19  official corporate name, but it looks like
20  they do business as Revenue Ads.  Do you
21  recall purchasing services for ZIP submits?
22      A.   Well, that would make sense
23  because like I said, our websites only
24  collected ZIP and e-mail.

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 29

1    Q.   And hold on.  Bear with me for
2  a second here.  Would it surprise you if
3  you were still paying for those services in
4  July of 2015?
5    A.   Definitely not.
6    Q.   You don't think you would have
7  been paying for that service in July?
8    A.   No, I do not.
9    Q.   Can you just tell us what ZIP
10  submits are?
11    A.   Figure you go to a web page.
12  You know how web pages have a form on them.
13  It would say, enter your ZIP code.  You
14  enter your ZIP code.  That's a ZIP submit.
15    Q.   So what's the service that
16  you're paying for?
17    A.   The lead.
18    Q.   So this is --
19    A.   The ZIP was considered a lead.
20    Q.   Okay.  So this is where they're
21  not entering it on a website that you own;
22  they're entering it on a different website;
23  is that fair?
24    A.   No, no, no, no.  They would

---

Page 30

1  send the traffic to our website.
2    Q.   Can you kind of break that down
3  for us and explain how that works?
4    A.   So in affiliate marketing, I'm
5  trying to put this into the easiest to
6  understand terms.  So give me a second to
7  think about it.  So Revenue Ads is an
8  affiliate network.  They have a list of
9  people, affiliates, what they call, that
10  they work with.  They give their affiliates
11  campaigns to run.  How their affiliates run
12  their campaigns is based off of the
13  approved traffic sources that the
14  advertiser, which would have been me at
15  that point, would allow.  So say, no
16  incentivized traffic, no e-mail traffic, or
17  you know, et cetera.
18        They would put, the affiliate
19  would put the banner ad or whatever on
20  their website, and when someone clicks on
21  it, it would get redirected to our website.
22  And when a lead was submitted, a tracking
23  pixel would have been fired, and that would
24  have triggered a lead in my system and

---

Page 31

1  Revenue Ads' system.
2    Q.   Okay.  When that happens, are
3  they still physically entering information
4  on your website?
5    A.   Just the form that we have on
6  our website on, that we, on page one, which
7  would be the ZIP code and e-mail submit.
8  That's where, or some pages actually just
9  had ZIP submit like you were saying.
10  That's where the pixel would fire.  We then
11  would hope that they would go to page two
12  and fill out the form, where All Web Leads
13  and Leadnomics were paying us.  That's
14  where we were making the money, however, it
15  never really worked out and that's why we
16  paused.
17    Q.   Okay.  How would they navigate
18  from page one to page two, what happens?
19  Would they enter --
20    A.   Enter your ZIP.  On this
21  particular I guess one that you're
22  mentioning here, I guess enter your ZIP
23  code and press submit.
24    Q.   So if they pressed submit, that

---

Page 32

1  takes them to page two?
2    A.   That's correct.
3    Q.   Then they have the option of
4  entering additional information?
5    A.   That's correct, which is not
6  hosted by us.
7    Q.   Right.  So if they entered it
8  there, would you ever see that data entered
9  on page two?
10    A.   No.
11    Q.   So if this is a ZIP only form
12  on page one, you wouldn't even ever see the
13  e-mail; is that correct?
14    A.   That's correct.
15    Q.   Do you know if you searched the
16  Snappy database by ZIP code?
17    A.   I mean, if I searched it by ZIP
18  code, I'm going to get probably, you know,
19  god knows how many leads from back in the
20  day from that ZIP code.  That's not going
21  to do anything.
22    Q.   But just for the purposes of my
23  question, do you know if the Snappy
24  database was searched by Mr. Mantha's ZIP

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 33

1  code?
2      A.   I don't believe so.  We only
3  searched by the e-mail address because that
4  would have been a lot more targeted.
5      Q.   Do you know if Snappy was a ZIP
6  only page one web form?
7      A.   I do not believe so because I
8  have the screenshots of the web page here,
9  and it's an e-mail and ZIP.  Actually I
10 mean, the screenshots only show a ZIP
11 submit, but I know for a fact after you
12 entered the ZIP code, the e-mail address
13 field would pop up.  So I know for a fact
14 that that was an e-mail and ZIP page.
15     Q.   You're talking about page one
16 in the Snappy website?
17     A.   That's correct.
18     Q.   So I thought you said when you
19 enter it on page one, you get taken to page
20 two.  Is that not correct?
21     A.   That is correct.  So like I
22 said, on Snappy, it's still page one before
23 the form.  But think about, like, so you
24 enter your ZIP code.  And then it's still

Page 34

1  on the landing page, but the form quickly
2  changes.  You guys might want to consider
3  it page two, but I consider it still page
4  one because the page never changed.  But
5  enter your ZIP code, and then where it said
6  enter your ZIP code, that changes to enter
7  your e-mail address.  You enter your e-mail
8  address.  You press submit.  Then it takes
9  you to a physical new page, where that
10 iframe code was on.
11     Q.   You said you know for a fact
12 that Snappy was both a ZIP code and e-mail
13 page one of that form; is that correct?
14     A.   That is correct.
15     Q.   How are you so sure about that?
16     A.   Because 99.9 percent of our
17 websites were always like that.  We only
18 did the ZIP submit on a certain, on certain
19 cases.
20     Q.   Do you have any documents to
21 show that that was also true for Snappy?
22     A.   I don't know.
23     Q.   So is it fair to say, it's an
24 assumption you're making based on your

Page 35

1  practice?
2      A.   That's correct.
3      Q.   I just want to go back to, so I
4  understand a ZIP submit.  Was there any
5  type of marketing that you did, where a
6  lead would come to you already submitted,
7  and by you, I'm talking about Snappy Auto
8  Insurance right now?
9      A.   What kind of leads?  Like a
10 full lead, like with their name, their
11 e-mail, their phone, and everything like
12 that?
13     Q.   Well, you tell me.  So we
14 talked about how a customer --
15     A.   We were pretty much an e-mail
16 generation company.  So we were only really
17 generating e-mail.  That was the only form
18 of contact information that we would store.
19     Q.   I think I understand that
20 portion of it, but I'm just talking about
21 how you even get to that ZIP code and
22 e-mail to begin with.  So a consumer could
23 have navigated to Snappy Auto Insurance
24 organically, right?  That's one way?

Page 36

1      A.   I mean, I guess.  But to be
2  honest with you, we've never driven any
3  organic traffic.  It was all affiliate
4  traffic.  That doesn't mean that I guess
5  somehow online, you can find the website.
6  I mean, sure.  I'm not going to say that
7  that could not have happened.
8      Q.   Another way would have been
9  through affiliate marketing, where I think
10 you described as an example someone clicked
11 on a banner on another website, and it
12 redirects to Snappy; is that right?
13     A.   That is correct.
14     Q.   Is it also possible that the
15 leads were being generated on another
16 website in terms of a consumer already
17 entered their ZIP code and e-mail, and
18 possibly other information somewhere else,
19 and then that was given to Snappy?
20     A.   No.
21          MR. BRODERICK:  Objection.
22     A.   We never operated that way.
23     Q.   How do you know that for sure?
24     A.   Because that's not how we ever

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 37

1  did anything. I know that. Our system, we
2  always were at that point when we were
3  doing the auto insurance and affiliate
4  network. So an affiliate network, we gave
5  out a unique link to each of our
6  affiliates, and that's the link that they
7  used to send the traffic to the website.
8      Q.  Do you know how many affiliates
9  you had for Snappy?
10     A.  I don't recall. I don't even
11 have access to CAKE Marketing, or what was
12 the other one we used? HasOffers is the
13 other tracking software we used.
14     Q.  What was the other one?
15     A.  CAKE Marketing, like a birthday
16 cake.
17     Q.  What did those companies do?
18     A.  They are an affiliate marketing
19 software company. So basically they have
20 the, what we call the affiliate network.
21 We pay them monthly to have our branded
22 copy of their software, and this is where
23 our affiliates come in, and this is where
24 they pull their campaigns, they check their

---

Page 38

1  stats, and all that.
2      Q.  Okay. When's the last time you
3  paid them in connection with Snappy Auto
4  Insurance?
5      A.  Well, it wouldn't necessarily
6  be just for Snappy. This would have been
7  every single campaign that we were running.
8  But let's see. When I stopped doing that
9  as full-time, but the auto insurance
10 stopped roughly in 2009, so it would have
11 stopped roughly around when that article
12 was written, which was when the merger
13 happened. That would have roughly stopped
14 around 2008 -- I'm sorry. 2015 era. And
15 then at that time, we switched over to the
16 surveys and sweeps.
17     Q.  Sorry. Did you say 2018?
18     A.  I didn't mean that. I didn't
19 mean that. I corrected myself. I said, I
20 meant '15.
21     Q.  And you just described it as a
22 merger. Are you talking about the deal
23 with Affiliate Crossing?
24     A.  That's correct. Like I said,

---

Page 39

1  that was the time we pretty much stopped
2  doing auto insurance.
3      Q.  But when you described it as a
4  merger, do you now have part ownership
5  stake in this company, Affiliate Crossing?
6      A.  No. As you can see in the
7  article that I will be sending you, it was
8  actually a purchase. They paid $12,000 for
9  the assets.
10     Q.  So it wasn't a traditional
11 merger. You're just saying that they
12 bought kind of knowledge --
13     A.  That is absolutely correct.
14     Q.  Okay. And who owns Affiliate
15 Crossing?
16     A.  His name is Ricky, and his last
17 name is spelled, it's like, really I can't
18 really pronounce it too well. It's
19 spelled, A-H-U-J-A.
20     Q.  Is he based in Florida?
21     A.  No. I think if I'm not
22 mistaken, Virginia.
23     Q.  Is it a Virginia company, do
24 you know?

---

Page 40

1      A.  Doesn't say. Nah. I don't
2  recall.
3      Q.  Do you still do business with
4  him or Affiliate --
5      A.  No.
6      Q.  - Crossing? Was this the only
7  deal you've ever done with him?
8      A.  Like I said earlier, he used to
9  be one of my affiliates. So he was running
10 traffic for me for a while, and then he
11 decided he'd like to purchase.
12     Q.  Was he an affiliate for Snappy
13 Auto Insurance?
14     A.  He was.
15     Q.  Was that individually, or
16 through this company, Affiliate Crossing?
17     A.  Through the company.
18     Q.  Do you know if Affiliate
19 Crossing has any other officers or members?
20     A.  At this point, I have no clue.
21     Q.  What about at that time?
22     A.  They had a guy named Chris.
23     Q.  Do you recall his last name?
24     A.  No, I do not.

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 41

1    Q.   At the time of the sale, was
2  there any discussion at all about what
3  would happen to the websites, like Snappy
4  Auto Insurance?
5    A.   I don't recall.  It could be
6  listed in this agreement that I would send
7  you, but I haven't read it in a long time.
8    Q.   Okay.  So we'll circle back on
9  that when I have a copy.  All right.  I
10  kind of want to go take a step back and
11  talk about some basics about the website.
12  So GoDaddy indicated the website, Snappy
13  Auto Insurance, was created around
14  September of 2013.  Does that sound about
15  accurate?
16    A.   That sounds about right.
17    Q.   Were you the only one involved
18  in creating it?
19    A.   At that point, I was doing some
20  business with Blueflame.  We had partnered
21  up on a lot of our auto insurance stuff.
22    Q.   Is that Blueflame Web Marketing
23  LLC?
24    A.   That's correct.

---

Page 42

1    Q.   There's also a Blueflame Elite?
2    A.   Well, that's real old.
3    Q.   Is that your company?
4    A.   No.  That's Justin Cohen's.
5  Well, actually I don't even know if he
6  actually owned that to be honest with you.
7  I don't even know.
8    Q.   Do you know if it was
9  associated with Blueflame Web Marketing?
10    A.   So I don't recall.
11    Q.   What do you recall about
12  Blueflame Elite?
13    A.   Let's see.  So Blueflame Elite
14  if I'm not mistaken was ran by Weet
15  (phonetic) Smart Interactive out of South
16  Carolina, if I'm not mistaken.
17    Q.   You don't think it was owned by
18  Justin Cohen, as well, even though they're
19  both Blueflame?
20    A.   He very well might have.  I
21  know like I said, I know I worked with
22  Justin at Blueflame Marketing with, we
23  partnered up on a lot of the auto insurance
24  sites.  But I worked for Blueflame Elite

---

Page 43

1  back in the day, and I don't recall Justin
2  ever being, like, an owner of that.
3    Q.   So you worked for Blueflame
4  Elite?
5    A.   Yeah.
6    Q.   What did you do with them?
7    A.   I was an affiliate manager.
8    Q.   What does that mean?
9    A.   Meaning, I was the guy that was
10  going out and looking for the affiliates to
11  run our campaigns.
12    Q.   Did Blueflame Elite have
13  anything to do with Snappy Auto Insurance?
14    A.   I, no.  I don't recall.  I
15  think this is before that ever started.
16    Q.   So do you mean that you don't
17  remember that Blueflame Elite had any
18  connection to Snappy?
19    A.   That's correct.
20    Q.   So Blueflame --
21    A.   We're talking years ago.
22    Q.   So Blueflame Web Marketing was
23  also involved in some respect with Snappy
24  Auto Insurance?

---

Page 44

1    A.   I don't think so.
2    Q.   I thought that you --
3    A.   Did you say Elite, or
4  Marketing.
5    Q.   Marketing?
6    A.   Yes, yes.  Marketing was.
7    Q.   Okay.  Can you just kind of
8  generally describe to me what your role was
9  versus Blueflame Web Marketing with respect
10  to Snappy?
11    A.   We were even partners.
12    Q.   Was that set forth in a
13  contract or agreement?
14    A.   No.
15    Q.   Would you say that you were
16  kind of half and half owners?
17    A.   Yeah.  During that time.
18    Q.   Are you talking about the time
19  it was created?
20    A.   Yes.
21    Q.   So we're talking 2013?
22    A.   Mm-hmm.
23    Q.   And would you say that you half
24  owned this website individually, or on

---

Page 45

1  behalf of a company?
2      A.   Well, at that point, my company
3  was Author Vision and Justin had Blueflame.
4  And we necessarily weren't like legal
5  partners or anything like that, but we
6  basically just split.  We did everything
7  50/50.
8      Q.   And I assume at some point,
9  some money was being made off of leads that
10  came through the site?
11     A.   If anything was, if any money
12  was generated off of that website, me and
13  Justin split it.
14     Q.   Split 50/50?
15     A.   Yes.
16     Q.   But you don't think there was
17  any written agreement about that?
18     A.   Not that I know of.
19     Q.   You two are kind of long-term
20  friends; is that --
21     A.   That's correct.
22     Q.   Who built the website?
23     A.   Again we used at that time, it
24  was Elance.  Now it's called Upwork.  We've

Page 46

1  used designers pretty much on there to do
2  it.  We just kind of find someone that's
3  cheap that, you know, has good past work,
4  and that's who we hired.
5      Q.   Was their role just --
6      A.   Just as a designer.  Project by
7  project.  Not by staff.
8      Q.   So this would have happened in
9  2013.  Do you know that if they had any
10  further work on the site besides then?
11     A.   Definitely not.
12     Q.   They didn't do any periodic
13  maintenance or anything like that?
14     A.   No.
15     Q.   If the site needed some
16  maintenance work, who did you call or who
17  did you engage?
18     A.   We had our tech.
19     Q.   Who would that be?
20     A.   I don't recall if our current
21  tech was still working for us then, but so
22  I couldn't give you an actual name.
23     Q.   Is that the person you
24  mentioned earlier?

Page 47

1      A.   Yes.  The Kapeo.
2      Q.   Do you know his last name --
3      A.   But like I said, I don't
4  remember if he was still working for us at
5  that time.
6      Q.   Do you know Kapeo's last name?
7      A.   I don't.
8      Q.   Do you know where he's based
9  out of?
10     A.   He's in India.
11     Q.   How do you communicate with
12  him?
13     A.   Skype.
14     Q.   Do you ever communicate with
15  him over e-mail?
16     A.   No.
17     Q.   You've never communicated with
18  him over e-mail?
19     A.   I'd have to double check.  It's
20  mostly through Skype.  I send him
21  everything over Skype.  There might be some
22  e-mail.
23     Q.   For tech team, is that it, or
24  is there someone else?

Page 48

1      A.   He's the only person we've been
2  using lately.
3      Q.   Do you recall who you used
4  before him?
5      A.   I don't.  Like, remember I just
6  told you, I'm not 100 percent sure if he
7  was still with us at that point or if, I
8  don't remember.
9      Q.   So I guess one thing I'm
10  wondering.  If you're not sure when he
11  became involved, would he even have all the
12  information and documents on the database
13  for Snappy?
14     A.   Well, he has access to the
15  database, so.
16     Q.   But, so I thought you said that
17  he created the database?
18     A.   What's that?
19     Q.   I thought you said that he
20  created the database?
21     A.   He might have.  I don't
22  remember if he was involved with us during
23  the beginning.  I know that he worked
24  everything out and fixed a bunch of stuff

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 49

1  in your system, and redesigned it,
2  redesigned everything.
3      Q.   But if there was someone before
4  him, would he have been given what they had
5  at the time?  I mean, do you have any
6  knowledge of that?
7      A.   I don't remember.
8      Q.   All right.  So you and
9  Mr. Cohen created this website in 2013.  I
10 think you said you were kind of 50/50 on
11 it, but you paid for it, right?
12     A.   It was in my GoDaddy account.
13 Yes.
14     Q.   Do you know why the decision
15 was made for you to pay for it?
16     A.   I just probably went in there
17 and started looking for a domain to buy,
18 and it was available.  So I probably just
19 purchased it.
20     Q.   Did Mr. Cohen --
21     A.   I know the database side is on
22 his side.
23     Q.   The database side?
24     A.   Mm-hmm.

Page 50

1      Q.   What do you mean?
2      A.   He pays for I believe the
3  database.  I don't know what, I do not know
4  where that's hosted.
5      Q.   So you're not sure if it's a
6  cloud or something like that?
7      A.   Yeah.  I don't know.  Yeah.  I
8  know he has the database on his end.
9      Q.   Let me ask you this.  What else
10 is in the database besides
11 snappyautoinsurance.com records?
12     A.   I mean, we would have for any
13 URL that we have a database for.  So
14 obviously our survey sites, our sweepstakes
15 site.  Some of the older, you know, auto
16 insurance sites are probably still in
17 there.
18     Q.   Is it true that he's always
19 been kind of in control of the database?
20     A.   He's always paid for that.
21 Yes.
22     Q.   Do you know if he has access to
23 it?
24     A.   I don't know.

Page 51

1      Q.   If you had a question about the
2  database, would you ask him, or would you
3  ask Kapeo --
4      A.   I would ask my tech.
5      Q.   Did Mr. Cohen ever reimburse
6  you for any of the GoDaddy expenses for
7  Snappy?
8      A.   We've always just split
9  revenues and profits.  So whoever had
10 expenses that, you know, was yes, that was
11 paid back.
12     Q.   So how would you split that?
13 Would you take --
14     A.   On the end of the month,
15 whatever profit came in and whatever the
16 cost was, we deducted the cost to the
17 profit and divided it evenly.
18     Q.   In terms of recordkeeping for
19 profit and cost for these websites, how do
20 you keep those records?
21     A.   Well, back then, it was very
22 easy because we had the affiliated network.
23 The affiliated network showed you your
24 costs and showed you your revenue.

Page 52

1  Everything was tracked in there.  The only
2  cost that was not was obviously, you know,
3  servers and this and that.  So whoever paid
4  for that at that time, I don't recall who
5  was paying for what, got paid back for
6  their costs.
7      Q.   Okay.  Just to back up.  So
8  what I understand, the affiliated network
9  provides the leads to your website in terms
10 of --
11     A.   Well, it doesn't provide the
12 leads.  It just provides the tracking
13 software.
14     Q.   So it directs people to the
15 Snappy website; is that accurate?
16     A.   No.
17     Q.   Okay.
18     A.   So affiliate marketing is so
19 hard to explain.  The tracking software
20 that we used, just say CAKE Marketing is
21 one.  They just provided a platform for you
22 to use.  Here, you enter all your
23 campaigns, get your affiliates to sign up.
24 The affiliates pick up the campaign from

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 53

1  the system.  They run it on their websites.
2  All the tracking software is going to do is
3  just generate a lead and tracking.  It's
4  not going to store any information.  All it
5  does is it tracks the actions, the clicks,
6  the conversions, the cells, et cetera.  The
7  database is what stores the data.  Hope
8  that answered your question.
9      Q.   Sort of.  So, but on a kind of
10  larger level from what I understand, you're
11  paying the affiliates to drive traffic and
12  by --
13     A.   We pay the affiliates for every
14  conversion that was generated.  So on this
15  case, I guess you were mentioning a ZIP
16  submit.  If they entered their ZIP and it
17  was a valid ZIP because we had validations
18  in place, then the tracking pixel from the
19  affiliate network would fire, and that
20  would trigger the affiliate system to show
21  the lead.
22     Q.   What were the validation
23  systems that you had in place?  Was that
24  Xverify?

---

Page 54

1      A.   I think we did work with them.
2  I'm not 100 percent sure if it was them the
3  whole entire time, but I believe we did
4  work with them at one point.
5      Q.   Do you recall any other
6  validation services you used?
7      A.   I don't remember.  We're
8  talking years ago.
9      Q.   Do you remember how that worked
10  in terms of validating the ZIP codes?
11     A.   I'm assuming that they had a
12  list of every valid ZIP, and I'm assuming
13  that when a lead was entered in our
14  website, it would validate through their
15  system real quick.  And then if it was
16  valid, it would continue.  If not, then
17  maybe the tracking pixel wouldn't fire and
18  the lead wouldn't count.
19     Q.   Do you have any reference about
20  that, or would that be with a company?
21     A.   That would have to be with that
22  company.
23     Q.   So I think I generally
24  understand how you generated traffic, and I

---

Page 55

1  get that if a lead was converted, you're
2  then paying the affiliates.  But the
3  missing link is, who are you selling the
4  leads to?
5      A.   Like I told you, the only form
6  of selling the lead was through Leadnomics
7  or All Web Leads.  Those were the only two
8  companies that we worked with.
9      Q.   So they would have purchased
10  every single --
11     A.   It's not even that.  So
12  basically like I said, our website
13  collected either ZIP submit or e-mail and
14  ZIP.  At that point once that was formed
15  and submitted, it goes to page two.  At
16  page two, they had iframe.  The iframe was
17  the full form auto insurance lead.  That
18  was either hosted by Leadnomics or All Web
19  Leads.  So one of those two companies was
20  getting the lead.
21     Q.   Right.  So did you have a
22  contract in place with those companies?
23     A.   We had an affiliate agreement.
24  Like, basically, like, our affiliates would

---

Page 56

1  sign up for our affiliate network.  We
2  would do the same thing with their
3  affiliate network.
4      Q.   Do you have copies of those
5  agreements --
6      A.   I do not.
7      Q.   Do you know anyone who would
8  have a copy of that?
9      A.   Those two companies would.
10     Q.   You're not sure which one you
11  used for Snappy?
12     A.   I mean, we rotated.  So we
13  probably had both of them on there at one
14  point.
15     Q.   What was the per lead purchase
16  price, do you recall?
17     A.   I do not remember.  Those kind
18  of things do go up and down.
19     Q.   How did they pay you?
20     A.   Either check or a bank wire.
21     Q.   Do you recall the last time
22  that they paid you?
23     A.   No, I do not.
24     Q.   Is there a way for you to find

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 57

1  out the last time they paid you in
2  connection with any of your auto insurance
3  sites?
4      A.   I mean, you can contact them I
5  guess.  They might know.
6      Q.   I know, but right now we're
7  just talking about your records?
8      A.   I don't have anything.  I don't
9  even have Author Vision's bank account
10 anymore.
11     Q.   So Author Vision had a separate
12 account?
13     A.   Yup.
14     Q.   Do you know what bank?
15     A.   I don't recall.  I know.  I do
16 know.  It was Citibank.
17     Q.   When did you close that
18 account?
19     A.   I don't remember.  It had to
20 have been somewhere around that timeframe
21 of the merger in, like, 2015.
22     Q.   Did either Leadnomics or All
23 Web Leads ever pay you individually?
24     A.   To me, personally?

Page 58

1      Q.   Mm-hmm.
2      A.   No.
3      Q.   What about Justin Cohen?
4      A.   I couldn't answer.
5      Q.   Okay.  But --
6      A.   I don't know how he had his
7  thing set up on finances.
8      Q.   But just for Snappy, if they're
9  paying you for the leads that they're
10 purchasing, who do you recall as getting
11 paid for that?
12     A.   I mean, it could have been
13 either one of our companies at that point.
14     Q.   Do you still use either
15 company?
16     A.   No, I definitely do not.
17     Q.   Why is that?
18     A.   Because we don't do anything in
19 the auto insurance base or insurance at
20 all.
21     Q.   Do they just do work in that
22 area?
23     A.   Last time I heard, I knew that
24 they did.  Yes.

Page 59

1      Q.   So if a consumer was on Snappy
2  Auto Insurance and they got to page two,
3  they enter that information, I think you
4  said that you wouldn't know any of that
5  information that was entered, right?
6      A.   That's correct.  That goes
7  strictly straight, that form is hosted, and
8  the leads go straight into their database.
9  Either Leadnomics or All Web Leads.
10     Q.   You talked about earlier when a
11 lead's converted, does that just mean when
12 a consumer fills out that page two?
13     A.   When we get paid, you're
14 saying?  When we got paid for that?
15     Q.   Sure.
16     A.   Yes.  It would have to get,
17 fill out page two, and it would have to be
18 valid.
19     Q.   So assuming those two things at
20 that point, the lead's converted?
21     A.   That's correct.
22     Q.   How did you find out that a
23 lead was converted?
24     A.   The same exact way as our

Page 60

1  affiliates would.  We had what was called a
2  tracking pixel from either Leadnomics or
3  All Web Leads on our page two.  So that way
4  on their system, we can log in just like
5  our affiliates would do in our system, and
6  they would see the lead like we would see
7  the lead in their system.
8      Q.   When you say log on, do you
9  mean to an account that you had with them?
10     A.   That is correct.  We had a
11 login to both of their systems.
12     Q.   Do you still have access to
13 those systems?
14     A.   I highly doubt it.
15     Q.   Why is that you doubt it?
16     A.   Because it's been over, what,
17 five years, six years.  They usually close
18 accounts when they're inactive for over a
19 year.
20     Q.   And --
21     A.   And I wouldn't even know what
22 my username or password was anymore because
23 I don't even have Author Vision's e-mails
24 anymore.

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 61

1    Q.    What happened to Author
2  Vision's e-mails?
3      A.    I deleted the inbox on my
4  computer when the company closed.
5      Q.    What timeframe was that?  Let's
6  just put it this way.  Was it the time that
7  you sold Affiliate Crossing?
8      A.    Roughly about that same time,
9  yes.
10     Q.    So Mr. Brown, I understand that
11  the leads were sold to Leadnomics and All
12  Web Leads, but was there ever a time for
13  Snappy that you were selling the leads to
14  anyone else?
15     A.    No.
16     Q.    But only would have been those
17  two companies?
18     A.    That's correct.
19     Q.    At the time when you were
20  running the website, who had access to it?
21     A.    The website?
22     Q.    Yeah.  Let's take a step back.
23  It's hosted on GoDaddy, right?
24     A.    The website was, yes.

---

Page 62

1    Q.    So you had a login to access
2  the website.  Is that fair to say?
3      A.    You mean like a login on
4  GoDaddy?
5      Q.    Right.
6      A.    Yeah.  Yes.
7      Q.    So if you wanted to change
8  something on the website, would you go
9  through the GoDaddy website?
10     A.    I couldn't answer.  I don't
11  know because like I told you, our tech
12  pretty much did all the changes at that
13  point.  The website was developed, made
14  from the designer on Upwork.  Well, back
15  then, Elance.  Our tech took care of
16  everything.
17     Q.    So you would have provided the
18  GoDaddy login to those people?
19     A.    Only to my tech.
20     Q.    So you're not sure who the tech
21  was at the time, right?  Did you hear my
22  question?
23     A.    Yes, yes.  Did you hear my
24  answer?

---

Page 63

1    Q.    I didn't.
2      A.    Okay.  I'm sorry.  I said yes.
3  I don't recall if Kapeo was working with us
4  back then.  But if he was, then he would
5  have been the one.
6      Q.    Do you have an e-mail address
7  for him?
8      A.    I can take a look for you.
9  Yeah.
10     Q.    We'll do that during the next
11  break.  Do you know if you ever logged onto
12  Snappy Auto Insurance?
13     A.    Like the website?
14     Q.    Right.
15     A.    Yeah.  I used to go on the
16  website all the time to check things out.
17     Q.    So do you mean visit the
18  website, like type it into a URL, or do you
19  mean actually like log on as kind of the
20  webmaster?
21     A.    I never was a webmaster.  I
22  don't know any of that kind of stuff.
23     Q.    Is that a term that's used in
24  the industry, webmaster?

---

Page 64

1      A.    I guess.  Yeah.  I've heard it
2  before.
3      Q.    What's your understanding of
4  what that means?
5      A.    I guess the person that makes
6  the changes.
7      Q.    Was your tech guy the
8  webmaster?
9      A.    Yes.
10     Q.    Was that true for the entire
11  time that you owned the website?
12     A.    I couldn't answer if it was the
13  whole entire time.  I told you that before.
14     Q.    You mean, because you don't
15  know who it was at the time; is that --
16     A.    Correct.
17     Q.    But it either would have been
18  your old tech guy or Kapeo, right?
19     A.    That's right.
20     Q.    Was there anyone else who would
21  have been the webmaster for Snappy?
22     A.    I don't think so.
23     Q.    You don't think so?
24     A.    Yes.

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 65

1    Q.   Mr. Brown, if you need to take
2  a break, I'm happy to accommodate you.
3  Otherwise, I do need you to pay attention.
4    A.   Sorry.  I'm still running a
5  business here, too.  So.
6    Q.   I understand, but kind of the
7  quicker we can get through this, the
8  quicker I get you out of here.  So besides
9  your tech guy, would anyone else have
10  access to the website?
11    A.   No.
12    Q.   Do you know if Mr. Cohen ever
13  accessed it?
14    A.   I can't answer for someone.  I
15  don't know.
16    Q.   Just from your personal
17  knowledge?
18    A.   I don't know.
19    Q.   You paid for Snappy Auto
20  Insurance on GoDaddy through 2020, that's
21  correct?
22    A.   What's that?
23    Q.   You paid for the domain name,
24  snappyautoinsurance.com, through 2020; is

Page 66

1  that right?
2    A.   That's, I believe so.  I
3  cancelled it when I guess I got this
4  notification because I didn't even know
5  that the site was still active.  I know
6  there was no traffic driven to it because I
7  haven't paid for anything in over five, six
8  years for it.  But I didn't even know it
9  was still on GoDaddy.
10    Q.   So when you say you didn't pay
11  for it, do you mean the affiliate network
12  services?
13    A.   Say that again.
14    Q.   You said that you haven't paid
15  for it in a couple years, I think was your
16  testimony.  So I'm asking, what do you mean
17  by that?  Do you mean the affiliate network
18  services?
19    A.   Yes.  We haven't paid for any
20  sort of traffic related, I guess other than
21  keeping the domain alive.  And I didn't
22  even know the domain was alive.
23    Q.   So despite the fact that you
24  were paying for it, you weren't aware that

Page 67

1  it was still active in the GoDaddy --
2    A.   Yeah.  I own a lot of different
3  websites.  I mean, I don't keep track of
4  them all because as long as I'm not, if I'm
5  not using them, it's in my account.  If I
6  ever decide to use it again, it's there.
7    Q.   When was the first time you
8  became aware of this lawsuit?
9    A.   When the letter came in the
10  mail.  I don't remember the date.
11    Q.   Do you mean the subpoena?
12    A.   Yes.
13    Q.   What did you do when you got
14  that?
15    A.   Originally I thought it was a
16  cease and desist.
17    Q.   But did you speak to anyone
18  when you got that?
19    A.   No.
20    Q.   You didn't speak to a single
21  person when you got the subpoena?
22    A.   I mean, I spoke to Justin
23  because his name was on it to see if he
24  received anything.

Page 68

1    Q.   What did you two speak about?
2    A.   About this, and we both thought
3  I guess it was a cease and desist.  So we
4  removed the website, and that was it.  And
5  told you guys it was offline and had no
6  information.
7    Q.   When did you remove the
8  website?
9    A.   I guess it was the date that
10  you just mentioned.  I don't have the
11  physical date here.  Actually I might.
12  Let's see.  Let's see here.  Screenshot.
13  It looks like according to my tech here
14  screenshot, well.  Actually the screenshot
15  that I took last night from GoDaddy.  Not
16  from him.  4/17/2000 was when the website
17  went down, and 2015 looks like was the last
18  even change on the website.
19    Q.   You're referring to screenshots
20  from GoDaddy?
21    A.   Mm-hmm.
22    Q.   So we're definitely going to
23  need to see copies of that.  I think you
24  said 4/17/2000.  You meant 2020, right?

Page 69

1      A.   Yes.
2      Q.   How did you go about taking the
3   website down?
4      A.   I went, logged onto GoDaddy and
5   deleted the URL.
6      Q.   Did you access the website
7   itself, or were you just on your GoDaddy
8   account?
9      A.   I went on my GoDaddy account.
10     Q.   So you weren't accessing the
11  website itself?
12     A.   I don't know what you mean by
13  that.
14     Q.   So your GoDaddy account is
15  separate from logging onto the website
16  itself to make changes, right?
17     A.   Okay.  I don't know.  Again I'm
18  not, I don't know tech stuff, so.
19     Q.   Okay.  So we talked about
20  earlier, someone built the website and put
21  all the terms on it that we see, right?
22     A.   Yes.
23     Q.   To do that, you have to be able
24  to log on to some site to modify it, right?

Page 70

1      A.   I guess so.
2      Q.   If I understand your testimony,
3   you've never logged onto that website to
4   access it and make modifications?
5      A.   That's correct.
6      Q.   When you took the website down,
7   that's not what you did.  You're saying
8   that you logged onto your GoDaddy account;
9   is that right?
10     A.   I logged into GoDaddy.  I went
11  into my URLs.  I selected the URL.  I
12  clicked beneath.
13     Q.   Did you take any other actions
14  at the time?
15     A.   No.
16     Q.   For Snappy when you were
17  running it, there would have been some type
18  of TCPA consent or opt-in language,
19  correct?
20          MR. BRODERICK:  Objection.
21     A.   Say that again.
22     Q.   When you ran Snappy, on one of
23  the web forms or both, there would have
24  been some type of TCPA consent or opt-in

Page 71

1   language, correct?
2          MR. BRODERICK:  Objection.
3      A.   I mean, there was definitely
4   opt-in for in the privacy policies for the
5   e-mail, but TCPA, we wouldn't need that
6   because we weren't collecting phone.
7      Q.   But what about on page two?
8      A.   That wasn't us.  That wasn't
9   hosted by us.
10     Q.   So that's what I'm getting at.
11  So if there was language, that would have
12  been on the page two web form; is that
13  accurate?
14          MR. BRODERICK:  Objection.
15     A.   It would have to be their
16  responsibility, yes.
17          MR. BRODERICK:  Christine?
18          MS. KINGSTON:  Yeah.
19          MR. BRODERICK:  Sorry to
20     interrupt.  Just when you get a
21     chance, I could use a really quick
22     break.
23          MS. KINGSTON:  Sure.  Yeah.
24     All right.  We'll take a 10-minute

Page 72

1   break.
2          (Whereupon, a short recess was
3      taken.)
4      Q.   So Mr. Brown, we're back on the
5   record.  You testified earlier that I think
6   I understood your testimony to be that you
7   had logged onto the GoDaddy website to
8   check when it was last used.  Do you recall
9   testifying to that?
10     A.   Yes.  And I guess I was looking
11  at the database, not GoDaddy.
12     Q.   Did the database reflect when
13  you last used Snappy?
14     A.   So, yeah.  Let me open that
15  screenshot, as well.  Screenshot number
16  two.  As you can see, there hasn't been any
17  changes prior to, I mean, there was one.  I
18  don't know what this change was here in
19  2019, but other than that, any changes
20  regarding the actual website itself,
21  anything with the last one was in 2015.
22  The ones that you see on 17/4/2020 were
23  the, that's the day that the website was
24  terminated.

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 73

1    Q.   Are you talking about a
2  screenshot labeled, manager two?
3    A.   No.  Screenshot two.
4    Q.   I don't think that you've given
5  us that.  We just have lead one, manager
6  two, and manager?
7    A.   Let's see what I sent here.  If
8  I didn't, I will send it to you right now.
9    Q.   Okay.  Thank you.
10   A.   You should have it any second.
11      MS. KINGSTON:  Okay.  So I'm
12   going to go ahead and mark all 18
13   exhibits now, and then, Hannah, I'm
14   not sure if you have those.  But if
15   not, then I'll e-mail them to you
16   directly.  Once I get this
17   screenshot, I'll mark that as Exhibit
18   19.
19      MR. BRODERICK:  Can you e-mail
20   me those, as well?  Just maybe do
21   they pick up on the Cohen ones?
22      MS. KINGSTON:  No.  These are
23   all --
24      THE WITNESS:  My wife just got

---

Page 74

1  home, so I'm just texting her,
2  telling her I'm on this call.
3      MS. KINGSTON:  Ted, you got one
4  e-mail this morning from my
5  assistant, or you should have.
6      MR. BRODERICK:  I got it.
7  There it is.  Sorry.
8      (Whereupon, a screenshot was
9  marked as Brown Exhibit 19 for
10  identification as of this date by the
11  Reporter.)
12      MS. KINGSTON:  So what I'm
13  going to do is we'll make this
14  screenshot Exhibit 19, and Hannah,
15  I'll make sure I e-mail you a copy.
16  And I'm going to screen share it.
17      THE WITNESS:  All right.  That
18  way, a four-year-old and my wife
19  won't come near and bug us.
20   Q.   It's not wanting to screen
21  share a picture, which is typical.  I'm
22  going to mark that Exhibit 19, which is a
23  screenshot you just sent me.
24   A.   You want me to try to do it?

---

Page 75

1    Q.   I'm sorry?
2    A.   You want me to try to do it?
3    Q.   No.  That's all right.  You can
4  just refer to it because you have it, and I
5  sent that to Ted, as well.  So let me know
6  if you have that in front of you.
7    A.   I have the document in front of
8  me.  I'm just trying to figure out how to
9  get back to the video here.  Here we go.
10   Q.   So we're looking at what I've
11  marked as Exhibit 19.  This is a screenshot
12  that you just e-mailed to me.  Can you just
13  kind of describe what we're looking at
14  here?
15   A.   Yup.  From my knowledge, you
16  can see the dates that, pages on the
17  website were modified.  Showing that there
18  hasn't been any changes related to
19  modifying the website at all since 2015.
20  The only dates on here from 2020 were the
21  dates that we removed the website from the
22  online.
23   Q.   Okay.  So was this sent to you
24  by your tech guy?

---

Page 76

1    A.   I actually e-mailed.  Well, not
2  e-mailed.  I'm sorry.  I Skyped Justin for
3  the records because remember I told you, he
4  has database records.
5    Q.   When was that, that you Skyped?
6    A.   I believe it was yesterday
7  getting ready documents for you.
8    Q.   So this is a screenshot that he
9  took of the database?
10   A.   That's correct.
11   Q.   Did he explain any of this to
12  you of what we're looking at?
13   A.   Yeah.  I just told you what he
14  told me about this screenshot.  That's what
15  I have records of.
16   Q.   So your understanding and your
17  explanation is coming directly from
18  Mr. Cohen?
19   A.   Yup.
20   Q.   Besides this screenshot, did he
21  send you anything else?
22   A.   I got the screenshot of,
23  wherever did my screenshots go?  All the
24  screenshots that I actually sent you were

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 77

1  from him.  So the two managers that we
2  looked up those two companies.  Quotewizard
3  and Fenix, we did not show those in the
4  database.  The lead one was the e-mail
5  address of the person in question I guess,
6  of the lead that was generated.  That shows
7  that we do not have that e-mail in our
8  database.  And I believe that I also sent,
9  well.  That's what he sent me.  And then I
10  sent you, as well, the buyout agreement.
11      Q.   So it was my understanding that
12  those screenshots had come from your tech
13  guy in India.  Is that not correct?
14      A.   No.
15      Q.   So they came from Mr. Cohen?
16      A.   Yup.  If he got them from the
17  tech guy, I can't answer that.
18      Q.   Do you know if he ran the
19  searches?
20      A.   I asked Justin because he has
21  the, he pays for the database.  So I asked
22  him for if we had some screenshots that I
23  can show.
24      Q.   So you're not --

---

Page 78

1      A.   He most likely got them from
2  our programmer because I don't believe
3  Justin knows any tech stuff either.
4      Q.   When you say the programmer,
5  you mean the tech guy in India?
6      A.   That's correct.
7      Q.   What are these files we're
8  looking at, do you know?  So for example,
9  there's one that says quotes.  There's one
10  that says step two.  Do you know what those
11  are?
12      A.   On which screenshot are we
13  looking at right now?
14      Q.   We're looking at Exhibit 19,
15  which is the most recent one you sent me,
16  screen --
17      A.   So I don't know what these are.
18  I'm assuming that they're pages on the
19  website maybe.  So step two would be where
20  the iframe was.  Terms is the terms and
21  conditions.  The privacy policy.  The index
22  file is usually where the landing page is.
23  So I'm assuming they're just different
24  parts of the website.  I don't know.  I'm

---

Page 79

1  not a web developer.
2      Q.   Okay.  So since Mr. Cohen was
3  able to access what we're looking at, it's
4  fair to say he would be able to click on
5  those documents, correct?
6      A.   Unless he got it from our tech.
7      Q.   Did he tell you that he got it
8  from your tech guy?
9      A.   No.  I just asked if he had any
10  documents that he can pull up.  He said
11  he'll look.  So I'm assuming he probably
12  got it from our tech.
13      Q.   You said when you took this
14  site down that you deleted the URL on
15  GoDaddy; is that right?
16      A.   I did do that, as well.
17      Q.   What else did you do?
18      A.   That's all I did.
19      Q.   So what I'm trying to
20  understand is, why are there documents here
21  dated in July 4th, 2020 if no changes to
22  the website were made at that time?
23      A.   Like I told you, those were the
24  dates that the website went down.

---

Page 80

1      Q.   Well, I understand that.  But
2  you said that the actions you took to take
3  the website down was to simply delete the
4  URL from the GoDaddy account; is that --
5      A.   That's what I did.
6      Q.   Did anyone else do anything
7  else to take the website down?
8      A.   I mean, Justin might have
9  reached out to our programmer and asked him
10  to do stuff, as well.  This is what I was
11  under the knowledge of, that those were the
12  dates that the changes were done to remove
13  the website, other than me deleting the
14  domain name from GoDaddy.
15      MR. BRODERICK:  Christina, I
16  don't see anything on this document
17  from July, 2020, if that was your
18  question.
19      MS. KINGSTON:  That's right.
20  For the record, it looks like I was
21  transposing it.  So it's actually
22  April, it looks like 17th, 2020.
23      MR. BRODERICK:  Right.
24      Q.   Okay.  So Mr. Brown, looking at

---

Page 81

1  this, this certainly seems to reflect that
2  someone modified something on the website
3  at that time, correct?
4       MR. BRODERICK:  Objection.
5       A.   I'm under the impression that
6  this was to remove the website.
7       Q.   When you say under the
8  impression, do you --
9       A.   That's what I was told, that
10 the changes from 2020 were to remove the
11 website.
12      Q.   Who told you that?
13      A.   That's what Justin has
14 mentioned that the tech has said to us.
15      Q.   Did someone ask the tech to do
16 this?
17      MR. BRODERICK:  Objection.
18      A.   Again I'm assuming that Justin
19 had asked the tech to do this.
20      Q.   Well, I'm just at this point
21 asking about what you know.  So did at any
22 point Justin tell you, I'm going to ask the
23 tech to do something on the website?
24      A.   I do not recall that.

Page 82

1       Q.   You don't recall a conversation
2  with Mr. Cohen about this?
3       A.   Not him saying that, no.
4       Q.   What do you recall was the
5  conversation?
6       A.   I asked Justin if we have any
7  documentation to show that we have removed
8  the website, or proved that we had not made
9  any changes prior, and this is what they
10 sent me.
11      Q.   That was the conversation you
12 had yesterday?
13      A.   Yesterday, and the day before.
14 Something like that.  Yes.
15      Q.   But before then, have you
16 spoken with Mr. Cohen about the website
17 being taken down?
18      A.   Other than the day that I
19 deleted the domain.
20      Q.   So you told Mr. Cohen, you were
21 going to be deleting the domain, correct?
22      A.   Yes.
23      Q.   Did you two discuss doing
24 anything else besides that to take the

Page 83

1  website down?
2       A.   Not that I know of.
3       Q.   So you had no knowledge of
4  whatever changes we're looking at
5  happening?
6       MR. BRODERICK:  Objection.
7       A.   Again like when I told him I
8  was taking the website down, he probably as
9  well made these changes, as well, or had
10 the programmer make these changes.  All
11 I'm --
12      Q.   Did you --
13      A.   That's all I know.
14      Q.   Did you ask him to make these
15 changes?
16      MR. BRODERICK:  Objection.
17      A.   I, we both agreed that we need
18 to take the website down.
19      Q.   Why was that?
20      A.   Because you guys obviously sent
21 us an issue with the site, which we weren't
22 even running the website at the time.  So
23 like I told you prior, I didn't even know
24 the website was still active.

Page 84

1       Q.   Do you know who was running it
2  in 2019?
3       MR. BRODERICK:  Objection.
4       A.   As far as my impression, no one
5  was because this site was inactive.
6       Q.   When you say inactive, what do
7  you mean?
8       A.   We weren't driving any traffic
9  to the website.
10      Q.   Was it possible that someone
11 else was?
12      MR. BRODERICK:  Objection.
13      A.   If there was, I had no
14 knowledge of it.
15      Q.   I'm just trying to understand.
16 Looking at Exhibit 19, there's five files
17 from 2020.  Do you see that?
18      A.   Yes.
19      Q.   And that certainly seems to
20 indicate to me, but correct me if I'm
21 wrong, that there were changes made to
22 those files relative to that website at
23 that time?
24      MR. BRODERICK:  Objection.

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 85

1    A.   Under my impression, those were
2  the dates that the website was changed to
3  get removed.
4    Q.   But if you deleted the URL, why
5  would these files need to be changed?
6    A.   I don't know.  I'm not a tech
7  person.
8    Q.   Who would know that?
9    A.   I guess my programmer.
10    Q.   Would Mr. Cohen know?
11    A.   Possibly.
12    Q.   I'm also seeing there's one
13  file from it looks like December 15th of
14  2019.  Do you see that?
15    A.   I do.  I don't know what that
16  is.
17    Q.   Did you ask Mr. Cohen about
18  that?
19    A.   I did not.
20    Q.   Have you ever spoken to
21  Mr. Cohen about it?
22    A.   I did not.
23    Q.   Have you spoken to anyone about
24  it?

---

Page 86

1    A.   I did not.
2    Q.   Are you surprised to see that
3  there is a file with that date?
4    MR. BRODERICK:  Objection.
5    MS. KINGSTON:  Ted, are these
6  form objections?
7    MR. BRODERICK:  Yeah.  You're
8  asking him for a question, which he
9  has no foundation to answer about a
10  document --
11    MS. KINGSTON:  That's not a
12  form question.  That's not a form
13  objection, I mean.
14    MR. BRODERICK:  I'm not sure
15  about that.
16    MS. KINGSTON:  It isn't.
17  That's an evidentiary basis.  Getting
18  back to my question.  Actually,
19  Hannah, could you tell me what the
20  question was?
21    (Whereupon, the referred to
22  question was read back by the
23  Reporter.)
24    Q.   Mr. Brown, my question was, are

---

Page 87

1  you surprised to see that there was a file
2  dated in December, 2019?
3    A.   I am because like I said, we
4  haven't used the website since 2015.
5    Q.   I mean, but certainly does this
6  not indicate that someone used it in 2019?
7    A.   I don't know.  I'm not a tech
8  person.  I don't know what these are.  I
9  can tell they're folders for the website.
10  That's about it.
11    Q.   Have you ever accessed this
12  database directly?
13    A.   No.
14    Q.   Is this the first time you're
15  even seeing a screenshot of it?
16    A.   Yes.
17    Q.   When you made the sale to
18  Affiliate Crossing, how come you didn't
19  take Snappy down at that time?
20    A.   I don't remember.
21    Q.   Was there any reason why you
22  would have kept paying for it?
23    A.   I don't remember.  Like I said,
24  I didn't even know that I still even had

---

Page 88

1  the website at that, when you guys sent
2  that letter.  So I thought I might have
3  even removed it a long time ago.
4    Q.   Do you remember if your GoDaddy
5  account that you were paying in bulk for
6  certain domains during certain time
7  periods, do you remember that?
8    MR. BRODERICK:  Objection.
9    A.   I don't remember what settings
10  I had in my GoDaddy account.
11    Q.   Just trying to understand your
12  testimony.  So when you received a copy of
13  the subpoena in this case, that's when you
14  decided to take down Snappy Auto Insurance;
15  is that right?
16    A.   That's when I realized that the
17  site domain was still in my account.  Yes.
18    Q.   Why was the decision made to
19  take it offline at that point?
20    A.   Well, one, why would I pay for
21  a URL that I'm not using anymore?  That's
22  number one.  And number two, obviously, you
23  know.  I mean, I thought this was a cease
24  and desist when that letter came.  So we

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 89

1  removed this website.
2      Q.   So do you understand that the
3  lead that was sold to my client, the lead
4  information indicates that it came from
5  snappyautoinsurance.com --
6      A.   I mean, it's fully impossible
7  that that happened because first of all, we
8  never even collected e-mail.  I mean, we
9  never collected anything more than e-mail
10 and ZIP.  And two, we haven't generated any
11 traffic to the website since at least 2015.
12 So that's impossible.
13     Q.   Okay.  But regarding the first
14 thing you mentioned, I think you've
15 testified at length that on page two, the
16 web form did collect that type of
17 information; is that --
18     A.   We never hosted that
19 information.
20     Q.   Okay.  I understand that, but
21 so you're saying if someone entered
22 information on page one of Snappy --
23     A.   That information, we hosted.
24 So that information, our database keeps.

Page 90

1  On page two, our database does not keep
2  that information because it doesn't even go
3  into our system at all.
4      Q.   I understand that, but if you
5  just let me finish my question before you
6  begin answering for the benefit of the
7  Court Reporter.  What I'm trying to figure
8  out is, if a consumer goes to
9  snappyautoinsurance.com and enters their
10 information on page one, and then continues
11 to page two and enters their information,
12 you're saying that that lead is not
13 considered to come from Snappy?
14     MR. BRODERICK:  Objection.
15     A.   In theory, no, it doesn't
16 because it's an iframe that's on our web
17 page.  At that point, it is the
18 advertiser's system that is recording that
19 lead not ours.
20     Q.   Have you ever seen how that
21 information is sold?
22     A.   No.  It's not in my system.  I
23 don't know.
24     Q.   But what I'm getting at is,

Page 91

1  would you have any knowledge of how a
2  downstream purchaser would see that
3  information about whether it would indicate
4  if it comes from Snappy?
5      MR. BRODERICK:  Objection.
6      A.   I wouldn't even know what
7  you're technically talking about.
8      Q.   So when a lead is generated on
9  snappyautoinsurance.com, it's sold to --
10     A.   Okay.
11     Q.   -- either Leadnomics or All Web
12 Leads, correct?
13     A.   Correct.
14     Q.   Then they can sell it
15 downstream to other companies, correct?
16     A.   I guess if that's their
17 business model, yeah.
18     Q.   By the time they sell it, do
19 you know one way or the other if they're
20 indicating this lead came from
21 snappyautoinsurance.com?
22     MR. BRODERICK:  Objection.
23     A.   After it leaves the e-mail and
24 ZIP page, no, I don't.  It's basically,

Page 92

1  it's all on their system at that point.  I
2  have no visible...
3      Q.   Okay.  So what I'm trying to
4  get at is, if they're selling a lead that
5  started from snappyautoinsurance.com,
6  meaning a consumer enters the information
7  on page one, it's certainly possible that
8  if they sell that lead, it's going to
9  indicate snappyautoinsurance.com, correct?
10     MR. BRODERICK:  Objection.
11     A.   I have no clue.  I don't know
12 how their system works.  I can only tell
13 you my site, not someone else's system or
14 company.
15     Q.   I'm going to attempt to screen
16 share what's been marked as Exhibit 16.
17 Hopefully I can do it correctly.  Can you
18 see it all right?
19     A.   Yeah, I see it.
20     Q.   Do you recognize this?
21     A.   I don't recall this, no.
22     Q.   So I'll just represent to you
23 that this is a copy of a complaint that was
24 filed by LeadVision Media, LLC, D/B/A,

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 93

1 Revenue Ads. I think you mentioned that
2 you've done work with Revenue Ads before,
3 correct?
4     A. I mean, a long time ago.
5 Probably, like, around 2015. Maybe even
6 later.
7     Q. So this is a complaint that
8 they filed against Seal Dog Media LLC,
9 which is your company, correct?
10     A. It is.
11     Q. Is that still your current
12 company?
13     A. It is.
14     Q. Are you the sole officer?
15     A. Me and my wife.
16     Q. So just going to go down. The
17 substance of the complaint isn't relevant
18 to us. Just going to go down to, there's
19 invoices attached. And it looks like these
20 are invoices from Revenue Ads to various
21 companies. So just looking at the first
22 one, can you see that all right, or do you
23 want me to zoom in?
24     A. I see it.

---

Page 94

1     Q. It's an invoice dated May 4th
2 2015, and it's billed to Seal Dog Media --
3     A. I can tell you Seal Dog Media I
4 don't even believe was in business then.
5 So that can't be Seal Dog. It would have
6 to be either Author Vision or Affiliate
7 Crossing at that time.
8     Q. So you don't think Seal Dog was
9 in business in May of 2015?
10     A. Let's see. Nope. No, I don't.
11 It was not.
12     Q. So it's also billed to Author
13 Vision, and it says, quote, then Affiliate
14 Crossing now is Seal Dog Media. Do you see
15 that?
16     A. I mean, I, like I told you.
17 Yeah, I see it. And like I mentioned to
18 you and I sent you the documents, Author
19 Vision was sold to Affiliate Crossing.
20 Seal Dog Media has nothing do with either
21 one of those companies.
22     Q. This invoice seems to be
23 treating Affiliate Crossing as a successor
24 of Author Vision. Do you see that?

---

Page 95

1     A. I see how it's written, yes.
2 But I mean, I'm, it's not associated to,
3 Seal Dog's not associated to any of those
4 companies.
5     Q. So I understand that you think
6 Seal Dog is not associated, but just
7 between Author Vision and Affiliate
8 Crossing, this company's billing, it says
9 Author Vision, then Affiliate Crossing.
10 That indicates to me that they think that
11 Affiliate Crossing took on Author Vision's
12 contractual --
13         MR. BRODERICK: Objection.
14     Q. -- obligations. Do you agree
15 with that?
16         MR. BRODERICK: Objection.
17     A. I don't know. I'm not --
18     Q. So looking at this invoice, it
19 indicates for April of 2015 that someone
20 was paying for ZIP submits on
21 snappyautoinsurance.com. Do you see that?
22     A. Back in 2015. That's roughly
23 around, like, when I sold it. So I mean,
24 there could have been a couple little

---

Page 96

1 trickle things coming in back then, but
2 like I told you, it stopped around '15,
3 '16. Around that timeframe.
4     Q. So when was the last time that
5 you ran the website?
6     A. Some point back in 2015. No
7 later than 2016.
8     Q. So earlier you testified that
9 the sale to Affiliate Crossing was in April
10 of 2015 I believe, correct?
11     A. That's what I said. That's
12 probably why I said to you that I stopped
13 running the site around 2015. I mentioned
14 that many times.
15     Q. But now you're indicating that
16 it might have been --
17     A. I'm just trying to give you a
18 broad frame. I don't have exact dates.
19     Q. So it's possible that you were
20 still running it in --
21     A. I doubt it, but --
22     Q. -- 2015?
23     A. I mean, I doubt it, but I sold,
24 everything was stopped roughly around the

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 97

1 sale.
2 Q. Do you have any idea why
3 Revenue Ads would have billed Affiliate
4 Crossing for this?
5 MR. BRODERICK: Objection.
6 A. I do not know. I'm not Revenue
7 Ads.
8 Q. Did Affiliate Crossing pay for
9 any of these bills?
10 A. If they generated traffic with
11 them, I don't know.
12 Q. Do you know if Affiliate
13 Crossing contracted with Revenue Ads?
14 A. I do not know.
15 Q. Would they have contracted with
16 anyone for Snappy Auto Insurance?
17 MR. BRODERICK: Objection.
18 A. I mean, I don't know. I sold
19 them my affiliate list. So they had
20 everyone that I worked with.
21 Q. But in terms of Snappy Auto
22 Insurance, would they have been buying
23 services for that website?
24 MR. BRODERICK: Objection.

---

Page 98

1 A. I don't know.
2 Q. Do you have any specific memory
3 of that?
4 A. I don't.
5 Q. Is it possible that they were
6 purchasing services for Snappy Auto
7 Insurance?
8 MR. BRODERICK: Objection.
9 A. I don't know. After the sale
10 of the company, I was out of the picture.
11 Q. So I'm just trying to
12 understand whether you think it's possible
13 that Affiliate Crossing was generating any
14 money from Snappy Auto Insurance?
15 MR. BRODERICK: Objection.
16 A. I don't know. I stopped
17 running auto insurance after that sale.
18 Q. Your testimony earlier was that
19 they didn't purchase Snappy Auto Insurance
20 in the deal; is that right?
21 A. Correct. They purchased my
22 affiliates.
23 Q. But for what I'm --
24 A. And knowledge of where, you

---

Page 99

1 know, who I worked with on the back end and
2 sold the leads to, or use iframes from.
3 Q. What I'm understanding your
4 testimony is that you don't know one way or
5 the other whether they were using
6 snappyautoinsurance.com after the sale; is
7 that accurate?
8 A. I guess so.
9 Q. Okay. Would they have
10 knowledge of that?
11 MR. BRODERICK: Objection.
12 A. I don't know.
13 Q. Just going to go down to, this
14 is another looks like invoice from Revenue
15 Ads. This one's dated July, 2015, and it
16 says date span, June. Do you know what
17 Five Star Insurance Savings is?
18 A. That was another insurance
19 website.
20 Q. Did you stop running that at
21 the time of the sale?
22 A. All auto insurance websites
23 were stopped. The only thing that I
24 started up was my survey websites.

---

Page 100

1 Q. Including Snappy Surveys?
2 A. That is correct. That is my
3 property.
4 Q. Did you give up the right to
5 run Snappy Auto Insurance when you sold to
6 Affiliate Crossing?
7 A. What they purchased was my
8 knowledge of the auto insurance affiliate
9 space, my affiliates, where I've got the
10 iframes from and who I worked with.
11 Q. But my question was, did you
12 give up the right to run
13 snappyautoinsurance.com when you made the
14 sale?
15 A. I don't remember. All I
16 remember is what I just mentioned.
17 Q. So this invoice seems to
18 indicate that someone's paying for, well.
19 I'm not actually sure what is being
20 purchased, but purchasing something from
21 Revenue Ads for Five Star Insurance
22 Savings. Do you see that?
23 A. I do.
24 Q. Do you know if this was you, or

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 101

1   was this Affiliate Crossing because the
2   invoice is billed to both?
3         MR. BRODERICK:  Objection.
4         A.   I don't recall.  I could tell
5   you the Snappy Surveys is mine.
6         Q.   Does this indicate that you
7   were still using the insurance websites in
8   June of 2015?
9         MR. BRODERICK:  Objection.
10        A.   I did not have any insurance
11  traffic after the web sale.
12        Q.   That's April, 2015?
13        A.   That's correct.  Roughly, yes.
14        Q.   So with that in mind, the fact
15  that someone is paying for these services,
16  doesn't that indicate that someone is using
17  these websites?
18        MR. BRODERICK:  Objection.
19        A.   I don't know.
20        Q.   But your testimony that you
21  were not paying --
22        A.   I can answer about Snappy
23  Surveys.  That's all I can answer about.
24        Q.   But do you remember either way

Page 102

1   whether you were using the service for Five
2   Star Insurance Savings?
3         A.   I don't recall.  As far as my
4   knowledge, we stopped running auto
5   insurance back after the sale.
6         Q.   Would it surprise you if
7   Affiliate Crossing was using these
8   websites?
9         MR. BRODERICK:  Objection.
10        A.   I don't know.
11        Q.   You don't know.  What do you
12  mean by you don't know?
13        MR. BRODERICK:  Objection.
14        A.   I haven't touched auto
15  insurance since after the sale.  So I don't
16  know.
17        Q.   Do you know if you paid for a
18  single service related to your auto
19  insurance websites after April of 2015?
20        MR. BRODERICK:  Objection.
21        A.   The only thing that I would
22  ever pay for was I guess GoDaddy hosting.
23  Not even.  Not even GoDaddy hosting.  Well,
24  the domain names I guess.

Page 103

1         Q.   To your knowledge, you wouldn't
2   have been paying for any ZIP submits at
3   that time, right?
4         A.   That's correct.
5         Q.   But what I'm showing you
6   indicates that someone was paying for that
7   with respect to Snappy.  I mean, do you see
8   that?
9         MR. BRODERICK:  Objection.
10        A.   I do.
11        Q.   If it wasn't you, what I'm
12  trying to get at is, it must have been
13  Affiliate Crossing, correct?
14        MR. BRODERICK:  Objection.
15        A.   I don't know.
16        Q.   Are you surprised to see that
17  someone was paying for these services at
18  this time?
19        MR. BRODERICK:  Objection.
20        A.   I don't know.
21        Q.   Have you spoken with anyone at
22  Affiliate Crossing about the use of Snappy
23  Auto Insurance after April of 2015?
24        A.   I don't recall.

Page 104

1         Q.   You don't recall, meaning you
2   don't know if you had conversations with
3   them?
4         A.   Correct.
5         Q.   Have you had any conversations
6   with Affiliate Crossing or their officers,
7   employees since you got the subpoena in
8   this case?
9         A.   No.
10        Q.   When's the last time you spoke
11  with anyone there?
12        A.   Years ago.  Other than saying
13  hi at a trade show.
14        Q.   Do you recall this lawsuit --
15        A.   I don't remember.
16        Q.   -- and I'm referring to you
17  what's been premarked as Exhibit 16, or
18  marked.
19        A.   I don't recall that, no.  I
20  don't remember.
21        Q.   Just bear with me for a moment
22  while I stop sharing this.  I'm just going
23  to look at something before I share the
24  screen.  So a little bit earlier, you

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 105

1  e-mailed me a file entitled, screen two,
2  and we marked that as Exhibit 19.  Do you
3  have a screen one or any other files --
4      A.   I sent you what I was given.
5      Q.    So besides the screenshots
6  you've e-mailed me, you have none others?
7      A.   No.
8      Q.    So I just want to be clear
9  about that.  I have screen two, and I have
10  lead one, manager two, and manager.  And so
11  you don't have any others besides those?
12      A.   That's correct.
13      Q.    Just bear with me for one
14  moment here.  Do you run the website called
15  insuranceallstar.net?
16      A.   I don't know.  I don't
17  remember.
18      Q.    Did Affiliate Crossing buy
19  authorvision.com in that sale of 2015?
20      A.   No.  They bought the assets of
21  the knowledge of the affiliates, where I
22  get lead forms from, who I work with.
23      Q.    So I'm trying to understand
24  what came of Snappy after the sale to

Page 106

1  Affiliate Crossing --
2      A.   I don't know.  So as far as my
3  knowledge, we stopped running auto
4  insurance at, after that sale.  And we
5  moved over to Seal Dog Media, and started
6  the sweepstakes and surveys campaigns.
7      Q.    Has Seal Dog Media ever done
8  anything with insurance?
9      A.   No.
10      Q.    I know you've testified that
11  you have not been running Snappy Auto
12  Insurance since you think sometime in the
13  2015 timeframe, correct?
14      A.   That's correct.
15      Q.    And I think, correct me if I'm
16  wrong, that you actually think it wasn't
17  after April of 2015?
18      A.   If you're referring to
19  screenshot two, that's what I was told I
20  guess.  And I removed, deleted the domain
21  from GoDaddy, and I guess let you know when
22  I sent you that e-mail I guess, or when I
23  got the, your letter or e-mail, or
24  whatever.  However you originally first

Page 107

1  sent it.
2      Q.    So we just looked at, and I'm
3  happy to put it back up if you want to see
4  it, but Exhibit 16, which was the complaint
5  against Seal Dog?
6      A.   Right.
7      Q.    So what I'm trying to
8  understand is, if someone's paying for
9  services into the latter part of 2015
10  for --
11      A.   But that letter that you also
12  listed above also said Author Vision and
13  Affiliate Crossing.  So I don't know why
14  Seal Dog was being interacted into that
15  when it had nothing to do with that, other
16  than the Snappy Surveys that you saw on
17  that invoice.
18      Q.    So what I'm trying to
19  understand is, if you're not running it in
20  2015, someone's paying for services.  And I
21  understand you're saying it's not you, and
22  I understand that.  But I'm trying to
23  understand what you know about who was
24  running that.

Page 108

1      A.   So I don't know anything about
2  that.
3      Q.    To the best of your memory,
4  were there any conversations with Affiliate
5  Crossing about them running these insurance
6  websites?
7      A.   I mean, I don't recall, but I
8  can only imagine there probably were.
9      Q.    What do you mean by that?
10      A.   I mean, they were buying my
11  company at that point.  So I'm sure that
12  came into the conversations, but that was
13  never sold.
14      Q.    You mean, the websites
15  themselves?
16      A.   That's correct.
17      Q.    Have you ever done a deal where
18  you agree to continue hosting the website,
19  but someone buys the rights to the leads?
20      A.   Not that I'm aware of.
21      Q.    You've never done a deal like
22  that?
23          MR. BRODERICK:  Objection.
24      A.   Not that I recall.

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 109

1    Q.   Is it possible that you
2  continued to host this website and someone
3  else, like Affiliate Crossing, was still
4  generating, buying, and selling leads?
5       MR. BRODERICK:  Objection.
6    A.   I'm sure anything's possible.
7    Q.   I'm going to screenshot a
8  couple of exhibits here.  Have you ever
9  heard of someone named George Rios?
10   A.   No.
11   Q.   Have you ever heard of a
12  company called Plural Marketing?
13   A.   What marketing?
14   Q.   Plural?
15   A.   No.
16   Q.   What about Fenix, F-E-N-I-X,
17  Media?
18   A.   No.
19   Q.   What about a person named Dario
20  Osmancevic?
21   A.   No.
22   Q.   And what about Michael Berger,
23  B-E-R-G-E-R?
24   A.   No.

---

Page 110

1    Q.   I'm going to show you what's
2  been marked as Exhibit 12.  Can you see it
3  okay?
4    A.   Yup.
5    Q.   All right.  So this is an
6  e-mail, a copy of which we received in
7  discovery in this case.  It was provided by
8  George Rios of Plural Marketing, who was
9  one of the links in the chain, who
10  purchased this lead.  And this is an e-mail
11  from Dario Osmancevic to George Rios, dated
12  September 11th, 2019.  I can just represent
13  to you that this was in response to an
14  apparent request from Mr. Rios for
15  information concerning plaintiff's lead.
16  So if you look at it, you can see that it
17  says, original source lead generator,
18  snappyautoinsurance.com, and then it lists
19  your name.  Do you see that?
20   A.   I do see that.
21   Q.   This is a lead from 2019.
22  Okay.  Do you have any idea why your name
23  and snappyautoinsurance.com would be listed
24  here?

---

Page 111

1    A.   I have no clue.  Never worked
2  with this company before in my life.  Never
3  even heard of them.
4    Q.   Do you know how he would know
5  that you were the owner of the website?
6       MR. BRODERICK:  Objection.
7    A.   I don't know.
8    Q.   Are you surprised to see this?
9       MR. BRODERICK:  Objection.
10   A.   I'm very surprised.
11   Q.   Is this the first time you're
12  seeing this?
13   A.   This is.
14   Q.   Then going down, it's described
15  as applicant TCPA audit, and there's a
16  series of I guess data points.  Do you see
17  that?
18   A.   Yup.
19   Q.   Have you ever seen any of this
20  information before?
21   A.   Nope.  Like I told you, we
22  looked up this e-mail address in our
23  system, and we don't show it.
24   Q.   So you have no idea why this

---

Page 112

1  person is saying that you're the original
2  source lead generator?
3       MR. BRODERICK:  Objection.
4    A.   That's correct.
5    Q.   Would you still describe
6  yourself is as the owner of the site as of
7  2019 though?
8       MR. BRODERICK:  Objection.
9    A.   I mean, I own the domain.
10  That's about it.
11   Q.   I'm going to show you Exhibit
12  13.  Can you see that all right?
13   A.   Yeah.
14   Q.   All right.  So this is also an
15  e-mail we received during discovery.  Again
16  apparently from a person named Dario
17  Osmancevic to George Rios at Plural
18  Marketing.  He provides a screenshot of
19  Snappy Auto Insurance, and then he says, I
20  can most certainly say that Joe Mantha has
21  signed up on our website and filled up the
22  application in full by himself.  I am
23  webmaster of the site --
24   A.   I might need to contact him

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 113

1  because I don't know who that is.
2      Q.   Okay.  So if you --
3      A.   They're obviously responsible
4  for the site.
5      Q.   So would it be possible that
6  someone could be running this website
7  without your knowledge?
8          MR. BRODERICK:  Objection.
9      A.   Not that I know of.  I mean,
10  not, I can't answer that.
11     Q.   Would there be any way for you
12  to find out who's accessing or running the
13  website?
14         MR. BRODERICK:  Objection.
15     A.   I have no clue.
16     Q.   Would you be receiving any
17  updates, or data, or information if someone
18  were doing that?
19     A.   I don't know.
20     Q.   What type of information or
21  data were you receiving when you ran it?
22     A.   Say that again.
23     Q.   When you were running Snappy
24  Auto Insurance, what type of data or info

Page 114

1  were you receiving from the website?
2      A.   E-mail and ZIP code only.
3      Q.   No, no.  Let me ask a better
4  question.  Would you receive any periodic
5  updates from GoDaddy about the website?
6      A.   No.
7      Q.   If a lead was sold, would you
8  receive information about that?
9      A.   No.
10     Q.   Is there any way for you to
11  know whether someone was running this
12  website in 2019?
13         MR. BRODERICK:  Objection.
14     A.   I have no clue because I
15  wouldn't even know.  According to my
16  knowledge, the website was not even
17  running.
18     Q.   When you say that, do you mean
19  that's because you weren't running it?
20     A.   Right.  We stopped running
21  after the sale of all auto insurance
22  websites, put it to the side, killed all
23  the traffic, and moved onto my surveys and
24  sweepstakes.

Page 115

1      Q.   Are you surprised to see that
2  this person is describing himself as the
3  webmaster --
4          MR. BRODERICK:  Objection.
5      A.   I'm very surprised.
6      Q.   Is it possible that he actually
7  is the webmaster?
8          MR. BRODERICK:  Objection.
9      A.   I wouldn't know.
10     Q.   You set up the login, correct?
11     A.   For GoDaddy?
12     Q.   Yeah.  Right.
13     A.   Yeah.
14     Q.   Let me ask this.  To your
15  knowledge, is there a way to modify Snappy
16  without going through GoDaddy?
17     A.   I'm not a programmer.  I don't
18  know.
19     Q.   I can't recall the companies
20  you used to build the site, but when you
21  hired those companies, did you have to give
22  them your GoDaddy login?
23     A.   No.
24     Q.   So does that suggest to you

Page 116

1  then that there's a way to modify the site
2  without going into GoDaddy?
3          MR. BRODERICK:  Objection.
4      A.   I don't know.  I'm not a
5  programmer.
6      Q.   When you log into your GoDaddy
7  account, what type of information can you
8  see about the websites that you're running
9  and that you own?
10     A.   I mean, I don't really go in
11  there, but I can see the URLs that I own.
12  I can see the hosting accounts that I have,
13  and that's about it.
14     Q.   What are the hosting accounts?
15     A.   Just list to basic hosting,
16  which is where we host our live websites
17  on.
18     Q.   I'm sorry if I'm, you know,
19  ignorant on the topic.  I thought GoDaddy
20  was the host?
21     A.   Yeah.  They are my hosting
22  company.  We host our websites on GoDaddy.
23     Q.   So when you said when you log
24  in, you can see the URLs that you own?

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 117

1    A.   Correct.
2        Q.   And then you mentioned hosting
3    information.  So I'm not sure what that --
4        A.   I use two hosting accounts
5    through GoDaddy.  And again I'm not a
6    programmer.  So I can't really describe
7    this kind of stuff to you.  I mean, I don't
8    know all the technical and logical, and all
9    that kind of stuff.  I'm a marketer.  I
10   don't set up websites.  I don't create
11   websites.  I don't manage websites.  So I
12   just see two types of hosting accounts in
13   GoDaddy and my URLs.  That's all I can see.
14       Q.   When you say two hosting
15   accounts, do you mean that you literally
16   have two accounts with GoDaddy, or is this
17   something else?
18       A.   It's, I don't know how GoDaddy
19   classifies it.  I have one login with
20   GoDaddy, and I have two hosting accounts in
21   my GoDaddy account.
22       Q.   Do you know why you have two?
23       A.   I don't know.  I didn't set it
24   up that way.  I wasn't the one that's

---

Page 118

1    setting it up.
2        Q.   Who set it up?
3        A.   The person I hired, I must have
4    hired back in the day to help me.
5        Q.   This is the original tech
6    person we were speaking about?
7        A.   That's correct.
8        Q.   Is there a way for you to find
9    out who that person was?
10       A.   I don't know.
11       Q.   Do you have any e-mails,
12   invoices, payments that --
13       A.   Everything was done through
14   Elance.
15       Q.   Have you talked to Mr. Cohen
16   today?
17       A.   No.
18       Q.   Is the last conversation you
19   had with him about the screenshots?
20       A.   That's correct.
21       Q.   I'm going to show you what's
22   been marked as Exhibit 1.  Can you see that
23   all right?
24       A.   Yup.

---

Page 119

1        Q.   This is schedule A to the
2    subpoena that was issued to you, as you can
3    see.  So these are our document requests
4    that we sent to you.  So I'm just going to
5    go through them because the only documents
6    we have received are the documents you sent
7    today.
8        A.   Okay.
9        Q.   I just want to figure out if
10   you have anything else.  So request number
11   one, any and all documents concerning your
12   connection to Snappy in 2019?
13       A.   I wouldn't have any because I
14   didn't have any, other than owning the
15   domain.
16       Q.   Did you search any of your
17   records to determine that?
18       A.   Yes.  I don't have anything.
19       Q.   What did you search?
20       A.   I searched my computer.
21       Q.   Your hard drive, or do you have
22   a cloud?
23       A.   I searched e-mail for e-mails,
24   anything, any files that I had saved, and

---

Page 120

1    anything like that.  That's it.
2        Q.   What type of search terms did
3    you use?
4        A.   Snappy Auto Insurance.
5        Q.   No documents came up?
6        A.   Nope.
7        Q.   Going to number two, your
8    testimony is that Seal Dog Media has
9    nothing to do with Snappy Auto Insurance;
10   is that accurate?
11       A.   Other than owning the domain,
12   which I admitted that we did, yes.
13       Q.   But it's registered in your
14   individual name; isn't that right?
15       A.   If that's what my GoDaddy's
16   registered to, I don't know.  I mean, Seal
17   Dog itself is a totally different company
18   from the company that owned, that operated
19   auto insurance, which was Author Vision.  I
20   don't know what my GoDaddy account is
21   registered to.  I haven't looked.  I don't
22   know what e-mail or name my websites are
23   associated to.  I just reframe everything
24   as my company, so.

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 121

1    Q.    So at any point after receiving
2  the subpoena, have you logged into GoDaddy
3  to see what type of names or people are
4  connected to these websites?
5    A.    I wouldn't even know how to do
6  that.
7    Q.    All right.  But you do have
8  access to your tech guy; is that right?
9    A.    Yes.
10    Q.    Is that something that he could
11  do?
12    A.    Which he did.  But I sent you
13  the report showing that we searched for
14  that e-mail address, and nothing came up.
15    Q.    But I think you said that that
16  came from Mr. Cohen, correct?
17    A.    But that was the database of
18  the website.
19    Q.    I believe that that was
20  screenshots from your internal database,
21  correct?
22    A.    Right, but that shows that that
23  lead is not in our system.
24    Q.    Okay.  But right now I'm asking

---

Page 122

1  about the GoDaddy website?
2    A.    Okay.  What about the GoDaddy
3  website?
4    Q.    Since receiving the subpoena,
5  have you searched to determine whose name
6  or contact information is connected to
7  Snappy?
8    A.    I have not.
9    Q.    You said that Seal Dog Media's
10  name might be listed as the owner of
11  Snappy?
12    A.    It could.  It could be my
13  personal name.  I don't know.
14    Q.    But Seal Dog I think you said
15  was created in some time after mid 2015,
16  right?
17    A.    Correct.  I don't know what
18  names I have registered in my GoDaddy
19  account.  I haven't looked at that in
20  years, other than adding new websites or
21  whatnot.
22    Q.    Going down to request number
23  three, communications between you and
24  Justin Cohen.  Have you had any e-mail

---

Page 123

1  communications with Mr. Cohen about --
2    A.    No.  We talk on the phone.  We
3  talk on the phone or in person.
4    Q.    Just please let me finish the
5  question.  Any e-mail communications
6  between you and Mr. Cohen concerning this
7  lawsuit or snappyautoinsurance.com?
8    A.    No e-mails.  We talk on the
9  phone or in person.
10    Q.    What about text messages?
11    A.    No.  We talk in person or
12  actually on the phone.  No text.
13    Q.    What about Skype conversations,
14  are those recorded in your system?
15    A.    I don't think they are.
16    Q.    Number four and five, have you
17  searched for those documents?
18    A.    I mean, four, I don't have
19  anything.  And number five, I mentioned to
20  you, I have never even heard of that
21  company before prior to today.
22    Q.    You mentioned that you deleted
23  Author Vision's e-mails; is that correct?
24    A.    Yes.

---

Page 124

1    Q.    You have a copy of the contract
2  with Author Vision and is it Affiliated,
3  their name's escaping me.  Affiliated...
4    A.    Crossing.
5    Q.    Affiliate Crossing.  Is there a
6  place where you keep files like that for
7  Author Vision?
8    A.    I have a folder, yes, on my
9  computer.
10    Q.    Does anything else in that
11  folder relate to Snappy?
12    A.    Let's see.  Go to documents.  I
13  don't think so, but I will check.  Author
14  Vision.  2013 business report.  Independent
15  contractor.  Nope.  Nothing.
16    Q.    Okay.  Do all the documents
17  relate to the sale?
18    A.    I have a sale.  I have an offer
19  letter from 2014.  October 30, 2014.
20  October 8th, 2014, I have an offer letter.
21  I have my nondisclosure agreement.  My
22  noncompete.  Folder for hiring any
23  contractors.  I have a list of my
24  publishers.  I have a list of advertisers.

---

Page 125

1  Nope.  Nothing regarding Snappy.
2      Q.   When you say you have a list of
3  publishers and advertisers, none of those
4  documents relate to Snappy?
5      A.   No, because it won't say
6  anything.  They're just going to show the
7  publisher's name and contact information.
8  Those are people that were driving traffic
9  or signed up to drive traffic at one point
10  or another.
11      Q.   You know, because I'd also like
12  to see copies of those.  And I'm happy to
13  explain why, but I think those are
14  relevant, as well.
15      A.   Okay.  I mean, it's not going
16  to show anything though.
17      Q.   All right.  Getting back to the
18  request.  Number six, any and all
19  communications between you and plaintiff's
20  attorneys.  You had some e-mails with the
21  plaintiff's attorneys in this case,
22  correct?
23      A.   I have no idea who I'm replying
24  to when I reply to these e-mails.  I just

Page 126

1  reply when I get one.
2      Q.   Did you have any communications
3  with any attorneys in this case before the
4  subpoena was issued?
5      A.   No.
6      Q.   So that was kind of your first
7  tip off that there was a lawsuit?
8      A.   Yes.
9      Q.   Number seven, screenshots of
10  TCPA disclosures.  I think you testified
11  earlier that any type of opt-in language
12  would have been on page two of Snappy; is
13  that accurate?
14      MR. BRODERICK:  Objection.
15      A.   Hold on.  I'm trying to find
16  the screen here.  I just have a little box
17  on my screen here.
18      Q.   Okay.
19      A.   I have no idea how to open this
20  to be big again.  Here we go.  I can do it
21  this way.  Sorry.
22      Q.   That's all right.
23      A.   How do I make this full screen
24  again?  All right.  I guess I'm not able to

Page 127

1  make this full screen anymore.
2      Q.   I can read you the request if
3  you can't see all right.
4      A.   Okay.  Hold on.  There's got to
5  be a way to do this.
6      MS. KINGSTON:  Ted, can you see
7      this okay?  Is it big enough?
8      MR. BRODERICK:  I can, but I
9      was looking at a different screen
10      with the request.  But, yeah.  I can
11      see it on the screen share.
12      A.   Let me try it here.  Zoom.
13  Give me one minute.  I'm sorry.
14      Q.   It's all right.
15      A.   Okay.  I got it.  That's
16  better.
17      Q.   I'm looking at number seven,
18  screenshots of TCPA disclosures on
19  snappyautoinsurance.com.  Your testimony
20  earlier I think was that any type of TCPA
21  language or opt-in would have been on page
22  two of Snappy, correct?
23      MR. BRODERICK:  Objection.
24      A.   Regarding phone, yes.  I would

Page 128

1  think so.  Not my area because that wasn't
2  our form.
3      Q.   And a lead couldn't be
4  converted unless a consumer completed both
5  web forms, right, on page one and two?
6      A.   Say that again.
7      Q.   So a lead couldn't be generated
8  or converted, however you want to describe
9  it, unless a consumer signed up on both of
10  the two pages, correct?
11      MR. BRODERICK:  Objection.
12      A.   I don't know to be honest with
13  you what you're asking here.  Are you
14  asking for the, with the lead for the full
15  information, or are you asking about the
16  lead that we capture?
17      Q.   Well, if a consumer only signs
18  up on page one and --
19      A.   We only record the e-mail and
20  ZIP code.
21      Q.   Right.  I understand that.  I'm
22  asking a different question.  If a consumer
23  only completes on page one and they never
24  get to page two, is the lead considered

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 129

1  generated at that point, or is that a
2  failed lead?
3        MR. BRODERICK:  Objection.
4     A.   A failed lead.
5     Q.   So it's not considered
6  generated at that point?
7     A.   Correct.
8     Q.   So any of this TCPA language or
9  opt-in would have been on page two operated
10  by Leadnomics or All Web Leads?
11        MR. BRODERICK:  Objection.
12     A.   Correct.
13     Q.   Have you ever run a website
14  where you had that type of information on
15  page one, or is it always on the page two?
16        MR. BRODERICK:  Objection.
17     A.   The only form of privacy policy
18  we ever had would be in our privacy policy
19  page, and that was regarding e-mail
20  marketing.
21     Q.   Who drafted the privacy policy
22  for Snappy?
23     A.   I don't recall.
24     Q.   Do you know who drafted the

Page 130

1  terms of use?
2     A.   I don't recall.  It was
3  probably copied from my other website.
4     Q.   There was an opt-out listed and
5  address given for Arbor Oaks.  That was
6  your address at that time, correct?
7     A.   Yeah.  I lived at, that was an
8  apartment of mine.
9     Q.   Do you remember if you got any
10  opt-outs for Snappy?
11     A.   Opt-outs?
12     Q.   Right.
13     A.   I'm sure we did.  We have
14  obviously all tooken (sic) care of it.
15     Q.   Do you know where those would
16  be stored?  Do you have copies --
17     A.   No.  I have no clue.
18     Q.   Number eight is documents in
19  your possession that refer or relate to Joe
20  Mantha part or Joseph Mantha, and then his
21  cell phone and e-mail.  So I think your
22  testimony was that you searched by e-mail
23  in the database, where Snappy's records are
24  kept?

Page 131

1     A.   That's correct.  There was no
2  records for that e-mail address in my
3  system.
4     Q.   I'm just trying to understand.
5  You didn't search that.  It was either
6  Mr. Cohen or your tech guy, correct?
7     A.   Correct.
8     Q.   You don't think that the name
9  or cell phone number was searched?
10     A.   Well, we don't have any way of
11  searching for cell phone number or phone
12  number.  We don't even collect that.
13     Q.   I'm just trying to understand
14  what types of searches were done.  Okay.
15  Number nine is communications with any
16  third party.  Have you had any written
17  communications with anyone else concerning
18  this lawsuit?
19     A.   No.
20     Q.   So we've talked about, you've
21  had communications with the plaintiff's
22  attorney.  Certainly with me.  You've
23  talked to Mr. Cohen on the phone or in
24  person.  Besides that, have you spoken to

Page 132

1  anybody else in this case?
2     A.   No.
3     Q.   Have you spoken to your tech
4  guy at any point?
5     A.   Not regarding this, no.
6     Q.   Number 10, any documents in
7  your possession that relate to who paid for
8  or operated Snappy in 2019.  Do you have
9  any documents concerning that?
10     A.   No, I do not.
11     Q.   Is there any way for you to
12  tell from the GoDaddy website?
13     A.   Not per URL.  They just charge.
14  They don't say what URL they're billing
15  for.
16     Q.   What about number 11?
17     A.   The only thing that I have is
18  the record I'm showing you that we do not
19  have that e-mail address in our system.
20     Q.   Number 12, this relates to the
21  website being taken down.  So I know you've
22  given me that one screenshot, screen two.
23  Do you have anything else?
24     A.   I do not.

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 133

1     Q.    My understanding is that your
2  search was talking to Mr. Cohen about that,
3  correct?
4     A.    Yes.
5     Q.    Mr. Cohen told you that either
6  he or your tech guy screenshotted the
7  database?
8     A.    Correct.
9     Q.    Okay.  Request number 13, all
10  screenshots of internet web pages a
11  consumer could access in 2019.  Do you see
12  that?
13     A.    Which number are we?  I'm
14  sorry.
15     Q.    Thirteen.
16     A.    I thought you said 14.
17     Q.    No.  Yeah.  Thirteen.
18     A.    All screenshots of internet web
19  pages a consumer could access on Snappy.
20  Are you asking if I have any?
21     Q.    Yeah.  So I actually have a
22  specific question in mind.  Remember we
23  were looking at screen two, the screenshot
24  that was provided to you by Mr. Cohen?

Page 134

1     A.    Yes.
2     Q.    There were certain documents
3  listed?
4     A.    Yes.
5     Q.    Who could give me copies of
6  those documents?  Who has access to those?
7          MR. BRODERICK:  Objection.
8     A.    I'm not sure.  I'd have to find
9  out.
10     Q.    Do you have access?
11     A.    I do not, no.
12     Q.    Could you get it through your
13  tech guy?
14     A.    I can ask.
15     Q.    Mr. Cohen might have access to
16  those?
17     A.    Possibly.
18     Q.    Number 14 relates to Jornaya.
19  Did you ever use Jornaya on your insurance
20  website?
21     A.    Nope.  Because I don't even
22  believe they were around when we were
23  running traffic, and the laws and
24  everything like that were much different

Page 135

1  back then.
2     Q.    So you testified that you might
3  have been using Xverify, correct?
4     A.    Xverify I know we definitely
5  used at one point.
6     Q.    Do you know if Leadnomics or
7  All Web Leads was using any type of
8  authentication?
9     A.    I don't know.
10     Q.    Did you have any protection
11  contractually if someone came back and said
12  there was a fraudulent consent created on
13  page two of Snappy?
14          MR. BRODERICK:  Objection.
15     A.    What are you asking me?
16     Q.    So we spoke about earlier how
17  Leadnomics and All Web Leads basically
18  operated page two of Snappy, right?
19     A.    Yes.
20     Q.    You're not sure if they had any
21  type of authentication software that they
22  were running?
23     A.    Right, I have no clue how they
24  operate their company.

Page 136

1     Q.    And what would happen if
2  someone came back and said, I didn't enter
3  my consent on page two of Snappy like
4  you're saying I did?
5          MR. BRODERICK:  Objection.
6     A.    I don't know.  I don't know how
7  they would handle that.
8     Q.    Did you have any contractual
9  protection from a scenario like that?  Was
10  All Web Leads or Leadnomics required to
11  indemnify you if that happened?
12          MR. BRODERICK:  Objection.
13     A.    I don't know.
14     Q.    Was that a concern that
15  something could be fraudulently created on
16  page two of Snappy?
17     A.    Not that I recall.
18     Q.    Request number 15, your
19  testimony is that you did not sell
20  plaintiff's lead to Fenix Media Solutions;
21  is that --
22     A.    That's correct.
23     Q.    You never heard of Fenix Media
24  Solutions?

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 137

1    A.   Never.
2    Q.   What about 16, have you ever
3  had conversations with Plural Marketing?
4    A.   Never even heard of that
5  company before.
6    Q.   What about number 17, RevPoint?
7    A.   RevPoint, that was which one
8  again?  You said they had another name.
9    Q.   No.  I don't think RevPoint
10  operated under any other name.
11    A.   Okay.  No.  That one, I don't
12  know.
13    Q.   When's the last time you that
14  you sold or you were involved in selling
15  insurance leads?
16    A.   Back in 2015.
17    Q.   How many websites did you
18  effectively stop using at that time?
19    A.   Probably around five.
20    Q.   Do you remember the other ones?
21    A.   Not offhand.  I'd have to look.
22    Q.   Would that be in your files
23  somewhere?
24    A.   I mean, it might be somewhere.

Page 138

1  I'm not sure.
2    Q.   What about invoices for
3  services that you paid for on Snappy, would
4  those be stored anywhere?
5    A.   I definitely don't have any of
6  those anymore.
7    Q.   At what point did you stop
8  possessing those?
9    A.   When I got rid of Author
10  Vision, I got rid of the e-mail addresses
11  on my computer.
12    Q.   What's the current corporate
13  status of Author Vision?
14    A.   Inactive.
15    Q.   Is that some action that you
16  took, or it just fell into that status, do
17  you know?
18    A.   I dissolved the company.
19    Q.   At that point, all your
20  operations were moved into Seal Dog?
21    A.   That's correct.
22    Q.   Does Seal Dog have any DBAs?
23    A.   No.
24    Q.   Did it have any at any point?

Page 139

1    A.   No.
2    Q.   After the sale to Affiliate
3  Crossing, did you do any work with
4  Affiliate Crossing?
5    A.   I helped them out a little bit
6  to help them set things up with what goes
7  where on the insurance stuff, but other
8  than that, no.
9    Q.   Just give me like a broad sense
10  of what that help entailed?
11    A.   So basically I obviously gave
12  them the affiliate list, but what I helped
13  them was, okay.  You would put the e-mail
14  and ZIP here.  On page two, you would
15  iframe Leadnomics all All Web Leads' form
16  here hosted by them.  And then on your exit
17  traffic, you can do one or a couple
18  different things of how to make extra
19  revenue.  And that's by displaying other
20  related ads by other advertisers.
21    Q.   What was the reason behind you
22  selling this network?
23    A.   I wanted to get out of that
24  space.

Page 140

1    Q.   Was there any particular reason
2  why?
3    A.   No, not necessarily.  I just
4  wanted to do something new.  I saw a better
5  opportunity in the surveys and sweep stuffs
6  throughout the change of the industry.
7    Q.   Was the Snappy website and the
8  other insurance websites, were they at all
9  successful in generating money?
10    A.   They did generate some money in
11  the past.  But around the 2015 era is when
12  things pretty much started going downhill
13  for those websites, and they stopped making
14  money.  And that's one of the reasons why
15  we all sold, got rid of the auto insurance,
16  and took a little bit of a loss, and sold
17  my assets, and called it a day.
18    Q.   Do you know if Affiliate
19  Crossing still does work in the insurance
20  space?
21    A.   I have no clue.  Like I said, I
22  haven't spoken to them in years, other than
23  saying hi at a trade show.
24    Q.   I guess what I'm trying to

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 141

1 understand is, you were teaching them
2 basically how to run these websites, but at
3 the same time, you already had these
4 websites set up. Why wouldn't they just
5 want to step into your shoes?
6        MR. BRODERICK: Objection.
7    A.   I don't remember the
8 conversations we had.
9    Q.   But you understand what --
10    A.   Again they were mostly buying
11 my affiliate list, and where and who I used
12 forms from. They weren't necessarily
13 buying my websites, but they were buying my
14 affiliate list, who I worked with, where,
15 and how.
16    Q.   When you used the words, I mean
17 you said mostly, and then you said
18 necessarily. So are you indicating that
19 it's possible that they did purchase the
20 right to use these websites?
21        MR. BRODERICK: Objection.
22    A.   Possibly. I just don't
23 remember. This is going back to many, many
24 years now.

Page 142

1    Q.   All right. What I'm going to
2 do is, I really don't have too much more
3 for you. But I'm just going to take a
4 quick break because I want to take a look
5 at the documents you sent me before I
6 conclude. Okay?
7    A.   Sure.
8        MS. KINGSTON: Let's just say,
9    make it 15 minutes, and then we'll go
10    back on.
11        (Whereupon, a short recess was
12    taken.)
13        MS. KINGSTON: We're back on.
14    Q.   Mr. Cohen, I'm just going to
15 show you a couple documents here.
16    A.   You mean Brown.
17        MR. BRODERICK: You said Cohen.
18    Q.   I did. That's okay. My
19 apologies. All right. Can you see it
20 okay?
21    A.   Yup.
22    Q.   All right. So this is a
23 response, subpoena response that was
24 received by the parties in this case from

Page 143

1 GoDaddy.
2    A.   Okay.
3    Q.   And the subpoena sought
4 information concerning the owner of
5 snappyautoinsurance.com. So this was
6 GoDaddy's document response. So we're
7 seeing some account information. Is this
8 all your information?
9    A.   It is.
10    Q.   This indicates a login name.
11 Do you see that?
12    A.   Yup. That's correct.
13    Q.   Is that your login for --
14    A.   That is. Yes. I mean, I
15 actually use the user ID number instead of
16 the login name, but yes. It's correct.
17    Q.   Is the user ID number here? I
18 don't see it. It's not listed I guess.
19    A.   I think that login name's
20 actually the password. I don't know. But
21 that's the information I do use, yes.
22    Q.   Is this the login information
23 for Snappy, or is this for your --
24    A.   That's my GoDaddy account in

Page 144

1 general.
2    Q.   Would there be a different
3 login to access and modify the Snappy
4 website?
5    A.   No. Every single website I
6 have is under this account.
7    Q.   No. I understand that. I
8 guess my question is, I'm still trying to
9 understand if someone were to modify
10 snappyautoinsurance.com, could they do that
11 through your GoDaddy account?
12    A.   I don't know.
13    Q.   Just going to go down here to
14 page eight. So this is just reflecting a
15 transaction on July 16th, 2019. Do you see
16 that?
17    A.   I do.
18    Q.   So we go down, we see bulk --
19    A.   What was the date on this one
20 again? I'm sorry.
21    Q.   That was July 16th, 2019. Do
22 you see that at the top?
23    A.   Okay. Yes.
24    Q.   We see a dot com, bulked name,

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 145

1  named renewal, and one of them is
2  snappyautoinsurance.com.  Do you see that?
3      A.   Like I said, I didn't even know
4  that the website was still in my GoDaddy
5  account.  We just renew all websites all
6  the time.
7      Q.   Okay.
8      A.   I mean, I have things set on
9  autopay with GoDaddy.
10     Q.   All right.  So going down to
11  the next page, there's a few websites here.
12  You see insuranceallstar.net?  Do you see
13  that?
14     A.   Yeah.
15     Q.   So it looks like you were
16  renewing for that, as well; is that
17  correct?
18     A.   Sure.  I never really remove
19  websites because you never know when you
20  can actually sell something.  So unless
21  there's an issue, I'll remove it, like
22  obviously this case.  But that doesn't mean
23  like I said, we were never operating that
24  website after 2015.

---

Page 146

1      Q.   Going down further, the last
2  entries for authorvision.com.  Do you see
3  that?
4      A.   Okay.
5      Q.   I thought that you had sold
6  authorvision.com to Affiliate Crossing?
7      A.   I sold the assets to the
8  company, like I said.
9      Q.   But my understanding of your
10  testimony was that you actually sold
11  authorvision.com, as well?
12         MR. BRODERICK:  Objection.
13     A.   I don't remember what the deal
14  was here.  I know I sold the company.  I
15  sold them the assets.  They paid me
16  $12,000.
17     Q.   Do you know if authorvision.com
18  is operational?
19     A.   It is not.
20     Q.   Did you take it down recently?
21     A.   I think a long time ago, if I
22  remember the impression.
23     Q.   Okay.
24     A.   I haven't run that company

---

Page 147

1  since 2015.
2      Q.   Do you know if Affiliate
3  Crossing ever ran that website?
4      A.   I don't recall.
5      Q.   Then there's one for
6  swiftyhealthinsurance.com.  Do you see
7  that?
8      A.   Yes.
9      Q.   Then below that for
10  speedyautoinsurancequote.com?
11     A.   Right.
12     Q.   So you're still paying for
13  these domain names as of 2019, correct?
14     A.   Yes.  But they're not
15  operating.  But yes.
16     Q.   When's the last time you used
17  speedyautoinsurancequote.com?
18     A.   Any auto insurance site has not
19  ran since 2015.
20     Q.   Okay.  So that's true for any
21  website we see on here, your testimony is
22  that you have not run those websites since
23  2015?
24     A.   Regarding the insurance

---

Page 148

1  websites, correct.
2      Q.   I'm going to show you a
3  different exhibit.  All right.  This is
4  Exhibit 6.  And this was also received by
5  the parties in this case during discovery.
6  The plaintiff's attorneys issued a subpoena
7  to Mailgun Technologies, Inc. concerning
8  the owner of snappyautoinsurance.com --
9      A.   I don't know what Mailgun is.
10  That's not me.
11     Q.   Okay.  So this was the response
12  that we received, that the parties received
13  from Mailgun Technologies.  Have you ever
14  heard Mailgun Technologies, Inc.?
15     A.   Never have.
16     Q.   So basically this document
17  indicates that Justin Cohen was paying for
18  their services in connection with
19  snappyautoinsurance.com in 2017.  Why would
20  he be paying for service on
21  snappyautoinsurance.com if you weren't
22  using it after 2015?
23         MR. BRODERICK:  Objection.
24     A.   I don't recall, but again like

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 149

1  I said with our GoDaddy account, it could
2  be just using another URL for something
3  different.
4      Q.   What do you mean?
5      A.   Meaning that it could be listed
6  as this URL, but using this company for a
7  different URL.  But again I don't know
8  because I never heard of this company
9  before.
10     Q.   But wouldn't they be providing
11 the services directly to the URL that you
12 provided them?
13         MR. BRODERICK:  Objection.
14     A.   I don't recall ever working
15 with this company.
16     Q.   Okay.  Do you have any
17 knowledge of Justin Cohen running this
18 website in 2017?
19     A.   I don't recall.
20     Q.   Is it possible that he was?
21         MR. BRODERICK:  Objection.
22     A.   I don't know.
23     Q.   Would he have had the login
24 information?

Page 150

1      A.   I don't know.
2      Q.   To your knowledge, who had the
3  login information?
4          MR. BRODERICK:  Objection.
5      A.   Me.
6      Q.   Anyone else besides you?
7      A.   Not that I recall.
8      Q.   At some point, the people who
9  built the website would have had it,
10 correct?
11     A.   I would think so.
12     Q.   So besides you and those
13 people, anyone else that you know has
14 access to that information?
15     A.   I don't know.
16     Q.   Going to show you Exhibit 17.
17 Can you see that okay?
18     A.   Mm-hmm.
19     Q.   Okay.  So these are e-mails we
20 received from you and Mr. Cohen --
21     A.   Right.
22     Q.   -- about three minutes apart on
23 September 2nd.  Do you recognize your
24 e-mail?

Page 151

1      A.   Yes.
2      Q.   So would you agree with me that
3  the response that Mr. Cohen provides, and
4  then the response that you provide three
5  minutes later is substantially the same, if
6  not identical, correct?
7      A.   Yeah.
8      Q.   Did you discuss with Mr. Cohen
9  responding in this manner?
10     A.   Yeah.  Like we've been
11 constantly saying, that we have no records
12 of operating our site after 2015 and do not
13 have that e-mail address in our database.
14 So this cannot be associated to us.
15     Q.   But just in terms of the fact
16 that your response is identical to his, did
17 you coordinate your responses?
18     A.   I don't remember.
19     Q.   I mean, looking at the e-mails,
20 you're providing essentially the same
21 response, and --
22     A.   I --
23     Q.   -- do you remember speaking
24 about that with him?

Page 152

1      A.   I remember we had spoken about
2  the case before, but I don't remember
3  talking to him before this e-mail.
4      Q.   No, no.  I'm talking
5  specifically about your response here.  Did
6  you talk to him --
7      A.   That's what I just answered.  I
8  don't recall.  I don't remember.
9      Q.   This was only 16 days ago
10 though, correct?
11     A.   Okay.  I mean, I have a lot
12 going on.  So I don't remember every single
13 detail about everything.
14     Q.   Either before or after he sent
15 his e-mail, did he e-mail you about it?
16     A.   I don't remember.
17     Q.   So earlier you mentioned that
18 you don't believe you have any e-mails from
19 Justin Cohen though, correct?
20     A.   Not directly between us
21 communicating about anything regarding
22 this, no.
23     Q.   What do you mean not directly
24 between you two?

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

Page 153

1    A.   You asked if we had any
2  communications about the case.  I said no.
3    Q.   What about, about Snappy Auto
4  Insurance?
5    A.   No.
6    Q.   Have you searched your
7  e-mails --
8    A.   Yes.
9    Q.   -- for that?
10   A.   Yes.
11   Q.   How did you search?
12   A.   I searched for Justin Cohen in
13  sent and trash and received, and searched
14  everything.  Nothing regarding Snappy Auto
15  Insurance.
16   Q.   What about more generally,
17  Joseph Mantha, or anything else relating to
18  this case?
19   A.   I have, we have no records of
20  Joseph Massa (sic).
21   Q.   All right.  I want to just go
22  back to when the website was taken down.
23  It was I think you said April of this year.
24  Can you tell me exactly what you know about

Page 154

1  what happened at that time?
2    A.   I don't remember.
3    Q.   Okay.  So you told me that you
4  received a subpoena in this case?
5    A.   Right.
6    Q.   And then the response to that,
7  the decision was made to take down the
8  website --
9    A.   Yeah.  That sounds about right.
10   Q.   You went into your GoDaddy
11  account and you deleted the website URL?
12   A.   That's correct.
13   Q.   What other steps were taken to
14  your knowledge?
15   A.   I don't know any, other than
16  what I did.  I sent you screenshots of
17  other things, too, but I don't know what
18  was done.
19   Q.   Did you tell anyone that you
20  would be taking down the URL?
21   A.   Yes.
22   Q.   Who did you tell?
23   A.   I mentioned to Justin that I
24  was gonna kill the URL.

Page 155

1    Q.   What did he say?
2    A.   Okay.
3    Q.   Did he say that he was going to
4  do anything?
5    A.   Not to my knowledge.
6    Q.   So your testimony is, you have
7  no idea if anyone else took any other
8  action to take down this website?
9    A.   Other than what I did, that's
10  correct.
11   Q.   To your knowledge, was the
12  website modified at that time?
13   A.   I don't know.
14   Q.   When you say you don't know,
15  are you saying that you don't have a memory
16  of that?
17   A.   That's right.
18       MR. BRODERICK:  Objection.
19   Q.   The extent of your
20  communications with Mr. Cohen, was that you
21  told him you were going to kill the URL and
22  he said okay?
23   A.   Yup.
24   Q.   You didn't have any other

Page 156

1  conversations with him about that?
2    A.   That's correct.
3    Q.   When you received the document
4  that we've marked as an exhibit, the screen
5  two, were you surprised to see that there
6  were files modified of this year?
7        MR. BRODERICK:  Objection.
8    A.   I don't know.
9    Q.   I'm going to go back to that
10  because I want to have you have that in
11  front of you.  Can you see that all right?
12   A.   Mm-hmm.
13   Q.   So you see how it looks like
14  there's some documents that were modified
15  in April of this year, about five of them?
16   A.   Like I told you --
17       MR. BRODERICK:  Objection.
18   A.   -- earlier from my knowledge
19  from the last couple days, that this was
20  told to me that this was proving that the
21  website was removed or killed at that time,
22  as well.
23   Q.   Okay.  But did you notice that
24  it looks like some things were updated at

Page 157

1  that time --
2       MR. BRODERICK:  Objection.
3     Q.   -- or changed?
4       MR. BRODERICK:  Objection.
5     A.   I was just sent this the other
6  day --
7     Q.   Okay.  I'm just asking you
8  about --
9     A.   -- right.  And I just told you
10  that those changes, I was told that that is
11  when the site was killed.
12     Q.   So Mr. Cohen told you that?
13     A.   Mm-hmm.
14     Q.   Is that the first time you
15  became aware that he took some steps to
16  kill the site?
17       MR. BRODERICK:  Objection.
18     A.   I don't recall.
19     Q.   Okay.  So when did you receive
20  this document?
21     A.   The other day.
22     Q.   You can't recall whether this
23  is the first time you heard of him taking
24  actions to kill the site?

Page 158

1       MR. BRODERICK:  Objection.
2     A.   That's correct.
3     Q.   Okay.  Are you aware that the
4  plaintiff in this case is seeking $5
5  million in damages?
6       MR. BRODERICK:  Objection.
7     A.   No.  I wasn't aware of that.
8       MS. KINGSTON:  What's your
9  objection?  It's listed on your cover
10  sheet.  It's a CAFA case.
11       MR. BRODERICK:  It's more than
12  that, but correct.
13       MS. KINGSTON:  That's not
14  accurate?
15       MR. BRODERICK:  It's more than
16  that?
17       MS. KINGSTON:  At the minimum,
18  you agree to that that's what you're
19  seeking?
20       MR. BRODERICK:  Yeah.
21     Q.   So are you aware that the
22  minimum, plaintiff is seeking $5 million in
23  damages in this case?
24     A.   No, I was not.

Page 159

1     Q.   Are you aware that the lead
2  information traces back to
3  snappyautoinsurance.com?
4       MR. BRODERICK:  Objection.
5     A.   Okay.  But like I told you,
6  one, we haven't ran the website.  Two, you
7  even show an e-mail from someone saying
8  that they're the webmaster and they sent
9  the lead.  So I think you should be
10  contacting them.
11     Q.   But here's the thing.  This is
12  what plaintiff thinks is a $5 million plus
13  case.  We have lead information tracing
14  back to snappyautoinsurance.com, and you're
15  the person of record linked with this
16  website.  So I want to know what happened
17  to that website after 2015 --
18     A.   I stopped using it --
19       MR. BRODERICK:  Objection.
20     Q.   You have no knowledge of anyone
21  using that website after 2015?
22     A.   That's correct.
23     Q.   You have no interest in doing
24  any type of investigation to figure that

Page 160

1  out?
2       MR. BRODERICK:  Objection.
3     A.   We did.  I showed you the lead
4  that this e-mail address was never in our
5  system.  I mean, how much more can I show
6  you?
7     Q.   But I mean, you testified
8  earlier that it's possible that Affiliate
9  Crossing is using this website after you
10  sold the network to them, correct?
11       MR. BRODERICK:  Objection.
12     A.   I said I don't recall, and I
13  don't know.
14     Q.   Let me ask again.  Is it
15  possible that they were using this website
16  after you sold the network?
17       MR. BRODERICK:  Objection.
18     A.   I don't know.
19     Q.   Before you received the
20  subpoena in this case, when is the last
21  time that you spoke to anyone about Snappy
22  Auto Insurance?
23     A.   Years ago.
24     Q.   What year?

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

---

Page 161

1    A.   2015.
2    Q.   When did you stop?  You
3  mentioned after you sold the network to
4  Affiliate, you helped them out with some
5  things.  When did you stop helping them?
6    A.   In 2015.
7    Q.   Before the end of the calendar
8  year?
9    A.   Yes.
10    Q.   Do you have any idea what
11  month?
12    A.   No.
13    Q.   Do you have contact information
14  for Affiliate?
15    A.   Not anymore.
16    Q.   When's the last time you spoke
17  with them?
18    A.   In 2015.
19    (Jurat continued on following page.)
20
21
22
23
24

---

Page 162

1      MS. KINGSTON:  I have nothing
2  further, but at this point, I do
3  believe that there are further
4  documents that have not been provided
5  that are available, and have not been
6  provided.  So what we're going to do
7  is we're going to follow up with you
8  after the deposition.  And if for
9  some reason, you can't or won't
10  provide that, we might need to take
11  further enforcement action.  But we
12  can talk about that offline.
13      MR. BRODERICK:  No questions
14  from me.  Thanks very much.
15      (Whereupon, at 4:14 P.M. the
16  Examination of this witness was
17  concluded.)
18
19
20
21
22
23
24

---

Page 163

1    ERRATA SHEET DISTRIBUTION INFORMATION
   DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
2
3    ERRATA SHEET DISTRIBUTION INFORMATION
4    The original of the Errata Sheet has
5  been delivered to Adam Brown.
6    When the Errata Sheet has been
7  completed by the deponent and signed, a
8  copy thereof should be delivered to each
9  party of record and the ORIGINAL forwarded
10  to Christine M. Kingston, Esq., to whom the
11  original deposition transcript was
12  delivered.
13
14    INSTRUCTIONS TO DEPONENT
15    After reading this volume of your
16  deposition, please indicate any corrections
17  or changes to your testimony and the
18  reasons therefor on the Errata Sheet
19  supplied to you and sign it.  DO NOT make
20  marks or notations on the transcript volume
21  itself.  Add additional sheets if
22  necessary.  Please refer to the above
23  instructions for Errata Sheet distribution
24  information.

---

Page 164

1  ATTACH TO DEPOSITION OF: ADAM BROWN
2  CASE: 1:19CV12235-LTS
3  DATE TAKEN: September 18th, 2020
4      ERRATA SHEET
5  Please refer to Page 163 for Errata Sheet
6  instructions and distribution instructions.
7  Page Line          Correction/Reason
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  I have read the foregoing transcript of my
16  deposition, and except for any corrections
17  or changes noted above, I hereby subscribe
18  to the transcript as an accurate record of
19  the statements made by me.
20  Executed this____day of_____,
21  2020.
22
23      _____
24          ADAM BROWN

---

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

```
                                  Page 165

  1        COMMONWEALTH OF MASSACHUSETTS.

  2   MIDDLESEX, SS.

  3

  4      I, Hannah Bea Lorber, Court Reporter

  5   and Notary Public in and for the

  6   Commonwealth of Massachusetts, do hereby

  7   certify that on Friday, 18th of September,

  8   2020, ADAM BROWN, whose deposition is

  9   hereinbefore set forth, was duly sworn by

 10   me and that such deposition is a true

 11   record of the testimony given by the

 12   witness.

 13      I further certify that I am neither

 14   related to or employed by any of the

 15   parties in or counsel to this action, nor

 16   am I financially interested in this action.

 17   In witness whereof, I have hereunto set my

 18   hand and affixed my seal on this 18th of

 19   September, 2020.

 20

 21

 22   _____
           Hannah Bea Lorber

 23        NOTARY PUBLIC
           My Commission Expires:

 24          October 10, 2025
```

**$**

**$12,000**
39:8 146:16
**$5**
158:4,22
159:12

**1**

**1**
118:22
**10**
132:6
**10-minute**
71:24
**100**
48:6 54:2
**10th**
23:21
**11**
132:16
**11th**
110:12
**12**
110:2 132:20
**13**
112:12 133:9
**14**
133:16 134:18
**15**
38:20 96:2
136:18 142:9
**15th**
85:13
**16**
92:16 96:3
104:17 107:4
137:2 152:9
**16-ish**
17:1
**16th**
144:15,21
**17**
137:6 150:16
**17/4/2020**
72:22
**17th**
80:22
**18**
73:12

**19**
73:18 74:9,14,
22 75:11
78:14 84:16
105:2

**2**

**2008**
38:14
**2009**
38:10
**2013**
17:22 41:14
44:21 46:9
49:9 124:14
**2014**
124:19,20
**2015**
17:1 20:13
23:10,21
28:10 29:4
38:14 57:21
68:17 72:21
75:19 87:4
89:11 93:5
94:2,9 95:19,
22 96:6,10,13,
22 99:15
101:8,12
102:19 103:23
105:19
106:13,17
107:9,20
122:15 137:16
140:11 145:24
147:1,19,23
148:22 151:12
159:17,21
161:1,6,18
**2016**
20:14,16 96:7
**2017**
148:19 149:18
**2018**
38:17
**2019**
72:19 84:2
85:14 87:2,6
110:12,21
112:7 114:12
119:12 132:8
133:11

144:15,21
147:13
**2020**
65:20,24
68:24 75:20
79:21 80:17,
22 81:20
84:17
**2nd**
150:23

**3**

**30**
11:17 124:19

**4**

**4/17/2000**
68:16,24
**4/8/2015**
22:18 23:14
**4:14**
162:15
**4th**
79:21 94:1

**5**

**50/50**
45:7,14 49:10

**6**

**6**
148:4

**8**

**8th**
124:20

**9**

**99.9**
34:16

**A**

**A-H-U-J-A**
39:19
**ability**
13:8,12,16
**absolutely**
39:13

**access**
16:16,18
37:11 48:14
50:22 60:12
61:20 62:1
65:10 69:6
70:4 79:3
121:8 133:11,
19 134:6,10,
15 144:3
150:14
**accessed**
65:13 87:11
**accessing**
69:10 113:12
**accommodate**
12:7 65:2
**account**
49:12 57:9,12,
18 60:9 67:5
69:8,9,14 70:8
80:4 88:5,10,
17 116:7
117:21 120:20
122:19 143:7,
24 144:6,11
145:5 149:1
154:11
**accounts**
60:18 116:12,
14 117:4,12,
15,16,20
**accurate**
41:15 52:15
71:13 99:7
120:10 126:13
158:14
**accurately**
13:8,13
**acknowledge**
10:5
**action**
138:15 155:8
162:11
**actions**
53:5 70:13
80:2 157:24
**active**
15:15,19
27:19 66:5
67:1 83:24
**actual**
24:22 46:22

72:20
**ad**
30:19
**Adam**
12:23
**adding**
122:20
**additional**
32:4
**address**
14:12,19
18:15,19,23
19:21 33:3,12
34:7,8 63:6
77:5 111:22
121:14 130:5,
6 131:2
132:19 151:13
160:4
**addresses**
138:10
**administered**
10:6
**admitted**
120:12
**ads**
28:14,16,20
30:7 93:1,2,20
97:3,7,13
99:15 100:21
139:20
**Ads'**
31:1
**advertiser**
21:3 30:14
**advertiser's**
90:18
**advertisers**
124:24 125:3
139:20
**affect**
13:8,12,16
**affiliate**
21:19,20,21
22:7 24:4
25:2,8 30:4,8,
18 36:3,9
37:3,4,18,20
38:23 39:5,14
40:4,12,16,18
43:7 52:18
53:19,20

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

55:23 56:1,3
61:7 66:11,17
87:18 94:6,13,
19,23 95:7,9,
11 96:9 97:3,
8,12,19 98:13
100:6,8 101:1
102:7 103:13,
22 104:6
105:18 106:1
107:13 108:4
109:3 124:5
139:2,4,12
140:18
141:11,14
146:6 147:2
160:8 161:4,
14
**affiliated**
51:22,23 52:8
124:2,3
**affiliates**
21:18 22:8
24:19 25:10
30:9,10,11
37:6,8,23 40:9
43:10 52:23,
24 53:11,13
55:2,24 60:1,5
98:22 100:9
105:21
**agree**
10:21,24
95:14 108:18
151:2 158:18
**agreed**
11:20 83:17
**agreement**
10:14,16
11:12 41:6
44:13 45:17
55:23 77:10
124:21
**agreements**
56:5
**ahead**
25:19 73:12
**alive**
66:21,22
**altogether**
26:6
**answering**
90:6

**answers**
12:11
**anymore**
16:4 57:10
60:22,24
88:21 127:1
138:6 161:15
**anything's**
109:6
**apartment**
130:8
**apologies**
142:19
**apparent**
110:14
**apparently**
112:16
**applicant**
111:15
**application**
112:22
**approved**
30:13
**April**
23:21 28:10
80:22 95:19
96:9 101:12
102:19 103:23
106:17 153:23
156:15
**Arbor**
130:5
**area**
58:22 128:1
**arrangement**
10:11
**article**
22:17,20
23:12,17,19
38:11 39:7
**assets**
24:3,18 25:1
39:9 105:20
140:17 146:7,
15
**assistant**
74:5
**assume**
11:11 45:8
**assuming**
14:14 19:6
54:11,12

59:19 78:18,
23 79:11
81:18
**assumption**
34:24
**attached**
93:19
**attempt**
92:15
**attention**
65:3
**attorney**
131:22
**attorneys**
125:20,21
126:3 148:6
**audible**
12:12
**audit**
111:15
**authentication**
135:8,21
**Author**
23:18,19
26:10,11 45:3
57:9,11 60:23
61:1 94:6,12,
18,24 95:7,9,
11 107:12
120:19 123:23
124:2,7,13
138:9,13
**authorvision.
com**
105:19 146:6,
11,17
**authorvision.
com.**
146:2
**auto**
16:13 19:5
20:3,5,15,18
21:23 22:1,4,
9,11 25:7
26:5,18 27:5
28:8 35:7,23
37:3 38:3,9
39:2 40:13
41:4,13,21
42:23 43:13,
24 50:15
55:17 57:2
58:19 59:2

63:12 65:19
88:14 97:16,
21 98:6,14,17,
19 99:22
100:5,8 102:4,
14,18 103:23
106:3,11
112:19 113:24
114:21 120:4,
9,19 140:15
147:18 153:3,
14 160:22
**autopay**
145:9
**aware**
66:24 67:8
108:20 157:15
158:3,7,21
159:1

**B**

**B-E-R-G-E-R**
109:23
**back**
15:12 16:12,
13 17:1,2,22
25:10 26:1
32:19 35:3
41:8,10 43:1
51:11,21 52:5,
7 61:22 62:14
63:4 72:4 75:9
86:18,22
95:22 96:1,6
99:1 102:5
107:3 118:4
125:17 135:1,
11 136:2
137:16 141:23
142:10,13
153:22 156:9
159:2,14
**backside**
22:14
**bank**
56:20 57:9,14
**banner**
30:19 36:11
**base**
58:19
**based**
30:12 34:24

39:20 47:8
**basic**
116:15
**basically**
25:19 26:1,12,
14,16 37:19
45:6 55:12,24
91:24 135:17
139:11 141:2
148:16
**basics**
41:11
**basis**
86:17
**bear**
29:1 104:21
105:13
**begin**
10:18 35:22
90:6
**beginning**
48:23
**behalf**
10:20,23 45:1
**beneath**
70:12
**benefit**
12:10 90:6
**Berger**
109:22
**big**
23:12 126:20
127:7
**billed**
94:2,12 97:3
101:2
**billing**
95:8 132:14
**bills**
97:9
**birthday**
37:15
**bit**
21:16 104:24
139:5 140:16
**blank**
23:5
**Blueflame**
41:20,22 42:1,
9,12,13,19,22,
24 43:3,12,17,
20,22 44:9

45:3
**bought**
25:17 39:12
105:20
**box**
126:16
**branded**
37:21
**break**
12:7 18:6 25:4
30:2 63:11
65:2 71:22
72:1 142:4
**broad**
96:18 139:9
**Broderick**
10:22 11:13,
20 36:21
70:20 71:2,14,
17,19 73:19
74:6 80:15,23
81:4,17 83:6,
16 84:3,12,24
86:4,7,14 88:8
90:14 91:5,22
92:10 95:13,
16 97:5,17,24
98:8,15 99:11
101:3,9,18
102:9,13,20
103:9,14,19
108:23 109:5
111:6,9 112:3,
8 113:8,14
114:13 115:4,
8 116:3
126:14 127:8,
23 128:11
129:3,11,16
134:7 135:14
136:5,12
141:6,21
142:17 146:12
148:23
149:13,21
150:4 155:18
156:7,17
157:2,4,17
158:1,6,11,15,
20 159:4,19
160:2,11,17
162:13

**Brown**
11:21 12:23
61:10 65:1
72:4 74:9
80:24 86:24
142:16
**bug**
74:19
**build**
115:20
**built**
45:22 69:20
150:9
**bulk**
88:5 144:18
**bulked**
144:24
**bunch**
48:24
**business**
15:17 16:21,
22 25:13
28:20 40:3
41:20 65:5
91:17 94:4,9
124:14
**buy**
25:21 49:17
105:18
**buying**
24:2 25:4,6
26:1 97:22
108:10 109:4
141:10,13
**buyout**
23:19 77:10
**buys**
108:19

_____
    **C**
_____
**CAFA**
158:10
**cake**
37:11,15,16
52:20
**calendar**
161:7
**call**
30:9 37:20
46:16 74:2
**called**
11:1 16:4

19:13 25:13,
14 45:24 60:1
105:14 109:12
140:17
**campaign**
38:7 52:24
**campaigns**
30:11,12
37:24 43:11
52:23 106:6
**cancelled**
66:3
**capture**
128:16
**care**
62:15 130:14
**Carolina**
42:16
**case**
53:15 88:13
104:8 110:7
125:21 126:3
132:1 142:24
145:22 148:5
152:2 153:2,
18 154:4
158:4,10,23
159:13 160:20
**cases**
34:19
**cease**
67:16 68:3
88:23
**cell**
130:21 131:9,
11
**cells**
53:6
**cetera**
30:17 53:6
**chain**
110:9
**chance**
71:21
**change**
62:7 68:18
72:18 140:6
**changed**
17:18 34:4
85:2,5 157:3
**charge**
132:13

**cheap**
46:3
**check**
37:24 47:19
56:20 63:16
72:8 124:13
**Chris**
40:22
**Christina**
80:15
**Christine**
10:19 11:22
71:17
**circle**
41:8
**Citibank**
57:16
**classifies**
117:19
**clear**
105:8
**click**
25:15,16 79:4
**clicked**
36:10 70:12
**clicks**
30:20 53:5
**client**
24:1 89:3
**close**
57:17 60:17
**closed**
61:4
**cloud**
17:3 50:6
119:22
**clue**
40:20 92:11
111:1 113:15
114:14 130:17
135:23 140:21
**code**
19:14,17,24
21:2,5,10,14
29:13,14 31:7,
23 32:16,18,
20 33:1,12,24
34:5,6,10,12
35:21 36:17
114:2 128:20
**codes**
54:10

**Cohen**
42:18 49:9,20
51:5 58:3
65:12 73:21
76:18 77:15
79:2 82:2,16,
20 85:10,17,
21 118:15
121:16 122:24
123:1,6 131:6,
23 133:2,5,24
134:15
142:14,17
148:17 149:17
150:20 151:3,
8 152:19
153:12 155:20
157:12
**Cohen's**
42:4
**collect**
19:10 21:13
89:16 131:12
**collected**
28:24 55:13
89:8,9
**collecting**
71:6
**Commonwealth**
11:3
**communicate**
47:11,14
**communicated**
47:17
**communicating**
152:21
**communication**
20:13
**communications**
122:23 123:1,
5 125:19
126:2 131:15,
17,21 153:2
155:20
**companies**
16:11 20:9
21:11 37:17
55:8,19,22
56:9 58:13

61:17 77:2
91:15 93:21
94:21 95:4
115:19,21
**company**
21:4,9 23:24
24:9 25:12,14,
18 26:9,17
28:15 35:16
37:19 39:5,23
40:16,17 42:3
45:1,2 54:20,
22 58:15 61:4
92:14 93:9,12
98:10 108:11
109:12 111:2
116:22
120:17,18,24
123:21 135:24
137:5 138:18
146:8,14,24
149:6,8,15
**company's**
28:2 95:8
**complaint**
92:23 93:7,17
107:4
**completed**
128:4
**completes**
128:23
**computer**
61:4 119:20
124:9 138:11
**concern**
136:14
**conclude**
142:6
**concluded**
162:17
**conditions**
13:12 78:21
**connected**
121:4 122:6
**connection**
38:3 43:18
57:2 119:12
148:18
**consent**
10:11 70:18,
24 135:12
136:3

**considered**
29:19 90:13
128:24 129:5
**constantly**
151:11
**consumer**
35:22 36:16
59:1,12 90:8
92:6 128:4,9,
17,22 133:11,
19
**contact**
35:18 57:4
112:24 122:6
125:7 161:13
**contacting**
159:10
**continue**
54:16 108:18
**continued**
109:2 161:19
**continues**
90:10
**contract**
22:24 23:3
44:13 55:22
124:1
**contracted**
97:13,15
**contractor**
124:15
**contractors**
124:23
**contractual**
95:12 136:8
**contractually**
135:11
**control**
50:19
**conversation**
82:1,5,11
118:18
**conversations**
104:2,5 108:4,
12 123:13
137:3 141:8
156:1
**conversion**
53:14
**conversions**
53:6

**converted**
55:1 59:11,20,
23 128:4,8
**coordinate**
151:17
**copied**
130:3
**copies**
23:5 56:4
68:23 125:12
130:16 134:5
**copy**
22:19 23:6,7
37:22 41:9
56:8 74:15
88:12 92:23
110:6 124:1
**coregistration**
26:16
**corporate**
28:19 138:12
**correct**
14:18 15:9
17:13 27:3
28:6 32:2,5,
13,14 33:17,
20,21 34:13,
14 35:2 36:13
38:24 39:13
41:24 43:19
45:21 59:6,21
60:10 61:18
64:16 65:21
70:5,19 71:1
76:10 77:13
78:6 79:5 81:3
82:21 84:20
91:12,13,15
92:9 93:3,9
96:10 98:21
100:2 101:13
103:4,13
104:4 105:12
106:13,14,15
108:16 112:4
115:10 117:1
118:7,20
121:16,21
122:17 123:23
125:22 127:22
128:10 129:7,
12 130:6
131:1,6,7

133:3,8 135:3
136:22 138:21
143:12,16
145:17 147:13
148:1 150:10
151:6 152:10,
19 154:12
155:10 156:2
158:2,12
159:22 160:10
**corrected**
38:19
**correctly**
92:17
**cost**
51:16,19 52:2
**costs**
51:24 52:6
**counsel**
10:11
**count**
54:18
**couple**
12:1 14:6,20
66:15 95:24
109:8 139:17
142:15 156:19
**court**
12:10 90:7
**cover**
19:4 158:9
**create**
117:10
**created**
18:2,3,4 22:12
41:13 44:19
48:17,20 49:9
122:15 135:12
136:15
**creating**
41:18
**Crossing**
21:22 22:7
24:5 38:23
39:5,15 40:6,
16,19 61:7
87:18 94:7,14,
19,23 95:8,9,
11 96:9 97:4,
8,13 98:13
100:6 101:1
102:7 103:13,
22 104:6

105:18 106:1
107:13 108:5
109:3 124:4,5
139:3,4
140:19 146:6
147:3 160:9
**Crossing's**
25:3
**current**
15:13 46:20
93:11 138:12
**customer**
35:14

———
    **D**
———

**D/b/a**
28:13 92:24
**damages**
158:5,23
**Dario**
109:19 110:11
112:16
**data**
32:8 53:7
111:16
113:17,21,24
**database**
14:7,23 15:8,
10,11,13,20
16:17 17:3,11,
24 18:4,23
19:4 32:16,24
48:12,15,17,
20 49:21,23
50:3,8,10,13,
19 51:2 53:7
59:8 72:11,12
76:4,9 77:4,8,
21 87:12
89:24 90:1
121:17,20
130:23 133:7
151:13
**date**
23:11,20
67:10 68:9,11
74:10 86:3
99:16 144:19
**dated**
79:21 87:2
94:1 99:15
110:11

Joseph Mantha vs
QuoteWizard.com, LLC

Adam Brown
September 18, 2020

dates
75:16,20,21
79:24 80:12
85:2 96:18
day
15:12 16:12
32:20 43:1
72:23 82:13,
18 118:4
140:17 157:6,
21
days
11:17 152:9
156:19
DBAS
138:22
deal
38:22 40:7
98:20 108:17,
21 146:13
December
85:13 87:2
decide
67:6
decided
40:11 88:14
decision
49:14 88:18
154:7
declare
10:8
deducted
51:16
defendant
11:23
delete
80:3
deleted
61:3 69:5
79:14 82:19
85:4 106:20
123:22 154:11
deleting
80:13 82:21
deposed
13:19,23
deposition
11:24 14:2,5
162:8
describe
18:10 44:8
75:13 112:5

117:6 128:8
describing
115:2
designer
46:6 62:14
designers
46:1
desist
67:16 68:3
88:24
detail
152:13
determine
119:17 122:5
developed
62:13
developer
79:1
directly
19:23 73:16
76:17 87:12
149:11
152:20,23
directs
52:14
discerning
20:8
disclosures
126:10 127:18
discovery
110:7 112:15
148:5
discuss
82:23 151:8
discussion
41:2
displaying
139:19
dissolved
138:18
divided
51:17
document
75:7 80:16
86:10 119:3
143:6 148:16
156:3 157:20
documentation
82:7
documents
14:6,10 23:16,
18 34:20

48:12 76:7
79:5,10,20
94:18 119:5,6,
11 120:5
123:17
124:12,16
125:4 130:18
132:6,9 134:2,
6 142:5,15
156:14 162:4
Dog
26:15,22 93:8
94:2,3,5,8,14,
20 95:6 106:5,
7 107:5,14
120:8,17
122:9,14
138:20,22
Dog's
95:3
domain
24:22 49:17
65:23 66:21,
22 80:14
82:19,21
88:17 102:24
106:20 112:9
119:15 120:11
147:13
domains
88:6
dot
144:24
double
47:19
doubt
60:14,15
96:21,23
downhill
140:12
downstream
91:2,15
drafted
129:21,24
drive
53:11 119:21
125:9
driven
36:2 66:6
driving
84:8 125:8
duly
11:2

——————
E
——————
e-mail
14:12,19 15:1,
3,5 18:8,15,
19,22 19:12,
24 21:13
28:24 30:16
31:7 32:13
33:3,9,12,14
34:7,12 35:11,
15,17,22
36:17 47:15,
18,22 55:13
63:6 71:5
73:15,19 74:4,
15 77:4,7
89:8,9 91:23
106:22,23
110:6,10
111:22 112:15
114:2 119:23
120:22 121:14
122:24 123:5
128:19 129:19
130:21,22
131:2 132:19
138:10 139:13
150:24 151:13
152:3,15
159:7 160:4
e-mailed
75:12 76:1,2
105:1,6
e-mails
20:11,12
60:23 61:2
118:11 119:23
123:8,23
125:20,24
150:19 151:19
152:18 153:7
earlier
40:8 46:24
59:10 69:20
72:5 96:8
98:18 104:24
126:11 127:20
135:16 152:17
156:18 160:8
easiest
30:5

easy
51:22
Ed
10:22
effectively
137:18
Elance
16:1,4 45:24
62:15 118:14
Elite
42:1,12,13,24
43:4,12,17
44:3
else's
92:13
employees
104:7
empty
18:21
end
16:21 25:10
26:1 50:8
51:14 99:1
161:7
enforcement
162:11
engage
46:17
entailed
139:10
enter
21:8 29:13,14
31:19,20,22
33:19,24 34:5,
6,7 52:22 59:3
136:2
entered
19:20 32:7,8
33:12 36:17
53:16 54:13
59:5 89:21
entering
18:14 29:21,
22 31:3 32:4
enters
90:9,11 92:6
entire
54:3 64:10,13
entitled
105:1
entries
146:2

era
38:14 140:11
escaping
124:3
essentially
151:20
evenly
51:17
events
13:17
evidentiary
86:17
exact
23:11 59:24
96:18
Examination
11:6 162:16
examined
11:4
exhibit
73:17 74:9,14,
22 75:11
78:14 84:16
92:16 104:17
105:2 107:4
110:2 112:11
118:22 148:3,
4 150:16
156:4
exhibits
73:13 109:8
exit
25:14,16
139:16
expenses
51:6,10
experiencing
12:17
explain
21:1 30:3
52:19 76:11
125:13
explanation
76:17
extent
155:19
extra
139:18

___ F ___

F-E-N-I-X
109:16

fact
33:11,13
34:11 66:23
101:14 151:15
failed
129:2,4
fair
29:23 34:23
62:2 79:4
fell
138:16
Fenix
14:20 77:3
109:16
136:20,23
field
33:13
figure
29:11 75:8
90:7 119:9
159:24
file
15:5 78:22
85:13 86:3
87:1 105:1
filed
92:24 93:8
files
78:7 84:16,22
85:5 105:3
119:24 124:6
137:22 156:6
fill
31:12 59:17
filled
112:21
fills
59:12
Finally
12:16
finances
58:7
find
14:7 16:14
27:7 36:5 46:2
56:24 59:22
113:12 118:8
126:15 134:8
finish
90:5 123:4
fire
31:10 53:19

54:17
fired
30:23
fixed
48:24
Florida
39:20
folder
124:8,11,22
folders
87:9
follow
162:7
form
11:15 19:21
21:7,8,9
27:15,18
29:12 31:5,12
32:11 33:6,23
34:1,13 35:17
55:5,17 59:7
71:12 86:6,12
89:16 128:2
129:17 139:15
formed
55:14
forms
22:10 25:11,
12 70:23
105:22 128:5
141:12
forward
26:5
foundation
86:9
four-year-old
74:18
frame
96:18
fraudulent
135:12
fraudulently
136:15
friends
45:20
front
16:21 75:6,7
156:11
full
12:21 35:10
55:17 112:22
126:23 127:1

128:14
full-time
38:9
fully
13:4 89:6

___ G ___

gave
37:4 139:11
general
20:6 144:1
generally
18:11 20:4
44:8 54:23
153:16
generate
22:9 53:3
140:10
generated
36:15 45:12
53:14 54:24
77:6 89:10
91:8 97:10
128:7 129:1,6
generating
20:21 25:8,9
35:17 98:13
109:4 140:9
generation
35:16
generator
110:17 112:2
George
109:9 110:8,
11 112:17
give
16:18 23:16
30:6,10 46:22
96:17 100:4,
12 115:21
127:13 134:5
139:9
god
32:19
Godaddy
41:12 49:12
51:6 61:23
62:4,9,18
65:20 66:9
67:1 68:15,20
69:4,7,9,14
70:8,10 72:7,

11 79:15 80:4,
14 88:4,10
102:22,23
106:21 114:5
115:11,16,22
116:2,6,19,22
117:5,13,16,
18,20,21
120:20 121:2
122:1,2,18
132:12 143:1,
24 144:11
145:4,9 149:1
154:10
Godaddy's
120:15 143:6
good
46:3
ground
12:1
guess
14:13 15:5
16:4 31:21,22
36:1,4 48:9
53:15 57:5
64:1,5 66:3,20
68:3,9 70:1
72:10 77:5
85:9 91:16
99:8 102:22,
24 106:20,21,
22 111:16
126:24 140:24
143:18 144:8
guy
40:22 43:9
64:7,18 65:9
75:24 77:13,
17 78:5 79:8
121:8 131:6
132:4 133:6
134:13
guys
34:2 68:5
83:20 88:1

___ H ___

half
44:16,23
handle
12:19 136:7

**Hannah**
73:13 74:14
86:19
**happen**
22:15 41:3
136:1
**happened**
36:7 38:13
46:8 61:1 89:7
136:11 154:1
159:16
**happening**
83:5
**happy**
12:3,7 65:2
107:3 125:12
**hard**
52:19 119:21
**Hasoffers**
37:12
**he'll**
79:11
**head**
12:13
**hear**
12:18 62:21,
23
**heard**
58:23 64:1
109:9,11
111:3 123:20
136:23 137:4
148:14 149:8
157:23
**helped**
139:5,12
161:4
**helping**
161:5
**highly**
60:14
**hire**
16:1,3
**hired**
46:4 115:21
118:3,4
**hiring**
124:22
**hold**
29:1 126:15
127:4
**home**

74:1
**honest**
36:2 42:6
128:12
**honestly**
17:5 23:4
**hope**
31:11 53:7
**host**
109:2 116:16,
20,22
**hosted**
19:19 21:9
32:6 50:4
55:18 59:7
61:23 71:9
89:18,23
139:16
**hosting**
102:22,23
108:18
116:12,14,15,
21 117:2,4,12,
14,20

_____

**I**
**ID**
143:15,17
**idea**
97:2 110:22
111:24 125:23
126:19 155:7
161:10
**identical**
151:6,16
**identification**
74:10
**iframe**
19:13,14
20:22 21:2,5
34:10 55:16
78:20 90:16
139:15
**iframes**
20:19 24:19
99:2 100:10
**ignorant**
116:19
**imagine**
108:8
**impossible**
89:6,12

**impression**
81:5,8 84:4
85:1 146:22
**inactive**
60:18 84:5,6
138:14
**inbox**
61:3
**incentivized**
30:16
**Including**
100:1
**indemnify**
136:11
**Independent**
124:14
**index**
78:21
**India**
47:10 77:13
78:5
**indicating**
91:20 96:15
141:18
**individual**
120:14
**individually**
23:23 24:8,10
40:15 44:24
57:23
**industry**
23:13 25:7
63:24 140:6
**info**
113:24
**information**
21:8 31:3 32:4
35:18 36:18
48:12 53:4
59:3,5 68:6
89:4,17,19,22,
23,24 90:2,10,
11,21 91:3
92:6 110:15
111:20
113:17,20
114:8 116:7
117:3 122:6
125:7 128:15
129:14 143:4,
7,8,21,22
149:24 150:3,
14 159:2,13

161:13
**informations**
21:11
**insurance**
15:12 16:13
19:5 20:3,5,
16,18 21:23
22:1,4,10,11
26:6,19 27:5,6
28:9 35:8,23
37:3 38:4,9
39:2 40:13
41:4,13,21
42:23 43:13,
24 50:16
55:17 57:2
58:19 59:2
63:12 65:20
88:14 97:16,
22 98:7,14,17,
19 99:17,18,
22 100:5,8,21
101:7,10
102:2,5,15,19
103:23 106:4,
8,12 108:5
112:19 113:24
114:21 120:4,
9,19 134:19
137:15 139:7
140:8,15,19
147:18,24
153:4,15
160:22
**insuranceallsta**
**r.net**
105:15 145:12
**interacted**
107:14
**Interactive**
42:15
**interest**
159:23
**internal**
121:20
**internet**
133:10,18
**interrupt**
71:20
**investigation**
159:24
**invoice**
94:1,22 95:18

99:14 100:17
101:2 107:17
**invoices**
93:19,20
118:12 138:2
**involved**
41:17 43:23
48:11,22
137:14
**issue**
83:21 145:21
**issued**
119:2 126:4
148:6

_____

**J**
**jmantha7@**
**yahoo.com.**
15:6
**Joe**
112:20 130:19
**Jornaya**
134:18,19
**Joseph**
10:23 14:17
130:20
153:17,20
**July**
29:4,7 79:21
80:17 99:15
144:15,21
**June**
99:16 101:8
**jurat**
161:19
**Justin**
42:4,18,22
43:1 45:3,13
58:3 67:22
76:2 77:20
78:3 80:8
81:13,18,22
82:6 122:24
148:17 149:17
152:19 153:12
154:23

_____

**K**
**Kapeo**
16:8 17:12
47:1 51:3 63:3

64:18
**Kapeo's**
47:6
**keeping**
66:21
**kill**
154:24 155:21
157:16,24
**killed**
114:22 156:21
157:11
**kind**
25:4 28:18
30:2 35:9
39:12 41:10
44:7,16 45:19
46:2 49:10
50:19 53:9
56:17 63:19,
22 65:6 75:13
117:7,9 126:6
**Kingston**
10:19,20 11:7,
8,14,22 71:18,
23 73:11,22
74:3,12 80:19
86:5,11,16
127:6 142:8,
13 158:8,13,
17 162:1
**knew**
58:23
**knowledge**
25:7,17 39:12
49:6 65:17
75:15 80:11
83:3 84:14
91:1 98:24
99:10 100:8
102:4 103:1
105:21 106:3
113:7 114:16
115:15 149:17
150:2 154:14
155:5,11
156:18 159:20

———
**L**
———

**labeled**
73:2
**landing**
21:13 34:1

78:22
**language**
70:18 71:1,11
126:11 127:21
129:8
**larger**
53:10
**laws**
134:23
**lawsuit**
67:8 104:14
123:7 126:7
131:18
**lead**
14:14 29:17,
19 30:22,24
35:6,10 53:3,
21 54:13,18
55:1,6,17,20
56:15 59:23
60:6,7 73:5
77:4,6 89:3
90:12,19 91:8,
20 92:4,8
105:10,22
110:10,15,17,
21 112:2
114:7 121:23
128:3,7,14,16,
24 129:2,4
136:20 159:1,
9,13 160:3
**lead's**
59:11,20
**Leadnomics**
19:16 21:5
25:11 31:13
55:6,18 57:22
59:9 60:2
61:11 91:11
129:10 135:6,
17 136:10
139:15
**leads**
16:22 19:16
20:21 21:17
25:8,9,12
27:15,18
31:12 32:19
35:9 36:15
45:9 52:9,12
55:4,7,19
57:23 58:9

59:8,9 60:3
61:11,12,13
91:12 99:2
108:19 109:4
129:10 135:7,
17 136:10
137:15
**Leads'**
139:15
**Leadvision**
28:13 92:24
**leaves**
91:23
**legal**
45:4
**length**
89:15
**letter**
67:9 88:2,24
106:23 107:11
124:19,20
**level**
53:10
**lieu**
10:6
**life**
111:2
**lines**
24:21
**link**
37:5,6 55:3
**linked**
159:15
**links**
110:9
**list**
22:8 30:8
54:12 97:19
116:15
124:23,24
125:2 139:12
141:11,14
**listed**
41:6 107:12
110:23 122:10
130:4 134:3
143:18 149:5
158:9
**lists**
110:18
**literally**
117:15

**live**
20:20 27:12
116:16
**lived**
130:7
**LLC**
11:24 28:13
41:23 92:24
93:8
**log**
60:4,8 63:19
69:24 116:6,
23
**logged**
63:11 69:4
70:3,8,10 72:7
121:2
**logging**
69:15
**logical**
117:8
**login**
60:11 62:1,3,
18 115:10,22
117:19
143:10,13,16,
19,22 144:3
149:23 150:3
**long**
41:7 67:4 88:3
93:4 146:21
**long-term**
45:19
**longer**
28:4
**looked**
14:11,20 77:2
107:2 111:22
120:21 122:19
**loss**
140:16
**lot**
33:4 41:21
42:23 67:2
152:11

———
**M**
———

**made**
19:9 45:9
49:15 62:13
79:22 82:8
83:9 84:21

87:17 88:18
100:13 154:7
**mail**
67:10
**Mailgun**
148:7,9,13,14
**maintenance**
46:13,16
**make**
12:13 28:22
69:16 70:4
74:13,15
83:10,14
126:23 127:1
139:18 142:9
**makes**
64:5
**making**
31:14 34:24
140:13
**manage**
117:11
**manager**
17:20 43:7
73:2,5,6
105:10
**managers**
77:1
**manner**
10:13 151:9
**Mantha**
10:24 14:17
112:20 130:20
153:17
**Mantha's**
32:24
**mark**
73:12,17
74:22
**marked**
74:9 75:11
92:16 104:18
105:2 110:2
118:22 156:4
**marketer**
117:9
**marketing**
30:4 35:5 36:9
37:11,15,18
41:22 42:9,22
43:22 44:4,5,
6,9 52:18,20

109:12,13
110:8 112:18
129:20 137:3
**Massa**
153:20
**Massachusetts**
11:4
**matter**
10:8
**meaning**
18:22 25:11
43:9 92:6
104:1 149:5
**means**
13:3 64:4
**meant**
38:20 68:24
**Media**
14:21 26:15
28:13 92:24
93:8 94:2,3,
14,20 106:5,7
109:17 120:8
136:20,23
**Media's**
122:9
**medical**
13:11
**medication**
13:7
**members**
40:19
**memory**
13:15 98:2
108:3 155:15
**mentioned**
11:21 20:14
46:24 68:10
81:14 89:14
93:1 94:17
96:13 100:16
117:2 123:19,
22 152:17
154:23 161:3
**mentioning**
31:22 53:15
**merger**
38:12,22 39:4,
11 57:21
**messages**
123:10
**Michael**

109:22
**mid**
122:15
**million**
158:5,22
159:12
**mind**
101:14 133:22
**mine**
27:10 101:5
130:8
**minimum**
158:17,22
**minute**
127:13
**minutes**
142:9 150:22
151:5
**missing**
55:3
**mistaken**
39:22 42:14,
16
**Mitchell**
12:23
**Mm-hmm**
44:22 49:24
58:1 68:21
150:18 156:12
157:13
**model**
91:17
**modifications**
70:4
**modified**
23:20 75:17
81:2 155:12
156:6,14
**modify**
69:24 115:15
116:1 144:3,9
**modifying**
75:19
**moment**
104:21 105:14
**money**
31:14 45:9,11
98:14 140:9,
10,14
**month**
51:14 161:11

**monthly**
37:21
**morning**
74:4
**motions**
11:16
**mouse**
18:2
**moved**
21:23 26:18
106:5 114:23
138:20
**MSMMYSQL**
18:21

——————
**N**
**Nah**
40:1
**name's**
124:3 143:19
**named**
40:22 109:9,
19 112:16
145:1
**names**
102:24 121:3
122:18 147:13
**navigate**
28:4 31:17
**navigated**
35:23
**necessarily**
16:19 38:5
45:4 140:3
141:12,18
**needed**
46:15
**network**
21:21 22:3,6
23:2,23 24:17
28:8 30:8
37:4,20 51:22,
23 52:8 53:19
56:1,3 66:11,
17 139:22
160:10,16
161:3
**news**
23:13
**night**
68:15

**noncompete**
124:22
**nondisclosure**
124:21
**notarization**
11:19
**Notary**
11:2
**notice**
156:23
**notification**
66:4
**number**
19:22 72:15
88:22 119:10
120:7 122:22
123:16,19
125:18 126:9
127:17 130:18
131:9,11,12,
15 132:6,16,
20 133:9,13
134:18 136:18
137:6 143:15,
17

——————
**O**
**Oaks**
130:5
**oath**
10:6 13:1
**objection**
36:21 70:20
71:2,14 81:4,
17 83:6,16
84:3,12,24
86:4,13 88:8
90:14 91:5,22
92:10 95:13,
16 97:5,17,24
98:8,15 99:11
101:3,9,18
102:9,13,20
103:9,14,19
108:23 109:5
111:6,9 112:3,
8 113:8,14
114:13 115:4,
8 116:3
126:14 127:23
128:11 129:3,
11,16 134:7

135:14 136:5,
12 141:6,21
146:12 148:23
149:13,21
150:4 155:18
156:7,17
157:2,4,17
158:1,6,9
159:4,19
160:2,11,17
**objections**
10:12 11:14
86:6
**obligated**
13:4
**obligations**
95:14
**October**
124:19,20
**offer**
124:18,20
**offhand**
137:21
**officer**
93:14
**officers**
40:19 104:6
**official**
28:19
**offline**
68:5 88:19
162:12
**older**
50:15
**one's**
99:15
**online**
23:12 36:5
75:22
**open**
72:14 126:19
**operate**
135:24
**operated**
36:22 120:18
129:9 132:8
135:18 137:10
**operating**
145:23 147:15
151:12
**operational**
28:4 146:18

**operations**
138:20
**opportunity**
140:5
**opt-in**
70:18,24 71:4
126:11 127:21
129:9
**opt-out**
130:4
**opt-outs**
130:10,11
**option**
32:3
**oral**
12:12
**organic**
36:3
**organically**
35:24
**original**
110:17 112:1
118:5
**originally**
67:15 106:24
**Osmancevic**
109:20 110:11
112:17
**owned**
24:13 42:6,17
44:24 64:11
120:18
**owner**
24:11 43:2
111:5 112:6
122:10 143:4
148:8
**owners**
44:16
**ownership**
39:4
**owning**
119:14 120:11
**owns**
39:14

_____
**P**
_____

**P.M.**
162:15
**pages**
29:12 31:8
75:16 78:18

**128:10**
133:10,19
**paid**
25:16 38:3
39:8 49:11
50:20 51:11
52:3,5 56:22
57:1 58:11
59:13,14
65:19,23 66:7,
14,19 102:17
132:7 138:3
146:15
**pains**
10:9
**part**
39:4 107:9
130:20
**parties**
10:10 142:24
148:5,12
**partnered**
41:20 42:23
**partners**
44:11 45:5
**parts**
78:24
**party**
131:16
**password**
60:22 143:20
**past**
46:3 140:11
**paused**
20:18 22:13
31:16
**pay**
37:21 49:15
53:13 56:19
57:23 65:3
66:10 88:20
97:8 102:22
**paying**
29:3,7,16
31:13 52:5
53:11 55:2
58:9 66:24
87:22 88:5
95:20 100:18
101:15,21
103:2,6,17
107:8,20
147:12

**148:17,20**
**payments**
118:12
**pays**
50:2 77:21
**PDF**
22:22
**penalties**
10:9
**penny**
25:16
**people**
30:9 52:14
62:18 121:3
125:8 150:8,
13
**percent**
34:16 48:6
54:2
**periodic**
46:12 114:4
**periods**
88:7
**perjury**
10:10
**person**
10:7 14:13
17:6 20:24
46:23 48:1
64:5 67:21
77:5 85:7 87:8
109:19 112:1,
16 115:2
118:3,6,9
123:3,9,11
131:24 159:15
**personal**
15:2 65:16
122:13
**personally**
57:24
**phone**
19:11,22
35:11 71:6
123:2,3,9,12
127:24 130:21
131:9,11,23
**phonetic**
16:8 42:15
**physical**
34:9 68:11
**physically**

**10:1,2 31:3**
**pick**
52:24 73:21
**picture**
74:21 98:10
**pixel**
30:23 31:10
53:18 54:17
60:2
**place**
53:18,23
55:22 124:6
**plaintiff**
10:23 14:17
158:4,22
159:12
**plaintiff's**
15:2 19:9
110:15
125:19,21
131:21 136:20
148:6
**platform**
52:21
**Plural**
109:12,14
110:8 112:17
137:3
**point**
12:6 15:14
16:20 18:7
20:21 21:7,22
22:13 26:5,12
30:15 37:2
40:20 41:19
45:2,8 48:7
54:4 55:14
56:14 58:13
59:20 62:13
81:20,22
88:19 90:17
92:1 96:6
108:11 121:1
125:9 129:1,6
132:4 135:5
138:7,19,24
150:8 162:2
**points**
111:16
**policies**
71:4
**policy**
78:21 129:17,

**18,21**
**pop**
33:13
**portion**
35:20
**possessing**
138:8
**possession**
130:19 132:7
**possibly**
36:18 85:11
134:17 141:22
**posted**
23:12
**practice**
35:1
**premarked**
104:17
**prepare**
14:4
**present**
10:1,2
**press**
31:23 34:8
**pressed**
31:24
**pretty**
21:22 35:15
39:1 46:1
62:12 140:12
**price**
56:16
**prior**
72:17 82:9
83:23 123:21
**privacy**
71:4 78:21
129:17,18,21
**problem**
12:5,20 18:9
**problems**
12:18 13:15
**proceeding**
10:1,4,13
**profit**
51:15,17,19
**profits**
51:9
**programmer**
78:2,4 80:9
83:10 85:9
115:17 116:5

O'Brien & Levine Court Reporting Solutions
888.825.3376 - production@court-reporting.com
Index: operations–programmer

117:6
**project**
46:6,7
**pronounce**
39:18
**properties**
26:23
**property**
100:3
**protection**
135:10 136:9
**proved**
82:8
**provide**
52:11 151:4
162:10
**provided**
19:17 21:10
52:21 62:17
110:7 133:24
149:12 162:4,
6
**providers**
19:15 25:11
**providing**
149:10 151:20
**proving**
156:20
**Public**
11:3
**published**
22:18
**publisher's**
125:7
**publishers**
124:24 125:3
**pull**
15:4 37:24
79:10
**pulled**
14:6
**purchase**
39:8 40:11
56:15 98:19
141:19
**purchased**
49:19 55:9
98:21 100:7,
20 110:10
**purchaser**
91:2

**purchasing**
28:21 58:10
98:6 100:20
**purposes**
32:22
**pursuant**
22:23 23:3
**put**
11:10 19:17
21:6 22:14
30:5,18,19
61:6 69:20
107:3 114:22
139:13

———————
**Q**
———————
**question**
12:3 19:3
32:23 51:1
53:8 62:22
77:5 80:18
86:8,12,18,20,
22,24 90:5
100:11 114:4
123:5 128:22
133:22 144:8
**questions**
13:4 162:13
**quick**
54:15 71:21
142:4
**quicker**
65:7,8
**quickly**
23:14 34:1
**quote**
94:13
**quotes**
78:9
**Quotewizard**
14:20 77:2
**Quotewizard.
com**
10:21 11:23

———————
**R**
———————
**ran**
42:14 70:22
77:18 96:5
113:21 147:3,
19 159:6

**reached**
16:13 80:9
**read**
11:18 41:7
86:22 127:2
**ready**
76:7
**real**
42:2 54:15
**realized**
88:16
**reason**
87:21 139:21
140:1 162:9
**reasons**
140:14
**recall**
13:16 28:12,
21 37:10 40:2,
23 41:5 42:10,
11 43:1,14
46:20 48:3
52:4 54:5
56:16,21
57:15 58:10
63:3 72:8
81:24 82:1,4
92:21 101:4
102:3 103:24
104:1,14,19
108:7,24
115:19 129:23
130:2 136:17
147:4 148:24
149:14,19
150:7 152:8
157:18,22
160:12
**receive**
114:4,8
157:19
**received**
18:12,14
67:24 88:12
110:6 112:15
119:6 142:24
148:4,12
150:20 153:13
154:4 156:3
160:19
**receiving**
113:16,21
114:1 121:1

122:4
**recent**
78:15
**recently**
146:20
**recess**
72:2 142:11
**recognize**
92:20 150:23
**record**
10:16 11:10
12:14,22
18:16 72:5
80:20 128:19
132:18 159:15
**recorded**
123:14
**recording**
90:18
**recordkeeping**
51:18
**records**
50:11 51:20
57:7 76:3,4,15
119:17 130:23
131:2 151:11
153:19
**redesigned**
49:1,2
**redirected**
30:21
**redirects**
36:12
**refer**
75:4 130:19
**reference**
54:19
**referred**
86:21
**referring**
22:3,5 24:4
26:8 68:19
104:16 106:18
**reflect**
72:12 81:1
**reflecting**
144:14
**reframe**
120:23
**registered**
120:13,16,21
122:18

**registrations**
26:17
**reimburse**
51:5
**relate**
124:11,17
125:4 130:19
132:7
**related**
22:10 66:20
75:18 102:18
139:20
**relates**
132:20 134:18
**relating**
153:17
**relative**
84:22
**relevant**
93:17 125:14
**remember**
17:14 27:8
43:17 47:4
48:5,8,22 49:7
54:7,9 56:17
57:19 67:10
76:3 87:20,23
88:4,7,9
100:15,16
101:24
104:15,20
105:17 130:9
133:22 137:20
141:7,23
146:13,22
151:18,23
152:1,2,8,12,
16 154:2
**remotely**
10:4
**remove**
68:7 80:12
81:6,10
145:18,21
**removed**
68:4 75:21
82:7 85:3 88:3
89:1 106:20
156:21
**renew**
145:5
**renewal**
145:1

renewing
145:16

rephrase
12:4

replicate
25:20

reply
125:24 126:1

replying
125:23

report
121:13 124:14

reporter
12:11 74:11
86:23 90:7

reporting
10:4

represent
11:23 92:22
110:12

request
11:19 110:14
119:10 122:22
125:18 127:2,
10 133:9
136:18

requests
119:3

required
136:10

reserved
11:15

resources
22:8

respect
43:23 44:9
103:7

responding
151:9

response
110:13 142:23
143:6 148:11
151:3,4,16,21
152:5 154:6

responses
151:17

responsibility
71:16

responsible
113:3

result
18:21

results
18:21

returned
18:21

revenue
28:14,16,20
30:7 31:1
51:24 93:1,2,
20 97:3,6,13
99:14 100:21
139:19

revenues
51:9

Revpoint
137:6,7,9

Ricky
39:16

rid
138:9,10
140:15

rights
108:19

Rios
109:9 110:8,
11,14 112:17

role
44:8 46:5

room
10:2

rotated
56:12

roughly
17:19 18:3
38:10,11,13
61:8 95:22
96:24 101:13

rows
18:22

rules
12:1

run
30:11 43:11
53:1 100:5,12
105:14 129:13
141:2 146:24
147:22

running
16:13,23
20:17 24:20
26:5,24 38:7
40:9 61:20
65:4 70:17

83:22 84:1
96:13,20
98:17 99:20
102:4 106:3,
11 107:19,24
108:5 113:6,
12,23 114:11,
17,19,20
116:8 134:23
135:22 149:17

_____
        S
_____

sale
23:2 24:15
41:1 87:17
96:9 97:1
98:9,17 99:6,
21 100:14
101:11 102:5,
15 105:19,24
106:4 114:21
124:17,18
139:2

saved
119:24

Savings
99:17 100:22
102:2

scenario
136:9

schedule
119:1

screen
18:17 23:15
74:16,20
78:16 92:15
104:24 105:1,
3,9 126:16,17,
23 127:1,9,11
132:22 133:23
156:4

screenshot
17:21 18:14,
18 68:12,14
72:15 73:2,3,
17 74:8,14,23
75:11 76:8,14,
20,22 78:12
87:15 106:19
109:7 112:18
132:22 133:23

screenshots

15:23 17:9,17
18:8,11 33:8,
10 68:19
76:23,24
77:12,22
105:5 118:19
121:20 126:9
127:18
133:10,18
154:16

screenshotted
133:6

Seal
26:15,22 93:8
94:2,3,5,8,14,
20 95:3,6
106:5,7 107:5,
14 120:8,16
122:9,14
138:20,22

search
18:15 19:8
119:16,19
120:2 131:5
133:2 153:11

searched
15:7 32:15,17,
24 33:3
119:20,23
121:13 122:5
123:17 130:22
131:9 153:6,
12,13

searches
77:19 131:14

searching
18:18,20
131:11

seeking
158:4,19,22

selected
70:11

sell
24:15 91:14,
18 92:8
136:19 145:20

selling
23:22 24:8,11
55:3,6 61:13
92:4 109:4
137:14 139:22

send
21:5 22:19

23:7 30:1 37:7
41:6 47:20
73:8 76:21

sending
39:7

sense
28:22 139:9

separate
57:11 69:15

September
41:14 110:12
150:23

series
111:16

servers
52:3

service
29:7,15 102:1,
18 148:20

services
28:13,21 29:3
54:6 66:12,18
97:23 98:6
101:15 103:17
107:9,20
138:3 148:18
149:11

set
17:11,14,22
18:22 19:7
44:12 58:7
115:10
117:10,23
118:2 139:6
141:4 145:8

setting
118:1

settings
88:9

shaking
12:12

share
74:16,21
92:16 104:23
127:11

sharing
104:22

sheet
14:21 158:10

shoes
141:5

short

72:2 142:11

**show**
14:18,23 17:8
21:7 23:21
33:10 34:21
53:20 77:3,23
82:7 104:13
110:1 111:23
112:11 118:21
125:6,16
140:23 142:15
148:2 150:16
159:7 160:5

**showed**
51:23,24
160:3

**showing**
20:12 75:17
103:5 121:13
132:18

**shows**
14:11 18:18,
20 77:6
121:22

**sic**
130:14 153:20

**side**
25:8 49:21,22,
23 114:22

**sign**
11:18 52:23
56:1

**signed**
23:5 112:21
125:9 128:9

**signify**
27:20

**signs**
128:17

**simply**
80:3

**single**
38:7 55:10
67:20 102:18
144:5 152:12

**site**
15:14 16:24
17:17 23:13
45:10 46:10,
15 50:15 66:5
69:24 79:14
83:21 84:5
88:17 92:13

96:13 112:6,
23 113:4
115:20 116:1
147:18 151:12
157:11,16,24

**sites**
16:22 20:16,
18 22:11
42:24 50:14,
16 57:3

**Skype**
47:13,20,21
123:13

**Skyped**
76:2,5

**Smart**
42:15

**Snappy**
15:12 16:11
19:1,5 20:3,9
27:5 32:16,23
33:5,16,22
34:12,21 35:7,
23 36:12,19
37:9 38:3,6
40:12 41:3,12
43:13,18,23
44:10 48:13
51:7 52:15
56:11 58:8
59:1 61:13
63:12 64:21
65:19 70:16,
22 72:13
87:19 88:14
89:22 90:13
91:4 97:16,21
98:6,14,19
100:1,5 101:5,
22 103:7,22
105:24 106:11
107:16 112:19
113:23 115:15
119:12 120:4,
9 122:7,11
124:11 125:1,
4 126:12
127:22 129:22
130:10 132:8
133:19
135:13,18
136:3,16
138:3 140:7

143:23 144:3
153:3,14
160:21

**Snappy's**
130:23

**snappyautoins
urance.com**
24:13 50:11
65:24 89:5
90:9 91:9,21
92:5,9 99:6
100:13
110:18,23
123:7 144:10
148:8,19,21
159:3,14

**snappyautoins
urance.com.**
95:21 127:19
143:5 145:2

**snappysurveys
.net**
27:2

**software**
37:13,19,22
52:13,19 53:2
135:21

**sold**
21:21 22:2,7
24:17 28:7
61:7,11 89:3
90:21 91:9
94:19 95:23
96:23 97:18
99:2 100:5
108:13 114:7
137:14
140:15,16
146:5,7,10,14,
15 160:10,16
161:3

**sole**
93:14

**Solutions**
136:20,24

**someone's**
100:18 107:8,
20

**sort**
53:9 66:20

**sought**
143:3

**sound**
41:14

**sounds**
28:11 41:16
154:9

**source**
110:17 112:2

**sources**
30:13

**South**
42:15

**space**
100:9 139:24
140:20

**span**
99:16

**speak**
67:17,20 68:1

**speaking**
12:13 118:6
151:23

**specific**
98:2 133:22

**specifically**
152:5

**speedyautoins
urancequote.
com**
147:10,17

**spelled**
39:17,19

**split**
45:6,13,14
51:8,12

**spoke**
67:22 104:10
135:16 160:21
161:16

**spoken**
82:16 85:20,
23 103:21
131:24 132:3
140:22 152:1

**staff**
46:7

**stake**
39:5

**Star**
99:17 100:21
102:2

**started**
11:9 12:2

26:15 27:1
43:15 49:17
92:5 99:24
106:5 140:12

**state**
12:21

**stating**
10:15

**stats**
38:1

**status**
138:13,16

**stayed**
16:20

**step**
41:10 61:22
78:10,19
141:5

**steps**
154:13 157:15

**stips**
11:10

**stop**
99:20 104:22
137:18 138:7
161:2,5

**stopped**
15:16 16:23
20:17 21:20,
22 26:5 28:8
38:8,10,11,13
39:1 96:2,12,
24 98:16
99:23 102:4
106:3 114:20
140:13 159:18

**store**
21:10 35:18
53:4

**stored**
15:21,23
19:24 130:16
138:4

**stores**
53:7

**straight**
59:7,8

**strictly**
26:16 59:7

**strike**
11:17

**stuff**

28:9 41:21
48:24 63:22
69:18 78:3
80:10 117:7,9
139:7

**stuffs**
140:5

**submit**
14:14 29:14
31:7,9,23,24
33:11 34:8,18
35:4 53:16
55:13

**submits**
28:21 29:10
95:20 103:2

**submitted**
30:22 35:6
55:15

**subpoena**
67:11,21
88:13 104:7
119:2 121:2
122:4 126:4
142:23 143:3
148:6 154:4
160:20

**substance**
93:17

**substantially**
151:5

**successful**
140:9

**successor**
94:23

**suggest**
115:24

**sunbiz.com.**
26:13

**supplied**
21:3

**Surehits**
25:14

**surprise**
29:2 102:6

**surprised**
86:2 87:1
103:16 111:8,
10 115:1,5
156:5

**survey**
26:17,19,21

50:14 99:24

**surveys**
21:24 26:20
38:16 100:1
101:5,23
106:6 107:16
114:23 140:5

**swear**
10:17

**sweep**
140:5

**sweeps**
38:16

**sweepstakes**
26:20,21
50:14 106:6
114:24

**swiftyhealthins
urance.com.**
147:6

**switched**
38:15

**sworn**
11:2

**system**
14:19 18:17
19:23 30:24
31:1 37:1 49:1
53:1,20 54:15
60:4,5,7 90:3,
18,22 92:1,12,
13 111:23
121:23 123:14
131:3 132:19
160:5

**systems**
53:23 60:11,
13

_____

**T**
_____

**takes**
32:1 34:8

**taking**
11:24 69:2
83:8 154:20
157:23

**talk**
41:11 123:2,3,
8,11 152:6
162:12

**talked**
35:14 59:10

69:19 118:15
131:20,23

**talking**
14:16 15:2
17:23 20:2
27:13 33:15
35:7,20 38:22
43:21 44:18,
21 54:8 57:7
73:1 91:7
133:2 152:3,4

**targeted**
33:4

**TCPA**
70:18,24 71:5
111:15 126:10
127:18,20
129:8

**teaching**
141:1

**team**
47:23

**tech**
15:22 17:6
20:24 46:18,
21 47:23 51:4
62:11,15,19,
20 64:7,18
65:9 68:13
69:18 75:24
77:12,17 78:3,
5 79:6,8,12
81:14,15,19,
23 85:6 87:7
118:5 121:8
131:6 132:3
133:6 134:13

**technical**
117:8

**technically**
19:18 22:7
91:7

**technological**
12:17

**Technologies**
148:7,13,14

**Ted**
11:9 74:3 75:5
86:5 127:6

**telling**
74:2

**term**
63:23

**terminated**
26:12,14
72:24

**terms**
24:7 25:2
27:21,22 28:1
30:6 36:16
51:18 52:9
54:10 69:21
78:20 97:21
120:2 130:1
151:15

**testified**
11:4 72:5
89:15 96:8
106:10 126:10
135:2 160:7

**testify**
13:9,13

**testifying**
72:9

**testimony**
10:8 66:16
70:2 72:6
88:12 98:18
99:4 101:20
120:8 127:19
130:22 136:19
146:10 147:21
155:6

**text**
123:10,12

**texting**
74:1

**theory**
19:18 90:15

**thing**
24:22 48:9
56:2 58:7
89:14 99:23
102:21 132:17
159:11

**things**
56:18 59:19
63:16 96:1
139:6,18
140:12 145:8
154:17 156:24
161:5

**thinks**
159:12

**Thirteen**
133:15,17

**thought**
33:18 44:2
48:16,19
67:15 68:2
88:2,23
116:19 133:16
146:5

**time**
11:16 26:14
38:2,15 39:1
40:21 41:1,7
44:17,18
45:23 47:5
49:5 52:4 54:3
56:21 57:1
58:23 61:6,8,
12,19 62:21
63:16 64:11,
13,15 67:7
70:14 79:22
81:3 83:22
84:23 87:14,
19 88:3,6
91:18 93:4
94:7 96:4
99:21 103:3,
18 104:10
111:11 122:15
130:6 137:13,
18 141:3
145:6 146:21
147:16 154:1
155:12 156:21
157:1,14,23
160:21 161:16

**timeframe**
20:14 21:17
57:20 61:5
96:3 106:13

**times**
96:14

**tip**
126:7

**today**
11:24 13:1
14:1,5 118:16
119:7 123:21

**told**
48:6 55:5
62:11 64:13
68:5 76:3,13,
14 79:23 81:9,
12 82:20 83:7,

23 94:16 96:2
106:19 111:21
133:5 154:3
155:21
156:16,20
157:9,10,12
159:5
**tooken**
130:14
**top**
144:22
**topic**
116:19
**totally**
120:17
**touched**
102:14
**traces**
159:2
**tracing**
159:13
**track**
67:3
**tracked**
52:1
**tracking**
30:22 37:13
52:12,19 53:2,
3,18 54:17
60:2
**tracks**
53:5
**trade**
104:13 140:23
**traditional**
39:10
**traffic**
15:16 16:24
20:17 21:19,
20,23 24:20
25:15,17 30:1,
13,16 36:3,4
37:7 40:10
53:11 54:24
66:6,20 84:8
89:11 97:10
101:11 114:23
125:8,9
134:23 139:17
**transaction**
144:15
**transposing**

80:21
**trash**
153:13
**treating**
94:23
**trial**
11:16
**trickle**
96:1
**trigger**
53:20
**triggered**
30:24
**true**
34:21 50:18
64:10 147:20
**truthfully**
13:5
**type**
35:5 63:18
70:17,24
89:16 113:20,
24 116:7
120:2 121:3
126:11 127:20
129:14 135:7,
21 159:24
**typed**
23:18
**types**
117:12 131:14
**typical**
74:21

——————
**U**
——————
**understand**
12:2,24 30:6
35:4,19 52:8
53:10 54:24
61:10 65:6
70:2 79:20
80:1 84:15
88:11 89:2,20
90:4 95:5
98:12 105:23
107:8,19,21,
22,23 128:21
131:4,13
141:1,9 144:7,
9
**understanding**
64:3 76:16

77:11 99:3
133:1 146:9
**understood**
72:6
**unique**
37:5
**updated**
156:24
**updates**
113:17 114:5
**Upwork**
16:4 45:24
62:14
**URL**
15:17,18
18:19,24 19:1
50:13 63:18
69:5 70:11
79:14 80:4
85:4 88:21
132:13,14
149:2,6,7,11
154:11,20,24
155:21
**URLS**
70:11 116:11,
24 117:13
**user**
18:16 21:7
143:15,17
**username**
60:22
**usual**
11:10

——————
**V**
——————
**valid**
53:17 54:12,
16 59:18
**validate**
54:14
**validating**
54:10
**validation**
53:22 54:6
**validations**
53:17
**verbally**
10:7
**version**
22:22

**versus**
44:9
**video**
75:9
**viewpoint**
25:3
**Virginia**
39:22,23
**virtual**
12:16
**visible**
92:2
**Vision**
23:18,19
26:10,11 45:3
57:11 94:6,13,
19,24 95:7,9
107:12 120:19
124:2,7,14
138:10,13
**Vision's**
57:9 60:23
61:2 95:11
123:23
**visit**
63:17

——————
**W**
——————
**waive**
10:12
**wanted**
24:24 25:1
62:7 139:23
140:4
**wanting**
74:20
**web**
19:16 25:12
27:15,18
29:11,12
31:12 33:6,8
41:22 42:9
43:22 44:9
55:7,18 57:23
59:9 60:3
61:12 70:23
71:12 79:1
89:16 90:16
91:11 101:11
128:5 129:10
133:10,18
135:7,17

136:10 139:15
**webmaster**
63:20,21,24
64:8,21
112:23 115:3,
7 159:8
**website**
18:1,3 19:1,2
24:13 26:23
27:14,17,23
29:21,22 30:1,
20,21 31:4,6
33:16 36:5,11,
16 37:7 41:11,
12 44:24
45:12,22 49:9
52:9,15 54:14
55:12 61:20,
21,24 62:2,8,
9,13 63:13,16,
18 64:11
65:10 68:4,8,
16,18 69:3,6,
11,15,20 70:3,
6 72:7,20,23
75:17,19,21
78:19,24
79:22,24 80:3,
7,13 81:2,6,
11,23 82:8,16
83:1,8,18,22,
24 84:9,22
85:2 87:4,9
88:1 89:1,11
96:5 97:23
99:19 105:14
108:18 109:2
111:5 112:21
113:6,13
114:1,5,12,16
121:18 122:1,
3 129:13
130:3 132:12,
21 134:20
140:7 144:4,5
145:4,24
147:3,21
149:18 150:9
153:22 154:8,
11 155:8,12
156:21 159:6,
16,17,21
160:9,15

**website's**
28:3
**websites**
19:12 20:4,5,
19 22:4,12,13
24:15 25:22,
23 27:4 28:23
34:17 41:3
51:19 53:1
67:3 99:22,24
101:7,17
102:8,19
108:6,14
114:22 116:8,
16,22 117:10,
11 120:22
121:4 122:20
137:17 140:8,
13 141:2,4,13,
20 145:5,11,
19 147:22
148:1
**Weet**
42:14
**whatnot**
14:14 23:20
122:21
**When's**
38:2 104:10
137:13 147:16
161:16
**whichever**
21:3
**wife**
73:24 74:18
93:15
**wire**
56:20
**wondering**
48:10
**words**
141:16
**work**
16:10 30:10
46:3,10,16
54:1,4 58:21
93:2 105:22
139:3 140:19
**worked**
14:22 19:15
20:2 24:2
31:15 42:21,
24 43:3 48:23

54:9 55:8
97:20 99:1
100:10 111:1
141:14
**working**
20:15 21:4
46:21 47:4
63:3 149:14
**works**
30:3 92:12
**written**
22:17,23 23:3,
13,20 38:12
45:17 95:1
131:16
**wrong**
84:21 106:16

———
**X**
———
**Xverify**
53:24 135:3,4

———
**Y**
———
**year**
60:19 153:23
156:6,15
160:24 161:8
**years**
43:21 54:8
60:17 66:8,15
104:12 122:20
140:22 141:24
160:23
**yesterday**
76:6 82:12,13
**Yup**
22:21 23:11
57:13 75:15
76:19 77:16
110:4 111:18
118:24 142:21
143:12 155:23

———
**Z**
———
**ZIP**
19:12,24
21:14 28:21,
24 29:9,13,14,
19 31:7,9,20,
22 32:11,16,
17,20,24 33:5,

9,10,12,14,24
34:5,6,12,18
35:4,21 36:17
53:15,16,17
54:10,12
55:13,14
89:10 91:24
95:20 103:2
114:2 128:20
139:14
**zippyinsuranc
e.net.**
27:11
**zoom**
93:23 127:12