Page 1

1              IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF MASSACHUSETTS
3    _____X
4    JOSEPH MANTHA on behalf of      )
     themselves and others           )
5    similarly situated,             )
                                     )
6              Plaintiff,            )
                                     )
7         vs.                        ) No. 1:19-cv-12235
                                     )
8    QUOTEWIZARD.COM, LLC,           )
                                     )
9              Defendant.            )
10   _____X
11            VIDEOTAPED ZOOM 30(b)(6) DEPOSITION
12               UPON ORAL EXAMINATION OF
13                   MATTHEW WEEKS
14                QUOTEWIZARD.COM, LLC
15
16                 2:46 P.M. (EST)
17                 JULY 22, 2020
18               SEATTLE, WASHINGTON
19
20
21
22
23
24      REPORTED BY: CHERYL O. SPRY, CCR No. 2226
25

Page 2

1        A P P E A R A N C E S

2                    (All participants appeared remotely.)

3

4        FOR THE PLAINTIFF:

5                    EDWARD A. BRODERICK

6                    Broderick Law, P.C.

7                    176 Federal Street, Fifth Floor

8                    Boston, Massachusetts 02110

9                    617.738.7080

10                   ted@broderick-law.com

11

12       FOR THE DEFENDANT:

13                   KEVIN POLANSKY

14                   Nelson Mullins Riley & Scarborough

15                   One Post Office Square, 30th Floor

16                   Boston, Massachusetts 02109

17                   617.217.4720

18                   kevin.polansky@nelsonmullins.com

19

20       ALSO PRESENT:

21                   MICHAEL TAKOS, Videographer

22

23

24

25

```
                                                     Page 3
 1                         I N D E X

 2

 3       EXAMINATION BY:                              PAGE

 4              MR. BRODERICK                           5

 5              MR. POLANSKY                           63

 6              MR. BRODERICK                          69

 7       EXHIBITS FOR IDENTIFICATION                 PAGE

 8       Exhibit 1  7/14/2020 Notice of Rule 30(b)(6) of    7

 9                  QuoteWizard.com, LLC

10       Exhibit 2  QuoteWizard Opt In                19

11       Exhibit 3  5/18/2020 Defendant's Responses to     41

12                  Plaintiff's First Set of

13                  Interrogatories

14       Exhibit 4  RevPoint Subpoena Response Combined    41

15       Exhibit 5  IP Subpoena for RevPoint - tracks to   45

16                  Guerrero

17       Exhibit 6  Plural Response to Mantha Subpoena     46

18       Exhibit 7  Verizon IP June 26, 2019              52

19       Exhibit 8  Jornaya Subpoena response             59

20

21

22

23

24

25
```

Page 4

1          SEATTLE, WASHINGTON; JULY 22, 2020

2                   2:46 P.M. (EST)

3                      --oOo--

4          THE VIDEOGRAPHER:  We are on the record at

5     2:46 p.m. in the Eastern Time Zone.

6          Today is July 22nd, 2020.  We are here for the

7     video deposition of QuoteWizard.com represented by

8     Matthew Weeks, being taken by counsel for the plaintiff

9     in the matter of Joseph Mantha versus QuoteWizard.com.

10          This case is filed in the U.S. District Court

11     for the District of Massachusetts.  The case number is

12     1:19-cv-12235.

13          This deposition is being conducted remotely.

14     My name is Michael Takos from the firm Veritext, and I'm

15     the videographer.  The court reporter is Cheryl Spry

16     from the firm Veritext.

17          Counsel, please identify yourselves and state

18     whom you represent.  If there are any objections to the

19     proceeding, please state them at the time of your

20     appearance.

21          MR. BRODERICK:  This is Edward Broderick for

22     the plaintiff.

23          MR. POLANSKY:  This is Kevin Polansky on

24     behalf of the defendant, QuoteWizard.com, LLC.

25          THE VIDEOGRAPHER:  Will the court reporter

```
                                                  Page 5
 1      please swear in the witness.
 2                      MATTHEW WEEKS,
 3        sworn as a witness by the Certified Court Reporter,
 4                    testified as follows:
 5                       EXAMINATION
 6      BY MR. BRODERICK:
 7           Q.   Okay.  Thanks for being here, Mr. Weeks.
 8      Obviously, we met off the record, but my name is Ted
 9      Broderick and I represent the plaintiff, Joe Mantha.
10                The first thing I'm going to do is show you an
11      exhibit, which is the notice of this deposition.  Let's
12      see if I can do this correctly.
13                There.  Do you see that?
14           A.   I'm looking in the --
15           Q.   In the "Marked Exhibits."
16           A.   Let me refresh and see if it shows up.  I
17      still only see the Verizon IP.
18           Q.   Maybe go out of the doc -- out of the folder
19      and back in.
20           A.   Yeah.
21                MR. POLANSKY:  Matthew, double click on the
22      document again to refresh.
23           A.   Yeah, I see the -- now I see the notice of
24      30(b)(6) PDF.
25           Q.   (BY MR. BRODERICK:)  And Mr. Weeks, could you
```

Page 6

1    state your name, full name for the record and your job

2    title?

3         A.   Matthew Weeks.  And I am senior manager of

4    data partnerships for QuoteWizard.

5         Q.   Okay.  And do you recognize that notice of

6    30(b)(6) QuoteWizard document?

7         A.   I was -- yes, I do.

8         Q.   Okay.  And are you -- are you designated to

9    testify on behalf of QuoteWizard as to all topics listed

10   in that document?

11        A.   Yes.

12        Q.   And what did you do to prepare for this

13   deposition?

14        A.   I went back through my calendar to refresh

15   myself on some dates, as well as check some emails.

16        Q.   Did you speak with any other employees of

17   QuoteWizard?

18        A.   I did not.

19        Q.   And before you answered interrogatories as

20   they pertain to Mr. Mantha's alleged consent to receive

21   calls by or on behalf of QuoteWizard, did you talk to

22   other employees when you were answering interrogatories?

23        A.   I did not.

24        Q.   And do you understand that your testimony is

25   on behalf of QuoteWizard in each of the topics in that

Page 7

```
1        30(b)(6) notice?

2              A.    I do.

3                    MR. BRODERICK:  So I'm going to try to move

4        this into the "Introduce Exhibit."

5                    (Deposition Exhibit 1 was marked for

6                    identification.)

7                    MR. BRODERICK:  Okay, it looks like that

8        worked.

9              Q.    (BY MR. BRODERICK:)  What is your

10       understanding of Mr. Mantha's claim against QuoteWizard?

11             A.    I don't have much understanding of it.  I

12       mean, I seen -- briefly seen the complaint, and that's

13       about it.

14             Q.    Okay.  And do you have any understanding as to

15       restrictions placed on telemarketing by the Telephone

16       Consumer Protection Act, which I'll refer to as the

17       "TCPA"?

18                   MR. POLANSKY:  Objection.

19                   You can answer.

20             A.    Say that again?

21             Q.    (BY MR. BRODERICK:)  Do you have any

22       understanding of -- the statute that Mr. Mantha is suing

23       under is the Telephone Consumer Protection Act.  And I

24       was asking if you have any understanding as to what

25       that -- what restrictions that places on telemarketing.
```

```
                                                    Page 8

1              MR. POLANSKY:  Objection.

2              You can answer, if you know.

3         A.   I have a very high-level understanding of it,

4    not -- you know, by no means an expert on TCPA.

5         Q.   (BY MR. BRODERICK:)  That's fine.  What's your

6    understanding of the TCPA?

7         A.   It's the set of guidelines that telemarketers

8    have to abide by in order to obey the law.

9         Q.   Okay.  And what's your understanding of the

10   consent required to call someone whose telephone number

11   is listed on the National Do Not Call Registry?

12             MR. POLANSKY:  Objection.

13             You can answer.

14        A.   My understanding, I mean, if someone is on the

15   Do Not Call directory, a company should not call them.

16             THE VIDEOGRAPHER:  Counsel, could we go off

17   the record briefly?  I want to see if we can get your

18   microphone turned up.

19             MR. BRODERICK:  Sure.

20             THE VIDEOGRAPHER:  Going off record.  The time

21   now is 2:54 p.m.

22             (Discussion off the record.)

23             THE VIDEOGRAPHER:  We are back on record.

24   It's 2:55 p.m.

25        Q.   (BY MR. BRODERICK:)  Mr. Weeks, does
```

Page 9

1      QuoteWizard claim that Mr. Mantha provided his prior

2      expressed written consent to receive text messages from

3      QuoteWizard?

4           A.   It's our belief that consent was provided,

5      yes.

6           Q.   Okay.  And can you explain what that belief is

7      based on?

8           A.   The belief is based on information provided to

9      us from another company.

10          Q.   What are those other companies?

11          A.   That would be RevPoint Media.

12          Q.   Okay.  And you said "companies" plural.  What

13     others?

14          A.   I said company, singular.

15          Q.   Company, okay.  Sorry.

16               And what documents support that claim, that

17     Mr. Mantha gave prior expressed written consent?

18          A.   We have a contract with RevPoint that

19     explicitly states that they, you know, cannot break the

20     law and, you know, send us leads that have not been --

21     you know, have not given consent.

22               We also -- we do not purchase leads that don't

23     have a Jornaya LeadiD attached to them.

24          Q.   Okay.  Any other documents that support that

25     claim?

Page 10

```
 1              MR. POLANSKY:  What was that?  I couldn't hear
 2        that.
 3              Q.   (BY MR. BRODERICK:)  Any other documents that
 4        support the claim that Mr. Mantha provided prior
 5        expressed written consent?
 6              A.   We -- there -- when asked to provide -- when
 7        this initially came up and we received the complaint and
 8        reached out to RevPoint Media to provide the consent
 9        information, and they sent me some things such as the IP
10        address of the complainant, and as well as the URL to
11        the consent portion of the website that the complainant
12        went through.
13              Q.   Okay.  Who was it you spoke to at RevPoint to
14        collect that information?
15              A.   His name is Michael Fishman.
16              Q.   Did you talk to him on the telephone or did
17        you send him an email?
18              A.   I talked -- email.  I mean, I have talked to
19        him on the phone, not about this, but...
20              Q.   Okay.  And how did he provide that, that
21        document that we're discussing to you?  Did he email it
22        to you?
23              A.   Yes, email.
24              MR. POLANSKY:  Objection.
25              Q.   (BY MR. BRODERICK:)  Okay.  And I'm going to
```

```
                                                      Page 11
1          show you a document now.

2                      Okay.  In the "Marked Exhibits" folder, do you

3          see a document labeled "QuoteWizard Opt In"?

4               A.    Yes.

5               Q.    Okay.  Can you open that document and tell me

6          what it is?

7               A.    This is the report that I compiled after we

8          received the complaint from Mr. Mantha.

9               Q.    And you say you compiled this, or was it --

10         well, tell me what you mean by you "compiled" it.

11              A.     I mean exactly that, I compiled it.  I reached

12         out to RevPoint to get some of the information contained

13         in it, and I included the rest myself from our own

14         database.

15              Q.    What information in that document came from

16         RevPoint?

17              A.    The consumer IP address, the form URL.

18              Q.    Is that it?

19              A.    I believe so, yes.

20              Q.    And not the Jornaya LeadiD?

21              A.    That, like I said earlier, that's -- we don't

22         accept or buy a lead without a Jornaya LeadiD.  So that

23         is sent to us at the time, before we even purchase the

24         lead.  So that's our own database.

25              Q.    That's your own database?
```

Page 12

1          A.    It's contained in our own database.

2          Q.    Right.  But I wanted to know who put that

3     information in this document.

4          A.    I did.

5          Q.    And you got it from -- you got that Jornaya

6     LeadiD from RevPoint?

7          A.    No.  I got it from our own database.

8          Q.    How did it get into your database, is my

9     question.

10         A.    It was sent to us in the data packet with the

11    original purchase of the lead.  We work on a ping post

12    system.

13              MR. POLANSKY:  He's asking who sent the data

14    packet to you.

15         A.    RevPoint sent the data packet to us

16    originally.

17         Q.    (BY MR. BRODERICK:)  Okay.  And is there a

18    document -- when you say -- tell me what a ping post

19    system is.

20         A.    So it's how we purchase leads from vendors

21    like RevPoint.  We -- it's called ping post.  They send

22    into our system, they ping into our API a portion of

23    essentially a lead, a lead without all of the PII

24    information.

25              It comes into our system, into our API.  Our

Page 13

1    system takes a look at that -- this is all happening in

2    milliseconds -- determines whether we have a match for

3    that lead.

4              We then, if it matches, if we think -- you

5    know, if our system determines that, you know, we have

6    an agent or a corporate carrier that this lead matches

7    to, we return a bid to whoever the vendor is; in this

8    case, RevPoint.

9              RevPoint then either accepts the bid or

10   rejects the bid.  And if they accept the bid, they then

11   send us the rest of the lead details.  And that's it.

12        Q.   Okay.  You used an acronym "API."  What does

13   that stand for?

14        A.   You know, I should know that.

15        Q.   It happens a lot.

16        A.   I'm not a tech person.  It's, you know, it's

17   the acronym for the system.  I honestly don't know what

18   it is.

19        Q.   Okay.  And you also said that it's information

20   without a PI.  Is that personal information?

21        A.   Personal identifying information, the PII.

22        Q.   PII.  Okay, thank you.

23              So what is the -- what is the first -- what

24   data is in the first ping when you're provided a lead

25   that your system can then make a bid on?

Page 14

1          A.    I'm not -- I don't know.  I'm not sure exactly

2     what all is included in that.

3          Q.    Okay.  Do you know if consent has to be

4     validated in that first ping?

5              MR. POLANSKY:  Are we talking about Joseph

6     Mantha, or in general?

7          Q.    (BY MR. BRODERICK:)  Well, when you got the

8     Joseph Mantha thing sent to you, did it have consent

9     information in that first ping before your system would

10     provide a bid to --

11          A.    It had the Jornaya LeadiD.

12          Q.    And is that how you check whether the consent

13     is valid?

14          A.    Yes, that and, I mean, the fact that we have a

15     contract with our vendors that explicitly state they

16     have to obey all TCPA laws and laws in general.

17          Q.    Right.  So you rely on the vendor to secure

18     the consent, there is nothing else that -- well, is that

19     correct, that you rely on the vendor to secure prior

20     expressed written consent from people to whom text

21     messages are sent?

22              MR. POLANSKY:  I'm just going to object to the

23     extent that it relates to any of the other potential

24     plaintiffs, other than Mr. Mantha.

25          Q.    (BY MR. BRODERICK:)  All right.  Well, for

Page 15

1       Mr. Mantha, were you relying on RevPoint to obtain his

2       prior expressed written consent?

3            A.   They are responsible for securing that.

4            Q.   And QuoteWizard itself doesn't do anything

5       to -- doesn't secure consent on its own on top of the

6       obligation that RevPoint had to get Mr. Mantha's

7       consent; correct?

8            A.   On top of the contracts that we have and the

9       requiring of a Jornaya LeadiD?

10           Q.   Right.

11           A.   We do not.

12           Q.   Okay.  And on what system did you create this

13      what I'll call the QuoteWizard opt in?

14           A.   What system?

15           Q.   Yeah.

16           A.   Microsoft Word.

17           Q.   Okay.  And you pulled this from this API

18      system, this data that you filled into this, other than

19      what was provided to you by --

20           A.   I pulled the data from our SQL databases.

21           Q.   And how did you -- how did you pull that data?

22      Did you have to run a query?

23           A.   Correct, I wrote a query and ran it and pulled

24      the information around this lead.

25           Q.   And what -- what items would you put into a

Page 16

1          query to be able to pull up Mr. Mantha's -- the

2          information that populated this document?

3                A.    Phone number, email address.

4                Q.    Did you have to use the Jornaya LeadiD?

5                A.    I did not have the Jornaya LeadiD at the time.

6          I had to pull the lead information to get that.

7                Q.    Okay.  And did you have the consumer IP

8          address when you pulled the lead?

9                A.    I did not.  That was provided by RevPoint.

10               Q.    And the "Form URL & Carrie List URL," was that

11         pulled from your system or that was provided by

12         RevPoint?

13               A.    That was provided by RevPoint.

14               Q.    Do you know what "Carrie List," and that's

15         C-A-R-R-I-E list, "URL stands" for, means?

16               A.    That's a typo.  It's supposed to say carrier

17         list.

18               Q.    Okay.  Okay.  And at the bottom, well, not the

19         very bottom, but then there is something that says "TCPA

20         Disclosure," which is bolded.

21               A.    Uh-huh.

22               Q.    Where did that data come from, that language?

23               A.    That came from the link provided by RevPoint

24         Media that is the form URL.

25               Q.    And did you copy and -- did you go -- did you

Page 17

1    click on that link URL that was provided by RevPoint?

2         A.   Yes, I did.

3         Q.   And then did you cut and paste that language

4    and put it in this document?

5         A.   Correct.

6         Q.   Okay.  And what about the -- below the "TCPA

7    Disclosure" in bold it says "Screenshot."  Does that --

8    where did that language come from?

9         A.   That was a screenshot that I captured after

10   clicking on the link for RevPoint Media.

11        Q.   And is -- was TCPA, the words "TCPA

12   Disclosure," was that on the Snappy Auto Insurance link?

13        A.   No, that's part of the -- that's just the

14   heading for that section of the file.

15        Q.   Okay.  So is it -- the Snappy Auto Insurance

16   website, when you clicked on it, did it say the words

17   "TCPA Disclosure"?

18        A.   It did not.

19        Q.   Okay.  And when did you create this document?

20   This is you say after the litigation was filed; correct?

21             MR. POLANSKY:  Objection.

22             You can answer.

23        A.   Correct.  I just was -- this was after we

24   received the complaint.

25        Q.   (BY MR. BRODERICK:)  Okay.  And so, again,

Page 18

1    where it says "Screenshot" in bold, is that also just a

2    header that did not appear on the Snappy Auto Insurance

3    website?

4         A.   Correct.  It's a header that I -- that's part

5    of this report.

6         Q.   Okay.  Where on the Snappy Auto Insurance site

7    did you get that, the language that follows

8    "Screenshot"?

9         A.   I'm not sure I follow your question.

10        Q.   Well, below "Screenshot" and the colon, it

11   says in fairly small font, "By clicking the 'Compare

12   Rates' button, I hereby consent to receive marketing

13   communications via autodialed and/or pre-recorded calls,

14   including SMS messages," and then it continues.

15             I'm just wondering where you got that.

16        A.   That's a screenshot of the website.  I didn't

17   type that under -- that's a screen capture of the

18   website.

19        Q.   Is that a separate web page on the Snappy Auto

20   Insurance website?

21        A.   A separate web page?  I'm --

22        Q.   Well, I'm just saying that -- it says

23   "Screenshot," and I'm saying screenshot of what?

24        A.   That is a screenshot of the consent language

25   from the Snappy Auto website.

```
                                                         Page 19
```

1          Q.   Okay.  And would you agree with me that that

2     screenshot does not mention QuoteWizard?

3               MR. POLANSKY:  Objection.

4          A.   It mentions QuoteWizard in "marketing

5     partners."

6          Q.   (BY MR. BRODERICK:)  But the word

7     "QuoteWizard" does not appear in that screenshot;

8     correct?

9          A.   QuoteWizard does not appear in that

10    screenshot, no.

11         Q.   And under TCPA disclosure, QuoteWizard's name

12    does not appear in the TCPA disclosure; correct?

13         A.   QuoteWizard does not appear.

14              MR. BRODERICK:  Okay.  I'm going to introduce

15    that document, I hope.  Or no, sorry.  And that will be

16    Exhibit No. 2.

17              (Deposition Exhibit 2 was marked for

18              identification.)

19         Q.   (BY MR. BRODERICK:)  Now, Mr. Weeks, I want to

20    show you QuoteWizard's answers to interrogatories in

21    this case, now being put in the "Marked Exhibits"

22    folder.  If you'd open those --

23         A.   Yep.

24         Q.   -- and I'll ask you a few questions.

25              Do you recognize that document?

```
                                                   Page 20
 1          A.    Yes.

 2          Q.    And what is it?

 3          A.    What is the document?  It's the answers to the

 4     interrogatories.

 5          Q.    Right.  And at the bottom, the very last thing

 6     in the document is a "Verification."  And did you

 7     authorize your digital signature to be put on that

 8     verification?

 9          A.    Yes, I did.

10          Q.    Okay.  So these are your answers on behalf of

11     QuoteWizard?

12          A.    Yes.

13          Q.    And in your answers to interrogatories, you

14     said that you got the -- you got the data from RevPoint.

15     And that's correct; right?

16          A.    Yes.

17          Q.    And then in the I guess it's interrogatory

18     answer No. 4, you say that you got that -- you

19     understand that RevPoint got -- got its data from Plural

20     Marketing Solutions, Inc.

21             Is that -- first of all, is that a fair --

22     well, is that a fair summary of your answer to No. 4?

23             MR. POLANSKY:  After the objection?

24          Q.    (BY MR. BRODERICK:)  After the objection, yes,

25     where it starts with, "Further answering...."
```

```
                                                    Page 21
1          A.    On No. 4.

2          Q.    Yeah, I'll read it to you.  It might be

3    easier.  "Further answering, QuoteWizard states that

4    Plaintiff's consent was generated on

5    www.SnappyAutoInsurance.com on August 5, 2019;

6    QuoteWizard received Plaintiff's lead information and

7    consent to contact from RevPoint Media prior to the time

8    QuoteWizard sent or caused to be sent any text messages

9    to Plaintiff; RevPoint has asserted that Plural

10   Marketing Solutions, Inc. a/k/a Plural Marketing Group,

11   PLMRKG," and that's all caps, ".com or unitedquotes.com

12   ('Plural') originated Plaintiff's subject lead and/or

13   that it received the lead from Plural;" and that

14   Plaintiff's lead contains the Jornaya LeadiD.

15          Do you believe all of that statement remains

16   true?

17          A.    Yes.  I learned about Plural Marketing through

18   counsel and information relayed by them.

19          Q.    Okay.  And did you -- you didn't talk to

20   anybody at RevPoint to find out where they got the

21   information?

22          A.    No.

23          Q.    And who do you believe put the Jornaya LeadiD

24   on the data package that was sent to you by RevPoint?

25          MR. POLANSKY:  Objection.
```

```
                                                       Page 22
 1            Q.    (BY MR. BRODERICK:)   If you know.

 2            A.    I have no idea.

 3            Q.    And nobody at RevPoint has ever told you they

 4       were responsible for the Jornaya LeadiD?

 5            A.    No.

 6            Q.    And how about anybody at Plural?

 7            A.    No.

 8            Q.    Okay.  And have you ever spoken with Adam

 9       Brown?

10            A.    No.

11            Q.    Have you had any email communication with him?

12            A.    No.

13            Q.    Have you spoken with anyone at

14       SnappyAutoInsurance.com?

15            A.    No.

16            Q.    And how about unitedquotes.com?

17            A.    No.

18            Q.    Now, the QuoteWizard opt in that we looked at

19       earlier, that doesn't reference unitedquotes.com, does

20       it, as being the sourced URL for Mr. Mantha's consent?

21            A.    No.  I believe that document lists a Snappy

22       something URL.

23            Q.    But you put this in your interrogatory answer

24       because you believed that Plural had represented that

25       that was their source of the Mantha opt-in data;
```

Page 23

1      correct?

2              MR. POLANSKY:  Objection.

3          A.    I didn't follow that question.

4          Q.    (BY MR. BRODERICK:)  Yeah, I don't blame you.

5              You say that "RevPoint has asserted that

6      Plural Marketing Solutions... or unitedquotes.com."

7              Do you know the relationship between Plural

8      Marketing Solutions and unitedquotes.com?

9          A.    I do not.

10         Q.    But RevPoint -- so this information is that

11     RevPoint was told by Plural that Plural originated the

12     lead, the subject lead.  But what I'm wondering about is

13     what did RevPoint say about whether unitedquotes.com was

14     the actual source as opposed to SnappyAutoInsurance.com?

15         A.    Never had any communication with RevPoint

16     about any of that.

17         Q.    But how about QuoteWizard as a whole?  I think

18     we're entitled to know where did this come from or know

19     what you know about where it came from.

20         A.    Like I said, the Plural Marketing, the only

21     reason I'm aware of them is information I was given from

22     counsel.

23              MR. POLANSKY:  Don't speak about what you

24     learned from counsel.

25              MR. BRODERICK:  Well, I guess I just want to

Page 24

1        lodge an objection that I think we're entitled to know

2        what QuoteWizard knows about the facts relating to how

3        Mr. Mantha's consent was generated.

4                So those are facts and not -- not legal

5        advice, but just this is what we know about where this

6        consent came from.

7                MR. POLANSKY:  Well, I think he's testified to

8        that.  I mean, I think he's testified that, you know,

9        where the consent came from was from RevPoint.  That is

10       his information.  He hasn't spoken to Plural.

11               MR. BRODERICK:  Right, but I want to know why

12       he was able to answer in an interrogatory that RevPoint

13       said that it was Plural.  And what I'm also just not

14       clear on is whether Plural and unitedquotes.com are one

15       in the same or they're -- whether there is an assertion

16       that this supposed lead and opt-in consent, prior

17       expressed written consent was provided on

18       unitedquotes.com or on SnappyAutoInsurance.com.

19               MR. POLANSKY:  Right, but I think his

20       information on that answer is coming through counsel.

21       That's information learned through discovery in this

22       case.  And he's provided what he knows in the answer.

23               MR. BRODERICK:  Okay.  Well, we'll table that

24       for now, but I think we are entitled to that because

25       they are facts in possession of QuoteWizard.

Page 25

1           Q.    (BY MR. BRODERICK:)   Do you know who Plural

2      obtained Mr. Mantha's data from?

3           A.    I do not.

4           Q.    Do you know what Plural Marketing Solutions,

5      Inc., is or does?

6           A.    I do not.

7           Q.    Do you know what RevPoint's relationship is to

8      Plural?

9           A.    I do not.

10          Q.    Does QuoteWizard have any relationship with

11     Plural?

12          A.    We do not.

13          Q.    Do you know, I think I might have just asked

14     this, do you know how Plural obtained Mr. Mantha's data?

15          A.    I do not.

16          Q.    Are you now aware that Plural was not the

17     original source of Mr. Mantha's opt-in data and that the

18     original source was reportedly SnappyAutoInsurance.com

19     run by a man named Adam Brown?

20          A.    In -- I'm not sure.  You just told me that, so

21     I'm aware of it.

22          Q.    But you hadn't heard that before?

23          A.    No.

24          Q.    So you do not know who Adam Brown is?

25          A.    I do not.

Page 26

1          Q.    And you don't know his role in regard to this

2     case?

3          A.    I do not.

4          Q.    And the QuoteWizard opt in notes a date of

5     August 5th, 2019.  What is it that happened on that date

6     that caused you to put that in that document?

7          A.    That was the date that we purchased the lead

8     from RevPoint Media.

9          Q.    That's the date of the purchase.  It's not --

10    is it the date on which Mr. Mantha supposedly visited

11    the website?

12         A.    I do not know.

13         Q.    How is that date recorded by your system?

14         A.    How is it --

15              MR. POLANSKY:  Objection.

16         Q.    (BY MR. BRODERICK:)  Well, you did a query of

17    a SQL database to pull this information?

18         A.    Correct.

19         Q.    And when you pulled up information relating to

20    Mr. Mantha, August 5th was in there as the date of

21    purchase?

22         A.    Yes.

23         Q.    And the website reference on the QuoteWizard

24    opt in is www.SnappyAutoInsurance.com.  What's the --

25    what's the significance of that reference in the

Page 27

1    document?

2         A.   I'd have to go -- I mean, I have the

3    interrogatories up right now, so I'd have to go back to

4    the document.

5         Q.   Let's go back.  Fair point.

6              MR. POLANSKY:  So we're going back to

7    Exhibit 2?

8              MR. BRODERICK:  That's right.

9         Q.   (BY MR. BRODERICK:)  Do you have it up?

10        A.   I do, yes.

11        Q.   Okay.  And it says "Form URL," and it should

12   say "Carrier List URL."  I just wanted you to explain to

13   me again what that -- where you got that information,

14   how you pulled it out of the SQL database.

15        A.   That did not come from the SQL database, that

16   came from RevPoint Media in an email that was sent to

17   me.

18        Q.   And when was that email sent to you?

19        A.   I'm -- I don't know.  I'd have to check my

20   email.

21        Q.   Do you know if that email was produced in this

22   litigation?

23        A.   I do not.

24             MR. POLANSKY:  Objection.  It was identified

25   in the privilege log.

```
                                            Page 28
1              MR. BRODERICK:  And why is that -- why is an

2      email from RevPoint privileged?

3              MR. POLANSKY:  We can talk about it now, we

4      can talk about it later.  It's privileged because it was

5      after receiving a demand letter from your -- I guess

6      your colleagues on behalf of the plaintiff in

7      preparation for litigation.

8              MR. BRODERICK:  So it's work product?

9              MR. POLANSKY:  That's right.

10             MR. BRODERICK:  Gathering information from

11     RevPoint about where the consent came from.  Okay.  I'll

12     just reserve that issue and keep moving.

13             MR. POLANSKY:  I understand.

14         Q.   (BY MR. BRODERICK:)  And was any other

15     information in this document emailed to you by RevPoint?

16         A.   Like I said, the IP address was in there as

17     well.

18         Q.   In an email?

19         A.   Yes.

20         Q.   And so did this -- Mr. Mantha's, is that the

21     way your system works, that Mr. Mantha, that you

22     wouldn't -- if you got a lead like Mr. Mantha's, would

23     that form URL ordinarily be in the data packet?

24         A.   No.

25             MR. POLANSKY:  Objection.
```

Page 29

1          Q.    (BY MR. BRODERICK:)   And would the consumer IP

2     address normally be in the data packet?

3               MR. POLANSKY:   Again, just relating to

4     Mr. Mantha; right?

5               MR. BRODERICK:   Yeah.   Well, I want to know if

6     Mr. Mantha's is unique.

7               MR. POLANSKY:   Objection.

8          A.    I'm not sure I -- what was the question?

9          Q.    (BY MR. BRODERICK:)   The "Consumer IP Address"

10    that shows up here, would you expect to find that in

11    a -- in the data packet that would already be in your

12    SQL database, or would you ordinarily have to get that

13    from the lead provider, in this case RevPoint, via an

14    email?

15         A.    We --

16              MR. POLANSKY:   Objection.

17              You can answer.

18         A.    Like I said, we reach out to the lead provider

19    and they give us the IP address.   It's not in the data

20    packet.

21         Q.    (BY MR. BRODERICK:)   It's not in the data

22    packet.   How about the Jornaya LeadiD, is that in the

23    data packet, or do you have to get that after the fact?

24              MR. POLANSKY:   Objection --

25         A.    That is --

Page 30

1          MR. POLANSKY:  -- to the extent it's speaking

2     about any others.

3          You can answer.

4          A.   The Jornaya LeadiD is something that we

5     require.  We don't purchase a lead without it being sent

6     to us as part of the -- as part of the lead information

7     being sent on the -- on the ping.  That's something that

8     we get before we even formulate a bid.  We will not buy

9     a lead without it.

10         Q.   (BY MR. BRODERICK:)  And was Mr. Mantha's, the

11    Jornaya LeadiD, was that in the ping that you got from

12    RevPoint?

13         A.   Yes.

14         Q.   So that is not a piece of information that you

15    had to get via email to put into this form; correct?

16         A.   Correct.

17         Q.   Okay.  Thank you very much.

18         So did that URL, form URL, did RevPoint tell

19    you this is where Mr. Mantha opted in to get

20    solicitations?

21         A.   That was the URL that was provided when I

22    asked for the consent information.

23         Q.   Okay.  And the IP address in this form, what

24    is the significance of that IP address?

25              MR. POLANSKY:  Objection.

Page 31

1          Q.    (BY MR. BRODERICK:)   Let me ask you, why did

2      you include an IP address?

3          A.    Why do I include an IP address in this report?

4          Q.    Yes.

5          A.    This is a report that we do.  It's kind of a

6      template, if you will.  We do a lot of work with a lot

7      of the large insurance carriers, and this was a report

8      that was formulated with them as far as satisfying

9      requests from them.

10         Q.    Okay.  And it says, "Consumer IP Address."  Is

11     that meant to be this is the IP address from which

12     Mr. Mantha opted in to get text messages from

13     SelectQuote?

14              MR. POLANSKY:   Objection.

15         A.    It's the IP address that was provided to us by

16     RevPoint when asking for the complainant's IP address.

17         Q.    (BY MR. BRODERICK:)   Okay.  And so the IP

18     address should -- should match Mr. Mantha or someone

19     associated with Mr. Mantha, if he was the one who opted

20     in to get this text; correct?

21              MR. POLANSKY:   Objection.

22         A.    I'm not an IP address expert.  I -- I don't

23     know.

24         Q.    (BY MR. BRODERICK:)   Okay.  Do you know

25     whether or not this IP address matches Mr. Mantha's IP

```
                                              Page 32
1       address?

2              A.    I do not.

3              Q.    If they don't match, could you explain why

4       that would be the case?

5              MR. POLANSKY:  Objection.

6              A.    I'm not an IP address expert.  I can't.

7              Q.    (BY MR. BRODERICK:)  So you couldn't explain

8       why the IP address might tie to New Jersey, for example?

9              A.    Yeah, I don't know.

10             Q.    Okay.  And the language, that "TCPA

11      Disclosure" language, can you tell me the date on which

12      you cut and pasted that language from the Snappy Auto

13      Insurance website?

14             A.    I cannot tell you the exact date.

15             Q.    But it was not on August 5th, 2019; correct?

16             A.    No.  We didn't receive the complaint at that

17      point.

18             Q.    Okay.  And can -- and it was after you -- this

19      whole document was created after you got the complaint

20      and you were trying to figure out where did this come

21      from; correct?

22             A.    Correct.

23             Q.    And do you know the date on which RevPoint

24      claims that Mr. Mantha visited SnappyAutoInsurance.com

25      to opt in to get text messages on behalf of QuoteWizard?
```

```
                                                          Page 33

 1              A.    I do not.

 2              Q.    Do you know what AutoInsurQuotes.com is?

 3              A.    I do not.

 4              Q.    Does it have any affiliation or relation to

 5         QuoteWizard?

 6              A.    Not that I'm aware of.

 7              Q.    And at any time, was QuoteWizard a marketing

 8         partner of AutoInsurQuotes.com?

 9                    MR. POLANSKY:  Objection.

10              A.    I -- a direct partner?

11              Q.    (BY MR. BRODERICK:)  No, a marketing partner.

12         Pardon me.

13              A.    As in one of my vendors that I work with like

14         RevPoint or --

15              Q.    Well, the language in the TCPA, after -- the

16         heading you put in of "TCPA Disclosure," it says, "I

17         hereby consent to receive marketing communications via

18         autodialed and/or pre-recorded calls, including SMS

19         messages, from AutoInsurQuotes.com and one or more of

20         its marketing partners...."

21                    Is QuoteWizard a marketing partner of

22         AutoInsurQuotes.com?

23                    MR. POLANSKY:  Objection.

24              A.    I -- the way the -- I do not know.

25              Q.    (BY MR. BRODERICK:)  Okay.  But you've never
```

```
                                                    Page 34
1        heard of AutoInsurQuotes.com; correct?
2             A.    Correct.
3             Q.    Would you know who your marketing partners are
4        in your job?
5                   MR. POLANSKY:  Objection.
6             A.    I know who my direct partners are.
7             Q.    (BY MR. BRODERICK:)  So is it fair to say that
8        you know you don't have a contract with
9        AutoInsurQuotes.com?
10            A.    Yes.
11            Q.    And the opt -- the QuoteWizard opt in, same
12       exhibit, references a "Jornaya Lead ID."
13                  Can you tell me, what is Jornaya?
14            A.    They're a company.  I don't work for Jornaya,
15       so I'm not the best to explain what they are, but they
16       are -- my understanding is they're a lead verification
17       company.  They're kind of an industry standard, that
18       everybody uses them or TrustedFrom, at this point.
19            Q.    TrustedFrom is their competitor?
20            A.    I believe that's the case, yes.
21            Q.    Okay.  And what does -- does QuoteWizard have
22       a contract with Jornaya?
23            A.    We do not.
24            Q.    Has it ever had a contract with Jornaya?
25                  MR. POLANSKY:  Objection.
```

```
                                                    Page 35
 1            A.    Not that I'm aware of.
 2            Q.    (BY MR. BRODERICK:)  And what's your
 3       understanding of what a Jornaya LeadiD signifies?
 4       What -- well, let me strike that.
 5                  Why does QuoteWizard require an Jornaya LeadiD
 6       on any lead that it buys?
 7                  MR. POLANSKY:  Objection.
 8            A.    We require it for a number of reasons.  I
 9       mean, it's a signifier that there is a record around the
10       leads, and it is also something that all of the major
11       carriers, all of our head buyers require as well.
12            Q.    (BY MR. BRODERICK:)  And is it fair to say
13       that Jornaya and QuoteWizard have no direct
14       relationship?
15            A.    Not that I'm aware of.
16            Q.    Okay.  And should that -- when does that --
17       let me strike that.  I may have asked this, and I
18       honestly apologize.
19                  You don't know the date on which Mr. Mantha
20       supposedly visited SnappyAutoInsurance.com; correct?
21            A.    I do not.
22            Q.    And does the Jornaya LeadiD confirm the
23       address used to access the SnappyAutoInsurance.com
24       website on some date?
25                  MR. POLANSKY:  Objection.
```

```
                                                    Page 36
 1              A.    I didn't follow the question.

 2              Q.    (BY MR. BRODERICK:)  Well, the Jornaya LeadiD,

 3      does Jornaya capture the IP address of -- did it capture

 4      the IP address of Mr. Mantha when he was visiting this

 5      website?

 6                    MR. POLANSKY:  Objection.

 7              A.    I'm not sure what Jornaya -- I don't work for

 8      Jornaya.  I don't --

 9              Q.    (BY MR. BRODERICK:)  You don't know what

10      Jornaya --

11              A.    No.

12              Q.    Do you know where RevPoint got the IP address

13      that it provided to you?

14              A.    I do not.

15              Q.    And this was provided directly from RevPoint,

16      not from Plural; correct?

17              A.    Correct.

18              Q.    And do you know if the Jornaya LeadiD -- so

19      the -- the Jornaya LeadiD was not the source of the

20      disclosure, the "TCPA Disclosure" language you have at

21      the bottom of the QuoteWizard opt in which is Exhibit 2;

22      correct?

23                    MR. POLANSKY:  Objection.

24              A.    That's correct.  As I said before, it came

25      from the URL that was provided by RevPoint Media.
```

Page 37

1          Q.   (BY MR. BRODERICK:)  Did you do anything to

2     try to match that disclosure language to the date or

3     dates on which Mr. Mantha visited, allegedly visited

4     that website?

5               MR. POLANSKY:  Objection.

6          A.   I'm not sure I understand the question.

7          Q.   (BY MR. BRODERICK:)  Well, you -- on the date

8     that you can't remember, and I understand that, that you

9     compiled this document as you said, that language was

10    what was on the website on the day on which you visited;

11    correct?

12         A.   That is correct.

13         Q.   But you can't say whether the same language

14    was on the website earlier, can you?

15         A.   I cannot say.

16         Q.   And is that the only time you visited

17    SnappyAutoInsurance.com?

18         A.   Yes.

19         Q.   Let's turn to another exhibit.

20              MR. POLANSKY:  Ed, before we get into the next

21    exhibit, can we take a short break?

22              MR. BRODERICK:  Absolutely.  Good thinking.

23              THE VIDEOGRAPHER:  We're going off the record.

24    The time now is 3:42 p.m. in the Eastern Time Zone.

25              (Recess.)

```
                                                      Page 38
  1                 THE VIDEOGRAPHER:  We are back on record.  The
  2         time now is 3:51 p.m. in the Eastern Time Zone.
  3                 Q.   (BY MR. BRODERICK:)  Mr. Weeks, are you aware
  4         that RevPoint was issued a subpoena in this case in
  5         regards to all documents related to Mr. Mantha's consent
  6         to receive texts from QuoteWizard?
  7                 MR. POLANSKY:  Did you say RevPoint was or
  8         QuoteWizard was?
  9                 MR. BRODERICK:  RevPoint was.
 10         A.    I'm not aware of anything from RevPoint.
 11                 Q.   (BY MR. BRODERICK:)  Have you ever seen what
 12         RevPoint produced in response to that subpoena?
 13         A.    No.
 14                 Q.   But it's RevPoint that QuoteWizard purchased
 15         Mr. Mantha's data from; correct?
 16         A.    Yes.
 17                 Q.   And that data is reflected in the QuoteWizard
 18         opt in, correct, which is Exhibit 2?
 19         A.    Correct.
 20                 Q.   Would you expect, then, that RevPoint would
 21         produce documents that would match the information you
 22         put on the QuoteWizard opt in?
 23                 MR. POLANSKY:  Objection.
 24         A.    Yes.  I mean, it should match.
 25                 Q.   (BY MR. BRODERICK:)  Okay.  So I'm going to
```

1       ask you to look at, in the "Marked Exhibits" folder, the

2       RevPoint's subpoena response --

3           A.    Okay.

4           Q.    -- which I'll represent to you -- sorry.

5           MR. POLANSKY:  Is it "Subpoena Response

6       Combined"?

7           Q.    (BY MR. BRODERICK:)  Yeah, "RevPoint Subpoena

8       Response Combined."  Do you got it?

9           A.    Yep.

10          Q.    Okay.  So you've never seen this document

11      before; correct?

12          A.    I have not, no.

13          Q.    Okay.  I'm going to ask you to -- I'll

14      represent to you that this is what was produced in

15      response to a subpoena issued by the plaintiff in the

16      case by RevPoint.  And I'm going to ask you to scroll to

17      the last page.

18          A.    Okay.

19          Q.    Which was -- this was what was provided by

20      RevPoint.  And would you look at that last page?  Do you

21      see any reference in this document to

22      SnappyAutoInsurance.com?

23          A.    I don't see SnappyAutoInsurance, no.

24          Q.    And does this document make any reference to

25      the date of any website visit?

```
                                                        Page 40

1              A.    Not that I can tell.

2              Q.    Okay.  And does it have an IP address listed?

3              A.    Yes.

4              Q.    And that IP address is 66.189.107.166;

5        correct?

6              A.    Yes.

7              Q.    And now I'm going to ask you to flip back to

8        Exhibit No. 2, which is the QuoteWizard opt in document

9        you compiled.

10             A.    To the -- which -- there is two versions now.

11       Exhibit 2 or the original QuoteWizard opt in?

12             Q.    Exhibit 2, sorry, Exhibit 2 is what I want you

13       to look at.

14             A.    I'm there.

15             Q.    Okay.  That IP address is 96.242.132.28.

16       That's a different IP address than appears in the

17       RevPoint subpoena response; correct?

18             A.    Yes.

19             Q.    Is it your belief that either of those --

20       well, is it your belief that this IP address, this

21       consumer IP address connects to Mr. Mantha?

22                   MR. POLANSKY:  Objection.

23             A.    Which -- which IP address are you talking

24       about?

25             Q.    (BY MR. BRODERICK:)  On Exhibit 2, do you
```

Page 41

1      think that IP address connects to Mr. Mantha?

2                 MR. POLANSKY:   Objection.

3           A.    That's the IP address that was provided to me

4      by RevPoint when asked for Mr. Mantha's IP address.

5           Q.    (BY MR. BRODERICK:)   Okay.  Do you have any

6      more understanding or do you know why those IP addresses

7      are different in those two documents?

8           A.    No idea.

9           Q.    Now I want to show you another -- well, I want

10     to introduce that before I forget.  Actually, let me

11     introduce the QuoteWizard answers to interrogatories.

12     We'll make that Exhibit 3.

13                And then I'm going to introduce the RevPoint

14     response as Exhibit 4, the subpoena response.

15                (Deposition Exhibits 3-4 were marked for

16                identification.)

17          Q.    (BY MR. BRODERICK:)   It will take a little

18     while to load.  My apologies.

19                Okay.  Now I'll show you -- sorry, I'm in the

20     wrong folder.  I want to show you another document that

21     I can represent to you is a response to a subpoena

22     issued by the plaintiff in this case.

23          A.    Which one do you want me looking at?

24          Q.    I'm trying to make sure I'm asking you to look

25     at the right one.

```
                                              Page 42
 1           A.    "Tracks to Guerrero"?
 2           Q.    Right.  And I can represent to you that this
 3      is a response to a subpoena issued in this case by your
 4      attorneys, and particularly Christine Kingston.
 5              Have you seen that document before?
 6           A.    I have not.
 7           Q.    Okay.  And I'll ask you to scroll to the
 8      second page.  And do you recognize where it says "Target
 9      Details"?
10           A.    Yes, I see that.
11           Q.    And is that -- that is the same IP address as
12      was on the RevPoint subpoena response, correct, which is
13      66.189.107.166?
14           A.    Without seeing the two documents right next to
15      each other, I can't say that that's the same.
16           Q.    Okay.  Well, let me -- let me read to you
17      first, before I show you -- we go back to the RevPoint
18      subpoena response, this subpoena, this is from Charter
19      Communications saying, "Charter Communications, Inc.
20      acknowledges receipt of the above referenced request for
21      subscriber information."  And it says, "Pursuant to the
22      specific obligations imposed by 47 U.S.C. section 551(c)
23      and (h), the Federal Cable Privacy Act, this letter is
24      to advice you that Charter investigated and was able to
25      identify the attached information."
```

```
                                                    Page 43
1             Now, so let's go back to the Exhibit 4.

2      Scroll all the way to the bottom.  And that IP address,

3      where it says "IP address," colon, it says,

4      "66.189.107.166."

5             Now, that's the same IP address as Charter

6      Communications' response in the documents we were just

7      looking at; correct?

8             MR. POLANSKY:  Objection.

9      A.    Like I said, I mean, I'd like to see the two

10     next to each other or write them down and compare.

11     Q.    (BY MR. BRODERICK:)  No, that's fine.  Let's

12     write them down.  We'll go back to Exhibit 4.  You can

13     write this -- write down -- this was RevPoint, this is

14     RevPoint's response to a subpoena, Exhibit 4.  There is

15     an IP address in that document.

16     A.    Uh-huh.

17     Q.    And you can write it down.

18     A.    Yeah.

19     Q.    66.189.107.166.

20     A.    Yes, I've written that down.

21     Q.    Okay.  And then after we got that, your

22     attorney sent a subpoena to Charter Communications

23     trying to find out who owned that IP address, who was

24     using that IP address.

25             And do you see "Target Details"?  That's the
```

Page 44

1    same number in Charter Communications' response, which

2    is 66.189.107.166.

3         A.   Yes, that's the same.

4         Q.   And then there is a date there, six dash --

5    "6/26/2019."  Correct?

6         A.   Correct.

7         Q.   And there is an individual listed named Mario

8    Guerrero who lives at 26 Pemberton Street, Apartment 2

9    in Worcester, Mass.  Do you see that?

10        A.   Yes.

11        Q.   And are you aware that your attorneys are

12   going to depose -- well, I guess it's not going to be

13   Mr. Guerrero because he's a minor, but it could be his

14   sister?

15             MR. POLANSKY:  Objection; relevance.

16        Q.   (BY MR. BRODERICK:)  Well, do you know if that

17   IP address ties to Mr. Mantha?

18             MR. POLANSKY:  Objection.

19        A.   I don't know.

20        Q.   (BY MR. BRODERICK:)  And so you can't explain

21   why RevPoint's subpoena response has an IP address that

22   does not match what was in QuoteWizard's opt in, which

23   is Exhibit 2?

24             MR. POLANSKY:  Objection.

25        A.   I -- I can't explain why it doesn't match what

```
                                                      Page 45

 1        RevPoint provided to me.

 2                 MR. BRODERICK:  Okay.  And I'd like to

 3        introduce this IP subpoena for RevPoint, which will be

 4        Exhibit 5.

 5                 (Deposition Exhibit 5 was marked for

 6                 identification.)

 7        Q.   (BY MR. BRODERICK:)  Were you aware that

 8        Plural Marketing Solutions was issued a subpoena for all

 9        documents related to Mr. Mantha's alleged consent to

10        receive texts from QuoteWizard?

11        A.   I was not.

12        Q.   So you haven't seen that response before

13        today?

14        A.   I have not.

15        Q.   So I'm going to show you another document.

16        This is in the "Marked Exhibits" folder, and it is

17        Plural -- we have a typo, but it's supposed to say

18        "Plural Response to Mantha Subpoena."

19        A.   Yes, I see that.

20        Q.   And you've never seen this document before;

21        correct?

22        A.   I have not.

23        Q.   And I'll ask you to go all the way to the

24        bottom, end of the document.  Actually, excuse me, not

25        the end of the document.  We're on page -- after
```

```
                                               Page 46
 1       Exhibit C, if you can scroll down.
 2            A.   Okay.
 3            Q.   And this is, I'll represent to you, is
 4       Plural's response to a subpoena issued by the plaintiff
 5       in this case.
 6            A.   Okay.
 7            Q.   And do you see, if you scroll down, do you see
 8       applicant -- "Applicant IP Address"?
 9            A.   Yes.
10            Q.   You can write that one down, too, but it's --
11       let me introduce this before I get too far so we can be
12       clear enough what we're talking about.  I'm going to
13       introduce this as Exhibit 6.
14                 (Deposition Exhibit 6 was marked for
15                 identification.)
16            Q.   (BY MR. BRODERICK:)  So now you can look at
17       the marked version with the stamp on it, Exhibit 6.
18       Just tell me when you have it up on your screen.
19            A.   And go back down to just below Exhibit C?
20            Q.   Thank you, yes.
21            A.   Okay.
22            Q.   Do you see where it says "IP Address"?
23            A.   Yes.
24            Q.   And this is in Exhibit 6, there is an IP
25       address of "96.242.132.28."
```

```
                                                    Page 47
 1            A.    Yes.

 2            Q.    And then it says "Applicant IP Address."

 3            A.    Yes.

 4            Q.    And then it says, "Applicant IP Address ISP:

 5       Verizon."

 6                  You understand "ISP" means Internet service

 7       provider?

 8            A.    Yes.

 9            Q.    And the "Applicant IP Location" is listed as

10       Morristown, New Jersey?

11                  MR. POLANSKY:  Are you just asking him to read

12       from the document?

13            Q.    (BY MR. BRODERICK:)  Yeah.  Well, I'm just

14       saying -- how do you understand what that means?  That's

15       where the person applied from; correct?

16                  MR. POLANSKY:  Objection.

17            A.    That's the location of this IP address.  I

18       don't --

19            Q.    (BY MR. BRODERICK:)  And that IP address

20       provided by Plural as the "Applicant IP Address" doesn't

21       match either the QuoteWizard -- doesn't match the

22       QuoteWizard opt in from Exhibit 2 that you compiled;

23       correct?

24            A.    I don't know.  I don't have that one in front

25       of me, and I didn't write that one down.
```

Page 48

1          Q.    Okay.  Let's go back to Exhibit 2.  You can

2     write that one down.

3          A.    Oh, that does looks like it matches.  It does

4     match.

5          Q.    Can you tell me how it is that you matched

6     Plural's but not RevPoint's IP address in that document?

7               MR. POLANSKY:  Objection.

8          A.    I cannot.  I can only say that the IP address

9     that I have received I received from RevPoint Media.

10          Q.    (BY MR. BRODERICK:)  Okay.  And let's go back

11     to Exhibit 6.

12               Does QuoteWizard contend that Mr. Mantha

13     visited Snappy Auto Insurance and provided his consent

14     on that site?

15          A.    Yes.

16          Q.    And on what date?

17          A.    I do not know.

18          Q.    Plural lists 6/26/2019, or at least it lists

19     date of application.  Do you have any reason to believe

20     that is the date that someone visited and put in

21     Mr. Mantha's information?

22               MR. POLANSKY:  Objection.

23          A.    I have no idea.

24          Q.    (BY MR. BRODERICK:)  Do you know anything

25     about the person who resides at -- whose IP address this

```
                                                    Page 49
1       is on the Plural Exhibit 6?

2            A.   I have no idea.

3            Q.   There is no sale date on this Plural document;

4       correct?

5                 MR. POLANSKY:  Objection.

6            Q.   (BY MR. BRODERICK:)  Sale of the lead.  On

7       QuoteWizard 2 you listed a date.  Well, that was the

8       date that you purchased the lead.  There is no lead sale

9       date on this document; correct?

10           A.   I haven't read this whole document.  I have no

11      idea.

12           Q.   Okay.  Well, I'm just asking you to look at

13      this one page of data here.

14           A.   Back down just below Exhibit C?

15           Q.   Yes, thank you.

16                MR. POLANSKY:  Objection.

17           A.   So you want me to see if there is a sale date?

18           Q.   (BY MR. BRODERICK:)  Yes.

19           A.   There is not a sales date.

20           Q.   Okay.  And you don't -- I believe you

21      testified you didn't know the date of the visit, the

22      alleged visit to SnappyAutoInsurance.com; correct?

23           A.   That is correct.

24                MR. POLANSKY:  Objection.

25           Q.   (BY MR. BRODERICK:)  And does the Plural data
```

Page 50

1              on this page make any reference to a Jornaya LeadiD?

2                        MR. POLANSKY:   Objection.

3              A.    I do not see anything that says Jornaya

4         LeadiD.

5              Q.    (BY MR. BRODERICK:)   Do you know if the

6         Jornaya LeadiD that appears on QuoteWizard -- on the

7         QuoteWizard opt in, which is Exhibit 2, do you know

8         if -- do you know where that came from?

9              A.    We received that from RevPoint Media.

10             Q.    Okay.  But you don't know what that Jornaya

11        LeadiD ties to, do you?

12             A.    I couldn't hear the last half of that.

13             Q.    I'm sorry.  You don't know what that Jornaya

14        LeadiD ties to, do you?

15             A.    Ties to?  I'm not sure I understand.

16             Q.    Well, does the Jornaya LeadiD indicate that

17        someone from Mr. Mantha's IP address logged on and

18        provided consent on SnappyAutoInsurance.com?

19                       MR. POLANSKY:   Objection.

20             A.    I don't know.

21             Q.    (BY MR. BRODERICK:)   Okay.  And are you aware

22        that a subpoena was issued to Verizon to identify the

23        subscriber assigned to the IP address contained on the

24        Plural opt in as of June 26, 2019?  By "Plural opt in,"

25        I mean Exhibit 6 that we've just been talking about.

```
                                                      Page 51
 1              A.   I'm not aware.
 2              Q.   Okay.  So I'm going to show you Verizon's
 3         subpoena response.  I want you to open the Verizon --
 4         the document that says "Verizon IP."  It should say
 5         June, but it says "Jue 26, 2019."  Can you open that?
 6              A.   Yep.
 7              Q.   And I'll represent to you that this is a
 8         subpoena response in response to a subpoena issued by
 9         the plaintiff in this case for a search for the Verizon
10         customer that was assigned IP address 96.242.132.28.
11                   First of all, that's the same IP address that
12         shows up on the Plural subpoena response; correct?
13                   MR. POLANSKY:   Objection.
14              A.   Yes, it is.
15              Q.   (BY MR. BRODERICK:)   And that's the same IP
16         address that shows up on the QuoteWizard opt in
17         document, which is Exhibit 2; correct?
18              A.   Yes.
19              Q.   And the customer name is, on this subpoena
20         response, is Peter Petroff; correct?
21              A.   Yes.
22              Q.   And do you know of any connection between
23         Mr. Petroff and Mr. Mantha?
24              A.   I do not.
25              Q.   Does QuoteWizard believe Mr. Petroff put in
```

                                                        Page 52

1        information on SnappyAutoInsurance.com on behalf of

2        Mr. Mantha?

3                 MR. POLANSKY:  Objection.

4            A.   I have no idea.

5            Q.   (BY MR. BRODERICK:)  Do you know why

6        Mr. Petroff's IP address shows up on the QuoteWizard opt

7        in, which is Exhibit 2?

8                 MR. POLANSKY:  Objection; asked and answered

9        several times.

10           A.    It shows up there because that's the IP

11       address that I was given by RevPoint Media.

12                MR. BRODERICK:  And I'm going to mark this

13       as -- introduce that exhibit.  That will be Exhibit 7.

14                (Deposition Exhibit 7 was marked for

15                identification.)

16           Q.   (BY MR. BRODERICK:)  Can you turn back to

17       Exhibit 6?

18                MR. POLANSKY:  What page?

19           Q.   (BY MR. BRODERICK:)  Scrolling back down to --

20                MR. BRODERICK:  I'm just getting there.  Hold

21       on.  I'll tell you.

22                MR. POLANSKY:  15?

23           Q.   (BY MR. BRODERICK:)  After exhibit -- no, it's

24       after the page we were looking at, when we get to what

25       looks like an image of the SnappyAutoInsurance.com

```
                                                     Page 53
 1      website.
 2           A.    Just below the section we were previously
 3      looking at under Exhibit C?
 4           Q.    Exactly.
 5                 MR. POLANSKY:   Just for record purposes, it's
 6      page 16 of 20 on Exhibit 7 -- no, Exhibit 6.
 7                 Go ahead.
 8           Q.    (BY MR. BRODERICK:)   Now, previously we went
 9      over Exhibit 2, which I've been calling the QuoteWizard
10      opt in, the document that you compiled.
11           A.    Uh-huh.
12           Q.    On this subpoena response from Plural, do you
13      see any "TCPA Disclosure" language --
14                 MR. POLANSKY:   Objection.
15           Q.    (BY MR. BRODERICK:)   -- similar to what you
16      copied into Exhibit 2 when you yourself visited the
17      SnappyAutoInsurance.com website?
18                 MR. POLANSKY:   Objection.
19           A.    I do not.   How far down am I supposed to be
20      going?   It seems to go for a while.   Yeah, I don't -- I
21      mean, I don't see anything.
22           Q.    (BY MR. BRODERICK:)   Okay.   Do you know what
23      this -- do you think that's a complete version of the
24      website, or was there something different that you
25      captured that language from when you created Exhibit 2?
```

Page 54

```
 1          A.   You're kind of fading in and out for me.
 2          Q.   Do you -- do you know if that's a -- does that
 3     look like the Snappy Auto insurance website that you
 4     visited in order to cut and paste the "TCPA Disclosure"
 5     language?
 6          A.   I don't remember.
 7          Q.   Okay.  So you don't know what -- why that
 8     language doesn't show up on Exhibit 7?
 9          A.   I have no idea.
10          Q.   And would you agree with me that this --
11     Exhibit 6, the Plural response to Mantha's subpoena,
12     there is no reference to AutoInsurQuotes.com and its
13     marketing partners on this document?  I'll just
14     represent that to you.  Do you know why that is?
15               MR. POLANSKY:  Objection.  I think that's
16     incorrect as well.
17          Q.   (BY MR. BRODERICK:)  (Inaudible.)
18               MR. POLANSKY:  We can't hear you.  Ed, are you
19     talking?  We can't hear anything, unless you guys can't
20     hear me.
21               THE WITNESS:  I can hear you.  I can't hear
22     him at all.
23               THE VIDEOGRAPHER:  We can't hear.
24               MR. BRODERICK:  Can you hear me?
25               MR. POLANSKY:  Yeah, you're going in and out.
```

```
                                                    Page 55

 1          Ted, we can't hear you.  No.  I can see your mouth

 2          moving, but...

 3                    THE VIDEOGRAPHER:  Should we go off record,

 4          Mr. Polansky?

 5                    MR. POLANSKY:  Yeah, let's go off record until

 6          we can fix Ted.

 7                    THE VIDEOGRAPHER:  Going off record.  The time

 8          now is 4:23 p.m.

 9                    (Recess.)

10                    THE VIDEOGRAPHER:  We are back on record.

11          It's now 4:30 p.m. in the Eastern Time Zone.

12              Q.   (BY MR. BRODERICK:)  Okay.  So Mr. Weeks,

13          turning back to Exhibit 6, the final part which starts

14          at page 15, which looks like a representation of the

15          SnappyAutoInsurance.com website, at least part of it,

16          this is -- this is Plural's response to a subpoena.

17                    From page 15 on, there is no -- would you

18          agree there is no reference to AutoInsurQuotes.com?

19              A.   I have no idea.  I mean, this is -- there is a

20          lot of text here.  It would take a while to read this.

21              Q.   I represent to you that is --

22                    THE VIDEOGRAPHER:  Counsel, we can't hear you.

23                    MR. BRODERICK:  Really?

24                    MR. POLANSKY:  Yeah, you're coming in very

25          low.
```

Page 56

1          MR. BRODERICK:  But it was working okay?

2          MR. POLANSKY:  Now we can hear you.  Don't

3    hold that, put that down.  No, we can't hear you if

4    you're holding it.

5          MR. BRODERICK:  I was holding it when you

6    heard me.  Now?

7          MR. POLANSKY:  Yeah, that's better.

8          No, that's no good.

9          THE VIDEOGRAPHER:  Can we go off record and

10    maybe we attempt to switch to phone audio?

11          MR. POLANSKY:  Okay, go off record again.

12          THE VIDEOGRAPHER:  Off record at 4:32 p.m.

13          (Discussion off the record.)

14          THE VIDEOGRAPHER:  Back on record.  The time

15    now is 4:34 p.m.

16     Q.    (BY MR. BRODERICK:)  Okay, Mr. Weeks.  So do

17    you have any -- any explanation for why the Plural opt

18    in, which is what I'm referring to as Exhibit 6, would

19    be different from the QuoteWizard opt in?

20          MR. POLANSKY:  Objection.

21          We can't hear you, Matthew.

22     A.    Why our document is different from theirs?

23     Q.    (BY MR. BRODERICK:)  Well, let me -- let me

24    rephrase.  And specifically with respect to references

25    to AutoInsurQuotes.com and its marketing partners, if

Page 57

1      you --

2          A.    I mean, I can't speak to their document.

3          Q.    But you don't have any knowledge of whether

4      RevPoint added the language that it provided to you?

5      Strike that.

6              Do you know why the Plural Exhibit 6 doesn't

7      reference a Jornaya LeadiD?

8              MR. POLANSKY:  Objection.

9          A.    I can't speak to anything in their document.

10     I don't -- I don't know.

11         Q.    (BY MR. BRODERICK:)  Okay.  You don't know

12     who -- where that Jornaya LeadiD came from, other than

13     it was provided to you by RevPoint?

14         A.    The ID?  The Jornaya LeadiD that we have was

15     provided to us by RevPoint.

16         Q.    Yeah.  And that was the one that was via email

17     that we talked about earlier?

18         A.    Yes.  Well, the ID --

19         Q.    No, no, strike that.  I think that's wrong.

20     But that's fine.  Strike that question.

21              Do you know who -- does RevPoint have a

22     contract with Jornaya, to your knowledge?

23         A.    I have no idea of RevPoint's contract

24     situations.

25         Q.    And same for Plural, you don't know if they

Page 58

1       have a contract with Jornaya?

2              A.    I have no idea.

3                    MR. BRODERICK:  Okay.  Now, I'm getting close.

4                    I'm going to introduce the IP subpoena for

5       RevPoint, and that's going to be Exhibit 7.

6                    MR. POLANSKY:  The June 26th -- you have an

7       Exhibit 7, and it says Verizon IP June, versus J-U-E --

8                    MR. BRODERICK:  Okay, sorry.  So this will be

9       eight, unless I just clicked the wrong thing.

10                   MR. POLANSKY:  So what is Exhibit 8?

11                   MR. BRODERICK:  I'm trying to figure that out

12      myself.

13                   Did I introduce Charter before?  I apologize.

14      Let's see here.

15                   MR. POLANSKY:  Yeah.

16                   MR. BRODERICK:  You know what the problem is?

17      My page isn't refreshing.

18                   MR. POLANSKY:  So just to help you out, you

19      have Exhibits 1 through 7.  You have Exhibit 7 as the

20      Verizon IP address for June 26, 2019.

21                   MR. BRODERICK:  Yeah, I got it, I got it, I

22      got it, I got it.

23                   Okay.  What I was trying to do was introduce

24      the IP subpoena for RevPoint which tracks to Guerrero.

25                   MR. POLANSKY:  You have that.

                                                    Page 59
1              MR. BRODERICK:  Oh, jeez.

2              MR. POLANSKY:  That's No. 5.

3              MR. BRODERICK:  That's No. 5, okay.  What I --

4       just a tip for next time we do this:  It's good to cut

5       them out of your private folder, out of your marked

6       folder, and then you don't go over the same thing twice.

7              We have not gone over -- have we gone over

8       Jornaya, Jornaya subpoena response?

9              MR. POLANSKY:  No.

10         Q.   (BY MR. BRODERICK:)  Okay.  That is what I

11      wanted to show you.

12             MR. POLANSKY:  Do you want to just mark it as

13      Exhibit 8 now so we don't have to go back and forth?

14             MR. BRODERICK:  Thank you, Kevin.

15             (Deposition Exhibit 8 was marked for

16             identification.)

17         Q.   (BY MR. BRODERICK:)  Yeah, so we've marked the

18      Jornaya subpoena response as Exhibit 8.  And Mr. Weeks,

19      I'll represent to you that that is a response from

20      Jornaya to a subpoena issued to it in connection with

21      this case.

22             And we've already talked about that you don't

23      have any relationship -- QuoteWizard does not have any

24      relationship with Jornaya.  Have you ever seen this

25      response before, Exhibit 8?

```
                                              Page 60
 1           A.   I have not.
 2           Q.   And going down to the bottom here, do you see
 3      a -- is that -- now we have a "Universal LeadiD" on the
 4      last page of Exhibit 8, which is the Jornaya response.
 5                Have you ever seen a Jornaya LeadiD like this?
 6                MR. POLANSKY:  Objection.
 7           A.   Like -- like what?  I'm not --
 8           Q.   (BY MR. BRODERICK:)  Well, in connection with
 9      your work.  Like, I just want to know if this is a --
10      this LeadiD which ties -- you know, which is the LeadiD
11      that was on -- well, this LeadiD on the last page of
12      Exhibit 8, is that the same lead, Jornaya LeadiD that's
13      on Exhibit 2?
14                MR. POLANSKY:  Objection.
15           A.   I have no idea.  I'd have to go back and look.
16           Q.   (BY MR. BRODERICK:)  I want to do that,
17      because I just -- I'm just trying to establish that --
18      because what we tried to do, I'll just explain, was take
19      the LeadiD from the QuoteWizard opt in, which is
20      Exhibit 2, and asked Jornaya to provide us with
21      information on that LeadiD.  I just want to confirm
22      that.
23                All right.  I've got it written down.  Let's
24      go look at Exhibit 2.  Can you write down the Jornaya
25      LeadiD?
```

```
                                                    Page 61
 1          A.    I did the opposite.  I went back and wrote it

 2     down from two and was going to go back and look at the

 3     one for eight.

 4          Q.    So now you're looking at -- you wrote it down

 5     from two, which is the QuoteWizard opt in?  Yes?

 6          A.    Correct.

 7          Q.    Okay.  And that's the same LeadiD as appears

 8     on Exhibit 8, correct, in the last page of Exhibit 8?

 9          A.    Yes, that's the same.

10          Q.    Okay.  And that LeadiD, this -- this response

11     from Jornaya says that the "Event Date" was 6/21/2019.

12     And it has an "IP Address" of 13.66.191.218.  And we're

13     talking about on Exhibit 8.

14                Now, that's a different IP address from all

15     the other IP addresses we've discussed; correct?

16          A.    Yes.

17                MR. POLANSKY:  Objection.

18          Q.    (BY MR. BRODERICK:)  Okay.  And do you know

19     what it means where it says, "TCPA information witnessed

20     by TCPA Guardian:  TCPA disclosure statement witnessed

21     at the lead event," colon.  And it says, "Jornaya cannot

22     verify TCPA disclosure language because a disclosure was

23     not tagged on the website according to Jornaya's

24     standard instructions."

25                Do you know what that means?
```

```
                                                    Page 62
 1            A.    I do not.

 2            Q.    And have you ever talked to anyone at Jornaya

 3      about that LeadiD or that language?

 4            A.    I have not.

 5            Q.    Okay.  And similarly -- no, we've already

 6      covered that.

 7                  And having reviewed all of these subpoena

 8      responses in this case, is it still Quote -- your

 9      position that Mr. Mantha consented to receive

10      telemarketing texts from QuoteWizard?

11                  MR. POLANSKY:  Objection.

12            A.    It's our opinion that consent was provided.

13            Q.    (BY MR. BRODERICK:)  And that consent was on

14      SnappyAutoInsurance.com?

15            A.    According to the email that I received from

16      RevPoint Media, yes.

17                  MR. BRODERICK:  Okay.  All right.  Well, I

18      don't have anything further.  Thank you very much for

19      your time.  And I don't know if Kevin has any questions

20      for you.

21                  MR. POLANSKY:  I do.  I just have a couple.

22      This won't take all but a few minutes, but there are a

23      couple of areas that I want to clarify stuff on.

24

25
```

```
                                                    Page 63

1                          EXAMINATION

2      BY MR. POLANSKY:

3           Q.    Okay.  So first I want to switch gears and go

4      back to Exhibit 6.

5           A.    Okay.

6           Q.    Now, I understand that you haven't seen this

7      document before, but you were asked some questions on

8      it, specifically as it related to auto insurance quotes.

9           A.    Yes, I believe so.

10          Q.    I want to go to page I think it's 16 of 20 on

11     Exhibit 6.  And if you scroll to the very bottom of that

12     page, it's the last sentence where it says, starts,

13     "Taking advantage of...."

14          A.    For some reason, the page numbers aren't

15     showing up.

16                Oh, here we go.  Hold on one sec.

17          Q.    It's the page where it says enter zip code.

18          A.    Okay.

19          Q.    Okay?  So go to the very bottom of that page.

20     I'm going to direct you as best I can.  It says, "Call

21     1-888-920-8495 for your Instant Quote now."

22          A.    Yes.

23          Q.    Okay.  And so I want to first look at that

24     phone number.  So write down that phone number --

25          A.    Okay.
```

```
                                                    Page 64
```

1          Q.    -- and tell me when you've done that.

2          A.    Okay.

3          Q.    And then pop out of that exhibit and go to

4    Exhibit 2, the QuoteWizard opt in.

5          A.    Okay.

6          Q.    And go to the "TCPA Disclosure" that you

7    copied and pasted from the SnappyAutoInsurance website.

8          A.    Uh-huh.

9          Q.    Can you tell me if those phone numbers are a

10   match?

11         A.    Yes, they match.

12         Q.    Okay.  So now do you see where it says, right

13   before that phone number, "please call

14   AutoInsurQuotes.com"?

15         A.    Yes.

16         Q.    You were asked some questions earlier about

17   AutoInsurQuotes.com; is that right?

18         A.    Yes.

19         Q.    I want you to go back to Exhibit 6 and, if you

20   can, I know this is not the most easy thing, but go back

21   to that page you just had the phone number.

22         A.    Uh-huh.

23         Q.    On my screen it comes up as page 16 of 20.  I

24   don't know what it shows up on yours.

25               Under that phone number, do you see where it

Page 65

1     says "SnappyAutoInsurance.com"?

2          A.   Yes.

3          Q.   And then do you see where it says "Copyright

4     2013"?

5          A.   Yes.

6          Q.   And then on your page is there another

7     sentence there?

8          A.   Yes.

9          Q.   Okay.  Can you read that sentence to me?

10         A.   "Taking advantage of this free Auto Insurance

11    Quote service is completely optional and will not impact

12    your ability to win samples, prizing, or sweepstakes."

13         Q.   Okay.  So it says "Auto Insurance Quote

14    service."  Do you see that?

15         A.   Yes.

16         Q.   Okay.  Now, looking at the same page, at the

17    very top of that page do you see where it looks like

18    there is a website, URL address,

19    "SnappyAutoInsurance.com"?

20         A.   Yes.

21         Q.   And underneath it says "58 captures"?

22         A.   Uh-huh.

23         Q.   Do you -- do you understand what those 58

24    captures are?

25         A.   I do not.

```
                                                Page 66
 1           Q.    Okay.  And do you see the dates 10 March 2014
 2      to September 6, 2019?
 3           A.    Uh-huh.
 4           Q.    And you don't know what those dates are,
 5      either, I assume; is that correct?
 6           A.    I do not.
 7           Q.    Okay.  Now, you testified earlier that you
 8      went on to the SnappyAutoInsurance.com website to obtain
 9      the "TCPA Disclosure" that you believe Mr. Mantha would
10      have seen; is that correct?
11           A.    Yes.
12           Q.    Do you know if you went into and entered any
13      information to get in this form here on page six -- or
14      Exhibit 6?
15           A.    Yes.
16           Q.    Okay.  So what you're looking at isn't the
17      final form that you saw?
18           A.    No.
19           Q.    And again, you don't -- you don't have any
20      understanding, sitting here today, what the 58 captures
21      are?
22           A.    I do not.
23           Q.    Earlier you were asked some questions by
24      plaintiff's counsel about when you prepared the Quote --
25      the QuoteWizard data file, the opt in information; is
```

Page 67

1       that right?

2            A.   Yes.

3            Q.   And you kept on referring to a "complaint."

4       When you say "complaint," are you referring to a demand

5       letter, or are you referring to a complaint that was

6       filed in this lawsuit?

7            A.   I may have misspoke.  It was the original

8       demand letter that we got.

9            Q.   Okay.  So after -- so if I understand

10      correctly, after receiving that demand letter, that's

11      when you reached out to RevPoint for the consent

12      information?

13           A.   Yes.

14           Q.   So you were using "complaint" to mean demand

15      letter, just to be clear for the record?

16           A.   Yeah.  I apologize.  I'm not a lawyer.

17           Q.   Okay.  Going back to Exhibit 2, which is the

18      QuoteWizard opt in, and I think you cleared this up but

19      I just want to make sure the record is clear.

20              Now, after receiving that demand letter, you

21      reached out to Michael Fishman at QuoteWizard; is that

22      right?

23           A.   Of RevPoint.

24           Q.   Oh, excuse me, of RevPoint.

25           A.   Yeah.

```
                                                        Page 68
```

1          Q.    And he provided information to you via email?

2          A.    Correct.

3          Q.    And you used that information to prepare at

4     least a portion of Exhibit 2; is that right?

5          A.    Yes.

6          Q.    Now, you said the other information came from

7     your data system at QuoteWizard; is that right?

8          A.    Yes.

9          Q.    Did QuoteWizard generate any of that

10    information, or is that information that came from

11    RevPoint?

12         A.    It all ultimately came from RevPoint.  It's

13    just I went to our database, because that's where it's

14    stored for me.

15         Q.    Okay.

16         A.    But all this information in this ultimately

17    came from RevPoint.

18         Q.    So I just want to be clear.  So QuoteWizard

19    didn't create any of this data, you just happened to

20    take it from two different sources and put it together;

21    right?

22         A.    Correct.  The only thing that would have been

23    created by us was the lead purchase date.

24         Q.    Okay.  And that's the date that you purchased

25    the lead?

```
                                                    Page 69
 1          A.   Yeah, the date that our system recognizes that
 2     the lead was purchased.
 3               MR. POLANSKY:  Okay.  That might be all I
 4     have.  Just give me one second to go over my notes.
 5               That's all I have.
 6               MR. POLANSKY:  Ted, do you have any questions?
 7                          EXAMINATION
 8     BY MR. BRODERICK:
 9          Q.   With the document that is Exhibit 2, the
10     QuoteWizard opt in, you said you did it in Word.  Would
11     that document have a created-on date?
12          A.   I don't know.
13          Q.   When you look at "Properties" -- do you know
14     how to do that?
15          A.   I'd have to -- are you asking me to open up my
16     original file?
17          Q.   Do you still have it in Word?
18          A.   I believe so.
19          Q.   I have the impression you weren't sure on the
20     date when I asked you about when it was created.  Are
21     you -- do you know when you received the demand letter?
22          A.   I'd have to check emails for that.  I don't
23     know off the top of my head.
24          Q.   And do you know when the complaint was filed?
25          A.   I do not.
```

```
                                                     Page 70
1              Q.   And when I say the "complaint," I mean a

2         complaint in court as opposed to a demand letter.

3              A.   I don't.

4              Q.   Okay.  But is that something that if we go

5         through counsel we could find out, you know, look at the

6         date on the Word document, when it was created, meaning

7         you right click on "Properties" and it tells you when it

8         was originally created and then when it was -- when it

9         was sort of last modified?

10             A.   I mean, if you're asking me to do that, I can

11        try and do that.

12                  MR. POLANSKY:  We'll have you go through

13        counsel for that, but...

14                  MR. BRODERICK:  Right.  Yeah, I don't mean to

15        give you homework on the fly.

16                  THE WITNESS:  Okay.

17                  MR. BRODERICK:  Okay.  All right.  Well, with

18        that, I don't have -- yeah, I don't have anything else.

19        And I appreciate your patience with the technical snafus

20        here.

21                  THE WITNESS:  Not a problem.

22                  MR. POLANSKY:  That's great.  Thank you,

23        Matthew.

24                  MR. BRODERICK:  Thank you very much.

25                  THE VIDEOGRAPHER:  This is the end of the
```

Page 71

1          30(b)(6) deposition of QuoteWizard.com represented by

2      Matthew Weeks.  We are going off the record at

3      approximately 4:57 p.m. in the Eastern Time Zone.

4                  (Deposition recessed at 4:57 p.m.)

5                  (Signature was reserved.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

REPORTER'S CERTIFICATE

1

2          I, CHERYL O. SPRY, the undersigned Certified Court

3     Reporter, pursuant to RCW 5.28.010, authorized to

4     administer oaths and affirmations in and for the State

5     of Washington, do hereby certify that the sworn

6     testimony and/or proceedings, a transcript of which is

7     attached, was given before me at the time and place

8     stated therein; that any and/or all witness(es) were by

9     me duly sworn to testify to the truth; that the sworn

10    testimony and/or proceedings were by me stenographically

11    recorded and transcribed under my supervision, to the

12    best of my ability; that the foregoing transcript

13    contains a full, true, and accurate record of all the

14    sworn testimony and/or proceedings given and occurring

15    at the time and place stated in the transcript; that a

16    review of which was requested; that I am in no way

17    related to any party to the matter, nor to any counsel,

18    nor do I have any financial interest in the event of the

19    cause.

20         WITNESS MY HAND AND DIGITAL SIGNATURE THIS 4th day

21    of AUGUST, 2020.

22

23

24    CHERYL O. SPRY

      Washington State Certified Court Reporter No. 2226

25

```
                                                    Page 73
 1    Kevin Polansky, Esq.

 2    kevin.polansky@nelsonmullins.com

 3                        August 4, 2020

 4    RE:    Mantha, Joseph v. Quotewizard.Com, LLC

 5         7/22/2020, Matthew Weeks (#4182716)

 6         The above-referenced transcript is available for

 7    review.

 8         Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com.

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25
```

Page 74

1    Mantha, Joseph v. Quotewizard.Com, LLC

2    Matthew Weeks (#4182716)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Matthew Weeks                              Date

25

Page 75

1    Mantha, Joseph v. Quotewizard.Com, LLC

2    Matthew Weeks (#4182716)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Matthew Weeks, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Matthew Weeks                        Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

[& - address]                                                                    Page 1

| & | | | a |
|---|---|---|---|

**&**   2:14 16:10

**0**

**02109**   2:16
**02110**   2:8

**1**

**1**   3:8 7:5 58:19
**1-888-920-8495**
  63:21
**10**   66:1
**12235**   1:7 4:12
**13.66.191.218.**
  61:12
**15**   52:22 55:14,17
**16**   53:6 63:10
  64:23
**176**   2:7
**19**   3:10
**19871**   72:23
**1:19**   1:7 4:12

**2**

**2**   3:10 19:16,17
  27:7 36:21 38:18
  40:8,11,12,12,25
  44:8,23 47:22
  48:1 49:7 50:7
  51:17 52:7 53:9
  53:16,25 60:13,20
  60:24 64:4 67:17
  68:4 69:9
**20**   53:6 63:10
  64:23 75:15
**2013**   65:4
**2014**   66:1
**2019**   3:18 21:5
  26:5 32:15 50:24
  51:5 58:20 66:2
**2020**   1:17 4:1,6
  72:21 73:3

**22**   1:17 4:1
**2226**   1:24 72:24
**22nd**   4:6
**26**   3:18 44:8 50:24
  51:5 58:20
**26th**   58:6
**2:46**   1:16 4:2,5
**2:54**   8:21
**2:55**   8:24

**3**

**3**   3:11 41:12
**3-4**   41:15
**30**   1:11 3:8 5:24
  6:6 7:1 71:1 73:17
**30th**   2:15
**3:42**   37:24
**3:51**   38:2

**4**

**4**   3:14 20:18,22
  21:1 41:14 43:1
  43:12,14 73:3
**41**   3:11,14
**4182716**   73:5 74:2
  75:2
**45**   3:15
**46**   3:17
**47**   42:22
**4:23**   55:8
**4:30**   55:11
**4:32**   56:12
**4:34**   56:15
**4:57**   71:3,4
**4th**   72:20

**5**

**5**   3:4,15 21:5 45:4
  45:5 59:2,3
**5.28.010**   72:3
**5/18/2020**   3:11
**52**   3:18

**551**   42:22
**58**   65:21,23 66:20
**59**   3:19
**5th**   26:5,20 32:15

**6**

**6**   1:11 3:8,17 5:24
  6:6 7:1 46:13,14
  46:17,24 48:11
  49:1 50:25 52:17
  53:6 54:11 55:13
  56:18 57:6 63:4
  63:11 64:19 66:2
  66:14 71:1
**6/21/2019**   61:11
**6/26/2019**   44:5
  48:18
**617.217.4720**   2:17
**617.738.7080**   2:9
**63**   3:5
**66.189.107.166**
  40:4 42:13
**66.189.107.166.**
  43:4,19 44:2
**69**   3:6

**7**

**7**   3:8,18 52:13,14
  53:6 54:8 58:5,7
  58:19,19
**7/14/2020**   3:8
**7/22/2020**   73:5

**8**

**8**   3:19 58:10 59:13
  59:15,18,25 60:4
  60:12 61:8,8,13

**9**

**96.242.132.28.**
  40:15 46:25 51:10

**a**

**abide**   8:8
**ability**   65:12 72:12
**able**   16:1 24:12
  42:24
**absolutely**   37:22
**accept**   11:22 13:10
**accepts**   13:9
**access**   35:23
**accuracy**   73:9
**accurate**   72:13
**acknowledgement**
  75:3
**acknowledges**
  42:20
**acknowledgment**
  73:12
**acronym**   13:12,17
**act**   7:16,23 42:23
**actual**   23:14
**adam**   22:8 25:19
  25:24
**added**   57:4
**additions**   75:6
**address**   10:10
  11:17 16:3,8
  28:16 29:2,9,19
  30:23,24 31:2,3,10
  31:11,15,16,18,22
  31:25 32:1,6,8
  35:23 36:3,4,12
  40:2,4,15,16,20,21
  40:23 41:1,3,4
  42:11 43:2,3,5,15
  43:23,24 44:17,21
  46:8,22,25 47:2,4
  47:17,19,20 48:6,8
  48:25 50:17,23
  51:10,11,16 52:6
  52:11 58:20 61:12
  61:14 65:18

**addresses** 41:6
61:15
**administer** 72:4
**advantage** 63:13
65:10
**advice** 24:5 42:24
**affiliation** 33:4
**affirmations** 72:4
**agent** 13:6
**agree** 19:1 54:10
55:18
**ahead** 53:7
**alleged** 6:20 45:9
49:22
**allegedly** 37:3
**allotted** 73:20
**answer** 7:19 8:2
8:13 17:22 20:18
20:22 22:23 24:12
24:20,22 29:17
30:3
**answered** 6:19
52:8
**answering** 6:22
20:25 21:3
**answers** 19:20
20:3,10,13 41:11
**anybody** 21:20
22:6
**apartment** 44:8
**api** 12:22,25 13:12
15:17
**apologies** 41:18
**apologize** 35:18
58:13 67:16
**appear** 18:2 19:7,9
19:12,13
**appearance** 4:20
**appeared** 2:2
**appears** 40:16
50:6 61:7

**appended** 75:7
**applicable** 73:8
**applicant** 46:8,8
47:2,4,9,20
**application** 48:19
**applied** 47:15
**appreciate** 70:19
**approximately**
71:3
**areas** 62:23
**asked** 10:6 25:13
30:22 35:17 41:4
52:8 60:20 63:7
64:16 66:23 69:20
**asking** 7:24 12:13
31:16 41:24 47:11
49:12 69:15 70:10
**asserted** 21:9 23:5
**assertion** 24:15
**assigned** 50:23
51:10
**associated** 31:19
**assume** 66:5
**attached** 9:23
42:25 72:7 73:11
**attempt** 56:10
**attorney** 43:22
73:13
**attorneys** 42:4
44:11
**audio** 56:10
**august** 21:5 26:5
26:20 32:15 72:21
73:3
**authorize** 20:7
**authorized** 72:3
**auto** 17:12,15 18:2
18:6,19,25 32:12
48:13 54:3 63:8
65:10,13

**autodialed** 18:13
33:18
**autoinsurquotes....**
33:2,8,19,22 34:1
34:9 54:12 55:18
56:25 64:14,17
**available** 73:6
**aware** 23:21 25:16
25:21 33:6 35:1
35:15 38:3,10
44:11 45:7 50:21
51:1

**b**

**b** 1:11 3:8 5:24 6:6
7:1 71:1
**back** 5:19 6:14
8:23 27:3,5,6 38:1
40:7 42:17 43:1
43:12 46:19 48:1
48:10 49:14 52:16
52:19 55:10,13
56:14 59:13 60:15
61:1,2 63:4 64:19
64:20 67:17
**based** 9:7,8
**behalf** 1:4 4:24 6:9
6:21,25 20:10
28:6 32:25 52:1
**belief** 9:4,6,8
40:19,20
**believe** 11:19
21:15,23 22:21
34:20 48:19 49:20
51:25 63:9 66:9
69:18
**believed** 22:24
**best** 34:15 63:20
72:12
**better** 56:7
**bid** 13:7,9,10,10
13:25 14:10 30:8

**blame** 23:4
**bold** 17:7 18:1
**bolded** 16:20
**boston** 2:8,16
**bottom** 16:18,19
20:5 36:21 43:2
45:24 60:2 63:11
63:19
**break** 9:19 37:21
**briefly** 7:12 8:17
**broderick** 2:5,6,10
3:4,6 4:21,21 5:6
5:9,25 7:3,7,9,21
8:5,19,25 10:3,25
12:17 14:7,25
17:25 19:6,14,19
20:24 22:1 23:4
23:25 24:11,23
25:1 26:16 27:8,9
28:1,8,10,14 29:1
29:5,9,21 30:10
31:1,17,24 32:7
33:11,25 34:7
35:2,12 36:2,9
37:1,7,22 38:3,9
38:11,25 39:7
40:25 41:5,17
43:11 44:16,20
45:2,7 46:16
47:13,19 48:10,24
49:6,18,25 50:5,21
51:15 52:5,12,16
52:19,20,23 53:8
53:15,22 54:17,24
55:12,23 56:1,5,16
56:23 57:11 58:3
58:8,11,16,21 59:1
59:3,10,14,17 60:8
60:16 61:18 62:13
62:17 69:8 70:14
70:17,24

**brown** 22:9 25:19
  25:24
**button** 18:12
**buy** 11:22 30:8
**buyers** 35:11
**buys** 35:6

**c**

**c** 2:1 16:15 42:22
  46:1,19 49:14
  53:3
**cable** 42:23
**calendar** 6:14
**call** 8:10,11,15,15
  15:13 63:20 64:13
**called** 12:21
**calling** 53:9
**calls** 6:21 18:13
  33:18
**caps** 21:11
**capture** 18:17
  36:3,3
**captured** 17:9
  53:25
**captures** 65:21,24
  66:20
**carrie** 16:10,14
**carrier** 13:6 16:16
  27:12
**carriers** 31:7
  35:11
**case** 4:10,11 13:8
  19:21 24:22 26:2
  29:13 32:4 34:20
  38:4 39:16 41:22
  42:3 46:5 51:9
  59:21 62:8
**cause** 72:19
**caused** 21:8 26:6
**ccr** 1:24
**certificate** 72:1

**certified** 5:3 72:2
  72:24
**certify** 72:5
**change** 74:4,7,10
  74:13,16,19
**changes** 73:10
  75:6
**charter** 42:18,19
  42:24 43:5,22
  44:1 58:13
**check** 6:15 14:12
  27:19 69:22
**cheryl** 1:24 4:15
  72:2,24
**christine** 42:4
**claim** 7:10 9:1,16
  9:25 10:4
**claims** 32:24
**clarify** 62:23
**clear** 24:14 46:12
  67:15,19 68:18
**cleared** 67:18
**click** 5:21 17:1
  70:7
**clicked** 17:16 58:9
**clicking** 17:10
  18:11
**close** 58:3
**code** 63:17
**colleagues** 28:6
**collect** 10:14
**colon** 18:10 43:3
  61:21
**com** 21:11
**combined** 3:14
  39:6,8
**come** 16:22 17:8
  23:18 27:15 32:20
**comes** 12:25 64:23
**coming** 24:20
  55:24

**communication**
  22:11 23:15
**communications**
  18:13 33:17 42:19
  42:19 43:6,22
  44:1
**companies** 9:10,12
**company** 8:15 9:9
  9:14,15 34:14,17
**compare** 18:11
  43:10
**competitor** 34:19
**compiled** 11:7,9
  11:10,11 37:9
  40:9 47:22 53:10
**complainant**
  10:10,11
**complainant's**
  31:16
**complaint** 7:12
  10:7 11:8 17:24
  32:16,19 67:3,4,5
  67:14 69:24 70:1
  70:2
**complete** 53:23
  75:8
**completed** 73:17
**completely** 65:11
**conducted** 4:13
**confirm** 35:22
  60:21
**connection** 51:22
  59:20 60:8
**connects** 40:21
  41:1
**consent** 6:20 8:10
  9:2,4,17,21 10:5,8
  10:11 14:3,8,12,18
  14:20 15:2,5,7
  18:12,24 21:4,7
  22:20 24:3,6,9,16

  24:17 28:11 30:22
  33:17 38:5 45:9
  48:13 50:18 62:12
  62:13 67:11
**consented** 62:9
**consumer** 7:16,23
  11:17 16:7 29:1,9
  31:10 40:21
**contact** 21:7
**contained** 11:12
  12:1 50:23
**contains** 21:14
  72:13
**contend** 48:12
**continues** 18:14
**contract** 9:18
  14:15 34:8,22,24
  57:22,23 58:1
**contracts** 15:8
**copied** 53:16 64:7
**copies** 73:14
**copy** 16:25
**copyright** 65:3
**corporate** 13:6
**correct** 14:19 15:7
  15:23 17:5,20,23
  18:4 19:8,12
  20:15 23:1 26:18
  30:15,16 31:20
  32:15,21,22 34:1,2
  35:20 36:16,17,22
  36:24 37:11,12
  38:15,18,19 39:11
  40:5,17 42:12
  43:7 44:5,6 45:21
  47:15,23 49:4,9,22
  49:23 51:12,17,20
  61:6,8,15 66:5,10
  68:2,22 75:8
**corrections** 75:6

correctly  5:12
   67:10
counsel  4:8,17
   8:16 21:18 23:22
   23:24 24:20 55:22
   66:24 70:5,13
   72:17 73:14
couple  62:21,23
court  1:1 4:10,15
   4:25 5:3 70:2 72:2
   72:24
covered  62:6
create  15:12 17:19
   68:19
created  32:19
   53:25 68:23 69:11
   69:20 70:6,8
cs  73:15
customer  51:10,19
cut  17:3 32:12
   54:4 59:4
cv  1:7 4:12

**d**

d  3:1
dash  44:4
data  6:4 12:10,13
   12:15 13:24 15:18
   15:20,21 16:22
   20:14,19 21:24
   22:25 25:2,14,17
   28:23 29:2,11,19
   29:21,23 38:15,17
   49:13,25 66:25
   68:7,19
database  11:14,24
   11:25 12:1,7,8
   26:17 27:14,15
   29:12 68:13
databases  15:20
date  26:4,5,7,9,10
   26:13,20 32:11,14

32:23 35:19,24
   37:2,7 39:25 44:4
   48:16,19,20 49:3,7
   49:8,9,17,19,21
   61:11 68:23,24
   69:1,11,20 70:6
   74:24 75:12
dates  6:15 37:3
   66:1,4
day  37:10 72:20
   75:15
days  73:17
declare  75:4
deemed  75:6
defendant  1:9
   2:12 4:24
defendant's  3:11
demand  28:5 67:4
   67:8,10,14,20
   69:21 70:2
deponent  73:13
   75:3
depose  44:12
deposing  73:13
deposition  1:11
   4:7,13 5:11 6:13
   7:5 19:17 41:15
   45:5 46:14 52:14
   59:15 71:1,4
designated  6:8
details  13:11 42:9
   43:25
determines  13:2,5
different  40:16
   41:7 53:24 56:19
   56:22 61:14 68:20
digital  20:7 72:20
direct  33:10 34:6
   35:13 63:20
directly  36:15

directory  8:15
disclosure  16:20
   17:7,12,17 19:11
   19:12 32:11 33:16
   36:20,20 37:2
   53:14 54:4 61:20
   61:22,22 64:6
   66:9
discovery  24:21
discussed  61:15
discussing  10:21
discussion  8:22
   56:13
district  1:1,2 4:10
   4:11
doc  5:18
document  5:22 6:6
   6:10 10:21 11:1,3
   11:5,15 12:3,18
   16:2 17:4,19
   19:15,25 20:3,6
   22:21 26:6 27:1,4
   28:15 32:19 37:9
   39:10,21,24 40:8
   41:20 42:5 43:15
   45:15,20,24,25
   47:12 48:6 49:3,9
   49:10 51:4,17
   53:10 54:13 56:22
   57:2,9 63:7 69:9
   69:11 70:6
documents  9:16
   9:24 10:3 38:5,21
   41:7 42:14 43:6
   45:9
double  5:21
duly  72:9

**e**

e  2:1,1 3:1 16:15
   58:7 74:3,3,3

earlier  11:21
   22:19 37:14 57:17
   64:16 66:7,23
easier  21:3
eastern  4:5 37:24
   38:2 55:11 71:3
easy  64:20
ed  37:20 54:18
edward  2:5 4:21
eight  58:9 61:3
either  13:9 40:19
   47:21 66:5
email  10:17,18,21
   10:23 16:3 22:11
   27:16,18,20,21
   28:2,18 29:14
   30:15 57:16 62:15
   68:1
emailed  28:15
emails  6:15 69:22
employees  6:16,22
enter  63:17
entered  66:12
entitled  23:18 24:1
   24:24
errata  73:11,13,17
es  72:8
esq  73:1
essentially  12:23
est  1:16 4:2
establish  60:17
event  61:11,21
   72:18
everybody  34:18
exact  32:14
exactly  11:11 14:1
   53:4
examination  1:12
   3:3 5:5 63:1 69:7
example  32:8

excuse  45:24
  67:24
exhibit  3:8,10,11
  3:14,15,17,18,19
  5:11 7:4,5 19:16
  19:17 27:7 34:12
  36:21 37:19,21
  38:18 40:8,11,12
  40:12,25 41:12,14
  43:1,12,14 44:23
  45:4,5 46:1,13,14
  46:17,19,24 47:22
  48:1,11 49:1,14
  50:7,25 51:1,17
  52:7,13,13,14,17
  52:23 53:3,6,6,9
  53:16,25 54:8,11
  55:13 56:18 57:6
  58:5,7,10,19 59:13
  59:15,18,25 60:4
  60:12,13,20,24
  61:8,8,13 63:4,11
  64:3,4,19 66:14
  67:17 68:4 69:9
exhibits  3:7 5:15
  11:2 19:21 39:1
  41:15 45:16 58:19
expect  29:10 38:20
expert  8:4 31:22
  32:6
explain  9:6 27:12
  32:3,7 34:15
  44:20,25 60:18
explanation  56:17
explicitly  9:19
  14:15
expressed  9:2,17
  10:5 14:20 15:2
  24:17
extent  14:23 30:1

**f**

fact  14:14 29:23
facts  24:2,4,25
fading  54:1
fails  73:19
fair  20:21,22 27:5
  34:7 35:12
fairly  18:11
far  31:8 46:11
  53:19
federal  2:7 42:23
fifth  2:7
figure  32:20 58:11
file  17:14 66:25
  69:16
filed  4:10 17:20
  67:6 69:24
filled  15:18
final  55:13 66:17
financial  72:18
find  21:20 29:10
  43:23 70:5
fine  8:5 43:11
  57:20
firm  4:14,16
first  3:12 5:10
  13:23,24 14:4,9
  20:21 42:17 51:11
  63:3,23
fishman  10:15
  67:21
fix  55:6
flip  40:7
floor  2:7,15
fly  70:15
folder  5:18 11:2
  19:22 39:1 41:20
  45:16 59:5,6
follow  18:9 23:3
  36:1

follows  5:4 18:7
font  18:11
foregoing  72:12
  75:5
forget  41:10
form  11:17 16:10
  16:24 27:11 28:23
  30:15,18,23 66:13
  66:17
formulate  30:8
formulated  31:8
forth  59:13
free  65:10
front  47:24
full  6:1 72:13
further  20:25 21:3
  62:18

**g**

gathering  28:10
gears  63:3
general  14:6,16
generate  68:9
generated  21:4
  24:3
getting  52:20 58:3
give  29:19 69:4
  70:15
given  9:21 23:21
  52:11 72:7,14
  75:9
go  5:18 8:16 16:25
  27:2,3,5 42:17
  43:1,12 45:23
  46:19 48:1,10
  53:7,20 55:3,5
  56:9,11 59:6,13
  60:15,24 61:2
  63:3,10,16,19 64:3
  64:6,19,20 69:4
  70:4,12

going  5:10 7:3
  8:20 10:25 14:22
  19:14 27:6 37:23
  38:25 39:13,16
  40:7 41:13 44:12
  44:12 45:15 46:12
  51:2 52:12 53:20
  54:25 55:7 58:4,5
  60:2 61:2 63:20
  67:17 71:2
good  37:22 56:8
  59:4
great  70:22
group  21:10
guardian  61:20
guerrero  3:16
  42:1 44:8,13
  58:24
guess  20:17 23:25
  28:5 44:12
guidelines  8:7
guys  54:19

**h**

h  42:23 74:3
half  50:12
hand  72:20
happened  26:5
  68:19
happening  13:1
happens  13:15
head  35:11 69:23
header  18:2,4
heading  17:14
  33:16
hear  10:1 50:12
  54:18,19,20,21,21
  54:23,24 55:1,22
  56:2,3,21
heard  25:22 34:1
  56:6

help  58:18
hereto  75:7
high  8:3
hold  52:20 56:3
  63:16
holding  56:4,5
homework  70:15
honestly  13:17
  35:18
hope  19:15
huh  16:21 43:16
  53:11 64:8,22
  65:22 66:3

**i**

idea  22:2 41:8
  48:23 49:2,11
  52:4 54:9 55:19
  57:23 58:2 60:15
identification  3:7
  7:6 19:18 41:16
  45:6 46:15 52:15
  59:16
identified  27:24
identify  4:17
  42:25 50:22
identifying  13:21
image  52:25
impact  65:11
imposed  42:22
impression  69:19
inaudible  54:17
include  31:2,3
included  11:13
  14:2
including  18:14
  33:18
incorrect  54:16
indicate  50:16
individual  44:7
industry  34:17

information  9:8
  10:9,14 11:12,15
  12:3,24 13:19,20
  13:21 14:9 15:24
  16:2,6 21:6,18,21
  23:10,21 24:10,20
  24:21 26:17,19
  27:13 28:10,15
  30:6,14,22 38:21
  42:21,25 48:21
  52:1 60:21 61:19
  66:13,25 67:12
  68:1,3,6,10,10,16
initially  10:7
instant  63:21
instructions  61:24
insurance  17:12
  17:15 18:2,6,20
  31:7 32:13 48:13
  54:3 63:8 65:10
  65:13
interest  72:18
internet  47:6
interrogatories
  3:13 6:19,22
  19:20 20:4,13
  27:3 41:11
interrogatory
  20:17 22:23 24:12
introduce  7:4
  19:14 41:10,11,13
  45:3 46:11,13
  52:13 58:4,13,23
investigated  42:24
ip  3:15,18 5:17
  10:9 11:17 16:7
  28:16 29:1,9,19
  30:23,24 31:2,3,10
  31:11,15,16,17,22
  31:25,25 32:6,8
  36:3,4,12 40:2,4

40:15,16,20,21,23
41:1,3,4,6 42:11
43:2,3,5,15,23,24
44:17,21 45:3
46:8,22,24 47:2,4
47:9,17,19,20 48:6
48:8,25 50:17,23
51:4,10,11,15 52:6
52:10 58:4,7,20,24
61:12,14,15
isp  47:4,6
issue  28:12
issued  38:4 39:15
  41:22 42:3 45:8
  46:4 50:22 51:8
  59:20
items  15:25

**j**

j  58:7
jeez  59:1
jersey  32:8 47:10
job  6:1 34:4
joe  5:9
jornaya  3:19 9:23
  11:20,22 12:5
  14:11 15:9 16:4,5
  21:14,23 22:4
  29:22 30:4,11
  34:12,13,14,22,24
  35:3,5,13,22 36:2
  36:3,7,8,10,18,19
  50:1,3,6,10,13,16
  57:7,12,14,22 58:1
  59:8,8,18,20,24
  60:4,5,12,20,24
  61:11,21 62:2
jornaya's  61:23
joseph  1:4 4:9
  14:5,8 73:4 74:1
  75:1

jue  51:5
july  1:17 4:1,6
june  3:18 50:24
  51:5 58:6,7,20

**k**

k  21:10
keep  28:12
kept  67:3
kevin  2:13 4:23
  59:14 62:19 73:1
kevin.polansky
  2:18 73:2
kind  31:5 34:17
  54:1
kingston  42:4
know  8:2,4 9:19
  9:20,21 12:2 13:5
  13:5,14,14,16,17
  14:1,3 16:14 22:1
  23:7,18,18,19 24:1
  24:5,8,11 25:1,4,7
  25:13,14,24 26:1
  26:12 27:19,21
  29:5 31:23,24
  32:9,23 33:2,24
  34:3,6,8 35:19
  36:9,12,18 41:6
  44:16,19 47:24
  48:17,24 49:21
  50:5,7,8,10,13,20
  51:22 52:5 53:22
  54:2,7,14 57:6,10
  57:11,21,25 58:16
  60:9,10 61:18,25
  62:19 64:20,24
  66:4,12 69:12,13
  69:21,23,24 70:5
knowledge  57:3
  57:22
knows  24:2,22

**[labeled - milliseconds]**

**l**

labeled   11:3
language   16:22
  17:3,8 18:7,24
  32:10,11,12 33:15
  36:20 37:2,9,13
  53:13,25 54:5,8
  57:4 61:22 62:3
large   31:7
law   2:6 8:8 9:20
law.com   2:10
laws   14:16,16
lawsuit   67:6
lawyer   67:16
lead   11:22,24
  12:11,23,23 13:3,6
  13:11,24 15:24
  16:6,8 21:6,12,13
  21:14 23:12,12
  24:16 26:7 28:22
  29:13,18 30:5,6,9
  34:12,16 35:6
  49:6,8,8 60:12
  61:21 68:23,25
  69:2
leadid   9:23 11:20
  11:22 12:6 14:11
  15:9 16:4,5 21:14
  21:23 22:4 29:22
  30:4,11 35:3,5,22
  36:2,18,19 50:1,4
  50:6,11,14,16 57:7
  57:12,14 60:3,5,10
  60:10,11,12,19,21
  60:25 61:7,10
  62:3
leads   9:20,22
  12:20 35:10
learned   21:17
  23:24 24:21

legal   24:4 73:23
letter   28:5 42:23
  67:5,8,10,15,20
  69:21 70:2
level   8:3
line   74:4,7,10,13
  74:16,19
link   16:23 17:1,10
  17:12
list   16:10,14,15,17
  27:12
listed   6:9 8:11
  40:2 44:7 47:9
  49:7
lists   22:21 48:18
  48:18
litigation   17:20
  27:22 28:7
little   41:17
lives   44:8
llc   1:8,14 3:9 4:24
  73:4 74:1 75:1
load   41:18
location   47:9,17
lodge   24:1
log   27:25
logged   50:17
look   13:1 39:1,20
  40:13 41:24 46:16
  49:12 54:3 60:15
  60:24 61:2 63:23
  69:13 70:5
looked   22:18
looking   5:14 41:23
  43:7 52:24 53:3
  61:4 65:16 66:16
looks   7:7 48:3
  52:25 55:14 65:17
lot   13:15 31:6,6
  55:20

low   55:25

**m**

major   35:10
man   25:19
manager   6:3
mantha   1:4 3:17
  4:9 5:9 7:22 9:1
  9:17 10:4 11:8
  14:6,8,24 15:1
  22:25 26:10,20
  28:21 29:4 30:19
  31:12,18,19 32:24
  35:19 36:4 37:3
  40:21 41:1 44:17
  45:18 48:12 51:23
  52:2 62:9 66:9
  73:4 74:1 75:1
mantha's   6:20
  7:10 15:6 16:1
  22:20 24:3 25:2
  25:14,17 28:20,22
  29:6 30:10 31:25
  38:5,15 41:4 45:9
  48:21 50:17 54:11
march   66:1
mario   44:7
mark   52:12 59:12
marked   5:15 7:5
  11:2 19:17,21
  39:1 41:15 45:5
  45:16 46:14,17
  52:14 59:5,15,17
marketing   18:12
  19:4 20:20 21:10
  21:10,17 23:6,8,20
  25:4 33:7,11,17,20
  33:21 34:3 45:8
  54:13 56:25
mass   44:9
massachusetts   1:2
  2:8,16 4:11

match   13:2 31:18
  32:3 37:2 38:21
  38:24 44:22,25
  47:21,21 48:4
  64:10,11
matched   48:5
matches   13:4,6
  31:25 48:3
matter   4:9 72:17
matthew   1:13 4:8
  5:2,21 6:3 56:21
  70:23 71:2 73:5
  74:2,24 75:2,4,12
mean   7:12 8:14
  10:18 11:10,11
  14:14 24:8 27:2
  35:9 38:24 43:9
  50:25 53:21 55:19
  57:2 67:14 70:1
  70:10,14
meaning   70:6
means   8:4 16:15
  47:6,14 61:19,25
meant   31:11
media   9:11 10:8
  16:24 17:10 21:7
  26:8 27:16 36:25
  48:9 50:9 52:11
  62:16
mention   19:2
mentions   19:4
messages   9:2
  14:21 18:14 21:8
  31:12 32:25 33:19
met   5:8
michael   2:21 4:14
  10:15 67:21
microphone   8:18
microsoft   15:16
milliseconds   13:2

minor 44:13
minutes 62:22
misspoke 67:7
modified 70:9
morristown 47:10
mouth 55:1
move 7:3
moving 28:12 55:2
mullins 2:14

**n**

n 2:1 3:1
name 4:14 5:8 6:1
 6:1 10:15 19:11
 51:19
named 25:19 44:7
national 8:11
necessary 75:6
nelson 2:14
nelsonmullins.c...
 2:18 73:2
never 23:15 33:25
 39:10 45:20
new 32:8 47:10
normally 29:2
notary 75:13,19
note 73:10
noted 75:7
notes 26:4 69:4
notice 3:8 5:11,23
 6:5 7:1
number 4:11 8:10
 16:3 35:8 44:1
 63:24,24 64:13,21
 64:25
numbers 63:14
 64:9
ny 73:15

**o**

o 1:24 72:2,24

oaths 72:4
obey 8:8 14:16
object 14:22
objection 7:18 8:1
 8:12 10:24 17:21
 19:3 20:23,24
 21:25 23:2 24:1
 26:15 27:24 28:25
 29:7,16,24 30:25
 31:14,21 32:5
 33:9,23 34:5,25
 35:7,25 36:6,23
 37:5 38:23 40:22
 41:2 43:8 44:15
 44:18,24 47:16
 48:7,22 49:5,16,24
 50:2,19 51:13
 52:3,8 53:14,18
 54:15 56:20 57:8
 60:6,14 61:17
 62:11
objections 4:18
obligation 15:6
obligations 42:22
obtain 15:1 66:8
obtained 25:2,14
obviously 5:8
occurring 72:14
office 2:15
oh 48:3 59:1 63:16
 67:24
okay 5:7 6:5,8 7:7
 7:14 8:9 9:6,12,15
 9:24 10:13,20,25
 11:2,5 12:17
 13:12,19,22 14:3
 15:12,17 16:7,18
 16:18 17:6,15,19
 17:25 18:6 19:1
 19:14 20:10 21:19
 22:8 24:23 27:11

28:11 30:17,23
 31:10,17,24 32:10
 32:18 33:25 34:21
 35:16 38:25 39:3
 39:10,13,18 40:2
 40:15 41:5,19
 42:7,16 43:21
 45:2 46:2,6,21
 48:1,10 49:12,20
 50:10,21 51:2
 53:22 54:7 55:12
 56:1,11,16 57:11
 58:3,8,23 59:3,10
 61:7,10,18 62:5,17
 63:3,5,18,19,23,25
 64:2,5,12 65:9,13
 65:16 66:1,7,16
 67:9,17 68:15,24
 69:3 70:4,16,17
ooo 4:3
open 11:5 19:22
 51:3,5 69:15
opinion 62:12
opposed 23:14
 70:2
opposite 61:1
opt 3:10 11:3
 15:13 22:18,25
 24:16 25:17 26:4
 26:24 32:25 34:11
 34:11 36:21 38:18
 38:22 40:8,11
 44:22 47:22 50:7
 50:24,24 51:16
 52:6 53:10 56:17
 56:19 60:19 61:5
 64:4 66:25 67:18
 69:10
opted 30:19 31:12
 31:19

optional 65:11
oral 1:12
order 8:8 54:4
ordinarily 28:23
 29:12
original 12:11
 25:17,18 40:11
 67:7 69:16
originally 12:16
 70:8
originated 21:12
 23:11
owned 43:23

**p**

p 2:1,1
p.c. 2:6
p.m. 1:16 4:2,5
 8:21,24 37:24
 38:2 55:8,11
 56:12,15 71:3,4
package 21:24
packet 12:10,14
 12:15 28:23 29:2
 29:11,20,22,23
page 3:3,7 18:19
 18:21 39:17,20
 42:8 45:25 49:13
 50:1 52:18,24
 53:6 55:14,17
 58:17 60:4,11
 61:8 63:10,12,14
 63:17,19 64:21,23
 65:6,16,17 66:13
 74:4,7,10,13,16,19
pardon 33:12
part 17:13 18:4
 30:6,6 55:13,15
participants 2:2
particularly 42:4
partner 33:8,10,11
 33:21

partners  19:5
  33:20 34:3,6
  54:13 56:25
partnerships  6:4
party  72:17
paste  17:3 54:4
pasted  32:12 64:7
patience  70:19
pdf  5:24
pemberton  44:8
people  14:20
person  13:16
  47:15 48:25
personal  13:20,21
pertain  6:20
peter  51:20
petroff  51:20,23
  51:25
petroff's  52:6
phone  10:19 16:3
  56:10 63:24,24
  64:9,13,21,25
pi  13:20
piece  30:14
pii  12:23 13:21,22
ping  12:11,18,21
  12:22 13:24 14:4
  14:9 30:7,11
place  72:7,15
placed  7:15
places  7:25
plaintiff  1:6 2:4
  4:8,22 5:9 21:9
  28:6 39:15 41:22
  46:4 51:9
plaintiff's  3:12
  21:4,6,12,14 66:24
plaintiffs  14:24
please  4:17,19 5:1
  64:13

plmrkg  21:11
plural  3:17 9:12
  20:19 21:9,10,12
  21:13,17 22:6,24
  23:6,7,11,11,20
  24:10,13,14 25:1,4
  25:8,11,14,16
  36:16 45:8,17,18
  47:20 48:18 49:1
  49:3,25 50:24,24
  51:12 53:12 54:11
  56:17 57:6,25
plural's  46:4 48:6
  55:16
point  27:5 32:17
  34:18
polansky  2:13 3:5
  4:23,23 5:21 7:18
  8:1,12 10:1,24
  12:13 14:5,22
  17:21 19:3 20:23
  21:25 23:2,23
  24:7,19 26:15
  27:6,24 28:3,9,13
  28:25 29:3,7,16,24
  30:1,25 31:14,21
  32:5 33:9,23 34:5
  34:25 35:7,25
  36:6,23 37:5,20
  38:7,23 39:5
  40:22 41:2 43:8
  44:15,18,24 47:11
  47:16 48:7,22
  49:5,16,24 50:2,19
  51:13 52:3,8,18,22
  53:5,14,18 54:15
  54:18,25 55:4,5,24
  56:2,7,11,20 57:8
  58:6,10,15,18,25
  59:2,9,12 60:6,14
  61:17 62:11,21

63:2 69:3,6 70:12
  70:22 73:1
pop  64:3
populated  16:2
portion  10:11
  12:22 68:4
position  62:9
possession  24:25
post  2:15 12:11,18
  12:21
potential  14:23
pre  18:13 33:18
preparation  28:7
prepare  6:12 68:3
prepared  66:24
present  2:20
previously  53:2,8
prior  9:1,17 10:4
  14:19 15:2 21:7
  24:16
privacy  42:23
private  59:5
privilege  27:25
privileged  28:2,4
prizing  65:12
problem  58:16
  70:21
proceeding  4:19
proceedings  72:6
  72:10,14
produce  38:21
produced  27:21
  38:12 39:14
product  28:8
properties  69:13
  70:7
protection  7:16,23
provide  10:6,8,20
  14:10 60:20
provided  9:1,4,8
  10:4 13:24 15:19

16:9,11,13,23 17:1
  24:17,22 30:21
  31:15 36:13,15,25
  39:19 41:3 45:1
  47:20 48:13 50:18
  57:4,13,15 62:12
  68:1
provider  29:13,18
  47:7
public  75:19
pull  15:21 16:1,6
  26:17
pulled  15:17,20,23
  16:8,11 26:19
  27:14
purchase  9:22
  11:23 12:11,20
  26:9,21 30:5
  68:23
purchased  26:7
  38:14 49:8 68:24
  69:2
purposes  53:5
pursuant  42:21
  72:3
put  12:2 15:25
  17:4 19:21 20:7
  21:23 22:23 26:6
  30:15 33:16 38:22
  48:20 51:25 56:3
  68:20

| q |
| --- |

query  15:22,23
  16:1 26:16
question  12:9 18:9
  23:3 29:8 36:1
  37:6 57:20
questions  19:24
  62:19 63:7 64:16
  66:23 69:6

[quote - revpoint]                                                                                          Page 10

**quote**  62:8 63:21
  65:11,13 66:24
**quotes**  63:8
**quotewizard**  3:10
  6:4,6,9,17,21,25
  7:10 9:1,3 11:3
  15:4,13 19:2,4,7,9
  19:13 20:11 21:3
  21:6,8 22:18
  23:17 24:2,25
  25:10 26:4,23
  32:25 33:5,7,21
  34:11,21 35:5,13
  36:21 38:6,8,14,17
  38:22 40:8,11
  41:11 45:10 47:21
  47:22 48:12 49:7
  50:6,7 51:16,25
  52:6 53:9 56:19
  59:23 60:19 61:5
  62:10 64:4 66:25
  67:18,21 68:7,9,18
  69:10
**quotewizard's**
  19:11,20 44:22
**quotewizard.com**
  1:8,14 3:9 4:7,24
  71:1 73:4 74:1
  75:1
**quotewizard.com.**
  4:9

---

**r**

**r**  2:1 16:15,15 74:3
  74:3
**ran**  15:23
**rates**  18:12
**rcw**  72:3
**reach**  29:18
**reached**  10:8
  11:11 67:11,21

**read**  21:2 42:16
  47:11 49:10 55:20
  65:9 73:9 75:5
**really**  55:23
**reason**  23:21
  48:19 63:14 73:11
  74:6,9,12,15,18,21
**reasons**  35:8
**receipt**  42:20
  73:18
**receive**  6:20 9:2
  18:12 32:16 33:17
  38:6 45:10 62:9
**received**  10:7 11:8
  17:24 21:6,13
  48:9,9 50:9 62:15
  69:21
**receiving**  28:5
  67:10,20
**recess**  37:25 55:9
**recessed**  71:4
**recognize**  6:5
  19:25 42:8
**recognizes**  69:1
**record**  4:4 5:8 6:1
  8:17,20,22,23 35:9
  37:23 38:1 53:5
  55:3,5,7,10 56:9
  56:11,12,13,14
  67:15,19 71:2
  72:13
**recorded**  18:13
  26:13 33:18 72:11
**refer**  7:16
**reference**  22:19
  26:23,25 39:21,24
  50:1 54:12 55:18
  57:7
**referenced**  42:20
  73:6

**references**  34:12
  56:24
**referring**  56:18
  67:3,4,5
**reflected**  38:17
**refresh**  5:16,22
  6:14
**refreshing**  58:17
**regard**  26:1
**regards**  38:5
**registry**  8:11
**rejects**  13:10
**related**  38:5 45:9
  63:8 72:17
**relates**  14:23
**relating**  24:2
  26:19 29:3
**relation**  33:4
**relationship**  23:7
  25:7,10 35:14
  59:23,24
**relayed**  21:18
**relevance**  44:15
**rely**  14:17,19
**relying**  15:1
**remains**  21:15
**remember**  37:8
  54:6
**remotely**  2:2 4:13
**rephrase**  56:24
**report**  11:7 18:5
  31:3,5,7
**reported**  1:24
**reportedly**  25:18
**reporter**  4:15,25
  5:3 72:3,24
**reporter's**  72:1
**represent**  4:18 5:9
  39:4,14 41:21
  42:2 46:3 51:7
  54:14 55:21 59:19

**representation**
  55:14
**represented**  4:7
  22:24 71:1
**request**  42:20
**requested**  72:16
**requests**  31:9
**require**  30:5 35:5
  35:8,11
**required**  8:10
  75:13
**requiring**  15:9
**reserve**  28:12
**reserved**  71:5
**resides**  48:25
**respect**  56:24
**response**  3:14,17
  3:19 38:12 39:2,5
  39:8,15 40:17
  41:14,14,21 42:3
  42:12,18 43:6,14
  44:1,21 45:12,18
  46:4 51:3,8,8,12
  51:20 53:12 54:11
  55:16 59:8,18,19
  59:25 60:4 61:10
**responses**  3:11
  62:8
**responsible**  15:3
  22:4
**rest**  11:13 13:11
**restrictions**  7:15
  7:25
**return**  13:7 73:13
  73:17
**review**  72:16 73:7
**reviewed**  62:7
**revpoint**  3:14,15
  9:11,18 10:8,13
  11:12,16 12:6,15
  12:21 13:8,9 15:1

15:6 16:9,12,13,23
17:1,10 20:14,19
21:7,9,20,24 22:3
23:5,10,11,13,15
24:9,12 26:8
27:16 28:2,11,15
29:13 30:12,18
31:16 32:23 33:14
36:12,15,25 38:4,7
38:9,10,12,14,20
39:7,16,20 40:17
41:4,13 42:12,17
43:13 45:1,3 48:9
50:9 52:11 57:4
57:13,15,21 58:5
58:24 62:16 67:11
67:23,24 68:11,12
68:17
**revpoint's** 25:7
39:2 43:14 44:21
48:6 57:23
**right** 12:2 14:17
14:25 15:10 20:5
20:15 24:11,19
27:3,8 28:9 29:4
41:25 42:2,14
60:23 62:17 64:12
64:17 67:1,22
68:4,7,21 70:7,14
70:17
**riley** 2:14
**role** 26:1
**rule** 3:8
**run** 15:22 25:19

**s**

**s** 2:1 74:3
**sale** 49:3,6,8,17
**sales** 49:19
**samples** 65:12
**satisfying** 31:8

**saw** 66:17
**saying** 18:22,23
42:19 47:14
**says** 16:19 17:7
18:1,11,22 27:11
31:10 33:16 42:8
42:21 43:3,3
46:22 47:2,4 50:3
51:4,5 58:7 61:11
61:19,21 63:12,17
63:20 64:12 65:1
65:3,13,21
**scarborough** 2:14
**screen** 18:17 46:18
64:23
**screenshot** 17:7,9
18:1,8,10,16,23,23
18:24 19:2,7,10
**scroll** 39:16 42:7
43:2 46:1,7 63:11
**scrolling** 52:19
**search** 51:9
**seattle** 1:18 4:1
**sec** 63:16
**second** 42:8 69:4
**section** 17:14
42:22 53:2
**secure** 14:17,19
15:5
**securing** 15:3
**see** 5:12,13,16,17
5:23,23 8:17 11:3
39:21,23 42:10
43:9,25 44:9
45:19 46:7,7,22
49:17 50:3 53:13
53:21 55:1 58:14
60:2 64:12,25
65:3,14,17 66:1
**seeing** 42:14

**seen** 7:12,12 38:11
39:10 42:5 45:12
45:20 59:24 60:5
63:6 66:10
**selectquote** 31:13
**send** 9:20 10:17
12:21 13:11
**senior** 6:3
**sent** 10:9 11:23
12:10,13,15 14:8
14:21 21:8,8,24
27:16,18 30:5,7
43:22 73:14
**sentence** 63:12
65:7,9
**separate** 18:19,21
**september** 66:2
**service** 47:6 65:11
65:14
**set** 3:12 8:7
**sheet** 73:11
**short** 37:21
**show** 5:10 11:1
19:20 41:9,19,20
42:17 45:15 51:2
54:8 59:11
**showing** 63:15
**shows** 5:16 29:10
51:12,16 52:6,10
64:24
**sign** 73:12
**signature** 20:7
71:5 72:20,23
**signed** 73:20
**significance** 26:25
30:24
**signifier** 35:9
**signifies** 35:3
**similar** 53:15
**similarly** 1:5 62:5

**singular** 9:14
**sister** 44:14
**site** 18:6 48:14
**sitting** 66:20
**situated** 1:5
**situations** 57:24
**six** 44:4 66:13
**small** 18:11
**sms** 18:14 33:18
**snafus** 70:19
**snappy** 17:12,15
18:2,6,19,25 22:21
32:12 48:13 54:3
**snappyautoinsur...**
39:23 64:7
**snappyautoinsur...**
22:14 23:14 25:18
32:24 35:20,23
37:17 39:22 49:22
50:18 52:1,25
53:17 55:15 62:14
65:1,19 66:8
**snappyautoinsur...**
24:18
**solicitations** 30:20
**solutions** 20:20
21:10 23:6,8 25:4
45:8 73:23
**sorry** 9:15 19:15
39:4 40:12 41:19
50:13 58:8
**sort** 70:9
**source** 22:25
23:14 25:17,18
36:19
**sourced** 22:20
**sources** 68:20
**speak** 6:16 23:23
57:2,9
**speaking** 30:1

**specific** 42:22
**specifically** 56:24
  63:8
**spoke** 10:13
**spoken** 22:8,13
  24:10
**spry** 1:24 4:15
  72:2,24
**sql** 15:20 26:17
  27:14,15 29:12
**square** 2:15
**stamp** 46:17
**stand** 13:13
**standard** 34:17
  61:24
**stands** 16:15
**starts** 20:25 55:13
  63:12
**state** 4:17,19 6:1
  14:15 72:4,24
**stated** 72:8,15
**statement** 21:15
  61:20
**states** 1:1 9:19
  21:3
**statute** 7:22
**stenographically**
  72:10
**stored** 68:14
**street** 2:7 44:8
**strike** 35:4,17 57:5
  57:19,20
**stuff** 62:23
**subject** 21:12
  23:12
**subpoena** 3:14,15
  3:17,19 38:4,12
  39:2,5,7,15 40:17
  41:14,21 42:3,12
  42:18,18 43:14,22
  44:21 45:3,8,18

46:4 50:22 51:3,8
  51:8,12,19 53:12
  54:11 55:16 58:4
  58:24 59:8,18,20
  62:7
**subscribed** 75:14
**subscriber** 42:21
  50:23
**suing** 7:22
**summary** 20:22
**supervision** 72:11
**support** 9:16,24
  10:4
**supposed** 16:16
  24:16 45:17 53:19
**supposedly** 26:10
  35:20
**sure** 8:19 14:1
  18:9 25:20 29:8
  36:7 37:6 41:24
  50:15 67:19 69:19
**swear** 5:1
**sweepstakes** 65:12
**switch** 56:10 63:3
**sworn** 5:3 72:5,9,9
  72:14 75:14
**system** 12:12,19
  12:22,25 13:1,5,17
  13:25 14:9 15:12
  15:14,18 16:11
  26:13 28:21 68:7
  69:1

---
**t**
---

**t** 74:3,3
**table** 24:23
**tagged** 61:23
**take** 37:21 41:17
  55:20 60:18 62:22
  68:20
**taken** 4:8

**takes** 13:1
**takos** 2:21 4:14
**talk** 6:21 10:16
  21:19 28:3,4
**talked** 10:18,18
  57:17 59:22 62:2
**talking** 14:5 40:23
  46:12 50:25 54:19
  61:13
**target** 42:8 43:25
**tcpa** 7:17 8:4,6
  14:16 16:19 17:6
  17:11,11,17 19:11
  19:12 32:10 33:15
  33:16 36:20 53:13
  54:4 61:19,20,20
  61:22 64:6 66:9
**tech** 13:16
**technical** 70:19
**ted** 2:10 5:8 55:1,6
  69:6
**telemarketers** 8:7
**telemarketing**
  7:15,25 62:10
**telephone** 7:15,23
  8:10 10:16
**tell** 11:5,10 12:18
  30:18 32:11,14
  34:13 40:1 46:18
  48:5 52:21 64:1,9
**tells** 70:7
**template** 31:6
**testified** 5:4 24:7,8
  49:21 66:7
**testify** 6:9 72:9
**testimony** 6:24
  72:6,10,14 73:9,18
  75:8
**text** 9:2 14:20 21:8
  31:12,20 32:25
  55:20

**texts** 38:6 45:10
  62:10
**thank** 13:22 30:17
  46:20 49:15 59:14
  62:18 70:22,24
**thanks** 5:7
**theirs** 56:22
**thing** 5:10 14:8
  20:5 58:9 59:6
  64:20 68:22
**things** 10:9
**think** 13:4 23:17
  24:1,7,8,19,24
  25:13 41:1 53:23
  54:15 57:19 63:10
  67:18
**thinking** 37:22
**tie** 32:8
**ties** 44:17 50:11,14
  50:15 60:10
**time** 4:5,19 8:20
  11:23 16:5 21:7
  33:7 37:16,24,24
  38:2,2 55:7,11
  56:14 59:4 62:19
  71:3 72:7,15
  73:19
**timeframe** 73:8
**times** 52:9
**tip** 59:4
**title** 6:2
**today** 4:6 45:13
  66:20
**told** 22:3 23:11
  25:20
**top** 15:5,8 65:17
  69:23
**topics** 6:9,25
**tracks** 3:15 42:1
  58:24

---

transcribed  72:11
transcript  72:6,12
  72:15 73:6,20
  75:5,8
tried  60:18
true  21:16 72:13
  75:8
trustedfrom  34:18
  34:19
truth  72:9
try  7:3 37:2 70:11
trying  32:20 41:24
  43:23 58:11,23
  60:17
turn  37:19 52:16
turned  8:18
turning  55:13
twice  59:6
two  40:10 41:7
  42:14 43:9 61:2,5
  68:20
type  18:17
typo  16:16 45:17

**u**

u  58:7
u.s.  4:10
u.s.c.  42:22
uh  16:21 43:16
  53:11 64:8,22
  65:22 66:3
ultimately  68:12
  68:16
underneath  65:21
undersigned  72:2
understand  6:24
  20:19 28:13 37:6
  37:8 47:6,14
  50:15 63:6 65:23
  67:9
understanding
  7:10,11,14,22,24

8:3,6,9,14 34:16
  35:3 41:6 66:20
unique  29:6
united  1:1
unitedquotes.com
  21:11 22:16,19
  23:8,13 24:14,18
unitedquotes.com.
  23:6
universal  60:3
url  10:10 11:17
  16:10,10,15,24
  17:1 22:20,22
  27:11,12 28:23
  30:18,18,21 36:25
  65:18
use  16:4
uses  34:18

**v**

v  73:4 74:1 75:1
valid  14:13
validated  14:4
vendor  13:7 14:17
  14:19
vendors  12:20
  14:15 33:13
verification  20:6,8
  34:16
verify  61:22 73:9
veritext  4:14,16
  73:14,23
veritext.com.
  73:15
verizon  3:18 5:17
  47:5 50:22 51:3,4
  51:9 58:7,20
verizon's  51:2
version  46:17
  53:23
versions  40:10

versus  4:9 58:7
video  4:7
videographer  2:21
  4:4,15,25 8:16,20
  8:23 37:23 38:1
  54:23 55:3,7,10,22
  56:9,12,14 70:25
videotaped  1:11
visit  39:25 49:21
  49:22
visited  26:10
  32:24 35:20 37:3
  37:3,10,16 48:13
  48:20 53:16 54:4
visiting  36:4
vs  1:7

**w**

want  8:17 19:19
  23:25 24:11 29:5
  40:12 41:9,9,20,23
  49:17 51:3 59:12
  60:9,16,21 62:23
  63:3,10,23 64:19
  67:19 68:18
wanted  12:2 27:12
  59:11
washington  1:18
  4:1 72:5,24
way  28:21 33:24
  43:2 45:23 72:16
we've  50:25 59:17
  59:22 61:15 62:5
web  18:19,21
website  10:11
  17:16 18:3,16,18
  18:20,25 26:11,23
  32:13 35:24 36:5
  37:4,10,14 39:25
  53:1,17,24 54:3
  55:15 61:23 64:7
  65:18 66:8

weeks  1:13 4:8 5:2
  5:7,25 6:3 8:25
  19:19 38:3 55:12
  56:16 59:18 71:2
  73:5 74:2,24 75:2
  75:4,12
went  6:14 10:12
  53:8 61:1 66:8,12
  68:13
win  65:12
witness  5:1,3
  54:21 70:16,21
  72:8,20 73:8,10,12
  73:19
witnessed  61:19
  61:20
wondering  18:15
  23:12
worcester  44:9
word  15:16 19:6
  69:10,17 70:6
words  17:11,16
work  12:11 28:8
  31:6 33:13 34:14
  36:7 60:9
worked  7:8
working  56:1
works  28:21
write  43:10,12,13
  43:13,17 46:10
  47:25 48:2 60:24
  63:24
written  9:2,17
  10:5 14:20 15:2
  24:17 43:20 60:23
wrong  41:20 57:19
  58:9
wrote  15:23 61:1,4
www.snappyaut...
  21:5

**[www.snappyautoinsurance.com. - zoom]**                    Page 14

| **www.snappyaut...** |
| --- |
| 26:24 |
| **x** |
| **x**   1:3,10 3:1 |
| **y** |
| **yeah**   5:20,23 |
| 15:15 21:2 23:4 |
| 29:5 32:9 39:7 |
| 43:18 47:13 53:20 |
| 54:25 55:5,24 |
| 56:7 57:16 58:15 |
| 58:21 59:17 67:16 |
| 67:25 69:1 70:14 |
| 70:18 |
| **yep**   19:23 39:9 |
| 51:6 |
| **z** |
| **zip**   63:17 |
| **zone**   4:5 37:24 |
| 38:2 55:11 71:3 |
| **zoom**   1:11 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.