# EXHIBIT G

Page 1

1        UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF MASSACHUSETTS
3         Civil Action No. 1:19-cv-12235-LTS
4
5   JOSEPH MANTHA, on behalf of himself,
6   and all others similarly situated,
7                           Plaintiff,
8   V.
9   QUOTEWIZARD.COM, LLC,
10                          Defendant.
11
12
13         Remote videotaped deposition of
14   DEREK PADON, a witness called on behalf of the
15   Defendant, taken pursuant to the Federal Rules of Civil
16   Procedure, before Lori Atkinson, Notary Public in and
17   for the Commonwealth of Massachusetts and Professional
18   Shorthand Reporter, conducted via Zoom on
19   Friday, September 11, 2020, commencing at 11:16 a.m.
20
21
22
23   Job No. NE 4222188
24

Page 6

1      MR. BRODERICK: Sure.
2  BY MS. KINGSTON:
3    Q. Mr. Padon, just a couple of ground rules before
4  we get started. If you don't understand my question at
5  any point, just let me know. I'm happy to rephrase
6  that. If at any point, you need a break, just let me
7  know, we are happy to accommodate you. It is important
8  that you have only oral and audible answers. Try not
9  answer by shaking your head "yes" or "no"; something
10 oral on the record.
11     Finally, since we are doing this virtually, if at
12 any time you are having technological problems, you
13 can't hear me, you can't see me, just stop me and let me
14 know. Okay?
15    A. Okay.
16    Q. Can you please state your full name for the
17 record?
18    A. Derek James Padon.
19    Q. Now, are you currently employed?
20    A. I am.
21    Q. Where are you employed?
22    A. Doctor Franklin Perkins School.
23    Q. We are going to be talking about the school a lot
24 today, is there a good shorthand for that?

Page 7

1    A. Perkins.
2    Q. Perkins. If I use the term "Perkins," you know
3  that I'm referring to the school?
4    A. Correct.
5    Q. How long have you worked at the Perkins School?
6    A. Four years on October 11th of 2020.
7    Q. What is your job title there?
8    A. Vice president of human resources.
9    Q. What does that job entitle?
10   A. Managing the day-to-day human resources functions
11 of the entire -- the entire scope.
12   Q. When you say entire school, are there multiple
13 parts of the school?
14   A. We have different divisions.
15   Q. Could you just give me a brief overview of those
16 divisions?
17   A. Yes. We have special education, residential
18 services, child development center, Rein In A Dream, and
19 adult and elder services.
20   Q. I think the first one you said is special
21 education?
22   A. Yes.
23   Q. What does that involve?
24   A. So we have three schools; an elementary, middle,

Page 8

1  and high school. There's approximately a hundred kids.
2  About half of those stay here on campus with us in a
3  residential group home setting and the other half go
4  home to their families.
5    Q. About how many students total?
6    A. It's about a hundred.
7    Q. Hundred total. How many stay on campus?
8    A. Between 50 and 60.
9    Q. Okay. What is the duration of the school year?
10   A. Year round.
11   Q. So even through the summer?
12   A. Yes.
13   Q. Are there any breaks in the school year?
14   A. There are, yeah. School vacations and then there
15 is two weeks in the summer that they take the weeks off.
16   Q. Do you know what weeks those are?
17   A. I don't.
18   Q. Do you know what month?
19   A. One is at the end of August. The other is the
20 end of June, June into July.
21   Q. And I think you mentioned a couple or other
22 breaks during the year?
23   A. So, yeah, your traditional school vacations. I
24 don't know what they are.

Page 9

1    Q. Do you know the approximate time of the year?
2  Month?
3    A. I don't. I'm in human resources so I'm not on
4  that side of the operations.
5    Q. Okay.
6       And you mentioned, I think you said 50 to 60
7  students live on the campus?
8    A. Yes.
9    Q. Do you have dorms for them to live in?
10   A. We do.
11   Q. Is that what you refer to them as dorms?
12   A. We call them group homes.
13   Q. How many of those do you have?
14   A. Six.
15   Q. Six. Okay. How big is the -- how many -- do you
16 know how many approximate acres we are talking at the
17 school?
18   A. No.
19   Q. How big would you describe?
20   A. It's big. You mean like the entire campus or?
21   Q. Yeah.
22   A. I mean I don't -- I honestly couldn't even guess.
23   Q. Is it akin to like a college campus?
24   A. Yeah. I would say like a small college campus.

3 (Pages 6 - 9)

Page 14

1  evening?
2     A.  Repeat that.
3     Q.  Is anyone supervising the students in the
4  evening?
5     A.  Yes.
6     Q.  At some point do they go home?
7     A.  Not the ones that stay on campus.
8     Q.  When you say, the ones that stay on campus, are
9  you referring to students or staff?
10    A.  Let me ask this you first:  Are we still on the
11 adult and elder services division still?
12    Q.  Let's focus on the special education division for
13 now.  I'm trying to get a sense, I know that there are
14 50 to 60 students that live there.  I'm trying to get a
15 sense of when the staff is there watching or
16 supervising?
17    A.  So like we talked about, during the day that we
18 are generally at school, we do have kids who refuse and
19 if they refuse then we'd have teaching assistants and
20 residential counselors stay back in their residential
21 group home with them.
22        Then we have a 2 to 10 shift that is staffed with
23 residential counselors and a shift supervisor for each
24 -- there is a shift supervisor for each of the six group

Page 15

1  homes.
2         Then evening shift, we have -- it's staffed with
3  night awakes, which is essentially the same thing as
4  residential counselor although the clients or students
5  are sleeping and that is managed by a night
6  administrative supervisor.
7     Q.  What are the hours for the night -- for the
8  evening shift?
9     A.  Ten a.m. -- 10 p.m. to 8:00 a.m.
10    Q.  It's safe to say that at no point are the
11 students unsupervised?
12    A.  Never.
13    Q.  During the evening shift, they would be in the
14 group homes supervising them; is that right?
15    A.  Correct.
16    Q.  I think you said there is a shift supervisor for
17 each of the six group homes?
18    A.  Yes.
19    Q.  Then that's also true at the evening shift; is
20 that correct?
21    A.  Yes.
22    Q.  Trying to get a sense in the evening shift, how
23 many staff members would be in each group home?
24    A.  Three to four depending on how many students are

Page 16

1  there.
2     Q.  Three to four staff members in each group home?
3     A.  Yes.
4     Q.  That be would be the shift supervisor and then I
5  think you used the term residential counselor?
6     A.  Correct.
7     Q.  Do you know -- do those employees report to
8  anyone directly?
9     A.  The program director.
10    Q.  Who is that?
11    A.  There are six of them.  There is one for each.
12 There is one for each of the group homes.
13    Q.  Do you have their names?
14    A.  Yes.
15    Q.  Could you tell us the names for each of the six
16 program directors?
17    A.  Just the first name or?
18    Q.  Full.
19    A.  I guess it's not confidential.  It is Joe Howell.
20    Q.  Who do you spell the last name?
21    A.  H-O-W-E-L-L.
22        Amanda Saunders; Kelley Gross; Bill Czy, C-Z-Y;
23        Dillon -- his name is escaping me.  I can look it
24 up right here if that's appropriate.

Page 17

1     Q.  We can do that during a break.
2     A.  I'm missing somebody.  That is one, two, three,
3  four, five -- and Timothy O'Day.
4     Q.  O, apostrophe, D-A-Y?
5     A.  O, apostrophe, D-A-Y, yes.
6     Q.  Bill C-Z-Y?
7     A.  Yes.
8     Q.  Those are the six program directors for each of
9  the group homes; is that right?
10    A.  Yes.
11    Q.  Do they report to anybody?
12    A.  They report to Joe Mantha.
13    Q.  What is his title?
14    A.  Director of residential services.
15    Q.  Does residential services encompass the two to
16 three adult residence that we spoke of earlier?
17    A.  It does not.
18    Q.  That's a different division?
19    A.  Correct.
20    Q.  Does Mr. Mantha report to anyone directly?
21    A.  He reports to the chief operating officer, Tim
22 Hammond.
23    Q.  Hammond?
24    A.  H-A-M-M-O-N-D.

Page 42

1  A. Yes.
2  Q. Do you know if it receives any government
3  funding?
4  A. We do.
5  Q. Do you know what the nature of that funding is?
6  A. I don't.
7  Q. How many employees total?
8  A. 351.
9  Q. We spoke about the divisions earlier. Is it
10 possible for you to give me a breakdown by division?
11 A. Of how many?
12 Q. Yeah. How many employees approximately in each
13 division?
14 A. No.
15 Q. How about residential?
16 A. I could guess that is around a hundred.
17 Q. A hundred. Are those are all residential
18 counselors and shift supervisors?
19 A. No. They would been residential counselors,
20 shift supervisors, nursing, clinicians, admin
21 assistants. I think it is around 110 consistent,
22 everyone that would be within that division.
23 Q. That kind of includes everyone who has needed to
24 keep the residential portion up and running. Not

Page 43

1  necessarily just someone who is supervising the kids?
2  A. Correct. The majority of it, however, would be
3  residential counselors and residential supervisors,
4  obviously.
5  Q. How many of those approximately do you employ?
6  A. I would say like a hundred.
7  Q. 100 of the 110 approximately are the residential
8  counselors?
9  A. Correct.
10 Q. Do all of 100 of those employee report to
11 Mr. Mantha?
12 A. No.
13 Q. How many of those employees report to Mr. Mantha?
14 A. Around six. Those would be the individuals names
15 that I gave you earlier.
16 Q. The program directors?
17 A. Yes.
18 Q. So in turn, the residential counselors and the
19 shift supervisor, do they report to the program
20 directors?
21 A. They do.
22 Q. It is kind of a chain of command?
23 A. Correct.
24 Q. At the end of the day is Mr. Mantha responsible

Page 44

1  for the entire residential division?
2  A. Yes.
3  Q. They might not report to him directly, but they
4  are still under him; is that accurate?
5  A. Yes, they are within his scope.
6  Q. So we have spoken about Mr. Mantha's job title.
7  I think you said director of residential operations?
8  A. Director of residential services. We do use -- I
9  have heard a few people say director of residential
10 operations as well. I'm not sure where that comes from.
11 The official title on record is director of residential
12 services.
13 Q. Have you prepared any documents to refer to for
14 today's deposition?
15 A. No.
16 Q. You haven't made any notes?
17 A. Am I making notes?
18 Q. No. Did you make any before the deposition?
19 A. No.
20 Q. And how would you describe Mr. Mantha's job
21 duties?
22 A. I don't understand the question.
23 Q. What does he do day-to-day?
24 A. He, you know, honestly I don't know. He oversees

Page 45

1  the residential services so I'm not sure specifically
2  what he does.
3  Q. Does that involve ensuring that the six group
4  homes are running smoothly?
5  A. Yes, yes.
6  Q. Is he just overseeing the group homes or
7  overseeing the treatment and education of the students
8  as well?
9  A. He oversees just the group homes. That is the
10 scope of what is he supervises. He would be involved
11 in, I mentioned, the clinicians. If the clinicians were
12 meeting, he would be involved in that. He may be on
13 committees. I don't know which ones.
14     Yeah, I would say 98 percent of what he is doing
15 is all related to, you know, what happens in the
16 residential services division with families, with
17 parents, with the staff and hiring and sort of -- it is
18 a lot of different things.
19 Q. When you said clinicians, are those teachers?
20 A. No. Clinicians. That will be a licensed social
21 worker.
22 Q. Did Mr. Mantha hold that position in 2019?
23 A. Yes.
24 Q. Do you know how long he has been an employee?

Page 46

1  A. He has been an employee since June 4th of 2005.
2  Q. Do you know what was -- strike that.
3     Did he hold any other titles besides the one he
4  currently holds?
5  A. He did. I don't know what the history is. I
6  know the title was before his current role. He was the
7  program director and then moved into the director of
8  residential services. I could get all of that -- all
9  the exact dates I do have. My guess would be it would
10 be about three years ago.
11 Q. Going to back the students, the students who are
12 living in the -- do you use the term home -- I can't
13 remember the exact term.
14 A. Group home, yeah.
15 Q. Are these students that have special education
16 needs?
17 A. Yes.
18 Q. In general, what type of special education needs?
19 A. They're generally behavioral needs or social and
20 emotional well-being needs.
21 Q. And are these students coming from Massachusetts
22 or are they coming from all over the country?
23 A. Most primarily Massachusetts. There are a few
24 that come from New Hampshire and maybe one that comes

Page 47

1  from Rhode Island.
2  Q. I think you testified earlier that they are
3  enrolled and living at the school year round minus a few
4  weeks during break; is that accurate?
5  A. Yes.
6  Q. Fair to say there probably is a lot of contact
7  with their parents and family; is that correct?
8  A. I would say so, yes.
9  Q. Do you know who is usually making contact with
10 their parents and families?
11 A. I didn't hear that.
12 Q. I will phrase it better.
13    Whose responsibility would it be in the
14 residential divisions to contact the parents and family
15 where appropriate and needed?
16 A. I'm not sure.
17 Q. Does Mr. Mantha have a physical office at
18 Perkins?
19 A. Yes.
20 Q. Does he have a physical work phone?
21 A. I think so.
22 Q. Do you know the number of his work phone offhand?
23 A. Not off the top of my head. That essentially is
24 really name driven. I would pull up Joseph Mantha and

Page 48

1  click on that. The days of seeing numbers, you don't
2  really see that anymore. I know behind it it would have
3  his extension.
4     Oh, wait. I do remember it. 978-368-4900.
5  Q. Do you have an idea of how much during a normal
6  day, pre-COVID, that he would spend in his physical
7  office versus somewhere out in the campus?
8  A. Honestly, I don't. Human recourses is offsite.
9  We are like a mile and a half down the road. We are not
10 physically on campus. I don't tend to see that coming
11 and going in traffic.
12 Q. There is a portion of Perkins that is not on the
13 campus but is down the road I think you said?
14 A. Yes.
15 Q. Is that just HR?
16 A. It is HR, finance and facilities.
17 Q. Does facilities involve residential or is that on
18 the campus?
19 A. I would say no.
20 Q. It does not involve residential?
21 A. No.
22 Q. Any employee who is within the residential
23 division, they would probably be working on campus, is
24 that accurate?

Page 49

1  A. Absolutely.
2  Q. Would they have reason to visit this offsite
3  location?
4  A. Only if they wanted to talk to somebody from HR.
5  But they generally don't. They usually call or email.
6  Q. What does facilities entail?
7  A. That would be grounds and, you know, maintaining
8  the grounds, fixing buildings. Those types of things.
9  So they are sort of dispersed all over campus. Sort of
10 coming and going. But the building, which we call south
11 campus, which is a mile and a half down the rode, that
12 is sort of where their stuff is, for lack of a better
13 word, sort of their home base, if you'd call it. They
14 meet there in the morning and then they disperse
15 throughout the day.
16 Q. Are there multiple -- you mentioned south campus.
17 Is that what you said?
18 A. Yes.
19 Q. Are there other portions of the campus?
20 A. No. It is just finance, HR, and facilities.
21 Q. Is that what you referred to as south campus?
22 A. Yes.
23 Q. What is the main campus called?
24 A. Main campus.

13 (Pages 46 - 49)

Page 78

1  Q. Why is that?
2  A. Why did I know that he would be eligible for the
3  reimbursement?
4  Q. Yes.
5  A. Just because I know what the job entails so it is
6  an easy one.  Obviously, he needs if they are on call
7  they sort of need to go around the campus, so, yeah.
8  Q. Do you know the year that Mr. Mantha first
9  received a reimbursement?
10 A. I don't.  I would have to like do some serious
11 digging to find that out.
12 Q. I'm going to ask you after the deposition to go
13 back into your system and look for documents relating to
14 reimbursement for Mr. Mantha.
15 A. Okay.
16 Q. This is approximately a $30 reimbursement;
17 correct?
18 A. Yes.
19 Q. Do you know if Mr. Mantha -- if there was a
20 written request by his supervisor at the time he
21 received reimbursement?
22 A. I don't.  Only because I don't even know when he
23 started receiving it.
24 Q. Would that be stored in Perkins' electronic

Page 79

1  records if it existed?
2  A. My hesitation is we have a new HRIS system as of
3  July 2017.  When we integrated from the old system to a
4  new system, we didn't bring in a whole lot of history,
5  we couldn't.  That is my hesitation, I would have to
6  look.
7  Q. What about physical files?
8  A. Possibly either physical files or something that
9  is in a payroll document somewhere.
10 Q. If he was approved in September of 2017, that
11 would have involved you and Lisa Harrington; correct?
12 A. Yes.
13 Q. Do you have any memory of that?
14 A. Yes.  That was a little bit different.  Anybody
15 -- when we rolled this policy out, as I told you, it was
16 already happening.  So any folks that were already
17 getting it, we didn't go through that approval.  We just
18 sort of -- they were grandfathered.  They were getting
19 it.
20     Obviously, Lisa and I reviewed a list and said
21 does this make since?  And it did.  And we sort of moved
22 forward with those people.
23 Q. You think this written policy was created after
24 September 2017 or before?

Page 80

1  A. After.  Definitely after.
2  Q. After September.
3      From your memory and understanding, Mr. Mantha's
4  reimbursement would have been pursuant to the ordinary
5  practice but not necessarily to this policy?
6  A. Correct.
7  Q. Is it accurate to say that this policy simply
8  memorializes what this practice was?
9  A. Correct.
10 Q. Do you have any specific memory of approving
11 Mr. Mantha in 2017?
12 A. No.  Other than what I just told you.  When we
13 sort of rolled out the policy, when we reviewed it.  I
14 saw his name on the list, knew it made sense, and,
15 obviously, didn't take him out of the system or made any
16 changes to it.
17 Q. Fair to say it was a no-brainer --
18 A. Yeah.
19 Q. -- to have approved him for this reimbursement?
20 A. Exactly.
21 Q. There's 351 employees at the school; is that
22 right?
23 A. Yes.
24 Q. How many currently get cell phone reimbursements?

Page 81

1  A. I want to say like 15 to 20; not a lot.
2  Q. Can you give me a sense -- you don't have to give
3  specific names, but a sense of who these people are,
4  what their roles are?
5  A. Yeah.  The executive team members that I talked
6  to you about, all of those folks.  And then anybody that
7  is a director of one of the divisions that I mentioned
8  that we talked about so they certainly have it.  Then
9  maybe one or two people underneath the divisional heads.
10 Q. What about the program directors to the
11 residential group?
12 A. Yes, they get that as well.
13 Q. What is the reason for that?
14 A. Because -- I'm using your word now -- it's a
15 no-brainer.  They participate in the call.  They are
16 there as well.  Not as much as Joe.  They leave their
17 office, which their office in the residential group
18 home.  They may go to a meeting, they go to a cafeteria.
19 They are going back and forth.
20     If there are issues with kids at school to sort
21 of make that transition happen.  And probably more
22 importantly if there is ever an emergency with a kid or
23 a parent needed a kid, we would need a way to get that
24 kid so those program directors are the way that we would

21 (Pages 78 - 81)

Page 98

1  A. No. No. It is more of a convenience thing.
2  Q. What do you mean by that?
3  A. So, you know, we have desk phones here. We have
4  phones in the hallway. So, you know, people could
5  utilize those.
6       The cell phone reimbursement and people using
7  their phones was easier for them. It could be somebody.
8  I don't want to have to worry about two or three phones.
9  Or it could be somebody, you know, they are in and out
10 of their office all day. So you get a phone call versus
11 a voicemail or email. I look at it for emergency. It
12 is certainly, for on call if you want to use that
13 example, I guess that wouldn't be optional. You have to
14 have it to be on call because you are not physically
15 here. But other than that, I feel it's more of a
16 convenience thing.
17 Q. That would also apply to being informally on call
18 in the way that we spoke about earlier. Is that
19 accurate?
20 A. Yes.
21      MS. KINGSTON: That's all that I have. I
22 thank you for your time. I will be following up about
23 the remaining items that we discussed.
24      THE WITNESS: Okay.

Page 99

1      MR. BRODERICK: I have one quick one.
2  BY MR. BRODERICK:
3  Q. You had said, Well, if they are not using their
4  phone at all for any work-related purpose. But would
5  getting emails on your smart phone qualify for
6  justifying the $30 reimbursement that you are using data
7  to get emails on your iPhone?
8  A. It is not written anywhere. But we talked about
9  that a lot when we rolled this policy out and we decided
10 not to make it.
11      But part of informally with Michael, who I report
12 to, is he didn't want Lisa and I approving any that were
13 just related to just email or just the phone. We just
14 felt like we could have other solutions for those.
15      MR. BRODERICK: All right. Thank you very
16 much. Thank you for your time.
17      MS. KINGSTON: Thank you.
18      THE WITNESS: Thank you.
19      THE VIDEOGRAPHER: The time is 1:49. We are 0
20 going off the record. This is the end of the deposition
21 of Derek Padon.
22      MS. KINGSTON: Full and mini PDF.
23      MR. BRODERICK: I will do the same thing.
24

Page 100

1  COMMONWEALTH OF MASSACHUSETTS.
2  COUNTY OF SUFFOLK, SS.
3
4      I, Lori J. Atkinson, Professional Court Reporter
   and Notary Public duly and qualified in and for the
5  State of Massachusetts do hereby certify that the
   foregoing transcript is a true and correct transcript of
6  my original stenographic notes.
   I further certify that I am neither an attorney or
7  counsel for, nor related to or employed by any of the
   parties to the action in which this deposition is taken;
8  and furthermore, that I am not a relative or employee of
   any attorney or counsel employed by the parties hereto
9  or financially interested in the action.
10
11
   IN WITNESS THEREOF, I have hereunto
12 Set my hand and affixed my Notarial Seal this 30th day
   of October, 2020.
13
14
15
16
   LORI J. ATKINSON
17 NOTARY PUBLIC
18
19
20
21
       ***PLEASE NOTE***
22 THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
   APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE
23 SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
   SUPERVISION OF THE CERTIFYING COURT REPORTER.
24

Page 101

1  DEPOSITION ERRATA SHEET
2  Case Caption: MANTHA VS QUOTEWIZARD
3  Deponent: DEREK PADON
4  Deposition Date September 11, 2020
5      To the Reporter:
6  I have read the entire transcript of my Deposition taken
7  in the captioned matter or the same has been read to me.
8  I request that the following changes be entered upon the
9  record for the reasons indicated. I have signed my name
10 to the Errata Sheet and the appropriate Certificate and
11 authorize you to attach both to the original transcript.
12 Page No.      Line No.      Change to
13
14 Reason for change:
15 Page No.      Line No.      Change to
16
17 Reason for change:
18 Page No.      Line No.      Change to
19
20 Reason for change:
21 Page No.      Line No.      Change to
22
23 Reason for change:
24