```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3      * * * * * * * * * * * * * *
      JOSEPH MANTHA, ON BEHALF     *
 4    OF HIMSELF AND OTHERS        *
      SIMILARLY SITUATED           *
 5              Plaintiffs         *    CIVIL ACTION
                   vs.            *    No. 19-12235-LTS
 6                                *
      QUOTEWIZARD.COM, LLC         *
 7              Defendant          *
        * * * * * * * * * * * * * *
 8

 9              BEFORE THE HONORABLE M. PAGE KELLEY
                UNITED STATES MAGISTRATE JUDGE
10                   HEARING ON MOTIONS
                     January 11, 2021
11

12    APPEARANCES:

13         LAW OFFICE OF MATTHEW P. MCCUE, (By Matthew P.
      McCue, Esq.) One South Avenue, Third Floor, Natick,
14    Massachusetts, 01760, on behalf of Plaintiffs

15         THE LAW OFFICE OF EDWARD A. BRODERICK, (By Edward
      A. Broderick, Esq.) 208 Ridge Street, Winchester,
16    Massachusetts 01890, on behalf of Plaintiffs

17         NELSON MULLINS RILEY & SCARBOROUGH, LLP, (By Kevin
      P. Polansky, Esq.), One Post Office Square, 30th Floor,
18    Boston, Massachusetts, 02109, on behalf of Defendant

19

20                            Courtroom No. 23
                              (Via Videoconference)
21                            1 Courthouse Way
                              Boston, Massachusetts 02210
22

23              JAMES P. GIBBONS, CSR, RPR, RMR
                      Official Court Reporter
24                1 Courthouse Way, Suite 7205
                  Boston, Massachusetts  02210
25                   jamesgibbonsrpr@gmail.com
```

```
 1              P R O C E E D I N G S

 2              (VIA ZOOM VIDEOCONFERENCE)

 3         THE CLERK:  Today is Monday, January 11, 2021, and

 4    we are on the record in the Civil Case No. 19-12235, Joseph

 5    Mantha versus QuoteWizard.com, LLC, the Honorable M. Page

 6    Kelley presiding.

 7       Would counsel please identify themselves for the

 8    record.

 9         MR. McCUE:  Matthew McCue for the plaintiffs.

10         THE COURT:  Good afternoon, Mr. McCue.

11         MR. BRODERICK:  Good afternoon, your Honor.  Edward

12    Broderick, also for the plaintiff.

13         THE COURT:  Good afternoon to you, Mr. Broderick.

14         MR. POLANSKY:  Good afternoon, your Honor.  Kevin

15    Polansky on behalf of the defendant, QuoteWizard.

16         THE COURT:  Good afternoon, Mr. Polansky.  So

17    you're outnumbered here, so there's no other --

18         (Laughter.)

19         MR. POLANSKY:  Yes.

20         THE COURT:  All right.  So I'm looking at Documents

21    No. 124, 126, and 128 on the docket.  And I will just say

22    that, because I think I kind of got it wrong and then Judge

23    Sorokin corrected me on the docket, I did communicate with

24    him about precisely what his idea is about the information

25    that was downloaded by the expert.  So I'm happy to address
```

1    that with you.

2        So let's start with 124, and these are the documents

3    relating to the Do Not Call requests.  And I think I will

4    hear you, whether you want to say, but, Mr. Polansky, when

5    someone opts out of receiving a call, what is the screen

6    that they're looking at?  Because I just happen to know from

7    my personal experience you are sometimes asked to give

8    reasons for unsubscribing or opting out of future calls, and

9    I don't know if that's the case here.

10        MR. POLANSKY:  Your Honor, based on the recent

11   testimony of Drips, the vendor that provides the actual text

12   messages, the person, the consumer, who receives the text

13   can simply write "stop, lawyer, do not call."  They can just

14   text back in the string, in text that they receive,

15   something along those lines.

16        And the attorney -- or I guess the 30(b)(6)

17   representative for Drips testified they have a very liberal

18   view as to an opt out.  So "stop" is enough.  If they

19   mention a lawyer.  If they say, "I don't want any call or

20   texts," anything like that -- and I believe it's even more

21   broadly, that person, that consumer, will text back to

22   Drips, and they will be removed from the text going forward.

23        THE COURT:  Okay.  If someone mentions the word

24   "lawyer," does that signify anything to you?

25        MR. POLANSKY:  To me, no.

1            THE COURT:  Does it not signify that they don't

2      think they should have been getting the texts?

3            MR. POLANSKY:  It doesn't imply that at all to me.

4            THE COURT:  Why not?

5            MR. POLANSKY:  Because you might just say, "I'm a

6      lawyer" just to stop receiving something.  I mean, in times

7      where I get a phone call that I believe that I haven't

8      received -- that I've never consented to, I may say, Listen.

9      I'm a lawyer.  I ask you not to do it.

10         But it doesn't imply that they didn't actually consent

11     to something, or it isn't even evidence that they didn't

12     consent to something.  I don't think by suggesting or

13     stating that you have a lawyer means that you didn't provide

14     consent or even evidences that.

15            MR. McCUE:  Your Honor, could I be heard?

16            THE COURT:  Sure.

17            MR. McCUE:  This is absurd.  It's absolutely

18     absurd.

19         When a consumer responds, they're responding via text.

20     They're saying, Stop calling.  Do not call me.  And we don't

21     know what else they're saying.  I never consented.

22         This is absurd.  I --

23            THE COURT:  Let me just ask you, Mr. McCue, let's

24     say that you have 48,000 phone numbers of people you know

25     that opted out.

1          MR. McCUE:   Right.

2          THE COURT:   So what are you going to do with 48,000

3    phone numbers?

4          MR. McCUE:   So here is the crucial point, right.

5    The issue right now is we are proceeding individually as to

6    Mr. Mantha.   We haven't gotten to the class side yet.   The

7    issue is consent.   Did they have consent?   And did

8    QuoteWizard, were they on notice that their perceived

9    consent that they got from third parties, some that are in

10   Bosnia, was not legitimate?   So if 47,000 people are

11   responding saying, Stop calling me, that to anyone, anyone

12   doing any level of due diligence, would mean, Holy cow,

13   what's going on?   We thought we had --

14         THE COURT:   So this is 47,000 out of how many

15   calls?

16         MR. McCUE:   This is the problem, your Honor, is

17   that they have fought tooth and nail from the beginning not

18   to tell us that, okay.   At the Drips deposition,

19   Mr. Polansky tried to obstruct -- to get testimony from

20   Drips.   Even Drips' own attorney said they're going to allow

21   that testimony, and the best we got was that there are

22   millions of these texts, millions.

23         THE COURT:   So if there's millions sent out by

24   Drips and you have 16,000 people who respond, "Do not call,"

25   then this doesn't seem that significant, right?

1          MR. McCUE:  Here's the crucial point, your Honor,

2    here's the crucial point.  They are supposed to have prior

3    express written consent for every person they send a text

4    to, millions and millions of people.  The 47,000 people are

5    just those people who are taking the time to affirmatively

6    respond and say, What the heck, stop calling me.

7          We know from our experience, and you probably know as a

8    consumer, the vast majority of time you get a telemarketing

9    call, you don't take the time to respond and formally opt

10   out.  You just blow it off.

11         So the fact that there are 47,000 to us signifies a

12   massive problem.  You can't look at that and say, Well,

13   that's a small problem.  You have to look at the macros.

14   Where is the evidence that they had consent to contact all

15   these people?  They don't have it.

16         The 47,000 opt outs is red-flag confirmation that they

17   have problems in their consent, and they should be looking

18   into it.  And to withhold that evidence, despite your

19   explicit order to produce the Do Not Call requests, not just

20   the phone numbers, defies what you had told them to do.

21         We're entitled to look at those comments.  If someone

22   says, I have a lawyer, holy cow, that is a red flag that the

23   call is illegal and QuoteWizard is on notice that they

24   should be doing something to look into that problem.

25         They have not given us that --

1          THE COURT:  Okay.

2      So, Mr. McCue, if you get the comments that went along

3  with the opt outs, does this satisfy you for the time being?

4          MR. McCUE:  Your Honor, that's the first.  At least

5  we get that, right.  But you notice what they did in

6  response to complaints, right?  You said they need to

7  produce the complaints, and then as to complaints

8  relating -- documents relating to the complaints, we were to

9  meet and confer, right.

10      So what QuoteWizard did is they said, Well, oh, we have

11  47,000 opt outs, but we're just going to say that those are

12  47,000 Do Not Call "complaints," and we're going to say

13  those are "opt outs."  And because we've now magically

14  redefined these 47,000 "do not calls" as "opt outs," we

15  don't have to confirm that they had any complaints, and they

16  don't have to meet and confer about documents relating to

17  those complaints.

18      That is absurd, your Honor.

19      It is a complaint.  When someone says, Stop calling me,

20  that is a complaint.

21      So what we're looking for, and I laid it out in a

22  prayer for relief, is very specific references to what we

23  need, and QuoteWizard and their counsel have a way of

24  parsing your words, redefining your words, shape-shifting

25  around what the intent is.  That's what they're doing.

1    So very specifically we're looking for all the Do Not

2    Call requests, the comments, the texts themselves.  What are

3    you consumers telling QuoteWizard?  And then we want to

4    know, internally at QuoteWizard, did they care?  Did they

5    care that 47,000 were saying, Stop calling me.  Did that

6    raise any red flags?

7    That goes two ways.  One it could show, yes, they were

8    concerned and they didn't do anything about it; or, no, they

9    weren't concerned at all.  Either way, that supports

10   willfulness of Mr. Mantha's individual claim.

11        THE COURT:  That's not all you asked for in your

12   prayer for relief though.  So if you get the substantive

13   comments relating to the 46,000 Do Not Call requests, and I

14   really feel like, All documents referring or relating to

15   them is too broad.  I think that just has to be tightened

16   up.

17   But other than that, what else in this prayer for

18   relief do you think is appropriate at this time?

19   I mean, I did feel like if you can show that your

20   client or that -- I know the burden is on them, that they

21   can't show that your client consented --

22        MR. McCUE:  Right.

23        THE COURT:  -- then isn't this kind of a detour at

24   this stage of the case?

25        MR. McCUE:  It is not, your Honor, and let me

1    explain why.

2        We know that Mr. Mantha's call was illegal.  The TCP

3    provides for minimum damages are $500 and $1500 for willful

4    or knowing violations.  This whole issue, yes, does it goes

5    to class issues, yes, but it also goes to the individual

6    issue of the willfulness of his individual claim.  Is he

7    entitled to $1500 in damages or just 500?  500 is a

8    negligence violation.  What we are talking about here is

9    evidence that goes to willfulness.

10        THE COURT:  Okay.

11        So, Mr. Polansky, what do you say to all this?

12        MR. POLANSKY:  Your Honor, I have quite a bit to

13    say.

14        I mean, we've got to look at the proportionality of

15    their request.  So there are two calls at issue, or two text

16    messages at issue.  That's 500 per violation.  And if it's

17    willful, it's treble to 1500, for a total of 3,000, three

18    thousand dollars.  They would like to produce from a

19    nonparty, because QuoteWizard's already said, We don't have

20    the documents they seek, these actual substantive

21    complaints.  Or they want to call them "complaints."  They

22    are opt outs.  We don't have --

23        THE COURT:  Mr. Polansky, what evidence do you have

24    that Mr. Mantha consented to get these calls?

25        MR. POLANSKY:  We have been provided information

1    from Plural Marketing that shows the date that he signed up,

2    the information related to the type of auto insurance that

3    he sought, the information he had, and the consent language

4    that he provided.

5             THE COURT:  This is the Snappy Auto Insurance

6    thing?

7             MR. POLANSKY:  It is.

8             MR. McCUE:  Your Honor, could I just be heard on

9    that?

10            MR. POLANSKY:  May I be heard?

11            THE COURT:  Yes, let Mr. Polansky finish.

12       Okay.

13            MR. POLANSKY:  What we heard ad nauseam is, This is

14   absurd; this is absurd.  It's not.  It's a $3,000 case, a

15   $3,000 case in which the plaintiffs have just conceded they

16   want class discovery despite Judge Sorokin saying it's not

17   open yet.

18       I mean, they want 46,000 emails, or text messages, that

19   Drips has, to comb through to make a class discovery or a

20   class certification argument at this point.  It's too early,

21   I mean --

22            THE COURT:  Well, it does go to willfulness,

23   though, right, if you have numerous consumers threatening

24   legal recourse as they opt out?  I mean, that suggests to me

25   that they don't think they consented.

1          MR. POLANSKY:  We have no evidence that they've

2     threatened legal action when they opted out.

3          THE COURT:  What if someone says "lawyer"?  What

4     does that mean to you?

5          MR. POLANSKY:  It doesn't mean they're threatening

6     legal action.  They say, "I have a lawyer."

7      I mean, you may become annoyed with some of these texts

8     and say "I have a lawyer," and that's the only way, you

9     know, some caller may stop calling.  That doesn't mean you

10    actually intend to file anything.  It doesn't mean you

11    served a demand letter.

12         THE COURT:  But it means you don't believe you

13    consented or you wouldn't say that.

14         MR. POLANSKY:  I disagree.  I disagree.

15     We sign up as consumers on emails or pages all the time

16    when you go to purchase things which you don't know about.

17    And you may have inadvertently unclicked the box that says,

18    hey, I don't want to receive.  And just after the fact

19    because you get calls and emails, because it happens to me

20    too, doesn't mean that I didn't consent.  It means that at

21    that point in time I may have forgotten that I opted in.  I

22    may have not seen that I opted in, and at that point in time

23    I don't want any more calls.

24     But to receive 46,000, you know, documents that the

25    plaintiffs want relating to class discovery at this time is

```
1   inappropriate, and it's not proportional to the needs of the

2   case.

3       I mean, Mr. Mantha didn't even opt out, so it's not

4   even a question of whether he opted out.  He never did,

5   but --

6               MR. McCUE:  Can I be heard quickly?

7               THE COURT:  Wait.  Let Mr. Polansky finish.

8               MR. POLANSKY:  Your Honor, when you read Request

9   for Production 25 and 26 in conjunction, we complied with

10  Request 25, which is, Identify the opt outs, the DNC

11  requests.  We've provided that.

12      No. 26, your Honor denied that request, which is, All

13  documents related to the DNC request" without prejudice, and

14  yet here they are seeking a motion for reconsideration, not

15  having done so the first time around, and seeking the

16  same --

17              THE COURT:  "Without prejudice" means we will

18  discuss it further to me, that if I deny something without

19  prejudice, that means, let's see what you get on the Do Not

20  Call requests -- I mean, frankly, I never dreamed there

21  would be 48,000 of them, but I don't know that much about

22  your client's business -- and then we'll see.  I didn't want

23  to order all the documents without knowing what we were

24  dealing with.

25              MR. POLANSKY:  Correct, your Honor.
```

1          But here's nother issue.  Now, one of the words that
2     Drips testified to, and this wasn't in relation to
3     QuoteWizard, by the way, it was in relation to their clients
4     when they were talking about what an "opt out" to them is.
5     And that's what they said:  This is an "opt out," not a
6     "complaint," an out opt.  They said words like "lawyer." We
7     don't know if in any of theses there's the word "lawyer."
8     We're going to have to do significant discovery to see if
9     the word "lawyer" comes up in any of these as they relate to
10    QuoteWizard.  That's just an example of the testimony
11    provided by Drips.
12        So at this point in time it could be a needle in a
13    haystack.  What if nobody says "lawyer"?  Now we have to
14    review $46,000 [sic] on a $3,000 claim.
15          MR. McCUE:  Your Honor, if I could be heard
16    briefly.
17          THE COURT:  Okay.
18        And, Mr. Polansky, I will let you speak again, but go
19    ahead, Mr. McCue.
20          MR. McCUE:  Mr. Polansky continues to reiterate how
21    Mr. Mantha consented.  We have taken multiple depositions,
22    and the consent evidence is absolutely bonkers not true.
23        We've gone all the way back to the individual who runs
24    Snappy Auto, and he says, I have nothing to do with Snappy
25    Auto.  It's been closed since 2015, and never had

```
 1    Mr. Mantha's data in my system.

 2         So for him to continue to show up in court and say they

 3    have evidence of consent is just ridiculous.

 4         What we're looking for on the Do Not Call -- you

 5    ordered them to produce the Do Not Call requests,

 6    "requests," not the numbers.  The numbers are part of the

 7    requests, but they need to produce the actual requests

 8    themselves.

 9         And these are text messages, right, so just like

10    Mr. Mantha, they've put before you every single text

11    exchange they had with Mr. Mantha.  They did that.

12         But now, when we're looking at, Show me the exact same

13    evidence for people who demanded to stop calling, now

14    they're claiming burden, right.  These are text messages

15    that Drips has in its possession.  QuoteWizard has them in

16    its possession or control.  It got Mr. Mantha's text

17    messages from Drips.  Why can't it get the text messages of

18    the 46,000 other consumers who said, "Do Not Call."  And

19    whether you call is an "opt out" or "complaint" or whatever

20    language you want to label this, these are people telling

21    QuoteWizard, Stop calling me.

22         It's directly relevant to willfulness, directly

23    relevant to whether QuoteWizard should have been on notice

24    that there were problems with their telemarketing.

25         What did they do about it?
```

1          So the next step, documents relating to that, I

2     struggle to cabin requests because QuoteWizard has a

3     propensity to redefine and reinterpret things so that

4     relevant documents somehow don't have to be produced.

5          So what we're looking for is documents internally at

6     QuoteWizard where they're talking about this level, this

7     high, high level, of complaints from people they're sending

8     texts to.  That's what we're looking for.

9          And the numbers, your Honor -- you asked, What else do

10    we need?  They redacted the numbers.  I got an Excel

11    spreadsheet that had a couple of columns on it -- I can send

12    you the Excel if you'd like to look at it -- and the numbers

13    are completely redacted for confidentiality reasons.

14         These are witnesses to our case, both to the individual

15    case and to the class case.  We should be able to look at

16    those numbers, do a sampling from those numbers, contact

17    those consumers and say, What was your experience?  Did you

18    really consent or not?  That is all relevant.

19         And the standard here, your Honor, is "calculated to

20    lead to admissible evidence."  That is the standard.

21              THE COURT:  Okay.  All right.

22         So let me ask you, Mr. McCue, do you accept

23    QuoteWizard's position that your client's cell phone number

24    may not qualify as residential to make a claim such as this

25    if you use it substantially -- if you used it substantially

```
1    for business or his employment?
2              MR. McCUE:  No, your Honor.  That's their pivot,
3    right.
4         So they started out -- they've threatened us with
5    sanctions because of consent.  Now we've completely beaten
6    that back.  Now they're going through my client's cell
7    records and cherry picking what they think is a business
8    phone call and arguing that this somehow magically takes the
9    consumer's number off the registry.
10        That's not true.  We'll litigate that issue before you.
11   That's not -- I guess it's before you on the second piece of
12   this.
13        But the law on that is, Is the number on the DNC?  That
14   shows the consumer's objective -- objective feeling of, What
15   is this phone number?  Mr. Mantha doesn't have a landline.
16   He doesn't have a traditional landline at home.  He only has
17   a cell phone.  He uses that for personal reasons.
18        He's also a directer of group homes.  He has to be on
19   calls at all hours of the night.  So, yes, he gets calls on
20   his cell and he makes calls on his cell.  That does not
21   magically take that phone off the DNC.  He pays for the
22   phone bill.  Yes, he gets a small credit for the payment,
23   but it's -- he pays for it.  The number's in his name.  It
24   comes to his home.  He treats it as his personal cell phone.
25   He put it on the Do No Call Registry.
```

1      So that's the next issue.  So we'll litigate that

2   before you, but that will be part of the summary judgment

3   practice.

4      But, no, we don't accept the fact that just because you

5   made some business calls on your personal cell phone, that

6   does not strip your phone of Do Not Call protection.

7      THE COURT:  Okay.  So here's what I'm going to do

8   with regard to this issue about the Do Not Call list.  I am

9   going to require QuoteWizard to provide all the text

10   messages either in Dribs or QuoteWizard's possession

11   concerning the approximately 48,000 calls.  And that just

12   means what I say.  All the text messages that are associated

13   with those.

14      With regard to all the phone numbers, I am going to

15   deny that without prejudice, and what I mean by that is once

16   you get the text messages that correlate to those calls, and

17   I expect them to be related to the list so that we can tell

18   from the list which text messages go to which calls that are

19   listed there on the discovery that has already been

20   provided, then I may allow some sampling of that list where

21   plaintiff is allowed to contact certain people.  But I'm not

22   going to order that 48,000 numbers be handed over to

23   plaintiff to do with whatever they see fit.

24      So let's see what the text messages say, and we will do

25   this step by step, and then I'll ask if the parties want to

1    confer on a certain sampling of the numbers being given

2    over, that's fine, and if you can't reach agreement on that,

3    then you can come back.

4        Also with regard to the prayer for relief that's found

5    on Document 126 at page 5, I don't know the precise wording

6    of this request, but I am inclined to allow for QuoteWizard

7    documents discussing the Do Not Call requests.  So let's see

8    if you can work with that.  That may need to be narrowed.

9            MR. POLANSKY:  Your Honor, may I inquire?

10           THE COURT:  Yes.

11           MR. POLANSKY:  You would like documents related to

12   46,000 opt outs?

13           THE COURT:  So what I am really looking for -- are

14   you talking about the documents referring or relating to Do

15   Not Call requests?

16           MR. POLANSKY:  No, I'm not referring to the text

17   messages relating to the 46,000.  I'm referring to --

18           THE COURT:  So -- go ahead.

19           MR. POLANSKY:  -- to whether there are internal

20   documents associated with every single one of those 46,000

21   documents, which is going to --

22           THE COURT:  Here what's I'm interested in,

23   Mr. Polansky.  If QuoteWizard officials or employees among

24   themselves are talking about the Do Not Call requests and

25   whether -- for example, let's say someone in QuoteWizard

```
 1    customer service says, Wow, this is a lot of Do Not Call
 2    requests.  Are we sure all these people consented?  Or
 3    someone says, Wow, you know, in 50 percent of the Do Not
 4    Call requests, people are threatening legal action.  Does
 5    this have any significance for us?  Things like that.  If
 6    there's discussion of the Do Not Call requests, or -- I
 7    mean, frankly, I'll just say I find it hard to believe that
 8    if you're making millions of calls at your business that
 9    there are no complaints, even unreasonable ones.  I just
10    find that kind of crazy.  There must be some consumer
11    complaint office at QuoteWizard, right?  And they're just
12    completely idle?  They get no business at all?  They're just
13    sitting --
14              MR.  McCUE:  Your Honor, may I be heard?
15              THE COURT:  -- there?  You're never --
16              MR.  McCUE:  Your Honor, just very quickly on that?
17              THE COURT:  -- getting one complaint at all?
18         Yes, go ahead.
19              MR. McCUE:  Your Honor, this is another issue that
20    you haven't addressed yet, and I really hope you will.  If
21    QuoteWizard is allowed to call everything an "opt out," then
22    there are no "complaints."  That's the magic land that
23    they're living in right now.  So when you say "complaints,"
24    when I say "complaints," QuoteWizard says, Oh, oh, they're
25    not "complaints," so, therefore, we have no responsive
```

1    documents.

2          THE COURT:  Here's the thing.  I think you're both

3    right.  I think it's perfectly possible that someone who did

4    consent didn't realize it and then opts out.  I think it's

5    possible that someone who did consent decided they didn't

6    want to and opts out.  And I think it's possible that there

7    are people who never consented and get the texts and are

8    furious and opt out.

9      So we're looking for the last group, right, people who

10    never consented and opted out?  And I am just -- I don't

11    know how to get at that data.

12      But I will just say, Mr. Polansky, it's kind of fishy

13    to me that there aren't ever any complaints.

14          MR. POLANSKY:  When you say a "complaint," are you

15    talking about filed litigation?  We have produced all that.

16          THE COURT:  No.  I don't mean a complaint in a

17    court of law.  I mean a complaint to a company, like someone

18    sends your company a missive somehow somewhere saying, How

19    come you keep texting me, or, I didn't consent to this.  Or

20    there's no one single person who texts backs, "I never

21    consented"?

22          MR. POLANSKY:  Well, your Honor, I mean, we're

23    going to get the 46,000, you know, opt outs, and then I

24    guess that will tell us.

25          THE COURT:  Okay.

1          MR. POLANSKY:  I mean, I would request that that at

2     least be modified.  I mean, again, part of the issue here is

3     that Mr. Mantha never opted out.  Now, can we at least limit

4     these opt outs until the time frame in which Mr. Mantha

5     received the texts?  I mean, anything after doesn't make any

6     sense because the text has already been sent.

7          THE COURT:  January 2018 to October 2020, is that

8     the time period, Mr. McCue?

9          MR. McCUE:  I believe that's the time frame of the

10    scope of the Drips campaign, your Honor.

11         And it is essential, your Honor, that the details of

12    what you're talking about are very clear because what

13    QuoteWizard will do is they'll say, Oh, this text message

14    doesn't say, "I did not consent."  It might say, "Stop

15    calling me," or, "Why are you texting me," but because it

16    didn't have the magic language it doesn't have to be

17    produced.

18         So I think the way to get around this and deal with

19    this -- it doesn't matter what you call it, right.  You can

20    call it "complaints," you can call it "opt outs."  So maybe

21    for every single order now for QuoteWizard it has to say

22    "complaints" or "opt outs."  So "Documents to complaints or

23    opt outs internally at QuoteWizard must be produced."

24         And it's not -- your Honor, you asked about trying to

25    find the right bucket.  You're right, that the bucket we're

1    looking for, people who consented didn't consent to receive

2    these calls, but all of the texts are relevant.  All of the

3    responses are relevant.  Some of those folks might not have

4    a complaint admittedly, maybe.  We think nobody consented to

5    these texts, nobody, or didn't consent in a valid TCPA way,

6    but all of this is relevant to allow us to put the puzzle

7    together.

8         MR. POLANSKY:  Your Honor, again I would object,

9    given that this is class discovery, which isn't open, but I

10   understand your ruling.

11        THE COURT:  Okay.

12   All right.

13        So with regard to number -- I think we can move on to

14   128.

15        So let me just say at the outset of these issues that I

16   do think that Judge Sorokin meant that the data that was

17   extracted by Mr. Mantha's former expert is in his possession

18   for discovery purposes, not just for his Internet search

19   history but the whole of it, and that's what Judge Sorokin

20   meant.

21        So I think -- and it's his -- this is his case, so he

22   gets the last word.  So I think Mr. Mantha needs to go

23   through the data that was extracted by the former expert,

24   which Judge Sorokin says is in his possession and control

25   for the purposes of discovery, and respond to all discovery

1    requests with that in mind, so not just certain ones.

2       Okay?

3           MR. BRODERICK:  Understood, your Honor.

4           THE COURT:  Okay.

5       All right.  I think that clears up one of the issues

6    that you have here.

7       With regard to Mr. Mantha's cell phone and who had

8    access to it.  I mean, Interrogatory No. 6 is just way

9    overbroad:  Provide a list of employees, independent

10   contractors, agents of the school who had access to your

11   cell phone number or called your cell phone number in 2019

12   or whom you called from your cell phone number, names,

13   position of employment, any number from which they may have

14   called or did -- from which they may have called your cell

15   phone.

16      So he's supposed to contact every person who ever

17   called him who's in any way affiliated with the school and

18   say, What are all the numbers from which you might have

19   called me?

20          MR. POLANSKY:  Your Honor, we --

21          THE COURT:  That's way overbroad.

22          MR. POLANSKY:  We would limit it to co-employees or

23   individuals that report to Mr. Mantha as they call him.  I

24   mean, one of the arguments in this case is whether this is a

25   business line.  We have already, just based on 10 or 12

1    individuals, identified 1400 calls, 1400.  Not a few, like

2    Mr. McCue wants to say, 1400, with these other individuals

3    who all report to him.  He has a hundred -- he has, I

4    believe, 100 people that report to him, one hundred.  It's

5    not going to be 1400 calls --

6            THE COURT:  Do you have those people's information,

7    the hundred people who report to him?

8            MR. POLANSKY:  I have at this point just the call

9    records.  So I have phone numbers.  I don't know who they

10   relate to other than the 10 to 12 individuals we now know

11   from the on-call list.  That's it.

12       So it would be easy for him to go through.  I mean,

13   we're going to spend forty -- spend a substantial amount of

14   time going through 46,000 records in addition.  The

15   plaintiff should have to go through his calls, they're not

16   that extensive, and identify who that number belongs to as

17   his employer.

18           THE COURT:  Mr. McCue?

19           MR. BRODERICK:  Your Honor, I will address that.

20           THE COURT:  Yes, Mr. Broderick.

21           MR. BRODERICK:  They have the employee directory,

22   which is, I think, how they've been matching, claiming that

23   these are clearly business calls.  So they know who some of

24   these folks are.  I don't think it's a reasonable thing to

25   say, Go figure out what 1400 calls were about that happened

1    a year ago.  I do think it's overbroad, and I strongly agree

2    that this is a -- you know, during the deposition they were

3    going down the list, so we said, There are people with

4    after-hours access that would have to call him, and we

5    provided that on-call list with the numbers of those people,

6    his direct reports.  He doesn't have 100 direct reports.  He

7    has -- he manages five group homes, and he has a handful of

8    administrators who report to him.

9         So I do think it's an amazing burden.  And, you know,

10   comparing it to the electronic production of text responses,

11   which we've gotten in other cases from Drips, you know, they

12   maintain all of that electronically and can say -- and they

13   have to.  Under the TCPA you have to maintain that.

14        This is a totally different situation that they are

15   trying to ask him to identify the subject matter and caller

16   for all of those numbers when they already have the employee

17   directory as well as the cell phone numbers of the

18   administrators.

19             THE COURT:  So I don't think they're -- in

20   Interrogatory No. 36, anyway, they're not asking you to go

21   through your own phone records and check off every person.

22   I think they're asking you to provide them with a list of

23   any work-related numbers that might have called your

24   client's number.

25             Is that so, Mr. Polansky?

1          MR. POLANSKY:  Yes.  And this would include not

2    just the -- the directory only has the school's numbers.  We

3    are looking also for these individuals' cell phone numbers.

4    That's how they call Mr. Mantha, not just from their own

5    office number, but from their cell phone.  So we're looking

6    for both numbers.

7          THE COURT:  So, Mr. Broderick, I don't think it's

8    unreasonable to ask for the cell phone numbers, not just the

9    work numbers, of people who were calling him for

10   work-related reasons.

11         MR. BRODERICK:  That seems to me a very different

12   request than how I read it --

13         THE COURT:  Sure.

14         MR. BRODERICK:  -- but that I do think we can do,

15   your Honor, to say, look --

16         THE COURT:  I just think what it boils down to,

17   Mr. Broderick, is your client should provide QuoteWizard

18   with the numbers, whether they're cell phone -- private cell

19   phone numbers or work desk numbers that are related to

20   people who call him from work on work-related issues.  And

21   so, for example, if there's even like an outside social

22   worker or someone who doesn't work directly for the Perkins

23   School but is calling him on a work-related issue, he needs

24   to provide them with that number just so they can

25   cross-reference it.  And obviously these numbers are going

```
1   to be protected and highly confidential so they won't be
2   used for any other purpose than this.
3           MR. BRODERICK:  Okay.  Could I ask for a little
4   clarification, your Honor, because they have the entire
5   directory of the Perkins School -- or make a suggestion, I
6   should say?
7           THE COURT:  Sure.
8           MR. BRODERICK:  If he were to provide -- he can't
9   necessarily know who has his cell phone number.  If somebody
10  else gave -- you know, Coworker A gave Mr. Mantha's cell
11  phone to Coworker B, but he didn't give it to him directly,
12  but if he can provide a list of people whose cell phone he
13  has, that seems to me would be a way to say, Okay, this is a
14  coworker who I know I have his cell phone, so I think he has
15  mine.
16          THE COURT:  Well, that's great, and I think that's
17  a start.  But I also think if there are calls on his phone
18  from people's cell phones rather than their work phones -- I
19  mean, I happen to know in my job I hardly ever use my desk
20  phone.  I use my cell phone constantly, especially during
21  COVID.  You're just not sitting at your desk all that much.
22          MR. BRODERICK:  Right.
23          THE COURT:  So if he's getting cell phone calls
24  from coworkers, those need -- I'm sorry, but those really
25  just need to be provided.  They're not in the directory.  Is
```

1    the directory just mainly people's official phone lines kind

2    of thing?

3            MR. BRODERICK:  Yes, that's right.

4            THE COURT:  Okay.

5        I guess this isn't -- is this covering the time of

6    COVID?  What's the time period here?

7        (Background phone ringing.)

8            MR. BRODERICK:  No, this predated it, your Honor.

9            THE COURT:  So we know Mr. McCue is still getting

10    calls at his desk.

11        (Laughter.)

12            MR. BRODERICK:  He's very old fashion, your Honor.

13            MR.  McCUE:  It is my business landline, which is

14    not on the Do Not Call list.

15            MR. BRODERICK:  He's got an analogue dial on his

16    desk, your Honor.

17        (Laughter.)

18            THE COURT:  All right.  So let's get to work on

19    that and see -- I mean, it may be there's someone who's --

20    well, I don't know what to say.

21        Let's see what you can do to provide QuoteWizard with a

22    list of work-related numbers, whether they're people's

23    personal cell phones or not.

24            MR. BRODERICK:  Work-related numbers, I mean --

25            THE COURT:  I mean if people are calling him for

1    work purposes from their cell phones, you need to get that

2    to QuoteWizard.

3              MR. BRODERICK:  Right.

4         "Who calls you using their cell phone, and do you know

5    what that cell phone number is?"

6              THE COURT:  Yes.

7              MR. BRODERICK:  "Who is it that you work with,

8    whether it's an outside social worker or what have you?"

9         We can do that.

10             MR. McCUE:  Your Honor, if I could just flag for

11   you the slippery slope here?

12        Some of these folks are calling Mr. Mantha for --

13   they're his friends.

14             THE COURT:  So this is something you will have to

15   cover.  What's the content of calls from work phones that's

16   actually personal and not business?  But that's just -- I

17   mean, that doesn't mean you don't give them the number.

18             MR. McCUE:  I just want to flag for you, you --

19   know, down the road we're going to go there.  And the courts

20   that have looked at these issues have looked at objective

21   common evidence.  Who's name is the phone in?  Is it the

22   name of a business?  Oh, it's a business phone.  Is it in

23   the name of a consumer?  Well, that's more likely a consumer

24   number.  Who is the bill sent to?  Is it sent to someone's

25   residence?  Well, then it's probably a personal phone.  Is

1     the number on the DNC?  There's a presumption if it's in the

2     DNC, literally a presumption the FCC has said, that that's a

3     personal line.

4          So I understand that he wants to go down this slippery

5     slope, get all these numbers, but what I want to focus you

6     on, your Honor, is at the end of the day this comes down to

7     common proof.  His number is not a business number.  He

8     doesn't declare it as a business expense.  He doesn't -- I'm

9     sorry.  It's not a business expense.  It's in his name.  It

10    doesn't go to his work.

11         THE COURT:  So here's the thing.  Work with

12    Mr. Polansky on this, and if it turns out they're just

13    getting too granular and you think we don't need to go down

14    that road, then I think it is time to file a motion to stop

15    the discovery in that area and raise these cases because I

16    don't know what you're talking about, frankly.  I mean, I

17    just have never looked at this before.  So I hear you, and

18    maybe you win on this issue right now and there shouldn't be

19    any discovery on it, but until I am presented with that in a

20    more formal way, I am not going to rule that way because I

21    don't know the case law you're talking about.

22         MR. McCUE:  Sure.

23         MR. POLANSKY:  Your Honor, so does your current

24    order stand with respect to the information, or the

25    requested information, that you provided to Mr. Broderick?

1              THE COURT:  Yes.  I think he should provide you

2      with the numbers of people who called for work-related

3      matters, whether it's their work phone or their cell phone.

4              MR. POLANSKY:  Thank you.

5              THE COURT:  Okay.

6          So with regard to --

7              MR. BRODERICK:  Your Honor, could I just respond

8      quickly?

9              THE COURT:  Yes.

10             MR. BRODERICK:  I don't want my discovery response

11     to be deemed as an admission that, Yes, you got a work call

12     on your cell phone, as opposed to, This is somebody who I

13     work with who called me on my cell phone.

14         The only thing that my ears perked up at was, If he

15     called you for work.  It might be impossible to say that,

16     for, you know --

17             THE COURT:  Sure.

18         So I think if you're going -- let's say there's a

19     person at work who never called him for work-related

20     purposes but was only his friend, and maybe they're not

21     working with him directly, they're working somewhere else

22     and they're just his buddy.  I think you should still note

23     that.  Like, Here's an employee, but we happen to know that

24     all their calls were personal calls.  But they should know

25     that just for clarity sake.

1          And if you have someone who's half-and-half, maybe you

2     want to let them know.  Our client would say about half the

3     time this person's calling for personal reasons and that

4     type of thing.

5          And if it turns out, as Mr. McCue has suggested, that

6     this is all a big waste of time and you just win hands down

7     on these others issues such as, it's his phone, it's the

8     only phone, it's sent to his house, et cetera, then you may

9     want to brief that.

10         Okay, so Interrogatory No. 37, "Identify the phone

11    numbers used for the on-call system."

12         It sounds like that's been done, right?

13              MR. POLANSKY:  No, that wasn't done.

14         The on-call would be -- I think it would be inclusive,

15    and I think Mr. Broderick can confirm if I'm incorrect.  I

16    think it would be inclusive of your prior -- or your

17    previous order just now.

18              THE COURT:  Okay.

19              MR. POLANSKY:  We're looking for the individuals

20    who were working within the on-call system who called

21    Mr. Mantha after hours when he isn't at work.

22              THE COURT:  So you're looking again for cell phone

23    numbers?

24              MR. POLANSKY:  That's right.

25              THE COURT:  I think that is included in what we

1    just talked about.

2        Mr. Broderick?

3            MR. BRODERICK:  Yes, but also the document that was

4    provided had the cell phone numbers of the night responsible

5    folks who report to Mr. Mantha.

6            THE COURT:  So maybe you don't --

7            MR. BRODERICK:  But it will certainly be included

8    in the supplemented provision of cell phone numbers.  And it

9    may be that they're after, What is the sort of -- what is

10   the hotline cell phone number, which I believe is on that

11   sheet, but that may be a separate number.  So I'll just

12   confirm that as well.

13           THE COURT:  Okay.

14       So with regard to the monthly credit, so plaintiff's

15   position is, I got $30 a month, and defendant says, Well,

16   show me proof of that.

17       Am I correctly characterizing the dispute?

18           MR. POLANSKY:  Yes, your Honor.

19           THE COURT:  So what's wrong with showing the $30

20   that he gets in some kind of documentation?

21           MR. BRODERICK:  We do have a document that does

22   reference $30, and I had thought, honestly, in our confer

23   meeting that that was something that wasn't disputed.  We

24   would even stipulate to that.  If he has to dig out every

25   pay stub, it seemed a waste of time.  There was no dispute,

1    both in his testimony and in the document that he provided,

2    that shows there is a $30 reimbursement.

3            THE COURT:  Okay, Mr. Polansky.

4            MR. POLANSKY:  Yes, I think we'd be entitled to

5    that documentation.  It certainly goes to the credit.  It

6    goes to the issue of whether he uses his phone for business.

7    I don't think we should have to rely on his testimony when

8    documents do exist.

9        Moreover, it wouldn't just be the pay stub.  It would

10   also be if there's an application.  But let's say -- and I

11   don't know if this exists, but if it does, we would be

12   entitled to it -- he files an application every year with

13   his employer which says, you know, I use my phone for

14   business purposes.  If there's that sort of application that

15   he has to fill out to get the credit, we should be entitled

16   to that.

17       We haven't heard whether that exists or not.

18           MR. BRODERICK:  That doesn't exist, and I conferred

19   with Ms. Kingston on that.  He doesn't have a document like

20   that.

21       I'm just guessing whether an empty pay stub may have a

22   $30 line on it without having to dig out pay stubs for the

23   entire time.  I mean, we've already got testimony from his

24   employer that that is the amount of the credit.  They

25   produced documents to that effect, but Mr. Mantha doesn't

1    have any documents in his possession like a yearly re-upping

2    for the $30 a month.

3            THE COURT:  And $30 just appears on his pay stub?

4            MR. BRODERICK:  That's right.

5            THE COURT:  Okay, so, Mr. Polansky, do you really

6    want a copy of his monthly pay stub?

7            MR. POLANSKY:  Well, what about tax returns?  Does

8    he use this for business purposes?  Is he writing any of it

9    off?  I mean, that's really what this goes to.

10       The reason this came up, your Honor, is we asked for

11   this information early on, about whether this goes to a

12   business purchase, and they respond and said, We don't have

13   any documents.

14       Then we find out in the second deposition that, Hey, by

15   the way, I get a credit for this, the use of this phone.

16       So we should be entitled to the documents and not just

17   relying on his testimony in the event that it's different.

18   Maybe it's more than $30.  Maybe it's half of what he's

19   receiving.

20            THE COURT:  Okay.

21       So I think I'm going to ask you to give two pay stubs

22   that show a $30 credit in the relevant time period, and then

23   if there are any -- if there's any reference to this on his

24   tax returns, you need to show that.  You don't have to give

25   over the whole tax return, but any reference on the return

1    to this -- the use of this phone, they should have,

2    defendant should have.

3        And what are the years of the tax returns,

4    Mr. Polansky?

5            MR. POLANSKY:  It would just be 2019.

6            THE COURT:  Okay, 2019 tax return, if there's any

7    write-off for the phone, you should get that to

8    Mr. Polansky.

9        Okay.  So with regard to the imaging of the plaintiff's

10   electronic devices, I'm not going to order that.  I think

11   I've made it clear what Judge Sorokin intends with regard to

12   that, and so I think that's enough.

13        So, anything I have missed?

14           MR. POLANSKY:  Your Honor, can I just be heard on

15   that, just quickly, and I understand your ruling.

16           THE COURT:  Yes.  Go ahead.  Sure.

17           MR. POLANSKY:  So early in this case the plaintiffs

18   thought it important enough to retain an expert to take the

19   imaging, review it, and then provide an answer to an

20   interrogatory stating, Hey, he never consented.

21        Since that time they've gotten rid of the expert and

22   refused to provide the imaging.

23        Now, we have no idea what's on that imaging, other than

24   taking them at face value in their discovery responses

25   saying, There's no responsive documents.

1       Now, it seems unlikely, and it's very surprising and

2   interesting, that they would hide behind this spiel of an

3   expert then not use him just so we can't get the imaging.  I

4   mean, there's obviously something in there that's responsive

5   and relevant, otherwise they would produce it.  And we've

6   even agreed to a protective order.  But I just find highly

7   surprising and interesting that they can obtain an expert,

8   obtain the imaging, have the expert opine as to the

9   imagining, and now not produce anything.  And so we'll never

10  be able to produce whatever imaging existed and take them at

11  face value when they originally said that, you know, these

12  documents don't exist.  They could have just said that in

13  the beginning.  They didn't need an expert.  They could have

14  said, These documents don't exist.

15          MR. McCUE:  Your Honor, if you I could be heard

16  briefly?

17          THE COURT:  Okay.

18          MR.  McCUE:  We retained an expert after

19  Mr. Polansky sent me a Rule 11 saying he's is going to hold

20  me personally responsible for sanctions for filing a

21  frivolous lawsuit.  So given the gravity of the allegation,

22  which is absolutely false, we took an extra step to make

23  sure data was preserved.  If Mr. Mantha's computer had been

24  lost or blown up somehow, they would have been arguing

25  spoliation.  So we wanted to make sure that we were crossing

1    the Ts and making sure that there was no way that they could

2    argue spoliation.  That's the only reason why we retained

3    him, and to make sure that these Rule 11 threats were

4    absolutely nonsense.

5        So now we've proven that any allegation of consent is

6    nonsense.  Every deposition has led to a dead end for

7    Mr. Polansky.  That's the only reason we hired an expert.

8    We don't do it in typical cases, but when someone comes out

9    of the box with a Rule 11 sanctions letter, yeah, it gets my

10   attention; and, yeah, I'll pay the extra money to make sure

11   a forensic expert preserves the backup of the data so

12   there's no spoliation nonsense and no sanctions nonsense

13   down the road.

14       MR. POLANSKY:  Your Honor, just quickly to respond?

15       So on that particular issue, I believe the letter was

16   sent, and I don't have it in front of me, but I believe --

17       MR. McCUE:  January of 2020, January.

18       MR. POLANSKY:  Okay.

19       And according to Mr. Mantha, the data was extracted in

20   April or June.

21       So it wasn't, We retained him right away to preserve

22   the imagery.  It wasn't until April or May that he was

23   asked --

24       THE COURT:  Let me just say, though, Mr. Polansky,

25   I think it's just beyond argument that -- a person's

```
1    electronic devices these days has a ton of highly, highly
2    personal information on it, especially -- I don't know what
3    he keeps, but everyone keeps very highly personal
4    information on their data.  And I understand you're both
5    very vigorously litigating this case, but I do just have to
6    trust that Mr. McCue and Mr. Broderick are playing by the
7    rules; and that if there's some evidence they're holding
8    onto that their client consented, they're going to lose
9    their bar cards if that's found out.  So I'm not going to
10   suspect that they've found some smoking gun that would blow
11   their case up and they're sitting on it, and so --
12        MR.  McCUE:  Your Honor, the corollary is true.
13   The corollary is also true, that when a defense counsel
14   knows that their initial allegation of Rule 11, their
15   initial threat against a plaintiff, a consumer plaintiff
16   trying to step up and do the right thing for a class, when
17   he knows that is nonsense, then he should formally withdraw
18   the Rule 11 threat, and he should stop showing up in the
19   front of the court and saying, We have consent, because he
20   knows they don't.
21        THE COURT:  Okay.
22      But at any rate, I will just say I have put plaintiff
23   on notice that the extracted information is discoverable,
24   and they're on their honor as officers of the court to go
25   through it and produce to you not just the Internet search
```

1    history but any responsive information that's in there.  So

2    I'm going to trust them to do that.

3              MR. POLANSKY:  Thank you, your Honor.

4              THE COURT:  Yes.

5         Okay.  So I would just say if at any time -- I know

6    emotions are running high here, but if at any time you want

7    to go to mediation, you can go.  We'll refer you.  We will

8    give you whatever time you need to try to resolve the case.

9    We are doing mediations by Zoom, and you can pick your

10   magistrate judge, if you choose to use the court's mediation

11   program, anyone except for myself.  And so I will just say

12   that and keep reminding you of that.

13             MR. POLANSKY:  Thank you, your Honor.

14             THE COURT:  Okay.

15             MR. BRODERICK:  Thank you, your Honor.

16             THE COURT:  All right.  I will try to memorialize

17   all this on the docket as I've been doing.  If I get some of

18   it wrong or you want clarification, please just email

19   Ms. Belmont.  I'm happy to clarify anything.  And I

20   appreciate the parties filing the status reports.  This is

21   very helpful, and I intend to try to stay on top of this

22   case and keep things moving for you.

23        Anything else I can do for you at this point?

24             MR. POLANSKY:  Yes, your Honor.

25             THE COURT:  Yes?

1          MR. POLANSKY:  As far as compliance with the

2    forthcoming order, how much time are we looking at?  I mean,

3    there is quite a bit that we are going to have to produce.

4          THE COURT:  Sure.

5      Why don't we try for two weeks.  Do you think -- see

6    what you can do, because my guess is if you have these lists

7    of the numbers you may be able to pull up the list of the

8    text messages fairly easily, so let's try for -- do you want

9    to say three weeks?  I notice --

10          MR. POLANSKY:  Three weeks.

11          THE COURT:  -- you're kind of raising your eyebrow.

12      Okay, let's try for three weeks, and if that isn't

13    possible and you have some good explanation for why it's

14    not, you're welcome to work out a longer time period with

15    plaintiffs without coming back to me.  But if that doesn't

16    work out, then I'll hear you on that.

17          MR. POLANSKY:  Thank you, your Honor.

18          THE COURT:  All right.

19      Okay, so I'll get busy and try to get this right up on

20    the docket, and we'll wait to hear from you if there's any

21    refinements needed.

22          MR. POLANSKY:  Great.

23      Thank you, your Honor.

24      Thank you, Madam Clerk.

25          MR. BRODERICK:  Thank you, your Honor.

1          THE COURT:  Thank you very much.

2      (Proceedings adjourned.)

3

4

5                  **C E R T I F I C A T E**

6

7      I, James P. Gibbons, Official Court Reporter for the

8  United States District Court for the District of

9  Massachusetts, do hereby certify that the foregoing pages

10  are a true and accurate transcription of my shorthand notes

11  taken in the aforementioned matter to the best of my skill

12  and ability.

13

14      /s/James P. Gibbons                March 1, 2021
          James P. Gibbons
15

16

17

18           JAMES P. GIBBONS, CSR, RPR, RMR
                Official Court Reporter
                1 Courthouse Way, Suite 7205
19            Boston, Massachusetts 02210
                jamesgibbonsrpr@gmail.com
20

21

22

23

24

25