

1          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3   - - - - - - - - - - - - - - - - - - x

4   JOSEPH MANTHA, on behalf of himself   |
    and others similarly situated,
5                                         |    Civil Action No.
            Plaintiff,                         1:19-cv-12235-LTS
6                                         |

7       v.                                |

    QUOTEWIZARD.COM, LLC,
8                                         |

            Defendant.
9                                         |

10  - - - - - - - - - - - - - - - - - - x

11

12     BEFORE THE HONORABLE M. PAGE KELLEY, MAGISTRATE JUDGE

13

14                    Hearing
                  VIDEOCONFERENCE

15

16            Monday, October 19, 2020
                  10:56 a.m.

17

18

19

20

21  John J. Moakley United States Courthouse
    One Courthouse Way
22  Boston, Massachusetts

23

24  Rachel M. Lopez, CRR
    Official Court Reporter
25  raeufp@gmail.com

1                    **A P P E A R A N C E S**

2

  On behalf of the Plaintiff:

3

       LAW OFFICE OF MATTHEW P. MCCUE
4      BY:  MATTHEW P. MCCUE
       One South Avenue
5      Third Floor
       Natick, Massachusetts  01760
6      (508) 655-1415
       mmccue@massattorneys.net
7


8

  On behalf of the Defendant:

9

       NELSON MULLINS RILEY & SCARBOROUGH, LLP
10     BY:  CHRISTINE KINGSTON
       One Post Office Square
11     30th Floor
       Boston, Massachusetts  02109
12     (617) 573-4700
       christine.kingston@nelsonmullins.com

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1
2          (In open court via videoconference.)
3          THE DEPUTY CLERK:  Today is Monday, October 19,
4    2020, and we are on the record in civil case number 19-12235,
5    Joseph Mantha vs. QuoteWizard.com, LLC, the Honorable M.
6    Page Kelley presiding.
7          And would counsel please identify themselves for
8    the record.
9          MR. MCCUE:  Matthew McCue for the plaintiff, Joe
10   Mantha.
11         THE COURT:  Okay.  Good morning, Mr. McCue.
12         MR. MCCUE:  Good morning, Your Honor.
13         MS. KINGSTON:  Good morning, Your Honor.  Attorney
14   Christine Kingston on behalf of the defendant,
15   QuoteWizard.com, LLC.
16         THE COURT:  All right.  And good morning to you.
17         So we're here for argument on Document 104, which
18   is a joint letter/report and -- concerning some responses for
19   production of documents that the parties are disputing.  And
20   I think the simplest thing, really, is just to go through
21   them and see what I can do to keep you moving on these.
22         And let me just ask you at the outset, I think this
23   is the only thing outstanding right now; is that right?
24         MR. MCCUE:  That's correct, Your Honor.
25         MS. KINGSTON:  Yes, Your Honor.

1          THE COURT:  Okay.  Okay.  All right.  So I have

2     read this pretty carefully, but I -- I'm happy to hear you.

3     And we'll start with Request Number 5.

4          "All contracts between you and the insurance

5     companies that you would have obtained a quote on insurance

6     from."

7          MR. MCCUE:  Sure, Your Honor.  It's Matthew McCue.

8     I'm happy to go through these.  We seek your guidance kind of

9     at the outset.  This is the first time we've been before you

10    in this case.  Would you benefit from an overview of the

11    facts and the TCPA, or do you feel that you want to go

12    straight to the requests?

13         THE COURT:  I think -- thank you for asking me.  I

14    think I understand the statute and what needs to be proved,

15    and so let's just try going straight to the first request and

16    see how we do.  Thank you.

17         MR. MCCUE:  Sure.  And if at any time you want more

18    context, just let me know.

19         So turning, first, to Number 5, we've asked for

20    contracts between QuoteWizard and the insurance companies

21    that they represented in sending out these texts.  So

22    QuoteWizard is essentially an insurance broker, that they go

23    out and find interested parties, and then they connect those

24    parties with some of the biggest insurance companies in

25    America.  So they're essentially a go-between.  So it's

1    important for us to know who's on the far end of this

2    transaction, because QuoteWizard is kind of in the middle.

3            Under the TCPA, it can be enforced by a vicarious

4    liability.  So in other words, just because you don't

5    physically send the text, doesn't mean that you can escape

6    liability, if you knew what was going on and turned a blind

7    eye.

8            So it's relevant because we'd like to know who all

9    the players are involved in this telemarketing scheme, and

10    also it's relevant because, under the TCPA, we need to show

11    that it's a telemarketing call, a sales call.  And

12    QuoteWizard has flagged that one of its defenses is going to

13    be that they were not selling anything.  They were just

14    essentially -- I'm not sure how exactly they would articulate

15    it, but they've said that they -- they're not selling

16    insurance, so therefore, they're not subject to the statute.

17    So it's relevant, for our perspective, to know what exactly

18    did QuoteWizard agree to do with these insurance companies?

19            I'm assuming these contracts between QuoteWizard

20    and, say, State Farm say, "You're going to go out and find us

21    people who are interested in buying our product."  That

22    obviously would support our argument that these are

23    telemarketing calls, and they're not something vague that

24    does not connect to the statute.  So those are really the two

25    reasons why we think it's relevant.

1          THE COURT:  So let me just ask you, do you want all

2    contracts between -- I guess this Request Number 5 is limited

3    to the quotes from certain companies that would have resulted

4    from the text to plaintiff, right?

5          MR. MCCUE:  Yeah.  So at this point, Judge Sorokin

6    has cabined discovery to just Mr. Mantha, so this request has

7    been appropriately cabined.  We want to know, when

8    QuoteWizard contacts Mr. Mantha and says, "Are you interested

9    in auto insurance?" who were they representing at the time

10   that they sent those texts?  And I don't know if it's one

11   company or ten or 100.  I don't know.

12         THE COURT:  Okay.

13         So Ms. Kingston?

14         MS. KINGSTON:  Yes, Your Honor.  Thank you.

15         So what happened here was that when we sent the

16   text messages to plaintiff, he was -- he said, "How do I get

17   a quote?"  And there was response, "Well, let's set up a

18   call."  He suggested a date and time for a call.  We called

19   him, and he never picked up.  So it never got to the point

20   that his lead was then sold to an insurance carrier.

21         It's not the case that we have an insurance carrier

22   in place.  The purpose of the call is to determine what

23   exactly Mr. Mantha would have been seeking.  So there's no

24   kind of, to my knowledge, identifiable third party here that

25   we can kind of point to and then produce a contact with.  So

1    that's the first thing I'd say, Your Honor.

2            The second thing I'd say is, you know, if the

3    plaintiff wants to kind of understand our business model

4    better, okay, what happens if Mr. Mantha was interested, and

5    if he does pick up that call, what happens to his lead, I

6    think that the most commonsense way to approach that is

7    during the second deposition of QuoteWizard, which hasn't

8    happened yet.  I think that could be identified as a topic of

9    the deposition, and he can depose our representative about,

10    "Okay.  What's the business model here?  What happens to his

11    lead?  Who are the insurance carriers you work with?"  I

12    think that's fair game.

13            But to ask for contracts, Your Honor -- I mean,

14    like I said, there was an insurance carrier definitively

15    involved here at this stage.  These are confidential,

16    proprietary documents, and I don't think they really shed any

17    light on the issue at hand, which is whether we were engaged

18    in telephone solicitation.  So I think if this kind of topic

19    is at all relevant, I think it should be dealt with in the

20    second deposition.

21            THE COURT:  So are you really claiming that you

22    were not selling anything?

23            MS. KINGSTON:  Our argument, Your Honor, is that we

24    don't sell insurance.  At no point are we selling insurance.

25            THE COURT:  How do you make money?

1          MS. KINGSTON:  We -- if it gets to the point that a
2    consumer was interested and confirms that interest and we
3    kind of collected more information, that lead would then be
4    sold to an insurance carrier, and they would be connected to
5    conclude that transaction or not.  That's totally --
6          THE COURT:  Well, how can you say you're not
7    selling anything?
8          MS. KINGSTON:  We're not directly selling it, Your
9    Honor.
10          THE COURT:  You're selling the lead from the guy,
11    right?
12          MS. KINGSTON:  Right.
13          THE COURT:  So how can you say you're not selling
14    anything?
15          MS. KINGSTON:  Because the statute speaks of
16    encouraging or selling -- encouraging the sale of or selling
17    a product or service.  And so our argument is we're one step
18    removed from that.  We're just merely putting into contact a
19    consumer who's possibly interested in insurance, with an
20    insurance carrier, and whether they complete that transaction
21    or not, that's totally beyond our services.  So I -- I don't
22    think --
23          THE COURT:  So any kind of middleman who is just
24    direct -- for a fee, directing a consumer to a service is
25    exempt from the TCPA?

1              MS. KINGSTON:  That's our argument.  Because at no

2      point -- we have no control over what happens after we sell

3      the lead.  And that transaction might not be completed.

4      There might never be something sold.  And so, of course,

5      there's a commercial backdrop to this, but whether that

6      constitutes the sale of a service, I think that's a mixed

7      fact and legal question that should be presented to the --

8              THE COURT:  Do you get paid more money if the lead

9      pans out?

10             MS. KINGSTON:  I don't know, Your Honor.  I'd have

11     to check.  But that would make sense, if that were the case.

12             THE COURT:  Okay.  So I'm going to allow this,

13     because I think if it's a mixed question of law and fact,

14     they're entitled to discovery on the facts as to how you made

15     your money, and the best evidence of that is the contracts

16     between the people who were paying you and yourself.  So

17     whatever they're paying you for is relevant, and I will limit

18     this to the contracts that were in effect at the time you --

19     at the time you texted plaintiff.  So whatever -- I don't

20     want all the contracts from all time, but the ones that were

21     in effect at that time, you need to provide him.  And those

22     will be protected by a protective order.

23             MR. MCCUE:  And Your Honor, it's Matthew McCue.

24             THE COURT:  Yes.

25             MR. MCCUE:  Just to advance the ball just one --

1    you know, one of the issues that we've had in this case,

2    which is -- it's been a difficult case, to be frank, trying

3    to work through discovery issues.  So I need to kind of

4    anticipate what's the next issue.  And if you noticed,

5    Attorney Kingston said, "We don't know who was definitively

6    involved."  Right?  So the next step is going to be there's

7    no responsive documents, because we didn't sell the lead to

8    anybody.  So I assume this is the case, but I just want to

9    make sure that they're going to produce the contracts of any

10   insurance company that they could have sold Mr. Mantha's lead

11   to, so we don't have to come back to you for clarification.

12          THE COURT:  Yes, that's my -- that's what I intend

13   to allow.

14          MR. MCCUE:  Thank you, Your Honor.

15          THE COURT:  So I mean, as long as it's in this

16   play, how you're getting paid, and that you're saying you're

17   not covered by the TCPA, I think it's fair game for plaintiff

18   to discover how you make your money.  And to say it's a mixed

19   question of law and fact is fine.  He's entitled to discovery

20   on that if it is.  I mean, if there's -- if it's a factual

21   issue, it's a factual issue, and he gets his discovery.  But

22   I do want the parties -- I haven't looked at your protective

23   order, but I do want you to have this under an adequate

24   protective order, and I'll leave it to the parties to work

25   that out.

1          MR. MCCUE:  Not an issue from the plaintiff's

2     perspective, Your Honor.

3          THE COURT:  Okay.  Number 7.

4          MR. MCCUE:  So let me jump into Number 7, Your

5     Honor.  And I'll try not to share with you too much of my

6     frustration, but here it is.

7          So we had asked for the contract between

8     QuoteWizard and Drips.  Drips is the entity that sent out the

9     texts.  They're the ones that market this autobot technology

10    that allows the machine to interact with a consumer via text

11    message.

12         So we had asked for this in discovery and they

13    objected, and so then we moved to compel.  And in their

14    position, they say the contract is not relevant in any way to

15    whether an ATDS was used.  An ATDS is an abbreviation for

16    automatic telephone dialing system.  That's an essential

17    issue on Count 1:  Did they use an ATDS?  So that's the

18    position.

19         It's not relevant.  It has nothing to do with ATDS.

20    We go through all the hassle of filing the motion, coming to

21    you, taking up your time, and last week, they produce, just

22    out of the blue, the Drips contract.  And the Drips contract,

23    halfway down, says this is between Drips and QuoteWizard.  It

24    says, "We will generate and send text messages to telephone

25    numbers, using what someone might argue is an automatic

1    telephone dialing system."

2              How -- how is it possible that they could not

3    produce this contract and say it's not relevant, when the

4    language of the contract itself refers to an ATDS?  So it's

5    frustrating.  So now I have the contract; that issue has been

6    resolved.  But I just want to let you know for context what's

7    happening in this case, and why it's frustrating.

8              THE COURT:  Okay.  So is there anything left on

9    Number 7?

10             MR. MCCUE:  No, Your Honor.

11             THE COURT:  Okay.  All right.  And I do agree to

12   refuse to produce the contract because it's not relevant when

13   it does contain that reference is wrong.  So I feel your

14   pain.  Like, it should have been produced.

15             MR. MCCUE:  I'm just looking for an explanation,

16   Your Honor.  These attorneys have threatened us with Rule 11,

17   threatened us with sanctions, and then they come and do this.

18   You know, I don't like filing sanctions motions.  I don't

19   like filing Rule 11.  I've told Attorney Kingston I've never

20   done that once in my entire career.  I'm not going to do it

21   today, but I do want to let you know what's going on.

22             THE COURT:  Okay.

23             MS. KINGSTON:  Your Honor?

24             THE COURT:  Yes, go ahead.

25             MS. KINGSTON:  I can tell you that we have

1      waived -- we have produced more than, I think, has been

2      required.  I mean, we have avoided many disputes.

3               THE COURT:  How did you not think that contract was

4      relevant?

5               MS. KINGSTON:  Because that -- this is standard

6      language in any type of -- any time you have a vendor sending

7      it, that's standard language.

8               THE COURT:  So you are being sued for using an ATDS

9      or allowing your agent to use one, and you have a contract

10     where they're explicitly telling your client that they're

11     using one --

12              MS. KINGSTON:  They say that --

13              THE COURT:  -- or something that could arguably be

14     called one.  Okay.  Why did you not produce that?

15              MS. KINGSTON:  Well, that was one of our

16     objections.  We did produce it.  But I do think that standard

17     language to say someone somewhere would construe this to be

18     an ATDS, I don't think that means --

19              THE COURT:  That -- well -- then you need to go

20     back to your basics and understand that, in litigation like

21     this, that's relevant.  That puts your client on notice that

22     they're using what is arguably, or not, an ATDS, which is

23     illegal.  Right?  Could be violative of the statute which

24     you're being accused of violating.

25              MS. KINGSTON:  Correct, Your Honor.

1          THE COURT:  And just saying, over and over, "It's

2     not relevant, it's not relevant" -- it is relevant, and it's

3     discoverable.  And we're on the honor system here, and

4     whatever -- however hard you're fighting for your client,

5     it's not worth it to impugn your integrity on behalf of your

6     client.  It's not worth it.  Trust me.

7          MS. KINGSTON:  I understand, Your Honor.  There's

8     no intention to not produce something that was discoverable,

9     and we have.

10         THE COURT:  Okay.  Well, let's go through the rest

11    of these, but I don't want to hear this kind of thing again.

12         Okay.  Number 16.  All e-mails --

13         MR. MCCUE:  So the e-mails.

14         THE COURT:  Yes, go ahead.

15         MR. MCCUE:  I'm sorry, Your Honor.  I interrupted

16    you.  I didn't mean to do that.

17         THE COURT:  Okay.  That's all right.  Go ahead.

18         MR. MCCUE:  So 16, and I think throughout, but I'll

19    need to look at them all, there's a theme throughout a number

20    of these following requests, and they deal with telemarketing

21    complaints.  And telemarketing complaints is very -- I'm

22    talking broad.  And the issue is what did QuoteWizard know,

23    and when did it know it?  Is it on notice that people are

24    complaining about these texts or about telemarketing calls in

25    general that QuoteWizard thinks it has consent for?

1          THE COURT:  So why are all telemarketing complaints

2     relevant, rather than ones that have to do with people

3     consenting?

4          MR. MCCUE:  Well, I think -- I'm certainly willing

5     to cabin the request to telemarketing complaints or

6     telemarketing calls for which QuoteWizard has to have prior

7     express consent.  That relates to any call by ATDS, any call

8     via text or prerecorded message, or any call to someone on

9     the Do Not Call list.

10          The issue is what is their knowledge.  Right?  And

11     under the statute, even under Mr. Mantha's individual claim,

12     there's statutory damages for negligent violation, which is

13     $500 for an ATDS violation, and up to $500 for a Do Not Call

14     violation.  And then there's treble damages, up to $1,500 for

15     each, if the violation was knowing or willful.  It doesn't

16     have to be both, knowing or willful.  So even under

17     Mr. Mantha's individual claim, it's relevant as to what did

18     QuoteWizard know about telemarketing complaints generally

19     being submitted by consumers?

20          Certainly as to Drips' text messages, did they

21     know, prior to sending Mr. Mantha texts, that people were

22     saying, "Why are you doing this?"  Because QuoteWizard will

23     say we're doing this because we had your consent.  If people

24     are complaining, or even saying, "Do not call," then that

25     places QuoteWizard on notice that their belief that they had

1    consent from all these brokers that they bought this data

2    from was suspect, and they have a duty, then -- they're on

3    notice then to conduct due diligence and find out, "Are we

4    buying good data from these brokers?  Do we really have

5    people's prior, express consent signed in writing?"  Did they

6    check?  Did they do anything to figure it out?

7            Because that's what we know from Mr. Mantha, after

8    a year of litigation.  He did not consent.  And QuoteWizard

9    is going to say "Oh, we thought he consented."  Well, he

10   didn't.  What QuoteWizard thought is not relevant.

11           So what did QuoteWizard know?  Were people

12   complaining?  Were they submitting do not call requests?

13   Were they complaining in writing, via e-mail?  Were they

14   making phone calls?  And what did QuoteWizard do to

15   investigate?  They can't just stand back and say, "Well, we

16   thought the data we bought was valid."  If they're on notice

17   that that was not the case, that is, if they looked the other

18   way, that is the essence of knowing or willful violation of

19   the TCPA.

20           THE COURT:  All right.  Ms. Kingston?

21           MS. KINGSTON:  Thank you, Your Honor.

22           As we point out, the knowing and the willful

23   finding relates solely to plaintiffs Lee in particular.  And

24   it's either did we knowingly contact Mr. Mantha, which we

25   admit we did, or did we know that we were violating the TCPA

1    when we did that.  And the evidence on that point, Your

2    Honor, is that we purchased Mr. Mantha's lead from a company

3    called RevPoint.  We've produced our contract with RevPoint,

4    and that contract states that RevPoint can only sell us leads

5    that have TCPA compliant consent.  To the extent they sell us

6    a lead that doesn't, that's a material breach of their

7    obligations.  So any lead that we're buying from RevPoint has

8    TCPA consent, whether or not a consumer disputes that.

9         And when we give that to our vendor, Drips, to

10   contact the plaintiff, we're also telling Drips, "All we're

11   giving you are leads that have TCPA compliant consent."  So

12   our whole business model, the fundamental basis, is that

13   we're only buying leads with consent.

14        THE COURT:  So let's just say that in a two-year

15   period, you get hundreds and hundreds of consumers whose

16   information you bought from RevPoint telling you that they

17   did not consent.  Would that put you on notice that, in fact,

18   RevPoint is selling you nonconsenting people's information?

19        MS. KINGSTON:  Well, I think, no, because this

20   isn't a case where RevPoint sells us a pool of leads from the

21   same source.  That's just not the case.

22        In other words, what happens is RevPoint will ping

23   individual leads in this kind of electronic portal, and we

24   bid on them.  They're not -- they're coming from all

25   different sources.  And what I mean by that is this lead came

1    from a website called snappyautoinsurance.com, or at least

2    that's the information that we've been given.  So to me, I

3    don't see how this relates to the individual claim.  I think

4    if we were to get to class discovery, the only thing that

5    could be relevant is were you on notice that leads coming

6    from snappyautoinsurance.com were not valid.  To me that --

7         THE COURT:  What if you're buying things -- what if

8    you're bidding, and persistently the people you take from

9    RevPoint are then complaining to you?  Does that tell you

10   that there's a problem with RevPoint and that they're saying

11   that the leads are consenting isn't true?

12        MS. KINGSTON:  Well, I still thinks it goes back to

13   where the leads are originating from.  Because RevPoint is,

14   in turn, buying from other companies.

15        THE COURT:  Well, isn't RevPoint kind of vouching

16   to you that all of these people consented?

17        MS. KINGSTON:  Yes.  That's they're --

18        THE COURT:  Where does the buck stop for your

19   company?  Who are you trusting that you're getting consenting

20   information from?

21        MS. KINGSTON:  We're trusting that RevPoint

22   complies with its contractual obligations.

23        THE COURT:  So okay, here's what I'm going to do.

24   I'm going to order that, with regard to RevPoint, any

25   complaints relating to consent, whether they're implied

1    consent and express consent, and what QuoteWizard did to

2    investigate that from your leads that you got from RevPoint.

3    And if, in fact, no one else ever complained that -- who came

4    from RevPoint that they hadn't consented, you're in luck,

5    because then I think you probably reasonably understand that

6    RevPoint was okay.  But if you're getting a torrent of

7    complaints about information you get from RevPoint, then your

8    company is on notice that that information may not be

9    consented to.

10          MS. KINGSTON:  And Your Honor, I just ask for some

11    type of temporal limitation for that.

12          THE COURT:  How long has your company been in

13    business?

14          MS. KINGSTON:  QuoteWizard?

15          THE COURT:  Yeah.

16          MS. KINGSTON:  More than four years.  I think

17    because we're looking for a TCPA claim, I think four years

18    would be kind of the outer temporal limit, or at least I

19    suggest that.

20          THE COURT:  So when did QuoteWizard start this

21    business model of collecting people's information and texting

22    them?

23          MS. KINGSTON:  I don't know, Your Honor.  And I

24    particularly don't know as to RevPoint as I sit here.

25          THE COURT:  Well, in that case, I'm not going to

1  temporally limit it, because it could be a year or less.  I

2  just don't know what it is.

3          Okay.  So that's Number 16.

4          Moving along to Number 17.

5          "All documents evidencing any complaints received

6  by you from anyone, including the Government, in regard to

7  text messages sent by you or some entity on your behalf,

8  utilizing Drips technology."

9          So this seems really, really broad, Mr. McCue, way

10  overbroad.

11          MR. MCCUE:  Well, let me address that, Your Honor,

12  because I don't necessarily agree.  What we're doing is we're

13  limiting it to any text sent by Drips.  Right?  So we're not

14  sending -- it's not any calls, it's not even any text calls.

15  It's limiting the complaints specifically to the Drips

16  technology and that is the technology that was used to

17  contact Mr. Mantha.  The reason why it's broad is because I

18  don't know at this point where the complaints are from.  Are

19  they from individuals?  Are they from government agencies?

20  So I need to be broad, because what happens is, if I'm not

21  super broad, then it's a very narrow production, "Oh, you

22  didn't ask for government agency complaints.  I just thought

23  complaints was individuals."

24          So I don't -- I really don't think -- I think it's

25  as narrow as I could possibly draw it.  It's limited to text

1    messages and it's limited to text messages sent by Drips, and

2    that is the class.  So certainly it's relevant if -- if

3    QuoteWizard is in possession of complaints received from

4    anyone.  The prior request related to RevPoint.  I don't

5    know, as I sit here today, what the different sources of

6    these complaints are.  So the -- the sources need to be

7    broad, but the specifics as to what it relates to is very

8    narrow.  It's texts and it's involving Drips technology.

9              THE COURT:  Okay.  Ms. Kingston?

10             MS. KINGSTON:  Your Honor, as an initial matter, I

11   just -- I don't understand how this is relevant to

12   Mr. Mantha's individual claims, and I don't think that

13   Mr. McCue has articulated that.

14             MR. MCCUE:  I'm happy to do so, Your Honor, if you

15   agree.

16             THE COURT:  Okay.  I'll hear you.

17             MR. MCCUE:  Sure.  It's -- it's the entire case.

18   It's:  Did QuoteWizard know that the texts it was sending to

19   consumers, via Drips, was in violation of the TCPA?  Were

20   they on notice that people were saying, "No, we did not

21   consent"?

22             QuoteWizard is going to say, "We only bought data

23   that consented.  If consumers or government AGs or the FCC or

24   the FTC are saying here's a consumer who got your texts and

25   they're complaining, then Drips -- QuoteWizard is on notice

1    that the leads that they're getting and sending to Drips are

2    bad leads, and they need to do something about it, conduct

3    due diligence.  They can't come to the Court or to the jury,

4    ultimately, and say, "We said in our contract with RevPoint

5    'Only send us good leads'."  They can't just point to the

6    contract and ignore a whole history of people complaining,

7    "No, that's not true."  That goes to the essence of a willful

8    violation of the TCPA.

9              THE COURT:  Okay.  So I'm inclined to allow Number

10    17, too.

11              And I'll just say, Ms. Kingston, if you are running

12    up against problems collecting this information, because I

13    don't know how your organization, your client's organization

14    collects complaints, but if there's some problem with this,

15    I'll let you further negotiate it.  But you'll see what you

16    can do to find that information.

17              MS. KINGSTON:  Your Honor, I'd just like to say

18    that, you know, this relates, I think, closely back to Number

19    16, and Your Honor did limit that to relating to consent.

20    And so if Your Honor is inclined to grant this one, I'd ask

21    that it also be limited to that issue, as well, because

22    that's the issue of this case.  We did not contact Mr. Mantha

23    without at least apparent consent.

24              THE COURT:  I do think that's fair, Mr. McCue.

25              MR. MCCUE:  Well, Your Honor, if I could just be

1    heard briefly and kind of back to my frustration about this
2    case in general.  What we're going to find, then, is that
3    they are going to produce documents that literally have, "I
4    did not consent," in the complaint.  If someone complains and
5    says, "Stop calling me.  I hate getting text messages.  Why
6    are you calling me," and they don't include the magic
7    language, "I did not consent," then I'm not going to get
8    them.  I just know it.  So the spirit needs to be understood
9    that they're not going to cabin productions using magic
10   language.  Because their past history in this case has
11   indicated they're going to use magic language.
12           THE COURT:  Okay.  So I think what I'll say is any
13   complaints that arguably could involve consent.  And so I do
14   expect vague complaints, such as, "Please stop texting me,"
15   or, "Why are you texting me," but that don't mention consent
16   to be included.
17           I mean, I will just say that I know that things do
18   not have to be admissible in order to be discoverable, but I
19   do think, Mr. McCue, you -- it may well be you're going down
20   a very deep rabbit hole with regard to people complaining,
21   and then you have to figure out if they consented or not.
22   And I think you know -- can tell from the discovery, just
23   with regard to your client, that can be a very complicated
24   question.  But I do think I'll let you have the discovery,
25   the broad discovery at this stage, but I don't know that

1    we're going to go get into the granular level you might need

2    in order to use it.

3              MR. MCCUE:  And I'll just -- you know, just common

4    sense, Your Honor, is people don't complain about getting

5    telemarketing calls if they consented to receive the calls.

6    It just -- it doesn't happen.

7              THE COURT:  Sure.  Well, I think I know from my own

8    experience, sometimes people do consent when they don't mean

9    to, and that type of thing.  So it can get very tricky, but

10   okay.

11             So Number 18, investigation and response to such

12   complaints.  Let's wait on 18 to get the answer to 17.  Let's

13   see what happens with 17, and then I'm going to let the

14   parties further negotiate on 18 once you get your 17

15   response.  Because I -- we don't know what volume we're

16   talking about or what types of complaints, et cetera.

17             MR. MCCUE:  So 19, Your Honor, if I can just jump

18   ahead.

19             THE COURT:  Okay.

20             MR. MCCUE:  This request is similar to the earlier

21   one.  The earlier one was limited to text calls, and this one

22   is relating to all telemarketing calls, I believe.  Let me

23   just check.

24             THE COURT:  It says "alleging that telemarketing

25   texts or calls relating to QuoteWizard."

1          So Ms. Kingston, does QuoteWizard also make calls?

2          MS. KINGSTON:  Yes, Your Honor.  And this is where

3     I'd say not only are we getting beyond Mr. Mantha's

4     individual claim, we're actually getting beyond the putative

5     class, because no calls were made to Mr. Mantha that are

6     complained of in this complaint.  We're only speaking about

7     text messages sent by Drips on behalf of QuoteWizard.  So I

8     don't see how this would even be discoverable in class

9     discovery.

10          You know, I think it's one thing, I can understand

11     why Your Honor would require us to produce complaints

12     concerning leads sold by RevPoint, and then complaints

13     concerning texts sent by Drips.  But then saying any consumer

14     complaint ever received in any situation is severing that

15     from the circumstances of this case.  And it just -- not only

16     is that extremely burdensome, but it's not even relevant to

17     the putative class, Your Honor.  In the class, the classes

18     are restricted solely to text messages sent by Drips on

19     behalf of QuoteWizard.

20          THE COURT:  Okay.  So I'm going to deny that

21     without prejudice.  And let's do the discovery that we're

22     doing, and you may raise this some time down the road.  But I

23     don't want to get into calls at this time, and I agree with

24     Ms. Kingston on that.

25          MR. MCCUE:  Your Honor, if I can just be heard just

1    for ten seconds.

2              THE COURT:  Okay.  Go ahead.

3              MR. MCCUE:  The issue that I foresee is I don't

4    know if QuoteWizard organizes its complaints based on text or

5    call.  I don't know that.  So that's a reason why it's

6    broader.

7              THE COURT:  Okay.  So I do -- if you're organizing

8    your complaints by calls and it somehow is excluding texts

9    that would have been included in my -- in the prior request,

10   you need to be aware of that and produce everything relating

11   to texts.  Okay?

12             MS. KINGSTON:  Understood, Your Honor.

13             THE COURT:  Okay.  All right.  So that also takes

14   care of Number 20.

15             And then 21.  What about 21?

16             MR. MCCUE:  Your Honor, so 21 is a more narrow

17   request that is probably already taken care of.  Because

18   you've ordered a more broader production, it doesn't have to

19   be specifically to people who said they did not consent.  So

20   I'm comfortable moving on from that one, given your prior

21   order.

22             THE COURT:  Okay.  And Number 22, I think, is also

23   taken care of.

24             MR. MCCUE:  Yes.

25             THE COURT:  Okay.  Now, Number 23, I'm not inclined

1   to allow all documents relating to any other litigation, but

2   I do think it's appropriate to have QuoteWizard provide

3   plaintiff with documents necessary to identify any other TCPA

4   litigation relating to QuoteWizard.

5           MR. MCCUE:  That's acceptable to the plaintiff,

6   Your Honor.

7           THE COURT:  Okay.

8           MR. MCCUE:  24 is a similar request, but it's not

9   cabined to Drips.  It's identify.  And we'd be limiting --

10  we'd be ready to eliminate it -- sorry -- limit it,

11  similarly, to documents sufficient -- I did, "Documents

12  sufficient to identify other TCPA litigation where you are

13  named as a defendant."

14          MS. KINGSTON:  Your Honor, the only thing that I'd

15  ask is that, I mean, I think we've tried -- these are very

16  broad requests.  I mean, it's basically any time we've ever

17  been sued under the TCPA, and I think that it should focus on

18  the issues in this case.  And what we have here is we've had

19  at least apparent consent to contact.  And so I think if

20  we're required to comply with this, I think that it should be

21  limited in the same manner, like Your Honor has done with

22  other requests.  Because as you know, the TCPA can involve --

23  there's many different provisions; there's many different

24  ways you can allegedly violate it.  I mean, this is extremely

25  broad compared to the issues actually at play in this case.

1           MR. MCCUE:  Your Honor --

2           THE COURT:  Can I --

3           MR. MCCUE:  I'm sorry.

4           THE COURT:  Can I just ask, Ms. Kingston, how many

5    lawsuits are we talking about?

6           MS. KINGSTON:  I don't know.  I mean, I can tell

7    you currently we have one other one with plaintiff's -- same

8    plaintiff's counsel here that involves similar issues, which

9    of course they're already aware of because they're plaintiff

10   counsel.

11          THE COURT:  So I just -- if it's just a handful of

12   cases, I think I'll allow 23 and 24, just a list of the cases

13   where you've been named as a defendant under the TCPA or in

14   connection with the TCPA.

15          Okay.  Number 25.

16          "All consumer requests that future telemarketing

17   calls cease relating to text telemarketing."

18          So I think that's covered, don't you think?

19          MR. MCCUE:  Well, let me provide a little context,

20   Your Honor.  Very often telemarketers have taken the position

21   that a do not call request is not a complaint.  So that's

22   what I have dealt with in the past.  A DNC request is very

23   specific.  Because under the do not call provision of the

24   statute, a company like Drips or QuoteWizard has to maintain

25   a list of anyone who says do not call me.  So in a text

1    perspective, it could be even a reply to the text saying, "Do

2    not call," and by statute, those numbers then need to be

3    added to a list, on a daily basis, and then future calls or

4    texts have to be scrubbed against that list.  So it's a

5    little different than complaints.  It's not like I'm writing

6    to the CEO, saying, "Please stop calling me."  It's in the

7    ordinary course.  If, on the phone call, if someone gets a

8    live phone call, they say, "Why are you calling me?  Stop

9    calling me," by statute, that number has to be added to the

10   do not call list.

11          So what I anticipate is that there is a daily list

12   that is probably maintained by Drips and sent to QuoteWizard

13   every day, saying, "Here is the text run we did today.  Here

14   is the DNC, the do not call response," and then that has to

15   be used as a scrub going forward.

16          So similar to formal complaints or lawsuits, a

17   consumers's request to do not call me puts QuoteWizard on

18   notice that its leads are bad.  And I anticipate that, well

19   prior upon to Mr. Mantha, they were aware that any time they

20   did a text and they got a whole host of do not call requests,

21   those should be stored electronically, no burden at all to

22   produce them, and they're probably sent by Drips to

23   QuoteWizard on a daily basis.

24          MS. KINGSTON:  Your Honor, if I may, this is where

25   we're getting really far afield from what's at issue in this

case.  This is a very big difference between a consumer
saying, "Please add me to your do not call list," and a
complaint that says, "You should never have called me.  You
didn't have consent."  A do not call request could even
happen where a consumer has consented, but simply doesn't
want to receive any further communications.  It's just a type
of thing where a consumer says, "Yes, I opt out.  Please put
me on your do not call list."

            That never happened with Mr. Mantha.  He was
contacted by text message.  He responded.  He solicited
further information.  So this is in no way what happened in
this case.

            THE COURT:  So let me just say one thing.  I'm
assuming Mr. Mantha responded in order to figure out who was
texting him, right?

            MS. KINGSTON:  He kept responding after QuoteWizard
was identified.  He still -- he still kept responding, Your
Honor.

            THE COURT:  Okay.  And what's the deal with that,
Mr. McCue?

            MR. MCCUE:  Your Honor, first, he's on the National
Do Not Call Registry, so he indicated "do not call me" by
doing that.  When he responded, he had received two text
messages from QuoteWizard saying, "Are you interested in more
insurance?"

1          QuoteWizard was mentioned on the text, but he was
2     not aware of who QuoteWizard was.  He didn't know if
3     QuoteWizard was a legitimate company or not a legitimate
4     company.  Later on he realized, "Oh, that is the actual name
5     of the company."  But more often in telemarketing, fake names
6     are used, DBAs are used.  So he responded to the text to get
7     more information to clarify exactly who was calling, and
8     that's what he did.
9          THE COURT:  Okay.  So --
10          MS. KINGSTON:  Your Honor, what happened --
11          THE COURT:  Yes, go ahead.
12          MS. KINGSTON:  I apologize.  Your Honor, what
13     happened is it plainly stated, "This is QuoteWizard," and
14     after that he said, "How do I get a quote?"  And when he was
15     asked, "What time is a good time to speak?" he gave a date
16     and time.  So this was all after he learned this was coming
17     from QuoteWizard.  And he was being coached on how to respond
18     by his friend.  So I think this is -- there was never an
19     opt-out or do not call request made, ever, during the course
20     of this case.
21          MR. MCCUE:  Your Honor, It's not required under the
22     law.  And what he was trying to do was also find out who else
23     was involved.  You know, it's certainly relevant was State
24     Farm behind this?  Was State Farm paying QuoteWizard to do
25     this?  That's what's relevant.  He did nothing wrong, and

1    they've attacked him from the beginning just because he said,

2    "Who's calling me," and trying to set up a meeting to find

3    out more information.

4            THE COURT:  Okay.

5            MR. MCCUE:  We're getting far afield from what is

6    it -- the importance of the do not call.  It's irrelevant if

7    Mr. Mantha said, "Add me to the do not call list."  He's

8    already on the do not call registry.  The do not call lists

9    are for people who are not on the registry already, so it's

10   relevant for knowledge.

11           THE COURT:  Okay.  So I'm going to allow Number 25.

12   And since we don't know anything about how long QuoteWizard

13   has used Drips, or how these do not call lists are stored,

14   and that type of thing, if Ms. Kingston has follow-up

15   concerns about the production, I'm going to ask the parties

16   to negotiate that.

17           So for example, I just don't know the length of

18   time, but if it's a decade or something, then I think that

19   may be too long.  So I'll let the parties negotiate that.

20           Okay.  Number 26, all documents referring to -- and

21   I think -- let's see what we get from 25, and I'm going to

22   deny 26 without prejudice at this time.

23           Okay.  31.  Okay.  So we have the QuoteWizard

24   opt-in.  And I read this very carefully, so I think I

25   understand the facts behind it.

```
 1              And I'll hear you, Mr. McCue.
 2              MR. MCCUE:  Sure.  Your Honor, this is -- this is a
 3   really important issue here.  As you heard from Ms. Kingston,
 4   in some of her comments, on QuoteWizard's end, Mr. Mantha,
 5   his data is just what you'd call a blip or a ping.  The
 6   entire process is automated.  So when we notified QuoteWizard
 7   of Mr. Mantha's claim, they did not have his prior express
 8   consent signed in writing.  They didn't have it.  All they
 9   have is a phone number, maybe an e-mail.  That's all they
10   have.  They're supposed to have that prior to calling him.
11   That's what prior express consent is.  And under the Drips
12   contract with Drips, QuoteWizard was responsible to have
13   prior express consent in their possession for every piece of
14   data sent to Drips.  They didn't have that.
15              So what happened after we filed a lawsuit is they
16   essentially scrambled to put together data in regards to
17   Mr. Mantha.  They put out the request to RevPoint.  RevPoint
18   contacts Plural.  Plural contacts a guy in Serbia.  The guy
19   in Serbia says, "We got it from Adam Brown," all the way down
20   the food chain.  Then QuoteWizard, and apparently their
21   in-house counsel, gathers all of this data together, creates
22   a document after the fact, after we placed them on notice,
23   and then sends it to me under a letter from their counsel
24   threatening sanctions for filing a frivolous lawsuit.  So
25   that's what the QuoteWizard opt-in issue is.
```

1          THE COURT:  So is -- are some of the documents that

2     you're looking for on the privilege log?

3          MR. MCCUE:  I don't think so, Your Honor.  I don't

4     know.  Because the privilege log, as I've said in other

5     papers, it's so vague, I don't know what it relates to.  But

6     what I'm looking for is how is this document created?  The

7     document that they used to threaten sanctions, how is it

8     created?  Who created it?  How many drafts were made of it?

9     Because we know, because we took multiple depositions

10    focusing on the document, it's almost entirely false.  The IP

11    addresses on the opt-in don't connect to Mr. Mantha.  The

12    lead ID does not connect to Mr. Mantha.  Over and over and

13    over again, all that data is incorrect.

14         So what did QuoteWizard do?  How did they collect

15    this?  Before they're going to threaten counsel with

16    sanctions, you would think they would think pretty carefully

17    and be pretty diligent about what they're doing.  So how was

18    that document created?  Who was involved?  And that leads to

19    their counsel was involved.  And so that was just disclosed

20    several weeks ago, that their in-house counsel apparently

21    sent a number of e-mails to RevPoint, all under work-product.

22         And this is another example, Your Honor.  We talked

23    about the Drips contract.  Well, the e-mails between

24    QuoteWizard and RevPoint, that I attached to this motion,

25    also were pulled back on work-product.  And those were

1   produced only after I filed a motion to compel, and then
2   those documents are produced.  And, oh, my god, those
3   documents literally say, from QuoteWizard to RevPoint, "Where
4   is Mr. Mantha's data?  You are supposed to have this.  This
5   is not compliant.  Not compliant with our policy."
6           How is that withheld from discovery?  Under any
7   concept, how is that withheld?  But again, I have to initiate
8   litigation, file a motion to compel, and then -- and only
9   then are these documents produced.  Same thing with the Drips
10  contact.  So what did these e-mails between RevPoint and
11  QuoteWizard's in-house counsel, what do they say?  The
12  timeframe was right around the time that they're creating
13  this opt-in.  So they can't hide behind work-product on
14  something that's factual, that relates to a factual defense
15  of consent.
16          THE COURT:  Okay.
17          Ms. Kingston, yes.
18          MS. KINGSTON:  Thank you, Your Honor.
19          My brother seems to be confusing prior consent with
20  an extensive record of it, and he suggests that we didn't
21  have consent to contact.  To be clear, we produced the
22  contract with RevPoint that requires them to send only TCPA
23  compliant leads.  So when that information is posted on
24  RevPoint's system, that is tagged with prior consent.  We're
25  not purchasing that lead without it, so it's coming in with

1    consent.  Whether we have all the information that RevPoint

2    has at the point, no, of course we don't.  We only have

3    what's needed to purchase that lead and to contact the

4    consumer.

5         So when litigation is initiated, of course we're

6    going to go back to RevPoint and we're going to say, "Give us

7    everything that you have on this lead, because we want to

8    investigate this to properly defend this lawsuit.  So if you

9    have additional information," which they do, and which

10   they're required to maintain under the contract, we're going

11   to seek that from them.

12         THE COURT:  Okay.  But why are your communications

13   seeking that not discoverable?

14         MS. KINGSTON:  Well, the -- specifically our

15   in-house counsel -- I can tell Your Honor, besides the

16   e-mails from our in-house counsel that we've logged, there's

17   nothing else to provide.  We have provided the -- what

18   they're calling the opt-in.  Our deponent testified at great

19   length, if you look at the deposition transcript, of all the

20   steps he took to investigate this complaint after he received

21   it.  He testified at great length.  He told plaintiff's

22   counsel exactly what he got from RevPoint.  We've provided

23   all that information.  So the only information that we're

24   talking about that hasn't been produced are e-mails from our

25   in-house counsel.  And on that point --

1              THE COURT:  Okay -- yeah, go ahead.

2              MS. KINGSTON:  On that point, Your Honor, this is

3    at the time that we received a legal demand and after a time

4    that a complaint has been filed and our in-house counsel is

5    investigation this complaint.  It is classic work-product.

6    It is classic work-product, Your Honor.  To say that

7    plaintiff's counsel can go behind the screen and to ask our

8    in-house counsel what she's doing --

9              And I can tell you, Your Honor, as a separate

10   matter, not only is it work-product, there's nothing in those

11   e-mails, factually, that already hasn't been disclosed.

12   There's no smoking gun, there's no hidden evidence.  I'm more

13   than happy to produce that in-camera for Your Honor to

14   review.  There's absolutely nothing in there that's a factual

15   matter.  But beyond that, this is work-product.

16             She's investigating a legal demand, and she's

17   QuoteWizard's counsel.  It's no more discoverable than my

18   e-mails investigating this case, and, quite frankly, I'm not

19   sure why they're being sought.  We have literally produced

20   any type of investigation we did, although I think those

21   steps are protected.  We've produced all the factual matter

22   that came out of that.  And if you look at QuoteWizard's

23   deposition, we were deposed at length about that process,

24   Your Honor.

25             THE COURT:  Okay.  So I'd like you to produce the

1      privileged documents, ex parte to me, and I would like to

2      know who these people are.  For example, Mike Fishman,

3      RevPoint Media, that -- he must be someone who works at

4      RevPoint.

5              MS. KINGSTON:  He is, Your Honor.

6              THE COURT:  And then who is Matthew Weeks?  Who is

7      Sean Moynihan?  I need to know who each person -- what their

8      role is, whether they're a lawyer or not, who do they work

9      for, et cetera.

10             MS. KINGSTON:  Well, Your Honor, if I may, the only

11     part of the privilege log that's at issue is the Eryn Linkous

12     Bennett e-mails.  We've already produced the Matthew Weeks

13     e-mails, and plaintiff's counsel voluntarily agreed to not

14     seek the others, which are the correspondence with

15     Mr. Moynihan and Mr. King.

16             THE COURT:  Okay.  So if you've introduced the --

17     well, just -- I think I would like to see everything that's

18     on your privilege log, so just submit it.  And you can

19     deliver to the courthouse --

20             When do you need to do it?  How much time would you

21     like?

22             MS. KINGSTON:  A week, Your Honor, would be more

23     than sufficient, I'm sure.

24             THE COURT:  Okay.  So -- and then once it's

25     delivered, because the clerk's office is basically empty

1    right now, if you could e-mail Ms. Belmont and tell her it's

2    been delivered, and I'll go down there and find it.

3            So -- okay.  And if you could just note which have

4    been provided to defendant -- I mean, plaintiff, and which

5    does he not want anymore or which has he waived?

6            MS. KINGSTON:  Yes, Your Honor.

7            THE COURT:  And I still would like to know who

8    everyone is.  Okay.

9            MR. MCCUE:  Your Honor, can I just clarify one

10   thing with RPD 31 is that we've been talking about e-mails,

11   but it also asked about the numerous drafts of the document

12   that we call the "QuoteWizard Opt-In."  I certainly think

13   it's relevant if the information in that opt-in changed over

14   time, and why.  That would be relevant.

15           THE COURT:  Okay.  So are there drafts of the

16   QuoteWizard Opt-In that have been withheld or are not in the

17   privilege log?

18           MS. KINGSTON:  No, Your Honor.  We've produced that

19   document, and there are no drafts of this.  We've informed

20   plaintiff's counsel of this.

21           THE COURT:  Okay.  All right.  So that takes care

22   of 31.  Long argument on that.

23           32.  Okay.  So I just think that's very broad.

24           MR. MCCUE:  Your Honor, we'll waive that one.

25           THE COURT:  Okay.  35.  "Produce all documents

1    relating to other occasions where the IP address identified

2    in the computer did not match the name of that consumer or

3    was not subscribed to that consumer."

4            I think I'll just hear you, Ms. Kingston, on this.

5            MS. KINGSTON:  Thank you, Your Honor.

6            I think what underlies this request is an

7    assumption that the IP address -- well, let me back up.

8            When we were in discovery of this case, there were

9    a few IP addresses that were produced in connection with

10   plaintiff's lead.  And plaintiff pulled -- there's some

11   suggestion that those are not plaintiff's IP addresses

12   currently.  And so I think what underlies this request is an

13   assumption that if the IP address doesn't match plaintiff's

14   current IP address, that means that somehow this signifies

15   that this lead is false or fraudulent or incorrect.  And I

16   just think that's not right, Your Honor.

17           We have sworn testimony from some of the nonparties

18   that the IP address that's associated with the lead is not

19   necessarily the IP address for the person who went to the

20   website and entered the information.  It could be the IP

21   address associated -- we did cite that testimony, Your Honor;

22   it could be the IP address associated with the person running

23   the website, with the server for the website.  It doesn't

24   necessarily have to be the plaintiff's IP address.

25           So the point being is that the fact that this IP

1    address does not match Mr. Mantha's is not evidence that this

2    lead didn't ultimately come from Mr. Mantha.  And we have

3    sworn testimony on that point.

4              THE COURT:  So let me ask you this.  Do you have

5    other complaints where it's gotten far enough along that

6    you've investigated someone's IP address?

7              MS. KINGSTON:  I don't know, but I can -- I'm

8    almost 99 percent certain that this is the furthest we've

9    ever gotten into a case in terms of consent.  I mean, the

10   number of depositions, the number of subpoenas, I don't think

11   we've ever gotten into the weeds like this.

12             THE COURT:  So -- okay.  Here's what I'm going to

13   order.  I'm going to order that you see, are there other

14   instances in which you had a mismatched or an alleged

15   mismatched IP address, and then let counsel know if there are

16   others and how many, and then we'll take it from there.  So

17   I'm allowing it just to go that far, and you inquire and find

18   out, has this issue come up before where someone

19   says, "That's not my IP address."  And if there are other

20   ones, we'll allow Mr. McCue to make a further request.  And

21   if there aren't, then that puts that to bed.  Okay.

22             And I think I'm going to deny Number 36, without

23   prejudice, to figuring out what is the other litigation.  So

24   let's see what other litigation there is, and then you can

25   maybe refine that request or make it again, whatever you want

1    to do.  Okay.  All right.

2         So here's what I'm going to do.  I am going to do

3    my best to memorialize this in a docket entry, because I'm

4    not writing big orders in this matter, because I want to get

5    you moving and keep you going.  So I'm going to put this in a

6    docket entry, and if I get it wrong or I don't say something

7    with enough precision, you can e-mail Ms. Belmont, CC the

8    other side, and say, "We thought the Judge actually ordered

9    this," and then I'll correct it.  So I'll do that quickly,

10   hopefully right now, so that while it's fresh in my mind.

11        And I would just really urge the parties to keep

12   trying to negotiate this.  And I think you have tried, but

13   keep trying and see if you can avoid coming back to court as

14   much as you can.  Okay.

15             MR. MCCUE:  Your Honor, two quick issues.

16             THE COURT:  Yes.

17             MR. MCCUE:  One is that our discovery has been

18   pushed out until November, but we don't have a briefing

19   schedule.  So under Judge Sorokin's initial kind of guidance

20   about this case, we were supposed to move for summary

21   judgment very quickly on the limited issue of consent.  And

22   then, from at least a plaintiff's perspective, after the

23   consent, defense didn't seem to pan out.  QuoteWizard now

24   wants to move for summary judgment on all issues.  So I

25   don't -- I seek the guidance in terms of what the briefing

1    schedule will be, and hopefully it's right at the time that

2    discovery ends, would be my hope.  So that's one issue to

3    chat about.

4              THE COURT:  Ms. Kingston?

5              MS. KINGSTON:  Yeah, we haven't -- I think that the

6    parties I'm sure can come to an agreement on a briefing

7    schedule.  It's not something we've discussed yet.  But Judge

8    Sorokin's prior order was giving, I think, 30 days from the

9    end of individual discovery, and I think that's probably

10   appropriate here.  So I'm sure that's something that we can

11   come to agreement on, you know, outside of this hearing.

12             MR. MCCUE:  That's fine, Your Honor.

13             Second issue, if I may.

14             THE COURT:  Yes.

15             MR. MCCUE:  One of the most important things from

16   the outset of this case relates to the class text records.

17   So these are the call records that will show how many texts

18   were sent to class members.  Those have not been produced.

19   They were in the possession of Drips.  Judge Sorokin left

20   that open as an issue for you to deal with.  I would seek

21   your guidance on that.  But the more we keep pushing things

22   back, the more worried I get about these call records.  If we

23   can't get these call records, we can't prove the class.

24             These are records that are stored electronically.

25   Their production should not be a big deal at all.  We're

1    willing to, of course, accept them under a confidentiality

2    order, but the records continue not to be in our possession.

3           So from plaintiff's perspective, not only do we

4    have an obligation to the class to preserve this evidence, we

5    would also like to know, what is the scope of the class?  Is

6    this -- is this five people or 500,000 people?  We have no

7    idea.  So one thing that plaintiffs envisioned is a motion

8    for the production of the call records, separate from

9    starting class discovery, but a motion that's limited to the

10   production of call records.  So I just seek your guidance

11   about that, but that is something that's foremost on my mind

12   in this case.

13          THE COURT:  Is -- are the call records in the

14   possession of Drips?

15          MR. MCCUE:  Yes.

16          THE COURT:  What if you asked the Court for an

17   order to Drips to preserve the records?

18          MR. MCCUE:  I'm open to that, Your Honor.  Drips

19   has already said that they will preserve them.  Certainly an

20   order would help with that.

21          Here's my concern.  This issue of an ATDS is going

22   to the Supreme Court.  Drips' entire business model is based

23   upon this technology.  If the Court goes the consumer way,

24   Drips' business model is done.  So what happens to Drips?

25   What happens to those call records?  So I worry that even

1    with an order from the Court, what happens?  And what is the

2    remedy for the plaintiff if Drips just dissolves and we can't

3    get these records?

4          At a minimum, I would suggest that QuoteWizard take

5    possession of these text records, and represent to the Court

6    they have these records so that we have a remedy, in case

7    those records are destroyed or they go away?

8          MS. KINGSTON:  Your Honor, I think -- I mean, Drips

9    is represented by very competent counsel, so I'm not sure we

10   should be heard on that without them here.  But I can tell

11   you that they have, repeatedly, in writing, assured

12   plaintiff's counsel that they're maintaining these records.

13   I would have no problem with plaintiff filing a motion to

14   confirm preservation, but I think that, to me, there's no

15   doubt that these records are being preserved.

16         THE COURT:  How big of volume of records are we

17   talking about?

18         MR. MCCUE:  I have no idea.  What I can tell you,

19   Your Honor, is that we've done many of these cases all around

20   the country, and I've seen millions and millions of call

21   records produced in Excel format and a single FTP download.

22   This is not a burdensome process.  But for us to continue to

23   say, "Well, you know, Drips says, okay, they have competent

24   counsel, it's okay for them to confirm they have them," that

25   is not enough for plaintiff's counsel, I gotta be completely

1  frank with you.  That does not help me sleep well at night

2  that Drips has competent counsel.  That doesn't do anything

3  for me.

4          What I need is an assurance that either Attorney

5  Kingston has these records or I have these records or you

6  have these records, Your Honor.  Because it's another issue,

7  too, what exactly are they producing?  Are they producing

8  what truly are the text records?  I don't know.  I mean, I

9  should at least get a sampling that I can have our expert

10  look at and say, "Yeah, these are what you need."

11          To identify the class, we need:  Who did they call,

12  when did they call, was the text successful or not?  How many

13  times did they get texted?  So it erases all kinds of issues

14  that even, down the road, if they produce what they thought

15  might be helpful, and it turns out, oh, these are just a list

16  of phone numbers, they don't show anything, they don't show

17  how many times they were called, they don't show a --

18          THE COURT:  So can I just ask you, is some of the

19  discovery they I ordered just now going to give you an idea

20  of whether this -- whether Drips had been complained about?

21          MR. MCCUE:  This will certainly show did they

22  complain, yes; but it will do nothing to show, what is the

23  volume?  How big is the class?  How many people were called?

24  For a do not call violation, you need to show two calls

25  within 12 months, so a list of phone numbers doesn't help

1    with that.

2              So to be clear, no, just having -- just having

3    evidence of complaint is relevant of knowledge, but it

4    doesn't really help move the ball in the terms of the size of

5    the class.

6              THE COURT:  So I wonder if what you should do here

7    is file a motion, Mr. McCue, and we'll get counsel for Drips

8    here and argue it.

9              MR. MCCUE:  Okay.  I can do that, Your Honor.

10              THE COURT:  Yes, Ms. Kingston?

11              MS. KINGSTON:  I think what you just said makes

12    sense.  I think that they should be in the room when it's

13    discussed, because they have most knowledge of what they're

14    maintaining.

15              THE COURT:  Great.

16              MR. MCCUE:  Your Honor, one other issue on that,

17    and I'll promise to be quiet.

18              THE COURT:  Okay.

19              MR. MCCUE:  At the outset of this case, plaintiff

20    took the initiative, sent out a lot of subpoenas trying to

21    track down this consent issue.  Attorney Kingston wrote to

22    me, and she said, "I want your communications with these

23    entities; not just the subpoena response, I want your

24    communications them."  And I produced over 100 pages of

25    correspondence.

1          Now Attorney Kingston has been pursuing subpoenas.

2     There's a number of them outstanding.  I haven't heard

3     anything about has there been a production?  She told me

4     yesterday, "I will give you whatever is produced."

5          And I said to her, "What about the e-mails?

6          And she said, "I am not obligated to give those to

7     you."

8          So we're having a situation here where she's asking

9     me to do one thing, I complied.  We flip it around, and she

10    refuses.  So I seek your guidance as to that issue.  And the

11    issue is e-mails between counsel and third-party subpoenas,

12    about those subpoenas.  We are entitled to know what are

13    those subpoena recipients saying, even if it's not a formal

14    subpoena response.  Are they writing back and saying, "What

15    are you talking about?  We have nothing about Mr. Mantha."

16    That's relevant.  I should be able to know that.  But

17    apparently not.

18          THE COURT:  Okay.

19          Ms. Kingston?

20          MS. KINGSTON:  Yeah, I -- I disagree with my

21    brother's recitation.  He -- earlier in the case, they did

22    voluntarily produce some -- they had extensive e-mails with

23    subpoenaed parties.  In some cases they asked for substantive

24    information from these subpoenaed parties, follow-up

25    information after they had received formal responses.  And so

1    obviously, yes, I think that's discoverable, if a subpoenaed

2    party says, "Here's more information," and supplements our

3    response.

4            The types of e-mails I'm having with subpoenaed

5    parties include:  Do you want an extension on your response?

6    Do you want to set up a call?  I don't have an obligation to

7    share those e-mails, you know, to go back through my e-mails

8    and share those.  Every time that we've received a response

9    to your subpoenas, we promptly forward those in the same day

10   to plaintiff's counsel, as we're required to do under the

11   rules.  But to say that I'm required to produce my e-mails

12   with the subpoenaed parties, Your Honor, particularly when

13   these e-mails have nothing to do with the substantive

14   responses, I think that's well beyond the scope of discovery.

15           THE COURT:  Okay.  I'm not going to order the

16   e-mails at this time.

17           Okay.  So thank you very much, everyone.  I'm going

18   to try to memorialize this.  And as I said, if you have

19   issues with what I remember saying just now, then, by all

20   means, e-mail Ms. Belmont, but always CC the other side.

21           MR. MCCUE:  Thank you for your time today, Your

22   Honor.

23           MS. KINGSTON:  Thank you, Your Honor.

24           THE COURT:  Thank you very much.

25           (Court in recess at 12:02 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4        I, Rachel M. Lopez, Certified Realtime Reporter, in

5   and for the United States District Court for the District of

6   Massachusetts, do hereby certify that pursuant to Section

7   753, Title 28, United States Code, the foregoing pages

8   are a true and correct transcript of the stenographically

9   reported proceedings held in the above-entitled matter and

10  that the transcript page format is in conformance with the

11  regulations of the Judicial Conference of the United States.

12

13               Dated this 28the day of February, 2021.

14

15

16

17          /s/ RACHEL M. LOPEZ

18

19

20          _____

            Rachel M. Lopez, CRR
21          Official Court Reporter

22

23

24

25