## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH MANTHA, *on behalf of himself and all others similarly situated*,

        Plaintiff,

    v.

QUOTEWIZARD.COM, LLC,

        Defendant.

Civil Action No. 1:19-cv-12235-LTS

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant QuoteWizard.com, LLC ("QuoteWizard") submits this memorandum of law in support of its Motion for Summary Judgment on the remaining claim, Count II, of Plaintiff Joseph Mantha's ("Mantha") Amended Complaint, pursuant to Fed. R. Civ. P. 56.

### INTRODUCTION

This case represents an example of the abuses of the Telephone Consumer Protection Act ("TCPA") and a money-making scheme. In the summer of 2019, shortly before Mantha received the text messages at issue, Mantha's friend told him how he had retained a lawyer to make money by serving a TCPA demand on a company that had sent him communications. Mantha was curious and his friend offered him tips on how to do the same thing.

A short month or two later, Mantha (who, records show, solicited an auto insurance quote but contests the same) was texting back and forth with QuoteWizard, asking "How do I get a quote?" Mantha even set up a date and time for a phone call with QuoteWizard for that purpose. *At the exact same time*, Mantha was furiously in contact with the same friend, who was advising him on how to respond to set QuoteWizard up for potential liability and consulting with his

lawyer for that information.  That friend then referred Mantha to his lawyer, who also became Mantha's lawyer in this case.  *Eight days later*, that lawyer was retained and then served a monetary demand on QuoteWizard for the text conversation that Mantha had so willingly engaged in.  Mantha has no evidence to show that the text messages genuinely injured him.  Indeed, he never mentioned the text messages to his wife or even told her that he filed this lawsuit until many months after doing so.  All the while, Mantha and the same friend texted back and forth—Mantha's friend told him to go "get paid" the life-changing money and it was all a "game," and Mantha thanked him for his help.

Under even a broad interpretation of the TCPA, this is not a situation the TCPA was designed to cover and Mantha is not a person harmed under the statute.  QuoteWizard at all times believed, and maintains, that Mantha consented to the conversation, as further shown by his willing responses.  Mantha engaged in a classic money-making scheme, aided by his friend and their shared lawyer.  Simply put, he lacks both Article III and prudential standing to bring this case.  His remaining claim, alleging a "do not call" claim under the TCPA, must be dismissed.

Further showing Mantha's lack of standing, the cell phone from which he willingly conversed with QuoteWizard is not a residential line subject to the TCPA's "do not call" protections.  Courts have found that cell phones either categorically do not qualify, or that the burden is on plaintiff to show that the cell phone was a residential device.  Under either line of cases, Mantha's cell phone does not qualify as residential.  As the director of six group homes for special needs (behavioral or emotional) students aged 12 to 21 who live on a school campus year-round, Mantha is on call virtually 24/7, via that cell phone.  His phone records establish that, in 2019 (when the QuoteWizard conversation took place), Mantha took work calls on his cell phone constantly, at all hours of the day and night, on weekends, and even on Christmas.  In one weekend alone, he fielded 59 work calls at all hours of the day and night. He lacked any

reasonable expectation of privacy on his cell phone commensurate with a residential line. For this separate reason, his "do not call" claim fails.

Finally, Mantha must show that was *solicited* for a service or product by QuoteWizard, twice, to prevail on his remaining claim. Nothing of the sort ever happened here. The text messages themselves show that QuoteWizard at all times was attempting to provide an auto insurance quote to Mantha in response to a request for the same. The text messages were transactional and informational, and therefore exempted from the "do not call" regulation on either ground. More broadly, QuoteWizard does not sell insurance, never attempted to sell insurance to Mantha, and never solicited him for anything. For this additional reason, his "do not call" claim must be dismissed.

When considering the undisputed facts submitted herewith, the Court should reach only one conclusion: in engaging in this money-making scheme with the real-time assistance of a TCPA litigant and his lawyer, in willingly engaging with QuoteWizard and asking for a quote, and in using a cell phone that he uses at all hours of the day and night for work, Mantha was not covered by the protections of the TCPA. To find otherwise is to stretch the TCPA beyond its carefully designed limits and, worse, reward a clear abuse of the statute.

## FACTS[1]

In the summer of 2019, shortly *before* the text messages at issue were sent, Mantha had a conversation with his friend, Steven Novia. SOF, ¶¶ 78-82. Novia told Mantha that, through his lawyer, he had served a TCPA demand on a company to recover money. *Id*. Mantha was curious and Novia provided him with tips on how to do the same. *Id*.

---

[1] QuoteWizard's complete statement of undisputed material facts ("SOF") is filed herewith. A condensed version of the statement of undisputed material facts is provided within this memorandum.

Shortly thereafter, QuoteWizard was sold a lead for Mantha by RevPoint Media, LLC ("RevPoint") in connection with a request for an auto insurance quote. SOF, ¶¶ 95-98. RevPoint sold the lead to QuoteWizard with a contractual and actual guarantee that Mantha had solicited the request for an auto insurance quote and consented to be contacted under the TCPA. *Id*. Each of the companies that bought and sold Mantha's lead, three in total, were under contractual obligations to only buy/sell leads that comply with the TCPA, *i.e.* the consumer has consented to receive communications under the TCPA. SOF, ¶¶ 86-90, 103, 111. In buying the lead from RevPoint, QuoteWizard also required that the lead have a Jornaya LeadiD, which is an industry-standard lead verification tool to further ensure TCPA consent. SOF, ¶¶ 91-94, 96. Records show that the lead was generated on www.snappyautoinsurance.com (the "Website"). SOF, ¶ 107.

QuoteWizard, through its texting agent (Drips Holdings, LLC), then texted Mantha's cell phone, (XXX) XXX-9690, on August 9 through August 23, 2019, identifying itself immediately, to connect with Mantha to provide him information for an auto insurance quote as requested. SOF, ¶¶ 116-121; *see also* Exhibit 17. Mantha did not ask QuoteWizard to stop contacting him, nor did he ask QuoteWizard how it got his number, nor did he indicate anything suggesting he did not want to be contacted. *See* Ex. 17. Rather, Mantha responded <u>five times</u> on August 19, 2019, asking QuoteWizard: "***How do I get a quote?***" *See* Ex. 17. Mantha even provided QuoteWizard a day and time to call him to discuss his request for a quote. *See id*.

QuoteWizard does not sell insurance to consumers. SOF, ¶ 144. QuoteWizard only provides information to consumers to get quotes for insurance. SOF, ¶ 89. QuoteWizard sold Mantha's lead to GEICO Insurance so that GEICO could provide Mantha a quote for auto insurance. SOF, ¶ 147. QuoteWizard does not receive any additional compensation should GEICO later complete a sale of insurance. SOF, ¶ 146. The transaction between QuoteWizard

4

and a consumer is for informational purposes only as requested by the consumer.  SOF, ¶ 150.
*See also* Ex. 17.

As Mantha was texting with QuoteWizard, Mantha was furiously texting and calling with the same friend, Novia, asking for advice on how to respond.  SOF, ¶¶ 122-128.  Mantha also solicited legal advice, asking Novia if text messages "count[ed]" under the TCPA.  SOF, ¶¶ 123-124.  Novia then asked his lawyer, Alex Washkowitz, Esq. ("Attorney Washkowitz") in the meantime, relaying the answer to Mantha that text messages did "count" under the TCPA. *Id.*  Immediately afterwards, Novia provided Mantha the contact information for Attorney Washkowitz so Mantha could pursue a demand against QuoteWizard.  SOF, ¶ 125.  No more than eight (8) days after the last text message in the QuoteWizard/Mantha conversation, Mantha had already retained Attorney Washkowitz, who served a demand on QuoteWizard for money in connection with the messages.  SOF, ¶¶ 127-128.

Mantha did not tell his wife, Melisa Mantha, about the text messages.  He did not tell her about the filing of this lawsuit until the spring of 2020 after filing it in October 2019.  SOF, ¶¶ 136-143.  Mantha never complained about the text messages to his wife, or to anyone.  *Id.*

Novia later acted as a go-between for Mantha and Attorney Washkowitz.  Novia told Mantha that the attorney had reached out to Novia and told Mantha to get back to the attorney "ASAP" to "get paid."  SOF, ¶¶ 129-135.  *See also* Exhibit 19.  Novia further advised that it is "life changing money," that the "longer it plays out the better you are, It's a game.  Let them play and let it play out."  Ex. 19.

Mantha uses his cell phone, on which he engaged in the voluntary conversation with QuoteWizard, during the day, evenings, on weekends, and on holidays for work purposes.  SOF, ¶¶ 1-77.  Mantha is the Director of Residential Services at the Doctor Franklin Perkins School ("Perkins School"), which, among other things, has an elementary, middle, and high school for

students with special needs, *i.e.* behavioral/emotional issues, etc.  SOF, ¶¶ 2-3, 6.  About 50 to 60 of the students ("Residential Students") live on campus at the Perkins School year-round in six "group homes."  SOF, ¶¶ 4-5, 7.  Mantha is ultimately responsible for the Residential Students and the staff, totaling about 110 employees, at the six group homes.  SOF, ¶ 8.

Mantha's job is 24/7.  SOF, ¶¶ 21-23 (whereby Perkins School describes Mantha's job as providing "twenty-four hour administrative on-call consultation" in relation to the six group homes).  When Mantha is physically on campus (generally, Mondays through Friday from 8 a.m. to 4 p.m. or 9 a.m. to 5 p.m.), the best way for anyone to reach him is on his cell phone.  SOF, ¶¶ 18-20.  When not on campus, the *only* way for Perkins School employees to contact Mantha is on his cell phone, either directly or through a phone application called "Ring Central."  SOF, ¶¶ 56, 74, 77.

Based on on-call schedules for the group homes in 2019 (at the time of the relevant events), Mantha was the official administrative on-call contact for the six group homes *approximately half of the year,* to be reached at his cell phone.  SOF, ¶¶ 23-32.  That meant that Mantha must be available via his cell phone to field calls relating to any critical situations at the group homes.  SOF, ¶¶ 32-33. Even when not on call, Mantha was the person to be called on his cell phone in the event of emergency situations, such as run-away students, which had happened occasionally.  SOF, ¶¶ 33-39.  Other situations that would require calls to Mantha's cell phone at off-hours included injured staff, police responding to the group homes, physical altercations, or Residential Students experiencing psychiatric emergencies.  SOF, ¶¶ 38-39.

Mantha's cell phone records confirm that he was called constantly, all hours of the day and night, on weekends, and even holidays like Christmas, for work.  SOF, ¶¶ 57-73.  The records show that he made or received at least 1,400 calls for work on his cell phone in 2019, or

approximately 117 per month or almost 4 a day.  SOF, ¶ 58.  *See also* Exhibit 9.[2]  The work calls

constituted nearly 50 percent (48.6%) of calls he made or took on his cell phone in 2019 in total.

SOF, ¶ 58.  He receives a $30 monthly reimbursement from Perkins School for his cell phone

use for work, only given to employees who cannot do their jobs without using their cell phones.

SOF, ¶¶ 50-55.  Mantha is also able to use his work e-mail on his cell phone, forward calls from

his desk work phone to his cell phone, and use the "Ring Central" application to call any Perkins

School employee via his cell phone anywhere, anytime.  SOF, ¶¶ 74-77.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if the movant shows "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56.  If the opposing party's evidence is "merely colorable, or is not significantly

probative," summary judgment is appropriate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249-50 (1986) (citations omitted).  The movant need only show "an absence of evidence to

support the nonmoving party's case" to warrant the entry of summary judgment.  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325 (1986).

## ARGUMENT AND AUTHORITIES

**I.    Mantha's Remaining Claim is Barred in Light of His 24/7 Use of his Cell Phone for Employment Purposes**

As summarized below, the TCPA makes it unlawful to send telephone solicitations to a

residential telephone subscriber.  As an initial matter, many courts construe the statute to not

apply to cellular telephones.  The courts that find, on the other hand, that a cell phone can qualify

---

[2] Importantly, the number of work calls that Mantha made or received on his cell phone is likely higher than what is reflected in Exhibit 9.  That exhibit reflects only the work calls that QuoteWizard was able to identify and confirm based on information provided in discovery by Mantha.  In addition, QuoteWizard sought Mantha's text message and e-mail histories in discovery, which would have shown additional work usage of the cell phone, but these were not preserved/produced.

still require the plaintiff to show that the cell phone was a residential device, commensurate with the expectation of privacy that applies to a residential landline. The undisputed facts here show that, regardless of Mantha's conclusory and self-serving characterizations of how he uses his cell phone, his cell phone was (and still is) his lifeline for his job. Mantha does not work an ordinary 9-5 job. He is expected to be on call, via his cell phone, virtually 24 hours a day, all year long to ensure the health, safety, and welfare of the 60 Residential Students and to oversee 110 staff members. In light of these facts, even if the Court concludes that a cell phone *can* qualify as a residential line, Mantha's cell phone does not so qualify.

A.    The Regulation Does Not Apply to Cell Phones

As relevant here, for a "do not call" ("DNC") claim, the TCPA prohibits a company from initiating a telephone solicitation to a "***residential telephone subscriber*** who has registered his or her telephone number" on the National Do Not Call Registry ("DNCR"). *See* 47 C.F.R. § 64.1200(c)(2) (emphasis added). The Federal Communications Commission's ("FCC") procedures relating to honoring DNC requests were designed "to protect ***residential*** telephone subscriber privacy." *In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd. 14014, 14065 (July 3, 2003) (emphasis added). The DNC prohibitions, therefore, do not apply to numbers associated with a business or non-residential purpose. *See In re Rules and Regulations Implementing the TCPA of 1991*, 23 FCC Rcd. 9779, 9785 (June 17, 2008) ("The National Do Not Call Registry applies to 'residential subscribers' and does not preclude calls to businesses"). *See also Clauss v. Legend Securities, Inc.*, 2014 U.S. Dist. LEXIS 184286, at *5, 2014 WL 10007080 (S.D. Iowa Sep. 8, 2014) ("This regulation unambiguously applies only to residential telephone subscribers.") (citation omitted).

In the first instance, based on a plain, textual reading of the TCPA, many courts have concluded that a cell phone categorically does not qualify as a residential one for a DNC claim,

regardless of FCC interpretation to the contrary.[3]  This is due to the fact that 47 U.S.C. § 227(c)(1) (the authorizing statute) and 47 C.F.R. § 64.1200(c)(2) (the related regulation) apply only to "residential telephone subscriber[s]" and <u>not</u> to cellular phone users.  This omission is notable because other parts of the TCPA *do* expressly apply to cellular telephone users, such as 47 U.S.C. § 227(b)(1)(A)(i)-(iii) (setting conditions for use of robocalls to cellular and other covered telephones).

This conclusion is further supported by the definition of the word "residential"; as one court noted, Merriam Webster defines "residential" as "used as a residence or by residents," and "resident" as "living in a place for some length of time," or "one who resides in a place"— definitions that do not apply to a cell phone used outside the home or (as here) in connection with employment.  *See Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 362 n.7 (E.D. Pa. 2019) ("[T]he plain language of 'residential telephone' describes a telephone used by individuals in the home, and not a cellular telephone, which can be used anywhere.").

For this reason, many courts have categorically rejected DNC claims premised on communications made to a cell phone because the plaintiff does not qualify as a "residential telephone subscriber" under 47 U.S.C. § 227(c)(1) and 47 C.F.R. § 64.1200(c)(2).  *See, e.g.*, *Cunningham v. [Caribbean] Cruise Lines, Inc.*, 2016 U.S. Dist. LEXIS 179758, at *5-6 (S.D. Fla. Dec. 28, 2016) ("Plaintiff concedes that all telephone calls at issue were made to his cellular telephone number, and the Court finds Plaintiff's assertion that a cellular phone can be converted into a residential phone unavailing."); *Cunningham v. Politi*, 2019 U.S. Dist. LEXIS 102447, at

---

[3] The FCC, in 47 C.F.R. § 64.1200(e), incorporated its discussion of the matter in "CG Docket No. 02-278, FCC 03–153," which is at 18 FCC. Rcd. 14014, 14038–39 (July 3, 2003). There, the FCC rejected a categorical approach, and stated that a "wireless subscriber" may be a "residential subscriber" based on a "fact-intensive" inquiry.  Ultimately, both the line of cases that categorically reject DNC claims involving cell phones and the FCC would agree on one thing: "residential telephone subscriber" has limits and does not encompass non-residential phones.

*10-11, 2019 WL 2517085 (E.D. Tex. Apr. 30, 2019) ("The private right of action created by 47 U.S.C. § 227(c)(5) is accordingly limited to redress for violations of the regulations that concern residential telephone subscribers. Recent courts considering claims asserted by Plaintiff have found this not to encompass Plaintiff's cellular phones and have dismissed his claims.") (collecting cases), report and recommendation adopted by 2019 U.S. Dist. LEXIS 102050, 2019 WL 2524737 (E.D. Tex. June 19, 2019). *See also Bates v. I.C. Sys., Inc.*, 2009 U.S. Dist. LEXIS 96488, at *3, 2009 WL 3459740 (W.D.N.Y. Oct. 19, 2009) ("[T]he TCPA differentiates between calls made to cellular and residential lines."); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250 (11th Cir. 2014) (distinguishing between "residential telephone number" and "cell-phone number"); *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1201 (M.D. Tenn. 2017) (TCPA "generally distinguishes between 'residential' lines and other protected lines"); *McEwen v. NRA of Am.*, 2021 U.S. Dist. LEXIS 72133, at *17-18, 2021 WL 1414273 (D. Me. April 14, 2021) (declining to decide the issue at motion to dismiss stage but finding that this "textual argument has potential") ("I am not inclined to unilaterally update and revise a law passed 30 years ago based on a hunch that Congress would have included personal cellular phones in its prohibitions had it the power to see into the future. I may also be reluctant to intuit that Congress intended one thing when the law says another thing.").

Thus, in the first instance, QuoteWizard urges the Court to find that the regulation at issue, 47 C.F.R. § 64.1200(c)(2), does not encompass a cell phone user, or at the very least one who uses their cell phone outside of their residence and for work. Where Congress intended to extend TCPA protections to cell phone users, it was explicit in that intent. *See*, *e.g.*, 47 U.S.C. § 227(b)(1)(A)(iii). Its decision *not* to include cellular telephone service under 47 U.S.C. § 227(c)(1) is a meaningful and dispositive omission that must be honored. *See*, *e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 578, 126 S. Ct. 2749, 165 L. Ed. 2d 723 (2006) ("A familiar principle of

statutory construction ... is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute."); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.").

This is not just a matter of statutory interpretation; it also has constitutional implications. In *Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1233 (10th Cir. 2004), the Tenth Circuit rejected a constitutional challenge to the DNCR. *Id.* As one relevant factor in finding that the DNCR is consistent with First Amendment principles, the Court noted that "the do-not-call registry targets speech that invades the privacy of the home, a personal sanctuary that enjoys a unique status in our constitutional jurisprudence." *Id.* at 1233. *See also id*. at 1245 ("[T]he [DNC] is narrowly tailored to restrict only speech that contributes to the problems the government seeks to redress, namely the intrusion into personal privacy and the risk of fraud and abuse caused by telephone calls that consumers do not welcome into their *homes*." (emphasis added)). The court's conclusions seem to presume that the DNCR excludes cell phones used outside of the home. This case is also instructive to the very factual scenario before this Court. A finding that the DNCR extends to a person's cell phone, and where such cell phone is publicly accessible to 351 employees at that person's place of employment and frequently contacted at all hours for work purposes (and further where the defendant was merely responding to a consumer's request for information), would raise serious First Amendment concerns if not be outright violative thereof.

QuoteWizard requests that the Court find that the DNC protections do not apply to Mantha's cell phone, whether because it is a cell phone or because it is non-residential.

B.      The Regulation Does Not Apply to Cell Phones Used for Work Purposes

Even if this Court concludes that a cell phone *can* qualify as "residential" within the meaning of the statute and regulation, the facts of this case prove that Mantha's cell phone does not so qualify.  Courts that have found "residential" to potentially include cell phones have concluded that plaintiffs have the burden to prove that the number at issue constitutes a residential line in the face of a summary judgment motion challenging the same where the phone at issue is a cell phone, not a home landline.  *See Lee v. Loandepot.com, LLC*, 2016 U.S. Dist. LEXIS 110100, at *16-18 (D. Kan. Aug. 17, 2016) (granting summary judgment where plaintiff failed to establish that his cellular number was used for residential purposes) ("The Court is not persuaded that Plaintiff has met his burden at summary judgment to overcome Defendant's motion. To prevail under 47 C.F.R. § 64.1200(c)(2), Plaintiff must establish that his cellular number is used for residential purposes."); *Stevens-Bratton v. Trugreen, Inc.*, 437 F. Supp. 3d 648, 655 (W.D. Tenn. Feb. 4, 2020) ("Courts have interpreted the 'residential telephone subscriber' element to require proof that the number called was used for 'residential purposes.'" (citing in part *United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1024 (C.D. Ill. 2014), vacated in part on other grounds, 80 F. Supp. 3d 917, 920 (C.D. Ill. 2015))).

Moreover, merely placing a number on the DNCR is not proof at the summary judgment stage that it is, in fact, a residential line entitled to DNC protections.  *See Stevens-Bratton*, 437 F. Supp. 3d at 657-58 (merely placing number on DNCR "is not enough to survive summary judgment"; the "determination about whether any particular wireless subscriber is a 'residential subscriber' is fact-intensive." (quotations and citation omitted)).[4]

---

[4] The FCC noted in its 2003 Order that further proof may be required pursuant to a fact-intensive inquiry to show that a wireless subscriber uses their wireless phone in a manner consistent with the definition of "residential."  *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14039 (July 3, 2003).

  — 

In making this determination, with the burden on the plaintiff to satisfy the element of the claim, courts look to the "facts and circumstances surrounding a particular case before deciding whether TCPA protection extended to a particular telephone number that was used for both business and residential purposes." *Blevins v. Premium Merch. Funding One, LLC*, 2018 U.S. Dist. LEXIS 183362, at *6, 2018 WL 5303973 (S.D. Ohio Oct. 25, 2018).[5] *See also Stevens-Bratton*, 437 F. Supp. 3d at 657-58 (it is a "fact-intensive" inquiry).

Here, the undisputed material facts show that Mantha used his cell phone nearly 24/7 for work purposes during the relevant time period in 2019. The evidence on this point is undisputed and overwhelming. Mantha's employer describes his job as providing "twenty-four hour administrative on-call consultation" in relation to the six group homes. SOF, ¶ 22. Mantha is responsible—both during his normal working hours and at all other times—for the health, safety, and welfare of 50-60 special needs students aged 12 to 21 who live on campus year-round. He is also responsible for the safety and staffing of 110 employees within the Residential Division, both during the work day and otherwise. Mantha is formally on call, via his cell phone, nearly *half the year* and informally on call via his cell phone the rest of the time. Mantha's cell phone is the best way to reach him during the day while he was at work and the *only* way to contact him when he was not at work at any other time. SOF, ¶¶ 1-77.

Mantha's cell phone records paint the picture of a person constantly fielding work calls at all hours of the day, over weekends, late into the night, and *even on holidays like Christmas*. There was no single time of year, perhaps with the exception of Mantha's personal vacations, that he was not fielding work calls to his cell phone. As representative examples:

---

[5] As explained *infra* Section II, courts also interpret this not only as a failure to satisfy an element to a DNC claim but also as a lack of standing to bring the claim. *See*, *e.g.*, *Shelton v. Target Advance LLC*, 2019 U.S. Dist. LEXIS 64713, at *15-18 (E.D. Pa. April 16, 2019). QuoteWizard argues both points herein based on the fact that Mantha's cell phone number was used 24/7 for work purposes.

- Mantha made or received at least 1,400 work calls on his cell phone in 2019;

- On January 19, 2019, a Saturday, Mantha received or made no fewer than nine (9) work calls to his cell phone, including three at 7:04 p.m., 10:25 p.m., and 10:37 p.m.;

- The next day, January 20, 2019, a Sunday, Mantha made or received no fewer than eighteen (18) calls starting at 8:10 a.m.;

- On March 18, 2019, Mantha made or received no fewer than twelve (12) work calls, including at 7:53 p.m., 8:33 p.m., 8:38 p.m., 9:49 p.m., and 11:07 p.m.;

- On March 28, 2019, Mantha fielded work calls nearly continuously from the first evening one at 5:14 p.m. through the (at least) twelfth (12th) call at 9:01 p.m. (in addition to daytime/afternoon calls);

- On May 6, 2019, Mantha made or received seven (7) evening (not including daytime/afternoon) work calls, starting at 6:57 p.m. and ending at 10:10 p.m.;

- On June 15, 2019, a Saturday, Mantha made or received no fewer than twenty-one (21) work calls from 9:33 a.m. to 1:59 p.m.;

- Mantha made or took work calls as early as 12:05 a.m. in the evening/morning and as late as 11:53 p.m. at night;

- ***On Saturday, July 13, 2019, Mantha took or received thirty-two (32) work calls, beginning at 10:05 a.m. and continuing to 11:31 p.m. at night;***

- ***The next day, Sunday, July 14, 2019, Mantha took or made no fewer than twenty-seven (27) work calls beginning at 12:05 a.m. and continuing until 9:42 p.m.;***

- On September 2, 2019, a holiday (Labor Day), Mantha received nine (9) work calls ending at 9:55 p.m.; and

- ***On Christmas day, December 25, 2019, Mantha fielded two work calls at night, at 9:03 and 9:13 p.m.***

*See* Ex. 9.

In addition, Mantha's cell phone number is his contact number in his employer's human resources file; any school employee who uses the "Ring Central" application on their phones will reach Mantha at his cell phone; Mantha receives a $30 per month cell phone reimbursement from

his employer for this cell phone usage; Mantha uses work e-mail on his phone; and he can forward calls from his work desk phone to his cell phone. SOF, ¶¶ 74-77.

In light of these undisputed material facts, Mantha cannot genuinely argue that his cell phone is "residential." He cannot genuinely claim that he has a reasonable expectation of privacy on his cell phone in his home or otherwise commensurate with a residential line. Mantha can be called anywhere, anytime, by any Perkins School employee (including any of the 110 employees in the Residential Division whom he oversees or 351 of the total employees) concerning work. In fact, he *was* called at all hours of the day, night, and weekend by Perkins School employees for work purposes in 2019. This is *exactly* analogous to the way that a hospital doctor uses a pager service: 24/7 availability and the ability to be contacted anywhere, anytime, in connection with work. It would be an absurd interpretation of the TCPA to conclude that Mantha is entitled to the protections of the DNC protections applicable to residential subscribers in connection with this cell phone just because he *also* uses it for some undefined personal (not residential) use. *See Worsham v. Disc. Power, Inc*., 2021 U.S. Dist. LEXIS 1931, at *9-12 (D. Md. Jan. 6, 2021) ("Regardless of whether the … number is primarily used by Worsham for residential purposes, the number is also used for business, and business numbers are not permitted to be registered on the DNC registry.") (dismissing DNC claim where, although plaintiff also used cell phone for personal purposes, the number was publicly listed on PACER in connection to a law firm).

For these reasons, the Court should conclude that Mantha has failed to meet an essential element of his claim because his cell phone does not qualify as a residential line. *See Bank v. Indep. Energy Grp. LLC*, 2015 U.S. Dist. LEXIS 96532, at *4-5, 2015 WL 4488070 (E.D.N.Y. July 23, 2015) (granting summary judgment for defendant where plaintiff provided his "number on his business card, professional letterhead for his law practice, and in pleadings and court

filings, and he provides it to clients, prospective clients, other attorneys, and business contacts"); *Shelton v. Target Advance LLC*, 2019 U.S. Dist. LEXIS 64713, at *15-18, 2019 WL 1641353 (E.D. Pa. Apr. 16, 2019) (finding that plaintiff's cellphone was business phone despite being registered on DNCR and being used for both personal and business (a judgment collection business) use) ("[Plaintiff's] Phone Number is also for business use, and business numbers are not permitted to be registered on the National Do Not Call Registry. … [B]ecause Plaintiff held the Phone Number out to the world as a business phone number, he could not register it on the National Do Not Call Registry.").

## II.    Mantha Lacks Article III and Prudential Standing

The undisputed material facts of this case also establish that Mantha lacks both Article III standing and prudential standing for his remaining DNC claim.

Every plaintiff in federal court must establish that he has standing to assert his claim, *i.e.*, that he is entitled to have the court decide the merits of the dispute. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).  Federal courts apply two distinct but related standing analyses: constitutional standing and prudential standing.  *See, e.g.*, *Swearingen-El v. Cook Co. Sheriff's Dept.*, 456 F. Supp. 2d 986, 989 (N.D. Ill. 2006).  "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendants, … and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982) (quotation and citation omitted).  "Article III standing requires a concrete injury even in the context of a statutory violation."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549, 194 L. Ed. 2d 635 (2016).  "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff

automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 1549.

Prudential standing, on the other hand, "stems not from the Constitution but from prudent judicial administration … [A] court may decide that in certain instances policy militates against judicial review." *Swearingen-El*, 456 F. Supp. 2d at 990.  A party lacks prudential standing if he asserts an injury outside the "zone of interests" a given statute was designed to protect. *Valley Forge*, 454 U.S. at 474-75.[6]

Here, the undisputed material facts show that Mantha was not a consumer who was genuinely injured by unsolicited communications and seeking to redress those injuries but rather that he attempted to manufacture liability through the help of a friend and his friend's lawyer by inducing QuoteWizard into a conversation.  Mantha's wife testified that they frequently received unsolicited communications and found them "silly."  Not once had they ever filed a demand for money or lawsuit based on those.  But when Novia apprised Mantha of his TCPA demand to recover money, Mantha then engaged with QuoteWizard shortly afterwards, with Novia's (and, indirectly, Novia's lawyer's) help, to set QuoteWizard up for liability.  SOF, ¶¶ 78-82, 122-128, 136-143.  Mantha was so obviously unbothered by the text messages to which he willingly responded ("How do I get a quote?" for example) that he never even told his wife about the messages or that he had filed this putative class action lawsuit until many months after filing it. *Id.*, ¶¶ 136-138.

---

[6] For prudential standing, a court must "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014). If a plaintiff's interests "are so marginally related to or inconsistent with the purposes implicit in the [TCPA] that it cannot reasonably be assumed that Congress intended to permit the suit," they lack prudential standing. *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 805 (W.D. Pa. 2016).

In an analogous case, *Garcia v. Credit One Bank, N.A.*, 2020 U.S. Dist. LEXIS 136881, at *6-10 (D. Nev. July 31, 2020), the court found that the plaintiff lacked both Article III and prudential standing with respect to his TCPA claim; he did not "suffer[] from the harm that Congress intended the TCPA to address." *Id*. at *7. For example, and with Mantha, the plaintiff in *Garcia* was "familiar with the mechanics of a TCPA claim" (Mantha, through Novia); "knew that if he instructed [defendant] at any time during one of these calls to cease calling him, [it] would have likely complied"; but "[i]nstead of taking the steps necessary to stop the alleged injury (the unwanted calls), ***he took steps to allow the continuance of the injury while building a record to facilitate a later claim***." *Id*. at *7-8 (emphasis added). In other words, it was (as here) "part of a scheme to generate revenue." *Id*. at *8. *See also Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 805-06 (W.D. Pa. 2016) (plaintiff who purchased prepaid cellphones hoping to receive messages violative of the TCPA—as part of a business to recover statutory damages—was not within the "zone of interests" of the statute) ("Plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the [TCPA] that it cannot reasonably be assumed that Congress intended to permit the suit.").

Like the plaintiff in *Garcia*, Mantha had been taught/coached about TCPA demands; willingly engaged with QuoteWizard; did not ask for the conversation to stop; but rather "took steps to allow the continuance of the [conversation] while building a record to facilitate a later claim." *Garcia*, 2020 U.S. Dist. LEXIS 136881, at *7-8. Mantha's intent to manufacture a claim to make money is made further clear by the fact that, only eight days after the last text message, Mantha had retained Novia's lawyer, who then almost immediately served a demand for money on QuoteWizard. Novia later acted as a go-between for Mantha and the lawyer, instructing Mantha to "get paid" and that the money was life-changing. Mantha never bothered to actually ask QuoteWizard to stop contacting him because he did not want QuoteWizard to

stop contacting him; he wanted to create a record to recover money with the advice of Novia. Like in *Stoops*, Mantha's "interests are so marginally related to or inconsistent with the purposes implicit in the [TCPA] that it cannot reasonably be assumed that Congress intended to permit the suit." *Stoops*, 197 F. Supp. 3d at 805-06.

To be clear, QuoteWizard is <u>not</u> arguing that any consumer who receives allegedly unsolicited communications and then files suit lacks standing because they are litigious. Rather, a person cannot *actively manufacture* a TCPA claim in the manner Mantha so clearly did here and then recover for alleged (but non-existent) damages. Mantha's actions and intent created or at least altered the course of the communications at issue; he not only was advised of the scheme by Novia prior to receiving the texts but was actively advised by Novia and Attorney Washkowitz during the course thereof. There was no concrete injury and he is outside of the TCPA's zone of interests.

Further stripping Mantha of standing to pursue his claims is the fact that, as discussed *supra*, the cell phone at issue was constantly used by Mantha for work purposes. As in *Shelton*, 2019 U.S. Dist. LEXIS 64713, at *15-16, Mantha lacks prudential standing to pursue claims for residential subscribers when his cell phone is used constantly in connection with his employment. *See id*. ("Plaintiff does not have standing to bring claims predicated on … prohibition against sales calls to telephone phone numbers listed on the National Do Not Call Registry. The Phone Number is also for business use, and business numbers are not permitted to be registered on the National Do Not Call Registry.").[7]

---

[7] Plaintiff abuses of the TCPA have become so rampant that courts have allowed defendants to counterclaim for fraud (allowing those claims at least past the pleadings stage) in TCPA cases where there is evidence (similar to here) that the plaintiff engaged in a scheme to make money. *See, e.g.*, *Franklin v. Upland Software, Inc.*, 2019 U.S. Dist. LEXIS 16938, at *10-13 (W.D. Tex. Feb. 1, 2019), report and recommendation adopted, 2019 U.S. Dist. LEXIS 118312 (W.D. Tex. Mar. 12, 2019) (denying plaintiff's motion to dismiss defendant's counterclaims alleging that plaintiff committed fraud by nondisclosure

As the U.S. Supreme Court recently held in *TransUnion LLC v. Ramirez*, __ S.Ct. ___, 2021 U.S. LEXIS 3401, at *40, 2021 WL 2599472 (2021), "No concrete harm, no standing"— regardless of whether the predicate statute (here, the TCPA) contemplates inherent harm in a violation thereof.  Even putting aside the clear fact that Mantha manufactured his claim, and even if he had not, he cannot rest on a mere alleged violation of the TCPA alone.  Importantly, the Court made clear that, "under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *Id*. at *21.  Mantha has to date produced no evidence of a non-conclusory concrete harm resulting from an alleged TCPA violation, and his own testimony and that of his wife make abundantly clear that he never actually suffered any injury in fact.[8]  An alleged injury in law is insufficient to confer Article III standing, particularly where the burden is on Mantha to establish his standing in this Court.  *See id*. at *25 ("As the

because he had "intimate knowledge of the TCPA, and therefore, had a duty to speak by opting out of the text messages and failed to do so to induce Upland's client to continue to send Franklin text messages"); *Cunningham v. USA Auto Prot., LLC*, 2021 U.S. Dist. LEXIS 3446, at *7-13 (E.D. Tex. Jan. 8, 2021), report and recommendation adopted, 2021 U.S. Dist. LEXIS 23716 (E.D. Tex. Feb. 8, 2021) (denying plaintiff's motion to dismiss defendant's counterclaims alleging fraud where plaintiff was a "professional litigant" who has filed at least 130 TCPA lawsuits and has a duty to disclose his wish to not receive automated phone calls or to take action to "press '2'" so that he may be added to a do not call list).

[8] Mantha may attempt to submit a self-serving statement that he suffered some vague invasion of privacy or similar alleged injury resulting from the text messages.  Such self-serving statements, however, are legally insufficient to overcome all of the evidence that he was not actually injured—particularly, the undisputed evidence that he solicited further contact from QuoteWizard to later serve a legal demand and get "paid" and never complained about the text messages to anyone, including his wife.  *See*, *e.g.*, *Stevens-Bratton*, 437 F. Supp. 3d at 657 (declaration from plaintiff in opposition to summary judgment motion was "not corroborated, but is contradicted, by the undisputed material fact"; "[e]vidence of something more is required to meet" a summary judgment motion).  *See also Whitley v. Spencer Cty. Police Dep't*, 178 F.3d 1298, 1999 WL 196499, at *3 (6th Cir. 1999) (unpublished) (affirming district court's grant of summary judgment to defendant where the evidence at the close of discovery contradicted plaintiff's self-serving affidavits and conclusory allegations).  Otherwise, any putative TCPA plaintiff can pass muster by simply claiming (without any legitimate support) that their privacy was invaded and they have suffered an injury in fact.  This would result in the exact outcome that the Court prohibited in *Ramirez*—that "if the law of Article III did not require plaintiffs to demonstrate a 'concrete harm,' Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law. Such an expansive understanding of Article III would flout constitutional text, history, and precedent." *Ramirez*, 2021 U.S. LEXIS 3401, at *23.

party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing."). For these reasons, Mantha's remaining claim should be dismissed for lack of standing.

### III.    QuoteWizard Did Not Make Telephone Solicitations

To sustain his DNC claim, Mantha must establish that he received two telephone solicitations from QuoteWizard. *See* 47 U.S.C. § 227(c)(5). The regulation at issue prohibits "telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call." 47 C.F.R. § 64.1200(c)(2). In turn, the TCPA defines "telephone solicitation" to mean "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4).

Both the content of the text messages themselves, and other undisputed, extrinsic evidence concerning the broader purpose of the conversation, proves that QuoteWizard did not make any solicitations to Mantha. In the first instance, the text messages qualify as "transactional communications" that are exempt from being deemed advertisements/telemarketing/telephone solicitations. *See Absolute Health Ctr., Inc. v. Multiplan, Inc.*, 2016 U.S. Dist. LEXIS 187496, at *8, 2016 WL 7868822 (D. Colo. Sep. 23, 2016) (the FCC has determined that "transactional communications" to "facilitate, complete, or confirm a transaction that the recipient" has agreed to do not constitute unsolicited advertisements for purposes of the statute). *See also In re Rules & Regs. Implementing the Tel. Consum. Prot. Act of 1991*, 21 FCC Rcd 3787, 3812 ¶ 49 (Apr. 5, 2006) (messages "whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements."); *Aderhold v. car2go N.A. LLC*, 2016 U.S. App. LEXIS 16596, at *2-3, 2016 WL 4709873 (9th Cir. Sep. 9, 2016)

(unpublished) (affirming finding that text message at issue did not encourage the purchase, rental, or investment of or in property, goods, or services; "Car2go's message contains no content encouraging purchase of car2go services. The message was directed instead to completing the registration process initiated by Aderhold and to validating personal information. We follow the FCC's determination that such messages … are not advertisements." (citing 2006 FCC Order, *supra*)); *An Phan v. Agoda Co.*, 351 F. Supp. 3d 1257, 1262-65 (N.D. Cal. 2018) (texts messages were transactional communications, not telemarketing that encouraged the purchase/sale of services or goods).

The undisputed record evidence shows that QuoteWizard responded to a request for auto insurance linked to Mantha's contact information solely to complete that request.  Regardless of the fact that Mantha contests whether he consented (which is disputed between the parties), his dispute over consent does not transform the nature or intent of the communications.  They were, and remain, transactional communications sent only to Mantha and designed to specifically respond to a request for an auto insurance quote and to provide that quote.  *See* Ex. 17 ("Hey, it's Amanda following up. When's a good day for us to talk Joe? You requested a quote on auto insurance. Message me if you're still interested!"; "Joe, Amanda from QuoteWizard here, with one final follow up. Get the auto insurance info you requested? We are just a quick call away!").  As such, the communications do not constitute telephone solicitations pursuant to the FCC's clear guidance.  *See also In re Rules & Regs. Implementing the Tel. Consum. Prot. Act of 1991*, 21 FCC Rcd 3787, 3812 ¶ 49 (Apr. 5, 2006) (messages "whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements.").

To the extent the Court disagrees that they were exempted transactional communications, more broadly, *none* of the messages encouraged the purchase/rental/investment of or in property,

goods, or services.  Rather, QuoteWizard at all times was attempting to set up a phone call to provide *an auto insurance quote* to Mantha.  At no point did QuoteWizard directly or indirectly suggest that Mantha should purchase goods or services from QuoteWizard or anyone else.  *See* Ex. 17.  The Court's inquiry begins and ends with the messages themselves.  *See*, *e.g.*, *Salmon v. CRST Expedited, Inc*., 2015 U.S. Dist. LEXIS 37560, at *14-15 (N.D. Okla. Mar. 25, 2015) (in considering whether communication was telemarketing, rejecting plaintiff's reliance on "information gathered from external sources"; "[t]he call itself does not propose a commercial transaction and it does not even indirectly suggest that the recipient of the call should purchase goods or services from [defendant].").

If the Court considers extrinsic evidence outside of the text messages, that does not detract from the conclusion that the messages were not solicitations.  QuoteWizard does not sell insurance to consumers.  Moreover, QuoteWizard sold Mantha's lead to GEICO Insurance *so that GEICO Insurance could provide him a quote*.  QuoteWizard is paid a flat fee for leads sold to GEICO and does not represent that a lead will result in a sale of insurance.  The entire transaction is premised on the sharing of insurance quotes and information.  To the extent that a consumer, Mantha included, would then take that information to later purchase insurance, from GEICO or someone else, as a result of his own actions, that is a completely separate transaction divorced from the text messages.  SOF, ¶¶ 144-150.

The mere fact that QuoteWizard or other companies minimally profited from the sale of Mantha's lead is immaterial to whether QuoteWizard's text messages were telephone solicitations.  "[T]he potential to gain some benefit from sending information, without the presence of additional commercial statement in the message, is insufficient to transform an informational message to an advertisement. The appropriate inquiry under the TCPA is not whether there is some ancillary commercial benefit to either party, but whether the message is an

advertisement which tends to propose a commercial transaction." *Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc.*, 2013 U.S. Dist. LEXIS 15952, at *13, 2013 WL 486207 (D.N.J. Feb. 6, 2013).  *See also Katz v. Focus Forward LLC*, 2021 U.S. Dist. LEXIS 66861, at *2, 8-10 (S.D.N.Y. April 6, 2021) (where defendant sent faxes seeking plaintiff to complete market research surveys, which defendant would use to collect information to sell to its clients, faxes were not advertisements relating to property, goods, or services) (faxes did not offer to sell anything or promote defendant's services; "mere fact that [d]efendant will profit from survey responses … does not transform [faxes] into advertisements.").

Nor is it relevant that GEICO could have later offered or sold auto insurance to Mantha (although it did not).  QuoteWizard would not have been involved in or compensated for that transaction.  That transaction, if it had occurred (it did not), would have been too attenuated from QuoteWizard's attempt to complete Mantha's request for a quote to be relevant here.  *See Daniel vs. Five Stars Loyalty, Inc.*, 2015 WL 7454260, at *4 (N.D. Cal Nov. 24, 2015) (where plaintiff gave contact information to restaurant after inquiring about rewards program and received text about the same, no encouragement of purchase of goods) ("To the extent that it could be reasonably inferred … that the text's purpose was also to encourage future purchases … that purpose is simply too attenuated to make the text telemarketing … [T]he text … could result in an increase in the chances of Daniel making future purchases … But Daniel cites no authority indicating that this degree of connection between communication and purchase is sufficient to transform a text of the sort he received into a telemarketing message."); *Suttles v. Facebook, Inc.*, 461 F. Supp. 3d 479, 483-84 (W.D. Tex. 2020) (unsolicited text messages sent to the plaintiff urging him to log-on to Facebook were not solicitations even though plaintiff claimed that the defendant would benefit from him logging on by selling his data; any link between the messages and that alleged profit was too weak and attenuated to transform the messages into solicitations).

Putting aside the transactional nature of the text messages that automatically exempts them (*see supra*), this case is analogous to *Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1067 (C.D. Cal. 2017).  There, the court considered calls whereby the defendant Blue Shield "notified recipients that they should have received information about changes to their insurance plan, encouraged them to seek out information about their plan by examining the information packet and visiting Blue Shield's website, and directed them to call the member service number (as opposed to the sales department) to resolve any questions or issues." *Id*. at 1066.  The court described this as an "informational" call.  *Id*.

The plaintiff in *Smith* pointed to evidence that the defendant's goal of the calls was to direct customers to Blue Shield's member renewal tool, which allowed consumers to compare their current plan with various Blue Shield alternatives.  But the court noted that the "renewal tool was purely informational—if customers 'wanted to switch plans or purchase a plan [they] would have to access a different portion of the website.'" *Id*. at 1067.  The "mere fact that … consumers [could] engage in commerce" on other parts of the website did not turn the call into telemarketing or advertising.  *Id*.  As such, a call to provide information to be used to evaluate insurance plans (similar to the information about auto insurance quotes QuoteWizard was trying to relay to Mantha) was purely informational even if it could be used to later complete a commercial transaction.  *See id*.

On a broader scale, the court noted that "[i]f the Court accepted Plaintiff's argument, nearly all innocuous, customer-friendly and informative gestures would be needlessly transformed into telemarketing and advertising." *Id*. at 1068.  "Evaluating Blue Shield's call with a measure of common sense, the Court must conclude that the call is not telemarketing or advertisement …. It makes no sense to the Court that a single call tracking Blue Shield's

mandatory communications regarding insurance enrollment and renewal would expose Blue Shield to millions of dollars of liability under the TCPA." *Id.*

The Court should reach the same conclusion here. Mantha likewise seeks millions of dollars from QuoteWizard in this putative class action based on QuoteWizard's attempt to provide him the very information that was requested. QuoteWizard had no product to sell and never solicited Mantha. Simply put, based on the undisputed facts and the applicable standard, QuoteWizard did not make any telephone solicitations to Mantha.

### IV.    QuoteWizard Reasonably and in Good Faith Relied on Proof of Consent

QuoteWizard purchased Mantha's lead from RevPoint with a contractual guarantee that the lead had TCPA-compliant consent; that the lead otherwise complied with all applicable laws; and that RevPoint could provide conclusive proof of consent at QuoteWizard's request.[9] RevPoint and Plural Marketing Solutions, Inc. (which sold the lead to RevPoint) both testified under oath that they understand and believe that Mantha consented. Mantha never responded to the text messages by asking how QuoteWizard got his number, by requesting that QuoteWizard stop texting him (which it would have immediately honored), or by doing or saying *anything* that was consistent with someone who had not consented. Mantha affirmatively asked "How do I get a quote?" and solicited a date and time for a phone conversation. *See* Ex. 17.

In light of these undisputed material facts, QuoteWizard is not liable under the TCPA in the event that Mantha actually did not consent (which QuoteWizard denies and contests) because it reasonably relied in good faith on all of the objective evidence that he did in fact consent. In *Sandoe v. Boston Sci. Corp.*, 2020 U.S. Dist. LEXIS 2800 (D. Mass. Jan. 8, 2020), Judge Gorton granted summary judgment for the defendant on the same "reasonable reliance" defense. *Id.* at

---

[9] As used herein, "consent" means and includes the consent exemption for a DNC claim, as defined in 47 C.F.R. § 64.1200(c)(2)(ii) and applicable to Mantha's remaining claim. *See id.* (no liability for DNC claim if defendant has "obtained the subscriber's prior express invitation or permission.").

*10-14.  There, the defendant had called the plaintiff but intending to call a patient who had given the same number and consented to be contacted; at some point before the calls, the number had been reassigned to the plaintiff.  *Id*. at *3-4.  The defendant contended that it could not be held liable under the TCPA because "when [it] called plaintiff's number, it reasonably relied on the consent it had previously obtained from … the intended recipient."  *Id*. at 10.

Accepting this argument and rejecting plaintiff's counter-argument that "reasonable reliance is not a valid defense under the TCPA," and while acknowledging that such defense cannot be found in the statute's text and courts are split on the issue, Judge Gorton noted that the "FCC has interpreted the TCPA not to require the impossible of callers, such as knowing that a number has been reassigned."  *Id*. at *11-12.  Judge Gorton reasoned that:

> Although the text of the TCPA does not provide for reasonable reliance, this Court finds persuasive the FCC's order emphasizing that the TCPA does not require the impossible of callers. It is unclear what else, if anything, Boston Scientific could have done to ensure the numbers of the clinic patients had not been reassigned. … Boston Scientific reasonably relied on its partner clinics to provide an invitee list of current patients who had provided their contact information for health-care-related events and services.

*Id*.

The same reasoning applies here.  Even crediting for the moment Mantha's allegation that he did not provide the disputed consent,[10] each and every lead that QuoteWizard purchases must come with TCPA-compliant consent.  QuoteWizard reasonably relied on RevPoint's contractual "guarantee" that Mantha had consented within the meaning of the TCPA to be contacted by QuoteWizard for an auto insurance quote.  In fact, every company that bought and sold Mantha's lead was under a contractual promise to comply with the TCPA.  Moreover,

---

[10] QuoteWizard maintains that Mantha provided the disputed consent and does not waive, but in fact expressly preserves, that affirmative defense. QuoteWizard's reasonable reliance defense does not depend on the validity of the disputed consent, however.

QuoteWizard required each and every lead to have a further verification of consent in the form of a Jornaya LeadiD, and Mantha's lead was sold to QuoteWizard with a Jornaya LeadiD attached.

Further, at the time Mantha was contacted, he did not opt out *but expressly solicited a quote and a phone call to discuss the same*.  In light of all of these factors, QuoteWizard reasonably relied on the fact of Mantha's consent before and while contacting him.  The TCPA did not require the impossible of QuoteWizard, *i.e.* to discern that Mantha would later claim *after* the voluntary conversation with QuoteWizard that he had not in fact consented.  *See Danehy v. Time Warner Cable Enters.*, 2015 U.S. Dist. LEXIS 125325, at *15-17 (E.D.N.C. Aug. 6, 2015) ("Even assuming that the prior express consent of TWC's Customer did not operate as consent by plaintiff, it is undisputed that defendant believed in good faith not only that it did have consent to call the … number, but also that the calls were being made for a service TWC's Customer had requested. Moreover, defendant acted reasonably based on its good faith belief. … Under the circumstances presented, defendant's good faith belief that it had consent to call the [] number would make imposition of liability under [the TCPA] unjust."), report and recommendation adopted by 2015 U.S. Dist. LEXIS 125053 (E.D.N.C. Sep. 18, 2015); *Chyba v. First Fin. Asset Mgmt.*, 2013 U.S. Dist. LEXIS 165276, at *32-33, 2013 WL 6880237 (S.D. Cal. Nov. 20, 2013) ("[A]lthough Plaintiff did not give consent directly to Defendant to call her cell phone number, it is sufficient that Defendant had a good-faith basis to believe that Plaintiff had provided consent to the creditor on whose behalf Defendant sought to collect a debt. Even if Plaintiff is correct in stating that she never gave Defendant or Enterprise consent to call, and there was no actual prior consent from Plaintiff, Defendant is not liable for acting in good faith upon the information provided to it.").

**CONCLUSION**

Congress did not intend for the TCPA to extend to a person who, interested in and curious about using the TCPA as a money-making scheme, manufactures and perpetuates an interaction with a company trying to provide information as requested. There must be some rational, common sense limit to the statute lest it violate Congressional intent, constitutional principles, and principles of fairness and justice. That limit is met here. Mantha's remaining claim should not survive in light of the undisputed material facts presented with this Motion, for all of the reasons stated herein.

<div style="margin-left: 40%;">

Respectfully submitted,

QuoteWizard.com, LLC,
By its attorneys,

*/s/ Kevin P. Polansky*
Kevin P. Polansky (BBO #667229)
kevin.polansky@nelsonmullins.com
Christine M. Kingston (BBO #682962)
christine.kingston@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
(t) (617)-217-4700
(f) (617) 217-4710

</div>

Dated: July 14, 2021

<u>CERTIFICATE OF SERVICE</u>

I, Kevin P. Polansky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: July 14, 2021                    */s/ Kevin P. Polansky*