**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOSEPH MANTHA, *on behalf of himself and all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>QUOTEWIZARD.COM, LLC,<br><br>    Defendant. | Civil Action No. 1:19-cv-12235-LTS |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**
**SUBMITTED PURSUANT TO LOCAL RULE 56.1**

Defendant QuoteWizard.com, LLC ("QuoteWizard") submits this statement of undisputed material facts in support of its Motion for Summary Judgment on Plaintiff Joseph Mantha's ("Mantha") remaining claim, Count II, of his Amended Complaint, pursuant to Local Rule 56.1.

**UNDISPUTED MATERIAL FACTS**

**I.    Mantha's Use of his Cell Phone for Business/Employment Reasons**

*A.  Perkins School; Mantha's Job Generally*

1.    Mantha's cell phone number at issue is XXX-XXX-9690 (hereinafter, "cell phone" or "Mantha's cell phone").  *See* Exhibit 1 to Affidavit of Counsel - *Copies of Mantha's Cell Phone Call Records for January 1, 2019 through December 28, 2019.*

2.    At all times relevant to this action, Mantha has been employed as Director of Residential Services at the Doctor Franklin Perkins School ("Perkins School").  *See* Exhibit 2 to

Affidavit of Counsel - *Deposition Transcript of Derek Padon (condensed)* ("Padon Tr."), p. 17:12-14.

3.    Perkins School has three special education schools: an elementary, middle, and high school, totaling about 100 students across the three schools.  *See* Padon Tr., pp. 7-8.

4.    Of the approximately 100 students across the three schools at Perkins School, between 50 and 60 of those students stay "on campus with [the Perkins School] in a residential group home setting" (hereinafter, "Residential Students").  *See* Padon Tr., p. 8:5-8.

5.    The Residential Students range in age from 12 to 21, and "age out" at 22.  *See* Exhibit 3 to Affidavit of Counsel - *Transcript of First Deposition of Joseph Mantha* ("Mantha Tr. I"), p. 18:13-15.

6.    The Residential Students, who come from different states within New England, have "special education needs," meaning "generally behavioral needs or social and emotional well-being needs."  Padon Tr., pp. 46-47.  *See also* Mantha Tr. I, p. 14:2-3 (whereby Mantha describes it as "special education" school).

7.    The Residential Students live in six "group homes" situated across a campus akin to a "small college campus," with five homes situated next to each other and the last one across the street, with about ten students in each group home.  *See* Padon Tr., pp. 9-10.

8.    The residential division of the Perkins School, and ultimately Mantha, is in charge of the six group homes where the Residential Students live.  *See* Padon Tr., p. 11:13-18.  *See also* Mantha Tr. I, p. 14:6-7.

9.    The school year at the Perkins School is year-round, even through the summer, with only a few breaks for school vacations.  *See* Padon Tr., p. 8:9-20.

10.     No staff members reside in the group homes with Residential Students or on campus, but the students are supervised by staff at all times.  *See* Padon Tr., p. 10:9-14; *id*., p. 15:10-12.

11.     During the day, most of the Residential Students are usually at school programs in other buildings on campus, but will occasionally stay back at their group homes, requiring supervision by staff there, including "residential counselors."  *See* Padon Tr., p. 14:21-21.

12.     The residential counselors are staffed at the group homes for Residential Students in shifts: a 2 p.m. to 10 p.m. shift (with a shift supervisor), and the "evening shift" from 10 p.m. to 8 a.m. with "night awakes," i.e. residential counselors who are required to be awake while the Residential Students are sleeping and who are managed by a night administrative supervisor for each group home.  *See* Padon Tr., pp. 14-15.

13.     Each group home is staffed by three to four staff members per group home, plus a shift supervisor, and each group home has its own program director.  *See* Padon Tr., pp. 15-17.

14.     The six program directors for the six group homes report to Mantha only as Director of Residential Services.  *See* Padon Tr., p. 17:12-14.

15.     The Residential Division includes approximately 110 employees in total, including "residential counselors, shift supervisors, nursing, clinicians, admin assistants," all of whom Mantha ultimately oversees.  *See* Padon Tr., 42:12-22.  *See also id*., pp. 43-44.

16.     There are 351 employees of the Perkins School total.  *See* Padon Tr., p. 42:7-8.

17.     On a day-to-day basis,  Mantha "oversees … the group homes," meaning "98 percent of what [Mantha] is doing [for his job] is all related to … what happens in the residential services division with families, with parents, with the staff and hiring."  Padon Tr., p. 45:6-18.

18.    Mantha's general work day is "sometime during the day" but "depending on emergencies on what is going on you could get calls in the evening or weekends. Or he may come in on weekends or evenings."  Padon Tr., p. 52:2-14.  *See also* Exhibit 4 to Affidavit of Counsel - *Transcript of the Second Deposition of Mantha* ("Mantha Tr. II"), pp. 20-21 (whereby Mantha describes typical hours in a workweek at the relevant time period in 2019 as 8 a.m. to 4 p.m. or 9 a.m. to 5 p.m.).

19.    In a normal workday pre-COVID, Mantha would spend about half of the workday outside of his physical office at the school.  Mantha Tr. II, pp. 48-49.

20.    It would be easier for staff to "track [him] down on his cell phone" rather than his desk phone at the school during the day.  Mantha Tr. II, pp. 48-49.

*B.  Mantha On Call Essentially 24/7*

21.    Mantha is "informally on call" at all times, meaning "you have to be generally available" for anything regarding Residential Services.  *See* Padon Tr., p. 71:10-18 (whereby Perkins School representative agrees with that characterization).

22.    The Perkins School job posting for Mantha's job explains that the Director of Residential Services, among other things, "[p]rovides twenty-four hour administrative on-call consultation to the program administrators."  *See* Exhibit 5 to Affidavit of Counsel - *Perkins School Job Posting for Director of Residential Services*.

23.    The Perkins School Residential Division has "Residential On-Call Schedule[s]" for the group homes.  *See* Exhibit 6 to Affidavit of Counsel - *Perkins School On-Call Schedules*.

24.    The On-Call Schedule for January - March 2019 reflects that Mantha was one of two administrative on-call contact persons for that time period.  *See* Ex. 6.

4

25.     For January through March 2019, Mantha (listed as "Joe M") was the designated "Admin. On-call" contact for 9 (or more than half) of 15 time periods listed (which appear to include end of week/weekend and holiday dates).  *See* Ex. 6 (listing Mantha as designated administrative on-call contact for January 4-6; January 18-20; January 21; February 1-3; February 15-17; February 18; March 1-3; March 15-17; and March 29-31).

26.     The On-Call Schedule for April 5 – June 30, 2019 reflects that Mantha was again one of two administrative on-call contact persons for that time period.  *See* Ex. 6.

27.     In addition, the only contact number or information listed for Mantha is his cell phone number.  *See id.*

28.      For April through June 2019, Mantha (listed as "Joe M" or "Joe M.") was the designated "Admin. On-call" contact for 9 (or more than half) of 16 time periods listed.  *See* Ex. 6  (listing Mantha as designated administrative on-call contact for April 12-14; April 26-28; May 10-12; May 24; May 25; May 26; May 27; June 7-9; and June 21-23).

29.     The On-Call Schedule for July – October 2019 reflects that Mantha was again one of two administrative on-call contact persons listed on the Schedule and the only contact information provided is his cell phone number.  *See* Ex. 6.

30.     The July – October 2019 Schedule reflects that, for the 27 time periods designated on the Schedule, Mantha (listed as "Joe M" or "Joe M.") was the designated "Admin. On-call" contact for 14 (or more than half) of those.  *See* Ex. 6 (listing Mantha as designated administrative on-call contact for June 21-23; "July 5 @ 5, 6, 7"; July 12-14; July 19-21; August 9-11; August 23-25; September 6-8; September 20-22; October 4-6; October 11; October 12; October 13; October 14; and October 25-27).

31.    For January through October 2019, Mantha was the designated administrative on-call contact, via his cell phone, for roughly half that time period.  *See* Ex. 6.

32.    If the Perkins School staff member who is on call "can't handle what's happening then they call [Mantha]."  *See* Exhibit 7 to Affidavit of Counsel - *Deposition Transcript of Melisa Mantha (condensed)* ("Melisa Mantha Tr."), p. 27:20-23.

33.    In addition, for any "major emergency" involving the Residential Services division, the "first call would probably be to Joe [Mantha]."  Padon Tr., pp. 71-72.

34.    This includes anything relating to the Residential Students' well-being, or relating to a staffing issue such as a night or weekend sick call to replace a staff member.  *See* Padon Tr., p. 72.

35.    If a "student r[a]n away … [Mantha] would be notified right away and possibly, depending on the circumstances, have to come on site and intervene in some way."  Padon Tr., p. 72:18-23.

36.    In fact, a student ran away in 2018 and Mantha was called with respect to that incident.  Padon Tr., pp. 72-75.

37.    Mantha's wife recalls a few incidents of students running away, describing them as emergencies for which Mantha was called.  *See* Melisa Mantha Tr., p. 28:5-25 ("[K]ids run away occasionally so there's probably been several instances.").

38.    Examples of other emergency events that occur are "psychiatric emergencies [where] kids become so dysregulated that they need to be evaluated. They go to an ER.  That stuff in the evening goes through the on call. Typically there is a precursor to it. A bigger event, an incident, you know, an assault or a restraint or something of that nature that triggers a psychiatric emergency, where they would go to be evaluated."  Mantha Tr. II, pp. 34-35.

39.     In addition, "a lot of staff get injured in accidents," which can be critical events requiring a call to Mantha.  Mantha Tr. II, pp. 48-49.

40.     Staff members have access to/know Mantha's cell phone number.   Mantha Tr. I, p. 21:13-16.

41.     That includes the 11 administrators "that work for [Mantha]."  *See* Mantha Tr. I, p. 24:7-15 ("I have 11 administrators that work for me and I'm pretty sure they know how to get in contact with me [after hours].").

42.     Mantha has "seven direct reports" underneath him at the Perkins School—"six directors and the overnight administrator."  Mantha Tr. II, p. 22:15-20.

43.     All of these direct reports have Mantha's cell phone number for use after Mantha leaves the Perkins School for the day, and Mantha has theirs.  Mantha Tr. II, pp. 23-24.

44.     Mantha also believes that nursing staff has his cell phone number.  Mantha Tr. II, p. 24:15-17.

45.     In addition, five "coordinators" who man the on-call numbers could also contact Mantha's cell phone during off hours, in addition to an assistant night awake administrator. Mantha Tr. II, pp. 30-31.

46.     "[I]f something reaches what we call like a critical -- so somebody goes to the hospital, a runaway, something major, police involvement, something big -- they would contact [Mantha] or the chief operating officer."  Mantha Tr. II, p. 25:3-7.

47.     Mantha admits to receiving critical work calls to his cell month every month, about 15 times per month.  Mantha Tr. II, pp. 25-26.

*C. Mantha Receives Cell Phone Reimbursement for Work Use of Phone*

48.    Perkins School does not issue any work-owned cell phones to employees.  *See* Padon Tr., pp. 57-58.  *See also* Mantha Tr. II, p. 26:4-6.

49.    Perkins School has a policy whereby an employee who has an "authorized need for mobile device services" can receive a $30 monthly reimbursement towards cell phone usage from the School. *See* Padon Tr., pp. 59-60; *id.*, p. 80:7-9.  *See also* Exhibit 8 to Affidavit of Counsel - *Perkins School Cell Phone Reimbursement Policy.*

50.    Mantha receives (including in 2019) the $30 per month cell phone reimbursement from Perkins School.  Padon Tr., pp. 75-76.  *See also* Mantha Tr. II, p. 26:7-12, p. 27.

51.    Mantha's eligibility for the reimbursement was a "no-brainer."  *See* Padon Tr., p. 80:10-20 (whereby Perkins representative agreed with that representation).  *See also id.*, p. 67:6-13 (describing "Joe [Mantha]" as a "good example" of the basis for the policy, for people who are on the move a lot or on call).

52.    Out of 351 employees at Perkins School, only about 15-20 employees receive the cell phone reimbursement.  Padon Tr., pp. 80-81.

53.    The people who receive the reimbursements are people "who really couldn't effectively do their jobs without use of a cell phone."  Padon Tr., p. 82:2-5 (agreeing with that characterization).

54.    Each of the six program directors who work under Mantha also receive the cell phone reimbursement.  Padon Tr., p. 86:5-7.

55.    Mantha's wife testified that "it's a school that runs 24/7 so it's not like he leaves at five and the doors close" to explain why he gets a cell phone reimbursement.  Melisa Mantha Tr., p. 57:3-15.

### D. Mantha Uses his Cell Phone for Work Around the Clock

56. All work calls to Mantha at home are to his cell phone. Melisa Mantha Tr., pp. 27-28; *see id.*, p. 65:12-16.

57. For Mantha's cell phone records from January 1, 2019 through December 28, 2019, there were 2,880 combined total calls to or from Mantha's cell phone. *See* Ex. 1.

58. Out of those 2,880 total calls for January through December 2019, at least 1,400 of those calls, or about 50 percent (48.6%), were to or from telephone numbers from/connected to the Perkins School or its employees. *See* Exhibit 9 to Affidavit of Counsel – *Mantha's 2019 Cell Phone Records with Calls to or from Work Numbers Highlighted*; *see also* Affidavit of Counsel, ¶ 11.

59. Mantha almost constantly received work calls to his cell phone late at night, early in the mornings, on weekends and on holidays, in 2019. *See* Ex. 9.

60. On January 5, 2019, a Saturday, he received and made a flurry of work calls at 7:37 p.m., 8:00 p.m., 8:16 p.m., and 9:48 p.m. *See* Ex. 9.

61. On January 19, 2019, a Saturday, Mantha received or made no fewer than nine (9) work calls to his cell phone, including three at 7:04 p.m., 10:25 p.m., and 10:37 p.m. *See* Ex. 9.

62. The work calls picked back up the next day, January 20, 2019, a Sunday, with Mantha making or receiving no fewer than eighteen (18) calls starting at 8:10 a.m. *See* Ex. 9.

63. On March 18, 2019, Mantha made or received no fewer than twelve (12) work calls, including at 7:53 p.m., 8:33 p.m., 8:38 p.m., 9:49 p.m., and 11:07 p.m. *See* Ex. 9.

64. On March 28, 2019, Mantha fielded work calls nearly continuously from the first evening one at 5:14 p.m. through the (at least) twelfth call at 9:01 p.m. (in addition to daytime/afternoon calls). *See* Ex. 9.

65.    One weekend in March 2019, March 30-31, saw Mantha make or take a flurry of work calls Saturday beginning at 3:21 p.m. and continuing to 9:50 p.m., and picking back up on Sunday with a series of work calls starting at 7:49 a.m.  *See* Ex. 9.

66.    On May 6, 2019, Mantha made or received seven (7) evening (not including daytime/afternoon) work calls, starting at 6:57 p.m. and ending at 10:10 p.m.  *See* Ex. 9.

67.    On May 16, 2019, Mantha fielded work calls at 10:16 p.m., 10:35 p.m., and 10:40 p.m.  *See* Ex. 9.

68.    On June 15, 2019, a Saturday, Mantha made or received no fewer than twenty-one (21) work calls from 9:33 a.m. to 1:59 p.m.  *See* Ex. 9.

69.    Mantha made or took work calls as early as 12:05 a.m. in the evening/morning and as late as 11:53 p.m. at night.  *See* Ex. 9 (July 14, 2019 and June 21, 2019 calls).

70.    On Saturday, July 13, 2019, Mantha took or received thirty-two (32) work calls, beginning at 10:05 a.m. and continuing to 11:31 p.m. at night.  *See* Ex. 9.

71.    The next day, Sunday, July 14, 2019, Mantha took or made no fewer than twenty-seven (27) work calls beginning at 12:05 a.m. and continuing until 9:42 p.m.  *See* Ex. 9.

72.    On September 2, 2019, a holiday (Labor Day), Mantha received nine (9) work calls ending at 9:55 p.m.  *See* Ex. 9.

73.    On Christmas day, December 25, 2019, Mantha fielded two work calls at night, at 9:03 and 9:13 p.m.  *See* Ex. 9.

    E.  *Other Uses of Cell Phone for Work*

74.    Perkins School employees use a cell phone application called "Ring Central," which allows employees to contact each other "wherever they are, at any time, for any reason"

via their cell phones using the directory within the application.  *See* Padon Tr., pp. 33-35.  *See also id.*, pp. 34-35.

75.     Mantha can access his work e-mails through his cell phone and does in fact use his work e-mail through his cell phone.  Padon Tr., p. 84:18-23.  *See also* Melisa Mantha Tr., p. 24:12-17.  Mantha Tr. II, pp. 27-28.

76.     Perkins School maintains an "HRIS system" containing employee contact information, and the entry for Mantha within that system lists only his cell phone number and no other telephone numbers.  *See* Padon Tr., p. 31:14-20; *id.*, p. 33:18-24.  *See also* Exhibit 10 to Affidavit of Counsel - *Perkins School Entry for Joseph Mantha from HRIS System*.

77.     Mantha also has the capability to forward calls on his desk office phone to his cell phone.  Mantha Tr. II, p. 39:9-19.

## II.     Mantha Learns About TCPA Prior to Text Messages at Issue

78.     Steven Novia is a friend of Mantha.  *See* Exhibit 11 to Affidavit of Counsel – *Deposition Transcript for Steven Novia (condensed)* ("Novia Tr."), p. 20:7-15.

79.     Novia has made at least one pre-lawsuit demand under the Telephone Consumer Protection Act ("TCPA"), through his attorney.   Novia Tr., pp. 23-24.

80.     Novia resolved that demand with the company to whom the demand was sent.  Novia Tr., pp. 24-25.

81.     Novia told Mantha about this experience with the TCPA to recover money sometime in the summer of 2019 shortly before the QuoteWizard text messages were sent in August 2019.  Novia Tr., pp. 25-26; *id.*, pp. 27-28.

82.     Novia gave Mantha, who was "curious," some information about how to best deal with a similar situation, telling him that he should find out who is trying to solicit you and then "you most likely have got something."  Novia Tr., pp. 28-30.

### III.    QuoteWizard Only Buys TCPA-Compliant Leads; Requires Lead Verification

83.     Every single lead that QuoteWizard purchases carries with it a contractual promise from the entity that sells the lead to QuoteWizard that the seller obtained consent for the lead that satisfies the TCPA and all other applicable laws and regulations.  *See* QuoteWizard Affidavit, ¶ 5.

84.     As relevant here, QuoteWizard had a contract with RevPoint Media, LLC ("RevPoint") whereby RevPoint sells consumer leads to QuoteWizard.  *See* Exhibit 12 to the Affidavit of Counsel – *Transcript for First Deposition of RevPoint Media, LLC (condensed)* ("RevPoint Tr. I"), p. 8:7-8.  *See also* Exhibit B to the QuoteWizard (Joel Peterson) Affidavit – *QuoteWizard Contract with RevPoint*.

85.     Under the contract between QuoteWizard and RevPoint, RevPoint is authorized to sell unsold (exclusive) leads to QuoteWizard relating to auto insurance quotes.  *See* Ex. B.

86.     Pursuant to Exhibit C to the RevPoint contract, RevPoint "represent[ed] warrant[ed] and agree[d] that the Leads sold to Quote Wizard pursuant to this Agreement" will "not be obtained in violation of any state or federal law, rule, regulation, court order, judgment, decree, or agreement."  *See* Ex. B (Exhibit C thereto).

87.     RevPoint further represented, warranted, and agreed (among other things) that the leads sold to QuoteWizard "will not be obtained by any unsolicited contacts with consumers."  *Id.*

88.     RevPoint further represented, warranted, and agreed that the leads sold to QuoteWizard "will be obtained from individuals who represent that they are specifically interested in obtaining a quote for the applicable type of insurance indicated." *Id*.

89.     RevPoint further represented, warranted, and agreed that the leads sold to QuoteWizard "will be collected from individuals who have provided prior express written consent required by law or regulation (including, but not limited to, Telephone Consumer Protection Act, 42 USC 227 and 47 CFR 64.200 and Do Not Call List Requirements) so that Quote Wizard or insurance agents or carriers may call any telephone or mobile phone numbers contained within Le[ad] for the purpose of providing insurance quotes or connecting the individual with insurance agents or carriers." *Id*.

90.     The contract also required RevPoint to obtain and maintain proof of express written consent for all leads sold to QuoteWizard, such that the consent can be "conclusively established under applicable law or regulation" and provided to QuoteWizard at its request. *See id.*

91.     QuoteWizard only purchased leads from RevPoint (and generally) that have a Jornaya LeadiD attached to them. *See* Exhibit 13 to the Affidavit of Counsel – *Deposition Transcript of QuoteWizard (condensed)* ("QuoteWizard Tr."), p. 9:22-25. *See also id*., p. 11:21-24; p. 14:11; p. 30:4-9.

92.     A Jornaya LeadiD is an industry standard tool used to verify lead consent. QuoteWizard Tr., p. 34:13-18 (describing Jornaya as a "lead verification company. They're kind of an industry standard, that everybody uses them or [their competitor]."). *See also id*., p. 35.

93.     The Jornaya LeadiD for each lead bought by QuoteWizard is sent to QuoteWizard "before [it] even purchase[s] the lead." QuoteWizard Tr., p. 11:20-24.

94.     QuoteWizard confirms that each lead it buys has TCPA-compliant consent by requiring the Jornaya LeadiD, and through the contractual guarantee that "our vendors … have to obey all TCPA laws and laws in general."  QuoteWizard Tr., p. 14:7-16.

## IV.     Mantha's Lead Sold to QuoteWizard with TCPA-Compliant Consent to Contact

95.     RevPoint sold Mantha's lead (inclusive of his contact information and other data points) to QuoteWizard on August 5, 2019 with TCPA-compliant consent to contact him. QuoteWizard Tr., p. 26:4-8.

96.     Mantha's lead was sold to QuoteWizard by RevPoint with an associated Jornaya LeadiD.  QuoteWizard Tr., p. 30:4-13.  RevPoint Tr. I, pp. 60-61.  *Id.*, p. 62:2-6.

97.     When RevPoint sold leads to QuoteWizard, it was making a "guarantee" that the lead has TCPA-compliant consent.  RevPoint Tr. I, p. 31:16-25.

98.     It is RevPoint's understanding that Mantha did provide the disputed consent to be contacted in regard to an auto insurance quote.  RevPoint Tr. I, p. 54:15-20.

99.     It is likewise QuoteWizard's position and belief that Mantha provided his consent to be contacted by QuoteWizard.  QuoteWizard Tr., p. 9:4-34.  *See also id*., p. 48:12-15 ("Does QuoteWizard contend that Mr. Mantha visited Snappy Auto Insurance and provided his consent on that site? A. Yes.").

100.    To ensure that RevPoint is only selling leads with TCPA-compliant consent, RevPoint has technology that "verifies that certain criteria is met from the sources, that [t]here is a consent text that is provided along with the lead, and … also in certain circumstances will verify that … a lead ID is passed with or a trusted form certificate is passed with the lead." RevPoint Tr. I, pp. 9-10.

101.    RevPoint had purchased Mantha's lead from Plural Marketing Solutions, Inc. ("Plural") on August 5, 2019 before selling it to QuoteWizard that same day.  *See* Exhibit 14 to Affidavit of Counsel – *Transcript of Second Deposition of RevPoint Media, LLC (condensed)* ("RevPoint Tr. II"), p. 23:5-8.  *See also* RevPoint Tr. I, p. 15:9-13.

102.    At the time when RevPoint purchased the lead, the lead came with TCPA consent language that Mantha would have agreed to.  RevPoint Tr. II, p. 23:9-12.

103.    In turn, Plural and RevPoint had a contract at the relevant time period that required Plural to also be in TCPA compliance with respect to leads.  *See* Exhibit 15 to Affidavit of Counsel – *Deposition Transcript of Plural Marketing Solutions, Inc. (condensed)* ("Plural Tr."), p. 73:15-21.

104.    The Jornaya LeadiD for the Mantha lead was given by Plural to RevPoint and from RevPoint to QuoteWizard.  RevPoint. Tr. II, p. 28:2-5.

105.    Plural verified at the time it sold the Mantha lead to RevPoint that it was TCPA-compliant.  RevPoint Tr. II, pp. 44-5; *id*., 49:9-12.

106.    Plural's understanding is that Mantha consented to receive the texts from QuoteWizard.  Plural Tr., p. 9:5-12 (testifying that "[m]y understanding is that [Mantha] did" consent to receive text messages from QuoteWizard; "the record that we received did indicate that there was an opt-in consent").  *See also id*., p. 56:2-7 ("[B]ecause I received the consent information from [Fe]nix, and in the consent information it does indicate that he did provide consents.").

107.    Plural, in turn, had bought Mantha's lead from Fenix Media Solutions, who indicated that Mantha had signed up on www.snappyautoinsurance.com (the "Website") and

consented to receive information about an auto insurance quote.  Plural Tr., pp. 9-10.  *See also id.*, p. 42:10-12; *id.*, p. 54:14-17.

108.    When it became known that Mantha disputed the consent, Plural reached out to Fenix and obtained further proof of consent.  *See* Plural Tr., pp. 12-15.

109.    Dario Osmancevic of Fenix told Plural's George Rios that the lead came from the Website, where Mantha signed up, and where Osmancevic was the "webmaster."  *See* Exhibit 16 to Affidavit of Counsel - *July 28, 2020 and September 11, 2019 E-mails* ("I … can most certainly say that 'Joe Mantha' have signed up on our web site and filled up the application in full by himself. I am webmaster of the site and [I] guarantee that he did filled [sic] it up by himself.").

110.    Plural had a contract with Fenix Media at the relevant time period.  Plural Tr., p. 72:16-18.

111.    Fenix's contract with Plural required it to sell Plural only TCPA-compliant leads. *See* Plural Tr., p. 72:19-25.

112.    Although Mantha disputes the consent, Mantha conceded under oath that it is "fair" to say that Mantha does not recall "every website that [he has] ever visited in 2019." Mantha Tr. I, p. 41:8-10.

113.    Mantha cannot say with "absolute certainty" that somebody did not sign up on the Website on his behalf.  Mantha Tr. I, p. 106:2-6.

114.    Mantha's two home laptops and cell phone were imaged but his browser/search history for June, July, and August 2019 were not captured on that imaging and no longer exist and were never produced.  Mantha Tr. II, pp. 52-53.  *Id.*, p. 58:6-13.

115.    Mantha took no steps to preserve his browser/search history before August 2020.

*See* Mantha Tr. II, pp. 59-60.

## V.    <u>Text Messages</u>

116.    After buying the lead from RevPoint with consent to contact, QuoteWizard

(through its agent Drips Holdings, LLC) and Mantha exchanged text messages in August 2019:

…

<u>QuoteWizard</u>: Joe, Amanda from QuoteWizard here, with one final follow up. Get the auto insurance info you requested? We are just a quick call away!

**<u>Mantha</u>: How do I get a quote?**

<u>QuoteWizard</u>: I can give you a quote for a variety of plans for auto insurance to fit your needs-- When can we have a quick call?

**<u>Mantha</u>: Tomorrow works**

<u>QuoteWizard</u>: Okay: What time do you want me to call? [I'm] free Mon 4pm, W 10am, F 1pm EST. Can you do any of those or is there a different time to call?

**<u>Mantha</u>: Friday at 1**

<u>QuoteWizard</u>: I can't! When are you available Mon thru Thur 9 a.m.-8 p.m. or Friday 9a-7:30p EST?

**<u>Mantha</u>: Friday at 1**

<u>QuoteWizard</u>: Sounds good to me! I will get in touch W/ you Fri, Aug 23, at 1:00PM!

**<u>Mantha</u>: Thanks.**

<u>QuoteWizard</u>: Hey Joe! Reminder, I[']ll call in 10 min about free auto insurance quote you wanted. Once you hear the message, press 1 to talk to me -Amanda@QW

<u>QuoteWizard</u>: Hello Joe! I just attempted reaching you for our planned call. When is a more appropriate time to reschedule?

*See* Exhibit 17 to Affidavit of Counsel - *Text and Call History for Mantha* (emphasis added).

117.    The text messages were sent by and between QuoteWizard and Mantha between August 9, 2019 and August 23, 2019; each of Mantha's texts to QuoteWizard were on August 19, 2019.  *See id*.

118.    Mantha acknowledges not asking QuoteWizard to stop texting him and testified that he does not know why he did not ask.  Mantha Tr. I, p. 112:5-16.

119.    It is QuoteWizard's policy and practice that any consumer who QuoteWizard contacts, either directly or (as here) through an agent, who requests no further contact be placed on an internal "Do Not Call" list and not be contacted again.  *See* QuoteWizard Affidavit, ¶ 6.

120.    If Mantha had requested that QuoteWizard not contact him, Mantha would have been placed on QuoteWizard's "Do Not Call" list, consistent with QuoteWizard's policies and practices.  *See* QuoteWizard Affidavit, ¶ 7.  *See also* Exhibit A to QuoteWizard Affidavit – *Copy of QuoteWizard's Do Not Call Policy*.

121.    Mantha never made any such request to QuoteWizard.  *See* QuoteWizard Affidavit, ¶ 8.

**VI.    Novia and his Attorney Coach Mantha on How to Respond to the Text Messages; Mantha Immediately Retains Novia's Attorney to Make Monetary Demand**

122.    Novia coached and helped Mantha respond to the QuoteWizard text messages.  Mantha Tr. I, p. 68:10-14.

123.    At the time when Mantha received the text messages from QuoteWizard, Mantha asked Novia if text messages "count" [under the TCPA].  Novia Tr., p. 33:6-21.

124.    Novia was not sure, so he asked his lawyer, who told him text messages do "count," and Novia passed that information to Mantha.  Novia Tr., pp. 33-34.

125.    Novia then passed his TCPA lawyer's information to Mantha, for Alex Washkowitz, Esq., so he could initiate a pre-suit demand.  Novia Tr., p. 36:3-11.  *Id*., pp. 39-40.

126.    Mantha's cell phone records reflect that he spoke with Novia (cell phone number XXX-XXX-9105) by phone on July 20, August 19, 22, 29, and September 12, 2019, both immediately before and after Mantha responded to QuoteWizard's text messages.  Mantha Tr. II, p. 65:7-16.  *See also* Novia Tr., p. 19:22-24; Ex. 1.

127.    Mantha retained his lawyer on or before August 31, 2019, no more than eight days after receiving the last QuoteWizard text message.  *See* Mantha Tr. I, pp. 85-86.

128.    On September 4, 2019, Mantha's counsel served a demand letter on QuoteWizard, demanding, among other things, a monetary payout in connection with the texts.  *See* Exhibit 18 to Affidavit of Counsel - *September 4, 2019 Demand Letter*.

**VII.    Mantha and Novia's Communications During Lawsuit**

129.    Mantha and Novia were in touch afterwards by text message, sometime before or during the filing of this lawsuit, although the dates of the messages are not known.  *See* Exhibit 19 to Affidavit of Counsel - *Copy of Mantha and Novia Text Message Thread*.

130.    Novia stated that Alex [Washkowitz, Esq.] [Mantha's and Novia's shared attorney] "reached out to me.  He sent you something over the weekend.  Get back to him ASAP."  *See* Ex. 19, p. 2.

131.    In later response, Mantha stated "I forgot you had texted this morning.  … Then got busy with these clowns."  *See id*.

132.    Novia responded that, "It's okay Just get back to Alex [Washkowitz, Esq.] and get paid."  Ex. 19, p. 3.

133.    When Mantha replied that he was "trying" and was told "it could take years," Novia responded that, "Yup, but it's life changing money. It will all be worth it." *Id.*

134.    Mantha responded "True story. I'm not sure that's the case. But I really have no idea. I guess they have another person hopping on with me. Same facts. Case will be much stronger." Ex. 19, p. 4.

135.    Novia responded "Don't know much about your case. Alex [Washkowitz, Esq.] and the people he's working with has got them by the balls though. The longer it plays out the better you are. It's a game. Let them play and let it play out." *Id.*

## VIII.   Lack of Injury and Standing

136.    Mantha first told his wife about this lawsuit in the spring of 2020; this putative class action lawsuit was filed in October 2019. Melisa Mantha Tr., p. 36:5-17.

137.    Mantha otherwise had never mentioned the text messages at issue to his wife. Melisa Mantha Tr., p. 37:4-15.

138.    Mantha never told his wife that he was annoyed by the text messages. Melisa Mantha Tr., p. 38:15-19. *See also id*., p. 51 (Mantha never mentioned being annoyed or that the text messages were a waste of time, invasion of privacy, or anything to that effect).

139.    Mantha's wife testified to receiving many unsolicited communications unrelated to this lawsuit, describing them as "silly." Melisa Mantha Tr., pp. 38-39. *See also id*., p. 39:16-23 ("[I]t happens so frequently to me I'm sure in passing we [Mantha and his wife] kind of said, Oh, I got a silly call or whatever, like I just said.").

140.    The Manthas "frequently" received unsolicited communications including by text message, unrelated to this lawsuit. Melisa Mantha Tr., pp. 47-48 (they received them

"frequently.· Probably once a week at least for me.· I don't know about him. I know he does because we probably talked about it before.").

141.    The Manthas never discussed filing a lawsuit in connection with the unsolicited communications they receive unrelated to the allegations of this lawsuit.  Melisa Mantha Tr., p. 69:8-13.

142.    When Mantha first spoke about the lawsuit with his wife in the spring of 2020, his wife described it as "[n]ot even a real conversation.· Like just this is going on.· Kind of like this is kind of silly it's like what you see on TV. … Both of us kind of thought -- it just seemed kind of like not a big deal."  Melisa Mantha Tr., p. 38:2-11.

143.    Mantha's wife had never even seen the text messages themselves before being shown them at her deposition.  Melisa Mantha Tr., p. 46:15-21.

## IX.    QuoteWizard Does Not Sell Insurance

144.    QuoteWizard does not sell insurance to consumers.  *See* QuoteWizard Affidavit, ¶ 10.

145.    Under QuoteWizard's contract with GEICO Insurance, to whom QuoteWizard sod Mantha's lead, QuoteWizard sells insurance leads to GEICO.  *See* Exhibit C to QuoteWizard Affidavit – *QuoteWizard Contract with GEICO Insurance*.

146.    QuoteWizard gets paid a uniform amount for each lead sold to GEICO, regardless of what GEICO does with the lead or if it later sells insurance to a consumer.  See Ex. C.

147.    QuoteWizard is to provide "all information of the customer necessary for GEICO to provide an insurance quote as specified by GEICO."  See Ex. C.

148.    QuoteWizard is prohibited from selling any leads to GEICO which "have been provided an incentive or benefit."  See Ex. C.

149.    QuoteWizard did not make any representations to GEICO under the contract that any leads sold thereunder would result in the sale of insurance.  See Ex. C.

150.    The buying and selling of leads in this context is designed to ultimately provide the consumer with a quote for insurance.  Plural Tr., p. 7:9-14.  *See also* Ex. B (Ex. C thereto); Ex. C.

Respectfully submitted,

QuoteWizard.com, LLC,
By its attorneys,


/s/ Kevin P. Polansky
Kevin P. Polansky (BBO #667229)
kevin.polansky@nelsonmullins.com
Christine M. Kingston (BBO #682962)
christine.kingston@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
(t) (617)-217-4700
(f) (617) 217-4710

Dated: July 14, 2021

## CERTIFICATE OF SERVICE

I, Kevin P. Polansky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: July 14, 2021                              /s/ Kevin P. Polansky