**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| JOSEPH MANTHA on behalf of himself and others similarly situated, | : | |
| | : | |
| Plaintiff, | : | Case No. 1:19-cv-12235-LTS-PK |
| | : | |
| v. | : | |
| | : | |
| QUOTEWIZARD.COM, LLC | : | |
| | : | |
| Defendant. | : | |
| | : | |
| _____ | / | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO "PRIOR EXPRESS CONSENT" AND ENTITLEMENT
OF PLAINTIFF'S PERSONAL CELL PHONE TO DNC PROTECTION**

## I.       INTRODUCTION

Plaintiff, Joseph Mantha, seeks to represent a class of consumers who received multiple

spam telemarketing texts from defendant QuoteWizard.com ("QuoteWizard"), despite the fact

that putative class members previously listed their personal telephone numbers on the National

Do Not Call Registry ("DNC") explicitly warning telemarketers not to call those numbers.[1] At

the outset of this case, QuoteWizard responded to Mr. Mantha's allegations with an attack. It

claimed that Mr. Mantha had explicitly consented to receive telemarketing texts from

---

[1] Although QuoteWizard still has not disclosed how many spam telemarketing texts it sent to consumers, it recently revealed that ***millions*** of consumers who received such spam texts on their personal telephone lines complained and took the time to respond to QuoteWizard demanding that such texts cease. *See ECF# 184, Defendant's Notice to Court Regarding Supplemental, Corrected Production,* (QuoteWizard acknowledges error in its prior discovery responses disclosing that the number of consumers who submitted Do Not Call complaints after receiving QuoteWizard telemarketing texts was not 46,000 as represented previously to the Court, but in fact was over ***two million***).

QuoteWizard, and that by filing this action, Mr. Mantha and his counsel engaged in conduct subject to sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.[2]

Thereafter, the Court ordered that discovery proceed for several months limited to the issue of whether Mr. Mantha consented to receive the texts at issue. As noted in detail below, the ensuing discovery was devastating to QuoteWizard's consent defense. With its initial primary consent defense in shambles, QuoteWizard altered course to focus on Mr. Mantha's use of his personal cell phone (the "Wireless Number"). Although the Wireless Number is Mr. Mantha's personal cell number, and is billed to his residence as part of a family phone plan, QuoteWizard claims that because Mr. Mantha used the Wireless Number for work related purposes when he was out of the office, the Wireless Number that is subscribed to Mr. Mantha personally and not to his employer, should be deemed by this Court as a "business line" that is not entitled to the protections afforded by the Telephone Consumer Protection Act ("TCPA" and the Do Not Call Registry ("DNC Registry"). Mr. Mantha respectfully now moves for partial summary judgment as to whether QuoteWizard has carried its burden to prove that he expressly consented to receive telemarketing texts from QuoteWizard, and whether the Wireless Number is entitled to the protections afforded by the TCPA and the DNC Registry.

## II.     STATEMENT OF FACTS[3]

### A.  QuoteWizard Engages Drips To Send Automated Text Messages To Consumers Nationwide Seeking To Generate Leads For QuoteWizard's Insurance Clients.

QuoteWizard is in the business of selling its services to insurance agents, and providing those agents with potential customers and new business. *See* https://quotewizard.com/corp/about-us. It is owned by the publicly traded LendingTree, Inc. *See* https://www.lendingtree.com. *See*

---

[2] A copy of the Rule 11 letter can be found at ECF #107-1.
[3] The following facts all appear with evidentiary support in the Plaintiff's Local Rule 56.1 Statement of Material Facts ("SOF at ¶___")

SOF at ¶1-2. 

On its web site, Drips explains that its automated "Conversational Text Messaging" technology uses artificial intelligence ("AI") to understand "tens of thousands of intent-driven responses to hold hundreds of millions of asynchronous conversations at a time…" *See* SOF at ¶5. Drips also claims that its AI based "Conversational Text Messaging" technology is:

> "***extremely human-like*** in that it can answer questions, respond to messages and hold actual conversations with customers.  These conversations are personalized and allow for information exchange and context to be conveyed."

*See* SOF at ¶6.

Consumers who receive these automated spam texts from Drips, are not interacting with a human being. They are interacting with a bot designed to appear like a human being. As Drips' founder, AC Evans, explained in an interview with MixEnergy.com:

> It has to be humanized because nobody wants to talk to a chatbot. That's one big difference between our system and any chatbot our there is you can't tell it's a bot. It is completely humanized. And when you may be able to trip it up to the point where you would be able to tell a bot, it actually still gets flipped back to a human to respond with empathy and context.

*See* SOF at ¶7. Mr. Evans further noted that he has "always had that kind of spammer marketer, you know, scale mentality" and noted that "millions and millions" of concurrent conversations were happening at Drips and most of the process is "completely automated." *See* SOF at ¶8.



### B. Millions Complain After Receiving QuoteWizard's Telemarketing Texts.

The exact number of telemarketing texts sent by Drips on behalf of QuoteWizard is unknown at this time, as initial discovery has been limited to Mr. Mantha's individual claim. *See* SOF at ¶11. During discovery, however, plaintiff sought the production of do not call requests submitted by consumers who received QuoteWizard's telemarketing texts ("DNC Complaints"). *See* SOF at ¶12. QuoteWizard resisted producing the DNC Complaints. *See* SOF at ¶13. This Court ultimately ordered QuoteWizard to produce the DNC Complaints, as well as all documents relating to the DNC Complaints. *See* SOF at ¶14. In response, QuoteWizard produced excel spread sheets identifying over 2.5 million DNC Complaints. QuoteWizard, however, omitted from this production the substance of the DNC Complaints. *See* SOF at ¶15-16.

[REDACTED]

Even after disclosing that over 2.5 million DNC Complaints had been made by consumer recipients of its telemarketing texts, QuoteWizard continued to refuse to produce the substance of the DNC Complaints, claiming the production of so many consumer DNC Complaints would be 'overly burdensome.' *See* SOF at ¶22. To overcome this claim of purported burden, the parties ultimately agreed that QuoteWizard would produce 600 of the substantive Tier 1 and Tier 2 DNC Complaints immediately preceding the text solicitation sent by Drips on behalf of QuoteWizard to Mr. Mantha. *See* SOF at ¶23. QuoteWizard also agreed to produce all of the DNC Complaints received between March 17, 2021, and May 17, 2021. *See* SOF at ¶23.

[REDACTED]

Even this small sampling, however, made it crystal clear that consumers did not consent to receive QuoteWizard's telemarketing text spam, and were annoyed and outraged by QuoteWizard's illegal telemarketing practices. *See* SOF at ¶23-24.[4]

### C.  Mr. Mantha Receives Multiple Telemarketing Texts From QuoteWizard

Mr. Mantha is a resident of Rutland, Massachusetts. He is married and has two minor children. Mr. Mantha is employed as the Director of Residential Services at the Franklin Perkins School, an entity that provides services and housing for individuals with special needs, located in Lancaster, Massachusetts. *See* SOF at ¶25-26. The wireless number assigned to Mr. Mantha's personal cellular phone is (508) 353-**** (the "Wireless Number") and is used by Mr. Mantha for personal purposes. *See* SOF at ¶27. The Wireless Number is subscribed to Mr. Mantha in his name, and not in the name of his employer. The bill for the Wireless Number is addressed to Mr. Mantha at his home. *See* SOF at ¶28-29. On November 7, 2008, Mr. Mantha listed the Wireless Number on the National Do Not Call Registry effectively instructing telemarketers not to call the Wireless Number with telemarketing solicitations. *See* SOF at ¶30.  Mr. Mantha does not have a work issued cell phone. *See* SOF at ¶31.

Mr. Mantha began receiving telemarketing texts from QuoteWizard on August 9, 2019. The texts were addressed to Mr. Mantha personally, and not to his employer. The texts sought to sell him personal auto insurance. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[4] A compilation of these DNC Complaints is attached at <u>Exhibit 5, Tabs A & B.</u> Even when taking into account this small sampling of DNC Complaints produced, the raw outrage expressed by consumers responding to QuoteWizard's telemarketing spam defies any conceivable claim that these consumers welcomed QuoteWizard's spam texts, as alleged, and expressly consented to receive text telemarketing messages from QuoteWizard.



After identifying QuoteWizard as, in fact, the entity responsible for the telemarketing text campaign at issue, Mr. Mantha proceeded to file the instant consumer TCPA class action acting

not just for himself, but for all other consumers similarly situated who received illegal

telemarketing text spam from QuoteWizard. *See* SOF at ¶48.

### D. Mr. Mantha Did Not Consent To Receive Telemarketing Texts From QuoteWizard Via The Snappy Auto Web Site[5]



---

[5] It is QuoteWizard's burden to prove by clear and convincing evidence that Mr. Mantha consented to receive its telemarketing texts. Although he bears no burden to do so, Mr. Mantha has denied ever visiting the Snappy Auto web site or to ever consenting to receive QuoteWizard telemarketing texts in any fashion or form, and has affirmatively demonstrated via discovery that QuoteWizard's consent claim is a sham. *See* SOF at ¶52.

**Mantha**



**F.  The IP Addresses Allegedly Used By Mr. Mantha To Access The Snappy Auto Web Site Have No Association With Mr. Mantha Whatsoever**



**G. The TCPA Disclosure Language On Snappy Auto Does Not Disclose The "Seller" As QuoteWizard**

**H. The 'Seller' Disclosed On The Snappy Auto Web Site Denies Any Connection to Snappy Auto, Plural, Fenix or to Mr. Mantha**



### I. Mr. Mantha's Personal Cell Phone Is Entitled to the Protection of the Do Not Call Registry

The telemarketing texts sent to Mr. Mantha's Wireless Number on behalf of QuoteWizard were personally directed to Mr. Mantha and sought to sell him auto insurance. *See* SOF at ¶85. The texts were not directed to Mr. Mantha's employer. *See* SOF at ¶86. The Wireless Number was subscribed to Mr. Mantha personally by the telecommunications carrier Verizon. *See* SOF at ¶87. The Wireless Number was subscribed to Mr. Mantha at his residential address. *See* SOF at ¶88. The Wireless Number was not subscribed to Mr. Mantha's employer or to any business. *See* SOF at ¶89. Mr. Mantha does not hold the Wireless Number out to the public as a business line, nor is it listed on his business card as a point of contact. *See* SOF at ¶90. Mr. Mantha does not have a home business. *See* SOF at ¶91. Mr. Mantha does not declare the Wireless Number as business expense on his tax return. *See* SOF at ¶92. The Wireless Number is part of a family plan that includes the personal cell phone of Mr. Mantha's wife. *See* SOF at ¶93.

In his capacity as the Director of Residential Operations at the Doctor Franklin Perkins School, Mr. Mantha needs to be available even when not at the office and during non-traditional work hours when he is on call. *See* SOF at ¶94. Due to the nature of his work, Mr. Mantha

frequently makes and receives work calls on the Wireless Number. *See* SOF at ¶95. Mr.

Mantha's employer partially reimburses Mr. Mantha $30 a month for internet data costs

associated with the Wireless Number to allow Mr. Mantha to access work related e-mail. *See*

SOF at ¶97. Mr. Mantha's employer confirmed the Wireless Number is Mr. Mantha's personal

cell phone number over which The Doctor Franklin Perkins School exercises no control. *See*

SOF at ¶98.

### III.    STANDARD OF REVIEW

Summary judgment is appropriate where the movant can show that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the

controlling law. . . . A genuine issue exists as to such a fact if there is evidence from which a

reasonable trier could decide the fact either way." *Katz v. Liberty Power Corp., LLC,* 2019 U.S.

Dist. LEXIS 162793 (D. Mass. Sep. 24, 2019), *Cochran v. Quest Software, Inc.,* 328 F.3d 1, 6

(1st Cir. 2003) (citation omitted). "To succeed in showing that there is no genuine dispute of

material fact," the moving party must point to "specific evidence in the record that would be

admissible at trial." *Id. a*t 4-5, citing *Ocasio-Hernandez*, 777 F.3d at 4. "That is, it must

'affirmatively produce evidence that negates an essential element of the non-moving party's

claim,' or, using 'evidentiary materials already on file ... demonstrate that the non-moving party

will be unable to carry its burden of persuasion at trial.*'" Id. a*t 4-5 (quoting *Carmona v. Toledo,*

215 F.3d 124, 132 (1st Cir. 2000)). "One of the principal purposes of the summary judgment rule

is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex,* 477 U.S. at

323-24. Once the movant takes the position that the record fails to make out any trial worthy

question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to

rebut the movant's assertions." *Nansamba v. N. Shore Med. Ctr., Inc.*, 727 F.3d 33, 40 (1st Cir. 2013).

In reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Cochran,* 328 F.3d at 6. The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." *Hannon v. Beard,* 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material," *Gomez v. Stop & Shop Supermarket Co*., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," *Cochran*, 328 F.3d at 6 *(quoting Medina-Munoz v. R.J. Reynolds Tobacco Co*., 896 F.2d 5, 8 (1st Cir. 1990)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Medina-Munoz*, 896 F.2d at 8 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett, All* U.S. 317,323,106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Natl Wildlife Fed'n*, 497 U.S. 871, 888,110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record ... or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380,127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will  not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Id.* (internal quotations, citations, and alterations omitted).

## IV.    STATEMENT OF ISSUES

**ISSUE ONE**: Has QuoteWizard carried its burden to prove, by clear and convincing evidence via a clear and conspicuous disclosure, that Mr. Mantha provided his prior express signed consent to receive telemarketing texts from QuoteWizard itself?

**ISSUE TWO:** Is Mr. Mantha's Wireless Number entitled to the consumer protections afforded by the National Do Not Call Registry?

## V.     AUTHORITY

### A.  Unwanted Telemarketing Calls Are A Nuisance And Invasion of Privacy

Congress enacted the TCPA, 47 U.S.C. § 227,  to prevent "intrusive nuisance calls" to

consumers' telephones that it determined were "invasive of privacy." *Mims v. Arrow Fin. Servs.*

*LLC*, 565 U.S. 368, 371 (2012); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954

(9th Cir. 2009); *In re Rules and Regulations Implementing the TCPA of 1991*, 18 FCC Rcd.

14014, ¶¶ 2, 8 (2003).[7] Even though the TCPA is more than 25 years old, "[m]onth after month,

unwanted telemarketing calls and texts top the list of consumer complaints received by the

[Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964, 2015

WL 4387780, at *2 (F.C.C. July 10, 2015). "Robocalls and telemarketing calls are currently the

number one source of consumer complaints at the FCC." FCC Chairman Tom Wheeler, *Cutting*

*Off Robocalls* (July 22, 2016) (https://www.fcc.gov/news-events/blog/2016/07/22/cutting-

robocalls). "The FTC receives more complaints about unwanted calls than all other complaints

combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer

Protection, *In re Rules and Regulations Implementing the TCPA of 1991*, Notice of Proposed

Rulemaking, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016). In 2017, the FTC

received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. For every

month in the fiscal year, robocalls made up the majority of consumer complaints about Do Not

Call violations. *See FTC Releases FY 2017 National Do Not Call Registry Data* (December 18,

2017) (https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-

do-not-call-registry-data-book-dnc). The New York Times reported extensively on the surging

---

[7] The TCPA is a remedial statute passed to protect consumers from unwanted automated
telephone calls and messages and should be construed in accordance with that purpose. *See*
*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013).

consumer outrage as to the prevalence of illegal telemarketing despite existing law. *See "Yes, It's Bad. Robocalls, and Their Scams, Are Surging. See Tara Siegel Bernard,* https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

### B. Telemarketing Via Text To A Phone Number Listed On The National Do Not Call Registry Is Permissible Only With The Consumer's Prior Express Consent Signed In Writing Expressly Agreeing To Receive Texts From A Specific Seller

The TCPA and its accompanying regulations prohibit sellers, such as QuoteWizard, from making telephone solicitations to "residential telephone subscribers" who have listed their telephone numbers on the national DNC Registry. *See* 47 C.F.R. § 64.1200(c)(2), *citing In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 FCC Rcd. 14014 at ¶22 (June 26, 2003) (recognizing the creation of the DNC Registry). Telemarketing calls to numbers listed on the DNC Registry are permissible only where the consumer has previously provided the telemarketer with their prior express permission consenting in writing to receive telemarketing calls. *See* 47 C.F.R. § 64.1200(c)(2)(ii) (prohibits initiating any telephone solicitation to number registered on the national do-not-call registry without a signed written agreement between the specific seller and the consumer). *See also* 18 FCC Rcd. 14014 at ¶44 (consent must be evidenced by a signed written agreement between the consumer and the seller which states that the consumer agrees to be contacted by **"this seller"**). *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 FCC Rcd. 1830 at ¶33 (Feb. 15, 2012) (recognizing that consent must include clear and conspicuous disclosure that the consumer is consenting to receive future telemarketing calls **from a specific seller**). The regulations further define "seller" as "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is

transmitted to any person." *See* 47 C.F.R. § 64.1200(f)(10).[8]

A telemarketer, such as QuoteWizard, who asserts a consent defense bears the burden to prove valid consent was obtained with clear and convincing proof. *See* 20 FCC Rcd. 3788; 2005 FCC LEXIS 1158 at ¶40 (Feb. 10, 2005). In February of 2012, the Federal Communications Commission reiterated cautioning telemarketers:

> Should any question about the consent arise, the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained.

*See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd 1830 at ¶26, 32, 33; 2012 FCC LEXIS 794 (Feb. 12, 2012).[9]

**C. The Protections Afforded Consumers Via The Do Not Call Registry Do Not Extend To Phone Numbers Subscribed To Businesses.**

The DNC Registry was intended by Congress to protect the personal telephone numbers of consumers be they traditional land lines or wireless cell phones. *See* 47 C.F.R. § 64.1200(e) (citing 18 F.C.C. Rcd. 14014, 14039-40 ¶ 28-36) (recognizing the privacy rights of wireless subscribers and recognizing that DNC protections afforded by 47 U.S.C. 227(c) extend "to wireless telephone numbers"). Such protections, however, do not apply to numbers

---

[8] Ironically, even Drips, the entity who QuoteWizard retained to utilize its AI driven automated text technology to text consumers, agrees that such texts should only have been sent to consumers who consented to receive telemarketing texts from an explicitly identified "seller." In this instance, that "seller" was QuoteWizard. *See* Exhibit 3, Declaration of Counsel, citing https://www.drips.com/blog/how-to-get-express-written-consent (Bates 000056-000062) (Drips explains to its customers that the TCPA requires a consumer to explicitly consent to receive telemarketing calls from a specific 'seller').

[9] The Federal Communication Commission ("FCC") possesses authority to issue implementing rules and regulations for the TCPA. *See* 47 U.S.C. § 227(b)(2). Pursuant to that authority, the FCC promulgated regulations for advertising and telemarketing calls that require a party to obtain "express written consent" prior to making such calls. *See* 47 C.F.R. § 64.1200(a)(1)-(2).

subscribed to businesses. *See* 47 C.F.R. § 64.1200 (c)(2)(limiting DNC Registry to "residential" subscribed numbers); 18 FCC Rcd. 14014 at ¶ 37 ("The national do-not-call rules will also not prohibit calls to businesses"). Determining the difference between a phone number that is protected by the DNC Registry, and one that is not, simply requires an examination as to whether the number is subscribed to a consumer or to a business. A "business subscriber" is defined by the Code of Federal Regulations as a "subscriber to a telephone exchange service for businesses." *See* 47 C.F.R. § 64.2305(b). A "residential subscriber" is specifically defined as a "subscriber to a telephone exchange service that is not a business subscriber." *See* 47 C.F.R. § 64.2305(d).[10] Accordingly, land lines and wireless numbers subscribed to consumers are protected by the DNC Registry. Land lines and wireless numbers subscribed to businesses are not.

To address industry concerns that cellular wireless numbers subscribed to businesses were impermissibly being listed on the DNC Registry, the FCC has noted that a consumer who lists their cellular number on the DNC Registry will be presumed to be a "residential telephone subscriber" entitled to the TCPA protections afforded by the DNC Registry. *See* 18 F.C.C. Rcd. 14014 at ¶36. To ensure this presumption is not abused, the FCC further recognized that, in the context of an enforcement action, a court may require the consumer/subscriber "to provide further proof of the validity of the presumption" that the wireless number listed on the DNC Registry is entitled to the protection afforded by the TCPA and the DNC Registry and, in fact, is not subscribed to a business. *Id. See Barton v. Temescal Wellness, LLC,* 2021 U.S.Dist

---

[10] The regulatory definitions of "business subscriber" and "residential subscriber" were enacted in 1999, prior to Congress' creation of the Do Not Call Registry in 2003. *Compare* 47 C.F.R. § 64.1200(e), *citing* 18 FCC Rcd. 14014, 14032, 14043; 2003 FCC LEXIS 3673 at ¶22, 42. (June 26, 2003) (Do Not Call Registry was enacted in 2003) *with* 47 C.F.R. § 64.2305(b) and (d) (effective date of regulations is October 5, 1999).

LEXIS 42211 *13 (March 8, 2021) (D. Mass, Hillman. J.) (reviewing applicable law and

denying a Motion to Dismiss in a TCPA telemarketing text class action where defendant

claimed plaintiff's cell phone was not entitled to the protections of the DNC Registry). [11]

## VI.   ARGUMENT

**ISSUE ONE: Mr. Mantha Did Not Consent To Receive Telemarketing Texts From QuoteWizard**

The undisputable evidence in this case confirms that Mr. Mantha did not consent to

receive telemarketing texts from QuoteWizard.

- Mr. Mantha has repeatedly denied under oath to ever consenting to receive telemarketing texts from QuoteWizard in any way. *See* SOF at ¶52.

- QuoteWizard does not claim it obtained Mr. Mantha's signature evidencing his consent to receive telemarketing texts. *See* SOF at ¶49-51.

- Rather, QuoteWizard's consent defense relies entirely on the QuoteWizard Opt In, an unreliable fabrication:

  - The IP address listed on the QuoteWizard Opt In has no connection whatsoever to Mr. Mantha.[12] *See* SOF at ¶70-76.

---

[11] One exception to this bright line arises when a consumer operates a home based business. In those circumstances, the FCC and the courts have employed a case by case factual determination to ascertain whether the number at issue is entitled to the protections afforded the by the TCPA and the DNC Registry. *See Blevins v. Premium Merch. Funding One, LLC*, No. 2:18-cv-377, 2018 U.S. Dist. LEXIS 183362, at *6-7 (S.D. Ohio Oct. 25, 2018) (collecting cases) (recognizing that in the context of a phone subscribed to a home based business the FCC and the courts will employ a case by case assessment to determine if the number is entitled to the protections afforded by the TCPA and the DNC Registry). There is no claim in this case that Mr. Mantha used his Wireless Number in conjunction with any home based business. Mr. Mantha has affirmatively denied that the Wireless Number is used for a home based business. If this matter were to proceed to class certification, Mr. Mantha would remove home based businesses from the class to avoid fact intensive inquiries relating to whether numbers subscribed to home based businesses are entitled to the protections of the DNC.

[12] After it was revealed that Mr. Mantha had no connection to the IP address listed on the QuoteWizard Opt In, a marketing vendor for QuoteWizard produced a second IP address to which QuoteWizard alleged was the IP address used by Mr. Mantha to consent to receive its telemarketing texts. A telecommunications subpoena and a follow up deposition also confirmed

o   The Jornaya Lead ID listed on the QuoteWizard Opt In has no connection whatsoever to Mr. Mantha. *See* SOF at ¶63-69.

o   Mr. Mantha never visited the Snappy Auto web site prior to receiving telemarketing texts from QuoteWizard. *See* SOF at ¶52.



In sum, Mr. Mantha never provided his TCPA compliant prior express written and signed consent to anyone to receive telemarketing texts from QuoteWizard. The claim to the contrary is based on the QuoteWizard Opt In, an inadmissible and fabricated farce, created after the fact to intimidate Mr. Mantha, and his counsel with false claims of unethical conduct in violation of

that Mr. Mantha had no connection whatsoever to this IP address as well. *See* SOF at ¶71, 72, 75, 76.

Fed.R.Civ.P. 11. As there are no material facts in dispute as to whether Mr. Mantha consented to receive telemarketing texts from QuoteWizard, partial summary judgment should be entered in Mr. Mantha's favor as to the affirmative defense of consent.

**ISSUE TWO: The Wireless Number Is Subscribed To Mr. Mantha And Not To Any Business And Is Entitled To The Protections Of The DNC Registry**

The following undisputed facts evidence that the Wireless Number is a "residential subscribed" telephone number entitled to the protections of the TCPA and the DNC Registry:

- Mr. Mantha listed his Wireless Number on the Do Not Call Registry long prior to his receipt of QuoteWizard telemarketing texts. *See* SOF at ¶30.

- The Wireless Number is subscribed to Mr. Mantha individually and is billed to him in his name at his residential address, and is used as a personal cell phone. *See* SOF at ¶27-29 and ¶85-98.

- The Wireless Number is not subscribed to any business. *Id.* at ¶27-29, and ¶89.

- Mr. Mantha uses his Wireless Number as his personal phone number. *Id.*

- Mr. Mantha does not hold the Wireless Number out as a business line and does not declare it as a business expense. *Id.*

- The texts were targeted to Mr. Mantha, individually, seeking to sell him personal auto insurance, and were not targeted at his employer. *See* SOF at ¶32-48.

- Mr. Mantha's employer confirmed the Wireless Number is not a business number and, in fact, is Mr. Mantha's personal cell phone number over which the employer does not exercise control. *See* SOF at ¶98.

These facts entitle Mr. Mantha to partial summary judgment as to the issue of whether the Wireless Number is a "residential subscribed number" subject to the protections of the TCPA and the DNC Registry.

QuoteWizard contends these undisputed facts should be ignored. Instead of focusing on the manner in which the Wireless Number was subscribed, QuoteWizard will parse through Mr. Mantha's cell phone records and will count the number of calls that it claims are "work" calls

versus personal calls. QuoteWizard will also point to the fact that Mr. Mantha's employer reimbursed Mr. Mantha a small amount each month for internet data costs associated with Mr. Mantha's use of work related e-mail accessed via the Wireless Number. QuoteWizard will then claim that because the Wireless Number was frequently used by Mr. Mantha for work related purposes, and was partially paid for by Mr. Mantha's employer, it is not entitled to the protections afforded by the TCPA and the DNC Registry. QuoteWizard will then claim the Wireless Number is really a business number not entitled to the protections of the TCPA and the DNC Registry.[13]

In enacting the Do Not Call provisions of the TCPA, Congress chose to extend protection to "residential telephone subscribers" a term it explicitly acknowledged easily extends to the non-business subscribers of wireless telephone lines. *See* 47 C.F.R. § 64.1200 (c)(2)(limiting DNC Registry to "residential" subscribed numbers); 18 FCC Rcd. 14014 at ¶ 37 ("The national do-not-call rules will also not prohibit calls to businesses"). *See* 47 C.F.R. § 64.1200(e) (citing 18 F.C.C. Rcd. 14014, 14039-40 ¶ 28-36 (recognizing the privacy rights of wireless subscribers and recognizing that DNC protections afforded by 47 U.S.C. 227(c) extend "to wireless telephone numbers"). A "residential subscriber" of a telephone number is specifically defined by the Code of Federal Regulations as a "subscriber to a telephone exchange service that is not a business subscriber." *See* 47 C.F.R. § 64.2305(d). On the other hand, a "business subscriber" is defined by the Code of Federal Regulations as a "subscriber to a telephone exchange service for businesses." *See* 47 C.F.R. § 64.2305(b).

---

[13] Under QuoteWizard's cramped reading of the TCPA, a consumer who lists their personal cell phone on the DNC Registry risks losing their privacy protections by simply using their personal cell phone to make work related calls. A work related call made from a personal telephone line, however, is still a call made from a personal telephone line. Similarly, a personal call made from a business line is still a call made from a business line.

It is undisputed that Mr. Mantha registered the Wireless Number on the DNC Registry long before his receipt of the telemarketing texts at issue. It is similarly undisputed that the Wireless Number was not subscribed to a business. Rather it was subscribed to Mr. Mantha personally in his name and billed to his home address. It is likewise undisputed that Mr. Mantha does not use the number for a home-based business. That Mr. Mantha may have used the Wireless Number, on occasion, in connection with work is irrelevant to whether or not the Wireless Number is subscribed to a business. Mr. Mantha is entitled to partial summary judgment as to his assertion that the Wireless Number is entitled to the protections afforded by the TCPA and the DNC Registry.[14]

---

[14] There is no real question that the Wireless Number is not subscribed to a business. In challenging whether the Wireless Number is entitled to the protections of the TCPA and the DNC Registry, QuoteWizard is playing a long game looking ahead to class certification. In this regard, what QuoteWizard really seeks in its challenge to the Wireless Number, is for this Court to adopt a test that requires the examination of the cell phone use of every class member to determine how many times a class member's personal cell phone was used for work purposes. QuoteWizard then will claim that it will require millions of mini trials to determine if cell phones of class members are in fact entitled to DNC protection dependent on their individual use. QuoteWizard will then claim that it could never be held to account for its massive violation of the TCPA, via a class action, due to predominant individual issues relating to the particular cell phone use of each class member. Courts, however, commonly certify TCPA class actions involving non business cell phones listed on the DNC Registry. To ensure that numbers subscribed to or used by businesses are not included in these cases, courts have repeatedly recognized expert analysis of industry leading and reputable data sources to identify and remove business phone numbers from class lists. *See Williams v. Pillpack, LLC,* 2021 U.S.Dist. LEXIS 27496 *14-15 (W.D.WA. February 12, 2021) (Court certifies a TCPA class action relating to calls made to consumers listed on the DNC Registry and approves a methodology whereby data analysis is utilized to remove business numbers from the class list); *Chinitz v. Intero Real Estate Serv.,* 2020 U.S.Dist. LEXIS 247921 * 44 (N.D.Cal. July 22, 2020)(same); *Wakefield v. Visalus, Inc.,* 2019 U.S.Dist.LEXIS 141974 * 20-21 (D.Or., Aug 21, 2019)((court certifies a TCPA class and recognizes methodology by which business numbers are removed from the class list). In fact, counsel for Mr. Mantha were part of the trial team that litigated *Krakauer v. Dish Network, LLC,* to a plaintiff's verdict that was affirmed on appeal. *See Krakauer v. Dish Network, LLC,* 2015 U.S.Dist. LEXIS 119524 * 29 (M.D.NC. Sept. 9, 20150 (granting class certification of a TCPA class action involving calls to consumers listed on the DNC Registry and rejecting claim that possibility that some calls may have been to business numbers precludes certification). *See Krakauer v. Dish Network, LLC,* 925 F.3d 643 (4th Cir. May 30, 2019)(jury verdict in favor of

## VII.   PRAYER FOR RELIEF

**ISSUE ONE:** For the factual and legal reasons detailed above, Mr. Mantha respectfully petitions the Court to enter partial summary judgment in his favor on the issue of consent. The issue of consent is an affirmative defense the burden of proof of which is upon QuoteWizard. Discovery has now closed on the issue of consent relating to Mr. Mantha. Mr. Mantha has denied under oath to consenting to receive QuoteWizard's telemarketing texts. QuoteWizard has failed to come forth with clear and convincing evidence demonstrating that Mr. Mantha granted QuoteWizard his prior express consent signed in writing agreeing to receive telemarketing texts from QuoteWizard, the undisputed 'seller' of the insurance products and services at issue.

**ISSUE TWO:** For the factual and legal reasons detailed above, Mr. Mantha respectfully petitions the Court to enter partial summary judgment in his favor recognizing that the Wireless Number is not subscribed to a business and is, therefore, entitled to the protections afforded by the TCPA and the DNC Registry.

PLAINTIFF,

By his attorneys

*/s/ Matthew P. McCue*
Matthew P. McCue
THE LAW OFFICE OF MATTHEW P.
MCCUE
1 South Avenue, Suite 3
Natick, MA 01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

---

class of consumers who received telemarketing calls promoting Dish Network while their numbers were listed on the DNC Registry affirmed on appeal). Further, Mr. Mantha's DNC class definition limits the class to persons who received telemarketing texts from QuoteWizard on their residential phone lines- meaning on phone lines not subscribed to a business. In other words, the class includes only consumers and by its terms excludes businesses. *See* ECF #80, Plaintiff's First Amended Complaint at ¶61.

Edward A. Broderick
BRODERICK LAW, P.C.
176 Federal Street, Fifth Floor
Boston, MA 02110
Telephone: (617) 738-7080
ted@broderick-law.com

Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

Alex M. Washkowitz
Jeremy Cohen
CW LAW GROUP, P.C.
188 Oaks Road Framingham, MA 01701
alex@cwlawgrouppc.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14th, 2021, I electronically transmitted the foregoing to all counsel of record via the electronic filing system.

By:   */s/ Matthew P. McCue*
         Matthew P. McCue