EXHIBIT 2

Page 1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3              Civil Action No. 1:19-cv-12235-LTS

4

5    JOSEPH MANTHA, on behalf of himself,

6    and all others similarly situated,

7                            Plaintiff,

8    V.

9    QUOTEWIZARD.COM, LLC,

10                           Defendant.

11

12

13              Remote videotaped deposition of

14   DEREK PADON, a witness called on behalf of the

15   Defendant, taken pursuant to the Federal Rules of Civil

16   Procedure, before Lori Atkinson, Notary Public in and

17   for the Commonwealth of Massachusetts and Professional

18   Shorthand Reporter, conducted via Zoom on

19   Friday, September 11, 2020, commencing at 11:16 a.m.

20

21

22

23   Job No. NE 4222188

24

Page 2

1 A P P E A R A N C E S:
2 FOR THE PLAINTIFF:
3 Edward A. Broderick, Esq.
4 The Law Office of Edward A. Broderick
5 208 Ridge Street
6 Winchester, MA 01890
7 Ted@broderick-law.com
8
9 FOR THE DEFENDANT, QUOTEWIZARD.COM, LLC:
10 Christine Kingston, Esq.
11 Nelson Mullins Riley & Scarborough LLP
12 One Post Office Square, 30th Floor
13 Boston, MA 02109
14 617.217.4700
15 Christine.kingston@nelsonmullins.com
16
17
18
19
20
21
22
23
24

Page 3

1                 I N D E X
2 WITNESS                       PAGE
3 DEREK PADON
4 By Ms. Kingston            5, 96
5 By Mr. Broderick              94
6
7
8            E X H I B I T S
9
10 Number    Description       Page
11 Ex 1      Subpoena          23
12
    Ex 2      Cell phone reimbursement
13         Policy             60
14
15
16
17
18
19
20
21
22     ****Exhibits retained electronically.***
23
24

Page 4

1            P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Good morning.  We are now
3 on the record.  This is the video operator speaking,
4 Gail Ashton, with Veritext.  Today's date is
5 September 11, 2020 and the time is 11:16 a.m.
6 We here to take the remote video deposition of
7 Derek Padon in the matter of Joseph Mantha versus
8 QuoteWizard.com.
9        Will counsel please introduce themselves for
10 the record.
11        MS. KINGSTON:  Good morning.  Attorney
12 Christine Kingston on behalf the QuoteWizard.com LLC.
13        MR. BRODERICK:  Good morning.
14 Edward Broderick on behalf of the plaintiff,
15 Joseph Mantha.
16        THE COURT REPORTER:  Will counsel present,
17 please stipulate to the swearing in of the witness
18 remotely.
19        MS. KINGSTON:  Yes, on behalf of
20 QuoteWizard.
21        MR. BRODERICK:  Yes, on behalf of
22 Plaintiffs.
23        THE COURT REPORTER:  Mr. Padon, would you
24 raise your right hand, please.

Page 5

1        (Witness complies.)
2        THE COURT REPORTER:  Do you solemnly swear
3 or affirm that the testimony you are about to give is
4 the truth, the whole truth, and nothing but the truth?
5        THE WITNESS:  I do.
6        DEREK PADON,
7 having been satisfactorily identified and first duly
8 sworn by the Notary Public, was examined and testified
9 as follows:
10        DIRECT EXAMINATION
11 BY MS. KINGSTON:
12    Q.  Good morning, Mr. Padon, as I mentioned my name
13 is Christine Kingston.  I will be taking your deposition
14 here this morning.
15        MS. KINGSTON:  Just to start off, Ted, for
16 some stipulations.  Just the usual ones we have been
17 going with.  All objections, except as to form, reserved
18 until the trial of the trial as are motions to strike.
19        MR. BRODERICK:  Agreed.
20        MS. KINGSTON:  30 days for the witness to
21 read and sign?
22        MR. BRODERICK:  Agreed.
23        MS. KINGSTON:  And I'm happy to waive
24 notary, if you are.

Page 6

1        MR. BRODERICK: Sure.
2    BY MS. KINGSTON:
3    Q. Mr. Padon, just a couple of ground rules before
4    we get started. If you don't understand my question at
5    any point, just let me know. I'm happy to rephrase
6    that. If at any point, you need a break, just let me
7    know, we are happy to accommodate you. It is important
8    that you have only oral and audible answers. Try not
9    answer by shaking your head "yes" or "no"; something
10   oral on the record.
11       Finally, since we are doing this virtually, if at
12   any time you are having technological problems, you
13   can't hear me, you can't see me, just stop me and let me
14   know. Okay?
15   A. Okay.
16   Q. Can you please state your full name for the
17   record?
18   A. Derek James Padon.
19   Q. Now, are you currently employed?
20   A. I am.
21   Q. Where are you employed?
22   A. Doctor Franklin Perkins School.
23   Q. We are going to be talking about the school a lot
24   today, is there a good shorthand for that?

Page 7

1    A. Perkins.
2    Q. Perkins. If I use the term "Perkins," you know
3    that I'm referring to the school?
4    A. Correct.
5    Q. How long have you worked at the Perkins School?
6    A. Four years on October 11th of 2020.
7    Q. What is your job title there?
8    A. Vice president of human resources.
9    Q. What does that job entitle?
10   A. Managing the day-to-day human resources functions
11   of the entire -- the entire scope.
12   Q. When you say entire school, are there multiple
13   parts of the school?
14   A. We have different divisions.
15   Q. Could you just give me a brief overview of those
16   divisions?
17   A. Yes. We have special education, residential
18   services, child development center, Rein In A Dream, and
19   adult and elder services.
20   Q. I think the first one you said is special
21   education?
22   A. Yes.
23   Q. What does that involve?
24   A. So we have three schools; an elementary, middle,

Page 8

1    and high school. There's approximately a hundred kids.
2    About half of those stay here on campus with us in a
3    residential group home setting and the other half go
4    home to their families.
5    Q. About how many students total?
6    A. It's about a hundred.
7    Q. Hundred total. How many stay on campus?
8    A. Between 50 and 60.
9    Q. Okay. What is the duration of the school year?
10   A. Year round.
11   Q. So even through the summer?
12   A. Yes.
13   Q. Are there any breaks in the school year?
14   A. There are, yeah. School vacations and then there
15   is two weeks in the summer that they take the weeks off.
16   Q. Do you know what weeks those are?
17   A. I don't.
18   Q. Do you know what month?
19   A. One is at the end of August. The other is the
20   end of June, June into July.
21   Q. And I think you mentioned a couple or other
22   breaks during the year?
23   A. So, yeah, your traditional school vacations. I
24   don't know what they are.

Page 9

1    Q. Do you know the approximate time of the year?
2    Month?
3    A. I don't. I'm in human resources so I'm not on
4    that side of the operations.
5    Q. Okay.
6        And you mentioned, I think you said 50 to 60
7    students live on the campus?
8    A. Yes.
9    Q. Do you have dorms for them to live in?
10   A. We do.
11   Q. Is that what you refer to them as dorms?
12   A. We call them group homes.
13   Q. How many of those do you have?
14   A. Six.
15   Q. Six. Okay. How big is the -- how many -- do you
16   know how many approximate acres we are talking at the
17   school?
18   A. No.
19   Q. How big would you describe?
20   A. It's big. You mean like the entire campus or?
21   Q. Yeah.
22   A. I mean I don't -- I honestly couldn't even guess.
23   Q. Is it akin to like a college campus?
24   A. Yeah. I would say like a small college campus.

3 (Pages 6 - 9)

1  Q. Are all six of the group homes in one location on
2 the campus?
3  A. Mostly. There's five that are a sort of next to
4 each other and then there is a sixth one which is like
5 sort of across the street, I guess.
6  Q. Is that about ten students in each home
7 approximately?
8  A. Yes.
9  Q. Is there any staff members who would live in the
10 group home during the year?
11  A. No.
12  Q. Are there any staff members who live on the
13 campus?
14  A. No.
15  Q. During the school year are they -- strike that.
16      During a typical day, where would those students
17 be?
18  A. On a typical day at the school from approximately
19 -- I don't know the exact time, approximately -- I go
20 based on the staff schedule between 7:30 and 3:30.
21  Q. When you say "school," are there certain
22 buildings where they are being taught during the day?
23  A. Yes.
24  Q. Can you just give me a general overview of those

1 buildings?
2  A. One is an elementary school, one is a middle
3 school, and other is the high school.
4  Q. Are those three separate buildings?
5  A. Yes.
6  Q. Are there any other buildings that would be there
7 during the day besides the group homes or the schools?
8  A. The only place I can think of is we have a gym
9 and pool facility so possibly there.
10  Q. Besides the group home, the school building or
11 the gym and pool, that's it; right?
12  A. Yes. They are just on the campus.
13  Q. I think the second we were taking about kind of
14 the divisions, I think you used that word, and you
15 mentioned residential?
16  A. Yes.
17  Q. Were you referring to the six group homes?
18  A. Yes.
19  Q. Is there anyone else who lives on the campus
20 besides the students?
21  A. Just the kids.
22  Q. Just the 50 to 60 kids that you mentioned,
23 approximately?
24  A. Correct.

1  Q. I think the next division you mentioned childhood
2 development. Do I have that down correctly?
3  A. We call it the child development center and
4 that's a traditional preschool.
5  Q. How many students are in that?
6  A. Honestly, I have no idea.
7  Q. There is a separate building from the building
8 that we spoke about earlier?
9  A. Correct.
10  Q. The next one that you mentioned is Rein In?
11  A. Rein In A Dream. It is a horsemanship program.
12 They do about 50 percent community-based therapeutic
13 riding instruction. And they also provide it for our
14 hundred'ish kids as well.
15  Q. There are some people who would come in from
16 outside the community to participate in the program; is
17 that correct?
18  A. Yes.
19  Q. Then the other half are the students who are
20 living on the campus?
21  A. Yes.
22  Q. And then I think you mentioned an adult program?
23  A. Adult and elderly services, yes.
24  Q. Adult and elder services. Okay.

1      What does that involve?
2  A. They have three sub programs there. One would be
3 a vocational program for about 80 individuals who they
4 would provide vocational services for. There is a small
5 residential component there where we have four
6 apartments with either two or three residents in them.
7 And then we have a very small elder services division
8 that I think -- I'm just thinking it is around six
9 clients. It's not a whole lot. Those serve an elderly
10 population with developmental disabilities.
11  Q. In that program, I think you mentioned two to
12 three residents live in four apartments?
13  A. Yes.
14  Q. Is that the total of people of that division who
15 live on campus?
16  A. Yes. Yes.
17  Q. On the campus you have the 50 to 60 students and
18 elementary to high school plus these two to three adult
19 to elder residents; is that correct?
20  A. Yes.
21  Q. Is there anyone else who lives on the campus?
22  A. No. There is really no where here for staff to
23 live.
24  Q. Is anyone supervising the students in the

Page 14

1 evening?
2   A.  Repeat that.
3   Q.  Is anyone supervising the students in the
4 evening?
5   A.  Yes.
6   Q.  At some point do they go home?
7   A.  Not the ones that stay on campus.
8   Q.  When you say, the ones that stay on campus, are
9 you referring to students or staff?
10   A.  Let me ask this you first:  Are we still on the
11 adult and elder services division still?
12   Q.  Let's focus on the special education division for
13 now.  I'm trying to get a sense, I know that there are
14 50 to 60 students that live there.  I'm trying to get a
15 sense of when the staff is there watching or
16 supervising?
17   A.  So like we talked about, during the day that we
18 are generally at school, we do have kids who refuse and
19 if they refuse then we'd have teaching assistants and
20 residential counselors stay back in their residential
21 group home with them.
22       Then we have a 2 to 10 shift that is staffed with
23 residential counselors and a shift supervisor for each
24 -- there is a shift supervisor for each of the six group

Page 15

1 homes.
2       Then evening shift, we have -- it's staffed with
3 night awakes, which is essentially the same thing as
4 residential counselor although the clients or students
5 are sleeping and that is managed by a night
6 administrative supervisor.
7   Q.  What are the hours for the night -- for the
8 evening shift?
9   A.  Ten a.m. -- 10 p.m. to 8:00 a.m.
10   Q.  It's safe to say that at no point are the
11 students unsupervised?
12   A.  Never.
13   Q.  During the evening shift, they would be in the
14 group homes supervising them; is that right?
15   A.  Correct.
16   Q.  I think you said there is a shift supervisor for
17 each of the six group homes?
18   A.  Yes.
19   Q.  Then that's also true at the evening shift; is
20 that correct?
21   A.  Yes.
22   Q.  Trying to get a sense in the evening shift, how
23 many staff members would be in each group home?
24   A.  Three to four depending on how many students are

Page 16

1 there.
2   Q.  Three to four staff members in each group home?
3   A.  Yes.
4   Q.  That be would be the shift supervisor and then I
5 think you used the term residential counselor?
6   A.  Correct.
7   Q.  Do you know -- do those employees report to
8 anyone directly?
9   A.  The program director.
10   Q.  Who is that?
11   A.  There are six of them.  There is one for each.
12 There is one for each of the group homes.
13   Q.  Do you have their names?
14   A.  Yes.
15   Q.  Could you tell us the names for each of the six
16 program directors?
17   A.  Just the first name or?
18   Q.  Full.
19   A.  I guess it's not confidential.  It is Joe Howell.
20   Q.  Who do you spell the last name?
21   A.  H-O-W-E-L-L.
22       Amanda Saunders; Kelley Gross; Bill Czy, C-Z-Y;
23       Dillon -- his name is escaping me.  I can look it
24 up right here if that's appropriate.

Page 17

1   Q.  We can do that during a break.
2   A.  I'm missing somebody.  That is one, two, three,
3 four, five -- and Timothy O'Day.
4   Q.  O, apostrophe, D-A-Y?
5   A.  O, apostrophe, D-A-Y, yes.
6   Q.  Bill C-Z-Y?
7   A.  Yes.
8   Q.  Those are the six program directors for each of
9 the group homes; is that right?
10   A.  Yes.
11   Q.  Do they report to anybody?
12   A.  They report to Joe Mantha.
13   Q.  What is his title?
14   A.  Director of residential services.
15   Q.  Does residential services encompass the two to
16 three adult residence that we spoke of earlier?
17   A.  It does not.
18   Q.  That's a different division?
19   A.  Correct.
20   Q.  Does Mr. Mantha report to anyone directly?
21   A.  He reports to the chief operating officer, Tim
22 Hammond.
23   Q.  Hammond?
24   A.  H-A-M-M-O-N-D.

5 (Pages 14 - 17)

Page 18

1   Q. I think you mentioned earlier you are the vice
2 president of human resources; is that accurate?
3   A. Yes.
4   Q. In that role are you overseeing each of these
5 divisions?
6   A. From an HR perspective, yes.
7   Q. Who do you report to directly, if anyone?
8   A. Michael Ames, who is the president and chief
9 executive officer.
10   Q. I think you indicated a CEO and a COO. Are there
11 any other executives?
12   A. Yes. There is a Cindy Wing, who is the chief
13 academic officer. Lisa Harrington who is the chief
14 financial officer. Steve Young, who is the vice
15 president of facilities and information services. There
16 is a Kathy -- Kathy Mills, who is the vice president of
17 organizational advancement.
18   Q. Those are all the executives, to your knowledge?
19   A. Yes.
20   Q. Mr. Padon, have you ever been deposed before?
21   A. Not in a long time.
22   Q. When were you previously deposed?
23   A. I was a witness to a car accident and then I was
24 also a witness to something to do with employment or job

Page 19

1 related. I can't remember it.
2   Q. Was that with respect to the Perkins School?
3   A. No. It was another organization.
4   Q. Have you ever been deposed as a Rule 30(b)(6)
5 designee?
6   A. No.
7   Q. To your knowledge, has the Perkins School hired
8 an attorney to represent you -- strike that.
9      Has the Perkins School hired an attorney to
10 represent the Perkins School with respect to the
11 subpoena?
12   A. No.
13   Q. What did you do to prepare for today's
14 deposition?
15   A. Read the deposition.
16   Q. When you say that, do you mean the subpoena?
17   A. Yeah. Sorry.
18   Q. Did you do anything else to prepare?
19   A. No.
20   Q. Did you review any documents?
21   A. No.
22   Q. Did you speak with anyone?
23   A. No.
24   Q. Did you speak to the plaintiff, Joseph Mantha?

Page 20

1   A. Just -- I did.
2   Q. When was that?
3   A. When was it?
4   Q. Um-hmm.
5   A. I want to say about three weeks ago.
6   Q. What did you discuss?
7   A. I told him that I got -- I received the subpoena.
8 He had -- let me backup.
9      The subpoena went to my supervisor, who is
10 Michael Ames, who sent Joe an email and let him know
11 that we had received it. He sent it to me and then I
12 would follow up with Joe.
13   Q. So Mr. Ames told you to follow up with
14 Mr. Mantha?
15   A. Correct.
16   Q. Did you do that?
17   A. I did.
18   Q. That was your conversation three weeks ago?
19   A. Yes.
20   Q. What did you two discuss?
21   A. I asked him what it was in regards to and he told
22 me -- to be honest with you, it wasn't anything that had
23 to do with Perkins or within the scope so I don't recall
24 a lot of the details. It wasn't necessarily relevant to

Page 21

1 myself or to the organization. He had mentioned that he
2 was involved in the lawsuit regarding somebody that was
3 contacting him on his cell phone and that his phone
4 number was listed with like Do Not Call or something.
5 That was really the only conversation. Then I had spoke
6 to him the other day and just asked him for the lawyer's
7 information so we could coordinate this.
8   Q. So those were the only conversations that you had
9 with the plaintiff?
10   A. Yes.
11   Q. Have you spoken at all with the plaintiff's
12 attorneys?
13   A. No.
14   Q. Did you speak with -- strike that.
15      You mentioned a conversation you had with Michael
16 Ames; correct?
17   A. It wasn't a conversation. It was an email.
18   Q. I think you said that he was directing you to
19 follow-up with Mr. Mantha?
20   A. Yes.
21   Q. Did you have any other conversations with
22 Mr. Ames?
23   A. No. No.
24   Q. Did you have conversations with anyone else at

Page 22

1 the school?
2    A. I did not.
3    Q. Fair to say you didn't speak to any of the
4 program directors; is that correct?
5    A. Correct.
6    Q. You didn't speak to any of the residential
7 counselors or shift supervisors?
8    A. Nope.
9    Q. Now, the subpoena that we issued, it commanded
10 you to -- or commanded Perkins to designate a witness to
11 appear here and testify. Do you understand that?
12    A. Yes.
13    Q. It also contains document requests, you
14 understand that as well?
15    A. I don't recall seeing that part so I did not
16 submit anything.
17    Q. So this subpoena you received a copy from
18 Mr. Ames; is that correct?
19    A. I did.
20    Q. Do you have a copy of that in front of you, the
21 one that you received from Mr. Ames?
22    A. I am pulling it up right now.
23       Yes, I have it.
24    Q. Okay.

Page 23

1    A. I hate to interrupt. I have to get it up -- no,
2 sorry, I have to plug my computer in. All set. Thank
3 you.
4    Q. So you have a copy of the subpoena that you
5 received from Mr. Ames in front you; right?
6    A. I do.
7    Q. Do you see a Schedule A attached?
8    A. I do.
9    Q. If we go to Section 4. You know what, let's mark
10 Exhibit 1 at this point.
11       (Document marked Exhibit No. 1 for
12 identification.)
13       MS. KINGSTON: Mr. Padon, I sent you a copy.
14 You should have received a copy of it. But I'm going to
15 mark as Exhibit 1 the subpoena that we sent to the
16 Perkins School. You can either refer to that or
17 assuming that the copy that you have is the same so you
18 can refer to your copy.
19       MR. BRODERICK: Okay.
20 BY MS. KINGSTON:
21    Q. I'm looking at Schedule A to Exhibit 1, subsection
22 4. Let me know when you see that?
23    A. Yes.
24    Q. Okay. You see that it says document request?

Page 24

1    A. Yes.
2    Q. Then there is seven requests that follow?
3    A. Correct.
4    Q. Do you recall seeing this before?
5    A. No.
6    Q. And did anyone speak to you about responding to
7 these document requests?
8    A. No.
9    Q. Did Mr. Ames ever mention that you need to
10 respond to these document requests?
11    A. No.
12    Q. So it's fair to say if you haven't seen these
13 requests before you didn't make an attempt to search the
14 schools' records to comply; correct?
15    A. I did not.
16    Q. Do you know if anyone at the Perkins School
17 searched any records in an effort to comply with these
18 requests?
19    A. No.
20    Q. You haven't spoken to anyone about these
21 requests?
22    A. I have not.
23    Q. I'm going to refer you to the first page of
24 Exhibit 1. About halfway down there is a box that is

Page 25

1 checked that says, "production". Do you see that?
2    A. I do.
3    Q. It says you or your representatives must also
4 bring with you to the deposition, the following
5 documents electronically stored information or objects.
6       Do you see that?
7    A. I do.
8    Q. That refers to an attached Schedule A. Do you
9 recall seeing this portion of the subpoena?
10    A. Honestly, just briefly. And it is extremely
11 unclear as to what is being requested. Nothing would
12 have been submitted based on what I read here now. It
13 is not asking for anything specific.
14    Q. You see where it says see attached Schedule A?
15    A. I do.
16    Q. We looked at those requests earlier; correct?
17    A. Repeat that.
18    Q. We looked at those requests within Schedule A
19 just a minute ago, didn't we?
20    A. Correct.
21    Q. You understand the subpoena to be referring to
22 these requests; correct?
23    A. I do.
24       MS. KINGSTON: Let's go off the record for a

7 (Pages 22 - 25)

Page 26

```
 1   1  second.
 2       11:43  2        THE VIDEOGRAPHER: The time is
 .    We
 3   3   are going off the record.
 4
 4       (Break in the proceedings.)
 5   5        THE VIDEOGRAPHER: We are back on the
 6
         11:45  6  record. Time is   .
 7   7  BY MS. KINGSTON
 8   8   Q. Mr. Padon, we just discussed a bit off the record
 9   9  that Perkins has not searched for documents responsive
10  10  to the request in our subpoena. We will discuss some of
11  11  those today. We are reserving the right to seek
12  12  compliance with those requests. Okay?
13  13   A. Correct.
14  14   Q. Can you give me just a high-level brief overview
15  15  of your educational background?
16  16   A. I have a bachelor's degree and a certification in
17  17  human resources management.
18  18   Q. Where did you get your bachelor's?
19  19   A. Johnson & Wales University.
20  20   Q. Can you give me a very brief high-level overview
21  21  of your employment prior to Perkins School?
22  22   A. I have been in human resources for 20 years. I
23  23  worked for the TJX companies. The May Institute. Four
24  24  healthcare organizations. Then Perkins.
```

Page 27

```
 1   Q. I think you said that you have been at Perkins
 2  for four years?
 3   A. Yes.
 4   Q. Has it also been in the capacity as vice
 5  president of human resources?
 6   A. It was director of human resources from 10-11-16
 7  to 7-1 of '18. Then I became vice president, which
 8  really was just a title change.
 9   Q. Do you know why you are being deposed here today?
10   A. No.
11   Q. What do you know about the lawsuit that Joseph
12  Mantha filed?
13   A. Honestly, I don't know anything. That was --
14  probably not an appropriate time. That was one of the
15  reasons some of the context in the documents that were
16  requested didn't really make sense to me.
17   Q. I think you said you've only had two
18  conversations with Mr. Mantha about this lawsuit?
19   A. Yes. I guess if you include when I called him to
20  ask him for lawyer's information.
21   Q. Do you understand that this is what we call a
22  Rule 30(b)(6) deposition?
23   A. No.
24   Q. Okay. Do you understand that you are not
```

Page 28

```
 1  testifying in your individual capacity, you are
 2  testifying on behalf of the Perkins School?
 3   A. Yes.
 4   Q. You understand that your answers today are on
 5  behalf of the Perkins School?
 6   A. I do.
 7   Q. I think you mentioned earlier that you reviewed a
 8  copy of the subpoena; is that correct?
 9   A. Yes.
10   Q. If you refer back to that, which I have marked as
11  Exhibit 1. I want you to look at Schedule A and
12  Subsection 2, which is entitled topics.
13        Let me know when you are there.
14   A. I'm there.
15   Q. So topic number one is Joseph Mantha's employment
16  with Doctor Franklin Perkins School in 2019.
17        Do you see that?
18   A. I do.
19   Q. Are you the person most knowledgeable at the
20  Perkins School about this topic?
21   A. Yes.
22   Q. There is no one else who would have superior
23  information about this topic?
24   A. It says Joseph Mantha, complainant, with Doctor
```

Page 29

```
 1  Franklin Perkins School.
 2        Yes, there's a lot of people who has knowledge of
 3  that. Anybody that works here. Anybody that Joe has
 4  contact with. So, yes, other people, it depends on what
 5  you are asking related to the employment but just the
 6  employment itself. Yes, there are other people that
 7  know that.
 8   Q. I'm asking if you are the person most
 9  knowledgeable?
10   A. I can't answer that.
11   Q. Moving on to topic number 2.
12        "Joseph Mantha's use of his cell phone in
13  connection with his employment with the Perkins School
14  in 2019."
15        Do you see that?
16   A. I do.
17   Q. Are you the person most knowledgeable at Perkins
18  School for this topic?
19   A. Nope.
20   Q. Who would that be?
21   A. Nobody at Perkins.
22   Q. Why is that?
23   A. Because it's Joe's cell phone and his personal
24  cell phone number. We have no control as an
```

8 (Pages 26 - 29)

Page 30

1 organization over our employees' cell phones.
2    Q. Topic number 3: "Doctor Franklin Perkins School
3 policy for reimbursing employees use of cell phones in
4 connection with employment and any reimbursement for
5 Joseph Mantha specifically."
6      Do you see that?
7    A. I do.
8    Q. Are you the person most knowledge for this topic?
9    A. It would be myself and Lisa Harrington, who is
10 the CFO; yes.
11    Q. Turning to number 4, Doctor Franklin Perkins
12 School issuance of cell phones to employees for
13 employment purposes.
14      Do you see that?
15    A. I do.
16    Q. Are you the person most knowledgeable for this?
17    A. I would say no because we don't issue cell phones
18 to employees.
19    Q. All right. I want you to turn to section 4 of
20 Schedule A, which are the document requests.
21    A. Number 4, did you say?
22    Q. The document requests.
23    A. A through G?
24    Q. No. I meant Schedule A to the subpoena and I'm

Page 31

1 on Section 4 entitled "Document requests"?
2    A. Yes. I'm there.
3    Q. Okay. So we've discussed that, you know, Perkins
4 hasn't searched for any of these documents. But I'm
5 going to try to get a sense of what you might have.
6    A. Okay.
7    Q. Request number 1, "Staff or employee directories
8 that would include Joseph Mantha's name."
9      Do you have any documents that would be
10 responsive to this?
11    A. No. The only -- I don't have it the way that it
12 is worded here. Our directory is electronic, so I'm not
13 even sure there is a way to print it out.
14      Telephone numbers. The only thing we would have
15 within our HRIS system we would have people's phone
16 numbers. But it would be to contact them personally.
17 And it could be their home number or a cell phone
18 number. It could be based on whatever the employee gave
19 to us. I couldn't say it was cell phone numbers if I
20 provided a list.
21    Q. You said it's an electronic directory. Is that
22 the Ring Central application?
23    A. Yes. Yes.
24    Q. Do employees use that on their phones and

Page 32

1 computers?
2    A. Yes.
3    Q. If a fellow employee wanted to contact another
4 employee they would look at the Ring Central app;
5 correct?
6    A. Yes. Correct.
7      MS. KINGSTON: I'm going to ask you to try
8 to provide us a copy of that. If there is a way to
9 print it or send it electronically.
10      THE WITNESS: It would be staff's name and
11 then telephone phone number recorded in the Ring Central.
12      MS. KINGSTON: That's fine. I'm just
13 looking for what you have for directories?
14      THE WITNESS: Okay.
15 BY MS. KINGSTON:
16    Q. Besides the Ring Central app, are there any other
17 directories that the school keeps or maintains?
18    A. No.
19    Q. Nothing on the website?
20    A. No. Nope.
21    Q. What about is there anything handed out to the
22 students or their families?
23    A. I don't know the answer to that. There may be
24 within their enrollment packets. There may be phone

Page 33

1 numbers for people, main numbers. It would be nobody's
2 individual numbers because we don't do that. There
3 would be the Perkins main number for the school or
4 something like that.
5    Q. Who would be in charge of handing that out?
6    A. I believe it would be whoever oversees each
7 division.
8    Q. So for the residential division, would that be
9 Mr. Mantha himself?
10    A. Yes.
11    Q. Moving to request number 2, "Any and all
12 documents stored internally that reflect Mr. Mantha's
13 contact information including telephone numbers."
14      Are you aware of any documents responsive to this
15 request?
16    A. Yes.
17    Q. What documents are those?
18    A. It would -- it is not really a document. It is
19 within our HRIS system. We would obviously have his
20 contact information, which would consist of his phone
21 number or mobile number and email address.
22    Q. You said that was HR?
23    A. HRIS.
24    Q. HRIS system.

9 (Pages 30 - 33)

Page 34

1    Is there a way for you print that out for
2  Mr. Mantha and it provide to us?
3    A. Yes.
4    Q. I would ask that do you that as well.
5    Besides that, can you think of any other
6  documents that you have that are responsive to number 2?
7    A. No. Just Ring Central. Again, I don't know if
8  people know how Ring Central works. We don't publish
9  anybody's personal cell phone number. That's why we
10  have Ring Central because it's a safety net to make sure
11  so if you would call me, you would call my work cell
12  phone and that would ring on my personal cell phone.
13    If I called you -- I could call you from this
14  phone, which is my personal cell phone, that has the
15  Ring Central app on there. So when I call you, it would
16  say Perkins was calling you. It wouldn't say my
17  personal phone number or anything like that.
18    I tell you that just so you understand why we
19  don't need to track people's personal cell phone numbers
20  because we have the Ring Central app and that is sort of
21  the numbers that we use.
22    Q. Is the purpose of Ring Central to basically be
23  able to contact employees wherever they are, at any
24  time, for any reason?

Page 35

1    A. It is. Is it for that but also to protect and
2  respect people's personal information.
3    Q. So if someone were to make a call from the Ring
4  Central app, would that come from their cell phone?
5    A. Yes. It would call from the cell phone, it
6  wouldn't say -- it wouldn't say the personal
7  information. It would say whatever was in the directory
8  on the Ring Central directory.
9    Q. I guess what I'm asking is, the app is only for
10  use on your cell phone; right?
11    MR. BRODERICK: Objection.
12    A. Yes. But they have other apps. They have an app
13  for the computer that can do that as well.
14    Q. You wouldn't use the Ring Central app with your
15  work phone?
16    A. Well, the work phone is Ring Central, yes.
17    Q. So my understanding -- let's strike that. Each
18  employee will have a Perkins related work number; is
19  that accurate?
20    A. Yes.
21    Q. Okay. Does each employee have a physical work
22  phone?
23    A. No, not necessarily. It depends. It is based on
24  the person's role and what they would need to perform

Page 36

1  the functions of their job.
2    Q. With the Ring Central app, my understanding is
3  you are using your work phone number but you are
4  physically dialing or taking calls with your cell phone.
5  Is that accurate?
6    A. Accurate, yes.
7    Q. I see. Okay.
8    And so that -- but that would show up as calling
9  from or to the actual work number; correct?
10    A. Yes.
11    Q. For privacy purposes?
12    A. Yes. Absolutely.
13    Q. And do employees use the Ring Central app during
14  the day or is it just after hours or weekends?
15    A. It could be at any time, really, based on their
16  role.
17    Q. Are the employees required to use this app?
18    A. No.
19    Can I rephrase that? Only if -- they are only
20  required to use it if they are getting cell phone
21  reimbursement.
22    Q. So if you are getting a cell phone reimbursement
23  from the Perkins School, you are required to use the
24  app?

Page 37

1    A. Correct.
2    Q. Is there a reason for that?
3    A. To protect people's personal information.
4    Q. Is that because if you are getting cell phone
5  reimbursement then you are necessarily using your cell
6  phone for work?
7    A. No. Not necessarily. It depends, to be honest.
8  It depends.
9    Q. What does it depend on?
10    A. The role.
11    Q. What do you mean?
12    A. So it depends on the person's role. So if I was
13  a residential counselor, then those folks wouldn't get
14  Ring Central or cell phone reimbursement because it is
15  not appropriate for their position and they don't need
16  it.
17    If it's generally a director or above, you know,
18  we basically have a process where we vet it through to
19  make sure that it is appropriate that they have it. And
20  then we would give them cell phone reimbursement. And
21  they would have the Ring Central app as well.
22    You know, for some people it is completely up to
23  them. For, me, for example, I can use my desk phone. I
24  can use my computer. It depends within your level

Page 38

1  within the organization or, I should probably say, your
2  role within the organization.
3    Q.  But is it accurate to say that -- we can -- we
4  will get into the reimburse policy a little more.  If
5  you are getting reimbursed, you are using your cell
6  phone for work in some respect; is that accurate?
7    A.  Yes.  Yes.
8    Q.  Is the cell phone reimbursement made on an
9  employee to employee basis?
10    A.  Yes.
11    Q.  How involved is the vetting for that?
12      MR. BRODERICK:  Objection.
13    A.  It really -- it would be myself and the CFO.  We
14  pull others in as we need if we didn't know.  If we had
15  a new director and the old director that we replaced had
16  it, then that would be an easy one that we probably
17  wouldn't discuss too much.
18    If we had a new role or a role that didn't have
19  one, I may reach out to the other vice president of that
20  area to say, Is this appropriate?  What does this job
21  look like?
22    Q.  Did Perkins have the Ring Central app in 2019?
23    A.  Oh, no.  I don't know.  I would have to get the
24  dates for sure.  I want to say I think we did but I

Page 39

1  can't be sure -- I can't be sure when we got it.
2    Q.  We will have to have confirmation on that.  And
3  like we spoke about, the directories from that.
4    Okay.  Moving on to Request No. A.  It is any and
5  all documents provided to students, residents that
6  reflect, identify or include Joseph Mantha's contact
7  information.
8    I think you said earlier that what is provided to
9  students is done on a division by division basis.  Is
10  that accurate?
11    A.  Yes.
12    Q.  As you sit here today, my understanding is you
13  don't know what is provided to students?
14    A.  Correct.
15    Q.  I think you said for the residential division
16  Mr. Mantha would know that.  Is that accurate?
17    A.  Yes.
18    Q.  For request number 3, you are not aware of any
19  documents that you have responsive to this; is that
20  accurate?
21    A.  Correct.
22      MR. BRODERICK:  Objection.
23  BY MS. KINGSTON:
24    Q.  Request number 4.  Joseph Mantha's business

Page 40

1  cards.  Did Perkins have that in their possession?
2    A.  Yes.
3      MS. KINGSTON:  If you could provide a copy
4  of that and specifically looking for the business cards
5  in 2019.
6    Q.  Okay.  Moving on to number 5.  Emergency contact
7  list.  Does Perkins maintain those?
8    A.  We do, yes.
9    Q.  And it's safe to say, you would have had one in
10  2019; is that correct?
11    A.  Yes.
12    Q.  Could you provide us with a copy of those?
13    A.  Yes.
14    Q.  All right.  Moving on to number 6, is any
15  documents that list, reference or identify, Mr. Mantha's
16  cell phone number.
17    To break this down a little bit, we talked about
18  phone directories, which you said are on the Ring
19  Central app; correct?
20    A.  Yes.
21    Q.  We spoke about emergency contact lists which you
22  are going to provide and we spoke about business cards
23  which you are going to provide?
24    A.  Correct.

Page 41

1    Q.  Are you aware of any other documents that Perkins
2  -- strike that.
3    You also mentioned documents stored in Perkins
4  HRIS system; is that correct?
5    A.  Yes.
6    Q.  Which you are going to provide.
7    Besides the documents that I just mentioned, are
8  there any other documents that Perkins would have that
9  would reference Mr. Mantha's contact information?
10    A.  Not that I'm aware of.
11    Q.  So that is equally applicable to request number
12  7.  We are just looking for anything that has his
13  contact information?
14    A.  Okay.
15      MS. KINGSTON:  If we could go off the record
16  for a moment.
17  12:07    THE VIDEOGRAPHER:  The time is
.  We
18  are going off the record.
19    (Discussion off the record.)
20    THE VIDEOGRAPHER:  We are back on the
21  12:08  record.  The time is    .
22  BY MS. KINGSTON
23    Q.  Mr. Padon, Perkins School is it a privately run
24  school?

11 (Pages 38 - 41)

Page 42

1   A. Yes.
2   Q. Do you know if it receives any government
3   funding?
4   A. We do.
5   Q. Do you know what the nature of that funding is?
6   A. I don't.
7   Q. How many employees total?
8   A. 351.
9   Q. We spoke about the divisions earlier. Is it
10  possible for you to give me a breakdown by division?
11  A. Of how many?
12  Q. Yeah. How many employees approximately in each
13  division?
14  A. No.
15  Q. How about residential?
16  A. I could guess that is around a hundred.
17  Q. A hundred. Are those are all residential
18  counselors and shift supervisors?
19  A. No. They would been residential counselors,
20  shift supervisors, nursing, clinicians, admin
21  assistants. I think it is around 110 consistent,
22  everyone that would be within that division.
23  Q. That kind of includes everyone who has needed to
24  keep the residential portion up and running. Not

Page 43

1   necessarily just someone who is supervising the kids?
2   A. Correct. The majority of it, however, would be
3   residential counselors and residential supervisors,
4   obviously.
5   Q. How many of those approximately do you employ?
6   A. I would say like a hundred.
7   Q. 100 of the 110 approximately are the residential
8   counselors?
9   A. Correct.
10  Q. Do all of 100 of those employee report to
11  Mr. Mantha?
12  A. No.
13  Q. How many of those employees report to Mr. Mantha?
14  A. Around six. Those would be the individuals names
15  that I gave you earlier.
16  Q. The program directors?
17  A. Yes.
18  Q. So in turn, the residential counselors and the
19  shift supervisor, do they report to the program
20  directors?
21  A. They do.
22  Q. It is kind of a chain of command?
23  A. Correct.
24  Q. At the end of the day is Mr. Mantha responsible

Page 44

1   for the entire residential division?
2   A. Yes.
3   Q. They might not report to him directly, but they
4   are still under him; is that accurate?
5   A. Yes, they are within his scope.
6   Q. So we have spoken about Mr. Mantha's job title.
7   I think you said director of residential operations?
8   A. Director of residential services. We do use -- I
9   have heard a few people say director of residential
10  operations as well. I'm not sure where that comes from.
11  The official title on record is director of residential
12  services.
13  Q. Have you prepared any documents to refer to for
14  today's deposition?
15  A. No.
16  Q. You haven't made any notes?
17  A. Am I making notes?
18  Q. No. Did you make any before the deposition?
19  A. No.
20  Q. And how would you describe Mr. Mantha's job
21  duties?
22  A. I don't understand the question.
23  Q. What does he do day-to-day?
24  A. He, you know, honestly I don't know. He oversees

Page 45

1   the residential services so I'm not sure specifically
2   what he does.
3   Q. Does that involve ensuring that the six group
4   homes are running smoothly?
5   A. Yes, yes.
6   Q. Is he just overseeing the group homes or
7   overseeing the treatment and education of the students
8   as well?
9   A. He oversees just the group homes. That is the
10  scope of what is he supervises. He would be involved
11  in, I mentioned, the clinicians. If the clinicians were
12  meeting, he would be involved in that. He may be on
13  committees. I don't know which ones.
14      Yeah, I would say 98 percent of what he is doing
15  is all related to, you know, what happens in the
16  residential services division with families, with
17  parents, with the staff and hiring and sort of -- it is
18  a lot of different things.
19  Q. When you said clinicians, are those teachers?
20  A. No. Clinicians. That will be a licensed social
21  worker.
22  Q. Did Mr. Mantha hold that position in 2019?
23  A. Yes.
24  Q. Do you know how long he has been an employee?

Page 46

1    A. He has been an employee since June 4th of 2005.
2    Q. Do you know what was -- strike that.
3       Did he hold any other titles besides the one he
4 currently holds?
5    A. He did. I don't know what the history is. I
6 know the title was before his current role. He was the
7 program director and then moved into the director of
8 residential services. I could get all of that -- all
9 the exact dates I do have. My guess would be it would
10 be about three years ago.
11   Q. Going to back the students, the students who are
12 living in the -- do you use the term home -- I can't
13 remember the exact term.
14   A. Group home, yeah.
15   Q. Are these students that have special education
16 needs?
17   A. Yes.
18   Q. In general, what type of special education needs?
19   A. They're generally behavioral needs or social and
20 emotional well-being needs.
21   Q. And are these students coming from Massachusetts
22 or are they coming from all over the country?
23   A. Most primarily Massachusetts. There are a few
24 that come from New Hampshire and maybe one that comes

Page 47

1 from Rhode Island.
2    Q. I think you testified earlier that they are
3 enrolled and living at the school year round minus a few
4 weeks during break; is that accurate?
5    A. Yes.
6    Q. Fair to say there probably is a lot of contact
7 with their parents and family; is that correct?
8    A. I would say so, yes.
9    Q. Do you know who is usually making contact with
10 their parents and families?
11   A. I didn't hear that.
12   Q. I will phrase it better.
13      Whose responsibility would it be in the
14 residential divisions to contact the parents and family
15 where appropriate and needed?
16   A. I'm not sure.
17   Q. Does Mr. Mantha have a physical office at
18 Perkins?
19   A. Yes.
20   Q. Does he have a physical work phone?
21   A. I think so.
22   Q. Do you know the number of his work phone offhand?
23   A. Not off the top of my head. That essentially is
24 really name driven. I would pull up Joseph Mantha and

Page 48

1 click on that. The days of seeing numbers, you don't
2 really see that anymore. I know behind it it would have
3 his extension.
4       Oh, wait. I do remember it. 978-368-4900.
5    Q. Do you have an idea of how much during a normal
6 day, pre-COVID, that he would spend in his physical
7 office versus somewhere out in the campus?
8    A. Honestly, I don't. Human recourses is offsite.
9 We are like a mile and a half down the road. We are not
10 physically on campus. I don't tend to see that coming
11 and going in traffic.
12   Q. There is a portion of Perkins that is not on the
13 campus but is down the road I think you said?
14   A. Yes.
15   Q. Is that just HR?
16   A. It is HR, finance and facilities.
17   Q. Does facilities involve residential or is that on
18 the campus?
19   A. I would say no.
20   Q. It does not involve residential?
21   A. No.
22   Q. Any employee who is within the residential
23 division, they would probably be working on campus, is
24 that accurate?

Page 49

1    A. Absolutely.
2    Q. Would they have reason to visit this offsite
3 location?
4    A. Only if they wanted to talk to somebody from HR.
5 But they generally don't. They usually call or email.
6    Q. What does facilities entail?
7    A. That would be grounds and, you know, maintaining
8 the grounds, fixing buildings. Those types of things.
9 So they are sort of dispersed all over campus. Sort of
10 coming and going. But the building, which we call south
11 campus, which is a mile and a half down the rode, that
12 is sort of where their stuff is, for lack of a better
13 word, sort of their home base, if you'd call it. They
14 meet there in the morning and then they disperse
15 throughout the day.
16   Q. Are there multiple -- you mentioned south campus.
17 Is that what you said?
18   A. Yes.
19   Q. Are there other portions of the campus?
20   A. No. It is just finance, HR, and facilities.
21   Q. Is that what you referred to as south campus?
22   A. Yes.
23   Q. What is the main campus called?
24   A. Main campus.

13 (Pages 46 - 49)

Page 50

1    Q. Those are the only two physical locations for
2  Perkins?
3    A. No. There is one more. Adult and elder
4  services, that division, they are in Clinton.
5    Q. Okay. On the main campus, are there any security
6  guards?
7    A. No.
8    Q. Is there any type of security personnel that is
9  employed with respect to the group homes?
10   A. Nope.
11   Q. Do you know if there has ever been instances of
12  violence that have occurred in the group homes?
13   A. Yes. Yes. I don't know that there would be
14  violence. A better word is the population that we serve
15  those individuals, you know, certainly have behavioral
16  outbursts. That is what we are doing is working with
17  them to minimize those behaviors. To be clear, it
18  wasn't necessarily violence but behavioral issues.
19   Q. Perkins would be relying on the residential staff
20  to kind of, for lack of a better word, handle those
21  situations. Is that accurate?
22   A. Correct.
23   Q. This was implicit from your testimony earlier
24  but, to be clear, employees are permitted to use their

Page 51

1  cell phones in connection with their work; correct?
2    A. Yes. As long as it is for business-related
3  reasons, yes.
4    Q. When you say business related-reasons, what do
5  you mean?
6    A. Something has, you know, something that is within
7  the scope of their employment. What we don't want to
8  happen is for them calling relatives or outside callers
9  or that kind of stuff just because it is disruptive to
10  the clients that we serve. Even internally we try to
11  keep that just for emergencies or have to's.
12   Q. You are talking about -- if I'm understanding you
13  correctly, you are talking about using your cell phone
14  during the workday?
15   A. Correct.
16   Q. Is there a set workday for all employees?
17   A. No.
18   Q. Does that vary from employee to employee?
19   A. It does.
20   Q. In fact, I think you mentioned like shifts for
21  residential employees; is that right?
22   A. Yes. For -- if we are just talking about
23  residential counselors, even then I was going to say
24  that there are standard shifts but there is really not.

Page 52

1  I would have to say no.
2    Q. Okay. Does Mr. Mantha have a set workday?
3    A. Generally.
4    Q. Generally, again, we are talking pre-COVID 2019,
5  I understand COVID is totally different. But at that
6  period what would that have been?
7    A. It would have been sometime during the day. I
8  know that is vague. Joe's position is salaried. We
9  don't track the time of salary folks. We just expect
10  them to get their job. Primarily days. However,
11  depending on emergencies on what is going on you could
12  get calls in the evening or weekends. Or he may come in
13  on weekends or evenings. Honestly, I don't know how
14  much he does that.
15   Q. Does the school have a written policy about using
16  a cell phone during the workday?
17   A. Yes.
18      MS. KINGSTON: We would request a copy of
19  that as well.
20      THE WITNESS: Okay.
21  BY MS. KINGSTON:
22   Q. What I take from what you are saying is the
23  thought is that use of a cell phone for personal reasons
24  during the day could be distracting from a person's job

Page 53

1  duties; is that right?
2    A. Correct.
3    Q. Which makes sense particularly when you are
4  working with kids, right? You want to be paying
5  attention?
6    A. Correct.
7    Q. And do you have any knowledge about Mr. Mantha's
8  specific use of his cell phone during the day for work-
9  related purposes?
10   A. No.
11   Q. Was the school you mentioned he was a salaried
12  employee; correct?
13   A. Correct.
14   Q. Does he need to log overtime work that he does?
15   A. No.
16   Q. So, in other words, he doesn't get paid extra for
17  working into the evenings or on the weekends; is that
18  right?
19   A. Not that I know of. The reason I say, "not that
20  I know of," we do have what is called come about for
21  salaried people who would pick up additional shifts that
22  are outside their job.
23      So if somebody was a human resource manager but
24  then they raised their hand and said, "I will pick up a

14 (Pages 50 - 53)

Page 54

1 shift as a residential counselor." We would pay them
2 $25 an hour.
3      I don't think Joe gets that but I would have to
4 check it, to be quite honest with you.
5      Q. Okay. And you mentioned earlier that it's
6 possible that he could be working on weekends or in the
7 evening because of an emergency; is that accurate?
8      A. Yes.
9      Q. When you say emergency, generally what do you
10 mean?
11      A. All I would know is there would be an emergency
12 situation with a student. I don't honestly -- I don't
13 tend to get -- that is not my skill set so I don't tend
14 to follow that.
15      Q. Do you know if there is an emergency line that is
16 maintained in case employees need to contact each other
17 about something like that?
18      A. No. I think it would be the main number.
19      Q. You are not aware of any on-call number?
20      A. I know we have people who are on call. I don't
21 know that there is any on call -- like a specific phone
22 number.
23      Q. Do you have any knowledge of Mr. Mantha being
24 called in an emergency situation?

Page 55

1      A. No. Not specifically.
2      Q. You can't recall any specific instances in which
3 you have heard that he has been contacted in an
4 emergency situation?
5      A. Yeah, I wouldn't. I know there is an on-call
6 schedule where I believe Joe is in rotation on that. It
7 is Joe and I think other program directors that are on a
8 rotating schedule to be on call but not anything that I
9 would be close to have an understanding about.
10      Q. Who creates and maintains the on call schedules?
11      A. I'm not sure. I would say Joe.
12      Q. Safe to say that would include the person's name
13 and contact information; is that accurate?
14      A. Yes.
15      MS. KINGSTON: So I will follow up with you
16 about this but we will be looking for that on call
17 schedule for the relevant time periods. It sounds like
18 Mr. Mantha would have that?
19      All right. Does anyone need a break?
20      MR. BRODERICK: I'm good.
21 BY MS. KINGSTON:
22      Q. Does each -- I think you said there is 351
23 employees total about 110 are in the residential
24 division; correct?

Page 56

1      A. Correct.
2      Q. Does each employee get a work computer?
3      A. No.
4      Q. About how many employees have work computers?
5      A. Honestly, I don't know.
6      Q. Is that handled through the HR department?
7      A. Everybody gets access. Access, you know, to log
8 in. But, you know, depending on their position would
9 depend whether they actually had a computer or used a
10 shared computer.
11      Q. What would they be able to access when they log
12 in?
13      A. It depends on their role.
14      Q. What type of systems available. I'm trying to
15 get a sense -- it sounds like Perkins has kind of
16 internal system that you can log onto; is that correct?
17      A. Our network.
18      Q. Network. What types of things are on there?
19      A. That HRIS system that I was talking to. So
20 people would have access to punch in and out. We have a
21 staff resource page. They access their email from that.
22 We have a client management system so they would
23 certainly would access -- that is role driven as well.
24 Most likely they would access that. That is really it.

Page 57

1 You know, email the staff resource page. The payroll/HR
2 system and then the client management system.
3      Q. It sounds like employees can access this network
4 remotely; is that correct?
5      A. No, not necessarily. Only senior leadership
6 staff.
7      Q. Would that include Mr. Mantha?
8      A. Yes.
9      Q. Did the school have a policy on personal use of
10 work computers?
11      A. A policy on personal use of computers? Yes. I
12 don't think it's a specific policy, it is embedded in
13 something else.
14      Q. Do you know generally or do you recall what the
15 policy is?
16      A. The gist of it is, you know, that computers, any
17 of the information services on systems that we have at
18 Perkins can only be used for business purposes.
19      Then there would be guidelines about HIPAA and
20 emails and things like that.
21      Q. Is it a blanket prohibition on personal use or is
22 there some like minimal allowance?
23      A. I believe you can't use it for personal use.
24      Q. Does Perkins issue work owned phones to employees?

15 (Pages 54 - 57)

Page 58

1  I think you said no.
2      A.  Yeah, we don't.  Nope.
3      Q.  Do you know why not?
4      A.  There are lot of factors that went into it.
5      One, which probably isn't appropriate, we don't
6  want to manage that nightmare.
7      Two, we don't really have any position that they
8  would use their cell phone all the time.  You know,
9  people are using a mixture of the, you know, desk
10  phones, wall phones.  We ideally prefer not to use a
11  cell phone.  And so just didn't want to sort of
12  encourage that.  But we also knew that some people, from
13  convenience, they may want to text back and forth about
14  a client or something like that.  Obviously, recognizing
15  that, you know, some professionals go offsite for
16  meetings and they need to have contact on occasion.
17      It just really wasn't -- you know, we wanted to
18  have something but we didn't really want to have people
19  sort of using their phone all the time.
20      Q.  That is kind of -- let me know if you agree.
21  That is kind of the norm for most workplaces?
22      A.  Correct.
23      Q.  It is the rare workplace that is going to give a
24  cell phone; right?

Page 59

1      A.  Exactly.  Ours, like I said, ideally we'd rather
2  somebody, you know, not use their cell phone.  So we
3  weren't asking to use it all the time.  It wasn't really
4  a company phone.  We didn't want to be in the business
5  of managing desk phones, cell phones; all of that.  It
6  doesn't make sense.
7      Hence, why we got Ring Central.  That kind of
8  puts it all as best as it can be put into one box to
9  manage it.
10      Q.  And I think you mentioned earlier there is a cell
11  phone policy; is that correct?
12      A.  Yes.
13      Q.  If I haven't asked before, I'm going to ask that
14  you that give me a copy of that.  Okay?
15      A.  Absolutely.  To be clear, it is a cell phone
16  reimbursement policy.
17      Q.  And do you have that -- do you have that handy on
18  your computer right now?
19      A.  I do.
20      MS. KINGSTON:  At the next break, I think
21  I'm going to ask you to email that to me in case I have
22  any questions.  We will keep going until we take a
23  break.
24  BY MS. KINGSTON:

Page 60

1      Q.  Can you tell me generally what that policy is?
2      A.  Yeah, it is a one page policy.  Is not a very
3  lengthy.  Essentially, it basically says, that it
4  applies to people who have an authorized need for mobile
5  device services, that we talked about earlier.  And that
6  we will reimburse them $30 a month.
7      Q.  Is "authorized need" further defined or given any
8  substance?
9      A.  Yes.  It does, yes.  There is an approval, a
10  section of an approval process.
11      MS. KINGSTON:  Okay.  I think it makes sense
12  that -- I think it makes sense to take a short break.
13  If you can email me that that will be a lot more
14  efficient if I have that in front of me.
15      Does a 15-minute break work for everybody?
16  When we come back, I will have that in front of me.
17  Thank you.
18  12:35      THE VIDEOGRAPHER:  The time is.  We
19  are going off the record.
20      (Break in the proceedings.)
21      THE VIDEOGRAPHER:  We are back on the
22  record.  The time is 12:35.
23      (Document marked as Exhibit No. 2 for
24  identification.)

Page 61

1  BY MS. KINGSTON:
2      Q.  Mr. Padon, I have marked as Exhibit 2 the cell
3  phone reimbursement policy that you sent me.
4      Do have you that in front of you?
5      A.  Yes.
6      Q.  Was that policy effective in 2019?
7      A.  Shoot.  You had asked that and I meant to -- it
8  was -- I just don't know the exact date we rolled it
9  out.  Sorry.
10      Q.  Are you talking about the Ring Central app?
11      A.  No.  The policy is what I don't know.  The Ring
12  Central was June 28, 2019.
13      Q.  June 28th?
14      A.  Yes.
15      Q.  Is that the date when employees would have been
16  starting to use that system?
17      A.  Yes.  That was the date -- on the 28th the phones
18  were really sort of installed throughout that week but
19  the official training happened on June 28th.
20      Q.  Okay.  Is it possible employees would have
21  started using that before the 28th?
22      A.  I don't know if I can access that.  It would say
23  possibly, yeah.  Yeah.  Not that -- not the, you know,
24  not the line staff, as we call it, which can be the

16 (Pages 58 - 61)

Page 62

1 direct care staff. But probably someone like myself or
2 somebody in an effective leadership capacity may have.
3    Q. Would that have included Mr. Mantha?
4    A. Yes.
5        MR. BRODERICK: Objection.
6 BY MS. KINGSTON
7    Q. Would you count him as part of the executive
8 staff?
9    A. No. Joe would fall under executive leadership and
10 senior leadership. So Joe would fall in senior
11 leadership.
12    Q. Turning back to the cell phone reimbursement
13 policy, I think you said this was in effect in 2019, but
14 you are not positive?
15    A. I was trying to look it up now when I sent out
16 the last policy. I'd have to get it for you.
17        I'm embarrassed. It should be on the bottom of
18 this document. Normally my policies do have that on
19 there. This one I guess I did not do that.
20    Q. Do you know if there were any changes to the
21 policy reasonably?
22    A. No. Nope.
23    Q. So I mean is it fair to say that the substance of
24 this policy would have been the same as in 2019?

Page 63

1    A. Absolutely. Absolutely.
2    Q. At some point we can take a short break and you
3 can confirm that for us.
4        We assume that this would have been the same
5 substance in 2019?
6    A. Correct.
7    Q. So referring you to that, did you write this
8 policy?
9    A. I did.
10    Q. Do you know when you first drafted it?
11    A. That's what I can't figure out. That's the date
12 I'm trying to get.
13    Q. Do you know how long Perkins has had a cell phone
14 reimbursement policy?
15    A. I don't know the exact date. We have done it in
16 this manner for quite a while. I want to say at least
17 five years if not more.
18    Q. That is that Perkins had any type of
19 reimbursement policy, is that correct, not just this
20 one?
21    A. Yes.
22    Q. Were you with Perkins when the decision was made
23 to create this policy?
24    A. Yes.

Page 64

1    Q. Do you remember kind of the thinking behind it at
2 the time?
3    A. Yeah, it was really based on the fact that we
4 were doing something and didn't have a policy for it. I
5 wanted to make sure it was fair and consistent and there
6 was something in place. It was a new policy but it
7 wasn't a new practice. It was putting what we were
8 doing into writing and formalizing it.
9    Q. At that time, you were already reimbursing
10 employees for cell phone use?
11    A. We were.
12    Q. Do you know how long that practice dates back to?
13    A. At least five years.
14    Q. Okay. All right. I want to look at some of the
15 language in it. Again, this is Exhibit 2. I'm looking
16 at the first paragraph under policy.
17    A. Um-hmm.
18    Q. It refers to authorized need. Do you see that?
19    A. Yes.
20    Q. Since you drafted this, you are best person to
21 ask. What does authorized need mean?
22    A. It really ties to what is included in the
23 approval process. It still is a little bit vague and we
24 had to put it that way because everybody's role is

Page 65

1 different. And the reasons why they would need it would
2 be different. But basically the supervisor writes a
3 justification and that's what myself and Lisa, who is
4 the CFO, would determine it was appropriate based on
5 what they wrote that would determine whether it was
6 appropriate of them to have the phone or not.
7    Q. Okay. It goes from a request -- is there a
8 written request for the supervisor?
9    A. Yes.
10    Q. Is it required to be in writing like you wouldn't
11 consider -- you wouldn't consider an oral request?
12    A. We have, unfortunately. Yes.
13    Q. So there is some type of request from a
14 supervisor and then that goes up to you and Lisa
15 Harrington?
16    A. Harrington, yes. She is the CFO.
17    Q. Is there anyone else involved in that process?
18    A. No. Only in the capacity that I spoke to earlier
19 where if I question something or didn't understand
20 something, I would immediately reach out to somebody
21 else to get clarification.
22    Q. Would it be to the employee who is seeking
23 reimbursement?
24    A. It could be the employee. It could be the

17 (Pages 62 - 65)

Page 66

1 supervisor. I could be the VP. It really just sort of
2 depends.
3      To be honest, although we wrote that in the
4 policy, the people that we are issuing it to are
5 replacements. So for, for a replacement, if I knew that
6 a previous director had a cell phone, there is no reason
7 to really go through that. We know the role is the
8 same. That's generally what happens. We don't have a
9 lot of new positions or new job titles go through that
10 process. I don't think we've actually done it since
11 this has been in writing.
12   Q. Okay. This is a fairly infrequent process; fair
13 to say?
14   A. Yes.
15   Q. And do you recall when Mr. Mantha became a
16 director of residential services? Do you recall?
17   A. The date?
18   Q. Yes.
19   A. I can get it for you if I have 45 seconds.
20 September 13th of 2017.
21   Q. Okay. And was he replacing someone?
22   A. Yes.
23   Q. Who was that?
24   A. Tyron Scott.

Page 67

1   Q. Do you know if Tyron Scott had an entitlement to
2 cell phone reimbursement at the time?
3   A. I think did he, yeah. Again, there is no real
4 way -- again, I don't know how I would be able to
5 validate that.
6   Q. So you mentioned that there are various reasons
7 why an employee might qualify for this. Can you give me
8 some general sense of what those reasons might be?
9   A. Somebody that works offsite. Somebody who, you
10 know, Joe, I guess, is a good example, who their scope
11 for a lot of employees over a lot of different
12 buildings. Definitively if somebody is on call that is
13 an easy one.
14      I think those would be the big ones, the bigger
15 ones. It tends to most -- it is all people who are
16 manager and above.
17   Q. It sounds like it's a practical-based policy that
18 recognizes that certain employees might just need to use
19 their cell phone during work for work purposes. Is that
20 accurate?
21      MR. BRODERICK: Objection.
22   A. Absolutely.
23   Q. You mentioned with Mr. Mantha specifically that
24 you mentioned the scope and others, lots of employees,

Page 68

1 and lots buildings.
2      Did I state that accurately?
3   A. Yes.
4   Q. Does that mean that he was just on the move a
5 lot?
6   A. Yes. Yes.
7   Q. In fact, I think you mentioned six group homes?
8   A. Yes.
9   Q. You also mentioned people being on call. Do you
10 know if that applies to Mr. Mantha?
11   A. I think so.
12   Q. Do you know of any specific instances in which he
13 was on call?
14      MR. BRODERICK: Objection.
15   A. I don't. That's why I don't know. I'm not
16 involved in that call rotation so.
17   Q. And you mentioned the scope and lots of
18 employees. Are you referring to the 110 or so that are
19 in the residential division?
20   A. I am, yes.
21   Q. Is that because it's possible that any one of
22 them could be contacting Mr. Mantha as director?
23   A. Yes.
24   Q. Do you know who among those employees has his

Page 69

1 cell phone number?
2   A. Nobody has his cell phone number.
3   Q. Let's go back to the time before Ring, first. So
4 I understand with Ring Central that they could reach his
5 cell phone by calling his work number; correct?
6   A. Correct.
7   Q. That's what you are saying that they wouldn't
8 have his cell phone number, per se; right?
9   A. Correct.
10   Q. Let's talk about before Ring. Do you know if
11 they would have had a cell phone number then?
12   A. Only if he gave it to them.
13   Q. Do you have any way of knowing who he gave his
14 cell phone number to?
15   A. I wouldn't. I can tell you I feel like that -- I
16 don't get around the campuses a lot. Just as a
17 practice, we don't really give people cell phone
18 numbers. If I saw someone do it, I would step in and
19 correct that.
20      That is really something that I'm passionate
21 about that we are not doing that based on the type of
22 work that we do. Kids can get it, they are pretty
23 creative. They will get it on their own without it
24 leaking. It is something that we sort of need to be

18 (Pages 66 - 69)

Page 70

1 very cautious of.
2    Q. You are talking about post implementation of this
3 Ring Central app; is that right?
4       MR. BRODERICK: Objection.
5    A. Correct.
6    Q. Just to go back to the policy, Exhibit 2. I'm
7 looking at the second section that says eligibility.
8 And it says, "An employee who has an authorized need and
9 where their position requires them to be on/call."
10      Do you see that?
11   A. Yes.
12   Q. So are all the employees who are on call in some
13 respect eligible for this reimbursement?
14   A. No. If they are just on call, yes. But there
15 are some people that get the reimbursement who are not
16 on call. Either they are not call or they are
17 informally on call. Informally would be myself. So I'm
18 not on call, per se. This is Derek Padon's weekend to
19 be call. But I also recognize as part of my role if
20 there was an emergency related to myself, I would be on
21 call at any time. It is sort of complicated and what
22 true on call is and just being on call. We don't have a
23 really great definition for that.
24   Q. I see. I think you mentioned earlier, I'm

Page 71

1 focusing on the residential staff for now. That there
2 is actually written on call schedules. Is that correct?
3    A. I believe so, yes. It is really -- it is not
4 something that is managed through HR or from an
5 organization. Each manager for the division would
6 figure out what work space if they have do call.
7    Q. That is kind of what you are referring to as a
8 formal on call, correct?
9    A. Correct.
10   Q. So informal, I think what you called it, on call
11 just means it is either -- correct me if I'm wrong -- it
12 is explicit or implicit in your job duties that you have
13 to be generally available. Is that accurate?
14   A. Correct. That is accurate.
15   Q. I know that all too well.
16      Would you say that Mr. Mantha is someone who
17 qualifies as someone who is informally on call?
18   A. Yes.
19   Q. Tell me a little bit more about that. Who is he
20 informally on call for?
21   A. Really for anything that had to do with his
22 division. You know, if we had a major emergency and
23 someone could reach out to me, for example. I wouldn't
24 have the specific details so my first call would

Page 72

1 probably to be Joe.
2      There could be an emergency that the CEO was
3 alerted to. I would obviously give him Joe's -- he
4 would have Joe's phone number in Ring Central. So he
5 would be able to contact Joe, you know, for feedback.
6 There might be something specific to a student or
7 building that Joe would have that knowledge for.
8    Q. Can you give me a specific example of what type
9 of emergency that might be? Is it typically something
10 where students -- you know, well-being -- there's a
11 concern for students well-being or something like that?
12 Could you give me some examples.
13   A. It is certainly that. If it was something that,
14 you know, if it was an evening night or weekend and it
15 was a supervisor, you know, they didn't -- if it was an
16 emergency, you know, sick call. They couldn't replace a
17 sick call, I guess would be an example.
18      Certainly what you said, if there -- I guess, I
19 have been involved, if we had a student run away. Joe
20 would be notified right away and possibly, depending on
21 the circumstances, have to come on site and intervene in
22 some way. I guess those are probably the only examples
23 that I can think of.
24   Q. You know, I don't know want to know any of the

Page 73

1 personal identifying details but the student who ran
2 away, when was that? Do you recall?
3    A. Two years ago, probably.
4    Q. Sometime in 2018?
5    A. Yes.
6    Q. It sounds like these are either employee-related
7 issues or student -- and/or student-related issues. Is
8 that fair to say?
9    A. Yes.
10   Q. I'm sure you've probably heard the phrase "the
11 buck stop here." Correct?
12   A. Yes.
13   Q. Is it fair to say in terms of the residential
14 division that the buck stops with Mr. Mantha?
15   A. No, I don't really have that perception. Because
16 there is, you know, there's program directors that the
17 staff report into and then those folks report into Joe.
18      We also have the COO, who is pretty close to that
19 program as well. So I have seen people work out from
20 him. You know, working in human resources if somebody
21 disagrees with something that Joe says or implements,
22 they certainly have no problem calling or emailing
23 myself.
24      So I don't feel -- we don't want that perception

Page 74

1 anywhere within that organization. So I don't feel that
2 way.
3     Q. Let me put it a different way. I guess what I'm
4 getting at in terms of someone who is the most
5 knowledgeable in a position to make decisions in terms
6 of the residential division, would you describe that as
7 Mr. Mantha?
8     A. No. I would say that would be Tim Hammond.
9     Q. Tim?
10     A. I think if we are talking about day-to-day
11 decisions, yeah, that would be Joe. But if there are, I
12 guess, important things or things that would impact the
13 entire organization, then it certainly would be Joe.
14     Q. Who is Tim Hammond again?
15     A. He is the chief operating officer.
16     Q. You mentioned a couple of minutes ago that when
17 there was an emergency you actually specifically recall
18 calling Mr. Mantha. You recall his COO calling him.
19         Do you recall testifying to that?
20     A. Can you say that again?
21     Q. Sure. I think a couple of minutes ago, you
22 mentioned when the student ran away, I think you said
23 you called -- someone called Mr. Mantha; is that
24 correct?

Page 75

1     A. Yes. Someone called Joe.
2     Q. I think you mentioned that you even called him
3 with respect to some residential issue once; is that
4 correct?
5     A. No. No. If I said that, I didn't articulate it.
6 I was giving it as an example as something that I was on
7 the sideline sort of observing.
8     Q. I see. In these kinds of emergency situations
9 from your testimony that I'm understanding that
10 Mr. Mantha is the one that is going to be called
11 generally; is that accurate?
12     A. Yes. However -- I hate howevers -- a lot of
13 times if it truly is a major emergency, he is probably
14 calling Tim for direction as well.
15         If it was an HR issue, he had called me to get
16 advice and/or supervision on, you know, most of the
17 stuff that relates to HR, though, would be something
18 that Joe probably wouldn't call me at night or on the
19 weekend. He didn't suspend an employee, for example,
20 and then we would talk about that on Monday.
21     Q. I want to go back to the policy, which is
22 Exhibit 2.
23         Mr. Mantha currently receives reimbursement for
24 his cell phone under this policy; is that correct?

Page 76

1     A. Yes.
2     Q. Is this something that is approved on a yearly
3 basis or is it more periodic than that?
4     A. It is just once they get the cell phone -- in
5 order to get the reimbursement, we have to approve them.
6 Once it is approved, it would stay on until they are no
7 longer with us.
8     Q. Do you know -- strike that.
9         Do you know when he was first approved?
10     A. I don't.
11     Q. Would that be somewhere in Perkins' records or
12 electronic databases?
13     A. Probably not. That's because we have switched
14 HRIS systems. I would only have what is in the new
15 system from July 1st of 2017.
16     Q. I believe you said he was put in his new position
17 on September 13, 2017; is that correct?
18     A. Yes.
19     Q. If he was approved at that time, it would be in
20 the HRIS system?
21     A. Yes.
22     Q. In fact, I think I read the policy to mean,
23 whenever you change positions, you have to be reviewed
24 anew. Is that accurate?

Page 77

1     A. No.
2     Q. I'm looking at -- under approval process, the
3 second point, "Any employee who transfers to a new
4 position will need a new mobile device reimbursement
5 justification approved for the new position."
6     A. I do. That hasn't come up, I guess. Unless it
7 has been -- so this, I will admit, we are not following
8 up our policy to the T as we should be. I believe Joe
9 had cell phone reimbursement -- he was a program
10 director. So he had it when he transferred to the
11 residential director. And so there was no -- we knew
12 that his position included it so we didn't go through
13 that in writing.
14         We should have in order to follow our policy but
15 we didn't.
16     Q. So I think you mentioned that the person in his
17 position before him was Tyron Scott?
18     A. Yes.
19     Q. You think that he had the reimbursement?
20     A. Yes.
21     Q. I think you just testified what when Mr. Mantha
22 became the director that you knew that included the
23 reimbursement; is that correct?
24     A. Correct.

Page 78

1  Q. Why is that?
2  A. Why did I know that he would be eligible for the
3  reimbursement?
4  Q. Yes.
5  A. Just because I know what the job entails so it is
6  an easy one. Obviously, he needs if they are on call
7  they sort of need to go around the campus, so, yeah.
8  Q. Do you know the year that Mr. Mantha first
9  received a reimbursement?
10  A. I don't. I would have to like do some serious
11  digging to find that out.
12  Q. I'm going to ask you after the deposition to go
13  back into your system and look for documents relating to
14  reimbursement for Mr. Mantha.
15  A. Okay.
16  Q. This is approximately a $30 reimbursement;
17  correct?
18  A. Yes.
19  Q. Do you know if Mr. Mantha -- if there was a
20  written request by his supervisor at the time he
21  received reimbursement?
22  A. I don't. Only because I don't even know when he
23  started receiving it.
24  Q. Would that be stored in Perkins' electronic

Page 79

1  records if it existed?
2  A. My hesitation is we have a new HRIS system as of
3  July 2017. When we integrated from the old system to a
4  new system, we didn't bring in a whole lot of history,
5  we couldn't. That is my hesitation, I would have to
6  look.
7  Q. What about physical files?
8  A. Possibly either physical files or something that
9  is in a payroll document somewhere.
10  Q. If he was approved in September of 2017, that
11  would have involved you and Lisa Harrington; correct?
12  A. Yes.
13  Q. Do you have any memory of that?
14  A. Yes. That was a little bit different. Anybody
15  -- when we rolled this policy out, as I told you, it was
16  already happening. So any folks that were already
17  getting it, we didn't go through that approval. We just
18  sort of -- they were grandfathered. They were getting
19  it.
20     Obviously, Lisa and I reviewed a list and said
21  does this make since? And it did. And we sort of moved
22  forward with those people.
23  Q. You think this written policy was created after
24  September 2017 or before?

Page 80

1  A. After. Definitely after.
2  Q. After September.
3     From your memory and understanding, Mr. Mantha's
4  reimbursement would have been pursuant to the ordinary
5  practice but not necessarily to this policy?
6  A. Correct.
7  Q. Is it accurate to say that this policy simply
8  memorializes what this practice was?
9  A. Correct.
10  Q. Do you have any specific memory of approving
11  Mr. Mantha in 2017?
12  A. No. Other than what I just told you. When we
13  sort of rolled out the policy, when we reviewed it. I
14  saw his name on the list, knew it made sense, and,
15  obviously, didn't take him out of the system or made any
16  changes to it.
17  Q. Fair to say it was a no-brainer --
18  A. Yeah.
19  Q. -- to have approved him for this reimbursement?
20  A. Exactly.
21  Q. There's 351 employees at the school; is that
22  right?
23  A. Yes.
24  Q. How many currently get cell phone reimbursements?

Page 81

1  A. I want to say like 15 to 20; not a lot.
2  Q. Can you give me a sense -- you don't have to give
3  specific names, but a sense of who these people are,
4  what their roles are?
5  A. Yeah. The executive team members that I talked
6  to you about, all of those folks. And then anybody that
7  is a director of one of the divisions that I mentioned
8  that we talked about so they certainly have it. Then
9  maybe one or two people underneath the divisional heads.
10  Q. What about the program directors to the
11  residential group?
12  A. Yes, they get that as well.
13  Q. What is the reason for that?
14  A. Because -- I'm using your word now -- it's a
15  no-brainer. They participate in the call. They are
16  there as well. Not as much as Joe. They leave their
17  office, which their office in the residential group
18  home. They may go to a meeting, they go to a cafeteria.
19  They are going back and forth.
20     If there are issues with kids at school to sort
21  of make that transition happen. And probably more
22  importantly if there is ever an emergency with a kid or
23  a parent needed a kid, we would need a way to get that
24  kid so those program directors are the way that we would

21 (Pages 78 - 81)

Page 82

1  get them.  That's why they would get it.
2    Q.  Not to oversimplify it, these are kind of people
3  who really couldn't effectively do their jobs without
4  use of a cell phone; is that accurate?
5    A.  Yes.
6    Q.  Are employees able to work from home?  We are
7  talking pre-COVID.
8    A.  No.
9    Q.  They weren't able to work from home pre-COVID;
10  is that what you just --
11    A.  Yes.  Our CEO has a very, very strict stance on
12  working from home.  It is not something that -- until we
13  got COVID.  We are very different now.  But before that,
14  no, it just wasn't allowed.
15    Q.  Do you know the rationale for that?
16    A.  I think there was a fear of being able to hold
17  people accountable at home.  The other issue that we had
18  is, you know, if we let some folks work from home, we
19  have the majority of our positions, teachers and
20  residential counselors, they can't do their jobs from
21  home.  They tend to say, "If we can't do that, why can
22  that group do it?"  It is sort of old-fashion thinking
23  where folks don't realize that some jobs are okay to
24  work from home and some, by nature, just aren't.

Page 83

1      So it was something that we just didn't want to
2  change that culture within the organization so we left
3  it alone and decided we'd look at it down -- I got
4  Michael Ames to sort of, you know, kind of let me know
5  that we'd talk about it a later time and see if it was
6  something that we could move towards.  COVID-19
7  certainly made that happen.
8    Q.  I can tell you it is a subject you are passionate
9  about.
10    A.  Very.
11    Q.  Law firms are the most old school so.
12      What about -- what if an employee comes home from
13  a workday and sends a couple emails at night.  Make a
14  couple of phone calls.  Is that permissible?
15    A.  If they are salaried, yes.  That does happen on
16  occasion.  Any employer would tell you this, we do have
17  hourly folks who probably are going on their email when
18  they are not on the clock.  We tell them not to as much
19  as we can.
20    Q.  Is there a policy about work from home?
21    A.  Nope.  Nope.
22    Q.  So Mr. Mantha is a salaried employee and he was
23  in 2019.  Is that right?
24    A.  Absolutely.

Page 84

1    Q.  If he wanted to send a couple of emails or make a
2  couple of phone calls off the clock at home, how would
3  he do that?
4    A.  He could -- from his phone he could certainly do
5  that.  Or from --- we have the VM wear.  I don't know
6  think Joe has that, though.  I'm not sure.
7    Q.  What is that?
8    A.  It is VM wear.
9      On days that I work from home I can log into -- I
10  would go to my desktop at home, my personal desktop,
11  sort of like Ring Central.  I click on an icon on the
12  desktop and it would bring me to the exact desktop at
13  Perkins.  I don't think Joe has that.
14      Yes, he could send emails or do phone calls at
15  night.  I have never -- I never had any contact with him
16  after hours.  That is not to say that he doesn't with
17  other people.
18    Q.  From what I'm understanding there is still a way
19  for him to access the network and his emails from home
20  on his cell phone; is that correct?
21    A.  I wouldn't say the network.  I would say his
22  emails.  Yes, he could certainly access them from his
23  phone.
24    Q.  I think you said 15 to 20 employees currently

Page 85

1  have approval for the reimbursement?
2    A.  Right.
3    Q.  When is the last time that you approved someone?
4    A.  It was three weeks ago.
5    Q.  What job title did that person have?
6    A.  It was a program -- it was somebody that reported
7  to Joe.  It was a program director.
8    Q.  Was there a written request.
9    A.  No.  It was an email from Joe.  And, you know,
10  again, it was a replacement and I knew that she would
11  get it and I processed it.
12    Q.  Do you recall if Mr. Mantha said anything in
13  support of the request?
14    A.  No.  His approach on it was that basically it
15  should have already happened.  So just made me think
16  that we need -- we need some education with folks so
17  they know that needs to come from them.  It is just not
18  this automatic thing that happens.
19    Q.  Do you know -- you gave me the names of the
20  program directors so this is someone who started
21  recently.  Is that correct?
22    A.  She started probably nine -- anywhere from six to
23  nine months ago.  Because we are not following the
24  process.  No one prompted HR to do it.  Joe sent the

22 (Pages 82 - 85)

Page 86

1 email and the approach was basically, you know, You
2 didn't do this.
3    Q. That is Amanda?
4    A. No. It was Kelley Gross.
5    Q. So there are six program directors and they all
6 have cell phone reimbursements?
7    A. Yes.
8    Q. Obviously, Mr. Mantha does. Did Mr. Mantha have
9 a cell phone reimbursement continuously from 2017 to
10 present?
11    A. I'm not sure of the date. I don't know.
12    Q. You are not sure of the date when he was
13 initially approved?
14    A. Exactly. It was sort of a chaotic process that I
15 just sort of recognized and said, "We need to clean this
16 up."
17    Q. My understanding is he had a reimbursement for
18 all of 2018, all 2019, and all of 2020?
19    A. Yes.
20    Q. Is it fair to assume that because the program
21 directors have a cell phone reimbursement, Mr. Mantha
22 has a cell phone reimbursement, fair to say they are
23 calling each other via each other's cell phone at some
24 point?

Page 87

1        MR. BRODERICK: Objection.
2    A. Are you waiting for my answer?
3    Q. Yes.
4    A. Honestly, I don't know. My true perception is
5 they are calling people on the Ring Central.
6    Q. And I think -- I think you said earlier that if
7 you get a cell phone reimbursement, you are required to
8 use the Ring Central app; is that right?
9    A. Yes.
10    Q. Is there a written policy on that?
11    A. No. It is not specifically stated out, no.
12    Q. But practically speaking that is the requirement?
13    A. Yes.
14    Q. Are the people on Ring app only the people who
15 have reimbursement or is it all employees?
16    A. All employees.
17    Q. Do you know if someone were to make a call or
18 receive a call through the app how that would show up on
19 their phone records, would it show the work number or
20 cell phone number?
21        MR. BRODERICK: Objection.
22    A. I don't know what it says on the records. I know
23 on the screen it would say -- the extension would come
24 up, the internal extension would come up.

Page 88

1    Q. When you say that if you get a reimbursement you
2 are required to use the Ring Central app, does that mean
3 you can't use your physical work phone -- can you
4 clarify that for me?
5    A. Yes. So if you are using your cell phone, then
6 you should be using the Ring Central.
7        But it doesn't mean you can only use your cell
8 phone to make calls. I use my cell phone; my desk
9 phone; the phone in the hallway. People aren't really
10 restricted to one phone, per se.
11    Q. Okay. I see. What do you think the practice is
12 since the Ring Central app has come in? Are people
13 primarily using their cell phones? Are they still using
14 their physical phones or it just depends?
15        MR. BRODERICK: Objection.
16    A. I see it all.
17    Q. I'm sorry?
18    A. I see people doing all different things.
19    Q. Okay.
20        Are people who receive cell phone reimbursements
21 ever required to submit the records to show --
22    A. No.
23    Q. So the only written documents that the school
24 would have relating to reimbursements would be the

Page 89

1 initial Ring request if there is one; correct?
2    A. Correct.
3    Q. Then would there be any documentation from you or
4 Lisa Harrington?
5    A. Documentation from us?
6    Q. In terms of the review and approval process?
7    A. No. Basically we would just review it and we set
8 it up in the HRIS system as a deduction.
9    Q. Have you ever -- strike that.
10        MS. KINGSTON: I don't have too much more.
11 I'm going to check my notes.
12 BY MS. KINGSTON:
13    Q. Just for my clarification, before the Ring
14 Central app came into place, employees who use their
15 cell phone would have been calling and taking calls from
16 their cell phone directly; is that correct?
17    A. Yes.
18    Q. Mr. Padon, you testified that you really don't
19 know anything about Mr. Mantha's specific use of his
20 cell phone; is that kind of accurate to say, because you
21 are in HR?
22    A. Yeah, yeah.
23    Q. All right. Who at Perkins would have -- outside
24 of Mr. Mantha, obviously, would have a better idea of

Page 90

1 that?
2    A. Can you explain to me what -- I guess I don't
3 understand what you are asking.
4    Q. Sure. So I know generally that he gets a
5 reimbursement and that it was a no-brainer to give that
6 to him. I think you testified because he has a need for
7 it.
8       In terms of factually how much he is using that
9 day-to-day I think your testimony was that you really
10 don't know because that is just not your job?
11    A. I don't know -- honestly, I don't know that
12 anybody would really be watching what phone Joe uses.
13    Q. Are there particular people at the school who if
14 he was using his cell phone, he would be using his cell
15 phone to call them and they would have knowledge of
16 that?
17    A. Possibly. But don't forget, we have Ring Central
18 now so they wouldn't know where -- he could be in his
19 living room. They probably wouldn't -- in the olden
20 days, yes, I guess I could say to somebody, "Does Joseph
21 Mantha call you on his cell phone?" They would say,
22 "Yes."
23       They probably say -- "Explain that to me. What
24 are you asking?"

Page 91

1       If I see somebody on a cell phone, I don't
2 whether that call is going through Ring Central or
3 another line. I don't really know.
4    Q. For the Ring Central app, you click on that icon.
5 Is that correct?
6    A. Yes.
7    Q. Then it is like employee by employee listing?
8    A. You could do that or you could, you know, click
9 on the icon and dial in a number or you could look a
10 person up and dial it.
11       However, say that somebody -- if you called my
12 work phone number. That I don't have to click on the
13 icon. It shows up on my phone which is a bad part of
14 the thing. If you called me on my work business number
15 -- at least on my iPhone, I'm speaking to iPhones, I
16 don't know that it is somebody calling through Ring
17 Central. You don't know. It comes up in the same
18 fashion any other call would come so it is a drawback.
19 My point is you don't have to click on the icon to get a
20 call or anything. It just comes through.
21    Q. Is someone able to leave messages on a person's
22 cell phone through the Ring app?
23    A. Yes.
24    Q. Are there texting capabilities or is it just

Page 92

1 telephone calls?
2    A. You can text from it. I don't know anybody that
3 uses that feature other than the executive team. He
4 might.
5    Q. Does the school store the Ring Central app record
6 or would that be on an individual's phone?
7    A. It would be -- they wouldn't be on site here. I
8 imagine Ring Central would have a way -- if we ever had
9 a need to look something up.
10    Q. Do you maintain kind of like a summary of
11 Mr. Mantha's job position in some way? When I say
12 "you," I mean Perkins, somewhere in Perkins books or
13 records?
14    A. Yes.
15    Q. Okay. Do you know if that has changed since last
16 year?
17    A. Not anything that was documented.
18    Q. Is that just something that is stored on the
19 electronic book somewhere?
20    A. Really all we would have is his evaluation, which
21 would speak to his accomplishments and then areas for
22 the next year.
23    Q. And do you recall seeing anything on his
24 evaluations about being on call?

Page 93

1    A. I didn't read his evaluation. I hourly doubt it.
2 But I didn't read them, to be honest.
3    Q. Is there any type of general description of his
4 job, not specific to him, that Perkins has and maintains?
5    A. I don't know. I would have to.
6    Q. I'm thinking specifically when a job opens and it
7 is posted, you kind of go through what the job might
8 entail. Do you understand the gist of what I'm talking
9 about?
10    A. Yes. Yes, there is definitely a job posting, I
11 don't know if there is a job description. We do have
12 job descriptions. Joe's position, I don't know if he
13 has it or not, off the top of my head. Yes, we would
14 have the job posting from when he applied for the
15 position, yes.
16       MS. KINGSTON: If you could give a copy of
17 that as well.
18       THE WITNESS: Okay.
19       MS. KINGSTON: Thank you. Those are all the
20 questions I have for now. I am going to reserve the
21 right to reopen this deposition because, as we
22 discussed, Perkins has not searched its records for the
23 document request. I'm not necessarily saying I will
24 need to redepose, but I'm reserving the right depending

24 (Pages 90 - 93)

Page 94

1 on the documents that we receive. And I just wanted to
2 put that on the record.
3     So Ted might have some additional questions for
4 you. But at this point, I will conclude and I will
5 reserve the right to reopen at a later time.
6     Thank you.
7     THE WITNESS: Thank you.
8     MS. KINGSTON: We will be in touch offline
9 about the documents.
10     THE WITNESS: Okay. If you could also give
11 me a deadline but as much time as you possibly could.
12     MS. KINGSTON: We will talk offline.
13 BY MR. BRODERICK:
14     Q. Mr. Padon, I just had a couple of questions for
15 you.
16     You had mentioned earlier that there is a policy
17 regarding work computers and not using them for personal
18 use?
19     A. Yes.
20     Q. And for someone who gets a cell phone
21 reimbursement of $30 a month, is there any similar
22 policy with respect to using that phone?
23     A. Not on the cell phone policy. But we have a
24 general phone policy that speaks to not using phones for

Page 95

1 any personal reason.
2     Q. When you say phones, though that is not -- like
3 you get a $30 reimbursement every month; correct?
4     A. Yes.
5     Q. You can use that, your cell phone, your iPhone,
6 for anything that you want; correct?
7     A. Yes.
8     Q. You are talking about a desk phone that you pick
9 up and call. You are not supposed to make personal
10 calls on that phone which is the Perkins number?
11     A. Yes.
12     Q. But you make personal calls on your own cell
13 phone?
14     A. No, not while I'm at work. That's not what we
15 do.
16     Q. Well, while you are working. You can use that
17 phone after work for any purpose?
18     A. Of course, absolutely.
19     Q. You consider that phone your personal cell phone?
20     A. It is my phone.
21     MR. BRODERICK: All right. Thank you.
22 Nothing further.
23     A. I'm pretty clear with employees that it's their
24 phone, too. And even with managers, we have to respect

Page 96

1 that. That is their phone and that's why we don't ask
2 for phone bills because I don't want to be in the cell
3 phone business or the phone business. It is really not
4 ours to have. We are not managing it in any other way
5 other than the reimbursement for when they do have to
6 use it. I'm passionate about this subject. Sorry.
7     MR. BRODERICK: Thank you very much. I'm
8 all set.
9     MS. KINGSTON: I have a couple of follow-up
10 questions on that.
11 BY MS. KINGSTON:
12     Q. If you were to find out that an employee who had
13 a reimbursement was making zero work-related calls, at
14 that point you would want to reconsider the
15 reimbursement. Is that accurate?
16     A. Absolutely, yes.
17     The problem is there is no way -- like I said, it
18 is not our phone and so that becomes problematic because
19 there is no real way to do that unless someone came up
20 and said, "I don't ever use or I don't have a need."
21 Hence, why we decided to sort of go through the written
22 justification that we are not using very well.
23     Q. It sounds like to me the concern is, which seems
24 practical, is that you don't want to purport to invade

Page 97

1 an employee's privacy?
2     A. Correct.
3     Q. You recommend at some point they are going to be
4 making some personal calls?
5     A. Correct.
6     Q. But in terms of the scope of their work, you are
7 interested to some extent what they are doing with their
8 phone. Is that accurate to say?
9     A. Yeah. If they were doing something inappropriate.
10 Again, we have to be careful what is happening within
11 the four walls of Perkins and what happens outside those
12 walls that is not our concern. That is where it gets
13 muddy, to be honest with you.
14     If it's something that we observe or somebody
15 observes on site, then, of course, if it was something
16 inappropriate then we would intervene. If it is
17 something outside of work, then we wouldn't.
18     Q. You know, I have one kind of final question, you
19 spoke about -- you used the term need earlier for some
20 employees, the 15 to 20, who have reimbursements to use
21 their cell phones. I take that to mean, correct me if
22 I'm wrong, that they literally could not carry out their
23 job duties unless they would use their cell phones. Is
24 that an accurate statement?

25 (Pages 94 - 97)

Page 98

1  A. No. No. It is more of a convenience thing.
2  Q. What do you mean by that?
3  A. So, you know, we have desk phones here. We have
4  phones in the hallway. So, you know, people could
5  utilize those.
6     The cell phone reimbursement and people using
7  their phones was easier for them. It could be somebody.
8  I don't want to have to worry about two or three phones.
9  Or it could be somebody, you know, they are in and out
10 of their office all day. So you get a phone call versus
11 a voicemail or email. I look at it for emergency. It
12 is certainly, for on call if you want to use that
13 example, I guess that wouldn't be optional. You have to
14 have it to be on call because you are not physically
15 here. But other than that, I feel it's more of a
16 convenience thing.
17 Q. That would also apply to being informally on call
18 in the way that we spoke about earlier. Is that
19 accurate?
20 A. Yes.
21     MS. KINGSTON: That's all that I have. I
22 thank you for your time. I will be following up about
23 the remaining items that we discussed.
24     THE WITNESS: Okay.

Page 99

1     MR. BRODERICK: I have one quick one.
2  BY MR. BRODERICK:
3  Q. You had said, Well, if they are not using their
4  phone at all for any work-related purpose. But would
5  getting emails on your smart phone qualify for
6  justifying the $30 reimbursement that you are using data
7  to get emails on your iPhone?
8  A. It is not written anywhere. But we talked about
9  that a lot when we rolled this policy out and we decided
10 not to make it.
11    But part of informally with Michael, who I report
12 to, is he didn't want Lisa and I approving any that were
13 just related to just email or just the phone. We just
14 felt like we could have other solutions for those.
15    MR. BRODERICK: All right. Thank you very
16 much. Thank you for your time.
17    MS. KINGSTON: Thank you.
18    THE WITNESS: Thank you.
19    THE VIDEOGRAPHER: The time is 1:49. We are  0
20 going off the record. This is the end of the deposition
21 of Derek Padon.
22    MS. KINGSTON: Full and mini PDF.
23    MR. BRODERICK: I will do the same thing.
24

Page 100

1     COMMONWEALTH OF MASSACHUSETTS.
2  COUNTY OF SUFFOLK, SS.
3
4     I, Lori J. Atkinson, Professional Court Reporter
   and Notary Public duly and qualified in and for the
5  State of Massachusetts do hereby certify that the
   foregoing transcript is a true and correct transcript of
6  my original stenographic notes.
   I further certify that I am neither an attorney or
7  counsel for, nor related to or employed by any of the
   parties to the action in which this deposition is taken;
8  and furthermore, that I am not a relative or employee of
   any attorney or counsel employed by the parties hereto
9  or financially interested in the action.
10
11
   IN WITNESS THEREOF, I have hereunto
12 Set my hand and affixed my Notarial Seal this 30th day
   of October, 2020.
13
14
15
16
   LORI J. ATKINSON
17 NOTARY PUBLIC
18
19
20
21
   ***PLEASE NOTE***
22 THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
   APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE
23 SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
   SUPERVISION OF THE CERTIFYING COURT REPORTER.
24

Page 101

1  DEPOSITION ERRATA SHEET
2  Case Caption: MANTHA VS QUOTEWIZARD
3  Deponent: DEREK PADON
4  Deposition Date September 11, 2020
5     To the Reporter:
6  I have read the entire transcript of my Deposition taken
7  in the captioned matter or the same has been read to me.
8  I request that the following changes be entered upon the
9  record for the reasons indicated. I have signed my name
10 to the Errata Sheet and the appropriate Certificate and
11 authorize you to attach both to the original transcript.
12 Page No.        Line No.        Change to
13
14 Reason for change:
15 Page No.        Line No.        Change to
16
17 Reason for change:
18 Page No.        Line No.        Change to
19
20 Reason for change:
21 Page No.        Line No.        Change to
22
23 Reason for change:
24

26 (Pages 98 - 101)