# EXHIBIT 3

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    JOSEPH MANTHA, on behalf of himself

 5    and all others similarly situated,

 6         Plaintiff,

 7      vs.              Civil Action No. 1:19-CV-12235-LTS

 8    QUOTEWIZARD.COM, LLC,

 9         Defendant.

10    -------------------------------x

11

12                 VIDEOTAPED DEPOSITION OF

13                     JOSEPH MANTHA

14                   CONDUCTED REMOTELY

15                 Monday, July 27, 2020

16                    10:13 a.m. EDT

17

18

19                 Laurie K. Langer, RPR

20

21

22

23

24
```

Page 2

1                        APPEARANCES

2

3       ON BEHALF OF THE PLAINTIFF(s):

4          BY:   Edward A. Broderick, Esq.

5                     THE LAW OFFICE OF EDWARD A. BRODERICK

6                     208 Ridge Street

7                     Winchester, Massachusetts 01890

8                     (781) 721-1354

9                     ted@broderick-law.com

10

11      ON BEHALF OF THE DEFENDANT(s):

12         BY:   Kevin P. Polansky, Esq.

13                     NELSON MULLINS RILEY & SCARBOROUGH, LLP

14                     One Post Office Square

15                     30th Floor

16                     Boston, Massachusetts 02109

17                     (617) 217-4700

18                     kevin.polansky@nelsonmullins.com

19

20      ALSO PRESENT:

21         Alan Paller, Videographer

22

23

24

                                                        Page 3

1                     INDEX OF EXAMINATION

2

3      WITNESS:  Joseph Mantha

4      EXAMINATION                              PAGE NO.

5      By Mr. Polansky                             6

6      By Mr. Broderick                           113

7

8                      INDEX TO EXHIBITS

9      NO.          DESCRIPTION                 PAGE NO.

10     Exhibit 9    Plaintiff's Answers to         38

11                  Defendant's First Set of

12                  Interrogatories

13     Exhibit 10   6/3/20 Letter to Mr. Paronich    49

14                  and Attached

15     Exhibit 11   5/22/20 Letter to Mr. Paronich   58

16                  and Attached

17     Exhibit 12   Text Messages                  64

18     Exhibit 13   9/4/19 Letter from Mr.         76

19                  Washkowitz and Attached

20     Exhibit 14   Plaintiff's Responses to        84

21                  Defendant's First Request for

22                  Production of Documents

23     Exhibit 15   Declaration of Joseph Mantha    102

24

```
                                                Page 4
1     NO.            DESCRIPTION                 PAGE NO.
2     Exhibit 16  Plaintiff's Response to          104
3                 Defendant's Second Set of
4                 Requests for Admission
5
6      (Original exhibits attached to original transcript)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

1                      P R O C E E D I N G S

2

3                VIDEOGRAPHER:  Good morning.  We're going on

4      the record at 10:13 a.m. on Monday, July 27, 2020.

5                Please turn off all cellphones or place them

6      away from the microphones as they can interfere with the

7      deposition audio.  Audio and video recording will

8      continue to take place unless all parties agree to go

9      off the record.

10                This begins media unit number 1 of the video

11      recorded deposition of Joseph Mantha taken by counsel

12      for the Defendant in the matter of Joseph Mantha on

13      behalf of himself and all others similarly situated

14      versus QuoteWizard.com, LLC.  Filed in the U.S District

15      Court for the District of Massachusetts, case number

16      1:19-CV-12235-LTS.

17                This deposition is being held remotely via

18      teleconference.  My name is Alan Paller from the firm

19      Veritext New England, I am the videographer.  And the

20      court reporter is Laurie Langer, also from Veritext.

21                I am not authorized to administer an oath, I

22      am not related to any party in this action, nor am I

23      financially interested in the outcome.

24                As this time counsel and everyone attending

Page 6

1    remotely will now state their appearances and

2    affiliations for the record.  If there are any

3    objections to proceeding please state them at the time

4    of your appearance beginning with the noticing attorney.

5              MR. POLANSKY:  Good morning.  Kevin Polansky

6    on behalf of QuoteWizard.

7              MR. BRODERICK:  Good morning.  Edward

8    Broderick on behalf of Mr. Mantha.

9              VIDEOGRAPHER:  The court reporter will now

10   swear in the witness.

11

12                     JOSEPH MANTHA,

13   having been satisfactorily identified by the production

14   of his driver's license, and duly sworn by the Notary

15   Public, was examined and testified as follows:

16

17                     EXAMINATION

18

19   BY MR. POLANSKY:

20      Q.  Good morning, Mr. Mantha.  As you know I

21   represent QuoteWizard which is a Defendant in the action

22   filed against them by you.

23              MR. POLANSKY:  Ted, the usual stipulations?

24              MR. BRODERICK:  Yes.  We'll reserve all

Page 7

1    objections, except as to form, until the time of trial.

2            MR. POLANSKY:  Okay.  30 days read and sign?

3    Waive notary?

4            MR. BRODERICK:  Yes, please.

5            MR. POLANSKY:  Okay.

6    Q.  Mr. Mantha, this is sort of an unusual way to

7    conduct a deposition, but it's becoming more normal.  I

8    just want to go through a few sort of ground rules to

9    make this run smoothly and hopefully get you out of here

10   sooner rather than later.

11        At any point in time if you don't understand any

12   of my questions please let me know and I'll be happy to

13   rephrase it; okay?

14   A.  Okay.

15   Q.  It's also very important that you give verbal

16   responses to my questions so that the court stenographer

17   can take them down; okay?

18   A.  Okay.

19   Q.  It's very important that only one of us speak at

20   a time, that way the court stenographer can take down

21   accurately everything that I've asked you and that

22   you've responded to; okay?

23   A.  Okay.

24   Q.  If at anytime you need a break I'm happy to give

Page 8

1    it to you.  This isn't a marathon.  You know, please

2    just let me know you need a break and we'll take a break

3    as soon as any question that's been posed is answered;

4    okay?

5        A.   Okay.

6        Q.   And if you have any questions that come up during

7    the deposition just let me know and we can address those

8    as they come; okay?

9        A.   Okay.

10       Q.   Mr. Mantha --

11             MR. BRODERICK:   Sorry.  Go ahead.

12       Q.   -- please state your name for the record.

13       A.   Joseph Mantha.

14             MR. BRODERICK:   Kevin, I just want to put

15    one thing on the record, just our understanding of the

16    limitation of the scope of the deposition, that we're

17    just here to answer questions about Mr., Mr. Mantha's

18    purported consent to receive text messages and/or calls

19    on behalf of QuoteWizard consistent with, with the

20    Court's order and consistent with the limitations that

21    you placed on, on our questioning in earlier

22    depositions.  And sorry to interrupt.

23             MR. POLANSKY:   That's all right.  I will

24    just respond to that saying that obviously we don't

                                                    Page 9

1      waive any right to ask those questions at another time

2      and that, you know, some questions that I do ask will go

3      to the history or background and may not, you know, if

4      you have any objections at that time obviously you're

5      free to raise them.

6                 MR. BRODERICK:  Will do.

7           Q.   Okay.  Mr. Mantha, do you go by Joseph or Joe or

8      both?

9           A.   Both.

10          Q.   Okay.  Is it okay to call you Joe?

11          A.   That's fine.

12          Q.   Have you ever been deposed before?

13          A.   No.

14          Q.   Where do you reside?

15          A.   38 Vista Circle, Rutland, Massachusetts 01543.

16          Q.   And how long have you lived at 38 Vista Road?

17          A.   Just over five years.

18          Q.   Okay.  So that would be around 2015?

19          A.   Correct.

20          Q.   And who do you currently live with?

21          A.   My wife and my two sons.

22          Q.   How old are your sons?

23          A.   Four, and eight months.

24          Q.   What's your wife's name?

```
                                                          Page 10
 1        A.   Melisa.

 2        Q.   And does she take -- did she take your last name?

 3        A.   Yes.  And for her spelling it's M-E-L-I-S-A.

 4        Q.   And what's her maiden name?

 5        A.   Banks.

 6        Q.   Now, has it -- for the -- strike that.

 7             Since January of 2019 have any other individuals

 8   lived with you and Melisa at 38 Vista Road?

 9        A.   No.

10        Q.   What about temporarily, has anyone come to live

11   with you during that period of time?

12        A.   No.

13        Q.   No family members have lived with you during that

14   period of time?

15        A.   No.

16        Q.   Since you've owned the property in 2015 have any

17   family members resided with you?

18        A.   No.

19        Q.   What about friends?

20        A.   No.

21        Q.   So is it -- it's fair to say based on what you

22   testified to so far, that nobody has resided with you

23   since you purchased the property in 2015 except for you,

24   your wife Melisa, and your two kids as soon as they were
```

Page 11

1     born?

2          A.   Correct.

3          Q.   Now, during the period of 2019 did you, did you

4     take any vacations?

5          A.   Yes.

6          Q.   Where did you go?

7          A.   I'm trying to think last year.  Typically we

8     would go up to Maine and I've been to Florida.  My

9     mother lives in Florida.

10         Q.   Did you go on any other, other vacations or trips

11    during 2019?

12         A.   Not that I recall.

13         Q.   Do you travel for work outside of Massachusetts?

14         A.   No.

15         Q.   Have you ever been to New Jersey to stay over?

16         A.   I think the last time that I went there was in

17    high school.  I think I went to Six Flags in New Jersey.

18         Q.   So you haven't been back to New Jersey since high

19    school.  What -- what year did you graduate?

20         A.   1997.

21         Q.   So over 20 years?

22         A.   Yes.

23         Q.   And as you sit here today you don't recall any

24    other vacations other than Maine and Florida in 2019?

Page 12

1      A.  I don't recall any other ones.  I went to the

2   Outer Banks, I think that was 2018.  That's what I'm

3   thinking about.

4      Q.  Any other weekends away that you might not

5   consider a vacation but just sort of getaways for the

6   weekend or night in 2019?

7      A.  No.

8      Q.  In preparing for today's deposition did you

9   review any document?

10              (Inaudible)

11              MR. POLANSKY:  What's that, Ted?

12      A.  Yes.

13      Q.  Hold on.

14              MR. POLANSKY:  Ted, did you say something?

15              MR. BRODERICK:  No.

16              MR. POLANSKY:  Okay.  I'm sorry.

17      Q.  What documents did you review?

18      A.  My responses.

19      Q.  When you say your "responses" were those to

20   interrogatories?  Or all discovery responses?

21      A.  I believe it's all.

22      Q.  Okay.  So do you recall seeing a document called

23   interrogatories?

24      A.  Along the way I, I do recall that word.  But I'm

1     not familiar with what document is what exactly.

2          Q.  But you believe you reviewed all of your

3     discovery responses in this case?

4          A.  Yes.

5          Q.  Did you review any other documents?

6          A.  No.

7          Q.  Did you speak to anybody other than your

8     attorneys in preparing for today's deposition?

9          A.  My wife.

10         Q.  And what did you discuss with your wife?

11         A.  Just the fact that I had it.  I had to take a day

12    off of work.  She knew that I had to do it.  Small talk.

13         Q.  Anybody else?

14         A.  No.

15         Q.  And what do you do for work?

16         A.  I'm the director of residential operations at the

17    Doctor Franklin Perkins School in Lancaster,

18    Massachusetts.

19         Q.  Did you say "director of residential operations"?

20         A.  Yes.

21         Q.  And how long have you had that role?

22         A.  Just over three years.

23         Q.  You said the school is located in Lancaster,

24    Mass.?

Page 14

1      A.   Correct.

2      Q.   And what type of school is it?

3      A.   It's a special education school.

4      Q.   And what's your role as director of residential

5   operations?

6      A.   Our residential division consists of six group

7   homes on campus.  I oversee the six residential homes.

8      Q.   And all of the group homes are on campus?

9      A.   Correct.

10     Q.   Do you have an office on campus?

11     A.   I do.

12     Q.   Do you also work out of the house for the, as the

13  director of residential operations?

14     A.   No.

15     Q.   So do you go into the office five, six, seven

16  days a week?

17     A.   Five days.  Monday through Friday.

18     Q.   No weekend time?

19     A.   No.

20     Q.   And what are your hours?

21     A.   Typically 8 to 4, 9 to 5.

22     Q.   What about after hours if there is an issue?

23     A.   Sometimes I could get stuck a little longer.

24  It's tougher these days with day-care, kids.

1       Q.   I know that.   I know that feeling.

2            Now, in your office has the school provided you

3       with any sort of desktop computer, a laptop?

4       A.   Desktop.

5       Q.   And what kind of desktop is it; what's the brand?

6       A.   I don't know.

7       Q.   How long have you had that desktop computer?

8       A.   I couldn't even give you a timeframe.   I'm not

9       sure.

10      Q.   How long have you worked at the -- what was the

11      name of the school?

12      A.   Doctor Franklin Perkins School.   I've been there

13      since 2007.

14      Q.   Have you had the same computer during that period

15      of time?

16      A.   No.   They've upgraded over the years at different

17      times and changed things, but I couldn't give you a date

18      or a timeframe.

19      Q.   Okay.   Well, let me ask you this way.   So you've

20      been in this role as director of residential operations

21      for three years; right?

22      A.   Right.

23      Q.   So roughly since 2017?

24      A.   Has it changed?   Yes.   I think it went from, we

Page 16

1    had more of these smaller -- they connected through, I

2    forget what it's called, but now I have a bigger kind

3    of -- like, we had towers, then we didn't have towers,

4    and now we have these smaller PCs.  I don't know the

5    lingo.

6        Q.  That's right.  Has it been the same PC in all of

7    2019?

8        A.  I think so.

9        Q.  Do you have the same PC now that you had in 2019?

10       A.  I believe so.

11       Q.  Now, do you work in an office or is it like a

12   cubicle?  Sort of explain your setup.

13       A.  It's an office.

14       Q.  Is it just you in the office, in that office, or

15   do you have other people with you?

16       A.  Just me in the office.  My office is in a wing

17   that has three offices total.

18       Q.  Who are the other offices?

19       A.  Kathy Mills and Tim Hammond.

20       Q.  Who is Kathy Mills?

21       A.  She is the VP of research and innovation.  And

22   Tim Hammond is the chief operating officer.

23       Q.  Does your office door lock?

24       A.  Yes.

1      Q.   And is it typical for you to lock the door when

2   you leave for the day?

3      A.   Yes.

4      Q.   And do you always do that?

5      A.   Yes.

6      Q.   Does anybody else have access to your school

7   computer?  Your work computer.

8      A.   No.

9      Q.   Does anybody have access to -- strike that.

10          Do you have a work e-mail account?

11      A.   Yes.

12      Q.   And does anybody else have access to that work

13   e-mail account?

14      A.   No.

15      Q.   What about the IT department, would they have

16   access?

17      A.   Well, I guess they would be able to.

18      Q.   And do you use the -- strike that.

19          Do you ever bring the work computer home?

20      A.   No.

21      Q.   And has that always been true, you've never

22   brought the work computer home?

23      A.   Correct.

24      Q.   Do you ever do any personal use on the work

Page 18

1      computer?

2          A.   No.

3          Q.   Never?  I mean, in other words, you don't check

4      the news, you don't go on ESPN, something like that?

5          A.   I try not to.

6          Q.   I understand you try not to, but have you?

7          A.   Maybe.  I've gone on Amazon, but typically that

8      might be for work purchases.

9          Q.   What would you need to purchase for, on Amazon

10     for work?

11         A.   Sports equipment, mostly.  Activities.  Keep the

12     kids going.

13         Q.   How old are the kids that are in the six

14     different residence halls?

15         A.   Roughly 12 to 21.  They age out at 22.

16         Q.   And what are your responsibilities with respect

17     to the residence halls in overseeing these groups of 12

18     to 21 year olds?

19         A.   Participate in treatment for all the kids.

20     Treatment meetings, team meetings, training, staff

21     meetings, policy procedure.

22         Q.   And do you work directly with each of the

23     individuals, these students?

24         A.   I would say indirectly at this point from my

Page 19

1    position.  I mean, I'm involved but it's harder these

2    days overseeing six houses, 60 kids.

3        Q.  How long have you had the role of director of

4    residential operations; did you say three years?

5        A.  Correct.

6        Q.  Has it always been around 60 kids?

7        A.  It fluctuates each year.  So we've dropped down

8    into the 40s and up to 64, 65.  So it depends on the

9    time of year.  Discharges at the end of the school year.

10   Kind of picks back up in the fall, so.

11       Q.  And do the kids have access to you if they need

12   to reach you?

13       A.  No.  Unless it was e-mail.  I guess they could

14   e-mail me at work.

15       Q.  Do they have your personal e-mail?

16       A.  No.

17       Q.  Just your work e-mail?

18       A.  Correct.

19       Q.  Do they have your personal phone?

20       A.  No.

21            MR. BRODERICK:  Kevin, I think we're getting

22   a little far afield of consent in getting into the

23   phones.

24            MR. POLANSKY:  Well, I don't.  I'm not

Page 20

1    asking whether he's received phone calls from them, I'm

2    asking whether they have access to his information.

3              MR. BRODERICK:  Okay.

4       Q.  Do they -- do they know where you live?

5       A.  No.

6       Q.  So none of the 60 kids knows your personal

7    e-mail?

8       A.  No.

9       Q.  Do you know whether any of the, other than

10   resident staff, has ever provided your personal

11   information to any of the kids?  And by "kids" I mean

12   students.

13      A.  Could you repeat that?

14      Q.  Sure.  So -- I mean, over the course of the last

15   three years I understand that there are six residence

16   halls, and you've seen it from, go from 40 kids to 60

17   kids; right?

18      A.  Uh-huh.

19      Q.  And how many staff work for you?

20      A.  This year's budget has about 86 in it.

21      Q.  You have 86 staff members?

22      A.  Uh-huh.

23      Q.  Do you know if any of those 86 staff members has

24   ever provided your personal information to any of the 60

```
                                                Page 21
 1      kids at any given time?

 2          A.  I don't know.

 3          Q.  Do the 86 staff members have access to your

 4      personal e-mail?  In other words, do they know your

 5      personal e-mail address?

 6          A.  Not that I know of.  They wouldn't.

 7          Q.  Do they know where you live?

 8          A.  Some might.

 9          Q.  Do they know what kind of car you drive?

10          A.  Yes.

11          Q.  What kind of car do you drive?

12          A.  2012 Nissan Ultima.

13          Q.  Do they know your personal cellphone?

14          A.  Staff?

15          Q.  Yes.

16          A.  Some.

17          Q.  Of the 86 how many do you think have access to

18      your personal cellphone number?

19          A.  I don't know.

20          Q.  More than half?

21          A.  I'm not sure.

22          Q.  Well, is there, is there any sort of directory

23      that's given to them providing that information for you?

24          A.  No.
```

Page 22

1      Q.  What about with your personal e-mail, is there

2   any directory that's provided -- strike that.

3          So you're the director of residential operations

4   and underneath you there are 86 staff members; is that

5   right?

6      A.  Yes.

7      Q.  Is there a directory provided to staff members to

8   see what the, the hierarchy of the residential

9   operations is?

10     A.  It's not a hierarchy, but through our phone

11  system there is a directory.

12     Q.  So they can do a dial by phone or dial by number?

13  Strike that.  A dial by name.

14     A.  Well, we use extensions.  So if you're in any of

15  the locations on campus you could hit 4900 and it would

16  come up to me.

17     Q.  If there is an issue after hours at the residence

18  hall do the staff members have access to you to get in

19  touch?

20     A.  Yes.

21     Q.  And how would they get in touch with you?

22          MR. BRODERICK:  Kevin, this has nothing to

23  do with consent.  And you're definitely just going for

24  the residential business distinction here.

1           MR. POLANSKY:  I'm actually not.  I haven't

2     asked about any of them.  I mean, I could.  I have his,

3     you know, certain of his telephone numbers so I know

4     there have been calls.  But I'm not going for that.  I'm

5     going for who has access to his personal information.

6     I'm not going to get into how many calls he's received

7     or anything like that, I mean, that's all reserved.  So

8     I think it's --

9           MR. BRODERICK:  You already asked him and he

10    said he wasn't sure, but they, they have access.  But

11    getting into how many calls he gets.

12          MR. POLANSKY:  I didn't ask that question.

13    That's what I'm saying, I'm not asking that question.

14          MR. BRODERICK:  Well, you asked the question

15    do they have access to you after hours, and you said yes

16    and you said do they call you.

17          MR. POLANSKY:  Right.

18          MR. BRODERICK:  That's why I spoke up.  The

19    access to the information.  I mean, I guess if the

20    theory is anybody who has this information could have

21    put it in on the Internet, that -- there's not much of a

22    limiting principle to, "hey, we have his consent, here

23    it is.  Did anybody put in this consent that we say we

24    relied on."  "They" being QuoteWizard.

Page 24

1              MR. POLANSKY:  Okay.  So if you want me to,

2     to end the line of questioning I'll just, I'll ask this

3     question and just, just to be clear.

4        Q.  So if -- so if one of the 86 staff members needed

5     to reach you after hours they can do so?

6        A.  Could you repeat that.

7        Q.  Sure.  If one of the 86 staff members needs to

8     reach you after, after hours, they could reach you?

9        A.  Well, again, I don't know how many know my phone

10    number, so.  I can't answer that.

11             I -- I could answer it in another way, I could

12    say that I have 11 administrators that work for me and

13    I'm pretty sure they know how to get in contact with me.

14       Q.  Okay.  So the 11 administrators could get in

15    touch with you if they needed to?

16       A.  Correct.

17       Q.  As far as the Nissan Ultima, you said that's a

18    2012?

19       A.  Yes.

20       Q.  And does the school pay for that?

21       A.  No.

22       Q.  Does the school reimburse you for mileage or gas?

23       A.  If I ever went somewhere I could put in for

24    mileage, but that doesn't happen.

Page 25

```
1        Q.  Okay.  So regular back and forth to the school
2    they don't pay for, for mileage or gas?
3        A.  No.  No.  If we had to go for a meeting, say,
4    somebody was hospitalized somewhere and we didn't have
5    access to a work van, if I drove I could put in for
6    mileage.
7        Q.  What about insurance, do they pay for insurance?
8        A.  No.
9        Q.  Do they reimburse you for insurance?
10       A.  No.
11       Q.  So you acquire your insurance on your own?
12       A.  Yes.
13       Q.  By the way, how far is your house from the
14   school?
15       A.  35 minutes.
16       Q.  One way?
17       A.  Yes.
18       Q.  Does your -- does your -- does the school give
19   you a work cellphone?
20            MR. BRODERICK:  Kevin, I'm not going
21   to -- don't -- don't answer, Joe.  This is way outside
22   the, whether he gave consent.  It's about a topic that
23   we specifically objected to and I'm not going to let him
24   answer questions about what is clearly a question about
```

Page 26

1    whether it's a residential or a business phone.  That's
2    beyond the scope of the limitation on discovery that you
3    all asked for and got from the, got from the Court.
4              MR. POLANSKY:  Fine.  I would object to
5    your, the way you've described your objection, but it is
6    what it is.
7       Q.  What's your date of birth?
8       A.  4/22/1979.
9       Q.  And what's your cellphone number?
10      A.  (508) 353-9690.
11      Q.  And what's your e-mail address?
12      A.  Jmantha7@yahoo.com.
13      Q.  How long have you had that e-mail address?
14      A.  As long as -- as far back as I can think.
15   Probably college.  Maybe even -- maybe even before.
16   Right around then.  It was....
17      Q.  Other than the e-mail address that you mentioned
18   for work earlier, do you have any other e-mail
19   addresses?
20      A.  I think I've created a few in the past.  Like, I
21   think I have a Gmail account, but I did that for, to try
22   to get a live document.  You know, kind of like when we
23   were setting up today and you have to, you know, you
24   were sharing a document.  But nothing that I use.  So I

Page 27

1      would say that I have a Gmail account.  I don't even

2      know if I could get into it right now.

3          Q.  Any other e-mail accounts, Hotmail; anything like

4      that?

5          A.  Not that I know of.

6          Q.  Who was your Internet service provider in 2019?

7          A.  It's all through Comcast.  It's the cable

8      company.  Charter.

9          Q.  Is your cable provider still Charter Comcast?

10         A.  Yes.  It's been the entire time since 2015.

11         Q.  And do you have a secure wireless network?

12         A.  Yes.

13         Q.  How long have you had the Nissan Ultima, the 2012

14      Nissan Ultima?

15         A.  I'm the only owner, so 2012.

16         Q.  Okay.  Does your wife have a vehicle?

17         A.  Yes.

18         Q.  What does she drive?

19         A.  A Mazda CX9.  I think it's a '14 or a '15.

20         Q.  Did she also buy that new?

21         A.  No.

22         Q.  When did she purchase that, that vehicle?

23         A.  Three years ago.

24         Q.  Has your household ever owned any other vehicles

```
                                              Page 28
 1    or --

 2        A.  Yeah.

 3        Q.  -- leased vehicles?

 4        A.  No.

 5        Q.  Are there only two vehicles at your residence at

 6    this time?

 7        A.  Yes.

 8        Q.  Is that the same for 2019?

 9        A.  Yes.

10        Q.  Did you drive any other vehicles in 2019 other

11    than the Mazda CX9 or the 2012 Nissan Ultima?

12        A.  Did I drive any other vehicle?

13        Q.  Yeah.  Did you borrow a friend or a family member

14    or anything like that in 2019?

15        A.  No.

16        Q.  Do you know anyone who drives a

17    Chevy Trailblazer?

18        A.  Can you repeat that.

19        Q.  Sure.  Do you know anyone who drives a Chevy

20    Trailblazer?

21        A.  No.

22        Q.  What about in 2019 --

23        A.  No.

24        Q.  -- did you know anyone that -- let me just finish
```

```
                                                        Page 29
 1     that question.
 2            So in 2019 you also didn't know anyone who drove
 3     a Chevy Trailblazer?
 4       A.   No.
 5       Q.   Have you ever owned a mid 2000 Chevrolet truck or
 6     SUV?
 7       A.   No.
 8       Q.   Do you know anyone in 2019 who owned or drove a
 9     mid 2000 Chevrolet truck or SUV?
10       A.   No.
11       Q.   Have you ever filed for bankruptcy?
12       A.   No.
13       Q.   Have you ever been pulled over for operating a
14     vehicle while intoxicated?
15       A.   Yes.
16       Q.   When was that?
17       A.   1997.
18       Q.   Anytime after that?
19       A.   No.
20       Q.   As you sit here today is there anything else in
21     your driving record that may impact your ability to get
22     a more preferential insurance rate on auto insurance?
23       A.   No.
24       Q.   Do you ever let any family members drive either
```

```
                                                     Page 30

1      of your vehicles?

2          A.   My wife has driven my vehicle.

3          Q.   Any other siblings or in-laws that have driven

4      the vehicles?

5          A.   No.

6          Q.   Have you ever visited the website

7      snappyautoinsurance.com?

8          A.   Yes.

9          Q.   And when did you do that?

10         A.   After I brought up this case and my lawyer sent

11     it to me and asked me if I had ever visited this

12     website, I clicked on it, I looked at it, and I had

13     never seen it before.

14         Q.   What computer were you using at the time to, to

15     view the website?

16         A.   I think it was my phone.

17         Q.   And what kind of phone do you have?

18         A.   IPhone 8, I believe.

19         Q.   How long have you had the iPhone 8?

20         A.   For a few years now.  Almost two, two full years,

21     I think.

22         Q.   Okay.  So you would have had that phone in 2019?

23         A.   Yes.

24         Q.   Did you have any other phones in 2019?
```

Page 31

1          A.   No.

2          Q.   And I'm going to ask this question again for the

3     reason of finding out how many devices you have.

4               Do you have a work phone?

5          A.   No.  Could you be more specific with that?

6          Q.   Sure.  Do you have a work cellphone?

7          A.   No.

8          Q.   Other than your work computer, your iPhone 8, do

9     you have a computer at home?

10         A.   Yes.

11         Q.   And what type of computer is that?

12         A.   I have a laptop.  It's a Dell.  I have two of

13    them.

14         Q.   Let's start with, is one yours and one your

15    wife's?

16         A.   Yes, I guess you could say that.  I use one for

17    school and she uses hers for pictures.

18         Q.   How long have you had the two Dell laptops?

19         A.   This -- the one that I use, about a little less

20    than two years.  I got this when I started grad school,

21    I use for school.

22         Q.   Is this the laptop you're currently on?

23         A.   Yes.

24         Q.   And what about the laptop that you use for

1      pictures; when did you get that?

2          A.  I've had it a long time.  At least -- at least

3      five years I would say.

4          Q.  So both of those laptops you had during the

5      duration of 2019?

6          A.  Yes.

7          Q.  Any other computers at the home that were in use

8      in 2019?

9          A.  No.

10         Q.  Does your wife also have a cellphone?

11         A.  Yes.

12         Q.  Do you ever use her cellphone?

13         A.  No.

14         Q.  How about tablets, do either you or your wife

15     have a tablet, like an iPad or something like that?

16         A.  Yeah, my son has one.

17         Q.  How about yourself, do you have a tablet?

18         A.  No.

19         Q.  No iPad?

20         A.  Well, it's connected through, you know, my four

21     year old doesn't have an iTunes account, if you will,

22     so.

23         Q.  So his account is connected to your account.  Or

24     you set up an account for him on the tablet?

```
                                                        Page 33
 1        A.   Yes.
 2        Q.   But neither you or your wife use an iPad or
 3    Amazon Fire or anything like that?
 4        A.   No.
 5        Q.   Do either you or your wife use his iPad -- is it
 6    an iPad?
 7        A.   Yes.
 8        Q.   Do either you or your wife use his iPad to browse
 9    the Internet?
10        A.   No.
11        Q.   Have you ever?
12        A.   Back when we first got it probably seven years
13    ago.  I'm guessing six years ago.
14        Q.   The iPad you got for him is six years old?
15        A.   I would guess around that, seven -- six, seven
16    years.
17        Q.   Okay.  Now, I want to go back to when you
18    received the link to the snappyautoinsurance.com
19    website.  Do you recall when that was?
20        A.   I do not.
21        Q.   Could it have been September of 2019?
22        A.   No.
23        Q.   Do you think it was before then or after then?
24        A.   It would be after.
```

Page 34

1      Q.  Why do you think that?  Why did you say "no" so

2   demonstrably?

3      A.  I think that I brought this forward in August at

4   some time and it took a fair amount of time to get that

5   information back.  So I'm just kind of, I don't know,

6   using commonsense, I guess, in my head, that, kind of

7   think of a timeline, and I don't think they got back to

8   me that soon with that information.

9      Q.  When they sent you the link to the website was it

10   operational?  Was the website -- could you use it?

11      A.  I only clicked on the link and just looked at the

12   homepage of it and that's it.  I didn't really -- I

13   didn't click on anything to explore it, I just looked at

14   it.

15      Q.  And tell me what you saw on the homepage?

16      A.  I don't even remember.

17      Q.  Did you save what you saw?

18      A.  No.

19      Q.  Does your web browser on your phone still have

20   the link or the date that you viewed the website?

21      A.  I would have to ask -- I did give up all of my

22   devices.

23      Q.  You gave your devices to who?  And again, before

24   you start answering these questions, I'm not asking for

Page 35

```
1      any communications you've had with your attorneys.  But
2      I'm going to ask you questions about your devices; okay?
3          A.  Okay.
4          Q.  So when did you give away your devices?
5          A.  When did I give them up?
6          Q.  Yes.
7          A.  I don't have that exact date either.  Over the
8      last, probably, two months ago.
9          Q.  Did you get your devices back?
10         A.  Yes.  And I didn't -- well, I didn't send them my
11     devices.
12         Q.  Okay.  What do you mean by that?
13         A.  So I was able to connect my phone to the computer
14     and they were able to read my phone through the
15     computer.  So remotely.  And then my hard drives.  They
16     sent me a hard drive and were able to copy remotely,
17     again, and then I sent the hard drive back to them.
18         Q.  Okay.  So they were able to copy the hard drive?
19         A.  To my knowledge, yes.
20         Q.  And what devices did they, did they copy?
21         A.  Both laptops and my iPhone.
22         Q.  So just to be clear for the record, the laptops
23     you're speaking about, the two Dell laptops that are
24     used in your home?
```

Page 36

1      A.   Yes.

2      Q.   And you think that was done two months ago?

3      A.   Roughly.

4      Q.   And they also copied what was on your cellphone?

5      A.   Correct.

6      Q.   Did you save your browser histories from, you

7  know, August of 2019, or had they been purged before you

8  gave your cellphone to your attorney?

9      A.   So that sounded like several questions.

10     Q.   Sure.  Do you want me to break them up?

11     A.   Yes.  The first one is you said save my browser

12 history?

13     Q.   Yep.

14     A.   So, I've never deleted it.

15     Q.   So you've never deleted your browser history for

16 your two laptops?

17     A.   Not that I know of, no.

18     Q.   What about for your phone?

19     A.   No.

20     Q.   Did you give them access to your work computer to

21 copy?

22     A.   No.

23     Q.   Do you know how long your browser history is

24 cached for or stored on your laptop?

Page 37

1       A.   I do not know.

2       Q.   Are you aware of any settings in which the

3  history is deleted after a period of time?

4       A.   I'm not.

5       Q.   I'm going to show you a document, I believe.

6  Give me one second.

7            When you went on the Snappy Auto Insurance

8  website you said that you just looked at the homepage;

9  did you flip through any other pages?

10      A.   No.

11      Q.   Prior to having been sent a link for this

12  website, did you recall the name Snappy Auto Insurance?

13               MR. BRODERICK:   Objection.

14      Q.   You can answer.

15      A.   I have never heard the name Snappy Auto

16  Insurance.

17      Q.   Prior to reviewing the website from the link did

18  you have any recollection of having gone on a website

19  called snappyautoinsurance.com?

20               MR. BRODERICK:   Objection.

21      A.   No recollection.

22      Q.   I want you to go onto the Veritext Exhibit Share

23  and go into the Shared Exhibit tab, or I believe it's

24  called Marked Exhibit tab.  And there should be an

Page 38

1      Exhibit 9.

2                  MR. BRODERICK:  I'm not seeing that on my

3      end, Kevin.  And when I hit "go to folder" when I hover

4      over it it says, "you do not have permission to view

5      this folder."

6                  MR. POLANSKY:  On the Marked Exhibit tab?

7                  MR. BRODERICK:  Yeah.  On this -- yes.  It

8      was shared by Chris Caselden.

9                  MR. POLANSKY:  Can you -- can you click on

10     it?  What happens if you click on it?

11                 MR. BRODERICK:  Nothing.  It says, "folder

12     is empty."

13                 MR. POLANSKY:  Try refreshing.

14                 MR. BRODERICK:  Okay.  Hold on here.

15                 MR. POLANSKY:  Why don't we go off the

16     record for a moment.

17                 MR. BRODERICK:  Sure.

18                 VIDEOGRAPHER:  Off the record 11 o'clock.

19                 (Short break taken.)

20                 VIDEOGRAPHER:  Back on the record at 11:01.

21                 (Deposition Exhibit No. 9 introduced.)

22        Q.  Mr. Mantha, I want you to turn your attention to

23     a document that's been marked as Exhibit 9 for

24     identification.  And let me know if you've seen this

Page 39

1    document before.

2        A.    (Witness reviewing.)    Yes.

3        Q.    And is that your signature on page 8 of 9 of

4    Exhibit 9?

5        A.    Yes.

6        Q.    I want to turn your attention to answer to

7    Interrogatory No. 9.    Let me know when you're there.

8        A.    Okay.

9        Q.    And it says that you had visited Snappy Auto

10   Insurance approximately on September 23, 2019.

11          Do you see that?

12       A.    Uh-huh.

13       Q.    Does that refresh your memory as to when you may

14   have viewed the Snappy Auto Insurance website?

15       A.    Yes.

16       Q.    And do you think that this date is accurate as to

17   when you reviewed it?

18       A.    I would think so, then.

19       Q.    After visiting the website on or around

20   September 23rd, 2019 did you print out any of the web

21   pages from snappyautoinsurance.com?

22       A.    No.

23       Q.    Did you save your browser history after accessing

24   this website on September 23rd, 2019?

```
                                                    Page 40
 1        A.  I never deleted it.

 2        Q.  So if you never deleted it the browser history

 3     would have been in the same form when it was transferred

 4     by your attorneys about two months ago?

 5        A.  It should be.

 6        Q.  Did you ask any -- strike that.

 7            Did you ask your wife Melisa whether she had ever

 8     been on the website snappyautoinsurance.com?

 9        A.  Yes.

10        Q.  And what did she say?

11        A.  "No."

12        Q.  Did you ask any family members whether they've

13     ever visited the website snappyautoinsurance.com?

14        A.  No.

15        Q.  That was a bad question.  No, they haven't

16     visited the website or, no, you never asked them whether

17     they visited the website?

18        A.  I never asked anyone.

19        Q.  Have you ever visited the website called

20     unitedquotes.com?

21        A.  Could you repeat the website.

22        Q.  Sure.  Unitedquotes.com.

23        A.  I've never heard of it.

24        Q.  Have you ever heard of the website
```

```
                                              Page 41
 1     autoinsurerquotes.com?

 2        A.   No.

 3        Q.   Do you know whether you've visited either United

 4     Quotes or autoinsurerquotes.com --

 5        A.   Not to my knowledge.

 6        Q.   -- in 2019?

 7        A.   Sorry.  Not to my knowledge.

 8        Q.   Is it fair to say that you can't recall every

 9     website that you've ever visited in 2019?

10        A.   That's fair.

11             (Inaudible)

12             MR. POLANSKY:  What's that?

13             MR. BRODERICK:  I'm just clearing my throat.

14     Sorry.

15        Q.   Do you know how far back your Internet browser

16     goes for your laptop you currently own?

17        A.   I do not.

18        Q.   Do you know whether it goes all the way back to

19     June 2019?

20        A.   It does not.  I don't -- when I had it sent in

21     they said it went back maybe a year.  I don't know

22     exactly.  That's why I can't answer the question.

23        Q.   If you gave them your Internet browser two months

24     ago, which would have been May of 2020, and it went back
```

1    a year to May 2019, wouldn't that include June of 2019?

2        A.  It would.

3        Q.  And do you have any idea why your browser does

4    not include the information or the web history for

5    June 2019?

6        A.  I don't.

7        Q.  Did the browser history change at all after

8    giving your laptops up to your counsel?

9                MR. BRODERICK:  Objection.

10       A.  I'm not sure I understand the question.

11       Q.  Sure.  Was your -- is your web history still

12   available now that you've given -- strike that.

13           Is your web history still available for the same

14   browser history as when you gave it to your counsel?

15               MR. BRODERICK:  Objection.

16       A.  Yes.  I haven't changed anything.

17       Q.  Do you know if anybody has changed anything in

18   your browser history?

19               MR. BRODERICK:  Objection.

20       A.  Not to my knowledge.

21       Q.  But you don't believe that at the time that you

22   gave your devices to your counsel it didn't include June

23   of 2019?

24               MR. BRODERICK:  Objection.

Page 43

1        A.   I believe they said it didn't go back that far.

2        Q.   Have you ever reviewed your browser history back

3    to June of 2019 since this litigation has started?

4        A.   No.

5        Q.   Did you ever review your browser history at

6    anytime to determine whether you went on the website

7    snappyautoinsurance.com?

8             MR. BRODERICK:   Objection.

9        A.   I did make an attempt, but I am not tech savvy.

10       Q.   What was the attempt you made?  Explain that to

11   me.

12       A.   I don't even recall how to do it.  I've looked at

13   the browser history, I would have to look over at it

14   right now to try to tell you.

15            MR. BRODERICK:   Well, no, don't -- we don't

16   want you to do homework on the fly.  You just answer

17   questions.

18       Q.   Can you explain what you did to search the

19   browser history?

20       A.   I can't off the top of my head.  That's how

21   little I know of this.

22       Q.   Did you click the browser history drop down

23   button to see what was in there?

24       A.   Possibly.

Page 44

1      Q.  Do you recall running any searches on your own?

2      A.  I don't.

3      Q.  Do you recall going into any of your data files

4      or folders on your, on your computer to see whether they

5      included cookies?

6           Do you know what a cookie is?

7      A.  No.  And no.

8      Q.  So the search that you performed on the web

9      history was limited; is that right?

10     A.  Yes.

11          MR. BRODERICK:  Objection.

12     Q.  Do you know how far back your browser history

13     actually goes if it doesn't include June of 2019?

14     A.  No.

15          MR. BRODERICK:  Objection.

16     Q.  Does it include August of 2019?

17     A.  I don't know.

18     Q.  But you are aware that it doesn't include June of

19     2019?

20          MR. BRODERICK:  Objection.

21     A.  Yes.

22     Q.  Other than, than your counsel or agents has

23     anyone else ever reviewed your browser histories?

24     A.  No.

Page 45

1      Q.   Okay.   What about your cellphone, has anyone gone

2   into your cellphone to review the histories?

3      A.   No.

4      Q.   Now, after, after you received -- strike that.

5           Do you recall when you received text messages

6   from QuoteWizard?

7      A.   I believe it was in August.

8      Q.   Of 2019?

9      A.   Yes.

10      Q.   Now, after receiving text messages did you, did

11   you make any attempts to save your browser history at

12   that time or image it?

13      A.   No.

14      Q.   How come?

15      A.   (No response.)

16      Q.   Did you -- did you hear my question?

17           MR. BRODERICK:   I didn't hear it either,

18   Kevin.

19           MR. POLANSKY:   Oh, okay.

20      Q.   How come you didn't take any attempts to image

21   your browser history after receiving a text message?

22           MR. BRODERICK:   Objection.

23      A.   I didn't think anything of it.

24      Q.   Well, at the time of receiving the text messages

Page 46

1      were you rethinking the litigation?

2                MR. BRODERICK:  Objection.

3      A.  No.

4      Q.  You weren't thinking of litigation at the time of

5      receiving the text messages?

6                MR. BRODERICK:  Objection.

7      A.  You say "messages," so I guess after the second,

8      and then I believe the third, then it kind of, I thought

9      about it, that I didn't consent to this, I didn't know

10     who this was.  So I took screen shots of the text

11     messages.  Nothing with my browser.

12     Q.  And how come you didn't take any screen shots of

13     your browser at that time?

14               MR. BRODERICK:  Objection.

15     A.  The text messages is what I had.

16     Q.  Well, you had your browser at that time, didn't

17     you?

18               MR. BRODERICK:  Objection.

19     A.  Correct.

20     Q.  And do you know if the browser went back to June

21     of 2019 at that time, at that point in time in August?

22               MR. BRODERICK:  Objection.

23     A.  In August did my browser go back to August?

24     Q.  No, no.  In August did your browser history go

Page 47

1     back to June of 2019?

2          A.  I don't know.  I don't know how long it goes for.

3          Q.  But you made no attempts to delete any material

4     from June of 2019?

5          A.  Never.

6          Q.  Does your -- does your wife have access to your

7     e-mail?  Your personal e-mail account.

8          A.  Unless it was left up, like, if you, you know,

9     open the laptop maybe or something and it was there, or

10    my phone was open and it was there.  But, like, access,

11    no, she doesn't know the password or anything.

12         Q.  Do you know of anybody that knows the password to

13    your personal e-mail address?

14         A.  No.

15         Q.  No family members?

16         A.  No.

17         Q.  Does your wife ever use your cellphone?

18         A.  No.

19         Q.  Does anyone other than you ever use your

20    cellphone?

21         A.  No.

22         Q.  What about back in 2019, was that the same?

23         A.  Correct.

24         Q.  At home, other than Melisa and yourself, does

Page 48

1    anybody else have access to your, either of your

2    personal computers?

3        A.   No.

4        Q.   No family members of yours?

5        A.   No.

6        Q.   What about family members of hers?

7        A.   No.  Can I change that answer?

8        Q.   Yeah.

9        A.   Her mother watches our kids a few days a week, so

10    I guess she's here.

11        Q.   So your mother-in-law might have access to the

12    computers?

13        A.   She'll come over from 8 to 4 and watch the kids

14    for the day and then go home, so.

15        Q.   And what's her name?

16        A.   Donna.

17        Q.   Last name?

18        A.   Banks.

19        Q.   And did she watch your kids back in 2019?

20        A.   Yes.

21        Q.   In this case have you ever seen the documentation

22    of the information provided by a company called

23    RevPoint?

24        A.   Not to my knowledge.  I'm not sure what that is.

Page 49

```
 1        Q.  Okay.  If you can refresh your Exhibit Share
 2     folder.  I'm showing you Exhibit 10.
 3                (Deposition Exhibit No. 10 introduced.)
 4        Q.  And let me know when you're there.
 5        A.  (Witness reviewing.)  I'm there.
 6        Q.  I'll represent to you that this is a response to
 7     a subpoena received by your counsel from a company
 8     called RevPoint Media.  And I want you to turn to page 3
 9     of 3.  Let me know when you're there.
10        A.  (Witness reviewing.)  Okay.
11        Q.  Okay.  Are you aware in this case of
12     QuoteWizard's purchase of a lead with your information
13     from any other company?
14                MR. BRODERICK:  Objection.
15        Q.  In other words, do you understand how QuoteWizard
16     obtained your information?
17        A.  I don't know exactly.  But I heard it was, they
18     got it from somebody who possibly got it from somebody.
19        Q.  Okay.
20        A.  You know, I'm not sure of the names and how it
21     all works.
22        Q.  And that's fine.  And that's the general gist I'm
23     getting to.
24                So this is one of those companies that it's
```

                                              Page 50

1      QuoteWizard's position that it purchased it from.  Okay?

2          A.   Okay.

3          Q.   So I want to go through the data that RevPoint

4      provided to your attorneys; okay?

5          A.   Uh-huh.

6          Q.   And find out what's, what's accurate and what's

7      not.

8               And based on what you've testified to far your

9      name is Joseph Mantha, right, or Joe Mantha?

10         A.   Yes.

11         Q.   That's your correct address; right?

12         A.   Correct.

13         Q.   Correct phone number?

14         A.   Yes.

15         Q.   Correct e-mail?

16         A.   Yes.

17         Q.   What about the IP address?

18         A.   No.

19         Q.   Do you -- do you know what your IP address is?

20         A.   I do.

21         Q.   And how did you find that information out?

22         A.   In the, like, a Google search.  I just wrote

23      "what's my IP address."

24         Q.   And what is your IP address?

Page 51

1            MR. BRODERICK:  Let me -- hold on, Joe.

2      We're not going to give his IP address.  We've taken

3      that position consistently in the discovery, so.

4            MR. POLANSKY:  So your position is you will

5      not allow him to testify as to what his actual IP

6      address is?

7            MR. BRODERICK:  That's right.

8      Q.  But your -- based on your testimony, Joe, this is

9      not your IP address?

10     A.  That is not my IP address.

11     Q.  Okay.  Driver number 1: Joe Mantha.  That's you.

12         Birth date appears to be inaccurate; is that

13     right?

14     A.  That is not accurate.

15     Q.  And do you recognize this birth date at all?

16     A.  I do not.

17     Q.  And marital status in 2019, you were married;

18     right?

19     A.  Yes.

20     Q.  So this is inaccurate?

21     A.  Yes.

22     Q.  Relationship, I guess that's the person that

23     entered the information itself.  Gender:  Male.

24     Occupation:  Professor, college degree.  Professional

Page 52

1      college degree.  What is your educational history?

2          A.  I have an associates and a bachelor's degree.

3          Q.  Where did you receive those from?

4          A.  Becker College.

5          Q.  So you did receive a college degree.  What about

6      a doctorate degree, did you receive one of those?

7          A.  No.

8          Q.  And you said you never filed for bankruptcy;

9      right?

10         A.  No.

11         Q.  And is your license -- was your license active in

12     2019?

13         A.  Yes.

14         Q.  Registered in Massachusetts?

15         A.  Yes.

16         Q.  Was your license ever suspended?

17         A.  Back in 1997.

18         Q.  For how long?

19         A.  I don't -- I don't remember.

20         Q.  And did you receive your license at age 16?

21         A.  I think 17.

22         Q.  And you -- so you said that you own your home; is

23     that right?

24         A.  Yes.

Page 53

1      Q.   So this is inaccurate.  It says "rent;" right?

2      A.   Correct.

3      Q.   "Months at residence" is that, is that accurate?

4      A.   I purchased in 2015.  So, no.

5      Q.   Months at employer:  Five.  So that's inaccurate;

6   right?

7      A.   That's inaccurate.

8      Q.   Have you ever received any tickets?  Driving

9   tickets.

10     A.   Yep.

11     Q.   For speeding?

12     A.   I don't think I ever got one for speeding.  I got

13   one for not stopping, supposedly, for a school bus.

14     Q.   How long ago was that?

15     A.   Early 2000s, maybe.  2001, 2002.

16     Q.   And that's a while ago?

17     A.   Yes.

18     Q.   And you testified that you don't own a 2005

19   Chevrolet Trailblazer; right?

20     A.   I did.  I did testify to that.  I don't.

21     Q.   And you don't own it; correct?

22     A.   No.  Correct.

23     Q.   And, again, do you know anyone who has ever owned

24   a 2005 Chevrolet Trailblazer?

```
                                                Page 54
 1        A.   No.

 2        Q.   And just quickly, on the right-hand side there's

 3     some additional information.  How do you garage your

 4     vehicle?

 5        A.   Say that again.

 6        Q.   Sure.  How do you -- how do you park your

 7     vehicle; is it in a garage, is it on the street, in the

 8     driveway?

 9        A.   Driveway or garage.

10        Q.   And you said you own your vehicle; is that right?

11        A.   Yes.

12        Q.   And the use of your vehicle, what's that, what's

13     the primary purpose?

14        A.   Every day.

15        Q.   So work, pleasure, everything?

16        A.   (Witness nods in the affirmative.)

17        Q.   Who -- who is your insurance with now?

18        A.   MAPFRE.

19        Q.   And who was it with in 2019?

20        A.   The same.

21        Q.   Have you ever had insurance with any other auto

22     insurer?

23        A.   Yes.

24        Q.   Who's that?
```

Page 55

1        A.  I've had Arbella.  I think I had another one when
2    I was younger, maybe like a Commerce or something
3    before.  Which I think might be them now.
4        Q.  How long have you had MAPFRE?
5        A.  At least six years or so.  I think I even had
6    them before I started this policy.  I started this
7    policy after I got married in 2013 at some point when my
8    wife and I went on the same insurance.
9        Q.  And since 2013 you believe you've had MAPFRE as
10   an insurer?
11       A.  Yeah, between 2013 and 2015 I would say.  I don't
12   know the exact timeline because we ended up doing the
13   two cars, her wedding ring, and the house when we moved
14   all in one.
15       Q.  Like a bundle?
16       A.  Yeah.
17       Q.  And how do you obtain insurance; do you have a
18   broker, do you have an agent?
19       A.  Triple A.
20       Q.  And how do you obtain it through them?
21       A.  I think I would have called them and then they
22   set me up.
23       Q.  Have you ever searched for insurance quotes
24   online?

Page 56

1      A.   No.

2      Q.   What about in 2018, did you search for insurance

3      quotes at that time?

4                MR. BRODERICK:   Objection.

5      A.   No.

6      Q.   Do you know if your wife has ever searched for

7      insurance quotes online in 2019?

8      A.   I think I asked her and she said no.  I'm the

9      primary, you know, I set it all up and, from Triple A

10     and all of that, so.

11     Q.   What about calling Triple A, did you, do you

12     recall ever calling them in 2019 searching for

13     competitive insurance quotes?

14     A.   No.

15     Q.   Have you ever had a policy with Allstate

16     Insurance Company?

17     A.   Allstate?

18     Q.   Yes.

19     A.   No.

20     Q.   Do you know the, the periods of time of your

21     policy, the effective and expiration date?

22     A.   I don't.

23     Q.   Do you know when it comes up for renewal every

24     year?

Page 57

1        A.   I can't even guess.

2        Q.   So we can put that exhibit away.

3             MR. POLANSKY:  Ted, I am going to move on to

4        Plural Marketing's responses and, again, inquire whether

5        anyone needs a break before I do that.

6             MR. BRODERICK:  Yeah, I'd love to grab a

7        drink.

8             MR. POLANSKY:  Okay.  Do you want to take

9        five, ten minutes before I start asking questions?

10            MR. BRODERICK:  That would be great.

11            MR. POLANSKY:  Okay.  So let's go back on at

12       11:40.  Okay, everyone?

13            VIDEOGRAPHER:  This concludes media number 1

14       of the videotaped deposition of Joseph Mantha, the time

15       is 11:28.  We are off the record.

16                 (Short break taken.)

17            VIDEOGRAPHER:  This begins media number 2 of

18       the videotaped deposition of Joseph Mantha.  The time is

19       11:40, we are on the record.

20       Q.   Mr. Mantha, before we went off the, off for a

21       short break we had been discussing RevPoint's response

22       to a subpoena served by your attorneys.

23            I now want to turn your attention to another

24       subpoena response, this time provided by Plural

Page 58

1    Marketing Solution.

2         If you can go into Exhibit Share and open

3    Exhibit 11, okay.

4              (Deposition Exhibit No. 11 introduced.)

5    Q.  And tell me when you have the Exhibit 11 open.

6    A.  I have it open.

7    Q.  Okay.  Now, turning your attention to page 15 of

8    20.  Tell me when you're there.

9    A.  (Witness reviewing.)  Okay.

10   Q.  So like the last one I just want to go through

11   some information that was provided to us by Plural

12   Marketing Solutions; okay?

13   A.  Uh-huh.

14   Q.  At the top you see where it says

15   Snappyautoinsurance.com.  That's the website we

16   discussed earlier that you don't recall visiting prior

17   to September 23rd; is that right?

18   A.  Correct.

19   Q.  Are you familiar with the person by the name of

20   Adam Brown?

21   A.  I am not.

22   Q.  Have you ever seen that e-mail address before?

23   A.  I have not.

24   Q.  Under where it says in bold, "Applicant TCPA

Page 59

1      Audit."  Again, you see your first and last name?

2          A.  Yes.

3          Q.  Okay.  And do you see your address, and that

4      appears to be correct; is that right?

5          A.  Correct.

6          Q.  And your phone number appears accurate; right?

7          A.  That's correct.

8          Q.  Okay.  Your phone type appears to be accurate;

9      right?

10         A.  Mobile/wireless, yep.

11         Q.  Now, the phone provider, I think you testified

12     that you have Charter; is that right?

13         A.  That's my Internet provider.

14         Q.  Who is your phone provider?

15         A.  Verizon.

16         Q.  How long have you had Verizon as a phone

17     provider?

18         A.  As far as I can remember.

19         Q.  So in 2019 you had Verizon?

20         A.  Correct.

21         Q.  Have you ever had New Cingular Wireless?

22         A.  Cingular Wireless?  I think that's the first

23     phone I ever had.  Late '90s, maybe.  Maybe '98, '99.

24         Q.  Do you know how long you had them for?

```
                                               Page 60
 1        A.  I don't.
 2        Q.  Now, it says, "applicant phone DNC status:  Not
 3     listed as DNC."  Is that accurate or inaccurate?
 4        A.  That's inaccurate.
 5        Q.  Is your phone registered on the National Do Not
 6     Call Registry?
 7        A.  It is.
 8        Q.  And how long has it been on that registry?
 9        A.  I'm not sure exactly.
10        Q.  And that's your correct e-mail address; right?
11        A.  Yes.
12        Q.  And the e-mail provider Yahoo is accurate; right?
13        A.  Yep.
14        Q.  The e-mail status:  Valid and confirm.  Well, we
15     know the e-mail works, that's valid; right?
16        A.  Yes.
17        Q.  Is the IP address valid?
18        A.  No.
19        Q.  Okay.  So that does not currently match your
20     current IP address?
21        A.  That's not my IP address.
22        Q.  You just testified that your IP, excuse me, your
23     phone provider is Verizon.
24            Have you ever been located in Morristown,
```

```
                                            Page 61
 1    New Jersey?
 2         A.   No.
 3         Q.   Have you ever visited Morristown, New Jersey?
 4         A.   Not to my knowledge, no.
 5         Q.   Do you know anyone that lives in Morristown,
 6    New Jersey?
 7         A.   I don't.
 8         Q.   Then it says, "applicant IP address coordinates."
 9    I'm not sure if you're familiar with these.  Do you know
10    what your IP address coordinates are?
11         A.   I do not.
12         Q.   Source of application, that's the website.  And
13    that's the website you went on in September; right?
14              MR. BRODERICK:  Objection.
15         A.   I think it is.
16         Q.   Now, it says, "date of application:  June 26,
17    2019;" right?
18              MR. BRODERICK:  Objection.
19         A.   I'm reading that.
20         Q.   And as you testified --
21         A.   That's what it says.  Sorry.  Go ahead.
22         Q.   Sure.  As you testified a moment ago you don't
23    have your June 2019 browser history; right?
24         A.   I do not.
```

Page 62

1       Q.  Do you know when the last time the June 2019

2    browser history was available?

3               MR. BRODERICK:  Objection.

4       A.  I don't.

5       Q.  Do you recall when you first learned that your

6    June 2019 browser history was unavailable?

7               MR. BRODERICK:  Objection.

8       A.  I don't recall the date that I had that

9    conversation.

10      Q.  Do you know the month?  Was it two months ago,

11   three months ago?

12      A.  I don't remember exactly.

13      Q.  Was it the same time that you gave your devices

14   up?

15      A.  It was afterwards.

16      Q.  After you gave the devices up.  Okay.

17          And are you aware of whether your July 2019

18   browser history exists?

19               MR. BRODERICK:  Objection.

20      A.  I don't.

21      Q.  What about August?  Does August exist?

22      A.  I'm not sure.

23      Q.  Have you ever gone back to see whether your

24   August browser history exists, August 2019 browser

```
                                                      Page 63
 1    history exits?
 2              MR. BRODERICK:  Objection.
 3       A.  I attempted it that time that I spoke of before.
 4       Q.  But as you sit here today you don't, you don't
 5    know whether July and August 2019 browser history
 6    exists?
 7              MR. BRODERICK:  Objection.
 8       A.  I only know what they told me after I sent my
 9    information in.
10       Q.  I don't want to -- I don't want to know any
11    communications with your counsel.
12          Now, the last sentence here it says, "applicant
13    agreed to receive promotional e-mails, calls, texts,
14    postal mails from third parties regarding his insurance
15    application."
16          Do you see that?
17       A.  I do.
18       Q.  Have you ever received promotional e-mails
19    regarding insurance quotes?
20              MR. BRODERICK:  Objection.
21              You may answer.
22       A.  Have I ever received any e-mails?
23       Q.  Yeah, let's narrow that down to, let's say in
24    2019.
```

Page 64

1          A.   I'm not sure.

2          Q.   Well, what do you recall -- sorry.

3          A.    I guess I was going to say I have a Yahoo account

4     and odd e-mails come in.  And when I say that, just

5     random sites come in at different times.  I just don't

6     look at them.

7          Q.   Do you know whether any of those --

8          A.   Junk mail, if you will.

9          Q.   Do you know whether any of that junk mail

10    includes insurance quote e-mails?

11         A.   I'm not sure.

12         Q.   Do you ever hit unsubscribe to those e-mails?

13         A.   I don't open them.

14         Q.   Okay.  We can put Exhibit 11 away.

15              Now, do you recall the text messages you received

16    from QuoteWizard?

17         A.   Somewhat, yeah.

18         Q.   And you took screen shots of those, those text

19    messages; is that right?

20         A.   Uh-huh.  Yes.

21         Q.   Okay.  I'm going to show you as Exhibit 12 those

22    text messages.

23              (Deposition Exhibit No. 12 introduced.)

24         Q.   Tell me when you've opened up Exhibit 12.

Page 65

```
1      A.   Okay.

2      Q.   And is this a portion of the text messages you

3   received from QuoteWizard?

4      A.   It looks that way, yes.

5      Q.   Now, on the right-hand side of the exhibit in

6   green those are your responses; right?

7      A.   Correct.

8      Q.   So you, you physically texted those, those

9   entries; right?

10      A.   Yes.

11      Q.   And so turning to the very top of page 1 of

12   Exhibit 12, and I'll reference Exhibit 12 is a two-page

13   exhibit.  You wrote, "how do I get a quote;" right?

14      A.   Yes.

15      Q.   And what was the purpose of asking that question?

16      A.   To find out who was texting me.

17      Q.   Didn't you know who was, who was texting you at

18   that time?

19      A.   No.

20      Q.   You had no idea that these text messages came

21   from QuoteWizard?

22      A.   No.

23      Q.   And so you -- it appears that you scheduled the

24   call with QuoteWizard to find out who was texting you;
```

```
                                               Page 66
1     is that right?

2               MR. BRODERICK:  Objection.

3        A.  Yes.  Yes.

4        Q.  And did you participate on that call?

5        A.  No.

6        Q.  Why not?

7        A.  I didn't answer that call.

8        Q.  And how do you know that call came from

9     QuoteWizard?

10       A.  I did not find out that information.

11       Q.  And in this text string does it identify whether

12    QuoteWizard was involved in these text messages?

13       A.  No.

14       Q.  So if I understand correctly, you responded about

15    getting a quote to find out who was texting you; is that

16    right?

17       A.  Correct.

18       Q.  And then you scheduled a call with that, with

19    that company; right?

20       A.  Yes.

21       Q.  But you never took the call to find out who was

22    texting you?

23       A.  No.

24       Q.  Why not?
```

1       A.  Because at that point that's when I sought out

2    counsel.

3       Q.  So you sought out counsel prior to the call of

4    August 23rd at 1:00 p.m.?

5       A.  No.

6       Q.  Earlier than that?

7       A.  No.

8       Q.  Did you have counsel at the time of texting

9    QuoteWizard?

10      A.  No.

11      Q.  How long after these text messages did you obtain

12   counsel?  And again, I'm not asking you about what was

13   discussed, I'm just asking you when did you obtain

14   counsel.

15      A.  Sure.  I'm not sure of the exact date.

16      Q.  Was it a matter of days or weeks?

17      A.  It might have been -- I don't know exactly.  Days

18   or a week.  I'm not sure.

19      Q.  Was -- was it months?

20      A.  No.

21      Q.  Was it more than one week?

22      A.  I don't know.

23      Q.  Had you ever received text messages like these

24   before?

1      A.   Not like -- not like this one.

2      Q.   What was it about this one that was different?

3      A.   They just kept coming through.  It said,

4    "Amanda."  "This is Amanda."

5      Q.   Did anyone -- did anyone help you in responding

6    to these texts?

7              MR. BRODERICK:  Objection.

8      Q.   You can answer.

9      A.   What was the question?

10     Q.   Sure.  Did anyone help you to respond to these

11   text messages that you received from QuoteWizard?

12     A.   I had talked to a friend.

13     Q.   Who was the friend?

14     A.   Steven Novia.

15     Q.   And who is Steven Novia?

16     A.   He's a friend that I grew up with.

17     Q.   Where does he live?

18     A.   I don't know exactly.  In Massachusetts.

19     Q.   Do you know what town?

20     A.   He just moved.  Down towards Boston.  I'm not

21   sure.

22     Q.   And what did you talk with Steve about?

23     A.   We had talked in the past about this type of

24   matter.  We talked about the TCPA and just a random

Page 69

1    conversation that we had.

2        Q.  And how long in the past?  How much earlier?

3        A.  It was over the summer.  I think I remember him

4    coming over and it was the summer.  I think we were

5    swimming and grilling, et cetera.

6        Q.  How did the conversation come up?

7        A.  It was random.  I don't recall exactly how it had

8    come up.  But we had started talking about phone calls

9    that you get or that you shouldn't get.  And then we

10   talked about, like, text messages as well that aren't,

11   you're not supposed to get.  He just told me, he told me

12   a little bit more about....

13       Q.  And what did he tell you?

14       A.  Just about the TCPA, and.

15       Q.  And had he ever, to your knowledge, do you know

16   if he's ever filed a lawsuit under the TCPA?

17       A.  I believe he has.

18       Q.  And do you know who his attorneys were?

19       A.  He introduced me to Alex.

20       Q.  And was -- was Steve successful in his lawsuit?

21       A.  I'm not sure.

22       Q.  Do you know if he got any money as a result of

23   his lawsuit?

24       A.  I'm not sure.

1      Q.  Do you know how many lawsuits he's had?

2      A.  I do not.

3      Q.  How do you spell his last name?

4      A.  N-O-V-I-A.

5      Q.  And -- and when did he introduce you to Alex?

6      A.  Right around this time.

7      Q.  Before or after receiving the text messages?

8      A.  After.

9      Q.  Had you spoken to Alex before receiving the text

10     messages?

11     A.  No.

12     Q.  After receiving the text messages did you, did

13     you call Steve and let him know that you received the

14     text messages?

15     A.  I believe I did.

16     Q.  And what did you say to him?

17     A.  I just said, "hey, remember we were talking about

18     that, I just got these texts."  Something along those

19     lines.

20     Q.  And what did he say?

21     A.  I don't -- I don't recall.  I think I said

22     something about, you know, "do these fit the criteria"

23     or something like that.  And I didn't -- he just gave me

24     Alex's e-mail address.

Page 71

1       Q.   And did you e-mail Alex?

2       A.   I did.

3       Q.   And did Alex help you respond to this text, the

4    sender of the text?

5            MR. BRODERICK:   I'm -- I'm going to instruct

6    him not to answer that both on the ground that you're

7    asking about attorney-client privilege communications,

8    but also it has nothing to do with consent.

9            I've been trying to stay quiet, but we're

10   pretty far afield from consent on, you know.  We're

11   getting into why he brought the lawsuit, his

12   relationship with people who have nothing to do with

13   consent.  So I'll just ask you to try to bring it back

14   to the topic at hand which is his purported consent.

15           MR. POLANSKY:   I think it's very much

16   relevant to consent.  So I'm going to keep asking.  If

17   you want to object you can object.

18      Q.   So did anyone help you to respond to these text

19   messages?

20           MR. BRODERICK:   Objection.  Asked and

21   answered.

22      Q.   You can answer.

23      A.   No.  The only person I had talked to was Steve

24   about the text.

Page 72

1      Q.  And did Steve assist you in drafting responses?

2               MR. BRODERICK:  Objection.  Asked and

3      answered.

4               MR. POLANSKY:  I don't think so.

5      Q.  But you can answer.

6               MR. BRODERICK:  It's also -- what does it

7      have to do with consent?  This is after he supposedly

8      consented.

9               MR. POLANSKY:  Right.  So we're -- we've

10     talked about, you know, whether he's given consent,

11     whether, you know, this, this could have been something

12     that he provided knowing full well that, you know, he

13     has an interest in the TCPA.  You know, whether this is

14     the type of lawsuit he intends to bring.  I mean, it all

15     goes to consent.

16               MR. BRODERICK:  No -- no, it doesn't.  You

17     have a single document that you say is where he opted

18     in.  And you're supposed to have his consent before you

19     text.

20               MR. POLANSKY:  Right.  But at this time

21     we've learned today that we actually can't go in his

22     browser history in June to see whether he gave his

23     consent because those no longer exist.

24               MR. BRODERICK:  But you supposedly captured

1       his browser, the browser history of whoever allegedly

2       filled this out and it doesn't match.  I'm not sure

3       what's left to dispute.

4                   MR. POLANSKY:  Well, since, you know, we

5       can't go in his browser to see whether he provided

6       consent in June, I think it's a significant issue.

7                   And his conversation happened with Mr. Novia

8       in the summer around that time to see whether, you know,

9       this is something he did provide consent.  This is all

10      new information that we're gleaning and I have a right

11      to ask questions about it.

12                  MR. BRODERICK:  I'm going to try and let you

13      go, Kevin, but I'm not going to, I'm not going to, I'm

14      not going to tolerate too much outside the scope of the

15      very limited discovery.

16                  MR. POLANSKY:  Ted, if you didn't think that

17      Mr. Novia was relevant you wouldn't have provided his

18      name in the answer to interrogatories.  You would have

19      objected like you did on the other bases about consent.

20      You provided Steve's name in the answers to

21      interrogatories, so clearly he's relevant.  And I -- and

22      I can point you and direct you to that one if you don't

23      believe me.

24                  MR. BRODERICK:  No --

Page 74

1            MR. POLANSKY:  But you wouldn't provide his

2    info if that didn't relate to the consent.  So I'm

3    inquiring about the individual that you've identified in

4    discovery as relevant to the issue of consent.

5            MR. BRODERICK:  I think those answers were

6    given, Kevin, prior to that limitation being --

7            MR. POLANSKY:  No, you guys raised that

8    issue of consent the entire time.  That has been an

9    issue that you've raised since the status conference.

10           So you could of -- you could have taken that

11   objection because you did in every other answer to

12   interrogatory.  So I'm entitled to know what Steve knows

13   and what he discussed.  If you want to limit him and

14   instruct him not to answer, that's fine, we'll take it

15   up in another status report.

16           What's your position?  Am I entitled to ask

17   questions about Steve Novia or not?

18           MR. BRODERICK:  Let me just take a -- can we

19   go off the record for a second, I just want to -- we'll

20   come back on and I'll put it on, I just don't want to

21   waste time.

22           MR. POLANSKY:  Sure.  We'll go off the

23   record.

24           VIDEOGRAPHER:  Off the record at 12:03.

Page 75

1              (Discussion off the record.)

2              VIDEOGRAPHER:   Back on the record at 12:14.

3      Q.   So, Mr. Mantha, before we got into a back and

4   forth on one of the questions and took a break, I had

5   asked you whether Steve Novia had assisted you in

6   responding to the text messages that you were receiving.

7        Did he?

8      A.   I sent him, I think, a -- I believe I called him

9   and sent him a message asking him about those original,

10   there's three, I believe, right, that said, "Amanda."

11        And I think he had said to me, "you need to know

12   who the company is."  So that's when I texted to inquire

13   about that information, so.

14      Q.   Okay.  Did he respond to your text?

15      A.   Again, I don't remember how we spoke.

16      Q.   Do you still have your text messages if you, if

17   you texted him from that period of time?

18      A.   Only in my phone records.  I didn't screen shot

19   anything.

20      Q.   When you say your "phone records" what do you

21   mean by that?

22      A.   Through Verizon.  That's the only way that I

23   would have the phone record.

24      Q.   Okay.  But you don't -- you don't still -- if you

Page 76

```
1    text somebody it doesn't show up whether you still have

2    a text from him around August of 2019?

3        A.   No.

4        Q.   Do you have any text messages with him in June of

5    2019?

6        A.   Possibly.  (Inaudible.)

7        Q.   What's that?

8        A.   We're friends, we talk, so I'm, I'm guessing that

9    there's a possibility in June of 2019 we had a

10   conversation.

11       Q.   So you said the purpose was, the purpose in

12   responding was to find out the entity's name; is that

13   right?

14       A.   Yes.

15       Q.   But weren't you aware of the name from the

16   initial text from QuoteWizard?

17             MR. BRODERICK:  Objection.

18       A.   Did I know who it was right away?

19       Q.   Yeah.

20       A.   No.  Not the second I got -- not right when I got

21   the text.

22       Q.   Okay.  I want to have you now turn to Exhibit 13.

23             (Deposition Exhibit No. 13 introduced.)

24       Q.   Tell me when you're there.
```

Page 77

1           A.   (Witness reviewing.)   Okay.

2           Q.   Okay.  And on page 3 of 10.  Turn to page 3 of 10

3      of Exhibit 13.

4           A.   (Witness reviewing.)

5           Q.   Tell me when you're there.

6           A.   Okay.  I'm here.

7           Q.   And do you see on the bottom of that page the

8      text messages begin?

9           A.   Uh-huh.

10          Q.   Do you see where it says, "Joe, Amanda from

11      QuoteWizard here."

12               Do you see that?

13          A.   I do.

14          Q.   So didn't she tell you where she was from?

15          A.   It appears that way on that one.

16          Q.   Okay.  And yet despite her having told you who

17      she was texting on behalf of, you sent the text messages

18      that we've just reviewed on the other exhibit to find

19      out where she was texting from?

20          A.   Yes.

21          Q.   I mean, is it possible that you were actually

22      interested in insurance at this time?

23          A.   No.

24          Q.   Did you send this e-mail or this text string to

Page 78

1     Mr. Novia?

2         A.  I may have.  I'm not 100 percent.  Very possible.

3         Q.  Do you recall him saying, "hey, Joe, it looks

4     like you already have the entity that texted you"?

5         A.  I do not recall that conversation.

6         Q.  As you sit here you don't know whether you have

7     any text messages from Mr. Novia in the June, July, or

8     August timeframe?

9         A.  No.

10        Q.  I just ask if you do, not to delete them.

11        A.  Okay.

12        Q.  Okay.  So going back.  Now, to, to the original

13    exhibit where you responded to Amanda.  And you asked to

14    schedule a call so you could find out where she was

15    from.

16            You scheduled the call but then you didn't attend

17    the call; right?

18        A.  Right.

19        Q.  Why not?

20            MR. BRODERICK:  Objection.

21        A.  I wasn't interested in talking.

22        Q.  But your interest wasn't about talking, wasn't it

23    about to find out who the entity was who was texting

24    you?

Page 79

1     A.   Gather more information, I guess.

2     Q.   But your testimony is you set up a call to find

3     out who was texting you; isn't that right?

4     A.   (No response.)

5              MR. BRODERICK:   Joe, did you hear that

6     question?

7     A.   No.

8     Q.   So your testimony is you set up a call to find

9     out who was texting you; right?

10    A.   Correct.   I think I said I wanted to gather more

11    information.

12    Q.   And yet you didn't attend the call.   So how did

13    you find out that it was QuoteWizard?

14    A.   I think at that point I just took the text and

15    took that information.

16    Q.   Did anyone else help you determine it was

17    QuoteWizard that sent the text?

18    A.   Well, I think you said here, you showed me that

19    my text says it's QuoteWizard.

20    Q.   Yeah, but you said you hadn't realized -- just

21    before I asked you that you said you've never been aware

22    that QuoteWizard provided their name in the text?

23              MR. BRODERICK:   Objection.

24    Q.   So now is it your testimony that you have a

Page 80

```
 1    memory of determining that they did tell you their name
 2    in the text?
 3         A.   No, I think at that point I think we looked up
 4    the phone numbers and tried to track it backwards.
 5         Q.   You said who -- "we looked up the phone numbers,"
 6    who is "we"?
 7         A.   I think I had asked Steve.
 8         Q.   So was Steve helping you at this time?
 9         A.   I think he looked it up.
10         Q.   And what did he find out about the phone number?
11         A.   I think that he said that it was QuoteWizard.
12         Q.   And do you know if he shared that information
13    with you via phone, e-mail, or text?
14         A.   I don't recall.
15         Q.   Do you know if he was talking to his attorneys
16    and relaying information to you?
17                   MR. BRODERICK:  Objection.
18         A.   No.  I -- I do not.
19         Q.   But at some point in time you asked him to make
20    an introduction for you?  To his attorneys.
21         A.   Yes.
22         Q.   And you believe it was after receiving these
23    texts?
24         A.   Yes.
```

Page 81

1      Q.   Now, you said you have received text like this

2    before except not as many; is that right?

3      A.   Automated text like robots, I guess.  Like,

4    things like doctors appointments.

5      Q.   Any other sort of, like, solicitations or other

6    text messages, marketing, things like that?

7      A.   Never like this.  Phone calls.  No texts.

8      Q.   You received phone calls regarding insurance?

9      A.   No.

10     Q.   Phone calls regarding what?

11     A.   I just don't answer them.

12     Q.   Well, how do you know who they're from?

13     A.   There's been voicemails.

14     Q.   And what are the voicemails, what are they

15   selling or marketing?

16     A.   Some are in different languages, sometimes you

17   don't know.  Sometimes it's just a, like an automated

18   recording to call back and because it went to voicemail

19   you don't have -- it cuts off at the beginning or it

20   cuts off at the end.

21     Q.   Now, you mentioned earlier that by the third text

22   you were interested in filing litigation regarding these

23   texts; is that right

24              MR. BRODERICK:  Objection.

Page 82

1        A.  By the third text what?  Sorry.

2        Q.  Sure.  You mentioned earlier that you received a

3    number of texts from QuoteWizard; right?

4        A.  Yes.

5        Q.  And by the third text you stated you were

6    interested in bringing some litigation against

7    QuoteWizard; is that right?

8            MR. BRODERICK:  Objection.

9        A.  I was interested in finding out more information

10    about QuoteWizard.

11        Q.  And how did you find out more information about

12    QuoteWizard?  And let me stop you right now.  If this

13    involves, you know, communications through your counsel

14    don't, don't share that with me.  But if it involved any

15    of your own investigation or those of others, let me

16    know.

17        A.  Yep.  Going back to the conversation that I had

18    with Steve, so I think Steve actually confirmed for me

19    that QuoteWizard was a real company, from what he

20    thought.

21        Q.  And did he suggest or recommend pursuing anything

22    against QuoteWizard?

23        A.  He gave me Alex's number.  E-mail.

24        Q.  And he gave you Alex's e-mail after receiving

1     these texts or before?

2               MR. BRODERICK:  Objection.  Asked and

3     answered.

4        Q.  You can answer.

5        A.  After.

6        Q.  And how did he provide that e-mail address?

7        A.  I don't recall.

8        Q.  Does Steve ever e-mail you?

9        A.  No, not typically.

10       Q.  It's either by phone or text?

11       A.  Yes.

12       Q.  And what's Steve's phone number, by the way?

13       A.  I would have to look that up.

14       Q.  Can you?

15       A.  Sure.  617.

16       Q.  Yep.

17       A.  418.

18       Q.  418?

19       A.  9105.

20       Q.  (617) 418-9105 is Steve Novia?

21       A.  Yeah.

22       Q.  Okay.  Let's go to your document responses.  Give

23    me one second to mark this.  Bear with me one second.

24    Okay.  I'm going to introduce exhibit -- I think it's

Page 84

1      Exhibit 14.  Give me a second.

2                    (Deposition Exhibit No. 14 introduced.)

3      Q.  It's loading.  Hold on a second.  If you could

4      look for Exhibit 14 in your Exhibit Share folder.

5      A.  (Witness reviewing.)  Okay.

6      Q.  And turn your attention to page 12 of 44.

7      A.  Uh-huh.

8      Q.  And so these are color copies of the text

9      messages that we just looked at in one location to make

10     it a little easier.

11          Do you see the text messages?

12     A.  Yes.

13     Q.  So in the text message where you stated, "how do

14     I get a quote?"  Do you see where it says, you responded

15     to do a text that said, "Joe, Amanda from QuoteWizard

16     here"?

17     A.  Yes.

18     Q.  And it's still your testimony that despite

19     receiving that text and responding to it, you were

20     responding to it in order to find out the entity that

21     was sending you the text?

22     A.  Correct.

23     Q.  Now, let's turn to the page 15 of 44.

24                    MR. BRODERICK:  Is that the Gmail?

Page 85

```
1            MR. POLANSKY:  Yep.

2       Q.  It's Bates stamped Mantha 18.

3       A.  Where am I going now?  Sorry.

4       Q.  Sure.  Just go down one or two pages.  It's a

5   Gmail, it says "Mantha DNC."  It's a Gmail e-mail.

6           Tell me when you're there.

7       A.  (Witness reviewing.)  Okay.

8       Q.  So do you see an e-mail dated August 31, 2019, it

9   says, "to Alex Washkowitz"?

10      A.  Yes.

11      Q.  And this is approximately one week after the call

12  that you were supposed to have with QuoteWizard; is that

13  right?

14      A.  Correct.

15      Q.  Now -- so by now is Alex your counsel?

16      A.  I'm not sure of the exact date.

17      Q.  Okay.  Was -- do you know whether he was

18  obtaining your DNC information on your behalf on this

19  date?  And again, this is a document that's been

20  produced by your counsel.

21      A.  I would have to go back and check when I reached

22  out to Alex for the first time.

23      Q.  Okay.  And it's safe to say it would have been

24  before this day; right?
```

```
                                                    Page 86
 1        A.  I believe so.
 2        Q.  And did you know Alex prior to retaining him as
 3    your counsel?
 4        A.  No.
 5        Q.  Did you ever share information from Alex with
 6    Steve Novia?
 7        A.  What kind of information?
 8        Q.  Sure.  Anything that Alex told you about your
 9    case against QuoteWizard, did you share that with Steve
10    Novia?
11        A.  A little bit.
12        Q.  Okay.  Like what?  What information did you share
13    with Steve?
14        A.  Just my conversation at the beginning, where it
15    was going.
16        Q.  When you say "where," where what was going?
17        A.  Where it was heading.  What was happening.
18        Q.  Okay.  What did you tell Steve?
19        A.  I don't -- I don't recall exactly what I told
20    him.
21        Q.  And was this information that you
22    shared -- strike that.
23            Was this information that Alex shared to you via
24    e-mail?
```

Page 87

1      A.   I'm not sure.

2      Q.   But you had a conversation, or conversations with

3   Steve regarding information that Alex was telling you

4   about where your litigation was going to proceed?

5      A.   Steve knew or knows some of the information.

6      Q.   And what information does he know?

7      A.   That I pursued this.

8      Q.   What about you pursuing this?  What -- have you

9   continued to share information along the way and give an

10  update?

11          MR. BRODERICK:  Again, I'm going object.

12  Because this definitely doesn't have to do with consent.

13     Q.   At the time of receiving the text messages did

14  you share information with Steve about whether you

15  provided consent to receive these text messages?

16     A.   That wasn't a discussion.

17     Q.   Did you ever discuss consent at all with Steve?

18     A.   No.

19     Q.   Have you ever discussed with Steve whether you

20  visited the website Snappy Auto Insurance?

21     A.   Not to my knowledge.

22     Q.   Did you ever provide him with the website info

23  and say, "hey, take a look at this"?

24     A.   No.

```
                                              Page 88
```

1        Q.   Does Steve have any of your personal identifying

2    information?

3        A.   Like what?

4        Q.   So Steve knows about your phone number, your

5    address, your e-mail; does he know what kind of car you

6    drive?

7        A.   Yep.

8        Q.   Does he know who your insurance agent is?

9        A.   No.

10        Q.   Does he know who your insurance policy is with?

11        A.   No.

12        Q.   Do you know how many TCPA cases Steve has

13    brought --

14        A.   I do not.

15        Q.   -- or pursued?

16        A.   I do not.

17        Q.   Do you know if Steve's made any money in filing

18    TCPA litigation or demands?

19              MR. BRODERICK:   Objection.

20        A.   What was that?

21        Q.   Sure.  Do you know if Steve has received any

22    money from pursuing any TCPA type of demands?

23        A.   I do not.

24        Q.   In your conversation with Steve in the summer,

```
                                              Page 89
 1      would that have been in June, if you know?
 2           A.   I don't know.
 3           Q.   Prior to receiving text messages from
 4      QuoteWizard, did you know whether you were on the Do Not
 5      Call Registry?
 6           A.   I didn't know specifically when my phone number
 7      was on there.
 8           Q.   But did you think it was on there?
 9           A.   Yes.
10           Q.   I know you said earlier you spoke to your wife
11      about Snappy Auto Insurance; did you ever discuss with
12      her the website autoinsurerquotes.com or
13      unitedquotes.com?
14           A.   No.
15           Q.   Did you ever ask her if she submitted your
16      information to obtain insurance quotes in 2019?
17           A.   Yes, I believe at the beginning I asked.
18           Q.   At the beginning when?
19           A.   Well, once that site popped up.
20           Q.   So around September?
21           A.   Even at the beginning when this whole thing
22      started, it was just....
23           Q.   When you say "the beginning when this whole thing
24      started," what time period are you talking about?
```

Page 90

1          A.  So between that late August and, you know,

2     September, by the end of September there.

3          Q.  Other than your wife have you ever asked anybody

4     who you're friendly with or that's your family member,

5     whether they've entered your information into any

6     website for insurance quotes?

7          A.  Did I ask anybody?

8          Q.  Yes.

9          A.  No.

10          Q.  So you can't say with any certainty that they

11     have not done so?

12                    MR. BRODERICK:  Objection.

13          A.  Sure.

14          Q.  And I know you mentioned telemarketing calls in

15     2019.  Again, do you, do you remember whether any of

16     those related to auto insurance?

17          A.  I do not.

18          Q.  What about your wife, does she receive

19     telemarketing calls?

20          A.  I'm not sure.

21          Q.  Had you ever spoken with her about what you

22     learned from Steve in the summer of 2019 about TCPA

23     litigation?

24          A.  Could you repeat that.

Page 91

1      Q.  Sure.  After speaking with Steve, I think you had

2   a cookout; was it at your house or his house?

3      A.  Mine.

4      Q.  In which he discussed, you know, TCPA litigation.

5   Did you discuss with your wife the conversation that you

6   had with Steve?

7      A.  No.  She -- she might have heard some of it.  I

8   mean, she was there that day.  So I'm not sure what

9   exactly she heard or didn't hear.

10     Q.  Have you ever heard of the site or company called

11  Blue Flame Web Marketing?

12     A.  No.

13     Q.  What about Seal Dog Media, LLC?

14     A.  No.

15     Q.  RevPoint Media, LLC?

16     A.  I'm sorry.  I didn't catch that one.

17     Q.  Sure.  RevPoint Media, LLC.

18     A.  No.

19     Q.  Plural Marketing Solutions?

20     A.  Nope.

21     Q.  Lead Intelligence, Inc.?

22     A.  Nope.

23     Q.  What about Joynia (ph.)?

24     A.  No.

Page 92

1      Q.  Do you know the IP address of all of your

2   devices?  And I'm not asking what it is, I'm just asking

3   if you know.

4      A.  No, I'm not really sure how that works.  I just

5   know when I typed in "what's my IP address" it pops up,

6   so.

7      Q.  And would --

8      A.  I would think it was the same for all.

9      Q.  Okay.  And have you done that for all of your

10   devices?

11      A.  I know my phone and this computer.  I don't know

12   if I ever looked it up on the other one.  I'm not sure.

13      Q.  So you know your IP address for your iPhone 8 and

14   the computer that you do most of your schooling on?

15      A.  Correct.

16      Q.  Do you recall the last time you looked up your IP

17   address?

18      A.  I think I did it this morning.

19      Q.  Was it the same IP address that you previously

20   saw when you looked it up?

21      A.  Yes, I believe so.

22      Q.  Has it changed at all?

23      A.  Not that I know of.

24      Q.  How many times have you looked up your IP

1    address?

2        A.   Only a couple.

3        Q.   In those couple of times that you've looked it up

4    has it ever changed?

5        A.   Not to my knowledge.  It doesn't appear to have.

6        Q.   Did you ever look up your wife's IP address for

7    her phone?

8        A.   No.

9        Q.   What about your work computer?

10       A.   No.

11       Q.   And what about the laptop that has the pictures

12   on it?

13       A.   I don't think that I typed it into that computer.

14   I may have.  But I don't -- I can't recall.

15       Q.   Are you familiar with the cable WiFi hotspot that

16   comes with Charter?

17       A.   No.

18       Q.   Have you ever used a hotspot for your laptop?

19       A.   No.

20       Q.   Have you ever connected to a public WiFi hotspot

21   using your home laptop?

22       A.   Yes.

23       Q.   And in order to connect to the public WiFi

24   hotspot did you have to enter your user name information

Page 94

1    to get onto the Internet?

2        A.   No.  You just type in the password.  Connect,

3    password.  I might not even have had to.  I'm not sure.

4        Q.   In traveling to Florida in 2019 was it a direct

5    flight or did you stop over somewhere?

6        A.   I would have to look back.  Typically we, we fly

7    to Miami or Fort Lauderdale and then drive to get to the

8    Keys where my mom lives.

9        Q.   Do you ever stop over in New York or LaGuardia?

10   Or what's the one in Jersey?

11               MR. BRODERICK:  Objection.

12       A.   Possibly.  I don't -- I don't recall.  Typically

13   it's, you know, at this point Worcester to Fort

14   Lauderdale.

15       Q.   Okay.  So you fly out of Worcester?

16       A.   More recently the last few years, two, three

17   years, since they started doing more flights.

18       Q.   And do you know whether, last year, whether your

19   flight from Worcester was direct or there was a

20   stopover?

21       A.   Yeah, it was -- there was probably the stop.  So

22   I'm guessing that it was Fort Lauderdale, because that's

23   the Worcester to Fort Lauderdale is the flight that's

24   there.  I'm pretty confident in that at this point.  It

1    was probably to Fort Lauderdale and we drove down.

2        Q.  And do you recall -- (inaudible.)

3        A.  Sorry.  I've been doing it for many years.  My

4    mom has been down there a long time.  So I've flown

5    every which way to try to save money.

6        Q.  So you -- do you know when you went down to

7    Florida last year?

8        A.  I would have to check.  It's just been different

9    with my school schedule.

10       Q.  So -- (inaudible.)

11       A.  Typically we try to go in October and in April

12   each year.  But with school, and then this last year

13   which is 2020, we didn't go.  But typically it's October

14   and April.

15       Q.  But as you sit here today you don't know whether

16   last year you went in October or April?

17       A.  It might have -- both.  Actually, now that I

18   think about it it was definitely April I was there.

19       Q.  And did you bring your iPad with you -- I mean,

20   not your iPad.  Strike that.

21           Did you bring your laptop with you?

22       A.  I think I did, because I was in school.

23       Q.  Do you usually bring your laptop with you?

24       A.  No.  No.  I flew in -- I'm trying to think now.

Page 96

1    I think that was for my 40th birthday party in April,

2    so, at my mom's.

3        Q.  Safe to say you always bring your iPhone 8,

4    though?

5        A.  Yes.  But I did take my laptop that time because

6    I know I had to -- let me think.  I don't know.  I'm

7    sorry.  I can't -- I took my laptop there one time.  I

8    remember because I had a final due or an assignment and

9    I wanted to make sure that it was done and I did some

10   work on the plane.  And then when I got to my mom's.

11       Q.  You said assignment --

12       A.  I can't remember what trip it was.

13       Q.  Is this an assignment you did for school or for

14   your work?

15       A.  School.

16       Q.  Okay.  Are you currently in school?  Strike that.

17           Were you in school in 2019?

18       A.  Yes.

19       Q.  Where -- where did you go to school?

20       A.  Bay Path University.  Online program.

21       Q.  Any -- any class -- any in-person classes?

22       A.  No.

23       Q.  What were you going to school for?

24       A.  Nonprofit management.

Page 97

1      Q.   And was that all through 2019?

2      A.   Yes.

3      Q.   And typically where did you, where did you take

4    the online courses, at your house or at work or

5    somewhere else?

6      A.   Home.

7      Q.   When you used your laptop in Florida did you use

8    it at your mother's house or did you go to a public

9    hotspot?

10     A.   My mother's.

11     Q.   Do you know what her IP address is?  I'm not

12   asking for it, I'm just asking if you know what it is.

13     A.   No.

14     Q.   Do you know a person by the name of Peter Petrov

15   (ph.)?

16     A.   Could you repeat the name.

17     Q.   Peter Petrov.

18     A.   No.

19     Q.   Do you know a person by the name of Mario

20   Guerreiro?

21     A.   No.

22     Q.   How far do you live from Worcester?

23     A.   20-minute ride.

24     Q.   How often do you go to Worcester?

1          A.   It depends.   A few times a month.   Shopping.

2     Home Depot.

3          Q.   Would that be consistent with 2019, you went

4     there a few times a month to Worcester?

5          A.   Yeah.

6          Q.   Would you ever stop and use any sort of public

7     hotspot, coffee shop, or anything like that?

8          A.   No.

9          Q.   So in Worcester you would go to where for

10    shopping?

11         A.   I've just given an example, like a Home Depot.

12         Q.   Do you know anyone that lives near Pemberton

13    Street?   On or near it.

14         A.   No.

15         Q.   What about Park Ave.?

16         A.   On Park Ave.?

17         Q.   Or anyone that lives near Park Ave. or on Park

18    Ave.

19         A.   No.

20         Q.   And where did you say Steve lives?   Steve Novia.

21         A.   I'm not sure exactly his address.   I know he's

22    formally in Winthrop.

23         Q.   Do you know where he lived in 2019?

24         A.   I believe Winthrop.   I'm not sure of the exact

```
1       date that he left his residence.

2            Q.   Do you have any relatives that live in Worcester?

3            A.   Not anymore.

4            Q.   Did somebody used to live in Worcester?

5            A.   Say that again.

6            Q.   Did somebody used to live in Worcester?

7            A.   My grandparents.

8            Q.   When was that?  Was that in 2019?

9            A.   I think my grandmother still did.  She moved

10      after my grandfather passed.  I'm not sure of the exact

11      timeframe of her moving.

12           Q.   Do you know roughly where she lived in Worcester?

13           A.   Mill Street.

14           Q.   Is that M-I-L-L?

15           A.   Correct.

16           Q.   What number?

17           A.   I don't -- I don't have that number.  It's kind

18      of like these two big complexes, condo complexes.

19           Q.   Okay.  I'm going to ask you a number of

20      individuals and let me know if you know any of these

21      people; okay?

22           A.   Uh-huh.

23           Q.   Maylin Corpan Sanchez?

24           A.   No.
```

```
                                              Page 100
 1        Q.   Behymer Corpan?

 2        A.   Can you say the first name again.

 3        Q.   Yeah.  It's B-E-H-Y-M-E-R.  Behymer Corpan.

 4   C-O-R-P-A-N.

 5        A.   No.

 6        Q.   What about Eric Sierra?

 7        A.   Nope.

 8        Q.   Francis Sierra?

 9        A.   No.

10        Q.   Danielle Esposito?

11        A.   No.

12        Q.   Lewis Rouche (ph.)?

13        A.   Nope.

14        Q.   Gina DePhillips?

15        A.   Nope.

16        Q.   What does your wife do?

17        A.   She's a nurse.

18        Q.   Is she a visiting nurse?

19        A.   She is.

20        Q.   And does she travel to locations in Worcester?

21        A.   Sometimes.

22        Q.   Does she ever bring your laptop with you?

23        A.   No.

24        Q.   Has she ever been known to bring your home laptop
```

Page 101

```
 1    with her?
 2        A.   No.
 3        Q.   Has she ever told you whether her phone has been
 4    stolen or missing for a period of time?
 5        A.   No.
 6        Q.   Have you ever used a VPN or a virtual private
 7    network?
 8        A.   What is that?
 9        Q.   Sure.  It's a -- it generates a private
10    connection between a private network and public
11    connection to give you WiFi on your, on your desktop,
12    your computer?
13        A.   No.
14        Q.   Have you used any device in 2019 or in the
15    present to obscure your or alter your IP address --
16        A.   No.
17        Q.   -- when connecting to the Internet?
18        A.   No.
19        Q.   Does your employer require you to have any device
20    management applications to protect your students
21    personal information?
22        A.   No.
23        Q.   I want to show you another document.  Can you
24    turn to Exhibit 15.
```

Page 102

1                    (Deposition Exhibit No. 15 introduced.)

2          Q.  Are you there?

3          A.  (Witness reviewing.)  I'm there.

4          Q.  Okay.  Have you seen this document before?

5          A.  Yes.

6          Q.  And is that your signature on page 3?

7          A.  Yes.

8          Q.  And turning to paragraph 7.  You state "the

9     purpose of the texts was to sell auto insurance."

10         Do you know if that's true or not?

11         A.  I believe the original text says, "I have a quote

12    for you."

13         Q.  Do you know whether -- do you know whether

14    QuoteWizard sells insurance?

15              MR. BRODERICK:  Objection.

16         A.  Am I answering anything here?  I'm sorry.

17         Q.  Yes.  Do you know whether QuoteWizard sells any,

18    sells insurance?

19         A.  Well, you just told me off of their texts.

20         Q.  And what is it that you learned from their text?

21         A.  They said that they had auto insurance.

22         Q.  So you've done no independent research to learn

23    that QuoteWizard doesn't actually sell insurance?

24              MR. BRODERICK:  Objection.

Page 103

1       A.  I haven't.

2       Q.  Does it surprise you that QuoteWizard doesn't

3    sell insurance?

4              MR. BRODERICK:  Objection.

5       Q.  You can answer.

6       A.  I'm not aware.

7       Q.  Do you know of any person who consented to be

8    contacted on your behalf regarding auto insurance?

9       A.  No.

10       Q.  Do you have any suspicions or theories about who

11    may have consented, if anybody, on your behalf?

12       A.  No.

13       Q.  Do you have any reason to believe that your wife

14    may have consented on your behalf?

15              MR. BRODERICK:  Objection.

16       A.  No.

17       Q.  Do you have any reason to believe that any family

18    members may have consented on your behalf?

19       A.  No.

20       Q.  Do you have any reason to believe that Steve

21    Covia -- Novia may have consented on your behalf?

22       A.  No.

23       Q.  Okay.  I'm going to refer to another document.

24    Give me a second.  We can go off the record just for a

Page 104

1    moment so I can tell you sort of the timing of what I've

2    got left.

3                    VIDEOGRAPHER:  Off the record at 1 o'clock.

4                    (Short break taken.)

5                    VIDEOGRAPHER:  Back on the record at 1:05.

6    Q.  Mr. Mantha, I want you to go to the Exhibit Share

7    account, Inc. and click on Exhibit 16.

8                    (Deposition Exhibit No. 16 introduced.)

9    A.  (Witness reviewing.)  I'm there.

10   Q.  Yep.  Okay.  So I'm showing you your responses to

11   the second set for request for admissions, specifically

12   your Request for Admission No. 14.

13        And this asks you whether you have "personal

14   knowledge that the consent obtained from Joseph Mantha

15   on June 26, 2019 on Snappy Auto Insurance was

16   fraudulent."  And you denied that.

17        Do you see that?

18                    MR. BRODERICK:  Objection.  It's signed by

19   counsel.

20   Q.  Are these one of the responses you reviewed today

21   as you testified earlier?

22   A.  Is that towards me?

23   Q.  Yes.

24   A.  What did you say?  Sorry.

Page 105

1     Q.  Sure.  Are these -- is this one of the documents

2   that you referred to in preparation for your deposition

3   today?

4     A.  No.

5     Q.  Have you ever seen this document before?

6     A.  I believe.

7     Q.  Let me ask you this.  Do you have any personal

8   knowledge whether the consent allegedly obtained from

9   you on June 26th from the website

10   snappyautoinsurance.com is fraudulent?

11              MR. BRODERICK:  Objection.

12     A.  Can you repeat how you said that.

13     Q.  Sure.  Do you have any personal information

14   whether the consent obtained allegedly from you on

15   June 26th, 2019 on the website snappyautoinsurance.com

16   is fraudulent?

17     A.  Do I have information that it's fraudulent?

18     Q.  Yes.  Do you have personal knowledge.

19     A.  No.

20     Q.  Okay.

21              MR. BRODERICK:  Objection.

22     Q.  Do you have any personal knowledge that

23   QuoteWizard fraudulently created the consent at issue?

24     A.  No.

1          MR. BRODERICK:  Objection.

2      Q.  Can you say with absolute certainty that somebody

3   did not create the consent on your behalf?

4          MR. BRODERICK:  Objection.

5      Q.  You can answer.

6      A.  No.

7      Q.  Do you know an individual by the name of Nicholas

8   Banks?

9      A.  I do.

10     Q.  Who is that?

11     A.  That's my wife's brother.

12     Q.  Does he ever live with you?

13     A.  No.

14     Q.  Does he have your cellphone number?

15     A.  Possibly.

16     Q.  Does he know your e-mail address?

17     A.  No.

18     Q.  Does he know the type of car you drive?

19     A.  Possibly.

20     Q.  Has he ever stayed with you, not live, but stayed

21   at your house in Rutland?

22     A.  No.

23     Q.  Are you familiar with his criminal history?

24     A.  Yes.

1    Q.   Are you aware of him ever using your personal

2    information?

3    A.   No.

4    Q.   Do you know what type of car he drives?

5    A.   I don't.

6    Q.   Do you know whether it's a Chevrolet Trailblazer?

7    A.   I don't.  I don't know anything about his

8    vehicle.

9    Q.   Do you know his birthday?

10   A.   I don't.

11   Q.   He's younger than you; right?

12   A.   Yes.

13   Q.   A couple of years?

14   A.   I would say 10 or 11.

15   Q.   10 or 11 years younger?

16   A.   Yes.

17   Q.   Are you aware of him ever taking or stealing or

18   using your wife's personal identifying information?

19   A.   No.

20   Q.   Has he ever had access to your laptop to your

21   knowledge?

22   A.   No.

23   Q.   Do you know where he lives?

24   A.   I do not.

1    Q.  Do you know if he's lived in Worcester for a

2  period of time?

3    A.  I think so.

4    Q.  Do you know whether you saw him in 2019 in

5  Worcester?

6    A.  Did I see him in Worcester?

7    Q.  Yeah.  Have you ever visited him in Worcester?

8    A.  Not to my knowledge.  We haven't seen him in

9  quite some time.

10    Q.  Do you know whether he still lives in Worcester?

11    A.  I don't.

12    Q.  Have you ever been the victim of identity theft?

13    A.  No.

14    Q.  Now, as a Yahoo e-mail user were you ever

15  notified that your account was one of the accounts in

16  question from the data breach a couple of years ago?

17    A.  No.

18    Q.  Other than Miss Novia and your lawyers have you

19  discussed this case with anybody else, other than your

20  wife as well?

21    A.  I -- I -- I did bring it up to my COO about that

22  I was taking today off for this.  But I did not discuss

23  it going into details.

24    Q.  Did you discuss what the case was about?

Page 109

1        A.   No.

2        Q.   Did he ask what the case was about?

3        A.   No.  It was more, I did say around the TCPA.

4        Q.   Is this the first time you've discussed this case

5    with your COO?

6        A.   Yes.

7        Q.   Do you know if Phil DePuy (ph.) did a search of

8    your web browser for Snappy Auto Insurance?

9        A.   Phil is who I worked with who I send my two

10   computers and my phone to.  I believe that's what he

11   did.

12       Q.   Do you know if he, he saw any reference to Snappy

13   Auto Insurance on your browsers?

14       A.   I believe he did not.

15       Q.   Even after you searched the Snappy Auto Insurance

16   website in September?

17       A.   I didn't get into that with anyone.

18       Q.   I'm not talking about anybody, I'm talking about

19   him.

20       A.   I didn't talk to him about it at all.  He was

21   just the person who extracted the information.

22       Q.   Do you -- do you know what he saved from your

23   computer, your two computers and your iPhone?

24       A.   I believe just hard drives from the computers,

Page 110

```
 1      and I don't know what from the phone.
 2          Q.  And you believe that was about two months ago?
 3          A.  Roughly.  I don't know.  It was certainly during
 4      Covid.
 5          Q.  Did Mr. DePuy ask to see your work computer?
 6          A.  No.
 7          Q.  Did you offer to provide your work computer to
 8      him?
 9          A.  No.
10          Q.  Did you inform him that you occasionally use your
11      work computer for personal use?
12          A.  We wouldn't have discussed that, no.
13          Q.  Was it simply you just sent him what was asked
14      for?
15          A.  Yes.
16          Q.  Did he tell you what browser history was
17      available in 2019 on your, on your devices?
18                  MR. BRODERICK:  Objection.
19          A.  No.
20          Q.  Have you ever spoken to Mr. DePuy?
21          A.  Yes.
22          Q.  How many times?
23          A.  I would say less than a handful.  It took a few
24      tries and it took some time for each device.  You know,
```

1    it takes a little bit of time.  So I talked to him, hook

2    it up, talked to him when that device was completed.

3    Start the next device.  And it took more than a day, so.

4      Q.  It took more than a day to back up the, or, I

5    guess, copy the devices?

6      A.  Each one, yeah.

7      Q.  So each device took over a day or a day?

8      A.  No, I'm not saying that.  It's the timeframes

9    that we did it.  If we started at 4 o'clock it took

10   until this time for that one.

11     Q.  Did you ever see what he has copied?

12     A.  No.

13     Q.  So you've never been provided with a copy of the

14   copy image, the copied images that he took?

15     A.  No.

16     Q.  Did he ever inform you whether anything that was

17   transferred was deleted?

18     A.  Say that again.

19     Q.  Sure.  Did he ever make any mention of anything

20   that was attempted to be transferred was deleted?

21              MR. BRODERICK:  Objection.

22     A.  No.

23     Q.  Other than your COO, and the other individuals I

24   mentioned, Steve Novia, your wife, your attorneys, have

Page 112

1     you spoken with, about this case with anybody else?

2         A.  No.

3         Q.  I'm just about done.  I might need a few minutes

4     just to confirm.

5             After receiving the first text from QuoteWizard

6     did you ever ask QuoteWizard to just stop sending you

7     the text?

8         A.  No.

9         Q.  How come?

10        A.  No more texts came after the call.

11        Q.  No, I said the first text.

12        A.  The first text?

13        Q.  Yeah.  Anything after -- after you received the

14     first text how come you didn't tell them to stop texting

15     you?

16        A.  I don't know why.

17        Q.  Did you ever ask QuoteWizard how it obtained your

18     cellphone number?

19        A.  No.

20            MR. POLANSKY:  Ted, just give me a moment, I

21     might be done.

22            MR. BRODERICK:  Okay.

23            (Pause.)

24        Q.  Okay.  I think that's all I have.

```
                                                    Page 113
```

1              MR. BRODERICK:  I just have one or two

2     questions about Exhibit 16, Joe.

3

4                         EXAMINATION

5

6     BY MR. BRODERICK:

7        Q.  You were asked -- you didn't direct -- you didn't

8     provide consent on snappyautoinsurance.com at anytime;

9     correct?  To receive text messages.

10       A.  Correct.

11       Q.  And you didn't ask anybody to do it on your

12    behalf; correct?

13       A.  Correct.

14       Q.  And you know that so that's part of your personal

15    knowledge; correct?

16              MR. POLANSKY:  Objection.

17       A.  Correct.

18       Q.  And so when you say you deny that you have no

19    personal knowledge that the consent obtained from Joseph

20    Mantha on June 26th, 2019 on

21    www.snappyautoinsurance.com was fraudulent, is it fair

22    to say that you do have knowledge that you didn't do it

23    yourself or ask anyone to do it for you?

24              MR. POLANSKY:  Objection.

Page 114

1      A.   That's fair.

2      Q.   Okay.  No further questions.

3           MR. POLANSKY:  Mr. Mantha, thank you very

4      much for your time.  Appreciate it.

5      A.   Thank you.

6           VIDEOGRAPHER:  This concludes today's

7      testimony given by Joseph Mantha.  The total number of

8      media units used was two and will be retained by

9      Veritext New England.  We are off the record at

10     1:22 p.m.

11          (Whereupon, the deposition concluded at

12     approximately 1:22 p.m.)

13          COURT REPORTER:  Mr. Broderick, did you need

14     a copy today of the transcript?

15          MR. BRODERICK:  Yes, please.

16          VIDEOGRAPHER:  And will you be wanting a

17     video?

18          MR. BRODERICK:  I'll take a video too,

19     please.

20

21

22

23

24

Page 115

1                          **CERTIFICATE**

2

3    **COMMONWEALTH OF MASSACHUSETTS**

4    **SUFFOLK, ss.**

5

6        I, Laurie Langer, Registered Professional Reporter
     and Notary Public in and for the Commonwealth of

7    Massachusetts, do hereby certify that the witness whose
     deposition is hereinbefore set forth, was duly sworn by

8    me and that such deposition is a true record of the
     testimony given by the witness.

9

10

         I further certify that I am neither related to or

11   employed by any of the parties in or counsel to this
     action, nor am I financially interested in the outcome

12   of this action.

13

         In witness whereof, I have hereunto set my hand and

14   seal this 4th day of August, 2020.

15

16

17

18                        NOTARY PUBLIC
                          Commission Expires

19                        7/27/2023

20

21

22

23

24

Page 116

1    Edward A. Broderick, Esq.

2    ted@broderick-law.com

3                        August 4, 2020

4    RE:    Joseph Mantha v. Quotewizard.Com LLC

5        7/27/2020, Joseph Mantha (#4186175)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19     If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

Page 117

1    Joseph Mantha v. Quotewizard.Com LLC

2    Joseph Mantha (#4186175)

3                   E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Joseph Mantha                              Date

Page 118

1    Joseph Mantha v. Quotewizard.Com LLC

2    Joseph Mantha (#4186175)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Joseph Mantha, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Joseph Mantha                        Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24