# EXHIBIT 4

Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MASSACHUSETTS

3                Civil Action No. 1:19-cv-12235-LTS

4

5        JOSEPH MANTHA, on behalf of himself,

6        and all others similarly situated,

7                                    Plaintiff,

8        V.

9        QUOTEWIZARD.COM, LLC,

10                                    Defendant.

11

12

13                Remote videotaped deposition of

14        JOSEPH MANTHA, a witness called on behalf of the

15        Defendant, taken pursuant to the Federal Rules of Civil

16        Procedure, before Lori Atkinson, Notary Public in and

17        for the Commonwealth of Massachusetts and Professional

18        Shorthand Reporter, conducted via Zoom on

19        Thursday, September 10, 2020, commencing at 10:32 a.m.

20

21

22

23

24

Page 2

1    A P P E A R A N C E S:

2    FOR THE PLAINTIFF:

3    Edward A. Broderick, Esq.

4    The Law Office of Edward A. Broderick

5    208 Ridge Street

6    Winchester, MA 01890

7    Ted@broderick-law.com

8

9    FOR THE DEFENDANT, QUOTEWIZARD.COM, LLC:

10   Kevin P. Polansky, Esq.

11   Nelson Mullins Riley & Scarborough LLP

12   One Post Office Square, 30th Floor

13   Boston, MA 02109

14   617.217.4700

15   Kevin.polansky@nelsonmullins.com

16

17

18

19

20

21

22

23

24

```
                                              Page 3
 1                    I N D E X
 2   WITNESS                                  PAGE
 3   JOSEPH MANTHA
 4   By Mr. Polansky                          5
 5
 6              E X H I B I T S
 7
 8   Number      Description                  Page
 9   Exh 1       Notice of Plaintiff's
                 Continued Virtual Deposition for
10               09.10.20                     4
11   Exh 2       2020.07.26 Text Message
                 Mantha and Novia            8
12
13   Exh 3       MANTHA000335-MANTHA000335-MANTHA000503
                 CONFIDENTIAL                 38
14
     Exh 4       Business Calls Franklin Perkins School
15               Ed Manual 2014-15           43
16   Exh 5       Supplemental Answers
                 To Interrogatories          68
17
     Exh 6       Supplemental Answers to
18               Defendant's First Set of Admissions    76
19   Exh 7          Supplemental                        81
20
21
22
23          ****Exhibits retained electronically.***
24
```

Page 4

1              P R O C E E D I N G S

2              (Document marked as Exhibit No. 1 for

3      identification.)

4              THE VIDEOGRAPHER:  We are on the record.

5      This is the videographer speaking, Bill Slater, of

6      Veritext.  Today's date is September 10, 2020.  The time

7      is approximately 10:32 a.m.  This is day two of the

8      deposition of Joseph Mantha.

9              Counsel, please introduce yourselves for the

10     record.

11             MR. POLANSKY:  Good morning.  This is

12     Kevin Polansky for the Defendant, QuoteWizard.

13             MR. BRODERICK:  Good morning, Edward

14     Broderick, for the Plaintiff.

15             THE VIDEOGRAPHER:  Will the court reporter,

16     Lori Atkinson, please swear the witness in and we will

17     proceed.

18             THE COURT REPORTER:  Will counsel please

19     stipulate to the swearing in of the witness remotely?

20             MR. POLANSKY:  Yes.

21             MR. BRODERICK:  Yes.

22             THE COURT REPORTER:  Mr. Mantha, would you

23     raise your right hand, please.

24             (Witness complies.)

Page 5

1          THE COURT REPORTER:  Do you solemnly swear

2    or affirm that the testimony you are about to give is

3    the truth, the whole truth, and nothing but the truth?

4          THE WITNESS:  I do.

5              JOSEPH MANTHA,

6    having been satisfactorily identified and first duly

7    sworn by the Notary Public, was examined and testified

8    as follows:

9              DIRECT EXAMINATION

10   BY MR. POLANSKY:

11   Q.  Good morning, Mr. Mantha.  I'm not going to go

12   through sort of the background information we did last

13   time.  We are going to try to stick to new topics or

14   expanding on topics that were already discussed briefly

15   last time.

16        Before I do so, I wanted to ask you:  What did

17   you do to prepare for today's deposition?

18   A.  In -- over the -- since the last one, I talked to

19   my lawyers a few times.

20   Q.  I don't want to know anything that you discussed.

21        Did you speak to anyone else?

22   A.  No.

23   Q.  Did you view any documents in preparation for

24   today's deposition?

Page 6

1      A.   No.

2      Q.   Did you review your prior deposition testimony?

3      A.   I received it shortly after.  I kind of scanned

4   through it.  I don't think I read every word start to

5   finish.

6      Q.   When was that?  When did you review it?

7      A.   Around the time that I received it.  I'm not sure

8   when I got it.

9      Q.   Sometime in August?

10     A.   Yes.  What was the date of the last deposition?

11  I don't even know at this point.

12     Q.   I think it was in July.

13     A.   So whenever it was sent to me, maybe within a

14  week of that time.  I don't have a date for you.  I

15  don't know.

16     Q.   It wasn't last week or two weeks ago?

17     A.   No.

18     Q.   Did you -- when you were reviewing the testimony,

19  was there anything that stood out to you that needed to

20  be changed?

21     A.   No.

22     Q.   After you testified last time, did you speak to

23  Steve Novia?

24     A.   No.

Page 7

1      Q.  You didn't tell him that you testified and his

2    name came up?

3      A.  No.

4      Q.  At some point did Mr. Novia become aware, to your

5    knowledge, about a deposition of his coming up?

6      A.  Yes.

7      Q.  Did you speak to him about his deposition?

8      A.  No.

9      Q.  In advance of your first deposition, did you

10   speak to Mr. Novia about your deposition?  Not this one,

11   the first one.

12     A.  I made him aware that I was going into it.  But

13   didn't really speak about it, necessarily.

14     Q.  What did you make him aware of?

15     A.  That I had it.

16     Q.  Did you speak to him on the phone?

17     A.  I'm not sure.  I don't think so.  I might have.

18   I don't know.  I remember letting him know that I was

19   doing it.

20     Q.  Do you have access to the Exhibit Share website?

21     A.  We did this last time.  I would need a refresher

22   of how to do it.  But it worked.

23              MR. POLANSKY:  If you sign into Veritext --

24   we can go off the record for a moment.

Page 8

1              THE VIDEOGRAPHER:  The time is 10:36.  We

2     are off the record.

3              (Break in the proceedings.)

4              THE VIDEOGRAPHER:  This is the beginning of

5     media number two.  We are back on the record.  The time

6     is 10:37.

7              (Document marked as Exhibit No. 2 for

8     identification.)

9     BY MR. POLANSKY:

10     Q.  I'm showing you what has been marked as Exhibit 2

11     for this deposition.  And I will represent to you that

12     this is a text message that we received from Mr. Novia

13     prior to his deposition.

14         Have you seen this text stream before?

15     A.  I don't remember having that exact conversation

16     but it is there.  So sure.

17     Q.  You don't remember having that conversation?

18     A.  I remember that I had a communication with Steve.

19     I don't remember if I talked to him on the phone or if

20     we had a text message.  Now you are showing me a text

21     message.  I was aware that I talked to him in some form

22     letting him know that I had a deposition.

23     Q.  Right.  You can see from the first text that he

24     says, "Good luck tomorrow."  Right?

Page 9

1      A.   Yes.

2      Q.   There is nothing that I can see above it.   Right?

3  That appears to be the first text in this string.   Would

4  you agree with me?

5      A.   Yeah.

6      Q.   I honestly don't know whether there was a text

7  before this.   What I would like to get at is whether

8  there were more texts with Mr. Novia or whether you had

9  spoken to him on the phone about your deposition?

10      A.   I understand what you're saying.   I don't know.

11  I don't have any other text messages or even have those.

12      Q.   You don't have these text messages?

13      A.   I would have to look.   I don't think so.

14          What I'm saying is I don't know if I spoke to him

15  on the phone prior to this or not?

16      Q.   Let's back up a second.   This is July 26th which,

17  you would agree with me, is about five or six weeks ago;

18  right?

19      A.   Yes.

20      Q.   Have you spoken to Mr. Novia between July 26th

21  and today on the phone?

22      A.   No.

23      Q.   If you spoke to him on the phone around the time

24  of July 26th, you have no memory of it from five weeks

Page 10

1    ago?

2        A.  I don't.

3        Q.  I don't mean to sound degrading, But do you have

4    issues with your memory?

5        A.  No, sir.

6        Q.  You don't know if you've ever received these

7    texts from Mr. Novia?

8        A.  Could you repeat that?

9        Q.  You don't know if you still have these text

10   messages?  By "text messages," I mean iMessages from

11   Mr. Novia?

12       A.  You are asking me if I have them?

13       Q.  Yes.  Are they still on your phone?

14       A.  I would have to look.

15       Q.  You are free to look.

16       A.  When I type in his name for a message, nothing

17   comes up.

18       Q.  Do you have a tendency to delete your messages?

19       A.  No.

20       Q.  So if the message with Mr. Novia --  strike that.

21           Do you recall receiving these text messages from

22   Steve?

23       A.  Yes.  I remember him saying "Good luck".

24       Q.  Do you recall deleting these messages from your

Page 11

1   phone?

2       A.  No.

3       Q.  How is it you know that these messages no longer

4   exist on your phone?

5       A.  I just typed in his name.  It is not there.  Text

6   messages don't stick around.

7       Q.  I think they stick around for most people.  I can

8   go on my phone and look three years back and they still

9   come up.

10          Do you know if anyone else deleted these from

11  your phone?

12      A.  No.

13      Q.  Does anyone have access to your iMessages?

14      A.  No.

15      Q.  Have you ever had issues with text messages or

16  iMessages being deleted in the past?

17      A.  No.

18      Q.  As you sit here today, you have no text messages

19  from Mr. Novia in your phone?

20      A.  No.

21              MR. BRODERICK:  Joe, did you hit message

22  before you typed his name in?

23              THE WITNESS:  I hit message to type in like

24  a new message.  Then I type in his name.  Then when I

Page 12

1    hit his name, nothing comes up.  If I were to do that --

2    say with my brother right now.  When I typed in his

3    name, the last messages come up.  I don't think my phone

4    keeps them after a certain period of time.  I think

5    that's what it is.

6    BY MR. POLANSKY:

7        Q.  The messages with your brother aren't deleted?

8        A.  If I hit new message, I typed in Michael, and I

9    hit his name, the conversation comes up.

10       Q.  But it doesn't come for Mr. Novia?

11       A.  No.

12       Q.  Are you searching under the correct name?  Do you

13   have a nickname for Mr. Novia that possibly is contained

14   within your phone?

15       A.  No.  I type it in, there is one.  It pops up

16   other Steve's that I have in my phone.  There is only

17   one Steve Novia.

18       Q.  Is my screen still being shared?

19       A.  No.

20       Q.  Moving on.  It appears that you may have spoke to

21   Mr. Novia prior to your first deposition but you have no

22   memory of that conversation.  Is that right?

23               MR. BRODERICK:  Objection.

24       A.  Correct.

Page 13

1          I don't know if I texted with him or if I talked
2     to him on the phone.
3          Q.  You are aware that your employers' deposition is
4     tomorrow; is that correct?
5          A.  Correct.
6          Q.  Have you spoken to anyone of your employer
7     regarding this case?
8          A.  I spoke to the VP of HR.
9          Q.  Who is that?
10         A.  Derek Padon.
11         Q.  When did you speak with Derek Padon?
12         A.  When it first came up for them.  I believe they
13    received a subpoena.  My CEO asked me to reach out to
14    him to follow up with what that is for.
15         Q.  Who is your CEO?
16         A.  Michael Ames.
17         Q.  Did you speak to Michael Ames about the subpoena?
18         A.  No.
19         Q.  Michael Ames was the recipient of the subpoena
20    that was issued in this case and he didn't discuss it at
21    all with you about what the case was about?
22         A.  No.  He put me in contact with HR.
23         Q.  Then you spoke to Derek Padon?
24         A.  Yes.

Page 14

1     Q.   When was that conversation with Derek Padon?

2     A.   I don't know an exact date.  Probably within a

3   few days of receiving that.

4     Q.   How many times have you spoken to Derek Padon

5   about the case?

6     A.   Just that first time.  Then I believe that was

7   cancelled and I sent him another date to see if he could

8   do that date and he said yes.

9     Q.   What was the conversation or -- strike that.

10        What was the substance of the conversation

11   between you and Mr. Padon?

12     A.   I let him know that I was involved in a lawsuit.

13     Q.   Did he ask you why he was being asked to testify?

14     A.   Yes.

15     Q.   What did you say?

16     A.   I said that they are questioning my phone and

17   whether that is a business phone or a residential phone,

18   personal.

19     Q.   What did he say?

20     A.   I don't really remember what he said.

21     Q.   Did you give him any instructions with respect to

22   his testimony?

23     A.   No.

24     Q.   Did he tell you whether he thought your phone was

Page 15

1   a personal or a business phone?

2       A.  I think he immediately said, "Why would they

3   think that?"  Or something along those lines.  We don't

4   -- That's not a work phone.  That is your phone.  Or

5   something.

6           I said, Well, they need you to join the

7   deposition.  Or something along those lines.  It was

8   pretty quick and brief.

9       Q.  Was there any discussion about being able to

10  provide helpful testimony to you?

11      A.  No.

12      Q.  Did he ask anything more about the case?

13      A.  No.

14      Q.  Did you talk about business records that the

15  school may have produced?

16      A.  No.

17      Q.  Did you talk to him about how often you use the

18  phone to receive calls from the school?

19      A.  No.

20      Q.  Did you talk to him about any directories where

21  your cell phone may be included at the school?

22      A.  Can you repeat that?

23      Q.  Sure.  Did you speak to Mr. Padon about any

24  directories at the school that might list your cell

1    phone number?

2        A.   No.

3        Q.   Since your last deposition, have you spoken to

4    anybody else other than your lawyers about this case?

5        A.   My wife.

6        Q.   What have discussed with your wife?

7        A.   I think the one thing in particular that I talked

8    to her about was her brother.

9        Q.   What about her brother?

10       A.   He was brought up and, you know, I think I

11   mentioned or you mentioned him.  And then we haven't

12   seen him in quite some time.

13       Q.   Was there any discussion of whether -- strike

14   that.

15            Is his name Nicholas Banks?

16       A.   Yes.

17       Q.   Was there any discussion whether he could have

18   supplied your information in a website called

19   SnappyAutoInsurance.com?

20       A.   No, I think I said, "Your brother's name came

21   up."

22       Q.   Did she ask in what context?

23       A.   No -- I shouldn't say no.  I said something like

24   that.  But I mentioned like, Are you aware of his

Page 17

1  criminal history?  Or something.

2      Q.  I guess having a spouse of my own and knowing the

3  conversations that we have between one another it

4  strikes and me as odd that she wouldn't inquire about

5  why they were asking about her brother and his criminal

6  history?

7      A.  Yes.  She definitely did ask that first question

8  and what I said was that you had asked about his

9  criminal history and I think I said something like -- I

10  don't know.

11          It has been a sore subject in our family -- her

12  family.  He has been -- I don't know what you call it --

13  taken out our lives by our doing.  It has been a long

14  time of substance abuse history.  And, you know, my wife

15  has done everything she can to help him and it is just

16  sad.

17      Q.  Do you know whether your wife spoke to Mr. Banks

18  after you told her about your deposition testimony?

19      A.  No, she hasn't talked to him.

20      Q.  Other than -- did you have more to your answer?

21      A.  I said she hasn't talked to him in a long time.

22  There might have been a few attempts by him over the

23  last two years to kind of start talking to her again.

24  But he has just not taken responsibility for his life

```
                                                    Page 18
 1    and his actions.

 2        Q.   Other than -- I'm sorry.

 3        A.   She doesn't talk to him.

 4        Q.   Other than speaking with your wife about her

 5    brother, was there any conversation regarding Snappy

 6    Auto Insurance?

 7        A.   No.

 8        Q.   Were there any other -- did you discuss with her

 9    the Steve Novia communications that you testified about?

10        A.   I said Steve's name came up.  Once I found out

11    that he was going to be deposed, I said that.

12        Q.   Did she ask?

13        A.   She asked the same question that I asked.  "Can I

14    talk to Steve?"  You know, "Am I allowed to?"  We just

15    haven't which stinks.

16        Q.   So are you aware whether she had spoken to Steve

17    at all during the course of this litigation?

18        A.   To my knowledge she hasn't.

19        Q.   What about Steve's wife?

20        A.   What is that?

21        Q.   What about Steve's wife?

22        A.   Steve is not married.

23        Q.   Does he have a significant other?

24        A.   Not to my knowledge.
```

Page 19

1    Q.  Anything else that you guys have discussed about

2    this case since your last deposition?

3    A.  Since the last deposition?

4    Q.  Yes.

5    A.  Not really.

6    Q.  When you say "not really," what have you

7    discussed?

8    A.  When it is coming up and got scheduled, you are

9    going to be deposed.  They are asking, can you do this

10   date?  So small talk around it.

11        But in terms of talking about it, my wife has

12   never really cared to hear about it.

13   Q.  Her deposition is tomorrow; is that right?

14   A.  Correct.

15   Q.  And have you done anything to assist her in

16   preparing for her testimony?

17   A.  No.  I set it up with her.

18   Q.  You haven't told her what she can expect as far

19   as questions go?

20   A.  No.

21   Q.  No questions relating to consent, use of

22   computers; things like that?

23   A.  No.  I mean, she knows some of that stuff along

24   the way like when I sent off my computers.  I had to sit

Page 20

1    by my computer and download my hard drive and all of

2    that stuff.  She kind of knows some of the things that

3    went on along the way.  But details and deep

4    conversations about it -- we have two little ones.  She

5    doesn't really care.

6        Q.  Now, moving on to your employment.  I understand

7    that you are the director of residential operations; is

8    that right?

9        A.  Yes.

10       Q.  What is the name of the school?

11       A.  Doctor Franklin Perkins School.

12       Q.  That's a special education school?

13       A.  Correct.

14       Q.  From the last time, I understand you oversee six

15   residential homes; is that right?

16       A.  Correct.

17       Q.  The kids range anywhere from 12 to 21; is that

18   right?

19       A.  Yes.

20       Q.  I know you said the numbers fluctuate but usually

21   you have about 60 kids?

22       A.  Correct.

23       Q.  I'm sort of asking these questions because I'm

24   trying to move this along.  Your normal hours that you

Page 21

1    work are usually in the office at the school; right?

2        A.  Yes.

3        Q.  That's from 8 to 4, 9 to 5?

4        A.  Yes.

5        Q.  Was that consistently the same -- strike that.

6            Were those the hours that you worked in 2019?

7        A.  Yes.  Occasionally a little earlier, occasionally

8    a little later.  You know, the average that is the

9    schedule?

10       Q.  As the director of residential operations, what

11   are your duties at the school?

12       A.  I oversee the six programs.  I oversee the six

13   directors.  I oversee the overnight administrator.  I

14   work together with the clinical directors, the nursing

15   director to provide treatment to the students, the

16   policy and procedures.  We have licensures

17   accreditation.

18       Q.  You said you have six directors.  Do those six

19   directors report to you?

20       A.  Correct.

21       Q.  Who are those individuals?

22       A.  Now?  Or at the time back in --

23       Q.  2019.

24       A.  I guess it would depend.  I hired two new

```
                                                    Page 22
 1    directors this year.  That's why I'm asking because
 2    there were four before.
 3        Q.   What are the two names?
 4        A.   Tim O'Day.
 5        Q.   Tim who?
 6        A.   Tim O'Day.
 7             Bill Cyr, C-Y-R.
 8        Q.   Those are the two new ones from 2020?
 9        A.   No.  I was naming the four.  Sorry.
10             The new ones are Dylan Zukowski.  And Kelly
11    Gross.  They are both new since August of last year.
12        Q.   Going back to the four directors from 2019, we
13    have Tim O'Day and Bill Cyr.  Who are the other two?
14        A.   Joel Howell.  Amanda Saunders.
15        Q.   If I understand the hierarchy, you oversee
16    approximately 88 individuals, 88 staff members?
17        A.   Yeah.  So those direct reports.  So I have seven
18    direct reports.  I have six directors and the overnight
19    administrator.  They have their staff for each of their
20    programs or division.
21             For example, the overnight staff cover the whole
22    agency.  But each director only cover covers the staff
23    in their house, if you will; morning and evening staff.
24        Q.   Who is the overnight administrator?
```

Page 23

1      A.   Josh Ehrets.

2      Q.   If I understand correctly, the six directors

3   oversee the staff in their house.  The overnight

4   administrator oversees sort of everybody during his

5   hours?

6      A.   Correct.  Exactly.

7      Q.   Approximately how many different staff members

8   are in of each director of the different housing units?

9      A.   Anywhere from ten to 15 maybe.

10     Q.   Do the -- strike that.

11          As the director of residential operations and

12   having your hours generally finish around the 5:00 hour,

13   do the directors and overnight administrator have your

14   cell phone number?

15     A.   Yes.

16     Q.   How do they get access to your cell phone number?

17     A.   They just add it.  Just go off of the two that

18   just started, when they start, we share our cell phone

19   numbers.

20     Q.   Is there a list that you share all the cell phone

21   numbers?

22     A.   No.

23     Q.   How do you share that information with them?

24     A.   Supervision.

Page 24

1    Q.  When you say you shared the information, how is

2  it shared, the information, email or phone number?

3    A.  As I said in supervision, I have supervision with

4  them when somebody first starts.  I would say, "Here is

5  my phone number.  They would give me their phone

6  number."

7    Q.  It would be sort of a face-to-face type of deal?

8  There are no emails or letters or anything to these

9  individuals?

10    A.  Yeah.  Face to face.

11    Q.  In addition to the six directors and the

12  overnight administrator, does the nurse -- did you say

13  nurse?

14    A.  We have nursing.

15    Q.  Nursing.  Does the nursing department have access

16  to your cell phone number?

17    A.  I think so.  Maybe.

18    Q.  If something comes up after your normal hours,

19  again, when you leave around 5 or so, and I understand

20  some days it would be longer.  If there is an issue,

21  would they call your cell phone?

22    A.  If it is something major.  We have an on call

23  system.  An on call phone that is a Perkins phone that

24  an administrator, a program director, program

Page 25

1    coordinator carries for a week.  It goes Friday to

2    Friday.  They receive all the calls.

3           Now, if something reaches what we call like a

4    critical -- so somebody goes to the hospital, a runaway,

5    something major, police involvement, something big --

6    they would contact myself or the chief operating

7    officer.

8       Q.  So the on call system, is that something that you

9    have to participate in?

10      A.  For direct calls, no.  But as the kind of

11   critical upper admin call, I rotate back and forth with

12   my COO, who is my supervisor.

13      Q.  But the on call system, you have people who would

14   walk around with that phone for a week?

15      A.  Yes.

16      Q.  That does not include yourself?

17      A.  No.

18      Q.  You are the individual that gets the critical

19   phone calls in addition to the COO?

20      A.  Correct.

21      Q.  Would you say that there are critical calls to

22   your cell phone every month?

23      A.  Yes.

24      Q.  Approximately how many times per month?

Page 26

1      A.  I wouldn't even give an approximation.  It could

2   be none.  It could be 15.  Just kind of how it goes, you

3   know, it ebbs and flows, certainly.

4      Q.  The school doesn't give you a work cell phone for

5   these calls; is that right?

6      A.  No.

7      Q.  If I understand you correctly, the school doesn't

8   reimburse you for the use of your phone.  Is that

9   correct?

10     A.  I have a $30 credit that I get from my agency.

11     Q.  Who is the agency?

12     A.  Doctor Franklin Perkins.

13     Q.  So they give you a $30 credit because of the time

14  that you use on your phone per month; is that right?

15              MR. BRODERICK:  Objection.

16     A.  Originally when it was put in place, it was for

17  data.  We were asked to have our -- part of

18  communication is email, having email access.  That's how

19  it came up.  I forget what year that started.  That was

20  put in place a while ago and now it has just carried on.

21  It is something that I believe is either the first or

22  last check of each month you get a $30 credit.  I don't

23  think it says anything like cell phone or anything on

24  it.  I don't really look at it.

Page 27

1      Q.    That's the --

2      A.    Say that again.

3      Q.    Is that monthly?  Strike that.

4            How often do you get paid?

5      A.    Biweekly.

6      Q.    So that is $30 per paycheck?

7      A.    It is 12 times a year.

8      Q.    They give the $30 credit once a month?

9      A.    Yeah.  One check a month.  I don't know if it is

10     the first or the last.  That's why it is one or the

11     other.  That's why it's 12 per year.

12     Q.    That $30 credit is reflected in your pay stub, 12

13     times per year?

14     A.    It should be.  I never looked for it.

15     Q.    Was that $30 credit in place in 2019?

16     A.    Yes.

17     Q.    Was it in place in 2018?

18     A.    Yes.

19     Q.    Has it been in place for a couple of years now?

20     A.    Yes.

21     Q.    The email that you get on your personal cell

22     phone, is that the same email that you would get if you

23     were on a desktop computer at work?

24     A.    Yes, it is an Outlook account.

Page 28

1      Q.   Do you respond to your emails on your cell phone?

2      A.   Yes, sometimes.

3      Q.   All the emails come to your cell phone?

4      A.   Yes, if I open it up.

5      Q.   Do you have a -- strike that.

6           Generally, how much email traffic would you get

7      in a day?

8      A.   Maybe a hundred.

9      Q.   Personal emails, how many emails do you get a

10     day?

11     A.   You said personal?

12     Q.   Yes.

13     A.   I don't know, 50.

14     Q.   50 personal emails.

15     A.   Each time you are asking questions there is a --

16     I don't know if you are hitting your microphone, it is

17     muffling.

18               (Technical difficulties.)

19     BY MR. POLANSKY:

20     Q.   So I think I asked you, I don't know if you heard

21     it, excluding spam email on your personal email, how

22     many personal emails do you receive a day?

23     A.   Not many.  It is a lot of junk.

24     Q.   When the staff members of the school call you on

1    your phone, are they calling from a school number or

2    their personal cell phone number?

3        A.  Can be either.

4        Q.  Do you know the numbers that come up as staff

5    members, do their numbers come up on your cell phone?

6        A.  Yes.  Usually I guess there has some

7    clarification in there.  I don't get direct calls from

8    -- so when you say staff, you might be speaking of my

9    administrators, you know, that are underneath me.  Staff

10   are the staff that work in the programs.  Then the

11   administrators, there are program coordinators.  There

12   are directors.

13       The directors and coordinators are the on call

14   folks.  So they take calls through the on call phone.

15   And they either call me.  Sometimes they call me from

16   the on call phone.  Sometimes they use their phone.

17   Sometimes if they are at work they call me from either

18   their work phone or their cell phone.

19       Q.  That is a helpful clarification.  You have the

20   six directors and then you have the one overnight

21   administrator and then you also have nursing that

22   reports directly to you; is that right?

23       A.  Not nursing.

24       Q.  Not nursing.

Page 30

1          Who does nursing report to?

2      A.   The nursing director reports to one of our

3    clinical directors.

4      Q.   Who does the clinical director report to?

5      A.   The chief operating officer; same person that I do.

6      Q.   Focusing on the six directors and the overnight

7    administrator, I understand all in there is about 86

8    staff members?  Or is that including the directors and

9    overnight administrator?

10     A.   That 80 -- roughly in that 86, that includes

11   directors, coordinators, overnight staff.

12          That's -- I think I told you we budgeted for but

13   we're rarely ever full.  Tough job.

14     Q.   Again, you know, let me know if I'm incorrect.

15   The folks would call you after hours would be the

16   directors and the overnight administrator; is that

17   right?

18     A.   Or the coordinators because the coordinators are

19   in the rotation with the director.

20     Q.   When you say the rotation, you are talking about

21   the on call system?

22     A.   Yes.

23     Q.   How many coordinators are there?

24     A.   Five.

Page 31

1    Q.   Who are they in 2019?  Who they were in 2019?

2    A.   Joy Zias.  Jessica Tashajian.  Dwayne Murray.

3  Will St. Claire.  And Jeff Terho.

4    Q.   Are they all still employed today by the school?

5    A.   Yes.

6    Q.   So there's these five individuals, the six

7  directors that we talked about, and the overnight

8  administrator that could possibly call you after hours.

9  Is that right?

10    A.   Yes.  The overnight has a second, like, an

11  assistant night awake administrator.  It is a vacant

12  position right now.   There are seven days in a week.

13  They work ten hours shifts.  He only works four days a

14  week.  Then the assistant night awake administrator

15  would work the other three nights.

16    Q.   Who is that?

17    A.   Last year it rotated and it's a vacant position

18  right now.  So there was a few names that might have

19  been for 2019 was Kyle Burke and another -- I think

20  another person started after that like right around the

21  holiday season this year.  I'm drawing a blank.  She

22  didn't last very long.

23    Q.   All of those individuals, the directors, the

24  overnight administrator, the coordinators, you would

Page 32

1   have their cell phone number as well in your phone?

2       A.  Yes.

3       Q.  So if they called you, you would know it was

4   coming from one of them and not some unknown number?

5       A.  Correct.  There's two on call numbers.  The PDs

6   or PCs would use the 8:00 a.m. to 10 p.m. where they

7   take calls.  They also take any callouts during that

8   time.

9           The 10 p.m. to 8:00 a.m. the overnight

10  administrator or an assistant or a backup type person

11  they carry a phone as well.  Each of them have a

12  work-issued on call phone.

13      Q.  Is it also possible to receive calls from folks

14  in the residential home?

15      A.  It is certainly possible.

16          But I don't get direct calls from them off it.

17  It goes to the on call system.  They call the on call

18  phone.  They talk to the PD, PC.  And if it reaches that

19  critical nature that I spoke of, then it gets bumped up.

20      Q.  Do you meet with the -- do you call them students

21  or residents?

22      A.  I call them both.  They are changeable.  There

23  are residents and students.  We have a school on site

24  that also day students come in for.  There's roughly,

1    say, a hundred day students that get bused in from an

2    hour radius.  And then there's the 60 residential

3    students from the programs that attend school there.

4        Q.  Do you meet with all of the residents or

5    students?

6        A.  Do I meet with them?

7        Q.  Yes.  Do they have direct access to you or are

8    you mainly overseeing the administrator?

9        A.  Yeah, I'm overseeing the program.  Sometimes

10   things get, you know, the culture of the program, if you

11   will.  Programming becomes unstable.  Sometimes I

12   support the program director in trying to stabilize the

13   house.  Sometimes if a student maybe did something

14   bigger that wasn't appropriate, you know, got in a fight

15   in multiple restraints, I sometimes join them in trying

16   to reset expectations or come up with an ISP,

17   individualized support plan; things like that.

18            So, directly, no.  I have kind of gotten more and

19   more removed over the last three years.

20       Q.  Do the students or residents have direct access

21   to you if they want to get ahold of you?  After hours?

22       A.  If they wanted to talk to me, if they said, you

23   know, "I'm not happy with what is going on."  I have a

24   kind of open door policy in that sense.  They would talk

Page 34

1    to their staff.

2            They would talk to their program director,

3    coordinator and say, Sometimes a lot of kids want to

4    skip and jump right to the top, you know.  So they can't

5    just walk over to my office and walk in.

6        Q.  What about contacting you after hours, would the

7    students or residences ever do that?

8        A.  No.

9        Q.  What about their parents, do they have access to

10   your cell phone number?

11       A.  Their what?

12       Q.  Their parents.  The students ages are 12 to 21.

13   Would you be involved with their parents at all?

14       A.  No.

15       Q.  Their parents wouldn't contact you on your

16   personal cell phone?

17       A.  No.

18       Q.  Have you ever received calls from the students or

19   residents on your cell phone?

20       A.  No.

21       Q.  If a student was hospitalized that would come

22   through the nursing department?

23       A.  Hospitalized?  Well, it depends on what we are

24   saying there.  We have psychiatric emergencies so kids

Page 35

1    become so dysregulated that they need to be evaluated.

2    They go to an ER.

3            That stuff in the evening goes through the on

4    call.  Typically there is a precursor to it.  A bigger

5    event, an incident, you know, an assault or a restraint

6    or something of that nature that triggers a psychiatric

7    emergency, where they would go to be evaluated.

8        Q.  Outside of the residential unit, are there other

9    individuals at the school that would contact you after

10   hours?

11       A.  No.

12       Q.  The CEO wouldn't contact a CFO or COO; things

13   like that?

14       A.  No.  If there is a bigger, bigger, you know,

15   incident that happens, I would contact my supervisor,

16   the COO.  If he was on vacation or something, out of the

17   country, I would call the COO.  That is kind of our

18   chain of command.

19       Q.  Are you aware of any written formal policy

20   regarding calling you after hours?

21       A.  No.

22       Q.  Are you aware of any informal policy other than

23   what you have already discussed about calling after

24   hours?

Page 36

1      A.   No.

2      Q.   The folks that report to you understand that if

3    something reaches that critical level that they can

4    call?

5      A.   Yes.   They should.

6      Q.   I think last time you said were 11

7    administrators.   When we have been discussing the

8    coordinators, the directors, are you lumping those into

9    that term administrator?

10     A.   Yeah.   Exactly.   In that I was speaking directly

11   to the program so that is six directors, five

12   coordinators.

13          Then, again, I took the night administrator not

14   in that 11.   It is kind of a separate entity.   That

15   person is responsible for overnight staff and all six

16   programs.   Whereas, the director and coordinator for a

17   team would be responsible for the first shift and second

18   shift.

19     Q.   I don't want to do it right now.   I don't want to

20   take the time to do it.   If it was asked of you to

21   provide the cell phone numbers for those 11

22   administrators and overnight administrator, could you

23   do so?

24     A.   Yes.

Page 37

```
1                    (Technical difficulties.)

2                    THE VIDEOGRAPHER:  The time is 11:20.  We're

3       off the record.

4                    (Break in the proceedings.)

5                    THE VIDEOGRAPHER:  This is the beginning of

6       media number three.  We are back on the record.  The

7       time is 11:25.

8                    MR. POLANSKY:  Ted, are you agreeable to

9       providing those numbers after the fact?  Or do you want

10      me to go through that now?

11                   MR. BRODERICK:  No, we can get you those

12      because he could easily just serve them.

13                   Cell numbers for whom exactly?

14                   MR. POLANSKY:  For the administrators that

15      call him after hours.  I think there's 11 or 12

16      individuals.

17                   THE WITNESS:  Are you asking for the ones

18      currently or last year?

19                   MR. POLANSKY:  It would be last year.

20                   THE WITNESS:  It would be slightly

21      different.

22                   MR. POLANSKY:  That's all right.

23                   MR. BRODERICK:  Kevin, when you get to a

24      breaking point, I could use, not an emergency, you know
```

```
                                                      Page 38
 1   five minutes.
 2              MR. POLANSKY:  Now is fine.  I am still
 3   booting up.  Now would be a good time.
 4              THE VIDEOGRAPHER:  The time is 11:26.  We
 5   are off the record.
 6              (Break in the proceedings.)
 7              THE VIDEOGRAPHER:  This is the beginning of
 8   media number four.  We are back on the record.  The time
 9   is 11:36.
10   BY MR. POLANSKY:
11      Q.  Okay.  I'm going to show you another document.
12              (Document marked Exhibit No. 3 for
13   identification.)
14      Q.  Mr. Mantha, do you see what I have put in front
15   of you as Exhibit 3?
16      A.  Yes.
17      Q.  And in discovery, we had asked for your business
18   records and this is what I was provided.
19          Is that your business card?
20      A.  That is.
21      Q.  Is that a current business card?
22      A.  Yes.
23      Q.  How many prior business cards have you had, if
24   any?
```

Page 39

1    A.   I think I had one as a program director prior to

2    this position, which would have just read the same but

3    with program director underneath it.

4    Q.   This lists your direct line at the school; is

5    that right?

6    A.   Um-hmm.

7    Q.   It doesn't go to your cell phone?

8    A.   No.

9    Q.   Do you ever forward your calls from your direct

10   line to your cell phone?

11   A.   Now I do.

12   Q.   When did you start doing that?

13   A.   After COVID hit we started doing a lot more

14   remote stuff.  Just started learning a lot more

15   capabilities of our phone system.

16   Q.   Now the calls that go to this direct line will be

17   forwarded to your cell phone?

18   A.   They could if it is turned on.  It is through an

19   app.

20   Q.   How often do you turn it on?

21   A.   Since COVID hit I had it on pretty much all the

22   time.

23   Q.   Do you have the prior business card?

24   A.   I don't think so I think I would have tossed it

Page 40

1    when I got these.  I don't think so.

2        Q.  Did you look for them when you worked looked for

3    this card?

4        A.  No.  I think I just hit three years at this

5    position.

6        Q.  When you got the business card, do you -- strike

7    that.

8            Is the business card issued by the school or in

9    certain format or do you request what is provided on the

10   card?

11       A.  It is issued by the school.  I didn't request

12   anything.

13       Q.  Do you have any other sort of documentation

14   regarding any directories that the school provides with

15   your phone number on it -- your cell phone number on it?

16       A.  No.

17       Q.  Are you aware of any directories that include

18   your cell phone?

19       A.  No.

20       Q.  Are you aware of any directories that include

21   your business phone, your school phone?

22       A.  Yes.

23       Q.  What are those directories?

24       A.  That is the directory in our phone system, which

Page 41

1    is called Ring Central that is also the app that I would

2    put on my phone.  So within Ring Central there is a

3    directory.

4        Q.  And is Ring Central something that you have

5    access to an internet browser?  Can you go in Ring

6    Central and print out a telephone directory?

7        A.  Yes.

8        Q.  Have you done that in this case?

9        A.  I have a copy of our directory sitting on my desk

10   so that I don't have to go into the app every single

11   time at my desk and look for somebody.

12       Q.  Have you provided that to your counsel?

13       A.  I don't think so.

14       Q.  Why not?

15       A.  I'm not sure.

16            MR. BRODERICK:  Objection.

17   BY MR. POLANSKY:

18       Q.  You can answer.  Why have you not provided that

19   telephone directory to your counsel?

20       A.  I said --

21            MR. BRODERICK:  Objection.  I don't think it

22   was requested.

23            MR. POLANSKY:  Well, it was requested.  We

24   are going to go through those requests.  That's why I'm

Page 42

1    asking.  I think it is relevant as to why any sort of

2    telephone directory wasn't provided.

3                Again, we will go through the specific

4    request later.  But apparently it was requested of

5    Mr. Mantha.  And now I will go down that road about, you

6    know, what he provided and when and what else is out

7    there.

8                MR. BRODERICK:  You requested it of the

9    school.

10                MR. POLANSKY:  No, I requested it of

11    Mr. Mantha.  We will take a look at it.  We will go

12    through those requests later as they are very specific.

13    BY MR. POLANSKY:

14    Q.  Is this the telephone directory for 2020?

15    A.  I don't know what it -- like is it for a year or

16    is it just ongoing?  I don't know how it is operated or

17    who oversees it.  How many numbers get plugged in.  You

18    know what I mean, if a new employee starts they somehow

19    get in there.  I think it is an ongoing directory.

20    Q.  Are you aware of any school directories that are

21    not contained in Ring Central?

22    A.  Not since Ring Central started.

23    Q.  When did Ring Central start?

24    A.  A few years, two or three.  I don't know exactly.

Page 43

1      Q.  Are you aware of a document called the Franklin

2   Perkins School Ed manual?

3      A.  Ed manual?  That would be education.

4      Q.  Yes, education manual.

5      A.  No.  I'm residential so, you know, we are kind of

6   separate divisions.

7             (Document marked as Exhibit No. 4 for

8   identification.)

9   BY MR. POLANSKY:

10     Q.  I'm going put this on my screen in a moment.

11         Can you see what has been marked as Exhibit 4 on

12  my screen?

13     A.  Yes.

14     Q.  Have you ever seen one of these education manuals

15  before?

16     A.  I would have to see what is still in it.

17     Q.  It has organizational charts.  School contact

18  numbers.  Program contact numbers.

19         Now you have been here since 2014, 2015; right?

20     A.  Yes, 2007.

21     Q.  Do you know if this was provided to all employees

22  for the school including residential?

23     A.  I don't know.  It is an educational document, it

24  is not a residential document.  It is not something that

Page 44

1    I refer to or --

2        Q.   I'm looking at where it says school contacts.  It

3    has numbers for teachers, clinical nurse specialist; is

4    that somebody who would report to you?

5        A.   No.

6        Q.   Is that somebody that might call you?

7        A.   No.   That is somebody underneath -- that is like

8    a -- like a nurse practitioner.  They are not a

9    psychiatrist but they can prescribe meds.

10       Q.   What about residential program, does that apply

11   to you?

12       A.   Yes.   Tim Hammond is now the chief operating

13   officer.

14       Q.   What about Terri Philbrick?

15       A.   Terri is still one of the clinical directors.  We

16   now have two.  And Meg McDonald is still the director of

17   nursing healthcare.

18       Q.   There are numbers of residential programs,

19   individuals, at least as of 2014, 2015 in this manual?

20       A.   Yes.

21       Q.   Then it has different buildings.  Are these

22   residential buildings?

23       A.   Correct.

24       Q.   You would --

Page 45

1      A.   If you just go right there, in 2014, 2015 I was

2   the program director of Curtis and Duplex.

3      Q.   These people would report to you?

4      A.   Not the program nurse.  That is just a list of

5   program staff down below, the day staff, evening staff.

6   The nurse would report to the nursing director, Meg.

7      Q.   Does this refresh your memory as to whether you

8   would have received this?

9      A.   No.

10      Q.   Do you have access to other manuals like this at

11   the school?

12      A.   Access to -- there is a lot of policy.

13      Q.   Sure.  What I'm getting at --

14      A.   This is telephone numbers.  This is something

15   that I have never seen.

16      Q.   Do you know where they would keep documents like

17   this at the school?

18      A.   No.  We have an F drive, if you will, that has --

19   you know, kind of like a drive for the agency that has

20   all different folders in it.  The school has some

21   folders.  Residential has some folders.  We have adult

22   services.  Child development center.  Rein In A Dream;

23   it is a therapeutic riding program, horsemanship.

24          There are six divisions, if you will, bigger

Page 46

1    divisions.

2        Q.   I'm going to ask you phone numbers and tell me if

3    you recognize them.  978-368, those are the first six

4    numbers of the school, right?  Area code?

5        A.   Correct.  Sometimes it is the 365.  Then the main

6    number that is on the business card I think has a

7    different one as well.

8        Q.   978-368 -- 978-365.

9        A.   Then a four digit extension 4900.

10       Q.   Do you know who 4904 is?

11       A.   Off the top of my head, I don't.

12       Q.   What about 4818?

13       A.   I think that is Carol, the nurse.

14       Q.   How about 1658?

15       A.   I don't know.

16       Q.   What about 6415?

17       A.   Yes.

18       Q.   Who is that?

19       A.   That is HR.

20       Q.   Would it be typical for HR to call you after

21   hours?

22       A.   No.

23       Q.   What would be the purpose of a call after hours

24   from HR?

Page 47

1       A.   If we were unable to connect, that was the only

2   time to connect.  We just said, Can we contact?

3       Q.   What about 6424?

4       A.   That sounds familiar.  That is the manner

5   program, supervisor line.

6       Q.   So that would be -- do you see, 6424; that is

7   right?

8       A.   Yes.

9       Q.   Why would the supervisors be calling you after

10  hours?

11      A.   Typically they wouldn't.  At that point back in

12  2014, 2015 when I was a director, they might have been

13  calling me.

14      Q.   What about in 2019?

15      A.   2019, they wouldn't call me, if at all.

16      Q.   Even if they did, what would be the reason for

17  them calling?

18      A.   Emergency.

19      Q.   Was it -- back in 2014, 2015 was it typical for

20  them to call you in your role at that time?

21      A.   More so.

22      Q.   What about 6451?

23      A.   6451?

24      Q.   Um-hmm.

Page 48

1      A.   HR.   Deb Dawson.

2      Q.   Same question as earlier, why would she be

3    calling you after hours?

4      A.   Deb?

5      Q.   Yes.

6      A.   I don't know.

7      Q.   I guess if it was during hours, why would they be

8    calling you on your cell phone rather than your work

9    phone?

10     A.   If something came up that was staff injuries,

11   need to get paperwork submitted.  They have a lot of

12   staff get injured in incidents.  Some things are on a

13   timely matter.  Sometimes if they were unable to get

14   ahold of me via email or my work line.  We are a campus

15   so, you know, so pre-COVID, we are moving around the

16   campus a lot, meetings all over the school.  So I guess

17   if they were trying to track me down.

18     Q.   It would be easier tracking you down on your cell

19   phone than your work phone during the day?

20     A.   Yeah.  Pre-COVID probably.

21     Q.   During the day, pre-COVID, were you in front of

22   your office or were you out of your office, meeting with

23   people?

24     A.   It is 50/50, maybe.  I have a lot of meetings,

Page 49

1    six programs, a lot of different meetings and meeting

2    with program directors.  Sometimes I go to their office

3    versus mine.  Lots of different meetings, whether it is

4    my building or school building.

5         Q.  And if 50 percent of your time is outside of the

6    office, how often would you check your email to make

7    sure you are getting back to people?

8         A.  Hard to put a time on it.  If a meeting was

9    starting would I check my phone and check emails?  Sure.

10   If there was a break in a meeting would I check my

11   email?  Sure.

12        Q.  Are you familiar with a number 6504?

13        A.  6504?  Yes.  Weymouth.

14        Q.  Is Weymouth another residential hall?

15        A.  Yes.

16        Q.  What about 6535 is that duplex?

17        A.  Duplex.

18        Q.  6544?

19        A.  6544, that is a weird -- I think that is Steve

20   Young.

21        Q.  Who is Steve Young?

22        A.  The director of facilities.  But I'm not a

23   hundred percent sure.  I'm guessing there, just letting

24   you know.  Doing the best I can.

```
                                              Page 50

 1      Q.   You are doing well.  6551 is that Curtis?

 2      A.   6551 is Curtis, correct.

 3      Q.   What about 8600?

 4      A.   8600, I have no idea.  8600?

 5      Q.   Yes.

 6      A.   That doesn't even sound like one of our

 7   extensions.

 8      Q.   It's 978-368-8600.

 9      A.   No.

10      Q.   What about 6420?

11      A.   6420 that seems familiar.  I'm not sure.

12      Q.   4861?

13      A.   Yeah.  I think that is one of the house lines

14   maybe at Curtis.

15      Q.   6541?

16      A.   Whitehall.

17      Q.   4861?

18      A.   I think that is the one we just said.  I think it

19   is a Curtis house line.  Each house has a supervisor

20   line and then a house line.

21      Q.   534?

22      A.   6534?

23      Q.   No, no.  4003?

24      A.   4003?
```

Page 51

1    Q.  Yes.

2    A.  I don't know that one.

3    Q.  6545?

4    A.  Yes, Tim Hammond.

5    Q.  Who is Tim Hammond?

6    A.  Chief operating officer.

7    Q.  4814?

8    A.  4814, sounds familiar but I'm not sure.  I don't

9    know exactly who that one is.

10   Q.  Then on your business card you have 978-365-7376;

11   right?

12   A.  Yes.  That goes to like the operator, if you

13   will, kind of a straight in call.

14   Q.  Okay.  I was going to ask you why would that

15   number be calling you?

16   A.  That is back before everything -- every time you

17   called out of Perkins, that is the number that showed

18   up.

19   Q.  Okay.

20   A.  So that is the main number.  Everything went

21   through that -- what am I trying to say -- switchboard.

22   Right.

23   Q.  Yes.  Then you said there are two on call cell

24   phones.  Do you know the number of those two?

```
                                                    Page 52
 1      A.  I would have to look.

 2      Q.  Do you mind looking?  Or if your counsel wants to

 3   provide them after, we can move along.

 4            MR. BRODERICK:  Yeah, I can do that.  Let me

 5   keep a running list here.

 6            MR. POLANSKY:  On call phone numbers.

 7            MR. BRODERICK:  Gotcha.

 8   BY MR. POLANSKY:

 9      Q.  I want to take a few minutes to go through the

10   browsing history.  My understanding is back in May you

11   provided access to your two laptops.  One is your

12   personal use and the other has photos in your phone to

13   Mr. DePui; is that right?

14      A.  Correct.

15      Q.  He imaged or copied all of those browsers?

16      A.  Correct.

17      Q.  You previously testified that the only one he

18   couldn't find was June of 2019; is that right?

19            MR. BRODERICK:  Objection.

20      A.  The only one that he couldn't find, I don't know

21   what that means.

22      Q.  Sure.  You testified that the browser history

23   didn't go back to June of 2019; is that right?

24      A.  Correct.
```

Page 53

1      Q.  That is something that he told you?

2              MR. BRODERICK:  Objection.

3      A.  I don't recall if he told me that or if my

4    counsel told me that.

5      Q.  But, in any event, you testified that they didn't

6    have a browser history for June of 2019; is that right?

7      A.  Correct.

8      Q.  Did he give you a copy of the imaging that he

9    took from your browser?

10     A.  No.

11     Q.  Now, I understand that you no longer intend to

12   call him as an expert in this case.  And that you have

13   personal knowledge of your browser.  Is that correct?

14     A.  When you say personal knowledge of my browser?

15     Q.  Sure.

16     A.  What does that mean?

17     Q.  Well, have you looked back to see whether your

18   browser history exists for July of 2019?

19     A.  Yes.

20     Q.  Does it?

21     A.  No.

22     Q.  When is the last time, to your knowledge, that it

23   did exist?

24              MR. BRODERICK:  Objection.

Page 54

1    A.  Well, I think based on --  I don't even know at

2   this point.  I think it was three months that it went

3   back.  If it was three months, it would be three months

4   from whatever that date is.

5    Q.  How do you know it was three months?

6    A.  When I was asked to do it, I went on -- I Googled

7   how to search my browser.  I'm not IT.  I'm not computer

8   savvy.  I Googled how to search my browser.  I followed

9   the quick -- I think it was two or three steps.  That's

10  what it came up with.  I think -- I'm going off memory

11  here.  I think it is three months.  I don't know.  I

12  think it is three months.

13   Q.  So in light of your sort of inexperience

14  reviewing browser history, are you comfortable affirming

15  that there is no July 2019 browsing history on any of

16  three devices?

17          MR. BRODERICK:  Objection.

18   A.  Yes.  According to the steps that I took to look

19  back that's what it showed me.

20   Q.  The steps that you found on a website?  A Google

21  search?

22   A.  Sure.  Yes.

23   Q.  Did you take those steps prior to providing

24  access to your devices to Mr. DePui?

Page 55

1      A.   I think I was asked, "Can you tell how far back

2    it goes?"   I think I looked at that time and was asked

3    to provide -- take images, if that's what you call it.

4      Q.   Did you find images?

5      A.   No.   When I say image your computer that's have

6    somebody, the person that you referenced, image my

7    computers.

8           When you say image that, I'm talking about, I

9    believe, the hard drive or something like that.   Not an

10   image like a photo.   But I guess it is the same thing if

11   you are talking scales.

12     Q.   I want to see if I can dissect this a little bit.

13          Prior to Mr. DePui copying the three devices, did

14   you ever go back prior to that to see what was available

15   as far as your browser history went?

16               MR. BRODERICK:   Objection.   Asked and

17   answered.

18               MR. POLANSKY:   If it has been asked and

19   answered, it is has unclear.

20   BY MR. POLANSKY:

21     Q.   Did you?

22          Do you want me to ask the question again?   Do you

23   understand the question?

24     A.   No.   It kind of -- you know, I don't know what

Page 56

1   Ted said.  Sorry.

2              MR. BRODERICK:  I said:  Objection, asked

3   and answered.

4   BY MR. POLANSKY:

5      Q.  Mr. DePui imaged your devices in May of 2019, is

6   that right?

7      A.  Yes.  I'm not sure of the exact date but it would

8   lineup with what I remember.

9      Q.  Prior to that time, by "that time," I mean

10  Mr. DePui imaging your devices.  Did you ever go back

11  and search your browsing history to see what was

12  available in 2019?

13             MR. BRODERICK:  Objection.

14     A.  I think right before we reached out or, you know,

15  had the computers imaged, I did the same thing.  I think

16  I checked.  And I think I said whatever -- I don't even

17  know.  I think it is 90 days.  I'm not a hundred percent

18  sure in my head right now what it is.  I reported that

19  and then we had them imaged.

20     Q.  Do you know why they were imaged if the browsing

21  history didn't exist at that time?

22     A.  I don't.

23     Q.  Do you have -- strike that.

24         How many times have you spoken to Mr. DePui?

Page 57

```
 1        A.   A handful, a couple of times, each time to -- we
 2     did this remotely, so it was, you know, can we set up
 3     this time.  We'd set up a time and I would sit down and
 4     plug, you know, a hard drive into my computer, he'd
 5     remotely takeover my computer and do whatever he did.  I
 6     don't know the terms, sorry.
 7        Q.   That's all right.
 8             Was he successful -- and by "successful," was he
 9     able to copy whatever is on your browser history at that
10     time?
11        A.   I believe so.
12        Q.   Did he provide you with a copy of what was copied
13     by him or imaged by him?
14        A.   No.
15        Q.   Have you asked him for a copy?
16        A.   No.
17        Q.   Did you speak to him after he imaged your browser
18     history?
19        A.   No.
20        Q.   Did he ever tell you that in June of 2019,
21     browser history didn't exist?
22        A.   No.
23        Q.   Did he ever tell you July of 2019 browser history
24     didn't exist?
```

Page 58

1    A.   No.

2    Q.   What about August 2019?

3    A.   No.  He didn't tell me anything.  He imaged the

4    stuff and it was, "Thank you.  Bye."

5         I never had any type of conversation with him.

6    Q.   Now, in your discovery responses, which we are

7    going to take a look at very shortly.  You say there is

8    no responsive documents.  I understand that your lawyers

9    drafted your responses.  What I'm trying to figure out,

10   I just want to confirm is whether the browser history,

11   to your knowledge, exist for June, July or August of

12   2019?

13   A.   To my knowledge they don't.

14   Q.   Do you know when the last time they existed?

15            MR. BRODERICK:  Objection; asked and

16   answered.

17            THE WITNESS:  Am I answering?

18            MR. BRODERICK:  Yes.  You can answer unless

19   I tell you not to answer.

20   A.   If, you know, again, I think I said I think it's

21   in 90 days that it went back.  So 90 days from whatever,

22   whatever date you choose, would be the last time it

23   existed if that's how it works.

24   Q.   When did you -- when did you come to understand

Page 59

1    that QuoteWizard was alleging that you had provided

2    consent to go on to the SnappyAutoInsurance.com website?

3        A.  I don't remember the exact date.

4        Q.  In your answers to interrogatories you stated

5    that you retained Alex Washkowitz in August 30th of

6    2019; is that right?

7        A.  I would have to look at it.  If you are saying

8    that that is the date then okay.

9        Q.  Are you aware that they sent a demand letter to

10   QuoteWizard regarding these text messages?

11       A.  I don't know what you really mean by a demand

12   letter.

13       Q.  Are you aware that they sent a letter to

14   QuoteWizard as a result of the text messages that you

15   received from QuoteWizard?

16       A.  I'm aware that they reached out to them.  I don't

17   know the names and what time frames.

18       Q.  Did you ever see a response by my office to that

19   letter?

20       A.  I do not recall.

21       Q.  Prior to May 2020, did you take any steps to

22   preserve your browser history?

23       A.  May 2020?  That's when -- what's the name?

24       Q.  Mr. DePui?

Page 60

1    A.   Mr. DePui.  No.

2    Q.   Have you ever gone in and deleted your browser

3  history?

4    A.   No.

5    Q.   Have you cleared the cookies?  The think I asked

6  last time what a cookie is?

7    A.   You said that last time.  To me that is Keebler

8  and Girl Scouts.

9    Q.   Do you know why Mr. DePui didn't image your work

10  computer, your work desktop computer?

11    A.   No.

12    Q.   Have you ever gone back on the work computer and

13  looked for the browser history?

14    A.   No.

15    Q.   You haven't looked to see whether the browser

16  history for June, July, or August of 2019 exists on the

17  work computer?

18    A.   No, I don't think so.  I don't remember.

19    Q.   You testified last time that when you gave Mr.

20  DePui your laptop, they told you it only went back one

21  year.  Do you remember that?

22         MR. BRODERICK:  Objection.

23    A.   Yeah.  And then you said one year.  One year

24  would cover that time.

Page 61

1    Q.  Do you know whether what they imaged included one

2  year's worth of browser history?

3    A.  I don't know.

4    Q.  After your first deposition, did you go back and

5  look to see whether any of your browser history for that

6  three year period existed?

7            MR. BRODERICK:  Objection.

8    A.  After the deposition?

9    Q.  After your deposition.

10    A.  Recently, again, yes.

11    Q.  When was the most recent time that you've looked?

12    A.  I don't have date.  I think it was after the

13  deposition, checked again to see how far it went back.

14  I think I used the same tactic of Google search.  How to

15  search my browser, if you will.

16    Q.  Has anyone else had access to your computer since

17  the last deposition?

18    A.  No.

19    Q.  Other than Mr. DePui, has anyone else looked at

20  your computer to look at browser history?

21    A.  No.  Me.

22    Q.  How about your wife?

23    A.  No.

24    Q.  You testified at your last deposition that you

Page 62

1    never reviewed your browser history prior to giving it

2    to Mr. DePui?

3              MR. BRODERICK:  Objection.

4        Q.  Do you recall that?

5              MR. BRODERICK:  Objection.

6        A.  No.

7        Q.  I'm going to show you your deposition transcript.

8    Do you see where I asked you:  "Have you ever reviewed

9    your browser history back to June of 2019 since this

10   litigation started?"

11        Your answer was "No."

12        Do you see that?

13       A.  Yes.

14       Q.  A moment ago you testified that you had attempted

15   to review it before you gave your device to Mr. DePui to

16   image; is that right?

17             MR. BRODERICK:  Objection.  Can you read the

18   rest of the testimony?

19             MR. POLANSKY:  Sure.  Do you want to read

20   the rest of the testimony?  It seems pretty clear to me.

21             MR. BRODERICK:  "I did make an attempt but

22   I'm not tech savvy."

23   BY MR. POLANSKY:

24       Q.  It said, "Did you ever review your browsing

Page 63

1    history at any time to determine whether you went on the

2    website SnappyAutoInsurance.com?"

3                MR. BRODERICK:  "I did make an attempt but I

4    am not tech savvy."

5                I don't think it is a fair characterization

6    of the testimony to say.

7                MR. POLANSKY:  I would disagree.  That's why

8    I'm asking it now.

9    BY MR. POLANSKY:

10       Q.  What I would like to know is prior to giving your

11    devices to Mr. DePui to have imaged, did you ever review

12    your browser history back to June --

13                MR. BRODERICK:  Asked and answered.  This is

14    the third time now.

15                MR. POLANSKY:  Ted, you just said it is not

16    a fair characterization of his testimony.

17                MR. BRODERICK:  That's a fair

18    characterization.  This is the third time you are asking

19    him this question.

20                MR. POLANSKY:  I want a clear record.

21                MR. BRODERICK:  Let me get my objection on

22    the record.

23                MR. POLANSKY:  Sure.

24                MR. BRODERICK:  You can't ask him three

Page 64

1    times just because you don't like the answer.

2                MR. POLANSKY:  I will stick with the answer

3    that we have.

4    BY MR. POLANSKY:

5       Q.  Unless you would like to change your answer,

6    Mr. Mantha?

7       A.  No.

8       Q.  Did you ever provide your devices to your

9    attorneys, and I don't want to know what you

10   communicated with them.  I'm asking if you ever provided

11   your devices to your attorney?

12      A.  No.

13      Q.  What about Mr. Novia?

14      A.  No.

15      Q.  Does Mr. Novia have access to your email

16   information?

17                MR. BRODERICK:  Objection.

18      A.  Like does he know my email address?  Or does he

19   have access into my account?

20      Q.  Into your account?

21      A.  No.

22      Q.  Back to Mr. Novia for a moment.

23          After Mr. Novia's deposition, did he call you to

24   tell you how it went?

```
                                                      Page 65
 1      A.   No.

 2      Q.   Where there any text messages exchanged?

 3      A.   No.

 4      Q.   Is it fair to say that there are no text messages

 5   between you and Mr. Novia at all in your cell phone?

 6      A.   Correct.

 7      Q.   Going back to 2019, there is a call record

 8   between you and Mr. Novia on July 20th.

 9           Do you remember anything about that phone call?

10      A.   No.

11      Q.   What about in August of 2019 there's four calls

12   between you and Mr. Novia, do you have any recollection

13   of the substance of any of those calls?

14      A.   No. What are the dates?

15      Q.   The dates would August 19, 22, 29th and then

16   September 12th.

17      A.   And those calls -- were they long calls?

18      Q.   I would have to go back and look at the records.

19      A.   And what was the date of the text messages?

20      Q.   The date of the text messages was in August, I

21   believe, August 5th.

22      A.   So were the calls after that?

23      Q.   And at least four other calls after text

24   messages?
```

1      A.   I would definitely say that there was a

2   possibility that during one of those calls that we

3   discussed this.

4      Q.   That's the information about him advising you how

5   you had to find out who the sender was?

6      A.   Yes.   I got information from him around counsel;

7   all of the above.

8      Q.   Right.   But when you say all of the above, I have

9   to drill down.

10         He advised you and counsel; right?

11      A.   Yes.

12      Q.   He advised you --

13      A.   No.   It was his phone number.

14      Q.   Did he give that to you over phone or by email or

15   text.   Do you recall?

16      A.   I don't.

17      Q.   He advised you you have to find the source or the

18   entity behind the text messages; right?

19      A.   I don't know if he said that.   I don't know if he

20   said that you have to find the source or entity behind

21   it?

22      Q.   Did he say you have to find out who is sending

23   you the text?

24      A.   I don't recall if he said that.

1    Q.  I think last time you testified to that, that's

2  fine.  We will leave that alone.

3       Do you recall anything else he might have said to

4  you during those calls?

5    A.  I don't.

6    Q.  Did you ever email with Mr. Novia?

7    A.  No.

8    Q.  You have no emails between him and you regarding

9  any of those calls?

10    A.  No.

11    Q.  After your last deposition, did you go back and

12  review the dates of the emails that you first had with

13  Alex Washkowitz?  I'm not asking again any substance.

14  I'm asking for dates.

15    A.  I don't think I did.  I'm not -- emails.  I'm not

16  sure.  I don't know.

17    Q.  I just want to pull up some of the documents that

18  your other response that you -- strike that.

19       I want to pull up discovery responses your

20  attorney has recently served on us and then we should

21  just be about done.

22       You don't happen to have those in front of you,

23  do you?  The supplemental responses to RPDs.  Answers to

24  interrogatories?

Page 68

```
 1      A.  No.

 2              MR. POLANSKY:  Before we do this, does

 3   anyone need to take a break?  This will run about ten

 4   minutes.

 5              MR. BRODERICK:  It's okay with me.

 6              MR. POLANSKY:  Ted, Exhibit 5 is

 7   Supplemental Answers to Interrogatories.

 8              MR. BRODERICK:  You mean in the Exhibit

 9   Share?

10              MR. POLANSKY:  Yes.

11              Off the record for a moment.

12              THE VIDEOGRAPHER:  The time is 12:23.  We

13   are off the record.

14              (Break in the proceedings.)

15              THE VIDEOGRAPHER:  This is the beginning of

16   media number five.  We are back on the record.  The time

17   is 12:25.

18              (Document marked as Exhibit No. 5 for

19   identification.)

20   BY MR. POLANSKY:

21      Q.  I'm now showing you what has been marked as

22   Exhibit 5 for identification.  These are Plaintiffs'

23   Answers to Defendants' First Set of Interrogatories as

24   supplemented.
```

Page 69

1          Have you seen this document before,

2     Mr. Mantha?  I can scroll through it so it is easier.

3          A.  Yeah.  Most likely.  They all look the same at

4     this point to me.

5          Q.  So you signed it, Mr. Mantha, it looks like on

6     August 18th; is that right?

7          A.  Yes.

8               MR. BRODERICK:  I thought that is pretty

9     fancy, personally.

10              MR. POLANSKY:  It is.  I have never used

11     that before.

12     BY MR. POLANSKY:

13         Q.  I want to go through just a few of these.

14     Number seven says, "Please identify your employer and

15     your position of employment from January 1, 2019 to

16     present and state whether you used the telephone number

17     508.353.9690 for relating to or in connection with your

18     employment for January 1, 2019.  Describing your use of

19     that telephone number for business employment purposes."

20          Okay.  Do you see that question?

21         A.  Yes.

22         Q.  Here is the supplementary answer that you gave,

23     your employer is Doctor Franklin Perkins School.  Right?

24         A.  Um-hmm.

Page 70

1     Q.   You are the director of residential operations;
2    right?
3     A.   Yep.
4     Q.   You state the telephone number is 508.353.9690 is
5    my personal cell phone number, right?
6     A.   Correct.
7     Q.   You state, "I use it overwhelming for personal
8    and residential purposes."
9          Is that right?
10     A.   Um-hmm.
11     Q.   So you would agree that you do use it in some
12    respects for your work; is that right?
13              MR. BRODERICK:   Objection.
14     A.   At times.
15     Q.   So we went through all the numbers that have
16    called you and the individuals that call you on your
17    cell phone.  Is that right?
18     A.   We went through some numbers.
19     Q.   Can you -- can you apportion what percentage you
20    use for personal use versus work use?
21              MR. BRODERICK:   Objection.
22     A.   I couldn't, no.
23     Q.   Is it 50/50?
24     A.   I don't know.

Page 71

1      Q.  Could it be 50/50?

2               MR. BRODERICK:  Objection.

3      A.  I don't know.

4      Q.  Number eight asks you to "....describe any

5   communications that you had with anyone else regarding

6   this case or regarding auto insurance generally."

7          Do you see that?

8      A.  Um-hmm.

9      Q.  In your answer you described communications that

10  you had with Steve Novia that we have gone through at

11  length; right?

12     A.  Correct.

13     Q.  You didn't identify your wife, though.  You

14  identified her in the answer but not the supplemental

15  answer.  Is there a reason for that?

16     A.  Can you go back up to the -- the question?

17     Q.  The question, yes.

18     A.  So it is asking if I had any -- who did I have

19  communication with?  Who knows about this whole thing?

20     Q.  Yes.

21     A.  Yes.  Those two.

22     Q.  Okay.  I was just wondering your why your wife

23  wasn't included in the supplemental.  Is that because

24  she was identified in the first answer?

Page 72

1      A.   Yeah, I guess.  I'm not sure.

2      Q.   Now, we also spoke today about a few other

3  individuals you have talked to about this case.

4           Dr. Padon.  Is that right?

5      A.   Derek.

6      Q.   Derek Padon; right?

7           You don't list him, why is that?

8      A.   I didn't really speak with him, I guess, at any

9  length about it.  It was a subpoena that came in that

10  said, Why are we being subpoenaed?  At that point I had

11  to.

12     Q.   Is there anyone other than those three

13  individuals, and Michael Ames, that you have spoken to

14  about this case other than your attorneys?

15          MR. BRODERICK:  Objection.

16     A.   I said that prior to the first deposition, I

17  spoke to my chief operating officer, Tim Hammond.  I had

18  to take a day off of work.  I gave him a brief -- I said

19  I'm in the middle of a lawsuit.

20     Q.   Anybody else?

21     A.   I can't think.

22     Q.   Okay.  Number 19, "Please state whether you

23  helped, guided, or otherwise informed your responses to

24  QuoteWizard communications in and around August of 2019.

                                                            Page 73

1    And identify those persons and the substance of your

2    conversations with them."

3            Since your last deposition, you provided a

4    supplemental answer.  And it says "Apart from Steven

5    Novia advising me that I needed to identify who was

6    behind the text messages that I received, no one helped

7    guide or otherwise inform my communications with

8    QuoteWizard."

9            Do you see that?

10    A.   Um-hmm.

11    Q.   I asked you a moment ago as to whether he gave

12    you advice as to finding out who the identity was.  And

13    you didn't recall.  Does this refresh your memory about

14    what he told you?

15    A.   Yeah.

16            You have changed what you said multiple times.  I

17    think the first deposition you used the word "coach,"

18    consecutively and kept repetitively saying, "Coached,

19    coached, coached."

20    Q.   Here is your opportunity to tell me.

21            MR. BRODERICK:  Objection.

22    A.   I think you said there was a few phone calls in

23    August with Steve, do you remember the nature of them?

24    I said it was around this -- it was probably around

Page 74

1    this.  I don't know the exact -- every statement --

2    every, you know, back and forth that we had about it --

3    but...

4        Q.  I understand.  I'm asking if this refreshes your

5    memory.  This is your answer; right?

6        A.  Um-hmm.

7        Q.  As to whether he advised you to find out the

8    identity behind the text messages?

9                MR. BRODERICK:  Objection.

10       A.  Yes.  I guess I asked -- I responded.

11       Q.  Okay.

12              Number 20, it says, "Please identify the date in

13   which you retained your attorneys."  You provided a

14   supplemental answer.

15              Can you read that?

16       A.  Yes.

17       Q.  And how did you find out that it was August 31st,

18   that you retained your attorneys after the deposition?

19                MR. BRODERICK:  Objection.  I'm going to

20   instruct you not to disclose --

21                MR. POLANSKY:  Yes.

22                MR. BRODERICK:  -- attorney-client

23   communication with Alex.

24   BY MR. POLANSKY:

1    Q.  Don't tell me anything you communicated with him.

2         How did you find out that August 31st was the

3    first date that you communicated with him?

4    A.  I don't recall if I looked up in my email or he

5    sent the email back to me or something like that.  I

6    don't know.

7    Q.  How did you --

8    A.  I originally reached out to Alex via email.  I

9    said who I am.

10   Q.  So you emailed him and that was the first date?

11   A.  If that is August 31st then I will go with that,

12   yes.

13   Q.  I don't know.  I'm asking you.

14   A.  Right here, right now, off the top of my head, I

15   am saying that I am not a hundred percent positive.  I

16   would to look.  But if that is what I wrote at some

17   point it was sent back to me or I looked it up.  I don't

18   recall which way I confirmed that.

19   Q.  Okay. In number 25, can you read that to

20   yourself?  The supplemental answer, after you read the

21   question.

22   A.  Okay.

23   Q.  Is that the entirety of your personal knowledge

24   for the basis of claiming that the Joseph Mantha consent

```
                                            Page 76
 1    was fraudulent?
 2        A.   Yep.   The big pieces, I'm not shopping or I
 3    wasn't or haven't been shopping for auto insurance so.
 4             (Document marked as Exhibit No. 6 for
 5    identification.)
 6    BY MR. POLANSKY:
 7        Q.   Let's see if we can go through the rest of these
 8    pretty quickly.
 9             I'm showing you what has been marked as
10    Exhibit 7 -- 6 for identification.   These are your
11    Supplemental Answers to Defendant's First Set of
12    Admissions.
13             Have you seen these before?
14        A.   I'm thinking, yes.
15        Q.   I'm going to scroll through quickly.   So it is a
16    six page document.
17                  MR. BRODERICK:   What number is it going to
18    be Kevin, for the record.
19                  MR. POLANSKY:   I believe it is 6.
20        Q.   I want to flip to number --   I want to go to
21    number eight, A request for admission number 8,
22    supplemental answer.
23             Can you read those to yourself.
24             (Pause in the proceedings.)
```

Page 77

1       A.   Okay.

2       Q.   It could just be semantics.  But I want to

3   understand why you denied that given Mr. Novia's

4   interactions with you?

5            Is there any part of that in which you are

6   specifically denying?  Didn't we just review his advice

7   or assistance?

8                MR. BRODERICK:  Objection.

9       A.   We did.  I'm not sure.

10      Q.   Same question for number 9.  It might be

11  semantics.  Could you take a look at that request and

12  answer?

13               MR. BRODERICK:  Objection.

14               (Pause in the proceedings.)

15      A.   Okay.

16      Q.   So we just looked at your supplemental answer

17  advising that you retained Alex Washkowitz on

18  August 31, 2019; right?

19      A.   Correct.

20      Q.   But you've denied that you were in communications

21  with your attorneys in and around August 2019; is that

22  inaccurate?

23               MR. BRODERICK:  Objection.

24      A.   No.  That's not what it is saying, I don't

Page 78

1    believe, the way I'm reading it.  The way I'm reading it
2    says it doesn't relate to the issue of consent.  When
3    this was asked, this was related to consent which that
4    has nothing to do with.  Am I misreading that?
5        Q.  I don't see the word consent in that request, do
6    you?
7             MR. BRODERICK:  Objection.  The request is
8    during the time that you received and responded.
9    BY MR. POLANSKY:
10       Q.  So is it your testimony, Mr. Mantha, that you
11   discussed or first retained counsel after you responded
12   to the text messages from QuoteWizard?
13       A.  I retained counsel after I responded.
14       Q.  So you've denied that you used the number
15   508.353.9690 for nonresidential uses; right?
16       A.  Say that again?  Sorry.  I was reading as well in
17   a different spot.
18       Q.  You see the request, right?  You can read it
19   yourself?
20       A.  Yes.
21       Q.  But we have discussed at length today that you
22   have used your phone for work purposes.  No?
23             MR. BRODERICK:  Objection.
24       A.  In emergency situations.

Page 79

1      Q.  This doesn't say in emergency situations, does

2   it?  It says for nonresidential uses?

3              MR. BRODERICK:  Objection.

4      A.  Yes.

5      Q.  Is this answer correct or incorrect?

6              MR. BRODERICK:  Objection.

7      A.  It is not clear the way it says.

8      Q.  It is not clear?

9      A.  The way it's stated, it says that -- I'm saying

10   me, I, he cannot control who calls him for what reasons.

11     Q.  That's your answer.  I'm asking the first word

12   that you wrote here is "denied"; isn't that right?

13              MR. BRODERICK:  Objection.  He didn't write

14   it.  He is not signing this.

15              MR. POLANSKY:  They are on his behalf,

16   aren't they?

17              MR. BRODERICK:  These are counsel.

18              MR. POLANSKY:  Aren't these on his behalf?

19              MR. BRODERICK:  They are, but you are saying

20   he wrote it.

21   BY MR. POLANSKY:

22     Q.  These were wrote on your behalf.  It was denied.

23   I'm asking if the answer is a correct answer or not or

24   an accurate answer?

```
                                            Page 80

 1               MR. BRODERICK:  Objection.

 2               MR. POLANSKY:  You can object.

 3   BY MR. POLANSKY:

 4      Q.  You can answer.

 5      A.  I've received phone calls from my work on my

 6   telephone.

 7      Q.  Which you would agree are nonresidential uses;

 8   right?

 9               MR. BRODERICK:  Objection.

10   BY MR. POLANSKY:

11      Q.  You can answer.

12               MR. BRODERICK:  Objection.

13      A.  Correct.

14      Q.  Number 11, can you read the request in the

15   supplemental answer?

16      A.  Um-hmm.

17      Q.  In your supplemental answer, it says,

18   "Plaintiff's cellular phone is a personal residential

19   cellular phone in his name and paid for by himself."

20   Right?

21      A.  Yes.

22      Q.  But you testified today that you received a $30

23   credit per month; isn't that right?

24      A.  Correct.
```

Page 81

1      Q.  You didn't state that in the answer -- strike

2   that.

3          Your counsel doesn't acknowledge that in the

4   answer; correct?

5              MR. BRODERICK:  Objection.

6      A.  It is not stated.

7              (Document marked as Exhibit No. 7 for

8   identification.)

9   BY MR. POLANSKY:

10     Q.  One last document.  I think we are just about

11  done.  Okay.  Let's put this back up in front of you?

12         These are -- Exhibit 7 are supplemental responses

13  that your counsel provided in discovery.  I just want to

14  go through a few of them to see whether you are aware of

15  any additional documents.  It is possible that I already

16  covered it, I might skip it.

17         As to number seven, it asks for "Any notes,

18  journals, ledgers, diaries, or other compilations

19  maintained by plaintiff.  For any reason documented

20  communications with or from QuoteWizard."

21         Do you see that?

22     A.  Okay.

23     Q.  Are you aware of any ledgers or emails not

24  involving your counsel relating to these communications

Page 82

1    with QuoteWizard?

2        A.  No.

3        Q.  Number eight, can you read that to yourself?

4        A.  It jumped all around on me.

5        Q.  I will leave it at the top is 8.  And I want you

6    to read the supplemental answer.

7        A.  I'm not really understanding the full extent of

8    the question.

9        Q.  Other than the imaging that Mr. DePui took from

10   your three devices, are you aware of any other documents

11   provided to him?

12              MR. BRODERICK:  Objection.

13       A.  No.

14       Q.  Are you aware of any other experts other than

15   Mr. DePui involved in this case?

16       A.  No.

17       Q.  19, "Any and all documents evidencing your

18   physical location August 5, 2019."

19            You state that no responsive documents are in

20   plaintiff's possession or control.

21            When you -- did you buy things through your

22   normal course of living on your credit card?

23       A.  Do I buy things on, like, a debit card?

24       Q.  Yes.  Debit or credit card?

Page 83

1      A.   Sure.  I buy them.

2      Q.   And that would show the location where you made

3   the purchase?

4      A.   I guess.  I don't know.  If I purchase something

5   online.  I don't know.  I never really looked through my

6   purchases in like a PDF that is more descriptive, maybe.

7      Q.   Well, have you gone back to look through any sort

8   of debit or credit card statement to see what purchases

9   you might have made in August 5th, 2019 to determine

10  whether it has your physical location?

11            MR. BRODERICK:  Objection.

12     A.   No.

13     Q.   I think the same question for number -- 21, we

14  already covered.  I think the last one is --

15         I guess the same question for June of 2019.  Is

16  it fair to say you haven't gone back through your credit

17  card or debit card statement to identify where you might

18  have made purchases during that period of time?

19     A.   Fair.

20     Q.   Two final questions.  There was a response in one

21  of your discovery responses that you didn't own a Chevy

22  Trailblazer in 2019.  Is that true?

23     A.   Correct.

24     Q.   Just for clarification purposes, did you ever use

Page 84

1    a Chevrolet Trailblazer in 2019?

2        A.  No.

3        Q.  As you sit here today, are you aware of the

4    number of text messages that you seek damages for in

5    this case?

6        A.  I'm not sure of the number.

7                MR. POLANSKY:  I think that is all I have.

8    Give me one second.

9                That's all I have, Mr. Mantha.  Thank you

10   very much.

11               THE WITNESS:  Thank you.

12               MR. POLANSKY:  Mr. Broderick, do you have

13   any questions?

14               MR. BRODERICK:  No questions from me.

15               MR. POLANSKY:  Thank you.

16               THE VIDEOGRAPHER:  This is the end of Joseph

17   Mantha day two and media number five in the deposition

18   for today.  The time is 12:51.  We are off the record.

19

20

21

22

23

24

Page 85

1               COMMONWEALTH OF MASSACHUSETTS.
2     COUNTY OF SUFFOLK, SS.
3
4          I, Lori J. Atkinson, Professional Court Reporter
      and Notary Public duly and qualified in and for the
5     State of Massachusetts do hereby certify that the
      foregoing transcript is a true and correct transcript of
6     my original stenographic notes.
      I further certify that I am neither an attorney or
7     counsel for, nor related to or employed by any of the
      parties to the action in which this deposition is taken;
8     and furthermore, that I am not a relative or employee of
      any attorney or counsel employed by the parties hereto
9     or financially interested in the action.
10
11
      IN WITNESS THEREOF, I have hereunto
12    Set my hand and affixed my Notarial Seal this 15th day
      of October, 2020.
13
14
15
16
             LORI J. ATKINSON
17           NOTARY PUBLIC
18
19
20
21
             ***PLEASE NOTE***
22    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
      APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE
23    SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
      SUPERVISION OF THE CERTIFYING COURT REPORTER.
24

Page 86

1    DEPOSITION ERRATA SHEET

2    Case Caption:  MANTHA VS QUOTEWIZARD

3    Deponent:  JOSEPH MANTHA

4    Deposition Date September 10, 2020

5         To the Reporter:

6    I have read the entire transcript of my Deposition taken

7    in the captioned matter or the same has been read to me.

8    I request that the following changes be entered upon the

9    record for the reasons indicated.  I have signed my name

10   to the Errata Sheet and the appropriate Certificate and

11   authorize you to attach both to the original transcript.

12   Page No.          Line No.          Change to

13

14   Reason for change:

15   Page No.          Line No.          Change to

16

17   Reason for change:

18   Page No.          Line No.          Change to

19

20   Reason for change:

21   Page No.          Line No.          Change to

22

23   Reason for change:

24

Page 87

1    Deposition of JOSEPH MANTHA

2    Page  No.            Line No.          Change to

3

4    Reason for change:

5    Page No.            Line No.          Change to

6

7    Reason for change:

8    Page No.            Line No.          Change to

9

10   Reason for change:

11   Page No.            Line No.          Change to

12

13   Reason for change:

14   Page No.            Line No.          Change to

15

16   Reason for change:

17   Page No.            Line No.          Change to

18

19   Reason for change:

20   Page No.            Line No.          Change to

21

22   Reason for change:

23

24   SIGNATURE:                   DATE:_____