# EXHIBIT 7

# In the Matter of:

*Joseph Mantha vs*

*Quotewizard.com, LLC*

*Melisa Mantha*

*September 11, 2020*

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



O'BRIEN & LEVINE COURT REPORTING SOLUTIONS

## Page 1

```
 1    UNITED STATES DISTRICT COURT
 2    FOR THE DISTRICT OF MASSACHUSETTS
 3    ----------------------------------x
 4    JOSEPH MANTHA, ON BEHALF OF HIMSELF AND
 5    ALL OTHERS SIMILARLY SITUATED,
 6          Plaintiff,
 7    v.        No. 1:19-cv-12235-LTS
 8    QUOTEWIZARD.COM, LLC,
 9          Defendant.
10    ----------------------------------x
11
12
13          DEPOSITION OF MELISA MANTHA, a witness
14    called on behalf of the Defendant, taken
15    remotely pursuant to the provisions of the
16    Massachusetts Rules of Civil Procedure,
17    before Linda Bernis, a Registered
18    Professional Reporter and Notary Public in
19    and for the Commonwealth of Massachusetts,
20    held in Boston, Massachusetts, on Friday,
21    September 11, 2020, commencing at 2:00 p.m.
22
23
24
```

## Page 2

```
 1   APPEARANCES:
 2
 3   NELSON, MULLINS, RILEY & SCARBOROUGH
 4       By Christine M. Kingston, Esq.
 5       One Post Office Square
 6       Boston, Massachusetts 02109
 7       Counsel for the Defendant
 8       christine.kingston@nelsonmullins.com
 9
10   LAW OFFICE OF EDWARD A. BRODERICK
11       By Edward A. Broderick, Esq.
12       208 Ridge Street
13       Winchester, Massachusetts 01890
14       Counsel for the Plaintiff
15       Ted@broderick-law.com
16
17   (Present via Zoom)
18
19
20
21
22
23
24
```

## Page 3

```
 1              I N D E X
 2   Deposition of:          Direct
 3   MELISA MANTHA
 4   By Ms. Kingston          5
```

## Page 4

```
 1              PROCEEDINGS
 2         THE STENOGRAPHER:  This is Linda
 3   Bernis, a Registered Professional Reporter
 4   and Notary Public in the Commonwealth of
 5   Massachusetts.
 6         This deposition is being taken
 7   remotely.  The witness is appearing remotely
 8   from Rutland, Massachusetts.
 9         The attorneys participating in
10   this proceeding acknowledge their
11   understanding that I am no physically
12   present in the proceeding room, nor am I
13   physically present with the witness and that
14   I will be reporting this proceeding
15   remotely.  They further acknowledge that in
16   lieu of an oath administered in person, the
17   witness will verbally declare his testimony
18   in this matter under the pains and penalties
19   of perjury.  The parties and their counsel
20   consent to this arrangement and waive any
21   objections to this manner of proceeding.
22         Please indicate your agreement by
23   stating your name and your agreement on the
24   record, after which I will swear in the
```

Page 5

1  witness.
2       MS. KINGSTON: Christine Kingston
3  on behalf of the Defendant.
4       MR. BRODERICK: Edward Broderick on
5  behalf of the plaintiff and the witness,
6  Melisa Mantha. I agree.
7       (Witness sworn.)
8
9       DIRECT EXAMINATION
10  BY MS. KINGSTON:
11  Q. Good afternoon. Is it okay if I call you
12     Ms. Mantha?
13  A. Sure.
14  Q. As you just heard, my name is Christine
15     Kingston. I represent the defendant in this
16     case and will be taking your deposition
17     today.
18        Just to start off, I wanted to get
19     some stipulations on the record.
20        Ted, same as last time -- all
21     objections besides as to form reserved until
22     the time of trial as are motions to strike?
23        MR. BRODERICK: Yes.
24        MS. KINGSTON: 30 days to read and

Page 6

1  sign?
2       MR. BRODERICK: Yes.
3       MS. KINGSTON: And I am fine with
4  waiving notary if you are as well.
5       MR. BRODERICK: Yes.
6  Q. Ms. Mantha, just some general ground rules
7     before we get started. If at any point you
8     don't understand a question that I ask just
9     please tell me and I'm happy to rephrase it.
10     If you need a break at any point, please
11     tell me and I will certainly accommodate
12     you.
13        The other thing is, please try to
14     give audible answers. Try not to shake your
15     head yes or no. Finally, because this is a
16     virtual deposition and we are dependent on
17     technology, if at any point you're having a
18     technical problem, you can't hear me, can't
19     see me, just let me know and we will take a
20     break to figure it out. Okay?
21  A. Yes.
22  Q. Can you please state your full name for the
23     record.
24  A. Melisa Mary Mantha.

Page 7

1  Q. You understand you're under oath here today?
2  A. Yes.
3  Q. And that means that you're obligated to
4     answer my questions fully and truthfully?
5  A. Yes.
6  Q. Have you ever been deposed before?
7  A. No.
8  Q. Are you represented by an attorney?
9  A. Yes.
10  Q. And who is your attorney?
11  A. Mr. Broderick.
12        MS. KINGSTON: Can we go off the
13  record for just one minute.
14        MR. BRODERICK: Sure.
15        (Off the record discussion.)
16  Q. So, Ms. Mantha, I just asked you if you had
17     an attorney and you indicated Mr. Broderick.
18     And off the record, Mr. Broderick and I
19     spoke and he indicated that he is
20     representing you with respect to the
21     subpoena issued on you; is that your
22     understanding?
23  A. Yes.
24        MS. KINGSTON: So, Mr. Broderick,

Page 8

1  our kind of understanding here is that if
2  there's conversations that post-date the
3  (inaudible) they are privileged. If they
4  predate that they are not. Are you in
5  agreement?
6       MR. BRODERICK: Yes.
7  Q. What did you do to prepare for your
8     deposition today?
9  A. Nothing. I put the baby down for a nap.
10  Q. Did you review any documents?
11  A. No.
12  Q. I just want to say, if at any point you need
13     a break to attend to your child just let me
14     know. I'm happy to accommodate you.
15        You said that you hadn't reviewed
16     any documents?
17  A. No.
18  Q. Did you speak with anyone?
19  A. Today, no. Yesterday, Mr. Broderick.
20  Q. Without getting into what you spoke to Mr.
21     Broderick about, did you speak to anyone
22     else?
23  A. No.
24  Q. Did you speak to Joe Mantha?

Page 9

1  A. Yes.
2  Q. And when was that?
3  A. This morning.
4  Q. Can you just tell me the general substance
5     of that conversation?
6  A. That if I wasn't done with this by
7     three o'clock he would have to pick up our
8     son from preschool.
9  Q. Did you talk about the substance of the
10    deposition itself or just logistics?
11 A. Just logistics.
12 Q. Before you were served with the subpoena in
13    this case, did you have any conversations
14    with Mr. Mantha's attorney?
15 A. No.
16 Q. So the first conversation you had with
17    Mr. Broderick was after you received the
18    subpoena?
19 A. Yes.
20 Q. Besides speaking to Mr. Mantha this morning,
21    have you spoken to anyone else, putting
22    aside Mr. Broderick, about this deposition?
23 A. No.
24 Q. Did you bring any documents with you to the

Page 10

1     deposition?
2  A. My license.
3  Q. And nothing else?
4  A. No.
5  Q. Are you currently employed?
6  A. Yes.
7  Q. And where do you work?
8  A. I'm a home care nurse.
9  Q. How long have you -- strike that.
10    Who is your employer?
11 A. VNA Care out of Worcester.
12 Q. How long have you been with them?
13 A. Almost seven years.
14 Q. And that whole time you've been a home care
15    nurse?
16 A. Yes.
17 Q. What does that job generally entail?
18 A. I travel from home to home visiting patients
19    usually who have just gotten out of the
20    hospital after an illness or surgery.
21 Q. And did you have the same job in 2019?
22 A. Yes.
23 Q. How far do you typically travel for this
24    job?

Page 11

1  A. All over Central Massachusetts. Some days,
2     I travel over 100 miles between all the
3     patients.
4  Q. Are you generally at the same house each day
5     or might you be at multiple houses in a
6     single day?
7  A. Multiple houses.
8  Q. When you're traveling for work, do you bring
9     any electronic devices with you?
10 A. Yes.
11 Q. What are those?
12 A. A phone, a tablet, a business phone.
13 Q. Can you tell me what the, when you say
14    phone, you mean just a cell phone?
15 A. Yes.
16 Q. And what type of cell phone is that?
17 A. Two iPhones, my personal iPhone and work
18    iPhone.
19 Q. Did you have these same phones in 2019?
20 A. Yes. My personal iPhone is the same. My
21    work iPhone was updated, upgraded at the
22    beginning of this year.
23 Q. And what about the tablet?
24 A. Yes, that was the same.

Page 12

1  Q. And what type of tablet was that?
2  A. I think it's an Android.
3  Q. Is that for personal use?
4  A. No.
5  Q. That's for work?
6  A. Yes.
7  Q. And is it work issued?
8  A. Yes.
9  Q. And is the cell phone for work also work
10    issued?
11 A. Yes.
12 Q. Do you bring, besides these three devices,
13    do you bring any other devices with you?
14 A. No.
15 Q. So, Mr. Mantha, I know it might be strange
16    for you to hear that, but just for the
17    record that's the easiest way for me to
18    identify him. You understand when I say
19    that I mean your husband, right?
20 A. Yes.
21 Q. So Mr. Mantha has been deposed in this case
22    twice. Is that your understanding?
23 A. Yes.
24 Q. Did you speak with him before either of

Page 13

1   those depositions about the depositions?
2 A. That they were happening, yes.
3 Q. Beyond that, did you discuss them?
4 A. Details, no.
5 Q. So you just kind of knew they were happening
6   and that was pretty much it?
7 A. Yes.
8 Q. I think you said that you spoke with him
9   before this deposition but just about
10  logistics?
11 A. Yes.
12 Q. So you didn't talk about any of his claims
13  or kind of the factual circumstances of
14  them?
15 A. I only know a few details about this case;
16  and that is that he was solicited for
17  insurance and didn't ask for somebody to
18  contact him. And so he, I guess, is
19  involved in this case about that. Which has
20  been going on for however long, but we live
21  pretty busy lives so this is something
22  that's like not for me to deal with so I
23  just don't really, not to be rude or
24  anything, not that I don't care, but it's

Page 14

1   just that we are busy enough so this is
2   something he deals with and we don't really
3   talk about it.
4       Obviously because now I'm involved
5   so now I have to be deposed. But really the
6   only talking about it is, you have to be
7   deposed so make sure you're ready, make sure
8   you sign on, who is going to get the kids.
9   Things like that.
10 Q. Where do you currently reside?
11 A. In Rutland, Massachusetts.
12 Q. And what's the address?
13 A. 38 Vista Circle.
14 Q. And who currently, who lives with you?
15 A. Mr. Mantha, my husband, and our two
16  children. Actually, in 2019 we only had one
17  child.
18 Q. And how long have you resided there?
19 A. Six years, I think, almost.
20 Q. So some time in 2014 you moved in?
21 A. Yes.
22 Q. And did you purchase at that time?
23 A. Yes.
24 Q. Has anyone ever visited or stayed with you?

Page 15

1 A. Live with us, no. Sleep over, occasionally.
2 Q. Let's go back to 2019. Do you recall if
3   anyone stayed even a night?
4 A. Yes. Well, at the end of the year we had
5   visitors because we had a baby. So in
6   December, I had my sister here.
7 Q. What's her name?
8 A. Bridget Correa.
9 Q. What was the last name?
10 A. Her name is Bridget Correa. But she
11  normally lives in Florida.
12 Q. So she was visiting to kind of help out with
13  the kids?
14 A. Just visiting, yes, to meet the new baby.
15 Q. Besides her, do you recall anyone else
16  staying a night or longer?
17 A. Not that I can think of.
18 Q. Do you have anyone come into the home to
19  help with child care?
20 A. My mother.
21 Q. Was that also happening in 2019?
22 A. I'm actually not sure because there was a
23  time when my son was only going to preschool
24  and daycare and we didn't need her to come.

Page 16

1   I just don't know when it ended and when it
2   picked up again. So I'm not sure.
3 Q. Do you recall at any point in 2019 that she
4   began coming over?
5 A. She comes over the house at least once a
6   week anyway.
7 Q. Just to visit or for child care?
8 A. Both.
9 Q. But do you know -- strike that.
10      Right now, how often is she coming
11  over to help with child care?
12 A. Two times a week.
13 Q. Do you know when that started?
14 A. Well, this year she started coming three
15  times a week in June or July because we
16  couldn't get our kids into, or maybe even
17  May, because of Covid, and then since things
18  have reopened she's been able to back off to
19  two times a week. Then starting next week,
20  actually, she only comes once a week.
21  Because our daycare has reopened and the
22  preschool has reopened.
23 Q. Do you recall if she was coming over to help
24  at the end of 2019?

Page 17

1  A.  I had our baby in November so I was out of
2      work and so we didn't need anyone to come
3      and watch the children, but, of course, she
4      came to visit.
5  Q.  What about prior to November, you had one
6      child, would she have been coming to help
7      then or was it just when you had the second
8      child?
9  A.  In November, I'm going to say no, she didn't
10     come because I know our son was in preschool
11     pretty regularly.
12         In October probably the same.
13     August -- over the summer she likes to
14     travel to Maine so she doesn't come as much.
15     I just can't remember, I mean, she comes,
16     even if she doesn't come to watch the kids
17     during the day while we're working she will
18     come so we can get dinner or something here
19     and there.  She's a pretty regular part of
20     our life.
21 Q.  Does she live in the area?
22 A.  Yes.
23 Q.  Besides your sister and your mom, did any
24     other family members visit your home in

Page 18

1      2019?
2  A.  I'm sure many did for short periods of time
3      on various days.
4  Q.  No overnight visits or anything like that,
5      just sporadic?
6  A.  (Witness nods head.)
7  Q.  Okay.
8  A.  No.  I shook my head.
9  Q.  How many people, I know it's difficult to
10     say, but how many people would you
11     approximate came into your home in 2019
12     family-wise?
13 A.  Seven, 10.
14 Q.  And those are all immediate family members?
15 A.  What do you consider immediate?
16 Q.  Parent, brother, sister, that type of thing,
17     of either you or Mr. Mantha?
18 A.  Yes.
19 Q.  Can you tell me who?
20 A.  Well, my husband's father and his wife.  My
21     husband's brother and his girlfriend and
22     their stepson and son.  And on my side it's
23     really just my mom and dad.  And then my
24     sister from Florida briefly.

Page 19

1  Q.  So you said, you mentioned earlier that you
2      have a personal iPhone; is that right?
3  A.  Yes.
4  Q.  As that's the same one you had in 2019?
5  A.  Yes.
6  Q.  Does your husband ever use your phone or
7      borrow your phone?
8  A.  No.
9  Q.  Even if, you know, you're sitting at home
10     and his battery died, he doesn't just grab
11     your phone for a moment?
12 A.  No.
13 Q.  Do you recall him ever using your personal
14     cell phone?
15 A.  Never.
16 Q.  Do you have it password protected?
17 A.  Yes.
18 Q.  Does he know your password?
19 A.  No.  It's got security settings on it
20     because it also has my work e-mail on it so
21     it's always password protected and the
22     password is always changing.
23 Q.  Your husband has a personal iPhone as well;
24     is that right?

Page 20

1  A.  Yes.
2  Q.  Do you know if he had the same one in 2019?
3  A.  I believe, yes.
4  Q.  Did you get your iPhones at the same time?
5  A.  Yes.  Well, no.  I don't know if we got them
6      exactly the same time but I think in the
7      same year, and we've had both of our phones
8      for several years.
9  Q.  And do you ever use his cell phone?
10 A.  Never.
11 Q.  Do you recall an instance in which you've
12     ever used it?
13 A.  Never.
14 Q.  Do you know if his is password protected?
15 A.  Yes.
16 Q.  Do you know the password to it?
17 A.  No.
18 Q.  I just want to talk a minute about some of
19     the electronic devices that you have in the
20     home.  I know you mentioned your personal
21     iPhone, Mr. Mantha's personal iPhone and
22     then you also mentioned a work iPhone and a
23     work tablet; is that right?
24 A.  Yes.

Page 21

1  Q. Can you tell me any other electronic devices
2     that you have in the home?
3  A. We have a personal tablet and two personal
4     laptops.
5  Q. What type of tablet is that?
6  A. An iPpad.
7  Q. Did you have that in 2019?
8  A. Yes.
9  Q. Is that password protected?
10 A. Yes. Until January of this year. I took
11    the password off because our son uses it.
12 Q. Prior to January of this year it was
13    password protected?
14 A. Yes.
15 Q. And who would have known the -- strike that.
16          Who knew the password to the iPad?
17 A. Me and my husband.
18 Q. And how is that iPad generally used?
19 A. Mostly for my son if we put a movie on it or
20    something.
21 Q. What about last year?
22 A. Same.
23 Q. Do you or your husband ever use that for
24    your personal use?

Page 22

1  A. No.
2  Q. So is that iPad is solely for your son?
3  A. Yes. It's very old.
4  Q. Do you recall ever using it for personal
5     use?
6  A. Probably more than four or five years ago.
7  Q. You also mentioned two laptops. Can you
8     tell me what type of laptops those are?
9  A. They are both Dell laptops.
10 Q. Did you have both of those last year?
11 A. Yes.
12 Q. And how do you use those laptops?
13 A. I use mine mostly for uploading and editing
14    photos. And my husband uses his mostly to
15    do schoolwork.
16 Q. Is he in school currently?
17 A. He's taking a break, but, yes, he's, I
18    guess, currently in school still.
19 Q. Have you ever used the one that he uses for
20    school?
21 A. I have on maybe two occasions to upload my
22    photos because my laptop is getting full.
23 Q. What about, does he ever use the one that
24    you use for your pictures?

Page 23

1  A. No.
2  Q. Is that password protected?
3  A. Yes.
4  Q. And who knows the password to that?
5  A. Me.
6  Q. Just you?
7  A. Yes. And I'm sure I've shared it with my
8     husband but he doesn't remember and would
9     ask me if he, but he doesn't use my laptop
10    because it's too slow.
11 Q. Is that similar for his laptop, it's
12    password protected and he knows the password
13    to that?
14 A. Yes.
15 Q. And so you would, fair to say, you probably
16    don't know the password to that?
17 A. No.
18 Q. So besides the iPad, the two laptops, his
19    cell phone, your cell phone and your work
20    cell phone and your work tablet, are there
21    any other devices that you use in the home?
22 A. No.
23 Q. And is that also the case for 2019?
24 A. Yes.

Page 24

1  Q. Does your husband ever do work from home?
2  A. Yes.
3  Q. Let's talk pre-Covid because Covid changed
4     everything for everyone. Did he work from
5     home at all before Covid?
6  A. No.
7  Q. Does that include working from home in the
8     evenings?
9  A. He doesn't work from home but he will
10    occasionally get a follow-up call if an
11    emergency happens or something.
12 Q. Do you know if he, referring to 2019
13    specifically, do you know if he was able to
14    access work e-mails from home?
15 A. Probably.
16 Q. I'm sorry?
17 A. On his phone probably.
18 Q. Have you ever seen him responding to work
19    e-mail from home?
20 A. Sure.
21 Q. Has he ever mentioned doing that?
22 A. I'm not sure.
23 Q. You're not sure, you don't recall an
24    instance?

Page 25

1  A. If he's on his phone he could be doing a
2     number of things. We don't like necessarily
3     about what he's doing. So he could be
4     responding to e-mails. He could be doing
5     fantasy sports. He could be talking to
6     somebody.
7  Q. Who is your Internet service provider?
8  A. It is Charter.
9  Q. That was the same in 2019; is that correct?
10 A. Yes.
11 Q. Does your husband have a work laptop?
12 A. I think so. I think he brought it home
13    before but barely.
14 Q. So he has a laptop at work that he sometimes
15    brings home?
16 A. I guess, I can't say sometimes. I know I've
17    seen it but not recently and not often, so I
18    don't remember when.
19 Q. But you know that to be his work laptop?
20 A. I can't say that it's his own personal work
21    laptop either. I just know perhaps have
22    seen him bring, I have seen him bring one
23    home but I just don't know when and if it's
24    his own like that he uses only.

Page 26

1  Q. But it's coming from the school in some
2     respect; is that accurate?
3  A. Yes.
4  Q. When is the last time you saw him with that?
5  A. I don't know. I don't know if it was, it
6     definitely wasn't this year. I don't know.
7  Q. Do you recall seeing it last year?
8  A. I don't know.
9  Q. You mentioned that your husband sometimes
10    receives follow-up calls related to work?
11 A. Yes.
12 Q. Can you tell me a little bit more about
13    that?
14       MR. BRODERICK: Objection.
15 Q. Well, what do you mean by follow-up calls?
16 A. He could get a call -- I mean, I'm not sure.
17    I don't know exactly what you're talking
18    about. Occasionally he will get a call and
19    it's somebody at work.
20 Q. And how do you know that it's someone at
21    work?
22 A. I mean, I can just tell if he's referring to
23    a kid or something that sounds like it has
24    to do with work.

Page 27

1  Q. So we're talking about when he's at home
2     kind of off work hours; is that fair?
3  A. Yes.
4  Q. And how often would you say that you observe
5     that?
6  A. Couple times a week.
7  Q. It sounds like it's not unusual for him to
8     take some work calls in the home?
9        MR. BRODERICK: Objection.
10 A. True.
11 Q. What about the weekends?
12 A. Occasionally. I think, he switches, I
13    think, he gets calls like, somebody else
14    takes calls on-call issues and then if they
15    can't handle it they will occasionally call
16    him for like more insight.
17 Q. Can you give me an idea of how frequently
18    that happens?
19 A. Couple times a week. Like the same thing.
20 Q. Is he ever on-call?
21 A. I don't think he's specifically on-call,
22    it's just if the on-call person can't handle
23    what's happening then they call him.
24 Q. Are they calling your home phone or his cell

Page 28

1     phone?
2  A. We don't have a home phone.
3  Q. So they're calling his cell phone?
4  A. Yes.
5  Q. I think you used the word emergency use as
6     well. Is that when something is happening
7     at the school and he's at home but they need
8     his input?
9  A. Yes.
10 Q. And do you recall any specific instances of
11    that happening?
12 A. Recently, no. With Covid starting and
13    questions about how to handle certain
14    things, perhaps a couple of calls.
15 Q. I'm sorry, I cut you off. A couple calls
16    per week?
17 A. A couple of calls total.
18 Q. Related to emergency?
19 A. Yes.
20 Q. Okay. Do you recall an instance of one of
21    the students running away?
22 A. Yes. I mean, I think, kids run away
23    occasionally so there's probably been
24    several instances.

Page 29

1  Q. Do you recall him having to deal with that
2     kind of after official work hours?
3  A. Probably.
4  Q. Do you have any specific memories of that
5     happening?
6  A. I don't.
7  Q. How did you find out about that?
8  A. I probably heard him get a call.
9  Q. Is he getting a call typically from one of
10    the people who works underneath him?
11 A. Yes.
12 Q. Do you know their names?
13 A. I may have heard some of their names, like
14    their first names, yes.
15 Q. You overheard that when he was talking on
16    the phone?
17 A. Yes.
18 Q. Have you ever heard that the Perkins School
19    has an on-call (inaudible)?
20 A. No.
21 Q. Are you aware at some point during this case
22    that some of the electronic devices from
23    your home were scanned or imaged?
24 A. Yes.

Page 30

1  Q. And do you recall that happening?
2  A. Yes.
3  Q. And do you know which of those devices were
4     scanned?
5  A. Both laptops.
6  Q. So that includes the laptop you said you use
7     for pictures?
8  A. Yes.
9  Q. And do you know if anything else besides the
10    laptops were scanned?
11 A. I'm not sure.
12 Q. Do you know if your personal iPhone was
13    scanned?
14 A. No, my personal iPhone was not.
15 Q. What about the iPad, do you know if that was
16    scanned?
17 A. I'm not sure. Not that I know of.
18 Q. What if anything did your husband tell you
19    about that?
20 A. Just that they were looking to see if he
21    solicited for the insurance that he was
22    solicited for.
23 Q. Do you recall if he had looked at his
24    browser search history before that happened?

Page 31

1  A. No.
2  Q. Did he mention anything to you about his
3     browser search history being deleted or not
4     preserved?
5  A. No.
6  Q. Do you know for either of the laptops the
7     browser searches for those?
8  A. I do not know.
9  Q. Have you ever deleted anything off of the
10    laptops for any reason?
11 A. No.
12 Q. Do you know if your husband has?
13 A. Not that I'm aware of. He's usually not as
14    tech savvy as me so he probably asked me for
15    help if he was going to do something with
16    the laptop other than schoolwork.
17 Q. I think, I asked you this. But you're not
18    sure how far back the browser search history
19    goes on either of those laptops; is that
20    right?
21 A. Correct.
22 Q. Is anyone able to access any of these
23    devices besides you and/or your husband?
24 A. No.

Page 32

1  Q. I know you mentioned your son is now able to
2     access the iPad. But besides him, is there
3     anyone else?
4  A. No.
5  Q. Do you know someone named Stephen Novia?
6  A. Yes.
7  Q. And who he is?
8  A. A good family friend.
9  Q. When you say family, you mean your husband
10    and you?
11 A. Yes; and our kids, and our son.
12 Q. How did you come to know him or meet him?
13 A. When I met my husband, he's a very good
14    friend of my husband's from childhood, so
15    I've known him for as long as I've known my
16    husband.
17 Q. They grew up together?
18 A. Yes.
19 Q. Where did your husband grow up?
20 A. Holden.
21 Q. Do you recall having a cookout or barbecue
22    in the summer of 2019?
23 A. Yes, maybe.
24 Q. Specifically thinking of one where Steve

Page 33

1  Novia was there?
2  A. Yes.
3  Q. So you do recall that specific cookout?
4  A. Yes, I mean, it wasn't a cookout. He just
5     came to hang out.
6  Q. I'm trying to think of a better work for it
7     besides cookout. We can just use cookout
8     for now.
9       Do you recall when that was?
10 A. I don't remember specifically. I just
11    remember that it was mostly like you haven't
12    seen us in a while come visit and swim and
13    have lunch or whatever we had that day.
14 Q. This was at your house?
15 A. Yes. It was a hot day.
16 Q. I'm sorry, I missed what you said.
17 A. It was a hot summer day, so, yes, I
18    remember.
19 Q. And was anyone else there?
20 A. No. Just me and my husband and our son.
21 Q. And do you think this was in the summer of
22    2019?
23 A. Yes.
24 Q. Do you know the approximate month?

Page 34

1  A. I don't remember. I think maybe later in
2     the summer because the pool was warm, very
3     warm, and we were swimming.
4  Q. Do you recall the time period when your
5     husband received the text from QuoteWizard?
6  A. No.
7  Q. Do you know if this, if Stephen Novia coming
8     over to your house was before or after that?
9  A. I do not know, no.
10 Q. Is there any way to figure out when you had
11    Stephen Novia over?
12 A. I might be able to look back for pictures.
13    No, because I don't think I took any
14    pictures of him when he was here so I don't
15    know.
16 Q. Do you recall, I wish I could give you a
17    better term than cookout but it's just easy.
18 A. Visit.
19 Q. I'm sorry?
20 A. Visit.
21 Q. We'll use visit.
22      Do you remember at that visit
23    Stephen Novia talking to your husband about
24    the Telephone Consumer Protection Act?

Page 35

1  A. No.
2  Q. Have you had heard the term TCPA?
3  A. No.
4  Q. You've never heard that before?
5  A. No.
6  Q. Do you remember Mr. Novia talking about
7     illegal telephone calls or text messages?
8  A. No.
9  Q. Did you hear him talking to your husband
10    about anything related to telephone calls at
11    all?
12 A. No.
13 Q. Were there portions of that visit when they
14    were speaking and you weren't within
15    earshot?
16 A. Not that I can think of.
17 Q. So your husband testified that he had a
18    conversation with Mr. Novia about what's
19    called the TCPA. Has he ever spoken to you
20    about that?
21 A. Not that I can think of.
22 Q. Did he ever tell you about this conversation
23    that he had with Mr. Novia?
24 A. No.

Page 36

1  Q. Okay. I think you said that what you know
2     about this case is that your husband was
3     solicited for insurance; is that accurate?
4  A. Yes.
5  Q. When did you first hear about this?
6  A. Maybe in the spring of this year.
7  Q. Spring of this year?
8  A. Yes.
9  Q. So you don't recall hearing about this in
10    2019?
11 A. Not that I can remember.
12 Q. And how did it come up in the spring of
13    2020?
14 A. Well, since we spent a little more time
15    together from Covid, he probably was just
16    telling me if I can remember like that he
17    was involved in a lawsuit.
18 Q. So this was after he filed the lawsuit?
19 A. I don't know. What transpired was probably,
20    I was solicited for insurance and I'm
21    involved in a lawsuit about it. Then that's
22    about it.
23 Q. Do you remember hearing anything before the
24    time that he filed the lawsuit? Like did he

Page 37

1  say that I'm planning on filing a lawsuit,
2  I'm hiring an attorney?
3  A. No.
4  Q. Did he tell you, I was sent these text
5     messages that I didn't ask for, did he say
6     anything like that?
7     MR. BRODERICK: Objection.
8  A. Possibly. I mean, honestly, until now, I
9     didn't even think, the thought of this
10    lawsuit going on like was never in my head
11    until, Oh, it's really happening because now
12    I have to be a part of it.
13 Q. So this is just not something that he has
14    spoken to you about?
15 A. Correct.
16 Q. Do you remember when he first mentioned an
17    attorney?
18 A. I do not. I mean, obviously recently
19    because I'm involved. But prior to this
20    week or this past month, I'm not sure.
21 Q. I just want to make sure I'm understanding.
22    You can't remember any conversations from
23    2019 that you had with your husband about
24    this?

Page 38

1  A. No.
2  Q. So the first kind of memory you have of this
3     is the spring of this year?
4  A. Not even a real conversation. Like just
5     this is going on. Kind of like this is kind
6     of silly it's like what you see on TV.
7     Have you been -- I don't know.
8     Both of us kind of thought -- it just seemed
9     kind of like not a big deal. I have been
10    solicited for insurance and I'm, you know,
11    pursuing it. And that's it.
12 Q. Do you know why he's pursuing it?
13 A. I mean, it's annoying that you're constantly
14    being solicited for anything so.
15 Q. Did he ever mention to you that he had
16    received these text messages and he was
17    annoyed by them?
18 A. Not that I can remember specifically about
19    this. But, I mean, you get calls and texts
20    and things from different things constantly.
21    I can think of an occasion where I would be
22    like, you know, I got a silly call from New
23    York today. It's like how do they call my
24    phone. You know, something like that.

Page 39

1  Otherwise, I don't remember this specific
2  situation being discussed.
3  Q. Can you recall other times that either you
4     or your husband received telephone calls or
5     text messages that weren't, in your word,
6     solicited?
7  A. Specifically -- myself probably just like
8     last week, I answer my phone just in case,
9     like it's a number I don't know but it's an
10    emergency from a family member or my son or
11    something like that, so I answer most
12    numbers, and I do keep getting one from like
13    a Chinese woman.
14 Q. What about your husband?
15 A. Recently he hasn't said anything.
16 Q. Has he ever complained about receiving these
17    unsolicited communications?
18    MR. BRODERICK: Objection.
19 A. I can't think of a specific time. But I'm
20    sure, like I said, it happens so frequently
21    to me I'm sure in passing we kind of said,
22    Oh, I got a silly call or whatever, like I
23    just said.
24 Q. Were you surprised to learn that he was a

Page 40

1  plaintiff to a lawsuit?
2  A. At the time I didn't give it any thought.
3     It didn't seem like anything was really
4     happening until now, now I'm like surprised
5     that this is what we're doing.
6  Q. And do you understand that this is a
7     proposed class-action on behalf of other
8     consumers as well?
9     MR. BRODERICK: Objection.
10 A. I guess, I don't know -- he hasn't talked
11    about other people being involved.
12 Q. Just going back to Stephen Novia for a
13    moment. What I take from your testimony is
14    that you don't remember him and Mr. Mantha
15    talking about anything even remotely related
16    to unsolicited text messages at this visit,
17    right?
18 A. Right.
19 Q. It was kind of just like normal friend
20    discussion?
21 A. Yes.
22 Q. And you didn't hear the word TCPA or
23    Telephone Consumer Protection Act or you
24    didn't hear anything about lawsuits; is that

Page 41

1  correct?
2  A. Not that I can think of or remember.
3  Q. What about attorneys or legal demands or
4     things like that?
5  A. No.
6  Q. Are you aware if Stephen Novia has ever
7     filed a lawsuit or served a legal demand?
8  A. I am not.
9  Q. Were you aware -- strike that.
10        Are you aware that Mr. Novia was
11     represented by the same attorney as your
12     husband?
13 A. I am not.
14 Q. Were you aware that Mr. Novia recommended
15     his attorney to your husband?
16 A. I am not.
17 Q. So your husband never mentioned any of this
18     to you prior to filing a lawsuit?
19 A. I don't know that he mentioned -- he
20     mentioned that Stephen Novia did something
21     similar, but I don't know any of those
22     details, who, what, when, where.
23 Q. When you say did something similar, what do
24     you mean?

Page 42

1  A. Like was solicited, received solicited calls
2     or texts or something and pursued it.
3  Q. When did your husband mention that?
4  A. I'm not sure.
5  Q. Can you give me -- was it this year?
6  A. Yes.
7  Q. Some time in the spring or after?
8  A. Yes, probably.
9  Q. Was that in connection with your husband
10     telling you, hey, I'm a plaintiff in a
11     lawsuit?
12 A. I don't remember. I mean, to be honest, I
13     don't even like specifically remember a time
14     when he sat down and said, hey, I'm a
15     plaintiff in a lawsuit. I just know, I just
16     vaguely knew that it was happening until,
17     like I said, now I'm a part of it so now I
18     know it's happening.
19 Q. When he mentioned Stephen Novia doing
20     something similar, did you take that to mean
21     filing a lawsuit?
22 A. I mean, no, not until now, I guess. I
23     guess, it could mean anything.
24 Q. What did you take that to mean when you

Page 43

1  heard it?
2  A. I mean, I guess, I didn't even believe that
3     we were involved in a lawsuit until now. So
4     I just took it, I mean, because prior to now
5     anything that he did about this I never saw.
6     There was never him going anywhere. There
7     was never like any phone calls or
8     conversations. So it was like, I'm involved
9     in this but like I never see or hear of it
10    so, it's almost like I don't really believe
11    it or it's not really happening, it's just
12    not part of my mindset.
13       So whenever I knew that Steve had,
14    I guess, been a part of something similar
15    it's almost like the same thing, a part of
16    what, like what are we even doing. I don't
17    even see or hear or know of anything going
18    on.
19 Q. Do you know if Stephen Novia ever got money
20    relating to that?
21 A. I don't know.
22 Q. You don't know either way?
23 A. I don't know.
24 Q. Okay. Did your husband ever mention

Page 44

1  something like, you know, Stephen Novia was
2  able to get money because he received
3  unsolicited communications?
4  A. I don't know.
5  Q. Your husband never mentioned anything like
6     that to you?
7  A. Not that I can remember.
8  Q. Do you know if Stephen Novia ever received
9     money relating to that?
10 A. I'm not sure.
11 Q. I think you testified that the first time
12    you heard about QuoteWizard texting your
13    husband was in the spring of this year; is
14    that right?
15 A. Yes.
16 Q. Not to belabor the point, but can you just
17    tell me what he told you at the time?
18 A. I can't remember a specific conversation. I
19    just know at some point prior to now he said
20    he was involved in, or that he had been
21    solicited for insurance that he didn't ask
22    for and he was pursuing it.
23 Q. Do you recall when your husband hired
24    attorneys

Page 45

1  A. I do not know when.
2  Q. Have you ever heard of the website
3     Snappyautoinsurance.com?
4  A. No.
5  Q. Have you ever heard of it before today?
6  A. Not that I can think of.
7  Q. Has anyone ever asked you if you went on to
8     that website at any point?
9  A. I guess not, no.
10 Q. Had you ever been to that website?
11 A. No.
12 Q. Do you know if your husband has ever visited
13    it?
14 A. Not that I'm aware of. I believe we've had
15    the same insurance for a long time.
16 Q. Do you know what that is?
17 A. I don't, because he takes care of that.
18 Q. Have you ever shopped for auto insurance
19    quotes?
20 A. No. I mean, when I was younger probably,
21    but in the past 10 years, no.
22 Q. I'm going to show you what's been previously
23    been marked as an exhibit in your husband's
24    deposition but I'm not going to mark it here

Page 46

1     unless, Ted, you have objections to that?
2        MR. BRODERICK: No.
3  Q. Okay. It's already been marked in Joe
4     Mantha's deposition. I'm going to use the
5     screen share so just bear with me for a
6     moment.
7        Can you see that all right?
8  A. Yes.
9  Q. I'm showing you what was previously marked
10    as Exhibit 12 at your husband's deposition.
11    I'm going to try and give you a full view so
12    you can see.
13       Can you see that all right?
14 A. Yes.
15 Q. So this is a portion of the text message
16    exchanged between your husband and
17    QuoteWizard. Have you ever seen this
18    before?
19 A. No.
20 Q. He's never shown you copies of the texts?
21 A. No.
22 Q. I'm just going to scroll down so you can see
23    it. Let me know when you've kind of
24    reviewed it.

Page 47

1  A. Okay.
2  Q. I'm just going to show you, there's two
3     pages. I'm going to show the second page of
4     this. Let me know when you're all set.
5  A. Okay.
6  Q. I know you have not seen these before today,
7     but you see here that your husband, in fact,
8     was responding to the text, correct?
9        MR. BRODERICK: Objection.
10 A. I guess, if that's him in the green.
11 Q. I'll represent to you that that is him in
12    the green and this is a copy of the
13    exchange. So anything in the gray is
14    QuoteWizard and anything in the green is
15    your husband.
16 A. Okay.
17 Q. Having seen these for the first time are you
18    surprised that your husband was responding?
19       MR. BRODERICK: Objection.
20 A. I don't know that, I mean, I guess. I don't
21    know. I don't feel any way about it.
22 Q. I know you mentioned earlier that you and
23    possibly your husband receive a lot of
24    unsolicited communications; is that

Page 48

1     accurate?
2  A. I'd say, I mean, frequently.
3  Q. I'm sorry, I cut you off.
4  A. I said frequently. Probably once a week at
5     least for me. I don't know about him. I
6     know he does because we probably talked
7     about it before.
8  Q. Have you ever received in text message form?
9  A. Yes.
10 Q. Have you ever responded?
11 A. I probably have and then once I realized,
12    because I think that people don't always,
13    didn't always do this through text, so once
14    I realize that they solicit you through text
15    now I don't respond anymore.
16       I can't think of a specific time,
17    but I can imagine if I was caught off guard
18    and didn't realize that somebody would
19    solicit me through text and I might response
20    who are you, what do I do.
21 Q. And that would be because you didn't know
22    who was contacting you?
23       MR. BRODERICK: Objection.
24 A. For me personally, I guess, I don't know.

Page 49

1  If I got these texts, I mean, I might
2  respond.
3  Q. Why is that?
4      MR. BRODERICK: Objection.
5  A. Because somebody is texting me and I don't
6  realize that it's like, I don't know, a trap
7  kind of. I don't know.
8  Q. The reason I'm asking is because your
9  husband says here, how do I get a quote.
10 And this is a portion of the text messages.
11 I want to be clear about that. He's saying
12 here, how do I get a quote. Do you see
13 that?
14 A. Yes.
15 Q. Do you know if he was searching for auto
16 insurance quote in 2019.
17     MR. BRODERICK: Objection.
18 A. Not that I'm aware of. He didn't tell me he
19 was.
20 Q. Do you know why he would say, how do I get a
21 quote?
22     MR. BRODERICK: Objection.
23 A. Is there a message before how do I get a
24 quote?

Page 50

1  Q. This is part of a text message exchange,
2  yes, and I'm just asking you based off this
3  document.
4      MR. BRODERICK: Objection.
5  A. The person, I mean, there must be a text
6  before that so he must be responding to a
7  text before that.
8  Q. It's just based on what you know. I'm just
9  asking you if you know why he would have
10 responded that way?
11     MR. BRODERICK: Objection.
12 A. If I know -- I don't know why he would
13 respond that way. I imagine he was texted
14 and he responded so.
15 Q. Have you ever had any e-mail communications
16 with your husband about this lawsuit?
17 A. No.
18 Q. Have you ever had any text messages with
19 your husband about this lawsuit?
20 A. Not that I can think of.
21 Q. To your knowledge, the only conversations
22 would have been in person?
23 A. I mean, yes, like I said. I don't know if
24 we texted like this week about, hey, your

Page 51

1  deposition is at whatever time, I don't
2  know.
3  Q. Okay. Besides this week you can't recall
4  any other e-mails or texts that you would
5  have sent?
6  A. No.
7  Q. I'm going to stop screening sharing
8  Exhibit 12.
9      Do you recall your husband, and
10 right now I'm specifically talking about the
11 text messages from QuoteWizard. Do you
12 recall your husband ever saying that he was
13 annoyed, or something to that effect, by
14 these text messages?
15     MR. BRODERICK: Objection.
16 A. Specific ones, no.
17 Q. And specifically about these text messages,
18 do you recall him saying anything like, you
19 know, this was a waste of my time, or
20 invasion of privacy, or something like that?
21     MR. BRODERICK: Objection.
22 A. Not that I can remember.
23 Q. I think, you said that you never seen the
24 text messages that are part of this lawsuit

Page 52

1  before I just showed you a portion; is that
2  right?
3  A. Correct.
4  Q. Do you know anyone who drives a Chevy
5  Trailblazer?
6  A. No.
7  Q. What about a Chevy Silverado?
8  A. Not that I can think of.
9  Q. I'm going to represent to you that -- strike
10 that.
11     It's QuoteWizard's position in this
12 lawsuit that either your husband or someone
13 purporting to be your husband gave consent
14 to be contacted. Do you have any knowledge
15 of that?
16     MR. BRODERICK: Objection.
17 A. No.
18 Q. Do you have any reason to believe anyone
19 would have entered his information for him
20 or purporting to be him?
21 A. No.
22 Q. Has your husband ever mentioned the website
23 Snappyautoinsurance.com?
24 A. No.

Page 53

1  Q. My next series of questions, we're going to
2     talk pre-Covid in 2019. What was your
3     husband's normal workday, the hours?
4  A. Like 8:00 to 5:00.
5  Q. Does he work weekends?
6  A. No, not usually.
7  Q. Did he sporadically work weekends around
8     this time?
9  A. No.
10 Q. Has he ever worked a weekend?
11 A. I don't know that it's work, but if there's
12    like the kids' graduation, I know he's
13    attended that. It's usually on a Saturday.
14 Q. We mentioned a little bit before about your
15    husband getting work calls on his cell
16    phone. Do you remember that?
17 A. Yes.
18 Q. I think you said, please correct me if I'm
19    wrong, that it's, I think you said a couple
20    times a week; is that accurate?
21 A. Yes.
22 Q. And that's the ones that you're observing,
23    correct?
24 A. Correct.

Page 54

1  Q. How long do his calls usually last?
2  A. A minute or two.
3  Q. And these are, just to clarify, these are
4     outside of his normal working hours; is that
5     right?
6  A. Correct.
7  Q. Has he ever mentioned the ring central ap to
8     you?
9  A. Yes.
10 Q. What do you know about that?
11 A. I think that I know it connects his office
12    phone to his cell phone if he wants it to.
13 Q. Do you know if he makes calls through the
14    ap?
15 A. I don't know.
16 Q. Have you ever seen him make a work call
17    through his cell phone at home?
18 A. Have I ever seen him call work with his cell
19    phone?
20 Q. Any call relating to work.
21 A. Have I seen him make a call related to work,
22    yes.
23 Q. How frequently is he doing that outside of
24    his work hours that you're observing?

Page 55

1  A. Like a couple times a week. Like, if he
2     gets a call about an issue that surpasses
3     the usual on-call person then maybe he might
4     hear what the person is saying and then like
5     make a call a couple of minutes later, an
6     hour later, to follow-up.
7  Q. What type of issues would that generally
8     entail? Is this where there's a student
9     having an issue or is it employee related?
10 A. It could be like too many call-outs or a
11    student is having a major issue, not just
12    any issue.
13 Q. Call-outs, you mean like when an employee
14    calls out sick?
15 A. Correct.
16 Q. And is your husband responsible for kind of
17    scheduling and reshuffling in that
18    situation?
19 A. I don't think so. It sounds like if there
20    are multiple and they need to get his input
21    on what to do next then that's when they
22    might, usually if he has a call related to
23    that it sounds like there has been multiple
24    call-outs and he's just giving his advice.

Page 56

1     If I hear him get a call about a
2     call-out they are usually multiple and the
3     people under him have already done the
4     footwork to take care of it so they are
5     probably just calling him to say, should I
6     put this person at this program or something
7     like that.
8  Q. So these are the employees who work
9     underneath him?
10 A. Yes.
11 Q. Do you know how many employees he is in
12    charge of, approximately?
13 A. I have no idea.
14 Q. Do you know if it's a little or a lot?
15 A. I think, I'd say, I would guess that it's
16    under 100, but I can't be sure at all.
17 Q. That's a pretty sizeable number that he's in
18    charge of, right?
19       MR. BRODERICK: Objection.
20 A. It could be under 50. It's hard to say who
21    he is in charge of like. I don't know.
22 Q. Are you aware that he gets a $30 cell phone
23    reimbursement from work?
24 A. I guess, I was aware that they contributed

Page 57

1  to the cell phone bill just a tiny amount
2  but I didn't know it was $30.
3  Q. Do you know why he gets that?
4      MR. BRODERICK: Objection.
5  A. I would assume they understand that he will
6  occasionally get calls.
7  Q. I missed that first part of your answer.
8  A. I said, I assume that they realize that he
9  will occasionally get calls due to the
10 nature of the job.
11 Q. What do you mean by "the nature of the job?"
12     MR. BRODERICK: Objection.
13 A. I mean, it's a school that runs 24/7 so it's
14 not like he leaves at five and the doors
15 close.
16 Q. Do you know if there's, I might have asked
17 you this and I apologize. Do you know if
18 there's an on-call number?
19 A. I don't know.
20 Q. Have you ever heard your husband refer to an
21 on-call number?
22 A. I don't know that there's a number. I know
23 there's other on-call people, so I don't
24 know if there's like one number that gets

Page 58

1  people to them. I'm not aware of an on-call
2  number.
3  Q. And are you aware that your husband has ever
4  been on-call in 2019?
5  A. As far as I know, he's not on-call. He just
6  is called if the on-call person can't handle
7  whatever is going on.
8  Q. You reside in Rutland; is that correct?
9  A. Yes.
10 Q. How far are you time-wise to Worcester?
11 A. 30 minutes, 25.
12 Q. How often are you guys in Worcester?
13 A. Hardly. I guess, actually, pre or post
14 Covid?
15 Q. Pre.
16 A. Pre-Covid maybe once or twice a week.
17 Q. What type of things do you guys do there?
18 A. Go to dinner. My mother lives in Worcester.
19 Q. I'm sorry, who lives in Worcester?
20 A. My mom.
21 Q. And besides your mom, do you have any other
22 friends or family that live in Worcester?
23 A. We do, but we don't usually go to their
24 houses.

Page 59

1  Q. What about family besides your mom?
2  A. Living in Worcester, no.
3  Q. What about outside Worcester?
4  A. I mean, yes. What do you mean?
5  Q. So do you have any family members who live
6  in the Worcester area but not in Worcester?
7  A. No. Well, my mother lives in Worcester, and
8  my husband's brother lives in town with us.
9  And, otherwise, those are the two most local
10 people.
11 Q. So your husband's brother lives in Rutland?
12 A. Yes.
13 Q. Did you take any vacations in 2019?
14 A. Yes.
15 Q. Do you recall when? By "you", I mean, I'm
16 assuming it would have been with your
17 husband.
18 A. Family vacations, we took one in April.
19 Q. Do you recall where you went?
20 A. Yes, we went to Florida.
21 Q. Do you recall any other vacations?
22 A. Where we all left, no.
23 Q. When your husband goes on vacation because
24 of the nature of his job, does he need to

Page 60

1  get someone to basically cover what he
2  usually does?
3  A. I don't know that he needs to find coverage
4  more than he just needs to delegate what he
5  might normally do to other people.
6  Q. Does he ever get work calls when he's on
7  vacation?
8  A. No.
9  Q. Is that because he just kind of pushed
10 everything off his plate?
11 A. Yes.
12 Q. So you don't recall any other vacations or
13 trips you took besides the one in April?
14 A. As a family, no.
15 Q. What about your husband, did he take any
16 trips?
17 A. No. When I say that, it's just because I
18 personally go visit my sister in Florida.
19 He didn't come. And, I think, I did that
20 twice last year.
21 Q. Do you recall when you were in Florida, the
22 time period?
23 A. January and, I think, July last year.
24 Q. Do you remember what portion of July?

Case 1:19-cv-12235-LTS   Document 208-7   Filed 07/14/21   Page 18 of 20

Joseph Mantha vs
Quotewizard.com, LLC

Melisa Mantha
September 11, 2020

Page 61

1  A.  Maybe it was June. I mean, I can't
2      remember. I know I wasn't gone for the 4th
3      of July holiday. But I don't remember if it
4      was before or after that.
5  Q.  Do you know for that trip whether your
6      husband had any friends over when you were
7      away?
8  A.  As far as I know, no, because he was in
9      school for his master's so he spends a lot
10     of time doing schoolwork.
11 Q.  I think you mentioned he's taking a break
12     from that.
13 A.  He took this summer off.
14 Q.  Okay.
15 A.  But he'll return next month.
16 Q.  Do you know what your husband's sort of goal
17     out of this lawsuit is?
18         MR. BRODERICK: Objection.
19 A.  I guess not. We never really talked about
20     it.
21 Q.  He's never mentioned to you what he's hoping
22     to get?
23         MR. BRODERICK: Objection.
24 A.  At this point, I mean, since this week has

Page 62

1      come and we've both had to do this
2      deposition thing he just wishes for it to be
3      over.
4  Q.  You have a brother; is that correct?
5  A.  Yes.
6  Q.  What's his name?
7  A.  Nick.
8  Q.  Has Nick ever stayed with you at your
9      Rutland home?
10 A.  No.
11         MR. BRODERICK: Objection.
12 Q.  Has he ever visited?
13 A.  Not recently.
14 Q.  Do you recall the last time he visited?
15 A.  Maybe February 2019.
16 Q.  Was that just during the day?
17 A.  It was probably for my son's birthday.
18 Q.  Do you know what car he drives?
19 A.  I do not.
20 Q.  Do you know if he owns a car?
21 A.  I doubt he owns a car.
22 Q.  Where does he reside?
23 A.  Currently, I don't know.
24 Q.  Do you know if he's in Massachusetts?

Page 63

1  A.  I think so.
2  Q.  What's the last residence that you know of?
3  A.  The last residence in February of 2019 he
4      was living with his girlfriend in Spencer
5      and they moved to Milford. I mean -- where
6      did they move to -- Milbury, sorry.
7  Q.  Have you had any conversations with your
8      brother about this case?
9  A.  I have not spoken to my brother in over a
10     year.
11 Q.  Have you ever had any conversations with
12     your husband about your brother relating to
13     this case?
14 A.  No.
15 Q.  You mentioned earlier you haven't heard of
16     Snappyautoinsurance.com; is that correct?
17 A.  Correct.
18 Q.  And your husband hasn't mentioned it?
19 A.  No.
20 Q.  Have you ever heard of a website called
21     Autoinsure.com?
22 A.  Not that I know of. Not that I can think
23     of.
24 Q.  Had you ever heard of QuoteWizard before?

Page 64

1  A.  No.
2  Q.  What about Autoinsurequotes.com?
3  A.  Not that I know of.
4  Q.  What about Unitedquotes.com?
5  A.  Not that I know of.
6  Q.  Just give me a moment here.
7          How often would you say that you're
8      using -- strike that.
9          You said you have a work cell
10     phone; is that right?
11 A.  Yes.
12 Q.  Are you using that just during your working
13     hours?
14         MR. BRODERICK: Objection.
15 A.  Yes.
16 Q.  Same is true for your work, the tablet?
17 A.  Yes.
18         MR. BRODERICK: Objection.
19 Q.  And those were specifically used for your
20     working hours?
21         MR. BRODERICK: Objection.
22 A.  Yes.
23 Q.  Do you get any work reimbursements for your
24     personal cell phone?

O'Brien & Levine Court Reporting Solutions
888.825.3376 - production@court-reporting.com

Pages 61–64

Page 65

1        MR. BRODERICK: Objection.
2   A.   No.
3   Q.   Do you use your personal cell phone for
4        work.
5        MR. BRODERICK: Objection.
6   A.   I mean, maybe occasionally if I have poor
7        service. It seems silly, but they are both
8        Verizon phones, sometimes my personal phone
9        works better than my work phone AND
10       sometimes my work phone works better than my
11       personal phone.
12  Q.   Okay. I think you said you do not have a
13       home phone; is that correct?
14  A.   Correct.
15  Q.   Was that also true in 2019?
16  A.   Yes.
17  Q.   Do you have any reason to think that someone
18       would have taken your husband's personal
19       information and entered it on
20       Snappyautoinsurance.com?
21       MR. BRODERICK: Objection.
22  A.   No.
23  Q.   And you did not do that; is that correct?
24  A.   Correct.

Page 66

1   Q.   Did your husband ever mention to you that
2        it's our position in this lawsuit that
3        either he or someone using his information
4        went to that website and entered it?
5        MR. BRODERICK: Objection.
6   A.   No. I guess, I would assume that is why we
7        are here because he didn't, he claims -- I'm
8        sorry, I just heard something. He was
9        solicited without his consent, and, I guess,
10       the thought would be that he somehow gave
11       consent.
12  Q.   But he hasn't, I guess, discussed the
13       specifics of those issues with you?
14  A.   No.
15  Q.   Has your husband ever had to go back to work
16       after returning home for the day?
17  A.   No.
18  Q.   Bear with me for a moment here.
19       I just have a few more questions
20       for you. I just want to be perfectly clear
21       about the time-line. You don't recall
22       hearing anything relevant to this lawsuit at
23       that visit?
24  A.   Correct.

Page 67

1   Q.   You don't recall in August of 2019 when
2        these texts were sent that your husband
3        mentioned them to you; is that correct?
4   A.   Correct.
5   Q.   So you think the first time you heard about
6        the text messages or this lawsuit was in the
7        spring of 2020?
8   A.   Correct.
9   Q.   Do you have an approximate month in mind?
10  A.   Maybe, April. I guess, I say that because
11       all I can think about in March is Covid.
12  Q.   Do you remember where that initial
13       conversation took place?
14  A.   Probably in the living room on our couch.
15  Q.   Do you remember any of the specific details
16       of that?
17       MR. BRODERICK: Objection.
18  A.   I don't remember any details period. I
19       don't think that there were any -- there
20       were no details to discuss. It was just a
21       quick like this is going on.
22  Q.   Have you ever read the complaint?
23  A.   No.
24  Q.   Have you ever seen a copy of it?

Page 68

1   A.   Not that I can think of.
2   Q.   Have you had any conversations with the
3        person who took the imaging of the devices?
4   A.   No.
5   Q.   So that was just your husband who was
6        interacting with him?
7   A.   I guess so.
8   Q.   Have you ever seen the imaging that was
9        taken from the devices?
10  A.   No.
11  Q.   Has anyone ever told you what's on them?
12  A.   No.
13  Q.   So your husband -- essentially you only knew
14       that they were scanned but you're not sure
15       what was on it or what was taken or any
16       other --
17  A.   Yes.
18  Q.   Has your husband ever discussed that with
19       you?
20  A.   Just that it was happening.
21  Q.   Were you home for that?
22  A.   I don't know that I was home. I feel like I
23       remember seeing the laptop on the table and
24       then maybe going to work.

Page 69

1  Q. Okay. Do you know -- are you aware that
2     Steve Novia was deposed for this lawsuit?
3  A. No.
4  Q. Your husband didn't mention that to you?
5  A. Not that I can remember.
6  Q. Has your husband ever mentioned -- strike
7     that.
8        You mentioned that you and your
9     husband sometimes receive unsolicited
10    communication.  Have you and your husband
11    ever discussed filing a lawsuit based on
12    those?
13 A. No.
14        MS. KINGSTON:  I believe those are
15    all the questions I have.  Bear with me for
16    a moment here while I double-check.
17        (Pause)
18 Q. What did you drive in 2019, what type of
19    vehicle?
20 A. A Mazda.
21 Q. What does your husband drive?
22 A. A Nissan.
23 Q. Do you recall renting any cars in 2019?
24 A. Yes.

Page 70

1  Q. Do you recall when that was?
2  A. In April when we went to Florida we rented a
3     small car.  I think it was a Kia Soul to
4     drive from the airport.
5  Q. Besides that, can you recall any other
6     rentals?
7  A. In July, I think, I also rented a car from
8     Orlando and I believe it was the same car.
9  Q. Did you know what the IP addresses are for
10    any of your electronic devices?
11 A. No.
12 Q. Has anyone ever asked you to check?
13 A. No.
14        MS. KINGSTON:  Those are all the
15    questions I have for you.
16        Ted, do you have any questions?
17        MR. BRODERICK:  I don't.
18        MS. KINGSTON:  Thank you for your
19    time.
20        I will take a full and mini PDF,
21    please.
22        MR. BRODERICK:  Same.  Thank you.
23        (Whereupon the deposition was
24    concluded at 3:31 p.m.)

Page 71

1  ERRATA SHEET DISTRIBUTION INFORMATION
2  DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4      ERRATA SHEET DISTRIBUTION INFORMATION
5        The original of the Errata Sheet has
6  been delivered to Theodore Broderick,
7  Esquire.
8        When the Errata Sheet has been
9  completed by the deponent and signed, a copy
10 thereof should be delivered to each party of
11 record and the ORIGINAL forwarded to
12 Christine Kingston, Esquire, to whom the
13 original deposition transcript was
14 delivered.
15        INSTRUCTIONS TO DEPONENT
16        After reading this volume of your
17 deposition, please indicate any corrections
18 or changes to your testimony and the reasons
19 therefor on the Errata Sheet suppled to you
20 and sign it.  DO NOT make marks or notations
21 on the transcript volume itself.  Add
22 additional sheets if necessary.  Please
23 refer to the above instructions for errata
24 sheet distribution information.

Page 72

1  PLEASE ATTACH TO THE DEPOSITION OF:
2  Melisa Mantha
3  CASE:  Mantha
4  DATE TAKEN:  Friday, September 11, 2020
5              ERRATA SHEET
6  Please refer to page 72 for errata sheet
7  instructions and distribution instructions.
8
9  PAGE     LINE    CHANGE       REASON
10
11
12
13
14
15
16     I have read the foregoing transcript
17 of my deposition and except for any
18 corrections or changes noted above, I hereby
19 subscribe to the transcript as an accurate
20 record of the statements made by me.
21     Executed this       day of        , 2020.
22
23
24            MELISA MANTHA