# EXHIBIT 11

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3
 4
 5     *********************************
 6     JOSEPH MANTHA, on behalf of himself
       and all others similarly situated,
 7
                    Plaintiff
 8
 9     vs.              CA NO. 1:19-cv-12235-LTS
10
11     QUOTEWIZARD.COM, LLC,
12                  Defendant
13     *********************************
14
15              VIDEOTAPED DEPOSITION OF:
16                    STEVEN NOVIA
17                   (Taken Remotely)
18                   160 Speen Street
19              Framingham, Massachusetts
20           September 1, 2020     10:07 a.m.
21
22
                      Darlene M. Coppola
23
                   Registered Merit Reporter
24
                 Certified Realtime Reporter
```

Page 2

1  APPEARANCES:
2  Representing the Plaintiff and the witness:
3  (Via Zoom)
4      THE LAW OFFICE OF EDWARD A. BRODERICK
5      208 Ridge Street
6      Winchester, MA  01890
7      BY:  EDWARD A. BRODERICK, ESQUIRE
8      T 617.738.7080
9      E ted@broderick-law.com
10  -and-
11      CW LAW GROUP, P.C.
12      188 Oaks Road
13      Framingham, MA  01702
14      BY:  ALEX M. WASHKOWITZ, ESQUIRE
15      T 508.309.4880
16      E alex@cwlawgrouppc.com
17
18
19  (Continued on next page)
20
21
22
23
24

Page 3

1  APPEARANCES (Continued):
2  Representing the Defendant:
3  (Via Zoom)
4      NELSON MULLINS RILEY & SCARBOROUGH LLP
5      One Post Office Square, 30th Floor
6      Boston, MA  02109
7      BY:  KEVIN P. POLANSKY, ESQUIRE
8      T 617.217.4700
9      E kevin.polansky@nelsonmullins.com
10
11  Also present:
12  Adam Venturini, Videographer

Page 4

1                INDEX
2              EXAMINATION
3  Witness Name                              Page
4  STEVEN NOVIA
5    Direct By Mr. Polansky .......................... 7
6
7              EXHIBITS
8  Exhibit    Description               Page
9  Exhibit 1  Subpoena                  10
10 Exhibit 2  Proof of Service          10
11 Exhibit 3  Text Message              11

Page 5

1        (Deposition commencing at 10:07 a.m.)
2
3        THE VIDEOGRAPHER:  Good morning.
4  We are going on the record at 10:07 a.m.
5  on September 1, 2020.
6        Please note that the microphones are
7  sensitive and may pick up whispering, private
8  conversations and possible cellular
9  interference.  Please turn off all cell phones
10 or place them away from microphones, as they
11 can interfere with the deposition audio.
12        Audio and video recording will
13 continue to take place unless all parties
14 agree to go off the record.
15        This is Media Unit No. 1 of the
16 video-recorded deposition of Steven Novia
17 taken by counsel for the defendant in the
18 matter of Joseph Mantha versus
19 QuoteWizard.com, LLC, filed in the US District
20 Court for the District of Massachusetts.
21        My name is Adam Venturini from the
22 firm Veritext, and I'm the videographer.  The
23 court reporter is Darlene Coppola from the
24 firm Veritext.

Page 6

1  I'm not authorized to administer an
2  oath. I'm not related to any party in this
3  action, nor am I financially interested in the
4  outcome.
5      Counsel and all present remotely will
6  now state their appearances and affiliations
7  for the record. If there are any objections
8  to proceeding, please state them at the time
9  of your appearance, beginning with the
10 noticing attorney.
11     MR. POLANSKY: Good morning.
12 Kevin Polansky on behalf of the defendant
13 QuoteWizard.
14     MR. BRODERICK: Good morning.
15 Edward Broderick for the plaintiff, Joe
16 Mantha.
17     MR. WASHKOWITZ: Good morning.
18 Alex Washkowitz on behalf of plaintiff Joe
19 Mantha and on behalf of Steven Novia.
20     THE VIDEOGRAPHER: Will the
21 court reporter please swear in the witness.
22
23
24

Page 7

1          STEVEN NOVIA,
2  a witness called for examination by
3  counsel for the Defendant, having been
4  satisfactorily identified by the production of
5  his driver's license and being first duly
6  sworn by the Notary Public, was examined and
7  testified as follows:
8
9      THE VIDEOGRAPHER: You may
10 proceed.
11     MR. POLANSKY: Thank you.
12
13         DIRECT EXAMINATION
14 BY MR. POLANSKY:
15   Q.  Good morning, Mr. Novia. Will you
16 please state your name for the record.
17   A.  How are you? Steve Novia.
18     MR. POLANSKY: Alex and Ted,
19 usual stipulations?
20     MR. WASHKOWITZ: Yes.
21     MR. BRODERICK: Yes.
22     MR. POLANSKY: Thirty days to
23 read and sign, waive notary?
24     MR. BRODERICK: Yes.

Page 8

1      MR. WASHKOWITZ: Yes.
2  BY MR. POLANSKY:
3    Q.  Mr. Novia, have you ever provided
4  deposition testimony before?
5    A.  No. This is the first one.
6    Q.  Okay. So there's a couple of ground
7  rules that your counsel may have informed you
8  of, but I'll just go over them quickly.
9    A.  Yes, sir.
10   Q.  First, as you know, this is being
11 taped both by video and being recorded by a
12 stenographer. So it's very important that we
13 use verbal responses to respond to questions.
14 Okay?
15   A.  Yes, sir.
16   Q.  If you don't understand a question
17 that I have, please let me know and I'll
18 rephrase it. Okay?
19   A.  Yes, sir.
20   Q.  If you need a break at any time, just
21 let me know. I would just ask that you answer
22 any question posed before you take a break.
23 Okay?
24   A.  Yes, sir.

Page 9

1    Q.  And if you're having any technical
2  difficulties, either hearing me or with your
3  own screen, just let us know and we'll take a
4  break. Okay?
5    A.  Yes, sir.
6    Q.  Could you please state your full name
7  for the record.
8    A.  Steve Novia, Jr.
9    Q.  And did you view any documents in
10 preparation for today's deposition?
11   A.  No, sir.
12   Q.  Did you speak to anyone other than
13 your counsel in preparation for today's
14 deposition?
15   A.  No, sir.
16   Q.  Did you speak with Joe Mantha prior to
17 today's deposition?
18   A.  No, sir.
19   Q.  Did you bring any documents with you
20 today?
21   A.  No, sir.
22   Q.  Now, you received a subpoena requiring
23 your attendance to give testimony in this
24 case; is that correct?

Page 10

1   A. I'm sorry?
2   Q. Sure. You received a subpoena
3   requiring you to give attendance in this case;
4   is that correct?
5   A. Yes, sir.
6   Q. I'm referring to Exhibit 1, which is
7   the subpoena. Can you take a look at that.
8
9       (Exhibit No. 1 marked for
10  identification.)
11
12      (Exhibit No. 2 marked for
13  identification.)
14
15  BY MR. POLANSKY:
16  Q. Let me know when you have it in front
17  of you.
18  A. I have it in front of me, sir.
19  Q. Specifically, I'm referencing page 6
20  of 6 where it says "Document Requests."
21  A. Last -- yes, sir.
22  Q. And do you see where it says "Request
23  No. 1"?
24  A. Yes, sir.

Page 11

1   Q. And it asks for "any and all
2   correspondence between you and Joe Mantha
3   and/or any other person or entity regarding
4   this lawsuit including, but not limited to,
5   copies of text message exchanges."
6       Do you see that?
7   A. Yes, sir.
8   Q. Now, you have provided us with one
9   text message exchange; is that correct?
10  A. Yes, sir.
11  Q. And I'm referring to Exhibit 3.
12
13      (Exhibit No. 3 marked for
14  identification.)
15
16  BY MR. POLANSKY:
17  Q. Do you see the text exchange in front
18  of you?
19      MR. WASHKOWITZ: I can pull it
20  up.
21  A. Yes, sir.
22  BY MR. POLANSKY:
23  Q. And is that the only text message
24  exchange that you currently have in your

Page 12

1   possession with Mr. Mantha regarding this
2   lawsuit?
3   A. Yes, sir.
4   Q. Did you search your text messages with
5   Mr. Mantha to ensure there are no other text
6   messages available?
7   A. No, sir.
8   Q. So you didn't go back and review your
9   text messages with Mr. Mantha from any time,
10  let's say from August to the present?
11  A. No, sir.
12  Q. And why is that?
13  A. I don't understand the question.
14  Interview?
15  Q. I'm sorry. You said --
16  A. I don't understand the question.
17  Review? Interview? What did you say?
18  Q. Review. So --
19  A. I'm --
20  Q. Sure. My question is, did you review
21  any text message exchanges that you've had
22  with Mr. Mantha from August 2019 to the
23  present?
24  A. Yeah, this was the only one.

Page 13

1   Q. Okay. That was my question.
2   A. Oh, I'm sorry. I -- apologies.
3   Q. No, that's okay.
4       So there's no other text messages
5   between you and Mr. Mantha from that time
6   frame regarding this litigation?
7   A. No, I do not have any.
8   Q. Do your text messages with Mr. Mantha
9   go back to August of 2019?
10  A. I'm sorry?
11  Q. Do your text messages with Mr. Mantha
12  go back to August of 2019?
13  A. No, I don't have any -- I don't have
14  any text messages that go back that far.
15  Q. How far do your text messages go back
16  with Mr. Mantha?
17      MR. BRODERICK: Object.
18  A. July 26.
19  BY MR. POLANSKY:
20  Q. July 26 of what year?
21  A. Of 2019.
22  Q. I think you may be confused. So --
23  A. I think I am. I'm sorry.
24  Q. That's all right. That's all right.

Page 14

1  So I'm not trying to overcomplicate
2  things.
3      I'm asking, how far do your text
4  messages go back with Mr. Mantha?
5      MR. BRODERICK: Objection.
6  A. The only text message that I have is
7  the one that is provided. Anything else is
8  usually deleted after it's -- as I send texts.
9  I don't keep texts.
10     Is that what -- is that what you're
11 asking?
12 BY MR. POLANSKY:
13 Q. Yes. Well, let me ask you this way,
14 do you have an iPhone?
15 A. Yes, sir.
16 Q. Do you have iMessage?
17 A. Yes, sir.
18 Q. And do you keep your messages that you
19 have with other individuals?
20 A. Sometimes.
21 Q. So are you stating that you don't have
22 any sort of messages or text messages with
23 Mr. Mantha that go back to August of 2019?
24     I'm asking about in general, not just

Page 15

1  specifically related to this case. I'm just
2  trying to figure out the scope of the messages
3  you currently have available in your phone.
4  A. Yeah, I -- I don't have any text
5  messages other than that one with Mr. Mantha.
6  Q. But I don't know if you're
7  understanding my question.
8      So do you have any text messages with
9  Mr. Mantha that go back to August of 2019?
10 A. No.
11 Q. Okay. So any text messages that you
12 had with Mr. Mantha from August 2019 forward,
13 other than the one you provided in Exhibit 3,
14 have been deleted?
15     MR. BRODERICK: Objection.
16 BY MR. POLANSKY:
17 Q. You can answer.
18     Sorry. There's going to be objections
19 throughout. You can answer unless you're
20 instructed by your counsel not to.
21 A. Okay. I'm -- no, I don't have any
22 other text messages from that time.
23 Q. So any text messages with Mr. Mantha
24 dating back to August 2019 other than what you

Page 16

1  provided have been either deleted, destroyed,
2  whatever?
3  A. Yes, yes.
4  Q. Okay. That's all I'm asking.
5      So it's fair to say that you don't
6  have any text messages from July of 2019; is
7  that right?
8  A. No, not with him. The only thing I
9  have is that one. I still have it in my
10 phone.
11 Q. That's the only text message that you
12 currently have with Mr. Mantha?
13 A. Yes, sir, that's correct.
14 Q. Do you ever e-mail with Joe --
15 Mr. Mantha?
16 A. No. If I did, it was a long, long
17 time ago. We're talking years.
18 Q. So your modes of communication are
19 text message and phone call?
20 A. That's correct, sir.
21     MR. BRODERICK: Objection.
22 BY MR. POLANSKY:
23 Q. Or I guess in person if you see him?
24 A. Yes, sir.

Page 17

1  Q. Are you currently employed?
2  A. I am, sir.
3  Q. Where are you employed?
4  A. Oh, I'm a sworn-in law enforcement
5  officer.
6  Q. And who do you work for?
7  A. DHS, Department of Homeland Security.
8  Q. How long have you worked for DHS?
9  A. Ten years.
10 Q. And in your role -- strike that.
11     What's your job title at DHS?
12     MR. BRODERICK: Kevin, can we
13 take a quick break, or can I give you a call
14 on your cell phone?
15     MR. POLANSKY: Sure.
16     MR. BRODERICK: I'm sorry I
17 didn't flag this in advance.
18     MR. POLANSKY: Yes. Yes, okay,
19 we'll go off the record.
20     THE VIDEOGRAPHER: We are off
21 the record at 10:18 a.m.
22
23     (Recess taken from 10:18 a.m.
24     to 10:21 a.m.)

1-800-727-6396   Veritext Legal Solutions   www.veritext.com

Page 18

1
2        THE VIDEOGRAPHER:  Back on the
3   record, 10:21 a.m.
4   By MR. POLANSKY:
5      Q.  Before we had taken a break, I had
6   asked what your job title was at the DHS.  I'm
7   going to withdraw the question.
8      A.  Yes, sir.
9      Q.  In your role with DHS, do you have
10  access to the Internet?
11     A.  Yes, sir.
12     Q.  And how often -- how often do you use
13  the Internet?
14     A.  I don't even know how to answer that.
15  I mean, how often do you use your phone?  You
16  know what I mean?
17         Yeah, we -- we have our own phones for
18  work, so I have access to the Internet all the
19  time.
20     Q.  In your role, do you have the ability
21  to use IP addresses for other people?
22     A.  Do I -- do I have the ability?
23  I'm --
24     Q.  Yes, yes.

Page 19

1      A.  I have no idea.
2      Q.  Okay.
3      A.  I'm not tech savvy, so I don't know.
4      Q.  I'm not either, that's why my
5   questions aren't that good.
6          What I'm trying to figure out, though,
7   is, in your role at DHS, do you have the
8   ability to, you know, go in and use other
9   people's information and enter it and access
10  other people's sites?
11     A.  No, I don't -- I don't believe I do.
12  And if I do -- if I did have access, I
13  wouldn't even know how to begin to do it.
14     Q.  Where do you reside?
15     A.  247 Washington Avenue, Apartment 15,
16  Winthrop, Massachusetts, 02152.
17     Q.  How long have you lived there?
18     A.  Since December 30, 2019.
19     Q.  Any intention of moving any time
20  soon?
21     A.  No, sir.
22     Q.  And is your phone number -- does it
23  end with 9105?
24     A.  Yes, sir.

Page 20

1      Q.  And is that the phone number that you
2   use to communicate with Mr. Mantha on?
3      A.  Yes, sir.
4      Q.  Any other phone numbers that you would
5   communicate with Mr. Mantha on?
6      A.  No, sir.
7      Q.  How long have you known Mr. Mantha?
8      A.  Kindergarten.
9      Q.  So you've been lifelong friends?
10     A.  No.  Friends since high school and
11  into college, but -- yeah, we've played soccer
12  together basically throughout all our lives.
13     Q.  Have you stayed in touch with him
14  since college?
15     A.  Yes, sir.
16     Q.  How often do you speak to Mr. Mantha
17  on a weekly basis?
18     A.  Not on a weekly basis.
19     Q.  Monthly basis?
20     A.  Not even a monthly basis any more.  We
21  kind of went our separate ways.
22     Q.  What about back in 2019?
23     A.  Visited once; once or twice.
24     Q.  Do you recall the dates of those

Page 21

1   visits?
2      A.  I do not.  I do know one was during
3   the summertime when his wife was still
4   pregnant, before she had the baby last year.
5   But, yeah, I don't -- I don't recall the date,
6   sir.
7      Q.  When you say "during the summertime,"
8   do you recall whether it was June?  July?
9      A.  I do not.  I do not.  I just know it
10  was hot enough that we were in the pool with
11  the kids, so...
12     Q.  And that was at his house?
13     A.  That was at his house.
14     Q.  Have you ever heard of the website
15  SnappyAutoInsurance.com?
16     A.  No, sir.
17     Q.  Have you ever discussed that website
18  with Mr. Mantha?
19     A.  No, sir.
20     Q.  So is it fair to say that if you've
21  never heard of SnappyAutoInsurance.com, you've
22  never visited the website?
23     A.  If I did, I wouldn't know it.  But no,
24  it doesn't -- I don't recall it, no.

Page 22

1  Q. Now, I understand from Mr. Mantha that
2  you've had some experience with the TCPA; is
3  that correct?
4  A. Oh, yes, sir.
5  Q. And what's generally been your
6  experience with the TCPA?
7      And I want to put out there that I
8  don't want any -- to know about any
9  communications you've had with your counsel.
10  A. Understood, sir.
11  Q. And generally, what's been your
12  experience with the TCPA?
13  A. One -- what do you call it? I guess I
14  don't understand the question.
15      Have I had -- like, have I sued
16  anybody, or have I just -- like, what do I
17  know as far as information-wise?
18  Q. Sure. Well, let's -- those are good
19  questions. Let's back up a little bit.
20      Do you know what the TCPA is?
21  A. Yeah, it's like a telephone act saying
22  solicitors can't call you through automated
23  systems; something like that.
24  Q. Have you ever -- have you ever sued

Page 23

1  anybody alleging a violation of the TCPA?
2  A. Yes.
3  Q. And when did you do that?
4  A. I would have to look back, but I
5  believe it was sometime last -- last year. I
6  don't know, yeah, the exact date of it.
7  Q. And do you recall whether you filed in
8  a state court or federal court?
9  A. I don't know.
10  Q. Do you recall what state you filed the
11  lawsuit in?
12  A. Massachusetts.
13  Q. Do you recall the company you sued?
14      MR. WASHKOWITZ: Kevin, I think
15  he's misunderstanding your question. There
16  was no lawsuit. It was a presuit demand.
17      MR. POLANSKY: Okay. I was
18  going to follow up on that.
19      THE WITNESS: Apologies.
20      MR. POLANSKY: No, that's all
21  right. That's all right.
22  BY MR. POLANSKY:
23  Q. So I understand from your attorney
24  that you sent a presuit demand or a presuit

Page 24

1  demand was sent on your behalf; is that
2  correct?
3  A. If that's what you call it, I believe
4  so, sir, yes.
5  Q. So you don't recall ever being named
6  as the plaintiff in a lawsuit?
7  A. Oh, no.
8  Q. Correct?
9  A. No.
10  Q. And do you know who the presuit demand
11  was sent to?
12  A. I don't recall.
13  Q. Do you recall the company that you
14  allege violated the TCPA?
15  A. I probably should, but I don't recall
16  offhand.
17  Q. Did you resolve the claim with that
18  company that you sent the presuit demand to?
19  A. Yes, sir.
20  Q. In your experience, have you -- how
21  many times have you sent a presuit demand?
22  A. For that instance? I -- that's the
23  only one that I've ever done.
24  Q. Not that instance. So I'm saying

Page 25

1  whether you sent presuit demands to a number
2  of companies, so --
3  A. Oh, no. No, sir, no.
4  Q. Are the terms of that resolution
5  confidential?
6  A. Yes, sir.
7  Q. Did you -- did you tell Mr. Mantha
8  about this experience that you had sending a
9  presuit demand to a company that allegedly
10  violated the TCPA?
11  A. Yes, sir.
12  Q. And what did you tell him?
13  A. Generally, that I was -- I had this
14  thing going, and he asked me if it was
15  illegal.
16      I was like, Yeah, and hopefully it
17  works out in my favor.
18      And, yeah, he asked a couple more
19  questions about what exactly you have to do.
20  And I was just, like, you've got to know who's
21  actually sending you this stuff. And if you
22  find -- if you find that answer, then you may
23  have a case.
24  Q. When you said you hoped it works out

Page 26

1  in your favor, what did you mean by that?
2      A.  If you find out the information as to
3  who's actually trying to solicit you, if that
4  makes any sense.
5      Q.  Now when you told him it works out in
6  your favor -- you said you had these ongoing
7  issues with this company and it works out in
8  your favor; isn't that what you said?
9      A.  Ongoing issues?  No, I don't believe I
10 said that.
11     Q.  Okay.  So I guess to clarify what you
12 just testified to, when I asked you if it
13 works out in your favor, you said if you can
14 find out the company that sent it to you.
15 What -- what --
16     A.  Right.
17     Q.  I guess I'm confused by --
18     A.  Find out who actually is sending you
19 that information, because this is -- what do
20 you call it?  Robo call.
21     Q.  And so what -- what was your hope to
22 get out of the presuit demand?
23     A.  Oh, I had no expectation.  I was
24 just -- I heard it's illegal.  So it was brand

Page 27

1  new to me.  So...
2      Q.  Were you trying to get a monetary
3  settlement?
4      A.  That's what I was told that you could
5  get, yeah, when I had asked some questions,
6  so...
7      Q.  Was Mr. Mantha interested in getting a
8  monetary demand -- a monetary settlement when
9  you spoke to him?
10     A.  No.  This was -- this was before
11 this -- this stuff happened to him.  He -- he
12 was asking me -- he couldn't believe it was
13 illegal, and I was like, Yeah, apparently it
14 is because this is all -- this was all new to
15 me too.
16     Q.  When you said you had this
17 conversation this summer of 2019 when you were
18 at his house in the pool, was that -- would it
19 be fair to say that that would have been
20 before August of 2019?
21     A.  Yeah, I -- yeah, that makes sense.
22     Q.  Did he -- did he provide you with any
23 information about whether he had been
24 receiving robo calls in the past during this

Page 28

1  conversation?
2      A.  No.  No, he was just curious.
3      Q.  Do you know who brought up the issue
4  of the TCPA?
5      A.  Yeah, it was me who told him about --
6  he had asked me what was going on.  I told him
7  my golf game was going to hell, and I was
8  doing this -- this TCPA thing.
9          It was in the beginning process of it.
10 So I was a little -- I really didn't
11 understand it myself.  So it was very little
12 that I could really explain to him since I was
13 so new to it.
14     Q.  So when you said you were beginning
15 this TCPA process, what was the process that
16 you were hoping to complete?
17     A.  I wasn't hoping to complete any
18 process at that time.  It was just so brand
19 new.  I was just kind of going through the
20 motions at that time.
21     Q.  So what were the motions?
22         I mean, why would you send a presuit
23 demand if you didn't know what you were going
24 to get out of it?

Page 29

1      A.  I guess I don't really -- basically
2  just waiting to hear back to see -- I had no
3  expectations as far as not getting my hopes up
4  if I was getting monetary value.  If I get
5  something, I get something.  If I don't, I
6  don't, I guess.
7          Does that answer your question?
8      Q.  So was the hope you that you were
9  hoping to get something out of it, some
10 monetary compensation out of it?
11     A.  Yeah.  Well, yeah, sure.
12     Q.  And did you -- did you tell Mr. Mantha
13 that you were hoping to get some monetary
14 settlement out of it?
15     A.  Yeah.
16     Q.  Was he interested in that?
17     A.  I wouldn't say interested.  He was
18 just curious.
19     Q.  Did he ask you the steps that you took
20 in setting this up, the presuit demand?
21     A.  No.  I think I just divulged some
22 information about, you've just got to find out
23 who -- who's actually trying to solicit you,
24 who's trying to reach out to you.  So if you

Page 30

1  find out who that is, then you most likely
2  have got something. So...
3     Q. And at that time, he didn't mention
4  anything about whether he had been receiving
5  robo calls or text messages from any
6  companies?
7     A. No, sir.
8     Q. How long was the conversation
9  regarding the TCPA, if you recall?
10    A. It was -- it was kind of all meshed
11 together, as far as what I -- what I was --
12 what I had been doing. He had asked me what I
13 had been up to, and that was like -- probably
14 like one of several things that we discussed,
15 so I really can't put a time on it.
16    Q. The robo calls that you received, were
17 they text messages or phone calls?
18    A. They were phone calls.
19    Q. And what were the phone calls about?
20 Were they insurance? Some other -- mortgages?
21    A. It was about a college loan.
22    Q. Now at that time, did you inform
23 Mr. Mantha that you had counsel who prepared
24 the demand for you?

Page 31

1     A. I think I said my lawyer was on it,
2  doing the -- doing the -- doing what he does.
3     Q. And do you recall when you provided
4  him with your lawyer's information?
5     A. The exact date? No. He had asked
6  me -- yeah, I couldn't give you a date on
7  it.
8     Q. He asked you what? You said he had
9  asked you?
10    A. No. I was just saying what you just
11 said. I'm not really sure when he had asked
12 me for that information.
13       Obviously, it was after that he -- he
14 received that text, so...
15    Q. Why do you say it was obviously after
16 he received the text?
17    A. Because that's when he was curious
18 about text messaging.
19    Q. Did he express curiosity regarding
20 text messaging to you?
21    A. Yes, sir.
22    Q. And when did you --
23    A. Like I said, I don't have a date. I
24 just -- this is obviously after -- the summer

Page 32

1  after we had had that, you know, where we hung
2  out with the kids, but I couldn't tell you a
3  date.
4     Q. So after the conversation at his
5  house, you don't recall whether you had
6  provided your counsel's information at that
7  time to Mr. Mantha?
8     A. No, I didn't -- I didn't provide any
9  counsel information to him at that time; no,
10 sir.
11    Q. Between the time at his house and the
12 time when he received the text message in
13 August, did you have any conversations with
14 him, either by phone or text message,
15 regarding the TCPA?
16    A. Yes, sir.
17    Q. And how often did you speak to him
18 about the TCPA between that time period?
19    A. I think a text to ask me if text
20 messaging counted, because I didn't know. But
21 I wasn't sure, and then a phone call maybe.
22    Q. And you don't -- it's fair to say you
23 don't have that text message any more, right?
24    A. No, no, but it was very basic.

Page 33

1     Q. And do you recall when he sent you
2  that text regarding text messaging?
3     A. No. It was just after, that he
4  apparently received a text message himself.
5     Q. So I guess -- I just want to clarify.
6        What I'm talking about is the period
7  between the time when you're at his house at
8  the pool, right, and then the time when he
9  received the text messages in early August.
10       Were there any communications with you
11 during that time frame regarding the TCPA?
12    A. No, sir.
13    Q. Okay. So the conversations you're
14 talking about were after he received the
15 initial text message from my client?
16    A. Yes, it was a text message. I just
17 don't -- I don't have it, but I remember the
18 basis of it. It asked me, Do text messages
19 count?
20       And I'm like, Maybe, I'm not sure.
21 So...
22    Q. And did you -- did you find out if
23 text messages count?
24    A. I did.

Page 34

1   Q. And how did you find that out?
2   A. I had asked my lawyer.
3   Q. And did you provide that information
4   to Mr. Mantha?
5   A. Yes, I did.
6   Q. And what did you tell him?
7   A. I told him, Yeah, they do count.
8   Q. And did you tell him that via text, or
9   was it over the phone?
10  A. It was through text.
11  Q. And do you know how many text messages
12  you and Mr. Mantha exchanged during this sort
13  of one issue?
14  A. Like I said, I don't have it, but it's
15  just basic and brief.
16  Q. Now, you said there was also a phone
17  call. Was that phone call that you had with
18  Mr. Mantha after he received that text
19  message?
20  A. Yes, I believe so. No, I know so.
21  Sorry.
22  Q. And what was the phone call about?
23  A. I couldn't even tell you.
24  Q. How do you --

Page 35

1   A. I have -- I can't even recollect
2   exactly what we talked about.
3   Q. So you recall there was a phone call
4   discussing the TCPA, but you don't recall what
5   it was about?
6   A. Say that again.
7   Q. Sure. You recall that there was a
8   phone call with you and Mr. Mantha regarding
9   the TCPA, but you don't recall any of the
10  substance?
11  A. No, not really.
12  Q. Did he screenshot the text messages to
13  you that he received from QuoteWizard?
14  A. I don't recall. It's possible. It's
15  just -- it's been a while.
16  Q. Was -- after he received the initial
17  text from QuoteWizard, did you provide your
18  counsel's information to him then at that
19  point?
20  A. After he received -- no, it was -- it
21  was during -- it was when he had asked me the
22  question, and then I had to find -- like, he
23  had asked me if text messaging counts, and I
24  was like, I think so, but I'm not sure.

Page 36

1   So I had checked with my lawyer, and
2   he said, yes.
3   So I texted him back. That was that
4   brief text that I don't have.
5   But I said, Yes, they do count. And
6   if you want to pursue this, like, here's the
7   information to the guy, the lawyer that I
8   have, and, yeah, that was it. It was basic.
9   Q. And the information you provided was
10  to Mr. Washkowitz?
11  A. Yes, sir.
12  Q. And do you recall how you exchanged
13  Mr. Washkowitz's information to Mr. Mantha?
14  A. I'm actually thinking about that right
15  now.
16  I don't know if it was through text or
17  perhaps it was during that phone call, because
18  I don't really remember the phone call. I
19  just know that there was one after that first
20  text that first, you know, going back and
21  forth, but I just can't remember the
22  specifics.
23  Q. Now I understand that you can't recall
24  as you sit here today whether he sent you a

Page 37

1   snapshot of the QuoteWizard text messages.
2   Do you have any memory of what those
3   text messages said?
4   A. No.
5   Q. Did you try to assist Mr. Mantha in
6   determining who was texting him?
7   A. I -- yeah, I don't remember. I'm not
8   really sure.
9   Q. If Mr. Mantha testified that he
10  believed that you did assist him in trying to
11  find out who had texted him, would that shock
12  you or --
13  A. No, no, but I'm not really sure about
14  investigation. I possibly -- if I did see the
15  text, which I may have seen it, I may have,
16  like, looked it up to see if -- where -- where
17  that person was or if it was real.
18  But other than that, no, I -- I don't
19  have any investigative skills in that sense,
20  so I wouldn't know.
21  Q. So you don't recall finding out for
22  him who texted him?
23  A. No, I don't recall specifically,
24  but -- yeah, I'm sorry, I don't remember.

Page 38

1  Q.  That's all right.
2      Do you have access to any sort of
3  databases for phone numbers, you know, to
4  determine, you know, who sent a message from a
5  certain phone number?
6  A.  No, sir.
7  Q.  So just to be clear, if I was going to
8  look up a number, I would probably Google it,
9  411 reverse look-up or something, try to find
10 out who called.
11     Do you have any other databases that
12 you can access that would provide that level
13 of information?
14 A.  No, sir.  I don't have access to
15 something like that.
16 Q.  So as you sit here today, you can't
17 confirm whether it was you that determined
18 that QuoteWizard was a real company for
19 Mr. Mantha?
20 A.  Not with any certainty; no, sir.
21 Q.  But you wouldn't dispute the fact that
22 if Joe testified that it was you that it, in
23 fact, was you?
24 A.  You know, like I said, a Google search

Page 39

1  tops, but nothing like -- when you say
2  "investigative," I think, like, really
3  in-depth.
4      No, I don't believe it was to that --
5  to that extent.  Maybe a Google search, but
6  that's about it.
7      Like I said, I don't remember.
8  Q.  Do you recall having any conversations
9  with Mr. Mantha after it was learned that it
10 was QuoteWizard that sent the text messages to
11 him and what to do next?
12 A.  No, sir.  After I gave him the
13 information about my lawyer, I left it up to
14 them to figure it out.
15 Q.  Did you have any conversations with
16 him regarding, you know, what it was that he
17 planned to do in light of the text messages
18 sent by QuoteWizard?
19 A.  Plan to do?
20 Q.  Sure.  So even after he retained
21 Mr. Washkowitz to represent him with respect
22 to the claim, did he inform you of what, you
23 know, their plan was or anything that they
24 planned to do against QuoteWizard?  Any steps

Page 40

1  they planned to take?
2  A.  No.  I guess it was just implied at
3  that point when we had a conversation after,
4  like, Oh, okay, but not -- nothing we talked
5  about, so...
6  Q.  What was implied?
7  A.  That he was going down the same road
8  that I had previously done and -- yeah.
9  Q.  And that was the presuit demand?
10 A.  Yes.  My presuit?  Yes, yes.
11 Q.  So he was going to go down the same
12 road of sending a presuit demand like you had
13 done; is that right?
14 A.  I guess it was implied, but he didn't
15 specifically say.  There was no conversation
16 where he was, like, All right, I'm going to do
17 X, Y, and Z; my lawyer and I are going to do
18 this.
19     It was just, he was like, Hey, I think
20 I've got something here.
21     I'm like, Okay.
22 Q.  Did he say anything more about what he
23 thinks he had?
24     THE STENOGRAPHER:  I'm sorry,

Page 41

1  was there an objection?
2      MR. BRODERICK:  Yes.  Objection.
3  BY MR. POLANSKY:
4  Q.  You said he thinks he got something
5  here, right?
6  A.  Say that again, sir.
7  Q.  Sure.  Your testimony was you said, I
8  think I got something.  "I" being Mr. Mantha;
9  is that right?
10 A.  Yes, sir.
11 Q.  Did he inform you as to what the
12 something was that he had?
13 A.  No, sir.  Like I said, I just -- it
14 was implied that -- the text message, I took
15 from that conversation, vague conversation, I
16 can't really remember specifics, but that
17 he -- the text message was good and, like, him
18 and his lawyer were going to do, you know, I
19 forget the word, the pre-whatever, but it was
20 not specifically said to me, you know, so...
21 Q.  Has Mr. Mantha kept you informed of
22 sort of the status of his case from time to
23 time?
24 A.  Nothing specific, just vagueness.

11 (Pages 38 - 41)

Page 42

1  Just, yeah, it's coming along, it's still
2  going. Basically, sort of stuff like that.
3     Q. Has he ever discussed with you any
4  issues relating to consent? Consent to
5  receive text messages from QuoteWizard?
6     A. Doesn't -- no, that doesn't sound
7  familiar.
8     Q. Has he -- has he ever discussed any
9  issues with respect to fraudulent consent?
10    A. No, sir.
11    Q. He's never discussed anything relating
12 to fraudulent allegations in this litigation?
13    A. I -- things that I remember? No,
14 nothing like that.
15       He told me about his deposition and he
16 was, like, weirded out about it. He was
17 worried about his name being on a document.
18       But as far as that, there were no
19 specifics on that.
20    Q. When you say he told you about his
21 deposition, did he discuss it with you prior
22 to the deposition?
23    A. He had told me when his deposition was
24 going to be and he was weirded out about it.

Page 43

1     Q. And what was he weirded out by?
2     A. I don't know. He was -- this is all
3  new to him, I guess. He felt uncomfortable
4  with his name on the -- this.
5       (Witness indicating.)
6       So...
7     Q. His name on the case caption?
8     A. Yes, sir.
9     Q. I just couldn't see what you were
10 referring to, but I assume --
11    A. No, no, it's okay. Yeah.
12    Q. Is it -- is what you're referring to,
13 is that the top of the pleading? Does it say
14 Joseph Mantha and other individuals?
15    A. Yes, sir, that's what I'm referring
16 to.
17    Q. Okay. Was that conversation by phone
18 or text message?
19    A. That was by phone.
20    Q. And about how long was that
21 conversation?
22    A. I couldn't put a time on it. A
23 couple -- a few minutes.
24    Q. And did he call you, or did you call

Page 44

1  him?
2     A. He could have called me. I think he
3  did call me. I don't know for certain.
4     Q. Did he discuss with you anything that
5  he expected to come up in the deposition?
6     A. No, no, nothing like that. He just
7  felt uncomfortable, yeah, so...
8     Q. And he felt uncomfortable because his
9  name was on the pleading?
10    A. He thought that was weird seeing that,
11 but I don't think that -- from what I could --
12 from what I could understand, he wasn't
13 looking forward to the deposition, just like
14 I'm not today, probably.
15    Q. And when you say he felt
16 uncomfortable, what did he feel uncomfortable
17 about, if he said anything?
18    A. I really don't remember how he
19 described it or if there was any description
20 about it.
21       I just -- I kind of just felt that,
22 okay, yeah, this is all new and this is kind
23 of weird, like I feel right now. I think he's
24 feeling the same thing I'm feeling right now.

Page 45

1     Q. Which is what?
2     A. Like, weird, like I'm in trouble, like
3  I'm in front of the principle like I did
4  something wrong.
5     Q. Well, I hope you don't look at me like
6  the principle.
7     A. Well, it's kind of like that. You
8  know, you seem like a good guy, but I'm
9  just -- this is all weird to me, so...
10    Q. I get it.
11       And you understand I'm using sort of
12 what you tell me to further explore, right?
13       So when you say he felt uncomfortable,
14 it's my job to sort of ask you what that
15 means. You know?
16    A. No, I understand. And I can't give
17 you, like, an answer for that because he never
18 gave any specifics. But I kind of feel what
19 he's feeling right now. I guess I can kind of
20 relate. I don't know if it's true or not.
21 But...
22    Q. Sure. Now, before you had the
23 conversation regarding his impending
24 deposition, approximately how many times have

Page 46

1  you discussed this case with him over the
2  course of it?
3     A.  Before today?
4     Q.  Before his deposition. So his
5  deposition was back in July.
6     A.  Oh. Yeah, it -- we may have talked --
7  yeah, I don't know. I can't put a number on
8  it, but once or twice maybe. I'm not really
9  sure.
10    Q.  And did he give you any sort of
11  details on how it was going? What the status
12  was?
13    A.  No. It was just delay, delay, and,
14  yeah, no specifics though.
15    Q.  Did he say what was delayed?
16    A.  No, not specific. Like the process,
17  and I just didn't really -- I didn't ask
18  anything, like, to question that.
19       I was, like, Oh, okay, must be a
20  lawyer thing.
21    Q.  Did he discuss with you any
22  discussions regarding settlement?
23    A.  No, sir, nothing like that.
24    Q.  Anything about monetary value?

Page 47

1     A.  No, sir. No, no figure or anything
2  like that, no.
3     Q.  Did he discuss with you any
4  allegations that are -- strike that.
5        Has he ever discussed with you any
6  allegations that he entered his personal
7  information into a website called
8  SnappyAutoInsurance.com in 2019?
9     A.  Could you repeat that question,
10  please.
11    Q.  Sure. Has he ever discussed with you
12  allegations that he entered his personal
13  information onto a website called
14  SnappyAutoInsurance.com?
15    A.  No, I don't recall, no.
16    Q.  So he's never discussed anything
17  related to that web suit or web suit --
18  website relating to issues involving whether
19  he provided consent to receive the text
20  messages at issue?
21    A.  Not -- I don't specifically remember
22  that. Could be, but I just -- I don't
23  remember. It was a while ago, and it's not
24  something I -- in all honesty, it's not really

Page 48

1  important for me to retain, I guess. But it's
2  possible, I just don't remember.
3     Q.  And it's fair to say that you've never
4  gone on the SnappyAutoInsurance.com website
5  for him in 2019; is that right?
6     A.  Not that I know of. No, sir. It
7  doesn't sound familiar.
8     Q.  Has he ever forwarded you any case
9  documents in this case?
10    A.  No, sir.
11    Q.  Now after he sent the presuit demand,
12  did he advise you that he was going to file
13  litigation involving the claim?
14    A.  I don't even remember a conversation
15  where he sent the demand. It's not really
16  those type of conversations.
17       You just -- yeah, we're going with it.
18  His verbiage is a lot different from yours.
19       He was like, Yeah, my lawyer and I are
20  going to explore it. We'll see what happens.
21       But nothing specific about the case
22  itself, yeah.
23    Q.  Now, you said you spoke to Mr. Mantha
24  prior to the deposition. Right?

Page 49

1     A.  Text message, yeah, that last text
2  message.
3     Q.  Well, let's take a look at the text
4  message, which is Exhibit 3.
5     A.  Yes, sir, I've got a copy of it. I'm
6  looking at it right now.
7     Q.  So if you look at the text message,
8  it's dated July 26; is that right?
9     A.  Yes, I see it.
10    Q.  And this is a message that you sent to
11  him, right?
12    A.  Yes. Yes, sir.
13    Q.  So there was a conversation with him
14  prior to sending this text message, because I
15  think it's fair to say that you were already
16  aware that there was going to be a deposition
17  happening before you sent this text; is that
18  right?
19    A.  Yes, sir, you're correct.
20    Q.  So that conversation is the one you
21  just told me about, right?
22    A.  I don't know if that was the exact
23  conversation, but -- no, I can't tell you if
24  it was or wasn't. I don't remember.

Page 50

1  Q. Does anything stick out to you
2  regarding that conversation prior to you
3  sending this text?
4  A. Nothing that sticks out.
5  Oh, this text?
6  The only thing, he told me that maybe
7  a week before, but -- I can't even be positive
8  about the time -- but, yeah, I've got my
9  deposition coming up. And I just remembered
10 it was that day and I just sent him a text.
11 Q. Now, in your text, you say, "Show no
12 fear, Joseph. It ain't nothing."
13 Now, you've never been involved in a
14 deposition, right?
15 A. No.
16 Q. So what was the purpose of saying "It
17 ain't nothing"?
18 A. Telling him to relax, because like I
19 said before, seeing his name kind of weirded
20 him out, and he had already expressed that the
21 deposition was kind of like making him
22 uncomfortable, so...
23 Q. So did he -- after the deposition was
24 over, did he text you?

Page 51

1  A. No. No, sir.
2  Q. Did he call you?
3  A. No, sir.
4  Q. He didn't -- he didn't give you a buzz
5  and tell you how it went?
6        MR. BRODERICK: Objection.
7  A. No, sir.
8  BY MR. POLANSKY:
9  Q. And what about you? I mean, so you
10 sent a text message, good luck tomorrow. Did
11 you follow-up with him and say, Hey, how did
12 things go yesterday or today?
13 A. Yeah, I don't think so. I don't think
14 so, no.
15 Q. He didn't call you after and say, Hey,
16 by the way, your name came up quite a bit at
17 the deposition?
18 A. No.
19 Q. He didn't outline for you what he
20 testified to regarding conversations he had
21 with you?
22        MR. BRODERICK: Objection.
23 BY MR. POLANSKY:
24 Q. You can answer.

Page 52

1  A. No, sir.
2  Q. Did you read his deposition transcript
3  before today?
4  A. No. I don't have access -- no, no.
5  Oh, this -- no. His deposition? No, no.
6  Q. So as you sit here today, you don't
7  have any memory that he informed you of what
8  was discussed or what he testified to
9  regarding his deposition?
10       MR. BRODERICK: Objection.
11 A. He has never discussed that, no. I
12 haven't talked to him in a while, so no.
13 BY MR. POLANSKY:
14 Q. Do you recall speaking to Mr. Mantha
15 on August 19, 2019?
16 A. I don't. The date doesn't pop out.
17 No, sir, I don't.
18 Q. August 22nd?
19 A. 19th? 22nd? I don't recall.
20 Q. 29th?
21 A. No, sir, I can't -- I can't recall
22 those dates specifically as -- but that sounds
23 like a lot.
24 So we -- we don't usually talk. So,

Page 53

1  like I said, we have busy lives now, but those
2  dates don't pop out.
3  Q. Right. And I guess that's why I'm
4  asking that, because based on your earlier
5  testimony, it doesn't sound like you talked
6  all that often. But, you know, we got his
7  call records and it shows that, you know, when
8  and how long you spoke to him, and there's
9  quite a few during that time frame.
10 Do you recall what those conversations
11 were relating to?
12 A. No. And I'm actually surprised,
13 because like I said, I don't talk to him a
14 lot. So...
15 Q. What about September 12th?
16 A. No. I can't recall these dates.
17 Q. Let me ask you a couple of other
18 questions, whether you know any of these
19 people or entities. Okay?
20 A. Okay.
21 Q. Have you ever heard of QuoteWizard
22 before today?
23 A. No, I don't believe so.
24 Q. When you were discussing the text

Page 54

1  messages received by Mr. Mantha, you have no
2  memory of telling him QuoteWizard was a real
3  company?
4      A.  I don't recall the specific company.
5  But like I said, I possibly could have Googled
6  whatever that -- Wizard, whatever you just
7  said.  But I don't recall the specific, and I
8  don't want to get it wrong, so...
9      Q.  Have you ever heard of the company
10 Plural Marketing Solutions?
11     A.  Doesn't come to mind, no.  No, sir.
12     Q.  And so it's fair to say you haven't
13 discussed that company with Mr. Mantha?
14     A.  That would be correct.  No, I don't
15 know anything about that company.
16     Q.  And I apologize in advance.  It's
17 going to be the same line of questioning for
18 all of these companies to see if --
19     A.  Sir, it's fine.
20     Q.  Have you ever heard of Rev Point
21 Media?
22     A.  No, sir.
23     Q.  And fair to say you've never spoken to
24 Mr. Mantha about Rev Point Media?

Page 55

1      A.  That's correct.
2      Q.  Have you ever heard of George Rios?
3      A.  No, sir.
4      Q.  Peter Petrof?
5      A.  No, sir.
6      Q.  Mario Carreiro?
7      A.  No, sir.
8      Q.  Nicholas Banks?
9      A.  No, sir.
10     Q.  Blue Flame Marketing?
11     A.  Going back to Nicholas Banks, is
12 that -- it could possibly be his wife's
13 brother.  I just can't remember.  Is that
14 where we're going with this?
15     Q.  Well, that's who it is, yeah.
16     A.  So I've heard of the name, yeah.
17 Yeah, I've heard of his name before.
18     Q.  Have you ever met him?
19     A.  I don't believe so, and if I did it
20 was a long time ago.
21     Q.  Blue Flame Marketing?
22     A.  No, sir.
23     Q.  How about Justin Cohen?
24     A.  Justin Cohen?  For some reason, that

Page 56

1  name sounds familiar, but I can't put a face
2  to the name.
3      Q.  Is it possible you spoke to Mr. Mantha
4  about a Justin Cohen?
5      A.  It doesn't jog a memory, no.  No,
6  sir.
7      Q.  What about Adam Brown?
8      A.  No, sir.
9      Q.  So all of these people I just listed,
10 is it fair to say that you haven't spoken to
11 Mr. Mantha regarding any of these individuals
12 or entities?
13     A.  No, sir, you would be correct.
14         MR. POLANSKY:  Let's take a
15 two-minute break.  I might be done.  Just give
16 me a few minutes or so to go through my notes.
17 Okay?
18         THE WITNESS:  Yes, sir.
19         THE VIDEOGRAPHER:  Off the
20 record, 11:05 a.m.
21
22         (Recess taken from 11:05 a.m.
23         to 11:11 a.m.)
24

Page 57

1          THE VIDEOGRAPHER:  We are back
2  on the record at 11:11 a.m.
3  BY MR. POLANSKY:
4      Q.  Mr. Novia, not too much more, probably
5  five or so minutes.
6      A.  Yes, sir.
7      Q.  Have you ever heard of the website
8  called SnappySurveys.com?
9      A.  Is that -- possibly.  Is that
10 something that you can get money for?  As far
11 as taking surveys and then they pay you?
12     Q.  It could be.  I don't know.
13     A.  Okay.  If that -- if that is, that's
14 possible.  I think I've signed up for
15 something like that before.
16     Q.  Do you know whether Mr. Mantha has
17 signed up for anything on SnappySurveys.com?
18     A.  I wouldn't know that, sir.  I
19 couldn't -- he never told me anything like
20 that.
21     Q.  Has he ever discussed that website
22 with you?
23     A.  No, sir.  Like I said, I'm not even
24 familiar with that website.  But when you said

Page 58

1  "surveys," I -- I remember something from a
2  while back where I was just seeing how much
3  you could make with surveys. So...
4      Q. What about UnitedQuotes.com? Have you
5  heard of that site?
6      A. No, sir.
7      Q. Did you ever discuss with Mr. Mantha
8  his interest, if he had any, in obtaining
9  automobile insurance quotes?
10     A. No, sir. It doesn't come to mind.
11     Q. When he received the text messages
12 from QuoteWizard relating to auto insurance,
13 did he say anything about the subject matter
14 of the text, whether he had or hadn't
15 requested any sort of auto insurance quotes?
16     A. I don't recall. I don't recall.
17     Q. Did he --
18     A. I don't recall that.
19     Q. Did he say anything regarding whether
20 this is something he did or didn't sign up
21 for?
22     A. I can't recall. I'm sorry.
23     Q. When he received the text messages
24 from QuoteWizard, did he ask you how to

Page 59

1  respond to them?
2          MR. BRODERICK: Objection.
3      A. No. I think it was just an initial
4  question, because I wasn't 100 percent sure
5  that it was illegal because I had only done it
6  over the phone, you know, through my
7  experience.
8          So -- but, no, not -- not that
9  specific. I think -- I think it was just that
10 dialogue where I texted back "yes" after I had
11 talked to my lawyer, nothing specific.
12 BY MR. POLANSKY:
13     Q. Did you have any communications with
14 Mr. Mantha regarding the fact that he did
15 respond to the text messages to schedule a
16 meeting with the entity texting him?
17     A. It's possible. I just don't remember.
18 I think it perhaps may have been through a
19 text, but I just can't remember.
20     Q. Did you ever have any discussions with
21 Mr. Mantha about opting in to receive either
22 text messages or calls via websites?
23     A. Opting in? I don't 100 percent
24 understand that question. Could you repeat

Page 60

1  that?
2      Q. Sure. Yes.
3          So sometimes when you go on a website,
4  right, it asks you before your signature to
5  click a button, it says, you agree to receive,
6  you know, promotional materials or whatever
7  else.
8      A. I know that box, yeah.
9      Q. Have you ever -- did you ever discuss,
10 you know, whether you received certain
11 messages via either phone calls or text
12 messages as a result of clicking that opt-in
13 button?
14     A. No. No, not specifically.
15     Q. Did you -- did you ever give
16 Mr. Mantha any advice on how to go about
17 determining who was sending him the text
18 messages?
19     A. I was so new to it myself, I was just,
20 like, basically you've just got to try to --
21 my understanding of what it was, you have to
22 find out who is actually trying to send you
23 the stuff and, yeah, I mean, my -- like I
24 said, my extent is a Google search. That's

Page 61

1  basically what -- what I would know and what I
2  would do. So...
3      Q. Is it fair to say that you've never
4  had access to either his phone or computer?
5      A. No, sir, I've never had access to his
6  phone or computer.
7      Q. And again, just to confirm, did you
8  ever have any conversations with Mr. Mantha
9  about whether he knew who QuoteWizard was and
10 whether he signed up to receive any sort of
11 text messages or calls with them?
12         MR. BRODERICK: Objection.
13     A. No, I don't recall. Like I said, I
14 don't -- I mean, I would imagine now, just
15 from talking, that it's QuoteWizard.
16         But I don't recall QuoteWizard itself.
17 So, no, these -- I have no recollection of
18 these conversations, no.
19         MR. POLANSKY: I think that's
20 all I have.
21         Thank you very much for your time.
22         THE WITNESS: Yes, sir.
23         MR. POLANSKY: Mr. Mantha, your
24 counsel may have questions for you.

16 (Pages 58 - 61)

Page 62

1  MR. BRODERICK: No, I don't have
2  any questions, but thank you very much for
3  your time.
4  MR. POLANSKY: Thank you very
5  much for your time.
6  the WITNESS: Yes, sir.
7  THE VIDEOGRAPHER: Off the
8  record, 11:17 a.m.
9  THE STENOGRAPHER: Before you
10 hang up, will you be ordering a transcript?
11 MR. BRODERICK: Yes, please.
12 I'll take a transcript.
13 MR. POLANSKY: I'll take a
14 transcript as well.
15 THE STENOGRAPHER: Thank you.
16
17 (Deposition concluded at 11:17 a.m.)

Page 63

1  CERTIFICATION
2  I, DARLENE M. COPPOLA, a Notary Public, do hereby
3  certify that STEVEN NOVIA, after having satisfactorily
4  identifying himself, appeared remotely on the 1st day
5  of September, 2020, in Framingham, Massachusetts, and
6  was by me duly sworn to testify to the truth and
7  nothing but the truth as to his knowledge touching and
8  concerning the matters in controversy in this cause;
9  that he was thereupon examined upon his oath and said
10 examination reduced to writing by me; and that the
11 statement is a true record of the testimony given by
12 the witness, to the best of my knowledge and ability.
13    I further certify that I am not a relative or
14 employee of counsel/attorney for any of the parties,
15 nor a relative or employee of such parties, nor am I
16 financially interested in the outcome of the action.
17    WITNESS MY HAND THIS 15th day of September, 2020.
18
19
20 Darlene M. Coppola
21 DARLENE M. COPPOLA       My commission expires:
22 NOTARY PUBLIC            November 11, 2022
23 REGISTERED MERIT REPORTER
24 CERTIFIED REALTIME REPORTER

Page 64

1  Edward A. Broderick, Esq.
2  ted@broderick-law.com
3          September 15, 2020
4  RE:  Joseph Mantha v. Quotewizard.Com LLC
5     9/1/2020, Steven Novia (#4237832)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 65

1  Joseph Mantha v. Quotewizard.Com LLC
2  Steven Novia (#4237832)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Steven Novia                    Date
25

Page 66

1  Joseph Mantha v. Quotewizard.Com LLC
2  Steven Novia (#4237832)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Steven Novia, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____   _____
12  Steven Novia              Date
13  *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25