# EXHIBIT 12

```
 1
 2   UNITED STATES DISTRICT COURT
 3   FOR THE DISTRICT OF MASSACHUSETTS
 4   -------------------------------------x
 5   JOSEPH MANTHA on behalf of
     themselves and others similarly
 6   situated,
 7                  Plaintiff,
 8   v.                      Case no. 1:19-cv-12235
 9   QUOTEWIZARD.COM, LLC,
10   Defendant.
11   -------------------------------------x
12                  12:30 p.m.
                    July 28, 2020
13
14            VIDEOTAPED VIRTUAL DEPOSITION of LEAD
15   INTELLIGENCE INC., by and through MICHAEL FISHMAN,
16   a non-Party in the above entitled matter, pursuant
17   to Subpoena, before Stephen J. Moore, a Registered
18   Professional Reporter, Certified Realtime Reporter
19   and Notary Public of the State of New York.
20
21
22
23
24
25
```

Page 2

1        MICHAEL FISHMAN
2  A P P E A R A N C E S:
3    BRODERICK LAW PC
4        Attorneys for Plaintiffs
5        208 Ridge Street
6        Winchester, MA 01890
7
8    BY:   EDWARD A. BRODERICK, ESQ.
9    NELSON MULLINS RILEY & SCARBOROUGH
10       Attorneys for Defendant
11       One Post Office Square
12       Boston, MA 02109
13
14   BY:   KEVIN POLANSKY, ESQ.
15   KLEIN MOYNIHAN TURCO LLP
16       Attorneys for RevPoint Media, LLC.
17       450 Seventh Avenue
18       New York, NY  10123
19
20   BY:   EVAN KING, ESQ.
21
22
23
24
25

Page 3

1        MICHAEL FISHMAN
2  EXAMINATION BY                   PAGE
3  MR. BRODERICK                  6    6
4  MR. POLANSKY                  55    8
5
6        E X H I B I T S
7
8  EXBT 19  RevPoint subpoena response    43  15
9    combined
10 EXBT 20  Letter                        49  16
11 EXBT 21  PDF Quotewizard_mantha        49  16
12 EXBT 22  Subpoena response             51  13
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        MICHAEL FISHMAN
2        THE VIDEOGRAPHER:  We are on the
3  record, the time is approximately 12:33
4  p.m. on Tuesday July 28, 2020.
5        Please note the microphones are
6  sensitive and will pick up whispering and
7  private conversations and cell
8  interference.
9        Please turn off all cell phones or
10 place them away from your computer as they
11 will interfere with the audio.
12       Audio and video recording will
13 continue to take place unless all parties
14 agree to go off the record.
15       This is media unit 1 of the video
16 recorded deposition of Michael Fishman
17 taken by the counsel for the Plaintiff in
18 the matter of Joseph Mantha on behalf of
19 themselves and all others simply situated
20 versus Quotewizard.com LLC.
21       The case is filed in the U.S.
22 District Court for the District of
23 Massachusetts, case number 1:19-CV-12235.
24       The deposition is being held via
25 teleconference.

Page 5

1        MICHAEL FISHMAN
2        I am Ken Williamson for the firm
3  Veritext New England, I am the
4  videographer.
5        Our court reporter, is Stephen
6  Moore for the firm Veritext New York.
7        Please note I am not authorized to
8  administer an oath, I am not related to
9  any party in this action, nor am I
10 financially interested in the outcome.
11       Counsel, please identify yourselves
12 for the record and please start with the
13 noticing attorney.
14       MR. BRODERICK:  Good morning, Mr.
15 Fishman, I am Edward Broderick, I
16 represent the Plaintiff, Joseph Mantha.
17       MR. POLANSKY:  Good afternoon Mr.
18 Fishman, I am Kevin Polansky and I
19 represent Quotewizard.
20       MR. KING:  Evan King, counsel for
21 RevPoint and counsel for the witness.
22       MR. LANDAU:  Please swear in our
23 witness.
24
25 MICHAEL    FISHMAN,    called as

2 (Pages 2 - 5)

Page 6

```
 1             MICHAEL FISHMAN
 2    a witness, having been first duly sworn by
 3    the Notary Public, was examined and
 4    testified as follows:
 5
 6  EXAMINATION BY
 7  MR. BRODERICK:
 8
 9      Q    Mr. Fishman, can you state
10  your -- actually, first let me give you some
11  ground rules.
12           Have you ever been deposed
13  before, Mr. Fishman?
14      A    I have not.
15      Q    So, just to keep a clear record,
16  and particularly since we are over Zoom, I am
17  going to ask that you let me finish my question
18  entirely, and I will try to do the same and not
19  jump into the middle of your answer because it
20  drives the -- it will drive Mr. Moore crazy
21  trying to take down the record.
22           Even though he is in that harbor
23  that we can see him sitting in, it gets
24  aggravating.
25      A    Fair enough.
```

Page 7

```
 1             MICHAEL FISHMAN
 2      Q    And can you give me -- state
 3  your full name for the record?
 4      A    My full name, Michael Alex
 5  Fishman.
 6      Q    And how long have you worked for
 7  RevPoint?
 8      A    Approximately eight years.
 9      Q    What's your job title there?
10      A    CEO.
11      Q    What did you do before you
12  started at RevPoint?
13      A    I've been in digital marketing
14  ultimately my entire career.
15      Q    And did you found RevPoint, are
16  you the owner as well?
17      A    I am.
18      Q    Do you have partners in the
19  business?
20      A    Not active.
21      Q    What does RevPoint do?
22      A    RevPoint Media is a software and
23  lead acquisition and distribution marketplace.
24      Q    In layman's terms for the
25  non-digital marketer, what does that mean?
```

Page 8

```
 1             MICHAEL FISHMAN
 2      A    So, we help facilitate leads
 3  that are captured from entities and help
 4  distribute them to end service providers.
 5      Q    What is the relationship, if
 6  any, between RevPoint and Quotewizard.com?
 7      A    We were a provider of leads to
 8  Quotewizard.
 9      Q    You say in the past tense, are
10  you no longer a provider of leads?
11      A    We have not provided them with
12  leads in -- I'm not exactly sure, but in many
13  months.
14      Q    Did you have a contract with
15  Quotewizard?
16      A    Yes, we did.
17      Q    And why did the relationship
18  end?
19           MR. POLANSKY:  Objection.
20           MR. KING:  I object as to form,
21      unless -- when you hear the word
22      objection, unless I instruct you not to
23      answer, you can still answer.
24           THE WITNESS:  Okay, so I can
25      answer, or no?
```

Page 9

```
 1             MICHAEL FISHMAN
 2           MR. KING:  Yes, you can answer.
 3      I'm sorry.
 4      A    I actually don't know exactly
 5  why the relationship ended.
 6      Q    Was it because of this lawsuit,
 7  do you know?
 8           MR. KING:  Objection as to form.
 9           MR. POLANSKY:  Objection.
10      A    That is not my recollection.
11      Q    Is it fair to say that RevPoint,
12  when you were working with Quotewizard you
13  would provide them with potential leads for
14  telemarketing purposes?
15      A    I don't know what the leads --
16  what the purpose of the leads were for
17  Quotewizard.
18           So I don't know that they were
19  used for telemarketing purposes.
20      Q    Okay.
21           But you just sold them leads.
22           Does RevPoint do anything to
23  ensure that leads that it's providing -- did
24  you do anything to ensure that leads you were
25  providing to Quotewizard had -- that the people
```

Page 10

```
 1              MICHAEL FISHMAN
 2  whose information was being sold had consented
 3  to receive calls or texts under the TCPA?
 4       A    Our technology verifies that
 5  certain criteria is met from the sources, that
 6  there is a consent text that is provided along
 7  with the lead, and we also in certain
 8  circumstances will verify that a -- that a lead
 9  ID is passed with or a trusted form certificate
10  is passed with the lead.
11       Q    When you say a lead ID, is that
12  a Jornaya lead ID?
13       A    Yes, correct, a Jornaya lead ID.
14       Q    And trusted form is a different?
15       A    Is a different service.
16       Q    I'm just going to show you, do
17  you have your Exhibit Share set up?
18       A    I do.
19       Q    This is one of the nice things
20  of working with somebody who is in technology,
21  it's a lot easier.
22       Q    Are you designated to testify
23  today on behalf of RevPoint Media LLC?
24       A    I am.
25       Q    And are you the person most
```

Page 11

```
 1              MICHAEL FISHMAN
 2  knowledgeable about the lead that was sold to
 3  Quotewizard?
 4       A    Yes.
 5       Q    How much does RevPoint get paid
 6  for a -- how much did you get paid for the lead
 7  related to Joseph Mantha?
 8            MR. POLANSKY:  Objection.  Before
 9       you answer, I mean is that part of the
10       notices?  The notice that was
11       identified?
12       I don't see it on the topics of
13       examination.
14            MR. KING:  Yes, I object as well.
15            MR. BRODERICK:  I will just take
16       a look here, I've got it open.
17            Any purchase or sale of Mr.
18       Mantha's purported consent lead by
19       RevPoint Media LLC.
20            MR. POLANSKY:  Sure, and I
21       understand that to mean whether it was
22       purchased or sold by RevPoint, but not
23       for value.
24            I mean I don't see what the price
25       of purchasing a lead has anything to do
```

Page 12

```
 1              MICHAEL FISHMAN
 2       with this case.
 3            MR. BRODERICK:  Well, I think
 4       it's within the topic.
 5            Unless you are going to instruct
 6       not to answer I will let the question
 7       stand.
 8            MR. POLANSKY:  I will object.
 9            MR. KING:  I will object as well,
10       but I won't instruct.
11            You can answer.
12       A    I don't even have that in front
13  of me; so I don't know.
14       Q    Do you know what's generally the
15  cost?  I mean you are not getting $100 per
16  lead, I take it?
17       A    I am not getting $100 per lead.
18            I would say it's drastically
19  lower than that, but I don't know because the
20  pricing per lead is dynamic.
21       Q    Is that set through an API
22  system?
23       A    Yes; through what's called a
24  ping/post.
25       Q    What are the factors on which
```

Page 13

```
 1              MICHAEL FISHMAN
 2  your pricing depends?
 3       A    I'm not sure I understand the
 4  question.
 5       Q    Well, you say the pricing is
 6  dynamic.  I assume that there is -- what is the
 7  dynamic in the pricing, I guess is what I'm
 8  asking?
 9       A    Well, that price is determined
10  by Quotewizard, I don't have any understanding
11  of how they are determining pricing.
12       Q    Do you have a set minimum that
13  you are willing to sell a lead for?
14       A    Sometimes; it depends.
15            I don't know if there was one
16  set in this case, I have no -- that's not a
17  standard practice.
18       Q    Can you give me a ballpark of
19  what the -- when you ping and post, are you
20  pinging and posting only to one potential
21  buyer, or is that posted to many and anyone can
22  bid on it, on the API?
23       A    The ping is sent to multiple
24  buyers, that does not include any PII
25  information.
```

4 (Pages 10 - 13)

Page 14

MICHAEL FISHMAN

The post is only sent to one buyer.

Q  And that is the buyer who responds with an offer to buy the lead?

A  No. The offer to buy -- there is a bid on a ping, so information is sent, there is a bid.

If the bid is accepted, then the lead is sent in the post and that is the agreement to purchase that lead.

And possibly, by the way, because the post then could be rejected as well.

Q  Right.

And just give me a ballpark, are we talking 10 cents a lead or $1 a lead for the Mantha lead?

MR. POLANSKY: Objection.

MR. KING: Objection, I think that's kind of explained as best he could, but you can answer.

A  I don't know, I wouldn't want to speculate on the price.

Q  I'm not going to hold you to a

Page 15

MICHAEL FISHMAN

price, I'm just trying to get a universe.

A  I mean it could be -- I would say that 10 cents is probably not realistic and I would say that $30 is not realistic.

But that's a very wide range of potential for pricing.

Q  Got it.

What is the relationship between RevPoint and Plural Marketing Solutions, if any?

A  Plural was a lead provider into the RevPoint lead marketplace.

Q  How long did RevPoint work with Plural?

A  I think somewhere around ten months.

Q  And when did you stop working with Plural?

A  Soon after we learned of this complaint.

Q  So, is it fair to say that RevPoint was not involved -- had no connection to the website that -- on which this lead for Mr. Mantha was purportedly created?

Page 16

MICHAEL FISHMAN

A  Yes, that's fair to say.

Q  And do you have any understanding of whether Plural was directly involved with that website?

A  I have no understanding of that.

Q  Okay.

Who did you -- with whom, if anyone, did you work at Plural for employees?

A  The only contact that we have over there is George Rios.

Q  Do you know how to spell that last name?

A  I don't.

I would be speculating on the spelling of his name.

Q  Can you say it again?

A  Rios, if you want just R-i-o-s; maybe.

Q  Okay, sure. I couldn't quite hear you.

What is your understanding of what Plural provided to RevPoint?

MR. POLANSKY: Objection; when?

Q  What did they provide -- when

Page 17

MICHAEL FISHMAN

they provided you with a lead, what would you get?

MR. POLANSKY: Are you asking in general, or in this case?

I can't hear you, Ted.

Q  Sorry.

For the Mantha lead, what was provided to RevPoint by Plural, if anything?

A  Do you mean at the point of the initial lead, or in general?

Q  At the point of the initial lead, then we will get to other points.

A  I mean this was a ping/post relationship, so they would have pinged the RevPoint marketplace with information without any PII and then they would have received a bid and then they would have posted that lead into RevPoint's marketplace.

Q  Okay. When you say PII, that's personal identifying information?

A  Correct.

Q  So would you get a -- when your system was pinged by Plural with the Mantha lead, what data does your API system see?

Page 18

MICHAEL FISHMAN

1  MICHAEL FISHMAN
2  A   I don't know specifically,
3  because every API integration might be a little
4  different.
5      So if we are talking
6  specifically auto insurance, it might be make
7  and model of a vehicle, it might be a zip code.
8      These are -- I can only
9  speculate on this particular API integration on
10 what's being provided.
11      But those are some examples of,
12 you know, data that would be provided within a
13 ping.
14 Q   Got it, got it.
15     And what is the PII that is not
16 provided when you get this?
17 A   No, no.
18 Q   I was actually asking what is
19 the -- what is PII in that context?
20 A   So, PII would include name,
21 address, e-mail, phone number.
22 Q   Is the IP address from which the
23 lead was created PII?
24 A   I don't know that we define that
25 as PII.

Page 19

MICHAEL FISHMAN

1  MICHAEL FISHMAN
2      I am not sure if that is
3  provided on the ping or the post.
4      I don't know that I've ever
5  classified that as PII in conversation.
6      But that's -- but I would have
7  to look up whether we are receiving IP on the
8  ping and the post.
9  Q   Also on the ping or the post is
10 the URL of the website on which the lead was
11 purportedly collected, is that provided on the
12 ping?
13 A   That depends on the integration.
14     I don't know what the case was
15 specific for this.  Website URLs are not
16 standardized, and masking of them is.
17     So, I -- in order to try and
18 avoid circumvention.
19     So I'm not sure what the
20 specifics of this lead were on whether --
21 sometimes it's not provided at all and
22 sometimes it is.
23 Q   Okay.
24     And then after your marketplace
25 purchases the lead, purchased the lead from

Page 20

MICHAEL FISHMAN

1  MICHAEL FISHMAN
2  Mantha from Plural, then what happens?
3  A   Well, the marketplace for Jangl
4  only purchases a lead if it has an opportunity
5  to distribute it, to sell it.
6      So, that transaction takes in
7  Jangl's marketplace, RevPoint Media's
8  marketplace, only takes upwards of 30 seconds.
9      So that lead would have been
10 acquired and then sent to Quotewizard.
11 Q   You said Jangl is that
12 J-a-n-g-l?
13 A   Yes.
14 Q   What is that?
15 A   That is the name of our
16 technology that allows ping/post.
17 Q   Is that technology, or is that
18 software?
19 A   Yes.
20 Q   And did you develop that
21 software yourself?
22 A   Yes.
23     Well, I did not personally
24 develop that software myself, but RevPoint
25 Media did.

Page 21

MICHAEL FISHMAN

1  MICHAEL FISHMAN
2  Q   Do you have computer programmers
3  that work for you?
4  A   Yes.
5  Q   Do you know who Adam Brown is?
6  A   I do not.
7  Q   Have you ever dealt with a
8  company called Request Path Media?
9  A   Not to my knowledge, no.
10 Q   How about Blue Flame marketing?
11 A   Not to my knowledge, no.
12 Q   Anything that sounds like that?
13 A   I mean there are a lot of
14 companies that have the word blue in them, I
15 don't know Blue Sky, I can't -- I mean anything
16 with blue in it might ring a bell.
17     It's certainly something we can
18 look up, but I don't have any knowledge of
19 those companies.
20 Q   Okay.
21     How about Justin Cohen?
22 A   Doesn't ring a bell.
23 Q   Does RevPoint buy or are you
24 aware of buying leads that were generated on a
25 website called SnappyAutoInsurance.com?

6 (Pages 18 - 21)

Page 22

MICHAEL FISHMAN

2  A   Not until after this complaint.
3  Q   But before this complaint that
4  was not a website you were familiar with?
5  A   No.
6  Q   How about unitedquotes.com?
7  A   Yes, I was familiar with that
8  site.
9  Q   And do you know what company
10 owns that domain, unitedquotes.com?
11 A   I don't.
12 Q   How were you familiar with
13 unitedquotes.com?
14 A   The site was provided for us to
15 vet -- at some point it was provided to us as a
16 lead generation website.
17      That's about all the knowledge I
18 have of that particular website.
19      I don't remember much more than
20 that, other than I remember that website being
21 provided as something for us to look at as a
22 lead generation website.
23 Q   Do you know when that was that
24 you vetted the unitedquotes.com website?
25 A   I couldn't recall.  More than a

Page 23

MICHAEL FISHMAN

2  year ago, or possibly within a year.
3      A long time ago, it hasn't --
4  not recently.
5  Q   Was it in connection with this
6  lawsuit?
7  A   No.
8  Q   What did you do or what do you
9  do to vet a website, as you said?
10 A   In most cases we actually
11 provide that to the lead purchaser to allow
12 them to take a look at that website.
13 Q   Right, but do you just get a
14 link to the website, or is there something more
15 to vet?
16 A   No, it's mainly just a link.
17 Q   Do you check TCPA disclosure
18 language on those websites?
19 A   We will -- it's not standard
20 practice for us to do that, but we will take a
21 look.
22      But no, mainly we would be, if
23 that was requested, then we would provide that
24 link.
25 Q   Okay, is the company called --

Page 24

MICHAEL FISHMAN

2  are you familiar with a company named Seal Dog
3  Media?
4  A   I am not.
5  Q   Have you had any conversations
6  with anyone at Plural about this lawsuit?
7  A   No, other than notifying them of
8  the Complaint after it occurred.
9  Q   Who provided that Complaint to
10 you?
11 A   Someone at Quotewizard.
12 Q   Who was that?
13 A   I think Matthew, I am trying to
14 remember his last name, Weiss.
15 Q   Matthew Weeks?
16 A   Yes; correct.
17 Q   Did he provide that to you in an
18 e-mail?
19 A   Most likely, yes.
20 Q   Did RevPoint send any
21 information back via e-mail?
22 A   Yes.
23 Q   What did you send to Mr. Weeks?
24 A   We sent them what was provided
25 to us from Plural.

Page 25

MICHAEL FISHMAN

2  Q   And what was that that was
3  provided to Plural?
4  A   I don't have that information in
5  front of me, but from my recollection it was a
6  URL, time stamp, IP address, and possibly
7  technique of acquisition of the lead and
8  consent verification.
9  Q   What do you mean by technique of
10 acquisition of the lead?
11 A   Whether the lead was generated
12 through e-mail or search or display, but I
13 don't remember specifically whether that was
14 provided.
15 Q   If you had that e-mail that you
16 transmitted that information with, would that
17 refresh your memory as to what it was?
18 A   If I had that e-mail that we
19 sent to Quotewizard?
20 Q   Yes.
21 A   Yes, sure.
22      MR. KING:  I think he's about to
23      show it.
24      THE WITNESS:  Yeah, I got it.
25 Q   Actually I am going to show

Page 26

1  MICHAEL FISHMAN
2  you -- first go to the marked exhibits folder.
3     A    Okay.
4     Q    I will ask you to look at what's
5  already been marked as Exhibit 2?
6     A    Wait, hold on, that folder just
7  now says folder not found.
8         MR. KING: That happened to me as
9  well when I just -- now it's back.
10    Q    You might have to refresh.
11    A    Okay. Okay.
12        MR. KING: Sorry, guys, mine is
13 loading.
14        MR. BRODERICK: No worries.
15        MR. POLANSKY: What folder are we
16 looking at? Mine is just gone now.
17        MR. KING: All I see is
18 deposition of George Rios.
19        THE WITNESS: Click on that
20 again.
21        MR. KING: Then marked exhibits.
22        MR. BRODERICK: Mr. Fishman is
23 going to talk us through this.
24        THE WITNESS: Yeah, if you hit
25 refresh then you click on the deposition

Page 27

1  MICHAEL FISHMAN
2  folder again, it will launch the folder
3  again and then the file should be inside
4  it.
5         MR. KING: I am looking for what,
6  Ted?
7         MR. BRODERICK: Exhibit 2.
8         THE WITNESS: That I don't see.
9         MR. KING: I see four things
10 under deposition of George Rios.
11        MR. BRODERICK: I am in the wrong
12 folder myself.
13        Look at Exhibit 17, sorry.
14    A    Okay.
15    Q    Have you seen this document
16 before?
17    A    I don't recall seeing this
18 document before, no, but it's possible.
19    Q    Okay, I can represent to you
20 that this was a document produced in discovery
21 by Quotewizard and in your e-mail to Matthew
22 Weeks of Quotewizard, is that
23 SnappyAutoInsurance.com website, is that a URL
24 that you provided to him?
25        MR. KING: Are you going to show

Page 28

1  MICHAEL FISHMAN
2  him the e-mail to refresh his
3  recollection?
4         MR. BRODERICK: I don't think I
5  have the e-mail.
6     A    I don't remember what was in the
7  e-mail that I sent to him, it's certainly
8  possible.
9     Q    I am going to show you your
10 subpoena response, and maybe I have just missed
11 it.
12        Now I have put a document it's
13 supposed to say Plural response to Mantha
14 subpoena; can you open that?
15    A    Plural --
16        MR. KING: Plural, not RevPoint?
17        MR. BRODERICK: No, grabbed the
18 wrong one again.
19    Q    Okay, the RevPoint subpoena
20 response. Do you see that?
21    A    Hold on, RevPoint subpoena
22 response combined, is that what I am looking
23 at?
24    Q    Yes.
25    A    Okay.

Page 29

1  MICHAEL FISHMAN
2     Q    Do you recognize that document?
3     A    Yes.
4     Q    And were you served with a
5  subpoena to produce the records requested
6  there?
7     A    Yes, they were.
8     Q    I will ask you to scroll down to
9  the very last page.
10    A    Okay.
11    Q    Is the data that was provided
12 there, where did you collect that from?
13    A    So, the data here was collected
14 from our database.
15    Q    Did you have to run a query to
16 get that?
17    A    Yes.
18    Q    And what kind of database is
19 that?
20        Is it SQL?
21    A    I believe so, yes.
22        But I'm not 100 percent sure of
23 that, so I would have to get back to you. I
24 don't know for sure that it is SQL.
25    Q    Okay, and did you do the search

Page 30

1  MICHAEL FISHMAN
2  yourself, or somebody in your team?
3      A    Someone in my organization did.
4      Q    Is it fair to say that all of
5  the data on this sheet was provided to you by
6  Plural Marketing Solutions?
7      A    Yes.
8      Q    So you have no independent way
9  to confirm whether any of this is accurate
10 information, correct?
11     A    No.
12     Q    And you have no way to know
13 whether Joe Mantha visited any website and
14 input this information, correct?
15     A    No way to confirm.
16     Q    And when you provide a lead --
17 when you provided this lead to Quotewizard,
18 does RevPoint make any guarantee to Quotewizard
19 that the person listed on the lead has
20 consented to receive text messages?
21          MR. POLANSKY: Objection.
22     Q    Sorry, could you hear me?
23          THE WITNESS: I'm sorry. So,
24 Evan, I heard an objection.
25          MR. KING: Sorry, yes, yes, you

Page 31

1  MICHAEL FISHMAN
2  can answer.
3      A    I'm sorry, can you just repeat
4  the question?
5      Q    Sure. When you provided the Joe
6  Mantha lead with the data that we are looking
7  at here to Quotewizard, does RevPoint make any
8  guarantee that the person, that Mr. Mantha had
9  consented to receive -- provided TCPA consent
10 to receive calls or text messages?
11          MR. POLANSKY: Objection.
12     A    Yeah, I don't know how we would
13 make an individual guarantee, other than
14 supplying the data to Quotewizard that is
15 supplied to RevPoint Media.
16     Q    Right, but in essence you are
17 just selling them data, you are not making a
18 guarantee that this person has given TCPA
19 compliance consent in order to receive text
20 messages?
21          MR. POLANSKY: Objection.
22     A    Well, it's our understanding
23 that this lead had TCPA consent and text with
24 it, so that -- the way we look at it, is that
25 would be the guarantee.

Page 32

1  MICHAEL FISHMAN
2      Q    Right, but you don't indemnify
3  Quotewizard for any claims that sending a text
4  message based on that lead would be a
5  violation?
6          MR. POLANSKY: Objection.
7          MR. KING: Yes, I will object.
8  That's the kind of thing that he and I
9  talked about.
10         I mean we can talk about generally
11 or if he's familiar with the relationship
12 that they had with Quotewizard, but in
13 terms of this specific lead?
14         MR. POLANSKY: Yeah, I don't
15 see -- there is nothing in the topics of
16 examination that identify the contract
17 between the parties and the
18 indemnification agreement between them.
19         So I am going to object.
20         MR. BRODERICK: It all goes to
21 the purchase or sale.
22         MR. POLANSKY: The indemnity goes
23 to the purchase and sale? Where?
24         How do you get there?
25         MR. BRODERICK: It's part of the

Page 33

1  MICHAEL FISHMAN
2  sale.
3          Again, if you want to instruct him
4  not to answer, that's okay, but it's not a
5  huge point.
6          But I am trying to get at what he
7  represents to -- in selling them this
8  data, if it's a promise or a guarantee
9  that's enforceable that you can call based
10 on this.
11         MR. POLANSKY: Sure, I will just
12 state my objection for the record, which
13 is the agreement between the parties
14 speaks for itself.
15         You can answer, if your attorney
16 allows you to.
17         MR. KING: You can answer to the
18 extent you remember about this case
19 specifically, and it doesn't touch on
20 any discussions that you and I have had
21 or that you have had with counsel.
22     A    I don't know whether or not
23 there is any guarantee on this lead.
24         I would have to get back to you
25 on that.

```
                                                    Page 34
 1              MICHAEL FISHMAN
 2     Q    Did Plural provide you with a
 3  guarantee that the lead came with valid TCPA
 4  consent?
 5     A    I don't know how to answer that.
 6          Within the lead there is nothing
 7  other than the data that is created -- supplied
 8  that it is -- that there is consent there, I'm
 9  not sure about guaranteeing each lead.
10     Q    When you received -- when you --
11  did you have any phone conversations with
12  Matthew Weeks about Mr. Mantha's complaint?
13     A    Not to my knowledge.
14     Q    It was just e-mails?
15     A    Yes.
16     Q    Any text messages?
17     A    No, we don't have -- I never
18  texted with him.
19     Q    I'm sorry, I apologize if I
20  already asked, about when was that, if you
21  remember?
22          MR. POLANSKY:  About when was
23  what?  Objection.
24     Q    The e-mail correspondence with
25  Mr. Weeks.
```

```
                                                    Page 35
 1              MICHAEL FISHMAN
 2          MR. POLANSKY:  Thank you.
 3     A    I would have to get back to
 4  you -- I would say September, October of what
 5  was that, last year.
 6     Q    And then when you got that
 7  e-mail, did you then contact anyone at Plural?
 8     A    Yes.
 9     Q    And how did you do that?
10     A    I think that was done from
11  someone at RevPoint Media who had -- who then,
12  I'm not sure whether it was over e-mail or
13  Skype, but what at that point was their method
14  of communication with Plural.
15     Q    Okay, you don't know who the
16  person was at Plural who your employee
17  communicated with, do you?
18     A    I'm pretty sure it was George
19  Rios.
20     Q    George Rios, okay, good.
21          Did Plural say anything about
22  the original source of this Mantha lead, in
23  response to RevPoint's communication to Plural?
24     A    Not to my knowledge, no.
25     Q    Can you go back to Exhibit 17?
```

```
                                                    Page 36
 1              MICHAEL FISHMAN
 2     A    Okay.
 3     Q    On that document, what
 4  information did RevPoint have at the point at
 5  which it sold the lead to Quotewizard?
 6     A    I would have to do a comparison.
 7  I don't know, it would be my understanding that
 8  we would have received everything other than
 9  potentially the URL.
10     Q    Would your understanding be that
11  you would have to go to Plural to get that?
12     A    Yes.
13     Q    Do you know anything about that
14  lead date of 8/5/19?
15     A    I don't.
16     Q    There is an IP address there, I
17  will ask you to write that down, it's 96.2 --
18     A    You are asking me to write that
19  down?
20     Q    Yes, please.  Sorry.
21     A    Sorry, I didn't have anything to
22  write with in front of me.
23          Okay, so this 96.242.132.28.
24     A    132.28, okay.
25     Q    That's also associated with a
```

```
                                                    Page 37
 1              MICHAEL FISHMAN
 2  Jornaya lead ID which starts 8D3 and ends in
 3  BFF?
 4     A    Okay.
 5     Q    I just want to compare that to
 6  another document which is Exhibit 18, and I
 7  will represent to you this is a subpoena
 8  response from Jornaya about that?
 9     A    Hold on, Exhibit 18, okay.
10     Q    You've got it?
11     A    Yes.
12     Q    And that's -- this is a subpoena
13  response from Jornaya.
14          How long -- well, does RevPoint
15  have a contract with or an account with
16  Jornaya?
17     A    Not to my knowledge.  I don't
18  know that an account was never created with
19  Jornaya, but we do not have an account -- a
20  contract or relationship like that.
21     Q    Does RevPoint generate its own
22  leads that is for sale?
23          MR. KING:  Ted?
24          MR. BRODERICK:  Yes.
25          MR. KING:  Sorry, can you repeat
```

Page 38

MICHAEL FISHMAN

1
2  that, you kind of garbled up. I
3  couldn't really hear that.
4     Q    Does RevPoint generate its own
5  leads for sale to customers?
6     A    We do not.
7     Q    So you are purely a middleman of
8  you take somebody else's lead and then sell it?
9     A    Correct.
10    Q    So, can RevPoint generate a
11 Jornaya lead ID to associate it with one of the
12 leads that it's selling?
13    A    No.
14    Q    If there is a Jornaya lead ID
15 associated with your -- with a lead that you
16 are selling, that would have come with it to
17 you, right correct?
18    A    Correct.
19    Q    Would you look at the Jornaya
20 subpoena response today, last page, and I can
21 represent to you that the universal lead ID,
22 also known as a Jornaya lead ID, is the same as
23 on the Quotewizard opt in, but that IP address
24 on the Quotewizard -- on this Jornaya subpoena
25 response is not the same as on the Quotewizard

Page 39

MICHAEL FISHMAN

1
2  opt in, correct?
3        MR. KING: I object. They speak
4     for themselves but you can answer.
5        Sorry, I cut you off.
6     A    Yeah, I can see that.
7     Q    Do you know why those IP
8  addresses don't match?
9     A    I do not know why.
10       I would only be able to
11 speculate.
12    Q    Let's flip back to Exhibit 17.
13 Do you see the language on TCPA disclosure?
14    A    Yes.
15    Q    Did you provide that information
16 to Mr. Weeks at Quotewizard?
17    A    I believe so.
18    Q    Did you provide it separately or
19 was it just within a URL that you provided, on
20 a web page that linked through the URL?
21    A    I don't recall.
22    Q    And how about the screen shot
23 language on Exhibit 17?
24    A    I don't recall how the
25 information was provided.

Page 40

MICHAEL FISHMAN

1
2     Q    What's your understanding of how
3  a Jornaya lead ID works?
4     A    My opinion, understanding of how
5  Jornaya lead IDs work?
6     Q    Yes.
7     A    So a Jornaya lead ID code is
8  placed on a generation website that records or
9  captures the user experience on that website,
10 and then is in some way linked to a particular
11 ID where that ID can then be utilized to
12 recapture the user experience; or viewer
13 recording of the user experience, is my
14 understanding of Jornaya's lead IDs.
15    Q    Is it your understanding that an
16 IP address on a lead and a Jornaya lead ID
17 should match?
18    A    That is not my understanding.
19    Q    What is your understanding?
20    A    So an IP address delivered in an
21 APA could come from different places, it could
22 come from the IP address of the servers that
23 the platform is utilizing, it could come from
24 the website of where the lead was generated.
25       There is opportunity there for

Page 41

MICHAEL FISHMAN

1
2  IP addresses to not match the user IP address
3  who filled out the form.
4     Q    Then how do you know that a
5  particular user visited from a particular IP
6  address?
7     A    We would not be able to utilize
8  an IP address definitively in the lead that is
9  captured and then distributed.
10    Q    What would you use?
11    A    For what purpose?
12    Q    To validate the --
13    A    A particular lead?
14    Q    A particular lead, yes.
15    A    Well, in most cases we would
16 request the user IP address from the generator.
17    Q    From the lead generator?
18    A    Correct.
19    Q    And by that, do you mean the
20 website on which a lead was created?
21    A    Yes.
22    Q    And would that be captured -- is
23 that supposed to be captured by a Jornaya lead
24 ID?
25    A    I don't know what the

11 (Pages 38 - 41)

Page 42

```
 1               MICHAEL FISHMAN
 2   requirements are, which Jornaya lead IDs,
 3   because from my understanding that is up to the
 4   end users, the clients of Jornaya.
 5          But I don't have any knowledge
 6   of what the exact information Jornaya captures.
 7      Q    Okay.
 8          Have you ever seen a Jornaya
 9   rendering of the user experience in creating a
10   lead?
11      A    I actually don't believe I have.
12      Q    Have you ever given RevPoint's
13   role as a middleman, do you look at TCPA
14   disclosure language on whatever website
15   something was created?
16      A    Well, in many cases we are not
17   aware of the website in realtime.
18          And so we wouldn't be able to --
19   that would be a very difficult task.
20      Q    Did you terminate your
21   relationship with Plural because of this
22   lawsuit?
23      A    We -- I don't know that we
24   terminated our relationship, we certainly -- it
25   became restricted to say the least.
```

Page 43

```
 1               MICHAEL FISHMAN
 2          I don't know that there was an
 3   official termination.
 4      Q    But you are no longer accepting
 5   leads from Plural, correct?
 6      A    That is correct.
 7      Q    Have you had --
 8          MR. BRODERICK:  Strike that.
 9      Q    Can we go back to the RevPoint
10   subpoena response.
11          MR. BRODERICK:  I am going to
12      mark this, try to mark this as Exhibit
13      19.
14          (The above described document was
15      marked Exhibit 19 for identification as of
16      this date.)
17      A    I'm sorry, what am I looking at?
18      Q    What's now been marked as
19   Exhibit 19 which is the RevPoint subpoena
20   response combined, should be in the marked
21   exhibits folder?
22      A    I've got it, thank you.
23      Q    Do you still have the e-mail
24   exchange that you had with Matthew Weeks of
25   Quotewizard?
```

Page 44

```
 1               MICHAEL FISHMAN
 2      A    I don't know -- I believe so.
 3          MR. BRODERICK:  Evan, I will just
 4      make note for the record that I think
 5      that those e-mails were responsive to
 6      our subpoena and that we request that
 7      they be produced.
 8          MR. POLANSKY:  Ted, just for the
 9      record, I mean these e-mails we marked
10      as work product on our privilege log, we
11      discussed this last time during Matthew
12      Week's deposition, just for the record.
13          We can discuss it after.
14          MR. BRODERICK:  We can confer
15      about that, we don't need to bore Mr.
16      Fishman any more than we already are.
17      Q    Have you produced any additional
18   information to Quotewizard about what you --
19   about information that was provided to
20   Quotewizard when RevPoint sold them the Mantha
21   lead?
22          MR. POLANSKY:  Objection.
23          MR. KING:  When, do you mean like
24      through our subpoena response?
25          MR. BRODERICK:  Not through the
```

Page 45

```
 1               MICHAEL FISHMAN
 2      subpoena response.
 3      Q    We got a supplemental production
 4   recently and I want to know if you were the
 5   source of the information we received last
 6   night.
 7          MR. KING:  I haven't seen it, I
 8      know the witness hasn't either.
 9      Q    Okay, you didn't provide any
10   information within the last month to
11   Quotewizard?
12      A    No.
13          MR. KING:  He's talking to me,
14      really, so not to my knowledge.
15          I don't understand the question, we
16      haven't made a supplemental production in
17      the last month.
18          MR. POLANSKY:  No, Quotewizard
19      made a supplemental production that
20      didn't come from RevPoint.
21          MR. BRODERICK:  I am going to
22      move a folder into the marked exhibits
23      which is supplemental production
24      7-27-20.
25      A    This is a new folder.  I see it.
```

12 (Pages 42 - 45)

Page 46

1      MICHAEL FISHMAN
2   Q   Supplemental production.
3   A   Okay.
4       MR. KING: Just a second. Is it
5   under marked exhibits?
6       Thank you.
7       MR. BRODERICK: You might need to
8   refresh, everybody let me know when you
9   have it.
10      MR. KING: Got it.
11  Q   Do you see a document titled
12  Quotewizard_mantha 000101?
13  A   The PDF, oh, 000101-104?
14  Q   Yes.
15  A   Yes.
16  Q   Do you recognize that document?
17  A   Do I recognize the document?
18      No; I don't recognize the
19  document.
20  Q   Does the information contained
21  within the document look familiar?
22  A   It looks familiar, yes.
23  Q   And what is it?
24  A   It looks like -- it looks like
25  the lead information for Mr. Mantha.

Page 47

1      MICHAEL FISHMAN
2   Q   And is this the information that
3   is -- well, is this at the point at which you
4   ping the system, or is this when you provide
5   the full lead after purchase?
6       MR. KING: Sorry, objection as to
7   form.
8       I think we might be skipping a step
9   here. Did you ask if RevPoint created or
10  provided this document?
11  Q   Well, the information that's
12  within this document, you did not create this
13  document, correct?
14      This PDF?
15  A   Not to my knowledge, no.
16  Q   But you say the information
17  looks like the Mantha lead?
18  A   From the information that I can
19  decipher, yes.
20      I mean I am looking at his name
21  is in here and his e-mail address.
22      And there are a lot of -- it's
23  sort of a run-on sentence, but is that a
24  printout of what -- is that the type of
25  information that is exchanged by your API

Page 48

1      MICHAEL FISHMAN
2   system when someone buys a lead?
3   A   It could be, yes.
4   Q   And that would be provided on
5   the purchase of the lead by the end user?
6   A   Correct, yes, because there is a
7   first name and last name and e-mail and phone.
8   Q   Okay, can you open something
9   that says letter McKew?
10  A   Okay.
11  Q   And it's -- has RevPoint
12  provided two separate leads with Joe Mantha's
13  name to Quotewizard?
14  A   Not to my knowledge, no.
15  Q   Just the one lead that we have
16  been talking about in this deposition, correct?
17  A   Just the one lead, correct.
18  Q   Okay, can you open the Excel
19  spreadsheet there.
20      Do you recognize this Excel
21  spreadsheet?
22  A   No.
23  Q   You didn't create it?
24  A   No.
25  Q   Looking at this document, do you

Page 49

1      MICHAEL FISHMAN
2   have any idea what quote_ID means?
3   A   No.
4       MR. BRODERICK: I am just going
5   to go ahead and introduce these
6   exhibits.
7       I introduce the letter as 20, the
8   Excel spreadsheet, this I have to do
9   differently I guess.
10      This just gets moved into the
11  folder, I guess, but it doesn't get a
12  number.
13      And then the PDF Quotewizard_mantha
14  I am going to introduce as Exhibit 21.
15      (The above described document was
16  marked Exhibit 20 for identification, as
17  of this date.)
18      (The above described document was
19  marked Exhibit 21 for identification, as
20  of this date.)
21  Q   Go back to Exhibit 19, the
22  RevPoint subpoena response, the last page of it
23  which is the data that you said you queried
24  your database to get.
25  A   Okay.

13 (Pages 46 - 49)

Page 50

1              MICHAEL FISHMAN
2     Q    Did your database have any
3  reference to SnappyAutoInsurance.com?
4          That for some reason didn't get
5  put on this sheet of data?
6     A    No.
7     Q    Would you agree that the IP
8  address on your data sheet is not the same as
9  on the Quotewizard opt in?
10    A    Which two IP addresses am a
11 looking at, because I know there was a
12 discrepancy in that, but I'm not sure with
13 what.
14    Q    Right, so this one is
15 66.187.107.166 and then we can look at the --
16    A    The one I have written down?
17    Q    Yes, which you wrote down from
18 the Quotewizard opt in, which is 96. --
19    A    Yes, I can confirm that those
20 are not the same.
21    Q    Right.
22         Do you know why they don't
23 match?
24    A    I do not.
25    Q    Are you aware that Plural

Page 51

1              MICHAEL FISHMAN
2  Marketing Solutions has provided a response to
3  a subpoena in connection with this case?
4     A    I did not.
5     Q    Have you ever seen that subpoena
6  response?
7     A    I have not.
8     Q    I am going to show you that, I
9  am going to introduce it as Exhibit 22 for ease
10 of reference.
11    A    Okay.
12         (The above described document was
13         marked Exhibit 22 for identification, as
14         of this date.)
15    Q    I will ask you to scroll down in
16 that document to what starts after Exhibit C?
17    A    Okay.
18    Q    Have you seen any of that
19 information from any source?
20         MR. BRODERICK: Strike that.
21    Q    Are you familiar with that
22 e-mail address for Adam Brown?
23    A    No, I am not.
24    Q    And although Plural lists the
25 source of the application as

Page 52

1              MICHAEL FISHMAN
2  SnappyAutoInsurance.com, was that -- when did
3  you learn that that was where Plural said the
4  opt-in had come from?
5     A    We learned of that when we
6  requested and received opt in information in
7  order to verify consent.
8     Q    That was after this Complaint by
9  Mr. Mantha, though, correct?
10    A    To my knowledge, yes.
11         MR. POLANSKY: Just to be clear,
12         for the record when you say Complaint,
13         are you talking about the actual
14         complaint filed in the lawsuit, or some
15         sort of demand letter, Ted?
16         MR. BRODERICK: Really --
17         MR. POLANSKY: Because I know we
18         had confusion about this earlier in my
19         client's deposition.
20         MR. BRODERICK: No, right. No, I
21         would say when you were first contacted
22         with any kind of complaint, even if it
23         was just a demand letter, did you look
24         into whether the consent was valid,
25         correct?

Page 53

1              MICHAEL FISHMAN
2          MR. POLANSKY: Thanks.
3     A    Correct, yes.
4     Q    And you see that the date of the
5  application provided -- well, by Plural in
6  response to our subpoena, is 6/26/2019?
7     A    Yes.
8     Q    Did they provide that
9  information to you?
10    A    I don't recall, it's possible.
11    Q    And this data, I don't see a
12 Jornaya lead ID in Plural's response to the
13 subpoena.
14         Do you know if Plural had a
15 Jornaya lead ID associated with Mr. Mantha's --
16 Mr. Mantha's supposed lead at the time it was
17 created?
18    A    I can only talk about when that
19 lead was offered and then sent into RevPoint
20 Media.
21         At that point there was a
22 general lead ID associated with 2, so I
23 can't -- I have no idea how -- what Plural --
24 how they generate their Jornaya lead IDs.
25    Q    Do you have any -- I can

Page 54

                MICHAEL FISHMAN

2 represent to you that Jornaya says that the
3 lead ID provided by Plural is actually
4 associated with a website called
5 unitedquotes.com.
6       Do you have any idea why in its
7 transmission to you they said it was
8 SnappyAutoInsurance.com?
9     A    I have no idea.
10    Q    Do you have any idea why the
11 date of application on the Plural subpoena
12 response does not match the date of application
13 on the Jornaya lead ID?
14    A    I do not.
15    Q    Does RevPoint take any position
16 on whether Mr. Mantha consented to receive
17 telemarketing text from Quotewizard?
18    A    Well, it's my understanding that
19 consent was given, because that data was
20 provided to us.
21    Q    But nobody at RevPoint has any
22 personal knowledge as to who it was that
23 supposedly filled out this lead on a website?
24    A    Other than the information we
25 received, we have no other knowledge.

Page 55

                MICHAEL FISHMAN

2    Q    Okay, thanks.
3       MR. BRODERICK:  No further
4 questions right now.
5       Thank you very much.
6       MR. POLANSKY:  Great.
7
8 EXAMINATIN BY
9 MR. POLANSKY:
10
11    Q    Mr. Fishman, once again, I am
12 Kevin Polansky, I represent the Defendant
13 Quotewizard in this case.
14       I do have a couple of follow-up
15 questions.
16       This won't take very long, but I
17 do want to go through a few things.
18    A    Sure.
19    Q    Have you ever personally went to
20 the SnappyAutoInsurance website?
21    A    I don't know whether I clicked
22 on that link when it was provided by Plural.
23       Possibly -- I probably did, but
24 I don't recall, I probably made sure that it
25 was active before I sent it.

Page 56

                MICHAEL FISHMAN

2    Q    Do you know if when you clicked
3 on the link it was active?
4    A    I would not have sent a URL to
5 Quotewizard that was not active.
6    Q    And --
7       MR. POLANSKY:  Strike that.
8    Q    You personally sent the URL of
9 SnappyAutoInsurance.com to Quotewizard, is that
10 correct?
11    A    That is correct.
12    Q    And that was Matthew Weeks you
13 sent it to?
14    A    I'm pretty sure, yes.
15    Q    Now, are you aware that you also
16 sent him an IP address?
17    A    I'm sure.
18    Q    And you were asked by
19 Mr. Broderick some questions about whether the
20 IP address on the Quotewizard opt in sheet that
21 you looked at is the same as the RevPoint
22 response, and you testified that they are
23 different, right?
24    A    Yes.
25    Q    Do you know why they are

Page 57

                MICHAEL FISHMAN

2 different?
3    A    I don't know why.  I can only
4 speculate.
5    Q    And what's your belief?
6       MR. BRODERICK:  Objection.
7    Q    You can answer.
8    A    I can answer that?
9       MR. BRODERICK:  Yes.
10       MR. POLANSKY:  Yes.
11    A    So, my belief is that, and this
12 happens with some regularity in the space, is
13 that IP addresses come from the platforms that
14 are supplying the API data and not from the
15 user, and systems are not verifying the IP
16 address other than potentially if it's
17 international.
18       MR. BRODERICK:  Objection, move
19 to strike.
20    Q    The IP address identified in the
21 RevPoint response, was that IP address provided
22 by Plural?
23    A    We would -- anything that we
24 provided would have been provided by Plural.
25       Either in the original data that

15 (Pages 54 - 57)

Page 58

1          MICHAEL FISHMAN
2  was sent over, or in a subsequent request.
3     Q    Do you still have the Plural
4  response to the Mantha subpoena in front of
5  you?
6          MR. BRODERICK: Exhibit 22.
7     A    Yes, I do.
8     Q    On I believe it's page 15 of 20,
9  there is a document and at the top it says
10 "original source lead generator."
11         Do you see that?
12    A    No, I'm sorry, let me catch up
13 to where were you saying.
14    Q    Page 15 of 20.
15    A    15, okay.
16    Q    And do you see a Word document
17 with two bolded sections called original source
18 lead generator and applicant TCPA audit?
19    A    No, hold on, I think I'm in the
20 wrong place.  Exhibit C is this?
21    Q    Yes, right after Exhibit C or I
22 guess it is Exhibit C, yes.
23    A    And this is the lead data?
24    Q    Yes.
25    A    Okay; okay.

Page 59

1          MICHAEL FISHMAN
2     Q    Do you see where they identify
3  the applicant IP address?
4     A    Yes.
5     Q    And that's different from the IP
6  address that RevPoint provided in response to
7  its subpoena, right?
8     A    Again, I don't have the two in
9  front of me to make that comparison, because
10 that one looks like the one I have written
11 down, but I don't have the -- what we provided
12 in front of me.
13    Q    Okay, let's take a look at it,
14 its Exhibit 19.
15    A    Okay.
16    Q    I think it the last page.
17         Would you agree that the IP
18 addresses don't match?
19    A    Correct, they do not match.
20    Q    Do you know whether Plural
21 provided RevPoint with more than one IP address
22 for this lead?
23    A    Within the original lead?
24    Q    I guess within the original
25 lead, or at any time.

Page 60

1          MICHAEL FISHMAN
2     A    I don't know.
3          Within the original lead, I
4  don't think we accept in the API multiple IP
5  addresses, so that would not be possible.
6          But I don't know -- anything we
7  provided they provided, so if they provided a
8  different IP address, we certainly would have
9  been provided multiple IP addresses.
10    Q    Who created this document in
11 front of you at Exhibit 19?
12         MR. KING: Sorry, is Exhibit 19
13    RevPoint's response?
14    Q    Yes, page 10?
15         MR. KING: The subpoena response
16    obviously would have been created by me.
17         MR. POLANSKY: I guess my
18    question is on the last page, do you
19    know why the Jornaya lead ID is not
20    identified on this page.
21    A    That I don't know.
22    Q    Do you dispute that you
23 provided --
24         MR. BRODERICK: Strike that.
25    Q    Do you dispute that RevPoint

Page 61

1          MICHAEL FISHMAN
2  provided a lead ID to Quotewizard?
3     A    No, I don't ski.
4     Q    In fact Quotewizard required a
5  Jornaya lead ID, is that right?
6     A    That's right.  I don't recall
7  the API requirements, it's certainly possible
8  and not uncommon to have that as a requirement.
9     Q    In this case you don't dispute
10 that a Jornaya lead ID was provided from
11 RevPoint to Quotewizard?
12    A    No, I do not dispute that.
13    Q    Just turning back to Exhibit 17.
14    A    Okay.
15    Q    Do you dispute any of the
16 information on this exhibit was provided by
17 RevPoint to Quotewizard?
18         MR. BRODERICK: Objection to the
19    form.
20    A    I can't say one way or the
21 other, I don't recall.
22    Q    Okay.
23         But you do recall that RevPoint
24 provided an IP address to Quotewizard, right?
25    A    That's correct.

1-800-727-6396     Veritext Legal Solutions     www.veritext.com

Page 62

1  MICHAEL FISHMAN
2  Q   And a Jornaya lead ID was also
3  provided by RevPoint to Quotewizard, is that
4  right?
5  A   Within the original lead,
6  correct.
7  Q   And that at some point in time
8  you did provide a URL to SnappyAutoInsurance to
9  Quotewizard, right?
10 A   Correct.
11 Q   And then the other information
12 is sort of the data that would come with the
13 lead packet, is that right?
14     MR. BRODERICK: Objection.
15 A   That's my understanding.
16     I don't know if I provided this
17 screenshot or that was generated, I don't know.
18 Q   But in any event, you would have
19 advised or --
20     MR. BRODERICK: Strike that.
21 Q   In any event, you would have
22 informed Quotewizard where to find or obtain
23 the consent language?
24     MR. BRODERICK: Objection.
25 A   I don't recall.

Page 63

1  MICHAEL FISHMAN
2  Q   Well, do you know whether
3  RevPoint in the lead provided consent language
4  to Quotewizard?
5  A   We would have provided consent
6  language within the lead.
7     MR. BRODERICK: Objection to the
8     form.
9  Q   You would have?
10 A   It's my understanding that
11 consent language came with the lead.
12 Q   What type of consent language
13 comes with the lead?
14 A   Whatever is provided by the
15 lead, so whatever Plural sent us we would have
16 sent to Quotewizard.
17 Q   So I'm going to turn your
18 attention to Exhibit 21 that you just looked
19 at.
20 A   Okay.
21 Q   And I'm going to represent to
22 you that this was the electronic information
23 that came from RevPoint to Quotewizard after
24 the lead was purchased.
25     Can you go through these four

Page 64

1  MICHAEL FISHMAN
2  pages and tell me if you see any consent
3  language?
4  A   I do not see any consent
5  language.
6  Q   Do you recall after receiving, I
7  know Mr. Broderick used the term complaint, but
8  after Mr. Weeks informed you of a demand
9  received by Quotewizard from the Plaintiff in
10 this case, that he reached out to you for
11 consent language?
12 A   I don't know that I reached out
13 specifically for consent language, but reached
14 out for verification of consent.
15 Q   Okay, but he did reach out by
16 e-mail to you for verification of consent with
17 respect to Mr. Mantha, is that right?
18 A   Matthew Weeks, right?
19 Q   Yes, yes.
20 A   Yes, he did.
21 Q   And you provided the information
22 that you had received from Plural Marketing, is
23 that right?
24 A   Correct.
25 Q   And turning again to Exhibit 17,

Page 65

1  MICHAEL FISHMAN
2  do you have any reason to dispute the TCPA
3  disclosure that's on this document as being
4  provided by you to Mr. Weeks?
5  A   No, I have no reason to dispute.
6     MR. POLANSKY: That might be all
7     I have, but I would like to check my
8     notes real quickly.
9     Just give me a moment.
10    THE WITNESS: Sure.
11 Q   When you reached out after
12 hearing from Matthew Weeks to verify the
13 consent for Mr. Mantha did you personally reach
14 out to George Rios or did someone from your
15 team or company?
16 A   Someone from my team.
17 Q   Do you know who that individual
18 is?
19 A   Yes, that was Jesse Schreiber.
20 Q   Is Jesse a man or woman?
21 A   A man.
22 Q   And how do you spell Schreiber?
23 A   S-c-h-r-e-i-b-e-r.
24 Q   Okay.
25 Q   I think you mentioned it was

17 (Pages 62 - 65)

Page 66

MICHAEL FISHMAN

1  MICHAEL FISHMAN
2  either by Skype or e-mail, is that right?
3      A    Correct, or possibly a blend, I
4  don't know.
5          MR. BRODERICK: Possibly a what?
6      A    A blend of the two, maybe
7  reaching out on Skype and shooting an e-mail.
8      Q    Do you know if Plural Marketing
9  is associated with the website
10 unitedquotes.com?
11     A    I don't know. I could only
12 speculate.
13     Q    Have you ever heard of the
14 website called Snappy Surveys?
15     A    I have not.
16     Q    Have you ever heard of Justin
17 Cohen, I think you might have answered that?
18     A    No, I don't know that name.
19     Q    And Adam Brown?
20     A    Nope.
21     Q    When you went to the
22 SnappyAutoInsurance website to confirm that it
23 was working, did you happen to take any
24 screenshots or images from that website at the
25 time?

Page 67

MICHAEL FISHMAN

1  MICHAEL FISHMAN
2      A    No.
3      Q    When you went on the
4  SnappyAutoInsurance website, did you go on the
5  website to confirm there was TCPA compliance
6  language on the website?
7      A    I don't recall what I did when I
8  went on that website.
9          MR. POLANSKY: I have no further
10 questions.
11         Thank you very much for your time.
12         MR. BRODERICK: Nothing further
13 from me.
14         Thanks very much, Mr. Fishman.
15         THE WITNESS: This concludes
16 today's testimony given by Michael
17 Fishman, total number of media units is
18 1 and will be retained by Veritext.
19         The time is approximately 1:59 p.m.
20         We are off the record.
21
22
23
24
25

Page 68

MICHAEL FISHMAN

I, the undersigned, a Certified Shorthand Reporter of the State of New York, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction;

That the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case before completion of the proceedings, review of the transcript [ ] was [x] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this dat

Stephen J. Moore
RPR, CRR
Dated: 8/11/2020

Page 69

MICHAEL FISHMAN
DECLARATION UNDER PENALTY OF PERJURY

Case Name: MANTHA v. QUOTEWIZARD
Date of Deposition: July 28, 2020

I, MICHAEL FISHMAN, hereby certify Under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed this _____ day of _____, 2020, at _____.

_____
MICHAEL FISHMAN

18 (Pages 66 - 69)

```
                                                    Page 70
 1           MICHAEL FISHMAN
 2           DEPOSITION ERRATA SHEET
 3           Case Name: MANTHA v. QUOTEWIZARD
 4           Name of Witness: MICHAEL FISHMAN
 5           Date of Deposition: July 28,
 6           2020
 7           Reason Codes:  1. To clarify the
 8           record.
 9           2. To conform to the facts.
10           3. To correct transcription errors.
11 Page _____ Line _____ Reason _____
   From _____ to _____
12 Page _____ Line _____ Reason _____
   From _____ to _____
13 Page _____ Line _____ Reason _____
   From _____ to _____
14 Page _____ Line _____ Reason _____
   From _____ to _____
15 Page _____ Line _____ Reason _____
   From _____ to _____
16 Page _____ Line _____ Reason _____
   From _____ to _____
17 Page _____ Line _____ Reason
   From _____ to _____
18 Page _____ Line _____ Reason _____
   From _____ to _____
19 Page _____ Line _____ Reason _____
   From _____ to _____
20 Page _____ Line _____ Reason _____
   From _____ to _____
21 Page _____ Line _____ Reason _____
   From _____ to _____
22 Page _____ Line _____ Reason _____
   From _____ to _____
23 Page _____ Line _____ Reason _____
   From _____ to _____
24 Page _____ Line _____ Reason _____
   From _____ to _____
25
```

```
                                                    Page 71
 1           MICHAEL FISHMAN
 2           DEPOSITION ERRATA SHEET
 3 Page _____ Line _____ Reason _____
   From _____ to _____
 4 Page _____ Line _____ Reason _____
   From _____ to _____
 5 Page _____ Line _____ Reason _____
   From _____ to _____
 6 Page _____ Line _____ Reason _____
   From _____ to _____
 7 Page _____ Line _____ Reason _____
   From _____ to _____
 8 Page _____ Line _____ Reason _____
   From _____ to _____
 9 Page _____ Line _____ Reason _____
   From _____ to _____
10 Page _____ Line _____ Reason _____
   From _____ to _____
11 Page _____ Line _____ Reason _____
   From _____ to _____
12 Page _____ Line _____ Reason _____
   From _____ to _____
13 Page _____ Line _____ Reason _____
   From _____ to _____
14 Page _____ Line _____ Reason _____
   From _____ to _____
15 Page _____ Line _____ Reason _____
   From _____ to _____
16 Page _____ Line _____ Reason _____
   From _____ to _____
17           _____ Subject to the above
18      changes, I certify that the transcript is
19      true and correct
20           _____ No changes have been
21      made. I certify that the transcript is
22      true and correct.
23
24      _____
25           MICHAEL FISHMAN
```