# EXHIBIT 13

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3    _____X

 4    JOSEPH MANTHA on behalf of    )

      themselves and others         )

 5    similarly situated,           )

                                    )

 6            Plaintiff,            )

                                    )

 7            vs.                   ) No. 1:19-cv-12235

                                    )

 8    QUOTEWIZARD.COM, LLC,         )

                                    )

 9            Defendant.            )

10    _____X

11            VIDEOTAPED ZOOM 30(b)(6) DEPOSITION

12                UPON ORAL EXAMINATION OF

13                    MATTHEW WEEKS

14                  QUOTEWIZARD.COM, LLC

15

16                  2:46 P.M. (EST)

17                  JULY 22, 2020

18                SEATTLE, WASHINGTON

19

20

21

22

23

24    REPORTED BY: CHERYL O. SPRY, CCR No. 2226

25
```

Page 2

```
 1    A P P E A R A N C E S
 2         (All participants appeared remotely.)
 3
 4    FOR THE PLAINTIFF:
 5         EDWARD A. BRODERICK
 6         Broderick Law, P.C.
 7         176 Federal Street, Fifth Floor
 8         Boston, Massachusetts 02110
 9         617.738.7080
10         ted@broderick-law.com
11
12    FOR THE DEFENDANT:
13         KEVIN POLANSKY
14         Nelson Mullins Riley & Scarborough
15         One Post Office Square, 30th Floor
16         Boston, Massachusetts 02109
17         617.217.4720
18         kevin.polansky@nelsonmullins.com
19
20    ALSO PRESENT:
21         MICHAEL TAKOS, Videographer
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3    EXAMINATION BY:                       PAGE
 4         MR. BRODERICK              5
 5         MR. POLANSKY               63
 6         MR. BRODERICK              69
 7    EXHIBITS FOR IDENTIFICATION          PAGE
 8    Exhibit 1  7/14/2020 Notice of Rule 30(b)(6) of    7
 9         QuoteWizard.com, LLC
10    Exhibit 2  QuoteWizard Opt In          19
11    Exhibit 3  5/18/2020 Defendant's Responses to      41
12         Plaintiff's First Set of
13         Interrogatories
14    Exhibit 4  RevPoint Subpoena Response Combined     41
15    Exhibit 5  IP Subpoena for RevPoint - tracks to    45
16         Guerrero
17    Exhibit 6  Plural Response to Mantha Subpoena      46
18    Exhibit 7  Verizon IP June 26, 2019     52
19    Exhibit 8  Jornaya Subpoena response    59
20
21
22
23
24
25
```

Page 4

```
 1         SEATTLE, WASHINGTON; JULY 22, 2020
 2              2:46 P.M. (EST)
 3              --oOo--
 4         THE VIDEOGRAPHER:  We are on the record at
 5    2:46 p.m. in the Eastern Time Zone.
 6         Today is July 22nd, 2020.  We are here for the
 7    video deposition of QuoteWizard.com represented by
 8    Matthew Weeks, being taken by counsel for the plaintiff
 9    in the matter of Joseph Mantha versus QuoteWizard.com.
10         This case is filed in the U.S. District Court
11    for the District of Massachusetts.  The case number is
12    1:19-cv-12235.
13         This deposition is being conducted remotely.
14    My name is Michael Takos from the firm Veritext, and I'm
15    the videographer.  The court reporter is Cheryl Spry
16    from the firm Veritext.
17         Counsel, please identify yourselves and state
18    whom you represent.  If there are any objections to the
19    proceeding, please state them at the time of your
20    appearance.
21         MR. BRODERICK:  This is Edward Broderick for
22    the plaintiff.
23         MR. POLANSKY:  This is Kevin Polansky on
24    behalf of the defendant, QuoteWizard.com, LLC.
25         THE VIDEOGRAPHER:  Will the court reporter
```

Page 5

```
 1    please swear in the witness.
 2              MATTHEW WEEKS,
 3    sworn as a witness by the Certified Court Reporter,
 4         testified as follows:
 5              EXAMINATION
 6    BY MR. BRODERICK:
 7    Q.  Okay.  Thanks for being here, Mr. Weeks.
 8    Obviously, we met off the record, but my name is Ted
 9    Broderick and I represent the plaintiff, Joe Mantha.
10         The first thing I'm going to do is show you an
11    exhibit, which is the notice of this deposition.  Let's
12    see if I can do this correctly.
13         There.  Do you see that?
14    A.  I'm looking in the --
15    Q.  In the "Marked Exhibits."
16    A.  Let me refresh and see if it shows up.  I
17    still only see the Verizon IP.
18    Q.  Maybe go out of the doc -- out of the folder
19    and back in.
20    A.  Yeah.
21         MR. POLANSKY:  Matthew, double click on the
22    document again to refresh.
23    A.  Yeah, I see the -- now I see the notice of
24    30(b)(6) PDF.
25    Q.  (BY MR. BRODERICK:)  And Mr. Weeks, could you
```

2 (Pages 2 - 5)

Page 6

1  state your name, full name for the record and your job
2  title?
3      A.  Matthew Weeks.  And I am senior manager of
4  data partnerships for QuoteWizard.
5      Q.  Okay.  And do you recognize that notice of
6  30(b)(6) QuoteWizard document?
7      A.  I was -- yes, I do.
8      Q.  Okay.  And are you -- are you designated to
9  testify on behalf of QuoteWizard as to all topics listed
10  in that document?
11      A.  Yes.
12      Q.  And what did you do to prepare for this
13  deposition?
14      A.  I went back through my calendar to refresh
15  myself on some dates, as well as check some emails.
16      Q.  Did you speak with any other employees of
17  QuoteWizard?
18      A.  I did not.
19      Q.  And before you answered interrogatories as
20  they pertain to Mr. Mantha's alleged consent to receive
21  calls by or on behalf of QuoteWizard, did you talk to
22  other employees when you were answering interrogatories?
23      A.  I did not.
24      Q.  And do you understand that your testimony is
25  on behalf of QuoteWizard in each of the topics in that

Page 7

1  30(b)(6) notice?
2      A.  I do.
3      MR. BRODERICK:  So I'm going to try to move
4  this into the "Introduce Exhibit."
5      (Deposition Exhibit 1 was marked for
6      identification.)
7      MR. BRODERICK:  Okay, it looks like that
8  worked.
9      Q.  (BY MR. BRODERICK:)  What is your
10  understanding of Mr. Mantha's claim against QuoteWizard?
11      A.  I don't have much understanding of it.  I
12  mean, I seen -- briefly seen the complaint, and that's
13  about it.
14      Q.  Okay.  And do you have any understanding as to
15  restrictions placed on telemarketing by the Telephone
16  Consumer Protection Act, which I'll refer to as the
17  "TCPA"?
18      MR. POLANSKY:  Objection.
19      You can answer.
20      A.  Say that again?
21      Q.  (BY MR. BRODERICK:)  Do you have any
22  understanding of -- the statute that Mr. Mantha is suing
23  under is the Telephone Consumer Protection Act.  And I
24  was asking if you have any understanding as to what
25  that -- what restrictions that places on telemarketing.

Page 8

1      MR. POLANSKY:  Objection.
2      You can answer, if you know.
3      A.  I have a very high-level understanding of it,
4  not -- you know, by no means an expert on TCPA.
5      Q.  (BY MR. BRODERICK:)  That's fine.  What's your
6  understanding of the TCPA?
7      A.  It's the set of guidelines that telemarketers
8  have to abide by in order to obey the law.
9      Q.  Okay.  And what's your understanding of the
10  consent required to call someone whose telephone number
11  is listed on the National Do Not Call Registry?
12      MR. POLANSKY:  Objection.
13      You can answer.
14      A.  My understanding, I mean, if someone is on the
15  Do Not Call directory, a company should not call them.
16      THE VIDEOGRAPHER:  Counsel, could we go off
17  the record briefly?  I want to see if we can get your
18  microphone turned up.
19      MR. BRODERICK:  Sure.
20      THE VIDEOGRAPHER:  Going off record.  The time
21  now is 2:54 p.m.
22      (Discussion off the record.)
23      THE VIDEOGRAPHER:  We are back on record.
24  It's 2:55 p.m.
25      Q.  (BY MR. BRODERICK:)  Mr. Weeks, does

Page 9

1  QuoteWizard claim that Mr. Mantha provided his prior
2  expressed written consent to receive text messages from
3  QuoteWizard?
4      A.  It's our belief that consent was provided,
5  yes.
6      Q.  Okay.  And can you explain what that belief is
7  based on?
8      A.  The belief is based on information provided to
9  us from another company.
10      Q.  What are those other companies?
11      A.  That would be RevPoint Media.
12      Q.  Okay.  And you said "companies" plural.  What
13  others?
14      A.  I said company, singular.
15      Q.  Company, okay.  Sorry.
16      And what documents support that claim, that
17  Mr. Mantha gave prior expressed written consent?
18      A.  We have a contract with RevPoint that
19  explicitly states that they, you know, can't break the
20  law and, you know, send us leads that have not been --
21  you know, have not given consent.
22      We also -- we do not purchase leads that don't
23  have a Jornaya LeadiD attached to them.
24      Q.  Okay.  Any other documents that support that
25  claim?

3 (Pages 6 - 9)

Page 10

1      MR. POLANSKY:  What was that?  I couldn't hear
2  that.
3      Q.  (BY MR. BRODERICK:)  Any other documents that
4  support the claim that Mr. Mantha provided prior
5  expressed written consent?
6      A.  We -- there -- when asked to provide -- when
7  this initially came up and we received the complaint and
8  reached out to RevPoint Media to provide the consent
9  information, and they sent me some things such as the IP
10  address of the complainant, and as well as the URL to
11  the consent portion of the website that the complainant
12  went through.
13      Q.  Okay.  Who was it you spoke to at RevPoint to
14  collect that information?
15      A.  His name is Michael Fishman.
16      Q.  Did you talk to him on the telephone or did
17  you send him an email?
18      A.  I talked -- email.  I mean, I have talked to
19  him on the phone, not about this, but...
20      Q.  Okay.  And how did he provide that, that
21  document that we're discussing to you?  Did he email it
22  to you?
23      A.  Yes, email.
24      MR. POLANSKY:  Objection.
25      Q.  (BY MR. BRODERICK:)  Okay.  And I'm going to

Page 11

1  show you a document now.
2      Okay.  In the "Marked Exhibits" folder, do you
3  see a document labeled "QuoteWizard Opt In"?
4      A.  Yes.
5      Q.  Okay.  Can you open that document and tell me
6  what it is?
7      A.  This is the report that I compiled after we
8  received the complaint from Mr. Mantha.
9      Q.  And you say you compiled this, or was it --
10  well, tell me what you mean by you "compiled" it.
11      A.  I mean exactly that, I compiled it.  I reached
12  out to RevPoint to get some of the information contained
13  in it, and I included the rest myself from our own
14  database.
15      Q.  What information in that document came from
16  RevPoint?
17      A.  The consumer IP address, the form URL.
18      Q.  Is that it?
19      A.  I believe so, yes.
20      Q.  And not the Jornaya LeadiD?
21      A.  That, like I said earlier, that's -- we don't
22  accept or buy a lead without a Jornaya LeadiD.  So that
23  is sent to us at the time, before we even purchase the
24  lead.  So that's our own database.
25      Q.  That's your own database?

Page 12

1      A.  It's contained in our own database.
2      Q.  Right.  But I wanted to know who put that
3  information in this document.
4      A.  I did.
5      Q.  And you got it from -- you got that Jornaya
6  LeadiD from RevPoint?
7      A.  No.  I got it from our own database.
8      Q.  How did it get into your database, is my
9  question.
10      A.  It was sent to us in the data packet with the
11  original purchase of the lead.  We work on a ping post
12  system.
13      MR. POLANSKY:  He's asking who sent the data
14  packet to you.
15      A.  RevPoint sent the data packet to us
16  originally.
17      Q.  (BY MR. BRODERICK:)  Okay.  And is there a
18  document -- when you say -- tell me what a ping post
19  system is.
20      A.  So it's how we purchase leads from vendors
21  like RevPoint.  We -- it's called ping post.  They send
22  into our system, they ping into our API a portion of
23  essentially a lead, a lead without all of the PII
24  information.
25      It comes into our system, into our API.  Our

Page 13

1  system takes a look at that -- this is all happening in
2  milliseconds -- determines whether we have a match for
3  that lead.
4      We then, if it matches, if we think -- you
5  know, if our system determines that, you know, we have
6  an agent or a corporate carrier that this lead matches
7  to, we return a bid to whoever the vendor is; in this
8  case, RevPoint.
9      RevPoint then either accepts the bid or
10  rejects the bid.  And if they accept the bid, they then
11  send us the rest of the lead details.  And that's it.
12      Q.  Okay.  You used an acronym "API."  What does
13  that stand for?
14      A.  You know, I should know that.
15      Q.  It happens a lot.
16      A.  I'm not a tech person.  It's, you know, it's
17  the acronym for the system.  I honestly don't know what
18  it is.
19      Q.  Okay.  And you also said that it's information
20  without a PI.  Is that personal information?
21      A.  Personal identifying information, the PII.
22      Q.  PII.  Okay, thank you.
23      So what is the -- what is the first -- what
24  data is in the first ping when you're provided a lead
25  that your system can then make a bid on?

4 (Pages 10 - 13)

Page 14

1    A.   I'm not -- I don't know.  I'm not sure exactly
2    what all is included in that.
3    Q.   Okay.  Do you know if consent has to be
4    validated in that first ping?
5         MR. POLANSKY:   Are we talking about Joseph
6    Mantha, or in general?
7    Q.   (BY MR. BRODERICK:)  Well, when you got the
8    Joseph Mantha thing sent to you, did it have consent
9    information in that first ping before your system would
10   provide a bid to --
11   A.   It had the Jornaya LeadiD.
12   Q.   And is that how you check whether the consent
13   is valid?
14   A.   Yes, that and, I mean, the fact that we have a
15   contract with our vendors that explicitly state they
16   have to obey all TCPA laws and laws in general.
17   Q.   Right.  So you rely on the vendor to secure
18   the consent, there is nothing else that -- well, is that
19   correct, that you rely on the vendor to secure prior
20   expressed written consent from people to whom text
21   messages are sent?
22        MR. POLANSKY:   I'm just going to object to the
23   extent that it relates to any of the other potential
24   plaintiffs, other than Mr. Mantha.
25   Q.   (BY MR. BRODERICK:)  All right.  Well, for

Page 15

1    Mr. Mantha, were you relying on RevPoint to obtain his
2    prior expressed written consent?
3    A.   They are responsible for securing that.
4    Q.   And QuoteWizard itself doesn't do anything
5    to -- doesn't secure consent on its own on top of the
6    obligation that RevPoint had to get Mr. Mantha's
7    consent; correct?
8    A.   On top of the contracts that we have and the
9    requiring of a Jornaya LeadiD?
10   Q.   Right.
11   A.   We do not.
12   Q.   Okay.  And on what system did you create this
13   what I'll call the QuoteWizard opt in?
14   A.   What system?
15   Q.   Yeah.
16   A.   Microsoft Word.
17   Q.   Okay.  And you pulled this from this API
18   system, this data that you filled into this, other than
19   what was provided to you by --
20   A.   I pulled the data from our SQL databases.
21   Q.   And how did you -- how did you pull that data?
22   Did you have to run a query?
23   A.   Correct, I wrote a query and ran it and pulled
24   the information around this lead.
25   Q.   And what -- what items would you put into a

Page 16

1    query to be able to pull up Mr. Mantha's -- the
2    information that populated this document?
3    A.   Phone number, email address.
4    Q.   Did you have to use the Jornaya LeadiD?
5    A.   I did not have the Jornaya LeadiD at the time.
6    I had to pull the lead information to get that.
7    Q.   Okay.  And did you have the consumer IP
8    address when you pulled the lead?
9    A.   I did not.  That was provided by RevPoint.
10   Q.   And the "Form URL & Carrie List URL," was that
11   pulled from your system or that was provided by
12   RevPoint?
13   A.   That was provided by RevPoint.
14   Q.   Do you know what "Carrie List," and that's
15   C-A-R-R-I-E list, "URL stands" for, means?
16   A.   That's a typo.  It's supposed to say carrier
17   list.
18   Q.   Okay.  Okay.  And at the bottom, well, not the
19   very bottom, but then there is something that says "TCPA
20   Disclosure," which is bolded.
21   A.   Uh-huh.
22   Q.   Where did that data come from, that language?
23   A.   That came from the link provided by RevPoint
24   Media that is the form URL.
25   Q.   And did you copy and -- did you go -- did you

Page 17

1    click on that link URL that was provided by RevPoint?
2    A.   Yes, I did.
3    Q.   And then did you cut and paste that language
4    and put it in this document?
5    A.   Correct.
6    Q.   Okay.  And what about the -- below the "TCPA
7    Disclosure" in bold it says "Screenshot."  Does that --
8    where did that language come from?
9    A.   That was a screenshot that I captured after
10   clicking on the link for RevPoint Media.
11   Q.   And is -- was TCPA, the words "TCPA
12   Disclosure," was that on the Snappy Auto Insurance link?
13   A.   No, that's part of the -- that's just the
14   heading for that section of the file.
15   Q.   Okay.  So is it -- the Snappy Auto Insurance
16   website, when you clicked on it, did it say the words
17   "TCPA Disclosure"?
18   A.   It did not.
19   Q.   Okay.  And when did you create this document?
20   This is you say after the litigation was filed; correct?
21        MR. POLANSKY:   Objection.
22        You can answer.
23   A.   Correct.  I just was -- this was after we
24   received the complaint.
25   Q.   (BY MR. BRODERICK:)  Okay.  And so, again,

5 (Pages 14 - 17)

Page 18

1  where it says "Screenshot" in bold, is that also just a
2  header that did not appear on the Snappy Auto Insurance
3  website?
4      A.  Correct.  It's a header that I -- that's part
5  of this report.
6      Q.  Okay.  Where on the Snappy Auto Insurance site
7  did you get that, the language that follows
8  "Screenshot"?
9      A.  I'm not sure I follow your question.
10     Q.  Well, below "Screenshot" and the colon, it
11  says in fairly small font, "By clicking the 'Compare
12  Rates' button, I hereby consent to receive marketing
13  communications via autodialed and/or pre-recorded calls,
14  including SMS messages," and then it continues.
15         I'm just wondering where you got that.
16     A.  That's a screenshot of the website.  I didn't
17  type that under -- that's a screen capture of the
18  website.
19     Q.  Is that a separate web page on the Snappy Auto
20  Insurance website?
21     A.  A separate web page?  I'm --
22     Q.  Well, I'm just saying that -- it says
23  "Screenshot," and I'm saying screenshot of what?
24     A.  That is a screenshot of the consent language
25  from the Snappy Auto website.

Page 19

1      Q.  Okay.  And would you agree with me that that
2  screenshot does not mention QuoteWizard?
3          MR. POLANSKY:  Objection.
4      A.  It mentions QuoteWizard in "marketing
5  partners."
6      Q.  (BY MR. BRODERICK:)  But the word
7  "QuoteWizard" does not appear in that screenshot;
8  correct?
9      A.  QuoteWizard does not appear in that
10  screenshot, no.
11     Q.  And under TCPA disclosure, QuoteWizard's name
12  does not appear in the TCPA disclosure; correct?
13     A.  QuoteWizard does not appear.
14         MR. BRODERICK:  Okay.  I'm going to introduce
15  that document, I hope.  Or no, sorry.  And that will be
16  Exhibit No. 2.
17         (Deposition Exhibit 2 was marked for
18         identification.)
19     Q.  (BY MR. BRODERICK:)  Now, Mr. Weeks, I want to
20  show you QuoteWizard's answers to interrogatories in
21  this case, now being put in the "Marked Exhibits"
22  folder.  If you'd open those --
23     A.  Yep.
24     Q.  -- and I'll ask you a few questions.
25         Do you recognize that document?

Page 20

1      A.  Yes.
2      Q.  And what is it?
3      A.  What is the document?  It's the answers to the
4  interrogatories.
5      Q.  Right.  And at the bottom, the very last thing
6  in the document is a "Verification."  And did you
7  authorize your digital signature to be put on that
8  verification?
9      A.  Yes, I did.
10     Q.  Okay.  So these are your answers on behalf of
11  QuoteWizard?
12     A.  Yes.
13     Q.  And in your answers to interrogatories, you
14  said that you got the -- you got the data from RevPoint.
15  And that's correct; right?
16     A.  Yes.
17     Q.  And then in the I guess it's interrogatory
18  answer No. 4, you say that you got that -- you
19  understand that RevPoint got -- got its data from Plural
20  Marketing Solutions, Inc.
21         Is that -- first of all, is that a fair --
22  well, is that a fair summary of your answer to No. 4?
23         MR. POLANSKY:  After the objection?
24     Q.  (BY MR. BRODERICK:)  After the objection, yes,
25  where it starts with, "Further answering...."

Page 21

1      A.  On No. 4.
2      Q.  Yeah, I'll read it to you.  It might be
3  easier.  "Further answering, QuoteWizard states that
4  Plaintiff's consent was generated on
5  www.SnappyAutoInsurance.com on August 5, 2019;
6  QuoteWizard received Plaintiff's lead information and
7  consent to contact from RevPoint Media prior to the time
8  QuoteWizard sent or caused to be sent any text messages
9  to Plaintiff; RevPoint has asserted that Plural
10  Marketing Solutions, Inc. a/k/a Plural Marketing Group,
11  PLMRKG," and that's all caps, ".com or unitedquotes.com
12  ('Plural') originated Plaintiff's subject lead and/or
13  that it received the lead from Plural;" and that
14  Plaintiff's lead contains the Jornaya LeadiD.
15         Do you believe all of that statement remains
16  true?
17     A.  Yes.  I learned about Plural Marketing through
18  counsel and information relayed by them.
19     Q.  Okay.  And did you -- you didn't talk to
20  anybody at RevPoint to find out where they got the
21  information?
22     A.  No.
23     Q.  And who do you believe put the Jornaya LeadiD
24  on the data package that was sent to you by RevPoint?
25         MR. POLANSKY:  Objection.

6 (Pages 18 - 21)

Page 22

1    Q.  (BY MR. BRODERICK:)  If you know.
2    A.  I have no idea.
3    Q.  And nobody at RevPoint has ever told you they
4    were responsible for the Jornaya LeadiD?
5    A.  No.
6    Q.  And how about anybody at Plural?
7    A.  No.
8    Q.  Okay.  And have you ever spoken with Adam
9    Brown?
10   A.  No.
11   Q.  Have you had any email communication with him?
12   A.  No.
13   Q.  Have you spoken with anyone at
14   SnappyAutoInsurance.com?
15   A.  No.
16   Q.  And how about unitedquotes.com?
17   A.  No.
18   Q.  Now, the QuoteWizard opt in that we looked at
19   earlier, that doesn't reference unitedquotes.com, does
20   it, as being the sourced URL for Mr. Mantha's consent?
21   A.  No.  I believe that document lists a Snappy
22   something URL.
23   Q.  But you put this in your interrogatory answer
24   because you believed that Plural had represented that
25   that was their source of the Mantha opt-in data;

Page 23

1    correct?
2        MR. POLANSKY:  Objection.
3    A.  I didn't follow that question.
4    Q.  (BY MR. BRODERICK:)  Yeah, I don't blame you.
5        You say that "RevPoint has asserted that
6    Plural Marketing Solutions... or unitedquotes.com."
7        Do you know the relationship between Plural
8    Marketing Solutions and unitedquotes.com?
9    A.  I do not.
10   Q.  But RevPoint -- so this information is that
11   RevPoint was told by Plural that Plural originated the
12   lead, the subject lead.  But what I'm wondering about is
13   what did RevPoint say about whether unitedquotes.com was
14   the actual source as opposed to SnappyAutoInsurance.com?
15   A.  Never had any communication with RevPoint
16   about any of that.
17   Q.  But how about QuoteWizard as a whole?  I think
18   we're entitled to know where did this come from or know
19   what you know about where it came from.
20   A.  Like I said, the Plural Marketing, the only
21   reason I'm aware of them is information I was given from
22   counsel.
23       MR. POLANSKY:  Don't speak about what you
24   learned from counsel.
25       MR. BRODERICK:  Well, I guess I just want to

Page 24

1    lodge an objection that I think we're entitled to know
2    what QuoteWizard knows about the facts relating to how
3    Mr. Mantha's consent was generated.
4        So those are facts and not -- not legal
5    advice, but just this is what we know about where this
6    consent came from.
7        MR. POLANSKY:  Well, I think he's testified to
8    that.  I mean, I think he's testified that, you know,
9    where the consent came from was from RevPoint.  That is
10   his information.  He hasn't spoken to Plural.
11       MR. BRODERICK:  Right, but I want to know why
12   he was able to answer in an interrogatory that RevPoint
13   said that it was Plural.  And what I'm also just not
14   clear on is whether Plural and unitedquotes.com are one
15   in the same or they're -- whether there is an assertion
16   that this supposed lead and opt-in consent, prior
17   expressed written consent was provided on
18   unitedquotes.com or on SnappyAutoInsurance.com.
19       MR. POLANSKY:  Right, but I think his
20   information on that answer is coming through counsel.
21   That's information learned through discovery in this
22   case.  And he's provided what he knows in the answer.
23       MR. BRODERICK:  Okay.  Well, we'll table that
24   for now, but I think we are entitled to that because
25   they are facts in possession of QuoteWizard.

Page 25

1    Q.  (BY MR. BRODERICK:)  Do you know who Plural
2    obtained Mr. Mantha's data from?
3    A.  I do not.
4    Q.  Do you know what Plural Marketing Solutions,
5    Inc., is or does?
6    A.  I do not.
7    Q.  Do you know what RevPoint's relationship is to
8    Plural?
9    A.  I do not.
10   Q.  Does QuoteWizard have any relationship with
11   Plural?
12   A.  We do not.
13   Q.  Do you know, I think I might have just asked
14   this, do you know how Plural obtained Mr. Mantha's data?
15   A.  I do not.
16   Q.  Are you now aware that Plural was not the
17   original source of Mr. Mantha's opt-in data and that the
18   original source was reportedly SnappyAutoInsurance.com
19   run by a man named Adam Brown?
20   A.  In -- I'm not sure.  You just told me that, so
21   I'm aware of it.
22   Q.  But you hadn't heard that before?
23   A.  No.
24   Q.  So you do not know who Adam Brown is?
25   A.  I do not.

7 (Pages 22 - 25)

Page 26

1    Q.  And you don't know his role in regard to this
2    case?
3    A.  I do not.
4    Q.  And the QuoteWizard opt in notes a date of
5    August 5th, 2019.  What is it that happened on that date
6    that caused you to put that in that document?
7    A.  That was the date that we purchased the lead
8    from RevPoint Media.
9    Q.  That's the date of the purchase.  It's not --
10   is it the date on which Mr. Mantha supposedly visited
11   the website?
12   A.  I do not know.
13   Q.  How is that date recorded by your system?
14   A.  How is it --
15      MR. POLANSKY:  Objection.
16   Q.  (BY MR. BRODERICK:)  Well, you did a query of
17   a SQL database to pull this information?
18   A.  Correct.
19   Q.  And when you pulled up information relating to
20   Mr. Mantha, August 5th was in there as the date of
21   purchase?
22   A.  Yes.
23   Q.  And the website reference on the QuoteWizard
24   opt in is www.SnappyAutoInsurance.com.  What's the --
25   what's the significance of that reference in the

Page 27

1    document?
2    A.  I'd have to go -- I mean, I have the
3    interrogatories up right now, so I'd have to go back to
4    the document.
5    Q.  Let's go back.  Fair point.
6       MR. POLANSKY:  So we're going back to
7    Exhibit 2?
8       MR. BRODERICK:  That's right.
9    Q.  (BY MR. BRODERICK:)  Do you have it up?
10   A.  I do, yes.
11   Q.  Okay.  And it says "Form URL," and it should
12   say "Carrier List URL."  I just wanted you to explain to
13   me again what that -- where you got that information,
14   how you pulled it out of the SQL database.
15   A.  That did not come from the SQL database, that
16   came from RevPoint Media in an email that was sent to
17   me.
18   Q.  And when was that email sent to you?
19   A.  I'm -- I don't know.  I'd have to check my
20   email.
21   Q.  Do you know if that email was produced in this
22   litigation?
23   A.  I do not.
24      MR. POLANSKY:  Objection.  It was identified
25   in the privilege log.

Page 28

1       MR. BRODERICK:  And why is that -- why is an
2    email from RevPoint privileged?
3       MR. POLANSKY:  We can talk about it now, we
4    can talk about it later.  It's privileged because it was
5    after receiving a demand letter from your -- I guess
6    your colleagues on behalf of the plaintiff in
7    preparation for litigation.
8       MR. BRODERICK:  So it's work product?
9       MR. POLANSKY:  That's right.
10      MR. BRODERICK:  Gathering information from
11   RevPoint about where the consent came from.  Okay.  I'll
12   just reserve that issue and keep moving.
13      MR. POLANSKY:  I understand.
14   Q.  (BY MR. BRODERICK:)  And was any other
15   information in this document emailed to you by RevPoint?
16   A.  Like I said, the IP address was in there as
17   well.
18   Q.  In an email?
19   A.  Yes.
20   Q.  And so did this -- Mr. Mantha's, is that the
21   way your system works, that Mr. Mantha, that you
22   wouldn't -- if you got a lead like Mr. Mantha's, would
23   that form URL ordinarily be in the data packet?
24   A.  No.
25      MR. POLANSKY:  Objection.

Page 29

1    Q.  (BY MR. BRODERICK:)  And would the consumer IP
2    address normally be in the data packet?
3       MR. POLANSKY:  Again, just relating to
4    Mr. Mantha; right?
5       MR. BRODERICK:  Yeah.  Well, I want to know if
6    Mr. Mantha's is unique.
7       MR. POLANSKY:  Objection.
8    A.  I'm not sure I -- what was the question?
9    Q.  (BY MR. BRODERICK:)  The "Consumer IP Address"
10   that shows up here, would you expect to find that in
11   a -- in the data packet that would already be in your
12   SQL database, or would you ordinarily have to get that
13   from the lead provider, in this case RevPoint, via an
14   email?
15   A.  We --
16      MR. POLANSKY:  Objection.
17      You can answer.
18   A.  Like I said, we reach out to the lead provider
19   and they give us the IP address.  It's not in the data
20   packet.
21   Q.  (BY MR. BRODERICK:)  It's not in the data
22   packet.  How about the Jornaya LeadiD, is that in the
23   data packet, or do you have to get that after the fact?
24      MR. POLANSKY:  Objection --
25   A.  That is --

8 (Pages 26 - 29)

Page 30

1    MR. POLANSKY:  -- to the extent it's speaking
2  about any others.
3    You can answer.
4    A.  The Jornaya LeadiD is something that we
5  require.  We don't purchase a lead without it being sent
6  to us as part of the -- as part of the lead information
7  being sent on the -- on the ping.  That's something that
8  we get before we even formulate a bid.  We will not buy
9  a lead without it.
10    Q.  (BY MR. BRODERICK:)  And was Mr. Mantha's, the
11  Jornaya LeadiD, was that in the ping that you got from
12  RevPoint?
13    A.  Yes.
14    Q.  So that is not a piece of information that you
15  had to get via email to put into this form; correct?
16    A.  Correct.
17    Q.  Okay.  Thank you very much.
18    So did that URL, form URL, did RevPoint tell
19  you this is where Mr. Mantha opted in to get
20  solicitations?
21    A.  That was the URL that was provided when I
22  asked for the consent information.
23    Q.  Okay.  And the IP address in this form, what
24  is the significance of that IP address?
25    MR. POLANSKY:  Objection.

Page 31

1    Q.  (BY MR. BRODERICK:)  Let me ask you, why did
2  you include an IP address?
3    A.  Why do I include an IP address in this report?
4    Q.  Yes.
5    A.  This is a report that we do.  It's kind of a
6  template, if you will.  We do a lot of work with a lot
7  of the large insurance carriers, and this was a report
8  that was formulated with them as far as satisfying
9  requests from them.
10    Q.  Okay.  And it says, "Consumer IP Address."  Is
11  that meant to be this is the IP address from which
12  Mr. Mantha opted in to get text messages from
13  SelectQuote?
14    MR. POLANSKY:  Objection.
15    A.  It's the IP address that was provided to us by
16  RevPoint when asking for the complainant's IP address.
17    Q.  (BY MR. BRODERICK:)  Okay.  And so the IP
18  address should -- should match Mr. Mantha or someone
19  associated with Mr. Mantha, if he was the one who opted
20  in to get this text; correct?
21    MR. POLANSKY:  Objection.
22    A.  I'm not an IP address expert.  I -- I don't
23  know.
24    Q.  (BY MR. BRODERICK:)  Okay.  Do you know
25  whether or not this IP address matches Mr. Mantha's IP

Page 32

1  address?
2    A.  I do not.
3    Q.  If they don't match, could you explain why
4  that would be the case?
5    MR. POLANSKY:  Objection.
6    A.  I'm not an IP address expert.  I can't.
7    Q.  (BY MR. BRODERICK:)  So you couldn't explain
8  why the IP address might tie to New Jersey, for example?
9    A.  Yeah, I don't know.
10    Q.  Okay.  And the language, that "TCPA
11  Disclosure" language, can you tell me the date on which
12  you cut and pasted that language from the Snappy Auto
13  Insurance website?
14    A.  I cannot tell you the exact date.
15    Q.  But it was not on August 5th, 2019; correct?
16    A.  No.  We didn't receive the complaint at that
17  point.
18    Q.  Okay.  And can -- and it was after you -- this
19  whole document was created after you got the complaint
20  and you were trying to figure out where did this come
21  from; correct?
22    A.  Correct.
23    Q.  And do you know the date on which RevPoint
24  claims that Mr. Mantha visited SnappyAutoInsurance.com
25  to opt in to get text messages on behalf of QuoteWizard?

Page 33

1    A.  I do not.
2    Q.  Do you know what AutoInsurQuotes.com is?
3    A.  I do not.
4    Q.  Does it have any affiliation or relation to
5  QuoteWizard?
6    A.  Not that I'm aware of.
7    Q.  And at any time, was QuoteWizard a marketing
8  partner of AutoInsurQuotes.com?
9    MR. POLANSKY:  Objection.
10    A.  I -- a direct partner?
11    Q.  (BY MR. BRODERICK:)  No, a marketing partner.
12  Pardon me.
13    A.  As in one of my vendors that I work with like
14  RevPoint or --
15    Q.  Well, the language in the TCPA, after -- the
16  heading you put in of "TCPA Disclosure," it says, "I
17  hereby consent to receive marketing communications via
18  autodialed and/or pre-recorded calls, including SMS
19  messages, from AutoInsurQuotes.com and one or more of
20  its marketing partners...."
21    Is QuoteWizard a marketing partner of
22  AutoInsurQuotes.com?
23    MR. POLANSKY:  Objection.
24    A.  I -- the way the -- I do not know.
25    Q.  (BY MR. BRODERICK:)  Okay.  But you've never

9 (Pages 30 - 33)

Page 34

1  heard of AutoInsurQuotes.com; correct?
2      A.  Correct.
3      Q.  Would you know who your marketing partners are
4  in your job?
5          MR. POLANSKY:  Objection.
6      A.  I know who my direct partners are.
7      Q.  (BY MR. BRODERICK)  So is it fair to say that
8  you know you don't have a contract with
9  AutoInsurQuotes.com?
10     A.  Yes.
11     Q.  And the opt -- the QuoteWizard opt in, same
12 exhibit, references a "Jornaya Lead ID."
13         Can you tell me, what is Jornaya?
14     A.  They're a company.  I don't work for Jornaya,
15 so I'm not the best to explain what they are, but they
16 are -- my understanding is they're a lead verification
17 company.  They're kind of an industry standard, that
18 everybody uses them or TrustedFrom, at this point.
19     Q.  TrustedFrom is their competitor?
20     A.  I believe that's the case, yes.
21     Q.  Okay.  And what does -- does QuoteWizard have
22 a contract with Jornaya?
23     A.  We do not.
24     Q.  Has it ever had a contract with Jornaya?
25         MR. POLANSKY:  Objection.

Page 35

1      A.  Not that I'm aware of.
2      Q.  (BY MR. BRODERICK)  And what's your
3  understanding of what a Jornaya LeadiD signifies?
4  What -- well, let me strike that.
5          Why does QuoteWizard require an Jornaya LeadiD
6  on any lead that it buys?
7          MR. POLANSKY:  Objection.
8      A.  We require it for a number of reasons.  I
9  mean, it's a signifier that there is a record around the
10 leads, and it is also something that all of the major
11 carriers, all of our head buyers require as well.
12     Q.  (BY MR. BRODERICK)  And is it fair to say
13 that Jornaya and QuoteWizard have no direct
14 relationship?
15     A.  Not that I'm aware of.
16     Q.  Okay.  And should that -- when does that --
17 let me strike that.  I may have asked this, and I
18 honestly apologize.
19         You don't know the date on which Mr. Mantha
20 supposedly visited SnappyAutoInsurance.com; correct?
21     A.  I do not.
22     Q.  And does the Jornaya LeadiD confirm the
23 address used to access the SnappyAutoInsurance.com
24 website on some date?
25         MR. POLANSKY:  Objection.

Page 36

1      A.  I didn't follow the question.
2      Q.  (BY MR. BRODERICK)  Well, the Jornaya LeadiD,
3  does Jornaya capture the IP address of -- did it capture
4  the IP address of Mr. Mantha when he was visiting this
5  website?
6          MR. POLANSKY:  Objection.
7      A.  I'm not sure what Jornaya -- I don't work for
8  Jornaya.  I don't --
9      Q.  (BY MR. BRODERICK)  You don't know what
10 Jornaya --
11     A.  No.
12     Q.  Do you know where RevPoint got the IP address
13 that it provided to you?
14     A.  I do not.
15     Q.  And this was provided directly from RevPoint,
16 not from Plural; correct?
17     A.  Correct.
18     Q.  And do you know if the Jornaya LeadiD -- so
19 the -- the Jornaya LeadiD was not the source of the
20 disclosure, the "TCPA Disclosure" language you have at
21 the bottom of the QuoteWizard opt in which is Exhibit 2;
22 correct?
23         MR. POLANSKY:  Objection.
24     A.  That's correct.  As I said before, it came
25 from the URL that was provided by RevPoint Media.

Page 37

1      Q.  (BY MR. BRODERICK)  Did you do anything to
2  try to match that disclosure language to the date or
3  dates on which Mr. Mantha visited, allegedly visited
4  that website?
5          MR. POLANSKY:  Objection.
6      A.  I'm not sure I understand the question.
7      Q.  (BY MR. BRODERICK)  Well, you -- on the date
8  that you can't remember, and I understand that, that you
9  compiled this document as you said, that language was
10 what was on the website on the day on which you visited;
11 correct?
12     A.  That is correct.
13     Q.  But you can't say whether the same language
14 was on the website earlier, can you?
15     A.  I cannot say.
16     Q.  And is that the only time you visited
17 SnappyAutoInsurance.com?
18     A.  Yes.
19     Q.  Let's turn to another exhibit.
20         MR. POLANSKY:  Ed, before we get into the next
21 exhibit, can we take a short break?
22         MR. BRODERICK:  Absolutely.  Good thinking.
23         THE VIDEOGRAPHER:  We're going off the record.
24 The time now is 3:42 p.m. in the Eastern Time Zone.
25         (Recess.)

10 (Pages 34 - 37)

Page 38

1    THE VIDEOGRAPHER:  We are back on record.  The
2  time now is 3:51 p.m. in the Eastern Time Zone.
3    Q.  (BY MR. BRODERICK:)  Mr. Weeks, are you aware
4  that RevPoint was issued a subpoena in this case in
5  regards to all documents related to Mr. Mantha's consent
6  to receive texts from QuoteWizard?
7    MR. POLANSKY:  Did you say RevPoint was or
8  QuoteWizard was?
9    MR. BRODERICK:  RevPoint was.
10    A.  I'm not aware of anything from RevPoint.
11    Q.  (BY MR. BRODERICK:)  Have you ever seen what
12  RevPoint produced in response to that subpoena?
13    A.  No.
14    Q.  But it's RevPoint that QuoteWizard purchased
15  Mr. Mantha's data from; correct?
16    A.  Yes.
17    Q.  And that data is reflected in the QuoteWizard
18  opt in, correct, which is Exhibit 2?
19    A.  Correct.
20    Q.  Would you expect, then, that RevPoint would
21  produce documents that would match the information you
22  put on the QuoteWizard opt in?
23    MR. POLANSKY:  Objection.
24    A.  Yes.  I mean, it should match.
25    Q.  (BY MR. BRODERICK:)  Okay.  So I'm going to

Page 39

1  ask you to look at, in the "Marked Exhibits" folder, the
2  RevPoint's subpoena response --
3    A.  Okay.
4    Q.  -- which I'll represent to you -- sorry.
5    MR. POLANSKY:  Is it "Subpoena Response
6  Combined"?
7    Q.  (BY MR. BRODERICK:)  Yeah, "RevPoint Subpoena
8  Response Combined."  Do you got it?
9    A.  Yep.
10    Q.  Okay.  So you've never seen this document
11  before; correct?
12    A.  I have not, no.
13    Q.  Okay.  I'm going to ask you to -- I'll
14  represent to you that this is what was produced in
15  response to a subpoena issued by the plaintiff in the
16  case by RevPoint.  And I'm going to ask you to scroll to
17  the last page.
18    A.  Okay.
19    Q.  Which was -- this was what was provided by
20  RevPoint.  And would you look at that last page?  Do you
21  see any reference in this document to
22  SnappyAutoInsurance.com?
23    A.  I don't see SnappyAutoInsurance, no.
24    Q.  And does this document make any reference to
25  the date of any website visit?

Page 40

1    A.  Not that I can tell.
2    Q.  Okay.  And does it have an IP address listed?
3    A.  Yes.
4    Q.  And that IP address is 66.189.107.166;
5  correct?
6    A.  Yes.
7    Q.  And now I'm going to ask you to flip back to
8  Exhibit No. 2, which is the QuoteWizard opt in document
9  you compiled.
10    A.  To the -- which -- there is two versions now.
11  Exhibit 2 or the original QuoteWizard opt in?
12    Q.  Exhibit 2, sorry, Exhibit 2 is what I want you
13  to look at.
14    A.  I'm there.
15    Q.  Okay.  That IP address is 96.242.132.28.
16  That's a different IP address than appears in the
17  RevPoint subpoena response; correct?
18    A.  Yes.
19    Q.  Is it your belief that either of those --
20  well, is it your belief that this IP address, this
21  consumer IP address connects to Mr. Mantha?
22    MR. POLANSKY:  Objection.
23    A.  Which -- which IP address are you talking
24  about?
25    Q.  (BY MR. BRODERICK:)  On Exhibit 2, do you

Page 41

1  think that IP address connects to Mr. Mantha?
2    MR. POLANSKY:  Objection.
3    A.  That's the IP address that was provided to me
4  by RevPoint when asked for Mr. Mantha's IP address.
5    Q.  (BY MR. BRODERICK:)  Okay.  Do you have any
6  more understanding or do you know why those IP addresses
7  are different in those two documents?
8    A.  No idea.
9    Q.  Now I want to show you another -- well, I want
10  to introduce that before I forget.  Actually, let me
11  introduce the QuoteWizard answers to interrogatories.
12  We'll make that Exhibit 3.
13    And then I'm going to introduce the RevPoint
14  response as Exhibit 4, the subpoena response.
15    (Deposition Exhibits 3-4 were marked for
16    identification.)
17    Q.  (BY MR. BRODERICK:)  It will take a little
18  while to load.  My apologies.
19    Okay.  Now I'll show you -- sorry, I'm in the
20  wrong folder.  I want to show you another document that
21  I can represent to you is a response to a subpoena
22  issued by the plaintiff in this case.
23    A.  Which one do you want me looking at?
24    Q.  I'm trying to make sure I'm asking you to look
25  at the right one.

11 (Pages 38 - 41)

Page 42

1    A.  "Tracks to Guerrero"?

2    Q.  Right.  And I can represent to you that this

3  is a response to a subpoena issued in this case by your

4  attorneys, and particularly Christine Kingston.

5         Have you seen that document before?

6    A.  I have not.

7    Q.  Okay.  And I'll ask you to scroll to the

8  second page.  And do you recognize where it says "Target

9  Details"?

10    A.  Yes, I see that.

11    Q.  And is that -- that is the same IP address as

12  was on the RevPoint subpoena response, correct, which is

13  66.189.107.166?

14    A.  Without seeing the two documents right next to

15  each other, I can't say that that's the same.

16    Q.  Okay.  Well, let me -- let me read to you

17  first, before I show you -- we go back to the RevPoint

18  subpoena response, this subpoena, this is from Charter

19  Communications saying, "Charter Communications, Inc.

20  acknowledges receipt of the above referenced request for

21  subscriber information."  And it says, "Pursuant to the

22  specific obligations imposed by 47 U.S.C. section 551(c)

23  and (h), the Federal Cable Privacy Act, this letter is

24  to advice you that Charter investigated and was able to

25  identify the attached information."

Page 43

1         Now, so let's go back to the Exhibit 4.

2  Scroll all the way to the bottom.  And that IP address,

3  where it says "IP address," colon, it says,

4  "66.189.107.166."

5         Now, that's the same IP address as Charter

6  Communications' response in the documents we were just

7  looking at; correct?

8         MR. POLANSKY:  Objection.

9    A.  Like I said, I mean, I'd like to see the two

10  next to each other or write them down and compare.

11    Q.  (BY MR. BRODERICK)  No, that's fine.  Let's

12  write them down.  We'll go back to Exhibit 4.  You can

13  write this -- write down -- this was RevPoint, this is

14  RevPoint's response to a subpoena, Exhibit 4.  There is

15  an IP address in that document.

16    A.  Uh-huh.

17    Q.  And you can write it down.

18    A.  Yeah.

19    Q.  66.189.107.166.

20    A.  Yes, I've written that down.

21    Q.  Okay.  And then after we got that, your

22  attorney sent a subpoena to Charter Communications

23  trying to find out who owned that IP address, who was

24  using that IP address.

25         And do you see "Target Details"?  That's the

Page 44

1  same number in Charter Communications' response, which

2  is 66.189.107.166.

3    A.  Yes, that's the same.

4    Q.  And then there is a date there, six dash --

5  "6/26/2019."  Correct?

6    A.  Correct.

7    Q.  And there is an individual listed named Mario

8  Guerrero who lives at 26 Pemberton Street, Apartment 2

9  in Worcester, Mass.  Do you see that?

10    A.  Yes.

11    Q.  And are you aware that your attorneys are

12  going to depose -- well, I guess it's not going to be

13  Mr. Guerrero because he's a minor, but it could be his

14  sister?

15         MR. POLANSKY:  Objection; relevance.

16    Q.  (BY MR. BRODERICK)  Well, do you know if that

17  IP address ties to Mr. Mantha?

18         MR. POLANSKY:  Objection.

19    A.  I don't know.

20    Q.  (BY MR. BRODERICK)  And so you can't explain

21  why RevPoint's subpoena response has an IP address that

22  does not match what was in QuoteWizard's opt in, which

23  is Exhibit 2?

24         MR. POLANSKY:  Objection.

25    A.  I -- I can't explain why it doesn't match what

Page 45

1  RevPoint provided to me.

2         MR. BRODERICK:  Okay.  And I'd like to

3  introduce this IP subpoena for RevPoint, which will be

4  Exhibit 5.

5         (Deposition Exhibit 5 was marked for

6         identification.)

7    Q.  (BY MR. BRODERICK)  Were you aware that

8  Plural Marketing Solutions was issued a subpoena for all

9  documents related to Mr. Mantha's alleged consent to

10  receive texts from QuoteWizard?

11    A.  I was not.

12    Q.  So you haven't seen that response before

13  today?

14    A.  I have not.

15    Q.  So I'm going to show you another document.

16  This is in the "Marked Exhibits" folder, and it is

17  Plural -- we have a typo, but it's supposed to say

18  "Plural Response to Mantha Subpoena."

19    A.  Yes, I see that.

20    Q.  And you've never seen this document before;

21  correct?

22    A.  I have not.

23    Q.  And I'll ask you to go all the way to the

24  bottom, end of the document.  Actually, excuse me, not

25  the end of the document.  We're on page -- after

12 (Pages 42 - 45)

Page 46

1    Exhibit C, if you can scroll down.
2        A.  Okay.
3        Q.  And this is, I'll represent to you, is
4    Plural's response to a subpoena issued by the plaintiff
5    in this case.
6        A.  Okay.
7        Q.  And do you see, if you scroll down, do you see
8    applicant -- "Applicant IP Address"?
9        A.  Yes.
10       Q.  You can write that one down, too, but it's --
11   let me introduce this before I get too far so we can be
12   clear enough what we're talking about.  I'm going to
13   introduce this as Exhibit 6.
14           (Deposition Exhibit 6 was marked for
15           identification.)
16       Q.  (BY MR. BRODERICK:)  So now you can look at
17   the marked version with the stamp on it, Exhibit 6.
18   Just tell me when you have it up on your screen.
19       A.  And go back down to just below Exhibit C?
20       Q.  Thank you, yes.
21       A.  Okay.
22       Q.  Do you see where it says "IP Address"?
23       A.  Yes.
24       Q.  And this is in Exhibit 6, there is an IP
25   address of "96.242.132.28."

Page 47

1        A.  Yes.
2        Q.  And then it says "Applicant IP Address."
3        A.  Yes.
4        Q.  And then it says, "Applicant IP Address ISP:
5    Verizon."
6            You understand "ISP" means Internet service
7    provider?
8        A.  Yes.
9        Q.  And the "Applicant IP Location" is listed as
10   Morristown, New Jersey?
11           MR. POLANSKY:  Are you just asking him to read
12   from the document?
13       Q.  (BY MR. BRODERICK:)  Yeah.  Well, I'm just
14   saying -- how do you understand what that means?  That's
15   where the person applied from; correct?
16           MR. POLANSKY:  Objection.
17       A.  That's the location of this IP address.  I
18   don't --
19       Q.  (BY MR. BRODERICK:)  And that IP address
20   provided by Plural as the "Applicant IP Address" doesn't
21   match either the QuoteWizard -- doesn't match the
22   QuoteWizard opt in from Exhibit 2 that you compiled;
23   correct?
24       A.  I don't know.  I don't have that one in front
25   of me, and I didn't write that one down.

Page 48

1        Q.  Okay.  Let's go back to Exhibit 2.  You can
2    write that one down.
3        A.  Oh, that does looks like it matches.  It does
4    match.
5        Q.  Can you tell me how it is that you matched
6    Plural's but not RevPoint's IP address in that document?
7            MR. POLANSKY:  Objection.
8        A.  I cannot.  I can only say that the IP address
9    that I have received I received from RevPoint Media.
10       Q.  (BY MR. BRODERICK:)  Okay.  And let's go back
11   to Exhibit 6.
12           Does QuoteWizard contend that Mr. Mantha
13   visited Snappy Auto Insurance and provided his consent
14   on that site?
15       A.  Yes.
16       Q.  And on what date?
17       A.  I do not know.
18       Q.  Plural lists 6/26/2019, or at least it lists
19   date of application.  Do you have any reason to believe
20   that is the date that someone visited and put in
21   Mr. Mantha's information?
22           MR. POLANSKY:  Objection.
23       A.  I have no idea.
24       Q.  (BY MR. BRODERICK:)  Do you know anything
25   about the person who resides at -- whose IP address this

Page 49

1    is on the Plural Exhibit 6?
2        A.  I have no idea.
3        Q.  There is no sale date on this Plural document;
4    correct?
5            MR. POLANSKY:  Objection.
6        Q.  (BY MR. BRODERICK:)  Sale of the lead.  On
7    QuoteWizard 2 you listed a date.  Well, that was the
8    date that you purchased the lead.  There is no lead sale
9    date on this document; correct?
10       A.  I haven't read this whole document.  I have no
11   idea.
12       Q.  Okay.  Well, I'm just asking you to look at
13   this one page of data here.
14       A.  Back down just below Exhibit C?
15       Q.  Yes, thank you.
16           MR. POLANSKY:  Objection.
17       A.  So you want me to see if there is a sale date?
18       Q.  (BY MR. BRODERICK:)  Yes.
19       A.  There is not a sales date.
20       Q.  Okay.  And you don't -- I believe you
21   testified you didn't know the date of the visit, the
22   alleged visit to SnappyAutoInsurance.com; correct?
23       A.  That is correct.
24           MR. POLANSKY:  Objection.
25       Q.  (BY MR. BRODERICK:)  And does the Plural data

13 (Pages 46 - 49)

Page 50

1    on this page make any reference to a Jornaya LeadiD?
2        MR. POLANSKY:  Objection.
3        A.  I do not see anything that says Jornaya
4    LeadiD.
5        Q.  (BY MR. BRODERICK:)  Do you know if the
6    Jornaya LeadiD that appears on QuoteWizard -- on the
7    QuoteWizard opt in, which is Exhibit 2, do you know
8    if -- do you know where that came from?
9        A.  We received that from RevPoint Media.
10       Q.  Okay.  But you don't know what that Jornaya
11   LeadiD ties to, do you?
12       A.  I couldn't hear the last half of that.
13       Q.  I'm sorry.  You don't know what that Jornaya
14   LeadiD ties to, do you?
15       A.  Ties to?  I'm not sure I understand.
16       Q.  Well, does the Jornaya LeadiD indicate that
17   someone from Mr. Mantha's IP address logged on and
18   provided consent on SnappyAutoInsurance.com?
19       MR. POLANSKY:  Objection.
20       A.  I don't know.
21       Q.  (BY MR. BRODERICK:)  Okay.  And are you aware
22   that a subpoena was issued to Verizon to identify the
23   subscriber assigned to the IP address contained on the
24   Plural opt in as of June 26, 2019?  By "Plural opt in,"
25   I mean Exhibit 6 that we've just been talking about.

Page 51

1        A.  I'm not aware.
2        Q.  Okay.  So I'm going to show you Verizon's
3    subpoena response.  I want you to open the Verizon --
4    the document that says "Verizon IP."  It should say
5    June, but it says "Jue 26, 2019."  Can you open that?
6        A.  Yep.
7        Q.  And I'll represent to you that this is a
8    subpoena response in response to a subpoena issued by
9    the plaintiff in this case for a search for the Verizon
10   customer that was assigned IP address 96.242.132.28.
11       First of all, that's the same IP address that
12   shows up on the Plural subpoena response; correct?
13       MR. POLANSKY:  Objection.
14       A.  Yes, it is.
15       Q.  (BY MR. BRODERICK:)  And that's the same IP
16   address that shows up on the QuoteWizard opt in
17   document, which is Exhibit 2; correct?
18       A.  Yes.
19       Q.  And the customer name is, on this subpoena
20   response, is Peter Petroff; correct?
21       A.  Yes.
22       Q.  And do you know of any connection between
23   Mr. Petroff and Mr. Mantha?
24       A.  I do not.
25       Q.  Does QuoteWizard believe Mr. Petroff put in

Page 52

1    information on SnappyAutoInsurance.com on behalf of
2    Mr. Mantha?
3        MR. POLANSKY:  Objection.
4        A.  I have no idea.
5        Q.  (BY MR. BRODERICK:)  Do you know why
6    Mr. Petroff's IP address shows up on the QuoteWizard opt
7    in, which is Exhibit 2?
8        MR. POLANSKY:  Objection; asked and answered
9    several times.
10       A.  It shows up there because that's the IP
11   address that I was given by RevPoint Media.
12       MR. BRODERICK:  And I'm going to mark this
13   as -- introduce that exhibit.  That will be Exhibit 7.
14       (Deposition Exhibit 7 was marked for
15       identification.)
16       Q.  (BY MR. BRODERICK:)  Can you turn back to
17   Exhibit 6?
18       MR. POLANSKY:  What page?
19       Q.  (BY MR. BRODERICK:)  Scrolling back down to --
20       MR. BRODERICK:  I'm just getting there.  Hold
21   on.  I'll tell you.
22       MR. POLANSKY:  15?
23       Q.  (BY MR. BRODERICK:)  After exhibit -- no, it's
24   after the page we were looking at, when we get to what
25   looks like an image of the SnappyAutoInsurance.com

Page 53

1    website.
2        A.  Just below the section we were previously
3    looking at under Exhibit C?
4        Q.  Exactly.
5        MR. POLANSKY:  Just for record purposes, it's
6    page 16 of 20 on Exhibit 7 -- no, Exhibit 6.
7        Go ahead.
8        Q.  (BY MR. BRODERICK:)  Now, previously we went
9    over Exhibit 2, which I've been calling the QuoteWizard
10   opt in, the document that you compiled.
11       A.  Uh-huh.
12       Q.  On this subpoena response from Plural, do you
13   see any "TCPA Disclosure" language --
14       MR. POLANSKY:  Objection.
15       Q.  (BY MR. BRODERICK:)  -- similar to what you
16   copied into Exhibit 2 when you yourself visited the
17   SnappyAutoInsurance.com website?
18       MR. POLANSKY:  Objection.
19       A.  I do not.  How far down am I supposed to be
20   going?  It seems to go for a while.  Yeah, I don't -- I
21   mean, I don't see anything.
22       Q.  (BY MR. BRODERICK:)  Okay.  Do you know what
23   this -- do you think that's a complete version of the
24   website, or was there something different that you
25   captured that language from when you created Exhibit 2?

14 (Pages 50 - 53)

Page 54

1    A.  You're kind of fading in and out for me.
2    Q.  Do you -- do you know if that's a -- does that
3    look like the Snappy Auto insurance website that you
4    visited in order to cut and paste the "TCPA Disclosure"
5    language?
6    A.  I don't remember.
7    Q.  Okay.  So you don't know what -- why that
8    language doesn't show up on Exhibit 7?
9    A.  I have no idea.
10   Q.  And would you agree with me that this --
11   Exhibit 6, the Plural response to Mantha's subpoena,
12   there is no reference to AutoInsurQuotes.com and its
13   marketing partners on this document?  I'll just
14   represent that to you.  Do you know why that is?
15       MR. POLANSKY:  Objection.  I think that's
16   incorrect as well.
17   Q.  (BY MR. BRODERICK:)  (Inaudible.)
18       MR. POLANSKY:  We can't hear you.  Ed, are you
19   talking?  We can't hear anything, unless you guys can't
20   hear me.
21       THE WITNESS:  I can hear you.  I can't hear
22   him at all.
23       THE VIDEOGRAPHER:  We can't hear.
24       MR. BRODERICK:  Can you hear me?
25       MR. POLANSKY:  Yeah, you're going in and out.

Page 55

1    Ted, we can't hear you.  No.  I can see your mouth
2    moving, but...
3        THE VIDEOGRAPHER:  Should we go off record,
4    Mr. Polansky?
5        MR. POLANSKY:  Yeah, let's go off record until
6    we can fix Ted.
7        THE VIDEOGRAPHER:  Going off record.  The time
8    now is 4:23 p.m.
9        (Recess.)
10       THE VIDEOGRAPHER:  We are back on record.
11   It's now 4:30 p.m. in the Eastern Time Zone.
12   Q.  (BY MR. BRODERICK:)  Okay.  So Mr. Weeks,
13   turning back to Exhibit 6, the final part which starts
14   at page 15, which looks like a representation of the
15   SnappyAutoInsurance.com website, at least part of it,
16   this is -- this is Plural's response to a subpoena.
17       From page 15 on, there is no -- would you
18   agree there is no reference to AutoInsurQuotes.com?
19   A.  I have no idea.  I mean, this is -- there is a
20   lot of text here.  It would take a while to read this.
21   Q.  I represent to you that is --
22       THE VIDEOGRAPHER:  Counsel, we can't hear you.
23       MR. BRODERICK:  Really?
24       MR. POLANSKY:  Yeah, you're coming in very
25   low.

Page 56

1        MR. BRODERICK:  But it was working okay?
2        MR. POLANSKY:  Now we can hear you.  Don't
3    hold that, put that down.  No, we can't hear you if
4    you're holding it.
5        MR. BRODERICK:  I was holding it when you
6    heard me.  Now?
7        MR. POLANSKY:  Yeah, that's better.
8    No, that's no good.
9        THE VIDEOGRAPHER:  Can we go off record and
10   maybe we attempt to switch to phone audio?
11       MR. POLANSKY:  Okay, go off record again.
12       THE VIDEOGRAPHER:  Off record at 4:32 p.m.
13       (Discussion off the record.)
14       THE VIDEOGRAPHER:  Back on record.  The time
15   now is 4:34 p.m.
16   Q.  (BY MR. BRODERICK:)  Okay, Mr. Weeks.  So do
17   you have any -- any explanation for why the Plural opt
18   in, which is what I'm referring to as Exhibit 6, would
19   be different from the QuoteWizard opt in?
20       MR. POLANSKY:  Objection.
21       We can't hear you, Matthew.
22   A.  Why our document is different from theirs?
23   Q.  (BY MR. BRODERICK:)  Well, let me -- let me
24   rephrase.  And specifically with respect to references
25   to AutoInsurQuotes.com and its marketing partners, if

Page 57

1    you --
2    A.  I mean, I can't speak to their document.
3    Q.  But you don't have any knowledge of whether
4    RevPoint added the language that it provided to you?
5    Strike that.
6        Do you know why the Plural Exhibit 6 doesn't
7    reference a Jornaya LeadiD?
8        MR. POLANSKY:  Objection.
9    A.  I can't speak to anything in their document.
10   I don't -- I don't know.
11   Q.  (BY MR. BRODERICK:)  Okay.  You don't know
12   who -- where that Jornaya LeadiD came from, other than
13   it was provided to you by RevPoint?
14   A.  The ID?  The Jornaya LeadiD that we have was
15   provided to us by RevPoint.
16   Q.  Yeah.  And that was the one that was via email
17   that we talked about earlier?
18   A.  Yes.  Well, the ID --
19   Q.  No, no, strike that.  I think that's wrong.
20   But that's fine.  Strike that question.
21       Do you know who -- does RevPoint have a
22   contract with Jornaya, to your knowledge?
23   A.  I have no idea of RevPoint's contract
24   situations.
25   Q.  And same for Plural, you don't know if they

15 (Pages 54 - 57)

Page 58

1  have a contract with Jornaya?
2      A.  I have no idea.
3          MR. BRODERICK:  Okay.  Now, I'm getting close.
4      I'm going to introduce the IP subpoena for
5  RevPoint, and that's going to be Exhibit 7.
6          MR. POLANSKY:  The June 26th -- you have an
7  Exhibit 7, and it says Verizon IP June, versus J-U-E --
8          MR. BRODERICK:  Okay, sorry.  So this will be
9  eight, unless I just clicked the wrong thing.
10         MR. POLANSKY:  So what is Exhibit 8?
11         MR. BRODERICK:  I'm trying to figure that out
12 myself.
13         Did I introduce Charter before?  I apologize.
14 Let's see here.
15         MR. POLANSKY:  Yeah.
16         MR. BRODERICK:  You know what the problem is?
17 My page isn't refreshing.
18         MR. POLANSKY:  So just to help you out, you
19 have Exhibits 1 through 7.  You have Exhibit 7 as the
20 Verizon IP address for June 26, 2019.
21         MR. BRODERICK:  Yeah, I got it, I got it, I
22 got it, I got it.
23         Okay.  What I was trying to do was introduce
24 the IP subpoena for RevPoint which tracks to Guerrero.
25         MR. POLANSKY:  You have that.

Page 59

1          MR. BRODERICK:  Oh, jeez.
2          MR. POLANSKY:  That's No. 5.
3          MR. BRODERICK:  That's No. 5, okay.  What I --
4      just a tip for next time we do this:  It's good to cut
5      them out of your private folder, out of your marked
6      folder, and then you don't go over the same thing twice.
7          We have not gone over -- have we gone over
8      Jornaya, Jornaya subpoena response?
9          MR. POLANSKY:  No.
10     Q.  (BY MR. BRODERICK:)  Okay.  That is what I
11 wanted to show you.
12         MR. POLANSKY:  Do you want to just mark it as
13 Exhibit 8 now so we don't have to go back and forth?
14         MR. BRODERICK:  Thank you, Kevin.
15         (Deposition Exhibit 8 was marked for
16         identification.)
17     Q.  (BY MR. BRODERICK:)  Yeah, so we've marked the
18 Jornaya subpoena response as Exhibit 8.  And Mr. Weeks,
19 I'll represent to you that that is a response from
20 Jornaya to a subpoena issued to it in connection with
21 this case.
22         And we've already talked about that you don't
23 have any relationship -- QuoteWizard does not have any
24 relationship with Jornaya.  Have you ever seen this
25 response before, Exhibit 8?

Page 60

1      A.  I have not.
2      Q.  And going down to the bottom here, do you see
3  a -- is that -- now we have a "Universal LeadiD" on the
4  last page of Exhibit 8, which is the Jornaya response.
5          Have you ever seen a Jornaya LeadiD like this?
6          MR. POLANSKY:  Objection.
7      A.  Like -- like what?  I'm not --
8      Q.  (BY MR. BRODERICK:)  Well, in connection with
9  your work.  Like, I just want to know if this is a --
10 this LeadiD which ties -- you know, which is the LeadiD
11 that was on -- well, this LeadiD on the last page of
12 Exhibit 8, is that the same lead, Jornaya LeadiD that's
13 on Exhibit 2?
14         MR. POLANSKY:  Objection.
15     A.  I have no idea.  I'd have to go back and look.
16     Q.  (BY MR. BRODERICK:)  I want to do that,
17 because I just -- I'm just trying to establish that --
18 because what we tried to do here is, I'll just explain, was take
19 the LeadiD from the QuoteWizard opt in, which is
20 Exhibit 2, and asked Jornaya to provide us with
21 information on that LeadiD.  I just want to confirm
22 that.
23         All right.  I've got it written down.  Let's
24 go look at Exhibit 2.  Can you write down the Jornaya
25 LeadiD?

Page 61

1      A.  I did the opposite.  I went back and wrote it
2  down from two and was going to go back and look at the
3  one for eight.
4      Q.  So now you're looking at -- you wrote it down
5  from two, which is the QuoteWizard opt in?  Yes?
6      A.  Correct.
7      Q.  Okay.  And that's the same LeadiD as appears
8  on Exhibit 8, correct, in the last page of Exhibit 8?
9      A.  Yes, that's the same.
10     Q.  Okay.  And that LeadiD, this -- this response
11 from Jornaya says that the "Event Date" was 6/21/2019.
12 And it has an "IP Address" of 13.66.191.218.  And we're
13 talking about on Exhibit 8.
14         Now, that's a different IP address from all
15 the other IP addresses we've discussed; correct?
16     A.  Yes.
17         MR. POLANSKY:  Objection.
18     Q.  (BY MR. BRODERICK:)  Okay.  And do you know
19 what it means where it says, "TCPA information witnessed
20 by TCPA Guardian:  TCPA disclosure statement witnessed
21 at the lead event," colon.  And it says, "Jornaya cannot
22 verify TCPA disclosure language because a disclosure was
23 not tagged on the website according to Jornaya's
24 standard instructions."
25         Do you know what that means?

16 (Pages 58 - 61)

Page 62

1    A.  I do not.
2    Q.  And have you ever talked to anyone at Jornaya
3  about that LeadiD or that language?
4    A.  I have not.
5    Q.  Okay.  And similarly -- no, we've already
6  covered that.
7      And having reviewed all of these subpoena
8  responses in this case, is it still Quote -- your
9  position that Mr. Mantha consented to receive
10  telemarketing texts from QuoteWizard?
11    MR. POLANSKY:  Objection.
12    A.  It's our opinion that consent was provided.
13    Q.  (BY MR. BRODERICK:)  And that consent was on
14  SnappyAutoInsurance.com?
15    A.  According to the email that I received from
16  RevPoint Media, yes.
17    MR. BRODERICK:  Okay.  All right.  Well, I
18  don't have anything further.  Thank you very much for
19  your time.  And I don't know if Kevin has any questions
20  for you.
21    MR. POLANSKY:  I do.  I just have a couple.
22  This won't take all but a few minutes, but there are a
23  couple of areas that I want to clarify stuff on.
24
25

Page 63

1      EXAMINATION
2  BY MR. POLANSKY:
3    Q.  Okay.  So first I want to switch gears and go
4  back to Exhibit 6.
5    A.  Okay.
6    Q.  Now, I understand that you haven't seen this
7  document before, but you were asked some questions on
8  it, specifically as it related to auto insurance quotes.
9    A.  Yes, I believe so.
10    Q.  I want to go to page I think it's 16 of 20 on
11  Exhibit 6.  And if you scroll to the very bottom of that
12  page, it's the last sentence where it says, starts,
13  "Taking advantage of...."
14    A.  For some reason, the page numbers aren't
15  showing up.
16      Oh, here we go.  Hold on one sec.
17    Q.  It's the page where it says enter zip code.
18    A.  Okay.
19    Q.  Okay?  So go to the very bottom of that page.
20  I'm going to direct you as best I can.  It says, "Call
21  1-888-920-8495 for your Instant Quote now."
22    A.  Yes.
23    Q.  Okay.  And so I want to first look at that
24  phone number.  So write down that phone number --
25    A.  Okay.

Page 64

1    Q.  -- and tell me when you've done that.
2    A.  Okay.
3    Q.  And then pop out of that exhibit and go to
4  Exhibit 2, the QuoteWizard opt in.
5    A.  Okay.
6    Q.  And go to the "TCPA Disclosure" that you
7  copied and pasted from the SnappyAutoInsurance website.
8    A.  Uh-huh.
9    Q.  Can you tell me if those phone numbers are a
10  match?
11    A.  Yes, they match.
12    Q.  Okay.  So now do you see where it says, right
13  before that phone number, "please call
14  AutoInsurQuotes.com"?
15    A.  Yes.
16    Q.  You were asked some questions earlier about
17  AutoInsurQuotes.com; is that right?
18    A.  Yes.
19    Q.  I want you to go back to Exhibit 6 and, if you
20  can, I know this is not the most easy thing, but go back
21  to that page you just had the phone number.
22    A.  Uh-huh.
23    Q.  On my screen it comes up as page 16 of 20.  I
24  don't know what it shows up on yours.
25      Under that phone number, do you see where it

Page 65

1  says "SnappyAutoInsurance.com"?
2    A.  Yes.
3    Q.  And then do you see where it says "Copyright
4  2013"?
5    A.  Yes.
6    Q.  And then on your page is there another
7  sentence there?
8    A.  Yes.
9    Q.  Okay.  Can you read that sentence to me?
10    A.  "Taking advantage of this free Auto Insurance
11  Quote service is completely optional and will not impact
12  your ability to win samples, prizing, or sweepstakes."
13    Q.  Okay.  So it says "Auto Insurance Quote
14  service."  Do you see that?
15    A.  Yes.
16    Q.  Okay.  Now, looking at the same page, at the
17  very top of that page do you see where it looks like
18  there is a website, URL address,
19  "SnappyAutoInsurance.com"?
20    A.  Yes.
21    Q.  And underneath it says "58 captures"?
22    A.  Uh-huh.
23    Q.  Do you -- do you understand what those 58
24  captures are?
25    A.  I do not.

17 (Pages 62 - 65)

Page 66

1   Q.  Okay.  And do you see the dates 10 March 2014
2  to September 6, 2019?
3      A.  Uh-huh.
4      Q.  And you don't know what those dates are,
5  either, I assume; is that correct?
6      A.  I do not.
7      Q.  Okay.  Now, you testified earlier that you
8  went on to the SnappyAutoInsurance.com website to obtain
9  the "TCPA Disclosure" that you believe Mr. Mantha would
10  have seen; is that correct?
11      A.  Yes.
12      Q.  Do you know if you went into and entered any
13  information to get in this form here on page six -- or
14  Exhibit 6?
15      A.  Yes.
16      Q.  Okay.  So what you're looking at isn't the
17  final form that you saw?
18      A.  No.
19      Q.  And again, you don't -- you don't have any
20  understanding, sitting here today, what the 58 captures
21  are?
22      A.  I do not.
23      Q.  Earlier you were asked some questions by
24  plaintiff's counsel about when you prepared the Quote --
25  the QuoteWizard data file, the opt in information; is

Page 67

1  that right?
2      A.  Yes.
3      Q.  And you kept on referring to a "complaint."
4  When you say "complaint," are you referring to a demand
5  letter, or are you referring to a complaint that was
6  filed in this lawsuit?
7      A.  I may have misspoke.  It was the original
8  demand letter that we got.
9      Q.  Okay.  So after -- so if I understand
10  correctly, after receiving that demand letter, that's
11  when you reached out to RevPoint for the consent
12  information?
13      A.  Yes.
14      Q.  So you were using "complaint" to mean demand
15  letter, just to be clear for the record?
16      A.  Yeah.  I apologize.  I'm not a lawyer.
17      Q.  Okay.  Going back to Exhibit 2, which is the
18  QuoteWizard opt in, and I think you cleared this up but
19  I just want to make sure the record is clear.
20         Now, after receiving that demand letter, you
21  reached out to Michael Fishman at QuoteWizard; is that
22  right?
23      A.  Of RevPoint.
24      Q.  Oh, excuse me, of RevPoint.
25      A.  Yeah.

Page 68

1      Q.  And he provided information to you via email?
2      A.  Correct.
3      Q.  And you used that information to prepare at
4  least a portion of Exhibit 2; is that right?
5      A.  Yes.
6      Q.  Now, you said the other information came from
7  your data system at QuoteWizard; is that right?
8      A.  Yes.
9      Q.  Did QuoteWizard generate any of that
10  information, or is that information that came from
11  RevPoint?
12      A.  It all ultimately came from RevPoint.  It's
13  just I went to our database, because that's where it's
14  stored for me.
15      Q.  Okay.
16      A.  But all this information in this ultimately
17  came from RevPoint.
18      Q.  So I just want to be clear.  So QuoteWizard
19  didn't create any of this data, you just happened to
20  take it from two different sources and put it together;
21  right?
22      A.  Correct.  The only thing that would have been
23  created by us was the lead purchase date.
24      Q.  Okay.  And that's the date that you purchased
25  the lead?

Page 69

1      A.  Yeah, the date that our system recognizes that
2  the lead was purchased.
3         MR. POLANSKY:  Okay.  That might be all I
4  have.  Just give me one second to go over my notes.
5         That's all I have.
6         MR. POLANSKY:  Ted, do you have any questions?
7         EXAMINATION
8  BY MR. BRODERICK:
9      Q.  With the document that is Exhibit 2, the
10  QuoteWizard opt in, you said you did it in Word.  Would
11  that document have a created-on date?
12      A.  I don't know.
13      Q.  When you look at "Properties" -- do you know
14  how to do that?
15      A.  I'd have to -- are you asking me to open up my
16  original file?
17      Q.  Do you still have it in Word?
18      A.  I believe so.
19      Q.  I have the impression you weren't sure on the
20  date when I asked you about when it was created.  Are
21  you -- do you know when you received the demand letter?
22      A.  I'd have to check emails for that.  I don't
23  know off the top of my head.
24      Q.  And do you know when the complaint was filed?
25      A.  I do not.

18 (Pages 66 - 69)

Page 70

1  Q.  And when I say the "complaint," I mean a
2  complaint in court as opposed to a demand letter.
3  A.  I don't.
4  Q.  Okay.  But is that something that if we go
5  through counsel we could find out, you know, look at the
6  date on the Word document, when it was created, meaning
7  you right click on "Properties" and it tells you when it
8  was originally created and then when it was -- when it
9  was sort of last modified?
10  A.  I mean, if you're asking me to do that, I can
11  try and do that.
12  MR. POLANSKY:  We'll have you go through
13  counsel for that, but...
14  MR. BRODERICK:  Right.  Yeah, I don't mean to
15  give you homework on the fly.
16  THE WITNESS:  Okay.
17  MR. BRODERICK:  Okay.  All right.  Well, with
18  that, I don't have -- yeah, I don't have anything else.
19  And I appreciate your patience with the technical snafus
20  here.
21  THE WITNESS:  Not a problem.
22  MR. POLANSKY:  That's great.  Thank you,
23  Matthew.
24  MR. BRODERICK:  Thank you very much.
25  THE VIDEOGRAPHER:  This is the end of the

Page 71

1  30(b)(6) deposition of QuoteWizard.com represented by
2  Matthew Weeks.  We are going off the record at
3  approximately 4:57 p.m. in the Eastern Time Zone.
4  (Deposition recessed at 4:57 p.m.)
5  (Signature was reserved.)

Page 72

1  REPORTER'S CERTIFICATE
2  I, CHERYL O. SPRY, the undersigned Certified Court
3  Reporter, pursuant to RCW 5.28.010, authorized to
4  administer oaths and affirmations in and for the State
5  of Washington, do hereby certify that the sworn
6  testimony and/or proceedings, a transcript of which is
7  attached, was given before me at the time and place
8  stated therein; that any and/or all witness(es) were by
9  me duly sworn to testify to the truth; that the sworn
10  testimony and/or proceedings were by me stenographically
11  recorded and transcribed under my supervision, to the
12  best of my ability; that the foregoing transcript
13  contains a full, true, and accurate record of all the
14  sworn testimony and/or proceedings given and occurring
15  at the time and place stated in the transcript; that a
16  review of which was requested; that I am in no way
17  related to any party to the matter, nor to any counsel,
18  nor do I have any financial interest in the event of the
19  cause.
20  WITNESS MY HAND AND DIGITAL SIGNATURE THIS 4th day
21  of AUGUST, 2020.
22
23
24  CHERYL O. SPRY
    Washington State Certified Court Reporter No. 2226
25

Page 73

1  Kevin Polansky, Esq.
2  kevin.polansky@nelsonmullins.com
3  August 4, 2020
4  RE:  Mantha, Joseph v. Quotewizard.Com, LLC
5  7/22/2020, Matthew Weeks (#4182716)
6  The above-referenced transcript is available for
7  review.
8  Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12  The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22  Yours,
23  Veritext Legal Solutions
24
25

19 (Pages 70 - 73)

Page 74

1  Mantha, Joseph v. Quotewizard.Com, LLC
2  Matthew Weeks (#4182716)
3          E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____     _____
24 Matthew Weeks              Date
25

Page 75

1  Mantha, Joseph v. Quotewizard.Com, LLC
2  Matthew Weeks (#4182716)
3          ACKNOWLEDGEMENT OF DEPONENT
4     I, Matthew Weeks, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____     _____
12 Matthew Weeks              Date
13 *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25