# EXHIBIT 14

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH MANTHA, on behalf of himself
and all others similarly situated,

    Plaintiff,

  vs.              Civil Action No. 1:19-CV-12235-LTS

QUOTEWIZARD.COM, LLC,

    Defendant.

--------------------------------x

CONTINUED VIDEOTAPED DEPOSITION OF

MICHAEL FISHMAN

CONDUCTED VIRTUALLY

Monday, December 14, 2020

10:08 a.m. EST

Laurie K. Langer, RPR

Page 2

1        APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFF(s):
4    BY: Edward A. Broderick, Esq.
5        THE LAW OFFICE OF EDWARD A. BRODERICK
6        208 Ridge Street
7        Winchester, Massachusetts 01890
8        (781) 721-1354
9        ted@broderick-law.com
10
11 ON BEHALF OF THE DEFENDANT(s):
12   BY: Kevin P. Polansky, Esq.
13       NELSON MULLINS RILEY & SCARBOROUGH, LLP
14       One Post Office Square
15       30th Floor
16       Boston, Massachusetts 02109
17       (617) 217-4700
18       kevin.polansky@nelsonmullins.com

Page 3

1  (Appearances continued)
2
3  ON BEHALF OF THE DEPONENT (s):  RevPoint Media, LLC
4    BY: Evan King, Esq.
5        KLEIN MOYNIHAN TURCO
6        450 Seventh Avenue, 40th Floor
7        New York, New York 10123
8        (212) 246-0900
9        eking@kleinmoynihan.com
10
11
12
13 ALSO PRESENT:
14   Anthony Piccirilli, Videographer

Page 4

1              INDEX OF EXAMINATION
2
3  WITNESS: Michael Fishman
4  EXAMINATION                              PAGE NO.
5  By Mr. Polansky                             6
6  By Mr. Broderick                           53
7  By Mr. King                                63
8
9              INDEX TO EXHIBITS
10 NO.       DESCRIPTION                    PAGE NO.
11 Exhibit 2  Responses and Objections to     7
12            Subpoena to Produce
13            Documents, Information, or
14            Objects or to Permit
15            Inspection of
16            Premises in a Civil Action
17 Exhibit 3  11/13/20 Letter to             30
18            Mr. Paronich and Attached
19 Exhibit 4  8/13/20 Letter to Mr. Kingston 50
20            and Attached
21
22 (Original exhibits attached to original transcript)

Page 5

1              P R O C E E D I N G S
2
3        VIDEOGRAPHER: Good morning.  We are now on
4  the record.  Please note that the microphones are
5  sensitive and may pick up whispering and private
6  conversations.  Recording will continue until all
7  parties agree to go off the record.
8        My name is Anthony Piccirilli representing
9  Veritext.  The date today is December 14, 2020 and the
10 time is approximately 10:08 a.m.  This deposition is
11 being held remotely via Zoom.
12       The caption in this case is Joseph Mantha on
13 behalf of himself and all others similarly situated
14 versus QuoteWizard.com, LLC.  The name of the witness is
15 Michael Fishman.
16       At this time the attorneys will identify
17 themselves and the parties they represent, after which
18 our court reporter, Laurie Langer, representing Veritext
19 will swear in the witness and we can proceed.
20       MR. POLANSKY: Good morning.  This is Kevin
21 Polansky on behalf of the Defendant QuoteWizard.
22       MR. BRODERICK: Good morning.  This is
23 Edward Broderick on behalf of the Plaintiff Joseph
24 Mantha.

Page 6

1     MR. KING: Good morning. Evan King, I'm
2  representing the Deponent RevPoint Media, LLC.
3
4            MICHAEL FISHMAN,
5  having been satisfactorily identified by the production
6  of his driver's license, and duly sworn by the Notary
7  Public, was examined and testified as follows:
8
9            EXAMINATION
10
11 BY MR. POLANSKY:
12    Q. Good morning, Mr. Fishman. Could you please
13 state your full name for the record.
14    A. Michael Alex Fishman.
15    Q. Mr. Fishman, as you know I represent QuoteWizard
16 who is a Defendant in this case, and this is your second
17 deposition in this matter; is that correct?
18    A. That's correct.
19    Q. Did you have a chance to review your prior
20 deposition transcript yet?
21    A. I have not.
22    Q. Have you been provided with it?
23    A. Not to my knowledge. I have not.
24    Q. Prior to today's deposition did you review the

Page 7

1  subpoena that was served upon RevPoint?
2     A. Briefly, yes.
3     Q. Okay. Did you look at the Exhibits A through D
4  in preparation for today's deposition?
5     A. I did not look at the exhibits.
6     Q. Did you review any documents in preparation for
7  today's deposition?
8     A. I did not.
9     Q. Okay. Did you speak to anyone other than your
10 counsel?
11    A. I did not.
12    Q. Okay. After your first deposition and prior to
13 today's deposition, did you speak to anybody about your
14 prior deposition?
15    A. I did not.
16    Q. After your prior deposition did you later reflect
17 upon and believe that there was anything that you wanted
18 to change in your testimony?
19    A. Not to my knowledge, no.
20    Q. Okay. I'm going to jump right into the exhibits
21 that were attached to today's subpoena which is
22 Exhibit 1.
23       (Deposition Exhibit No. 2 introduced.)
24    Q. And the first exhibit we're going to look at is

Page 8

1  Exhibit 2 which is Exhibit A that was attached to the
2  subpoena. Let me know when you have that up.
3     A. Okay. Just direct me. I'm in the files. Where
4  am I going?
5     Q. Okay. So do you see Exhibit 2?
6     A. Well, just let me get into the right folder.
7     Q. Okay.
8     A. So I'm in shared, Exhibit Share, Mantha Joseph
9  versus QuoteWizard, and then is it -- there's a bunch of
10 PDFs that I'm looking at; is that correct?
11    Q. Yes. That's to identify the exhibit. It should.
12    A. Exhibit -- the first one on this list other than
13 a letter would be Exhibit 0017. Am I in the right
14 place? And then 0018, 0019, 0020.
15    Q. No, I don't know what that reflects.
16       MR. POLANSKY: Can we go off the record for
17 a second.
18       MR. KING: Sure.
19       VIDEOGRAPHER: The time is 10:12 and this is
20 the end of session number one, we are now off the
21 record.
22       (Discussion off the record.)
23       VIDEOGRAPHER: The time is 10:13, this is
24 the beginning of session number two and we are now back

Page 9

1  on the record.
2     Q. Okay. So, Mr. Fishman, we're looking at
3  Exhibit 2 which was Exhibit A attached to the subpoena
4  of this deposition; okay?
5     A. Uh-huh. Yes.
6     Q. It's -- it's a 64-page document. Do you see
7  that?
8     A. Yes, I do.
9     Q. Okay. And let's go to page 2 of 64. Do you see
10 this?
11    A. Yes, I do.
12    Q. And I'll represent to you that this was the
13 written response objections to the first subpoena issued
14 to RevPoint in this matter prepared by your counsel;
15 okay?
16    A. Okay.
17    Q. If you can turn to page 4.
18    A. Okay.
19    Q. It's Request No. 2.
20    A. Request No. 2 on this is on page 3.
21    Q. Yes. Right. It's page 4 of 64 of the PDF, page
22 3 of the document on the screen.
23    A. Okay.
24    Q. Okay. Document Request No. 2 says, "produce all

3 (Pages 6 - 9)

Page 10

1  documents relating to the Plaintiff."
2      In response to that subpoena RevPoint produced
3  what's Bates stamped RP9 through 52. Do you see that at
4  the bottom of the response?
5      A. I do.
6      Q. Okay. In coming up with, with that document
7  production what sources did RevPoint review to determine
8  what was responsive?
9      A. The sources that we would have referred to would
10 have been our, our database as well as the, the user
11 interface of our system. And so those would have been
12 the two sources of the information that we provided in
13 the subpoena.
14     Q. And does the database have any specific name that
15 you call it?
16     A. Does the database have any specific name? Well,
17 the platform is called Jangl.
18     Q. Jangl. Okay.
19     A. If that's what you're referring to.
20     Q. Yes. And that's your proprietary platform?
21     A. Yes.
22     Q. And does Jangl own RevPoint or is it vice versa;
23 does RevPoint own Jangle?
24     A. Jangl is, is an entity, RevPoint owns it.

Page 11

1      Q. Okay. So the database is called Jangl and the
2  user interface of our system, what is that called. What
3  kind of platform is it?
4      A. That -- that would be Jangl. I mean, the
5  database is not, doesn't really have a name --
6      Q. Okay.
7      A. -- per se. The system in itself is called Jangl.
8      Q. So you reviewed -- you reviewed Jangl to
9  determine what information you would have from
10 Mr. Mantha; is that correct?
11     A. Correct.
12     Q. And would that include all TCPA consent
13 information?
14     A. Whatever was provided, yes, that's correct.
15     Q. And when you say "whatever was provided,"
16 provided by who?
17     A. Whatever was provided by the publisher, the
18 vendor, the supplier of the data.
19     Q. And in this case that would be Plural Marketing?
20     A. Correct.
21     Q. And would that be -- would that be information
22 that was, was supplied by Plural Marketing at the time
23 of purchasing the lead or subsequently?
24     A. That would only be information that was supplied

Page 12

1  at the time of purchase.
2      Q. Did you also review information to determine what
3  you learned from Plural Marketing after this lawsuit was
4  filed?
5      A. After the lawsuit was filed not in, for this, for
6  a subpoena request; correct?
7      Q. Right.
8      A. We -- I'm not sure that we reviewed the
9  information per se, but we requested the information and
10 in turn then supplied that information to QuoteWizard.
11     Q. I want to turn to page 22 of 64 of Exhibit 2.
12     A. Can you just help me with the page number?
13     Q. Yeah. It --
14     A. Oh, I see it. Because it jumps around here. All
15 right. It's multiple documents. I'm sorry. Which
16 page?
17     Q. 22 of 64. It's the easiest way for me to
18 reference where we are.
19     A. I got it. Because I figured out how to look at
20 that too. Okay. I think I'm here. Yep.
21     Q. The version is a little bit blurry but I think
22 it's workable.
23     A. Uh-huh.
24     Q. So this is an e-mail from, from Jesse Schreiber

Page 13

1  to George at Plural; do you see at the very top of the
2  screen?
3      A. Yes.
4      Q. Okay. And who is Jesse Schreiber?
5      A. Jesse Schreiber was an employee of RevPoint
6  Media.
7      Q. When you say "was" -- is it a he?
8      A. He. Yes.
9      Q. He. He's no longer employed?
10     A. Correct.
11     Q. And when did his employment end?
12     A. I want to say on or about March of 2020.
13     Q. Okay. Was it -- was it voluntary?
14     A. Yes.
15     Q. And -- and what was his role at RevPoint?
16     A. He was a -- we don't fundamentally define these,
17 but ultimately an operations coordinator. Media
18 coordinator.
19     Q. Does he interface with the lead suppliers or
20 generators?
21     A. Yes.
22     Q. And do you know if he had prior communications
23 with, with George Rios of Plural Marketing?
24     A. Prior to this event?

Page 14

1  Q. Yeah, outside of this event.
2  A. I would assume that he had some, yes,
3  communication with George.
4  Q. Okay. So, now, on Bates stamp, same document,
5  but it's Bates stamped RP10. This appears to be a text
6  message on September 11, 2019.
7  A. Okay. I'm sorry. Just where am I looking?
8  Q. Sure.
9  A. So which page?
10 Q. Okay. So 22 of 64 of Exhibit 2.
11 A. Yep.
12 Q. Okay. This is, appears to be a text string from
13 Plural, between Plural and RevPoint; is that right?
14 A. I -- I would actually, I think, if I remember
15 correctly, that this is a Skype stream.
16 Q. Skype. Okay. Fair enough. And do you know if
17 the Skype is between you and Plural or is it between
18 Jesse and Plural?
19 A. It would have been between Jesse and Plural.
20 Q. Okay. And the first Skype on the right-hand side
21 is blue; do you see that?
22 A. Uh-huh.
23 Q. And so are you familiar with Skype, and so this
24 would be a message that you sent or "you" being

Page 15

1 RevPoint?
2  A. I'm relatively familiar with Skype. It's
3 not -- yes. So I understand that.
4  Q. And so it says, "hey, we got a TCPA request on an
5 auto insurance lead brought," I think it meant bought,
6 "from you on August 5th."
7     Do you see that?
8  A. Yes, I do.
9  Q. And it says, "upon checking it was a fraudulent
10 LeadiD code passed to us as well. Please get this info
11 for me ASAP."
12    Do you see that?
13 A. Yes, I do.
14 Q. And what, what info was Jesse looking for?
15 A. He would have been looking for ultimately
16 everything about the lead, specifics about the lead. IP
17 address, TCPA language, timestamp. It's a confirmation
18 of the information that would have been supplied either
19 within Plural's database from the generation of the lead
20 or from their source.
21 Q. Okay. And -- and do you know whether Jesse or
22 yourself reviewed what had been supplied by Plural
23 before sending this Skype request?
24 A. Reviewed? Like I said before, I don't know how

Page 16

1 much we reviewed the information as we did just pass the
2 information to QuoteWizard.
3  Q. Right. So I guess my question is after
4 QuoteWizard reached out for TCPA information on this
5 Plaintiff you then sent it along to Plural; is that
6 right?
7  A. Correct.
8  Q. And when I say "you" I don't mean you personally
9 but I mean RevPoint; okay?
10 A. I understand, okay.
11 Q. Okay. And so before you did that did you review
12 the information that was in your database, the Jangl
13 database, to determine what information you already had
14 for this Plaintiff?
15 A. We most likely reviewed the information we had in
16 our database, yes.
17 Q. And when you reviewed that information did you
18 see whether you had any TCPA consent or opt-in language?
19 A. We did not. To my knowledge that was, that was
20 not reviewed.
21 Q. So at that time you, you don't believe that you
22 had TCPA opt-in language?
23 A. No, I'm not saying that. I'm just saying that we
24 wouldn't have reviewed the language -- to my knowledge

Page 17

1 we don't pass leads in general within any sort of
2 relationship without TCPA language. So it wouldn't be
3 reviewed whether or not we had it, so that wouldn't have
4 been a question --
5  Q. Okay.
6  A. -- that we would have asked.
7  Q. So -- so let me ask it this way. Do you know
8 whether you had TCPA consent language at the time of
9 receiving the request from QuoteWizard?
10 A. That we had language at the time that we received
11 the request?
12 Q. Yes.
13 A. Yes. We would have known that we had language.
14 Q. And did you provide that language to QuoteWizard?
15 A. Well, that language would have been provided to
16 QuoteWizard upon the initial sale of the lead to my
17 understanding.
18    MR. KING: Yeah. Kevin, I just want to
19 chime in and just clarify, or ask you to sort of clarify
20 the timeline a bit. Because obviously there would have
21 been the sale of the lead which is, you know, one
22 instance of when information might have been passed
23 along and this second time in response to any specific
24 question. So if you can just clarify what time you're

5 (Pages 14 - 17)

Page 18

1  talking about.
2      MR. POLANSKY: Sure.
3  Q. So right now I'm talking about September 11th
4  which is when, which is when QuoteWizard reaches out to
5  you and says, "hey, we, we need information on Mantha,
6  the TCPA information on Mantha."
7  A. Yes.
8  Q. Did you at that time have TCPA consent language
9  from Plural?
10 A. Yes.
11 Q. Okay. Do you -- do you receive TCPA consent
12 language for all of your leads?
13 A. Yes.
14 Q. At the time of purchasing them?
15     MR. BRODERICK: Objection.
16 A. Do I answer?
17     MR. BRODERICK: Yeah, you can answer.
18     MR. KING: Yeah, you can answer.
19 A. I can't tell who is objecting.
20    Yes. We receive TCPA language for -- I
21 can't -- I can only speculate that it's every single
22 lead, but it would be just about there.
23 Q. Okay. Now, going back to when you sold the lead
24 to QuoteWizard, did you provide the TCPA consent

Page 19

1  language to QuoteWizard at that time?
2  A. I would have to look at our, at the integration
3  between RevPoint and QuoteWizard and whether or not that
4  information was supplied. It would be whether or not
5  QuoteWizard called for it upon the time of sale. I
6  don't know that offhand at this point. That is an
7  answer that I could provide at a later time. But
8  it -- but it would be whether or not it got called for.
9  If it got called for, that data, then, yes, it would
10 have been supplied.
11 Q. Okay. Now, would you have any reason to, to
12 disbelieve QuoteWizard if they say that they never
13 received that TCPA consent language at the time of sale?
14     MR. KING: Objection.
15 A. They never received?
16     MR. KING: You can answer.
17 A. Okay. Just so I clarify the question. Would I
18 believe if they told me that they had never received
19 TCPA?
20 Q. No, no, no. For this particular lead, if they
21 say that the lead information sold from RevPoint to
22 QuoteWizard didn't contain the TCPA consent language at
23 the time of sale, would you have any reason to
24 disbelieve that?

Page 20

1  A. So they're telling me they didn't have it or they
2  did?
3  Q. They did not.
4  A. I would definitely disbelieve that, because it
5  was provided from them to us at the time of sale.
6  Q. No, no, no. I'm talking about QuoteWizard, not
7  Plural.
8  A. Oh. I'm sorry. So if QuoteWizard said --
9  Q. Let' back up. Let's back up.
10 A. Okay. Sorry. I apologize.
11 Q. I'm just asking -- so I understand you from your
12 prior testimony that you said that if QuoteWizard calls
13 for TCPA consent being provided at the time of sale --
14 A. Uh-huh.
15 Q. -- you'll provide it?
16 A. Correct.
17 Q. Now, if I represent to you, and I understand I'm
18 asking you just to believe what I'm representing --
19 A. Okay.
20 Q. -- for the purpose of this question. If I
21 represent to you that QuoteWizard said, "hey, we never
22 received the consent language at the time of sale" would
23 you have any reason to disbelieve that?
24 A. No, I would not.

Page 21

1  Q. Okay. Now, going back to Plural, not
2  QuoteWizard. Was it part of your relationship with
3  Plural to receive TCPA consent language at the time of
4  sale? Of the, --
5  A. Not to my knowledge --
6  Q. -- lead of Plural to RevPoint?
7  A. To my knowledge, yes, it was.
8  Q. And how was that information provided from Plural
9  to RevPoint?
10 A. It was provided as a data field within the
11 integration of each, for each lead.
12 Q. And is that part of the Ping Post system?
13 A. Yes.
14 Q. And is that after you purchased the lead or you
15 get the high bid, or does it come along --
16 A. That's correct. I would have to look at the
17 specifics of that integration, but to my knowledge and
18 understanding it would be only after purchase would that
19 language come with the lead.
20 Q. Okay. Going back to page 22 of 64 in Exhibit 2.
21 A. Okay.
22 Q. When RevPoint says "it was a fraudulent LeadiD;"
23 what do they mean by that?
24 A. So we -- later during our work with, and I

Page 22

1  shouldn't -- not that we have a direct relationship with
2  Jornaya, but we were able to run a check on our side of
3  that LeadiD to just confirm or deny whether or not it
4  was valid. And at that time it looks like we had
5  determined or suspected that that Jornaya LeadiD was
6  invalid.
7     Q. Okay. And when you say "valid" do you mean it
8  doesn't relate to Mr. Mantha?
9     A. I -- I don't know what that means, other than we
10 would have received a valid or invalid response from
11 Jornaya's database and it came back invalid.
12    Q. Okay. So to be clear, the, the LeadiD that you
13 provided to Jornaya came back as invalid, an invalid iD?
14    A. At that time, correct.
15    Q. So in this same Skype communication string
16 RevPoint is asking for TCPA information; is that
17 correct?
18    A. That's correct.
19    Q. He's saying, you know, he's "more concerned with
20 the TCPA info" at 2:12 p.m. on September 11th; do you
21 see that?
22    A. Yes, I do.
23    Q. And, again, the TCPA info that he's more
24 concerned with is what?

Page 23

1     A. I'm speculating a little bit here, but my
2  understanding would be that ignoring the Jornaya
3  information and getting confirmation of the, of the
4  consent.
5     Q. Okay. Now, you would agree with me that this
6  lead was purchased by RevPoint from Plural on
7  August 5th, 2019; is that correct?
8     A. To my knowledge, yes, that's correct.
9     Q. And so if I understood your testimony just a
10 moment ago, you would have received the TCPA consent
11 language at the time of purchase; right?
12    A. Correct.
13    Q. So a month later you're asking for that same
14 information, although you should have it; right?
15    A. That's correct.
16    Q. And do you know why that's the case?
17    A. That is the case because it is relative common
18 practice when receiving a TCPA complaint request that
19 you request information from the source of where you
20 receive that lead. That is common practice. That's
21 kind of how that flow goes.
22       And the reason for that is to get confirmation on
23 data that might have been passed that might not fully
24 represent the individual user who filled out the form.

Page 24

1     Q. What do you mean by that?
2     A. So, for example, and I think we had maybe covered
3  this in the previous deposition, the IP address that was
4  passed might not be the IP address of the individual
5  user. The -- the website that was passed might not be
6  the specific website that the user had filled out the
7  form. So it's common practice in the industry to then
8  request specific information regarding that particular
9  complaint about the lead.
10    Q. And why would the websites differ?
11    A. The main reason for the website differing would
12 be to mask the source, and that is done with relative
13 common practice in order to avoid circumvention of
14 partnerships.
15    Q. I'm sorry. Can you -- which website are we
16 talking about here? Just generally.
17    A. Yeah, the website, I guess, where --
18    Q. The landing page, perhaps?
19    A. The landing page, yes, that's correct.
20    Q. So you -- sorry. Just to be clear. So you want
21 to mask the source of the, of the lead generator?
22    A. That -- that is -- I mean, I'm not saying we, we
23 did that.
24    Q. Right.

Page 25

1     A. I'm just saying that is common practice in the
2  industry to mask the, the source of the lead as to help
3  alleviate potential circumvention by a purchaser of the
4  lead.
5     Q. And what do you mean, the circumvention of a
6  purchaser of the lead?
7     A. So when data is passed, for example, if data was
8  passed from Plural to RevPoint and Plural is sending
9  RevPoint origination of the lead specifically,
10 hypothetically we could see where that lead is coming
11 from and then circumvent Plural and go right to their
12 sources.
13    Q. I see. So -- so you would just purchase directly
14 from the source?
15    A. It is a -- it adds risk of circumvention when
16 that data is passed.
17    Q. Okay. How do you know when a, when a website is
18 not the correct website that the user went on?
19    A. We wouldn't.
20    Q. And how do you find that out? From your -- from
21 your supplier, your lead supplier?
22    A. Exactly. And that would be why we would send an
23 e-mail requesting the specifics on a specific lead.
24    Q. Okay. Do you know if, if the website in this

Page 26

1 case Snappy Auto Insurance is the, is the web page that
2 Mr. Mantha went on?
3         MR. BRODERICK: Objection.
4   A. I do not.
5   Q. So to understand fully on the text -- or strike
6 that.
7       On the Skype string that we see here, although
8 you, RevPoint already had the consent language as of
9 this time, you're still seeking additional TCPA language
10 or information from Plural?
11   A. That's correct.
12   Q. Do you know on September 12th, 2019 whether
13 RevPoint had gone back through their Jangl system to
14 determine that they actually had the consent language in
15 the database at that time?
16   A. I do not know that.
17   Q. Turning to page 47 of 64. Let me know when
18 you're there.
19   A. I stopped counting.
20         MR. KING: If you just wiggle your mouse
21 around it brings it up.
22   A. Thank you. I've got it. 47?
23   Q. Yes.
24   A. Okay. I'm here.

Page 27

1   Q. Okay. And this is an e-mail from Matthew Weeks
2 at QuoteWizard to yourself; is that right?
3   A. That's correct.
4   Q. And he's looking for the Jornaya playback or
5 video of the Jornaya lead that was provided; right?
6   A. That's correct.
7   Q. And is this the LeadiD that, that was just
8 referenced a moment ago?
9   A. I believe so.
10   Q. And do you -- do you know where this Jornaya lead
11 came from?
12   A. I do not.
13   Q. Is this a LeadiD that was associated with the
14 lead -- strike that.
15       Is this a LeadiD that came with the lead when
16 purchased from Plural?
17   A. That's my understanding, yes.
18   Q. Is it possible this LeadiD was attached to the
19 lead at any point in time by RevPoint?
20   A. Just so I'm clear, that was not there prior.
21   Q. Yes.
22   A. No.
23   Q. In other words, did RevPoint relate this LeadiD
24 to the lead?

Page 28

1   A. No.
2   Q. So to your understanding this LeadiD came from
3 Plural and was then passed along to QuoteWizard; is that
4 right?
5   A. That's correct.
6   Q. Turning to page 60 of 64 of Exhibit 2.
7   A. Okay.
8   Q. This is an e-mail from you to Jesse Schreiber; is
9 that right?
10   A. Yes.
11   Q. And this, I assume, is the e-mail that precedes
12 the e-mail that Jesse Schreiber sent to George Rios; is
13 that right?
14         MR. BRODERICK: Objection.
15   A. I would -- I would speculate that, yes.
16         MR. BRODERICK: Sorry. Kevin, are you on
17 Exhibit 2?
18         MR. POLANSKY: I am, yep.
19         MR. BRODERICK: I only have pages -- oh,
20 okay. You're going by PDF --
21         MR. POLANSKY: Yeah.
22         MR. BRODERICK: Got it.
23         MR. KING: It's RP48 if that helps for Bates
24 stamps.

Page 29

1         MR. BRODERICK: Thank you. Thank you.
2   Q. Yeah, I'll try to refer to both of them. For us
3 it's just easier looking at the PDF number. This should
4 be the only exhibit that we have to do this on.
5   A. Okay.
6   Q. So back to page 60 of 64 of Exhibit 2, which is
7 also referenced as RP48.
8       And just to be clear, it's your belief that this
9 is the e-mail that you sent to Mr. Schreiber prior to
10 Mr. Schreiber sending an e-mail to George Rios of
11 Plural; is that correct?
12   A. Correct.
13   Q. And in the e-mail to Mr. Schreiber you asked him
14 for certain information; do you see that?
15   A. Yes, I do.
16   Q. Okay. Did you -- do you recall any conversations
17 that you had with Mr. Schreiber at that time about
18 whether you had some of this information already in the,
19 in the RevPoint database?
20   A. I do not.
21   Q. Do you know whether Mr. Schreiber would have been
22 trained on the Jangl database?
23   A. He would have been trained not into the database,
24 but would have been able to navigate the UI.

Page 30

1  Q. Okay. And what does "UI" stand for?
2  A. User interface.
3  Q. And would he have been able to search for the
4  information that you were seeking here in the database?
5  A. I believe so. But I'm not 100 percent sure
6  whether he had permission to look at specific lead
7  information.
8  Q. Do you know whether he would have been trained or
9  taught that TCPA consent language is within the database
10 for each particular lead?
11     MR. BRODERICK: Objection.
12 A. He -- I don't know that he was specifically
13 trained on that. I would believe that he would know
14 that.
15     (Deposition Exhibit No. 3 introduced.)
16 Q. I'm going to now move to Exhibit 3. So you just
17 have to back out, --
18 A. Okay.
19 Q. -- go into the shared folders and then it's an
20 eight-page document.
21 A. I'm there. Okay.
22 Q. Okay. On page 2 of Exhibit 3 is a letter from
23 your counsel dated November 13th, 2020 to Plaintiff's
24 counsel in this case. Do you see that?

Page 31

1  A. Yes, I do.
2  Q. Okay. Attached to this letter is a responsive
3  document that's been Bates stamped RP53; okay?
4  A. Okay.
5  Q. Have you seen this letter before?
6  A. Not to my knowledge, no.
7  Q. Okay. What about the document that's attached at
8  page 4 of 8? And I believe it was an Excel spreadsheet
9  that was made into a PDF.
10 A. I, based on the headers of this I can only
11 surmise that this was provided from us to, to counsel
12 because it looks like it's marked as our headers for
13 each column.
14 Q. And have you seen this type of detail for the
15 Mantha lead before?
16 A. Yes.
17 Q. And did you help search for and locate this
18 information?
19 A. I directed my, someone at my company to search
20 and get this information.
21 Q. Okay. And -- and who did you direct at your
22 company?
23 A. Probably a gentleman named Ryan Anguiano.
24 Q. Who is Ryan Anguiano?

Page 32

1  A. He is our CTO.
2  Q. Is that chief technology officer?
3  A. It is.
4  Q. Okay. And what directions did you give to
5  Mr. Anguiano regarding this particular lead?
6  A. I probably directed him to pull all information
7  in the database and supply it to, supply it to me.
8  That's probably what the direction was.
9  Q. Okay. And do you know why you wouldn't have done
10 that prior to getting Mr. Schreiber involved?
11 A. I don't know why I wouldn't have done that.
12 Well, at the -- well, I should say, actually, probably
13 the reason why I wouldn't have done that is that this
14 information, a majority of this information is presented
15 in the user interface. So I wouldn't have necessarily
16 needed to request someone search within the database for
17 the information.
18 Q. Well, I guess, I guess my question is why
19 wouldn't you have somebody search in the user interface
20 or the database at the same time that you're asking
21 Mr. Rios for additional information regarding the lead?
22 A. Well, I guess to answer that question, I'm sure
23 we did a lookup of the lead to verify that we, in fact,
24 purchased it, who we purchased it from. And that, in

Page 33

1  fact, we had verification that we had sold that lead to
2  QuoteWizard.
3      So from that perspective we would have looked up
4  that that lead was in our database prior to contacting
5  Plural. But that, regardless of that that would have
6  not -- that would have not stopped us from requesting
7  this information from Plural.
8  Q. Okay. I guess more specifically, with respect to
9  the TCPA consent language that's referenced in Exhibit 3
10 on page --
11 A. I see it. On page 7.
12 Q. 7 of 8. Why wouldn't that language have been
13 provided to QuoteWizard after they requested the Mantha
14 consent information?
15 A. It was most likely our belief that QuoteWizard
16 had that information already supplied to them and that
17 we were getting verification from Plural that that was
18 the consent language that the user had agreed to.
19 Q. When you say "it was most likely our belief" was
20 it your belief, or is --
21 A. Well, we -- we don't --
22 Q. Let me finish my question.
23 A. Okay. Sorry. I apologize.
24 Q. So was it RevPoint's belief that, that

9 (Pages 30 - 33)

Page 34

1  QuoteWizard had this information, or is it most likely
2  your belief as you sit here today?
3     A. I don't know what we were thinking back then.
4  And -- and I don't have any confirmation right now that
5  we looked at the integration to make sure that that
6  information was supplied. We would -- so if -- I'm
7  going to try and deduce this down.
8        So if QuoteWizard had called for this information
9  it would have been our understanding that was passed. I
10 don't have any confirmation that QuoteWizard called for
11 it. If they didn't call for it it wouldn't have been
12 passed. We did not verify that at that time. I have
13 certainly not verified that at this time as well.
14    Q. Okay. You don't believe that, that when
15 Mr. Weeks reached out to you after receiving a TCPA
16 demand letter from this claimant, he didn't ask for
17 consent information from RevPoint?
18    A. He did. He did ask for it. And what's common
19 practice at that point is to reach out to the supplier,
20 whoever supplied that information to get verification,
21 because, for example, the information that he requested,
22 screen shots and the like, was information that would
23 not have been supplied within the, within the lead that
24 we supplied to QuoteWizard.

Page 35

1     Q. Okay. But in response to him, I guess, why
2  didn't RevPoint say, "hey, here's consent information
3  that we, that we were sold, here you go." You could
4  have even said, "we've already supplied this to you in
5  the lead."
6     A. We could have. That -- that is correct. I don't
7  know why we decided to pursue Plural --
8     Q. Okay.
9     A. -- at the time.
10    Q. Are you aware of whether -- strike that.
11       You said you could have looked at the integration
12 between QuoteWizard and RevPoint prior to today; right?
13    A. Yes.
14    Q. Why didn't you?
15    A. I don't -- I don't have an answer for why we
16 didn't look at that integration.
17    Q. Okay. Now, again, on my representation, I'm just
18 asking you to accept my representation.
19    A. Uh-huh.
20    Q. QuoteWizard has never received this consent
21 information until produced in this document. I guess
22 what I'm just getting at is, is why didn't RevPoint just
23 say to QuoteWizard, "hey, here's the consent language,
24 it was in the lead we sold you," if it was, "here it is

Page 36

1  again." Or if it wasn't in the lead, "here is the
2  consent language that we received from Plural."
3     A. Like I said before, it is -- it is common to
4  request this information from the source in its
5  entirety. Most likely due to the fact that there's
6  additional information that is requested. Information
7  that we would not have been able to supply.
8        And so is it -- would it be -- would it have been
9  possible for me to reply to QuoteWizard and say, "here's
10 what we've supplied, here's what we received from our
11 source" and that be the end of it? Possibly. That
12 could have been a directive that was not obviously done,
13 where we requested the information from Plural. Let's
14 provide that.
15    Q. Right. And on top of that, I mean, you could
16 have said, "hey, here's the consent information we
17 received previously, we're still going back to Plural
18 for the rest of it."
19       Right?
20    A. We could have said that, that's correct.
21    Q. And that wasn't -- and that wasn't done either?
22    A. That was not done. Not in that way.
23    Q. Okay. Now, I want to take a look at this, this
24 document in more detail, just to see if you can explain

Page 37

1  it to me.
2        So I want to start at page 4 of 8. And I'm just
3  going to go, you know, left to right as to what certain
4  information means within the columns. Okay?
5     A. Uh-huh.
6     Q. So it's page 4 of 8, it says "iD." What does the
7  iD column refer to?
8     A. Which -- which because there's --
9     Q. I'm going to start --
10    A. Which one?
11    Q. -- on the left to right. So --
12    A. So vendor site iD. To vendor site iD? Am I on
13 the right page?
14    Q. I think --
15    A. Oh, here. "ID." I got you. It's one page
16 above. Okay.
17       So "iD" most likely means here the iD of the
18 individual lead within the Jangl database.
19    Q. Okay. And is that a Jangl iD number?
20    A. I believe it is.
21    Q. Okay. So if I understand correctly, when you
22 purchase a lead you'll assign a LeadiD from Jangl to
23 that individual?
24    A. Yes.

Page 38

1  Q. Okay. The "timestamp," what does that refer to?
2  A. That would be the timestamp that was provided by
3  the vendor as to when the -- well, I don't -- I want to
4  be clear here. You know what, that looks like the
5  timestamp of when the lead was processed, purchased by
6  Jangl, and delivered to QuoteWizard.
7  Q. So the timestamp refers to when Jangl sold it to
8  QuoteWizard?
9  A. Correct.
10  Q. In the "vertical" it says "auto insurance;" what
11  does that mean?
12  A. That means the lead was a request for a quote in
13  the auto insurance vertical.
14  Q. Okay. And it says, "buy, sell price." I know
15  that's redacted, but just generally is that the
16  price you bought it from.
17  A. It would be what we purchased it for and then
18  what we sold it for.
19  Q. Okay. What does "marketplace buy price, sell
20  price" mean?
21  A. Those are legacy fields that have no relevance.
22  Q. Okay. "Buyer iD," what does that refer to?
23  A. That would be the iD that represents QuoteWizard.
24  Q. Okay. So the buyer refers to QuoteWizard?

Page 39

1  A. Yes.
2  Q. Okay. And that's QuoteWizard's iD in the Jangl
3  database?
4  A. As it pertains to RevPoint Media, yes.
5  Q. What does that mean?
6  A. So Jangl also is the database for other
7  companies, and if they worked with QuoteWizard that
8  would be a different buyer iD representing QuoteWizard.
9  Q. Oh, I see. Okay. In the "buyer campaign iD;"
10  what does that refer to?
11  A. Well, that would be the specific iD regarding if,
12  for example, if QuoteWizard was purchasing health
13  insurance leads and life insurance leads there would be
14  different buyer campaigns for each one of those. And
15  more specifically, if there were additional filters or
16  coverage areas or different campaigns built to supply
17  more specific types of leads within verticals, they
18  would each be classified with different campaign iDs.
19  Q. Okay. The "buyer site iD;" what does that refer
20  to?
21  A. That refers to RevPoint Media as the purchaser
22  and seller to QuoteWizard. So if that was, like I said
23  before, a different company utilizing Jangl that would
24  be different.

Page 40

1  Q. Okay. The "vendor iD," what does that refer to?
2  A. That refers to Plural.
3  Q. And -- so that's an iD associated with them?
4  A. Specifically, yes.
5  Q. And -- and I assume the "vendor campaign iD" is
6  also a reference to Plural's campaign?
7  A. Correct.
8  Q. I guess similar to QuoteWizard would that mean,
9  like, something like if they were doing an auto
10  insurance campaign?
11  A. Yes, that's correct. Versus life insurance.
12  That would have a different campaign iD.
13  Q. And then turning to the page 5 of 8 on Exhibit 3,
14  the "vendor site iD." What does that refer to?
15  A. Again, that refers to the RevPoint Media.
16  Q. Okay. And "originally created;" what's that
17  column?
18  A. That would have been the, the time supplied by
19  Plural as to when the, the lead was created.
20  Q. And then "source iD, CC;" what does that refer
21  to?
22  A. That would have referred to a sub iD or data that
23  was supplied by Plural to RevPoint in order to reference
24  potentially a sub affiliate or source of how that lead

Page 41

1  was generated.
2  Q. So explain that a little bit more. What do you
3  mean a "sub source"?
4  A. So if that's a tracking data field that Plural
5  would be able to ultimately put whatever they wanted in
6  there, it could be because they put in whether the lead
7  was generated on Facebook or Google or e-mail or
8  different e-mail campaigns. I mean -- I mean, it's
9  basically infinite as to what they would put in there.
10     That would be a reference point, if requested,
11  for us to be able to supply back to them and potentially
12  remove that source, from receiving leads from that
13  source, or inform them that this particular source, you
14  know, I want more leads from them because the quality is
15  good. But that would be a reference point, a more
16  specific reference point of how that lead was generated
17  for Plural to use to then subcategorize the, the
18  generation of the lead.
19  Q. And do you know as you sit here today what "CC"
20  stands for?
21  A. I have no idea. I do not.
22  Q. Is there some sort of key that references what CC
23  is?
24  A. No.

Page 42

1  Q. So I guess how do you take that information and
2  give it to Plural?
3  A. I would just say to them, I would say to them
4  "here's this lead with source iD CC" and then they would
5  be responsible for determining what that meant, because
6  that's specific to them.
7  Q. Okay. So that's -- that's information that they
8  supply to you during the Ping Post process?
9  A. As a -- yes. As a trackable reference point for
10 that.
11 Q. Okay. The "offer iD," who generates that number?
12 A. That would be again another iD generated by
13 Plural as a potentially, it could be more specific, it
14 could be more granular than the source iD. But those
15 two fields are data that is supplied to RevPoint from
16 Plural.
17 Q. What about the "LeadiD code"?
18 A. That is, would be Jornaya's LeadiD code.
19 Q. And that's the one we looked at earlier?
20 A. Correct.
21 Q. So just to confirm what you've, you've previously
22 testified, that was provided by Plural to RevPoint and
23 then sent to QuoteWizard?
24 A. Correct.

Page 43

1  Q. Next page. "User agent" who does that refer to?
2  A. Well, that refers to the browser that the user
3  filled out the form on. Whether or not it's a Chrome,
4  or Explorer, Safari, that type of thing.
5  Q. So if I understand --
6  A. Mozilla. It represents Firefox is what this is.
7  And that would have been supplied to us by Plural.
8  Q. And so when you say "user" are you referring to
9  Mr. Mantha in this case?
10    MR. BRODERICK: Objection.
11    MR. KING: You can answer.
12 A. It would be user of where -- it would be our
13 understanding that that was the browser that Mr. Mantha
14 filled out the form on; correct.
15 Q. And the "landing page," what does that refer to?
16 A. That refers to the landing page where Mr. Mantha
17 would have or any user would have filled out the form.
18 Q. So do you believe the landing page would have
19 been Jangl?
20 A. No. That is an obvious masking of the, of the
21 URL of where the user had filled out the form.
22 Q. And in a masking by who?
23 A. Most likely this masking would have been done by
24 Plural.

Page 44

1  Q. So Plural would have used the Jangl website which
2  is owned by RevPoint?
3  A. Yeah. The Jangl, to be clear, Jangl.com is in no
4  way a lead generation website. So it would be a
5  specific placeholder to mask where that lead had
6  originated. Knowing that that is not a specific landing
7  page.
8  Q. And -- so it's your testimony that Plural would
9  have supplied the Jangl.com website info in the landing
10 page?
11 A. Yes. But I -- it is -- I'm speculating because I
12 would have to go look back at that, but, yes, that would
13 in -- that would have been supplied by Plural.
14 Q. And that would have been supplied to mask the
15 source of the lead?
16 A. Yes.
17 Q. And -- and when you say you would have to go back
18 to look at it; look at what?
19 A. I mean, I might compare it to other leads that
20 they had supplied to see, but it is my understanding
21 that that was common in this integration than to send
22 Jangl into us to mask that.
23 Q. Under "TCPA compliant" there's a 1. What does
24 that refer to?

Page 45

1  A. That represents that they verified upon sending
2  the lead that it was compliant.
3  Q. So -- so 1 references that it's compliant?
4  A. Yes. And a zero would reference that it is not.
5  Q. The TC -- the "TCPA consent text;" what does that
6  refer to?
7  A. That's the representation of what the user agreed
8  to upon submitting the lead. Supplied to us from
9  Plural. At the time of the lead purchase and sale.
10 Q. At the time that RevPoint purchased it from
11 Plural it would have received this TCPA consent text?
12 A. Yes.
13 Q. And do you know what website this, this text
14 refers to?
15 A. I do not. And in many cases this would also
16 potentially have redacted information for any
17 identifying information that could potentially give us
18 information where that lead was generated.
19 Q. With -- with the contract between RevPoint and
20 Plural are they required to provide source information
21 upon purchase of the lead, if, if requested?
22 A. My -- I believe so. They are, yes.
23 Q. And is that the same for the, between the
24 contract with QuoteWizard and RevPoint, that you're,

Page 46

1  you're required to provide the source of the information
2  upon request?
3     A. I haven't read the QuoteWizard contract lately.
4  I -- I -- possibly it is in there. I wouldn't be
5  surprised if it is.
6        Regardless of whether or not it was contracted we
7  would always request that information regardless in
8  order to supply consent language and verification.
9     Q. Okay. And then for the next eight fields you
10 have sort of name and consumer name and address
11 information. Where does that information come from?
12    A. That would have been supplied to us from Plural.
13    Q. Now, page 8 of 8. There is a column for "IP
14 address." What does that refer to?
15    A. Yes. I -- well, the IP address represents an IP
16 address of a server where potentially information is, is
17 housed. And so I don't know whether or not that's the
18 IP address of Plural's system or whether that's the IP
19 address of the user.
20    Q. Okay. The fields that this information requires,
21 is, what is your expectation that that IP address would
22 be? In other words --
23    A. It could be -- it could be -- as far as -- it
24 could be either a system. It could be -- okay.

Page 47

1     Q. So the field -- the columns are generated in the
2  spreadsheet by RevPoint; is that right?
3     A. Yes.
4     Q. And -- and clearly there's a field for IP
5  address; right?
6     A. Yes.
7     Q. And the, the information that's in the
8  spreadsheet is supplied by Plural; right?
9     A. Yes.
10    Q. And -- and so what is the expectation of the lead
11 supplier that that IP address is going to include?
12         MR. BRODERICK: Objection.
13    A. I'm not sure I fully understand the, the
14 question. But what is the expectation of what that
15 field represents?
16    Q. Yeah.
17    A. It could be --
18    Q. Let me ask it this way.
19         What IP address are you looking for? I mean,
20 it's your field; right?
21    A. Well, it is, it is our field. But that being
22 said, you know, this, the, the way Ping Post works is
23 the mapping of data from one place to another. And so
24 the generality of it is that in order to move data

Page 48

1  around, because there are so many different businesses
2  out there with different requirements and different
3  things, that in order to pass that data through there
4  are fields that are there, they could be legacy, they
5  could be -- it's hard to kind of know specifically on
6  every single lead, every single integration where that
7  lead potentially would have ended up to determine the
8  exact reasoning for that specific data point.
9        So I -- I don't know, you know, Jangl and
10 RevPoint Media didn't create the fields that were
11 requested upon lead acquisition and delivery. We didn't
12 create the industry, we didn't create the flow. And so,
13 you know, some of these fields are there as legacy
14 fields that really don't pose anything.
15       I will say that one thing that we use IP address
16 for would be to potentially determine whether or not
17 this lead is generated internationally. That would be
18 the specific reason for it, not for the specifics of
19 where the user generated the lead. Or -- is
20 that -- does that answer that?
21    Q. It does. Yep.
22    A. Okay.
23    Q. And then the last column is the "data." And
24 again, just, this is data supplied by Plural to RevPoint

Page 49

1  relating --
2     A. Correct.
3     Q. -- to this customer?
4     A. Correct.
5     Q. And then this is the data that, that RevPoint
6  then turns around and sends to QuoteWizard if they
7  purchase the lead; right?
8     A. Correct.
9     Q. And when did RevPoint receive the information
10 from Plural that's contained within this spreadsheet?
11    A. It would of been -- it would have been at the
12 time of purchase and delivery to QuoteWizard.
13    Q. And this is all electronically; right?
14    A. Yes.
15    Q. Now, in -- in RevPoint's prior subpoena response
16 that we looked at before this, I guess, four-page
17 spreadsheet, do you know why this information wasn't,
18 wasn't produced in response to the original subpoena?
19    A. Why it wasn't produced?
20    Q. And we can go back to Exhibit 2 if you want to
21 see what was, what was produced.
22    A. Produced in a subpoena? Yeah, I need to go back.
23 I don't know why it wouldn't have been produced.
24    Q. So if you look at Exhibit 2, and you go to the

Page 50

1  response to the objections. This refers to the
2  information contained within RevPoint's first response
3  to, I believe, it was Plaintiff's subpoena at that time,
4  if I'm not mistaken.
5     A. Can I look at what we supplied?
6     Q. Of course. Yeah. It's pages 1 through 64, so
7  take your time. And again, my question is do you know
8  why this information wasn't contained within the
9  original response?
10    A. I don't know why this wouldn't be -- I'd have
11 to -- I want to look at what the information was that we
12 supplied.
13    Q. Yeah, take your time.
14    A. (Witness reviewing.) Okay. If I remember
15 correctly I had supplied a screen shot of the user
16 interface with the information that was requested to my
17 counsel, and that screen shot did not contain all of the
18 data within that was requested. And that was, that was
19 accidental.
20          (Deposition Exhibit No. 4 introduced.)
21    Q. Okay. Turning to Exhibit 4.
22    A. Okay.
23    Q. So I'll represent to you that Exhibit 4 is the
24 subpoena response from Plural Marketing in response to a

Page 51

1  subpoena received in this case.
2     A. Okay.
3     Q. Within the response, if you look at page 3 of
4  22, --
5     A. Okay.
6     Q. -- there is a company called Fenix Leads. Have
7  you ever heard of them?
8     A. I have not.
9     Q. Did you have any conversations with George Rios
10 about Fenix Leads?
11    A. I did not.
12    Q. Have you ever heard of the name Dario Osmancevic?
13    A. I have not.
14    Q. Turning to page 11 of 22.
15    A. Okay.
16    Q. This is the information that was provided by
17 Mr. Rios to your counsel. Do you see an e-mail from
18 November 21, 2019 at 8:56 a.m.?
19    A. November 21st. Yes.
20    Q. Okay. And in there he identifies the source of
21 application which he identifies as
22 snappyautoinsurance.com, date of application, and then
23 just below it it appears to generally provide what the
24 applicant agreed to to receive as far as phone calls or

Page 52

1  text. Do you see that?
2     A. Yes.
3     Q. But nowhere in here does he provide the consent
4  language that we just looked at in Exhibit 3 that Plural
5  sent to RevPoint. Do you see that?
6     A. Yes, I see that there is no consent language.
7     Q. And even as of today they haven't produced that
8  same language.
9        Have you ever discussed the consent language
10 identified in Exhibit 3 with George Rios?
11    A. I have not.
12    Q. And do you see the IP address, the applicant IP
13 address?
14    A. Yep. Yes, I do.
15    Q. And that appears to be different than what we
16 just viewed in Exhibit 3; is that right?
17    A. It appears so, yes.
18    Q. In -- is it fair to say you don't know why?
19    A. It's fair to say I don't know why.
20    Q. Have you had any further communications with
21 Mr. Rios since your deposition?
22    A. I have not.
23    Q. And you're still not doing business with them?
24    A. That is correct.

Page 53

1     Q. I believe that's all the questions that I have.
2  Thank you very much. I'm going to turn you over to
3  Ted Broderick, if he has any questions.
4
5                    EXAMINATION
6
7  BY MR. BRODERICK:
8     Q. Hi, Mr. Fishman. I just want to go into a little
9  bit of this idea of masking that you say Plural did on
10 this lead. So you wouldn't know, then, if the IP
11 address is, is masked when it says -- it says Jangl as
12 the source, the URL source; correct?
13    A. Correct.
14    Q. And that obviously isn't the source of any lead
15 that you sell; correct?
16    A. That's correct.
17    Q. And so you don't know where Plural says this lead
18 was generated; correct?
19    A. Well, I know where they say the lead was
20 generated, but I wouldn't have known at the point of
21 purchase and sale.
22    Q. Purchase and sale. So you had to go to -- you
23 had to go back to them even though you've already sold
24 the lead to say, "hey, where was this lead generated"?

Page 54

1  A. That's correct.
2  Q. And you don't know whether that TCPA language
3  appeared on the website on which they claim the lead was
4  generated; correct?
5  A. Which TCPA language?
6  Q. The -- this language that, that you've been
7  looking at with Mr. Polansky, the, "I agree to get
8  quotes from marketing partners."
9  A. I -- well, I can only speculate that that was the
10 language that the user agreed to because that was the
11 language that they provided to us.
12 Q. Right. But I'm not asking -- I don't want you to
13 speculate, I want to know if you know if that language
14 was on any particular website at the point in which you
15 were sold the, the lead?
16 A. I do not have any confirmation of that, no.
17 Q. And in -- let's see. In Exhibit 2, I think I'm
18 in the right exhibit. In the contract in Exhibit 2, if
19 you could look at that.
20 A. Can you direct me to a page?
21 Q. Yes. Page -- starting at page RP8.
22 A. RP8. So is that, is that the page number at the
23 bottom?
24 Q. That's a Bates number at the bottom, yes. So

Page 55

1  it's the --
2  A. I gotcha. Yeah. I think I'm here. Okay.
3  Q. It says, "amendment to QuoteWizard insertion of
4  order to purchase data leads." And then if you can
5  scroll to the next page --
6  A. Hold on. Hold on. Hold on. I just want to make
7  sure I'm in the right place. Because I do not see that.
8  Q. Okay. Exhibit 2.
9  A. I'm there.
10 Q. Page 20 of a 64 page --
11 A. Okay. I was in the wrong place. I apologize.
12 Q. That's okay. Take your time.
13 A. (Witness reviewing.) I'm sorry. My daughter is
14 asking something.
15 Q. That's a very familiar problem. Luckily mine is
16 at school, the young one.
17 A. Yeah, mine are home schooling this week, so.
18    Okay. I'm at 20 of 64; is that correct?
19 Q. That's right. Marked at the bottom RPE with a
20 bunch of zeros and an 8 Bates number.
21 A. I see it.
22 Q. And that is an amendment to the QuoteWizard
23 insertion order to purchase data leads. Then scroll
24 down to the next page. This document is unsigned.

Page 56

1  A. Okay.
2  Q. Do you know if -- do you know if it was ever
3  signed?
4  A. I do not.
5  Q. But you don't have a copy of, a signed copy of
6  this document, --
7     MR. POLANSKY: Objection.
8  A. Not --
9  Q. -- do you?
10 A. Not to my knowledge. I -- I don't know.
11 Q. Do you -- did RevPoint consider itself bound by
12 the requirements in this amendment which is RP8 and 9?
13    MR. POLANSKY: Objection.
14 A. So should I answer that?
15    MR. POLANSKY: Yeah.
16    MR. KING: Yeah. You can answer, yes.
17 A. I, I, I don't know about this document so I can't
18 answer whether or not I feel that we were bound by it.
19 So I, I don't know that we felt that we were bound by a
20 document that I can't recall whether or not we executed.
21 Q. Okay. Do you know what RevPoint paid Plural for
22 the purported Joseph Mantha lead?
23 A. Paid Plural?
24 Q. Yes.

Page 57

1  A. Not offhand, I do not.
2  Q. Do you have a range? Is it a dollar?
3  A. My -- my assumption would be that that would be
4  in the relative general price point of that, of that
5  lead.
6  Q. Meaning it would be about a dollar that you would
7  get paid for, for the lead?
8  A. Anywhere, if I had to speculate right now,
9  between maybe 50 cents and $2. Somewhere in that
10 general.
11 Q. And what about the, the selling price to
12 QuoteWizard; what would they pay?
13 A. I don't have that in front of me. But I would
14 say north of that, obviously. Possibly between 3 and 5.
15 Q. Okay. Thank you. And is it fair to say that you
16 don't have any record -- well, do you have any record of
17 having transmitted TCPA consent language that was
18 purportedly viewed by the creator of, of the Mantha lead
19 on a website --
20    MR. POLANSKY: Objection.
21 Q. -- to QuoteWizard? I'll try to state that a
22 little clearer.
23    Do you have any record of having transmitted TCPA
24 language, consent language that was allegedly viewed by

15 (Pages 54 - 57)

Page 58

1 the creator of the Mantha lead to QuoteWizard?
2     MR. POLANSKY: Objection.
3  A. If I can get specific here. Should I answer?
4  Q. Yes.
5  A. Okay. Just so I -- so you're asking whether or
6 not I can verify whether the TCPA language at the time
7 of sale was sent to QuoteWizard?
8  Q. Right.
9  A. Okay. I cannot verify that now, but we
10 potentially would be able to verify that at a later
11 date.
12    Now, I can't verify, just to be specific, whether
13 or not they received it, but I could verify whether we
14 attempted to send it.
15  Q. And how would you send that; would that be
16 through the Ping and Post Jangl system?
17  A. That's correct.
18  Q. Would you have done business with Plural if you
19 knew that they were getting leads from an entity in
20 Bosnia?
21  A. I can only say probably not.
22  Q. And why not?
23     MR. POLANSKY: Objection.
24     MR. KING: You can answer.

Page 59

1  Q. Why do you say "probably not"?
2  A. Well, I don't -- I can't say that we've never or
3 would never work with any international companies, but
4 it would, could potentially increase the risk factor of
5 working outside of the U.S.
6  Q. And what's the risk factor that you're talking
7 about there?
8  A. Being just -- dealing with international
9 individuals. People that are not in the U.S.
10    I -- I -- it's -- I don't have anything specific.
11 Like I said, we, we, we do work with international
12 businesses. I would say that it, you know, on the
13 other, on the other side, you know, there's maybe higher
14 risk of not getting, collecting debts from
15 international. So there's a -- we're a little bit more
16 cautious when dealing with international businesses.
17  Q. Would it cause you to have less confidence that a
18 lead that you were being provided was in fact generated
19 in a TCPA compliant way, by which I mean --
20  A. No.
21  Q. No?
22  A. No.
23  Q. You don't think that a Bosnian entity would
24 present a greater risk that it's --

Page 60

1  A. I mean, I don't -- I can't -- I don't really know
2 too much about Bosnia in particular. But it
3 would -- and the individuals there that were obviously
4 conducting their business. You know, we, we do work
5 with companies that utilize our services that are out of
6 Europe and they, they are compliant. And so it would
7 be -- it would depend.
8    But there -- there -- just due to the fact that
9 they wouldn't be U.S based would definitely add a little
10 bit more of a concern for the relationship. I don't
11 know that their lead generation tactics.
12  Q. When you say you've worked with companies in
13 Europe, do you mean you sell them leads?
14  A. No. We -- they would potentially license Jangl
15 or use Jangl.
16  Q. And what does that mean they will license Jangl?
17  A. They would use our software to generate and sell
18 leads to users and buyers that are in the regeneration
19 industry.
20  Q. When you say "use that software," you mean they
21 could post a lead to the Jangl system for sale?
22  A. Yes.
23  Q. And when they post it, do, do you pay them for
24 that lead?

Page 61

1  A. No.
2  Q. How does it work?
3  A. Well, they would pay us a license fee to utilize
4 the software in order to ping post leads. That does not
5 necessarily mean that RevPoint Media is purchasing those
6 leads or has anything to do with the, the acquisition or
7 distribution of those leads.
8  Q. Okay. And is that distinct from, from what
9 happened with the Mantha lead with Plural selling the
10 lead to RevPoint?
11  A. Yes.
12  Q. Okay. And -- and that's not also what
13 QuoteWizard's relationship was with RevPoint?
14  A. That -- that -- that's correct.
15  Q. You said you don't know Dario Osmancevic, but do
16 you -- have you heard of him before the, these documents
17 were produced --
18  A. I have not.
19  Q. And so when you asked Plural about the source of
20 the lead they did not tell you this came from Fenix
21 Marketing Solutions; correct?
22  A. They did not.
23  Q. Would you have wanted to know that?
24  A. Potentially, if we were going to reengage with

| Page 62 | Page 64 |
|---|---|
| 1 them, we would potentially have wanted to know the<br>2 specifics of the business that they had generated this<br>3 lead from, potentially.<br>4   Q. Right. And I'm sorry, I'm having trouble finding<br>5 the document. But in one document did you refer any<br>6 e-mail to the Jornaya Lead iD associated with the Mantha<br>7 lead as fraudulent?<br>8   A. I -- at the time we looked up that lead, I think<br>9 we had determined that, according to us checking that<br>10 against Jornaya's database, that that lead was invalid.<br>11 That lead iD was invalid.<br>12   Q. And you, you referred to it in an e-mail as<br>13 fraudulent; correct?<br>14   A. I don't know that I did, but I think Jesse did,<br>15 yes.<br>16   Q. Did you ever get an explanation of where that<br>17 Jornaya lead -- how that Jornaya lead iD came to be<br>18 associated with Mr. Mantha's lead?<br>19   A. I did not.<br>20   Q. Did you ever ask anyone at Plural how that<br>21 happened?<br>22   A. I did not.<br>23   Q. Did anyone at RevPoint ask Plural how that had<br>24 happened? | 1 notify the source of that lead that that, that there has<br>2 been a request for information and that we would like<br>3 them to supply ultimately all the information that they<br>4 have regarding that lead. It is outside of what had<br>5 been purchased and delivered, or purchased and sold by<br>6 RevPoint, and that is just common practice that we do.<br>7 And we are not -- we're basically then saying that<br>8 because there is a complaint or a question on a<br>9 particular lead, that we would need to unmask that lead<br>10 and get to the bottom of how and where that lead was<br>11 sourced.<br>12   Q. Okay. All right. Thank you for clarifying that.<br>13         MR. KING: That's all I have.<br>14         MR. POLANSKY: I have nothing further.<br>15         MR. BRODERICK: Nothing further. Thank you.<br>16         VIDEOGRAPHER: The time is 11:32, this is<br>17 the end of session two, and we are now off the record.<br>18         COURT REPORTER: Mr. Broderick, did you need<br>19 to order a copy today?<br>20         MR. BRODERICK: Yes, please.<br>21         COURT REPORTER: Mr. King, how about you,<br>22 did you need one?<br>23         MR. KING: Yes, please.<br>24         (Whereupon, the deposition concluded at |
| Page 63 | Page 65 |
| 1   A. I don't think so, no.<br>2   Q. Has anyone at QuoteWizard ever asked you how that<br>3 happened?<br>4   A. I don't believe so.<br>5   Q. Okay. Okay. I don't have any further questions.<br>6 Thank you, Mr. Fishman.<br>7   A. You're welcome.<br>8         MR. POLANSKY: Evan, any questions from you?<br>9         MR. KING: Yeah.<br>10<br>11           EXAMINATION<br>12<br>13 BY MR. KING:<br>14   Q. Mike, just briefly. When we were talking earlier<br>15 about kind of going back, not when you originally sold<br>16 the lead to QuoteWizard, but when you got the inquiry<br>17 from Matthew Weeks at QuoteWizard, can you explain the,<br>18 the process for going back and checking, not just in<br>19 this lead, but generally why you would go back and, you<br>20 know, what your process is and why you do it that way?<br>21   A. Yes. So not that this is a frequent occurrence,<br>22 but if and when we get a complaint or a request for a<br>23 TCPA information from a buyer within, that purchases a<br>24 lead from RevPoint, we immediately send that request and | 1 approximately 11:32 a.m.) |

17 (Pages 62 - 65)

Page 66

1  CERTIFICATE
2
3 COMMONWEALTH OF MASSACHUSETTS
4 SUFFOLK, ss.
5
6   I, Laurie Langer, Registered Professional Reporter and Notary Public in and for the Commonwealth of
7 Massachusetts, do hereby certify that the witness whose deposition is hereinbefore set forth, was duly sworn by
8 me and that such deposition is a true record of the testimony given by the witness.
9
10
    I further certify that I am neither related to or
11 employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome
12 of this action.
13
    In witness whereof, I have hereunto set my hand and
14 seal this 24th day of December, 2020.
15
16
17
18     NOTARY PUBLIC
       Commission Expires
19     7/27/2023
20
21
22
23
24

Page 67

1       DEPOSITION ERRATA SHEET
2
3 Our Assignment No: 4373053
4 Case Caption: Mantha vs. QuoteWizard
5
6       DECLARATION UNDER PENALTY OF PERJURY
7    I declare under penalty of perjury that I have
8 read the entire transcript of my Deposition taken in the
9 captioned matter or the same has been read to me, and
10 the same is true and accurate, save and except for
11 changes and/or corrections, if any, as indicated by me
12 on the DEPOSITION ERRATA SHEET hereof, with the
13 understanding that I offer these changes as if still
14 under oath.
15    Signed on the_____day of_____20__
16
17 _____
18       MICHAEL FISHMAN
19
20
21
22
23
24

Page 68

1       DEPOSITION ERRATA SHEET
2 Page No._____ Line No. _____ Change to:_____
3 _____
4 Reason for change: _____
5 Page No._____ Line No. _____ Change to:_____
6 _____
7 Reason for change: _____
8 Page No._____ Line No. _____ Change to:_____
9 _____
10 Reason for change: _____
11 Page No._____ Line No. _____ Change to:_____
12 _____
13 Reason for change: _____
14 Page No._____ Line No. _____ Change to:_____
15 _____
16 Reason for change: _____
17 Page No._____ Line No. _____ Change to:_____
18 _____
19 Reason for change: _____
20 Page No._____ Line No. _____ Change to:_____
21 _____
22 Reason for change: _____
23 SIGNATURE:_____DATE:_____
24       MICHAEL FISHMAN