EXHIBIT 15

Page 1

1

2   UNITED STATES DISTRICT COURT

3   FOR THE DISTRICT OF MASSACHUSETTS

4   ----------------------------------------x

5   JOSEPH MANTHA on behalf of

    themselves and others similarly

6   situated,

7                   Plaintiff,

8   v.                        Case no. 1:19-cv-12235

9   QUOTEWIZARD.COM, LLC,

10  Defendant.

11  ----------------------------------------x

12                  2:21 p.m.

                    July 28, 2020

13

14          VIDEOTAPED VIRTUAL DEPOSITION of LEAD

15  INTELLIGENCE INC., by and through GEORGE RIOS, a

16  non-Party in the above entitled matter, pursuant

17  to Subpoena, before Stephen J. Moore, a Registered

18  Professional Reporter, Certified Realtime Reporter

19  and Notary Public of the State of New York.

20

21

22

23

24

25

Page 2

```
1           GEORGE RIOS
2  A P P E A R A N C E S
3       BRODERICK LAW PC
4           Attorneys for Plaintiffs
5           208 Ridge Street
6           Winchester, MA 01890
7       BY:   EDWARD A. BRODERICK, ESQ.
8  NELSON MULLINS RILEY & SCARBOROUGH
9           Attorneys for Defendant
10          One Post Office Square
11          Boston, MA 02109
12      BY:   KEVIN POLANSKY, ESQ.
13  KLEIN MOYNIHAN TURCO LLP
14          Attorneys for RevPoint Media, LLC.
15          450 Seventh Avenue
16          New York, NY  10123
17
18      BY:   EVAN KING, ESQ.
19  MARION & ALLEN
20          Attorneys for Plural Marketing
21          Solutions, Inc. and the Witness
22          488 Madison Avenue
23          New York, New York  100222
24
25      BY:   ROGER MARION, ESQ.
```

Page 3

```
1           GEORGE RIOS
2       THE VIDEOGRAPHER:  We are on the
3  record.  The time is approximately 2:21
4  p.m., on Tuesday, July 28th, 2020.
5       Please note microphones are
6  sensitive and will pick up whispering and
7  private conversations and cellular
8  interference.
9       Please turn off all cell phones and
10 place them away from your microphones as
11 they will interfere with deposition audio.
12      Audio and video recording will
13 continue to take place unless all parties
14 agree to go off the record.
15      This is media unit 1 of the video
16 recorded deposition of George Rios, taken
17 for counsel for the Plaintiff in the
18 matter of Joseph Mantha on behalf of
19 themselves and others similarly situated
20 versus Quotewizard.com, LLC.
21      The case is filed in the United
22 States District Court for the District of
23 Massachusetts, case number 1:19-CV-12235.
24      The deposition is being held via
25 teleconference.  I am Ken Williamson.  I
```

Page 4

```
1           GEORGE RIOS
2  am the videographer for Veritext New
3  England.  Our court reporter is Stephen
4  Moore, also with Veritext New York.
5       Please note I am not authorized to
6  administer an oath I am not related to any
7  party in this action, nor am I financially
8  interested in the outcome.
9       Counsel, please identify yourself
10 and state your appearance for the record,
11 beginning with the noticing attorney.
12      MR. BRODERICK:  Edward Broderick
13 for the Plaintiff, Joseph Mantha.
14      MR. POLANSKY:  Good afternoon,
15 Kevin Polansky for the Defendant,
16 Quotewizard.
17      MR. MARION:  Roger Marion.
18      And one correction, it's the
19 deposition of George Rios on behalf of
20 Plural Marketing Solutions, Inc., not just
21 as an individual, and that is my client.
22      MR. KING:  And Evan King,
23 representing RevPoint Media, LLC.
24      THE VIDEOGRAPHER:  Please swear
25 in our witness.
```

Page 5

```
1           GEORGE RIOS
2
3  G E O R G E     R I O S,  called as a witness,
4      having been first duly sworn by the Notary
5      Public, was examined and testified as
6      follows:
7
8  EXAMINATION BY
9  MR. BRODERICK:
10
11      Q    Good afternoon, Mr. Rios.  Just
12 a couple of quick ground rules.
13      I am going to ask you a series
14 of questions, obviously, but I would just ask
15 you to let me finish my question before you
16 start your answer so that we have a clean
17 record and it's easier to take down.
18      A    Understood.
19      Q    The other thing is all your
20 answers will have to be verbal, meaning you
21 can't nod or say um-hum.  We will just need a
22 full answer so that it's clear.
23      Can you tell me, state your full
24 name for the record?
25      A    George Rios.
```

2 (Pages 2 - 5)

GEORGE RIOS

1
2    Q    Where are you employed?
3    A    Plural Marketing Solutions.
4    Q    What's your job title there?
5    A    I am the owner.
6    Q    Are you the CEO as well?
7    A    Yes.
8    Q    How many employees do you have,
9 if any?
10    A    None.
11    Q    How long have you owned Plural
12 Marketing Solutions?
13    A    I founded the company around
14 March of 2017.
15    Q    And what relationship, if any,
16 is there between Plural Marketing Solutions and
17 RevPoint Media, LLC?
18    A    Now, none.
19    Q    Formerly what relationship did
20 you have?
21    A    As of what date?
22    Q    Well, when did your relationship
23 stop?
24    A    It stopped -- I mean, I would
25 have to go back and look at my records, I'm not

GEORGE RIOS

1
2 100 percent sure, but it stopped probably
3 around a year ago.
4    Q    What did you do when you were
5 working with RevPoint, what did Plural
6 Marketing Solutions do with them?
7    A    We are affiliate partners.
8    Q    What is an affiliate partner?
9    A    We basically broker consumer
10 information through our systems and pass those
11 records along so that they can ultimately be
12 sold into a larger marketplace so that the
13 requesting consumer can receive a quote on a
14 variety of services or products.
15    Q    Do you have a background in
16 computer science?
17    A    I do.
18    Q    What's your education?
19    A    College dropout.
20    Q    And what did you study in
21 college when you were there?
22    A    Computer science; yes.
23    Q    Is Plural Marketing Solutions
24 your first job post-college?
25    A    No.

GEORGE RIOS

1
2    Q    Where did you work before
3 Plural?
4    A    I held different positions
5 working with the computer science field at
6 different companies over the last 15 or 20
7 years.
8    Q    Is Plural the first time you
9 were self-employed?
10    A    Yes.
11    Q    Does Plural Marketing Solutions
12 have any direct relationship with
13 Quotewizard.com?
14    A    No.
15    Q    Do you know who Adam Brown is?
16    A    Not directly, no.
17    Q    How about indirectly?
18    A    His name became known to me
19 during this case.
20    Q    Do you understand that at least
21 for purposes of this deposition, we are here to
22 determine the validity of the claim that my
23 client, Joseph Mantha, opted in to receive
24 calls or texts from Quotewizard.
25         Do you understand?

GEORGE RIOS

1
2    A    That's my understanding.
3         MR. MARION:  Objection to form,
4    but obviously it's been answered.
5    Q    Do you have any knowledge as to
6 whether Mr. Mantha consented to receive text
7 solicitations from Quotewizard?
8    A    My understanding is that he did.
9    Q    And what do you base that on?
10    A    I don't send any text messages
11 or anything, but the record that we received
12 did indicate that there was an opt-in consent.
13    Q    And from whom did you receive
14 that record?
15    A    From one of my partners.
16    Q    Which partner did you receive it
17 from?
18    A    From a firm called Phoenix Media
19 Solutions.
20    Q    Is there anything more to the
21 name, is it an LLC or an Inc.?
22    A    I'm afraid I don't know.
23    Q    Do you know where they are
24 located?
25    A    Bosnia.

3 (Pages 6 - 9)

Page 10

GEORGE RIOS

2    Q    How did Phoenix Media Solutions
3  provide -- what was the record that you
4  referenced?
5    A    The recording that was provided
6  to me by Phoenix was Mr. Mantha's contact
7  information along with some auto insurance
8  information indicating that he was interested
9  in an auto insurance quote at that time.
10    Q    Did the record that you received
11  from Phoenix Media Solutions indicate that he
12  had opted in to receive this information on a
13  website?
14    A    It did.
15    Q    What website?
16    A    SnappyAutoInsurance.
17    Q    Did you produce that record in
18  response to a subpoena issued to Plural in this
19  case?
20    A    I did.
21    Q    Let's look at Exhibit 22.
22        I will ask you to scroll down
23  after Exhibit C.
24    A    Yes, I see it.
25    Q    You see it?  And it says at the

Page 11

GEORGE RIOS

2  top "Original source lead generator"?
3    A    Right.
4    Q    Just so we are looking at the
5  same page.
6    A    Yes.
7    Q    Is this the record that you
8  received from Phoenix Media Solutions?
9    A    That's correct.
10    Q    Was it in exactly -- sorry?
11    A    That's, just a point of
12  clarification, this is the TCPA audits, which
13  is sent upon request in the event that there is
14  a discrepancy about whether or not the consumer
15  had consented.
16        And that's what this is.
17        The full record has also been
18  sent as part of the initial process when I was
19  first contacted.
20        That does contain some auto
21  insurance information as well as some
22  additional details that were provided on the
23  form.
24    Q    You say it has been sent.  To
25  whom has it been sent?

Page 12

GEORGE RIOS

2    A    I'm sorry, I didn't catch that.
3    Q    You say the full record that you
4  received was sent.
5        And I was just asking to whom
6  was that sent?
7    A    It was provided to RevPoint.
8    Q    Did you send that to RevPoint
9  via an e-mail?
10    A    No, it was sent as part of the
11  original request.
12        And then it was sent -- sorry,
13  it was sent as part of the original request
14  when the transaction happened, and then it was
15  sent again I believe through my attorney to
16  either Mr. King or perhaps Mr. Polansky, I'm
17  not sure who, but the full record was sent.
18        What you are looking at here is
19  the TCPA audit that indicates when the person
20  actually filled out the form and on what site.
21    Q    And the TCPA audit, where did
22  that -- that we are looking at here in Exhibit
23  22, that came to you from Phoenix Media
24  Solutions in Bosnia?
25    A    Correct; yeah.  I requested this

Page 13

GEORGE RIOS

2  when I was initially contacted by RevPoint that
3  there was an issue, and as part of our normal
4  process, I requested this information, and I
5  forwarded it to RevPoint so they would have it
6  for their records.
7    Q    And was this provided to you via
8  e-mail from Phoenix Media Solutions?
9    A    Correct.
10    Q    Do you still have that e-mail?
11    A    I forwarded it already to my
12  attorney, who I believe forwarded it off to
13  RevPoint for their records.
14        MR. BRODERICK:  Okay, I will just
15    for the record say I don't believe we
16    have seen that e-mail, and we think it's
17    both responsive to the subpoena request
18    and the document request to Quotewizard
19    in the case, but I understand
20    Mr. Polansky has an objection.
21        MR. POLANSKY:  What?
22        I have never seen that
23    documentation.
24        MR. BRODERICK:  You haven't,
25    okay.

4 (Pages 10 - 13)

Page 14

GEORGE RIOS

1
2      MR. POLANSKY:  I didn't lodge an
3  objection, unless -- I can't object to
4  something I haven't seen before.
5      MR. BRODERICK:  Okay.
6      Well, that will be -- we will take
7  that up with Roger, but I think that was
8  responsive to our original subpoena.
9      MR. MARION:  I don't see a more
10  responsive request in my e-mail, which I
11  am looking in right now and searching
12  for the word Phoenix, but I will do a
13  search with my client, and if we come up
14  with a more expanded search, of course
15  we will provide it.
16      MR. BRODERICK:  Okay.
17  Q    So you got an e-mail from
18  Phoenix Media Solutions.  Was this page in the
19  form of a separate document attached to the
20  e-mail?
21  A    I don't recall, it was probably
22  in the body of the e-mail, but I can't say for
23  sure.
24  Q    Do you think that you then cut
25  and pasted that information into this document?

Page 15

GEORGE RIOS

1
2  A    The document that we are looking
3  at, yes.
4      MR. MARION:  You can answer if
5  you understand the question.
6  A    Are you asking me if I took the
7  body of wherever I got this and paced it into a
8  PDF?
9      I believe I did do that, yes, so
10  that it would be in a clean format for e-mail.
11  Q    Okay, and do you still have that
12  PDF?
13  A    I am sure it's in my e-mail,
14  yeah.
15      MR. MARION:  May I interject?
16      MR. BRODERICK:  Please.
17      MR. MARION:  Please take a look
18  at the following pages.  When you say
19  expanded information, are you talking
20  about the pages that follow the one you
21  are looking at in the same exhibit?
22      THE WITNESS:  Well, I am looking
23  at page 14 of 20 of Exhibit 22, original
24  source lead generator.
25      MR. MARION:  Right.  I am saying

Page 16

GEORGE RIOS

1
2  there are pages that follow that in the
3  same document.
4      If he scrolls down, I am asking if
5  those are the pages he's talking about as
6  the expanded record.
7      MR. BRODERICK:  Could you turn
8  your mic up a little bit, Roger?  You
9  are a little faint.
10      MR. MARION:  I will try and
11  figure out how to do that.
12      MR. BRODERICK:  Or get closer to
13  the mic.
14      MR. MARION:  Okay.  Is that
15  better?
16      MR. BRODERICK:  That's better.
17      MR. MARION:  I was saying in the
18  same exhibit, as you scroll down, there
19  is other insurance related pages, and I
20  am wondering if that's what my client is
21  talking about as the expanded
22  information.
23  Q    Okay, you see what follows page
24  14 of 20, it looks like, I'm not sure if it's a
25  screen shot or how that was created, but it

Page 17

GEORGE RIOS

1
2  looks like the web page
3  SnappyAutoInsurance.com.
4  A    Correct, yeah, that just looks
5  like it's a screen shot.
6      What I was referring to
7  specifically is what you asked me to look at in
8  terms of the TCPA audit on that one page, which
9  looks like it's 14 of 20.  That's what I was
10  referring to.
11  Q    Who is your contact at Phoenix
12  Media Solutions?
13  A    Dario Osmancevic.
14  Q    Do you know how to spell
15  Osmancevic?
16  A    Give me a second.
17      So Dario, so the last name is
18  O-s-m-a-n-c-e-v-i-c.
19      MR. POLANSKY:  O-s-m-a-n-c-e-v-i-
20  c, yes, O-s-m-a-n-c-e-v-i-c.
21  Q    Do you have his e-mail address?
22  A    I can provide that, yes.
23  Q    Do you see on page 14 of 20 on
24  Exhibit 22, Adam Brown?  Sorry if I just asked
25  you this, but do you know who Adam Brown is?

Page 18

GEORGE RIOS

1
2    A    I do not.
3    Q    So the only reason that appears
4 on this document is it was provided by Phoenix
5 Media Solutions to you?
6    A    Correct; correct.
7    Q    Have you ever exchanged any
8 e-mails with Adam Brown at that e-mail address?
9    A    I have not.
10    Q    What else if anything did
11 Phoenix Media Solutions tell you about this
12 lead?
13    A    Just what you see here is what
14 they have provided to me.
15    Q    And what was your e-mail, what
16 did your e-mail say to Phoenix Media Solutions
17 when you were trying to find out the source of
18 the consent?
19    A    I gave him the contact
20 information of the person that had reached out
21 to I guess file the requests, and she looked it
22 up and sent me what you see here.
23    Q    When you sold this lead
24 regarding Mr. Mantha to RevPoint, did you know
25 Mr. Mantha's name at that point?

Page 19

GEORGE RIOS

1
2    A    No.
3    Q    And did you have it in your
4 system, not what you remember, but that wasn't
5 part of the lead that you sold?
6        MR. MARION:  Objection to form.
7    You can respond if you understand the
8    question.
9    Q    Let me try to clean that up.
10    What was on the lead that you
11 sold to RevPoint?
12    A    I'm not sure I understand.  It's
13 contact information.
14    Q    But his name, the name Joe
15 Mantha?
16    A    Correct, yes.  The address, the
17 city, the state, the phone number, the fact
18 that it was not on a DNC at the time, that
19 phone number was not on a DNC at the time, the
20 e-mail address had been validated, and I
21 believe there was auto insurance information on
22 there as well in terms of the make and model
23 and year of his vehicle.
24    Q    Did you do anything to validate
25 that information yourself?

Page 20

GEORGE RIOS

1
2    A    I'm not able to do that, no.
3    Q    And you said the e-mail address
4 was validated.  What did you mean by that?
5    A    Meaning that it was a properly
6 formed valid e-mail syntactically, there were
7 no spaces in the domain, there was no
8 semicolons or anything that would make it an
9 invalid e-mail.
10    Q    But you didn't send a test
11 e-mail to that e-mail to see if it worked?
12    A    No.
13    Q    Did you do anything to check
14 what the TCPA disclosure language, if any, was
15 on the SnappyAutoInsurance website?
16    A    No.
17    Q    Are you familiar with a website
18 called Autoinsurquotes.com?
19    A    I saw it on the documentation in
20 this case, but prior to that, no.
21    Q    How about -- what's the other
22 one, maybe -- how about Quotewizard?
23        MR. BRODERICK:  No, no, excuse
24    me.  Kevin, help me out.
25        MR. POLANSKY:  Unitedquotes.com.

Page 21

GEORGE RIOS

1
2        MR. BRODERICK:  Unitedquotes,
3    thank you.
4    Q    Unitedquotes.com?
5    A    Thank you, yes.  That is one of
6 my properties.
7    Q    That's one of your properties?
8    A    Yes.
9    Q    And when you say one of your
10 properties, do you mean you own the domain for
11 Unitedquotes.com?
12    A    I own the domain for
13 Unitedquotes.com, correct.
14        MR. MARION:  Objection to form.
15    When you say "I" do you mean yourself or
16    an entity?
17    A    I mean Plural Marketing owns it.
18    Q    Plural Marketing owns it.
19    I am going to ask you to look at
20 Exhibit 17 -- actually, sorry, let's go back to
21 22, where we were.
22    I just want to note a couple of
23 things about this, page 14 of 20 of Exhibit 22.
24    This is information you say you
25 were provided by Phoenix Media Solutions.

GEORGE RIOS

1
2      It says the original source lead
3  generator was SnappyAutoInsurance.com, correct?
4      A    That's correct, to my
5  understanding.
6      Q    And is that one of your
7  properties?
8      A    No.
9      Q    Do you have any relation to
10 SnappyAutoInsurance.com?
11     A    None.
12     Q    Under applicant IP address --
13     A    Yes.
14     Q    -- I will ask you to write this
15 down, because we are going to compare it to
16 others.  It's 96 -- hold on.  96.242.132.28.
17     A    Yes, I see it.
18     Q    And it also says that the
19 applicant IP address is Morristown, New Jersey.
20 Do you see that?
21     A    Yes, I see that.
22     Q    And the date of the application,
23 and this is on the information provided to you
24 by Phoenix Media Solutions in Bosnia, is
25 6-26-2019 at 12:01 a.m.

GEORGE RIOS

1
2      A    That's what I see here, yes.
3      Q    And at the very bottom of this
4  page it says, "Applicant agreed to receive
5  promotional e-mails/calls/text/postal mails
6  from third parties regarding his auto insurance
7  application."
8          What's your understanding of
9  where that language came from?
10     A    I can't speak to that.
11     Q    But that was -- was that exact
12 language provided to you by Phoenix Media
13 Solutions in Bosnia?
14     A    It was.
15     Q    Now, let's go to Exhibit 17.
16     A    Yes.
17     Q    And here we have the same
18 consumer IP address on this document as was on
19 Exhibit 22, correct?
20     A    Yes, it looks like it.
21     Q    But this document has a Jornaya
22 lead ID?
23     A    Yes.
24     Q    Did you have a Jornaya lead ID
25 when you sold this lead to RevPoint?

GEORGE RIOS

1
2      A    That's the one that was attached
3  to the record during the transaction.
4      Q    During which transaction?
5      A    When the record was initially
6  sold.
7      Q    So by Plural to RevPoint?
8      A    Correct.
9      Q    Did Phoenix Media Solutions
10 provide you with that Jornaya lead ID?
11     A    They provided a record that did
12 not include this Jornaya lead ID.
13     Q    Then how did it get attached to
14 the lead during the transaction?
15     A    I'm not entirely sure.  I looked
16 today to refresh my memory of this particular
17 record, and I did not see that Jornaya lead ID
18 attached.
19          Then I looked further and saw
20 that it was generated on my site, one of my
21 sites, I'm not entirely sure how it got linked,
22 but the original record didn't include it.
23     Q    Did you attach the Jornaya lead
24 ID to this lead?
25          MR. POLANSKY:  Can I hear that

GEORGE RIOS

1
2  question again?  I couldn't hear the
3  question.
4      Q    Were you the one who attached
5  the Jornaya lead ID to Mr. Mantha's lead?
6      A    No, I'm not sure how that
7  happened.
8      Q    You don't know if someone at
9  RevPoint did that?
10     A    I don't know.
11     Q    But are you sure that you were
12 not provided that Jornaya lead ID by Phoenix
13 Media Solutions in Bosnia?
14     A    It's possible.  I have to look
15 and doublecheck, I'm not sure.
16     Q    Can we look at Exhibit 18, and I
17 can represent to you that this is a subpoena
18 response in this case from Jornaya.
19     A    Yes.
20     Q    And that same Jornaya lead ID
21 appears here, and I can also represent to you
22 that Jornaya associates that lead ID with
23 Unitedquotes.com.
24     A    Okay.
25     Q    Can you explain why a lead that

GEORGE RIOS

1
2 supposedly came from SnappyAutoInsurance has a
3 Jornaya lead ID that's associated with a site
4 to Unitedquotes.com, which is a domain that you
5 own?
6     A     Well, clearly it's a mistake,
7 because the lead was not sourced on
8 Unitedquotes.
9     Q     Do you have any personal
10 knowledge that it was sourced on
11 SnappyAutoInsurance.com?
12     A     Only what was provided to me by
13 Phoenix.
14     Q     And you don't know where Phoenix
15 got the lead, do you?
16     A     I do not.
17     Q     Has Phoenix ever told you
18 anything about how they get their leads that
19 they then sell to you?
20     A     No.
21     Q     Can you look at Exhibit 17,
22 which is the Quotewizard opt-in?
23     A     Yes.
24     Q     Do you see the language under
25 TCPA disclosure?

GEORGE RIOS

1
2     A     Yes.
3     Q     Did you provide that language to
4 RevPoint?
5     A     That may have also come from a
6 request from Phoenix to elaborate on what the
7 disclosure actually was at the time the
8 consumer filled out the form.
9     Q     So you got this TCPA disclosure
10 language from Phoenix Media Solutions in
11 Bosnia, correct?
12     A     Correct; yeah.
13     Q     Then did you in turn provide
14 that to RevPoint Media?
15     A     I did.
16     Q     And was that when -- after Mr.
17 Mantha complained that he had gotten a call or
18 rather a text message that he didn't want, were
19 you contacted by someone at RevPoint Media?
20         MR. MARION:  Objection to form.
21         You can answer if you understand
22     the question.
23     A     Was I contacted by RevPoint
24 Media when the complaint was lodged to them, is
25 that the question?

GEORGE RIOS

1
2     Q     Yes.
3     A     Yes.
4     Q     Was that a phone call or an
5 e-mail?
6     A     I don't recall.
7     Q     Do you still have your e-mails
8 from 2019?
9     A     I'm sure I have some.  I mean
10 I --
11     Q     When you responded to the
12 subpoena to Plural Marketing Solutions in this
13 case, did you search for e-mails?
14     A     I did.
15     Q     And at that time did you have
16 them?
17     A     I provided everything that I
18 could find.
19     Q     And to whom did you provide it,
20 your counsel?
21     A     Yes.
22     Q     And did you send it to anyone
23 else?
24     A     So, I believe the order of
25 events were that I was contacted by RevPoint in

GEORGE RIOS

1
2 regards to this particular issue, it may have
3 been over e-mail, I don't recall, or it could
4 have been a phone call.
5         They asked me to look into where
6 the particular record came from.
7         I responded with the standard
8 TCPA information that is required when these
9 complaints are lodged.
10         At which point I believe a few
11 weeks or months went by, and then I engaged my
12 counsel to work directly with the other lawyers
13 to basically exchange information, and I
14 started providing the documentation to my
15 attorneys, which in I guess just normal course
16 gave it to the other attorneys.
17     Q     You say the other attorneys.
18 Was that Mr. King?
19     A     I believe it was Mr. King, yes.
20     Q     How about Mr. Polansky?
21     A     I'm not sure who Mr. Polansky
22 represents.
23     Q     Quotewizard.
24     A     Okay, yeah, I don't think we had
25 any direct contact.

8 (Pages 26 - 29)

Page 30

GEORGE RIOS

1
2     Q     With anybody for Quotewizard,
3 okay.
4     A     Right.
5     Q     Did you do any business with a
6 company called Blue Flame Media?
7     A     No.
8     Q     How about Seal Dog Media?
9     A     No.
10     Q     Does Plural Marketing Solutions
11 have a Jornaya account?
12     A     Yes.
13     Q     What kind of account is that?
14     A     It's a standard account.
15     Q     Are you a publisher, do you
16 know?
17     A     On their system I believe it's
18 set up to be a publisher.
19     Q     And can you generate your own
20 Jornaya lead IDs, or visits to --
21     A     Yes, yes.
22     Q     What websites does Plural
23 Marketing Solutions run?
24     A     Unitedquotes.
25     Q     Is that the only one?

Page 31

GEORGE RIOS

1
2     A     Yes.
3     Q     And for leads that you yourself
4 generate on Unitedquotes.com, and by you I mean
5 Plural Marketing Solutions, do you associate a
6 Jornaya lead ID with each of those visits?
7     A     Yeah, when one is generated,
8 yes.
9     Q     Let's go back to Exhibit 18, the
10 last page, 7 of 7 of Exhibit 18, which is the
11 Jornaya subpoena response.
12     A     Yes.
13     Q     So, for this Jornaya lead ID,
14 which you're not sure how it got associated
15 with Mr. Mantha's lead, do you see in the
16 second box on that last page it says, "TCPA
17 information witnessed by TCPA Guardian"?
18     A     Yes, I see that.
19     Q     And "Jornaya cannot verify TCPA
20 disclosure language because a disclosure was
21 not tagged on the website according to
22 Jornaya's standard instructions."
23     A     Yeah, I see that.
24     Q     Did the Unitedquotes website,
25 did you try to install a Jornaya script to

Page 32

GEORGE RIOS

1
2 capture TCPA disclosure language on the
3 Unitedquotes.com website?
4     A     I did.  There is one there
5 presently.
6     Q     When did you install that?
7     A     I don't recall.  It's been a
8 while.
9     Q     Was it on the system -- I mean,
10 Jornaya says they didn't capture any disclosure
11 language on 6/21/2019, or whoever visited from
12 that IP address, which is not the same as the
13 Quotewizard ID address.
14     A     Correct.
15     Q     Was it months after that that
16 you put the script on that would capture any
17 TCPA disclosure language on Unitedquotes.com?
18     A     I'm not sure.
19     Q     Did you add the language
20 following receipt of Mr. -- notice that Mr.
21 Mantha had complained that he received an
22 unsolicited text?
23     A     No.
24     Q     How do you know that?
25     A     Looking at this now, the TCPA

Page 33

GEORGE RIOS

1
2 Guardian, I believe that's a separate script or
3 a separate setup that I don't believe is
4 currently on the Unitedquotes sites.
5         I believe all I have right now
6 is the generic lead ID script.
7         So I think that's why it's
8 coming back with it can't verify the
9 disclosure, because I don't believe it's
10 tagged, you know, based on Jornaya's standard.
11     Q     Okay, so you haven't added any
12 script which would capture your -- any
13 disclosure language on the Unitedquotes.com
14 website?
15     A     Correct.
16     Q     And did the Unitedquotes website
17 ever contain any disclosure that people signing
18 up there to receive a quote were agreeing to
19 receive a text message from Quotewizard.com?
20         MR. POLANSKY:  Objection.
21         MR. MARION:  The objection was as
22     to form.  You can answer if you know,
23     but he's asking if you had a very
24     specific objection -- a very specific
25     notice.

9 (Pages 30 - 33)

Page 34

GEORGE RIOS
1
2     A    I'm not even sure, I have to
3  look at the specific language, and I don't know
4  if it would contain any particular company like
5  Quotewizard.
6     Q    Right, I am looking at the
7  Unitedquotes.com terms and conditions as it
8  stands right now, and I don't see any
9  references to specific companies that might
10 market to visitors to the site.
11    A    Yeah, that would be --
12        MR. MARION:  If you understand
13    the question you can answer.
14    I believe -- counsel, I said to my
15    client there is no standing question, so
16    I'm not sure why he's speaking.
17        I'm waiting for counsel to ask a
18    question regarding what he's looking at.
19    Q    I guess I am asking, I mean it's
20 a website that you own, correct,
21 Unitedquotes.com?
22    A    Correct.
23    Q    And you are the sole
24 administrator of that website, correct?
25        MR. MARION:  Objection to form,

Page 35

GEORGE RIOS
1
2  vagueness of "you."
3  A    That's correct.
4  Q    Have you ever had TCPA
5  disclosure language on your website which
6  stated that someone might get a text message
7  from Quotewizard.com?
8        MR. POLANSKY:  Objection, you can
9    answer.
10   A    So, I believe what the process
11 is, because it wouldn't necessarily be under
12 terms and conditions, but I believe the process
13 would be you actually have to go through, and
14 on the last step, where the consumer is
15 prompted for their contact information, there
16 is a TCPA disclosure at the bottom that does
17 link out to a page that lists out partners, and
18 on that partners' page, Quotewizard does
19 appear.
20   Q    Do you have a document that
21 shows us that with respect to Mr. Mantha's
22 lead?
23   A    Well, Mr. Mantha didn't fill out
24 the form on Unitedquotes.com, but I can tell
25 you that Unitedquotes.com's TCPA disclosure on

Page 36

GEORGE RIOS
1
2  the last step of the form does link out to this
3  page, and that you can see it yourself, it's on
4  Unitedquotes.com/partners.
5     Q    But you -- but you're clear that
6  Mr. Mantha didn't fill it out on
7  Unitedquotes.com?
8     A    No, because the information was
9  provided to me by Phoenix, that he had filled
10 it out and consented to the TCPA consent form
11 on SnappyAutoInsurance.
12    Q    How would you know to put
13 Quotewizard on Unitedquotes.com if you didn't
14 do business with them?
15        MR. POLANSKY:  Objection.
16        MR. MARION:  Objection to form.
17    You can answer to the extent that you
18    know.
19    A    They are in the business, and
20 this is a list of virtually everybody who's in
21 the business, whether I do business with them
22 or not.
23    Q    Mr. Rios, my apologies if I
24 already asked you this.  Do you know of a
25 website called Autoinsurquotes.com?  And that's

Page 37

GEORGE RIOS
1
2  insure without an E.
3     A    You mentioned it earlier, and I
4  wasn't familiar with that website until prior
5  to seeing it involved in this matter.
6        MR. BRODERICK:  Could we take a
7    five minute break.  I may be close to
8    done.
9        MR. POLANSKY:  Sure, come back at
10   what, 3:15?
11       MR. BRODERICK:  Sure.  Is that
12   okay with you, Mr. Rios?
13       THE WITNESS:  Yes, that's fine.
14       MR. LANDAU:  The time is
15   approximately 3:07.  We are off the
16   record.
17       (At this point in the proceedings
18   there was a recess, after which the
19   deposition continued as follows:)
20       THE VIDEOGRAPHER:  We are on the
21   record.  The time is approximately 3:19
22   p.m.  Please continue.
23    Q    Okay, Mr. Rios, I just want to
24 compare Exhibit 17 with Exhibit 22.
25       We did talk about this, but I'm

10 (Pages 34 - 37)

Page 38

GEORGE RIOS

1 still very confused how this Jornaya lead ID
2 came to be associated with Mr. Mantha's lead in
3 that your subpoena response didn't have a
4 Jornaya lead ID and the Quotewizard opt-in
5 does?
6        Do you know why that is?
7    A    I don't.
8    Q    And the Quotewizard opt-in,
9 which is Exhibit 17, has a lead date of 8/5/19,
10 whereas Exhibit 22, the Plural response, has a
11 lead date, a date of application of 6/26/2019
12 at 12:01 a.m.
13        Do you know the reason for that?
14        MR. POLANSKY:  Objection.
15        MR. MARION:  Objection as to
16        form, and actually as to asked and
17        answered.
18    Q    Do you know why there are
19 different application dates between the
20 information that Plural provided and what's on
21 the Quotewizard form?
22        MR. POLANSKY:  Objection to
23        characterization of lead date as the
24        application date.

Page 39

GEORGE RIOS

1        MR. MARION:  I join in the
2        objection.
3    Q    If you know.  If you don't know,
4 that's fine.
5    A    I don't know.
6        MR. BRODERICK:  Okay, I don't
7        think I have any further questions,
8        thank you.
9
10 EXAMINATION BY
11 MR. POLANSKY:
12
13    Q    Okay, Mr. Rios.  My name is
14 Kevin Polansky.  I represent Quotewizard in
15 this case.  I do have several questions, and I
16 will go through this as quickly as possible.
17        You said that you are the owner
18 of Plural Marketing Solutions, is that right?
19    A    That's correct.
20    Q    And where is Plural Marketing
21 Solutions located?
22    A    New Jersey.
23    Q    Is that 30 Kern Drive Flanders,
24 New Jersey?

Page 40

GEORGE RIOS

1    A    That's my address, yeah.
2    Q    That's your personal address?
3    A    Right.
4    Q    Is there a different business
5 address for Plural Marketing Solutions?
6    A    I have like a UPS store address
7 also that I typically use for mail that's like
8 a remote address.
9    Q    What's the UPS address?
10    A    That would be 220 Route 10, box
11 number 105 Succasunna, New Jersey.
12    Q    How do you spell the city name?
13    A    Hold on, sorry.
14        So, I'm sorry, I am a terrible
15 speller.  It's S-u-c-c-a-s-u-n-n-a, New Jersey.
16    Q    What's Plural Marketing's
17 website?
18    A    Plmrkg.com.
19    Q    Now, prior to the dispute with
20 Joseph Mantha, had you heard of the website
21 SnappyAutoInsurance.com?
22    A    No.
23    Q    Is Plural Marketing in the
24 business of generating its own leads?

Page 41

GEORGE RIOS

1    A    Not directly, no.
2    Q    When you say not directly, what
3 do you mean by that?
4    A    I mean generating means like
5 sending out e-mail or whatever, or
6 participating in SEO or search marketing.  Is
7 that what you mean?
8    Q    No, so I guess I will change my
9 question.
10        So, Plural Marketing owns
11 Unitedquotes.com, right?
12    A    Correct.
13    Q    And does Unitedquotes.com
14 generate leads?
15    A    It does when I have traffic
16 driven to it, yes.
17    Q    And when traffic is driven to
18 that website, do you then sell those leads?
19    A    Yes.
20    Q    Is there any other forms of lead
21 generation that Plural Marketing engages in?
22    A    No.
23    Q    Is Plural Marketing, for lack of
24 a better word, like a middleman, they buy leads

11 (Pages 38 - 41)

Page 42

GEORGE RIOS

1
2 and then sell them, resell them?
3        A       Correct, through like a
4 ping/post mechanism.
5        Q       Did you use the ping/post in
6 this case with RevPoint?
7        A       I did.
8        Q       Did you --
9               MR. POLANSKY:  Strike that.
10        Q       Did Plural Marketing purchase
11 the Mantha lead from Phoenix Media Solutions?
12        A       That's correct.
13        Q       You said Phoenix Media Solutions
14 is a partner.  What do you mean by partner?
15 Are they just a company that you purchase leads
16 from?
17        A       Yes, we have a relationship that
18 they drive traffic to me, and I then turn
19 around and ping/post that traffic out to other
20 partners.
21               RevPoint happened to be one of
22 them at that time.
23        Q       How long have you had that
24 relationship with Phoenix?
25        A       Quite a while, probably over two

Page 43

GEORGE RIOS

1
2 years.
3        Q       Just about --
4        A       I'm not sure exactly.
5        Q       Just about from the start of the
6 company?
7        A       Yes, soon after, thereabouts.  I
8 would have to check, I'm not sure exactly.
9        Q       Do you own any share or --
10               MR. POLANSKY:  Strike that.
11        Q       Do you have any ownership stake
12 in Phoenix?
13        A       No.
14        Q       Does Phoenix have a U.S.
15 location?
16        A       Not that I'm aware of.  I don't
17 know.
18        Q       Do you have any contact
19 information for Dario?
20        A       Yes, I have his e-mail address.
21        Q       And what's his e-mail address?
22        A       It's CEO@Phoenixmedia.com, I
23 believe.  But I would have to doublecheck that.
24        Q       Is he the only employee of
25 Phoenix?

Page 44

GEORGE RIOS

1
2        A       I don't know.
3               He is my contact, that's all I
4 can say.
5        Q       Do you usually contact him by
6 e-mail or phone or both?
7        A       E-mail.
8        Q       Have you discussed with Dario
9 SnappyAutoInsurance.com?
10        A       Just as it relates to this in
11 terms of asking him for additional contact
12 information when it was asked of me.
13        Q       Do you know whether he purchased
14 the lead from SnappyAutoInsurance.com?
15        A       I don't.  That's just what he
16 sent to me when I requested for the TCPA
17 information.
18        Q       Did you pursue any diligence to
19 ensure that SnappyAutoInsurance.com was a valid
20 website?
21        A       I didn't know about
22 SnappyAutoInsurance until this.
23        Q       Was this the first lead
24 purchased from SnappyAutoInsurance?
25        A       I don't know.  I don't

Page 45

GEORGE RIOS

1
2 necessarily always get the URLs, so I'm not
3 sure.
4        Q       Do you know if Dario has ever
5 spoken to Adam Brown?
6        A       I don't know.  I assume, but I
7 don't know.
8        Q       And are you aware Adam Brown is
9 the owner of SnappyAutoInsurance.com?
10        A       Only through this process.  I
11 don't know.  I wasn't aware of that name prior
12 to this.
13        Q       Have you ever been at any time
14 to the SnappyAutoInsurance.com website?
15        A       Yeah, just to look at it after
16 it came up in this context.
17        Q       And at the time that you looked
18 at it, was it operative, was it still working?
19        A       Yes.
20        Q       Did you take any screen shots of
21 what you saw at that time?
22        A       Yeah, and I believe I sent them
23 off.
24        Q       Let's take a look at those
25 screen shots.

Page 46

GEORGE RIOS

2      So let's turn to Exhibit 22.
3      A    Yes.
4      Q    I think they are at the very
5 bottom of the exhibit.
6      A    Yeah.
7      Q    Okay, so I am going to start, it
8 looks like pages 16 of 20.  Is that what you
9 have?
10     A    Yes.
11     Q    And are these screen shots that
12 you personally captured from
13 SnappyAutoInsurance.com?
14     A    I believe they are, yes.
15     Q    Do you recall around what time
16 that you captured these images?
17     A    No, I don't.
18          It would have been around the
19 time that the -- it would have been around the
20 time that we had to produce the screen shots
21 for the information request, but I don't
22 remember exactly what date that was.
23     Q    Now do you see at the very top
24 there is a URL http://SnappyAutoInsurance.com/?
25     A    Yes, I see that.

Page 47

GEORGE RIOS

2      Q    Do you see where it says 58
3 captures?
4      A    Yes, I see that.
5      Q    Do you know what that refers to?
6      A    So, this isn't the actual
7 website, this is the Wayback Machine.
8      Q    What is it called?
9      A    The Wayback Machine.  So the
10 SnappyAutoInsurance website has since gone
11 offline.  I don't know when that happened
12 exactly.
13          But if you go to
14 WaybackMachine.com, that's the web archive and
15 that's where this screen shot came from.
16     Q    So if you go to
17 WaybackMachine.com -- so you went to
18 WaybackMachine.com?
19     A    To capture the images of the
20 website at that time, yeah, because I don't
21 believe the website was operational at that
22 time.
23     Q    Okay, so these images all come
24 from the Wayback Machine website?
25     A    That's correct, yeah.

Page 48

GEORGE RIOS

2      Q    Do you know if you clicked in
3 all of these captures, these 58 captures?
4      A    I'm sorry, do I know if what?
5 I'm sorry.
6      Q    Sure.  When you were on the
7 Wayback Machine website --
8      A    Yes.
9      Q    And you were scrolling through
10 these web images, do you know whether you
11 scrolled through all of the 58 captures?  It
12 appears to be a hyperlink on the website?
13     A    No, I did not look through all
14 58.
15     Q    And there is a date here that
16 says September 6, 2019.
17          Do you know what that date
18 refers to?
19          MR. BRODERICK:  Objection.  This
20     is 10 March, 2014.
21     A    I'm not sure.
22     Q    Sure, let me rephrase the
23 question.
24          Do you see there is a period of
25 time, it says 10 March, 2014 to 6 September,

Page 49

GEORGE RIOS

2 2019?
3      A    Yes.
4      Q    Did you enter any sort of data
5 points when reviewing on the Wayback Machine
6 website?
7          MR. BRODERICK:  Objection.
8          THE WITNESS:  I heard an
9     objection.  I don't know if I am allowed
10    to answer.
11         MR. MARION:  Yes, to the best of
12    your recollection.
13         THE WITNESS:  Sorry?
14         MR. MARION:  Yes, you can answer,
15    yes.
16         THE WITNESS:  I can't hear you,
17    sorry.
18         MR. MARION:  If you recall, yes,
19    you can answer.
20     A    Oh, so I don't run the Wayback
21 Machine, but my understanding, the way that it
22 works is that there are 58 captures between
23 these two dates, and that's what those two
24 dates refer to.
25          You can click on either one of

13 (Pages 46 - 49)

Page 50

GEORGE RIOS

1
2 those direction arrows to go back in time or
3 forward in time, and this just happens to be
4 one of the earlier screen shots that I was able
5 to capture relative to the time frame that was
6 in question.
7      Q     Okay, so this is only one of the
8 58 captures?
9           MR. MARION:  Objection to form.
10     A     Yes, I mean, I don't -- yeah, I
11 didn't look at the other ones, I don't know.
12     Q     And then if you go down to the
13 next page, this is another screen shot from the
14 WaybackMachine.com, is that right?
15     A     Yes.
16     Q     And the same is true for the
17 next page as well, is that right?
18     A     Yes.
19     Q     What about, is the same true for
20 the next two pages of this exhibit?
21     A     I would assume yes.  I haven't
22 looked, but yes, I just looked; yeah.
23     Q     Where it says captures in each
24 page, is it fair to say you didn't click on all
25 the captures for each of these web pages?

Page 51

GEORGE RIOS

1
2      A     I did not.
3      Q     Again, just to confirm, you
4 don't recall when you went onto the Wayback
5 Machine website?
6      A     No.
7      Q     Does Plural Marketing control
8 SnappyAutoInsurance.com's website?
9      A     No.
10     Q     Has it ever?
11     A     No.
12     Q     Have you ever personally spoken
13 to Adam Brown?
14     A     No.
15     Q     Now, you testified earlier that
16 you are the only employee of Plural Marketing,
17 is that right?
18     A     That's correct.
19     Q     And were you involved in the
20 process of submitting the bid from Phoenix to
21 RevPoint?
22           MR. POLANSKY:  Strike that.
23     Q     The lead --
24           MR. POLANSKY:  Let me just start
25 over.

Page 52

GEORGE RIOS

1
2      Q     Were you involved in the process
3 of submitting the lead from Phoenix to
4 RevPoint?
5      A     So, Plural's system received the
6 lead from Phoenix and then passed it to
7 RevPoint.
8      Q     And what's the name of your
9 system, your lead system?
10     A     It's a proprietary system.
11     Q     And what's the name of it?  Does
12 it have a name?
13     A     I mean, yeah, not really, it
14 doesn't really have a name, it's just one that
15 I wrote.
16     Q     Do you refer to it as anything?
17     A     Not really, no.  I mean, it's
18 just a system.
19     Q     So the system works
20 electronically, so Phoenix enters or transfers
21 the electronic data information of the lead to
22 Plural, and then you upload it into the
23 RevPoint site, is that how it works?
24     A     Yes, so the information is
25 basically pinged to my system.  My system in

Page 53

GEORGE RIOS

1
2 turn then pings that information to RevPoint.
3           RevPoint will bid based on
4 whatever they are able to get when they ping it
5 out to their partners.
6           And then there is a read share
7 that goes across everyone who is involved, and
8 that's basically it, and this happens in
9 seconds.
10     Q     When the leads ping to your
11 site, do you get notification of it?
12     A     No.
13     Q     Is there any human interaction
14 on your end when the lead is pinged to your
15 system from Phoenix?
16     A     No.
17     Q     Now you testified earlier that
18 you went back before today's deposition to
19 review whether there was a Jornaya lead ID
20 associated with this lead, is that correct?
21     A     Yes.
22     Q     From the information that you
23 have reviewed so far, you have not found a
24 Jornaya lead ID from Phoenix to Plural, is that
25 correct?

14 (Pages 50 - 53)

Page 54

GEORGE RIOS
2     A    Right, I have to go back and
3 doublecheck.
4     Q    But there was a Jornaya lead ID
5 from Plural to RevPoint, is that correct?
6     A    Right, that's on the record.
7     Q    And you don't know how the
8 Jornaya lead ID got connected or attached to
9 that lead when it went from Phoenix to you and,
10 you being Plural, to RevPoint, is that correct?
11    A    Right.
12    Q    Now, just because --
13         MR. POLANSKY:  Strike that.
14    Q    You've testified that the source
15 of this lead is SnappyAutoInsurance.com, is
16 that right?
17    A    That's correct.
18    Q    It's not Unitedquotes.com,
19 right?
20    A    It is not.
21    Q    So, is it your position that
22 even though there was an erroneous Jornaya lead
23 ID associated with this lead, that doesn't make
24 the consent provided by the consumer invalid?
25         MR. BRODERICK:  Objection.

Page 55

GEORGE RIOS
2         MR. MARION:  Objection to form.
3 You can respond if you understand.
4     A    Can you rephrase that?
5     Q    Sure.
6         So, there was a Jornaya lead ID
7 associated with this lead when it went from
8 Plural to RevPoint, right?
9     A    Right.
10    Q    We have now looked at the
11 response received from Jornaya with respect to
12 this lead, right, and I think you've had a
13 chance to look at it?
14    A    Right.
15    Q    And that lead came from
16 Unitedquotes.com, right?
17    A    Right.
18    Q    So it doesn't appear to be
19 associated with the Mantha lead, is that right?
20    A    That's correct.
21    Q    And just because that lead or
22 that Jornaya ID isn't associated with Mantha,
23 doesn't mean Mantha didn't consent to the lead,
24 is that right?
25         MR. BRODERICK:  Objection.

Page 56

GEORGE RIOS
2     A    That's -- I think so, yeah.  I
3 mean, because I received the consent
4 information from Phoenix, and in the consent
5 information it does indicate that he did
6 provide consents.  That's what I am basing that
7 off of.
8         MR. BRODERICK:  Objection, move
9 to strike.
10         MR. POLANSKY:  I couldn't hear,
11 what was it?
12         MR. BRODERICK:  I objected and
13 moved to strike, sorry.
14    Q    Do you have --
15         MR. POLANSKY:  Strike that.
16    Q    In reviewing for today's
17 deposition, what documents did you review?
18    A    The documents that were on the
19 Veritext site, the complaint that was sent to
20 me some time ago, my response to the subpoena,
21 and I believe that's it.
22    Q    And the lead information
23 transferred from Phoenix to Plural is all
24 electronic?
25    A    Yes.

Page 57

GEORGE RIOS
2     Q    Does it look different than the
3 information that's provided on Exhibit 22?
4         MR. BRODERICK:  Objection.
5     Q    In other words, despite the
6 form, I understand this is a PDF document, is
7 the information accessible by you, can it be
8 generated or printed out?
9         MR. BRODERICK:  Objection.
10    A    This information you are looking
11 at I received from Phoenix, the information
12 that came across from the record I provided to
13 Mr. Moynahan.
14    Q    Okay.  Let me ask you this, and
15 I think you just answered it.
16         So the information attached to
17 Exhibit 22 is what you received from Phoenix
18 after receiving the dispute, right?
19    A    Yes.
20    Q    And then your testimony is you
21 provided some other information to Mr. Moynahan
22 at the time of -- at what time?
23    A    When it was requested I provided
24 the basic contact information that came across
25 with the record plus the auto insurance, like

GEORGE RIOS

1
2 the vehicle information, that would make it an
3 auto insurance quote.
4        Q      I will turn your attention to
5 Exhibit number 19.
6        A      Yes.
7        Q      Go to the page 10 of 10.
8        A      Page what, I'm sorry?
9        Q      10 of 10.
10       A      10 of 10.
11              MR. MARION:  Exhibit 19 is 12
12 pages.
13              MR. POLANSKY:  It's only 10 on
14 mine.
15       A      Oh, wait, I see it, yes.  4 of
16 12 files.
17       Q      I see.
18       A      10 of 10, yeah, yeah, yeah, I
19 see it, yeah.
20              So this is basically what I was
21 referring to earlier, this is the record, this
22 is the record that comes across when an auto
23 insurance record is put into the ping system.
24       Q      So this is the information that
25 Plural provided to RevPoint?

GEORGE RIOS

1
2        A      Correct; yeah.
3        Q      Do you know why, if you look at
4 the IP address on --
5              MR. POLANSKY:  Strike that, I'm
6       going to start over.
7        Q      If you look at the IP address on
8 this document, can you write that down?
9        A      Okay, yeah I've got it.
10       Q      Let go back to Exhibit 22,
11 Plural's response.  Same page as before, after
12 Exhibit C.
13       A      Yes.
14       Q      Do you know why the IP addresses
15 are different if they are both coming from
16 Plural?
17       A      I can't say.  Sometimes -- I
18 mean, I can't say exactly, but sometimes I do
19 know that the IP address changes from partner
20 to partner, because sometimes they append their
21 own server's IP address either through an
22 incorrect code or some other disconnect in
23 mapping.
24       Q      Do you have any written
25 correspondence from Phoenix with the consent

GEORGE RIOS

1
2 information included therein from Mr. Mantha?
3              MR. BRODERICK:  Objection.
4        A      It's what I provided, that's
5 what I have.
6              It's what you are looking at on
7 Exhibit 22 where it says original lead source
8 generator, that's what the consent was that he
9 provided to me when I requested it.
10       Q      Do you know if that was a screen
11 shot from the website, or if that was just a
12 summary of what he believes the consent stated?
13       A      That's what he provided to me.
14 I don't know where he got it from.
15       Q      Do you know what date of
16 application means on the information on Exhibit
17 22?
18       A      I don't know, I'm not sure what
19 application is referring to.
20       Q      The information that you
21 provided to Mr. Moynahan after receiving the
22 dispute, is that different, does it look
23 different, or is it in a different form than
24 what we just looked at in Exhibit 19?
25       A      Hold on, in Exhibit 19?

GEORGE RIOS

1
2        Q      Yes.  So if you could turn again
3 to page 10 of 10.
4        A      The last page?
5        Q      Yes.
6        A      Yes, so I think I sent both.
7              So, this is the full record of
8 what would have been sent to RevPoint, and then
9 the TCPA audit is a -- is not all of this
10 stuff?
11              It's just the TCPA relevant
12 information, and I believe I sent both to
13 Mr. Moynahan.
14       Q      So the TCPA audit does not
15 include all of the information that Plural has
16 to this lead?
17       A      All the information I have for
18 this lead is what is on page 10 of 10 of
19 Exhibit 19.  That's everything that I have.
20       Q      Okay, but would you agree page
21 10 of 10 of Exhibit 19, it doesn't include the
22 URL for SnappyAutoInsurance.com?
23       A      I'm sorry?
24       Q      Sure.  On page 10 of 10 on
25 Exhibit 19, would you agree with me that

Page 62

GEORGE RIOS

1
2  SnappyAutoInsurance.com is not included on that
3  page?
4      A    Yeah, I don't see it here.
5      Q    So Plural does have more
6  information than what's contained on this
7  document, right?
8          MR. MARION:  Objection to form.
9      A    No.
10         MR. BRODERICK:  Objection.
11     A    SnappyAutoInsurance was on the
12  TCPA audit, that's how I got that URL, both of
13  which were provided to Mr. Moynahan.
14     Q    Okay, I think I misunderstood
15  you, then.  I thought you said all the
16  information that Plural has is on page 10 of 10
17  on Exhibit 19.
18         But now you've said that all the
19  information Plural has is on page 10 of 10 on
20  Exhibit 19 and on the TCPA audit we just looked
21  at, Exhibit 22, is that right?
22         MR. MARION:  Objection to
23  characterization.
24         MR. BRODERICK:  Objection.
25     Q    Let me ask it this way --

Page 63

GEORGE RIOS

1
2      A    I'm not -- yeah, sorry, I'm not
3  sure what you are asking.
4      Q    Sure.
5          So, in looking at page 10 of 10
6  on Exhibit 19, and in looking at the TCPA audit
7  that's been produced by Plural in response to
8  the subpoena, which is identified as Exhibit
9  22, is there any additional information that
10  Plural has with respect to this lead?
11     A    No.
12         MR. MARION:  I object to form.
13     Q    Do you know Michael Fishman?
14     A    I know him, yes, I know him.
15     Q    Have you spoken to him about
16  this lead?
17     A    When it first became an issue,
18  yeah, he called me and had told me that there
19  was a complaint, and I said I would look into
20  it and try to get some information back to him.
21  And he put me in contact with
22  Mr. Moynahan at the time, and I provided the
23  TCPA audit that I got from Phoenix.
24     Q    Did you provide that information
25  by e-mail?

Page 64

GEORGE RIOS

1
2      A    I believe I did.
3      Q    Other than that communication
4  with Michael Fishman about the dispute, how
5  many times have you spoken to Michael Fishman?
6      A    In what time frame?
7      Q    With respect to this lead?
8      A    We haven't spoken in a while.
9  We don't do business together anymore, yeah, I
10  couldn't even recall the last time I spoke to
11  him, but -- yeah, I can't even say.  It's been
12  a while.
13     Q    Have you heard of a company
14  called Request Path Media, Inc.?
15     A    Yes.
16     Q    And how do you know the company?
17     A    That was another partner.  I
18  believe that company is dissolved.
19     Q    Did you create that company?
20     A    No.
21     Q    Request Path was a company that
22  was a partner of Plural Marketing, is that
23  right?
24     A    No, that was not a partner, my
25  partner, so that was another entity that was,

Page 65

GEORGE RIOS

1
2  another marketing company that was at one point
3  affiliated with RevPoint, and I'm not sure who
4  else.  I don't remember.
5      Q    How was Request Path Media
6  affiliated with RevPoint?
7      A    The same way that Plural
8  Marketing is affiliated, they were just
9  affiliated partners, sold traffic on a
10  ping/post tree.
11     Q    Does Request Path Media have
12  anything to do with Unitedquotes.com?
13     A    No.
14     Q    Have you ever worked for Request
15  Path Media?
16     A    Yes.
17     Q    What was your role at Request
18  Path Media?
19     A    Same thing, technology.
20     Q    Did you create Request Path
21  Media?
22     A    No.
23     Q    Just bear with me, I am trying
24  to move a document from a private folder to
25  this folder.  I don't know how to do that.

17 (Pages 62 - 65)

GEORGE RIOS

1
2      MR. BRODERICK:  You click the
3  button to the left of it, then you can
4  drag it.
5      MR. POLANSKY:  The problem is
6  they didn't give me like a folder.  So
7  if I click exhibit, it goes into the
8  Plaintiff's Exhibit folder from the
9  other day.
10     MR. BRODERICK:  Meaning marked
11 exhibits?
12     MR. POLANSKY:  Yes.
13     MR. BRODERICK:  I think that's
14 okay, it will just be marked
15 sequentially.
16     MR. POLANSKY:  I don't think he
17 has access to the marked exhibits for
18 Joe Mantha.
19     MR. BRODERICK:  Oh, I see.  Which
20 one is it?
21     MR. POLANSKY:  Which document?
22     MR. BRODERICK:  Which do you want
23 it moved into?
24     MR. POLANSKY:  I want to move in
25 a new document called a Request Path

GEORGE RIOS

1
2  Media Florida business filing
3  incorporation for Request Path Media.
4      MR. BRODERICK:  Okay, yeah, I
5  don't have that.
6      MR. POLANSKY:  No.
7  Wait, I might have figured this
8  out.  I don't know why they don't give me
9  access.
10     Q    Let me ask you this question,
11 Mr. Rios.  Did you incorporate Request Path
12 Media?
13     A    The initial incorporation
14 possibly I was on, but it got transferred to
15 someone else, and it's kind of personal why, I
16 mean --
17     Q    I mean, you understand that you
18 incorporated this company on March 3, 2015, is
19 that right?
20     A    Yes, so I transferred it to --
21 okay, so I was in the middle of, or I should
22 say I was in the beginning of a divorce.
23         And that company was the company
24 that I was at the time had an ownership share,
25 and I was worried that that ownership share

GEORGE RIOS

1
2  would then come into the context of the divorce
3  and make it that much more difficult.
4         So I transferred the ownership
5  to another person, and then we operated under
6  that company for a period of time, and then it
7  got shut down.
8      Q    Okay.  Is that when you created
9  RevPoint Media?
10     A    I didn't create RevPoint Media.
11     Q    Sorry, Plural Marketing
12 Solutions?
13     A    Right.
14     Q    At any point in time did Request
15 Path Media operate Unitedquotes.com?
16     A    It might have been -- yeah, I
17 mean, I don't remember exactly, it might have
18 been a brand or one of the brands, but I don't
19 think it was actually.  I don't recall.
20     Q    Do you know anyone by the name
21 of Peter Petrov?
22     A    No.
23     Q    What about Mario Guerrero?
24     A    No.
25     Q    Justin Cohen?

GEORGE RIOS

1
2      A    No.
3      Q    And I think this was asked, but
4  I apologize, I don't have it written down.
5  Have you heard of Blue Flame Marketing, Inc.?
6      A    No, no.
7      Q    How far is your address from
8  Morristown, New Jersey, your business address?
9      A    Maybe 30 minutes, give or take.
10     MR. POLANSKY:  I think that might
11 be all I have.  Just give me a moment.
12         If you want we can go off or I can
13 just look at my notes.  It doesn't matter.
14     MR. BRODERICK:  How long do you
15 want to go off for, Kevin?
16     MR. POLANSKY:  Three or four
17 minutes.  I just want to collect my
18 thoughts.  Come back around 4:02.
19     THE VIDEOGRAPHER:  Okay.  The
20 time is approximately 3:57.  We are off
21 record.
22     (At this point in the proceedings
23 there was a recess, after which the
24 deposition continued as follows:)
25     MR. LANDAU:  We are on the

Page 70

GEORGE RIOS

1
2    record, the time is approximately 4:02
3    p.m.  Please continue.
4        Q    Mr. Rios, I only have a couple
5    of more questions.
6            Did you say that Phoenix Media
7    Solutions is located in Bosnia?
8        A    Yes.
9        Q    Do you know if Dario, I can't
10   pronounce his last name, lives in Bosnia or
11   some other location?
12       A    To my knowledge he lives in
13   Bosnia, but I'm not sure.
14       Q    How did you meet Dario?
15       A    I don't recall.
16       Q    How did you get in touch with
17   Phoenix?
18       A    Someone made an introduction at
19   some point, I don't remember where, through
20   e-mail, and we started talking over e-mail and
21   that was it.
22            I sent him my spec, that was it.
23            I mean, it's sort of like the
24   same way that I got engaged with RevPoint or
25   anybody else.

Page 71

GEORGE RIOS

1
2        Q    You testified earlier that on
3    the Unitedquotes website you only have the
4    generic lead ID script for Jornaya, is that
5    correct?
6        A    That's correct.
7        Q    What comes with the generic lead
8    ID script?  In other words, what's captured by
9    that script?
10       A    I don't know, I can't really
11   speak to Jornaya's technology.
12       Q    But the consent information is
13   not tagged with the script?
14           MR. MARION:  Objection to form.
15           You can answer to the extent you know.
16       A    I don't really know how that
17   piece works.
18           It doesn't look like it is
19   working correctly based on what I saw here, and
20   I would need to look at it further and
21   understand what's wrong.  I don't know.
22       Q    Do you have any understanding
23   for why the Jornaya lead ID was attached to the
24   lead when provided to RevPoint?
25       A    No.

Page 72

GEORGE RIOS

1
2           MR. POLANSKY:  No further
3    questions.  Thank you for your time.
4           MR. MARION:  No, no, we are not
5    done yet.  First of all, Ted, do you
6    have any more questions?
7           MR. BRODERICK:  I do not.  Thank
8    you, Roger.
9           MR. MARION:  So I am going to ask
10   a couple of follow-up questions just
11   because you guys didn't.
12
13   EXAMINATION BY
14   MR. MARION:
15
16       Q    So, do you have a contractual
17   relationship with Phoenix?
18       A    Yes, I do.
19       Q    Did Phoenix make any
20   representations in its contract regarding TCPA
21   compliance?
22       A    Yes.  He said everything he sold
23   to me would be compliant and he would be able
24   to provide that documentation in the event that
25   it was necessary.

Page 73

GEORGE RIOS

1
2        Q    And did it warrant compliance in
3    any way?
4        A    Yes, I believe that's what the
5    contract states.
6           MR. MARION:  Nothing further.
7           MR. LANDAU:  Anyone else have any
8    questions?
9           MR. POLANSKY:  I just have one
10   follow-up.
11
12   CONTINUED EXAMINATION BY
13   MR. POLANSKY:
14
15       Q    Does Plural have a contract with
16   RevPoint?
17       A    Not active.
18       Q    Right, but did it have a
19   contract requiring TCPA compliance from Plural?
20       A    Yes; I believe that was part of
21   the agreement as well.
22           MR. POLANSKY:  Okay, nothing
23   further.
24           MR. BRODERICK:  Nothing further
25   from me.  Thank you, Mr. Rios.

19 (Pages 70 - 73)

Page 74

GEORGE RIOS

1
2      THE WITNESS:  Thank you very
3  much.
4      THE VIDEOGRAPHER:  This concludes
5  today's testimony given by George Rios
6  consisting of one media unit and it will
7  be retained by Veritext New England.
8      At this time it is 4:06 p.m.  We
9  are off the record.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 75

GEORGE RIOS

1
2
3
4      I, the undersigned, a Certified
   Shorthand Reporter of the State of New
5  York, do hereby certify:
        That the foregoing proceedings were
6  taken before me at the time and place
   herein set forth; that any witnesses in
7  the foregoing proceedings, prior to
   testifying, were duly sworn; that a record
8  of the proceedings was made by me using
   machine shorthand which was thereafter
9  transcribed under my direction;
        That the foregoing transcript is a
10  true record of the testimony given.
        Further, that if the foregoing
11  pertains to the original transcript of a
   deposition in a federal case before
12  completion of the proceedings, review of
   the transcript [ ] was [x] was not
13  requested.
14      I further certify I am neither
   financially interested in the action nor a
15  relative or employee of any attorney or
   party to this action.
16      IN WITNESS WHEREOF, I have this
17
18
19
20  Stephen J. Moore
21  RPR, CRR
   Dated: 8/11/2020
22
23
24
25

Page 76

GEORGE RIOS

1
2  DECLARATION UNDER PENALTY OF PERJURY
3      Case Name: MANTHA v. QUOTEWIZARD
4      Date of Deposition: July 28,
5  2020
6
7      I, GEORGE RIOS, hereby certify
8      Under penalty of perjury under the
9  laws of the State of New York that the
10  foregoing is true and correct.
11      Executed this _____ day of
12  _____, 2020, at
13  _____.
14
15
16  _____
17
18      GEORGE RIOS
19
20
21
22
23
24
25

Page 77

GEORGE RIOS

1
2  DEPOSITION ERRATA SHEET
3  Case Name: MANTHA v. QUOTEWIZARD
4  Name of Witness: GEORGE RIOS
5  Date of Deposition: July 28,
6  2020
7  Reason Codes:  1. To clarify the
8  record.
9  2. To conform to the facts.
10  3. To correct transcription errors.
11  Page _____ Line _____ Reason _____
    From _____ to _____
12  Page _____ Line _____ Reason _____
    From _____ to _____
13  Page _____ Line _____ Reason _____
    From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15  Page _____ Line _____ Reason _____
    From _____ to _____
16  Page _____ Line _____ Reason _____
    From _____ to _____
17  Page _____ Line _____ Reason _____
    From _____ to _____
18  Page _____ Line _____ Reason _____
    From _____ to _____
19  Page _____ Line _____ Reason _____
    From _____ to _____
20  Page _____ Line _____ Reason _____
    From _____ to _____
21  Page _____ Line _____ Reason _____
    From _____ to _____
22  Page _____ Line _____ Reason _____
    From _____ to _____
23  Page _____ Line _____ Reason _____
    From _____ to _____
24  Page _____ Line _____ Reason _____
    From _____ to _____
25

20 (Pages 74 - 77)

Page 78

```
 1              GEORGE RIOS
 2          DEPOSITION ERRATA SHEET
 3  Page _____ Line _____ Reason _____
    From _____ to _____
 4  Page _____ Line _____ Reason _____
    From _____ to _____
 5  Page _____ Line _____ Reason _____
    From _____ to _____
 6  Page _____ Line _____ Reason _____
    From _____ to _____
 7  Page _____ Line _____ Reason _____
    From _____ to _____
 8  Page _____ Line _____ Reason _____
    From _____ to _____
 9  Page _____ Line _____ Reason _____
    From _____ to _____
10  Page _____ Line _____ Reason _____
    From _____ to _____
11  Page _____ Line _____ Reason _____
    From _____ to _____
12  Page _____ Line _____ Reason _____
    From _____ to _____
13  Page _____ Line _____ Reason _____
    From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15  Page _____ Line _____ Reason _____
    From _____ to _____
16  Page _____ Line _____ Reason _____
    From _____ to _____
17          _____ Subject to the above
18  changes, I certify that the transcript is
19  true and correct
20          _____ No changes have been
21  made. I certify that the transcript  is
22  true and correct.
23
24      _____
25          GEORGE RIOS
```