**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JOSEPH MANTHA, *on behalf of himself and all others similarly situated*,

      Plaintiff,

v.

QUOTEWIZARD.COM, LLC,

      Defendant.

Civil Action No. 1:19-cv-12235-LTS

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S PARTIAL CROSS-MOTION FOR SUMMARY JUDGMENT[1]**

    Defendant QuoteWizard.com, LLC ("QuoteWizard") submits its Opposition to Plaintiff Joseph Mantha's ("Mantha") partial cross-motion for summary judgment pertaining to his non-residential use of his cell phone number and the issue of his consent.[2]

**INTRODUCTION**

    In the face of QuoteWizard's motion for summary judgment, Mantha seeks partial summary judgment on two issues relating to his surviving claim: (1) whether he is a "residential subscriber" in connection with his cell phone; and (2) whether he consented to receive text messages from QuoteWizard.

    On the first issue, on which QuoteWizard has also moved for summary judgment, Mantha misrepresents the applicable law and the factual record. First, Mantha attempts to draw

---

[1] QuoteWizard incorporates herein its Memorandum of Law in support of its Motion for Summary Judgment, its Statement of Facts, and Affidavits in support thereof (*see* ECF Nos. 202, 203, 204, and 208), as the issues, material facts, legal arguments, and legal citations overlap between QuoteWizard's Motion, Mantha's partial Motion, and QuoteWizard's Opposition thereto.

[2] Only Count II of the Amended Complaint remains.

a distinction between personal and business use of a cell phone, claiming that the former is entitled to "do not call" protections under the Telephone Consumer Protection Act ("TCPA") while the latter is not. <u>But that is not a distinction that the applicable law draws</u>. Rather, the "do not call" protections apply only to *residential subscribers*, which is obviously different than personal use of a cell phone given the required explicit tie to a person's home. Therefore, the definition is **far narrower** than Mantha represents to the Court. On this front, Mantha offers a sole fact: his cell phone bill is addressed to his home address. Of course, this proves nothing of *how* Mantha uses his cell phone, an issue on which he advances no facts. As explained in QuoteWizard's Motion, Mantha's cell phone is his work lifeline, used all hours of the day, night, and weekends for his work and is therefore <u>not</u> a residential line even under the most generous interpretations. Summary judgment on that issue should enter for QuoteWizard.

Second, Mantha claims that the factual record warrants entry of summary judgment in his favor on the issue of consent. The issue of consent, however, presents a classic disputed issue of material fact that cannot be resolved at summary judgment: QuoteWizard has proof that Mantha consented via visiting a website, clicking through a web form, and agreeing to receive an auto insurance quote; Mantha denies the same. Despite Mantha's misstatements of the applicable legal standards and the factual record, the material facts show that *each company that bought and sold Mantha's lead has testified under oath that it believes the lead was sold with Mantha's consent*, and each promised to only sell the lead with that valid consent. Additional facts proving Mantha's consent include: (1) only about a month or so <u>before</u> QuoteWizard was sold Mantha's lead with proof that Mantha signed up for a quote and provided his personal information, Mantha had discussed with his friend making a TCPA demand to recover money (which, if Mantha did not consent to the text messages, would constitute an extreme coincidence); (2) the fact that Mantha freely responded to the text messages ("How do I get a quote?") and tried to schedule a

2

phone call to discuss auto insurance quotes; and (3) Mantha freely admitted that he could not recall every website he visited and could not rule out that someone provided his information on the website on his behalf.  The Court cannot enter summary judgment on these disputed facts on the issue of whether he consented; rather, weighing of the evidence and the resolution of credibility disputes is reserved for the factfinder.

## SUMMARY JUDGMENT STANDARD

In reviewing a motion for summary judgment, the Court grants summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of  law."  Fed. R. Civ. P. 56(c).  In doing so, the Court must take the record "in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990).  Generally speaking, cross- motions for summary judgment  do not alter the basic summary judgment standard, but require the court to determine whether either party deserves judgment as a matter of law on facts that are not disputed.  *See Adria Int'l Group, Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

## FACTS[3]

For the issue of whether Mantha qualifies as a "residential subscriber" for his remaining Count II, QuoteWizard references, incorporates, and relies on its factual statement for its Motion for Summary Judgment on the same issue.  *See* ECF No. 202, pp. 5-7; *see also* ECF No. 204.

---

[3] QuoteWizard's responses to Mantha's statement of facts, and QuoteWizard's additional statements, are filed herewith.  QuoteWizard incorporates those by reference herein, as well as its Statement of Facts in support of its Motion for Summary Judgment on the same/similar issues, filed at ECF No. 204.  As used herein, "SOF Response" refers to QuoteWizard's responses to Mantha's statement of facts and its additional statement of facts therein.

With respect to consent, records as produced in this case by Plural Marketing Solutions, Inc. ("Plural"), and RevPoint Media, LLC ("RevPoint") evidence that Mantha signed up to receive an auto insurance quote and consented to communications for that purpose on www.snappyautoinsurance.com (the "Website") by clicking through and agreeing to a web form. *See* SOF Response, ¶ 100.  In fact, the Website was operational and live at the time of the disputed consent in June or August 2019, and the website creator, Adam Brown, was paying to host the Website on GoDaddy.com, Inc. at that time.  *Id.*, ¶ 101.  Other evidence shows that the Website was updated in 2019 and 2020.  *Id.*, ¶ 102.

Plural bought Mantha's lead from a company called Fenix Media.  When Plural asked Fenix Media for additional information to prove Mantha's consent in the face of this lawsuit, Fenix Media provided it to Plural, which produced it in response to a subpoena.  *See id.*, ¶¶ 103-104.  E-mails between Plural and Fenix Media show that Dario Osmancevic of Fenix Media identifies himself as the "webmaster" of the Website and contends that Mantha did in fact sign up on the Website for a quote.  *See* ECF No. 208, Ex. 16.[4]  Fenix Media sold Mantha's lead to Plural with a contractual guarantee that Mantha provided TCPA-compliant consent to be contacted.  *See* SOF Response, ¶¶ 106-107.  Plural then sold Mantha's lead to RevPoint, guaranteeing that Mantha did in fact provide TCPA-complaint consent to be contacted, as Plural was contractually obligated to do.  *Id.*, ¶ 108.  RevPoint then sold Mantha's lead to QuoteWizard with a contractual promise that Mantha had provided TCPA-compliant consent to be contacted, as RevPoint was contractually obligated to do.  *Id.*, ¶ 109.  QuoteWizard contacted Mantha after buying the lead with that promise.  *Id.*, ¶ 110.

Both Plural and RevPoint's respective deponents testified that they believe the Mantha lead had TCPA-valid consent because it was sold to them with that contractual promise.  SOF

---

[4] Fenix Media is a Bosnia company outside the jurisdiction of this Court.

Response, ¶ 111.  Neither deponent conceded or suggested that the Mantha lead actually lacked TCPA-compliant consent.  *Id*., ¶ 112.

After Mantha served a legal demand on QuoteWizard and QuoteWizard reached out to RevPoint for additional consent information, RevPoint identified to QuoteWizard that the Website was the source of the lead.  QuoteWizard's employee then navigated to the Website, which was still live, and took a screenshot of the then-existing TCPA disclosure/consent language as follows:

> TCPA Disclosure: By clicking the "Compare Rates >" button, I hereby consent to receive marketing communications via autodialed and/or pre-recorded calls, including SMS messages, from AutoInsurQuotes.com and one or more of its marketing partners at the phone number provided, including wireless numbers, if applicable. I understand that consent is not a condition to receive quotes or make a purchase. In order to receive quotes without providing consent, please call AutoInsurQuotes.com ® at 1-888-920-8495



*See* SOF Response, ¶¶ 113-114.

It is undisputed that the Website was still live and operational as of the time the disputed consent was given in 2019.  SOF Response, ¶ 101.  Adam Brown, who paid to host the Website, deleted the Website after receiving a subpoena in this case.  *Id*., ¶ 115.  Although Brown testified that he stopped operating the Website sometime in 2015, he admitted that he does not know who had access to the Website after that, and did not know if someone else was running the Website up until the time he deleted it.  *Id*., ¶ 116.

Although Mantha has made a blanket denial that he visited the Website or signed up there, he conceded at his deposition that he cannot recall every website he visited in 2019 and he

cannot rule out that someone submitted his personal information and the consent information on his behalf.  *See* SOF Response, ¶ 52.

To further confirm Mantha's consent, QuoteWizard sought Mantha's browser/search histories from the time of the disputed consent (either June or August 2019) to confirm whether or not he went to the Website and signed up.  However, Mantha failed to produce such histories, as he did not preserve them or deleted them.  In fact, Mantha took no actions to preserve his browser and search histories until at the earliest in <u>May 2020</u>, when a person "imaged" some but not all of his personal devices—and by that time, the histories were somehow gone.  This is despite the fact that QuoteWizard served a discovery request for the histories in <u>April 2020, and</u> Mantha knew as early as <u>September 2019</u> that QuoteWizard contended, in response to his pre-litigation demand letter, that he had consented via the Website in August 2019.  *See* SOF Response, ¶¶ 117-122.

## ARGUMENTS & AUTHORITIES

### A.  Mantha Misrepresents the Legal/Factual Issues Surrounding Consent

In arguing that summary judgment is appropriate on the issue of consent, Mantha misrepresents both the applicable legal standard and some of the facts crucial to this issue.  In the first instance, QuoteWizard seeks to clarify the record on these points.

First, Mantha suggests that consent could never be valid because QuoteWizard was allegedly not listed as and/or was not a "marketing partner" on the Website.  This misrepresents the applicable legal standard and the record evidence.

It is <u>not</u> dispositive that the initial consent was not given to the calling entity.  Rather, "[a] defendant can obtain the consent of the called party through a third-party intermediary under a 2014 Declaratory Ruling issued by the Federal Communications Commission ("FCC")."  *Keim v. ADF MidAtlantic, LLC*, 328 F.R.D. 668, 682 (S.D. Fla. 2018).  *See also* 29 F.C.C. Rcd. 3442,

3444 (2014) ("[A] consumer's prior express consent may be obtained through and conveyed by an intermediary."). "[T]he appropriate analysis turns on whether the called party granted permission or authorization' to be called, 'not on whether the creditor received the [cell] number directly." *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123-24 (11th Cir. 2014). As such, a person "could provide his number to a creditor" and "grant prior express consent to receive autodialed or prerecorded calls" by "affirmatively giving an intermediary like [a hospital] permission to transfer the number to [his creditor] for use in billing." *Id*. at 1124. The FCC's rulings "make no distinction between directly providing one's cell phone number to a creditor and taking steps to make that number available through other methods, like consenting to disclose that number to other entities for certain purposes." *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 346 (6th Cir. 2016). Thus, it is not dispositive that the disputed consent was given on and to the Website rather than QuoteWizard directly.

Moreover, QuoteWizard's deponent testified that, when RevPoint first identified the Website as the source of the lead, he went to the Website and looked at the TCPA Disclosure "consent" language that would have been shown to the consumer. *See* ECF No. 208, Exhibit 13, pp. 16-19. QuoteWizard's deponent further testified that QuoteWizard was referenced on the Website at that time as a "marketing partner" of the site. *Id*., pp. 18-19; *id*., 19:1-5.

Plural's subpoena response, which included all data it had for the Mantha lead, indicated that "Applicant agreed to receive promotional emails / calls / texts / postal mails from third parties regarding his auto insurance application." *See* Affidavit of Counsel, Exhibit AA.

Further, Mantha lacks affirmative evidence that QuoteWizard was <u>not</u> a "marketing partner" of the Website (or the other website referenced, AutoInsurQuotes.com) at the time the lead was generated in 2019; QuoteWizard's deponent testified that he did not know whether that was the case, whereas Mantha's counsel has misrepresented his testimony to mean that

QuoteWizard was definitively not a marketing partner at the time. *See* ECF No. 208, Exhibit 13, pp. 33-34 (answering "I do not know" to whether QuoteWizard was considered a marketing partner of AutoInsurQuotes.com in 2019).[5]   Therefore, the record evidence shows that the disputed consent encompassed QuoteWizard, and the legal standard allows for consent-by-intermediary.

Second, Mantha suggests that QuoteWizard would need to produce evidence of his "signature" to show valid consent. *See* ECF No. 206, p. 20 ("QuoteWizard does not claim it obtained Mr. Mantha's signature evidencing his consent to receive telemarketing texts."). This is an incorrect interpretation of the law. For a "do not call" claim such as Mantha's remaining Count II, the defendant can show that it had "prior express invitation or permission" to contact the plaintiff, thereby barring the claim. *See* 47 C.F.R. § 64.1200(c)(2)(ii).[6]   "With respect to consent, the FCC issued a ruling that 'persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary.'" *Lamont v. Furniture North, LLC*, 2014 U.S. Dist. LEXIS 51927, at *6, 2014 DNH 62, 2014 WL 1453750 (D.N.H. April 15, 2014) (quoting *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991* (1992 Report and Order), 7 FCC Rcd. 8752, 8769, 1992 WL 690928, at *11 (Oct. 16, 1992), and citing *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991* (2008 Report and Order), 23 FCC Rcd. 559, 564, 2008 WL 65485, at *3 (Jan. 4, 2008) (reiterating the same ruling)).

---

[5] The reference to AutoInsurQuotes.com on the TCPA disclosure/consent language is a red herring. The TCPA disclosure/consent language appeared on the Website where Mantha's lead was generated and where the disputed consent was given, and QuoteWizard's deponent testified that QuoteWizard was listed as a marketing partner there when he visited the site.

[6] Although the legal standard is "prior express invitation or permission," for ease of reference, QuoteWizard will refer to the same as "consent" herein.

Contrary to Mantha's representation, a written signature is not required. Rather, the FCC has determined that consent can be acquired via "email, **website form**, text message, telephone keypress, or voice recording." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 (Feb. 15, 2012) (emphasis added); *see also* 15 U.S.C. § 7001(a)(1) ("[A] signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form."). Thus, a consumer may provide valid TCPA consent through a web form. *See, e.g.*, *Morris v. Modernize, Inc.*, 2018 U.S. Dist. LEXIS 232701, at *7-8, 2018 WL 7076744 (W.D. Tex. September 27, 2018) (finding valid TCPA consent for do-not-call claim where plaintiff submitted information through web form).

Factually speaking, the entities that bought/sold the lead ultimately to QuoteWizard— Plural Marketing and RevPoint—provided records and sworn testimony that Mantha consented via a web form on the Website. Although Mantha disputes those facts, those material facts are in dispute (*see infra*) and this issue is not appropriate for resolution at summary judgment under this correct standard. Legally speaking, consent via a web form as indicated here is sufficient consent under the TCPA.

Third, Mantha's counsel effectively misrepresents to the Court the effect of allegedly "mismatching" IP addresses, *i.e.*, that the IP addresses linked to the disputed consent did not trace back to Mantha's personal devices. Mantha appears to claim that this definitively proves that he did not provide the disputed consent. *See* ECF No. 206, pp. 10-11. But Mantha conveniently fails to point this Court to conflicting factual evidence in the record and therefore paints a misleading picture. The allegedly mismatched IP addresses have little to no relevance.

First, RevPoint's deponent testified that an IP address associated with a lead *often does not match* to the consumer's personal devices because it could be generated from/associated with various different sources:

> Q Is it your understanding that an IP address on a lead and a Jornaya lead ID should match?
>
> A That is not my understanding.
>
> Q What is your understanding?
>
> A So an IP address delivered in an APA could come from different places, it could come from the IP address of the servers that the platform is utilizing, it could come from the website of where the lead was generated. There is opportunity there for IP addresses to not match the user IP address who filled out the form.
>
> Q Then how do you know that a particular user visited from a particular IP address?
>
> A We would not be able to utilize an IP address definitively in the lead that is  captured and then distributed

*See* ECF No. 208, Exhibit 12 (RevPoint Tr. I), pp. 40-41.

When asked why there were two different IP addresses associated with the Mantha lead, the RevPoint deponent further testified that:

> A So, my belief is that, and this happens with some regularity in the space, is that IP addresses come from the platforms that are supplying the API data and not from the user, and systems are not verifying the IP address other than potentially if it's international.

*Id*. at pp. 56-57.  *See also* ECF No. 208, Exhibit 14, p. 24:2-9 (RevPoint Tr. II) (testifying that "the IP address that was passed might not be the IP address of the individual user. The … website that was passed might not be the specific website that the user had filled out the form. So it's common practice in the industry to then request specific information regarding that particular complaint about the lead."); *id*., p. 56:15-19 ("[T]he IP address represents an IP address of a server where potentially information is, is housed. And so I don't know whether or not that's the IP address of Plural's system or whether that's the IP address of the user."); *id*., p. 48:15-19 ("I

will say that one thing that we use IP address for would be to potentially determine whether or not this lead is generated internationally. That would be the specific reason for it, not for the specifics of where the user generated the lead.").

Plural's deponent testified consistently with RevPoint's deponent that the IP address(es) linked to the Mantha lead do not necessarily represent the IP address where the consumer signed up on the subject website but could be, for example, the IP address associated with the server that stored the consent data.  *See* Affidavit of Counsel, Exhibit EE, pp. 34-37 (although "typically" it would represent consumer's IP address, could also represent IP address for server of "buyer").

Moreover, Mantha cannot point to any evidence in the record where anyone definitively represented that the IP addresses associated with the lead were confirmed to be, or supposed to reflect, his personal IP addresses, as opposed to a source from somewhere else.  *Compare* ECF No. 208, Exhibit 13 (QuoteWizard Tr.), p. 31:10-23 (whereby QuoteWizard deponent was asked whether IP address linked to Mantha  lead was "meant to be … the IP address from which Mr. Mantha opted in to get text messages from SelectQuote? [sic]"; "A. It's the IP address that was provided to us by RevPoint when asking for the complainant's IP address. Q. (BY MR. BRODERICK:) Okay. And so the IP address should -- should match Mr. Mantha or someone associated with Mr. Mantha, if he was the one who opted in to get this text; correct? … A. I'm not an IP address expert. I -- I don't know."); *compare also id*., p. 36:12-14 (whereby QuoteWizard deponent testifies "I do not" in response to question "Do you know where RevPoint got the IP address that it provided to you?"); *compare also id*., pp. 40-41 (denying any representation that IP address linked to lead should match to Mantha's personal devices).

Additionally, as noted *infra* Section C, a large piece of the digital puzzle is missing: Mantha's own browser/search histories for his electronic devices, which, if preserved and

produced in this lawsuit, could have definitively proven, one way or the other, whether he provided the disputed consent. Mantha failed to preserve these histories as required; his browser/search histories from June-August 2019 were somehow unavailable as of May 2020. It would be abundantly unfair to allow Mantha to obtain summary judgment on the disputed issue of consent by relying on digital evidence in the form of IP addresses when Mantha has failed to preserve the very digital evidence in his own possession, custody, and control that would have been possibly dispositive.

Fourth, Mantha misleadingly overstates the scope of the deposition testimony of Adam Brown, who created the Website and was paying for it through 2020. Mantha suggests that, because Brown testified that *he* was not actively running the site in 2019 when the disputed consent was generated (but rather stopped actively using it in 2015), this proves that Mantha's consent is not valid. *See* ECF No. 206, p. 21. But other material facts show that the Website was running and operational at the time of the disputed consent and through 2020 until Brown deleted it during this case: the Website was modified in 2019 and 2020; the co-creator of the Website was paying for services on the Website through at least 2017; a person named Dario Osmancevic claimed to be the webmaster for the Website and Brown acknowledged that Osmancevic was "obviously responsible" for the Website; and Brown acknowledged that he does not know if anyone else accessed or was running the Website in 2019/2020. SOF Response, ¶¶ 57-58, 101-102, 105. Therefore, while Brown has denied that *he* was the one running the Website in 2019 and 2020, there are abundant material facts showing that the Website was (1) operational in 2019, (2) generating leads, and (3) run by Osmancevic. *See id*.

Finally, Mantha's counsel repeatedly misrepresents that QuoteWizard's arguments concerning consent "rel[y] entirely on the QuoteWizard Opt In, an unreliable fabrication." ECF No. 206, p. 20. This is a complete misrepresentation of the factual record. Mantha's counsel

labels a document prepared by QuoteWizard in anticipation of this litigation as the "QuoteWizard Opt In." First, Mantha's counsel's characterizations of evidence are not admissible evidence. *See*, *e.g.*, *Germinaro v. Fidelity Title Ins. Co.*, 2016 U.S. Dist. LEXIS 141797, 2016 WL 5942236, at *2 (W.D. Pa. 2016) (attorney argument is not evidence, but simply the characterization of the evidence on the record, and to the extent that it is unsupported by the evidence, it should be disregarded); *Yan v. Penn State Univ.*, 529 F.App'x 167, 170 (3d Cir. 2013) (mere "characterizations" of record evidence do not, alone, have probative value).

Second, Mantha's characterization of a document that QuoteWizard made in anticipation of this litigation as a "fabrication" is false. As QuoteWizard's deponent testified, this document was made by QuoteWizard to *compile* information already existing after a legal demand from Mantha was received, as a reference tool regarding Mantha's consent and lead with regards to the demand/litigation. The information in the document was culled and compiled by QuoteWizard from: (1) electronic data in QuoteWizard's systems that were provided to QuoteWizard by RevPoint at the time RevPoint sold the Mantha lead to QuoteWizard; (2) additional information provided by RevPoint to QuoteWizard after the legal demand was received; and (3) QuoteWizard's employee pulling the publicly available "TCPA Disclosure" and consent web form language from the Website when RevPoint first identified to QuoteWizard the Website as the source of the lead. SOF Response, ¶¶ 49, 51.

As such, nothing in this document was "fabricated" as Mantha's counsel falsely suggests. It contains all preexisting data linked to the Mantha lead by RevPoint. *See* ECF No. 208, Exhibit 13, p. 11:2-14, pp. 66-67 (QuoteWizard Tr.) (testifying that deponent compiled document "after we received" the legal demand from Mantha by "reach[ing] out to RevPoint to get some of the information contained in it, and I included the rest myself from our own database"); *id.*, pp. 11-12 (testifying that IP address, form URL, and Jornaya LeadiD associated with lead was

provided by RevPoint either when the lead was sold or in response to QuoteWizard's request for information); pp. 15-17 (testifying that data sent by RevPoint when it sold the lead was pulled from QuoteWizard's database to be included in this compiled document); *id*., pp. 17-19 (TCPA Disclosure consent language was taken directly from Website by QuoteWizard employee when RevPoint identified the Website as lead source); *id*., pp. 36-37 (pulled consent language from Website identified by RevPoint as lead source); *id.*, p. 50:5-9 (Jornaya LeadiD associated with Mantha lead was given to QuoteWizard by RevPoint); *id*., pp. 66-69 (testifying that, after QuoteWizard received legal demand letter from Mantha, it reached out to Michael Fishman at RevPoint for additional consent information regarding Mantha's lead; he provided some information, which QuoteWizard compiled; the remainder of the information was compiled from QuoteWizard's databases, and ultimately all consent information was what was provided to QuoteWizard from RevPoint); *id*. (QuoteWizard did not "create" any consent information; all of it derived from what RevPoint provided to QuoteWizard).

Thus, to prove consent, QuoteWizard is not relying on "fabricated" data but rather relying in part on the data that RevPoint provided it pursuant to its contractual obligations. As noted in QuoteWizard's Motion for Summary Judgment, RevPoint made a contractual promise that Mantha's lead had TCPA-valid consent *and* agreed to provide lead consent information if needed, which is the very information QuoteWizard relied on in part here. Moreover, it is likewise false for Mantha's counsel to suggest that QuoteWizard is relying <u>solely</u> on the information/data provided by RevPoint. As explained in Section B *infra*, there are numerous material facts showing Mantha's consent, not limited to the digital trail starting with Fenix Media, but also including Mantha's own words, actions, and willingness to engage in conversation with QuoteWizard.

**B. Numerous Material Facts Are in Dispute Concerning Mantha's Consent; the Court Cannot Weigh Evidence and Decide Credibility at Summary Judgment**

The issue of Mantha's consent—whether he gave it and whether it was legally effective—presents a classic case of disputed material facts where summary judgment is not appropriate.

In denying consent, Mantha relies on (1) his blanket denial that he consented, and (2) alleged inconsistencies in some of the data tied to his consent, such as the IP addresses and who was running the Website. But Mantha presents only a sliver of the evidence that was produced in discovery and omits all of the material facts that substantially weaken his reliance on the aforementioned evidence.

First, Mantha's blanket denial that he never visited the Website or consented to or requested the auto insurance quote information from QuoteWizard is substantially weakened by his sworn admissions that it is "fair" to say that Mantha does not recall "every website that [he has] ever visited in 2019" and he cannot rule out that somebody signed up on the Website on his behalf. *See* ECF No. 208, Ex. 3, p. 106:2-6; *id*., p. 41:8-10. It is an undisputed fact that *someone*, *somewhere*, entered Mantha's actual personal information (name, address, phone number, etc.) in connection with a request for an auto insurance quote before his lead was sold to QuoteWizard, even if Mantha denies doing it.

Second, if granting summary judgment on the issue of consent, the Court would have to accept as an extreme coincidence that, just a month or two before QuoteWizard purchased a lead for Mantha with information that he solicited an auto insurance quote using his personal information, Mantha and his friend Steven Novia discussed using a TCPA demand as a way to make money. *See* ECF No. 204, ¶¶ 78-82. To the contrary, the Court can and should readily infer from this evidence, in connection with all of the other record evidence, that Mantha did sign

up and solicit a quote from QuoteWizard and then later used the interaction to make a TCPA demand and file suit, with Novia's and his attorney's real-time help.

Third, when contacted by QuoteWizard, Mantha never opted-out, expressed surprise, asked how QuoteWizard got his information, or did *anything* consistent with a person who had not actually solicited contact. Although Mantha's counsel makes much of how some other non-party consumers reacted to QuoteWizard's text messages (*see* Attorney Paronich Declaration and exhibits thereto), and relies heavily on *their* responses, it is worth noting that Mantha never reacted similarly. Instead, he freely engaged with QuoteWizard, asked "How do I get a quote?" and even provided a date and time to discuss a quote. *See* ECF No. 208, Ex. 17. This is further proof of consent. Mantha's convenient, after-the-fact justification that he responded only to understand who was texting him is clearly belied by the text messages themselves; QuoteWizard was <u>twice</u> identified as the sender of the messages before he responded, and none of his responses were designed to identify QuoteWizard, anyway.

Fourth, Mantha was actively coached while responding to QuoteWizard's text messages by Novia and his attorney, determining how to best set QuoteWizard up for liability. This is further inconsistent with an innocent consumer who has received allegedly unsolicited communications.

Fifth, Mantha's conduct after being contacted by QuoteWizard is further proof that he provided the disputed consent. Mantha never complained about the text messages to his wife or Novia or anyone else. He did not even tell his wife about the text messages at all. Rather, he was prodded to hire an attorney by Novia to get "paid" "life-changing money" after Novia informed him of TCPA demands and helped him respond to the text messages in real-time. *See* ECF No. 208, Ex. 19.

Sixth, the fact of the consent is well-supported by a digital trail of records beginning with Fenix Media through RevPoint.  Documents produced in discovery by Plural show that Fenix Media's Dario Osmancevic has claimed to be the webmaster of the Website and that Mantha did in fact sign up there.  *See* ECF No. 208, Ex. 16.  Plural and RevPoint have provided proof of the lead and consent in their discovery productions in this case, all identifying Mantha (with his cell phone number) as the consumer who consented to receive a quote.  *See* Affidavit of Counsel, Exs. AA, GG; ECF No. 210, Ex. 19.  Plural's and RevPoint's deponents testified that they believe the Mantha lead did in fact have TCPA-compliant consent, and neither deponent expressed any doubt about the validity of the consent.  *See* Factual Section, *supra*.

Thus, it is undisputed that, beginning with Fenix Media, continuing to Plural, then to RevPoint, and finally as sold to QuoteWizard, Mantha's personal information (name, cell phone, address, etc.) was inputted in connection with the disputed consent and then sold three times with the representation that he had consented.  Although denying that he inputted the information, to this day, Mantha has never produced any evidence or even suggested that someone fraudulently entered his information in connection with a quote.  To dispatch with the issue of consent at summary judgment, this Court would have to infer or conclude precisely that—that the evidence of consent, accompanied by Mantha's personal information—was falsely made, but in the absence of any evidence on that point, which QuoteWizard submits it cannot do.

Seventh, every single entity that bought and sold Mantha's lead was under a contractual obligation to sell only leads with TCPA-compliant consent.  RevPoint specifically sold Mantha's lead to QuoteWizard with a contractual promise and guarantee that it had TCPA-compliant consent.  Thus, to find for Mantha at summary judgment, the Court would also be accepting and finding that at least three (3) different companies breached a contractual promise to the next

17

entity to whom it sold Mantha's lead. At the summary judgment stage and in light of all of the other evidence, this is not a fair inference for the Court to make against QuoteWizard.

Eighth, as discussed *infra* Section C, Mantha's inexcusable failure to preserve his browser/search history that could have confirmed the fact of his disputed consent warrants an adverse spoliation inference that prevents him from prevailing at summary judgment on this point.

In light of these material facts—whether direct evidence of Mantha's conduct and conversations that reasonably show that he solicited contact to later make a legal demand, the text messages with QuoteWizard themselves showing Mantha as an unsurprised, willing participant who never complained or opted out, the text messages between Mantha and Novia furthering the monetary scheme, the digital record from Fenix Media to RevPoint showing proof of consent, or the contractual promises underlying proof of consent—summary judgment cannot enter on the issue of Mantha's disputed consent.  This is an issue for the factfinder to resolve, whether touching on Mantha's credibility or simply weighing the disputed facts.  *See Kerner v. ConServe*, 2017 U.S. Dist. LEXIS 37959, at *8-9 (D.N.H. March 16, 2017) (denying summary judgment on issue of consent because evidence proffered by defendant was not "conclusive"); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1256 (11th Cir. 2014) (holding that summary judgment was inappropriate because the plaintiff said he told the caller to "stop calling," and the caller said the plaintiff never said such a thing) ("This is exactly the kind of factual dispute that cannot properly be resolved on summary judgment.").  *Compare Lucoff v. Navient Sols.*, LLC, 981 F.3d 1299, 1306 (11th Cir. 2020) ("TCPA consent issues are appropriate for summary judgment . . . when the underlying facts are not disputed.").

Thus, the issue of the disputed consent should be submitted to the factfinder, not resolved in the face of conflicting evidence at summary judgment.  *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and not properly before the court on summary judgment.); *accord Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018); *Anderson*, 447 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### C.  An Adverse Spoliation Inference is Warranted

A crucial missing piece of the digital puzzle on the issue of disputed consent is Mantha's browser and search histories for his personal devices.  Because Mantha, represented by counsel, failed to take required and very basic steps to preserve the same after being put on notice of its relevancy to this action, the absence of such history—which Mantha either deleted or failed to preserve—warrants an adverse spoliation inference against Mantha in the context of his summary judgment motion on consent.

QuoteWizard sought Mantha's browser/search histories in discovery, with the first formal request for the same made on April 28, 2020 via QuoteWizard's first set of document production requests served by e-mail.  *See* Affidavit of Counsel, Exhibit HH – *QuoteWizard's First Set of Document Requests to Plaintiff*, No. 17 (requesting "Browser and search history for August 1st through 5, 2019 for any and all computers, cell phones, or other electronic devices used by you on or around that date.").

But Mantha also knew long before April 28, 2020 that QuoteWizard contended that he had signed up on the Website and provided his consent there; he was first informed of the same by letter dated September 19, 2019 sent by QuoteWizard's counsel in response to his legal pre-litigation demand letter.  *See* Affidavit of Counsel, Exhibit II – *Demand Response Letter Dated September 19, 2019.*  The September 19, 2019 letter informed Mantha through counsel

that QuoteWizard contended that he had signed up for a quote on the Website in August 2019.
*See* Exhibit II.

Despite being on notice since September 2019 about the Website and receiving a request
for discovery on April 28, 2020 for his browser and search histories, Mantha failed to take ***any***
steps to preserve the same before approximately May 2020, when a person "imaged" some but
not all of the electronic devices he uses.  *See* ECF No. 208, Ex. 4, pp. 59-60.  *See also id*., p. 52
(person imaged laptop and phone); p. 60 (did not image his work computer).

Mantha failed to produce his browser/search histories for any of his electronic devices as
requested by QuoteWizard in discovery (including but not limited to the first request made in
April 2020), claiming that they were no longer available.  *See* ECF No. 208, Ex. 4, pp. 52-53, p.
58:6-13, pp. 59-60.  Mantha has been represented by counsel with respect to this action since
August of 2019.  *See* ECF No. 208, Ex. 4, p. 59.

Based on these undisputed facts, Mantha, through counsel, utterly failed to comply with
his duty to preserve relevant electronically stored informed.  Under Rule 37(e), a party must take
reasonable steps to preserve electronically stored information in anticipation or conduct of
litigation.  "The obligation to preserve evidence arises when the party has notice that the
evidence is relevant to litigation or when a party should have known that the evidence may be
relevant to future litigation." *Treppel v. Biovail Corp*., 249 F.R.D. 111, 117 (S.D.N.Y. 2008).  If
that information cannot be restored or replaced through additional discovery and the opposing
party was prejudiced from the loss, courts have discretion to remedy the loss by measures "no
greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). If the offending party
intentionally acted to deprive its opponent of the information, courts may: (1) presume the lost
information was unfavorable to the offending party; or (2) dismiss the action or enter a default
judgment.  Fed. R. Civ. P. 37(e)(2).  Spoliation of evidence occurs when a party destroys or

significantly alters evidence, or fails to properly preserve it for another's use as evidence in reasonably foreseeable litigation.  *See Alaimo v. Trans World Airlines, Inc.*, 2005 U.S. Dist. LEXIS 1530, 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005).  "For an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed."  *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

Here, Mantha's duty to preserve arose when in receipt of QuoteWizard's response to his legal demand letter threatening suit (*see* ECF No. 208, Ex. 18) dated September 19, 2019, when he was informed that QuoteWizard contended that he visited the Website in August 2019 and consented to receive the text messages.  At that time, it was objectively and subjectively clear that (1) litigation could be anticipated (given that Mantha himself threatened to file suit, *see* Ex. 18) and (2) Mantha's browser/search histories would be relevant evidence given QuoteWizard's position.  *See United Factory Furniture Corp. v. Alterwitz*, 2012 U.S. Dist. LEXIS 48795, 2012 WL 1155741, at *3 (D. Nev. Apr. 6, 2012) ("Litigants owe an uncompromising duty to preserve what they know or reasonably should know will be relevant evidence in a pending lawsuit even though no formal discovery requests have been made and no order to preserve evidence has been entered." (quotation and citations omitted)).  Yet Mantha, represented by counsel who routinely prosecutes TCPA putative class actions, took *no* steps to preserve his relevant digital histories.  If he had, it cannot be contested that his histories would have been available to QuoteWizard in this action since this was only a short time (a month) after the disputed consent was provided.

Mantha continued to fail to take any action to preserve his browser and search histories despite being on notice of their relevancy even after filing this lawsuit in October 2019 *and even after receiving a request for the browser and search histories in discovery*.  The first and apparently only action Mantha took to recover the histories was in approximately May 2020,

21

when a person was hired to "image" some (but not even all) of the electronic devices that he uses.  This imaging allegedly produced no browser/search history for the relevant time period in 2019, as Mantha has never produced any histories and claims it is gone.  It is unclear whether Mantha deleted or failed to preserve the histories; though he denies deleting histories, QuoteWizard was denied the right to review the imaging to understand what survived and what did not.

This conduct is egregious, particularly for someone represented by self-described experienced TCPA class action counsel.  *See* ECF No. 206, p. 24 n.14 (Mantha's counsel notes they were part of a trial team in TCPA certified class case).  It was clear that Mantha should have taken immediate (and simple) steps in September 2019 and then again in April 2020 to preserve his browser/search histories (for example by verifying that his settings on his personal devices would be set such not to delete and therefore preserve them).  He took none.  As a result, QuoteWizard is unable to verify the fact of his disputed consent via the most direct means, with reference to Mantha's browser and search histories.[7]

Under these circumstances, an adverse spoliation inference against Mantha is warranted, *at the very least* in the context of his summary judgment motion on the issue of consent.  Courts have held that, "[i]n borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment."  *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *Kronisch*, 150 F.3d at 126); *see also Talavera v. Shah*, 638 F.3d 303, 312 (D.C. Cir. 2011) (when evaluating a motion for summary judgment, "[t]he spoliation inference must be

---

[7] Mantha's inexcusable failure to preserve the evidence also likely denied QuoteWizard other potential evidence, or at least the right to search for such evidence, such as whether Mantha was searching the internet in furtherance of his scheme, concocted with Steven Novia, to make money from a TCPA demand.

considered along with [the party]'s other admissible evidence"); *Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218-19 (1st Cir. 1982) ("The issue before the court was not whether the destruction was sufficient, standing alone, to warrant an adverse inference about the documents' contents; it was simply whether the destruction was at all relevant to the tracing issue, and if so, whether it was sufficiently probative in conjunction with the other evidence to support the tracing conclusion"). Courts have made spoliation inferences where a party failed to preserve their browser/search histories. *See*, *e.g.*, *Feist v. Paxfire, Inc.*, 2016 U.S. Dist. LEXIS 116405, at *13-17 (S.D.N.Y. Aug. 29, 2016) (where plaintiff failed to preserve relevant browser history, granting adverse spoliation inference such to preclude plaintiff from relying on certain evidence and making certain arguments).

Thus, to the extent necessary, QuoteWizard requests that the Court recognize an adverse spoliation inference against Mantha for his clear, inexcusable failure to preserve his browser/search histories at the time of the disputed consent. In connection with the other material facts showing consent (*see supra* Section B), this spoliation inference requires the denial of Mantha's summary judgment motion on consent.

### D. Mantha's Incidental Personal Use of his Cell Phone Does Not Qualify him as a "Residential Subscriber"

In his partial motion, Mantha argues that (1) he uses his cell phone for unidentified "personal" use and (2) he does not use his cell phone for a home business. But these two factors are completely beside the point. As noted in QuoteWizard's Motion, the applicable standard is not personal versus business use. *See* 47 C.F.R. § 64.1200(c)(2) (applying only to "residential telephone subscriber[s]"). Rather, either "residential subscriber" completely excludes the use of a wireless cell phone, *see*, *e.g.*, *Cunningham v. Lines*, 2016 WL 7494871, at*2 (S.D. Fla. Dec. 29, 2016), *or at a minimum*, the burden is on Mantha to prove that he used his cell phone for

*residential* purposes, *see Stevens-Bratton v. Trugreen, Inc.*, 437 F. Supp. 3d 648, 655 (W.D. Tenn. Feb. 4, 2020).

Mantha therefore improperly attempts to convert "residential" to "personal," while also ignoring the fact that his cell phone was used constantly and overwhelmingly for work. On the issue of "residential" use, Mantha offers *no facts or evidence* concerning the use of his cell phone in connection with his residence in Rutland, Massachusetts. He has not filed any affidavits explaining how or when he uses his cell phone in connection with his <u>residence</u> and his phone records themselves establish nothing on that point. *See* ECF Nos. 205, 206, 207, 210.

The *only* reference in Mantha's papers to his residence is his contention that the cell phone records from Verizon are "addressed" to him at his home. While true, this speaks nothing of *how* he uses his cell phone. Receiving a bill at one's residence signifies nothing about the nature of the product or service being billed; any number of bills can be addressed or sent to one's home that have no tie between the product/service and the home, such as student loan bills or medical bills. Moreover, Federal law in most instances does not allow debt collection efforts that would involve third-parties such as employers, making a person's home the logical and likely only choice to send bills to comply therewith. *See* 15 U.S.C.S. § 1692c(b) (Federal Debt Collection Practices Act prohibits communications with third parties); *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1036 (9th Cir. 2012) (debt collection letter addressed to consumer in care of her employer violated FDCPA prohibition on communications with third parties). Therefore, it is simply irrelevant that Mantha's Verizon cell phone records are addressed to him at his home.

Moreover, Mantha's attempt to focus the Court on the nature of the text messages must be disregarded. As courts have made clear, in determining whether the plaintiff has met his burden of showing that he is a "residential subscriber" (and if this Court accepts that at least

24

some cell phones can qualify as "residential"), the *only* relevant and dispositive factor is how the plaintiff uses the cell phone.  The nature of the text messages sent or any other factor is simply irrelevant.  *See*, *e.g.*, *Stevens-Bratton*, 437 F. Supp. 3d at 659 (rejecting same attempt by plaintiff) ("To [interpret this way] would turn the relevant inquiry on its head by shifting the analysis from the consumer's use of the telephone to the caller's purpose in making the call.").

Therefore, Mantha's argument that he uses his cell phone for "personal" use in some unidentified manner[8] that he has not addressed is not relevant to the issue of *residential* use of his cell phone, a point on which he offers <u>no</u> evidence.  *See Lee v. Loandepot.com, LLC*, 2016 U.S. Dist. LEXIS 110100, at *16-18, 2016 WL 4382786 (D. Kan. Aug. 17, 2016) (granting summary judgment where plaintiff failed to establish that his cellular number was used for residential purposes) ("The Court is not persuaded that Plaintiff has met his burden at summary judgment to overcome Defendant's motion. To prevail under 47 C.F.R. § 64.1200(c)(2), Plaintiff must establish that his cellular number is used for residential purposes.").

As courts have found, merely claiming that a cell phone is also used for some alleged "personal" use is not enough to show that the person is a "residential subscriber" with respect to their cell phone.  *See Worsham v. Disc. Power, Inc*., 2021 U.S. Dist. LEXIS 1931, at *9-12 (D. Md. Jan. 6, 2021) ("Regardless of whether the … number is primarily used by Worsham for residential purposes, the number is also used for business, and business numbers are not

---

[8] Beyond merely contending that he uses his cell phone for some unidentified "personal use," Mantha has offered no details or actual facts to support this label.  Thus, even *if* the applicable standard was "personal" use (it is not), this conclusory contention is not enough to survive QuoteWizard's summary judgment motion on this issue, much less entitle Mantha to summary judgment on it.  *See, e.g.*, *Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 315 (1st Cir. 2016); *see Mendez-Aponte v. Bonilla*, 645 F.3d 60, 68 (1st Cir. 2011) ("agree[ing] with the district court that the plaintiffs' . . . statement of contested material facts consist[s], in large part, of speculation and conclusory allegations for which the only evidentiary support is Méndez—Aponte's sworn affidavit, which itself contains conclusory allegations"); *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 425 (1st Cir. 2017) (plaintiff "provides no detail and no support other than his subjective belief that he was being discriminated against by Costco"); *Quinones v. Buick*, 436 F.3d 284, 291 (1st Cir. 2006) ("mere unsupported characterizations" in affidavit "was not evidence creating a triable issue").

permitted to be registered on the DNC registry.") (dismissing DNC claim where, although plaintiff also used cell phone for residential purposes, the number was publicly listed on PACER in connection to a law firm).

Mantha also egregiously downplays his use of his cell phone for work, claiming it occurs only "on occasion."[9]    *See* ECF No. 206, p. 24.    This is an unsupported, inadmissible characterization of the undisputed record evidence.    The record evidence does not show that Mantha sometimes, occasionally, sporadically, or from time to time used his cell phone for work. The records show that he *constantly* used it for work, at one point in 2019 making or receiving no fewer than fifty-nine (59) work calls over two days.    *See* ECF No. 208, Ex. 9.    But equally important to the calls Mantha actually made or received is the fact that the cell phone was essential to him doing his job as Residential Director; he was on call 24/7, all year, via that cell phone.    *See* ECF No. 204, ¶¶ 21-23 (whereby Perkins School describes Mantha's job as providing "twenty-four hour administrative on-call consultation" in relation to the six group homes); ¶¶ 18-20; ¶¶ 56, 74, 77.

Simply put, regardless of how Mantha's counsel attempts to downplay or simply ignore the record evidence, the evidence is both undisputed and overwhelming: Mantha's cell phone was his work lifeline.    He used it constantly for work and was on call 24/7 via that phone, responsible for the health, welfare, and safety of 50-60 children and 100 staff members.    Equally as important, there is *no evidence* in the record regarding any alleged *residential* use of that cell phone.    Mantha offers only conclusory labels of "personal" use, which do not establish residential use, in any event.    The Court should enter summary judgment for QuoteWizard, as the

---

[9] "On occasion" is defined as "[f]rom time to time," or "now and then[.]"    *See* https://www.dictionary.com/browse/on--occasion.    Mantha's work use of his cell phone cannot genuinely be described in this manner.    *See* ECF No. 208, Ex. 9.

material facts are undisputed and prove that Mantha is not a residential subscriber with respect to his cell phone.

## CONCLUSION

For the aforementioned reasons and those in QuoteWizard's Motion for Summary Judgment, the Court should grant QuoteWizard's Motion for Summary Judgment and deny Mantha's Partial Motion for the same.

Respectfully submitted,

QuoteWizard.com, LLC,
By its attorneys,


*/s/ Kevin P. Polansky*
Kevin P. Polansky (BBO #667229)
kevin.polansky@nelsonmullins.com
Christine M. Kingston (BBO #682962)
christine.kingston@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
(t) (617)-217-4700
Dated: August 4, 2021                    (f) (617) 217-4710

## CERTIFICATE OF SERVICE

I, Kevin P. Polansky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: August 4, 2021                         */s/ Kevin P. Polansky*