EXHIBIT EE

Page 1

1                                      Volume: II

2                                      Pages: 1-74

3                                      Exhibits: 1

4              UNITED STATES DISTRICT COURT

5            FOR THE DISTRICT OF MASSACHUSETTS

6    - - - - - - - - - - - - - - - - - x

7    JOSEPH MANTHA, on behalf of

8    himself and all others similarly

9    situated,                              Civil Action No.

10           Plaintiff                      1:19-cv-12235-LTS

11           VS.

12   QUOTEWIZARD.COM, LLC,

13           Defendant

14   - - - - - - - - - - - - - - - - - x

15

16        DAY TWO OF AUDIO/VIDEO 30(b)(6) DEPOSITION

17   CONDUCTED REMOTELY of PLURAL MARKETING SOLUTIONS BY

18   GEORGE RIOS, a witness called by and on behalf of

19   the Defendant, taken pursuant to the provisions of

20   the Massachusetts Rules of Civil Procedure, before

21   Arlene R. Boyer, a Certified Verbatim Reporter and

22   Notary Public in and for the Commonwealth of

23   Massachusetts, taking place in Jersey City, NJ on

24   Monday, January 4, 2021, commencing at 10:45 a.m.

Page 2

| | |
|---|---|
| 1 | R E M O T E   A P P E A R A N C E S |
| 2 | |
| 3 | NELSON, MULLINS, RILEY & SCARBOROUGH, LLP |
| 4 | By:  Kevin P. Polansky, Esquire |
| 5 | One Financial Center, 35th Floor |
| 6 | Boston, MA 02111 |
| 7 | (617) 217-4700 |
| 8 | kevin.polansky@nelsonmullins.com |
| 9 |      Counsel for the Defendant |
| 10 | |
| 11 | THE LAW OFFICE OF EDWARD A. BRODERICK |
| 12 | By:  Edward A. Broderick, Esquire |
| 13 |      208 Ridge Street |
| 14 |      Winchester, MA 01890 |
| 15 |      (617) 680-0049 |
| 16 |      ted@broderick-law.com |
| 17 |          Counsel for the Plaintiff |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 4

| | |
|---|---|
| 1 | I N D E X |
| 2 | WITNESS          DIRECT  CROSS  REDIRECT  RECROSS |
| 3 | |
| 4 | PLURAL MARKETING SOLUTIONS |
| 5 | BY GEORGE RIOS |
| 6 | (By Mr. Polansky)     7 |
| 7 | (By Mr. Broderick)         61 |
| 8 | |
| 9 | |
| 10 | |
| 11 |      P R E M A R K E D   E X H I B I T S |
| 12 | NO.                              PAGE |
| 13 | Exhibit 1    Subpoena and Attachments          5 |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 3

| | |
|---|---|
| 1 | R E M O T E   A P P E A R A N C E S |
| 2 | |
| 3 | MARION & ALLEN, P.C. |
| 4 | By:  Roger K. Marion, Esquire |
| 5 |      488 Madison Avenue, Suite 1120 |
| 6 |      New York, NY 10022 |
| 7 |      (212) 658-0350 |
| 8 |      rmarion@rogermarion.com |
| 9 |          Counsel for Plural Marketing |
| 10 |          Solutions, Inc. |
| 11 | |
| 12 | Also Present: |
| 13 | Jim Roberts, Videographer |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 5

| | |
|---|---|
| 1 |      (Exhibit Number 1, Subpoena and |
| 2 |      Attachments, was Premarked for |
| 3 |      Identification.) |
| 4 | |
| 5 |      P R O C E E D I N G S |
| 6 | |
| 7 |      THE VIDEOGRAPHER:  Good morning. |
| 8 | We're going on the record at approximately |
| 9 | 10:45 a.m. on January 4, 2021.  Please silence |
| 10 | any cell phones, computer tones, or other |
| 11 | electronic devices.  Audio and video recording |
| 12 | will continue to take place, unless all |
| 13 | parties agree to go off the record. |
| 14 |      This is media unit one of the remote |
| 15 | video-recorded deposition of George Rios, |
| 16 | taken by counsel for defendant in the matter |
| 17 | of Joseph Mantha, et al versus |
| 18 | QuoteWizard.com, LLC, filed in the U.S. |
| 19 | District Court for the District of |
| 20 | Massachusetts, Civil Action Number |
| 21 | 1:19-cv-12235-LTS. |
| 22 |      My name is Jim Roberts, here in |
| 23 | association with Veritext New England.  I'm |
| 24 | the videographer.  The court reporter is |

2 (Pages 2 - 5)

Page 6

1    Arlene Boyer, also with Veritext.  All counsel
2    consent to this remote video arrangement,
3    waive objections to this matter of reporting
4    and to the remote swearing in of the witness.
5    Counsel, please state your appearances,
6    beginning with noticing counsel, please.
7            MR. POLANSKY:  Good morning.  This
8    is Kevin Polansky on behalf of QuoteWizard.
9            MR. BRODERICK:  Good morning.  This
10   is Edward Broderick for the plaintiff, Joseph
11   Mantha.
12           MR. MARION:  Good morning.  This is
13   Roger Marion on behalf of Plural Marketing,
14   and I just wanted to correct one thing Mr.
15   Roberts said.  It's a deposition of Plural
16   Marketing by George Rios appearing.
17           THE VIDEOGRAPHER:  The court
18   reporter will please swear in the witness.
19
20           GEORGE RIOS, having been
21   satisfactorily identified and duly sworn by
22   the Notary Public, was examined and testified
23   as follows in answer to direct
24   interrogatories:

Page 7

1            THE COURT REPORTER:  Usual
2    stipulations?
3            MR. POLANSKY:  Yes.
4            MR. MARION:  Agreed.
5            THE COURT REPORTER:  He's going to
6    read and sign, 30 days, waive notary?
7            MR. MARION:  Yes.
8            MR. BRODERICK:  Yes.  All
9    objections, except as to questions, reserved
10   until -- form of questions reserved until the
11   time of trial.
12
13           DIRECT EXAMINATION
14
15   BY MR. POLANSKY:
16   Q   Good morning, Mr. Rios.  My name is Kevin
17   Polansky, and I represent the defendant,
18   QuoteWizard, in this case.  This is a
19   continued deposition of the Rule 30(b)(6)
20   deposition of Plural Marketing Solutions.  Are
21   you aware of that?
22   A   Yes.
23   Q   And primarily, the deposition today is to
24   discuss some documents that were produced

Page 8

1    after your prior deposition.  Are you aware of
2    that?
3    A   Yes.
4    Q   So I'm not going to focus on what was
5    previously asked, but I do want to touch on --
6    or I should say there may be some follow up
7    with respect to some of those documents that
8    were produced.  So I'm going to try not to be
9    repetitive, but in the event I do, it's for
10   the purpose of discussing these newly-produced
11   documents.  Okay?
12   A   Understood.
13   Q   In preparation for today's deposition, did you
14   review any documents?
15   A   The one document that you're referring to that
16   has 103 pages.
17   Q   And you're referring to Exhibit 1, which is
18   the subpoena for your appearance today?
19   A   Yes.
20   Q   So in total, that pdf, including the subpoena
21   and the attachments, has 103 pages; is that
22   correct?
23   A   Yes, that's what it looks like.
24           MR. MARION:  Just so you know, I'm

Page 9

1    going to object.  It is a notice, not a
2    subpoena, for today.
3            MR. POLANSKY:  I couldn't hear the
4    objection, Roger.
5            MR. MARION:  It was a notice, not a
6    subpoena for today.
7            MR. POLANSKY:  I think there was a
8    prior subpoena, which I'm referring to as
9    Exhibit 1, and then we agreed on a new date;
10   is that correct?
11           MR. MARION:  I do have the 103-page
12   re-notice of deposition.  I think that is
13   Exhibit 1.
14           MR. POLANSKY:  So I'm actually
15   referring to the subpoena, but, I mean, for
16   our purposes, they both have 103 pages.
17   You're here today.  So it's really a mute
18   point as to whether it's a subpoena or re-
19   notice.
20   Q   In any event, did you review any other
21   documents --
22   A   No.
23   Q   -- in preparation for today's deposition?
24   A   I looked at this one.

3 (Pages 6 - 9)

Page 10

1  Q   Other than speaking with your counsel, did you
2      speak to anyone in preparation for today's
3      deposition?
4  A   I did not.
5  Q   Did you review your prior deposition
6      transcript?
7  A   I did not.
8  Q   Have you at any time reviewed your prior
9      deposition transcript?
10 A   No.
11         MR. MARION:  I do not believe it has
12     been served upon us for review.
13         MR. POLANSKY:  Ted, do you know if
14     your office served the depo transcript?
15         MR. BRODERICK:  I may have missed
16     doing that.  Apologies.
17         MR. POLANSKY:  No worries.
18 Q   So George, we'll try to get you that -- or
19     excuse me, Mr. Rios, we'll try to get you that
20     deposition transcript.  Okay?
21 A   That's fine.
22 Q   Is it okay if I call you George, or would you
23     prefer Mr. Rios?
24 A   George is fine.

Page 11

1  Q   So let's get right into the exhibit.  I'm
2      going to refer to Page 26 of the 103 pages.
3      Tell me when you're there.
4  A   Yeah.
5  Q   Have you seen this document before?
6  A   Yeah.  I looked at it a couple of days ago.
7  Q   And what is the document?
8  A   It looks like a transcript.
9  Q   Does it refer -- does it look like a Skype
10     chat?
11 A   Yeah.
12 Q   And do you know who the Skype chat is between?
13 A   Let me see.  Oh, probably Jesse.
14 Q   Who's Jesse?
15 A   I believe Jesse is an employee of RevPoint or
16     Jangl.
17 Q   And is the Skype chat between Jesse at
18     RevPoint and you at Plural Marketing?
19 A   Yes.
20 Q   And what's the date of the Skype chat?
21 A   It's hard to read it, but September maybe.
22 Q   And other than the document that's in front of
23     you now, do you have an actual memory of this
24     chat that you had with Jesse?

Page 12

1  A   Not particularly, no.
2  Q   And what information was RevPoint seeking from
3      Plural Marketing at this time in September
4      2019?
5  A   The TCPA audit.
6  Q   And what do you mean by "TCPA audit"?
7  A   Information that was provided by the source as
8      to the consumer's original consent and the URL
9      where they filled out the form, IP address,
10     things of that nature.
11 Q   Is that information that Plural Marketing
12     would have had at the time of purchasing the
13     lead?
14 A   No, not at that time.
15 Q   So to be clear, Plural Marketing would not
16     have had the consent provided by the consumer
17     at the time that it purchased the lead?
18         MR. MARION:  Objection to form.  You
19     can continue.  If you understand the question,
20     you can answer.
21 A   I mean, what we get is the language, the TCPA
22     language, that the consumer was presented at
23     the time that they filled out the form.  That
24     is passed along, and then some metadata, like,

Page 13

1      you know, IP address or something like that,
2      and then you actually have the request itself,
3      which is the consumer's contact information,
4      along with make, model, or year or height or
5      weight or, you know, whatever additional data
6      points were collected on the form at that
7      time.  That's what's passed over.
8  Q   So when you say the consent language that's
9      presented to the consumer, that consent
10     language is provided to Plural Marketing from
11     your lead supplier?
12         MR. BRODERICK:  Objection.
13 A   Yeah, they pass it along.
14 Q   And when you say "pass it along," is that
15     electronically?
16 A   Yes.
17 Q   And is that at the time that you purchase the
18     lead?
19 A   Yeah.  It's included in the record itself.
20 Q   Now, when Jesse from RevPoint reaches out in
21     September 2019, why didn't you just refer him
22     back to the consent language that was provided
23     to the consumer at the time of opting in?
24 A   They already had it.  I passed it to them,

Page 14

1    along with the IP address, along with
2    everything else. What we didn't pass, I
3    believe, was additional data that I had to
4    request from the source, which was the
5    original URL.
6  Q   And when you say "original URL," you're
7    referring to the website?
8  A   Correct.
9  Q   So the consent language would have been
10    provided to RevPoint at the time of sale --
11  A   Right.
12  Q   -- URL RevPoint?
13  A   Right.
14  Q   Now, are you familiar with Plural Marketing's
15    prior document production in this case?
16  A   Somewhat, yeah. I mean, I sent them
17    everything I had over the last year or so.
18  Q   Do you know whether you provided the original
19    consent language that was --
20  A   I'm sure of that. That was in an email that
21    was provided to Jesse, along with some
22    additional data points that came across from
23    the source.
24  Q   Now, on Page 26 of Exhibit 1, Jesse is asking

Page 15

1    for the TCPA audit information, right?
2  A   Correct. Yeah, that's what it looks like.
3  Q   And it says -- he mentioned something here
4    about "a fraudulent lead ID code." Do you
5    know what he was referring to?
6  A   At the time, I didn't.
7  Q   Do you know now?
8  A   Well, yeah, I mean, after looking into it
9    more. I don't know that it's fraudulent, but
10    it didn't look like it was linked to this
11    particular record.
12  Q   So your understanding is that the ID code
13    might not have been fraudulent, but it wasn't
14    associated with this particular consumer?
15  A   That's correct. That's what it looks like.
16  Q   And if you recall in your first deposition,
17    you testified that the Jornaya lead ID code
18    was placed on this lead by your company; is
19    that correct?
20  A   Right.
21  Q   And that was done inadvertently?
22  A   Yeah. I mean, it could have been a software
23    issue, I'm not sure, but it doesn't look like
24    it was associated with this particular record.

Page 16

1  Q   After your testimony last time, did you go
2    back to look to see how that Jornaya lead ID
3    might have been attached to the lead?
4  A   I did not look in detail, but it could have
5    been a software issue.
6  Q   Now, you're the only individual that works for
7    Plural Marketing; is that right?
8  A   Yes.
9  Q   So if it was done manually, it would have been
10    done by you, right?
11  A   Correct.
12  Q   And you have no memory of putting a Jornaya
13    lead ID on this lead, do you?
14  A   No.
15  Q   When you received this Skype message from
16    Jesse at RevPoint in September, did you go
17    back to look at the information you had in
18    your system on this lead at this time?
19  A   Well, I made the request to the source for
20    additional TCPA compliance information, as I
21    always do, and then said I would, you know,
22    submit a request and get back to him.
23  Q   When you say as you "always do," what do you
24    mean by that?

Page 17

1  A   I mean if a request comes in for this, I would
2    -- you know, that's my operating procedure. I
3    would go back to the source where I retrieved
4    that record and request that information.
5  Q   So you're not talking about this particular
6    source, you're just talking about your general
7    practice?
8  A   Correct.
9  Q   Now, when you got the request, did you go back
10    and look through Plural Marketing's lead
11    information for this lead?
12  A   I did, but I passed it to them at the time of
13    the transaction occurring.
14  Q   Right, right, but I'm just trying to ask to
15    see whether you reviewed the information that
16    you had at that time to see what additional
17    information you might need on this lead?
18       MR. MARION: Objection to form.
19  A   I don't recall specifically what I did, other
20    than make the request for the additional
21    information.
22  Q   Do you recall if you went back and looked to
23    see what information was provided to RevPoint
24    in the ping post system at the time of selling

5 (Pages 14 - 17)

Page 18

1    the lead to RevPoint?
2  A   I don't recall specifically, no.
3  Q   Who did Plural Marketing buy this lead from?
4  A   It was acquired through Fenix Media, and I
5    believe he got it from Snappy Auto something
6    -- Snappy Auto Quotes.
7  Q   Had you ever heard of Snappy Auto Quotes
8    before?
9  A   No.
10  Q   And when you said "he," who is "he" at
11    fenixsolutions.com?
12  A   Dario.
13  Q   And had you communicated with Dario in the
14    past?
15  A   Email.
16  Q   So all communications were him were through
17    email?
18  A   Right.
19  Q   And in this case, you did email Dario for this
20    information; is that right?
21  A   I requested it, yeah.
22  Q   Now, if you can flip to the next page, it is
23    Page 27 of 103 of Exhibit 1.
24  A   Um-hmm.

Page 19

1  Q   If you scroll to the bottom of the page where
2    it says "RP," which stands for RevPoint, "11,"
3    do you see a message that you sent to
4    RevPoint?
5  A   Yes.
6  Q   And I think it begins, "Lead traffic source,
7    organic PPC." Do you see that?
8  A   That's what it looks like, yeah.
9  Q   And is that the information that you received
10    from Dario?
11  A   That is correct.
12  Q   And what did you understand Snappy Auto
13    Insurance to be?
14  A   Just a consumer website that would market
15    directly to consumers to get them to fill out
16    the form, looking for insurance, or whatever
17    type of insurance.
18  Q   So is that the website you believe that the
19    lead was generated from?
20  A   That's my understanding, yeah, and that's what
21    Dario told me when I requested the audit.
22  Q   Give me a second. Can you jump to Page 72 of
23    103 of Exhibit 1 for me?
24        MR. MARION: What is the RP

Page 20

1    reference?
2        MR. POLANSKY: There is no RP
3    reference. It's Exhibit B to the subpoena and
4    re-notice, whatever is in front of you, but
5    it's Page 7 --
6  Q   Let's go to 70 of 103.
7        MR. MARION: 70?
8        MR. POLANSKY: Yeah.
9  A   Okay.
10  Q   Do you see a letter?
11  A   Yeah.
12  Q   So this is a letter from RevPoint's counsel to
13    plaintiff's counsel in this case, and with
14    this letter there is a supplemental document
15    production, which he refers to as RP53,
16    although I don't see an RP on the production,
17    but the production starts at Page 72.
18  A   Okay.
19  Q   Tell me when you're there.
20  A   Yeah, I'm there.
21  Q   Have you ever seen this document before?
22  A   No, I don't think so, I mean not the original.
23    I'm looking at it now, and I'm sure that I
24    paged through when I was reviewing the pdf

Page 21

1    that I was sent over, but I don't specifically
2    remember this. It didn't stand out to me.
3  Q   And this document is -- I believe is most
4    likely a spreadsheet that's been turned into a
5    pdf, and the entire document is Pages 72
6    through 76. So just take a second to refer to
7    those pages --
8  A   Okay.
9  Q   -- and let me know once you've had a chance to
10    review them.
11  A   Okay.
12  Q   Now, although you might not have seen this
13    document before, does the information look
14    familiar?
15        MR. BRODERICK: Objection.
16  A   I mean, it's a typical ping post request that
17    would be sent from system to system, it looks
18    like.
19  Q   So this looks like similar information as part
20    of a ping post that Plural might sell to
21    RevPoint?
22  A   That's correct.
23  Q   I want to go through these columns with you
24    just quickly to see what they reference or

6 (Pages 18 - 21)

Page 22

1    what they refer to.
2  A    Okay.
3  Q    And again, I understand this is produced from
4    RevPoint, so whatever your knowledge is is
5    fine.  Do you understand what the "ID" column
6    refers to?
7          MR. BRODERICK:  Objection.
8  A    I don't -- I can't say for sure.  I can only
9    guess.
10         MR. MARION:  No, they're not asking
11    for guesses, only if you actually know.
12  A    No, I don't know what it is.
13  Q    What about the "Time Stamp" column?
14         MR. BRODERICK:  Objection.
15  A    I don't know.  Do I answer?  I heard
16    objection.
17  Q    You can answer if you know.
18         MR. MARION:  That was not from me.
19    The objection was to the form of the question,
20    but you can answer if you know, and please
21    don't guess.
22  A    Time-stamped when their system -- you know
23    what, I don't know, because the time I don't
24    know.

Page 23

1  Q    Do you understand what "Vertical" means?
2          MR. BRODERICK:  Objection.
3  A    That's the type of record.
4  Q    And in this case, it was auto insurance?
5  A    Correct.  That's my understanding.
6  Q    By the way, are these columns filled in as
7    part of the ping post system by Plural to
8    RevPoint?
9          MR. BRODERICK:  Objection.
10         MR. MARION:  Objection to form.
11  A    So --
12  Q    Well, let me re-ask the question.
13  A    Yeah.  I don't know what these columns mean
14    specifically, because they didn't come from my
15    system.  That looks like it came from their
16    system, and I can't speak to what these
17    columns are or what they're for or how they're
18    aligned to what I may have sent them.
19  Q    So RevPoint's, you know, 30(b)(6) witness
20    testified that this is the information
21    provided by Plural to RevPoint.  Are you with
22    me so far?
23  A    Yeah, I am, but I didn't provide like "Buyer
24    ID."  I don't know what "ID" is.  I don't know

Page 24

1    what "Marketplace Buy Price" is or "Sell
2    Price" is.  I don't know what any of those
3    columns are.  That's their system, not mine.
4  Q    Right.  So I guess my question is would this
5    information that's represented in these
6    columns be provided by Plural to RevPoint, and
7    if it's easier, you can tell me what columns
8    you think would be information provided by
9    Plural.
10         MR. BRODERICK:  Objection.
11  A    Okay.  Nothing on the first two pages because
12    that's -- I don't recognize what any of that
13    is.  That's their stuff, not mine.
14  Q    So just for purposes of record keeping, that
15    would be Pages 72 and 73?
16  A    Correct.  74 is typically the beginning of
17    what would be part of a standard ping post
18    transaction:  "User Agent, Landing Page," stuff
19    like that.  That would be more typical of what
20    would be in a request.
21  Q    Let's stop there, then.  What does the
22    "User Agent" information refer to?
23         MR. BRODERICK:  Objection.
24  A    So user information is -- I'm sorry.  User

Page 25

1    agent is the technical versions potentially
2    installed software of the browser that the
3    consumer was using when they visited a site.
4  Q    And where would Plural get that information
5    from?
6          MR. BRODERICK:  Objection.
7  A    That would be passed from the source.  So the
8    source would collect it because they don't --
9    so the user agent is not like a question on a
10    form.  It's not like you're going to ask a
11    consumer, hey, what is your user agent.
12    That's not how that works.  The user agent is
13    part of the header.  When the -- you know,
14    just like you need your IP address, you need
15    your user agent.  It's information that's
16    presented to the server that is then stored
17    with the record.
18         (Whereupon, a discussion was held
19    off the record.)
20  Q    The "Landing Page URL," what does that refer
21    to?
22  A    That's typically hard coded something, and
23    that's just really the nature of this
24    business.

Page 26

1 Q   Now, in this case, you testified earlier that
2     you believe -- or you were presented with
3     information from Dario that the URL that the
4     consumer visited was Snappy Auto Insurance,
5     right?
6 A   That's correct.
7 Q   Now, in this production by RevPoint, they have
8     the landing page as "jangl.com"?
9 A   That is correct.
10 Q   Do you know why there would be a discrepancy
11     there?
12 A   I do.  So basically, when you're doing an
13     integration, that is to say tying two systems
14     together, you would sometimes hard code
15     information that you either don't have, don't
16     collect, and you would clear that with the
17     technical, you know, team of the company that
18     you would be working with, in this case, you
19     know, Jangl's tech team.  I don't always get
20     the URL of where the consumer actually landed
21     from -- or landed on.  And that's, again, why
22     I made the comment that's just the nature of
23     the business.
24         Typically, when you are working with

Page 27

1     multiple brokers, and you're in the middle, if
2     you expose that information every single time,
3     it's not, let's say, unheard of for a buyer to
4     simply say, oh, you know, I don't really need
5     you anymore.  I'll just go directly to where
6     this, you know, record is coming from.  And
7     it's sort of a practice or standard protocol
8     that you hard code that landing page, and you
9     hard code it to something that you control,
10     but that may or may not be where the record
11     actually came from.
12         In this case, it couldn't have come
13     from Jangl, because Jangl is obviously their,
14     you know, platform landing page URL.  So
15     there's no record -- there's no form there
16     that the consumer could have filled out to get
17     an auto insurance quote.
18 Q   What does it mean to "hard code" something?
19 A   Rather than it coming from a source or a third
20     party, technically in the code, you simply put
21     in a hard coded value or string or a code that
22     represents something that they understand and
23     I understand, that when we're passing along
24     this information, it's information either that

Page 28

1     I don't have at the time of collection or that
2     I don't get, period.  And it may or may not be
3     a required field.  And if it's a required
4     field, but I don't have it, it's a standard
5     procedure.  It's hard coded with something
6     that we both agree upon in advance.
7 Q   So is this something -- strike that.
8         Is this landing page URL something
9     that both Plural and RevPoint agreed to in
10     advance?
11         MR. MARION:  Objection to form.
12         MR. BRODERICK:  Objection.
13 Q   You can answer.
14         MR. MARION:  You can answer.
15 A   Yes, because we completed our integration test
16     cycle, and it was that, and it's always been
17     that for every record that is a post record
18     that I sent over.
19 Q   And so your understanding, and I want to make
20     sure I have this correctly, is that you
21     wouldn't provide the URL field to reveal the
22     source of your lead; is that correct?
23 A   Right.
24 Q   And that's to prevent them -- not to say that

Page 29

1     they would, but to prevent them from skipping
2     you and going to them directly?
3 A   Yeah, it's just a tactic that you use to
4     prevent circumvention, that's all.  It happens
5     all the time where, you know, you find out
6     that two people who weren't in a relationship
7     all of a sudden form a relationship and decide
8     to kind of cut you out.
9 Q   And do you know what the "TCPA Compliant"
10     column refers to?
11         MR. BRODERICK:  Objection.
12 A   I don't see that.  TCPA what?
13         MR. BRODERICK:  You mean TCPA
14     consent, Kevin?
15         MR. POLANSKY:  No, it's on Page 74.
16         MR. MARION:  It's the third column
17     at the top of Page -- third column on 74, with
18     the value of "1."
19 A   Oh, I think that's a flag that is in their
20     system.
21 Q   And do you know whether the "1" is hard coded?
22         MR. BRODERICK:  Objection.
23 A   Yes.
24 Q   And do you know what the "1" refers to?

8 (Pages 26 - 29)

Page 30

1  A   I don't know for sure, but it's probably a
2      boolean, true or false, yes or no.
3  Q   And would "1" mean true?
4          MR. BRODERICK: Objection.
5  A   Typically.
6  Q   Flipping down to Page 75 of 103, this is TCPA
7      consent language. And do you know whether
8      this is the TCPA consent language that was
9      provided from Plural to RevPoint as part of
10     the ping post system?
11         MR. BRODERICK: Objection.
12 A   It was. That is the standard TCPA language
13     that is passed across with the majority of
14     integrations. The one specifically that is
15     presented to the consumer depends upon what
16     site they actually landed on, and that's why
17     we make the request to the original source.
18 Q   So explain that to me. What do you mean that
19     this is the typical TCPA consent language
20     that's passed along with the ping post system?
21 A   Oh, depending upon what site the consumer
22     landed on, they would receive some TCPA
23     language. That's just in every form. That's
24     standard. You have to have that TCPA

Page 31

1      language. The specific words, the verbiage by
2      finishing -- "by clicking on finish, you
3      consent"; it might say "by clicking on submit,
4      you consent"; it might say "when you complete
5      this form, you consent" -- the language itself
6      will vary from site to site, but the substance
7      of the message, the consent, that you are
8      opting in to receive a call, a text, an email,
9      that is always standard. That's in the spirit
10     of the language that every form has.
11         The specific language, what the
12     consumer actually saw, may vary slightly
13     because a form might not actually have a
14     "finish" button. It might have a "submit"
15     button, or it might have a "request your
16     quote" button. So that's why the language
17     will vary from site to site and from place to
18     place. But again, the spirit of the language
19     is always the same. That's why most people
20     tend to hard code it to something that is like
21     this, boilerplate.
22 Q   So is this language hard coded?
23 A   Yes.
24 Q   So you don't know if this particular language

Page 32

1      was on the website where the consumer visited?
2  A   I don't know what the specific language was
3      until I requested it, and then that's when
4      they send the landing page, along with the
5      actual message that was, you know, rendered at
6      the time that the consumer landed on the page.
7      And again, I'm sure that it's similar to this,
8      because it always is.
9  Q   And then with respect to columns "First Name,
10     Last Name," all the way to the end on the
11     right of Page 75, is that typical data that's
12     provided to RevPoint?
13 A   Yes.
14 Q   And this information that's in these columns
15     on Page 75, is that information that is
16     obtained by Plural from Fenix Solutions?
17         MR. BRODERICK: Objection.
18 Q   You can answer. Unless you're instructed by
19     your attorney not to, you can answer after an
20     objection. They're preserving the record.
21         MR. MARION: Note my objection. I
22     mean, I would object to form. But you can
23     answer the question. If you know -- if you
24     understand it, you can answer.

Page 33

1  A   Yes, that's typical information that would be
2      provided for any record of any type. It would
3      always include the contact information of the
4      consumer.
5  Q   Do you know when Plural purchased the lead
6      information from Fenix whether consent
7      language like this shown in the first column
8      on Page 75 was provided to Plural?
9          MR. BRODERICK: Objection.
10 A   In the original transaction, no.
11 Q   So you don't know, or it was not provided?
12 A   No, it wasn't provided. I had to ask for it.
13         MR. MARION: By "provided" -- I'm
14     going to object to form as to who you're
15     asking. Was it provided to my client, was it
16     provided to Mr. Mantha?
17         MR. POLANSKY: It was provided to
18     your client.
19 Q   So let me ask the question again. The TCPA
20     consent language that's identified on Page 75
21     of Exhibit 1, was that provided by Fenix
22     Solutions to Plural Marketing as part of the
23     ping post system?
24 A   It was not.

9 (Pages 30 - 33)

Page 34

1 Q   So this is standard language that you included
2     on the lead when it was sold to RevPoint, and
3     by "you," I mean Plural?
4 A   Correct.  Plural technology will use -- again,
5     going back to the hard coded thing -- the hard
6     coded variable that will insert this data into
7     their request so that their system will accept
8     it and basically add it to the record.  So
9     that's what happened there.  This specific
10    language wasn't provided to me until after I
11    made the request, and it wasn't that exact
12    language, because that exact language is
13    typically the language that I use.  The
14    language, again, was similar, but it wasn't
15    the exact same language.
16 Q   Turning to Page 76 of Exhibit 1 --
17 A   Yes.
18 Q   -- are you -- strike that.
19        Is this the type of information that
20    is provided from Plural to RevPoint as part of
21    the ping post system?
22 A   It looks like it.
23 Q   In this instance, do you see "IP Address"?
24 A   I do.

Page 35

1 Q   Do you know what the IP address represents?
2        MR. BRODERICK:  Objection.
3        MR. MARION:  Objection to form.
4 A   Yeah, I can't say for sure what that IP
5     address is of --
6 Q   But that -- strike that.   What's that?
7 A   It doesn't say what it is.
8 Q   Right.  Now, it's RevPoint's representation
9     that this information is supplied from Plural
10    to RevPoint in the course of the ping post
11    system.  Are you with me so far?
12 A   I'm with you.
13 Q   If Plural in this case provided that IP
14    address to RevPoint, do you know what that IP
15    address would represent?
16        MR. BRODERICK:  Objection.
17 A   I would assume that that was --
18        MR. MARION:  Objection.  He's not
19    asking you to assume.  Do you have knowledge?
20 A   I mean, that would have been the address that
21    came from the record when I got it, if that's
22    what it is.
23 Q   When you get a record, in this case, like
24    let's say Fenix, what does that IP address

Page 36

1     represent to you?
2        MR. BRODERICK:  Objection.
3 A   Typically, it's the consumer's IP address.  In
4     my system, it's more specific.  In my system,
5     it would say consumer IP address or something
6     to that effect, request IP address or
7     something like that.
8 Q   Now, you said it could represent the
9     consumer's IP address.  What other IP
10    addresses could it represent?
11        MR. BRODERICK:  Objection.
12 A   In my experience, sometimes it has --
13        MR. MARION:  Objection,
14    hypothetical.  If you know.  If you don't
15    know, then don't say.
16 A   Yeah, I can't say for sure what it does or
17    what it doesn't represent.
18 Q   I'm not asking you that.  That wasn't my
19    question.  My question is what could it
20    represent, based on your experience?
21        MR. BRODERICK:  Objection.
22        MR. MARION:  Objection, requesting a
23    hypothetical.
24 Q   You can answer.

Page 37

1        MR. MARION:  You can answer to the
2     extent you actually have a belief.
3 A   I believe from what I've seen in the past is
4     that people use a server IP.
5 Q   And when you say "a server IP," whose server
6     IP?
7        MR. BRODERICK:  Objection.
8 A   The buyer or their own.
9 Q   Now, this information that Plural provides to
10    RevPoint is all electronic as part of the ping
11    post system; is that right?
12 A   It is.
13 Q   Now, if you flip down to Page 78 --
14 A   Yes.
15 Q   -- this is a letter from your counsel to my
16    office, dated August 13, 2020, which responds
17    to a subpoena in this case.  Have you seen
18    this letter before?
19 A   I'm sure I have.
20 Q   Flipping down to Page 79 -- I don't believe
21    it's Bates stamped, but let me check.  This is
22    part of the document production that we're
23    going to now go through, okay?  Have you seen
24    this document production in the past?

Page 38

1  A    Yes.
2  Q    Referring to Page 79 of 103 in Exhibit 1, what
3       is this document?
4  A    It looks like an email.
5  Q    An email from who to who?
6  A    From Dario to me.
7  Q    Now, he says, "Hello, George. Here is a
8       screenshot of a Snappy Auto Insurance form."
9       Do you see that?
10 A    Yeah.
11 Q    Do you have a copy of that Snappy Auto
12      Insurance form?
13 A    Just what looks like it's in the attachment of
14      the email, which is the next page, 80. That's
15      it.
16 Q    Now, in this email to you, Dario says that
17      he's the webmaster of the site. What site is
18      he referring to?
19         MR. BRODERICK:  Objection.
20 A    Let me see. He doesn't specifically say what
21      site he's referring to here.
22 Q    Do you believe it to mean the
23      snappyautoinsurance.com website?
24 A    I can't say.

Page 39

1  Q    Now, what is a webmaster?
2  A    Someone that is in control of a website.
3  Q    Prior to this email, were you aware that Dario
4       was the webmaster for at least what I could
5       to be the Snappy Auto Insurance website?
6         MR. BRODERICK:  Objection.
7         MR. MARION:  Objection to form.
8  A    I don't know what websites he's the webmaster
9       of.
10 Q    When was the last time you spoke to Dario by
11      email -- or communicated with Dario, I should
12      say?
13 A    A couple of days. I don't know. I mean, we
14      typically don't talk much during the holidays.
15 Q    Do you still communicate with Dario?
16 A    Yes.
17 Q    Does Plural still have a relationship with
18      Fenix?
19 A    Yes.
20 Q    When is the last time you communicated with
21      Dario about this lead?
22 A    Just the emails that we have here.
23 Q    Have you ever asked him what site he was
24      referring to when he said he was the webmaster

Page 40

1       of the site?
2  A    No.
3  Q    Is that something that you could do?
4         MR. MARION:  Objection to form.
5  Q    You can answer.
6  A    I'm not sure I understand. You're asking me
7       to ask him?
8  Q    I'm just asking if it's possible if you could,
9       since you still communicate with him?
10 A    I can.
11 Q    Has Dario ever informed you that attorneys in
12      this case have contacted him regarding this
13      lead?
14 A    I haven't asked.
15 Q    I'm just asking if he's ever informed you?
16 A    I don't recall if he's said anything.
17 Q    Do you have access to the website that Dario
18      obtained the lead from?
19 A    I do not.
20         MR. BRODERICK:  Objection.
21         MR. MARION:  Objection to form.
22 Q    Is that information you can obtain from Dario?
23         MR. MARION:  Objection to form.
24         MR. BRODERICK:  Objection.

Page 41

1  A    I don't -- I mean, I've asked him for
2       everything he has, and he's provided it. So I
3       don't know what else he would be able to
4       provide.
5  Q    Well, let's look at the information he
6       provided. If you could go down to Page 89.
7  A    89.
8  Q    Do you see an email from Dario to you on
9       September 11, 2019?
10 A    I do.
11 Q    Is this the information he provided to you
12      regarding this lead?
13 A    It looks like it.
14 Q    Do you see any consent language in this email?
15 A    At the bottom.
16 Q    Is that generic language, or do you believe
17      that to be the exact language that the
18      consumer saw on the website?
19 A    I don't know.
20 Q    Did you ask him for the exact consent language
21      that the consumer would have saw on the
22      website?
23 A    I don't remember exactly what I did. I just
24      basically said I have a TCPA audit request,

11 (Pages 38 - 41)

Page 42

1  and when I have an audit request, this
2  information looks like what he would typically
3  provide.
4  Q   In a TCPA audit request from a lead purchaser
5  of Plural -- strike that.
6           In this instance, were you aware
7  that RevPoint was seeking the actual consent
8  language from this consumer?
9           MR. MARION:  Objection to form.
10          MR. BRODERICK:  Objection.
11 A   They requested a TCPA audit -- they requested
12  TCPA information.  "Audit" is a term that I
13  use and that we use sometimes, but they
14  requested TCPA information.  This is typical
15  TCPA information production.
16 Q   Do you think that the actual consent language
17  would be prudent or important to provide?
18          MR. MARION:  Objection to form.
19 A   I mean, I provided the exact same thing to
20  them before.  So, I mean, that's what I sent
21  to them.  That's what I got.  That's what I
22  forwarded to Jesse or -- I'm assuming it was
23  Jesse.  I think it was Jesse.
24 Q   Going through this information that you

Page 43

1  received, it says, "Applicant IP address."  Do
2  you know what that means?
3  A   The IP address of the consumer, I would
4  assume.
5  Q   What does the "Applicant IP Address
6  Coordinates" mean?
7           MR. BRODERICK:  Objection.
8  A   I don't know exactly what that is.
9  Q   What about the "Applicant IP Location"?
10          MR. BRODERICK:  Objection.
11 A   Yeah, again, I don't know exactly what that
12  is.
13 Q   What about the "Source of Application"?
14          MR. BRODERICK:  Objection.
15          MR. MARION:  Objection to form.
16 A   That looks like Snappy Auto Insurance.
17 Q   I understand, but what is "Source of
18  Application"?  What does that mean?
19          MR. BRODERICK:  Objection.
20 A   Where the consumer went.
21 Q   And "Date of Application," what does that
22  mean?
23          MR. BRODERICK:  Objection.
24 A   When the consumer went there.

Page 44

1  Q   Do you know the date that Plural purchased
2  this lead from Fenix Solutions?
3  A   I don't recall.
4  Q   Now, on this email, Dario says that Adam Brown
5  is the owner of the site; is that correct?
6  A   Yes, that's what he says.
7  Q   And he makes no mention that he's the
8  webmaster, does he?
9  A   No, not here, not that I can see.
10 Q   Do you know where Dario is located?
11 A   I believe he's in Bosnia.
12 Q   Have you ever met him personally?
13 A   No.
14 Q   Is he generally responsive to your emails?
15 A   Generally.
16 Q   On Page 82, this appears to be an email from
17  you to Dario on September 11.  Do you see
18  that?
19          MR. MARION:  82 is a different date.
20 Q   Well, let's try 83.
21 A   83, yeah.
22 Q   And in this email to Dario, what are you
23  requesting from Dario?
24 A   "Need full TCPA, method, URL, etcetera."

Page 45

1  Q   And is this information you believe that he
2  can obtain without knowing the phone number
3  provided?
4           MR. MARION:  Objection to form.
5  A   I gave him the email.
6  Q   Now, go to the page just before that, Page 82.
7  A   Yes.
8  Q   Do you see an email from you to Dario on July
9  28, 2020?
10 A   Yes.
11 Q   Now, what's the purpose of this email?
12 A   To advise him that I'm being deposed.
13 Q   What do you mean in this email, "Please
14  understand that I may be required to give
15  additional details about our relationship"?
16 A   If you refer back to my earlier statements
17  regarding non-circumvention -- or
18  circumvention, that's what I'm referring to.
19 Q   Why did you think it was important to give him
20  a heads up?
21 A   Frankly, because I would want to know if, for
22  example, someone that is involved in this
23  would contact him directly to begin trying to
24  work with him directly.

12 (Pages 42 - 45)

Page 46

1  Q   As of today, has Fenix Solutions ever provided
2      Plural with the actual consent language that
3      the consumer would have seen on the Snappy
4      Auto Insurance website?
5          MR. BRODERICK:  Objection.
6  A   Just the screenshots and whatever he's
7      provided to you -- that I provided to you
8      already.
9  Q   Do you know why the IP addresses in what Dario
10     sent to you do not match for the information
11     that RevPoint says it receives from Plural?
12 A   I don't.
13 Q   Have you ever looked into that?
14 A   I have not.
15 Q   In the Dario email on September 11, which is
16     again Page 89 for reference, do you know why
17     there's no details relating to the type of
18     auto insurance that Mr. Mantha was interested
19     in?
20         MR. BRODERICK:  Objection.
21 A   I do not.
22 Q   Is it possible for you to go back to Dario and
23     ask for the actual consent language that Mr.
24     Mantha would have seen on the Snappy Auto

Page 47

1      Insurance website?
2          MR. MARION:  Objection to form.
3  A   I've asked him repeatedly, and he's already
4      provided everything that he has.  I don't have
5      anything, and he doesn't have anything else.
6  Q   Now, he said he was the webmaster to you,
7      didn't he?
8  A   That's what it looks like in the email, yeah.
9          MR. POLANSKY:  Just give me a
10     minute.  I might be done.  Just give me a few
11     seconds.
12 Q   Going back to the letter that your counsel
13     provided to my office, do you know why the
14     information that we looked at earlier that
15     RevPoint provided was not produced by Plural
16     in response to the subpoena?
17         MR. MARION:  Objection to form.  You
18     can answer if you know.
19 A   I don't know.
20 Q   I guess what I'm getting at is the date that
21     RevPoint alleges that they received as part of
22     the ping post system, why hasn't Plural
23     provided that same data that they sold to
24     RevPoint as part of the ping post system?

Page 48

1          MR. MARION:  Objection to form.  You
2      can answer if you know.
3  A   I don't understand.  I don't understand what
4      you mean.  I'm not clear on what you're
5      asking.
6  Q   Sure.  So you were asked -- or strike that.
7          Plural was asked to produce any
8      information it has with respect to this
9      lead --
10 A   Right.
11 Q   -- and specifically, what I would like to see
12     from Plural is the information, the actual
13     data it sold to RevPoint as part of the ping
14     post exchange.  Can you produce that?
15 A   I did.  You have it.
16 Q   Where is it?
17 A   It's in the document already.
18 Q   Which document?
19 A   This one.  Literally the request is in there.
20     The pages where you were having me look at
21     like ID and vertical type and all that, that
22     information is what I provided to them during
23     the transaction.
24 Q   So let's go back to that page, then.

Page 49

1  A   I don't remember what page number it was.
2  Q   That's all right.  I'll draw your attention.
3      It's Page 72.
4  A   Yeah.
5  Q   So first of all, this wasn't produced by
6      Plural.  This was produced by RevPoint.  So to
7      say that Plural produced it isn't accurate;
8      would you agree?
9  A   Right.  They produced this.
10         MR. MARION:  Objection to form.
11 A   This came out of their system.
12 Q   Right.  Plural has not produced this
13     information as part of any subpoena response.
14     Are you aware of that?
15         MR. MARION:  Objection to form, and
16     I'm not sure that's accurate.
17 A   Yeah, I believe I sent the same information
18     over, perhaps not in this format, but it's the
19     exact same data points.
20 Q   As of now, I have never seen consent
21     information received from Plural that's
22     identified on Page 75.  Is that information
23     you can provide as part of your ping post that
24     was sold to RevPoint?

13 (Pages 46 - 49)

Page 50

1          MR. BRODERICK:  Objection.
2  A   I'm not really following you.  The consent
3     language that you're looking at is what I sent
4     them.
5  Q   I understand.  What I'm asking is can you
6     produce, in documentary form, the information
7     that was sold to RevPoint for this lead?
8          MR. MARION:  At this point, Counsel,
9     I need to object.  Please refer to the
10     attached documents that were on the May 22
11     response that was sent to Anthony Paronich,
12     cc'd to all counsel, that I had names of in
13     this case, Exhibit C, and also the snapshot of
14     the Snappy Auto Insurance page was on there,
15     including the small print on law and whatnot,
16     everything we had.  I believe it also had TCPA
17     information on it.  So please refer to that
18     response to your information request.
19          MR. POLANSKY:  Do you have consent
20     information there, Roger?
21          MR. MARION:  It says, "Applicant
22     agreed to receive promotional emails, calls,
23     texts, promotional mails from third parties
24     regarding his auto insurance application."

Page 51

1          MR. POLANSKY:  Does that match the
2     information that RevPoint has produced as part
3     of the ping post system?
4          MR. MARION:  I have not taken a
5     moment to match it word for word, but I want
6     to just refer you to that.
7          MR. POLANSKY:  Thank you for the
8     reference.  Now I'll go back to my question.
9  Q   Can you provide the actual information that
10     Plural sold to RevPoint as part of the ping
11     post sale of this lead?  You can answer the
12     question.
13  A   Yeah, I'm just not sure how to answer you.  I
14     provided it already.  Like that's what you're
15     looking at.  That Excel spreadsheet is exactly
16     the same data that I provided.  So I'm not
17     clear on what else you're asking.
18  Q   So if that data is what was provided to
19     RevPoint, then you could provide it to us; is
20     that correct?
21          MR. MARION:  Objection to form.
22     We've already provided it, as I just stated.
23          MR. POLANSKY:  You didn't provide
24     the same consent, Roger.  You never provided

Page 52

1     it in this form.  So if you have that
2     information, I'd like it to be provided.  This
3     is information provided by RevPoint, not
4     Plural.
5  A   So you're asking for the like technical ping
6     request -- or post request of what was sent to
7     their system?
8  Q   Yes, that's it, the data that was sent through
9     their system electronically.  Is that
10     information -- are you capable at Plural
11     Marketing to produce that data?
12          MR. MARION:  Objection to form.
13  A   I guess my point is I did.
14  Q   You did to who?  Who did you produce it to?
15  A   I gave it to RevPoint.
16  Q   You have a subpoena obligation.  Have you
17     produced it in this case?  That's all I'm
18     asking.
19  A   I submitted every data point that I had
20     regarding this particular consumer's record in
21     all of my systems.  I don't have anything
22     else, and the information that you presented
23     to me on that -- what looks like an Excel
24     spreadsheet that was transferred into a pdf is

Page 53

1     exactly the same.  So I guess I'm not clear
2     what else you're asking.  I gave them the same
3     thing that I produced in my document
4     production requests.  It's the same
5     information.  It's the same contact
6     information.  It's the same record.  So I
7     don't -- I'm not sure what else you're asking.
8  Q   So let me break it down this way.  If the
9     information contained in Pages 72 to 76 is
10     information that Plural provided to RevPoint
11     -- well, strike that.
12          Is the information contained in
13     Pages 72 to 76 information that Plural
14     provided to RevPoint?
15          MR. MARION:  Objection to form.  Are
16     you asking for all of the information, or
17     which information?
18          MR. POLANSKY:  All of the
19     information.
20  Q   Is that all the information -- strike that.
21          In Pages 72 to 76, is that
22     information that was provided from Plural to
23     RevPoint?
24          MR. BRODERICK:  Objection.

                                        14 (Pages 50 - 53)

Page 54

1 A  Yes.
2 Q  So you should be able to --
3 A  Not all of it.  Not all of it.  I don't -- like
4    I don't know what some of those columns are
5    and what some of that data is.  That's their
6    system.  I provided the same thing in my
7    document production request in terms of what
8    data I actually had for this record.  Maybe it
9    wasn't an Excel spreadsheet, but it's the same
10   data, I guess, is what I'm trying to get at.
11   Like I'm not -- is this like a format
12   question, like you want it in like the
13   technical spec to get it from one system to
14   the other system, or are you asking for it in
15   an Excel spreadsheet?
16 A  I guess what I'm asking --
17          MR. MARION:  Let me cut to the
18   chase, if I may, Mr. Polansky.
19          MR. POLANSKY:  Sure, Mr. Marion.
20          MR. MARION:  Are you saying you
21   haven't received that information that we
22   produced, because I can email it to you as a
23   copy.
24          MR. POLANSKY:  Sure.

Page 55

1          MR. MARION:  Are you saying you
2    haven't received the May 22 production?
3          MR. POLANSKY:  I believe I have.
4    What I'm saying is none of it contains the
5    TCPA consent text that's in this spreadsheet
6    right here.  Are you saying it does?
7          MR. MARION:  I don't know.  Let me
8    review it quickly to see if it does,
9    specifically.
10          MR. POLANSKY:  If you want to
11   forward it to me, I'm happy to go through it
12   at the same time.
13          MR. BRODERICK:  I can say I haven't
14   seen it either in a Plural production.
15          MR. POLANSKY:  No one is trying to
16   play hide the ball.  I want to know where that
17   language came from and why it hasn't been
18   produced by Plural.
19          THE WITNESS:  I guess that's where
20   I'm confused.  I provided it in the request.
21          MR. MARION:  I think I understand
22   the difference between what we're saying and
23   what Mr. Polansky is asking.  He's asking do
24   we have a snapshot of the Snappy Auto

Page 56

1    Insurance page TCPA disclosure that was
2    specifically viewed by Mr. Mantha when he went
3    to that site.  Is that what you're asking, Mr.
4    Polansky?
5          MR. BRODERICK:  And I'll object.
6          MR. POLANSKY:  Well, one, that was a
7    prior question.  I am asking for that, but I'm
8    also asking --
9          MR. MARION:  That would come in it.
10          MR. POLANSKY:  Mr. Marion, I'm also
11   asking for this language.  So my understanding
12   is that this TCPA consent language was
13   provided from Plural to RevPoint as part of
14   the ping post system.  I think everyone would
15   agree with that, right?
16 A  You're referring specifically to the language,
17   "By clicking finish," right?
18 Q  Yes, on Page 75 of Exhibit 1.  Okay?
19 A  Yes, I'm with you.
20 Q  So now, that language, that consent language
21   has never been produced by Plural in this
22   case, and I'm just asking if you can do so,
23   because that information was sold from Plural
24   to RevPoint.  So if RevPoint can produce it,

Page 57

1    Plural should be able to produce it.  That's
2    all I'm asking.  It doesn't seem that
3    complicated to me.
4 A  No, I guess the reason I'm not clear is
5    because I've already spoken to this earlier
6    that this language is effectively boilerplate
7    language that is identical, so it's -- when I
8    -- so when the transaction actually happened,
9    right, when my system spoke to -- you know,
10   Plural's servers spoke to Jangl servers, that
11   information was submitted directly to them.
12   So it's word for word the same.  And then what
13   you're asking for is you want a copy of the
14   same language produced from Plural?
15 Q  That's right, that was sold -- that was
16   produced -- that was sold from -- strike that.
17          I want the exact same language if
18   Plural provided it to RevPoint as part of
19   their ping post sale -- or exchange.
20 A  Okay, so the -- and I'm just trying to be
21   clear on what it is that we're asking for
22   here.  The original like technical request,
23   like the actual -- and I'm going to get
24   technical here -- the actual JSON request, the

15 (Pages 54 - 57)

Page 58

1    JavaScript request, that was produced from
2    Plural servers to Jangl servers at the time of
3    the transaction?  Is that what you're asking
4    for?
5  Q   Yes.
6  A   So the technical request?
7  Q   Let me break it down again, because I don't
8    see the confusion here.  If you're telling me
9    that this language was provided from Plural to
10    RevPoint as part of the exchange of
11    information where the networks are talking,
12    then you should be able to produce it to us.
13  A   Like in an email?
14  Q   Like any sort of data that you sold to
15    RevPoint should be able to be put into some
16    sort of document or if it's a spreadsheet.  I
17    don't know how you pull your information.  I'm
18    not familiar with your system.
19  A   Right.  It would look the same, I guess.
20    That's what I'm getting at.  So I can produce
21    -- so you're asking me to produce a
22    spreadsheet that has the same TCPA language
23    that RevPoint was sent, but you want it from
24    Plural's system, not from RevPoint's system?

Page 59

1  Q   Right.
2  A   That's what you're asking for?
3  Q   That's what I'm asking for, if it exists.
4  A   The TCPA language like column, specifically?
5  Q   Yes, but if you're going to pull it all, I
6    want to see you pull all the data that was
7    sold from Plural to RevPoint.  I don't -- I
8    have it from RevPoint.  I want to see it from
9    Plural.  Both Ted -- his client has subpoenaed
10    it.  We've now subpoenaed it.
11  A   I guess when I was originally asked for that,
12    like I produced literally a spreadsheet with
13    everything I had, but the language, the TCPA
14    language, specifically, that I'm looking at
15    here, because it's, you know, again, like
16    boilerplate, I guess I, you know, may not have
17    extracted that particular field is what I'm
18    getting at.  So if you want that field, again,
19    the text is going to be identically the same.
20    I just want to make that clear.
21  Q   I can take your word for it, but I want to see
22    the documentation to prove it.
23  A   Understood.
24        MR. MARION:  Do you have such a

Page 60

1    field?  If you do, provide it to me, and I can
2    provide it to Mr. Polansky.
3        THE WITNESS:  I'm happy to do that.
4  A   I'm sorry that it took so long to drag that
5    out.  I was just confused because it's -- and
6    I get it's a legal thing, and I understand,
7    you know, where you're coming from, but, you
8    know, from my perspective, if it's the same
9    exact language, I thought it was, I guess,
10    redundant.  But fine, yeah.  I mean, I'm happy
11    to send it to you in my Excel spreadsheet, and
12    then I'll send it to Roger, and Roger can
13    forward it off.
14  Q   That would be great.
15  A   My apologies for dragging that out
16    unnecessarily.  I just -- I wasn't --
17  Q   No worries.
18  A   I was confused about the -- I guess I was
19    confused about the redundancy, but I
20    understand.
21  Q   No, that's it.  We just want to know if
22    RevPoint received it from Plural, and it's the
23    same form that Plural provided.  That's all.
24  A   Sorry about that.

Page 61

1  Q   No, no worries.
2        MR. POLANSKY:  That's all I have.  I
3    turn you over to Ted.
4        MR. BRODERICK:  Do you need a break
5    or anything, or are you okay to keep going?
6        THE WITNESS:  No, I'm good.
7    Actually, I have to pick up my son in a little
8    while.
9        MR. BRODERICK:  I'll be as quick as
10    I can.
11        THE WITNESS:  Sorry about that.
12        MR. BRODERICK:  No problem.
13
14        CROSS EXAMINATION
15
16  BY MR. BRODERICK:
17  Q   I want to direct your attention to Page 26 of
18    the exhibits we've been looking at, Page 26 of
19    the 103 page pdf.
20  A   Yeah.  I've got it.
21  Q   And this is -- I think you said this is a
22    Skype conversation that you had with Jesse --
23    and I can't read his last name -- at RevPoint?
24  A   Yeah, Jesse.

16 (Pages 58 - 61)

Page 62

1  Q   And he's asking you for the TCPA, the lead --
2      information about Mr. Mantha's lead, correct?
3  A   Yes.
4  Q   And he says that it's a fraudulent lead ID
5      code passed on to them and to us, as well?
6  A   Yes, that's what he said.
7  Q   And did Fenix provide you with that lead ID
8      code?
9  A   I don't know. I'd have to -- you know, I
10     don't know. I can't say.
11 Q   And then I want you to scroll down a little
12     bit. There's a number of requests where he
13     asks you that he wants the TCPA info, and
14     there's a follow up on September 12. You say
15     you're "working on it," 4:31 p.m., "anything
16     here," and then is that you with the picture
17     where it says, "It's coming in the a.m."? Is
18     that your side of the conversation?
19 A   That is my side of the conversation, yeah.
20 Q   And you say, "I'm not working with them
21     anymore," and you have a smiley face emoji.
22     Was that true?
23 A   I mean, whenever a request comes up, I
24     typically will pause the relationship to, I

Page 63

1      guess, you know, prevent any potential other
2      issues.
3  Q   How long did you pause the relationship with
4      Fenix?
5  A   I don't recall.
6  Q   But you were working with them presently, you
7      testified, correct?
8  A   At this point again, yes.
9  Q   Do you have a rough estimate as to when you
10     started working with them again?
11 A   No, I don't. I don't remember how long. I
12     mean, it's again fairly common when you're in
13     the middle of a TCPA request that you'll just
14     kind of hit the pause button on the
15     relationship and reassess what's going on, and
16     then after the information is produced and the
17     information is relayed over to the buyer, then
18     you kind of restart the relationship. I don't
19     know or remember exactly how long we paused or
20     how long we stopped for or when we restarted.
21     But again, that's not unusual.
22 Q   Did you ever get an explanation from Fenix or
23     Dario Osmancevic for why the lead ID didn't
24     match the lead that you sold to RevPoint for

Page 64

1      Mr. Mantha?
2  A   No. I don't recall ever getting a straight
3      answer.
4  Q   But you were willing to keep working with him?
5  A   I did keep working with him. I wanted to, you
6      know, make sure that we resolved this and make
7      sure that we got all the information that we
8      were required to get for this particular
9      request, and he provided that to me. And, you
10     know, what he provided to me at the time
11     seemed satisfactory. So at some point maybe
12     in the coming days or a week later, I don't
13     remember exactly when, but we resumed our
14     relationship.
15 Q   Are you working with RevPoint any longer?
16 A   I am not.
17 Q   When did that relationship stop?
18 A   I don't recall exactly when.
19 Q   Was it shortly after you had to provide this
20     information?
21 A   I don't -- yeah, I don't recall.
22 Q   Do you know if you did any business with him
23     following this inquiry about the Mantha lead?
24 A   I'm not 100 percent sure, but I believe --

Page 65

1      yeah, you know what, I'm not sure. I don't
2      know.
3  Q   Did you ever have any phone conversations with
4      anyone at RevPoint about the Mantha lead?
5  A   I do believe Jesse called me to follow up.
6  Q   When was that?
7  A   I don't recall. It would have been around the
8      same time frame.
9  Q   Tell me everything you remember about that
10     conversation.
11 A   It's the same as the Skype. It would have
12     been around the same time frame, and he would
13     have asked if there was any additional
14     information that was available that we can --
15     that they can provide to the end buyer. And
16     that's basically it, but it would have been
17     the total conversation.
18 Q   Did he ask you why the lead ID was fraudulent?
19 A   No, we didn't discuss that, I don't think. I
20     mean, we were just trying to get as much
21     information as we could to relay it over.
22 Q   Did you tell RevPoint -- they were -- well,
23     prior to this inquiry, were they aware that
24     your lead -- "they," being RevPoint, aware

17 (Pages 62 - 65)

Page 66

1    that your lead for Mr. Mantha came from Fenix
2    in Bosnia?
3  A    Were they aware at the time, no.
4  Q    It was only after you said I'll find the lead
5    information that you got it from Fenix?
6  A    Right, yeah.  They would not have known about
7    Fenix at that point.
8  Q    I'll ask you to scroll down to Page 75.
9  A    Yes.
10  Q    That TCPA consent text -- I believe you've
11    answered this clearly enough, but this is your
12    boilerplate language.  You don't say that this
13    came from any website?
14  A    That's correct.  That's my standard
15    boilerplate.
16  Q    Have you ever done any audit of Fenix Media
17    Solutions' leads that they provided to you?
18  A    No.
19  Q    So are you entirely reliant on Fenix Media
20    Solutions for whether a lead is TCPA
21    compliant?
22        MR. POLANSKY:  Objection.
23        MR. MARION:  Objection to form.  You
24    can answer.

Page 67

1  A    I am.
2  Q    You said this is the information that's
3    typically provided when you request a TCPA
4    audit, which is your term?
5  A    Yeah.
6  Q    How many times have you had to request a TCPA
7    audit of Fenix?
8        MR. POLANSKY:  Objection.
9  A    I don't recall.
10  Q    Can you give me a ballpark?
11        MR. POLANSKY:  Objection.
12  A    Maybe three times, four times, I guess.  I
13    have to make a guess.
14  Q    Did you have any -- prior to this Mantha lead
15    inquiry, did you have any direct communication
16    with anyone at QuoteWizard?
17  A    No.
18  Q    Your contact would have solely been RevPoint,
19    correct?
20  A    That's correct.
21  Q    Can we go back to Page 29 of the 103 page pdf?
22  A    Yes.
23  Q    Page 29, is that a continuation of the Skype
24    chat with Jesse at RevPoint?

Page 68

1  A    I don't know.  It was in October.  So it's
2    possible, but I don't know for sure.
3  Q    And the question put to you is, "Hey, George,
4    quick question about the last auto TCPA
5    request.  Do we know whether lead was able to
6    get through the third party's site without
7    confirming consent?"  And your response is,
8    "? Not sure," and it looks like a smiley face
9    emoji.  Why was that your response, because
10    you don't know what Fenix -- where Fenix got
11    the lead?
12        MR. MARION:  Objection.
13        MR. POLANSKY:  Objection to form.
14  A    Yeah, I just wanted to make something -- I
15    just wanted to point something out.  That's
16    not actually a smiley face emoji.
17  Q    What is it?
18  A    I didn't actually like put a smiley face.
19    Like that's just a feature of Skype that you
20    can add an emoji to an existing response.  It
21    wasn't like I'm saying "not sure," smiley
22    face.  I just said "not sure," and then I can
23    add an emoji to that.  That's the icon that
24    you would click to add an emoji.  I didn't

Page 69

1    typically send Jesse smiley face emojis trying
2    to, you know, process a TCPA request.
3  Q    So did you add that emoji, or did Jesse?
4  A    No, neither one of us added it.  I guess my
5    point is that it's a Skype feature that's
6    attached to every message.  Does that make
7    sense?
8  Q    So every time you send a Skype response,
9    there's an emoji, a smiley --
10  A    Right, yeah, and then you can optionally -- I
11    can or he can optionally add an emoji to a
12    response.  I guess that's what I'm trying to
13    say.  I guess my point is I'm not trying to
14    make light of it.  I didn't actually add a
15    smiley emoji, you know, to my "not sure."  I
16    would -- you know, I mean, I would say that if
17    I knew, I would have responded, but I wasn't
18    sure what -- you know, at that point, I wasn't
19    sure yet, so I said "not sure."
20  Q    Do you know anything about the Snappy Auto
21    Insurance website and how one would progress
22    through there, through that website?
23  A    No.
24  Q    And you have no explanation for why the IP

18 (Pages 66 - 69)

Page 70

1  addresses associated with the Mantha lead
2  don't match Mr. Mantha's IP address; is that
3  correct?
4  A    That's correct.
5          MR. MARION:  Objection to form.
6  Q   And you've never looked into why those IP
7  addresses don't match?
8  A    I have not.
9          MR. BRODERICK:  I don't think I have
10  any further questions.  Thank you.
11          MR. MARION:  I have no questions.
12          MR. POLANSKY:  I have no further
13  questions.  Thank you very much, Mr. Rios.
14          THE VIDEOGRAPHER:  Standby.  Going
15  off the record 12:08 p.m.  This concludes
16  today's testimony given by George Rios.
17  There's one media unit.  It will be retained
18  by Veritext.  We are off the video.
19          THE COURT REPORTER:  Attorney
20  Broderick, are you getting a copy of the
21  transcript?
22          MR. BRODERICK:  Yes, please.
23          THE COURT REPORTER:  Attorney
24  Marion, are you getting a copy of the

Page 71

1  transcript?
2          MR. MARION:  I believe that would be
3  wise, yes.
4          (Whereupon, the deposition in the
5  above-entitled matter was concluded at 12:08
6  p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 72

1      E R R A T A   S H E E T
2
3  Mantha v Quotewizard.com, LLC
4  Deposition of Plural Marketing Solutions
5  by George Rios
6
7  Re:  LINE    CORRECTION    REASON
8
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____

Page 73

1
2
3
4          I, George Rios, do hereby
5  certify that I have read the foregoing
6  transcript of my testimony given in the
7  aforementioned matter, and further certify
8  that said transcript is a true, accurate and
9  complete record of said testimony.
10
11          Signed under the pains and
12  penalties of perjury this          day
13  of              , 2021.
14
15
16
17                  George Rios
18
19
20
21
22
23
24

19 (Pages 70 - 73)

Page 74

```
 1            C E R T I F I C A T E
 2  COMMONWEALTH OF MASSACHUSETTS
 3  COUNTY OF NORFOLK, SS
 4      I, Arlene R. Boyer, a Professional Court
 5  Reporter and Notary Public in and for the
 6  Commonwealth of Massachusetts, do hereby certify
 7  that the foregoing deposition of Plural Marketing
 8  Solutions by George Rios, was taken before me on
 9  January 4, 2021.  The said witness was
10  satisfactorily identified and duly sworn before the
11  commencement of his testimony; that the said
12  testimony was taken audiographically by myself and
13  then transcribed under my direction.  To the best
14  of my knowledge, the within transcript is a
15  complete, true and accurate record of said
16  deposition.
17      I am not connected by blood or marriage with
18  any of the said parties, nor interested directly or
19  indirectly in the matter in controversy.
20      In witness whereof, I have hereunto set my
21  hand this ____ day of _____, 2021.
22
23
            Arlene R. Boyer, Notary Public
24          Commission Expires: Nov. 21, 2025
```