UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH MANTHA, *on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>QUOTEWIZARD.COM, LLC,<br><br>Defendant. | Civil Action No. 1:19-cv-12235-LTS |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE**

Defendant QuoteWizard.com, LLC ("QuoteWizard") submits its Opposition to Plaintiff Joseph Mantha's ("Mantha") Motion to Strike [ECF No. 219] the exhibit at ECF No. 208, Ex. 16.

**FACTUAL BACKGROUND**

As Mantha's motion contains multiple untrue or misleading characterizations of the evidence, QuoteWizard briefly addresses the discovery background in this case and the evidence at issue.

As set forth in QuoteWizard's summary judgment papers, QuoteWizard purchased Mantha's lead (together with his personal information and a contractual promise that he provided TCPA-compliant consent) and request for an auto insurance quote from RevPoint Media, LLC ("RevPoint"). RevPoint in turn purchased the lead from Plural Marketing Solutions, Inc. ("Plural"). *See* ECF No. 204, ¶¶ 95, 101. Plural was deposed, twice, via an authorized representative named George Rios, and also produced documents in response to a subpoena in this case. *See* ECF No. 208, Ex. 15, Ex. 16; *see also* ECF No. 224, Ex. AA, Ex. EE.

Rios testified that Plural had in turn purchased Mantha's lead from a company named Fenix Media ("Fenix") based out of Bosnia. *See* ECF No. 208, Ex. 15, pp. 9-10. He testified that Plural and Fenix had a contract that required Fenix Media to only sell it leads with valid consent. *Id*., p. 72:16-25. Rios explained that Fenix provided to Plural information that Mantha had signed up on www.snappyautoinsurance.com (the "Website") and consented to receive information about an auto insurance quote. *See also id*., pp. 9-10 ("The recording that was provided to me by [F]enix was Mr. Mantha's contact information along with some auto insurance information indicating that he was interested in an auto insurance quote at that time. Q Did the record that you received from [F]enix Media Solutions indicate that he had opted in to receive this information on a website? A It did. Q What website? A SnappyAutoInsurance. Q Did you produce that record in response to a subpoena issued to Plural in this case? A I did."). Plural produced that information in this litigation. *See id*.

Rios further explained that Dario Osmancevic of Fenix e-mailed Rios stating that Osmancevic was the webmaster of the site and "guarantee[d]" that Mantha did in fact sign up and provide consent there. *See* ECF No. 208, Ex. 16. *See also* ECF No. 224, Ex. EE, pp. 38-41 (Rios discusses Osmancevic e-mails). Plural, through Rios, produced the aforementioned Osmancevic e-mails in response to a subpoena in this case and also testified concerning the e-mails (thereby authenticating them) during Rios' deposition. *See* ECF No. 224, Ex. EE, pp. 38-41. Rios testified that he believes that Mantha consented based on the information provided to him by Fenix through Osmancevic. *See* ECF No. 208, Ex. 15, p. 9:5-19 ("Q Do you have any knowledge as to whether Mr. Mantha consented to receive text solicitations from Quotewizard? A My understanding is that he did. Q And what do you base that on? A I don't send any text messages or anything, but the record that we received did indicate that there was an opt-in consent. Q And from whom did you receive that record? 15 A From one of my partners. Q

Which partner did you receive it from? A From a firm called [F]enix Media Solutions."). *See also id*., p. 56:2-7 ("I received the consent information from [F]enix, and in the consent information it does indicate that [Mantha] did provide consent[].").

The Osmancevic e-mails were produced by Plural, through their counsel, on August 13, 2020. *See* Exhibit 1 – *August 13, 2020 E-mail Serving Plural's Responsive Documents*. Among other documents also produced by Plural's counsel at that time was the subject contract between Fenix and Plural. *See* Exhibit 2 – *Fenix and Plural Contract*. The contract further confirmed Rios' testimony that the contract required Fenix to sell to Plural only TCPA-compliant leads, as well as provide proof of consent for the leads when requested. *See* Ex. 2, pp. 1, 6-7.

Although Adam Brown was the owner of the domain for the Website through 2020 and testified that he was not actively running it, he essentially conceded that it was possible that someone else was using it at that time. When Brown was shown the aforementioned Osmancevic e-mails at his deposition, he testified under oath that Osmancevic is "obviously responsible" for the Website. *See* ECF No. 210, Exhibit 17, pp. 21-24 (Brown sold auto insurance network and stopped using Website in 2015); *id*., pp. 112-13 (testifying that Dario Osmancevic, who had identified himself as webmaster of Website, was "obviously responsible for the site"); *id*., p. 113:5-10 (answering "I can't answer that" when asked "would it be possible that someone could be running this website without your knowledge?").

## ARGUMENT & AUTHORITIES

### A. The Court Should Disregard Mantha's Inaccurate Representations

In Section B *infra*, QuoteWizard addresses the admissibility of the Osmancevic e-mails in the summary judgment record based on the facts at hand. But as an initial matter, Mantha has misrepresented numerous factual/procedural background matters that may affect this Court's resolution of this legal issue. QuoteWizard first addresses these misrepresentations.

Mantha states that the Osmancevic e-mails were "purportedly" sent to Rios by Osmancevic (*see* ECF No. 219, p. 1), but this is not an accurate characterization. Rios testified under oath that Osmancevic sent him the e-mails contained at Exhibit 16 to ECF No. 208, therefore the matter is not "purported" but undisputed based on sworn, admissible evidence. *See* ECF No. 208, Ex. 15, pp. 12-13 (Rios testified that, when RevPoint reached out to him for consent information, he reached out to Fenix Media by e-mail, and Fenix Media provided consent information by e-mail); *id*., pp. 14-15; ECF No. 224, Ex. EE, pp. 38-41 (Rio discusses content of Osmancevic e-mails).[1]

Second, Mantha suggests that the Osmancevic e-mails were created or "compiled" by QuoteWizard in anticipation or in response to litigation: "The emails … were created after this litigation was filed as part of an after-the-fact effort by QuoteWizard to compile evidence of Mr. Mantha's prior express written consent[.]" ECF No. 219, p. 4. This is false. Rios unequivocally testified that, in order to respond to RevPoint's request for consent information, he reached out to Fenix/Dario Osmancevic, received further (pre-existing) consent information for Mantha's lead via e-mail, and then sent that information to RevPoint. *See* ECF No. 208, Ex. 15, pp. 9-13, 14-15, 18:10-22, 65-66; ECF No. 224, Ex. EE, pp. 38-41. QuoteWizard had no role in that process by and between Fenix, Plural, and RevPoint.

Moreover, the Osmancevic e-mails were produced by Plural, through their counsel, on August 13, 2020. *See* Ex. 1. Mantha does not appear to challenge the authenticity of the documents as produced by Plural's counsel in this case.

---

[1] The existence of the Osmancevic e-mails were first disclosed by Plural/Rios at its initial deposition date but had not been provided in discovery at that point. After Plural's counsel produced copies in discovery in response to a subpoena (*see* Ex. 1), Plural, through Rios, was then re-deposed. *See* ECF No. 208, Ex. 15 (initial deposition transcript); *id.*, Ex. 16 (copies of Osmancevic e-mails); Ex. 1 (serving e-mails); *see also* ECF No. 224, Ex. EE (second deposition transcript).

Mantha also represents that the e-mails were all sent after this lawsuit was filed, but the initial e-mail that identifies the Website as the source of Mantha's lead is dated before this lawsuit was filed in October 2019. *See* ECF No. 208, Ex. 16 (Sep. 11, 2019 E-mail).[2]

### B. Exhibit 16 is Admissible in the Summary Judgment Record and Should Not be Stricken

As an initial matter, Mantha claims that QuoteWizard seeks to use Exhibit 16 for the purported truth of the matters therein in support of its summary judgment motion, but fails to point to anything in the record that supports this claim.

There is no reference in QuoteWizard's memorandum of law in support of its summary judgment motion to the Osmancevic e-mails, much less urging the Court to accept them for the truth of the matters asserted therein. *See generally* ECF No. 202. The only reference in QuoteWizard's LR 56.1 statement of facts to the Osmancevic e-mails merely notes that Osmancevic told Plural in the e-mails that he was the webmaster. *See* ECF No. 204, ¶ 109. The e-mails were provided for necessary context, and to illustrate Rios' testimony under oath that he believes Mantha consented—in reliance on Fenix Media's records.

Thus, in the first instance, Mantha cannot establish the core premise of his motion to strike, namely, that QuoteWizard seeks to use Exhibit 16 for an improper purpose somewhere in or in support of its summary judgment papers. This is simply not true. His motion fails for this reason alone.

Exhibit 16 is relevant and admissible in the summary judgment record for many purposes that do not constitute hearsay, including but not limited to:

(1) Providing necessary context for the background of Mantha's lead;

---

[2] Mantha also refers to Fenix Media as a "data broker," but is unclear what that means and what such label/characterization is based on.

(2) Rebutting Mantha's unsupported, false theory that QuoteWizard "created" "sham" or "fraudulent" proof of Mantha's consent to defend this lawsuit, whereby in reality there is a pre-existing digital trail of records for Mantha's lead and consent from Fenix Media, to Plural, to RevPoint, and then to QuoteWizard;[3]

(3) Rebutting Mantha's theory that the Website could not possibly have been operational/live in 2019 when Mantha's lead was generated because Adam Brown was no longer actively using it, given that Osmancevic claims to have a connection to the Website (whether or not he is the "webmaster" as he claims);

(4) Providing necessary background and context for Rios' testimony that he believes Mantha consented based on the information provided to him by Fenix and Osmancevic.

As the e-mails are proffered on these grounds, none of which constitute hearsay, Mantha's motion should be denied.

Furthermore, even *if* QuoteWizard had advanced the Osmancevic e-mails for the truth of the matters therein (that Osmancevic is the webmaster of the Website and he guarantees Mantha signed up there), the Court could still find the Osmancevic e-mails admissible for this purpose under the residual exception. Federal Rule of Evidence 807 provides:

> Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804: (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

The policy considerations underlying the residual exception are:

---

[3] Mantha has advanced this theory that QuoteWizard "created" "sham" or "fraudulent" proof of consent after-the-fact in his cross-motion for summary judgment and other papers he has filed. *See* ECF No. 206, p. 8 n.5 ("QuoteWizard's consent claim is a sham."); ECF No. 27-2 ("This consent claim is a fraud."). Originally, Mantha claimed that QuoteWizard had created proof of consent out of thin air. However, as noted in the summary judgment record, Plural and RevPoint were deposed and confirmed under oath that they each bought and sold the Mantha lead with the same proof of consent later provided to and relied upon by QuoteWizard. The Osmancevic e-mails also show another link of chain, *i.e.*, from where Plural purchased Mantha's lead. All of this evidence, including the e-mails, rebut Mantha's false narrative that QuoteWizard created the proof of consent. In truth, it already existed well before Mantha challenged the text messages.

1. To provide sufficient flexibility to permit the courts to deal with new and unanticipated situations.

2. To preserve the integrity of the specifically enumerated exceptions.

3. To facilitate the basic purpose of the Federal Rules of Evidence: truth ascertainment and fair adjudication of controversies.

*United States v. Sposito*, 106 F.3d 1042, 1048 (1st Cir. 1997) (quotation and citation omitted).

Here, it would be appropriate for the Court to consider the truth of the Osmancevic e-mails, to the extent necessary in resolving or addressing the issue of Mantha's disputed consent (an issue not briefed in QuoteWizard's Motion for Summary Judgment but only in Mantha's cross-motion and QuoteWizard's Opposition thereto). As to the first factor, trustworthiness, the Court can take note of the fact that: (1) Fenix/Osmancevic was under a contractual guarantee to sell Plural only TCPA-compliant leads and provide the necessary documentation of consent in the event of a dispute (*see* ECF No. 208, Ex. 15, p. 72:16-25; *see also* Ex. 2), meaning that the Court would have to accept/assume that Fenix materially breached its contractual obligations to Plural if the evidence is labeled not trustworthy; (2) Plural believed that Mantha consented based on the information provided to it by Fenix/Osmancevic and made that representation under oath (*see* ECF No. 208, Ex. 15, pp. 9-10); and (3) Osmancevic knew or should have known that the e-mails would become evidence in this case or that Fenix/Osmancevic would become material witnesses to the case (therefore refuting any suggestion that Osmancevic would freely lie about Mantha's lead).

Moreover, the Osmancevic e-mails are corroborated at least indirectly by other evidence in the record. For example, Adam Brown testified under oath, when shown the Osmancevic e-mails, that Osmancevic is "obviously responsible" for the Website. Records and testimony establish that the Website was operational and live through 2019 and 2020; that some Website files were modified in 2019 and 2020; and that Brown's business partner was paying for services

for the Website in 2017 (despite Brown saying he did not run the website since approximately 2015).  *See* ECF No. 224, Ex. CC and Ex. DD; *see also* ECF No. 210, Ex. 17, pp. 112-13.  Such evidence rebuts Mantha's claim that the Website was essentially dead because Brown himself was not running it.  In light of all of this evidence, there are sufficient indicia of reliability to allow admission of the Osmancevic e-mails for the truth of the matters asserted therein at the summary judgement stage on the issue of consent.

In addition, the Osmancevic e-mails are the most probative evidence of who was running the Website at the time of the disputed consent or at least that the Website *was* being run by someone.  Brown testified that he had no knowledge of who if anyone was running it after he stopped actively running it in 2015.  *See Se* ECF No. 210, Exhibit 17, pp. 21-24; *id*., pp. 112-13; *id*., p. 113:5-10.  George Rios testified to no personal knowledge of the same beyond what Osmancevic stated in the challenged e-mails.  Therefore, the second factor under Rule 807 is satisfied.

More broadly, the policy reasons behind the residual exception would be best served by inclusion of the Osmancevic e-mails for the truth at the summary judgment stage.  It is Mantha who urges the Court not to take at face value the content of e-mails produced in discovery during this case in response to a subpoena.  It is Mantha who questions the truthfulness of the content of the Osmancevic e-mails.  Yet Mantha did not endeavor to take any discovery of Osmancevic or Fenix.  To the extent Mantha disbelieved the evidence produced in discovery by Plural, which his attorneys were able to probe in the Plural depositions, then he should have pursued discovery of Fenix and Osmancevic.  It would be unfair for Mantha to seek to undermine the evidence at this stage by pointing to a lack of formal discovery of Fenix and Osmancevic that he could have equally taken.

Furthermore, at this stage of the litigation, it is appropriate to recognize that international pre-trial discovery would have been costly and time-consuming, if not impossible.[4] In the event this case were to reach trial, the Court could revisit the admissibility of the Osmancevic e-mails at that time or direct/encourage the Parties to pursue formal discovery or seek to obtain Osmancevic's attendance at the trial in this matter. But where Mantha seeks at this stage only statutory damages of $500 per alleged violation (trebled) in relation to one remaining claim, it is unreasonable to expect the Parties to conduct an international scavenger hunt to probe behind the Osmancevic e-mails. Should that discovery become appropriate and necessary, it is best saved for a later stage of the case (if the case survives) where time would allow for it. In short, this presents exactly the type of situation where Rule 807 confers flexibility for the Court to employ.

Therefore, similar to other cases in this Circuit, and to the extent necessary in resolution or consideration of the disputed issue of consent, the Court should find admissible the Osmancevic e-mails for the truth of the matters therein at the summary judgment stage; the Court can revisit the matter if the case proceeds to trial. *See*, *e.g.*, *Aoki Tech. Labs. v. FMT Corp.*, 1999

---

[4] Mantha attempts to undermine the Osmancevic e-mails by suggesting that, because no direct discovery of Fenix/Osmancevic was taken, the e-mails are not reliable or should not be taken at face value. This is not a fair inference or argument. First, Mantha incorrectly suggests that QuoteWizard could simply issue a subpoena to depose Osmancevic (*see* ECF No. 219, p. 2). However, Fenix and Osmancevic are located in Bosnia, outside the jurisdiction of this Court and all United States courts. Although Bosnia is a member of the Hague Convention, most countries do not allow pre-trial discovery and the process is lengthy and costly, if pre-trial discovery is to be had at all. In light of these factors, there can be no fair inference drawn from the fact that neither party so far has sought to obtain discovery under this complicated procedure, although QuoteWizard reserves the right to do so should it be needed.

Moreover, although Mantha contends that it is QuoteWizard's burden to prove consent, he ignores that this is a putative class case in which he would have to prove some type of common factor or fact pattern. If he believes his consent was *fraudulently entered*, as he has alleged, which if true would make his consent an outlier given that QuoteWizard requires valid consent for all consumers contacted, then he will need to identify what the alleged common factor was—such as a bad actor feeding fraudulent consents to QuoteWizard that includes his lead. He cannot rely on an inference that Osmancevic/Fenix may be that bad actor then not seek discovery of them. This will not be enough at the class stage if the case reaches it. Thus, Mantha's "fraudulent consent" theory is, at this stage, just that—a theory with no supporting evidence. And as relevant here, he has no evidence to prove that the Osmancevic e-mails should not be considered trustworthy at the summary judgment stage.

U.S. Dist. LEXIS 22712, at *7 (D.N.H. February 2, 1999) (permitting use of declaration for truth of matters under Rule 807 at summary judgment; "[t]his ruling will not affect whether the declaration would be admissible, if offered, in other contexts such as at trial.").

As a final matter, QuoteWizard notes that, even if the Court refuses to consider the Osmancevic e-mails for the truth of the matters asserted therein, this is not a material determination to the disputed issue of consent. Given the other evidence in the record that the Website *was* live and operational in 2019 as discussed *supra*, at this juncture of the case it is immaterial who was running the Website; that person's identity is not relevant or dispositive to the issue of consent. In other words, QuoteWizard has presented sufficient evidence of consent to survive Mantha's partial motion for summary judgment regardless of who was operating the Website in 2019.

## CONCLUSION

The Osmancevic e-mails were not offered by QuoteWizard pursuant to its Motion for Summary Judgment for the truth of the matters asserted therein. Even if taken for that purpose, this Court should deem them admissible under Rule 807. Finally, whether or not the e-mails are considered for the truth of the matters therein, there are sufficient disputed, material facts on the issue of Mantha's consent such that his partial cross-motion for summary judgment on that issue should not be granted.

[*Signatures on Next Page*]

|  | Respectfully submitted, |
|---|---|
|  | QuoteWizard.com, LLC,<br>By its attorneys, |
|  | */s/ Kevin P. Polansky*<br>Kevin P. Polansky (BBO #667229)<br>kevin.polansky@nelsonmullins.com<br>Christine M. Kingston (BBO #682962)<br>christine.kingston@nelsonmullins.com<br>Nelson Mullins Riley & Scarborough LLP<br>One Financial Center, Suite 3500<br>Boston, MA 02111<br>(t) (617)-217-4700 |
| Dated: August 18, 2021 | (f) (617) 217-4710 |

CERTIFICATE OF SERVICE

I, Kevin P. Polansky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: August 18, 2021                                                                                 */s/ Kevin P. Polansky*