# EXHIBIT 2

# PMS INSERTION ORDER

| | | | |
|---|---|---|---|
| Contact Information | Plural Marketing Solutions, Inc.<br>aka UnitedQuotes.com  c/o<br>George Rios<br>275 Route 10E Suite 220-105 Succasunna, NJ 07876<br>201.232.▮▮▮▮ (cell) 201.624.▮▮▮▮ (fax)<br>george@unitedquotes.com | george@plmrkg.com | | |
| Effective Date | 3/15/2018 | | |
| Seller Name | Fenix Media Solutions | | |
| Seller Main Contact | Sanjin Dario Osmancevic | Buyer Main Contact | George Rios |
| E-Mail Address | ceo@fenixmeda.com | Buyer E-Mail Address | george@plmrkg.com |
| Seller Business Address | Trg Krajine 3<br>City : Banja Luka<br>State : RS<br>ZIP : 78000<br>Bosnia and Herzegovina | Buyer Business Address | 275 RT10E STE 220-105 / Succasunna NJ 07876 |
| Leads/Call Transfers | Web Leads | | |
| Caps | None | | |
| Advertisers | Any | | |
| Products and Services | All insurance verticals, home improvement, solar, finance | | |
| Customers | NA | | |
| Transfer Numbers | NA | | |
| Price | Dynamic ping/post | Pre-Payment: | NA |
| Term | Indefinite. All leads provided must have full TCPA | | |
| Campaign Specifics: | TCPA reports must be provided within 24 hrs with no fees or exceptions. | | |

|  | ADDTL TERMS<br><br>Returns Due: 10th of the month<br>Incentivized: NO<br>Exclusive:  YES |
|---|---|
| Notes: FOR PDL vertical, payout on redirect only. TF/ULID | |

This Insertion Order incorporates the following terms and conditions set forth in <u>Schedule A</u>, which is attached hereto and incorporated herein (collectively, this "<u>Agreement</u>").  This IO may be executed in counterparts (which may be exchanged by facsimile or PDF), each of which will be deemed an original, but all of which together will constitute the same instrument.

                                    BUYER                                              SELLER

*[signature: Rios]*                                        *[signature: Osmancevic]*

                           By: __                                          _____
 By: _____
                                                            Print Name:__Sanjin Dario Osmancevic__
 Print Name:  George Rios_____
                                                            Title: __ _____Owner/CEO_____
 Title:  Owner/Founder/CEO_____

 Date: __March 15, 2018_____

SCHEDULE A – TERMS AND CONDITIONS

DEFINITIONS. The definitions for some of the defined terms used in this Agreement are set forth below. The definitions for other defined terms are set forth elsewhere in this Agreement.

1. "Advertiser" means an advertising partner of PMS (Plural Marketing Solutions aka UnitedQuotes.com).
2. "Affiliate" means, with respect to any entity, any other entity that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such entity. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise.
3. "Applicable Laws" means all applicable international, national, state, and federal laws, rules, and regulations, including, without limitation, the Gramm-Leach Bliley Act, the Fair Credit Reporting Act, the Federal Trade Commission Act, the CAN-SPAM Act of 2003, as amended, the Telephone Consumer Protection Act, the Fair Debt Collection Practices Act, the Federal Communications Act, the Amended Telemarketing Sale Rule, 16 CFR 310 et seq., and those governing the National Do Not Call Registry.
4. "Call Transfer" means the transfer of a Phone Call Request to PMS.
5. "Confidential Information" means the terms of this Agreement and any non-public information or material regarding a Party's legal or business affairs, financing, customers, properties, pricing, or data. Notwithstanding any of the foregoing, Confidential Information does not include information which: (i) is or becomes public knowledge without any action by, or involvement of, the party to which the Confidential Information is disclosed (the "Receiving Party"); (ii) is documented as being known to the Receiving Party prior to its disclosure by the other party (the "Disclosing Party"); (iii) is independently developed by the Receiving Party without reference or access to the Confidential Information of the Disclosing Party and is so documented; or (iv) is obtained by the Receiving Party without restrictions on use or disclosure from a third party.
6. "Customer" means a prospective customer of an Advertiser who has initiated a Phone Call Request and who has provided affirmative consent to receive e-mail advertising messages and/or other marketing communications.
7. "Duplicate Deliverable" means a Lead and/or a Call Transfer, as applicable, submitted by or on behalf of Seller that reproduces all or substantially of the uniquely identifying data of a Customer whose information was previously submitted to PMS by or on behalf of Seller and for which PMS has paid, or accrued an obligation to pay, Seller.
8. "Expired Lead" means any Lead submitted to PMS more than one (1) minute after the subject Phone Call Request was submitted by the applicable Customer.
9. "Fraudulent Deliverable" means a Lead and/or Call Transfer, as applicable, submitted by or on behalf of Seller that is the product of incentivized marketing, fraud, or manipulation of information on the part of Seller.
10. "Invalid Deliverable" means a Lead and/or Call Transfer, as applicable,

submitted by or on behalf of Seller that: (i) does not contain all of the information required as set forth in the IO; or (ii) is not based on a valid Phone Call Request.

11. "<u>Leads</u>" means the leads to be delivered to PMS pursuant to the IO.

12. "<u>Phone Call Request</u>" means an indication from a Customer to receive a telephone call from PMS or Advertiser or a phone call from a Customer, in either case with respect to specific products and/or services set forth in the IO.

13. "<u>Platform</u>" means Seller's designated proprietary technological platform.

14. "<u>PMS Content</u>" means any data or other materials that PMS makes available to Seller pursuant to this Agreement, including, without limitation, the trade names, trademarks, language to be included in phone call request prompts, and creative to be used by Seller and/or its agents and suppliers in connection with generating Phone Call Requests.

15. "<u>Transfer Number</u>" means the number to which Seller shall send a Call Transfer, as set forth in the IO.

16. "<u>Valid Call Transfer</u>" means a Call Transfer that is not a Duplicate Deliverable, Invalid Deliverable, or Fraudulent Deliverable.

17. "<u>Valid Lead</u>" means a Lead submitted by or on behalf of Seller based on a valid Phone Call Request that contains valid and complete information submitted by a Customer and is not an Expired Lead, Duplicate Deliverable, Invalid Deliverable, or Fraudulent Deliverable.

2. <u>PROVISION OF LEADS AND CALL TRANSFERS</u>.  Seller shall generate (or procure from a thirdparty supplier) and deliver to PMS the Leads and/or Call Transfers as set forth in the IO.  Where a Customer submits a Phone Call Request with Seller and/or its agents and suppliers, and such Customer then provides the requisite Lead information in connection with such Customer's Phone Call Request, Seller shall: (i) provide such Lead to PMS via in the format determined by PMS; and (ii) where requested in the IO, execute a Call Transfer via a live call transfer by and through the Platform.  Seller shall not submit any Expired Leads to PMS.  Seller shall not use any incentivized marketing or establish, or cause to be established, any promotion that provides any sweepstakes entries, rewards, points, or other compensation to be earned in connection with generating Leads, associated Phone Call Requests, and/or Call Transfers, nor create the appearance of incentivized marketing or otherwise attempt to induce Customers to make Phone Call Requests and/or provide Lead-related information through use of any other incentives.

3. <u>PURCHASER CONTENT</u>.  PMS shall provide Seller with all PMS Content.  No other creative may be used by Seller, its agents, or its suppliers without first obtaining the prior express written permission of PMS.  In the event that PMS desires to cancel the use of any PMS Content, Seller shall cease the use of same no more than twenty-four (24) hours following PMS's written request.  The Parties understand and agree that as between the Parties, PMS is the sole owner of any and all intellectual property rights associated with the PMS Content.

4. <u>REJECTION OF LEADS OR CALL TRANSFERS</u>. Seller must, upon the request of PMS, produce the name, date, time, IP address, and referral URL where the applicable Consumers submitted the Phone Call Request and associated Lead data, as well as the telephone call associated with the Call Transfer.  Where PMS suspects that a Lead and/or Call Transfer, as applicable, submitted by Seller is an Invalid Deliverable, PMS shall notify Seller thereof within thirty (30) business days of PMS's receipt of such Lead and/or Call Transfer; <u>provided, however</u>, that PMS shall not lose its dispute rights where Seller has committed fraud or otherwise acted to conceal the defective

nature of applicable Invalid Deliverables.  If Seller receives notice of an Invalid Deliverable from PMS within such thirty (30) business day period, the Parties shall investigate such Lead and/or Call Transfer, as applicable, and seek to resolve the matter in good faith within ten (10) business days of Seller's receipt of notice thereof.  If the Parties acting together in good faith determine that such Lead and/or Call Transfer was a Valid Lead or Valid Call Transfer, as applicable, then no further action shall be taken. If the investigation reveals that the Lead and/or Call Transfer was an Invalid Deliverable, Seller shall credit PMS's account for the amount of the subject Invalid Deliverable where PMS has already paid for it or, in the alternative, PMS's payment obligations shall be excused with respect to such Invalid Deliverable where PMS has not yet made payment.  Where the Parties cannot agree, PMS's good faith determination shall control in all respects.

5. OWNERSHIP/EXCLUSIVITY.  Following delivery, PMS shall have sole and exclusive ownership of any and all Leads, Phone Call Requests, and/or Call Transfers. Seller shall not: (i) transfer, license, rent, sell, or otherwise distribute any such Leads, Phone Call Requests, and/or Call Transfers to any third party; or (ii) use such Leads, Phone Call Requests, and/or Call Transfers on its own behalf in any manner whatsoever without obtaining the express prior written consent of PMS.

6. FEES AND PAYMENT.  Unless otherwise set forth in the IO, PMS shall pay Seller all undisputed sums due under the IO within thirty (30) days of receiving Seller's invoice.  All payments will be charged and made in U.S. dollars.

7. TERM AND TERMINATION.

    1. Term.  The term of this Agreement begins on the Effective Date and will continue for the term set forth in the IO (the "Term").

    2. Termination.  This Agreement may be terminated only as follows: (i) in the event of a material breach of this Agreement by a Party, the other Party may terminate this Agreement by giving ten (10) days prior, written notice to the breaching Party; provided, however, that this Agreement will not terminate if the breaching Party has cured the breach before the expiration of such ten (10) day period; (ii) this Agreement is terminable immediately without notice by a Party if the other Party: (a) voluntarily institutes insolvency, receivership, or bankruptcy proceedings; (b) is involuntarily made subject to any bankruptcy or insolvency proceeding and such proceeding is not dismissed within sixty (60) days of the filing of such proceeding; (c) makes an assignment for the benefit of creditors; or (d) undergoes any dissolution or cessation of business; and (iii) either Party may terminate this Agreement for any reason or no reason by giving two (2) days prior, written notice to the other Party.

    3. Effect of Expiration or Termination.  Upon expiration or termination of this Agreement: (i) PMS shall pay Seller for all undisputed amounts due and payable hereunder as of the effective date of termination or expiration; (ii) all rights granted hereunder will immediately cease; and (iii) each Party shall either return to the other Party (or, at such other Party's instruction, destroy and provide such other Party with written certification of the destruction of) all documents, computer files, and other materials containing any of such other party's Confidential Information that are in its possession or control.

    4. Survival.  The following provisions will survive expiration or termination of this Agreement:  Section 1 ("Definitions"), Section 5 ("Ownership/Exclusivity"), Section 7.3 ("Effect of Expiration or Termination"), Section 8 ("Confidentiality"), Section 9.3 ("Disclaimer"), Section 10 ("Limitation of Liability"), Section 11 ("Indemnification"), Section 12 ("General Provisions"),  and this Section 7.4 ("Survival").

8. CONFIDENTIALITY.

1. <u>Use and Disclosure of Confidential Information</u>.  The Receiving Party will, with respect to any Confidential Information of the Disclosing Party: (i) use such Confidential Information only in connection with the Receiving Party's performance of its obligations and exercise of its rights under this Agreement; (ii) subject to <u>Section 8.4</u> below, restrict disclosure of such Confidential Information within the Receiving Party's organization to only those employees and consultants of the Receiving Party who have a need to know such Confidential Information in connection with the Receiving Party's performance of this Agreement; and (iii) except as expressly contemplated under the preceding clause (ii), not disclose such Confidential Information to any third party unless authorized in writing by the Disclosing Party to do so; <u>provided</u>, <u>however</u>, that the Parties may disclose the terms of this Agreement if such disclosure is in connection with any audit, financing transaction, or due diligence inquiry provided the recipients are subject to obligations of confidentiality at least as restrictive as those contained herein.

2. <u>Protection of Confidential Information</u>.  The Receiving Party will protect the confidentiality of any Confidential Information disclosed by the Disclosing Party using at least the degree of care that it uses to protect its own confidential information (but no less than a reasonable degree of care).

3. <u>Compliance by Personnel</u>.  The Receiving Party will, prior to providing any employee or consultant access to any Confidential Information of the Disclosing Party, inform such employee or consultant of the confidential nature of such Confidential Information and require such employee or consultant to comply with the Receiving Party's obligations hereunder with respect to such Confidential Information.  The Receiving Party will be responsible to the Disclosing Party for any violation of this Section by any such employee or consultant.

4. <u>Required Disclosures</u>.  In the event the Receiving Party becomes or may become legally compelled to disclose any Confidential Information (whether by deposition, interrogatory, request for documents, subpoena, civil investigative demand, or otherwise), the Receiving Party shall provide to the Disclosing Party prompt prior written notice of such requirement so that the Disclosing Party may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this Section.  In the event that such protective order or other remedy is not obtained, or that the Disclosing Party waives compliance with the provisions hereof, the Receiving Party shall furnish only that portion of the Confidential Information which it is advised by counsel is legally required to be disclosed, and shall use its best efforts to insure that confidential treatment shall be afforded such disclosed portion of the Confidential Information..

9. <u>REPRESENTATIONS AND WARRANTIES; DISCLAIMER; AUDIT</u>.

    1. <u>Mutual Representations and Warranties</u>.  Each Party represents and warrants to the other Party that: (i) it is duly organized, validly existing, and in good standing under its jurisdiction of organization and has the right to enter into this Agreement; (ii) the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of such Party and have been duly authorized by all necessary corporate action on the part of such Party, and constitute a valid and binding agreement of such Party; and (iii) it has the full power, authority, and right to perform its obligations and grant the rights it grants hereunder.

    2. <u>Seller Representations, Warranties, and Covenants</u>.  In addition, Seller represents and warrants to PMS that: (i) it will comply with all Applicable Laws in the performance of its obligation hereunder; (ii) it shall strictly adhere to the phone call request prompts and placement of same as prepared and designated by PMS, or approved by PMS in advance, for use hereunder; and (iii) the Leads

and/or Call Transfers supplied to PMS consist of records of persons who have supplied prior express written consent to receive third-party commercial telephone calls (including artificial voice calls, pre-recorded calls and/or autodialed calls), e-mail advertising messages, and other marketing communications from PMS and its Advertisers.  For purposes of this Agreement, the term "prior express written consent" shall have the same meaning set forth under the Telephone Consumer Protection Act (47 USC § 227), and its implementing regulations adopted by the Federal Communications Commission (47 CFR § 64.1200), as amended from time-to-time (the "TCPA").  Seller shall retain the records of each individual's "prior express written consent" ("Consent Records") for a minimum of seven (7) years following creation of same, and shall provide such records to PMS within two (2) business days of request at any time.  The Consent Records shall include, at a minimum, the consent language appearing on online media from which Lead data was collected, the IP address of the source of the Lead data, and the date and time stamp indicating the time that the Lead data was collected.  Seller shall notify PMS of any and all Leads for which the "prior express written consent" required under this Section was not obtained, with such notice to be provided: (x) concurrent with the submission of any such Lead; and (y) via a specific identifier designated by PMS.

3. Audit.  Seller agrees that at all times during the Term it shall maintain accurate books and records relating to its generation of Leads and Call Transfers hereunder.  Seller agrees that PMS, or any designee of PMS that is legally bound to obligations of confidentiality and non-disclosure, shall have the right during the Term, and for one (1) year thereafter, to examine, inspect, audit and review all such books, records, and any source documents used in the preparation thereof during normal business hours upon written notice to Seller at least seven (7) business days prior to the commencement of any such examination, inspection, review, or audit.  Such audit shall be at PMS's sole cost and expense and shall be strictly limited to those books and records that specifically relate to Seller's generation of Leads and Call Transfers, as well as Seller's compliance with all Applicable Laws and/or the terms of this Agreement.  Notwithstanding the foregoing, if PMS uncovers any material misconduct associated with Seller's generation of Leads or Call Transfers hereunder, then the audit shall be at the sole cost and expense of Seller.

10. LIMITATION OF LIABILITY.  EXCEPT IN CONNECTION WITH A PARTY'S INDEMNITY OBLIGATIONS, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR BREACH OF ITS CONFIDENTIALITY OBLIGATIONS: (I) IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES OF ANY KIND (INCLUDING, BUT NOT LIMITED TO, LOST REVENUES OR PROFITS) ARISING FROM OR RELATING TO THIS AGREEMENT, REGARDLESS OF WHETHER SUCH PARTY WAS ADVISED, HAD OTHER REASON TO KNOW, OR IN FACT KNEW OF THE POSSIBILITY THEREOF; AND (II) EACH PARTY'S AGGREGATE LIABILITY FOR DIRECT DAMAGES UNDER THIS AGREEMENT WILL NOT EXCEED THE MONIES PAID BY PMS HEREUNDER.

11. INDEMNIFICATION.

1. Indemnification.  Each Party shall defend, indemnify, and hold harmless the other Party and the other Party's shareholders, partners, officers, directors, employees, agents, and assigns (collectively, the "Indemnified Parties") from and against any liabilities, awards, damages, losses, costs, and expenses, including, but not limited to, reasonable attorneys' fees incurred by such Indemnified Parties in connection with any third-party claim, action, or proceeding (each, a "Claim") to the extent arising from: (i) the gross negligence or willful misconduct of such Party; and/or (ii) such Party's breach of any of its representations, warranties, or covenants under Section 9.

2. Procedure.  The Indemnified Parties will provide the indemnifying Party with reasonably prompt notice of Claims, permit the indemnifying Party through mutually acceptable counsel to answer and defend Claims, and provide the indemnifying Party with reasonable information and

assistance, at the indemnifying Party's expense, to help the indemnifying Party defend Claims. The Indemnified Parties will have the right to employ separate counsel and participate in the defense of any Claim at their own expense. The indemnifying Party will not agree to any stipulation, admission, or acknowledgment of any fault, guilt, wrongdoing, or liability on the part of any Indemnified Party without the applicable Indemnified Party's prior written consent. An indemnifying Party will not settle any Claim on any Indemnified Party's behalf, or publicize any settlement, without the Indemnified Party's prior written permission, which shall not be unreasonably withheld, conditioned, or delayed.

12. GENERAL PROVISIONS.

1. Assignment. Neither Party may assign or otherwise transfer any of its rights or obligations under this Agreement without the prior, written consent of the other Party; provided, however, that a Party may, upon written notice to the other Party and without the consent of the other Party, assign or otherwise transfer this Agreement: (i) to any of its Affiliates; or (ii) in connection with a change of control transaction (whether by merger, consolidation, sale of equity interests, sale of all or substantially all assets, or otherwise), provided that in all cases, the assignee agrees in writing to be bound by the terms and conditions of this Agreement. Any assignment or other transfer in violation of this Section will be null and void. Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties hereto and their permitted successors and assigns.

2. Non-Circumvention. Seller recognizes that PMS has proprietary relationships with the Advertisers and other third parties that purchase Leads and/or Call Transfers from PMS (collectively, "Purchasers"). Seller agrees not to knowingly circumvent PMS's relationship with such Purchasers, or otherwise offer, make available, provide, contract for, or otherwise perform, directly or indirectly, advertising, marketing, or promotional services similar to the services performed by Seller hereunder for any Purchaser that is known, or should reasonably be known, by Seller to have such a relationship with PMS, during the Term and for six (6) months following termination or expiration of this Agreement. Notwithstanding the foregoing, to the extent that Seller can show that any such Purchaser already obtained such services from Seller prior to the Effective Date of this Agreement, then Seller shall not be prohibited from continuing such relationship. Seller agrees that monetary damages for its breach, or threatened breach, of this Section will not be adequate and that PMS shall be entitled to: (i) injunctive relief (including temporary and preliminary relief) without the requirement to post a bond; (ii) forfeiture of any and all amounts that are due Seller from PMS hereunder; (iii) liquidated damages in the amount of one hundred percent (100%) of the fees received by PMS from the subject Purchaser for the prior twelve (12) month period; and/or (iv) any and all other remedies available to PMS at law or in equity.

3. Force Majeure. Each Party shall be excused from the performance of its obligations under this Agreement and any delay or failure in performance by such Party shall not be grounds for termination of this Agreement for cause or give rise to any liability for damages, to the extent that such Party is prevented from performing due to a cause that is beyond its reasonable control, including, but not limited to, an act of God, act or omission of the other Party, act of any government or regulatory body (whether civil or military, domestic or foreign), fire, explosion, flood, earthquake or other natural or man-made disaster, epidemic, sabotage, war, riot, civil disturbance, strike, lockout, labor dispute, loss of electrical or other power or telecommunications equipment, or line failure (each a "Force Majeure Event"). Each Party agrees to use commercially reasonable and diligent and determined efforts to minimize the length and effects of delays that occur due to the occurrence of a Force Majeure Event. Each Party agrees to provide prompt notice to the other Party to the extent such Party is relying or expects to rely on the provision of this subsection to excuse its delay or failure to perform.

4. Waiver. No failure or delay by either Party in exercising any right or remedy

under this Agreement shall operate or be deemed as a waiver of any such right or remedy.

5. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard for choice of law provisions thereof.

6. <u>Exclusive Forum</u>. The Parties hereby consent and agree to the exclusive jurisdiction of the state and federal courts located in the State of New York, Borough of Manhattan for all suits, actions, or proceedings directly or indirectly arising out of or relating to this Agreement, and waive any and all objections to such courts, including but not limited to, objections based on improper venue or inconvenient forum, and each Party hereby irrevocably submits to the exclusive jurisdiction of such courts in any suits, actions, or proceedings arising out of or relating to this Agreement.

7. <u>Notices</u>. All notices required under this Agreement (other than routine operational communications) must be in writing. Notices shall be effective upon: (i) actual delivery to the other Party, if delivered in person, or by facsimile, or by national overnight courier; or (ii) five (5) business days after being mailed via U.S. postal service, postage prepaid.

8. <u>Independent Contractors</u>. The Parties are independent contractors. Neither Party shall be deemed to be an employee, agent, partner, joint venturer, nor legal representative of the other for any purpose, and neither shall have any right, power, or authority to create any obligation or responsibility on behalf of the other.

9. <u>Severability</u>. If any provision of this Agreement is found invalid or unenforceable by a court of competent jurisdiction, that provision shall be amended to achieve as nearly as possible the same economic effect as the original provision, and the remainder of this Agreement shall remain in full force and effect. Any provision of this Agreement, which is unenforceable in any jurisdiction, shall be ineffective only as to that jurisdiction, and only to the extent of such unenforceability, without invalidating the remaining provisions hereof.

10. <u>Complete Understanding</u>. This Agreement constitutes the final and complete agreement between the Parties regarding the subject matter hereof, and supersedes any prior or contemporaneous communications, representations, or agreements between the Parties, whether oral or written.