# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH MANTHA, *on behalf of himself and all others similarly situated*,

        Plaintiff,

v.

QUOTEWIZARD.COM, LLC,

        Defendant.

Civil Action No. 1:19-cv-12235-LTS

## DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO ITS SUMMARY JUDGMENT MOTION

Defendant QuoteWizard.com, LLC ("QuoteWizard") submits its Reply to Plaintiff Joseph Mantha's ("Mantha") Opposition [ECF No. 221] to QuoteWizard's Motion for Summary Judgment and supporting papers [ECF Nos. 201-204, 208, 211-212].

### INTRODUCTION

In response to QuoteWizard's summary judgment motion, Mantha does not meet or challenge QuoteWizard's undisputed factual evidence. Rather, Mantha improperly relies on, for example, inadmissible and confidential settlement negotiations that prove nothing; fictitious legal standards that do not apply; unrelated Federal regulations that do not bear on this case; straw men and misrepresentations of QuoteWizard's arguments; and his counsel's improper attempts to make evidence where it does not exist.

Stripping Mantha's response of these improper, inadmissible, or irrelevant matters, Mantha has not actually controverted any part of QuoteWizard's Motion. His response is, rather, an attempt to distract from the applicable legal standards and undisputed record evidence. Such

attempt is unavailing.  As Mantha has failed to meet QuoteWizard's Motion, the Motion should be granted on any and all grounds raised therein, and Mantha's remaining claim dismissed.

## ARGUMENT & AUTHORITIES

### A. Mantha Has Advanced a Fictitious Standard for "Residential Telephone Subscriber"

Mantha argues that "relevant to whether a wireless number is entitled to the protections of the DNC Registry is whether the number is subscribed to a business or not."  Opp., p. 12. Mantha then proceeds to argue that, because his cell phone number is not registered to an independent business, QuoteWizard's summary judgment motion must be denied.

*This is a fictitious legal standard created by Mantha out of whole cloth*.  The *only* relevant standard is whether the plaintiff qualifies as a "residential telephone subscriber."  *See* 47 U.S.C.§ 227(c)(1); 47 C.F.R. § 64.1200(c)(2).[1]  Nowhere in the text of the statute or the regulation will the Court find support for Mantha's fictitious standard and distinction between business phones versus all other phones.  Mantha purports to rely on FCC guidance for this alleged distinction, but even the FCC has recognized that whether a cell phone qualifies under "residential telephone subscriber" may necessarily be a fact-intensive inquiry.  *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14039

---

[1] QuoteWizard incorporates its argument in its memorandum of law (*see* ECF No. 202, pp. 8-11) that, in the first instance, "residential telephone subscriber" does not include cell phones because cell phones are absent from the statutory text.  Mantha claims in response that "Congress chose to extend protection to 'residential telephone subscribers' a term it explicitly acknowledged easily extends to the non-business subscribers of wireless telephone lines" (Opp., p. 3), but Mantha provides no support (and has none) for this untrue assertion.  There is no evidence that *Congress* included cell phones in the applicable definition.  Mantha seems to improperly conflate Congress and the FCC and relies solely on FCC regulations.  QuoteWizard reiterates that this is a threshold issue—whether "residential telephone subscriber" can include cell phone users—before the Court can proceed to address whether Mantha's cell phone specifically qualifies, to the extent that cell phones may qualify.

Because the bulk of Mantha's Opposition relates to whether Mantha's cell phone qualifies, QuoteWizard directs its Reply to that issue, but relies on and incorporates its threshold argument from its memorandum in support of its Motion.

(July 3, 2003) (further proof may be required pursuant to a fact-intensive inquiry to show that a wireless subscriber uses their wireless phone in a manner consistent with the definition of "residential.").

Thus, Mantha both improperly attempts to flip the burden on this issue from where it actually belongs (on Mantha) to QuoteWizard, and also argues for the Court to accept a business-versus-personal definition that is completely divorced from the statutory/regulatory definition and devoid of any basis. Despite Mantha's best attempts, the burden is and remains on him, as the plaintiff, to prove that he meets the essential element of his claim—that he is a "residential telephone subscriber." *See Lee v. Loandepot.com, LLC*, 2016 U.S. Dist. LEXIS 110100, at *16-18 (D. Kan. Aug. 17, 2016) (granting summary judgment where plaintiff failed to establish that his cellular number was used for residential purposes) ("The Court is not persuaded that Plaintiff has met his burden at summary judgment to overcome Defendant's motion. To prevail under 47 C.F.R. § 64.1200(c)(2), Plaintiff must establish that his cellular number is used for residential purposes."). And Mantha's repeated attempts to convince the Court to accept his fabricated business-versus-personal standard by emphasizing that the TCPA is a "remedial statute that is to be interpreted in a manner that effectuates its legislative purpose" ignores that Mantha himself is asking this Court to *ignore the statutory and regulatory language* and adopt a definition and standard contrary to the text of the statute and implementing regulation.

Of course, the Court references and is bound by the <u>text of the statute and implementing regulation</u> in the first instance. *See In re BankVest Capital Corp.*, 360 F.3d 291, 296 (1st Cir. 2004). "In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989). No matter how many times Mantha invokes the words "personal" or "personal use," the simple fact

of the matter is that the applicable definition is "residential telephone subscriber."  On this point, as noted, Mantha has produced a single alleged fact—that his cell phone bills are addressed to his home.  Mantha produces no evidence that he uses his cell phone for residential purposes; the overwhelming evidence is that, rather, he uses it constantly for work.

In addition, Mantha's counsel's attempt to create a disputed issue of fact over whether Mantha actually extensively used his cell phone for work is unavailing.  His counsel argues that some of the work calls could have been for personal purposes because some of his co-workers are his friends.  *See* Opp., p. 11 n.12.  This sheer speculation of his counsel must be disregarded.  Mantha offers no factual support for this suggestion, such as an affidavit from Mantha setting forth which of the 1,400 work calls he contends were actually personal calls.  Moreover, such speculation is disingenuous in light of the fact that the majority of the work calls were to/from Perkins School designated on-call numbers for emergencies, therefore rendering frivolous any suggestion that these were personal calls to friends. They were clearly work related and that point is not actually disputed.

QuoteWizard also notes that Mantha has cited case law that actively undermines his fictitious business-versus-personal definition.  For example, in footnote 15 on page 14, Mantha relies on a recent decision in *Worsham v. Discount Power, Inc.*, Civil Action No. RDB-20-0008 (D. Md.) (July 29, 2021 Order), contending that "[t]he Court … denied the defendant's renewed motion to dismiss noting there was not clear evidence that the number at issue was a business number."  Opp., p. 14 n.15.  However, the *Worsham* decision completely undercuts Mantha's fictitious definition.  There, even though the plaintiff's number at issue was a *residential landline* (not a cell phone) and the court accepted as true for Fed. R. Civ. P. 12(b)(6) purposes the plaintiff's allegations, the court noted only that the claim "may be viable" because at the motion to dismiss stage "there [wa]s not clear evidence that the phone line was used only or primarily as

a business line." *Worsham v. Discount Power, Inc.*, Civil Action No. RDB-20-0008 (D. Md.) (July 29, 2021 Order), p. 7.

Therefore, the court recognized that even *a residential landline* used substantially for business purposes may fall outside of "residential telephone subscriber," although the court did not decide the issue at the motion to dismiss stage. *See id.* (citing *Smith v. Truman Road Development, LLC*, No. 4:18-cv-00670-NKL, 2020 WL 2044730, at *11 (W.D. Mo. Apr. 28, 2020) (when clear evidence that a cell phone line is used only or primarily as a business line, summary judgment granted to the defendants); and *Mattson v. Quicken Loans Inc.*, No. 3:18-CV-00989-YY, 2019 WL 7630856, at *5 (D. Or. Nov. 7, 2019) (same)).  Mantha can hardly genuinely argue that some unidentified personal use of a <u>cell phone</u> categorically qualifies him as a "residential telephone subscriber" in light of this case law that he himself has proffered; even business use of a *landline* may exempt a consumer from the definition.

**B. Mantha's Counsel's Attempt to Distract with Unrelated Regulations is Unavailing**

As discussed *supra*, the *only* relevant standard and inquiry concerning Mantha's cell phone—on which Mantha bears the burden of proof as an element of his remaining claim—is whether Mantha was a "residential telephone subscriber" under 47 U.S.C. § 227(c)(1) and 47 C.F.R. § 64.1200(c)(2).  Also as noted *supra*, the Court begins—and can end—with the text of the statute and regulation.  Mantha has produced no evidence that he uses the cell phone commensurate with a residential line or for any residential purposes.

In the apparent hopes of distracting or confusing the Court from this simple, straightforward legal standard and definition, and the lack of evidence that he has to prove it, Mantha invokes unrelated Federal regulations.  *See* Opp., pp. 3-4 ("At the time the DNC Registry provisions of the TCPA were enacted, the Code of Federal Regulations specifically relating to 'Telecommunications' defined a 'residential subscriber' as a 'subscriber to a

telephone exchange service that is not a business subscriber.' See 47 C.F.R. § 64.2305(d). A 'business subscriber' was defined as a 'subscriber to a telephone exchange service for businesses.' See 47 C.F.R. § 64.2305(b).").

Mantha's attempt to use these unrelated Federal regulations to argue in support of his fictitious business-versus-personal definition is as misleading as it is unavailing. These unrelated regulations that Mantha cites—governing "Subscriber List Information"—relate only to "Telephone exchange service[s]." *See* 47 CFR § 64.2305(g). *See also* 47 CFR § 64.2309 (placing certain requirements on "telecommunications carrier that provides telephone exchange service"). "Telephone exchange service means: (1) Service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) Comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service." *See* 47 CFR § 64.2305(g).

Courts have found that a telephone exchange system, by its plain definition, <u>excludes</u> cell phone service. *See Mohon v. Agentra LLC*, 400 F. Supp. 3d 1189, 1233 (D.N.M. June 24, 2019) (construing New Mexico statute) ("wireless telephone users do not subscribe to local exchange companies") (citing *Alma Commc'ns Co. v. Missouri Pub. Serv. Comm'n*, 490 F.3d 619, 621 (8th Cir. 2007) (differentiating local exchange carrier and cellular telephone providers), and Local-exchange Network, <u>Black's Law Dictionary</u> at 1022 (9th ed. 2009) (describing physical lines as part of local exchanges' networks)). Thus, Mantha cannot rely on these unrelated regulations here because they do not include or categorize cell phones or cell phone uses. In other words, unrelated Federal regulations applicable to a telephone exchange service not

6

including wireless cell phones are necessarily irrelevant to the separate statute and regulation at issue in this case that Mantha claims are applicable to cell phone users.

Thus, Mantha's citation to these unrelated regulations carry no weight and meaning. Mantha apparently hopes that the Court will accept the duality of personal-versus-business or residential-versus-business and that such usages are necessarily and mutually exclusive. But the statute and regulation at issue herein make no such distinction. The case law and even FCC guidance concerning the regulation at issue acknowledge that a telephone number can be used for multiple purposes and that mixed usage will have to be examined to determine whether the number qualifies as a residential telephone subscriber.

### C. Even if Some Indeterminate, Unidentified "Personal Use" Was the Test, Mantha's Claim Still Fails

Even assuming *arguendo* that the Court could construe "residential" to mean "personal," regardless of a lack of any connection to the home—a construction that QuoteWizard submits the Court cannot accept—Mantha's Opposition *still* falls short. In the face of cell phone records and proof that he uses his cell phone for work constantly and that he is tied to his job 24/7 by that cell phone, *Mantha has not submitted an affidavit* to rebut these facts. Mantha, of course, would know how he uses his cell phone and could necessarily proffer proof on that point if it aided him. His silence is deafening. Instead, his counsel relies on speculation, unsupported contentions, or general assertions/denials, all of which are insufficient in the summary judgment context to rebut undisputed facts. *See*, *e.g.*, *Brown v. Latin Am. Music Co., Inc.*, 498 F.3d 18, 24 (1st Cir. 2007) (in opposing a motion for summary judgment, "general denials are insufficient and the court is not required to credit bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like.") (internal citation and quotation marks omitted). And Mantha's counsel's unsupported argument that the Court should assume he uses the cell phone to text for personal

purposes must be disregarded; Mantha has not produced even a single text message to support this contention or any other admissible evidence on this point.[2]

Finally, Mantha claims unconvincingly that the Court cannot and should not engage in what he refers to as a "use test" concerning the use of his cell phone because such test is not within the text of the statute or regulation at issue. Such a claim is nonsensical. If the Court accepts that cell phones can be "residential," then this *necessarily* depends on how the cell phone is used, as the FCC has recognized. *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14039 (July 3, 2003) (further proof may be required pursuant to a fact-intensive inquiry to show that a wireless subscriber uses their wireless phone in a manner consistent with the definition of "residential."). The Court cannot possibly otherwise determine if a cell phone is in fact residential because there is no explicit tie between a cell phone and a residence (in contrast to a residential landline), and regardless, the *burden remains on Mantha to show that his cell phone is residential*. Thus, in complete contrast to Mantha's nonsensical claim, the *only* way he could prevail on his claim is by showing that he uses his cell phone in a manner that qualifies it as residential. He would have to resort to the very same fact-intensive inquiry he claims is inapplicable. Of course, as noted, he has not even attempted to show how he uses his cell phone, and therefore has failed to satisfy a necessary element of his claim.

## D. Mantha's Attempt to Paint Himself as a Crusading TCPA Advocate is Belied by the Undisputed Facts; He Manufactured his Claim, Lacks Standing, and Was Not Injured

As an initial matter, Mantha attempts to create a straw man by misrepresenting QuoteWizard's argument on standing, claiming that QuoteWizard is either painting him as a

---

[2] QuoteWizard also sought certain of Mantha's text messages in discovery and was denied them; Mantha cannot now rely on alleged text messages that he has failed to produce in discovery or in support of his Opposition.

"professional plaintiff" or that QuoteWizard is equating standing to someone who is not primarily motivated to recover money. This is simply not true. QuoteWizard is merely holding Mantha to the same standard applicable to all plaintiffs in Federal courts, which Mantha has the burden to prove: that he has Article III and prudential standing to pursue his TCPA claim. *See TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2207, 2021 U.S. LEXIS 3401, at *25, 2021 WL 2599472 (2021) ("As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing."). This does not hinge on whether he is a seasoned litigant. Rather, it hinges on, for this lawsuit, whether he has suffered a concrete harm and is within the zone of interests under the TCPA. *See id*. at 2214 (plaintiff must prove concrete harm regardless of source of claim).

Critically, Mantha has *no evidence* to establish the first point; he has not offered an affidavit swearing that the text messages injured him in some way, and a review of the text messages show Mantha as a willing participant who perpetuated the exchange. And the undisputed record evidence proves that his attempted manufacturing of a TCPA claim takes him outside of the zone of interests. In Mantha's 31-page Opposition and supporting materials, the Court will not find a single shred of evidence establishing concrete harm. As the Court twice reiterated in *Ramirez*, "No concrete harm, no standing." *Id*. at 2200, 2214.

Rather than controvert QuoteWizard's standing argument head-on with proof of an alleged, concrete harm, which Mantha has not done and clearly cannot do, his counsel instead cherry-picks and isolates certain facts concerning his standing, arguing that each fact in isolation is insufficient to show lack of standing, *but ignoring that the totality of the facts does show lack of standing*. For instance, Mantha argues that the fact that he never told his wife about the text messages, alleged any injury from the texts to her, or even told her about the filing of this putative, nationwide class action is irrelevant because there is no requirement that plaintiffs

notify their spouses about their injuries.  *See* Opp., p. 21 n.20.  Of course, Mantha ignores the fact that, *in conjunction with the other record evidence*, it is certainly telling and probative that the text message conversation he so voluntarily engaged in that launched this putative nationwide class action was never such a prevailing thought in his mind to even inform his wife—not at the time the text messages were sent, not when he sent a TCPA monetary demand, and not even when he filed this suit.  Mantha is asking this Court to dispense with common sense by urging it to disregard this piece of evidence, which can and should be considered in conjunction with other evidence.

Mantha also argues that QuoteWizard has not established lack of standing because QuoteWizard has not cited to a case that includes *the exact same facts* as those here.   In other words, despite that QuoteWizard's standing argument *is* supported by case law specific to the TCPA context (*see* ECF No. 202, pp. 17-19 & 17 n.6), Mantha largely attempts to rely on other TCPA cases where courts found standing based on the facts before it.  This is a misleading device.   The undisputed facts underlying QuoteWizard's standing argument are unique to Mantha and unlikely to be repeated: for example, Mantha and a friend discussing using the TCPA as a money-making scheme, akin to a recruitment, only a month or two before the text messages; Mantha employing his friend and, indirectly, his eventual lawyer, to engage with QuoteWizard and respond to the text messages; Mantha asking QuoteWizard, "How do I get a quote?"; Mantha not mentioning the text messages to anyone and not even mentioning the filing of a putative class action lawsuit to his wife; and Mantha being prodded by his friend to hire his eventual lawyer and "get paid" life-changing money.

Mantha, of course, will not be able to point the Court to any analogous case where the same facts were found to be sufficient for standing purposes.  No such case exists.  But the Court can take note of the similar case where the plaintiff, like Mantha, actively invited further

communication, thereby perpetuating the interaction and manufacturing the TCPA claim. *See Garcia v. Credit One Bank, N.A.*, 2020 U.S. Dist. LEXIS 136881, at *6-10 (D. Nev. July 31, 2020) (plaintiff "knew that if he instructed [defendant] at any time during one of these calls to cease calling him, [it] would have likely complied"; but "[i]nstead of taking the steps necessary to stop the alleged injury (the unwanted calls), ***he took steps to allow the continuance of the injury while building a record to facilitate a later claim***." (emphasis added)).

Mantha also misrepresents QuoteWizard's standing argument to mean that TCPA plaintiffs cannot file suit based on a motivation to recover money. This is an untrue, misstatement of the arguments contained in QuoteWizard's brief. QuoteWizard does not argue that a plaintiff who has been *concretely harmed* under the TCPA is barred from filing suit even if the sole motivation is to obtain money. Rather, the undisputed record evidence is that Mantha *manufactured his TCPA claim* to obtain money. This is a crucial distinction. Having been tipped off to the scheme, and aided by his friend and eventual lawyer, Mantha literally created the circumstances he now complains about—having asked QuoteWizard, "How do I get a quote?" The filing of the lawsuit itself was a mere continuation of this scheme.

### E.  Mantha's Reliance on a Generic, Hypothetical Claim of Annoyance is Insufficient

Mantha claims that he *has* shown an injury under the TCPA—because he has generically discussed that (unrelated) unsolicited communications can be annoying. *See* Opp., p. 21 n.20. But Mantha has never complained about the *QuoteWizard text messages at issue*—not at his two depositions, not in an affidavit filed with the Court, not to his wife, not to his friend, not to anyone.

Article III and prudential standing, of course, require a tie to the conduct at issue; an alleged injury must be concrete and particular to the defendant, not hypothetical or unrelated. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)

(plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical.");  *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016) (injury-in-fact must be fairly traceable to challenged conduct of defendant).  Mantha's attempt to create an injury-in-fact based on an alleged *generic* annoyance do not suffice; it has no ties to QuoteWizard.   And Mantha's generic claim of annoyance over unidentified unsolicited communications (*not* QuoteWizard's texts) simply parrots Congress's reasons for passing the TCPA, the type of injury in law that the Court in *Ramirez* noted was insufficient to show injury in fact.  *See Ramirez*, 141 S.Ct. at 2205 ("[W]e cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so." (quotation and citation omitted)).

Moreover, Mantha's self-serving claims concerning an alleged generic annoyance are belied by his wife's sworn testimony that: (1) he never told his wife about the text messages or any alleged injury therefrom; (2) his wife described receiving many unsolicited communications and described them as "silly"; (3) Mantha and his wife, though frequently receiving unsolicited communications, never discussed filing a lawsuit over any of them; and (4) when Mantha finally told his wife about this pending lawsuit well after it was filed, they discussed it being "not a big deal."  *See* ECF No. 208, Ex. 7, p. 38:15-19; *id*., p. 51; *id.*, pp. 38-39; *id*., p. 39:16-23; *id*., pp. 47-48; *id*., p. 69:8-13; *id*., p. 38:2-11.

This begs the obvious question: what was the difference between the many times that Mantha and his wife received numerous, unsolicited "silly" communications to which they gave no thought, and the QuoteWizard text messages for which Mantha immediately hired an attorney provided by a friend and served a demand for money within a short period of time.  The obvious answer, even putting aside for a moment Mantha's proof of consent, is that *Mantha was recruited and actively coached* to manufacture a TCPA claim with respect to the QuoteWizard

text messages.  To the extent Mantha may have allegedly been bothered by past unsolicited communications (there is no proof of that), he was very clearly *not* bothered by the QuoteWizard text messages, as he actively worked to perpetuate the conversation he now claims was a violation of his rights.  In any event, it is immaterial what Mantha thinks of unsolicited communications generally.  He must prove, but has no evidence to show, an injury resulting from QuoteWizard's texts specifically.

**F. Mantha's New Argument that He was Seeking to "Conclusively Identify" QuoteWizard Should be Disregarded**

As highly relevant to Mantha's lack of standing, QuoteWizard has pointed out that, not only did Mantha *not* ask QuoteWizard to stop contacting him, he voluntarily and actively engaged with QuoteWizard, asked "How do I get a quote?" and set up a date and time for a phone call to further his request for an auto insurance quote.  Mantha's response is not surprising when considering the totality of the evidence that Mantha was interested in the TCPA as a money-making scheme and was being actively coached by his friend, Steven Novia, and Novia's attorney (later Mantha's attorney) to manufacture a TCPA claim.  QuoteWizard further noted that any attempt by Mantha to argue that he responded only to "identify" QuoteWizard is completely belied by the text messages showing that QuoteWizard was *twice* identified before Mantha responded.  *See* ECF No. 208, Ex. 17.

In response, Mantha's counsel now asks the Court to believe that Mantha was actually seeking to "conclusively identify QuoteWizard as the entity responsible for the [] texts" (Opp., p. 16).  By inserting the word "conclusively," Mantha's counsel obviously acknowledges that QuoteWizard had already been identified twice by the time Mantha first responded.  The problem with counsel's new explanation is two-fold.  First, there is no record evidence that

Mantha was trying to "conclusively identify" QuoteWizard.  This is merely a fiction created by Mantha's counsel in response to QuoteWizard's Motion for Summary Judgment.

Second, such a contention is ludicrous in light of the text message history.  *If* Mantha's intent in responding was to "conclusively identify" QuoteWizard as the sender of the text messages, despite that it had already twice self-identified as such, Mantha never managed to ask that question in the five (5) text messages he sent.  He never picked up the phone call that he himself had arranged.  Simply put, Mantha's new theory is an unsupported fiction.  For the same reasons, Mantha's reliance on cases where a plaintiff played along to identify the caller/texter (*see* Opp., pp. 18-19) is inapplicable and irrelevant because that is not what happened here.

### G.  Mantha's Reliance on a Law of the Case Doctrine Argument Must be Rejected

In arguing that the text messages that QuoteWizard sent to Mantha were telephone solicitations, Mantha urges this Court to apply the law of the case doctrine, arguing that a decision the Court made in the Rule 12(b)(6) context somehow precludes QuoteWizard from advancing an argument based on the *undisputed material facts*, rather than Mantha's unsworn allegations that the Court was earlier required to accept as true.  Mantha's reliance on the doctrine is misplaced.

In the First Circuit, "[i]nterlocutory orders, including ***denials of motions to dismiss***, remain open to trial court reconsideration, and do not constitute the law of the case."  *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) (emphasis added).  *See also Commerce Oil Refining Corp. v. Miner*, 303 F.2d 125, 128 (1st Cir. 1962) ("a ruling denying a motion to dismiss is not the law of the case, and is not final even in the district court"); *P.R. Tel. Co. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 207, 233-234 (D.P.R. July 25, 2016) (concluding that law

of case doctrine "does not" apply to denials of motion to dismiss in First Circuit; "[t]he law of the case doctrine is inapplicable to OneLink's motion for summary judgment.").[3]

### H.  Mantha's Arguments Concerning Telephone Solicitations are Misplaced

Mantha claims that the text messages could not have been transactional—and therefore not telephone solicitations—because he did not allegedly request an auto insurance quote.  *See* Opp., pp. 22-23.  Mantha here improperly conflates the transactional nature of the text messages (consumer asks for quote; QuoteWizard causes text messages to be sent to consumer concerning request for quote; consumer (here, Mantha) responds "How do I get a quote?") with proof of consent under the TCPA.  Mantha argues that, because he contends that he did not consent, this necessarily means that the text messages were not transactional.  This is a tortured, and incorrect, interpretation of transactional.  Regardless of the ultimate validity of Mantha's consent, QuoteWizard has indisputably shown that it was sold Mantha's lead with a request for an auto insurance quote and texted him solely to that end.  There was a request, and a corresponding response.  This is a transaction in every sense of the word.  Consent is a separate, and irrelevant, issue in this context.

Moreover, Mantha's reliance on *Panacci v. A1 Solar Power, Inc.*, 2015 U.S. Dist. LEXIS 77294 (N.D. Cal. June 15, 2015) (Opp., p. 25) is also misplaced.  Contrary to Mantha's misrepresentation that one of the defendants there was, as Mantha tries to paint QuoteWizard, an intermediary working to complete the sale of a service, the defendant there had actively tried to

---

[3] Moreover, even if the law of the case doctrine could apply to the denial of a motion to dismiss, which it does not in this Circuit, the doctrine does not extend to an expanded record in a different procedural context.  *See* Wright & Miller § 2713 ("The ruling on a motion to dismiss for failure to state a claim for relief is addressed solely to the sufficiency of the  complaint and does not prevent summary judgment from subsequently being granted based on material outside the complaint.").  Of course, here, the Court now has the benefit of: (1) the entirety of the text message exchange (rather than the two referenced in the Complaint); (2) evidence concerning QuoteWizard's business model, showing it does not sell insurance; and (3) its contract with GEICO, showing that it sells leads to insurers for insurers to provide quotes to consumers, none of which the Court had when it ruled on Mantha's unsworn allegations that it was obligated to accept.

sell a service during the challenged communications.  *See id*. at *13-14 ("The Complaint alleges that NREC called Plaintiff a total of at least nine times between July 2014 and the filing of the Complaint in February 2015, and that during the calls, NREC tried to sell him solar power-related services. … Thus, Plaintiff has alleged facts that support the elements of a telephone solicitation as defined by the TCPA. … The cases cited by Defendants are not applicable. *Friedman v. Torchmark* held that a phone call inviting plaintiff to learn about defendant's products to potentially sell to others was not a telephone solicitation because it did not attempt to sell anything to the plaintiff. … Here, the Complaint alleges that NREC did try to sell Plaintiff products—namely solar-related services.").

In addition, while in dicta the court in *Panacci* stated that referral of a consumer to another entity may constitute a telephone solicitation if the purpose of the referral is to encourage a purchase, *id*. at *16, ***that is not what the record evidence shows happened here***.  Rather, and contrary to Mantha's unsupported misrepresentation that QuoteWizard "would be paid $2.50 for every new insurance customer generated" (Opp., p. 23), the very contract that Mantha's counsel purports to rely on states: QuoteWizard is to provide "all information of the customer ***necessary for GEICO to provide an insurance quote as specified by GEICO***."  See ECF No. 211, Ex. C (emphasis added).  The very contract that Mantha's counsel pursued in discovery hoping to prove that QuoteWizard sells leads to insurers for the purpose of the insurers consummating the purchase of insurance actually provides that the purpose of the sale of leads is for the insurer to *provide a quote*.  QuoteWizard does not sell insurance, did not encourage the sale of insurance to Mantha (*see* ECF No. 208, Ex. 17), is one step removed from any communications between a consumer and the insurer, and sells leads to GEICO for the providing of quotes, not the direct purchase of insurance.

That a consumer and an insurer later interact does not prove the encouragement of the sale of a product or service, whether between QuoteWizard and the consumer or even the insurer and the consumer.  Not every interaction between a consumer and a business will be a solicitation, as this case proves.  As one witness in this litigation (Plural) put it, the buying and selling of leads in this context is designed to provide the consumer with a quote for insurance: "We basically broker consumer information through our systems and pass those records along so that they can ultimately be sold into a larger marketplace so that the requesting consumer can receive a quote on a variety of services or products."  ECF No. 208, Ex. 15, p. 7:9-14.

## I.    Mantha's Attempt to Misrepresent the "Do Not Call" Data Fails

As more thoroughly explained in QuoteWizard's pending Motion to Strike the Paronich Declaration and tabs thereto (*see* ECF No. 222), Mantha's characterization of consumer "do not call" requests as "complaints" is completely unsupported and inadmissible, as are the underlying consumer communications themselves.  As such, the Court cannot consider Mantha's counsel's egregious misrepresentation that "two and a half million consumers complained after receiving QuoteWizard's telemarketing text spam," or "2.5 million consumers who received QuoteWizard's telemarketing text spam took the time to complain as to such texts."  Opp., p. 2 & n.3, p. 26 n.21, p. 26.  The undisputed <u>evidence</u> shows that the "do not call" requests are not "complaints," and that for those fraction of consumers who made such requests, many not only did not express any complaint but openly acknowledged requesting and consenting to an auto insurance quote.  *See* ECF No. 124, Ex. 5 (QuoteWizard Declaration), ¶¶ 5-6 ("'[D]o not call' records reflect consumers who have consented to receive communications from QuoteWizard but who then requested no further contact.  It is the functional equivalent of an 'opt out.' … The 'do not call' requests are not complaints from those consumers and do not indicate that the

consumers did not originally consent to be contacted.  The records reflect a consumer's choice not to receive a further communication."); *see also* ECF No. 22, Ex. 1.

Mantha not only misrepresents the "do not call" data but, incredibly, claims that the data somehow undermines QuoteWizard's good faith reliance defense because QuoteWizard allegedly should have known that consumers were complaining.  *See* Opp., p. 26.  Again putting aside the fact that the DNC requests are not complaints, this is a shockingly misleading argument for Mantha to make because it is undisputed that QuoteWizard never saw the consumer communications to which Mantha refers until they were produced in discovery by Drips Holdings, LLC very recently in this case.  *See*, *e.g.*, ECF No. 151, ¶ 5 ("Drips has never shared with or produced to QuoteWizard … the underlying consumer communications to Drips that led Drips to classify the communications as a 'do not call' request.").  Therefore, the DNC requests are obviously not probative of QuoteWizard's state of mind at the time it texted Mantha given that QuoteWizard had never seen them; in any event, as noted above, Mantha's argument that the communications establish widespread lack of consent is also false.[4]

---

[4] Mantha's Opposition is replete with references to fictitious purported evidence created by Mantha's counsel, or legal argument masquerading as purported evidence, or egregiously false or misleading representations divorced from the factual record before the Court.  None of it can be considered in ruling upon QuoteWizard's Motion for Summary Judgment.  Perhaps most egregiously, Mantha's counsel attempts to convince the Court that QuoteWizard will have massive liability to the putative class if this Court allows his case to proceed past summary judgment.  Mantha apparently hopes that this Court will ignore the undisputed material facts that entitle QuoteWizard to entry of summary judgment and let the case pass for the good of the putative class.  Not only is this entirely inappropriate argument, Mantha relies solely on false, unsupported contentions advanced by his counsel.

As representative examples, Mantha's counsel claims that there were "many millions of telemarketing spam texts sent to consumers nation-wide" (Opp., p. 3); thrice refers to a "suspected massive violation of the TCPA" (*id.*, pp. 2-3); and again misrepresents that "do not call" requests constitute "complaints," and argues based on that misrepresentation that "millions of consumers who received such spam texts on their personal telephone lines complained demanding that such texts cease" (*id.*, p. 2 n.3).  *There is no factual support for these entirely inappropriate contentions by Mantha's counsel*.  Moreover, Mantha has deviated from the factual record and the applicable law in an attempt to distract the Court from the failures and holes in his own claim.  Mantha cannot hope to defeat summary judgment on *his claim* based on what he hopes and speculates he may find if the case reaches class discovery.

**J.  The Good Faith Reliance Defense Has Been Applied in this Circuit and is More Expansive than Mantha Allows**

Mantha improperly and far-too-narrowly misreads *Sandoe v. Boston Sci. Corp.*, 2020 U.S. Dist. LEXIS 2800 (D. Mass. Jan. 8, 2020)—a case relevant to QuoteWizard's good faith reliance defense.  After insisting that no such defense exists, Mantha then acknowledges that a judge in this Circuit (and others) has not only recognized the defense *but granted summary judgment on that basis*, in *Sandoe*.  Mantha then insists that *Sandoe* must be read to be limited only to where the defendant has called a number that was recently reassigned without its knowledge.  But *Sandoe* does not support such a narrow reading.  There, Judge Gorton applied a common-sense approach to the TCPA, noting that he "finds persuasive the FCC's order emphasizing that the TCPA does not require the impossible of callers."  *Id*. at *11-12.  The reassignment of a number was an *example* of this principle: the "FCC has interpreted the TCPA not to require the impossible of callers, **such as** knowing that a number has been reassigned."  *Id*. (emphasis added).

Mantha cannot reasonably interpret Judge Gorton's statements to narrowly apply only to reassigned numbers, all while denying Judge Gorton's central holding itself that a good faith, reasonable reliance defense *is* available under the TCPA and can be deployed at the summary judgment stage, as here.

Exactly as in *Sandoe*, QuoteWizard reasonably relied on its contractual partner, RevPoint, which sold Mantha's lead with a contractual promise of TCPA-compliant consent and other indicia of consent (such as an attached Jornaya LeadiD).  As Judge Gorton noted in *Sandoe*, "Boston Scientific reasonably relied on its partner clinics to provide an invitee list of current patients who had provided their contact information for health-care-related events and services."  *Id*.  Mantha fails to explain how *Sandoe* materially differs or why this Court cannot

and should not apply the exact same logic to the similar facts here.  This is particularly true where, not only did QuoteWizard have a contractual guarantee of consent, it had a willing participant in Mantha, who asked for a quote.  Mantha never made QuoteWizard aware, while texting back, that he did not consent to the communications.  The TCPA did not require QuoteWizard to do the impossible and divine that Mantha allegedly had not consented—or, more accurately, that Mantha would later claim he had not consented to obtain money in a TCPA suit.

## CONCLUSION

For all of the reasons stated in QuoteWizard's memorandum of law in support of its Motion for Summary Judgment, in its supporting materials, and in this Reply, summary judgment should enter in QuoteWizard's favor on Mantha's remaining claim.  Mantha lacks facts sufficient to show cognizable standing, both as a constitutional matter and under the TCPA; he does not qualify as a residential telephone subscriber; QuoteWizard did not make telephone solicitations; and QuoteWizard contacted Mantha in good faith reliance on his proof of consent and contractual guarantees of the same, even assuming *arguendo* that Mantha did not consent.

Respectfully submitted,

QuoteWizard.com, LLC,
By its attorneys,


/s/ Kevin P. Polansky
Kevin P. Polansky (BBO #667229)
kevin.polansky@nelsonmullins.com
Christine M. Kingston (BBO #682962)
christine.kingston@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
(t) (617)-217-4700
Dated: August 18, 2021                    (f) (617) 217-4710

<u>CERTIFICATE OF SERVICE</u>

     I, Kevin P. Polansky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: August 18, 2021                                   */s/ Kevin P. Polansky*