**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | : | |
| JOSEPH MANTHA on behalf of himself and others similarly situated, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Case No. 1:19-cv-12235-LTS-PK |
| | : | |
| v. | : | |
| | : | |
| QUOTEWIZARD.COM, LLC | : | |
| | : | |
| Defendant. | : | |
| | : | |
| _____ / | | |

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO "PRIOR EXPRESS CONSENT" AND ENTITLEMENT OF PLAINTIFF'S PERSONAL CELL PHONE TO DNC PROTECTION**

Plaintiff Joseph Mantha ("Plaintiff" or "Mr. Mantha") has petitioned the Court to enter Partial Summary Judgment (the "Motion") on his behalf as to whether he consented to receive telemarketing texts from QuoteWizard, and whether his Wireless Number is entitled to the protections of the TCPA and the DNC Registry. *See* ECF #205. QuoteWizard opposes the Motion claiming genuine and material facts are in dispute as to Mr. Mantha's purported consent to receive telemarketing texts from QuoteWizard, and that the Wireless Number is, in fact, a business number not entitled to the protections of the TCPA and the DNC Registry. *See* ECF #223 (the "Opposition"). As QuoteWizard's arguments in opposition are without merit, the Motion should be granted.

# I.    ARGUMENT

**A.  The Burden Of Proof As To Consent Is On QuoteWizard To Demonstrate That Mr. Mantha Consented To Receive Its Telemarketing Texts.**

Conspicuously missing from QuoteWizard's Opposition is any discussion or acknowledgement of the burden of proof. Before a telemarketer, such as QuoteWizard, can send spam texts to a consumer, it must first have the consumer's prior express consent signed and in writing to receive such telemarketing texts from a specific seller. *See* 47 C.F.R. § 64.1200(f)(8). *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 FCC Rcd. 1830, 1844 at ¶33 (recognizing that consent must include clear and conspicuous disclosure that the consumer is consenting to receive future telemarketing calls *from a specific seller*). The FCC has cautioned that a telemarketer claiming consent "must be prepared to provide *clear and convincing evidence* of the existence of such a relationship." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* FCC 03-153 at ¶112, -- FCC Rcd. --, 2003 WL 2157853, 2003 FCC LEXIS 3673 (July 3, 2003) (emphasis added). The FCC has warned telemarketers:

> Finally, should any question about the consent arise, the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained.

Act of 1991, 27 FCC Rcd 1830 at ¶112; 2012 FCC LEXIS 794 (Feb. 12, 2012).[1]

---

[1] The Federal Communication Commission ("FCC") possesses authority to issue implementing rules and regulations for the TCPA. *See* 47 U.S.C. § 227(b)(2). Pursuant to that authority, the FCC promulgated regulations for advertising and telemarketing calls that require a party to obtain "express written consent" prior to making such calls. *See* 47 C.F.R. § 64.1200(a)(1)-(2).

Accordingly, it is QuoteWizard and not Mr. Mantha, who bears the burden of proof on the issue of consent. [2]

**B.  QuoteWizard's Contention That Mr. Mantha Has 'Misrepresented' The Law As To The TCPA's Consent Requirement Is False.**

Quotewizard's Opposition not only ignores the burden of proof- but it misstates the applicable standard as to prior express consent for telemarketing calls made to consumers whose numbers are listed on the DNC Registry.[3] QuoteWizard claims that TCPA compliant consent, in the context of a DNC Registry claim, merely requires that a consumer release their phone number which "in effect" represents the consumer's invitation or permission to be called…" *See* ECF #223, Opposition at * 8. In support, QuoteWizard cites to 47 C.F.R. § 64.1200(c)(2)(ii), but only cites the regulation in part. The regulation, in whole, provides:

**(c)** No person or entity shall initiate any telephone solicitation to…

> **(2)** A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if…
>
> > **(ii)** It has obtained the subscriber's prior express invitation or permission. **<u>Such permission must be evidenced by a signed, written agreement</u>**

---

[2] QuoteWizard incorrectly suggests that it is Mr. Mantha who bears the burden of proof on consent, arguing, that Mr. Mantha has failed to come forth with "affirmative evidence" that QuoteWizard was not a marketing partner of AmerInsurQuotes.com listed on the purported TCPA disclosure language appearing on the Website. *See* Opposition at pg. 7 ("Further, Mantha lacks affirmative evidence that QuoteWizard was not a marketing partner of the Website.")

[3] As to QuoteWizard's assertion that TCPA compliant consent may be obtained via an intermediary, Mr. Mantha has never claimed to the contrary. Consent, whether through an intermediary or directly, be evidenced by a signed writing, supported by clear and convincing evidence, and that the specific name of the seller be clearly and conspicuously disclosed to the consumer. And, if the telemarketer does not have the consumer's signed consent, it must satisfy the requisites of the ESign Act. *See* 2012 TCPA Order at 1844, ¶33-34 (Feb 15, 2012).

> **between the consumer and seller which states that**
> **the consumer agrees to be contacted by this seller and includes the**
> **telephone number to which the calls may be placed.**

47 C.F.R. § 64.1200(c)(2)(ii) (emphasis added).

The standard is clear: a consumer must provide a signed writing[4] between the consumer and the seller that specifically identifies the company whose services are being offered. *See e.g. Mattson v. New Penn Fin.,* No. 3:18-cv-00990-YY, 2020 U.S. Dist. LEXIS 197955, at *12 (D. Or. Oct. 25, 2020) (Citing 47 C.F.R. § 64.1200(c)(2)(ii) and holding "the regulations promulgated under the TCPA require the consumer's prior express consent to receive calls from the specific telemarketer that makes the call before the telemarketer can call a number listed on the DNCR…Thus, consent to receive calls from 'other business partners' is insufficient."). It is not true that simply providing a phone number to any company opens a consumer to receive telemarketing calls regarding any product at any time on numbers listed on the DNC Registry.

---

[4] QuoteWizard's Opposition mischaracterizes Plaintiff's E-Sign argument, asserting that Plaintiff has suggested that a website opt in can never be compliant consent. Rather, Plaintiff points out that a signed writing may be obtained electronically if such a signature complies with the E-Sign Act. The FCC has recognized that "consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised [written consent] rule…" *See* 2012 TCPA Order at 1844, ¶33-34 (Feb 15, 2012). A telemarketer who claims a consumer consented to receive calls, but who does not present the consumer's actual signature in support of a consent defense, however, must satisfy the requirements of the ESign Act, 15 U.S.C. §§ 7001, *et seq,* in order to assert a consent defense. *Id.* Where a telemarketer cannot present a signature evidencing a consumer's prior express signed written consent to receive telemarketing calls, it must demonstrate that the consumer agreed to the various disclosures mandated by the ESign Acr. The ESign Act provides that consent may be obtained electronically from a consumer ***only if*** the consumer is first provided with a litany of important disclosures, including a disclosure relating to a mechanism that a consumer can use to withdraw their purported consent. *See* 15 U.S.C. § 7001(c). *See In re Rules and Regulations Implementing the TCPA of 1991,* 27 FCC Rcd. 1830, 1844 ¶33-34 (Feb 15, 2012); 47 C.F.R. § 64.1200(f)(8) (defining "prior express written consent" under the TCPA); *Larson v. Harman Mgmt. Corp,* 2016 U.S. Dist. LEXIS 149267 *5-7 (ED CA) (Oct. 27, 2016) (discussing the requirements of ESign in the context of TCPA consent). There is no contention in this case that the TCPA consent language offered by QuoteWizard provided any allegedly consenting consumer with a mechanism to withdraw their consent- yet another reason why QuoteWizard's consent argument fails.

Such a position is inconsistent with the above cited explicit requirements of 47 C.F.R. § 64.1200(c)(2)(ii) *See* 18 FCC Rcd. 14014, 14032, 14043; 2003 FCC LEXIS 3673 at ¶22, 42.

It is not surprising then that the cases cited by QuoteWizard in support of its consent argument, arise exclusively in the debt collection context, or in the context of informational (non-telemarketing) calls, which have different applicable consent standards than telemarketing calls to consumers whose numbers are listed on the DNC Registry. *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1115, 1123 (11th Cir. 2014) (in debt collection context court rules that a debtor who provided a creditor with their phone number on a hospital admission form and agreed to receive calls on that number relating to billing consented to receive follow up billing calls). The different consent standard applicable to debt collection calls under the TCPA was explained in *Thrasher - Lyon v. CCS Commer., LLC*, No. 11 C 04473, 2012 U.S. Dist. LEXIS 125203, at *10-11 (N.D. Ill. Sep. 4, 2012):

> The FCC concluded that providing a cell phone number to a creditor, *e.g.*, as part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt." This builds from the FCC's earlier determination that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *In Re Rules & Regulations Implementing the TCPA of 1991*, 7 FCCR 8752, 1992 WL 690928, at **11 (Oct. 16, 1992). The Court does not quibble with the FCC's carve-out for the creditor-debtor relationship; Congress specifically anticipated that the FCC would "design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy." *See* Pub. L. 102-243, § 2, ¶13,105 Stat 2394 (1991).

In further support of its claim that a consumer whose number is listed on the DNC Registry consents to receive telemarketing calls merely by knowingly releasing their phone numbers, QuoteWizard cites to *Lamont v. Furniture N., LLC*, 2014 U.S. Dist. LEXIS 51927 (D. NH. 2014). Similarly, this case has nothing to do with the consent standards applicable to consumers who have listed their numbers on the DNC Registry as recognized by Congress at

47 C.F.R. § 64.1200(c)(2)(ii) and the Federal Communications Commission at 18 FCC Rcd. 14014, 14032, 14043 (2003). Rather, in *Lamont*, the plaintiff who had purchased furniture from the defendant received a pre-recorded call relating to the furniture's delivery and filed suit claiming the pre-recorded calls violated the TCPA. *See Lamont,* 2014 U.S. Dist. LEXIS 51927 at *3-4. In granting the defendant's motion to dismiss, the Court properly found- in the context of an informational and not a telemarketing call- that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *Id.*

QuoteWizard, however, fails to mention that in dismissing the plaintiff's TCPA claim, the court in *Lamont* explicitly acknowledged and explained that the facts presented to the Court ***did not involve*** the stricter consent rules relating to telemarketing calls as implemented by the Federal Communications Commission in 2012 at 27 FCC Rcd 1830 at ¶112; 2012 FCC LEXIS 794 (Feb. 12, 2012). *See Lamont,* 2014 U.S. Dist. LEXIS 51927 at *6-7. Rather, the Court explained that in the context of a non-telemarketing calls, such as the business transaction at issue, the plaintiff consented to receive a follow-up informational call relating to the delivery of her furniture she admittedly purchased from the defendant, when she provided the defendant with her phone number. *Id.* at 8.

Of course, in this case, Mr. Mantha had no prior relationship whatsoever with QuoteWizard. The spam texts he received from QuoteWizard were telemarketing solicitations that are subject to the heightened consent rules and standards applicable to telemarketing calls as recognized by Congress at 47 C.F.R. § 64.1200(c)(2)(ii) and the Federal Communications Commission at 18 FCC Rcd. 14014, 14032, 14043 (2003). QuoteWizard's attempt to mislead the Court by encouraging it to apply a consent standard applicable only to debt collection or

informational calls under the TCPA, and not to telemarketing calls listed on the DNC Registry, falls flat.

**C. QuoteWizard's Efforts To Muddy The Consent Waters Do Not Disguise That It Has Failed To Prove That Mr. Mantha Ever Visited The Website Or Provided His TCPA Compliant Consent To Receive QuoteWizard Spam Telemarketing Texts.[5]**

In a heroic effort to muddy the factual record, QuoteWizard makes a series of exaggerated factual claims none of which present a material issue of genuine fact that would preclude this Court from entering partial summary judgment in Mr. Mantha's favor as to the issue of consent. Plaintiff addresses QuoteWizard's claims as follows:

**1. No Admissible Evidence Associates Mr. Osmancevic and Fenix Media With The Snappy Auto Website Or Mr. Mantha**

There is no clearer example of QuoteWizard's utter inability to meet its burden of proving by clear and convincing evidence that Mr. Mantha gave prior express written consent to receive telemarketing promoting QuoteWizard on www.snappyautoinsurance.com than the following passage from its Opposition:

> Mantha's blanket denial that he never visited the Website or consented to or requested the auto insurance quote information from QuoteWizard is substantially weakened by his sworn admissions that it is "fair" to say that Mantha does not recall "every website that [he has] ever visited in 2019" and he cannot rule out that somebody signed up on the Website on his behalf. *See* ECF No. 208, Ex. 3, p. 106:2-6; *id*., p. 41:8-10. It is an undisputed fact that *someone*, *somewhere*, entered Mantha's actual personal information (name, address, phone number, etc.) in connection with a request for an auto insurance quote before his lead was sold to QuoteWizard, even if Mantha denies doing it.

*See* ECF 222 at 15 (emphasis in original).

---

[5] References herein to ECF #210, Plaintiff's Statement of Facts In Support of Motion for Partial Summary Judgment, are noted as PSOF at ¶__.

*"Someone, somewhere"* is the opposite of clear and convincing evidence that Mr. Mantha opted in to receive telemarketing texts specifically promoting QuoteWizard. Moreover, even QuoteWizard's *"someone, somewhere" assertion* is not only disputed, it is demonstrably false. Adam Brown, the owner of the Snappy Auto website testified it is "fully impossible" that Mr. Mantha's lead came from his dormant snappyautoinsurance.com website and denied any connection to Mr. Osmancevic. PSOF ¶ 62 and Response to Defendant's Additional Facts at ¶ 100. Nor can QuoteWizard rely on its objected to deposition questions, for example, where it asked Mr. Mantha if he could recall literally every single website he visited over a one year period, or speculating as to what imaginary third parties might have done on his behalf. Further, QuoteWizard's effort to manufacture a material fact in dispute relating to Mr. Mantha's consent to receive its telemarketing texts, relies solely and entirely on an unauthenticated inadmissible hearsay email allegedly obtained from Mr. Osmacevic in Bosnia which Plaintiff has moved to strike from the record. ECF 219.





### 2. QuoteWizard's After The Fact Claim That It Was Listed As A Marketing Partner Of Snappy Auto Is Unsubstantiated And Irrelevant.

Apparently now finally recognizing that its TCPA consent argument fails for the simple reason that QuoteWizard was not identified as the "seller" on the Website, QuoteWizard points to a selected section of the testimony of Mr. Weeks, its 30(b)(6) deponent. At the time QuoteWizard sent multiple spam telemarketing texts to Mr. Mantha, it did not possess evidence of Mr. Mantha's TCPA compliant consent. *See* ECF #210, PSOF at ¶49-84. In fact, in an e-mail dated September 26, 2019, Mr. Weeks of QuoteWizard wrote to Mr. Fishman of Rev-Point (aka Jangl) seeking evidence of Mr. Mantha's consent to receive QuoteWizard telemarketing spam texts. Mr. Fishman then apparently sent Mr. Weeks some data relating to Mr. Mantha, which Mr.



*See* Plaintiff's Response to Defendant's Additional Facts Submitted In Opposition to

Plaintiff's Motion for Partial Summary Judgment at ¶109-11, and <u>Exhibit 26</u>, September

16, 2019, E-Mail Correspondence Between QuoteWizard and Rev-Point as to the Mantha

lead at QuoteWizard_Mantha 000013 (emphasis added).



data he obtained from various sources and created the QuoteWizard Opt In. *See* ECF #210,

PSOF at ¶49-51.

   Even, however, if the Website listed QuoteWizard as the seller who would be

telemarketing to consumers (it of course did not), QuoteWizard has offered no proof whatsoever

that such language appeared on the Website on the actual date on which Mr. Mantha allegedly





### 3.  QuoteWizard's Claim That Mr. Mantha's 'Consent' Is Evidenced By A Jornaya ID and By Two IP Addresses Is Proven False

At the outset of this litigation, QuoteWizard claimed that Mr. Mantha's visit to the Website and his purported consent to receive QuoteWizard telemarketing texts was confirmed both by a Jornaya ID assigned to Mr. Mantha which purportedly documented his visit to the Website, and by two IP addresses purportedly assigned to computers used by Mr. Mantha to access the Website. *See* ECF #210, PSOF at ¶63-76. As detailed in Mr. Mantha's prior papers, discovery proved devastating to these claims. First, discovery revealed that the Jornaya ID listed on the QuoteWizard Opt In, as purportedly confirming Mr. Mantha's visit to the Snappy Auto Website and confirming his alleged consent to receive QuoteWizard telemarketing texts, has absolutely nothing to do with Mr. Mantha. *Id.* at ¶63-69. To date, QuoteWizard has failed to explain why the Jornaya ID was falsely included on the QuoteWizard Opt-In, a document that

QuoteWizard used to threaten Mr. Mantha and his counsel with Rule 11 sanctions. Second, discovery also revealed that Mr. Mantha had no association whatsoever to the two IP addresses QuoteWizard claimed were used by Mr. Mantha to access the Website. *See* ECF #210, PSOF at ¶70-76. As detailed previously, the two consumers who were, in fact, the subscribers to these IP addresses were deposed and denied any association whatsoever with Mr. Mantha, and further denied ever visiting the Website. *Id.*



Mantha in any fashion whatsoever, confirms the fact that QuoteWizard's consent defense is a fabricated sham.

### 4. Whether QuoteWizard, Rev-Point Or Plural 'Believed' That Mr. Mantha Consented To Receive QuoteWizard Telemarketing Spam Is Irrelevant.



### 5. QuoteWizard's Spoliation Claim is Baseless as it Has Not and Cannot Carry its Burden of Establishing that the Purported Consent was Ever on Mr. Mantha's Computer or Any of the Elements Required to Establish Spoliation

Knowing it has failed to carry its heavy burden to prove by clear and convincing evidence that Mr. Mantha clearly and conspicuously consented in writing to receive QuoteWizard

---

[7] *See* Plaintiff's Response to QuoteWizard's Additional Statement of Facts In Opposition to Plaintiff's Motion for Partial Summary Judgment at ¶111.

telemarketing texts, QuoteWizard asks this Court to excuse its failure via a spoliation inference.

To prevail on a spoliation claim, a movant must establish and satisfy are five elements:

> (1)    an act of destruction; (2) discoverability of the evidence; (3) an
> intent to destroy the evidence; (4) occurrence of the act at a time after suit
> has been filed, or, if before, at a time when the party is on notice that
> evidence may be relevant to potential litigation; and (5) prejudice to the
> moving party.

*See Porcal v. Ciuffo*, Civil Action No. 10-cv-40016-TSH, 2011 U.S. Dist. LEXIS 134359, at *7

(D. Mass. Nov. 21, 2011) (citing *McGuire v. ACUFEX Microsurgical, Inc.*, 175 F.R.D. 149, 154

(D.Mass.1997)).

QuoteWizard has failed to make out these elements. First and foremost, QuoteWizard is

not entitled to a spoliation inference to stave off the entry of partial summary judgment against it

as to the issue of consent, because as Mr. Mantha has attested from the outset- he never

consented to receive telemarketing texts from QuoteWizard. Accordingly, he never was in

possession of such evidence as it did not exist. In addition, Mr. Mantha has not just denied he did

not consent, he has proven it. Over the past year and a half of discovery, Mr. Mantha has

demonstrated through admissible evidence and sworn testimony that he did not consent to

receive QuoteWizard's spam texts, and any claim that he did is premised on a sham. *See* ECF

#210, PSOF at ¶49-76. *See also* Plaintiff's Response to QuoteWizard's Additional Statement of

Facts In Opposition to Plaintiff's Motion for Partial Summary Judgment at ¶99-122.

As the First Circuit has observed, "It is a proposition too elementary to require citation of

authority that when there is no evidence to begin with, a claim of spoliation will not lie. This is

such a case." *Gomez v. Stop & Shop Supermarket Co*, 670 F.3d 395, 399 (1st Cir. 2012). In

*Gomez* the First Circuit forcefully established that a slip and fall plaintiffs' speculation the

existence of a purportedly missing videotape is insufficient to invoke a spoliation inference:

The plaintiff falls woefully short of meeting these requirements. He relies on three facts to support his contention that the defendant destroyed a videotape of the accident: the defendant had a store security system that employed a series of cameras; the defendant had exclusive control over that system; and no videotape was produced during discovery. These facts are true but, without more, they are inadequate to show spoliation.

We canvass the pertinent evidence. A cashier employed by the defendant testified that there are cameras in the store that cover "a good majority" of the selling floor. Although this testimony supports a conclusion that the store had cameras focused on some areas of the market, it does not support a conclusion (or even a reasonable inference) that a security camera filmed the incident that transpired in the greeting card aisle. The absence of any such evidence is fatal to the plaintiff's hypothesis. See Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989) ("The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

The conclusion that no videotape ever existed is buttressed by the record as a whole. The cashier testified that she had never seen or heard of a videotape of the accident. An assistant store manager testified that the security cameras did not surveil the greeting card aisle. Finally, a security supervisor confirmed that the greeting card aisle is usually not protected by camera surveillance. He added that while it would be possible for surveillance to occur there, an employee would have needed to specially position a camera aimed at that specific location. The record contains no evidence that any such positioning occurred on or near the date of the plaintiff's fall.

Id.

As Mr. Mantha never consented to receive QuoteWizard's telemarketing texts, evidence of such never existed and, as such, could not have been spoliated. See ECF #210, PSOF at ¶49-76. See also Plaintiff's Response to QuoteWizard's Additional Statement of Facts In Opposition to Plaintiff's Motion for Partial Summary Judgment at ¶117-121.

Further, there is no evidence whatsoever that Mr. Mantha destroyed anything. In September of 2019, Mr. Mantha submitted a class demand letter to QuoteWizard informing it of his receipt of telemarketing spam and that it was in violation of the TCPA. In response, on September 19, 2019, QuoteWizard denied Mr. Mantha's claim, alleged his claim was frivolous,

and claimed that Mr. Mantha had consented to receive telemarketing spam from QuoteWizard by visiting the Website. Mr. Mantha testified that after he received QuoteWizard's response to his legal demand, he visited the Website and confirmed that he had never visited the Website at any prior time. *See* ECF 201-6 at Supp Answer to Int. 22. Mr. Mantha further denied that he or anyone on his behalf gave consent for him to receive text messages. *See* Dep. of Joseph Mantha, ECF 210-7 at 113:7-114:1. In September of 2019, Mr. Mantha was under no duty to preserve his internet search histories as he had independently confirmed that he never consented to receive QuoteWizard telemarketing texts, and never visited the Website. Thereafter, Mr. Mantha further confirmed he never visited the Website when he affirmatively demonstrated that the Jornaya ID offered by QuoteWizard as purported evidence of his visit to the Website, in fact, had no connection to him whatsoever. Mr. Mantha went even further and confirmed he never visited the Website by confirming that he had no association whatsoever with the two IP Addresses which QuoteWizard initially claimed were associated with his visit to the Web-Site. Mr. Mantha went yet even further and confirmed via sworn testimony from Adam Brown, the owner of the Website that it was "impossible" for Mr. Mantha's lead data to have come from the Website and that the Website ceased generating auto-insurance leads in 2016. *See* ECF #210, PSOF at ¶49-76. *See also* Plaintiff's Response to QuoteWizard's Additional Statement of Facts In Opposition to Plaintiff's Motion for Partial Summary Judgment at ¶99-122.

For all of these reasons, QuoteWizard's attempt to revive its failed consent defense via a spurious spoliation sanction fails.

**D. Mr. Mantha's DNC Registered Cell Phone Is Subscribed To Him Personally And Not To Any Business And Is Entitled To The Protections Of The TCPA and the DNC Registry.**

In Opposition to Plaintiff's Motion for Partial Summary Judgment as to whether Mr. Mantha's DNC listed cell phone is entitled to the protections of the DNC Registry, QuoteWizard continues to spin and deflect pointing to the number of times it claims Mr. Mantha used the Wireless Number to make alleged work-related calls. *See* ECF #223, **Opposition at \* 23-27.** Notably absent from QuoteWizard's response is any rebuttal whatsoever to the undisputed fact that Mr. Mantha's Wireless Number is not subscribed to a business and is therefore entitled to the protections of the TCPA and the DNC Registry. *See* Defendant's Response to Plaintiff's Statement of Facts and Additional Statement of Material Facts at # 28, 29 (QuoteWizard acknowledges that it is undisputed that the Wireless Number is subscribed in Mr. Mantha's name, and not in the name of his employer, and the bill is mailed to his address at his home).

The TCPA and its accompanying regulations prohibit sellers, such as QuoteWizard, from making telephone solicitations to "residential telephone subscribers" who have listed their telephone numbers on the national DNC Registry. *See* 47 C.F.R. § 64.1200 (c)(2)(limiting DNC Registry to "residential" subscribed numbers). The protections afforded "residential" subscribed numbers, under the TCPA, however is not limited to traditional land lines, but rather extend to consumer's wireless numbers. *See* 47 C.F.R. § 64.1200(e) (citing 18 F.C.C. Rcd. 14014, 14039-40 ¶ 28-36 (recognizing the privacy rights of wireless subscribers and recognizing that DNC protections afforded by 47 U.S.C. 227(c) extend "to wireless telephone numbers").

Determining the difference between a phone number that is protected by the DNC Registry, and one that is not, regardless as to whether the number is a residential land line or a wireless number, simply requires an examination as to whether the number is "subscribed" to a consumer or to a business. A "business subscriber" is defined by the Telecommunications provisions of the Code of Federal Regulations as a "subscriber to a telephone exchange service

for businesses." *See* 47 C.F.R. § 64.2305(b). A "residential subscriber" is specifically defined as a "subscriber to a telephone exchange service that is not a business subscriber." *See* 47 C.F.R. § 64.2305(d). Accordingly, both traditional land lines and wireless numbers that are subscribed to consumers are protected by the DNC Registry. Land lines and wireless numbers subscribed to businesses are not.

Rather, than respond to this simple argument, QuoteWizard ignores it. Instead, QuoteWizard persists in its claim that since Mr. Mantha used his personal Wireless Number to make many calls it claims are "work related," the Wireless Number is not entitled to the protections of the TCPA and the DNC Registry. ECF #223, **Opposition at * 23-25.** In support, QuoteWizard claims that Mr. Mantha has offered "no facts or evidence" concerning the use of his cell phone… *Id.* at 24. QuoteWizard, again, misrepresents the record.

First, Mr. Mantha testified at his deposition that the only phone number he personally owned in 2019 was the Wireless Number. *See* ECF #210, PSOF, <u>Exhibit 7</u>, Deposition of Joe Mantha Day 1 at page 30-31 (Q- Did you have other phones in 2019: A- No). In other words, at the time he received text spam from QuoteWizard, Mr. Mantha did not own a traditional residential land line at the time. His only phone that he used for personal use, and to make work related calls when he was out of the office, was the Wireless Number. Second, Mr. Mantha testified that the "overwhelming" use of the Wireless Number was for personal and residential purposes. *Id.* at <u>Exhibit 6</u>, Plaintiff's Supplemental Answers to Interrogatories at Answer #5, 7. Third, Mr. Mantha introduced unrebutted evidence indicating that the Wireless Number is billed in his name, is mailed to his residence, and is not used in conjunction with any home based business. *See* ECF #225, Defendant's Response to Plaintiff's Statement of Facts and Additional Statement of Material Facts at # 28, 29, 91 (QuoteWizard acknowledges that it is undisputed that

the Wireless Number is subscribed in Mr. Mantha's name, and not in the name of his employer,

that the bill is mailed to his address at his home, and that Mr. Mantha does not own a home based

business). Mr. Mantha also introduced unrebutted evidence that the telemarketing texts were

directed to him personally, and not to his employer. Mr. Mantha's employer further confirmed

that the Wireless Number is subscribed to Mr. Mantha individually and not to the employer, and

is controlled by Mr. Mantha. *See* ECF #210, PSOF at ¶27-31, ¶85-98.



## II.    CONCLUSION

For the forgoing reasons and those stated in Plaintiff's Motion for Partial Summary

Judgment, Plaintiff respectfully requests that his motion be allowed.

PLAINTIFF,

By his attorneys

*/s/ Matthew P. McCue*
Matthew P. McCue
THE LAW OFFICE OF MATTHEW P.
MCCUE

---

[8] The call detail records also do not evidence text records, a means of communication frequently
used by Mr. Mantha.

1 South Avenue, Suite 3
Natick, MA 01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

Edward A. Broderick
BRODERICK LAW, P.C.
176 Federal Street, Fifth Floor
Boston, MA 02110
Telephone: (617) 738-7080
ted@broderick-law.com

Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

Alex M. Washkowitz
Jeremy Cohen
CW LAW GROUP, P.C.
188 Oaks Road Framingham, MA 01701
alex@cwlawgrouppc.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18th, 2021, I electronically transmitted the

foregoing to all counsel of record via the electronic filing system.

By: */s/ Matthew P. McCue*
Matthew P. McCue

PLAINTIFF,

By his attorneys

*/s/ Matthew P. McCue*
Matthew P. McCue
THE LAW OFFICE OF MATTHEW P.
MCCUE

21

1 South Avenue, Suite 3
Natick, MA 01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

Edward A. Broderick
BRODERICK LAW, P.C.
176 Federal Street, Fifth Floor
Boston, MA 02110
Telephone: (617) 738-7080
ted@broderick-law.com

Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

Alex M. Washkowitz
Jeremy Cohen
CW LAW GROUP, P.C.
188 Oaks Road Framingham, MA 01701
alex@cwlawgrouppc.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2021, I electronically transmitted the foregoing

to all counsel of record via the electronic filing system.

By:   */s/ Matthew P. McCue*
          Matthew P. McCue