## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH MANTHA, *on behalf of himself and all others similarly situated*,

           Plaintiff,

v.

QUOTEWIZARD.COM, LLC,

           Defendant.

Civil Action No. 1:19-cv-12235-LTS

**LEAVE TO FILE EXCESS PAGES GRANTED ON DEC. 29, 2021**

### DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT [ECF No. 258]

Now Comes Defendant QuoteWizard.com, LLC ("QuoteWizard"), pursuant to Federal Rule of Civil  Procedure 72(b),[1] and files its Objections to the entirety of the Report and Recommendation on the Parties' Cross-Motions for Summary Judgment [ECF No. 258] (hereinafter, the "R&R"), which recommended denying QuoteWizard's summary judgment motion and granting Plaintiff Joseph Mantha's ("Mantha") partial motion for summary judgment. These Objections are timely filed per ECF No. 260.[2]

### OBJECTIONS

QuoteWizard timely lodges objections to the entirety of the R&R.  For ease of reference for the Court, QuoteWizard uses herein the organization and headers from the R&R (omitting non-substantive portions thereof).

---

[1] "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  *See* Fed. R. Civ. P. 72(b).

[2] QuoteWizard herein incorporates its summary judgment briefing, statement of facts and response to Mantha's statement of facts/additional statement of facts, affidavits, and exhibits.

## II. Factual Background

Although the R&R's recitation of the factual background did not inform the ultimate findings therein, QuoteWizard notes the following objections to certain portions of that section:

(1) Beyond conclusory labels of "personal" or "residential" use of the cell phone that cannot be credited, Mantha produced no admissible evidence that he used his cell phone for such purposes during the subject time period in 2019.  Thus, QuoteWizard objects to the statement that Mantha "uses the number for personal purposes."  (R&R, p. 2);

(2) QuoteWizard objects to the statement that "Defendant generates leads," as QuoteWizard did not "generate" Mantha's lead but rather the lead was sold to it by RevPoint Media, LLC after it was generated.  (R&R, p.2; *compare* ECF No. 204, ¶ 95);

(3) QuoteWizard objects to the statement that "the client then provides an insurance quote to the lead" as applicable to this case—as there is no evidence in the record that Mantha was contacted by GEICO or was provided an insurance quote by GEICO or any other insurance company.  (R&R, p. 2);

(4) QuoteWizard objects to the statement that "Plaintiff … denies having visited the Snappy Auto website prior to receiving the text messages from defendant and denies giving defendant consent to contact him in any way," insofar as it fails to acknowledge that Mantha has also admitted under oath that he cannot recall every website he visited in 2019 and he cannot rule out that someone submitted his personal information and the consent information on his behalf.  (R&R, p. 4; *compare* ECF No. 225, ¶ 52);

(5) QuoteWizard objects to the statement concerning data Adam Brown collected on the Snappy Auto website to the extent it implies that the website could not have collected plaintiff's telephone number, as Brown testified under oath that the initial landing page collected only ZIP codes and e-mail addresses, but the next portion of the website (page 2) collected additional data.  (R&R, p. 4; *compare* ECF No. 210, Ex. 17, pp. 30-32);

(6) QuoteWizard objects to the statement that "if the website was still active in 2019, then as defendant acknowledges, Fenix was operating the site without Brown's permission," as the undisputed evidence in the record was the website was paid for and operational in 2019, and Brown testified that Dario Osmancevic was "obviously responsible" for it.  (R&R, p. 4 n.6; *compare* ECF No. 225, ¶¶ 57-58, 101-102, 105).

## IV. Discussion

### A.  Whether DNC Protection Applies to Cellular Telephone Numbers

The Magistrate Judge erred in concluding, as a threshold issue of law, that the Telephone Consumer Protection Act's ("TCPA") do not call ("DNC") protections extend to cellular telephone

numbers.  In so deciding, the Magistrate Judge relied exclusively on the Federal Communication Commission's ("FCC") interpretation and related regulation (42 C.F.R. § 64.1200(c)(2), (e)) without acknowledging much less considering QuoteWizard's argument that the FCC's interpretation was contrary to the TCPA.  *See* R&R, p. 8 ("In interpreting the TCPA, the FCC has expressed its view that the DNC provision applies to cellular numbers. … As a result, FCC regulations interpreting the TCPA extend DNC protection to cellular phones.").  Critically, the unambiguous TCPA text, not the FCC regulations contrary thereto, should control, but the R&R did not even consider the text of the TCPA or QuoteWizard's argument in this regard.

As QuoteWizard argued in its summary judgment motion (*see* ECF No. 202, pp. 8-11), the authorizing TCPA statute, 47 U.S.C. § 227(c)(1), applies only to "residential telephone subscriber[s]"[3] and <u>not</u> to cellular telephone users.  This omission is notable and dispositive because other parts of the TCPA *do* expressly apply to cellular telephone users, such as 47 U.S.C. § 227(b)(1)(A)(i)-(iii) (setting conditions for use of robocalls to cellular and other covered telephones).  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.").

Congress authorized the FCC to adopt rules to "protect ***residential telephone subscribers'*** privacy rights to avoid receiving telephone solicitations to which they object" (*see* 47 U.S.C. § 227(c)(1) (emphasis added)) and to establish and operate a "single national database to compile a list of telephone numbers of ***residential subscribers*** who object to receiving telephone

---

[3] Merriam Webster defines "residential" as "used as a residence or by residents," and "resident" as "living in a place for some length of time," or "one who resides in a place"—definitions that do not apply to a cell phone used outside the home or (as here) in connection with employment.  *See Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 362 n.7 (E.D. Pa. 2019) ("[T]he plain language of 'residential telephone' describes a telephone used by individuals in the home, and not a cellular telephone, which can be used anywhere.").

solicitations" (*see* 47 U.S.C. § 227(c)(3) (emphasis added)).  That was the limit of the FCC's authorization from Congress.  Where the FCC has exceeded that limit in expanding "residential telephone subscriber" to certain cell phone users, its regulations and interpretation cannot stand. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977) (scope of administrative rule cannot exceed the scope of the power granted by Congress); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124-25 (2016) (if "Congress has directly spoken to the precise question at issue," then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress") (quotation omitted).

Thus, as a threshold matter, cell phone users are not "residential telephone subscriber[s]" within the meaning of 47 U.S.C. § 227(c)(1) regardless of the FCC's interpretation to the contrary. Although courts disagree on this issue, numerous courts across the country sharply distinguish between residential lines/subscribers and cell phones.  *See Cunningham v. Creative Edge Mktg. LLC*, 2021 U.S. Dist. LEXIS 126859, at *10 (E.D. Tex. June 16, 2021) ("Plaintiff alleges, and indeed confirmed … that the calls were made to one of his cell phones—not a residential telephone. Various courts, including this Court, have considered similar claims by Plaintiff and found that the regulation does not encompass Plaintiff's cell phone.") (collecting cases); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250 (11th Cir. 2014) (distinguishing a case that discussed Section 227(b)(1)(B), which concerns calls to residential lines, because "the telephone number in question here, is a cell-phone number"); *Morgan v. U.S. Xpress, Inc.*, 2018 U.S. Dist. LEXIS 125001, 2018 WL 3580775, at *1 (W.D. Va. July 25, 2018) ("[T]he structure and language of the TCPA demonstrate that calls made to a cell phone are not calls made to a 'residential telephone line[.]'" (citation omitted)); *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1320 (S.D. Fla. 2012), *aff'd*, 755 F.3d 1265 (11th Cir. 2014) ("Practical realities support a distinction between

residential and cellular lines."); *Cunningham v. Caribbean Cruise Lines, Inc.*, 2016 U.S. Dist. LEXIS 179758, at *5-6 (S.D. Fla. Dec. 29, 2016) ("While Plaintiff argues that his cellular phone serves as both a mobile and residential line, the Eleventh Circuit distinguishes residential land line telephone numbers from cell-phone numbers. . . . [T]he Court finds Plaintiff's assertion that a cellular phone can be converted into a residential phone unavailing."); *Cunningham v. Politi*, 2019 U.S. Dist. LEXIS 102447, at *10-11 (E.D. Tex. Apr. 30, 2019) ("The private right of action created by 47 U.S.C. § 227(c)(5) is accordingly limited to redress for violations of the regulations that concern residential telephone subscribers. Recent courts considering claims asserted by Plaintiff have found this not to encompass Plaintiff's cellular phones and have dismissed his claims.") (collecting cases), adopted by 2019 U.S. Dist. LEXIS 102050 (E.D. Tex. June 19, 2019).  At a minimum, QuoteWizard requests judicial review of and a decision on this textual argument, which was not addressed or resolved in the R&R despite being fully briefed.

### B.  Whether Plaintiff Was a Residential [Telephone] Subscriber

Even assuming that cell phone users can qualify as "residential telephone subscribers," the Magistrate Judge erred, and in fact extended the statute and regulation beyond even their arguably broadest permissible use, when finding that a person who personally subscribes to a cell phone is *per se* a "residential telephone subscriber."  *See* R&R, p. 10 ("The parties do not dispute that plaintiff's cellular number was registered in his name or that the service plan for that number was billed to his home address. … [T]he court recommends granting summary judgment in favor of plaintiff *by finding that DNC protection applied to his number because he was a residential subscriber*." (emphasis added)).

To be clear, this interpretation is unsupported by any precedent, goes even further than the FCC's most consumer-friendly interpretations of "residential telephone subscriber," and would be

plainly unconstitutional.[4]  As the R&R noted but then failed to apply, the FCC—despite finding

that cell phone users *can* qualify as "residential telephone subscribers"—has acknowledged that

the way a cell phone is used impacts whether it so qualifies, and thus a fact-intensive inquiry into

usage may be necessary.  *See* 18 FCC. Rcd. 14014, 14038–39 (July 3, 2003) (FCC rejected a

categorical approach, and stated that a "wireless subscriber" may be a "residential subscriber"

based on a "fact-intensive" inquiry) (further proof may be required pursuant to a fact-intensive

inquiry to show that a wireless subscriber uses their wireless phone in a manner consistent with

the definition of "residential.").  The FCC is obviously constrained by the description "residential,"

which requires connection to a residence.

The Magistrate Judge apparently dismissed this FCC guidance on the purported ground

that it related to FCC enforcement, not to private litigation.  *See* R&R, p. 9 n.10 ("Defendant cites

the FCC's statement that '[s]uch a presumption . . . may require a complaining wireless subscriber

to provide further proof of the validity of that presumption should we need to take enforcement

action.' In re Rules 2003 ¶ 36. The court notes, however, that this statement uses 'may' to indicate

possibility rather than a definite course of action, and refers to FCC enforcement actions, not

private litigation.").  Yet the Magistrate Judge relied on the prior portions of the *exact same*

paragraph of the same FCC order in concluding, in the first instance, that cell phones *can* qualify,

with exceptions.  *See* R&R, p. 8 (citing FCC Rcd. 14014, ¶ 36 (June 26, 2003) in finding that "the

FCC has expressed its view that the DNC provision applies to cellular numbers"); *id*., p. 10 (citing

---

[4] *See Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1233, 1225 (10th Cir. 2004) (rejecting constitutional
challenge to the National Do Not Call Registry on the basis that "the do-not-call registry targets speech that
invades the privacy of the home, a personal sanctuary that enjoys a unique status in our constitutional
jurisprudence.") ("[T]he [DNC] is narrowly tailored to restrict only speech that contributes to the problems
the government seeks to redress, namely the intrusion into personal privacy and the risk of fraud and abuse
caused by telephone calls that consumers do not welcome into their *homes*." (emphasis added)).  A finding
that DNC protections extend to a person's "personal" cell phone regardless of where or how it is used (as
the Magistrate Judge erroneously concluded here) would be violative of the First Amendment.

FCC Rcd. 14014, ¶ 36 (June 26, 2003) in support of finding that cell phone users can qualify).  It is inconsistent, arbitrary, and capricious for the R&R to endorse the portions of the FCC order that benefit Mantha then reject out-of-hand the latter portions that benefit QuoteWizard, where they must necessarily be read together to mean that cell phones *may* qualify *with exceptions*.[5]  In short, the R&R fails to correctly acknowledge that, while the FCC has found that cell phone users can qualify as residential telephone subscribers, *this is not a per se rule*.

Moreover, QuoteWizard is not aware of a single court that has endorsed the same approach taken by the R&R here, namely, finding that a "personal" cell phone user necessarily is a residential telephone subscriber without regard to how the cell phone is used.  As noted, this is belied by even the FCC guidance on the issue, not to mention the TCPA statute.  Courts interpreting the very same paragraph relied upon by the Magistrate Judge, FCC Rcd. 14014, ¶ 36 (June 26, 2003), have consistently found that whether a cell phone qualifies depends on its *use* (*i.e.* whether it is used residentially), even taking into account an FCC presumption that they qualify if registered on the National Registry.  *See*, *e.g.*, *Strange v. ABC Co.*, 2021 U.S. Dist. LEXIS 38882, at *10-11 (W.D. La. March 1, 2021) (citing FCC Rcd. 14014, ¶ 36 (June 26, 2003)) ("From this, the Court finds persuasive authority that plaintiffs, like Strange, who register their cell phones with

---

[5] The R&R states that, "[y]et by extending DNC protection to cellular numbers, which are inherently mobile and not limited to use in the home, it is reasonable to interpret the TCPA and its relevant regulations as extending DNC protection to cellular numbers that are not used exclusively in the home."  R&R, p. 10.  But the FCC has never suggested that "residential telephone subscriber" applies to a cell phone regardless of where or how it is used. As noted, the FCC has recognized that some cell phones will not so qualify depending on their use.  The R&R's assumption that *all* "personal" cell phones *per se* qualify is simply, and clearly, erroneous.

The R&R also erroneously relies on a portion of a statement from Chairman Michael K. Powell concerning "personal phones and faxes" but that statement was not made about DNC protections in particular.  *See* 18 FCC Rcd 14014, 344-345 (June 26, 2003) ("The TCPA is about tools. … Our decision makes the American consumer's toolbox more complete by creating a national do not call list and strengthening and modifying our other longstanding protections under the TCPA. Our goal: to maximize consumers' ability to control the messages they receive on their personal phones and faxes. … In addition to the national do not call list, our decision contains a number of other important provisions.").

do-not-call registries are presumed to be residential subscribers. However, the Court finds that Strange is still required to put forth evidence supporting this presumption, as he is seeking enforcement of Section 227(c)(5) against the Defendants. … ***Strange cannot prevail under Section 227(c)(5) without sufficient proof that he used his cell phone for residential purposes***." (emphasis added)); *Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648, 655 (W.D. Tenn. Feb. 4, 2020) ("Courts have interpreted the 'residential telephone subscriber' element to require proof that the number called was used for 'residential purposes.'"); *Lee v. Loandepot.com, LLC*, 2016 U.S. Dist. LEXIS 110100, at *16-18 (D. Kan. Aug. 17, 2016) (granting summary judgment where plaintiff failed to establish that his cellular number was used for residential purposes) ("The Court is not persuaded that Plaintiff has met his burden at summary judgment to overcome Defendant's motion. To prevail under 47 C.F.R. § 64.1200(c)(2), Plaintiff must establish that his cellular number is used for residential purposes.").

To be clear, this is an element of Mantha's claim *on which he has the burden of the proof at the summary judgment stage and all other stages. See Strange*, 2021 U.S. Dist. LEXIS 38882, at *10-11; *Stevens-Bratton*, 437 F. Supp. 3d at 655.

In both denying QuoteWizard's motion on this issue *and* granting Mantha's on the same, the Magistrate Judge failed to hold Mantha to his burden of proof on an element of his claim, improperly shifted the burden of proof to QuoteWizard, improperly granted inferences in favor of Mantha, and wholly failed to consider the relevant issue under the applicable standard—whether Mantha used his cell phone for residential purposes in 2019.  Instead, the Magistrate Judge exclusively relied on the fact that the cell phone is subscribed to Mantha personally and not to his employer.  *See* R&R, p. 10.  This fact is irrelevant because it does not pertain to the *use* of the cell phone—to whom a cell phone is subscribed speaks nothing of how and where the cell phone is

8

used (*i.e.* whether it is used for "residential" purposes). Thus, the Magistrate Judge improperly converted "residential telephone subscriber" to "personal cell phone," which is *not* the operative definition under any statute, regulation, or judicial precedent.

If the Magistrate Judge had actually examined the issue of and evidence concerning alleged residential use of Mantha's cell phone, the evidence was both overwhelming and undisputed in QuoteWizard's favor. In making this determination, with the burden on the plaintiff to satisfy the element of the claim, courts look to the "facts and circumstances surrounding a particular case before deciding whether TCPA protection extended to a particular telephone number that was used for both business and residential purposes." *Blevins v. Premium Merch. Funding One, LLC*, 2018 U.S. Dist. LEXIS 183362, at *6 (S.D. Ohio Oct. 25, 2018).[6] *See also Stevens-Bratton*, 437 F. Supp. 3d at 657-58 (it is a "fact-intensive" inquiry). This is the necessary inquiry that the Magistrate Judge failed to take, let alone acknowledge in the R&R.

As to Mantha's use of his cell phone, Mantha's counsel submitted no evidence of residential use during the relevant time period in 2019 (or any time) whatsoever. For example, Mantha did not submit an affidavit describing how or when he used his cell phone in connection with his residence in 2019, nor did he make any attempt to identify specific calls that would so qualify despite that his entire call records for 2019 were in evidence. Advancing conclusory labels of "personal" or "residential" use is woefully insufficient at the summary judgment stage. *See Stevens-Bratton*, 437 F. Supp. 3d 656-57 (finding insufficient for summary judgment purposes plaintiff's declaration that she used her cell phone "as both [her] residential line and mobile line"

---

[6] Courts interpret this issue as relevant to both the element of a DNC claim concerning "residential telephone subscriber" and as a potential defect to plaintiff's standing under the TCPA. *See*, *e.g.*, *Shelton v. Target Advance LLC*, 2019 U.S. Dist. LEXIS 64713, at *15-18 (E.D. Pa. April 16, 2019). QuoteWizard argued both points based on the fact that Mantha's cell phone was used primarily for work purposes. The Magistrate Judge likewise failed to consider this evidence in ruling upon QuoteWizard's standing argument, and QuoteWizard further objects to the R&R on that basis.

where she lacked landline) ("That is not enough to establish that she uses her telephone for residential purposes. The first part is conclusory and simply states the legal requirement."). In short, there is no admissible evidence in the record for the Court to find any "residential" use of Mantha's cell phone in 2019 or at any time. For that reason alone, Mantha loses on this issue.

On the other hand, QuoteWizard submitted undisputed record evidence that:

- Mantha, as the Director of Residential Services at the Doctor Franklin Perkins School ("Perkins School"), which, among other things, has an elementary, middle, and high schools for students with special needs, *i.e.* behavioral/emotional issues, etc. where 50-60 students live on campus year-round in group homes, is ultimately responsible for those 50-60 students and about 110 staff (*see* ECF No. 204, ¶¶ 2-8);

- Mantha uses his cell phone during the day, evenings, on weekends, and on holidays for work purposes (*see id.*, ¶¶ 1-77);

- Mantha's job is 24/7 (*see id.*, ¶¶ 21-23);

- When Mantha is physically on campus (generally, Mondays through Friday from 8 a.m. to 4 p.m. or 9 a.m. to 5 p.m.), the best way for anyone to reach him is on his cell phone at issue in this case (*see id.*, ¶¶ 18-20);

- When not on campus, the *only* way for Perkins School employees to contact Mantha is on his cell phone, either directly or through a phone application called "Ring Central." (*see id.*, ¶¶ 56, 74, 77);

- Mantha was the official administrative on-call contact for the six group homes *approximately half of* 2019, to be reached at his cell phone, meaning that Mantha must be available via his cell phone to field calls relating to any critical situations at the group homes (*see id.*, ¶¶ 23-33);

- Even when not on call, Mantha was the person to be called on his cell phone in the event of emergency situations, such as run-away students, which had happened occasionally, or injured staff, police responding to the group homes, physical altercations, or residential students experiencing psychiatric emergencies (*see id.*, ¶¶ 33-39);

- Mantha made or received at least 1,400 calls for work on his cell phone in 2019, or approximately 117 per month or almost 4 a day (*see id.*, ¶ 58; *see also* Exhibit 9);[7]

---

[7] Importantly, the number of work calls that Mantha made or received on his cell phone is likely higher than what is reflected in Exhibit 9. That exhibit reflects only the work calls that QuoteWizard was able to identify and confirm based on information provided in discovery by Mantha. In addition, QuoteWizard

- The work calls constituted nearly 50 percent (48.6%) of calls Mantha made or took on his cell phone in 2019 in total that QuoteWizard was able to identify (*see* ECF No. 204, ¶ 58);

- Mantha receives a $30 monthly reimbursement from Perkins School for his cell phone use for work, only given to employees who cannot do their jobs without using their cell phones (*see id.*, ¶¶ 50-55);

- Mantha is also able to use his work e-mail on his cell phone, forward calls from his desk work phone to his cell phone, and use the "Ring Central" application to call any Perkins School employee via his cell phone anywhere, anytime (*see id.*, ¶¶ 74-77).

To be clear, Mantha did not present any countervailing evidence to rebut the foregoing. He does not contest that he uses his cell phone for work, nor has he contested the extent of its use for work or its necessity to carry out his job duties. In light of these undisputed material facts, and the complete absence of any evidence of "residential" use of the cell phone in 2019 or any other time, on an element of Mantha's claim on which he bore the burden—there was only one possible, correct finding: Mantha has failed to carry his burden in showing that he was a "residential telephone subscriber" when he received the text messages at issue in 2019. Contrary to the R&R, this <u>*necessitates*</u> entry of summary judgment in QuoteWizard's favor. *See In re Spigel*, 260 F.3d 27, 31 (1st. Cir. 2001) ("[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." (quotation and citation omitted)).

*At a bare minimum*, this issue presents a disputed issue of material fact for the factfinder (although QuoteWizard submits that Mantha's failure to present any evidence concerning the residential use of his cell phone precludes even that finding). *See Clauss v. Legend Sec., Inc.*, 2014

---

sought Mantha's text message and e-mail histories in discovery, which would have shown additional work usage of the cell phone, but these were not preserved/produced.

U.S. Dist. LEXIS 184286, at *6-7 (S.D. Iowa Sep. 8, 2014) (where there was "evidence supporting both the contention that Plaintiff's phone number was a residential phone number and that the phone number was a business phone number," question of residential telephone subscriber was disputed issue of material fact for factfinder at trial).

Because the Magistrate Judge applied a completely incorrect standard for "residential telephone subscriber" that is not supported at law, improperly shifted the burden of proof on an essential element of Mantha's claim to QuoteWizard, failed to acknowledge that Mantha presented no admissible evidence on this essential element of his claim, and also failed to consider the undisputed, overwhelming evidence in QuoteWizard's favor, the R&R's findings on this issue must be vacated, and summary judgment entered for QuoteWizard.

### C.  Whether Plaintiff Has Standing

The Magistrate Judge erred in finding that Mantha sufficiently established, as was his burden, both Article III and prudential standing.  In so finding, the Magistrate Judge mistakenly concluded that Mantha had put forth evidence of an injury-in-fact resulting from QuoteWizard's text messages.  This is unsupported by the record.  The Magistrate Judge also erroneously found prudential standing based largely on the fact that Mantha is not a "career plaintiff," which is irrelevant.

First, as to Article III standing, the R&R relied on three purported pieces of evidence of an injury-in-fact, none of which actually establish the same at the summary judgment stage.  First, it pointed to the allegations of Mantha's amended complaint.  *See* R&R, p. 11 ("In his complaint, plaintiff alleges that defendant's repeated text messages violated his privacy and were 'an annoying, harassing nuisance.' (#80 ¶ 58.).").  But the complaint is unsworn and merely the words of Mantha's counsel.  *See* ECF No. 80.  Unsworn allegations are <u>not</u> evidence at summary

judgment, particularly such boilerplate language as that cited here. *See Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 3 (1st Cir. 2010) ("mere allegations are not entitled to weight in the summary judgment calculus"); *Geshke v. Crocs, Inc.*, 740 F.3d 74, 78 (1st Cir. 2014); ("unverified allegations in a complaint are not evidence"). It was error for the Magistrate Judge to credit and rely upon these unsworn allegations.

Next, the Magistrate Judge cited a declaration "submitted in support of his motion for partial summary judgment [where] plaintiff stated that he finds unsolicited telemarketing irritating and a violation of his privacy rights, and that he listed his number on the DNC registry to alert potential callers to his desire to avoid such calls. (#210-14 ¶¶ 9-10.)." R&R, p. 11. Notably, Mantha did not claim therein that QuoteWizard's text messages caused him any specific harm or injury whatsoever. *See* ECF No. 210, Ex. 14. He rather included a boilerplate, *generalized* statement that "I find unsolicited telemarketing of all types irritating and a violation of my privacy rights." *Id.*, ¶ 9. Despite that Mantha easily could have explained that *QuoteWizard's messages* were "irritating and a violation of my privacy rights" *he has never so claimed*. His attempt to argue around this by claiming that "unsolicited telemarketing" is irritating to him is woefully insufficient to support a specific injury-in-fact resulting from QuoteWizard's messages such to satisfy his burden for Article III and prudential standing. Thus, it was error for the Magistrate Judge to construe this language to mean that Mantha had evidence of an injury-in-fact tied to QuoteWizard's messages.

Finally, the Magistrate Judge credited an interrogatory response where "plaintiff further stated that he communicated his frustration with defendant's messages to a friend." *See* R&R, pp. 11-12 (citing ECF No. 210, Ex. 6, p. 4). But this statement is inadmissible hearsay for the truth of the matter asserted herein, as Mantha is purporting to relay what he told a friend. Moreover, the

13

language of the interrogatory response is boilerplate and conclusory.  *See* ECF No. 210, Ex. 6, p. 4 ("I shared with my friend, Steven Novia, my general frustration with illegal telemarketing calls and the specific QuoteWizard texts at issue.").  Such conclusory statements are not sufficient evidence at the summary judgment stage.  *See Hochhalter v. Stephens Group*, 2006 U.S. Dist. LEXIS 114928, at *26-28 (D. Nev. March 30, 2006) ("Plaintiff's vague deposition testimony is not the objectively verifiable indicia required to support her emotional distress claims. Accordingly, summary judgment is appropriate for Defendants."); *Cellularm, Inc. v. Bay Alarm Co.*, 1991 U.S. Dist. LEXIS 20106, at *13-14 (N.D. Cal. April 11. 1991) ("Conclusory, speculative testimony is insufficient to raise genuine issues of fact and, thereby, defeat summary judgment.").

Furthermore, this inadmissible, boilerplate language is belied by Mantha's subsequent deposition testimony, where he described his conversation with Steven Novia after receiving the text messages and did not reference any statements about "frustration":

> Q. After receiving the text messages did you, did you call Steve and let him know that you the text messages?
> A. I believe I did.
> Q. And what did you say to him?
> A. I just said, "hey, remember we were talking about that, I just got these texts." Something along those lines.
> Q. And what did he say?
> A. I don't -- I don't recall. I think I said something about, you know, "do these fit the criteria" or something like that. And I didn't -- he just gave me Alex's e-mail address.

*See* ECF No. 208, Ex. 3, p. 70:12-24.  It is also further belied by Mantha's sworn deposition testimony that he did not even disclose to Steven Novia, when discussing the text messages, whether or not Mantha had consented to receive them.  *See id.*, p. 87:13-18.  In addition, none of the text messages that Mantha produced with Steven Novia (which he represented to be the only text messages he had concerning the case) evidenced any discussion about any alleged injury, and Mantha testified that he could not recall the substance of phone conversations he had with Novia

in August 2019 after he had received the text messages.  *See* ECF No. 208, Ex. 19.  *See also id.*, Ex. 4, pp. 65-66.  Finally, any boilerplate, conclusory claim of injury is further belied by evidence that Mantha never told his wife or anyone else about the text messages or complained about them. *See* ECF No. 204, ¶¶ 136-143.[8]  *See Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (court need not accept version of events if "blatantly contradicted" by other evidence); *accord Statchen v. Palmer*, 623 F.3d 15, 18 (1st Cir. 2010) ("incredible assertions" by the nonmoving party "need not be accepted").

All Mantha had to do was to submit a declaration explaining what, if any, specific injury he suffered from QuoteWizard's text messages.  To date, even facing a summary judgment motion on the issue, Mantha has not done so.  This compels only one conclusion: Mantha did not suffer any such injury from the messages.  In any event, this is Mantha's burden to meet, and he has utterly failed to meet it.  The Court can and should also take note of the fact that Mantha has never pleaded nor sought actual damages from the alleged TCPA violations but only statutory damages.

Thus, there is no admissible evidence in the record that Mantha suffered an injury-in-fact, or any type of harm, damage, or injury, directly as a result of the QuoteWizard text messages such to satisfy Mantha's burden to establish Article III standing.  To the extent the Magistrate Judge found that the mere sending/receipt of the messages in alleged violation of the TCPA confers Article III standing upon Mantha, this is contrary to U.S. Supreme Court precedent in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205, 2207  (2021) ("under Article III, an injury in law is not an

---

[8] Notwithstanding that the interrogatory statement is inadmissible hearsay, as noted, the Court can and should dismiss it on the additional ground that it is completely belied by the remaining record evidence. *See*, *e.g.*, *Stevens-Bratton*, 437 F. Supp. 3d at 657 (declaration from plaintiff in opposition to summary judgment motion was "not corroborated, but is contradicted, by the undisputed material fact"; "[e]vidence of something more is required to meet" a summary judgment motion).  *See also Whitley v. Spencer Cty. Police Dep't*, 178 F.3d 1298, 1999 WL 196499, at *3 (6th Cir. 1999) (unpublished) (affirming district court's grant of summary judgment to defendant where the evidence at the close of discovery contradicted plaintiff's self-serving affidavits and conclusory allegations).

injury in fact. Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court.") ("As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing.").

With respect to prudential standing, and relatedly, the undisputed record evidence shows that Mantha is outside the zone of interests the statute and regulation at issue were designed to protect.  In addition to the fact that Mantha's cell phone is essentially his work phone, when Mantha received the initial text message from QuoteWizard, he admittedly had but one thing on his mind: setting QuoteWizard up for liability.  Far from being actually injured from the text messages, Mantha was too busy contacting his friend, Steven Novia, who had already tipped him off to making money off TCPA claims, on whether the messages "count" for TCPA purposes and how he should respond to set up a claim.  Mantha then in fact responded—*five (5) times*—as Novia and Novia's attorney (later, Mantha's attorney) suggested.  He never asked QuoteWizard to stop contacting him or complained to QuoteWizard.  No more than eight (8) days after the last text message in the QuoteWizard/Mantha conversation, Mantha had already retained that attorney, Attorney Washkowitz, who served a demand on QuoteWizard for money in connection with the messages.  Novia later acted as a go-between for Mantha and Attorney Washkowitz.  Novia told Mantha that the attorney had reached out to Novia and told Mantha to get back to the attorney "ASAP" to "get paid."  Novia further advised that it is "life changing money," that the "longer it plays out the better you are, It's a game.  Let them play and let it play out."  *See* ECF No. 204, ¶¶ 78-82, 122-128, 129-135; *see also* ECF No. 208, Exs. 17, 19.

Under these undisputed facts, it cannot be genuinely argued that Congress had situations like this in mind when passing the TCPA and providing for the National Do Not Call Registry.

*See Garcia v. Credit One Bank, N.A.*, 2020 U.S. Dist. LEXIS 136881, at \*6-10 (D. Nev. July 31, 2020) (plaintiff "knew that if he instructed [defendant] at any time during one of these calls to cease calling him, [it] would have likely complied"; but "[i]nstead of taking the steps necessary to stop the alleged injury (the unwanted calls), ***he took steps to allow the continuance of the injury while building a record to facilitate a later claim***." (emphasis added)).   QuoteWizard asks the Court to apply a measure of common sense, relative to the purposes behind the TCPA, and hold Mantha to *his* burden in showing standing, in finding that, on these undisputed facts, Mantha lacks either Article III standing or prudential standing, or both, to pursue his claim.[9]

### D.   Whether Defendant's Text Messages Were Soliciting a Transaction/ Whether Plaintiff Consented to Contact

1. <u>Whether Plaintiff Visited the Snappy Auto Website</u>

The Magistrate Judge improperly acted as a factfinder and resolved credibility issues in concluding that Mantha definitively did not consent to be contacted.  *See* R&R, p. 14 ("Absent any evidence that plaintiff visited the website, the court recommends concluding that no reasonable jury could find that he did so.").  The issue of consent was before the Court only on Mantha's partial summary judgment motion.  Because QuoteWizard was the nonmoving party on this issue, critically, all inferences and credibility issues must be resolved in its favor.  *See Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 935 (1st Cir. 1987) ("[T]he nonmoving party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him. . . ."

---

[9] The Magistrate Judge erroneously reduced QuoteWizard's prudential standing argument to one about "professional plaintiffs," apparently believing that a defendant's argument about lack of standing under the TCPA can prevail only if the defendant can show that the plaintiff has engaged in similar schemes in the past.  R&R, p. 12.  This ignores the fact that standing is Mantha's burden to prove, not QuoteWizard's to disprove.  Moreover, it does not matter whether Mantha has never engaged in this scheme before or will never do it again.  The fact of the matter is that he manufactured his TCPA claim in real-time with the help of an experienced TCPA claimant and his eventual attorney.

(quotation marks and citation omitted)).  Moreover, the court <u>cannot</u> weigh the evidence at

summary judgment.  *See, e.g.*, *Medina v. Kevorkian Cleaning Co.*, 444 F. Supp. 3d 204, 208 (D.C.

Cir. 2020) ("Both sides, however, have offered conflicting evidence on a variety of crucial factual

issues, and the Court is not permitted to weigh this evidence and perform a credibility assessment

at the summary-judgment stage."); *Law Offices of Jeffrey S. Glassman v. Palmisciano*, 690 F.

Supp. 2d 5, 11 (D. Mass. 2009) ("Throughout [summary judgment] process, the court cannot make

credibility determinations, weigh the evidence, or draw legitimate inferences from the facts as

these are jury functions, not those of a judge.").

In finding for Mantha, the Magistrate Judge credited Mantha's claim that he did not go to

the website and input his information while simultaneously refusing to acknowledge or credit

countervailing, significant evidence in the record that Mantha did so.  For example:

(1) Records produced in this case by Plural Marketing Solutions, Inc. ("Plural") and
RevPoint Media, LLC ("RevPoint") evidence that Mantha signed up to receive an auto
insurance quote and consented to communications for that purpose on
www.snappyautoinsurance.com (the "Website") by clicking through and agreeing to a
web form.  *See* ECF No. 225, ¶ 100;

(2) The Website was operational and live at the time of the disputed consent in June or
August 2019, and the website creator, Adam Brown, was paying to host the Website
on GoDaddy.com, Inc. at that time.  *Id.*, ¶ 101;

(3) Other evidence shows that the Website was updated in 2019 and 2020.  *Id.*, ¶ 102;

(4) Plural bought Mantha's lead from a company called Fenix Media.  When Plural asked
Fenix Media for additional information to prove Mantha's consent in the face of this
lawsuit, Fenix Media provided it to Plural, which produced it in response to a subpoena.
*See id.*, ¶¶ 103-104;

(5) E-mails between Plural and Fenix Media show that Dario Osmancevic of Fenix Media
identifies himself as the "webmaster" of the Website and contends that Mantha did in
fact sign up on the Website for a quote.  *See* ECF No. 208, Ex. 16;[10]

---

[10] The Magistrate Judge denied Mantha's motion to strike the Fenix e-mail, and "consider[ed] it as
appropriate alongside other evidence presented by the parties for the purposes of summary judgment."  ECF
No. 249.  Mantha has not timely filed objections to that ruling.

(6)    Fenix Media sold Mantha's lead to Plural with a contractual guarantee that Mantha provided TCPA-compliant consent to be contacted.  *See* ECF No. 225, ¶¶ 106-107;

(7)    Plural then sold Mantha's lead to RevPoint, guaranteeing that Mantha did in fact provide TCPA-complaint consent to be contacted, as Plural was contractually obligated to do.  *Id*., ¶ 108;

(8)    RevPoint then sold Mantha's lead to QuoteWizard with a contractual promise that Mantha had provided TCPA-compliant consent to be contacted, as RevPoint was contractually obligated to do.  *Id*., ¶ 109;

(9)    QuoteWizard contacted Mantha after buying the lead with that promise.  *Id*., ¶ 110;

(10)    Both Plural and RevPoint's respective deponents testified that they believe the Mantha lead had TCPA-valid consent because it was sold to them with that contractual promise.  *Id*., ¶ 111;

(11)    Neither deponent conceded or suggested that the Mantha lead actually lacked TCPA-compliant consent.  *Id*., ¶ 112;

(12)    Although Brown testified that he stopped operating the Website sometime in 2015, he admitted that he does not know who had access to the Website after that, and did not know if someone else was running the Website.  *Id*., ¶ 116.

(13)    Although Mantha has made a blanket denial that he visited the Website or signed up there, he conceded at his deposition that he cannot recall every website he visited in 2019 and he cannot rule out that someone submitted his personal information and the consent information on his behalf.  *See id.*, ¶ 52.

(14)    To further confirm Mantha's consent, QuoteWizard sought Mantha's browser/search histories from the time of the disputed consent (either June or August 2019) to confirm whether or not he went to the Website and signed up.  However, Mantha failed to produce such histories, as he did not preserve them—or deleted—them.  In fact, Mantha took no actions to preserve his browser and search histories until at the earliest in May 2020, when a person "imaged" some but not all of his personal devices—and by that time, the histories were somehow gone.  This is despite the fact that QuoteWizard served a discovery request for the histories in April 2020, and Mantha knew as early as September 2019 that QuoteWizard contended, in response to his pre-litigation demand letter, that he had consented via the Website in August 2019.  *See id.*, ¶¶ 117-122.

(15)    Just a month or two before QuoteWizard purchased a lead for Mantha with information that he solicited an auto insurance quote using his personal information, Mantha and his friend Steven Novia discussed using a TCPA demand as a way to make money, which would be an extreme coincidence if Mantha did not actually consent.  *See* ECF No. 204, ¶¶ 78-82.

(16)    When contacted by QuoteWizard, Mantha never opted-out, expressed surprise, asked how QuoteWizard got his information, or did anything consistent with a person who had not actually solicited contact.  Instead, he freely engaged with QuoteWizard, asked "How do I get a quote?" and even provided a date and time to discuss a quote. *See* ECF No. 208, Ex. 17.

In light of this (and other) evidence, which created a disputed issue of genuine material fact, this was not an appropriate dispute for the Magistrate Judge to resolve at summary judgment. This is particularly true in light of the spoliation inference requested by QuoteWizard as a result of Mantha inexcusably failing to maintain (or worse, deleting) his browser and search histories. *See Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) ("[i]n borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment."); *see also Talavera v. Shah*, 638 F.3d 303, 312 (D.C. Cir. 2011) (when evaluating a motion for summary judgment, "[t]he spoliation inference must be considered along with [the party]'s other admissible evidence").

Distilling the consent dispute to its essence, Mantha denies that he visited the website and inputted his information, but this is uncorroborated since he failed to maintain his browser/search histories in violation of his discovery duties, <u>and</u> he conditioned that denial by acknowledging he does not remember every website he visited in 2019 and it is possible someone entered his consent on his behalf.  On the other hand, there is a digital trail of records showing that Mantha's information was inputted on the Website with consent provided, and various circumstantial evidence that Mantha did consent as a scheme to make money/file this lawsuit.  There are numerous possibilities to account for this conflicting evidence; for example, Mantha could have consented but simply forgotten, or could be not credible.  Or someone could have provided the information on Mantha's behalf.  Or, as the Magistrate Judge insinuated, an unknown rogue actor

could have entered the information. Simply put, the Magistrate Judge erred in simply crediting Mantha's uncorroborated, conditional denial while ignoring all evidence to the contrary; in other words, the Magistrate Judge found Mantha's statement credible and therefore purported to resolve this disputed issue as a factfinder.[11]

That was clearly inappropriate. This is a disputed issue of material fact for the factfinder. *See Kerner v. ConServe*, 2017 U.S. Dist. LEXIS 37959, at *8-9 (D.N.H. March 16, 2017) (denying summary judgment on issue of consent because evidence proffered by defendant was not "conclusive"); *Osorio*, 746 F.3d at 1256(summary judgment was inappropriate because the plaintiff said he told the caller to "stop calling," and the caller said the plaintiff never said such a thing) ("This is exactly the kind of factual dispute that cannot properly be resolved on summary judgment."). *Compare Lucoff v. Navient Sols.*, LLC, 981 F.3d 1299, 1306 (11th Cir. 2020) ("TCPA consent issues are appropriate for summary judgment . . . when the underlying facts are not disputed."). The facts are disputed; Mantha's summary judgment motion must be denied as a result.

2. <u>Whether Defendant's Text Messages Were Soliciting a Transaction</u>

The Magistrate Judge further erred in finding that "[a] conclusion that plaintiff did not visit the Snappy Auto website necessitates a finding that defendant's communications were solicitations." R&R, p. 14.

In the first instance, the Magistrate Judge failed to address QuoteWizard's argument that, regardless of the dispute over consent, the messages were "transactional" and therefore not

---

[11] The Magistrate Judge also suggested that Fenix may have been using "the site without Brown's knowledge" and if so "then Fenix was pirating the site and as such was not a reliable source for TCPA-compliant leads." *See* R&R, p. 14. But even if there was direct evidence (not merely an inappropriate inference drawn against QuoteWizard) that the site was "pirat[ed]," this does not mean that any consent given there is invalid for TCPA purposes. So long as Mantha consented as required under the TCPA, Fenix's alleged pirating of the Website is a separate issue not relevant to Mantha's TCPA claim.

telephone solicitations.  *See Absolute Health Ctr., Inc. v. Multiplan, Inc.*, 2016 U.S. Dist. LEXIS 187496, at *8 (D. Colo. Sep. 23, 2016) (FCC has determined that "transactional communications" to "facilitate, complete, or confirm a transaction that the recipient" has agreed to do not constitute unsolicited advertisements for purposes of the statute).  *See also* 21 FCC Rcd 3787, 3812 ¶ 49 (Apr. 5, 2006) (messages "whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements."); *Aderhold v. car2go N.A. LLC*, 2016 U.S. App. LEXIS 16596, at *2-3, 2016 WL 4709873 (9th Cir. Sep. 9, 2016) (unpublished) (affirming finding that text message at issue did not encourage the purchase, rental, or investment of or in property, goods, or services; "Car2go's message contains no content encouraging purchase of car2go services. The message was directed instead to completing the registration process initiated by Aderhold and to validating personal information. We follow the FCC's determination that such messages … are not advertisements." (citing 2006 FCC Order, *supra*)); *An Phan v. Agoda Co.*, 351 F. Supp. 3d 1257, 1262-65 (N.D. Cal. 2018) (texts messages were transactional communications, not telemarketing that encouraged the purchase/sale of services or goods).

Whether or not the factfinder finds that Mantha consented to be contacted, it is undisputed that QuoteWizard contacted Mantha believing that he had consented to be contacted about an auto insurance quote.  The messages therefore were, and remain, transactional communications sent only to Mantha and designed to specifically respond to a request for an auto insurance quote and to provide that quote.  *See* Ex. 17 ("Hey, it's Amanda following up. When's a good day for us to talk Joe? You requested a quote on auto insurance. Message me if you're still interested!"; "Joe, Amanda from QuoteWizard here, with one final follow up. Get the auto insurance info you

requested? We are just a quick call away!").  As such, the communications do not constitute telephone solicitations pursuant to the FCC's clear guidance.

The Magistrate Judge apparently (and improperly) assumed that QuoteWizard would need to definitively prove valid consent for its messages to be considered transactional, but this is a nonsensical interpretation of the "transactional" exception.  If QuoteWizard definitively proved valid consent, that would be the end of the case without the need to consider whether the messages were telephone solicitations.  The key is that QuoteWizard messaged Mantha for the transactional purpose recognized by the FCC—to complete or confirm a transaction.

Even if the Court rejects that the messages fall under the "transactional" exemption, they still do not qualify as telephone solicitations—an issue on which Mantha bears the burden as an element of his claim.  The Magistrate Judge erroneously denied QuoteWizard's summary judgment motion on this issue, finding that the text messages "w[ere] intended to share insurance quotes (i.e. purchase prices) for the purpose of encouraging a purchase of services—insurance coverage—from clients such as GEICO."  R&R, p. 15.  *There is no admissible record evidence to support this statement*.

Telephone solicitation is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(14); 47 U.S.C. § 227(a)(4).  None of the text messages to Mantha encouraged the purchase or rental of, or investment in, property, goods, or services—directly or indirectly.  *See* ECF No. 208, Ex. 17 (offering to help Mantha get an informational insurance quote or trying to set up a call for that purpose).  The Magistrate Judge appeared to impermissibly speculate, in the absence of any evidence, that QuoteWizard's *unstated intention* behind the texts

was to ultimately get Mantha to purchase insurance from GEICO.  The record evidence not only does not support such speculation, but belies it.[12]

Namely, the <u>undisputed</u> evidence was that: QuoteWizard does not sell insurance to consumers (*see* ECF No. 203, ¶ 10); under QuoteWizard's contract with GEICO Insurance, to whom QuoteWizard sold Mantha's lead, QuoteWizard sells insurance leads to GEICO (*see* ECF No. 203, Ex. C);  QuoteWizard gets paid a uniform amount for each lead sold to GEICO, regardless of what GEICO does with the lead or if it later sells insurance to a consumer (*see* ECF No. 203, Ex. C); QuoteWizard is to provide "all information of the customer necessary ***for GEICO to provide an insurance quote as specified by GEICO***" (ECF No. 203, Ex C (emphasis added)); QuoteWizard is prohibited from selling any leads to GEICO which "have been provided an incentive or benefit" (ECF No. 203, Ex. C); QuoteWizard did not make any representations to GEICO under the contract that any leads sold thereunder would result in the sale of insurance (*see* ECF No. 203, Ex. C); and the buying and selling of leads in this context is designed to ultimately provide the consumer with a quote for insurance (*see* ECF No. 208, Ex. 15, p. 7:9-14; *see also* ECF No. 203, Exs. B-C).  Furthermore, GEICO never contacted Mantha, tried to sell him

---

[12] The R&R relied exclusively on a single case, *Panacci v. A1 Solar Power, Inc.*, 2015 U.S. Dist. LEXIS 77294, at *16 (N.D. Cal. June 15, 2015), but as QuoteWizard had noted in its briefing, that case involved *completely distinguishable* allegations and facts.  There, the allegation was not that one of the defendants had merely referred the plaintiff to the other defendant for the purposes of encouraging a sale, but had actually tried to sell a product to plaintiff directly.  *See id.* ("Plaintiff does not merely allege NREC's attempt to make a referral; Plaintiff also specifically alleges that NREC 'tr[ied] to sell Plaintiff solar related services,' which is, on its own, enough to establish that NREC called for a prohibited purpose.").  In dicta, and relying on the allegations of the complaint and fair inferences therefrom, the court also said that "it is reasonable to infer that NREC intended to refer Plaintiff to A1 Solar for the purpose of encouraging Plaintiff to purchase A1 Solar's services. … Defendants do not propose any reasonable alternative inferences."  *Id.* at *16-17.  The same inference could not be drawn here.  None of the QuoteWizard text messages mention any product or service for sale but merely attempt to provide an informational quote.  The contract between QuoteWizard and GEICO establishes that Mantha would have been connected to GEICO only for the purposes of obtaining a quote from GEICO.  And Mantha was never connected to GEICO, in any event, nor was he ever actually solicited by anyone.  There is *no* evidence in the record that QuoteWizard at any time solicited Mantha to purchase a good or service, directly or indirectly.  Thus, *Panacci* is inapposite.

insurance, or solicited him for anything—Mantha has never even attempted to argue to the contrary.

Thus, QuoteWizard contacted Mantha for the purposes of helping him obtain an informational insurance quote. QuoteWizard sold his lead to GEICO for the purposes of GEICO providing him an informational insurance quote (but GEICO never contacted Mantha, much less to try to sell him insurance). None of this supports an inference, much less a finding, that any of the text messages to Mantha were for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services. A free, informational insurance quote is <u>not</u> a property, good, or service and, even if it was, QuoteWizard never encouraged Mantha to buy, rent, or invest in one.

As such, in concluding that QuoteWizard contacted Mantha with the intent to later have an insurance company sell or solicit insurance to him, the Magistrate Judge improperly relied upon speculation and not evidence, which is impermissible to defeat summary judgment. *See Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) ("mere speculation … is not enough to forestall summary judgment"); *Medina-Rivera v. MVM, Inc*., 713 F.3d 132, 136 (1st Cir. 2013) (plaintiff "cannot rely on speculation to avoid summary judgment"); *Pina v. Children's Place*, 740 F.3d 785, 796 (1st Cir. 2014) (nonmovant cannot rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation" to defeat summary judgment (quotation and citation omitted)). This was especially prejudicial because whether the text messages were "telephone solicitations" is an element of Mantha's claim *on which he bears the burden*. Without being able to rely on the text messages themselves, which clearly on their face are not solicitations, the R&R improperly leaped to speculative guesses that GEICO would have sold or attempted to sell Mantha insurance, but these guesses are simply unsupportable.

Furthermore, Mantha's argument that QuoteWizard profited off the transaction is irrelevant. *See, e.g.*, *Laccinole v. Appriss, Inc.*, 453 F. Supp. 3d 499, 505-06 (D.R.I. 2020) (finding that plaintiff "does not allege that the calls he received 'encourag[ed] the purchase or rental of, or investment in, property, goods, or services[]'"; allegation that defendant "gathers and sells data for profit" was irrelevant).

As courts have repeatedly found, the fact that the defendant profits or might profit from the communications does not relax the requirement that the *telephone subscriber be solicited* for the purchase of a good or service. For example, in *Suttles v. Facebook, Inc.*, 461 F. Supp. 3d 479, 482-484 (W.D. Tex. May 20, 2020), the court rejected a theory that Facebook's messages were solicitations merely because Facebook financially benefitted in ad revenue if plaintiff visited its website as the messages encouraged. *See id.* at 483 ("[TCPA] does not prohibit Facebook from soliciting others to buy ad space; it prohibits encouraging the 'telephone subscriber' to purchase property, goods, or services. … By alleging that Facebook sent Suttles text messages merely to help the company engage in commercial transactions with others who might purchase advertisements on the website's platform, he admits that Facebook was not soliciting him, as is required by the plain language of the Act."). *Accord Alleman v. Yellowbook*, 2013 U.S. Dist. LEXIS 127212, at *8, 17 (S.D. Ill. 2013) (rejecting plaintiff's arguments that call was a telephone solicitation) ("[A] call that merely verifies the receipt of a free informational directory" is not solicitation, even where "defendants sell ads to businesses [and] delivery of the directories results in defendants' direct financial benefit").

Like in *Facebook* and *Yellowbook*, the messages here do not "attempt to persuade or entice plaintiff to buy or invest in any commercially available product, good, or service." *Yellowbook*, 2013 U.S. Dist. LEXIS 127212, at *11. The "sale of goods or services is not advertised, promoted,

contemplated, alluded to, or encouraged." 2013 U.S. Dist. LEXIS 127212, at *17. This case is on

all fours as *Facebook* and *Yellowbook* and the same result must be reached here: none of the text

messages to Mantha were telephone solicitations.

    3. Whether Consent Form Was TCPA Compliant

    The Magistrate Judge further erred in accepting Mantha's argument that, "[e]ven if plaintiff

had visited the Snappy Auto website, … the consent form defendant identified as giving it consent

to contact plaintiff was insufficient to provide TCPA-compliant consent." R&R, p. 15.

    A DNC claim is barred when the defendant can show that it obtained the prior express

invitation or permission of the plaintiff. *See* 47 C.F.R. § 64.1200(f)(14). A caller obtains an

individual's "prior express invitation or permission" through a :signed, written agreement between

the consumer and seller which states that the consumer agrees to be contacted by this seller and

includes the telephone number to which the calls may be placed." *Id*. at § 64.1200(c)(2)(ii).

"Persons who knowingly release their phone numbers have in effect given their invitation or

permission to be called at the number which they have given, absent instructions to the contrary."

7 F.C.C. Rcd. 8752, 8769 (1992). The FCC has noted that written consent can be obtained using

various mediums or formats, including (as here) a web form. *See* 27 FCC Rcd. 1830, 1844 (Feb.

15, 2012).

    The disclosure language here complied with these requirements.[13] In finding to the

contrary, the Magistrate Judge added two requirements that simply do not exist. First, the

---

[13] As is undisputed, the disclosure language was as follows:

TCPA Disclosure: By clicking the "Compare Rates >" button, I hereby consent to receive marketing communications via autodialed and/or pre-recorded calls, including SMS messages, from AutoInsurQuotes.com and one or more of its marketing partners at the phone number provided, including wireless numbers, if applicable. I understand that consent is not a condition to receive quotes or make a purchase. In order to receive quotes without providing consent, please call AutoInsurQuotes.com ® at 1-888-920-8495.

Magistrate Judge erred in finding that the disclosure language did not include required E-Sign Act disclosures and thus was deficient for that reason.

However, there is no requirement that TCPA disclosure language include E-Sign Act disclosures, as courts have found; those E-Sign Act disclosures only apply where "a statute, regulation, or other rule of law requires that information relating to a transaction . . . be provided or made available to a consumer . . . ." 15 U.S.C. § 7001(c)(1).  There is no portion of the TCPA or any FCC regulation or "other rule of law" that requires the disclosures under the E-Sign Act be provided for valid TCPA consent.  *See Morris v. Modernize, Inc.*, 2018 U.S. Dist. LEXIS 232701, at *7-8 (W.D. Tex. September 27, 2018) ("Morris also protests the disclaimer was ineffective because it was not in compliance with the E-Sign Act. According to Morris, the E-Sign Act required Modernize to, among other things, 'provide [Morris] with a statement of the hardware and software requirements for access to and retention of the electronic records.' But the provisions of the E-Sign Act on which Morris relies apply only where 'a statute, regulation, or other rule of law requires that information relating to a transaction . . . be provided or made available to a consumer . . . .' 15 U.S.C. § 7001(c)(1). Morris has not identified a rule of law requiring Modernize to provide any sort of information or electronic record in connection with the parties' agreement. … § 7001(c)(1) does not apply." (internal citations omitted)); *see also Reinert v. Power Home Remodeling Grp., LLC*, 2020 U.S. Dist. LEXIS 214666, at *7 (E.D. Mich. Nov. 17, 2020) ("Plaintiff argues that the consent she gave to Defendant's agent … was invalid, because it was not informed by a litany of disclosures under the E-Sign Act. *See* 15 U.S.C. § 7001(c). However, the E-Sign Act only requires that consent be accompanied by certain disclosures under specific statutes. Consumer disclosures must be made to obtain an electronic record of consent 'if a statute, regulation, or other rule of law requires that information relating to a transaction or transactions in

or affecting interstate or foreign commerce be provided or made available to a consumer in writing.' 15 U.S.C. § 7001 (c)(1). However, Plaintiff has not shown that the TCPA is one of them." (citing *Morris*, *supra*)).[14]

Second, the Magistrate Judge erred in finding that the disclosure language was not valid because it did "not mention defendant or its clients by name." R&R, p. 16. There is no such requirement for consent to be valid. To the contrary, the FCC has noted that the TCPA "does not prohibit a caller … from obtaining the consumer's prior express consent through an intermediary." *See* 29 FCC Rcd. 3442, 3444 (March 27, 2014). The FCC has further noted that "consent to be called at a number in conjunction with a transaction extends to a wide range of calls 'regarding' that transaction, even in at least some cases where the calls were made by a third party." *Id.* at 3446. *See also* 30 FCC Rcd 7961, 7990 (July 10, 2015) ("[While the scope of consent must be

---

[14] The Magistrate Judge misinterpreted FCC guidance that "consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording." *See* R&R, p. 17 (citing 27 FCC Rcd 1830, ¶ 34 (In re Rules 2012)). But the FCC was merely making clear that e-signatures are a permissible format for consent—which the E-Sign Act recognizes. *See* 27 FCC Rcd 1830, ¶ 34 (entitled "Electronic Consent") ("[T]he Commission proposed to allow sellers or telemarketers to obtain prior express written consent using any medium or format permitted by the E-SIGN Act … Because it greatly minimizes the burdens of acquiring written consent, commenters generally support using electronic signatures consistent with the E-SIGN Act."). *See also* 15 U.S.C. § 7001(a) (for any transaction affecting interstate or foreign commerce, "a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form."). Nowhere did the FCC state (in the 2012 order or to date) that the disclosures under § 7001(c) are required for valid consent under the TCPA.

Moreover, although the Magistrate Judge cited to/relied on *Winner v. Kohl's Dep't Stores, Inc.*, 2017 U.S. Dist. LEXIS 131225 (E.D. Pa. Aug. 17, 2017), that court did not expressly find compliance with each disclosure requirement under the E-Sign Act, but highlighted only portions thereof. *See id.* at *15-21. For example, the court did not find that the TCPA disclosure language at issue "provided [the consumer] with a statement of the hardware and software requirements for access to and retention of the electronic records" as would be required by the E-Sign Act. *See generally id.* Therefore, this case cannot be fairly read to require compliance with all of the E-Sign Act's disclosures under § 7001(c) for valid TCPA consent because the court did not so find. *See id.* As noted herein, the case law squarely addressing this issue has found that TCPA consent *does not require* compliance with § 7001(c).

determined upon the facts of each situation, it was reasonable to interpret the TCPA to permit a texter … to send texts based on the consent obtained by and conveyed through an intermediary").

Thus, courts addressing this issue have never required proof of direct consent between the consumer and caller, nor (as here) proof that the caller was expressly named in the disclosure language.  Rather, courts have found valid TCPA consent even where a consumer's consent is passed along so long as the consent is valid and there is a connection between the original consent and the purpose behind the eventual contact.  *See Baisden v. Credit Adjustments, Inc*., 813 F.3d 338, 346 (6th Cir. 2016) ("[C]onsumers may give … consent under … when they provide a cell phone number to one entity as part of a commercial transaction, which then provides the number to another related entity … that is part and parcel of the reason they gave the number in the first place. ... The FCC's rulings in this area make no distinction between directly providing one's cell phone number to a creditor and taking steps to make that number available through other methods, like consenting to disclose that number to other entities for certain purposes. … [T]here is no one way for a caller to obtain consent, and … consent can be conveyed by another party."); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014) ("[T]he appropriate analysis turns on whether the called party granted permission or authorization, not on whether the creditor received the number directly.") (where plaintiff's wife gave his number to a hospital representative and was informed that information could be shared/used with third parties, this was valid consent for debt collector to contact him); *Daubert v. NRA Group, LLC*, 861 F.3d 382, 390 (3rd Cir. 2017) (same).

Here, there can be no dispute that there was a direct connection between the web form consent on the Website and QuoteWizard's eventual texts.  The undisputed record evidence establishes that Fenix claims to have originated Mantha's lead for an auto insurance quote, sold

that lead to its contractual partner Plural, which sold it to its contractual partner RevPoint, which sold it to its contractual partner QuoteWizard, who contacted Mantha with respect to that request for an auto insurance quote.  Under these facts, it is clear that consent given via the Website extends to the eventual text messages.  Moreover, Mantha was informed that the consent was not limited to contact from the Website.  There is no requirement that QuoteWizard have been expressly identified or must prove at this stage that it is marketing partner of the website identified in the disclosure language.  The Magistrate Judge clearly erred in adding this requirement that does not exist.

    4. <u>Contractual Promises Regarding TCPA Compliance</u>

The Magistrate Judge inexplicably isolated one part of QuoteWizard's argument against Mantha's summary judgment motion on consent—that Mantha's lead was sold down a chain with each entity contractually guaranteeing valid TCPA consent, finding that this was a "conclusory" allegation insufficient to defeat summary judgment.  *See* R&R, p. 18.  But this was admissible *evidence* in the summary judgment record, not a "conclusory" allegation.  *See*, *e.g.*, ECF No. 225, ¶¶ 100-112.

Moreover, QuoteWizard offered this as *one* piece of evidence among many others to show proof of consent to defeat Mantha's summary judgment motion on that issue.  It is nonsensical to isolate one piece of evidence from the rest and find that the one piece of evidence alone is insufficient, when offered as part of the totality of the evidence.  *See United States v. Portalla*, 496 F.3d 23, 26 (1st Cir. 2007) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.").

The Magistrate Judge also isolated QuoteWizard's argument that Mantha's five responses to the texts was *additional*, circumstantial evidence of consent—finding that fact alone allegedly insufficient.  But, again, QuoteWizard offered this as one piece of evidence among others to prove consent.  In addition to the fact that Mantha discussed TCPA money-making schemes with Novia before receiving the texts, the digital trail of consent for Mantha, the fact that he never told Novia he did not consent, he did not opt-out, and other evidence, the fact that Mantha freely responded to the texts is in fact evidence of consent sufficient to create a disputed issue of fact for the factfinder.

5. Summary

The Magistrate Judge concluded that "[t]he evidence is strongly in plaintiff's favor on the question of consent such that there is no genuine dispute."  R&R, p. 19.  As noted above, the only way the Magistrate Judge could reach this conclusion in the face of conflicting evidence and disputed facts is by improperly making a credibility determination—*i.e.*, finding Mantha's denial credible.  The facts are disputed and must be submitted to the factfinder on the issue of consent.

**E. Whether Defendant Relied in Good Faith on Leads It Purchased**

The Magistrate Judge erred in rejecting QuoteWizard's good faith defense as a matter of law while simultaneously acknowledging that such defense *has been applied in this Circuit* and deployed at the summary judgment stage.  *See* R&R, p. 19 & n.14.  Though the Magistrate Judge attempted to distinguish *Sandoe v. Bos. Sci. Corp.*, 2020 U.S. Dist. LEXIS 2800 (D. Mass. Jan. 8, 2020) from the facts of this case, *see* R&R p. 19 n.14, the reasoning of *Sandoe* applies equally and the facts are even stronger in this case in terms of reasonable reliance.  There, "Boston Scientific reasonably relied on its partner clinics to provide an invitee list of current patients who had provided their contact information for health-care-related events and services."  *Sandoe*, 2020 U.S.

32

Dist. LEXIS 2800, at *12.  Here, not only did QuoteWizard reasonably rely on its contractual partner for TCPA-valid consent, it did so under a *contractual guarantee* for the same.  *See* ECF No. 225, ¶¶ 100-111.

Moreover, here, Mantha ultimately responded and solicited further contact, further buttressing QuoteWizard's reasonable reliance on consent.  If the Court in *Sandoe* found that Boston Scientific could not have "reasonably been expected" to perform additional investigation "given the difficulty and unreliability associated with matching telephone numbers to subscribers," it certainly cannot be said that QuoteWizard should have been required to trace IP addresses, investigate who was operating the Website, and look into other related complicated technological details before contacting Mantha to ensure consent.  *Sandoe*, 2020 U.S. Dist. LEXIS 2800, at *14.

The Magistrate Judge also reported policy concerns with the defense—that "there would be no incentive for defendant to ensure that its data suppliers hold to their contractual obligations to provide TCPA-compliant data. Correspondingly, data suppliers would have no incentive to ensure that their data was, in fact, compliant."  R&R, pp. 19-20.  But such argument ignores that QuoteWizard's contractual partners are obligated to pay the cost of defense and indemnification even for an underlined allegation of a TCPA violation, even if no TCPA violation is actually, ultimately found. As evidenced by the docket in this case, putative TCPA class actions are inordinately expensive to defend and thus place a real penalty on any defendant, and their contractual partners, when consent is even questioned.

## CONCLUSION

In light of the foregoing, and pursuant to Federal Rule of Civil Procedure 72(b), QuoteWizard requests that the Court reject the R&R in its entirety, and grant QuoteWizard's motion for summary judgment and deny Mantha's partial motion for summary judgment.

Respectfully submitted,

QuoteWizard.com, LLC,
By its attorneys,


/s/ Kevin P. Polansky
Kevin P. Polansky (BBO #667229)
kevin.polansky@nelsonmullins.com
Christine M. Kingston (BBO #682962)
christine.kingston@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
(t) (617)-217-4700
Dated: December 30, 2021                    (f) (617) 217-4710


## CERTIFICATE OF SERVICE

I, Kevin P. Polansky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: December 30, 2021                    /s/ Kevin P. Polansky