**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| JOSEPH MANTHA on behalf of himself and others similarly situated, | : | |
| | : | |
| Plaintiff, | : | Case No. 1:19-cv-12235-LTS |
| | : | |
| v. | : | **REDACTED DOCUMENT** |
| | : | **FILED WITH** |
| QUOTEWIZARD.COM, LLC | : | **PERMISSION PER ECF** |
| | : | **275** |
| Defendant. | : | |
| | : | |
| _____/ | | |

<u>**JOINT STATUS REPORT REGARDING DISPUTE OVER CLASS DISCOVERY**</u>

Pursuant to Federal Rule of Civil Procedure 37, Local Rule ("LR") 37.1 and ECF No. 39, plaintiff Joseph Mantha ("Plaintiff" or "Mr. Mantha") and defendant QuoteWizard.com, LLC ("QuoteWizard" or "Defendant") (jointly "the Parties") file this Joint Status Report regarding QuoteWizard's responses to Plaintiff's Fourth Set of Requests for Documents and Plaintiff's Third Set of Interrogatories. QuoteWizard's Responses to Plaintiff's Third Set of Interrogatories is attached hereto as <u>Exhibit A</u>, and QuoteWizard's Responses to Plaintiff's Fourth Set of Requests for Production of Documents is attached hereto as <u>Exhibit B</u>.

<u>**Plaintiff's Background to the Dispute**</u>

QuoteWizard has flatly refused to provide any class discovery in this putative class action where the parties are in their final discovery period prior to trial, refusing to answer four interrogatories and refusing to produce a single document in response to 23 requests for production of documents. QuoteWizard's position that Plaintiff is not entitled to any class discovery is particularly meritless as for the two years this case has been pending, at

QuoteWizard's insistence, the Court limited initial discovery to Mr. Mantha's individual claim and instructed the parties to proceed to summary judgment noting:

> Previously, **at the urging of Defendant,** the Court bifurcated discovery in this case with the first phase culminating in an anticipated motion (or cross-motions) for summary judgment solely on the question of consent with a subsequent second phase addressing all other issues. After careful consideration of the various submissions by the parties regarding their myriad disputes, the Court now concludes that Phase I of discovery should address all issues related to Plaintiff's individual claims and that class discovery occur in Phase II.

See ECF 75 (emphasis added).

Having limited discovery to purely individual issues, the parties proceeded to summary judgment solely on Plaintiff's individual claims. On December 13, 2021, Magistrate Judge Kelley issued a Report and Recommendation recommending that QuoteWizard's Motion for Summary Judgment be denied and that Plaintiff's Motion for Partial Summary Judgment be granted, holding that (1) that Plaintiff Mantha did not provide QuoteWizard prior express consent to send him telemarketing texts and (2) that the protections of the TCPA and the federal Do Not Call ("DNC") Registry encompass his wireless phone number). ECF No. 253 (unredacted version appearing on the public docket as No. 258).

QuoteWizard objected to Magistrate Judge Kelley's decision, which was affirmed by this Court. ECF 268. At the close of the Court's denial of QuoteWizard's objections, the Court ordered the parties to submit a joint statement within 14 days "setting forth their joint or separate positions as to the schedule governing the further proceedings in this matter as well as any other case management issues either party wishes to raise." ECF 268

In the Parties Joint Statement, the parties set forth a single remaining discovery period as to all issues and Mr. Mantha urged that class discovery should be fully opened after this case had already been litigated for two years. Although QuoteWizard agreed to the proposed schedule, it

nonetheless urged the Court that class discovery should not commence as it contended that "threshold issues" as to the class definition should be resolved prior to proceeding to class discovery. QuoteWizard further contended that class discovery should be tailored in light of its claim that this Court lacks personal jurisdiction over class members outside Massachusetts, and that class members have not suffered an "injury in fact" sufficient to support this Court's exercise of subject matter jurisdiction.

On March 3, 2022, the Court entered an Electronic Order, adopting the parties' joint schedule and decisively rejecting QuoteWizard's position that class discovery should be further delayed:

> **The Court ADOPTS the schedule jointly proposed by the parties at page one of their Joint Status Report (Doc. No. [270]) as the governing schedule in the case. In the status report Defendant raised numerous issues that in its view defeat the possibility of class certification. Specifically, Defendants contend the "oneway intervention" rule precludes class certification. This is an objection more properly raised in response to the anticipated motion for class certification per the schedule proposed by the parties. Defendant also states it believes there are various "threshold" issues regarding class definition and allegations that the Court should resolve prior to class discovery. Much of these "threshold" issues are more appropriately and more effectively resolved when the Court resolves the motion for class certification. Insofar as Defendant contends that the scope of discovery ought to be narrowed from a nationwide class to a Massachusetts class at this point thereby limiting and narrowing discovery, Defendants failed to propose a schedule for briefing such a motion, failed to file such a motion, and failed to establish that the nature of the discovery is such that culling out Massachusetts members would be substantially less burdensome than discovery of the whole class. The time for motions to strike allegations in the operative complaint has passed. To the extent Defendant wishes to raise issues as to personal jurisdiction, it can do so at the class certification stage. Class discovery shall commence according to the adopted schedule with the questions of class definition and personal jurisdiction resolved in the course of the motion for class certification.**

ECF 271.

In defiance of the Court's clear Order, QuoteWizard has refused to take no for an answer and continues to refuse to provide any class discovery in this case. Although Quotewizard's specific objections will be addressed below, none has any merit. QuoteWizard's assertion that Plaintiff's claim is limited to leads that came from the same purported source as Plaintiff's lead (the defunct "snappyautoinsurance.com" website) is specious. As an initial matter, Plaintiff's proposed class is as follows:

> All persons within the United States to whom: (a) two or more text telemarketing calls were sent via Drips; (b) promoting QuoteWizard's goods or services; (c) to a residential phone number that was listed on the National Do Not Call Registry for at least 30 days before the first call; (d) within any twelve-month period.

ECF 80, para 61. The class definition is not limited to leads purportedly generated on snappyautoinsurance.com, sold to Plural Marketing, then sold to RevPoint, then provided to QuoteWizard, as QuoteWizard would have it. *See* QuoteWizard's Responses to Plaintiff's Third Set of Interrogatories at Objection to Interrogatory No. 2, p. 6 (Ex. A hereto).

First, Plaintiff has never conceded that his lead had anything to do with the snappyautoinsurance.com website. Indeed, he has disproven that the lead could have come from that defunct website, regardless of what a hearsay email from Bosnia purportedly says. More fundamentally, QuoteWizard's suggestion "on information and belief" that Plaintiff represents a class of one, being the only lead from snappyautoinsurance, sold to Plural, and then to RevPoint and on to QuoteWizard, and therefore is not entitled to class discovery, is nothing less than thumbing its nose at this Court's order that class discovery commence.

QuoteWizard's claim, moreover, that Plaintiff has failed to come forward with evidence

about other websites that provided phony leads smacks of "heads I win, tails you lose" approach
to discovery, given that it is QuoteWizard that has refused to provide class discovery regarding
the purported sourcing of its leads—particularly as to consent. As this Court has recognized
"Consent is an affirmative defense to a TCPA claim." quoting *Sagar v. Kelly Auto. Grp., Inc.*,
No. 21-CV-10540-PBS, 2021 WL 5567408, at *7 (D. Mass. Nov. 29, 2021) ECF 268 at 19.
Althought it is QuoteWizard's to prove consent, it now claims that it should be precluded from
doing so because it to "burdensome" to do so.

Critically, as to the issue of consent,  For
QuoteWizard's claim that it is too burdensome for it to carry its affirmative burden as to consent
is either entirely false, or a concession that, in fact, it has no legitimate evidence of consent.

The evidence that Plaintiff seeks is critical to his ability to move for class certification.
Call records are required to perform a Do Not Call Analysis as to how many class members
received two text messages (or calls) in a 12-month period. 47 U.S.C. § 227(c)(5), as held by
courts around the country, including in this District. *See Lopez et al v. New England Fat Loss 2,
Inc.*, Civil Action No. 19-cv-11215-NMG, ECF No. 56 (Compelling class wide discovery in a
TCPA case holding that "fact discovery, as plaintiffs correctly point out, on the 'merits' of

plaintiffs' individual claims and on 'class' certification issues is taking place 'in one [discovery time] period.'…There is no second stage for class certification-related discovery.").

In addition, Plaintiff is entitled to see any and all evidence on which QuoteWizard intends to rely in support of its affirmative defense of consent as to all consumers who may be class members. QuoteWizard should not be allowed to defeat class certification simply by refusing provide the discovery required to support a certification motion. As another Court held in a TCPA class action under a similar circumstance:

> If defendant cannot substantiate this defense with documents or information responsive to the interrogatory, it should say so under verification and withdraw that defense.

*Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 WL 2311869, at *1 (N.D. Ill. June 13, 2011). It further bears noting that the parties' agreed schedule, entered by the Court, provides for a single remaining discovery period as to both class and merits issues. Accordingly, QuoteWizard's repeated objection to discovery that it "has not apparent bearing on or relevancy to any of the Rule 23 facts" is particularly baseless as discovery is open as to all issues. *See Frey v. Frontier Utils. Ne. Llc*, No. 19-2372-KSM, 2020 U.S. Dist. LEXIS 260620 *5-6 (E.D. Pa. Apr. 13, 2020) (Compelling calling data in a TCPA case holding, "EAG argues that Frey is not entitled to this personal identifying information pre-class certification, but as discussed below, the Court did not bifurcate the discovery period in this matter. As such, Frey was required to seek discovery on both his individual claim and his class claim at the same time and could not wait until after the Court ruled on his motion for class certification to request this relevant information.") QuoteWizard must provide any consent evidence it relies on now, or it should be precluded from introducing purported consent evidence later in the certification process.

## QuoteWizard's Response

Contrary to Plaintiff's unfounded characterizations, QuoteWizard has not refused to engage in pre-certification class discovery, but rather has fully and timely complied by responding to Plaintiff's class discovery requests and preserving all proper objections thereto. QuoteWizard also proposes significant compromises herein that would appropriately tailor pre-certification discovery.

Rather than serving proper, relevant discovery requests limited to class discovery issues, Plaintiff has engaged in an *extreme* and inappropriate fishing expedition. This case is and always has been about Plaintiff's theory that his lead, purportedly generated on the Snappy website, was allegedly fraudulently generated by a non-party named Fenix Media and later sold to QuoteWizard without QuoteWizard's knowledge of the alleged fraud. To the extent Plaintiff believes that this lead generator, Fenix Media, is the alleged bad actor on a class-wide basis (he has never suggested it to be anyone else), Plaintiff has made no attempt to tailor his class discovery requests to leads ultimately sold to QuoteWizard from the Snappy website or even Fenix.

Instead, in search of a class theory that he does not have (a classic fishing expedition), Plaintiff is asking this Court to allow him to examine *every* lead QuoteWizard has *ever* purchased during the putative class period from *any* contractual partner, whether or not those leads would even be in his putative class as currently defined (persons registered on the National Do Not Call Registry who are residential telephone subscribers who received two or more solicitations without consent). Plaintiff has no evidence and has never even alleged that every single lead QuoteWizard purchased and later contacted was fraudulent. To the contrary, Plaintiff freely admits that *at least some* consumers QuoteWizard contacted gave valid TCPA consent—and also concedes that, to

determine who gave valid consent, the Court would have to look at every such lead.[1] *See* Plaintiff's argument, *infra* p. 31 ("It may be that some of the consumers who QuoteWizard sent telemarketing texts to did, in fact, provide their TCPA compliant consent to receive QuoteWizard's texts.")

Thus, what he is asking the Court to do is throw open all of QuoteWizard's corporate books without regard to relevancy to the specific subject matter of this case, subject 43 million largely irrelevant telephone numbers to disclosure and potential harassment in this case, and seek discovery of nearly a hundred of QuoteWizard's contractual partners so he can try to find proverbial needles in the haystack—other consumers who may claim they did not consent to be contacted. But even assuming his fishing expedition could uncover some such consumers, well-settled case law is clear that such broad, pre-certification discovery is not permissible where the plaintiff has no good faith basis or evidence to suggest nationwide, generalized, class-wide wrongdoing—here, alleged fraudulent leads across all of QuoteWizard's contractual partners rather than just Snappy or at most Fenix leads.[2] In other words, Plaintiff cannot conduct a fishing

---

[1] During the parties' meet-and-confer, Plaintiff's counsel freely admitted that the consent issue would have to be decided on a consumer-by-consumer basis, stating they would have to "look at all of those." This admission alone, otherwise plainly obvious, sinks Plaintiff's putative class case and also his attempt to obtain discovery on every single lead QuoteWizard contacted.

[2] Plaintiff overemphasizes throughout this joint report that consent is an affirmative defense for the putative class members, but at the same time concedes (as he must) that QuoteWizard has a consent-based business model and will be able to prove consent *at least for some putative class members*. By and through his admissions herein, he has shown that individualized issues will predominate. Moreover, on the meet and confer call, Plaintiff's counsel conceded that consent would have to be decided on an individual-by-individual basis. What he fails to appreciate is that it is his burden in the first instance under Rule 23 to show, among other things, that a class can be ascertained and that individual issues of consent will not predominate. For this reason, the burden to ultimately *prove* consent for individual consumers is irrelevant. What is dispositive is that the issue of consent cannot be decided on a class-wide basis. *See Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306-1307 (D. Nev. March 26, 2014) ("The parties dispute whether consent is an element of the prima facie case or an affirmative defense, but, as the Fifth Circuit has held, that issue is irrelevant for class certification. Kristensen's burden at the class certification phase is to advance a viable theory employing generalized proof to establish liability with respect to the class involved. If consent is an element of the prima facie case, as Meyer instructs, Kristensen must prove that lack-of-

*Footnote continued on next page*

expedition to find class-wide fraud that does not exist and which he does not allege exists.

And more importantly, even if he did uncover such needles in a haystack, this shows that Rule 23 certification is not possible because an individualized assessment of each consumer (for consent and for other factors, such as whether they are residential telephone subscribers) is necessarily required.  Given that his requested fishing expedition even if allowed would push him no closer to certifying a class, the requested discovery must be denied.  *See*, *e.g.*, *Josey v. Lockheed Martin Corp.*, 2020 U.S. Dist. LEXIS 127789, at *26 (D.D.C. July 21, 2020) ("[I]t might seem entirely reasonable to permit a plaintiff who allegedly observes disparate outcomes in a workplace, and who claims that unlawful discrimination has caused those disparities, to marshal the formidable force of the Federal Rules' discovery process to ferret out potentially problematic employment practices. But pre-certification discovery is not an opportunity to engage in a 'fishing expedition' concerning company policies that cannot plausibly result in a common injury across the putative class. … Plaintiffs' allegations about LM Commit on their face render classwide injury implausible"); *Rahmatullah v. Charter Communs.*, 2021 U.S. Dist. LEXIS 80072, at *10-13 (C.D. Cal. March 25, 2021) ("[T]he court concludes plaintiff fails to show the broad scope of discovery he seeks to conduct is likely to substantiate his class reimbursement claims.") (ordering parties to confer about more limited scope of pre-certification discovery) ("[C]ourts will not allow a fishing expedition where it is apparent that [p]laintiff cannot maintain the action on behalf of the class.").

However, in an effort to compromise this discovery dispute by focusing on appropriately tailored pre-certification discovery under Rule 23 as applicable to the subject matter of this case,

---

consent can be addressed with class-wide proof.  If Kristensen is correct that consent is an affirmative defense, then he must prove that he can defeat Defendants' consent argument with class-wide proof. ***The practical effect is the same: for purposes of class certification, Kristensen must prove that consent, or the lack thereof, can be resolved on evidence and theories applicable to the entire class***." (citation and quotation omitted) (emphasis added)).

QuoteWizard proposes certain compromises below.  For example, QuoteWizard is amenable to working jointly in discovery with Plaintiff to confirm that Plaintiff's lead was the only lead sold to/contacted by QuoteWizard from the Snappy website.  Alternatively, even expanding potential class consideration to leads that came from Fenix Media (which is not one of QuoteWizard's direct contractual partners), QuoteWizard is amenable to producing a redacted list of leads that it purchased from RevPoint, which in turn RevPoint purchased from Plural, which in turn some of which are believed to have come from Fenix.[3]  *See Burkhart-Deal v. Citifinancial, Inc.*, 2009 U.S. Dist. LEXIS 52222, at *9 (W.D. Pa. June 18, 2009) ("The typically expressed worry surrounding pre-certification discovery is that it will be used to obtain new clients, or broaden a class, rather than to support certification.") (given these concerns, limiting potential class discovery to "particular type of employee in Pennsylvania, during a particular time period. This limited class definition mitigates the danger of abuse.").  QuoteWizard respectfully asks the Court to either deny Plaintiff's motion to compel due to the extremely overbroad and irrelevant nature of his underlying discovery requests, or, at most, adopt QuoteWizard's proposed compromises herein.

## FAILURE TO MEET AND CONFER IN GOOD FAITH

As reflected herein, QuoteWizard offers proposed compromises to resolve this discovery dispute, unfortunately none of which were ever heard or considered by Plaintiff's counsel due to their failure to confer in good faith prior to this filing.  LR 7.1(a)(2) requires counsel to "certify

---

[3] Fenix was a contractual partner with Plural Marketing Solutions, but not QuoteWizard.  In turn, Plural was a contractual partner of RevPoint Media, but not with QuoteWizard.  Therefore, Plaintiff's lead from Fenix came to QuoteWizard only through this chain, never directly.  QuoteWizard has already determined, based on information provided by RevPoint, the leads that RevPoint sold to QuoteWizard during the putative class period that came from Plural, and is maintaining a list of those leads—a redacted version of which it is amenable to producing to Plaintiff forthwith.  QuoteWizard understands some of those leads came from/were originated by Fenix, but QuoteWizard is unable to determine which leads specifically came from Fenix.  This information would have to be sought from Plural/Fenix.  In the meantime, QuoteWizard has recently issued subpoenas (currently pending) in this case partly in an attempt to find United States-based contact information for Fenix.

that they have conferred and have attempted in good faith to resolve or narrow the issue." LR 37.1(a) similarly requires that, "[b]efore filing any discovery motion, … counsel for each of the parties shall confer in good faith to narrow the areas of disagreement to the greatest possible extent. It shall be the responsibility of counsel for the moving party to arrange for the conference." LR 1.3 allows the Court, to among other things, deny a request where counsel bringing it has failed to comply with the Local Rules.

Plaintiff's discovery dispute should be denied or at a minimum held in abeyance until Plaintiff's counsel has made an actual, good faith attempt to confer with QuoteWizard's counsel on the within matters, and *consider proposed compromises* and negotiate in good faith before needlessly presenting the Court with a discovery dispute on each line item. Instead of conferring in good faith, Plaintiff's counsel scheduled a phone conference that lasted fewer than ten (10) minutes, telling QuoteWizard's counsel that he was there to "check the box" (in obvious reference to the Local Rules' meet-and-confer requirements). Plaintiff's counsel also stated at the outset that the parties would not be able to reach agreement on any issue. Plaintiff's counsel made no attempt to identify or address the purported discovery deficiencies during the call nor was he willing to consider any proposed compromises that QuoteWizard could offer.

Plaintiff's recitation of the events below is simply inaccurate. Plaintiff's counsel unequivocally stated that consent would have to be reviewed for each and every lead purchased by QuoteWizard (a position confirmed by their arguments in this document).

Moreover, QuoteWizard could not offer any compromises during the purported meet and confer because Plaintiff's counsel neither identified the basis of the discovery dispute nor had any intention of listening to QuoteWizard's positions thereon. It was only when QuoteWizard received Plaintiff's then-40 page document describing their dispute that QuoteWizard could first understand

the nature and scope of the dispute. QuoteWizard has subsequently offered numerous compromises detailed herein; Plaintiff has not attempted to consider much less confer on any of them. As it is Plaintiff's request to compel, it is his duty to meet and confer in good faith before presenting this needlessly to the Court, and he has clearly made no attempt to satisfy that requirement.

### PLAINTIFF'S REPONSE TO CLAIMED FAILURE TO \
### MEET AND CONFER IN GOOD FAITH

The suggestion that Plaintiff failed to meet and confer in good faith is baseless. Faced with a categorical refusal to provide a single document or answer any substantive interrogatories after preventing class-wide discovery from proceeding for more than two years, undersigned Plaintiff's counsel suspected that compromise would not be possible, but inquired as to whether QuoteWizard would alter its position with respect to their objections. Undersigned counsel added that he did not expect that QuoteWizard would change its position. Undersigned counsel was advised QuoteWizard would not change its position. Further, contrary to QuoteWizard's assertion, at no point did Plaintiff's counsel "freely admit that the consent issue would have to be decided on a consumer-by-consumer basis" but rather stated Plaintiff's counsel is entitled to see QuoteWizard's purported consent evidence to evaluate it. Indeed, at the close of the meet and confer counsel had a discussion about whether the dispute should be resolved by a motion or in a joint status report format. Both sides agreed to check the Court's earlier order on the subject. Five days after the meet and confer, Christine Kingston emailed counsel for Plaintiff noting that she had checked the docket to refresh her memory and per ECF 39 the dispute should be presented as a joint status report. At no time prior to this response has counsel for QuoteWizard asserted that the meet and confer was inadequate.

The point of the meet and confer process is to identify whether the parties have a discovery dispute that can be resolved. QuoteWizard's counsel stated they would not change their position—meaning there very much is a dispute. QuoteWizard's claim that Plaintiff failed to meet and confer has the situation exactly backwards. QuoteWizard did not offer any purported compromise in the meet and confer, nor did it do so in the 19 days between receiving Plaintiff's proposed joint statement on April 29, 2022 and providing its response on May 18, 2022. The substance of the offer made for the first time in its response below, offering to negotiate on a sampling as to evidence relating a redefined version of Plaintiff's class limited to leads obtained from snappyautoinsurance.com (purportedly a class of one consisting of Plaintiff), or Fenix Media, or perhaps Plural via RevPoint, only serves to highlight that the Parties' have a dispute. Defendant is not entitled to unilaterally redefine Plaintiff's proposed class and then provide a sampling of discovery on that limited class, particularly in light of its contractual promise to Drips that QuoteWizard could provide its proof of consent on two business days' notice. QuoteWizard should not be rewarded for its total obstruction of discovery.

## I.    DOCUMENT REQUESTS AT ISSUE AND ARGUMENT

**DOCUMENT REQUEST NO. 1:** Please produce all records of outbound text messages provided to Quotewizard by DRIPS pursuant to this Court's prior Order.

**RESPONSE:** QuoteWizard objects to this Request as confusing as written, overly broad, unduly burdensome, not relevant to any class issues under Fed. R. Civ. P. 23, not proportional to the needs of the case, insofar as it seeks confidential information for non-party consumers that is not relevant herein, and because the requested records are not within QuoteWizard's possession, custody, or control. In addition, QuoteWizard objects because this Request is not limited in time, scope, or to the subject matter of this case (text messages sent to consumers two or more times where the consumer is registered (validly) on the National Do Not Call Registry and QuoteWizard allegedly lacked consent to contact them – and more specifically, relating to the Snappy website – within the statute of limitations period).

First, it is unclear whether the Request is seeking the text messages sent to consumers (which are not in QuoteWizard's possession, custody, or control, as Drips sent the messages), or the spreadsheet produced by Drips to QuoteWizard in this litigation for preservation purposes that

reflected phone numbers texted by Drips, but did not include the content of the text messages (which QuoteWizard's counsel has been maintaining). QuoteWizard objects to both/either such requests on the above and below grounds.

With respect to class issues, this Request has no bearing on or relevancy to any of the Rule 23 factors. "Generally at the pre-class certification stage, discovery in a putative class action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman v. Comcast Corp.*, 298 F.R.D. 592, 595 (S.D. Cal. 2014) (citing *Oppenheimer*, 437 U.S. at 359). Records of each and every consumer texted by Drips and/or the text messages sent to them is not relevant to any Fed. R. Civ. P. 23 factor; as noted below, QuoteWizard has identified the number of telephone numbers appearing on the Drips spreadsheet to the extent Plaintiff believes that number relevant to alleged numerosity. Moreover, the names and other PII of putative class members is not generally available in discovery prior to a class being certified. *See Dziennik*, 2006 WL 1455464, at *1.

Further, QuoteWizard objects insofar as Plaintiff is seeking information regarding third parties that exceeds the subject matter of this case. QuoteWizard's leads during the putative class period were not bought or generated from a common source, nor were the text messages sent pursuant to a single mass campaign. Plaintiff's lead was sold to QuoteWizard by RevPoint Media, LLC ("RevPoint"), which in turn had purchased it from Plural Marketing Solutions, Inc. ("Plural"), which in turn purchased it from Fenix Media ("Fenix"), which in turn claimed to have obtained it or generated it from the Snappy website. The Parties expended substantial resources in merits discovery regarding the owner and legitimacy of the Snappy website, and the TCPA disclosure language thereon, and the summary judgment briefing focused in large part on those issues and the generation of Plaintiff's lead. Consumers contacted pursuant to leads (with consent) that QuoteWizard purchased from other lead suppliers, generated from other websites, and with different TCPA disclosures in the putative class period is not relevant to, common to, or typical of Plaintiff's lead/claim or those similarly situated. In the putative class period, QuoteWizard purchased leads from over 180 possible lead suppliers. These lead suppliers in turn necessarily would have either purchased leads from or generated leads from thousands (if not hundreds of thousands) of different lead websites that necessarily have various different forms of consent language that might be contested by counsel and would require individualized inquiries into each consumer's agreement to the specific disclosure language. *See Berman v. Freedom Financial Network*, No. 20-16900 (9th Cir. 2022) (requirement to arbitrate in online webform not enforceable). Thus, pre-certification discovery into these unrelated leads that did not come from the Snappy website is not appropriate. *See Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985) (precertification discovery may be prohibited where plaintiff fails to advance a prima facie showing that the class requirements (i.e., numerosity, commonality, typicality and adequacy of representation) of Rule 23 are satisfied or that "discovery is likely to produce substantiation of class allegations.") (no abuse of discretion by denying pre-certification discovery where plaintiff merely cited "two other complaints filed elsewhere" by similar plaintiffs against the same defendant to demonstrate a likelihood that discovery would substantiate class allegations); *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977) ("[W]here the plaintiffs fail to make even a prima facie showing of Rule 23's prerequisites, as we find here, the burden is on the plaintiff to demonstrate that discovery measures are likely to produce persuasive

information substantiating the class action allegations."); *Pizana*, 2021 U.S. Dist. LEXIS 18926, at *9-10 (prohibiting pre-certification discovery where plaintiff failed to show why requested information concerning non-party companies "is likely to substantiate his class allegations"). *See also Fiorentine v. Sarton P.R., LLC*, 2021 U.S. Dist. LEXIS 96379, at *6 (D.P.R. May 20, 2021) (noting that precertification discovery into Rule 23 factors should be allowed "*[i]f* the complaint makes a prima facie showing that Rule 23 requirements are met or that discovery is likely to substantiate class allegations" (emphasis added)).

Plaintiff has never alleged nor presented any evidence to substantiate an allegation that QuoteWizard was sold allegedly fraudulent leads by over 180 possible lead suppliers; rather at all times this case has focused on the Snappy website. This is not a case where QuoteWizard sent the text messages pursuant to the same mass campaign or where all leads were generated from a single source or website. *See Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 92 (1st Cir. 2021) (affirming denial of class certification in TCPA case where individual issues of consent predominated) ("Bais Yaakov has made no argument that the court could cull from the class the consenting schools in an administratively feasible way, protective of ACT's rights. … The district court therefore reasonably determined that individual issues of permission would predominate over common questions"); *Bais Yaakov of Spring Valley v. ACT, Inc.*, 328 F.R.D. 6, 13 (D. Mass. 2018) ("[D]etermining consent would not be as simple as looking for a checked box, it would be a highly individualized inquiry into Defendant's relationship with each school."). *Compare Wendell H. Stone Co.*, 2021 U.S. Dist. LEXIS 50721, at *2, *12; *Sullivan*, 2017 U.S. Dist. LEXIS 84232, at *24-25.

Thus, where there is clearly no relevancy, commonality or typicality between leads sold to QuoteWizard from over 180 possible lead suppliers and Plaintiff's lead, class discovery must necessarily be limited to leads that originated from the same source—the Snappy website. Upon information and belief, however, Plaintiff's lead was the only lead purchased by QuoteWizard from RevPoint and in turn from Plural during the putative class period that purportedly originated from the Snappy website. Plural (which worked directly with Fenix, the alleged lead generator) would have direct knowledge of this fact and QuoteWizard is amenable to working with Plaintiff's counsel, via a subpoena, deposition or otherwise, to confirm the same.

To the extent this Request is actually seeking the text messages sent to consumers by Drips, QuoteWizard also objects to this Request on the grounds that these requested records are not in QuoteWizard's possession, custody, or control, but rather they are in the exclusive possession, custody, or control of Drips, requiring a third-party subpoena from Plaintiff to Drips.[4]

---

[4] Although the request states that the "records of outbound text messages [were] provided to Quotewizard by DRIPS pursuant to this Court's prior Order," this is not accurate to the extent the request is referring to the text messages themselves. Pursuant to a subpoena from QuoteWizard to Drips that resulted in a separate but related lawsuit, the parties entered into a voluntary agreement whereby Drips agreed to produce (1) "the underlying consumer response for up to 500 Tier 1 reports and up to 100 Tier 2 and 3 reports (for a total of up to 600 responses)" which QuoteWizard produced to Plaintiff; (2) in addition, "all consumer responses underlying disqualifications (all tiers) for the 60 days prior to May 18, 2021," which QuoteWizard produced to Plaintiff; (3) in addition, "[f]or preservation purposes only, Drips will undertake to produce to QuoteWizard a list of all phone numbers texted for QuoteWizard on each date during the class period date range specified by the Mantha and QuoteWizard," which such records QuoteWizard is preserving in the

*Footnote continued on next page*

QuoteWizard is neither obligated to produce nor capable of producing them. *See Ray v. FedEx Ground Package Systems, Inc.*, 2021 WL 3727143, at *1-2 (D. Mass. Aug. 23, 2021) ("Generally, the court will not order a party to produce documents when the party represents that the documents are not in his or her possession, custody, or control."). Drips does not "provide" outbound text messages to QuoteWizard in the ordinary course of business. Moreover, although QuoteWizard denies and disputes that there is any putative class beyond Plaintiff when properly limited to the Snappy website, Drips's records indicate a total of 43,166,509 rows of telephone numbers contacted by Drips, some on behalf of QuoteWizard.[5] As written, this request would force
Drips, a non-party, to compile records with respect to these millions of consumers. There is no contract or other document that would require Drips to produce this staggering breadth of records to QuoteWizard such that the records are even arguably in the control of QuoteWizard, which they are not. QuoteWizard also has no knowledge of how Drips stores these messages and whether it even has accessible records to produce at all.

QuoteWizard further objects to this request on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and is not relevant for class purposes. The content of the text messages themselves is not relevant to the Fed. R. Civ. P. 23 factors. In addition, Drips's records indicate a total of 43,166,509 rows of telephone numbers contacted by Drips, some on behalf of QuoteWizard. It is patently unreasonable to expect a third-party to gather and produce text messages sent to this many consumers, particularly when the text messages themselves have no independent relevancy and Plaintiff cannot represent these consumers who are not similarly situated.

Pursuant to the foregoing objections, to the extent this request seeks the text messages sent to consumers by Drips during the putative class period, QuoteWizard has no documents within its possession, custody, or control to produce, and otherwise reserves and maintains all objections herein. To the extent the request is requesting the Drips spreadsheet produced to QuoteWizard during this case by agreement, QuoteWizard objects to the same based on the foregoing objections, and no documents will be produced pursuant to that request.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 1**:

---

event required to be produced; and (4) Drips "supplied Plaintiff and QuoteWizard with a list of all aggregators used to send text messages on behalf of QuoteWizard." *See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37, pp. 2-4. Drips neither agreed to produce nor produced text messages. *See id.* Plaintiff agreed to "seek additional information *from Drips* … to the extent they determine that additional information is necessary to their claims … as discovery develops." *Id*., p. 5 (emphasis added).

[5] Drips's spreadsheet of telephone numbers contacted during the putative class period purported also to include numbers it texted dating back to 2016 on behalf of Bantam Connect, LLC *before* QuoteWizard acquired Bantam. These messages were therefore not sent on behalf of QuoteWizard. The earliest date that Drips could have been texting consumers on behalf of QuoteWizard was January 1, 2018, when QuoteWizard acquired Bantam. QuoteWizard is not and cannot be liable for any text messages sent by Drips on behalf of Bantam. *See, e.g., Zean v. SelectQuote Ins. Servs.*, 2022 U.S. Dist. LEXIS 6978, at *10 (D. Minn. Jan. 13, 2022) (defendant could not be legally responsible under TCPA for calls made by a separate entity on a date before defendant acquired that entity).

Document Request 1 seeks the production from QuoteWizard of the texting call records that were previously provided to QuoteWizard by Drips, LLC, the entity that QuoteWizard used to send the text solicitations at issue (the "Call Records"). As this Court may recall, a large portion of the Call Records were the subject of extensive litigation that was resolved when Drips agreed to produce a portion of the Call Records to QuoteWizard who was then to produce those records to Mr. Mantha at the appropriate time. *See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37, attached hereto as <u>Exhibit C</u>. Despite the fact, however, that this matter has now proceeded to class discovery, QuoteWizard still refuses to produce these Call Records. Of course, the production of the Call Records is necessary so that Mr. Mantha's expert can compare the list of cell phone numbers who received text solicitations from QuoteWizard to the National Do Not Call Registry to identify class members. Such production is recognized as common in TCPA class actions.[6] *See Mey v. Frontier Communications Corp.*, Civil Action No. 13-cv-01191-MPS, ECF No. 102 (D. Ct. 2015) (compelling the production of telemarketing call records recognizing they will assist Plaintiff's experts in determining which phone numbers were tied to cellular phones, which calls were for telemarketing purposes and which numbers were on the National Do Not Call Registry, and that such was relevant to the numerosity, commonality, and typicality inquiries the Court will undertake to decide Plaintiff's motion for class certification under Rule 23).

QuoteWizard's reliance on cases limiting pre-certification discovery is baseless as this Court has already ordered that class discovery is to proceed and noted that the time to strike class allegations has passed. QuoteWizard's reliance on cases denying motions for class certification has no bearing on whether QuoteWizard should provide discovery squarely relevant to such a motion.

---

[6] *See Knutson v. Schwan's Home Serv., Inc.*, 2013 WL 3746118, at *4 (S.D. Cal. July 15, 2013) (ordering the production of a "dial list" consisting of everyone in the plaintiff's proposed class); *Warren v. Credit Pros Int'l Corp.*, No. 3:20-cv-763-TJC-MCR, 2021 U.S. Dist. LEXIS 79150, at *21 (M.D. Fla. Apr. 26, 2021) (recognizing plaintiff is entitled to call data prior to class certification); *O'Shea v. Am. Solar Sol., Inc.*, No. 14CV894-L (RBB), 2016 WL 701215 (S.D. Cal. Feb. 18, 2016) (granting plaintiff's request for outbound dial list because the "information is relevant to both class certification and to the merits of the case"); *Cahill v. GC Servs. Ltd. P'ship*, No. 317CV01308GPCMDD, 2018 WL 1791910, at *4 (S.D. Cal. Apr. 16, 2018) (compelling production of call list); *Gossett v. CMRE Fin. Servs.*, Case No. 15cv803 MMA (NLS), 2015 WL 6736883, at *3 (S.D. Cal. Oct. 30, 2015) (granting a motion to compel responses to requests for production of outbound call lists, as such lists were "relevant to the class claims and meritorious claims and defenses in this case"); *Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 U.S. Dist. LEXIS 157579 at *8-*12 (N.D. Ill. June 13, 2011) (granting plaintiffs' requests for a call list); *Donnelly v. NCO Fin. Sys., Inc.*, 263 F.R.D. 500, 503-504 (N.D. Ill. 2009) (Nolan, J.) (granting plaintiffs' request for defendant's call logs); *Whiteamire Clinic, P.A. v. Quill Corp.*, 2013 WL 5348377, at *2 (N.D. Ill. 2013) (granting plaintiff's request for call list; "the information plaintiff seeks…is clearly relevant to class discovery; specifically to the issues of numerosity, commonality, and typicality"); *Mbazomo v. ETourandTravel, Inc.*, No. 2:16-CV-02229-SB, 2017 WL 2346981, at *5 (E.D. Cal. May 30, 2017) (call logs and dialing lists relevant to numerosity and commonality); *Ossola*, 2015 WL 5158712, at *7 ("Call data is relevant, and thus produced as standard practice . . . in cases where the defendant is the alleged dialer."); *Gossett v. CMRE Fin. Servs.*, 142 F. Supp. 3d 1083, 1087 (S.D. Cal. 2015) (same); *Thrasher v CMRE Financial Services, Inc.*, 2015 U.S. Dist. LEXIS 34965 (S.D. Cal. March 13, 2015) (same); *Gusman v. Comcast Corp.*, 298 F.R.D. 592 (S.D. Cal. 2014) (same); *Webb v. Healthcare Revenue Recovery Grp. LLC*, 2014 WL 325132, at *2-3 (N.D. Cal. Jan. 29, 2014) (same).

QuoteWizard should be compelled to respond in full to Document Request No 1. and to produce the portion of the Call Records that were previously provided to it by Drips by agreement of the parties. Here, like *Mey*, Plaintiff's expert will perform an analysis of all of the Call Records, once produced, to determine which telephone numbers were on the National Do Not Call Registry for the applicable period prior to the contact. This analysis will lay the foundation for the Class List.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 1:**

This request relates to a spreadsheet of non-party consumer names, telephone numbers, and dates contacted by non-party Drips Holdings, LLC ("Drips"), which was produced by Drips to QuoteWizard for preservation purposes only, and is now sought by Plaintiff. The list contains over 43 million telephone numbers, many of which *do not even relate to QuoteWizard* (they were contacted by Drips for a different company), and an unascertainable number of telephone numbers that could never be included in Plaintiff's putative class. Plaintiff's request wrongly assumes that the list constitutes putative class members. In truth, putative class members in this case are unascertainable for the reasons stated below. There is no good ground to reveal the confidential information of persons associated with 43 million numbers on the off chance that Plaintiff believes a smattering of them *could* be similarly situated to Plaintiff. As noted below, if Plaintiff is looking for a lead list to identify numerosity of potential class members or for other purposes, QuoteWizard is agreeable to producing a redacted list of Plural-to RevPoint-to QuoteWizard-to Drips leads during the putative class period.

First, Plaintiff wrongly implies that the Parties contemplated that the spreadsheet produced by Drips to QuoteWizard would become immediately subject to production to Plaintiff when pre-certification class discovery opened. The agreement between Drips, Plaintiff, and QuoteWizard in the related subpoena litigation is expressly to the opposite:

> ***For preservation purposes only***, Drips will undertake to produce to QuoteWizard a list of all phone numbers texted for QuoteWizard on each date during the class period date range specified by the Mantha and QuoteWizard. …
>
> ***c. This data will not be produced to Plaintiff at this time and the Parties reserve all rights as to the whether the records may or may not be subject to production later.***

*See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37, p. 3, ¶ 3 (emphasis added). Contrary to Plaintiff's statement that QuoteWizard "still refuses to produce" this spreadsheet, QuoteWizard expressly preserved the right to object if Plaintiff sought it, and has timely preserved such objection.

Second, Plaintiff's argument fails to address QuoteWizard's threshold objection that the Drips spreadsheet has no bearing on any possible Rule 23 issue—"such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman v. Comcast Corp.*, 298 F.R.D. 592, 595 (S.D. Cal. 2014). QuoteWizard has already identified the number of telephone numbers on the spreadsheet

(43,166,509) to the extent Plaintiff believes that bears on numerosity. As explained below, even if the Court ordered the production of the spreadsheet, the parties would be no closer to determining which of those 43 million numbers could ever be included in a putative class in this case because there is no way to ascertain the same on a class-wide basis.

Plaintiff argues that "the production of the Call Records is necessary so that Mr. Mantha's expert can compare the list of cell phone numbers who received text solicitations from QuoteWizard to the National Do Not Call Registry to identify class members." But Plaintiff has not identified any expert to date. Therefore, this is not a possible basis for production of the records. In addition, pre-certification identification of "class members" is not necessary nor relevant. This has no possible bearing on any of the Rule 23 factors. *If* a class is certified, class members could be identified at that time. Before such time, the identification of potential class members is not necessary nor does it justify a massive breach of privacy for 43 million non-parties. *See Enslin v. Coca-Cola Co.*, 2016 WL 7013508, at *2 (E.D. Pa. May 13, 2016) ("The names and addresses of class members are not, per se, within the scope of legitimate discovery") (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353-56, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978), and McLaughlin on Class Actions § 11:1 (17th ed.) ("courts ordinarily will not permit putative class counsel to obtain discovery of class members' identities at the precertification stage")). Plaintiff's fishing expedition into putative class members before a certification motion is even brought also speaks to potential illegitimate motives, further justifying denial of his motion to compel the information. "Courts have ordinarily refused to allow discovery of class members' identities at the pre-certification stage out of concern that plaintiffs' attorneys may be seeking such information to identify potential new clients, rather than to establish the appropriateness of certification." *Dziennik v. Sealift, Inc.*, 2006 WL 1455464, at *1 (E.D.N.Y. May 23, 2006). Thus, where as here a pre-certification request for information to identify potential class members is at the very least premature, and plaintiff has failed to establish the information's relevance and proportionality to the needs of the case, production should not be ordered. *Deibler v. SanMedica Intl., LLC*, 2021 WL 6198062, at *11 (D. N.J. Dec. 30, 2021) (denying plaintiff's motion to compel).

Moreover, as noted below, if/when Plaintiff identifies an expert to cull texting records to find people who were registered on the National Do Not Call Registry, QuoteWizard will file a *Daubert* motion because this a meaningless and unreliable exercise to determine National Do Not Call Registry registrants who are residential telephone subscribers, and QuoteWizard will also designate an expert on this point. As noted below, other courts have stricken or refused to consider plaintiffs' experts' attempts to cull public research services to find Registry members. This *Daubert* issue should be heard **before** such time that 43 million telephone numbers and consumer names are placed in the hands of Plaintiff's counsel without restrictions.

Further, the Drips spreadsheet will not allow Plaintiff to "identify class members" even if produced. As noted in QuoteWizard's objections, hundreds of thousands of telephone numbers on the Drips spreadsheet were necessarily *not* texted on behalf of QuoteWizard. Namely, Drips's spreadsheet purported also to include numbers it texted dating back to 2016 on behalf of Bantam Connect, LLC *before* QuoteWizard acquired Bantam. These messages were therefore not sent on behalf of QuoteWizard. The earliest date that Drips could have been texting consumers on behalf of QuoteWizard was January 5, 2018, when QuoteWizard acquired Bantam. QuoteWizard is not

and cannot be liable for any text messages sent by Drips on behalf of Bantam. *See, e.g., Zean v. SelectQuote Ins. Servs.*, 2022 U.S. Dist. LEXIS 6978, at *10 (D. Minn. Jan. 13, 2022) (defendant could not be legally responsible under TCPA for calls made by a separate entity on a date before defendant acquired that entity). Excluding leads on the Drips spreadsheet that predate January 5, 2018 eliminates 1,093,739 numbers in and of itself. Moreover, QuoteWizard notes that it cannot assure the accuracy of Drips' spreadsheet and, in fact, the amount of telephone numbers on the spreadsheet appears to be inconsistent with its electronic databases concerning leads sent to Drips over the relevant time period.[7]

Furthermore, though Plaintiff claims he needs the spreadsheet to identify persons on the Registry, merely identifying whether a telephone number was on the National Do Not Call Registry is a meaningless exercise for the purposes of Plaintiff's remaining claim. As the Court's summary judgment order (and other case law) establishes, the fact that a number is listed on the Registry is just the *beginning* of the inquiry since Plaintiff has the burden of proving (among other things) that the numbers texted were subscribed to residential telephone subscribers. *See* ECF No. 268, p. 11 ("[I]n determining if a phone number has a residential purpose, the Court considers the following particularly relevant: First, the precondition that the phone number is a 'residential telephone subscriber'—that is, the phone number is subscribed in the individual's name at their residence. If that precondition is met, the Court then considers material whether the phone number at issue is the primary means of reaching the individual at their residence—that is, there is no other landline or phone at their residence which is instead the primary means of reaching them."). Other courts have consistently recognized that the mere fact that a number is subscribed to the National DNC Registry is not at all dispositive to a DNC TCPA claim. *See Sandoe v. Bos. Sci. Corp.*, 333 F.R.D. 4, 10 (D. Mass. 2019) ("Plaintiff has also failed to demonstrate that common proof can be used to establish 1) whether the varying messages for each of the Seminars were health care messages or telephone solicitations, 2) whether a landline or a cell phone was called, 3) whether the prerecorded message was actually transmitted and 4) whether the individual who received the call was the individual who registered his or her name on the Do-Not-Call Registry."). As *Sandoe* correctly recognizes, the DNC Registry does not reflect, for example, whether the person who received the text messages was the individual who registered the number on the Registry. *See id*. Thus, even if Plaintiff's yet identified purported expert could report back on how many of the 43 million numbers appear to have been registered on the DNC Registry, this does not get the parties or the Court any closer to determining the telephone numbers who would be part of any alleged class. It is a truly meaningless exercise.

And equally as important, the fact that the so-called "texting call records" would have to be painstakingly culled, on an individual-by-individual basis, to exclude millions and millions of consumers as outside any potential class is proof alone that this case is not an appropriate class action and these records are not properly discoverable at this stage. To allow discovery into 43 million non-parties to include or exclude on an individual basis reduces the efficiencies of a purported class action case. *See Schwartz v. Celestial Seasonings*, 185 F.R.D. 313, 316 (D. Colo. 1999) ("Discovery of absentee or unnamed class members is neither prohibited nor sanctioned explicitly by the Federal Rules of Civil Procedure. ... It is within 'the court's discretion to utilize this procedure except when it only will confuse the absentees, some class members can demonstrate that it will prejudice their rights, it will be employed prematurely or administered in

---

[7] QuoteWizard is actively investigating this discrepancy in good faith.

an inappropriate fashion, or it will serve only to reduce the efficiencies of the class action.' (quoting in part 7B Charles Alan Wright et al., Federal Practice and Procedure § 1787 at 218-19 (2d ed. 1986)); *Siding & Insulation Co. v. Alco Vending, Inc.*, 2017 U.S. Dist. LEXIS 137071, at *40 (N.D. Ohio Aug. 25, 2017) (class certification properly denied not because "defendant had proven which potential class members were decidedly ineligible to share in any possible recovery, but because the process of identifying the eligible class members—something that would take place at a later time—would predominate the case.").

This also does not take into account the fact that trying to identify DNC Registry registrants is a historically and well-documented unreliable process. Although Plaintiff has not identified the purported expert he references in this document, courts have stricken or refused to give credence to plaintiffs' experts who use research services such as Lexis to try to identify numbers on the DNC Registry because, for example, Lexis has specifically avowed that its records <u>cannot be reliably used</u> to determine this information. *See, e.g., Carroll v. SGS Automotive Services, Inc.*, Case No. 3:16-cv-00537-SDD-SDJ (M.D. La. Nov. 30, 2020), Docket No. 232, Order striking plaintiff's purported expert (attached hereto as Exhibit D for reference), p. 11 (noting that LexisNexis representative explained that the Lexis database "cannot be used to determine definitively the subscribers or customary users of a telephone number on a current or historical basis. Nor can [it] be used to identify when a telephone number was reassigned from one person to another, or when the customary user of a phone number changed."); *see also Sandoe*, 333 F.R.D. at 10-12 (noting unreliability of plaintiff's expert's methods in identifying potential class members in DNC case).

Thus, Plaintiff's counsel asks this Court to allow them unfettered access, without any safeguards in place (such as redactions, restrictions on contacting non-parties, etc.) to the confidential information of 43,166,509 telephone numbers, including names, all of whom are currently non-parties to this case, a large subset of whom QuoteWizard never contacted (and thus could not be potential class members), an untold number of whom would never fall into the putative class as presently defined (because they were not listed on the DNC Registry at the time they were contacted; because they were not residential telephone subscribers; because they did not receive two or more solicitations; because they consented to receiving the text messages, and so on), and where each number would have to be investigated on an individual basis. What Plaintiff is asking this Court to do is to engage in a fishing expedition to the tune of revealing the confidential information of 43 million non-party consumers. Plaintiff has not offered a single plausible explanation why such production is relevant to Rule 23 factors, much less justify this extraordinary breach of non-party consumer privacy.

The above also does not even begin to address the fact that, *as is undisputed*, QuoteWizard will have proof of consent for each and every telephone number texted. Though Plaintiff may try to contest consent for each individual consumer, Plaintiff cannot deny that QuoteWizard's business model is predicated on consent such that QuoteWizard will have consent as an affirmative defense for each and every telephone number texted. Indeed, Plaintiff's counsel concedes in this joint document that QuoteWizard will in fact be able to prove consent for at least some consumers. Given this fact, Plaintiff's claim that he needs the spreadsheet to identify National DNC Registry subscribers is nonsensical. Even if that was a valid, reliable exercise, which it is not, that fails to exclude the consumers who consented to be contacted. *See, e.g., Sapan v. Yelp, Inc.*, 2021 WL

5302908, at *3-6 (N.D. Cal. Nov. 15, 2021) ("Even assuming that plaintiff's-side expert could identify phone numbers on the Do Not Call Registry that were called twice by Yelp in a twelve month period -- a possibility that is not at all clear in her declaration -- her method does not account for people who consented to being called in the ways that the record documents."); *Duval v. Gleason*, 1991 WL 214251, at *1 (N.D. Cal. June 12, 1991) (court refused to grant the defendant's motion for discovery of absent class members prior to class certification on the ground that such discovery was "not likely to resolve the issues central to class certification, and would be expensive and intrusive to class members."). Again, given the futility of Plaintiff's proposed reason for wanting this information, there is no justifiable basis to reveal the identities of consumers associated with 43 million numbers.

Finally, Plaintiff is seeking information regarding third parties that exceeds the subject matter of this case—the Snappy website or at most, Fenix Media leads. QuoteWizard's leads during the putative class period were not bought or generated from a common source, nor were the text messages sent pursuant to a single mass campaign. Contrary to Plaintiff's current claims that this case is not about the Snappy website or the alleged bad actor, Fenix, the briefing and prior orders in this case consistently focus on those narrow issues. For example, the Magistrate Judge's Report & Recommendation on summary judgment, adopted in part by the Court, found no valid consent because (as was insinuated) Fenix likely "pirated" a site and fraudulently entered Plaintiff's information there (indisputably without QuoteWizard's knowledge):

> If Fenix, the Bosnian company that now claims to be the site's webmaster, was operating the site without Brown's knowledge (as defendant admits is possible), then Fenix was pirating the site and as such was not a reliable source for TCPA-compliant leads. … [G]iven that the source of plaintiff's contact information, Fenix, appears to have pirated the Snappy Auto website in order to either generate leads or falsify the source of leads, the promise of TCPA compliance it made to Plural, which Plural in turn made to RevPoint, and which RevPoint ultimately made to defendant is not dispositive on the question of TCPA compliance.

*Mantha v. Quotewizard.com, LLC*, 2021 U.S. Dist. LEXIS 245059, at *19, 25-26 (D. Mass. Dec. 3, 2021) (R&R). Plaintiff has not cited *any* evidence that there are any other alleged bad actors pirating and entering information fraudulently and selling fraudulent leads that QuoteWizard is ultimately purchasing in bulk. Yet Plaintiff has made no attempt to tailor pre-certification discovery to the Snappy website or even Fenix leads.

Other courts have consistently found that pre-certification discovery cannot be used to expand the case beyond the subject matter thereof where the plaintiff has no evidence to suggest *common* wrongdoing beyond that subject matter. "Because Plaintiff has failed to produce any evidence of company-wide violations, and Defendant admittedly has produced contrary evidence showing company-wide policies consistent with California law, there is no basis at this time to require discovery beyond the Irvine facility where Plaintiff worked." *Nguyen v. Baxter Healthcare Corp.*, 275 F.R.D. 503, 508 (C.D. Cal. 2011); *Franco v. Bank of America*, 2009 WL 8729265, at *3-4 (S.D. Cal. Dec. 1, 2009) (sustaining objections that providing contact information for locations where plaintiff did not work was overly broad and unduly burdensome because plaintiff had "not provided sufficient facts to support his claim of a company-wide policy and practice by

[the defendant] to withhold regular and overtime wages from its employees"); *Martinet v. Spherion Atlantic Enterprises, LLC*, 2008 U.S. Dist. LEXIS 48113, at *2 (S.D. Cal. 2008) (limiting discovery to office where plaintiff worked until such time plaintiff could show evidence of company-wide violations).

At this advanced stage of the case, Plaintiff cannot use a fishing expedition to discover some alleged common type of wrongdoing that does not exist. To the extent he believes alleged fraud goes beyond Snappy or Fenix, he has never so alleged or offered evidence to that end. In the absence of such allegations or evidence, Plaintiff cannot fish for a class theory that does not exist. *See*, *e.g.*, *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985) (pre-certification discovery may be prohibited where plaintiff fails to advance a prima facie showing that the class requirements (i.e., numerosity, commonality, typicality and adequacy of representation) of Rule 23 are satisfied or that "discovery is likely to produce substantiation of class allegations.") (no abuse of discretion by denying pre-certification discovery where plaintiff merely cited "two other complaints filed elsewhere" by similar plaintiffs against the same defendant to demonstrate a likelihood that discovery would substantiate class allegations). Thus, where there is clearly no relevancy, commonality or typicality between leads sold to QuoteWizard from nearly a hundred possible lead suppliers[8] and Plaintiff's lead, class discovery must necessarily be limited to leads that originated from the same source—the Snappy website or at most from Fenix Media.

To that end, insofar as Plaintiff's discovery requests are properly denied, QuoteWizard is agreeable to producing a redacted version of the Plural-to RevPoint-to QuoteWizard-to Drips lead list, which may contain other Fenix leads (as could be potentially confirmed or denied by third-party discovery from Plural/Fenix, although upon information and belief, Plaintiff's lead was the only lead purchased by QuoteWizard from RevPoint and in turn from Plural during the putative class period that purportedly originated from the Snappy website).

In the alternative, if the Court believes that discovery into other lead sources besides Snappy/Fenix is appropriate, but balancing the need to protect the privacy of 43 million non-party consumers and also ensuring that this case does not become a consumer-by-consumer inquiry, QuoteWizard submits that a production of a sampling of consumers it contacted during the putative class period (up to a reasonable number, such as 500) would be the only appropriate production.

However, in the event the Court orders the Drips spreadsheet to be produced in full, QuoteWizard alternatively requests the following safeguards to maintain the privacy of the non-party consumers and prevent the unauthorized contact with such persons. Namely, QuoteWizard requests that the spreadsheet be produced as Confidential Pursuant to the Court's Default Protective Order and remain protected thereunder, that all identifying information (names) be redacted, and that the Court order that Plaintiff's counsel cannot contact any telephone numbers on the list for any purpose at all, in this case or for any other purpose, *only, and unless and until, class certification were granted*.

---

[8] QuoteWizard first identified approximately 180 possible lead suppliers during the putative class period. Subsequent investigation reveals that, further narrowing the list of suppliers only to those for which at least some of their leads were sent to Drips in order to text, approximately 88 lead suppliers remain.

**DOCUMENT REQUEST NO. 2:** Please produce all records of outbound text messages made by QuoteWizard on the DRIPS system during the putative class period.

**RESPONSE:** QuoteWizard objects to this Request as confusing as written, as it is not clear what "made … on the DRIPS system" means. QuoteWizard does not have access to "make" or send messages to consumers on Drips's systems. QuoteWizard further objects to this Request on the grounds that the requested records are not in the possession, custody, or control of QuoteWizard, as Drips has sole possession, custody, and control of its records except for the limited category of documents it has produced during this case by agreement (*see* FN1 herein). Further, the request is unduly burdensome, overly broad, not proportional to the needs of the case, is not relevant to any of the Fed. R. Civ. P. 23 factors or to liability, and also impermissibly seeks confidential PII of non-party consumers. QuoteWizard refers Plaintiff to, and incorporates herein, its objections to Request No. 1.

Pursuant to these objections, QuoteWizard has no documents within its possession, custody, or control to produce for Request No. 2, and otherwise maintains and preserves its objections.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 2:**

A large portion of the Call Records evidencing the QuoteWizard text telemarketing campaign at issue in this litigation were previously produced to QuoteWizard by Drips per agreement of the parties. *See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37. QuoteWizard, however, continued to send text solicitations to consumers on behalf of QuoteWizard despite the pendency of this litigation. Accordingly, the Call Records relating to Docket No. 37, do not represent records of all of the text solicitation sent by Drips to consumers on behalf of QuoteWizard during the entire class period. This request is designed to request a complete set of Call Records that can identify class members, and is not limited to those records produced to QuoteWizard by Drips pursuant to Docket No. 37.

Contrary to QuoteWizard's claim that it has no role in obtaining responsive documents from DRIPS, the Parties' Stipulation expressly contemplates as "Phase 2" production of additional records from DRIPS as to dialing platforms utilized (referred to as "lead aggregators") as well as phone numbers dialed, including texts sent after the date of production. The Stipulation provides "In the event of a future Phase 2 production, Drips will first produce these records to QuoteWizard, who will be responsible for producing these records to Plaintiff.

QuoteWizard should be compelled to respond in full to Document Request No 2. and to produce any additional records evidencing outbound text messages sent by QuoteWizard on the Drips system that were not included in Request No. 1.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 2:**

As noted in QuoteWizard's objections, QuoteWizard does not have outbound text messages made by Drips, whether made during the pendency of this case or not, in its possession, custody, or control. To the extent Plaintiff would contest this representation—he has no grounds to do so—the burden is on him to show that text messages made by Drips, a non-party, are in

QuoteWizard's possession, custody, or control, which they are not.  *See*, *e.g.*, *Markus v. Rozhkov*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) ("The party seeking the production bears the burden of demonstrating that the other party has control over the documents sought.").  To the extent Plaintiff's argument suggests otherwise, QuoteWizard does not have, nor did it ever have, copies of text messages sent by Drips to other consumers besides Plaintiff.  The text messages to Plaintiff were voluntarily produced in this case by Drips.

In the above argument, Plaintiff appears to clarify, contrary to the text of Request No. 2, that he is actually seeking documents referenced in the parties' agreement in the related Drips subpoena litigation: the "Phase 2" production. Request No. 2 does not request these documents. In any event, ***as per the parties' agreement, these documents are to be sought directly from Drips, not QuoteWizard, at or around the time of attempted certification***.  Nothing in the parties' agreement would allow Plaintiff to circumvent the agreement by seeking the documents directly from QuoteWizard, which does not have them, much less before a certification motion is even brought much less granted.  As the agreement states in pertinent part:

4. Drips has supplied Plaintiff and QuoteWizard with a list of all aggregators used to send text messages on behalf of QuoteWizard. Drips will separately maintain in readily accessible format a list of the aggregators used to send texts to each number on the dates specified but will not produce that list until its anticipated Phase 2 Production Date.

a. In the event of a future Phase 2 production, Drips will first produce these records to QuoteWizard's counsel, who will be responsible for producing these records to Plaintiff. The Parties agree that, when produced, this list will be labeled and treated as "Attorneys' Eyes Only" and "Confidential Pursuant to the Court's Default PO" in order to protect Drips' proprietary and trade secret information.

5. ***Drips will preserve in a more readily searchable and accessible fashion data regarding call logs and/or disqualification records related to QuoteWizard moving forward***.

a. The Parties agree that Drips will make one final Phase 2 production of pertinent disqualification notices and the phone numbers texted on each date along with, as applicable, a campaign ID and aggregator information.

b. ***This Phase 2 Production Date shall be selected at a future date, in all likelihood at or near the date of certification (if it occurs), jointly by Plaintiff and QuoteWizard in collaboration with and with appropriate notice to Drips***.

c. In the event of a future Phase 2 production, Drips will first produce these records to QuoteWizard, who will be responsible for producing these records to Plaintiff. Drips will designate these records as "Confidential Pursuant to the Court's Default PO" where appropriate, and the parties agree that the aggregator information shall be subject to "Attorneys' Eyes Only" treatment. QuoteWizard intends to redact telephone numbers, names, or any other PII from these records before producing to Plaintiff and will not produce telephone numbers, names, or any other PII to Plaintiff absent a court order.

25

…

7. Plaintiff and QuoteWizard reserve their right to seek additional information from Drips during Phase 2 to the extent they determine that additional information is necessary to their claims or defenses as discovery develops. … Drips reserves all jurisdictional, procedural and substantive objections and rights under all applicable rules related to those future potential discovery efforts and any disputes arising therefrom.

…

9. Drips reserves the right to present its request for cost shifting for these efforts to be determined by the Court. Drips intends to do so once it has sufficient information to more accurately estimate the costs associated with the above efforts. QuoteWizard and Plaintiff reserve the right to respond to any such request.

*See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37, pp. 3-5 (emphasis added).

As memorialized in the parties' agreement, these documents are to be sought from the entity that has possession, custody, or control over them—Drips. Drips preserved its objections in the event such request would be made. In addition, the parties' agreement contemplated that any Phase 2 production would occur only in the event of certification—whereas no motion has been filed yet let alone granted. In either event, Plaintiff's recourse is under the agreement in the related litigation, under the procedures set forth therein (which Plaintiff agreed to), *not* to seek these documents from QuoteWizard and therefore unfairly place the burden on QuoteWizard to obtain the documents Plaintiff seeks from Drips.

**DOCUMENT REQUEST NO. 3:** With respect to any documents produced in response to Request Nos. 1 or 2, any documents that evidence that the telephone numbers contacted were associated with a business.

 **RESPONSE:** QuoteWizard refers Plaintiff to and incorporates herein its objections to Requests No. 1 and 2. To the extent these requests relate to text messages sent to consumers, as noted in these objections, QuoteWizard has no records in its possession, custody, or control for Requests Nos. 1 and 2, and therefore also does not have records in its possession, custody, or control responsive to Request No. 3. To the extent Requests Nos. 1 and 2 related to the Drips spreadsheet produced during this case, QuoteWizard incorporates herein all of its other objections to Requests Nos. 1 and 2.

Specifically, QuoteWizard also objects to this Request as unduly burdensome, overly broad, not proportional to the needs of the case, and on the basis that it seeks confidential non-party consumer PII. Even if QuoteWizard had copies of the outbound text messages sent to all non-party consumers in its possession, custody, or control, which it does not, or if this request relates to the identity of all non-party consumers contacted by Drips, whether each consumer was contacted on a business versus residential number or not presents an extremely individualized and time consuming inquiry not appropriate for class discovery or certification. There is no

way to determine on a class-wide basis whether a particular number is business or otherwise without inquiring into each consumer's number. The Drips spreadsheet reflects 43,166,509 rows of telephone numbers. Determining which of these numbers were residential versus non-residential at the time they were contacted, in addition to whether they were registered on the National Do Not Call Registry and received two or more telephone solicitations (elements of Plaintiff's claim) would be an individualized task not appropriate of resolution on a class-wide basis.

Pursuant to these objections, QuoteWizard does not have any records in its possession, custody, or control to produce for Request No. 3 if relating to text messages sent, and if relating to all consumers contacted by Drips during the class period, QuoteWizard produces no documents pursuant to its foregoing objections.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 3**:

As this Court is now well aware, in response to Mr. Mantha's individual claim, QuoteWizard claimed that Mr. Mantha's cell phone was a business line not entitled to the protections of the Do Not Call Registry. Mr. Mantha suspects that QuoteWizard will try to make similar claims as to the personal cell phones of other class members. In anticipation of that claim, Mr. Mantha seeks from QuoteWizard all documents that would support its expected claim that any of its text messages were sent to numbers associated with a business. QuoteWizard has objected to this request on a number of grounds, none of which have merit. The request is simple and straight forward. If QuoteWizard is going to argue that any of the cell phones of class members were associated with a business and, therefore, are not entitled to the protections of the DNC Registry, it should be compelled to produce all evidence that supports such a claim. If QuoteWizard is not in possession of any such documents, as suspected, they should be clearly confirm that fact on the record.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 3**:

QuoteWizard first incorporates its objections and argument with respect to Request No. 1 for the proposition that the Drips spreadsheet is not properly discoverable because there is no way to ascertain which of the 43 million numbers on the spreadsheet are putative class members.

In addition, as noted, the Drips spreadsheet at issue includes 43,166,509 rows of telephone numbers. Thus, Plaintiff's request asks QuoteWizard to produce proof of whether each telephone number is a residential telephone subscriber or not for over 43 million telephone numbers. This request is, on its face, extremely overbroad, unduly burdensome, and not proportional to the needs of the case. This is especially true because whether a particular person qualifies as a residential telephone subscriber is the plaintiff's burden to show as an element of a DNC claim. *See*, *e.g.*, *Lee v. Loandepot.com, LLC*, 2016 U.S. Dist. LEXIS 110100, at *16-18 (D. Kan. Aug. 17, 2016) ("To prevail under 47 C.F.R. § 64.1200(c)(2), Plaintiff must establish that his cellular number is used for residential purposes.").

Moreover, this requested discovery is categorically inappropriate since it is antithetical to the purpose of a class action case—resolution on a class-wide, versus individualized, basis. *See*

*Schwartz*, 185 F.R.D. at 316 (discovery regarding putative class members improper where "it will serve only to reduce the efficiencies of the class action."). Critically, Plaintiff has offered no mechanism by which the attorneys or any potential, yet-identified experts could determine this element of his claim on a class-wide, versus individualized, basis.[9] What Plaintiff is really seeking to do is convert *his* burden—in showing ascertainability of a class on this issue, an element of his claim—to QuoteWizard's burden. This is not a proper class discovery request. Insofar as there is a class-wide basis to ascertain whether consumers were residential telephone subscribers, that is Plaintiff's burden under Rule 23 to show at the certification stage. This request is also completely irrelevant to the Rule 23 factors but rather seeks to discern the merits of the putative class members' claims. This is not a proper subject of class discovery.

In the alternative, if the Court orders a production of a sampling of leads as referenced above, then QuoteWizard submits that the parties can also take discovery from that sampling on this issue, on a consumer-by-consumer basis.

**DOCUMENT REQUEST NO. 4:** With respect to any documents produced in response to Request Nos. 1 or 2, any documents that evidence that the telephone numbers contacted were not registered to a residential service.

**RESPONSE:** QuoteWizard refers Plaintiff to and incorporates herein its objections to Requests Nos. 1, 2, and 3. To the extent these requests relate to text messages sent to consumers, as noted in these objections, QuoteWizard has no records in its possession, custody, or control for Requests Nos. 1 and 2, and therefore also does not have records in its possession, custody, or control responsive to Request No. 4. To the extent Requests Nos. 1 and 2 related to the Drips spreadsheet produced during this case, QuoteWizard incorporates herein all of its other objections to Requests Nos. 1, 2, and 3. Specifically, QuoteWizard also objects to this Request as unduly burdensome, overly broad, not proportional to the needs of the case, and on the basis that it seeks confidential non-party consumer PII.

Pursuant to these objections, QuoteWizard does not have any records in its possession, custody, or control to produce for Request No. 4 if relating to text messages sent, and if relating to all consumers contacted by Drips during the class period, QuoteWizard produces no documents pursuant to its objections.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 4:**

---

[9] Whether or not other consumers contacted by QuoteWizard were on the DNC Registry at the time they were contacted and qualified as residential telephone subscribers is a fact-intensive inquiry, on an individual-by-individual basis, dependent on numerous factors, including if/when the <u>person</u> contacted (not just the number) was entitled to DNC protections, and whether the person/number qualified as a residential telephone subscriber (versus a business number, a cell phone number with no ties to a residence, etc.). Information bearing on this inquiry could include, for example, the address associated with every lead/consumer/telephone number, as well as third-party discovery that would be necessary for each consumer including information obtainable only from the consumers themselves or their phone companies or employers, for example whether their cell phone is paid by their employers or associated in any way with their residence (or rather they have a dedicated landline for home calls). For example, just for Plaintiff alone, this issue required depositions of Plaintiff, his wife, his employer, and a subpoena to his phone company, as well as other research and investigation.

Request No. 4 is similar to Request No. 3 in that it also seeks to explore QuoteWizard's expected claim that some of the phone numbers of class members are not residential numbers, but rather are business lines not entitled to the protections of the Do Not Call Registry. If QuoteWizard is going to claim that any of the numbers to whom it sent text solicitations to were business numbers, they should be compelled now to produce any documents in support of such a claim or to clearly state that they do not possess such documents.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 4:**

QuoteWizard incorporates and relies on its above argument with respect to Requests Nos. 1 and 3, which apply equally to Request No. 4.

**DOCUMENT REQUEST NO.5:** With respect to any documents produced in response to Request Nos. 1 or 2, any documents that evidence the name and address of the call recipient.

**RESPONSE:** QuoteWizard refers Plaintiff to and incorporates herein its objections to Requests No. 1 and 2. To the extent these requests relate to text messages sent to consumers, as noted in these objections, QuoteWizard has no records in its possession, custody, or control for Requests Nos. 1 and 2, and therefore also does not have records in its possession, custody, or control responsive to Request No. 5. To the extent Requests Nos. 1 and 2 related to the Drips spreadsheet produced during this case, QuoteWizard incorporates herein all of its other objections to Requests Nos. 1 and 2. Specifically, QuoteWizard also objects to this Request as beyond the scope of class discovery and not relevant to the Rule 23 factors, unduly burdensome, overly broad, not proportional to the needs of the case, and on the basis that it seeks confidential non-party consumer PII. The names and other PII of putative class members is not generally available in discovery prior to a class being certified. *See Dziennik*, 2006 WL 1455464, at *1. In addition, in the Parties' agreement in the Drips lawsuit, QuoteWizard noted that it would not produce consumer names or PII for any class records it produced; Plaintiff did not object or reserve the right to seek the same. *See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37.

Pursuant to these objections, QuoteWizard does not have any records in its possession, custody, or control to produce for Request No. 5 if relating to text messages sent, and if relating to all consumers contacted by Drips during the class period, QuoteWizard produces no documents pursuant to its foregoing objections.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 5:**

Request No. 5 seeks information from QuoteWizard that can identify the names and addresses of the consumers whose phone numbers are included in the Call Records. Obviously, this information is essential to identify class members who received illegal text solicitations from QuoteWizard despite having their numbers listed on the Do Not Call Registry. These consumers are witnesses. Furthermore, if the contact information that Quotewizard has for these text recipients is consumer data as opposed to commercial business data, this further supports the idea that the individuals were contacted on "residential" telephone lines. Moreover, it is essential

for Mr. Mantha to identify class members for notice purposes. *See Frey v. Frontier Utils. Ne. Llc*, No. 19-2372-KSM, 2020 U.S. Dist. LEXIS 260620 *5-6 (E.D. Pa. Apr. 13, 2020) (Compelling calling data in a TCPA case holding, "EAG argues that Frey is not entitled to this personal identifying information pre-class certification, but as discussed below, the Court did not bifurcate the discovery period in this matter. As such, Frey was required to seek discovery on both his individual claim and his class claim at the same time and could not wait until after the Court ruled on his motion for class certification to request this relevant information.") QuoteWizard's objection to this specific request incorporates all its prior objections and notes that when Drips produced to it the Call Records, it did not include the contact information for consumers. Of course, QuoteWizard is already in possession of this data, as, like Mr. Mantha, QuoteWizard purchased contact data for consumers including their name and address, and instructed Drips to send texts to their cell phone numbers. QuoteWizard claims that it cannot produce this data because it constitutes "PII." Mr. Mantha, however, is willing to treat consumer data as confidential. QuoteWizard's further objection that it should not be compelled to produce this data now prior to class certification fails as this Court has ordered that class discovery commence now, and has not afforded for an additional discovery period post certification.

QuoteWizard should be compelled to produce the contact data for the phone numbers of all consumers who were sent text solicitations on behalf of QuoteWizard via Drips.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 5**:

QuoteWizard incorporates its argument regarding Request No. 1, which applies equally to this request.

Furthermore, Plaintiff has articulated no ground on which he would need the names and addresses for the 43 million telephone numbers on the Drips spreadsheet, who are all non-parties to this case. In fact, Plaintiff advances only an improper purpose for this request. With respect to "notice," no certification motion has been filed much less granted; there is nothing to notice. Plaintiff also claims that these non-parties are "witnesses," but courts strictly prohibit discovery from putative class members prior to certification. *See McPhail v. First Command Fin. Planning, Inc.*, 251 F.R.D. 514, 517 (S.D. Cal. 2008); *see also Fischer v. Wolfinbarger*, 55 F.R.D. 129, 132 (W.D. Ky. 1971) ("It is not intended that members of the class should be treated as if they were parties plaintiff, subject to the normal discovery procedures, because if that were permitted, then the reason [behind Rule 23(a)(1) of the Federal Rules of Civil Procedure] would fail."). The only exception to this generally strict rule is where a putative class member has been injected into the litigation by the other party. *See Mas v. Cumulus Media, Inc.*, 2010 U.S. Dist. LEXIS 130269, at *2 (N.D. Cal. Nov. 22, 2010 (defendant could take deposition of "two putative class members" who were "identified as witnesses in Plaintiff's initial disclosures"); *Antoninetti v. Chipotle, Inc.*, 2011 U.S. Dist. LEXIS 54854, at *(S.D. Cal. May 23, 2011) (defendant permitted to depose, on a limited basis, putative class members prior to opposing the plaintiff's class certification motion; those members, however, had been identified as witnesses by plaintiff in his supplemental disclosures, and had also signed declarations as putative class members in support of the class certification motion) (putative class members have "injected themselves into the litigation on two fronts and cannot claim noninvolvement as a means of avoiding discovery").

Moreover, Plaintiff does not identify on what subject matter these non-parties would be witnesses. To the extent he would claim they can submit affidavits regarding whether or not they consented to be contacted by QuoteWizard, this is an unavailing reason. First, as noted, a large portion of these non-parties would not even be putative class members—they would first have to show they were contacted by QuoteWizard two or more times with solicitations in the class period, were on the DNC Registry, and were residential telephone subscribers before consent ever becomes an issue. Second, to the extent Plaintiff would contact these non-parties for the desired purpose of obtaining affidavits contending a lack of consent, this is not admissible class evidence. Self-attestations or affidavits of putative class members are consistently rejected by courts. *See Stewart v. Beam Global Spirits & Wine, Inc.*, 2014 U.S. Dist. LEXIS 87487, at \*22-24 (D.N.J. June 26, 2014) ("The Third Circuit has made clear that ascertainability is important because it eliminates serious administrative burdens ... by insisting on the easy identification of class members[.] Despite this controlling case law, Plaintiffs neglect to identify what information would be included within the affidavits of putative class members, making it virtually impossible for putative class members, Defendants, or the Court to know that this method will result in easy identification of the class members. Moreover, … obtaining this information by way of affidavits does not appear to be an effect[ive] method for ascertaining the Classes. Without any independently verifiable proof of purchase through receipts, retail records, or otherwise, the Court finds it unlikely that putative class members will accurately remember every Skinnygirl Margarita purchase they made during the class period, let alone where these purchases were made and the prices they paid each time. Given the general inaccuracies of individuals' memories, the submission of affidavits supplying such information would be very likely to invite speculation, or worse, not to mention that this process would result in an extremely burdensome task for the Court or a claims administrator attempting to verify class members' claims. …Such a method cannot fairly be construed as an administratively feasible one which utilizes objective criteria. While the proposed class definitions appear to be based on objective criteria, i.e., who made purchases of Skinnygirl Margarita during a specified time frame, Plaintiffs' only proposed method for identifying potential class members relies on the completely subjective information provided by individuals claiming entitlement to class relief.").

The same concerns highlighted in this *Beam* case would apply here. If Plaintiff's counsel were to randomly contact telephone numbers previously contacted by Drips and ask if the consumer consented to contact from QuoteWizard, many consumers may misleadingly say no because (1) they might not recall consent (the act of clicking-through on a website) particularly dating back to the earliest dates of the putative class period and (2) the leads were generated on third-party websites owned and operated by different entities, not QuoteWizard, then later legally sold to QuoteWizard (and such potential sale disclosed on the websites), whereas some consumers would not understand that they legally consented to be contacted by the websites' partners. Any affidavits that Plaintiff could obtain from these non-parties would not be admissible, legitimate evidence as to consent. Thus, in short, there is no legitimate basis for Plaintiff's counsel to obtain non-party contact information and contact them.

What Plaintiff is really seeking to do is to obtain the names and addresses of these non-party consumers to conduct a fishing expedition in an attempt to find another consumer who claims they were contacted in violation of the TCPA. That is not the purpose of a putative class action nor class discovery, which focuses on the Rule 23 factors, but in fact defeats the entire purpose of

a class action case that it designed to eliminate individualized inquiries.  Moreover, QuoteWizard has concerns that Plaintiff's counsel's contact with non-parties could be improperly suggestive and coercive.  These non-parties have not interjected themselves in this litigation and the vast majority of them would not even arguably be in the putative class as defined.  It is simply not justified to allow Plaintiff's counsel access to confidential data for 43 million non-parties in the hopes of finding another allegedly non-consenting consumer.

QuoteWizard also notes that the addresses of consumers are not included on the Drips spreadsheet, rather just consumer names and telephone numbers.  QuoteWizard otherwise does not have a list of numbers texted by Drips with corresponding addresses in its possession, custody, or control.

*If* the Court determines that pre-certification contact with potential class members is appropriate in this case, this should be limited to a reasonable sampling (up to 100) of the Plural-to RevPoint-to QuoteWizard-to Drips lead list only.  If the Court determines that class discovery should not be limited to this chain of leads, then QuoteWizard suggests an increased sample size of up to 500 across its contractual lead partners.  QuoteWizard notes that this would likely require extensions of the current scheduling order, as discovery for each consumer in the sampling would be time-consuming.

**DOCUMENT REQUEST NO.6:** With respect to any documents produced in response to request Nos. 1 or 2, any documents that evidence any consent or permission for Quotewizard to contact the call recipient.

 **RESPONSE:** QuoteWizard refers Plaintiff to and incorporates herein its objections to Requests Nos. 1, 2, and 3. To the extent these requests relate to text messages sent to consumers, as noted in these objections, QuoteWizard has no records in its possession, custody, or control for Requests Nos. 1 and 2, and therefore also does not have records in its possession, custody, or control responsive to Request No. 6. To the extent Requests Nos. 1 and 2 related to the Drips spreadsheet produced during this case, QuoteWizard incorporates herein all of its other objections to Requests Nos. 1 and 2. Specifically, QuoteWizard also objects to this Request as unduly burdensome, overly broad, not proportional to the needs of the case, on the basis that it seeks confidential non-party consumer PII, and because consumers contacted for leads sold to QuoteWizard by a possible of 180 other lead suppliers and generated from different websites than the Snappy website have no relevancy to, commonality with or typicality to Plaintiff's claim and are not discoverable. Moreover, QuoteWizard notes that Drips's records reflect 43,166,509 rows of telephone numbers contacted in the records it sent to QuoteWizard pursuant to the parties' agreement. It is patently unreasonable to expect QuoteWizard to gather, at all much less within the timeframe provided for responses, "documents that evidence any consent or permission for Quotewizard to contact the call recipient" for 43,166,509 rows of telephone numbers. Further, consent for each consumer is a highly individualized inquiry. It would involve inquiring into the chain of the lead, from where the lead was generated, the TCPA disclosure language on the lead generation website, whether consent was revoked, etc. This is not appropriate for resolution on a purported class-wide basis, notwithstanding that (upon information and belief) there is no putative class beyond Plaintiff for the Snappy website.

QuoteWizard further objects on the basis that at least some of the requested "consent" documents are not in its possession, custody, or control. For example, QuoteWizard's lead suppliers, not QuoteWizard, would be in possession, custody, or control of certain information for each lead, including the lead generation website. In addition, for each lead, the lead verification information, such as visual playbacks and lead verification reports, are in the possession, custody, or control of Jornaya/Lead Intelligence Inc. or TrustedForm/Active Prospect, Inc., not QuoteWizard.

Pursuant to these objections, QuoteWizard does not have any records in its possession, custody, or control to produce for Request No. 6 if Request No. 1 relates to text messages sent, and if Request No. 1 relates to all consumers contacted by Drips during the class period, QuoteWizard produces no documents pursuant to its foregoing objections.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 6**:

Request No. 6 seeks all documents from QuoteWizard that evidence the consent or permission of the consumers whose numbers are included in the Call Records to receive text messages from QuoteWizard. In response, QuoteWizard asserted a myriad of objections and produced not a single document. As this Court has previously recognized, it is QuoteWizard\s burden to prove that it first obtained the consent of consumers before it sent them text solicitations via Drips. Critically, according to the contract between Drips and QuoteWizard, pursuant to which Drips agreed to transmit text solicitations to consumers on QuoteWizard's behalf, QuoteWizard agreed that it would maintain proof of consent for every single phone number being sent text solicitations via the Drips platform, and would produce such proof to Drips with only two business days' notice. Accordingly, all proof of consumers' consent to receive QuoteWizard telemarketing texts, to the extent it exists, should already be in QuoteWizard's possession and producing that information is a business expectation and agreement by QuoteWizard.

At class certification and trial, it will be QuoteWizard's affirmative burden to prove it had the consent of consumers to receive its text solicitations. As this case is now at the class discovery stage, Mr. Mantha is entitled to discover and challenge QuoteWizard's consent defense, in whole or in part, as to all potential class members. It may be that some of the consumers who QuoteWizard sent telemarketing texts to did, in fact, provide their TCPA compliant consent to receive QuoteWizard's texts. It is suspected, however, that a large number of consumers did not in fact provide QuoteWizard with their TCPA compliant consent to receive QuoteWizard's telemarketing texts. Mr. Mantha's counsel is entitled to discovery to ascertain which consumers who received QuoteWizard's telemarketing texts are class members, and which are not, and to define the class accordingly. Crucial to QuoteWizard's consent claim, will be the specific language listed on the specific web sites from which QuoteWizard claims it obtained TCPA compliant consent to text consumers. It is QuoteWizard's burden to produce this information in support of its consent claim. If it cannot not, then QuoteWizard will have failed to establish its affirmative defense.

QuoteWizard should be compelled now to produce all evidence of consent of all consumers whose numbers are included in the Call Records to receive their text messages. If

QuoteWizard chooses not to do so, it should be precluded from asserting any consent defense at the class certification or trial stages.[10]

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 6:**

QuoteWizard incorporates its argument regarding Request No. 1, which applies equally to this request.

It is undisputed that QuoteWizard has a contractual promise of TCPA-compliant consent for each and every consumer it contacted. It is further undisputed that, for each consumer, QuoteWizard will have certain consent data in its electronic records (for example—the consumer's data entered on the lead website and transmitted to QuoteWizard prior to purchase, the contractual partner from which the lead/consent was obtained, the contract requiring TCPA consent, the Jornaya LeadiD or TrustedForm identification number (which authenticates consent information), etc.). It is further undisputed that Jornaya and TrustedForm maintain consent records for each such LeadiD/identification and such consent records must be sought directly from those companies. The question raised by Plaintiff's request is whether QuoteWizard must be required, in class discovery at the pre-certification stage, to search its electronic records and compile electronic consent data for each and every telephone number listed on the Drips spreadsheet containing 43 million telephone numbers. The answer must be no.

Whether each individual consumer gave valid TCPA consent is a merits-based question not relevant to any of the Rule 23 factors. Critically, Plaintiff admits in his above argument that *at least some* of the consumers QuoteWizard texted gave valid consent to be contacted under the TCPA, and that this must be determined on an individual-by-individual basis partially dependent on the website each consumer visited. *See* Plaintiff's argument *supra* ("It may be that some of the consumers who QuoteWizard sent telemarketing texts to did, in fact, provide their TCPA compliant consent to receive QuoteWizard's texts. It is suspected, however, that a large number of consumers did not in fact provide QuoteWizard with their TCPA compliant consent to receive QuoteWizard's telemarketing texts. Mr. Mantha's counsel is entitled to discovery to ascertain which consumers who received QuoteWizard's telemarketing texts are class members, and which

---

[10] *See Rosales v. Heath,* No. 8:17CV87, 2019 U.S. Dist. LEXIS 225294, at *9 (D. Neb. June 27, 2019) ("The FCC ruled that 'if any question arises as to whether prior express consent was provided by a call recipient, the burden is on the *caller* to prove that it obtained the necessary prior express consent." Consistent with that burden, all circuit courts deciding the question of whether consent is part of a prima-facia TCPA case or an affirmative defense have concluded that consent is an affirmative defense. *See Latner v. Mount Sinai Health Sys., Inc.*, 879 F.3d 52, 54 (2nd Cir. 2018); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017); *Blow v. Bijora*, 855 F.3d 793, 803 (7th Cir. 2017); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1115 (11th Cir. 2014)."). As another Court has held in a TCPA case when compelling similar information:

> If defendant cannot substantiate this defense with documents or information responsive to the interrogatory, it should say so under verification and withdraw that defense.

*Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 WL 2311869, at *1 (N.D. Ill. June 13, 2011).

are not, and to define the class accordingly. Crucial to QuoteWizard's consent claim, will be the specific language listed on the specific web sites from which QuoteWizard claims it obtained TCPA compliant consent to text consumers."). Therefore, this discovery request is inappropriate because it defeats the very purpose of a purported class action case. *See Schwartz*, 185 F.R.D. at 316 (discovery regarding putative class members improper where "it will serve only to reduce the efficiencies of the class action.").

Plaintiff claims it is QuoteWizard's burden to prove consent, but that is a merits-based determination for each putative class member. Plaintiff ignores that it is his burden to show that the Rule 23 factors, including ascertainability and commonality, are met in a putative class action case. Plaintiff cannot satisfy these factors when Plaintiff plainly admits that consent is a viable defense for QuoteWizard for at least some class members and must be determined on an individual basis. *See Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306-1307 (D. Nev. March 26, 2014) ("The parties dispute whether consent is an element of the prima facie case or an affirmative defense, but, as the Fifth Circuit has held, that issue is irrelevant for class certification. … ***The practical effect is the same: for purposes of class certification, Kristensen must prove that consent, or the lack thereof, can be resolved on evidence and theories applicable to the entire class***." (citation and quotation omitted) (emphasis added)).

To require QuoteWizard to prove its affirmative defense with respect to each *putative* class member relating to 43 million numbers that have no common link to Plaintiff's lead, before a certification motion is even filed much less granted, and where it is clear Plaintiff cannot satisfy his burden under Rule 23, far exceeds the scope of Rule 23 and Rule 26. If a class is certified and there is a trial, it is only at that time that QuoteWizard would be required to present proof for its affirmative defenses for each class member. Until that time, QuoteWizard is not required to pre-prove the same when putative class members have not even been ascertained (and there is no way to ascertain them, as explained herein). *See, e.g., Siding & Insulation Co. v. Alco Vending, Inc.*, 2017 U.S. Dist. LEXIS 137071, at *39-40 (N.D. Ohio Aug. 25, 2017) ("[I]t is plaintiff that bears the duty of demonstrating the appropriateness of class certification, it is not defendant's duty to come forward with evidence demonstrating the opposite. … While defendant must do more than simply raise the possibility of an affirmative defense, … it is plaintiff that must ultimately convince the Court that the requirements of Rule 23 have been met. … [T]he purpose of the Rule 23 discovery period was to assist the parties in briefing plaintiff's renewed motion for class certification, it was not to identify with certainty the members of the proposed class.") (class certification properly denied not because "defendant had proven which potential class members were decidedly ineligible to share in any possible recovery, but because the process of identifying the eligible class members—something that would take place at a later time—would predominate the case.").

The request is also clearly overbroad, unduly burdensome, and not proportional to the needs of case, as it relates to 43 million numbers, many of which would never fall into the putative class as currently defined. If the Court decides that an inquiry into consent on a consumer-by-consumer basis is appropriate at this pre-certification stage, then QuoteWizard suggests a reasonable sampling (up to 100 consumers) of the Plural-to RevPoint-to QuoteWizard-to Drips lead list to focus on consent. If the Court determines that class discovery should not be limited to this chain of leads, then QuoteWizard suggests an increased sample size of up to 500 consumers

across its contractual lead partners to focus on consent.  QuoteWizard notes that this would likely require extensions of the current scheduling order, as discovery for each consumer's consent in the sampling would be time-consuming.

**DOCUMENT REQUEST NO.7:** With respect to any documents previously produced in the case that contain the name or telephone numbers of putative class members that were redacted, please produce unredacted versions of those documents

 **RESPONSE:** QuoteWizard objects to this Request as not relevant to any issue in class discovery. The names and other PII of consumers (or even putative class members) is not generally available in discovery prior to a class being certified. *See Dziennik*, 2006 WL 1455464, at *1; *Bray v. Santander Bank, N.A.*, 2021 WL 2349375, at *1, *6 (D. Conn. June 3, 2021) (bank customers' personal identifying information "not necessary at this pre-certification stage."); *Deibler v. SanMedica International, LLC*, 2021 WL 6198062, at *11 (D.N.J. Dec. 30, 2021) (denying motion to compel putative class members' personal identifying information as not relevant at pre-certification stage); *Mandrigues v. World Savings, Inc*., 2008 WL 11388759, at *1, *2 (N.D. Cal. June 20, 2008) (where plaintiff sought the names, addresses, and telephone numbers of putative class action plaintiffs before the class was certified, court denied motion to compel) ("[R]eleasing the names, addresses, and telephone numbers of the putative class members will not help plaintiffs meet their burden of demonstrating that class certification is proper."); *Bird Hotel Corp. v. Super 8 Motels, Inc*., 2007 WL 404703, at *1 (D.S.D. Feb. 1, 2007) (refusing to allow pre-certification discovery into identity and personal information of potential class members); *Robbins v. NCO Financial Systems, Inc*., 2006 WL 3833352, at *1 (N.D. Ind. Dec. 12, 2006) (number of putative class members relevant, but their personal information/identity is not relevant to pre-certification discovery).

Nor has Plaintiff identified a single reason why consumers' names or contact information is relevant to any class issue herein—particularly where none of the "documents previously produced in the case that contain the name or telephone numbers of putative class members" were even limited/restricted to actual putative class members based on Plaintiff's remaining claim (consumers registered on the National Do Not Call Registry with residential numbers who were contacted two or more times with telephone solicitations and did not consent to the same). Records of consumers whom Drips texted or who responded to Drips (for example, consumers who made DNC requests) go far beyond even the broadest of possible class definitions, and Plaintiff is not entitled to a fishing expedition into their names and identities for improper purposes.

In addition, in the Parties' agreement in the Drips lawsuit, QuoteWizard noted that it would not produce consumer names or PII for any class records it produced; Plaintiff did not object or reserve the right to seek the same. *See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37. Pursuant to these objections, no records are being produced in response to Request No. 7.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 7**:

As this Court may recall, earlier on in this litigation, Mr. Mantha sought from QuoteWizard the production of complaints or do not call requests submitted by consumers after receiving text solicitations from QuoteWizard. Ultimately, QuoteWizard was ordered to produce such complaints. In response, QuoteWizard was compelled to admit that over two million consumers had complained after receiving QuoteWizard's telemarketing texts.[11] QuoteWizard, however, only produced the substantive text of a limited number of the complaints themselves and refused to produce the actual phone numbers of any of the complaining consumers, claiming that such production was premature given that the initial focus of this litigation was on Mr. Mantha's individual claim. Now, however, this litigation has proceeded to class discovery and still, QuoteWizard refuses to produce these numbers again raising a host of meritless objections. It also has refused to produce the substance of the complaints of any additional consumers. In response, QuoteWizard claims the information sought is confidential and should not be produced prior to class certification. Again, however, Mr. Mantha has agreed to treat this data as confidential. Further, per this Court's Order, the time for class certification is *now* and not post class certification.

QuoteWizard should be compelled now to produce the phone numbers of all consumers who have complained or made what QuoteWizard claims are Do Not Call requests after receiving text messages from QuoteWizard, QuoteWizard has previously admitted that over two million submitted Do Not Call requests after receiving QuoteWizard's telemarketing texts. This Court should also compel QuoteWizard to produce the substance of these requests. The relevance of this information is clearly supported by the fact that (a) it has previously been compelled and (b) the untimely burden argument previously lodged by QuoteWizard is no longer persuasive now that class discovery has commenced.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 7:**

Plaintiff has misstated the factual and procedural background with respect to the opt-out/disqualification communications.  Pursuant to the agreement in the related Drips subpoena litigation, Drips produced to QuoteWizard certain "disqualification" records, meaning consumers who had been contacted but asked (or Drips construed them to be asking) not to be contacted again. Under the agreement, QuoteWizard then produced to Plaintiff redacted versions of these records, redacting only what was necessary to protect the identity of these non-party consumers but not redacting the substance of the communications.  *See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37, pp. 1-3 (Drips produced "up to 500 Tier 1 reports and up to 100 Tier 2 and 3 reports (for a total of up to 600 responses)" and "all consumer responses underlying disqualifications (all tiers) for the 60 days prior to May 18, 2021"; QuoteWizard produced to Plaintiff after redacting "telephone numbers, names, or any other PII … [QuoteWizard] will not produce telephone numbers, names, or any other PII to Plaintiff absent a court order").

---

[11] *See Dkt. #184, Defendant's Notice to Court Regarding Supplemental, Corrected Production,* (QuoteWizard acknowledges error in its prior discovery responses disclosing that the number of consumers who submitted Do Not Call complaints after receiving QuoteWizard telemarketing texts was not 46,000 as represented previously to the Court, but in fact was over ***two million complaints***).

To the extent Plaintiff took issue with the redactions, his recourse was to take that up at the time the production was made under the parties' agreement, not by serving further requests relating to the same documents at this later stage. Moreover, Plaintiff's statement that QuoteWizard has refused to produce additional disqualification requests is perplexing and false. Pursuant to Plaintiff's requests for do not call requests/communications during prior discovery in the merits/individual phase of discovery, the parties and Drips reached the global agreement described above and memorialized at Docket No. 37 in that related litigation. Plaintiff cannot seek *additional* such data, in the possession, custody, of control of Drips, to the extent he seeks to do so here. The production, and the dispute over the communications, was fully resolved by the parties' agreement and is not subject to alteration.

Furthermore, the identity of these non-party consumers is completely irrelevant to Rule 23 discovery; Plaintiff does not purport to advance a single plausible reason why their names, etc. are needed. As noted in the summary judgment briefing, the "disqualification" communications are not complaints that would indicate a lack of consent for the consumer to have been contacted in the first instance. To the contrary, numerous of these communications from the consumers to Drips *confirmed* that they had given consent to be contacted. *See* ECF No. 222. Thus, to the extent Plaintiff would contend that the identity of the consumers who sent these requests is relevant to alleged lack of consent, this is simply not true.

Finally, to the extent Plaintiff would claim that these consumers are potential class members, this is likewise not true. Plaintiff has not identified and could not identify any common link between putative class members even as currently defined in the Amended Complaint (residential telephone subscribers on the Registry who were solicited two or more times, without consent) and consumers who sent the disqualification requests. Thus, these non-party consumers are not putative class members in any objectively ascertainable way. Plaintiff seeks the names and contact information of the non-party consumers who made the disqualification requests solely with the clear purpose to conduct a fishing expedition to try to find other consumers who might deny consent. He is not entitled to that requested discovery, both because it is not relevant to any class issue and because it would unnecessarily subject hundreds of thousands of non-party consumers who would never be potential putative class members herein to the unnecessary disclosure of their personal information (and possibly to harassment or unwanted contact from Plaintiff's counsel). Plaintiff must do far more than claim that these consumers *could* be relevant to some unidentified issue in this case.

**DOCUMENT REQUEST NO.8:** All documents supporting the factual basis for any affirmative defense asserted.

**RESPONSE:** QuoteWizard objects to this request as overly broad, unduly burdensome, vague, not proportional to the needs of the case, not relevant to class discovery, and duplicative of individual discovery that has already been taken and completed. QuoteWizard has pleaded thirty-two (32) affirmative defenses in its Answer to the First Amended Complaint, and as such this overly broad and vague request is impossible to answer. QuoteWizard further objects on the ground that the Request purports to seek in part documents protected by the attorney-client and

work product privileges. Further, the requested documents have no apparent connection to or bearing on the class issues under Rule 23. *See Pizana*, 2021 U.S. Dist. LEXIS 18926, at *9-10. *See also Gusman*, 298 F.R.D. at 595.

Moreover, this request is duplicative of at least one request already made in individual/merits discovery—namely, Request No. 1 in Plaintiff's third set of document requests ("Produce all documents relating to, supporting or contradicting any affirmative defense(s) you claim in regard to this litigation."). Because QuoteWizard has already responded to this request, QuoteWizard refers Plaintiff to its prior response.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 8**:

Request No 8 is simple and straightforward. It seeks all documents that may support any affirmative defense that QuoteWizard may assert at any time in this litigation. QuoteWizard claims that this request is overbroad because it has asserted 32 affirmative defenses. Of course, QuoteWizard chose to assert 32 affirmative defenses. Mr. Mantha is simply trying to obtain discovery as to those defenses that QuoteWizard chose to assert. QuoteWizard's claim that it has already provided the information sought during the first phase of discovery, which was limited to Mr. Mantha's individual claim is a hollow assertion—that discovery expressly did not touch on

If QuoteWizard is going to pursue affirmative defenses it should be compelled to produce any evidence that supports such defenses. If there is no evidence that supports such defenses, then QuoteWizard should be compelled to so state. For example, and for illustrative purposes only, the TCPA provides for an affirmative defense to a defendant who sends text solicitation to a consumer with whom it has a prior established business relationship. So, to the extent QuoteWizard intends to assert such an affirmative defense, it must be compelled to produce any evidence in support of such a defense. Similar to its refusal to produce consent evidence, if QuoteWizard chooses to refuse to produce any evidence relating to affirmative defenses, it should be precluded from asserting such defenses at class certification or at trial.

QuoteWizard should be compelled to respond to Request No. 9 or be precluded from asserting any of the many affirmative defenses listed in its Amended Answer.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 8**:

As noted, this request is completely duplicative of a prior document request made by Plaintiff to QuoteWizard during individual/merits discovery. QuoteWizard referred Plaintiff to its prior response and nothing further is required. *See Grossman v. Dirs. Guild of Am., Inc.*, 2018 U.S. Dist. LEXIS 227227, at *20 (E.D. Cal. Aug. 22, 2018) ("Because defendant represents it located no responsive nonprivileged documents, nothing more is required."); *Shoemake v. McCormick*, 2011 U.S. Dist. LEXIS 131736, at *4 (D. Kan. Nov. 15, 2011) ("Despite its objections, Defendant indicates it has produced all documents that are responsive … or that no responsive documents exist. Generally, a response that a party has no additional responsive documents suggests judicial involvement is unnecessary. Because the Court has no information to suggest Defendant has withheld any responsive documents, there is nothing for the Court to compel. Accordingly, the Court denies as moot Plaintiff's motion to compel …").

To the extent Plaintiff is actually asking for QuoteWizard to produce every single document it may use against putative class members in furtherance of its affirmative defenses if a class is certified, this is clearly not an appropriate class discovery request. QuoteWizard could not respond to this request unless or until a putative class has been certified and its members have been ascertained. Parties cannot and are not required to identify documents with respect to putative class members not even yet ascertained prior to class certification. *See Wilcox v. Swapp*, 2018 U.S. Dist. LEXIS 226195, at *11-12 (E.D. Wash. Aug. 17, 2018) (denying motion to compel defendants to respond to written discovery requests concerning the applicability of their affirmative defenses to putative class members prior to class certification) (denying motion "to the extent that it seeks class-wide discovery, which will not become relevant unless a class is certified"). "Generally, discovery in a putative class action at the pre-certification stage is limited to such certification issues as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Owino v. CoreCivic, Inc.*, 2019 U.S. Dist. LEXIS 111808, *7 (S.D. Cal. July 3, 2019). Moreover, for the reasons stated in QuoteWizard's argument for Request No. 1, a class is not ascertainable here. Even putting aside the issue of consent, Plaintiff can never ascertain, on a class-wide basis in an objective, efficient, and reliable manner, the putative class members who were solicited two or more times, were on the National DNC Registry with respect to the number texted, and were residential telephone subscribers. QuoteWizard cannot fairly present evidence as to class members not yet ascertained or ascertainable at this pre-certification stage.

**DOCUMENT REQUEST NO.9:** All documents you intend to rely on to support any Safe Harbor defense under the TCPA.

**RESPONSE:** QuoteWizard objects to this Request on the ground that it purports to seek in part documents protected by the attorney-client privilege and work product doctrine. QuoteWizard further objects on the ground that the Request for "[a]ll documents" is overly broad, unduly burdensome, and not proportional to the needs of the case. Further objecting, this Request is not related in any way to class discovery. *See Gusman*, 298 F.R.D. at 595.

In addition, QuoteWizard objects on the basis that this Request is duplicative of at least one prior request for documents made by Plaintiff in merits discovery. In Plaintiff's third set of document requests, Plaintiff requested (as No. 2) "If you claim a 'safe harbor' defense, produce all documents relating to, supporting or contradicting such a claim." Because QuoteWizard has already responded to this request, QuoteWizard refers Plaintiff to its prior response.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 9**:

Request No 9 is companion to Request No. 8 and similarly relates to potential affirmative defenses that QuoteWizard may assert at any time in this litigation. Request No. 9, specifically relates to the affirmative defense of 'safe harbor.' The TCPA provides an affirmative 'safe harbor' defense to a defendant who claims that its telemarketing violation was made in error despite its compliance with a host of measures designed to prevent erroneous telemarketing calls. If QuoteWizard intends to pursue a 'safe harbor' defense, it should produce all evidence in support of such a defense. If it does not intend to pursue such a defense, it should simply say so.

If QuoteWizard chooses to refuse to produce any evidence relating to any claim of 'safe harbor', it should be precluded from asserting such a defense at class certification or at trial.

QuoteWizard should be compelled to respond to Request No. 9 or be precluded from asserting a safe harbor defense.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 9:**

QuoteWizard relies on and incorporates here its argument regarding Request No. 8, which applies equally to Request No. 9. In short, QuoteWizard cannot be required to produce documents potentially responsive for class members when no class certification motion has been filed or granted and putative class members are not currently or even possibly ascertainable. In addition, as noted, this request is improperly duplicative of a request that was already responded to; to the extent Plaintiff took issue with QuoteWizard's prior response, the time has long since passed for Plaintiff to bring that prior response to the Court's attention.

**DOCUMENT REQUEST NO.10:** Please produce all documents related to policies for compliance with the TCPA or the FCC's regulations thereunder and all documents necessary to construct a timeline of when each policy was in force. This request specifically includes, but is not limited to, policies related to the following:

     a)      compliance with the TCPA, including, but not limited to the rules, regulations, opinions, advisories, comments or filings of the Federal Communications Commission that relate to the TCPA or 47 C.F.R. § 64.1200;

     b)      obtaining or verifying prior express consent;

     c)      complying with E-SIGN Act, 15 U.S.C. §§ 7001 *et seq.*

**RESPONSE:** QuoteWizard objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. QuoteWizard also objects to this Request on the ground that it purports to seek in part documents protected by the attorney-client privilege and work product doctrine. There is no claim in the litigation that relates at all to QuoteWizard's policies. QuoteWizard also objects on the basis that it is not required to show policies to comply with the E-Sign Act and such request is not relevant herein.

In addition, QuoteWizard objects on the basis that the requested documents have no apparent connection to or bearing on the class issues under Rule 23. *See Pizana*, 2021 U.S. Dist. LEXIS 18926, at *9-10. *See also Gusman*, 298 F.R.D. at 595.

QuoteWizard notes that Plaintiff has already made requests at least partially if not completely duplicative of this request in individual/merits discovery—for example, Request No. 3 in Plaintiff's third set of requests ("Produce all documents evidencing your Do Not Call policy in effect as of the time of the texts at issue"), Request No. 4 in the same set ("If you claim to have implemented reasonable practices and procedures to prevent telephone solicitations in violation of the TCPA, produce all documents relating to, supporting or contradicting such claim"),

and Requests No. 11-12 in Plaintiff's first set of requests. Because QuoteWizard has already responded to this request, QuoteWizard refers Plaintiff to its prior responses. Subject to and notwithstanding these objections, QuoteWizard also refers Plaintiff to documents it already produced in merits discovery, such as a copy of its Do Not Call Policy.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 10**:

Request No. 10 seeks all documents from QuoteWizard that relate to its effort to comply with the TCPA. This request is relevant to QuoteWizard's consent defense. It is also relevant to whether QuoteWizard's alleged violation of the TCPA was knowing or willful. In response, QuoteWizard asserts a host of objections. First, it claims that responsive documents are privileged- yet QuoteWizard has failed to produce a privilege log. QuoteWizard also asserts the request is irrelevant as there is no claim in this case that relates to policies. QuoteWizard's policies, however, are relevant to whether it commonly obtained TCPA compliant prior express consent to send consumers telemarketing texts. Whether its policies commonly complied with the TCPA is also relevant to whether its conduct was knowing or willful. Moreover, Quotewizard's policy in regards to the manner it addressed complaints of unlawful telemarkting is also plainly relevant to a potential knowing or willful violation, as many other courts have held. *See Bratcher v. Navient Sols., Inc.*, No. 3:16-cv-519-J-20JBT, 2017 U.S. Dist. LEXIS 35015, 2017 WL 895739, at *2 (M.D. Fla. Mar. 2, 2017) (finding both "formal and informal prior complaints" relevant to whether the defendant's actions were intentional under either the TCPA or FCCPA); *Osborne v. Gila, LLC*, No. 15-62585-cv-COOKE/TORRES, 2016 U.S. Dist. LEXIS 190574, 2016 WL 7508260, at *1-2 (S.D. Fla. May 24, 2016) (finding prior complaints to be relevant to whether the defendant willfully violated the TCPA); *Morser v. Hyundai Capital Am., Inc.*, No. 2:15-cv-117-FtM-29CM, 2015 U.S. Dist. LEXIS 97494, 2015 WL 4527016, at *3 (M.D. Fla. July 27, 2015) ("A finder of fact could conclude that the existence of multiple complaints suggests that Hyundai was aware it was violating the TCPA.").

QuoteWizard should be compelled to respond to Request No. 10.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 10**:

As noted, this request is completely duplicative of prior requests made by Plaintiff to QuoteWizard during individual/merits discovery. QuoteWizard referred Plaintiff to its prior responses and production, and nothing further is required. *See Shoemake*, 2011 U.S. Dist. LEXIS 131736, at *4 ("Despite its objections, Defendant indicates it has produced all documents that are responsive … or that no responsive documents exist. Generally, a response that a party has no additional responsive documents suggests judicial involvement is unnecessary. Because the Court has no information to suggest Defendant has withheld any responsive documents, there is nothing for the Court to compel. Accordingly, the Court denies as moot Plaintiff's motion to compel …"). QuoteWizard also stands on the objections it timely made notwithstanding its prior compliance with this same request.

**DOCUMENT REQUEST NO.11:** All communications with any third party concerning this litigation.

**RESPONSE:** QuoteWizard objects to this request as overly broad, unduly burdensome, not proportional to the needs of the case, not relevant to any class issue under Fed. R. Civ. P. 23, and on the ground that it seeks documents protected by the attorney-client privilege and work product doctrine. "Generally at the pre-class certification stage, discovery in a putative class action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman*, 298 F.R.D. at 595. This Request has no apparent bearing on any of the Rule 23 factors.

In addition, QuoteWizard objects on the basis that this Request is duplicative of at least two prior requests for documents made by Plaintiff in merits discovery. In Plaintiff's first set of document requests, Plaintiff requested (as No. 10) "all correspondence with anyone other than your counsel in any way relating to this litigation or to the Plaintiff." In Plaintiff's second set of document requests, Plaintiff again requested (as No. 11) "all documents and communications between You and any third party relating to the Plaintiff." Because QuoteWizard has already responded to this request, QuoteWizard refers Plaintiff to its prior responses.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 11**:

Communications specifically about this ligation with third parties is of central relevance to this litigation. QuoteWizard's effort in response to Mr. Mantha's complaint included specific communications with Revpoint asking for Mr. Mantha's purported consent. This type of evidence shows that at the time QuoteWizard instructed DRIPS to text Plaintiff, it did not possess evidence that he had consented to be texted. QuoteWizard's communications with third parties regarding the litigation could contain other valuable admissions, such as a concession that QuoteWizard has no knowledge of the workings of the websites on which consent to telemarketing was obtained. Nor is QuoteWizard's claim that such communications could be protected by either the work product or attorney-client privilege well taken as the request targets communications with third parties, which by definition would waive both the attorney-client and work product privileges. The attorney-client privilege is waived when disclosed to a third party. Blattman v. Scaramellino, 891 F.3d 1, 4 (1st Cir. 2018). Similarly, disclosing material to a third party in a way inconsistent with keeping that information from an adversary waives work product protection. *Id.* 891. F. 3d at 5. QuoteWizard has failed to provide a privilege log or otherwise explain how any communications with third parties regarding the litigation was inconsistent with waiver of the privilege.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 11**:

As noted, this request is completely duplicative of prior requests made by Plaintiff to QuoteWizard during individual/merits discovery. QuoteWizard referred Plaintiff to its prior responses, and nothing further is required. *See Shoemake*, 2011 U.S. Dist. LEXIS 131736, at *4 ("Despite its objections, Defendant indicates it has produced all documents that are responsive … or that no responsive documents exist. Generally, a response that a party has no additional responsive documents suggests judicial involvement is unnecessary. Because the Court has no information to suggest Defendant has withheld any responsive documents, there is nothing for the Court to compel. Accordingly, the Court denies as moot Plaintiff's motion to compel …"). QuoteWizard

also stands on the objections it timely made notwithstanding its prior compliance with this same request.

**DOCUMENT REQUEST NO.12:** To the extent Defendant asserts that it, or a vendor on its behalf, obtained consent or permission to contact Plaintiff or putative class members based on a visit to a website, produce documents that identify those website(s) and the specific page(s) on those website(s) that you claim constitute consent or permission.

 **RESPONSE:** QuoteWizard refers Plaintiff to and incorporates herein its objections to Requests No. 1 and 2. Specifically, QuoteWizard objects to this Request as unduly burdensome, overly broad, not proportional to the needs of the case, and because consumers contacted for leads sold to QuoteWizard by a possible 180 other lead suppliers and generated from different websites than the Snappy website have no relevancy to, commonality with or typicality to Plaintiff's claim and are not discoverable. Moreover, QuoteWizard notes that Drips's records reflect 43,166,509 rows of telephone numbers contacted in the records it sent to QuoteWizard pursuant to the parties' agreement. It is patently unreasonable to expect QuoteWizard to gather, at all much less within the timeframe provided for responses, the requested documents. Further, consent for each consumer is a highly individualized inquiry. This is not appropriate for resolution on a purported classwide basis, notwithstanding that (upon information and belief) there is no putative class beyond Plaintiff for the Snappy website. Objecting further, QuoteWizard states that the requested records are not in the possession, custody, or control of QuoteWizard. QuoteWizard purchased leads from its lead suppliers and, in most cases, has no knowledge of where the leads were generated, and QuoteWizard does not own or maintain the lead generation websites. This information would only be in the possession, custody, or control of its lead suppliers or the companies from whom the lead suppliers in turn bought those leads. Pursuant to these objections, no documents are being produced.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 12**:

Request No. 12 is another discovery request that focuses on QuoteWizard's affirmative defense of consent. As this Court is well aware, QuoteWizard claims it obtained consumers' prior express consent or permission to receive telemarketing texts from QuoteWizard by visiting third party web-sites. Whether consumers, in fact, visited such web-sites and the exact content of the alleged consent language included on those web-sites, are relevant to QuoteWizard's affirmative defense of consent or permission. In response to this request, QuoteWizard failed to produce a single document and instead asserted a litany of objections. Notably, QuoteWizard claims the production of such consent evidence is too burdensome given the scope of its illegal telemarketing campaign. In QuoteWizard's view, because it sent so many illegal telemarketing texts based on purported consent it allegedly obtained from so many websites, it is impossible to hold QuoteWizard to account for what is suspected to be a massive campaign of illegal telemarketing in violation of the TCPA.

At class certification and trial, it will be QuoteWizard's affirmative burden to prove it had the consent of consumers to receive its text solicitations. As this case is now at the class certification stage, Mr. Mantha is entitled to discover and challenge QuoteWizard's consent defense, in whole or in part. It may be that some of the consumers who QuoteWizard sent

telemarketing texts to did, in fact, provide their TCPA compliant consent to receive QuoteWizard\s texts. It is suspected, however, that a large number of consumers did not in fact provide QuoteWizard with their TCPA compliant consent to receive QuoteWizard's telemarketing texts. Mr. Mantha's counsel is entitled to discovery to ascertain which consumers who received QuoteWizard's telemarketing texts are class members, which are not, and to define the class accordingly. Crucial to its consent claim, will be the specific language listed on the specific web sites from which QuoteWizard claims it obtained TCPA compliant consent to text consumers. It is QuoteWizard's burden to produce this information in support of its consent claim. If it cannot not, then QuoteWizard will have failed to establish its affirmative defense.

QuoteWizard should be compelled to respond in full to Request No. 12 and produce a list of all websites from which QuoteWizard claims it obtained the consent or permission of consumers to receive QuoteWizard text messages. Counsel for Mr. Mantha will then review those web-sites to ascertain whether any of those sites were a potential source of TCPA compliant consent. If QuoteWizard continues to refuse to even identify the web-sites from which it claims it obtained TCPA compliant consent to send consumers telemarketing texts, it should be precluded from making any consent defense at class certification or at trial.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 12**:

QuoteWizard first incorporates its argument with respect to Request No. 1. This case is solely about the Snappy website, or at most Fenix leads, and must be limited to the same. Upon information and belief, there were no other leads contacted by QuoteWizard from Snappy. QuoteWizard has no records to indicate which specific leads came to it indirectly from Fenix, but is agreeable to producing a redacted list of the Plural-RevPoint-QuoteWizard-Drips leads to the extent that list can be used as a starting point for third-party discovery to determine if any other Fenix leads were sold to QuoteWizard and from which websites those Fenix leads originated. Any discovery beyond this subject matter should be strictly prohibited.

Furthermore, as relevant to this case, QuoteWizard does not own nor operate the websites where consumers' leads were generated, nor do its contractual partners generally send the name of the lead generation website when selling QuoteWizard leads.[12] Thus, the identity of the websites, and the specific pages and TCPA disclosures thereon, where consumers consented are not within the current possession, custody, or control of QuoteWizard, but rather would be in the possession of QuoteWizard's contractual partners (and in some cases, the contractual partners of QuoteWizard's contractual partners). For this reason alone, Plaintiff's motion to compel documents that QuoteWizard does not have in its possession, custody, or control should be denied. Moreover, QuoteWizard would have to investigate this information on an individual-by-individual basis, for each consumer determining (1) the website where they consented, and (2) the TCPA disclosures they viewed and clicked on. This would be an *extremely* onerous and burdensome task—as directly evidenced by the lengthy discovery and voluminous briefing related solely to Plaintiff's lead in this case—where the parties issued multiple subpoenas and conducted numerous

---

[12] QuoteWizard does generate certain leads directly from websites it operates, and the identity of those websites are in its possession, custody, or control. However, because Plaintiff's lead was not generated on a QuoteWizard-run website but rather was sold to QuoteWizard by RevPoint and generated from a third-party site (Snappy), QuoteWizard's websites are beyond the scope of the subject matter of this case.

depositions to identify the lead generation website (Snappy), the person who owned/paid for it (Adam Brown), and the company that purportedly operated it as webmaster (Fenix). And again, this information is in the possession, custody or control of third-parties.

QuoteWizard also notes that Plaintiff's argument that, if this evidence is not in the direct possession of QuoteWizard, QuoteWizard cannot later rely on it to defend this case, is absurd. QuoteWizard is not prohibited from relying on consent evidence from non-parties merely because some of it is not, at this stage of the litigation, within QuoteWizard's direct possession with respect to the scope of Plaintiff's extremely overbroad requests. Moreover, it is undisputed that QuoteWizard contractually requires all inbound leads to have TCPA-valid consent and that its contractual partners are required to have and retain proof of the same. Consent evidence plainly exists for all potential class members no matter how the class is defined. Plaintiff also continues to ignore that, at the class stage, Rule 23 requires him to show that the individual issues will not predominate. Yet Plaintiff is requesting consent data for each and every consumer that QuoteWizard ever contacted in the putative class period—which would only serve to reduce the efficiencies of a class action and again proving that this is not and can never be a class case.

**DOCUMENT REQUEST NO.13:** For any website identified in response to the prior request, produce all access logs and error logs during the day you assert that Plaintiff or putative class members visited that website.

**RESPONSE:** QuoteWizard refers Plaintiff to and incorporates herein its objections to Requests Nos. 1 and 12. Pursuant to these objections, no documents are being produced in response to Request No. 13.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 13**:

Request No. 13 is a request companion to Request No. 12 and seeks access logs and effort logs that would evidence class members' alleged visits to the web-sites QuoteWizard alleges consumers visited and during such visit consented to receive QuoteWizard telemarketing texts. This request is relevant to whether, in fact, consumers even visited the web-sites from which QuoteWizard claims it obtained consumers consent to receive its telemarketing texts.

QuoteWizard should be compelled to respond in full to Request No. 13. If QuoteWizard is not in possession of such documents, or cannot obtain such documents from the vendors it contractually relies upon to obtain consumers' consent, it should be compelled to simply state such for the record. If QuoteWizard cannot prove that class members actually visited the web-sites upon which QuoteWizard relies upon for its defense of consent, it should be precluded from making any consent defense at class certification or at trial.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 13**:

For the same reasons stated in QuoteWizard's arguments for Requests Nos. 1 and 12 above, which it incorporates and relies on here, these documents are not properly discoverable because no other website besides the Snappy website is relevant to this case in the absence of any class-wide common theory of wrongdoing. In addition, for the reasons stated in the prior referenced

arguments, the requested documents are not within QuoteWizard's possession, custody, or control because QuoteWizard does not own or operate Snappy or any other third-party website where inbound leads were generated and then sold to QuoteWizard. The documents would have to be sought from QuoteWizard's various contractual partners pursuant to third-party discovery. Moreover, this request is also overly burdensome, not proportional to the needs of the case, and otherwise entirely inappropriate in a putative class action case. Plaintiff's repeated requests seeking documents for *each and every* individual QuoteWizard contacted, without regard to any of the threshold class requirements (residential telephone subscriber, etc.) is contrary to the entire purpose of Rule 23.

**DOCUMENT REQUEST NO.14:** For each website identified in response to Request No. 12, all documents sufficient to identify any vendor or third party used for visitor traffic reporting. This includes any companies performing search engine optimization or internet marketing consultants.

**RESPONSE:** QuoteWizard refers Plaintiff to and incorporates herein its objections to Requests Nos. 1 and 12. Pursuant to these objections, no documents are being produced in response to Request No. 14.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 14**:

Request No. 14 is also a companion to Request No. 12 and seeks documents that would identify any vendor or third party used by QuoteWizard for visitor traffic reporting as to those web-sites QuoteWizard alleges consumers visited and during such visit consented to receive QuoteWizard telemarketing texts. This request is relevant to whether, in fact, consumers even visited the web-sites from which QuoteWizard claims it obtained consumers consent to receive its telemarketing texts.

QuoteWizard should be compelled to respond in full to Request No. 14.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 14**

For the same reasons stated in QuoteWizard's arguments for Requests Nos. 1, 12, and 13 above, which it incorporates and relies on here, these documents are not properly discoverable because no other website besides the Snappy website is relevant to this case in the absence of any class-wide common theory of wrongdoing. In addition, for the reasons stated in the prior referenced arguments, the requested documents are not within QuoteWizard's possession, custody, or control because QuoteWizard does not own or operate Snappy or any other third-party website where inbound leads were generated and then sold to QuoteWizard. The documents would have to be sought from QuoteWizard's various contractual partners pursuant to third-party discovery. Moreover, this request is also overly burdensome, not proportional to the needs of the case, and otherwise entirely inappropriate in a putative class action case. Plaintiff's repeated requests seeking documents for *each and every* individual QuoteWizard contacted, without regard to any of the threshold class requirements (residential telephone subscriber, etc.) is contrary to the entire purpose of Rule 23. Furthermore, "visitor traffic reporting" including "companies performing

search engine optimization or internet marketing consultants" is not possibly relevant to any issue in this case, including consent.

**DOCUMENT REQUEST NO.15** All web logs for any website identified in response to Request No. 12, including the following information for each such website: IP Address, Location, Date and Time stamps, User Agent (including but not limited to user browser and operating system), Requested URL, Referring URL, Request Type (i.e. POST, GET), Response Code, and Status.

**RESPONSE:** QuoteWizard refers Plaintiff to and incorporates herein its objections to Requests Nos. 1 and 12. Pursuant to these objections, no documents are being produced in response to Request No. 15.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 15**:

Request No. 15 is also a companion to Request No. 12 and seeks documents that relate to QuoteWizard's affirmative defense of consent. If QuoteWizard is in possession of responsive documents, such documents should be produced. If it is not in possession of responsive documents, it should simply say so and should be precluded from producing such or similar documents at a future time in opposition to class certification or at trial.

QuoteWizard should be compelled to respond in full to Request No. 15.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 15**:

For the same reasons stated in QuoteWizard's arguments for Requests Nos. 1, 12, and 13 above, which it incorporates and relies on here, these documents are not properly discoverable because no other website besides the Snappy website is relevant to this case in the absence of any class-wide common theory of wrongdoing. In addition, for the reasons stated in the prior referenced arguments, the requested documents are not within QuoteWizard's possession, custody, or control because QuoteWizard does not own or operate Snappy or any other third-party website where inbound leads were generated and then sold to QuoteWizard. The documents would have to be sought from QuoteWizard's various contractual partners pursuant to third-party discovery. Moreover, this request is also overly burdensome, not proportional to the needs of the case, and otherwise entirely inappropriate in a putative class action case. Plaintiff's repeated requests seeking documents for *each and every* individual QuoteWizard contacted, without regard to any of the threshold class requirements (residential telephone subscriber, etc.) is contrary to the entire purpose of Rule 23. Furthermore, "web logs" are not possibly relevant to any issue in this case, including consent.

**DOCUMENT REQUEST NO.16** All lists of any leads, telephone numbers, or other information you obtained from Plural Marketing Solutions, Inc. that were sent text messages on the DRIPS system.

**RESPONSE:** QuoteWizard objects to this Request insofar as it seeks consumer names and PII. The names and other PII of putative class members is not generally available in discovery prior to a class being certified. *See Dziennik*, 2006 WL 1455464, at *1.

This request also seeks records in the possession, custody, or control of Plural rather than QuoteWizard. QuoteWizard does not maintain separate, discrete lead lists for each lead supplier it works with in a format that could be produced, but would have to compile the same, which the Federal Rules of Civil Procedure do not require. Further objecting, the request is beyond the time, scope, and subject matter of this case, as it is not limited to consumers solicited two or more times within the limitations period and whose numbers were validly registered on the National Do Not Call Registry. In addition, Plural did not provide any leads directly to QuoteWizard, thus QuoteWizard has no responsive documents for that category of documents. Pursuant to the foregoing objections, no documents are being produced.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 16**:

As this Court may recall, Mr. Mantha's contact data was purchased by QuoteWizard from a third party named Plural Marketing Solutions. This request seeks documents that can identify those consumers who QuoteWizard sent telemarketing texts using data purchased from Plural. QuoteWizard's purported privacy concerns are transparent attempt to obstruct Plaintiff from accessing crucial information. Plaintiff will treat any information as covered by the Court's standing protective order.

QuoteWizard should be compelled to respond in full to Request No. 16.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 16**:

While fully preserving its objections, QuoteWizard reiterates that Plural was not one of its direct contractual partners from which QuoteWizard purchased leads. Therefore, QuoteWizard does not have a "list" of leads it purchased directly from Plural and no documents responsive to this request. Nothing more from QuoteWizard is required.

Based on records voluntarily provided by RevPoint, QuoteWizard has compiled a list of leads it purchased from RevPoint, its contractual partner, which in turn came from Plural, which QuoteWizard is agreeable to producing (in redacted form) to Plaintiff as a compromise of this discovery dispute (even though this case must be limited to Snappy, or at most, Fenix leads). QuoteWizard addresses this proposed compromise below for Request No. 17.    QuoteWizard stands on its objections for Request No. 16.

**DOCUMENT REQUEST NO.17** All lists of any leads, telephone numbers, or other information you obtained from RevPoint Media Solutions that were sent text messages on the DRIPS system.

**RESPONSE:** QuoteWizard objects to this Request insofar as it seeks consumer names and PII. The names and other PII of putative class members is not generally available in discovery prior to a class being certified. *See Dziennik*, 2006 WL 1455464, at *1. In addition, in the Parties'

agreement in the Drips lawsuit, QuoteWizard noted that it would not produce consumer names or PII for any class records it produced; Plaintiff did not object or reserve the right to seek the same. *See Drips Holdings, LLC v. QuoteWizard.com LLC*, No. 1:21-mc-91266-LTS (D. Mass.), Docket No. 37. The request also seeks records in the possession, custody, or control of RevPoint rather than QuoteWizard. QuoteWizard does not maintain separate, discrete lead lists for each lead supplier it works with in a format that could be produced, but would have to compile the same, which the Federal Rules of Civil Procedure do not require. Further objecting, the request is beyond the time, scope, and subject matter of this case, as it is not limited to consumers solicited two or more times within the limitations period and whose numbers were validly registered on the National Do Not Call Registry, and where the leads came from the Snappy website. Pursuant to these objections, no documents are being produced.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 17**:

As this Court may recall, RevPoint was the marketing entity whom QuoteWizard relied upon to purchase consumer data from third party lead generators, including but not limited to Plural. This request seeks documents that can identify those consumers who QuoteWizard sent telemarketing texts using data purchased via RevPoint. QuoteWizard's purported privacy concerns are transparent attempt to obstruct Plaintiff from accessing crucial information. Plaintiff will treat any information as covered by the Court's standing protective order.

QuoteWizard should be compelled to respond in full to Request No. 17.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 17**:

As noted above, QuoteWizard does not maintain in its electronic records a discrete list of leads purchased from RevPoint.

Nevertheless, while preserving all objections, in an effort to compromise this discovery dispute, QuoteWizard investigated records previously voluntarily provided by RevPoint to determine leads that were sold by Plural to RevPoint, then by RevPoint to QuoteWizard, and then texted by Drips on behalf of QuoteWizard, during the putative class period. That data has been compiled into a spreadsheet list. In a good faith compromise effort, while not conceding that these consumers could be part of any putative class (not the least because consent is an affirmative defense for each), QuoteWizard is agreeable to producing a redacted version of this list to Plaintiff (redacted for consumer names and numbers). QuoteWizard notes that this list is not limited just to leads generated by Fenix, or on the Snappy website, or consumers who were on the DNC Registry, or consumers who were solicited two or more times, and thus the list contains numerous consumers who could never even arguably be part of any putative class in this case—which is why their continued privacy is paramount.

**DOCUMENT REQUEST NO.20** All Journaya IDs and associated documents for any numbers that were sent outbound text messages provided in response to Request Nos. 1 or 2.

**RESPONSE:** QuoteWizard objects to this Request as overly broad, unduly burdensome, not proportional to the needs of the case, and on the ground that it seeks confidential non-party

consumer PII. QuoteWizard further objects to this Request on the ground that it purports to seek documents outside of its possession, custody, or control, as QuoteWizard does not maintain or have access to Jornaya's information and records, beyond the LeadiD assigned to a particular consumer lead. QuoteWizard refers Plaintiff to its objections to Request No. 1 and incorporates them in full herein.

Drips' records reflect 43,166,509 telephone numbers contacted in the records it sent to QuoteWizard pursuant to the parties' agreement. It is patently unreasonable to expect QuoteWizard to gather Jornaya information for 43,166,509 numbers, notwithstanding that Jornaya's records are not in the possession, custody, or control of QuoteWizard. This would be a highly individualized, specific inquiry for each consumer. Pursuant to the foregoing objections, QuoteWizard will not produce any documents in response to this Request.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 20**:

As this Court may recall, Journaya was a third party that QuoteWizard allegedly relied upon to confirm that it had obtained consent from consumers before sending them telemarketing texts. At deposition, QuoteWizard testified that it obtained a Journaya ID Number for every single consumer to whom it sent telemarketing texts. This request seeks this data that is already in QuoteWizard's possession. It is relevant to QuoteWizard's consent defense and whether its conduct was knowing or willful. QuoteWizard claims that since it chose to send telemarketing texts to approximately 43 million people, this request is "patently unreasonable." It was QuoteWizard, however, who chose to send spam telemarketing texts to so many consumers. It was QuoteWizard who continued to do so even after over two million consumers took the time to text QuoteWizard and to demand that such spam texts cease. Further, it is QuoteWizard's affirmative defense to prove it obtained the consent of class members to receive its telemarketing texts. If QuoteWizard refuses to produce evidence as to such consent, it should be precluded from asserting a consent defense at class certification or at trial.

QuoteWizard should be compelled to respond in full to Request No. 20.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 20**:

QuoteWizard incorporates its argument with respect to Request No. 1, which applies equally to this request. Furthermore, QuoteWizard is agreeable to producing the list of Plural-RevPoint-QuoteWizard-Drips leads that contains the Jornaya LeadiD for each lead therein. Plaintiff is entitled to no more than this. The parties could seek third-party discovery of the Jornaya reports/visual playbacks for these leads at their own cost.

Further, as noted in QuoteWizard's objections, the only Jornaya information in the possession, custody, or control of QuoteWizard for each lead is the Jornaya LeadiD, but QuoteWizard does not have or maintain any documents that reflect Jornaya LeadiDs for the approximately 43 million telephone numbers listed on the Drips spreadsheet (which, as noted, includes over a million leads not even texted on behalf of QuoteWizard). To produce the Jornaya LeadiD for every consumer it contacted, QuoteWizard would have to manually search its electronic records to pull the LeadiD for each individual consumer, which the Federal Rules of

Civil Procedure do not require for Fed. R. Civ. P. 34 requests, and especially not on this large of a requested scale.  Jornaya (a/k/a Lead Intelligence, Inc.) is a non-party to this litigation that has possession, custody, and control over the Jornaya reports and Visual Playbacks for each Jornaya LeadiD; it would be required to pull/compile the reports for each consumer, but those requests must be directed at Jornaya.  Compiling this data could only be done on an individual-by-individual basis, as each lead produces a unique Jornaya LeadiD, report, and visual playback.

**DOCUMENT REQUEST NO.21** All lists of any purported consent language listed on any websites for individuals that were sent text messages on the DRIPS system by QuoteWizard.

**RESPONSE:** QuoteWizard objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. QuoteWizard further objects to this Request on the ground that it purports to seek documents outside of its possession, custody, or control, as QuoteWizard does not maintain lead generation websites or have this information. QuoteWizard refers Plaintiff to its objections to Requests Nos. 1 and 12 and incorporates them in full herein.

QuoteWizard notes that Drips' records reflect 43,166,509 telephone numbers contacted in the records it sent to QuoteWizard pursuant to the parties' agreement. It is patently unreasonable to expect QuoteWizard to gather the website name and the consent language on the website at the time the subject lead was made for 43,166,509 numbers. This is a highly individualized, specific inquiry for each consumer. For leads texted by Drips in the putative class period, QuoteWizard has identified over 180 possible lead suppliers, which such leads were likely generated from thousands of different websites. QuoteWizard does not own or operate those lead websites and does not possess the consent language on those websites. This information would solely be in the possession of the lead suppliers/generators. Subject to the foregoing objections, QuoteWizard will not produce any documents in response to Request No. 21.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 21**:

Similar to other requests, Request No. 21 focuses on QuoteWizard's consent claim. At class certification and trial, it will be QuoteWizard's affirmative burden to prove it had the consent of consumers to receive its text solicitations. As this case is now at the class certification stage, Mr. Mantha is entitled to discover and challenge QuoteWizard's consent defense, in whole or in part. It may be that some of the consumers who QuoteWizard sent telemarketing texts to did, in fact, provide their TCPA compliant consent to receive QuoteWizard\s texts. It is suspected, however, that a large number of consumers did not in fact provide QuoteWizard with their TCPA compliant consent to receive QuoteWizard's telemarketing texts. Mr. Mantha's counsel is entitled to discovery to ascertain which consumers who received QuoteWizard's telemarketing texts are class members, which are not, and to define the class accordingly. Crucial to its consent claim, will be the specific language listed on the specific web sites from which QuoteWizard claims it obtained TCPA compliant consent to text consumers. It is QuoteWizard's burden to produce this information in support of its consent claim. If it cannot not, then QuoteWizard will have failed to establish its affirmative defense.

QuoteWizard should be compelled to respond in full to Request No. 21. If QuoteWizard cannot produce the specific consent language that was purportedly agreed to by a particular class

member, it should be precluded from asserting any consent defense as to that particular class member at class certification or at trial.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 21**:

For the same reasons stated in QuoteWizard's arguments for Requests Nos. 1, 12, and 13 above, which it incorporates and relies on here, these documents are not properly discoverable because no other website besides the Snappy website is relevant to this case in the absence of any class-wide common theory of wrongdoing.  In addition, for the reasons stated in the prior referenced arguments, the requested documents are not within QuoteWizard's possession, custody, or control because QuoteWizard does not own or operate Snappy or any other third-party website where inbound leads were generated and then sold to QuoteWizard.  The documents would have to be sought from QuoteWizard's various contractual partners pursuant to third-party discovery. Moreover, this request is also overly burdensome, not proportional to the needs of the case, and otherwise entirely inappropriate in a putative class action case.  Plaintiff's repeated requests seeking documents for *each and every* individual QuoteWizard contacted, without regard to any of the threshold class requirements (residential telephone subscriber, etc.) is contrary to the entire purpose of Rule 23.  Plaintiff's discovery requests also reveal and confirm that each consumer would have to be evaluated on an individual basis—including the TCPA consent disclosure language they viewed and whether (in Plaintiff's estimation) the disclosures were clear and conspicuous.  This is *per se* not appropriate for a purported class case.  *See Schwartz*, 185 F.R.D. at 316 (discovery regarding putative class members improper where "it will serve only to reduce the efficiencies of the class action.").

**DOCUMENT REQUEST NO.22** Documents that evidence that QuoteWizard subscribed to the National Do Not Call Registry during the putative class period.

**RESPONSE:** QuoteWizard objects to this request as overly broad, unduly burdensome, not limited in time or scope, not relevant to any class discovery issues, and because it seeks in part documents protected by the attorney-client privilege and work product doctrine.

With respect to class discovery, "[g]enerally at the pre-class certification stage, discovery in a putative class action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman,* 298 F.R.D. at 595. This request has no relevancy to any class issue. Moreover, because merits/individual discovery and class discovery was bifurcated, the time for Plaintiff to seek such merits-related documents has passed. *See Pizana*, 2021 U.S. Dist. LEXIS 18926, at *9-10. Subject to and notwithstanding these objections, QuoteWizard notes that it has no documents responsive to this request, and otherwise maintains and preserves all objections.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 22**:

Mr. Mantha claims that QuoteWizard sent text solicitations to consumers whose residential and non-business numbers were listed on the National Do Not Call Registry. Obviously relevant to this claim is whether or not QuoteWizard even has a subscription to the National Do Not Call Registry. QuoteWizard objects to this straightforward request by claiming

that it is inappropriate "pre-class certification." Notably, however, per the Order of this Court class discovery is to take place now and not after the case is certified. QuoteWizard also curiously claims that the time to have made this request- which is obviously relevant to class claims- has already passed as it was relevant only to Mr. Mantha's individual claim.

QuoteWizard should be compelled to respond in full to Request No. 22. If QuoteWizard did not subscribe to the National Do Not Call Registry during the class period it should simply and clearly say so.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 22**:

This request sought "[d]ocuments that evidence that QuoteWizard subscribed to the National Do Not Call Registry during the putative class period." While making and preserving certain objections, QuoteWizard also noted that "it has no documents responsive to this request." Nothing additional is required. *See Grossman*, 2018 U.S. Dist. LEXIS 227227, at *20 ("Because defendant represents it located no responsive nonprivileged documents, nothing more is required.").

**DOCUMENT REQUEST NO. 23**: Documents that evidence that QuoteWizard utilized an Internal Do Not Call list, as well as a copy of that Internal Do Not Call list.

**RESPONSE:** QuoteWizard objects to this request as overly broad, unduly burdensome, not limited in time or scope, not relevant to any class discovery issues, on the basis that it seeks confidential PII of non-party consumers, and because it seeks in part documents protected by the attorney-client privilege and work product doctrine.

With respect to class discovery, "[g]enerally at the pre-class certification stage, discovery in a putative class action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman*, 298 F.R.D. at 595. This request has no relevancy to any class issue. Moreover, because merits/individual discovery and class discovery was bifurcated, the time for Plaintiff to seek such merits-related documents has passed. *See Pizana*, 2021 U.S. Dist. LEXIS 18926, at *9-10. These requested documents have also no relevancy to Plaintiff's claim (or class discovery), as Plaintiff was not on an internal do not call list when he was contacted. Whether or not other non-party consumers were on an internal call list is not an issue relevant to individual or class discovery.

Further objecting, QuoteWizard's internal do not call list is stored in a secure electronic database that is constantly updated. The electronic database is not in a form that could be easily produced, rather QuoteWizard would have to compile and create records in a format that could be shared externally based on a particular date range. The Federal Rules of Civil Procedure do not require a party to create a document, especially where such process would be time-consuming. *See In re Symbol Techs., Inc. Sec. Litig.*, 2017 U.S. Dist. LEXIS 50530, at *39 (E.D.N.Y. March 31, 2017) ("[T]he information sought by Defendants … is not presently memorialized in any tangible medium that could be turned over to Defendants. To the contrary, such information would need to be 'created' in documentary form. However, in general, a party is not required to create

documents responsive to another party's request."); *see also Universal Acupuncture Pain Servs., P.C. v. State Farm Mut. Auto. Ins. Co.*, 2002 U.S. Dist. LEXIS 19555, 2002 WL 31309232, at *4 (S.D.N.Y. Oct. 15, 2002) ("It is well-established . . . that courts may not compel the creation of documents to comply with a discovery demand.").

Finally, QuoteWizard notes that this request is largely duplicative of information that Plaintiff has already received from Drips pursuant to the parties' agreement in the related litigation, namely, do not call requests that consumers sent to Drips after Drips contacted them on QuoteWizard's behalf. Plaintiff has received, by agreement, a significant number of these DNC requests as summarized above. Plaintiff has no apparent need for even additional such requests.

Pursuant to these objections, no documents are being produced. Subject to the foregoing objections, QuoteWizard refers Plaintiff to a copy of its Do Not Call List already produced in discovery.

**PLAINTIFF'S ARGUMENT AS TO REQUEST NO. 23**:

Request No. 23 is similar to Request No. 22, however it relates not to the National Do Not Call Registry but to the obligation of QuoteWizard to maintain an Internal Do Not Call List. The maintenance and use of an internal Do Not Call List by a TCPA defendant is relevant to whether or not the defendant can assert a 'safe harbor' affirmative defense under the TCPA. Whether QuoteWizard maintained and used such a DNC list is also relevant to whether its alleged violation of the TCPA was knowing or willful. Did QuoteWizard send text messages to consumers who were also listed on the QuoteWizard Internal Do Not Call list? If so, such would be relevant to a claim of willful violation. QuoteWizard objects to this request claiming it is duplicative of request as to the Drips' DNC requests. It is not. Drips was only one of the vendors used by QuoteWizard to make telemarketing calls on its behalf. QuoteWizard also claims that it is burdensome to produce its IDNC list due to the manner in which it chose to create and house the list. QuoteWizard, of course, chose how to create and house its own IDNC list. It should not be allowed to benefit from housing its IDNC list in a difficult to access manner. In addition, QuoteWizard's purported privacy concerns are transparent attempt to obstruct Plaintiff from accessing crucial information. Plaintiff will treat any information as covered by the Court's standing protective order.

QuoteWizard should be compelled to respond in full to Request No. 23.

**DEFENDANT'S ARGUMENT AS TO REQUEST NO. 23**:

Plaintiff argues that whether or not QuoteWizard maintains an internal do not call list is relevant to the case, but QuoteWizard has already affirmatively stated that it does. QuoteWizard has also produced in this litigation a copy of its internal Do Not Call policy, which describes among other things that QuoteWizard does not contact consumers who have been placed on its internal do not call list. Whether or not QuoteWizard has contacted consumers on its internal do not call list is completely irrelevant to this case. Plaintiff was not on the internal do not call list at the time he was contacted. Moreover, even if QuoteWizard violated its own internal policy with respect to other consumers (it did not), this has absolutely no bearing on whether it violated the TCPA's do

not call provisions, which relate solely to whether a person was registered to the National DNC Registry, was a residential telephone subscriber, was solicited two or more times, and did not consent. Finally, even if Plaintiff could establish that this information was relevant, which it is not, he has made no attempt to properly tailor his request, which is currently extremely overbroad, not proportional to the needs of the case, and would expose the confidential information of non-party consumers. For example, Plaintiff does not attempt to limit his request to documents reflecting consumers who were on the internal do not call list but thereafter contacted by Drips on behalf of QuoteWizard and who complained about the same—which might inch marginally closer to relevancy about consent. A non-party consumer merely being placed on QuoteWizard's internal do not call list is simply irrelevant to this case.

QuoteWizard, as noted, also does not maintain this list in a manner in which it could be easily produced to Plaintiff. The burden on QuoteWizard to compile and produce this information, combined with the unnecessary breach of privacy protections for non-party consumers, far outweighs any potential relevance of this data. *See, e.g.*, *Jones v. Goord*, 2002 U.S. Dist. LEXIS 8707, at *48 (S.D.N.Y. May 15, 2002) ("Assuming for the sake of argument that the [electronic] databases sought by plaintiffs are relevant … the Court finds that discovery should be denied because … the burden of the proposed discovery far outweighs its likely benefit for resolving the issues before the Court").

However, in the event the Court orders this information to be produced, QuoteWizard requests that the Court only order redacted production such to redact any PII of non-party consumers, including names and the last four digits of their telephone numbers.

## II.     INTERROGATORIES AT ISSUE AND ARGUMENT

**INTERROGATORY NO. 2:** Identify all third parties that you obtained telephone numbers from that were sent text messages on the DRIPS system. This includes, but is not limited to, Plural Marketing Solutions, Inc.

**ANSWER:** QuoteWizard objects to this Interrogatory as overly broad, unduly burdensome, not relevant to any class issues under Fed. R. Civ. P. 23, and not proportional to the needs of the case. In addition, QuoteWizard objects because this Interrogatory is not limited in time, scope, or to the subject matter of this case (text messages sent to consumers two or more times where the consumer is registered (validly) on the National Do Not Call Registry and QuoteWizard allegedly lacked consent to contact them – and more specifically, relating to the Snappy website – within the statute of limitations period).

With respect to class issues, this Interrogatory has no apparent bearing on or relevancy to any of the Rule 23 factors. "Generally at the pre-class certification stage, discovery in a putative class action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman v. Comcast Corp*., 298 F.R.D. 592, 595 (S.D. Cal. 2014) (citing *Oppenheimer*, 437 U.S. at 359).

Moreover, QuoteWizard objects insofar as Plaintiff is seeking information regarding third parties that exceeds the commonality and typicality required under Rule 23. Plaintiff's lead was sold to QuoteWizard by RevPoint Media, LLC ("RevPoint"), which in turn had purchased it from Plural Marketing Solutions, Inc. ("Plural"), which in turn purchased it from Fenix Media ("Fenix"), which in turn claimed to have obtained it or generated it from the Snappy website. The Parties expended substantial resources in merits discovery regarding the owner and legitimacy of the Snappy website and the summary judgment briefing focused in large part on that issue and the generation of Plaintiff's lead. The identity of all other lead suppliers that QuoteWizard purchased leads from in the putative class period is not relevant to, common to, or typical of Plaintiff's lead or those similarly situated.

In the putative class period, QuoteWizard purchased leads from (approximately) over 180 possible lead suppliers. These lead suppliers in turn necessarily would have either purchased leads from or generated leads from thousands (if not hundreds of thousands) of different lead websites that necessarily have various different forms of consent language that might be contested by counsel and would require individualized inquiries into each consumer's agreement to disclosure language. *See Berman v. Freedom Financial Network*, No. 20-16900 (9th Cir. 2022) (requirement to arbitrate in online webform was not enforceable). Consumer leads sold by over 180 possible lead suppliers to QuoteWizard lack commonality and typicality with Plaintiff's lead, and thus precertification discovery into these unrelated leads is not appropriate. *See Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985) (precertification discovery may be prohibited where plaintiff fails to advance a prima facie showing that the class requirements (i.e., numerosity, commonality, typicality and adequacy of representation) of Rule 23 are satisfied or that "discovery is likely to produce substantiation of class allegations.") (no abuse of discretion by denying pre-certification discovery where plaintiff merely cited "two other complaints filed elsewhere" by similar plaintiffs against the same defendant to demonstrate a likelihood that discovery would substantiate class allegations); *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977) ("[W]here the plaintiffs fail to make even a prima facie showing of Rule 23's prerequisites, as we find here, the burden is on the plaintiff to demonstrate that discovery measures are likely to produce persuasive information substantiating the class action allegations."); *Pizana v. Sanmedica Int'l, LLC*, 2021 U.S. Dist. LEXIS 18926, at *9-10 (E.D. Cal. Feb. 1, 2021) (prohibiting pre-certification discovery where plaintiff failed to show why requested information concerning non-party companies "is likely to substantiate his class allegations").

Plaintiff has never alleged nor presented any evidence to substantiate an allegation that QuoteWizard was sold allegedly fraudulent leads by over 180 possible lead suppliers; rather at all times this case has focused on the Snappy website. This is not a case where QuoteWizard sent the text messages pursuant to the same mass campaign or where all leads were generated from a single source or website. *See Shamblin*, 2015 U.S. Dist. LEXIS 54849, at *28-29. *Compare Sullivan*, 2017 U.S. Dist. LEXIS 84232, at *24-25.

Thus, class discovery must necessarily be limited to leads that originated from the same source— the Snappy website. Upon information and belief, however, Plaintiff's lead was the only lead purchased by QuoteWizard from RevPoint and in turn from Plural during the putative class period that purportedly originated from the Snappy website. Plural (which worked directly with

Fenix, the alleged lead generator) would have direct knowledge of this fact and QuoteWizard is amenable to working with Plaintiff's counsel, via a subpoena, deposition or otherwise, to confirm the same. Pursuant to the foregoing objections, no answer is being provided.

**PLAINTIFF'S ARGUMENT AS TO RESPONSE TO INTERROGATORY NO. 2**:

Mr. Mantha seeks to assert class claims on behalf of all consumers who received telemarketing texts from QuoteWizard despite being listed on the National Do Not Call Registry, and who did not consent to receive such texts. In defense, QuoteWizard will claim that the recipients of its text messages consented to receive such texts by visiting various web sites and their contact and consent data was then sold to QuoteWizard via third parties, including but not limited to Plural. This interrogatory simply asks QuoteWizard to identify the third parties that it allegedly purchased consumer data from that it then used to send consumers' text solicitations via Drips. QuoteWizard's objections to this relevant and straight forward request are meritless.

QuoteWizard should be compelled to respond in full to Interrogatory No. 2

**DEFENDANT'S ARGUMENT AS TO ITS RESPONSE TO INTERROGATORY NO. 2**:

QuoteWizard incorporates herein its argument with respect to RPD Request No. 1, which applies equally here. This case is and must necessarily be limited only to Snappy leads or at most Fenix leads that reached QuoteWizard. No other contractual partner of QuoteWizard is even arguably relevant, as Plaintiff has put forth no allegations or evidence of any common wrongdoing beyond the subject matter of this case (Fenix's alleged pirating of the Snappy website and alleged fraudulent creation of Plaintiff's lead).

**INTERROGATORY NO. 3:** For all entities identified in response to Interrogatory No. 2, identify the amount of telephone numbers obtained from each entity.

**ANSWER:** QuoteWizard objects to this Interrogatory as over the number of interrogatories allowed under Fed. R. Civ. P. 33, as this is Plaintiff's 26th interrogatory. QuoteWizard further objects to this Interrogatory as overly broad, unduly burdensome, not relevant to any class issues under Fed. R. Civ. P. 23, and not proportional to the needs of the case. In addition, QuoteWizard objects because this Interrogatory is not limited in time, scope, or subject matter of this case (text messages sent to consumers two or more times where the consumer is registered (validly) on the National Do Not Call Registry and QuoteWizard allegedly lacked consent to contact them – and more specifically, relating to the Snappy website – within the statute of limitations period). QuoteWizard refers Plaintiff to its objections to Interrogatory No. 2 and incorporates and relies on those objections in response to Interrogatory No. 3.

Moreover, the number of leads sold by each of QuoteWizard's lead suppliers is not relevant to any Rule 23 issue. In addition, it would be incredibly overly burdensome for QuoteWizard to (1) identify with certainty every lead supplier that sold it leads during the class period, (2) compile a list of records of those leads, and (3) determine which of those leads were contacted by Drips during the putative class period. Further, although QuoteWizard retains records for each lead

sold to it, QuoteWizard does not maintain separate records of leads sold by each lead supplier in any discrete format that could be produced, but would have to create/compile such leads to respond to this Interrogatory. This would be a time-consuming, onerous, and expensive task, and the Federal Rules of Civil Procedure do not require QuoteWizard to do this. *See In re Symbol Techs., Inc. Sec. Litig.*, 2017 U.S. Dist. LEXIS 50530, at *39 (E.D.N.Y. March 31, 2017) ("[T]he information sought by Defendants … is not presently memorialized in any tangible medium that could be turned over to Defendants. To the contrary, such information would need to be 'created' in documentary form. However, in general, a party is not required to create documents responsive to another party's request."); *see also Universal Acupuncture Pain Servs., P.C. v. State Farm Mut. Auto. Ins. Co.*, 2002 U.S. Dist. LEXIS 19555, 2002 WL 31309232, at *4 (S.D.N.Y. Oct. 15, 2002) ("It is well-established . . . that courts may not compel the creation of documents to comply with a discovery demand."). Pursuant to the foregoing objections, no information is being provided.

**PLAINTIFF'S ARGUMENT AS TO RESPONSE TO INTERROGATORY NO. 3**:

QuoteWizard pays its lead providers on a per lead basis. Accordingly, its claim that determining how many leads it received from each would entail nothing more than checking with its accounting department how many leads it purchased from each lead generator. QuoteWizard's claim that breaking down the leads by lead generator is irrelevant is baseless. If all of the leads from a given lead provider share common defect, that information could be directly relevant as Plaintiff shapes his class definition in his motion for class certification.

QuoteWizard should be compelled to respond in full to Interrogatory No. 3 or to provide the records that it claims are indecipherable and allow Plaintiff to complete the analysis per Fed. R. Civ. P. 33(d) which allows a responding party to provide business records if the burden of compiling the information would be the same for either party.

**DEFENDANT'S ARGUMENT AS TO ITS RESPONSE TO INTERROGATORY NO. 3**:

First, Plaintiff fails to address that this interrogatory and the following interrogatories at issue herein are over the allowable limit under the FRCP and he never sought Court leave to exceed that limit. The Court should deny Plaintiff leave to exceed the limit on interrogatories, particularly because these over-limit interrogatories seek irrelevant and burdensome information, in any event.

In addition, QuoteWizard incorporates herein its argument with respect to RPD Request No. 1, which applies equally here. This case is and must necessarily be limited only to Snappy leads or at most Fenix leads that reached QuoteWizard. No other contractual partner of QuoteWizard or the leads they sold QuoteWizard are even arguably relevant, as Plaintiff has put forth no allegations or evidence of any common wrongdoing beyond the subject matter of this case (namely Fenix's alleged pirating of the Snappy website and alleged fraudulent creation of Plaintiff's lead).

Plaintiff fails to explain how this information is relevant to any class discovery issue. As noted, there are approximately 88 contractual lead partners for the relevant class period. QuoteWizard does not maintain separate lists detailing how many leads were purchased from each

partner, notwithstanding that not every lead sold to QuoteWizard was sent to Drips to be texted. QuoteWizard thus does not have this information readily available but would have to expend substantial time and resources to create lists to respond to this interrogatory, which is beyond the scope of discovery.

Further, Plaintiff's purported reason for this interrogatory is baseless. He indicates he is requesting information on a partner-by-partner basis because "If all of the leads from a given lead provider share common defect, that information could be directly relevant as Plaintiff shapes his class definition in his motion for class certification." This case is about the Snappy website, and in turn, Plaintiff's arguments that someone (Fenix Media) fraudulently generated his lead and then sold it to QuoteWizard (indisputably *without* QuoteWizard's knowledge of alleged fraud). To the extent Plaintiff wished to limit discovery for the putative class to Fenix leads that reached QuoteWizard, that might be a reasonable approach. Plaintiff is openly admitting to the Court that, at this advanced stage of the case, he has no knowledge that any particular contractual partner of QuoteWizard's was selling it allegedly fraudulent leads, but he would like to conduct free-wheeling discovery into its contractual partners to try to fish for a "common defect." This is not a valid basis to force QuoteWizard to create/compile the irrelevant information that Plaintiff requests.

As QuoteWizard has repeatedly noted, to date Plaintiff has never articulated a common issue of law or fact capable of class-wide resolution. For example, QuoteWizard's leads did not come from a common source (there is only one Snappy lead) or a single campaign. Plaintiff cannot plausibly tell this Court that he has any good faith evidence or indicia of a class-wide system of fraudulent leads purchased by QuoteWizard—by his own admission, *at least some* consumers texted by QuoteWizard have consented. Plaintiff's attempt to fish for a class theory where he lacks one must be rejected. *See Josey*, 2020 U.S. Dist. LEXIS 127789, at *26-27 ("But pre-certification discovery is not an opportunity to engage in a 'fishing expedition' concerning company policies that cannot plausibly result in a common injury across the putative class. … And, here, Plaintiffs' allegations about LM Commit on their face render classwide injury implausible … Put another way, it is the nature of the allegedly discriminatory policy that Plaintiffs wish to explore that makes it clear to this Court that no amount of discovery would make Plaintiffs' class allegations viable, and what is at stake here is a foundational problem …."); *Cute v. Icc Capital Mgmt.*, 2010 U.S. Dist. LEXIS 159381, at *9-10 (M.D. Fla. June 22, 2010) ("Defendant's efforts to obtain the employment records from Plaintiff's former employers on the off-chance that it may find some evidence of wrongdoing is merely a fishing expedition. 'District courts need not condone the use of discovery to engage in 'fishing expedition [s].'" (quoting *Rivera v. Nibco, Inc*., 364 F.3d 1057, 1072 (9th Cir. 2004) (finding magistrate judge's entry of protective order precluding defendant employer from using discovery process to support after-acquired evidence defense proper)); *Witten v. A.H. Smith & Co.*, 104 F.R.D. 398, 399 (D. Md. 1984) ("[T]he scope of discovery must not be so broad that it becomes overly burdensome, irrelevant, or an invasion of privileged matters … *it is an abuse of Fed.R.Civ.P. 23 to make unsupported charges of classwide discrimination in the hope that broad scale discovery may turn up some evidence to support the charges*." (emphasis added) (quotation and citation omitted)).

**INTERROGATORY NO. 4:**  Identify all websites that you obtained telephone numbers from that were sent text messages on the DRIPS system.  This includes, but is not limited to, www.snappyautoinsurance.com.

**ANSWER:** QuoteWizard objects to this Interrogatory as over the number of interrogatories allowed under Fed. R. Civ. P. 33, as this is Plaintiff's 27th interrogatory. QuoteWizard further objects to this Interrogatory as overly broad, unduly burdensome, not relevant to any class issues under Fed. R. Civ. P. 23, and not proportional to the needs of the case. Moreover, other leads/websites generated from other lead suppliers different than Plaintiff's lead lacks any relevancy to, commonality, or typicality with Plaintiff's lead. This case is, and always has been, about the Snappy website. In addition, QuoteWizard objects because this Interrogatory is not limited in time, scope, or to the subject matter of this case. QuoteWizard refers Plaintiff to its objections to Interrogatories Nos. 2 and 3 and incorporates and relies on those objections in response to Interrogatory No. 4. QuoteWizard further objects on the ground that some or all of this information is not within its possession, custody, or control but rather would be in the possession, custody, or control (if it exists) of the companies that sold QuoteWizard consumer leads—which has been approximately identified as over 180 different entities. More specifically, when QuoteWizard purchases leads (as with Plaintiff's lead), the source of the lead/website is not typically shared with QuoteWizard by the lead supplier and therefore is not ordinarily within the possession, custody, or control of QuoteWizard. It would be patently overly burdensome and not proportional to the needs of the case, and also beyond the scope of any permissible discovery, to require QuoteWizard to contact approximately 180 different lead suppliers and review each lead they ever sold to discern this information that is not within QuoteWizard's possession, custody, or control. Pursuant to these objections, no information is being provided.

**PLAINTIFF'S ARGUMENT AS TO RESPONSE TO INTERROGATORY NO. 4**:

This request asks QuoteWizard to identify by name all the websites from which it alleges it obtain telephone numbers that were then sent text messages via the Drips system. This request is relevant as to consent. Mr. Mantha is entitled to discovery that identifies the web sites QuoteWizard claims consumers used to consent to receive its telemarketing texts. Of course, if the consent language contained on these web sites was not TCPA compliant, QuoteWizard's assertion of consent for all numbers obtained from that particular web site will fail. QuoteWizard's objections to this simple request are not well taken. QuoteWizard claims that "this case is and always has been about the Snappy auto website." Of course, this is not true. It was QuoteWizard who claimed Mr. Mantha consented to receive its texts via the Snappy Auto web site. Mr. Mantha always denied this was true, and proved such was true. This case is not about Snappy Auto. Rather, what Mr. Mantha alleges appears to be a massive violation of the TCPA caused by QuoteWizard's spam text campaign to residential numbers listed on the Do Not Call Registry. If QuoteWizard is to pursue a defense claim, then the web sites upon which consumers purportedly consented to receive its text solicitations, and the TCPA consent language on each web-site is relevant to this case, must be disclosed. Mr. Mantha is entitled to discovery to examine these web sites and to ascertain which web sites do not contain TCPA compliant consent language all as part of framing the class ahead of class certification. If QuoteWizard is unable to identify the web-site that a particular consumer allegedly visited and

allegedly consented to receive QuoteWizard telemarketing texts, then it will be unable to carry its heavy burden to prove it obtain the consumers TCPA compliant consent to receive such texts either at class certification or trial.

QuoteWizard should be compelled to respond in full to Interrogatory No. 4

**DEFENDANT'S ARGUMENT AS TO ITS RESPONSE TO INTERROGATORY NO. 4**:

For the same reasons stated in QuoteWizard's arguments for RPD Requests Nos. 1, 12, and 13 above, which it incorporates and relies on here, this information is not properly discoverable, because no other website besides the Snappy website is relevant to this case in the absence of any class-wide common theory of wrongdoing.  In addition, for the reasons stated in the prior referenced arguments, the requested information is not within QuoteWizard's possession, custody, or control because QuoteWizard does not own or operate Snappy or any other third-party website where inbound leads were generated and then sold to QuoteWizard.  The information would have to be sought from QuoteWizard's various contractual partners pursuant to third-party discovery. Moreover, this request is also overly burdensome, not proportional to the needs of the case, and otherwise entirely inappropriate in a putative class action case.  Plaintiff's repeated requests seeking documents for *each and every* individual QuoteWizard contacted, without regard to any of the threshold class requirements (residential telephone subscriber, etc.) is contrary to the entire purpose of Rule 23.

**INTERROGATORY NO. 5:** For all entities identified in response to Interrogatory No. 4, identify the amount of telephone numbers obtained from each entity.

**ANSWER:** QuoteWizard objects to this Interrogatory as over the number of interrogatories allowed under Fed. R. Civ. P. 33, as this is Plaintiff's 28th interrogatory. QuoteWizard further objects to this Interrogatory as overly broad, unduly burdensome, not relevant to any class issues under Fed. R. Civ. P. 23, and not proportional to the needs of the case. In addition, QuoteWizard objects because this Interrogatory is not limited in time, scope, or to the subject matter of this case.  Moreover, other leads/websites generated from other lead suppliers different than Plaintiff's lead lacks any relevancy to, commonality, or typicality with Plaintiff's lead. This case is, and always has been, about the Snappy website. QuoteWizard refers Plaintiff to its objections to Interrogatories Nos. 2, 3, and 4 and incorporates and relies on those objections in response to Interrogatory No. 5. QuoteWizard further objects on the ground that some or all of this information is not within its possession, custody, or control but rather would be in the possession, custody, or control (if it exists) of the companies that sold QuoteWizard consumer leads. More specifically, when QuoteWizard purchases leads (as with Plaintiff's lead), the source of the lead/website is not typically shared with QuoteWizard by the lead supplier and therefore is not ordinarily within the possession, custody, or control of QuoteWizard. Further, although QuoteWizard retains records for each lead sold to it, QuoteWizard does not maintain separate records of leads sold by each lead supplier in any discrete format that could be produced, but would have to create/compile such leads to respond to this Interrogatory. This

would be a time consuming, onerous, and expensive task, and the Federal Rules of Civil Procedure do not require QuoteWizard to do this. *See In re Symbol Techs., Inc. Sec. Litig.,* 2017 U.S. Dist. LEXIS 50530, at *39.

In addition, QuoteWizard objects on the ground that this Interrogatory appears to be duplicative of Interrogatory No. 3. Pursuant to these objections, no information is being provided.


### PLAINTIFF'S ARGUMENT AS TO RESPONSE TO INTERROGATORY NO. 5:

QuoteWizard pays its lead providers and  on a per lead basis. Accordingly, its claim that determining how many leads it received from that lead providers website would entail nothing more than checking with its accounting department how many leads it purchased from each lead generator. QuoteWizard's claim that breaking down the leads by lead generator is irrelevant is baseless. If all of the leads from a given lead provider share common defect, that information could be directly relevant as Plaintiff shapes his class definition in his motion for class certification.

QuoteWizard should be compelled to respond in full to Interrogatory No. 5 or to provide the records that it claims are indecipherable and allow Plaintiff to complete that analysis pursuant to Fed. R. Civ. P. 33(d) which allows a responding party the option of responding to an interrogatory to provide business records iof the burden of analysis would be the same for either party.

### DEFENDANT'S ARGUMENT AS TO ITS RESPONSE TO INTERROGATORY NO. 5:

For the same reasons stated in QuoteWizard's arguments for RPD Requests Nos. 1, 12, and 13 above, which it incorporates and relies on here, this information is not properly discoverable, because no other website besides the Snappy website is relevant to this case in the absence of any class-wide common theory of wrongdoing.  In addition, for the reasons stated in the prior referenced arguments, the requested information is not within QuoteWizard's possession, custody, or control, because QuoteWizard does not own or operate Snappy or any other third-party website where inbound leads were generated and then sold to QuoteWizard.  The information would have to be sought from QuoteWizard's various contractual partners pursuant to third-party discovery. Moreover, this request is also overly burdensome, not proportional to the needs of the case, and otherwise entirely inappropriate in a putative class action case.  Plaintiff's repeated requests seeking documents for *each and every* individual QuoteWizard contacted, without regard to any of the threshold class requirements (residential telephone subscriber, etc.) is contrary to the entire purpose of Rule 23.

### Certification Pursuant to Local Rule 37.1

On April 22, 2022 at approximately 4:00 pm, Edward Broderick (for Plaintiff) and Kevin Polansky, Christine Kingston, and Matthew Lindenbaum (for QuoteWizard) met and conferred

via telephone for less than ten minutes and were unable to narrow the areas of disagreement. QuoteWizard contests the adequacy of this meet-and-confer.

*/s/ Edward A. Broderick*
                    Edward A. Broderick

Dated: May 24, 2022

Respectfully submitted,                    Respectfully submitted,
Joseph Mantha,                             QuoteWizard.com, LLC,
by his attorneys,                          By its attorneys,

*/s/*                                      */s/*
Edward A. Broderick                        Kevin P. Polansky, BBO (BBO #667229)
Broderick Law. P.C.                        Christine M. Kingston (BBO #682962)
176 Federal Street, Fifth Floor            Nelson Mullins Riley & Scarborough LLP
Boston, MA 02110                           One Financial Center, Suite 3500
(t) (617) 738-7080                         Boston, MA 02111
(f) (617) ) 830-0327                       (t) (617)-217-4700
ted@broderick-law.com                      (f) (617) 217-4710
                                           kevin.polansky@nelsonmullins.com
                                           christine.kingston@nelsonmullins.com

<u>CERTIFICATE OF SERVICE</u>

I, Edward A. Broderick, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: May 24, 2022                        */s/ Edward A. Broderick*