# EXHIBIT D: ORDER

*Carroll v. SGS Automotive Services, Inc.*, Case No. 3:16-cv-00537-SDD-SDJ (M.D. La. Nov. 30, 2020), Docket No. 232, Order

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

TAYLOR CARROLL, individually
and on behalf of all others
similarly situated                                                            CIVIL ACTION

VERSUS                                                          16-537-SDD-RLB

SGS AUTOMOTIVE SERVICES, INC.

## RULING

This matter is before the Court on the *Daubert Motion to Exclude Class Expert*[1] filed by Defendant, SGS Automotive Services, Inc. ("SGS"). Plaintiff Taylor Carroll ("Carroll") filed an *Opposition*,[2] to which SGS filed a *Reply*.[3] For the reasons that follow, the Court finds that SGS's *Daubert Motion to Exclude Class Expert*[4] shall be GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Taylor Carroll ("Carroll") has moved to certify this action, which seeks statutory damages for prerecorded "robo-calls" allegedly made by SGS in violation of the Telephone Consumer Protection Act (TCPA), as a class action.[5] Carroll's *Motion to Certify Class* sets forth two proposed classes -- a "Prerecorded Message Class" and a "Cell Phone Class" – and "offers the option to the Court of certifying either."[6] While Carroll describes this case as "ideal"[7] for class certification, SGS disagrees, arguing that certification should be denied because there is "no reliable, administratively feasible way

---

[1] Rec. Doc. No. 126.
[2] Rec. Doc. No. 142.
[3] Rec. Doc. No. 160.
[4] Rec. Doc. No. 126.
[5] *Motion to Certify Class*, Rec. Doc. No. 180.
[6] *Id.* at p. 2.
[7] *Id.* at p. 1.
63828

Page 1 of 17

to identify class members."[8] According to Carroll, membership in the Prerecorded Message Class "can be ascertained from SGS's own business records,"[9] and members of the Cell Phone Class are ascertainable using the "proven methodology of identifying cellular telephone numbers"[10] supplied by his expert witness, Anya Verkhovskaya ("Verkhovskaya"). Verkhovskaya's opinion is the subject of the instant *Daubert Motion to Exclude Class Expert*[11] filed by SGS.

## II.  *DAUBERT* MOTION

SGS seeks to strike Verkhovskaya's expert report and exclude her testimony because, it argues, she "lacks both proper qualifications and a reliable methodology."[12] Specifically, SGS takes issue with the fact that Verkhovskaya is a "nurse by training and education" and, in its view, "not an expert in data analysis or the identification of class members."[13] SGS also objects to Verkhovskaya's methodology insofar as it relies on the LexisNexis database, which SGS argues is unreliable. SGS further contends that her opinion is undermined by "[f]undamental errors in her work product" and that certain alleged "[m]isrepresentations to another court" raise credibility concerns.[14] Overall, SGS maintains, Verkhovskaya's report and testimony should be excluded because "comparing names from one list to another and re-tabulating to see if they might match is not 'expertise.'"[15]

---

[8] Rec. Doc. No. 196, p. 13.
[9] Rec. Doc. No. 180-1, p. 3.
[10] *Id.* at p. 1.
[11] Rec. Doc. No. 126.
[12] Rec. Doc. No. 126-1, p. 2.
[13] *Id.*
[14] *Id.* at p. 3.
[15] *Id.* at p. 10.
63828

Carroll opposes the *Daubert* motion, arguing first that "SGS misstates the applicable standard for expert admissibility at the class certification stage."[16] In fact, he argues, the Court need only apply "a limited *Daubert* analysis at the class certification stage by reviewing the reliability and relevance of the methodology used by the expert in reaching an opinion."[17] Under that standard, Carroll asserts, Verkhovskaya's methodology passes muster and should not be excluded; in fact, he states, the methodology is "straight-forward"[18] and "has been found in other cases to be a reliable basis to determine if the class certification requirements of numerosity or ascertainability are satisfied."[19] Per Carroll, LexisNexis's database is reasonably relied on by experts in the field, and the errors identified by SGS in Verkhovskaya's report were "the result of a limited data alignment error"[20] and do not discredit her methodology.

A. Whether a "Limited" *Daubert* Analysis is Appropriate

As stated *supra*, the parties disagree on the standard to be applied to this *Motion*. Carroll posits that, at the class certification stage, only a limited *Daubert* analysis is required. SGS's *Daubert* motion, by contrast, seeks the application of a "full" *Daubert* analysis.[21] Although the Fifth Circuit has not spoken directly on the issue, it is true that some courts have endorsed the notion of a "relaxed" *Daubert* standard outside of the trial context. In *Turner v. Murphy Oil USA, Inc.*,[22] for example, the District Court for the Eastern District of Louisiana reasoned that class certification is "'not an occasion for examination

---

[16] Rec. Doc. No. 142, p. 3.
[17] *Id.* at p. 1-2.
[18] *Id.* at p. 7.
[19] *Id.*
[20] *Id.* at p. 11.
[21] Rec. Doc. No. 126-1, p. 6-8.
[22] No. CIV.A. 05-4206, 2006 WL 91364 (E.D. La. Jan. 12, 2006).

63828

of the merits of the case'"[23] and endorsed a "limited *Daubert* review."[24] In doing so, however, the court also cited a Northern District of Texas case that found to the contrary, in a ruling that was subsequently affirmed by the Fifth Circuit, which "found that the district court had acted properly in 'applying 'rigorous, though preliminary, standards of proof'' to the class certification decision.'"[25] Three years after *Turner*, in *Schafer v. State Farm & Fire Cas. Co.,* a different section of the Louisiana Eastern District re-examined *Daubert* analysis in the context of class certification, reasoning that when engaging *Daubert* "specifically for class certification, this Court must determine whether [the proffered expert] is qualified as an expert, whether his methodology is adequately reliable, and whether his opinions are relevant to class certification."[26]

Courts outside the Fifth Circuit have agreed. For example, the United States Circuit Court of Appeals for the Eighth Circuit in *In re Zurn Pex Plumbing Products Liability Litigation* sanctioned a "tailored *Daubert* analysis" that "examined the reliability of the expert opinions in light of the available evidence and the purpose for which they were offered."[27] The *Zurn* court emphasized the "inherently preliminary nature of pretrial evidentiary and class certification rulings," and noted that the "main purpose of *Daubert*"—"to protect juries from being swayed by dubious scientific testimony"—does not arise in motions for class certification "where the judge is the decision

---

[23] *Id.* at *2 (quoting *In re Visa Check/Master Money Antitrust Litig.,* 280 F.3d 124, 135 (2d Cir. 2001)).
[24] *Id.* at *3.
[25] *Id.* (quoting *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 313 (5th Cir. 2005)).
[26] No. CIV.A. 06-8262, 2009 WL 799978, at *3 (E.D. La. Mar. 25, 2009).
[27] *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 612 (8th Cir. 2011); *see also id.* at 611 (declining to "adopt a new rule, requiring a district court to determine conclusively at an early stage, not just whether or not expert evidence is sufficient to support class certification under Rule 23, but also whether that evidence will ultimately be admissible for trial").
63828

maker."[28] Accordingly, the court reasoned that tailoring the *Daubert* review at the class certification stage was appropriate.

Nevertheless, a plain reading of Federal Rule of Evidence 702 does not suggest a different application of the Court's gatekeeping function in the context of class certification. The prevailing view seems to be that where an expert's testimony is critical to class certification, "a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion"—*i.e.,* "the district court must perform a full *Daubert* analysis before certifying the class."[29] Moreover, the United States Supreme Court has suggested that district courts should apply the same standard at the class certification stage that they would apply to expert testimony offered at a later stage of proceedings.[30]

The Supreme Court has likewise emphasized that "rigorous analysis" is required of the district court when assessing a plaintiff's request for class certification.[31] A court must ascertain whether the plaintiff in a would-be class action has proven compliance with Rule 23(a) "in fact" and whether the plaintiff has "'satisf[ied] through evidentiary proof

---

[28] *Id. a*t 613.
[29] *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010); *see also, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (district court "correctly applied the evidentiary standard set forth in *Daubert*" at the class-certification stage); *Sher v. Raytheon Co.*, 419 Fed. Appx. 887, 890–91 (11th Cir. 2011) ("Here the district court refused to conduct a *Daubert*-like critique of the proffered experts' qualifications. This was error."); *In re Carpenter Co.*, No. 14-0302, 2014 WL 12809636, at *3–4 (6th Cir. Sep. 29, 2014) (district court did not abuse its discretion by analyzing expert testimony offered in support of class certification under *Daubert* ); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) ("We join certain of our sister courts to hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*."); *but see In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 611–14 (8th Cir. 2011) (approving use of a "focused *Daubert* analysis" instead of a "full and conclusive *Daubert* inquiry").
[30] *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) (casting "doubt" on the conclusion "that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings").
[31] *See Comcast Corp. v. Behrend,* 569 U.S. 27, 34–35 (2013)*.*
63828

at least one of the provisions of Rule 23(b).'"[32] Under this approach, "[e]xpert testimony that is insufficiently reliable to satisfy the *Daubert* standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied."[33] Based on the foregoing, this Court concludes that the notion of a relaxed *Daubert* inquiry is misplaced. It is undeniably the role of the trial court to serve as the gatekeeper for expert testimony by determining whether the expert opinion is sufficiently reliable. Although the *Daubert* analysis is "flexible,"[34] the Court declines the invitation to water down the 702 analysis, potentially resulting in certification of a nationwide class action lawsuit on the basis of insufficiently reliable expert testimony.

B. The *Daubert* Standard

Federal Rule of Evidence 702 provides the parameters for admissible expert testimony:

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

When a *Daubert* issue is raised, a district court may hold a hearing at which the expert opinion in question may be challenged.[35] However, when no hearing is held, "a district court must still perform its gatekeeping function by performing some type of

---

[32] *In re Blood Reagents Antitrust Litig.*, 783 F.3d at 187.
[33] *Id.*
[34] *Sheperd v. Willis*, No. CV 18-1091-JWD-RLB, 2020 WL 5742843, at *4 (M.D. La. Sept. 25, 2020)(citing *Kumho*, 526 U.S. at 150).
[35] *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016).
63828

*Daubert* inquiry."[36] "At a minimum, a district court must create a record of its *Daubert* inquiry and 'articulate its basis for admitting expert testimony.'"[37] The Court finds the record adequately developed to permit the Court to make the gatekeeping analysis without a hearing.

The *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise and the subject of his testimony."[38] "District courts are to make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[39] The Fifth Circuit has noted that *Daubert* offers

> general observations intended to guide a district court's evaluation of scientific evidence. The nonexclusive list includes whether [a theory or technique] can be (and has been) tested, whether it has been subjected to peer review and publication, the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, as well as general acceptance."[40]

This Court has broad discretion in deciding whether to admit expert opinion testimony.[41] An expert witness's testimony should be excluded if the district court "finds that the witness is not qualified to testify in a particular field or on a given subject."[42]

---

[36] *Id.*
[37] *Id.* (quoting *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001)).
[38] *Kumho*, 526 U.S. at 150, *cited with approval in Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).
[39] *Carlson*, 822 F.3d at 199 (5th Cir. 2016)(cleaned up).
[40] *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997) (cleaned up).
[41] *See General Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997) (holding that appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *see also Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997) (holding "[d]istrict courts enjoy wide latitude in determining the admissibility of expert testimony"); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence.").
[42] *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999).
63828

### III. VERKHOVSKAYA'S REPORT

Verkhovskaya's *Expert Report*[43] begins by detailing her background and qualifications. Although SGS focuses on the fact that she is a "nurse by training and education,"[44] Verkhovskaya explains that she has "more than 19 years of experience serving as an expert or administrator in various class action matters"[45] and that she has "acted as project director in dozens of class actions brought under the TCPA and other state statutes protecting telephone-related consumer privacy."[46] The President of her company, Class Experts Group, LLC, Verkhovskaya attests that she has "regularly served as an expert witness, providing opinions and testimony concerning ascertainability, class certification, notice adequacy, and settlement issues in TCPA cases,"[47] attaching a list of twenty-seven cases where she has offered testimony at deposition or trial in the last four years.[48]

Verkhovskaya opines in her *Report* that "[i]t is feasible and administratively possible to verify class members' names" and to "identify class members' current addresses and provide notice"[49] of a class action suit. Verkhovskaya describes the methodology that she used to arrive at that opinion as follows. The data underlying her *Report* is derived from seven of SGS's "Call Log Files."[50] After loading the relevant data from those files into SQL tables,[51] she queried those tables and filtered the data contained

---

[43] Rec. Doc. No. 126-2.
[44] Rec. Doc. No. 126-1, p. 2.
[45] Rec. Doc. No. 126-2, p. 1.
[46] *Id.* at p. 2.
[47] *Id.*
[48] See *Id.* at p. 53 (Exhibit B).
[49] Rec. Doc. No. 126-2, p. 25.
[50] *Id.* at p. 17.
[51] SQL stands for Structured Query Language, which Verkhovskaya explains is "a programming code used to analyze the contents of a relational database." *Id.* at p. 17, n. 1.
63828

therein to arrive at a list of telephone numbers that appear in the Honda Customer Files and were called by SGS during the relevant date range.

From there, Verkhovskaya filtered the list of telephone numbers into two groups: the "Wireless Class" and the "Left Message at Home Class."[52] The wireless nature of a given telephone number was verified using "data from the Interactive Marketing Solutions ("IMS")," and she avers that "experts in [her] field regularly rely upon the IMS files and find them to be reliable."[53] Verkhovskaya identified 59,089 unique wireless telephone numbers that received a total of 262,023 calls from SGS.[54] These 59,089 numbers comprise her "Wireless Class." Next, Verkhovskaya identified a total of 89,124 non-wireless telephone numbers for the "Left Message at Home Class" by filtering out numbers that were wireless or that were coded in SGS's call logs to indicate that a message was left at *work*, and by further filtering the group of non-wireless home numbers to be sure that the number was not associated with a business at the time of the call.[55]

The above-described process of sorting numbers from the call logs into wireless or home numbers is not, for the most part, called into question by SGS in its *Motion*. The *next* step in the process – the matching of numbers to names of would-be class members – is where SGS's objection to Verkhovskaya's methodology mostly lies. Verkhovskaya describes the process of putting names with numbers in her *Report* in a section entitled "Verification of Subscriber/User Names."[56] She begins by stating that she has repeatedly used her "historical append process" to "identif[y] subscribers/users of a particular

---
[52] Rec. Doc. No. 126-2, p. 19-20.
[53] *Id.* at p. 20.
[54] *Id.*
[55] *Id.* at p. 21.
[56] *Id.* at p. 22 *et seq.*

63828

telephone at a certain period of time."[57] First, she "uploads files containing the unique telephone numbers to LexisNexis."[58] Then, "output files from LexisNexis would identify the customary users of the phone numbers at the time of the calls, where available."[59] If Lexis does not return any data for a particular number, Verkhovskaya repeats the same process using the TransUnion database. Once she has in hand the user data provided by both databases, she "would perform an analysis" to identify those numbers for which the user data provided by Lexis and TransUnion did not match the "intended recipients" listed in the source data provided by SGS. Based on the above, she opines, "it is feasible and administratively possible to verify class members' names"[60] and addresses.

## IV. ANALYSIS

SGS raises a number of quibbles with Verkhovskaya that do not rise to the level of a *Daubert* issue – for example, it criticizes the vagueness of the bill that she submitted for preparing her *Report*,[61] and raises the alarm that Verkhovskaya is guilty of making "misrepresentations" to other courts, based on evidence that is, at best, semantic. Specifically, SGS alleges that Verkhovskaya lied to the Middle District of Florida by stating in an expert report submitted there that courts have "approved" her methodology, citing as an example, among others, the instant case. This Court concedes that the use of "approved" is potentially somewhat misleading, but also notes, as Carroll points out, that at the time Verkhovskaya submitted her report in Florida, her expert report in the instant case was already part of the record here, and had not yet been challenged by SGS. Thus,

---

[57] *Id.* at p. 23.
[58] *Id.*
[59] *Id.*
[60] *Id.* at p. 25.
[61] Rec. Doc. No. 126-1, p. 4.
63828

Carroll argues that her methodology was thus "implicitly accepted" such that her statement regarding its "approval" was not inappropriate. In the eyes of this Court, Verkhovskaya's less-than-ideal verb choice in an expert report in the Middle District of Florida is not reason to exclude her testimony here.

Nevertheless, the Court ultimately agrees with SGS that Verkhovskaya's methodology is insufficiently reliable and of limited utility. SGS argues that the LexisNexis database is wholly unreliable in the context Verkhovskaya uses it, citing the fact that, in a similar case, a LexisNexis representative stated exactly that. In *Hunter v. Time Warner Cable, Inc.,* a case in the Southern District of New York, a "reverse-lookup" methodology like Verkhovskaya's was offered as a means of ascertaining the class members in a putative class action under the TCPA. Time Warner obtained a declaration from a LexisNexis representative, who explained that the Lexis database "cannot be used to determine definitively the subscribers or customary users of a telephone number on a current or historical basis. Nor can [it] be used to identify when a telephone number was reassigned from one person to another, or when the customary user of a phone number changed."[62] Carroll brushes this aside as being merely a boilerplate corporate disclaimer, but it strikes the Court as germane, especially since Verkhovskaya has not yet demonstrated that the database can be used to reliably determine anyone except Taylor Carroll (more on that *infra*).

Carroll posits that *Hunter v. Time Warner* is factually distinguishable from this case in an important respect: it was a "wrong-number" case, where LexisNexis was used to

---

[62] *Hunter v. Time Warner Cable Inc.,* No. 15-CV-6445 (JPO), 2019 WL 3812063, at *11 (S.D.N.Y. Aug. 14, 2019)(some internal quotations omitted).

63828

identify the user of a particular phone number with no information available besides the phone number itself. Here, Carroll argues, the "class members are generally the intended recipients of SGS's pre-recorded calls,"[63] and their identities can be corroborated using the data from SGS's Call Logs and the Honda Customer Files, which include names, phone numbers, addresses, and vehicle and lease information. But if the identities of would-be class members can be ascertained solely based on SGS and Honda's records, Verkhovskaya's testimony is not necessary or helpful to the Court on the question of ascertainability.

Moreover, the Court has reservations about using Verkhovskaya's methodology to corroborate the SGS and Honda records, as Carroll suggests. The problem with doing so is illustrated by the case of Plaintiff and putative class representative Taylor Carroll. His name does not appear in the SGS or Honda records, because he was not the customer; it was his wife, Cindy, who leased a vehicle and provided her husband's phone number on the application. Only by running the telephone number provided on the lease application through LexisNexis could Verkhovskaya have identified Taylor Carroll as a potential plaintiff. Of course, Verkhovskaya *already knew* that Taylor Carroll was a potential plaintiff, since his name appears on the caption of the case for which she was retained. It is not clear how Verkhovskaya's methodology would fare in a situation where she did not already have reason to know who the correct "customary user" was, or when a number is associated with multiple users in the LexisNexis database.

---

[63] Rec. Doc. No. 142, p. 7.
63828

On that point, SGS challenges the methodology that Verkhovskaya uses when her historical append process produces multiple "associations," i.e. multiple individuals who may be the actual user of a given telephone number. Verkhovskaya testified about this situation at her deposition, explaining that when conflicting data is offered by LexisNexis, she makes an "expert decision on how to handle the conflict."[64] Specifically, she stated that when conflicting data arises, she uses a software program to perform name matching, and that, if that software produces only a *potential* match, "the work of our software ends, and . . .we start reviewing those records manually, and making. . .judgment calls based on our knowledge and expertise."[65]

SGS describes Verkhovskaya's "name matching software" as "mysterious" and "a guessing game."[66] The Court shares its skepticism. At her deposition, Verkhovskaya testified that the protocols for her name matching process are "described in a variety of [her] reports" in other cases, but were not elaborated upon in her report in this case because this is "not a wrong number case" where no corroborating data is available – in fact, she testified that this is "a very straightforward case from the data perspective. . .where the data is pristine. . .clean, and very easy to filter out and handle."[67] Again, this argument presents a paradox: if the data in the corporate records is so pristine, Verkhovskaya's methodology is not necessary to identify potential plaintiffs; but, without using her methodology, Plaintiff and putative class representative Taylor Carroll would never have been identified. Even if the "multiple associations" issue only arises for a small

---

[64] Rec. Doc. No. 126-4, p. 17.
[65] *Id*. at p. 36.
[66] Rec. Doc. No. 126-1, p. 16.
[67] Rec. Doc. No. 126-4, p. 33.
63828

subset of numbers, as Verkhovskaya suggests, that small subset should be where Verkhovskaya's method can shine and provide clarity. Instead, the "multiple associations" scenario is when her method is at its most opaque and unverifiable.

Assuming *arguendo* that Verkhovskaya's methodology is necessary to identify potential plaintiffs, the Court finds that an unspecified and unexplained software program, combined with making "judgment calls," is not the type of expert methodology that can be assessed for hallmarks of reliability or scientific rigor. While Verkhovskaya contends that her methodology has an error rate of plus or minus seven percent, it is true, as SGS contends, that "there is literally zero proof or data supporting Verkhovskaya's claims of the accuracy or failure rates"[68] of her process, because her report only proposes a methodology and does not actually perform the proposed work. In fact, SGS argues, the fact that the historical append process has been proposed but not performed is "improper as a matter of law."[69] For that proposition, SGS provides a partial quotation from a Third Circuit case where the court criticized an expert report on that basis. A closer examination of that case reveals that the Third Circuit did not consider the fact that work was only proposed as a reason to *exclude* the report; it instead found that work that was proposed but not performed was insufficient to satisfy the requirements of Rule 23.[70] Whether Rule 23 is satisfied is not the question before the court on this *Daubert* motion. Yet, if work that is proposed but not performed cannot satisfy Rule 23, Verkhovskaya's report will be of

---

[68] Rec. Doc. No. 126-1, p. 11.
[69] *Id.* at p. 5.
[70] *Carrera v. Bayer Corp.,* 727 F.3d 300, 311 (3d Cir. 2013) ("At this stage in the litigation, the district court will not actually see the model in action. Rather, it will just be told how the model will operate with the plaintiff's assurances it will be effective. Such assurances that a party "intends or plans to meet the requirements" are insufficient to satisfy Rule 23").
63828

Page 14 of 17

limited utility to the Court in assessing ascertainability, which is the predominant issue raised by SGS in opposing class certification.

It is true, as Carroll points out, that other courts who have considered Verkhovskaya's qualifications and methodology have been satisfied that she is qualified to offer expert testimony.[71] In a 2015 case, the Middle District of Florida found that she was "amply qualified, and [her] relevant experience, education, and training render [her] competent to offer expert testimony in TCPA cases . . . [she employs] generally reliable methodologies which entail, inter alia, performance of detailed statistical analysis and utilization of LexisNexis data that has been independently verified by Verkhovskaya's company . . ."[72] It is also true that courts have criticized her methodology. In *Wilson v. Badcock Home Furniture*, the Middle District of Florida questioned whether a putative class in a TCPA case was ascertainable using Verkhovskaya's methodology, noting that her method was "most glaringly" suspect because, without extrinsic information, it would not have identified the named plaintiff in that case.[73] Likewise, in *Sandoe v. Boston Scientific Corporation*, the District Court for the District of Massachusetts found that, having offered Verkhovskaya's methodology in support of class certification, the "plaintiff has failed to establish that the proposed classes are ascertainable."[74]

---

[71] *Krakauer v. Dish Network, L.L.C.,* No. 1:14-CV-333, 2015 WL 5227693 (M.D.N.C. Sept. 8, 2015); *Johnson v. Comodo Grp., Inc.,* 2020 WL 525898, at *9 (D.N.J. Jan. 31, 2020); *Reyes v. BCA Fin. Servs., Inc.,* No. 16-24077-CIV, 2018 WL 3145807, at *2 (S.D. Fla. June 26, 2018), reconsideration denied, No. 16-24077-CIV, 2018 WL 5004864 (S.D. Fla. Oct. 15, 2018).
[72] *Shamblin v. Obama for Am.,* No. 8:13-CV-2428-T-33TBM, 2015 WL 1909765, at *3 (M.D. Fla. Apr. 27, 2015).
[73] *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 457 (M.D. Fla. 2018).
[74] *Sandoe v. Bos. Sci. Corp.,* 333 F.R.D. 4, 9 (D. Mass. 2019).

63828

Based on the record before the Court, Verkhovskaya has not satisfied the requirements of Federal Rule of Evidence 702. Her testimony is based on facts and data from databases including LexisNexis, which may be generally reliable, but has been expressly designated by the creator of the database as unsuitable for Verkhovskaya's purposes. Whether Verkhovskaya's opinion is the result of reliable principles and methods is somewhat difficult to say, given that significant parts of her methodology are either not described at all or described simply as "judgment calls." At the end of the day, her report appears to suggest running routine searches in LexisNexis and then, somehow, deciding who among the results is a potential plaintiff. The fact that this "multiple associations" issue allegedly applies to a small set of data, and the fact that Verkhovskaya can use the SGS and Honda records to corroborate her results, does not change the fact that her proposed methodology is neither "expert" nor clearly reliable. Her opinion is offered to show that she can identify the "actual" person who was called by SGS, not just the person who SGS *intended* to call (as reflected by the telephone number in SGS's records), and Verkhovskaya has not adequately explained how that determination is made in a scientific and verifiable manner.

Verkhovskaya's opinion is also of questionable value to the trier of fact (for purposes of the *Motion to Certify Class*, the Court) given that one of the proposed class definitions does not require the use of her methodology, and that her ability to use her method to accurately identify would-be plaintiffs under the second definition has not been adequately demonstrated. The United States Supreme Court has stated that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

63828

evidence that is connected to existing data only by the *ipse dixit* of the expert."[75] In this case, Verkhovskaya's opinion that she can reliably determine potential class members using her methodology is not clearly supported by the data. Ultimately, this Court exercises its discretion as the gatekeeper of expert testimony to exclude Verkhovskaya's report. Accordingly, SGS's *Daubert Motion* shall be GRANTED.

## V.  CONCLUSION

For the reasons stated above, SGS's *Daubert Motion to Exclude Class Expert*[76] is hereby GRANTED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on November 30, 2020.

**JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**

---

[75] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).
[76] Rec. Doc. No. 126.
63828