# EXHIBIT 5

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4    JOSEPH MANTHA on behalf of himself

5    and others similarly situated,

6         Plaintiff,

7      vs.                    CASE NO. 1:19-cv-12235-LTS

8    QUOTEWIZARD.COM, LLC,

9         Defendant.

10   ------------------------------x

11

12

13

14              VIDEOTAPED DEPOSITION OF

15                 MATTHEW WEEKS

16                CONDUCTED VIRTUALLY

17             Friday, September 8, 2023

18                 11:11 a.m. EDT

19

20

21

22

23              Laurie K. Langer, RPR

24

Page 22

1  is on our business development side who does that.  And
2  then she's got a couple of people on her team that, I
3  believe, also do it.
4      Q.  But the websites at which these third-party lead
5  vendors generate leads are not QuoteWizard websites;
6  correct?
7      A.  For the third-party traffic that, that me and my
8  team are specifically by?  No, that does not come from
9  QuoteWizard's websites.
10     Q.  Okay.  And are you familiar with -- do you have
11  any responsibility for leads that come through
12  QuoteWizard's own websites?
13     A.  I do not.
14     Q.  Are you familiar with, with the term "inbound"
15  with respect to a lead?
16     A.  Yes.
17     Q.  And is inbound a reference to a lead that's
18  generated on a third-party lead vendor website?
19     A.  Yes.
20     Q.  And in interrogatories in this case I believe
21  you've identified that there are approximately 180 lead
22  vendors that QuoteWizard uses; is that correct?
23     A.  That number fluctuates.  We're not at 180 at this
24  present moment.  It's -- that number is not a static

Page 23

1  number.
2      Q.  What -- what are you at now?
3      A.  I would say that we are -- we're probably in the
4  neighborhood of 80 to 90 right now.
5      Q.  Okay.  And --
6          MR. POLANSKY:  And, Ted, I don't mean to
7  interrupt, but your computer screen is on our screen.
8          VIDEOGRAPHER:  Ted, I don't mean to
9  interrupt either, but I don't suppose you got my chat
10  message.
11         MR. BRODERICK:  Oh.  I wasn't looking.
12  Sorry.
13         VIDEOGRAPHER:  Okay.  I'll just reiterate,
14  if you wouldn't mind when you're finished, when you're
15  finished with a document, questioning on the document, I
16  would take it down or otherwise it just stays up there.
17         MR. BRODERICK:  Okay.  Got it.  Got it.
18         VIDEOGRAPHER:  Okay.
19         MR. POLANSKY:  Sorry, Ted.
20         MR. BRODERICK:  No, no.  Thank you.
21     Q.  But over the last four years was, was 180 an
22  average; or do you have a sense?
23     A.  An average over the last four years.  I'd
24  also -- I would want to look at the interrogatory of

Page 24

1  that particular answer, because if I'm remembering
2  correctly I believe that number was a total number of
3  vendors that we had worked with, it wasn't -- I think
4  that was for a certain period of time.
5      Q.  Okay.  Why don't we do that.
6      A.  That wasn't a number like an always, an always
7  number.  If I'm remembering correctly.
8      Q.  Let's see if I can pull up the right one.
9          Okay.  I have marked as Exhibit 2
10  Defendants -- can you see that screen?
11     A.  Yeah, I'm pulling it up right now.
12     Q.  Okay.  Great.
13         (Deposition Exhibit No. 2 marked for
14  identification.)
15     A.  Which number am I looking for?
16     Q.  I'm just identifying it for the record.  I'm
17  showing you what's been marked as Exhibit 2, Defendant's
18  Supplemental Responses to Plaintiff's Third Set of
19  Interrogatories.
20         And I believe it's asked --
21     A.  Okay.  I see it.  It's in -- it's in the
22  first -- it's in the two, number 2.
23     Q.  Number 2.  Okay.  Thank you.
24     A.  One, two, three, four, it's in the fifth

Page 25

1  paragraph down.
2      Q.  On the fifth page?
3      A.  Correct.  That's where I'm seeing it at least.
4      Q.  Right.  And it says, "in the putative class
5  period, QuoteWizard purchased leads from (approximately)
6  over 180 possible lead suppliers."
7          And this is -- these are interrogatories that you
8  signed, correctly -- correct?
9      A.  Let me -- yes.
10     Q.  And your answer goes on to say that QuoteWizard
11  purchased -- "these lead suppliers in turn necessarily
12  would have purchased -- would have either purchased
13  leads from or generated leads from thousands (if not
14  hundreds of thousands) of different lead websites that
15  necessarily have various different forms of consent
16  language that might be contested by counsel and would
17  require individualized inquiries into each consumer's
18  agreement to disclosure language."
19         And that's your answer; correct?
20     A.  Correct.
21         MR. POLANSKY:  Just for clarification.  I
22  think that's part of the objection.
23         MR. BRODERICK:  It says "answer."
24  Interrogatory 2, answer.

7 (Pages 22 - 25)

Page 26

1    A. Yeah. But there is, "moreover, QuoteWizard
2  objects insofar as" and then it goes on to say all of
3  that stuff.
4    Q. Okay. Well, do you agree with that statement by
5  your attorney and the objection, if we're going to
6  characterize that as an objection?
7    A. Yes.
8    Q. And QuoteWizard didn't look at the thousands or
9  hundreds of thousands of different lead websites that
10  QuoteWizard's leads came from, did it?
11    A. No.
12    Q. And you couldn't have done that; right?
13    A. No.
14    Q. You don't even know what those different websites
15  that provided leads to your lead brokers were?
16        MR. POLANSKY: Objection.
17    A. I don't know what the -- I don't know what the
18  websites are, or?
19    Q. You don't know what the sub -- this -- this seems
20  to me to be describing that QuoteWizard's lead vendors
21  in turn get leads from other websites; correct?
22    A. That would be correct. Our vendors have
23  partners.
24    Q. And your vendors -- vendors or sub vendors, you,

Page 27

1  QuoteWizard never reviewed those websites; correct?
2    A. QuoteWizard didn't. We leave that up to our
3  partners to vet their sources.
4    Q. Okay. And for a lead provided to QuoteWizard,
5  does QuoteWizard require that any lead come with prior
6  express written consent to receive a telephone
7  solicitation from QuoteWizard by name?
8        MR. POLANSKY: Objection.
9    A. We require our vendors to provide consent, yeah.
10    Q. And what consent do you require them to provide?
11    A. Via our --
12        MR. POLANSKY: Objection.
13        You can answer.
14    A. Well, via our contracts with them they have, I
15  mean, they have to provide -- they can't sell us a lead
16  that doesn't, that doesn't have consent.
17    Q. Right. But I want to know what, what that
18  consent has -- what is the -- so it has to have consent;
19  what does that mean?
20    A. It's usually, like, a check box, like an opt in
21  is what we call it. Like, where the consumer flicks a
22  box that says, "I opt in to essentially be contacted."
23    Q. And does the -- do the contracts require that it
24  has to be consent that says, "I consent to be contacted

Page 28

1  by QuoteWizard"?
2        MR. POLANSKY: Objection.
3    A. Honestly, I -- I don't know if that's what it
4  says in our contracts.
5    Q. And do you require that the consent provided to
6  QuoteWizard allows consumers the right to opt out of
7  receiving telephone solicitations on behalf of
8  QuoteWizard?
9    A. Absolutely. A consumer can opt out at anytime.
10    Q. But does the consent -- do you require that the
11  consent that you get, the website through which that was
12  created has, provides that to the consumer?
13        MR. POLANSKY: Objection.
14    A. I'm -- I'm not following the question.
15    Q. Well, the consent to receive telephone
16  solicitations, you have to give the person a right to
17  opt out of receiving those.
18        Is there any requirement in your contracts that
19  leads have to -- leads that are provided to you have to
20  have come from a site that says the consumer can opt
21  out?
22        MR. POLANSKY: Objection.
23    A. I -- I'm not sure if that's in our contracts or
24  not.

Page 29

1    Q. QuoteWizard -- well, you're not -- you're not
2  specifically familiar with what leads Drips was
3  providing to -- well, you said that you don't buy leads
4  from Drips. What did Drips do for QuoteWizard?
5    A. That's -- that's Tricia's area.
6    Q. Not your area. Okay.
7    A. I don't deal with Drips, yeah.
8    Q. Are you familiar with when QuoteWizard gets a
9  lead from one of your lead vendors, what does
10  QuoteWizard then do with that lead?
11        MR. POLANSKY: Objection. At what point in
12  time? As part of the ping post? Once they've posted?
13        MR. BRODERICK: After it's posted, accepted,
14  purchased by QuoteWizard.
15        MR. POLANSKY: Okay.
16    Q. What does QuoteWizard then do with that lead, if
17  anything?
18    A. We pass that on to the insurance carrier that we
19  purchased it for. And depending on the lead it might go
20  to our own, our own call center.
21    Q. QuoteWizard has its own call center?
22    A. Correct.
23    Q. Do you know where that call center is located?
24    A. I do not. I -- that would be Tricia's over --

8 (Pages 26 - 29)

Page 66

1 is speaking on that.
2    Q.  I want to show you a different set of
3 interrogatory answers.  I've marked as Exhibit 9
4 Defendant's Supplemental Answers to Interrogatories
5 which are dated June 15th.  Although your verification
6 was signed on June 21st.
7    A.  It is loading currently for me.  Okay.  I can see
8 it.
9    Q.  I grabbed the wrong one again.  Hold on.
10    A.  So don't look at that?
11    Q.  Don't look at that.  Don't bother.
12    A.  Okay.
13    Q.  Let me just ask you, QuoteWizard, the purpose
14 when you were buying leads was to buy consumer leads;
15 correct?
16    A.  The -- yeah, the purpose is to buy leads of
17 consumers who are looking for insurance.
18    Q.  So you weren't looking to buy leads relating to
19 businesses; correct?
20    A.  To businesses, no.  We -- individual consumers.
21    Q.  Okay.  So if a -- if a lead had a business in it
22 that was an accident; correct?
23    A.  If a lead had a business in it?  What do you mean
24 by that?

Page 67

1    Q.  If a lead was, was for a business as opposed to
2 an individual consumer.
3    A.  Like, there was, like, for the first name or the
4 last name in the lead it was a business name?
5    Q.  Correct.
6    A.  Yeah, that would not have been intentional.
7    Q.  And that -- would that be a reason -- you talked
8 earlier about reasons that companies, let's say
9 insurance companies or agents to whom you've sold the
10 leads could return a lead, would the fact that it was a
11 business be one of those reasons?
12    A.  I -- I can't -- I don't want to speculate.  I
13 mean, I -- like I said, I don't -- I don't handle
14 returns or, or deal with returns in that manner.
15    Q.  But that's not what you intended to sell to
16 insurance companies, that wasn't QuoteWizard's business;
17 correct?
18    A.  Correct.
19    Q.  Does QuoteWizard require its lead
20 vendors -- strike that.
21      Are you familiar with the E-Sign Act?
22    A.  I am not.
23    Q.  So does QuoteWizard then require your lead
24 vendors to obtain consent that is compliant with the

Page 68

1 E-Sign Act?
2      MR. POLANSKY:  Objection.
3    Q.  Or do you know?
4    A.  Like I said, I don't know what the E-Sign Act is,
5 so.
6    Q.  But you are -- you are the person at QuoteWizard
7 responsible for third-party lead vendors; correct?
8    A.  For managing the relationships, yes.
9    Q.  And you set out the requirements for what
10 third-party lead vendors have to have in their leads in
11 order to sell them to QuoteWizard?
12      MR. POLANSKY:  Objection.
13    A.  That is not my role.
14    Q.  Whose role is that?
15    A.  Legal, probably.  And in conjunction with our
16 tech team to implement it.
17    Q.  Okay.  But it's fair to say that you're not aware
18 of any such requirement for leads sold to QuoteWizard?
19      MR. POLANSKY:  Objection.
20    Q.  That it comply with the E-Sign Act?
21    A.  Like I said, I don't know what the E-Sign Act is,
22 so I can't say either way.
23    Q.  Okay.  Does QuoteWizard have a written TCPA
24 policy?

Page 69

1      MR. POLANSKY:  This is for Tricia.
2      MR. BRODERICK:  Okay.
3      MR. POLANSKY:  You can answer, if you know.
4    Q.  Yeah, if you know.
5    A.  I don't -- I don't know if we have a written TCPA
6 policy.
7    Q.  And to your knowledge does QuoteWizard require
8 lead vendors to have on their website a mechanism for
9 which consumers can opt out of receiving telemarketing
10 messages?
11    A.  I do not know.
12    Q.  Okay.  I don't think I have any further
13 questions.  Thank you, Mr. Weeks.
14      MR. POLANSKY:  I have just a couple quick
15 follow ups and then we'll get you going.
16
17
18            EXAMINATION
19
20 BY MR. POLANSKY:
21    Q.  You were asked earlier about prior express
22 written consent, and you said you hadn't heard that
23 terminology before; is that right?
24    A.  Correct.

18 (Pages 66 - 69)