# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH MANTHA, *on behalf of himself and all others similarly situated*, | |
| Plaintiff, | Civil Action No. 1:19-cv-12235-LTS |
| v. | |
| QUOTEWIZARD.COM, LLC, | |
| Defendant. | |

## DEFENDANT QUOTEWIZARD.COM, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## I.    INTRODUCTION

Plaintiff's Motion for Class Certification should be denied and no class should be certified because he has failed to carry his burden to show, with evidence, that the implicit and explicit requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure are met and because, in any event, this case is simply not suitable for class treatment. Plaintiff fails to satisfy the implicit requirements for class certification both because he proposes no feasible means of applying objective criteria to ascertain class membership and because the proposed class definition would create an impermissible "fail-safe" class.

Plaintiff fails to satisfy Rule 23's explicit requirements because he is neither an adequate class representative, nor is he typical of the class he seeks to represent. Plaintiff is not even a member of his own class, as he does not meet his own proposed criteria for class membership. His unique circumstances also render him inadequate and atypical, as does the fact that he is both subject to defenses the rest of the class is not (*e.g.*, statutory standing), and immune from defenses

the rest of the class must face (*e.g.*, consent and Article III standing).  Most fundamentally, Plaintiff's class certification bid must fail because he offers no "common proof" to "common questions apt to drive resolution of the litigation," and that failure precludes not just a finding of commonality, but also of predominance and superiority.  He points to no common proof from which the Court could conclude either (i) that any class member's telephone number is "residential" or (ii) that QuoteWizard lacked adequate consent to contact any particular class member.  (For its part, QuoteWizard has produced at least one record – and often more than one record – of consent for 99.75% of the proposed class.). To accord QuoteWizard its due process right to defend itself, therefore, requires extensive, fact intensive and individualized inquiries into each class member's telephone number and the consent they provided – precisely the sort of inquiries that are anathema to class action litigation.  These individualized inquiries would dominate any trial and their necessity precludes a finding that a class action is a superior method of adjudicating absent class members' claims, to the extent they have any.

## II.    RELEVANT BACKGROUND

### A.    QuoteWizard Only Contacts Consumers for Whom It Has Documented Evidence Of Prior Express Written TCPA Consent, Often In Multiple Forms.

QuoteWizard is an insurance comparison platform that aims to connect customers with insurance carriers to identify the rates and coverages that align with customers' needs. QuoteWizard therefore attempts only to contact individual consumers who have expressed interest in hearing more about insurance products and who have expressly consented to being contacted for that purpose.  QuoteWizard does not "cold-call" consumers in an effort to market any products. *See* Exhibit 1 - *Affidavit of Matthew Weeks* ("Weeks Aff.").  Rather, QuoteWizard acquires Leads—collections of data including contact and other information for individual prospective customers who express interest in QuoteWizard's services—when customers request insurance

2

information.  *Id.*  Sometimes customers request information from QuoteWizard by entering their contact information and providing their consent to be contacted through one of QuoteWizard's forms.  *See* Affidavit of Kevin P. Polansky ("Polansky Aff."); Exhibit 2 – *Transcript of Sept. 8, 2023 Deposition of Patricia Winkler* ("Winkler Depo.") at 19:18-24 – 20:1-3.  When a customer requests information from QuoteWizard, they are first required to authorize QuoteWizard to contact to them.  *See* Weeks Aff.  QuoteWizard obtains TCPA-compliant express written consent from customers who ask QuoteWizard for insurance quotes or options.  *Id.*

Sometimes, rather than submit requests to QuoteWizard directly, customers request insurance options from third-parties ("Lead Vendors").  *See* Polansky Aff.; Exhibit 3 – *Transcript of Sept. 8, 2023 Deposition of Matthew Weeks* ("Weeks Depo.") at 22:14-19 (discussing "inbound" leads).  QuoteWizard also purchases Leads from its Lead Vendors and contacts those Leads directly.  QuoteWizard requires that its contracts with Lead Vendors contain provisions whereby Lead Vendors covenant only to procure Leads obtained in compliance with the TCPA.  *Id.* at 72:7-9.  Prior to contracting with any Lead Vendor, QuoteWizard reviews prospective Lead Vendors' websites to determine whether QuoteWizard condones the manner in which those Lead Vendors generate leads and whether those websites employ means of obtaining consent that comply with the TCPA.  *See id.* at 21:8-10; 35:7-15.  QuoteWizard engages in these individualized reviews because every Lead Vendor's website is different, the manner in which they obtain consent may differ, and the precise consent language they use often differs as well.

QuoteWizard requires its Lead Vendors to provide Jornaya LeadiDs or ActiveProspect Trusted Form Certificates proving consent for *every* Lead as a condition to QuoteWizard's purchase.  *Id.* at 43:24 – 44:1-16.  Jornaya is a company that provides third-party lead verification services to help verify TCPA consent.  *See* ECF 268 at 20-21.  In other words, QuoteWizard does

not simply take its Lead Vendors at their word; rather, QuoteWizard requires additional third-party verification for every Lead.  *See* Weeks Depo. at 42:13-24 – 43:1-2.  In addition to providing the required Jornaya LeadiD, Lead Vendors may also send QuoteWizard other, additional evidence of consumer consent in satisfaction of their contractual obligations.  *Id.*

Moreover, a Lead Vendor that sells a Lead to QuoteWizard may not have originated that particular Lead, *id.* at 25:10-20, as originating Lead Vendors may sell Leads to other third parties, which later sell the Leads to QuoteWizard.  *Id.*  Accordingly, the particular path of a particular Lead varies from consumer to consumer.  In all such cases, QuoteWizard obtains a contractual promise that each Lead it purchases has consented to be contacted under the TCPA and retains individual records of that consent for each consumer associated with a Lead.  *Id.* at 72:7-9.

QuoteWizard maintains, and has produced in this case, many different forms of consent verification, including the following:

1. **Screen Captures from the Originating Third-Party Site.**  The contractual consent language on each website from which each Lead originated.  Each website displays different consent language and express opt-in legal provisions authorizing contact to the consumer.  In this case alone, QuoteWizard produced in discovery 677 distinct examples of website screen images from which Leads were captured and the specific language to which consumers using those websites agreed.  *See* Exhibit 4 - *September 22, 2023 Expert Report of Jan Kostyun* ("Kostyun Report") ¶¶ 152-155 (including specific examples).

2. **Onsite Page Details Data.**  These are data records from third-party websites.  Those data records include the IP address of the device from which the customer accessed the third-party site, the personal and contact information that the consumer entered into the site, the timestamp for the consumer's visit, the third-party operating the site, and "page details" data on the interactions between the website visitor (the consumer) and the website.  The "page details" data provide the specific consent language to which the consumer agreed when the consumer submitted his personal data to the third-party.  QuoteWizard produced in discovery 274 different files, with each of those 274 files containing page details data pertaining to a different third-party lead vendor.  Kostyun Report ¶¶ 156-159 (including specific examples).

3. **Jornaya Compliance Reports and Visual Playbacks.**  Jornaya (now known as Verisk Marketing Solutions) provides the TCPA Guardian Service, which companies can integrate into their websites, and which allows a website operator to track website/visitor interactions.  The TCPA Guardian Service monitors a visitor's conduct on the site.  It

creates summaries of the interactions (a "Jornaya Compliance Report") in which a consumer provided personal contact information and gave consent to future contact. Jornaya Compliance Reports also display the TCPA disclosure and contact consent language, which Jornaya verifies as having been displayed to the consumer when the consumer submitted his or her personal and contact information. Jornaya Compliance Reports also include "Visual Playbacks," which are video recordings of the specific moments during which a consumer interacted with the website.[1]   Jornaya assigns a "Jornaya LeadiD" (also known as a "Universal Lead ID") for each interaction between a website and a customer ascribing to TCPA disclosure and contact consent language.

Website operators do not pay Jornaya for the service. Instead, the operator integrates Jornaya's Compliance service into the website.  Jornaya then sells Compliance Reports and Visual Playbacks to interested parties. Kostyun Report ¶¶ 160-174; *see also* Exhibit 5 - *November 24, 2023 Expert Rebuttal Report of Jan Kostyun* ("Kostyun Rebuttal") ¶¶ 102-118 (including specific examples for individuals on the "Class List" at ¶¶ 104-118).

Jornaya Compliance Reports are expensive, however, costing approximately $200 per report. During discovery, QuoteWizard purchased a subset of 75 Jornaya Compliance Reports for a total cost of $15,000. Weeks Aff.  Additional Jornaya reports are available (at substantial cost) for 60,560 members of the proposed class. *See* Exhibit 6 – Affidavit of Jan Kostyun ("Kostyun Aff.").

4.  **Inbound XML Files.**  Third-party website operators also independently capture similar data to the TCPA Guardian Service, and tag that data with the same Universal Lead IDs as those used in Jornaya Compliance Reports.  This data was provided for each of the leads those vendors provided and organized in "XML" data format, which stands for "Extensible Markup Language."  The XML Files display the third-party Lead source, the Compliance Report IP address, the date and time Jornaya recorded for when the consumer consented, the Universal Lead ID for the consumer, and the contact information the consumer provided, including phone number, first/last name, address, and email address.  Kostyun Report ¶¶ 175-181; Kostyun Rebuttal ¶¶ 56-60, 85-101, 108, and "Exhibit E" (pp. 72-76) (providing specific examples for numbers on the "Class List").

QuoteWizard produced 169 Inbound XML Files for the proposed class, which track website visitor behavior across most websites proposed class members visited. *Id.* ¶ 152.

5.  **Audio Recordings**.  QuoteWizard also produced call recordings confirming consumer consent. Kostyun Report ¶¶ 182-185 (citing specific examples of numbers associated with produced call recordings confirming consent).

6.  **Active Prospect Trusted Form Certificates.**  Active Prospect is a lead verification service.  Its Trusted Form Service creates Trusted Form Certificates. The Trusted Form Service, like Jornaya's service, is integrated into websites. These Certificates verify lead data a visitor entered on the website, and identify the website and software/device the consumer used to access the website, including the consumer's IP address.  Trusted Form Certificates also provide screen capture re-plays—akin to Jornaya's Visual Playbacks—

---

[1] *See* Verisk Marketing Solutions' Compliance Reports and Visual Playbacks at
https://marketing.verisk.com/docs/compliance-reports-visual-playbacks  (last visited 9/29/2023)

which display videos re-playing the consumer's entry of their data into the website. Trusted Form Certificates also capture the TCPA consent language displayed to the website user. Kostyun Report ¶¶ 186-200; Kostyun Rebuttal ¶¶ 103-118 (providing specific examples of such consent forms for numbers on the "Class List").  Active Prospect Trust Form Certificates are available for 12,579 members of the proposed class.  Kostyun Aff.

In short, QuoteWizard only contacts consumers for whom it has documented consent, and it maintains multiple forms of documentation confirming this consent, which it has produced in this case.  *See* Weeks Depo. at 70:1-10; *see also* Winkler Depo at 15:22-23.

### B.    The Unusual Circumstances of Mr. Mantha.

As it does for all of its Leads, QuoteWizard obtained records of express consent for Mr. Mantha (the "Mantha Lead") before it contacted him.  QuoteWizard purchased the Mantha Lead from RevPoint Media LLC ("RevPoint"), which, in turn had purchased the lead from Plural Marketing Group ("Plural"). ECF 258 at 3.  Plural had purchased the Lead from a Bosnian entity, Fenix Media Solutions ("Fenix"), who purported to operate www.snappyautoinsurance.com (the "Snappy Website"), the source of the Mantha Lead.  ECF 268 at 20.  *Id.*; *see* ECF No. 225 ¶ 50 and QuoteWizard's response.  Every Lead that QuoteWizard purchased from RevPoint included a contractual promise that the individual consumer associated with the Lead was interested in insurance products and had given TCPA-compliant consent to be contacted, and similar contractual guarantees were also given by Fenix and Plural.  ECF 258 at 3.

Mr. Mantha's telephone number is listed on the National Do Not Call Registry ("NDNCR").  Records produced in discovery, however, indicate that another individual registered the number in 2008, when Mantha was ***not*** the subscriber to that number.  Kostyun Report ¶ 131. Based on the indicia of express written consent associated with the Mantha Lead, QuoteWizard contacted Mr. Mantha by text on August 9, 2019, and several times thereafter. ECF 258 at 4.  Mr. Mantha ultimately responded and requested to set a call with QuoteWizard.  *Id.*  At no time during this exchange did Mr. Mantha ask QuoteWizard to stop contacting him.  *Id.*  Shortly after receiving

the texts, Mr. Mantha began working with an attorney and ultimately filed a class action complaint alleging that QuoteWizard had sent him telemarketing texts without his consent. *Id.* at 6.

In discovery, Mr. Mantha testified he had never visited the Snappy Website and or given his express written consent to be contacted, notwithstanding QuoteWizard's records indicating otherwise. *See* ECF No. 268 at 21. These consent records included information from RevPoint, two IP addresses documented in the consent file for Plaintiff, and a Jornaya LeadiD number indicating Mr. Mantha gave express consent to be contacted by QuoteWizard. *Id.* at 20-21. However, third party discovery revealed unusual circumstances with the Mantha Lead. For one, third-party testimony indicated the Snappy Website had been pirated and was no longer being operated by its original owner when it generated the Mantha Lead. *See* ECF No. 258 at 4. For another, Plural testified that, through its own error, Mantha's LeadiD was incorrectly associated with him. *Id.* at 5. Finally, the recorded IP addresses indicating Mantha's consent were apparently associated with two other individuals with whom he had no connection. *Id.*

Mr. Mantha is the only individual in the proposed class whose Lead (i) originated on the Snappy Website and (ii) was later sold by Plural to RevPoint. *See* Weeks Aff. From class discovery, it appears that all other putative class members' Leads originated from other sources. *Id*. Apart from Mr. Mantha, QuoteWizard is aware of no other circumstances in which: (1) one of the other Leads it obtained originated from a "pirated website"; (2) the recorded IP addresses in its files linked to a particular Lead are not, in fact, associated with the corresponding lead; or (3) Plural incorrectly associated a LeadiD with a consumer through its own error. *Id.*

### C.    The Class Certification Motion and Mantha's Proposed Class.

Mantha filed the Motion on January 12, 2024. ECF 340. Through his Motion, he seeks to certify a class defined as:

> All persons within the United States (a) whose residential telephone numbers were listed on the National Do Not Call Registry, and (b) who received more than one telemarketing text within any twelve-month period at any time from Drips, (c) to promote the sale of QuoteWizard's goods or services, and (d) whose numbers are included on the Class List.  Motion at 8.

The "Class List" referred to in the class definition is the work product of Plaintiff's proposed expert, Anya Verkhovskaya, who submitted several reports with several iterations of the "Class List" during and after expert discovery in this case concluded.[2]  Verkhovskaya's Report outlines her methodology for generating her original "Class List."  That list did not include Plaintiff's telephone number on it.  *See* Polansky Aff.; Exhibit  - *Transcript of Dec. 15, 2023 Deposition of Anya Verkhovskaya* ("Verkhovskaya Depo.") at 131:8-20; *see also* Exhibit 8 – *Nov. 22, 2023 Expert Rebuttal Report of Anya Verkhovskaya* ("Verkhovskaya Rebuttal") at 33, n.23.  Verkhovskaya amended this list in her "Rebuttal Report" to "manually add" Mantha's telephone number to her modified class list, something she only mentioned in a footnote.  Verkhovskaya Rebuttal at 33, n.23.  After the close of expert discovery, on December 8, 2023, Verkhovskaya submitted yet another report titled "Amended and Corrected Supplemental Report' in which she further altered the class list and conceded there were additional "corrections" to her prior reports and "Class List" resulting from "human error" by her and her team.  *Id.* ¶ 2.

QuoteWizard retained two experts who offered rebuttals to Verkhovskaya's opinions.  Defendant's first expert, Harold Furchtgott-Roth, the former Commissioner of the Federal Communications Commission ("FCC"), which has regulatory authority to enforce the TCPA, explained that the TCPA provisions at issue here were drafted in a time where "residential" numbers referred to landlines that were easily identified based on the way in which the line was

---

[2] QuoteWizard's Motion to Strike Verkhovskaya's "Amended and Corrected Supplemental Report," addresses the untimeliness and impropriety of Report and of the final "Class List" attached thereto.

registered, but that such determinations have become more complicated with the advent of cell phones.  *See* Exhibit 9 – *Sept. 22, 2023 Expert Report of Harold Furchtgott-Roth* ("Roth Report") ¶¶ 18-24.  He also explained that the "FCC has taken the position that determination of whether a phone number is a residential number is a fact-intensive inquiry," *id.* ¶¶ 28-29, which is consistent with the Court's analysis on this issue, and that the FCC does not presume that all wireless numbers registered on the NDNCR are "residential" in enforcement actions, instead requiring in such cases that "the status of a line should be verified."  *See* Exhibit 10 – *Nov. 24, 2023 Expert Rebuttal Report of Harold Furchtgott-Roth* ¶ 24.

QuoteWizard's second expert, Jan Kostyun, identified flaws in Verkhovskaya's proposed methodology and ultimately concluded that over 93% of the individuals on her "Class List" demonstrably were not appropriate class members for one or more reasons.  Kostyun Rebuttal ¶ 81.  He supported his opinions with specific examples of individuals on Verkhovskaya's class list for whom she (1) had no available text content on which to base her determinations that the individual had requested that the telemarketing cease; (2) had misidentified indications of interest in further communications as requests that telemarketing cease; and (3) had misidentified "business" numbers as "residential" even under her own stated methodology.[3]  Mr. Kostyun also criticized Verkhovskaya's proposed methodology generally on the grounds that she (1) endorsed a methodology that failed to identify Mantha as a class member and actively excluded him from possible class membership; and (2) used PacificEast data to ostensibly identify whether numbers are "residential" or "business" numbers, even though PacificEast offered testimony expressly contradicting that statement.  Kostyun Rebuttal ¶¶ 128-141, 64-81.

---

[3] Kostyun Rebuttal ¶ 16 ("[O]ver 30,000 of those class numbers – 42% of her entire class… DO NOT specify the text of the purported DNC directive…"), ¶¶ 36-47 (specific examples of text messages she misidentified as requests that they stop), ¶¶ 64-81 (examples of "business" numbers from Class List).

Testimony in this case, including Verkhovskaya's own deposition testimony, supports these (and other) criticisms:

- Verkhovskaya concedes Plaintiff was not on her initial Class List and only appeared on her later lists because she "manually added" him. She concedes he does not meet the criteria she used to identify anyone else in the class. Verkhovskaya Depo. at 68:4-14; 126:5-127:8.

- The vendor Verkhovskaya pulled data from to identify "residential" telephone numbers (PacificEast) testified that its services are not intended to and cannot reliably be used to differentiate between "business" and "residential" numbers. *See* Exhibit 11 – *December 27, 2023 Declaration of Scott Rice* ("Rice Decl.") ¶¶ 13-14.

- Verkhovskaya conceded that many people on her list actually responded to QuoteWizard with expressions of interest in future communications, not requests that the communications stop (even though her methodology was supposed to exclude interested customers). Verkhovskaya Depo. at 36:13-37:4; 40:22-41:42:4. Texts that Verkhovskaya falsely identified as "requests that the telemarketing cease" included the following consumer text responses actually indicating interest:

  o "Can we continue texting because I can't talk right now"
  o "Well hopefully 10 or 11am tomorrow we'll be ok with you. I'm really hoping to find some better AUTO + HOME INSURANCE SOON. SORRY ABOUT TODAY!."
  o "I'm sorry. I'm at work right now and want to check my current policy for comparison. I should be available after 5pm."
  o "Hey Amanda… I'll let you know a good day and time as soon as possible."
  o "Can u call me in the am 813 240 [****]…."[4]

- Moreover, although Verkhovskaya initially testified that these issues were corrected in her final "Amended and Corrected Supplemental Report," when confronted with counterexamples at deposition, Verkhovskaya conceded that these errors persist even in her latest version of the "Class List." *Id.* at 42:14-20; 43:4-14; 44:18-47:7. Indeed, each of the five examples quoted above are associated with numbers that are ***still*** on Verkhovskaya's final, amended and corrected, supplemental "Class List."

- Verkhovskaya also conceded that her "entire methodology does not account for the possibility that a consumer was happily texting with QuoteWizard, they got the quote that they wanted, and then they asked that the texts stop," and she conceded many such people may be on her class list. *Id.* 34:1-10; 64:10-65:10. Her methodology lacks any mechanism to identify these individuals, or to even ensure that texts received occurred ***after*** (not before) they asked that the texts cease. In other words, her methodology includes people who were happy customers who never received an unwanted text from QuoteWizard.

Notwithstanding these flaws, Plaintiff's Motion proposes to use Verkhovskaya's "Class List" and endorses her methodology in this case. The main thrust of the Motion is that this case is just like

---

[4] Kostyun Rebuttal ¶¶ 36-47 (quoting additional language used by class members confirming interest).

another case in which Mantha's counsel were counsel and in which Verkhovskaya was plaintiff's expert, *Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019). Essentially, Plaintiff argues that this case is just like *Krakauer* and so this Court should certify a class and bless Verkhovskaya's methodology. However, several facts and circumstances distinguish this case from *Krakauer*:

- In *Krakauer*, Dish was not attempting to reach someone for whom they had documented consent – rather, the calls were part of a telemarketing campaign aimed at **non-customers** to convince them to switch satellite TV providers from a competitor. *See id.* at 650; *see also Krakauer v. Dish Network*, 311 F.R.D. 384, 389 (M.D.N.C. 2015). Here, QuoteWizard does not place "cold calls" and it had records of consent for nearly every class member.

- Unlike Mantha, the plaintiff in *Krakauer did* request that the calls cease, but Dish continued to call him anyway, stating it was "not able to do anything" to stop the calls. *Krakauer*, 311 F.R.D. at 389.

- It was undisputed that the plaintiff had registered his **own** telephone number on the NDNCR. *Id.* at 392 ("Dr. Krakauer registered his number twice…"). Here, the evidence indicates that Mr. Mantha did not register his own number, someone else did.

- At class certification, Dish conceded that numerosity, commonality, and adequacy were met, and did not meaningfully contest typicality, instead challenging only ascertainability and predominance.[5] Here, QuoteWizard contests commonality, typicality, and adequacy, in addition to ascertainability and predominance.

- Dish did not dispute that the named plaintiff was a member of the NDNCR class he sought to represent. *Id.* at 389 ("As to the NDNC class, Dish also does not dispute that Dr. Krakauer is a member of the putative class."). Here, QuoteWizard disputes that Mantha is a member of the class he seeks to represent, and his own expert concedes that he does not meet her methodological criteria.

- Dish did not present any evidence of class member consent at class certification apart from "only a handful of examples supported by unsworn statements in a brief." *Id.* at 399. Here, QuoteWizard has produced consent records for over 99% of class members and cited specific examples of misidentified "Class Members" on the class list. *See* Kostyun Aff.

- While Verkhovskaya was not excluded as the expert in *Krakauer*, several critical concessions by Dish (concessions QuoteWizard does not make here) supported that ruling – the court observed that "Dish does not challenge Ms. Verkhovskaya's qualifications as an expert or the qualifications of her team; nor does Dish seriously dispute that the data vendors she and A.B. Data used are commonly used, reliable, and accurate; nor does Dish contend that Ms. Verhovskaya's method of culling non-actionable calls from the more than

---

[5] *Id.* at 400 ( "It is undisputed that Dr. Krakauer's proposed classes satisfy the numerosity, commonality and adequacy of representation requirements…"); *id.* at 388 ("Dish has not challenged that there are common questions of law and fact as to either class, nor had Dish challenged Dr. Krakauer's ability to fairly and adequately protect the interests of the class.").

1.6 million calls in SSN's records is unreliable." *Krakauer v. Dish Network*, No. 1:14-cv-333, 2015 WL 5227693, *6 (M.D.N.C. Sept. 8, 2015) (Memorandum Opinion and Order on *Daubert* Motion).  Here, QuoteWizard strenuously objects to Verkhovskaya's use of third-party data (objections supported by specific examples from the "Class" and testimony from the vendor sourcing that data), and it disputes that her methodology is reliable.

- Finally, at the time class certification in *Krakauer* was decided in 2015, many subsequent decisions questioning and/or excluding Verkhovskaya's expert opinions proposing similar methodologies had not yet been written, including the following: *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 457 (M.D. Fla. 2018); *Sandoe v. Bos. Sci. Corp.*, 333 F.R.D. 4, 8 (D. Mass. 2019); *Carroll v. SGS Auto. Serv's, Inc.*, No. 16-537-SDD-RLB, 2020 WL 7024477 (M.D. La. Nov. 30, 2020); *Sapan v. Yelp*, No. 3:17-cv-03240-JD, 2021 WL 5302908 (N.D. Cal. Nov. 15, 2021); and *Davis v. Capital One*, No. 1:22-cv-00903 (AJT/IDD), 2023 WL 6964051, (E.D. Va. Oct. 20, 2023).

In all of these subsequent TCPA class actions (discussed more fully in the *Daubert* motion), Verkhovskaya was the plaintiff's proposed expert and in every case the court denied class certification after criticizing her proposed methodology. In short, not only are there significant factual and legal differences between this case and *Krakauer*, but Verkhovskaya's proposed methodology has not aged well for reasons discussed here and in the *Daubert* Motion.

## III.    LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (internal citations omitted).  "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." *Id.*  "The Rule does not set forth a mere pleading standard.  Rather, a party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Id.*  "The party must also satisfy ***through evidentiary proof*** at least one of the provisions of Rule 23(b)." *Id.* (emphasis added).  In this Circuit, the named Plaintiff must also meet the implicit "threshold Rule 23 requirement of 'ascertainability,'" which inquires whether a class "exists" — in other words, it must be

"administratively feasible for the court to determine whether a particular individual is a member"
of the class. *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 9 (D. Mass. 2010).[6]

## IV.    ARGUMENT

### A.    Plaintiff's Proposed Class Fails to Satisfy Implicit Prerequisites for Certification of Any Class.

#### 1.    The Proposed Class is Not Ascertainable.

Plaintiff's Motion stumbles out of the gate because the proposed class is not ascertainable.

Plaintiff has the burden of proving that the Court can determine the composition of the proposed

class based on objective criteria and without conducting mini-trials or individualized fact-finding.

*In re Nexium*, 777 F.3d 9, 19 (1st Cir. 2015); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir.

2015) ("The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is

"defined with reference to objective criteria"; and (2) there is "a reliable and administratively

feasible mechanism for determining whether putative class members fall within the class

definition.").  Mr. Mantha's proposed class is not ascertainable because Plaintiff embeds a legal

determination – whether a particular telephone number is "residential" – into his proposed class

definition, a determination that this Court has held, in this case, requires a fact-intensive, multi-

factor analysis.  *See* ECF No. 268 [Order on Report & Recommendation] at 9–12, 11 n.8, 12 n.10;

*see also Shanley v. Cadle*, 277 F.R.D. 63, 67 (D. Mass. 2011) (denying certification in part because

"in order for the Court to ascertain whether an individual was a member of the class it would

require the determination of additional facts particular to each putative member.").  Under the

---

[6] Plaintiff cites several cases in a footnote in his "Summary of Argument," but none involve disputes over the "residential" status of phone numbers, a key issue here, and all but one were cases where consent was not a disputed issue either.  *See Ira Holtzman, CPA v. Turza*, 728 F.3d 682 (7th Cir. 2013) (junk fax case; lack of consent not at issue or contested); *Sparkle Hill v. Interstate Mat. Corp.*, Civ No. 11-10271, 2012 WL 6589258 (same); *Vance v. Direct TV*, 2022 WL 3044653 (N.D. W.Va. 2022) ("cold-calling" case; lack of consent not contested); *Clough v. Revenue Frontier*, No. 17-cv-411, 2019 WL 2527300, (D.N.H. 2019) (same).

standard this Court endorsed, class member identification requires individual inquiries into whether: (1) the individual's phone number "is subscribed in the individual's name at their residence," (2) "the phone number at issue is the primary means of reaching the individual at their residence," (3) the absent class member held "out their phone number to the public for work or business," and (4) they used the number for "such extensive business use that [the use] . . . eviscerates the phone number of its residential qualities."  ECF No. 268 at 9–12, 11 n.8, 12 n.10.

Plaintiff attempts to plug this gap with Verkhovskaya's Report, but that will not do for several reasons.  First, Ms. Verkhovskaya's proposed methodology for identifying "residential" telephone numbers ignores the standard that the Court applied at summary judgment discussed *supra*.  Verkhovskaya would only address the third factor—whether a class member held out the number for work or business—and her only means of accomplishing this is by using PacificEast, a third party vendor that expressly rejects the use of its services for this purpose and claims to lack the capacity to provide the kind of historical information that Verkhovskaya purports to rely on for her methodology.  Rice Decl. ¶ 14 ("[B]ecause there is no accepted definition of what constitutes a 'business' number as opposed to a 'residential' number, that is a question that cannot be authoritatively answered, nor is PacificEast's business lookup service intended to provide an authoritative answer to that question.").  *Id.* ¶ 13 ("PacificEast (through its vendor) can only determine whether there is some association between a particular number and a business or consumer account, *as of the date of the search*.  Historical information about the identification of a telephone number as a "business" or "residential" number is not available from any source that I know, and it is not a service that PacificEast provides.") (emphasis in original).

Second, the records Ms. Verkhovskaya relies on fail to identify business numbers "on the type of business-related web resources that Verkhovskaya claims to be used by PacificEast,

including B2BYellowPages; YellowPages.com; Yelp; Buzzfile … the Better Business Bureau; Dunn & Bradstreet; Facebook…"  Kostyun Rebuttal ¶ 68.  In fact, Mr. Kostyun manually evaluated a sample of Ms. Verkhovskaya's list and found numerous examples of "business" numbers appearing in business directories that nonetheless remained on her list.  *Id.* ¶¶ 64-79.

Third, Verkhovskaya concedes her "keyword" cross-check to determine whether numbers were "business" numbers was created "solely" by her "team" "poking around on Yelp or Google or Yellow Pages and performing their own subjective analysis of whether they think that a term appears a lot in business names," *id.* at 121:20-122:1; these are hardly "objective criteria."  And Verkhovskaya failed to apply her own flawed methodology correctly, as Mr. Kostyun identified numerous examples of numbers that should have been excluded based on her "keyword" search but still appeared on her class list.  Kostyun Rebuttal ¶¶ 70-78.

In short, Plaintiff has failed to propose a reliable means for ascertaining class membership based on his own class definition.  Identifying "residential" numbers cannot be accomplished through this methodology under the legal standards this Court has adopted.

### 2.    Plaintiff Proposes an Impermissible "Fail-Safe" Class.

Plaintiff also proposes an impermissible fail-safe class.  "[A] failsafe class definition requires the court 'to reach a legal conclusion on the validity of a person's claim in order to determine whether the person is in the class,' meaning the class is unascertainable prior to a liability determination."  *Waterbury v. A1 Solar Power Inc.*, No. 15-cv-2374-MMA (WVG), 2016 WL 3166910, at *4 (S.D. Cal. June 7, 2016) (internal citation omitted). A definition is "fail-safe" where a plaintiff would not be bound by the Court's judgment, because ruling against them on a liability issue defines them out of the class.  *In re Nexium*, 777 F.3d at 22 n. 19.

Plaintiff proposes a class that "requires the court 'to reach a legal conclusion on the validity of a person's claim in order to determine whether the person is in the class.'"  *Waterbury*, 2016

WL 3166910, at *4 (citation omitted).  Specifically, the Court would need to apply law to the facts to decide whether an individual class member's phone number qualifies as "residential" under the TCPA, and a negative determination would define them out of the class. *See Messner*, 669 F.3d at 825 ("Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment.").

**B.    Plaintiff's Proposed Class Fails To Satisfy Explicit Rule 23 Requirements for Class Certification.**

**1.    Mantha Has Not Satisfied Adequacy or Typicality.**

**i.    Plaintiff Is Neither Adequate Nor Typical Because He Does Not Meet His Own Class Definition.**

The Supreme Court has long made clear that a class cannot be certified if the named Plaintiff is not a member of that class.  *General Tel. Co. of SW v. Falcon*, 457 U.S. 147, 157 (1982) ("We have repeatedly held that 'a class representative must be part of the class….'") (quoting *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).[7]  "By extension, there can be no legally sufficient nexus between individual and shared claims if the purported class representative is not even a member of the class that he purports to represent, thereby undermining adequacy of representation (Rule 23(a)(4)) and typicality Rule 23(a)(3))." *Lindblom v. Santander Consumer USA*, NO. 15-cv-0990-BAM, 2018 WL 573356, at *4 (E.D. Cal. Jan. 26, 2018) This issue arises both as a threshold requirement for any class certification and as a barrier to establishing adequacy and typicality.  *See* Wright and Miller, Fed. Prac. & Proc. Civ. § 1761.

Plaintiff can satisfy neither typicality nor adequacy because he is not a member of the class he seeks to represent.  The "Class List" on which is proposed definition turns is the work product of Mr. Mantha's expert, Verkhovskaya, in which she claims to have employed a methodology that

---

[7] *See also Sosna v. Iowa*, 419 U.S. 393, 403 (1975) ("A litigant must be a member of the class which he or she seeks to represent at the time the class action is certified by the district court."); *Bailey v. Patterson*, 369 U.S. 31, 32–33 (1962) (Plaintiffs "cannot represent a class of whom they are not a part.").

limits this "Class List" to only those individuals "who, in response to their receipt of QuoteWizard text messages, made a specific request that the texts cease, that was designated by Drips and QuoteWizard as a DNC and which appear in the Do Not Call Files." Verkhovskaya Report ¶ 59.

Mr. Mantha, however, does not satisfy any of these requirements. It is undisputed that he **never** requested that the texts he received from QuoteWizard cease. *See* ECF 258 ("At no time during receipt of these text messages did plaintiff ask defendant to stop contacting him[.]"). Nor is there any evidence that he sent a text that "was designated by Drips and QuoteWizard as a DNC." Nor does his telephone number appear in any "Do Not Call" files. Having elected to define his class with these criteria, he has defined himself out of the class he seeks to represent, and he is neither an adequate class representative, nor is he typical of the class.[8]

### ii. Plaintiff Is Atypical Because He Is The Only Class Member Whom His Expert "Manually Added" To The Class List.

Mr. Mantha is also atypical of the class because he is the only person Verkhovskaya "manually added" to a subsequent version of the "Class list," as her own testimony confirms:

> Q: [Y]ou have gone through this whole methodology to get to this list of people who meet your criteria. And we get to the last step, and you go through the business number analysis, then at that step, you added plaintiff's telephone number to your list manually. Is that correct?
> A: Yes.
> Q: He does not meet the criteria that the other folks on that class list meet, right?
> A: I have not done that analysis for Mr. Mantha.
> Q: In your work on this case, you have not done any analysis to see whether the named plaintiff meets the criteria to belong on your class list. Is that accurate? […]
> A: I was directed by class counsel to add Mr. Mantha. And I did not do any specific analysis for his telephone number.
> Q: So you added him because counsel told you you should add his number to the list, correct?

---

[8] Plaintiff's discussion of typicality in his Motion reflects an apparent effort to gloss over this important point. Plaintiff titles that section: "Typicality is satisfied because all class members had phone numbers listed on the DNC registry, still received telemarketing texts promoting insurance products marketed by QuoteWizard, **and voiced their objections to such texts**." Motion at 13 (emphasis added). Yet, nowhere in his discussion of typicality (or in any other section of the Motion) does Plaintiff actually state that he "voiced an objection to such texts" and, indeed, the Court already found that he never did.

A:  Correct.

Q:  You did not do any independent analysis regarding Mr. Mantha or his telephone number to confirm whether he met any of the other criteria to be on your class list, is that also accurate?

A:  That's correct.

Verkhovskaya Depo. at 126:5-127:8

Q:  …every single telephone number on all of your versions of the class list has a corresponding Do Not Call notation in one of the Do Not Call files except for the named plaintiff in this case, correct?

A:  That's correct.

Q:  He is the only one?

A:  That's correct.

Q:  He is not like the others in that regard, correct?

A:  Correct.

*Id*. at 68:5-14.  Mr. Mantha is the only putative class member who was "manually added" to the

Class List because he did not meet the stated criteria for class membership.  He is atypical – "not

like the others" – because Verkhovskaya's proposed methodology would not (and did not) identify

him as a potential class member.

This is far from the first time that Verkhovskaya proposed a methodology that fails to

identify the named plaintiff in a TCPA class action.  *See Wilson v. Babcock Home Furniture,* 329

F.R.D. 454, 457 (M.D. Fla. 2018) ("Most glaringly, [Verkhovskaya's] method would not even

have discovered Plaintiff as a class member[.]"); *Sandoe*, 333 F.R.D. at 8 (Verkhovskaya only

identified the named plaintiff through "application of the six-month fuzzy period and by virtue of

individual testimony or analysis of plaintiff's phone records."); *Davis*, 2023 WL 6964051, at *10

n. 17 (citing *Sandoe* with approval, noting that "like the present case, the reverse append process

could not identify the named class representative without individual inquiry, a fact which the

district court found reflected on the reliability of Verkhovskaya's testimony.").  In each of these

cases, the courts critiqued Verkhovskaya's methodology and denied class certification.

### iii.  Plaintiff Is Atypical Because The Source Of His "Lead" Differs From Nearly All Other Class Members.

Mr. Mantha's claims are not typical of the class for another important reason – the source

of the Lead that led QuoteWizard to contact Mantha is only the same as 16 other people on the

Class List. *See* Kostyun Aff. In other words, the Leads resulting in texts to 66,676 of the 66,693

people on the Class List were obtained through different means and from other sources than the

Lead that led QuoteWizard to contact Mr. Mantha.[9] This is important because the peculiarities of

the Mantha Lead figured prominently in the Court's summary judgment analysis and were critical

to the Court's finding that Mr. Mantha had not actually provided express consent under the TCPA

to receive the texts at issue, notwithstanding documentary evidence of consent QuoteWizard

presented. *See* ECF 268 at 20 (tracing the Mantha Lead's lineage). For example, the Court

determined that Mr. Mantha had not adequately provided consent by considering the specific

circumstances and evidence concerning his Lead, *e.g.*, the Lead originated from a Bosnian

company whose website had been pirated (unbeknownst to QuoteWizard); third-party testimony

questioned the documented IP addresses associated with that Lead; and the lead was notated as

having proper consent only through an error of the lead verification company. *Id.* at 20-21.

Plaintiff has provided no evidence whatsoever to support the notion that these

circumstances, or even remotely similar circumstances, attended the Leads relating to anyone else

in the proposed class. In other words, the Motion offers the Court no reason to believe – and

certainly no evidence to prove – that the consent records relating to ***any*** other class members ***also***

involved: (1) a pirated website; (2) incorrectly reported IP addresses from a third-party; and/or

(3) an inaccurate third-party consent verification record resulting from an internal error. Indeed,

apart from Mr. Mantha, QuoteWizard is aware of no other circumstances in which: (1) one of the

---

[9] Plaintiff claims in his own Motion that "QuoteWizard purchased millions of sales leads from dozens of lead generators, which had in turn obtained leads from thousands of unknown sources," Motion at 3, and that the leads at issue were leads that "QuoteWizard purchased from myriad lead sources, who themselves bought them from many more thousands of sources and lead generation websites," Motion at 6-7.

other leads it obtained originated from a "pirated website"; (2) the recorded IP addresses in its files linked to a particular lead are not, in fact, associated with the corresponding lead; or (3) Plural incorrectly associated a LeadiD with a consumer through its own error.  Weeks Aff.

### iv.  Plaintiff Is Neither Typical Nor Adequate Because He Is Subject To A Unique Defense To Which Many Class Members Are Not.

A class may not be certified unless "the claims or defenses of the representative parties are typical of the claims or defenses of the class" and they "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)-(4).  These two inquiries tend to overlap:

> [T]he typicality and adequacy analyses tend to merge, because adequacy under Rule 23(a)(4) presents a two-step analysis: the Court must determine, "first, whether any potential conflicts exist between the named plaintiffs and the prospective class members, and, second, whether the named plaintiffs and their counsel will prosecute their case vigorously." . . . Both typicality and adequacy may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation.[10]

Plaintiff's claim is atypical because he faces a defense that is both dispositive of his claim and not applicable to all class members: evidence shows that Plaintiff did not register his own number on the NDNCR.[11]  The regulation states: "No person or entity shall initiate any telephone solicitation to: . . .  a residential telephone subscriber *who has registered his or her telephone number* on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.  47 C.F.R. § 64.1200(c)(2).  A plain reading of this text shows that a person only has a claim if they placed their own number on the registry.

---

[10] *Shanley*, 277 F.R.D. at 69 (quoting *In re Credit Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008)); *see also Conley v. Roseland Resid. Tr.*, 442 F. Supp. 3d 443, 452 (D. Mass. Mar. 5, 2020) ("Typicality 'may also be defeated where class members have additional claims or remedies that are unavailable to the class representative.'").

[11] QuoteWizard appreciates that Plaintiff has argued otherwise.  But the very records his expert proposes to use to identify NDNCR registrants identify someone other than him as the registrant.

Mr. Mantha's claim should ultimately fail because he never "registered his . . . telephone number on the national do-not-call registry" himself; rather his telephone number was placed on the NDNCR in November 2008. Kostyun Report ¶¶ 131, 131 n.20. According to the PacificEast records upon which Verkhovskaya relies, Mr. Mantha was first associated with that phone number in December 2009, 13 months after the number was placed on the NDNCR. *Id.* ¶ 131. AT&T also confirmed that the number was active and registered to Daniel Nordberg, not Joseph Mantha, between 12/7/2006 and 10/21/2011. *See* Polansky Aff.; Exhibit 12 – *Subpoena Response of AT&T*. Because the evidence (Verkhovskaya's own data set) shows that Mantha did not register his own number on the NDNCR, he could only prevail under a strained reading of the regulation – that it prohibits contact to *a number* on the NDNCR is prohibited, regardless of who registered it or whether the number is still theirs, and notwithstanding that the regulation expressly states that "a residential telephone **subscriber who** has registered **his or her** telephone number on the national do-not-call registry[.]" 47 C.F.R. § 64.1200(c)(2) (emphasis added).[12]

The Motion thus fails the typicality and adequacy requirement because the defense is "both inapplicable to many members of the class and likely to become a major focus of the litigation." *Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98, 135 (E.D. Penn. 2020). It is a complete defense inapplicable to many members of the class because about a third of the proposed class appears to have registered their own telephone numbers on the NDNCR, at least based on the data employed by Plaintiff's expert. Kostyun Report ¶ 132.[13] Under these circumstances, the Motion should be

---

[12] As an illustration of how untenable this strained reading of the statute would be, Mr. Kostyun identified approximately 1,600 numbers on the "Class List" that were registered on the NDNCR on a date when the corresponding putative class member was under the age of 10, and in some cases, "not yet born." Kostyun Rebuttal ¶¶ 55-62. The chances that these individuals registered their own numbers on the NDNCR as little children are vanishingly small (and in the case of the unborn class members, impossible).

[13] This Court has also recognized that the question of whether a particular individual registered his or her own number on the NDNCR may not be resolved on a class wide basis through common proof and therefore may preclude class certification on commonality and predominance grounds as well. *See Sandoe v. Bos.*

denied on typicality and adequacy grounds. *See, e.g.*, *Zenith Lab'ys, Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) ("If Zenith were allowed to represent the alleged class, Carter could assert defenses against it which would not be applicable to the class as a whole…. [that] could conceivably become the focus of the entire litigation and divert much of Zenith's attention from the suit as a whole…."); *Sapan v. Veritas Funding, LLC*, No.: SACV 23-00468-CJC (ADSx), 2023 WL 6370223, at *5 (C.D. Cal. July 28, 2023) ("While [plaintiff] may prevail on this defense, [defendant's] focus on it shows it will be litigated. While the defense is not unique to him …. the facts of his defense are unique. He will likely be forced to expend time and effort on this, possibly to the detriment of the class.").

### v. Plaintiff Is Atypical and Inadequate Because The Class Faces Defenses He Does Not – Consent and Lack of Article III Standing.

Certification is inappropriate if the named Plaintiff is subject to a significant defense that "would not be applicable to the class as a whole," *Zenith Lab'ys, Inc.*, 530 F.2d at 512, but the converse is also true: "a proposed class representative's claim may not be typical … in the rare circumstance where only the class representative is exempt from a defense that applies to the rest of the class." 1 Newberg and Rubenstein on Class Actions § 3:45 (6th ed.); *see Avilez v. Pinkerton Gov. Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015) (reversing district court class certification on both typicality and adequacy grounds where class members signed class action waivers but putative class representative did not); *see also Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 123–25 (E.D.N.Y. 2019) (denying certification on typicality and adequacy grounds where the class faces a defense that does not apply to the putative class representative). Two such defenses apply to all class members except Mantha – lack of Article III standing and consent.

---

*Sci. Corp.*, 333 F.R.D. 4, 9 (D. Mass. 2019) ("Plaintiff has also failed to demonstrate that common proof can be used to establish … whether the individual who received the call was the individual who registered his or her name on the Do-Not-Call Registry.")

The Court has already ruled that Mantha suffered an injury in fact sufficient to satisfy Article III standing.  It reached that ruling at summary judgment after considering Mantha's individual allegations and "sworn declaration stat[ing] he 'find[s] unsolicited telemarketing irritating and a violation of [his] privacy rights.'"  *See* ECF 268 at 3.  No such similar evidence is available for the remaining class members, and they are all subject to the same defense.   A recent decision in another putative TCPA class action is instructive.  In *Van Elzen v. Advisors Ignite USA*, the district court concluded that the named plaintiff had established his own standing under Article III, but that he had failed to demonstrate typicality, commonality or predominance, because "the question is not simply whether Van Elzen was harmed; in order for Van Elzen's motion for certification of a class under Rule 23 to be granted, he must show that the members of the class he seeks to certify were similarly harmed."  No. 22-C-859, 2024 WL 195473, *5 (E.D. Wisc. Jan. 18, 2024).  The court continued:

> The mere fact that [defendant] may have violated the TCPA in placing the messages does not mean that everyone who received one was harmed. The assumption might be reasonable if the same message was sent over and over to random individuals with no connection to the insurance business.  But this was essentially a one-time message targeted to individuals most likely to have some interest in the information conveyed.

*Id.*  In finding typicality lacking, the court observed: "The question of whether each member of the proposed class suffered an injury in fact is so particularized as to make resolving it on a class wide basis difficult, if not impossible."  *Id.* at *6.

Plaintiff is also unlike the rest of the proposed class in that he has established a lack of consent based on his unique circumstances, whereas QuoteWizard has documentary evidence to support its consent defense for over 99% of the people in Plaintiff's proposed class, and consent is a complete defense to each individual claim.  If certified, QuoteWizard will defend itself based on its individualized evidence of consent for over 99% of the class.  *See supra* at 4-5 (describing

multiple forms of consent evidence produced in this case).  Although class members will face this defense at trial if the case is certified, the Court has already ruled on the consent defense with respect to Mr. Mantha, who has no personal stake in litigating the consent issue at trial because he does not face it.  He is a paradigmatic example of a putative class representative who is "exempt from a defense that applies to the rest of the class." 1 Newberg and Rubenstein on Class Actions § 3:45 (6th ed.). This is no small matter. As discussed further below, Defendant's consent defense would dominate the trial.  The named Plaintiff's distinct status with respect to the consent defense is a fundamental distinction from class members and prevents certification on typicality and adequacy grounds.

### 2. Commonality Is Not Met Because Plaintiff Cannot Establish Class Claims Through Common Proof.

Plaintiff's Motion fails to prove commonality because it fails to identify what "common proof" could establish the claims of absent class members.   Plaintiff's entire argument regarding commonality comprises a recitation of the legal standard, a list of "common questions" and the bare statement that these questions can all be answered through "common proof," without explaining what that common proof might be.  Motion at 11-12.  Apart from reciting the legal standard, Plaintiff does not cite a single source of evidence to support that claim.  *Id*.  Plaintiff's failure to identify the "common proof" he intends to use to answer all of these questions precludes a finding that the commonality requirement for class certification is satisfied.[14]

---

[14] To the extent Mantha plans to file a threadbare motion for class certification with the intent to "sandbag" QuoteWizard with more fulsome evidence and legal support in their reply brief, this tactic is improper. Thus, to the extent Mr. Mantha attempts to rectify the defects in his Motion through new arguments or evidence in his reply brief, those efforts should not be countenanced.  *See, e.g.*, *Hot Stuff Foods, LLC v. Houston Cas. Co.*, 771 F.3d 1071, 1080 n.5 (8th Cir. 2014) ("We deplore this kind of sandbagging and would have been inclined to strike the Reply Brief had we been asked to."); *Holloway v. Hartford Life & Accid. Ins. Co.*, No. 10-4002-CV-S-ODS, 2010 WL 11565699, *1 n. 1 (W.D. MO. Aug. 5, 2010) ("The Court notes that Plaintiff improperly delayed making any argument in favor of her motion until her reply suggestions. This tactic–known as "sandbagging"–suggests that Plaintiff knew her arguments could not

As the Supreme Court has repeatedly advised:

> What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (internal citation omitted).  The Court went on to note that, for purposes of Rule 23(a)(2), a question is a common one if it is not only pertinent to all members of the proposed class, but also capable of class-wide resolution—of being resolved as to all class members in a common manner.  *Id.*  ("[C]laims must depend upon a common contention…. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

A recent case with similar facts clarifies these issues.  In *Hirsch v. USHealth Advisors, LLC*, the court denied class certification on commonality, typicality, and predominance grounds. There (as here), the Plaintiff sought class certification in a TCPA telemarketing case alleging that defendant – who marketed insurance products not by making "cold calls" but by using "leads," often obtained from "lead vendors" – had called putative class members whose numbers were registered on the NDNCR.  337 F.R.D. 118, 124-25 (N.D. Tex. 2020).  There, as here, the plaintiff sought certification of a class comprising all natural persons who "received more than one telephone solicitation call in a 12-month period made by or on behalf of [defendant] more than 31 days after registering [their number] with the National Do-Not-Call Registry."  *Id.* at 125.  After quoting the language above from *Dukes*, the court observed: "Thus, common questions do not cut

withstand opposing counsel's scrutiny."); *Horvath v. Apria Healthcare, LLC*, No. 19 CV 4894, 2019 WL 5725378, at *2 (N.D. Ill. Nov. 5, 2019) ("'A reply brief is for replying'—not for sandbagging.") (quoting *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 360 (7th Cir. 1987)).

it – the common questions must generate common answers that resolve issues central to the dispute." *Id.* at 128.  The plaintiff there proposed "common questions" similar to those proposed by Mantha here: whether defendant "(a) completed more than one telephone solicitation call (b) in a 12-month period (c) more than 31 days after the … telephone number to which the call was placed was registered with the NDNC."  *Id.*[15]  The court held that "while no doubt these are 'common questions' [plaintiff] must show that a class action would 'generate common answers apt to drive the resolution of the litigation."  *Id.* (citing *Dukes*).

In *Hirsch*, the court held that the plaintiff's "alleged commonalities fail that test" because "Even if these questions are answered in the affirmative… they would not establish Defendant's liability.  And if liability is not established, these common questions are not apt to drive the litigation's resolution."  *Id.* at 129.  As required at the class certification stage, the court "probe[d] behind the pleadings" to "dig into the merits of plaintiff's underlying claim," and "after clearing away the superficial questions, the case's substance is not whether Defendant made the calls, but were those calls prohibited?"  *Id.*  The court found that plaintiff's "common questions ignore[d] these issues."  *Id.*  Instead, the court concluded that the "issues that will drive the resolution of this case are… (a) whether the 100,000 or so class members consented to the calls; (b) whether the phone numbers were residential; and (c) whether Defendants are vicariously liable for the calls," and that "each of these questions defies class resolution because they cannot be answered from a single source."  *Id.*  "Instead, the questions require individualized evidence, which leads to the conclusion that myriad mini-trials cannot be avoided."  *Id.* (citations omitted).

On the issue of consent, the court first observed:

---

[15] *Compare id. with* Motion at 12 (listing as "common questions" "were the phone numbers of all class members listed on the DNC Registry for the required amount of time…"; "were the texts received"; "Did class members receive two or more calls in a 12-month period.")

> Under the TCPA consent takes many forms.  For instance, there is no liability when there is an "established business relationship," such as a prior purchase, subscription, application, or inquiry for information.  Also, the TCPA excepts solicitations where there is a prior personal relationship, such as a family member, friend, or acquaintance. And last, the residential number's owner may provide express consent through email, website form, text message, telephone keypress, or voice recording.

*Id.* at 130 (citations omitted).  For these reasons, "Consent often creates an obstacle to TCPA class certification."  *Id.*  While the issue of consent does not render TCPA class actions "*per se* unsuitable for class certification," in those cases where there is evidence that the defendant "developed its leads from various sources, including some purchased from lead generation vendors" and "obtained at least some of the solicited phone numbers by consent… consent could not be proven by general evidence – each member had its own story." *Id.*  (citing *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 328 (5th Cir. 2008)).[16] And because for the "leads Defendants bought from lead-generation vendors, there is evidence that at least some of those were screened or verified for TCPA compliance … even the purchased leads defy generalized proof."  *Id.*  The court also found persuasive that "Defendants submitted substantial evidence, albeit disputed, that their solicitations only target leads who have consented or are exempt from the TCPA."  *Id.*  Accordingly, "From the evidence presented, the Court f[ound] that at least some individuals consented to the calls, and also that no single source of evidence determines which individuals consented," precluding a finding of commonality on the issue of consent.  *Id.* at 130-131.

On the "residential number" issue, the plaintiff "failed to advance a theory of generalized proof that could establish each class member's phone number's residential status."  Indeed, [t]his

---

[16] The court distinguished cases in which Leads are obtained from multiple sources, which are not suitable for class certification, from those cases in which Leads are all obtained from a single source in which commonality may be found.  *Id.* at 130.  Here, Plaintiff himself asserts that QuoteWizard obtained "sales leads from dozens of lead generators, which had in turn obtained leads from thousands of … sources." Motion at 3.

question … is not susceptible to generalized proof.  The inquiry is fact intensive… [and] if this case goes to trial, the Court expects this issue to be central." *Id.* at 131.  The plaintiff in *Hirsch*, like Mr. Mantha, attempted "to provide generalized proof by culling out phone numbers listed as a business in a commercial database of business numbers… but this method is unreliable." *Id.* Indeed, "No single source answers this question for each phone number.  Each must be tested individually.  Thus, resulting in a Herculean task at best." *Id.*  The court concluded on this issue:

> In short, resolving each phone number's residential status requires a fact-intensive inquiry. And the burden to show the residential status is on [plaintiff], who failed to advance a viable theory employing generalized proof to establish residential status and therefore liability.  As a result, there is no commonality. *Id.*

Here, as in *Hirsch*, Mr. Mantha has failed to offer "common proof" to answer the key questions apt to drive resolution of this litigation, namely the issues of consent and the "residential" status of each putative class member's telephone number.  As in *Hirsch*, the Leads here come from multiple sources, there is copious evidence that at least some of the class members consented to the texts,[17] and there is no single source of evidence that determines which individuals consented. And, as in *Hirsch*, Mr. Mantha fails to offer a reliable or "viable theory employing generalized proof to establish residential status and therefore liability." *Id.*  This is, in part, because no reliable source for such information exists, as even the vendor Mr. Mantha employed for this purpose attests. *See* Rice Decl. ¶¶ 13-14.  And in part, this is because, even if a reliable source of this information did exist, the "methodology" Verkhovskaya employed to generate the "Class List" is so error-ridden and unreliable that it could not possibly serve as "common proof" of anything.

The lack of commonality comes into even clearer focus when one considers the evidence that Plaintiff relied on at summary judgment to answer key questions that are apt to drive liability

---

[17] To be clear, it is QuoteWizard's position that ***all*** class members provided consent to receive the texts at issue, but that is not a showing that it must make to defeat a finding of commonality.

in this case, as none of the evidence he offered there is "common" to the rest of the class.  At summary judgment, the Court addressed whether Mr. Mantha's phone number qualified as a "residential telephone subscriber" such that the invoked provisions of the TCPA applied to him. After first clarifying that "Mantha bears the burden of proof on this issue to show that his cellular phone number qualifies as a 'residential telephone subscriber' pursuant to 47 U.S.C. § 277(c)", the Court identified the relevant analysis:

> [T]he inquiry to determine whether a phone number qualifies as a "residential telephone subscriber" focuses on whether the subscriber has and uses the phone for residential purposes […]   [I]n determining if a phone number has a residential purpose, the Court considers the following particularly relevant:  First, the precondition that the phone number is a "residential telephone subscriber" – that is, the phone number is subscribed in the individual's name at their residence.  If that precondition is met, the Court then considers material whether the phone number at issue is the primary means of reaching the individual at their residence – that is, there is no other landline or phone at their residence which is instead the primary means of reaching them.

ECF 268 at 11-12.  The Court then applied this standard to Mr. Mantha's individual circumstances, and in doing so, considered relevant the following facts to ultimately conclude that "Mantha's cellular telephone number has a residential quality to it and he uses it for residential purposes":

> (1) the telephone number at issue is a cellular phone number subscribed to by Mantha in his name as part of a plan including a cellular phone number for his wife; (2) this cellular phone number "is used by Mr. Mantha for personal purposes"; (3) Mantha "has no home phone"; (4) Mantha lives with his wife and children in their home; (5) Mantha does not live at the residential school at which he works; and (6) the bill for the cellular phone number is addressed to Mantha at his home.

*Id.* at 12.  The Court relied on Mantha's individual testimony to establish each of these facts, not any form of proof that would be "common" to absent class members.

Although Plaintiff now insists that the question of whether texts were sent to "residential numbers" is a "common" one, he points to no "common proof" from which the Court could conclude that any one of these factors are satisfied.  Plaintiff fails, for example, to identify any form of "common proof" that could establish "in one stroke": (1) the nature of each class member's

cellular plan, (2) who used the phone; (3) the purposes for which it was used, (4) the other individuals living with the subscriber, (5) whether the phone was used in a "residence"; or (6) who the bill was addressed to. *See Dukes*, 564 U.S. at 350.

Other recent decisions denying class certification in TCPA cases highlight this point. In *Mattson v. New Penn Financial, LLC*, the court declined to disturb its prior finding that a plaintiff could not establish typicality or commonality because "the question whether plaintiff's number is a residential or a business phone number is not only fact intensive but also hotly contested, as the briefing on summary judgment illustrates." No. 3:18-cv-00990-YY, 2023 WL 8452659, at *3 (D. Or. Oct. 12, 2023) (Findings and Recommendation adopted in full, 2024 WL 21568 (D. Or. Jan. 2, 2024)). Referring to a recent Ninth Circuit decision regarding a presumption that a number was "residential" the court continued:

> To the extent *Chennette* established a presumption that applies at the pleading stage to determine whether a plaintiff has stated a claim, the case plainly does not stand for the proposition that the presumption carries through the case as an established fact, or somehow subsumes Rule 23's typicality, adequacy, or commonality requirements . . . If anything *Chennette* further supports the conclusion that analyzing whether plaintiff's mixed-use phone was a residential or business line is an individualized determination based on the totality of the circumstances that prevents plaintiff from establishing typicality and commonality requirements under Rule 23. *Id.*[18]

In another recent TCPA action in which the court denied class certification – one in which Mr. Mantha's counsel was also counsel of record – the court held that "whether [defendants] violated the TCPA's Do Not Call provisions depends on individualized inquiries, including whether the recipient's number was on that registry and whether the recipient consented to the call or had an existing business relationship with [defendant]." *Cunningham v. Vivint, Inc*., No. 2:19-

---

[18] Indeed, the court observed that "The mere fact that a pleading presumption applies here does not, as plaintiff suggests, inevitably mean that the suit is appropriate to certify as a class action." *Id.*

cv-00568-DBB-CMR, 2022 WL 2291669, *7 (D. Utah June 24, 2022).  In finding that the plaintiff

had failed to establish commonality, the court noted "Plaintiffs have not shown how there would

be a common answer to this question that is not dependent on individualized inquiries."  *Id.*  The

court also found that "'whether [defendant's] agents initiated calls without obtaining the

recipients' prior express invitation or permission for the call' will not generate common answers

among the class.  Consent obviously requires individualized inquiry."  *Id.*

Mr. Mantha nonetheless insists that determining whether a particular number is

"residential" can be accomplished through unidentified "common proof," but this argument is

further undermined by QuoteWizard's expert testimony and the testimony of third parties.  While

not expressly stated in Mr. Mantha's barebones commonality argument, it appears that he plans to

rely on the opinions of his expert, Verkhovskaya, which in turn rely on third-party vendor data

from PacificEast, to attempt to establish that all class member numbers are "residential."   But

PacificEast's own COO testified in this case that his company's services cannot reliably be used

for that purpose.  Rice Decl. ¶ 13 ("Historical information about the identification of a telephone

number as a "business" or "residential" number is not available from any source that I know, and

it is not a service that PacificEast provides."); ¶ 14 (testifying that whether a number is a business

or residential number "is a question that cannot be authoritatively answered, nor is PacificEast's

business lookup service intended to provide an authoritative answer to that question.").[19]  Courts

have criticized the use of such databases to identify residential or business numbers as unreliable,

including in cases in which Verkhovskaya served as the plaintiff's expert.  *See, e.g., Sapan v. Yelp,*

---

[19] Mr. Rice also testified that PacificEast's services could not be reliably used – as Verkhovskaya proposed – to identify the subscribers of ***any*** particular telephone number.  Rice Decl. ¶ 24 ("As a factual and practical matter, determining definitively whether, and the dates, a particular person subscribed and/or stopped subscribing to or using an input telephone number cannot reliably be achieved using the Reverse Phone Append service PacificEast provides.")

No. 3:17-cv-03240-JD, 2021 WL 5302908, *1 (N.D. Cal. Nov. 15, 2021).

In sum, Mantha fails to identify any "common proof" that will generate "common answers apt to drive the resolution of the litigation." He offers no common proof from which the Court could conclude that all class member numbers are "residential," and the only potential source of such information (PacificEast) has testified that its services cannot reliably be used for that purpose. Mantha also offers no common proof from the which the Court could conclude that none of the class members provided consent to the text messages at issue – and, indeed, QuoteWizard has offered copious proof that they did provide consent. These failures preclude a finding of commonality and, therefore, certification of a class.

### 3.    Plaintiff's Class Certification Bid Fails Because Individualized Issues Predominate Over Any Common Issues.

Plaintiff's Motion also should be denied because individualized issues predominate over any common issues, in particular the individual issues of: (1) whether each putative class member's telephone number was "residential," and (2) whether each individual class member provided consent to be contacted. None of these issues is suitable for class-wide resolution, and if a class is certified, this case will devolve into a series of mini-trials.

Plaintiff has the burden of proof in establishing that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3); *see In re Nexium*, 777 F.3d at 27 (explaining that plaintiff bears burden of proof).

> The aim of the predominance inquiry is to test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.' Inefficiency can be pictured as a line of thousands of class members waiting their turn to offer testimony and evidence on individual issues. Unfairness is equally well pictured as an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise plausible individual challenges on those issues.

*In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) (citations omitted).  The predominance inquiry overlaps with the commonality requirement of Rule 23(a)(2) but "is far more demanding." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20, (1st Cir. 2008).  Where "a great deal of individualized proof would need to be introduced, common questions do not predominate."  *Belezos v. Bd. of Selectmen of Hingham, Mass.*, No. 17-12570-MBB, 2019 WL 6358247, *14 (D. Mass. Nov. 27, 2019).  Because individualized proof will be necessary on the issues of consent and whether numbers are "residential," predominance is not met here.

### vi.    Plaintiff Fails to Show Predominance on Issues of Consent.

Consent issues often preclude a finding of predominance in TCPA class actions.  *See Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 92 (1st Cir. 2021) (affirming district court denial of class certification in part because consent could not be adjudicated class-wide "in an administratively feasible way, protective of [the defendant's] rights."); *Gene and Gene LLC*, 541 F.3d at 327 ("[W]e have noted that the 'predominance of individual issues necessary to decide an affirmative defense may preclude class certification.' . . . Whether established by [defendant] as an affirmative defense or by [plaintiff] as an element of the cause of action, the issue of consent will entirely determine how the proposed class-action trial will be conducted on the merits.") (citations omitted); *Tomeo v. Citigroup, Inc.*, No. 13 C 4046, 2018 WL 4627386, at *8 (N.D. Ill. Sept. 27, 2018) ("As a preliminary issue, the Court finds it irrelevant that consent is an affirmative defense rather than part of the cause of action. The need for individualized inquiries with respect to an affirmative defense may still defeat the predominance requirement.").

"Courts determine whether issues of individualized consent defeat commonality and predominance in . . . TCPA cases on a case-by-case basis after evaluating the specific evidence available to prove consent." *Tomeo*, 2018 WL 4627386, at *8 (quoting *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 725 (N.D. Ill. 2016)). "Generally, when the

defendant provides specific evidence showing that a significant percentage of the putative class consented to receiving calls, issues of individualized consent predominate." *Tomeo*, 2018 WL 4627386, at *8 (quoting *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017)); *Bais Yaakov*, 12 F.4th at 89 ("[W]e ask whether there *is more than speculation* that individual issues of permission may arise and, if so, whether [plaintiff] has shown that those who gave [defendant] prior express permission to send advertisements can be culled from the class in a way that is administratively feasible and protective of [defendant's] due process rights.") (emphasis added); *Sapan,* 2021 WL 5302908, at *6 (denying class certification and finding predominance lacking because defendant "identified evidence in the record showing an established business relationship with, or other prior consent provided by, putative class members"); *Davis v. Capital One, N.A.*, No. 1:22-cv-00903 (AJT/IDD), 2023 WL 6964051, at *14 (E.D. Va. Oct. 20, 2023) (finding predominance lacking "largely because the affirmative defense of consent is likely to be involved with respect to a significant number of the putative class members' claims, and Davis has shown no method for efficiently resolving who has provided consent, [thus] the merits of the claims would be dominated by an individualized inquiry as to each class member.").

Here, QuoteWizard has evidence of prior express written consent for **over 99%** of the putative class, and this evidence would need to be weighed for each class member before a liability determination could be made.[20] Moreover, QuoteWizard's evidence of consent will differ for every class member because the consent records vary from person-to-person. QuoteWizard has produced

---

[20] To the extent Plaintiff argues that consent issues are irrelevant because each class member (apart from Mantha himself) appears in QuoteWizard's DNC files, such argument would be disingenuous and does not address the issue. Plaintiff does not define the class as those individuals who received texts **after** being placed in the DNC files, and Verkhovskaya's methodology makes no effort to ensure that is the case. To the contrary, she concedes that her "entire methodology does not account for the possibility that a consumer was happily texting with QuoteWizard, they got the quote that they wanted, and then they asked that the texts stop," and she conceded many such people may be on her class list. Verkhovskaya Depo. at 34:1-10; 64:10-65:10.

26,480,000 consent records in this matter for 14,840,074 unique telephone numbers, including for nearly *every single number* on the proposed Class List.  Kostyun Report ¶ 216; Kostyun Aff. "Nearly nine million of those numbers received consent from more than one source, with some numbers receiving consent from as many as eight different lead sources."  Kostyun Report ¶ 216. Thus, not only does QuoteWizard have documentary evidence of consent for nearly every putative class member, it has more evidence of consent for some class members than others, and the specific types and forms of evidence of consent differ from class member to class member.[21]

Consent records produced by QuoteWizard show that the consent language that consumers would have viewed when providing their contact information to QuoteWizard's Lead Vendors vary greatly.  For example, consent data associated with Leads purchased by QuoteWizard from Inquir indicate that consumers would have viewed the following language:

> By checking, you authorize up to 3 insurance companies (or their agents) and marketing partners to email and/or place marketing calls (including via text/SMS) to the phone number you provided above using automated telephone dialing systems and/or artificial or pre-recorded messages.  You acknowledge that consent is not a condition to purchase goods or services, and that you may revoke your consent at any time.

*See* Weeks Aff.  Consent data associated with Leads purchased from a different Lead Vendor, Union Square Media, indicate that consumers would have viewed different language:

> By clicking the \Get Your Free Quote\ button, you agree that you are 18 years or older; you consent to our website Terms and Conditions and Privacy Policy; and you are giving your prior express written consent, via your electronic signature, for OttoInsurance.com or our marketing partners and/or their affiliates, whose names

---

[21] Plaintiff argues, in a footnote, that this Court's recent decision in *Thrower v. Citizen's Disability, LLC* supports a finding of predominance here.  No. 20-10285-GAO, 2022 WL 3754737, *1 (D. Mass. Aug. 30, 2022).  In *Thrower*, however, the class was limited to individuals who "were contacted based on leads from *the same lead generators that produced leads for the named plaintiffs*," which was why the court concluded that consent issues predominated.  *Id.* at *2 (emphasis added).  Here, Mr. Mantha places no such limit on the class definition, and if he did, the class would consist of only 17 individuals, as that is the number of individuals who "were contacted based on the leads from the same lead generators that produced leads for the named plaintiff[]."  *Id.*; Kostyun Aff.  Even then, none of the 16 other individuals used visited the snappyautoinsurance.com website.

you acknowledge that you've have accessed and read, to contact you via email at the email address you provided above and to place telephone calls or text messages to the phone number you provided above using automated telephone dialing systems and artificial voice or pre-recorded calls intended to market auto insurance and other services, and consent for OttoInsurance.com to provide your personal information to our marketing partners. This consent applies to mobile numbers, if applicable, including those previously registered on any Federal and State Do Not Call (DNC) Registries. Reply STOP to opt-out of text messages. Your consent is not a condition to purchase goods or services; if you prefer to get your free quote without providing consent, call 888-804-5641 for a quote. You may revoke your consent at any time by contacting us here.

*Id.* Different still, consent data associated with Leads purchased from Lead Gate Media indicate that consumers would have viewed this language:

By clicking Get My Quotes, I agree to the Terms of Service and Privacy Policy and authorize insurance companies, their agents and marketing partners to contact me about auto insurance and other non-insurance offers by telephone calls and text messages to the number I provided above. I agree to receive telemarketing calls and pre-recorded messages via an autodialed phone system, even if my telephone number is a mobile number that is currently listed on any state, federal or corporate \Do Not Call\ list. I understand that my consent is not a condition of purchase of any goods or services and that I may revoke my consent at any time. I understand that standard message and data rates may apply.

*Id.* QuoteWizard produced additional records of consent language used by dozens of other Lead Vendors, showing the variety of consent forms that class members would have viewed.

Those same consent records indicate that consumers visited numerous different websites when they provided consent. And individual Lead Vendors often sold Leads that originated on multiple websites. For example, Union Square Media sold Leads that originated on: ottoinsurance.com, auto-savings.com, easyautosavings.com, thegiraffe.com, and carsavings.io. Kostyun Aff. In contrast, Lead Gate Media sold Leads that originated on: insuranceoffersnow.com, www.insure.com, autosavertoday.com, autosaveforme.com, and 1minutequotes.com. Another vendor, Media Alpha sold Leads that originated on: healthplans.com, directhealthinsurance.com, healthplans.org, directhealthinsurance.com, and

coverageprofessor.com. *Id.* Yet another vendor, New Level Media sold Leads that originated on dailyinsurancedeals.com/home-insurance, dailyinsurancedeals.com/health-insurance, and dailyinsurancedeals.com/auto-insurance-quotes.

Plaintiff attempts to avoid this issue by stating "Mr. Mantha will demonstrate using common proof why none of the leads purchased by QuoteWizard from third party data brokers (a) are admissible (b) satisfy the TCPA or (c) comply with the E-Sign prerequisites for prior express written consent in writing." Motion at 16. Again though, Mr. Mantha fails to identify the "common proof" that would allow him to establish each of these positions. That failure alone is sufficient to deny Plaintiff's Motion. This is because Rule 23 "does not set forth a mere pleading standard. Rather, a party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." *Comcast v. Behrend*, 569 U.S. 27, 33 (2013). "The party must also satisfy ***through evidentiary proof*** at least one of the provisions of Rule 23(b)." *Id.* (emphasis added). Mr. Mantha cites no "evidentiary proof" whatsoever in support of his predominance arguments and he therefore cannot satisfy that element for class certification.

Plaintiff also misunderstands the Court's rulings on the relevance of the E-Sign Act to the question of effective consent under the TCPA. While the Report and Recommendation did include findings on that issue, QuoteWizard objected to those findings and they did not become a part of the Court's final ruling on summary judgment. *See* ECF 268. Nor would such a finding comport with the weight of authority on the issue. *See, e.g., Morris v. Modernize, Inc.*, 2018 U.S. Dist. LEXIS 232701, at *7-8 (W.D. Tex. Sept. 27, 2018) (E-Sign Act requirements do not govern consent under the TCPA); *Reinert v. Power Home Remodeling Grp., LLC*, 2020 U.S. Dist. LEXIS 214666, at *7 (E.D. Mich. Nov. 17, 2020) (rejecting argument that TCPA consent was ineffective because it did

not comply with E-Sign Act requirements). Put simply, issues of class member consent will need to be adjudicated individually, based on the individual evidence relating to each specific class member. Nor should Plaintiff's promise to somehow prove in the future (he does not say how) that QuoteWizard's individualized evidence of consent (in multiple and varied forms) for nearly every putative class member is either inadmissible or insufficient under the TCPA satisfy his evidentiary obligations or his burden to show that to obtain class certification. His burden is one of proof supported by evidence, and the time for that proof was in his Motion. Having eschewed that opportunity, Plaintiff has failed to satisfy predominance and class certification should be denied.

### vii. Individualized Issues Predominate as To Whether Class Members' Numbers Are "Residential."

Individualized issues also predominate over common issues as to whether each class member's telephone number is "residential." As the discussion above concerning commonality illustrates, this is a fact-intensive determination that requires the weighing of several different factors that will be different for each class member, including the details of their cellular plan, the existence of other phone lines at their residence, their living arrangements, the use to which they put the telephone number, etc. Each determination for each class member will be individualized and will involve different evidence, such that "only evidence specific to each class member's consent and phone number can determine liability." *Hirsch*, 337 F.R.D. at 134 (no predominance because "residential" status of numbers was an individualized issue); *Mattson v. New Penn Fin., LLC*, 2023 WL 8452659, *1 (D. Or. Oct. 12, 2023) ("individualized issues regarding plaintiff's mixed use telephone number will predominate this litigation").

Plaintiff appears to rely on Verkhovskaya's expert opinions to establish that every class members' telephone number is "residential." Plaintiff's reliance, however, is misplaced for the reasons discussed *supra*. In short, to the extent Plaintiff intends to rely on Verkhovskaya's expert

opinions to satisfy his evidentiary burden to show that predominance is met, those opinions are insufficient both because they are unreliable (and should be excluded) and because, even if they were reliable, they are no substitute for the multi-factor analysis this Court has endorsed.

### 4. Superiority Is Also Lacking.

A class action is not the superior method for adjudicating potential claims of putative class members. As an initial matter, where predominance is found to be lacking, as it is here, the Court need not address superiority. *See, e.g., Hirsch*, 337 F.R.D. at 134 (declining to address superiority because the court had already determined that commonality and predominance were lacking). Moreover, because the predominance and superiority analyses are intertwined, courts will typically find that superiority is lacking where predominance is lacking. *See, e.g.*, Newberg on Class Actions § 4:74 ("If the common issues do not predominate, a class cannot be certified and the manageability issue is somewhat irrelevant.").

The touchstone of the superiority analysis is whether a class action will be a superior method of litigation, considering the "likely difficulties in managing a class action," and here, it clearly would not. Plaintiff has not actually established that a single putative class member has a TCPA claim against QuoteWizard, nor has he pointed to common proof that could establish a viable claim for any member of his proposed class. Accordingly, Plaintiff's argument that any class member will lose out on a recovery is purely hypothetical and the size of such hypothetical recoveries is irrelevant. Indeed, given that QuoteWizard has provided individualized proof of consent for nearly all class members, the chance that any individual could establish a right to recover – whether on a class or individual basis – is small. Were the Court to approve of a class in this case, it would need to adjudicate nearly 70,000 individual claims with individual evidence on the issues consent, standing, and whether the numbers are "residential."

## V.    CONCLUSION

For the foregoing reasons, Defendant respectfully asks the Court to deny the Motion for

Class Certification and grant such other relief as it deems appropriate.

<div style="margin-left:50%">

Respectfully submitted,
QuoteWizard.com, LLC,
By its attorneys,

*/s/ Kevin P. Polansky*
Kevin P. Polansky (BBO #667229)
kevin.polansky@nelsonmullins.com
Daniel M. Curran (BBO #709082)
daniel.curran@nelsonmullins.com
Ben Sitter (*admitted pro hac vice*)
Ben.sitter@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02109
(t) (617)-217-4700

</div>

Dated: February 14, 2024

<p style="text-align:center;text-decoration:underline">CERTIFICATE OF SERVICE</p>

I, Kevin P. Polansky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 14, 2024

<div style="margin-left:50%">

*/s/ Kevin P. Polansky*
Kevin P. Polansky

</div>