# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

JOSEPH MANTHA, on behalf of himself and
all others similarly situated,

              Plaintiff,

vs.

QUOTEWIZARD.COM LLC

              Defendant.

CASE NO. 1:19-cv-12235

**EXPERT REBUTTAL REPORT OF JAN KOSTYUN**

**Table of Contents**

# Contents

Introduction ................................................................................................................... 3

Documents Reviewed ..................................................................................................... 3

Methodology .................................................................................................................. 4

Additional Case Background ......................................................................................... 4

Summary of Opinions .................................................................................................... 7

Discussion of Opinions .................................................................................................. 8

Opinion 1 - Verkhovskaya's methodology fails to confirm that any single text message was successfully delivered to the intended recipient. ....................................................... 8

Opinion 2 – Verkhovskaya's use of PacificEast results in the faulty identification of NDNCR registration dates ........................................................................................... 14

Opinion 3 – Verkhovskaya's methodology cannot reliably identify DNC directives ................. 16

Opinion 4 – Verkhovskaya's methodology fails to determine if the individual receiving violative text messages was the same individual who registered the given number on the NDNCR ......... 21

Opinion 5 – Verkhovskaya's methodology fails to accurately identify business telephone numbers to be removed from class eligibility .............................................................. 26

Opinion 6 – Plaintiff's and Verkhovskaya's contention - that Onsite leads are trusted, but Inbound leads are not – is unfounded, and available consent data shows that Onsite and Inbound leads are equally reliable, and in some cases, identical ............................................... 35

Opinion 7 – Telephone numbers in Verkhovskaya's class reflect significant indicia of consent, including, without limitation, Trusted Form certificates ........................................... 43

Opinion 8 – Verkhovskaya's proposal to use QuoteWizard's records to identify names and addresses of class members conflicts with her own assumption that such records are untrustworthy .............................................................................................................. 56

Opinion 9 – Every step of Verkhovskaya's methodology fails to identify Mantha as a class member .................................................................................................................... 59

Reservation of Right to Amend .................................................................................... 64

Exhibit A – Confirmation from the FTC that NDNCR registrations did not begin until 6/27/2003 ....................................................................................................................... 65

Exhibit B – Auto Information Lead data for Inbound Lead 201-320-5748 ................... 66

Exhibit C – Auto Information Lead data for Onsite Lead 602-904-1147 ...................... 69

Exhibit D – Partial list of ambiguous consumer responses assumed by Verkhovskaya to be DNC directives ..................................................................................................................... 71

Exhibit E – Full, identical XML lead data from Onsite XML 11 09 2022 and Inbound XML 11 09 2022 for telephone number 760-808-2206 .............................................................. 72

## Introduction

1.      In this case, Plaintiff Joseph Mantha ("Plaintiff") proposes to represent a class of

individuals in a Telephone Consumer Protection Act ("TCPA") class action lawsuit against

QuoteWizard.com LLC ("QuoteWizard" or "Defendant"):

> All persons in the United States who, from four years prior to the filing of this action: (1)
> Defendant (or an agent acting on behalf of Defendant) made (2) two or more telemarketing
> calls (3) promoting Defendant's products or services; (4) to a residential phone number that
> was listed on the National Do Not Call Registry for at least 30 days before the first call; and
> (5) within any twelve-month period.[1]

2.      On September 22, 2023, I submitted the Expert Report of Jan Kostyun ("First

Kostyun Report"). On that same date, Plaintiff submitted the Expert Report of Anya Verkhovskaya

("AV Report"). Counsel for QuoteWizard have asked me to rebut the opinions set forth in the AV

Report. I still hold the opinions I advanced in the First Kostyun Report, and I incorporate that

Report by reference in all respects.

## Documents Reviewed

3.      In forming my opinions, I have reviewed the following documents, in addition to

those described in the First Kostyun Report:

     a.   Expert Report of Anya Verkhovskaya – dated 9/22/2023, and Exhibits B-J;

     b.   Verkhovskaya supplemental production, including files "1.  02684_111816.txt",

        "2.  02684_111872.txt", and "3.  Exhibit J Records.csv";

     c.   "Full_Quote_Wizard_Report.csv";

---

[1] According to Plaintiff's First Amended Class Action Complaint ("FAC"), two classes were
proposed: An Automated Calling class (Class 1), and a DNC class (Class 2). Plaintiff
subsequently filed a Stipulation of Dismissal with Prejudice of Count I of The First Amended
Complaint (D.E. 187), dropping the Automated Calling Class, and retaining only the DNC Class.

     d.   "QUOTEWIZARD001619.csv";

     e.   "QUOTEWIZARD001620.csv";

     f.   "QUOTEWIZARD003653-QUOTEWIZARD003653.csv";

     g.   Declaration of Tom Martindale, dated 7/10/2023.

     h.   Declaration of Scott Rice on the Services Provided by PacificEast Research, Inc., *Clarence Davis v. Capital One*, No. 1:22-cv-00903 (E.D. Va.), D.E. 77-6.

4.     I incorporate paragraph 13 of the First Kostyun Report as if fully stated herein.

## Methodology

5.     The methodology that I have employed in producing my opinions in this report is based on my business experience in telecommunications, my experience as an expert with other TCPA-related cases, my education and training, and my review of documents and data relevant to this case, as cited above and throughout this report. Based on my experience and that review, I developed hypotheses regarding the opinions set forth in the AV Report. I have tested and confirmed my hypotheses using a combination of related documentation, research, data analysis, and experience – similar to the techniques that I have used during my career as a telecommunications system architect. I have analyzed the results of my analysis and testing, and used the results of that analysis to form my opinions and document them in this report.

## Additional Case Background

6.     In the AV Report, Plaintiff's Expert attempted to describe the steps taken to identify Plaintiff's proposed class of telephone numbers and purportedly violative text messages. Those steps are summarized as follows:

     a.   Step 1 (Verkhovskaya Opinion 1) - Identify telephone numbers that: (1) were procured from third-party lead generators; (2) were sent to Drips (QuoteWizard's

text vendor) with purported "authority" to send text messages; (3) received those text messages; and (4) responded to Drips with a Do Not Call ("DNC") directive. Verkhovskaya provided Exhibit E to the AV Report, which identified 386,785 telephone numbers that purportedly satisfied these criteria. These telephone numbers purportedly received 1,309,545 text messages[2].

b.  Step 2 (Verkhovskaya Opinion 2) - Identify telephone numbers from Step 1 that received two or more text messages within any 12-month period, and had been registered on the National Do Not Call Registry ("NDNCR") for at least 32 days. Verkhovskaya provided Exhibit F to the AV Report, which identified 77,135 telephone numbers that satisfied these criteria. These telephone numbers purportedly received 386,763 text messages.

c.  Step 3 (Verkhovskaya Opinion 3) - Identify telephone numbers from Step 2 for which consumers did not express interest in receiving texts from Drips, and for which QuoteWizard paid Drips for that lead. Verkhovskaya provided Exhibit G to the AV Report, which identified 76,441 telephone numbers that satisfied these criteria. These telephone numbers purportedly received 381,429 text messages.

d.  Step 4 (Verkhovskaya Opinion 4) – Identify telephone numbers from Step 3 for which QuoteWizard did not authorize Drips to send text messages. Verkhovskaya provided Exhibit H to the AV Report, which identified 73,781 telephone numbers

---

[2] Verkhovskaya did not provide the detail of any specific text messages for each one of her steps in the AV Report, but rather provided only a count of the number of text message for each telephone number. Subsequent to the submission of her report, she provided the text message detail for the final Step 5 of her class identification ("AV Text Message Detail"), at the request of Defendant's counsel.

that satisfied these criteria. These telephone numbers purportedly received 356,321 text messages.

e.  Step 5 (Verkhovskaya Opinion 5) – Identify telephone numbers from Step 4 that are residential numbers. Verkhovskaya provided Exhibit J to the AV Report, which identified 71,549 telephone numbers that satisfied these criteria. These telephone numbers purportedly received 345,526 text messages. Verkhovskaya also stated that she manually added Mantha's telephone number (and texts) to Exhibit J, thus raising the total telephone numbers and text messages to 71,550 and 345,534, respectively.[3] Subsequent to the submission of the AV Report, Verkhovskaya produced a file that identified the specific text messages for each telephone number in the form of the file "3. Exhibit J Records.csv" (hereinafter "AV Text Message Detail"), including a count of texts by date, and the aggregating vendor (Bandwidth, Twilio, etc.) that delivered each text message to the mobile telephone carrier.

f.  After identifying the telephone numbers in Step 5 as those comprising Plaintiff's potential class, Verkhovskaya then provided a sixth opinion, stating that using the class-eligible telephone numbers, "there is a reliable method of efficiently and effectively issuing notice to potential class members", which included identification of class individuals by using robust Inbound Third Party Lead Data produced by QuoteWizard, and enhancing that data with third-party reverse lookup data (from vendors such as PacificEast) when the Third Party Lead Data is somehow determined to be in any way deficient or inaccurate.

---

[3] AV Report ¶ 85: "After adding Mr. Mantha to the list of potential class members, there were **71,550** telephone numbers that received **345,534** texts …"

7.  In addition to the AV Text Message Detail, Verkhovskaya produced two additional files at the request of Defendant's counsel. These two files are:

   a.  File "1. 02684_111816.txt", which reflects the output received by Verkhovskaya from PacificEast identifying PacificEast's NDNCR registration date for each telephone number submitted, according to ¶ 67 of the AV Report. This file is referred to as the "AV NDNCR Data" throughout this Report.

   b.  File "2. 02684_111872.txt", which reflects the output received by Verkhovskaya from PacificEast identifying the business usage and associated names, addresses and associated date ranges for each telephone number submitted, according to ¶ 84 of the AV Report. This file is referred to as the "AV Consumer Data" throughout this Report.

## Summary of Opinions

8.  Based on my business experience in telecommunications and data analysis, my review of available evidence presented for this case, and my prior experience with similar TCPA cases, it is my opinion that:

   1.  Verkhovskaya's methodology fails to confirm that any single text message was successfully delivered to the intended recipient.

   2.  Verkhovskaya's use of PacificEast results in the faulty identification of NDNCR registration dates.

   3.  Verkhovskaya's methodology cannot reliably identify DNC directives.

   4.  Verkhovskaya's methodology fails to determine if the individual receiving violative text messages was the same individual who registered the given number on the NDNCR.

5. Verkhovskaya's methodology fails to accurately identify business telephone numbers to be removed from class eligibility.

6. Plaintiff's and Verkhovskaya's contention - that Onsite leads are trusted, but Inbound leads are not – is unfounded, and available consent data shows that Onsite and Inbound leads are equally reliable, and in some cases, identical.

7. Telephone numbers in Telephone numbers in Verkhovskaya's class reflect significant indicia of consent, including, without limitation, Trusted Form certificates.

8. Verkhovskaya's proposal to use QuoteWizard's records to identify names and addresses of class members conflicts with her own assumption that such records are untrustworthy.

9. Every step of Verkhovskaya's methodology fails to identify Mantha as a class member.

9. It is also worth noting that I am very familiar with the expert work performed by Verkhovskaya, having rebutted her opinions in more than 15 prior TCPA cases. Those cases include, for example, *Wilson v. Badcock*, *Sandoe v. Boston Scientific*, *Schaevitz v. Braman Hyundai*, *Dickson v. Direct Energy*, and *Shamblin v. Obama for America*, in which class certification was denied.

## Discussion of Opinions

## Opinion 1 - Verkhovskaya's methodology fails to confirm that any single text message was successfully delivered to the intended recipient.

10. In the First Kostyun Report, I explained that each text message sent by Drips was processed by an aggregating vendor, such as Bandwidth and Twilio, which subsequently sent each message to the appropriate mobile telephone carrier. However, any text message reported as

successfully delivered by those aggregators reflected only the delivery status to the mobile carrier, and NOT necessarily to the intended consumer telephone. That fact was confirmed by the deposition testimony of representatives from Bandwidth and Twilio.

11.     I also explained that numerous text messages appearing in the source data for this case were reported as successfully delivered, but could NOT have been delivered to the intended consumer telephone. I provided several examples of the unreliability of the delivery status, including, for example:

    a.   Conflicting delivery statuses reported between disparate Bandwidth text message records, and conflicting delivery statuses between Twilio and another text message source.

    b.   Call records reporting successful delivery of text messages to landline telephone numbers that are unable to receive text messages.

    c.   Call records reporting successful delivery of text messages to non-working telephone numbers.

12.     The AV Report failed to address any of the scenarios described above. Instead, Verkhovskaya's methodology appears to assume that text messages were successfully delivered to any intended consumer telephone based on the aggregator delivery status, which has been shown to be unreliable, and the existence of Do Not Call ("DNC") directive(s) from any given telephone number by way of text messages received by Drips from that number. Verkhovskaya's implication appears to be that telephone numbers that were able to send a DNC text message to Drips were therefore able to receive text messages from Drips, making them eligible for Plaintiff's class.

13.     However, my analysis reveals that there are significant flaws in Verkhovskaya's DNC analysis, and that the existence of inbound DNC text messages from any given telephone

number only indicates that the given number had received a single text message from Drips, at some point in time.

14.     As an initial matter, Verkhovskaya relied on five files described in the AV Report as "Do Not Call Files". The five files used by Verkhovskaya to identify the existence of DNC directives include:

      a.  DNC-Part1.csv
      b.  DNC-Part2.csv
      c.  DNC-Part3.csv
      d.  Inbound Messages – 2021-05-18.csv
      e.  QuoteWizard__Mantha 000211 UNREDACTED.csv

15.     I combined these five files in a "DNC Master File", and compared the telephone numbers in the DNC Master File against the 71,550 telephone numbers appearing in Verkhovskaya's Exhibit J class list. This analysis revealed that only 57,880 of the telephone numbers appearing in Verkhovskaya's Exhibit J class list also appeared in any of the five Do Not Call Files used in her analysis. This means that 13,670 telephone numbers – nearly <u>20 percent</u> - in the Exhibit J class list had NO indication of any DNC directive in the five Do Not Call Files used in Verkhovskaya's analysis, and had no basis to appear in Verkhovskaya's Exhibit J class list according to her own methodology.

16.     Moreover, of the 57,880 telephone numbers from Exhibit J that do appear in the five DNC files used by Verkhovskaya, more than 30,000 of those class numbers – 42% of her entire class – are matches with DNC records that DO NOT specify the text of the purported DNC directive, which precludes any analysis of the inbound message to determine if, in fact, a true DNC request from the consumer had been made.

17.     For example, telephone number 201-206-9517 appears only in the DNC-Part2 file used by Verkhovskaya to determine a DNC directive but the DNC-Part2 record corresponding to

201-206-9517 contains only five data fields: (1) The telephone number; (2) a *lead id* value of "125141380"; (3) a *source* value of "Campaign-Auto-Tier5"; (4) an invalid *date* value of "12:20:23 AM"; and (5) a tier value of "0". Nowhere in the DNC-Part2 file does the text content appear for any telephone number, which would be required to analyze and determine if the inbound message qualified as a valid DNC directive.

18.    Indeed, four of the five DNC files used by Verkhovskaya to determine the existence of a DNC directive – including DNC-Part1, 2, and 3, and QuoteWizard__Mantha 000211 UNREDACTED.csv – fail to include the text message content of the inbound, purported DNC directive. Once again, this means that 42% of the 71,550 telephone numbers in Verkhovskaya's Exhibit J class cannot be verified to have sent an Inbound DNC directive, which comprises the heart of her class eligibility requirements.

19.    As described above, the First Kostyun Report revealed the unreliability of the call records produced based on the existence of messages having been successfully delivered to landline numbers that are incapable of receiving text messages. My analysis reveals that Verkhovskaya's Exhibit J class data also includes telephone numbers for which successfully delivered messages were reported while that number was a landline, and incapable of receiving texts.

20.    See Figure 1 below for the activity related to text messages reported as successfully delivered to telephone number for 608-931-4477, which appears in the Exhibit J class data with four purportedly successfully delivered text messages:[4]

---

[4] In order to determine the timeframes that any given telephone number was wireless or landline, I used the database resources provided by Interactive Marketing Solutions ("IMS"). IMS is a vendor often used by plaintiffs' experts in order to identify the historical wireless/landline status of telephone numbers. The specific IMS product used is known as IMS'

| Number | Activity Date | Status type | Status |
|--------|--------------|-------------|--------|
| 6089314477 | 1/1/2010 | Portability status | Block 6089314XXX defined as wireless by default |
| 6089314477 | 12/8/2016 | Portability status | TN 6089314477 ported to Landline |
| 6089314477 | 4/15/2021 | Text activity | 1 text message reported as successfully delivered to Landline TN |
| 6089314477 | 8/3/2021 | Portability status | TN 6089314477 ported back to wireless |
| 6089314477 | 10/17/2021 | Text activity | 1 text message reported as successfully delivered to Wireless TN |
| 6089314477 | 10/18/2021 | Text activity | 2 text messages reported as successfully delivered to Wireless TN |
| 6089314477 | 10/18/2021 | Text activity | 2 DNC directives received |

Figure 1 – Text activity for 608-931-4477, showing successfully delivered text to landline number

21.  As seen in Figure 1, 608-931-4477 was a wireless telephone number from 1/1/2010 through 12/8/2016, at which time 608-931-4477 was ported to a landline telephone service. On 4/15/2021, a single text message was sent to 608-931-4477, and according to Bandwidth, that message was successfully delivered. However, 608-931-4477 was a landline number on that date, and incapable of receiving text messages. On 8/3/2021, 608-931-4477 was ported back to wireless telephone service, after which one text message was sent on 10/17/2021 and two messages were sent on 10/18/2021. Also, two DNC directive message were received by Drips on 10/18/2021,

22.  Verkhovskaya's Exhibit J calls list incorrectly indicates that 608-931-4477 received four text messages, but at least one of those messages – on 4/15/2021 – could NOT have been successfully delivered, since 608-931-4477 was a landline telephone number on that date.

23.  In another example, telephone number 970-323-0159 appears in the Exhibit J class data, with text records indicating that one successfully delivered text message was sent on 1/28/2021, and one successfully delivered text message was sent on 6/25/2021. See Figure 2 below for the text and porting activity related to 970-323-0159:

---

TCPA Litigation and Audit Services. See https://www.ims-dm.com/mvc/page/tcpa-litigation-service/ (last visited 10/14/2023).

| Number | Activity Date | Status type | Status |
|--------|--------------|-------------|--------|
| 9703230159 | 1/1/2010 | Portability status | Block 9703230XXX defined as landline by default |
| 9703230159 | 1/28/2021 | Text activity | 1 text message reported as successfully delivered to Landline TN |
| 9703230159 | 2/25/2021 | Portability status | TN 9703230159 ported to wireless |
| 9703230159 | 6/25/2021 | Text activity | 1 text message reported as successfully delivered to Wireless TN |
| 9703230159 | 6/25/2021 | Text activity | 1 DNC directives received |

Figure 2 – Text activity for 970-323-0159, showing successfully delivered text to landline number

24.     As seen in Figure 2 above, a single text message was sent to 970-323-0159 on 1/28/2021, and according to Bandwidth, that message was successfully delivered. However, 970-323-0159 was a landline number on that date, and incapable of receiving text messages.

25.     Verkhovskaya's Exhibit J calls list incorrectly indicates that 970-323-0159 received two text messages, since at least one of those messages – on 1/28/2021 – could NOT have been successfully delivered, since 970-323-0159 was a landline telephone number on that date.

26.     And in this example, telephone number 360-430-6203 appears in the Exhibit J class data, with text records indicating that successfully delivered text messages were sent on 7/3, 7/5 and 7/6/2021 (according to aggregator Teli), and successfully delivered text messages were sent on 11/19, 11/20 and 11/21/2021 (according to aggregator Bandwidth). See Figure 3 below for the text and porting activity related to 360-430-6203:

-13-

| Number | Activity Date | Status type | Status |
|---|---|---|---|
| 3604306203 | 1/1/2010 | Portability status | Block 3604306XXX defined as wireless by default |
| 3604306203 | 2/25/2021 | Portability status | TN 3604306203 ported to landline |
| 3604306203 | 7/3/2021 | Text activity | 1 text message reported as successfully delivered to Landline TN |
| 3604306203 | 7/5/2021 | Text activity | 1 text message reported as successfully delivered to Landline TN |
| 3604306203 | 7/6/2021 | Text activity | 1 text message reported as successfully delivered to Landline TN |
| 3604306203 | 10/15/2021 | Portability change | TN 3604306203 ported back to wireless |
| 3604306203 | 11/19/2021 | Text activity | 2 text messages reported as successfully delivered to Wireless TN |
| 3604306203 | 11/20/2021 | Text activity | 2 text messages reported as successfully delivered to Wireless TN |
| 3604306203 | 11/21/2021 | Text activity | 1 text message reported as successfully delivered to Wireless TN |
| 3604306203 | 11/21/2021 | Text activity | 1 DNC directive received |

Figure 3 – Text activity for 360-430-6203, showing successfully delivered text to landline number

27.     As seen in Figure 3 above, three text messages were sent to 360-430-6203 on 7/3, 7/5 and 7/6/2021, and according to Teli, those messages were successfully delivered. However, 360-430-6203 was a landline number on that date, and incapable of receiving text messages.

28.     Verkhovskaya's Exhibit J calls list incorrectly indicates that 360-430-6203 received three text messages, since at least three of those messages – on 7/3, 7/5 and 7/6/2021 – could NOT have been successfully delivered, since 970-323-0159 was a landline telephone number on those dates.

### Opinion 2 – Verkhovskaya's use of PacificEast results in the faulty identification of NDNCR registration dates

29.     As described in the First Kostyun Report, vendors that have been used by plaintiffs' experts fail to provide any significant documentation of their services that purport to identify DNC registration dates, and fail to advertise any testing methods or statistics that could be used to determine the reliability or accuracy of such services. This is true with the vendor used by

Verkhovskaya – PacificEast - in her attempt to identify the NDNCR registration dates of the Exhibit J class-eligible telephone numbers.

30.    Neither Verkhovskaya nor PacificEast provides any documentation certifying the accuracy or reliability of any historical NDNCR registration dates that it may provide. And with some 260 million telephone numbers registered on the NDNCR, any vendor such as PacificEast would be required to test thousands of telephone numbers for which the registration dates were already known, in order to provide statistically significant results as to the accuracy of the registration dates provided.

31.    However, I was able to analyze the registration dates provided by PacificEast for the telephone numbers appearing in Verkhovskaya's Exhibit J class results, and found that there are significant errors in those registration dates.

32.    At the request of Defendant's counsel, Verkhovskaya produced a copy of the PacificEast output reflecting the NDNCR registration dates received by Verkhovskaya, according to ¶ 67 of the AV Report.

33.    I then matched the PacificEast NDNCR registration dates against the 71,550 telephone numbers in Verkhovskaya's Exhibit J class list, and found that 3,455 telephone numbers (nearly 5 percent) reflect an invalid registration date of 6/1/2003.

34.    This registration date is invalid because the NDNCR did not begin accepting registrations until 6/27/2003, which is confirmed by an email from the FTC appearing as Exhibit A. There is no evidence indicating that the NDNCR registration dates provided by PacificEast are reliable or accurate, and it is indisputable that at least five percent of those dates for Exhibit J class telephone numbers are erroneous. Accordingly, it is my opinion that none of the NDNCR registration dates provided by PacificEast can be trusted for accuracy.

35.     Furthermore, as described in Opinion 9 below, Verkhovskaya made no attempt to demonstrate that PacificEast could identify any NDNCR registration date for Plaintiff's telephone number.

**Opinion 3 – Verkhovskaya's methodology cannot reliably identify DNC directives**

36.     The AV Report makes it clear that the identification of class-eligible telephone numbers is dependent on the receipt of a text message from each given telephone number indicating a DNC directive. For example, the first step of Verkhovskaya's methodology states that she can limit the proposed class to (among other criteria) "consumers who responded to the texts with a request that the telemarketing cease" (AV Report, Opinion 1).

37.     In the First Kostyun Report, I explained that many of the text messages sent from consumers to Drips, which Drips determined to be DNC directives, did not qualify as true DNC requests. Manual analysis of a subset of those inbound messages revealed that the message content did NOT appear to qualify as a request to cease communications, and in many cases, appeared to indicate that the consumer wished to engage with Drips/QuoteWizard, and wished to continue communications.

38.     The First Kostyun Report presented a list of some 60 text messages, based on a manual review of the message content, showing that Drips' interpretation of purported DNC directives was faulty, and that those inbound messages actually appear to represent consumer engagement and desire for further communications.

39.     Indeed, nine of those 60 misinterpreted DNC directives are related to telephone numbers appearing in Verkhovskaya's Exhibit J class data.

40.     Moreover, after manual review of the purported DNC directives corresponding to the Exhibit J class telephone numbers, I was able to identify an additional 20 messages from the

"Inbound Messages – 2021-05-18.csv" DNC file that correspond to numbers in the Exhibit J class list, but do not appear to be DNC directives, and in many cases appear to be requests from the consumer for further engagement.[5] See Figure 4 below for a listing of the nine invalid DNC directives that correspond to Exhibit J class numbers from the First Kostyun Report, as well as an additional 28 invalid DNC directives from my most recent analysis.

---

[5] The 28 additional invalid DNC directives were found by manually searching only a small portion of the DNC directives from the "Inbound Messages – 2021-05-18.csv" files matching telephone numbers in the Exhibit J class records. These 28 invalid DNC directives were found within the first 100 records (sorted by telephone number) from the "Inbound Messages – 2021-05-18.csv" file matching telephone numbers in the Exhibit J class records.

| Number | Inbound text content indicating invalid DNC directive |
|---|---|
| 2017041712 | Please give me a call today after 2pm. If you cant provide a quote for me that is not involving Amerihealth, and is under not a crazy number we don't need to talk |
| 2143251916 | Amanda, I have a a steady Geico, I'm paying $75 - not sure you can match it |
| 3864021507 | I do need insurance and I'm working right now. I get off at 6:30 tonight |
| 4045938119 | Hey! I deliver with Uber and think you should try it too. Sign up with my referral link today and you could qualify for a new promotion where you are guaranteed to make at least $800 in total payout for your first 100 trips: https://www.uber.com/signup/drive/deliver/?invite_code=t8tw15pq5 |
| 4192983477 | I see your text message I am currently with State Farm I was just looking at what other insurance companies were doing not really wanting to change |
| 6107374199 | Amanda my renewal for insurance is 7/2021 & I will revisit beginning of June |
| 6196740453 | Well hopefully 10 or 11am tomorrow we'll be ok with you. I'm really hoping to find some better AUTO + HOME INSURANCE SOON. SORRY ABOUT TODAY! |
| 7574776604 | Good afternoon already got Medicare do I need a second health insurance |
| 8132406895 | Can u call me in the am 813 240 6895. I don't even drive 50 miles in 2 or 3 weeks n I can tell u the ins I now have with State Farm n I have been with them for years. I believe I may have too much ins |
| 2015438699 | Hi Amanda. I'm a Allstate customer in NJ but will be moving to FL in June. And wanted to know what the cost will be there. The address that I'll be living is 6207 S West Shore Blvd. Apt 2012 Tampa FL 33616 I'm busy until 5 pm today but we could speak tomorrow @ 9:30 am |
| 2018786179 | Hi thank you for sending me the information to me it that right price $87 / month if the yes i like to switch my insurance asap |
| 2032337357 | Monday morning would be better for me! Thank you for calling! |
| 2054715791 | You can call me now if you want. I have to work tomorrow. |
| 2069489413 | My insurance is only $32 a month. Full coverage. If you can offer a better rate call me back |
| 2083174144 | Please call again...am having trouble with my phone |
| 2102641217 | I just got out of a 10 hour shift.  I will call you tomorrow Ã°Å¸Ëœâ€ |
| 2103475399 | What insurance company is this. I have had State Farm for over 40 years same agent the dad died now the son handles everything. Never has my insurance gone done just keeps going up. Let me know what company you work for. Don't want Farmers,  State Farm nor All State |
| 2103928202 | So my insurance will cost me$176 month full coverage |
| 2104215607 | Please send quotes to Almayarnold 0358@aol.com Ty Amanda |
| 2104736091 | I'm sorry Amanda I have bee in the hospital and should could get out soon.   I don't have my current policy with me |
| 2132821811 | Can we continue texting because i can't talk right now |
| 2144181538 | Can you please call me tomorrow about 10:30am. Please thank you |
| 2147146166 | Good morning ladies! Is it possible for you to stop by my house today and sign the baseball medical release form (again)? I can leave it on chair by my front door so just come by whenever. I live at 1121 Via Carolina (off Nautilus...near Muirlands Middle School). Thanks! |
| 2183301912 | I apologize for that.  I'm by my phone right now and will have it with me for the next hour |
| 2015667616 | Amanda may we have a telephone call to discuss my auto insurance today?  My cell phone is 2015667616. Thanks. Chih-ying chung |
| 2017369041 | Amanda,  I'm kind of quoted-out today, if you call me tomorrow  around noontime, I'd be happy to talk to you.    Allen Peduto |
| 2019936688 | I can't talk right now. I'll call you back shortly. |

| | |
|---|---|
| 2024159796 | Amanda This is Tina Richardson unfortunately I have to work late and I can't use my phone while I'm working if you call me tomorrow around 10:30 a.m. I'll put aside by break time and we can get to work on getting me some insurance I'm just really busy right now sorry |
| 2035001128 | I'm sorry.  I'm at work right now and want to check my current policy for comparison.  I should be available after 5pm |
| 2035433526 | I am NOT available now. I am working. If you have enough information to provide a quote, please send it. If not, I will call you back to provide that info when I am available to do so. Thank you for following up. Have a great day. |
| 2055638396 | Hey Amanda, i'm actually at work. I'll let you know a good day and time as soon as possible. |
| 2062906569 | I'm on vacation in carribean and can't take calls. Back next week. |
| 2069799888 | Perhaps tomorrow. Is there a time that works for you? |
| 2093568716 | Full coverage roadside assistance towing and car rental may I please have a quote for that coverage |
| 2099884241 | I have it but have not had time to look at it yet. Sorry |
| 2099963740 | Thank you Amanda I look forward to talking with you |
| 2152750895 | I am not doing this right now.  I can't talk until next week. Thanks for the text. . |

Figure 4 – Invalid DNC directives matching Exhibit J class telephone numbers

41.     I also performed further analysis by identifying some of the most frequent responses that appear in the "Inbound Messages – 2021-05-18.csv" file, which is the single DNC file out of the five used by Verkhovskaya that actually includes the text of the message provided by the consumer. I identified 30 common consumer responses that Verkhovskaya's methodology considers DNC directives but that appear to be ambiguous, such as "no", "no thanks", "OK", "yes", or "who is this". The full list of 30 ambiguous responses – that Verkhovskaya assumes to be DNC directives – appears in Exhibit D.

42.     I compared the telephone numbers appearing in Verkhovskaya's Exhibit J class list, with the telephone numbers from the "Inbound Messages – 2021-05-18.csv" files used by Verkhovskaya to determine DNC directives, and found that more than 12,500 telephone numbers in her Exhibit J class list were based on one of the 30 ambiguous DNC directives, which do NOT clearly indicate that the consumer wishes to no longer receive text messages from Drips.

43.     For example, telephone number 951-238-8456 appears in Verkhovskaya's Exhibit J class list, indicating that it received nine violative text messages. According to Verkhovskaya,

951-238-8456 appeared in one of the five DNC files used to indicate that the consumer at 951-238-8456 has provided a DNC directive by way of an inbound text message, asking for the messages from Drips to stop.

44.     Telephone number 951-238-8456 is found in the "Inbound Messages – 2021-05-18.csv" file, which is the only one of the five DNC files used by Verkhovskaya that includes the text of the inbound message. In this case, 951-238-8456 appears in that file with the following three inbound messages:

    a.  Who is this
    b.  Yes
    c.  724 is a Pennsylvania area code

45.     As seen in these three inbound messages, the first 2 messages are included in the list of 30 common, ambiguous responses that appear in Exhibit D – neither "Who is this" nor "Yes" appear to indicate that the consumer wishes the messages to stop. The third response "724 is a Pennsylvania area code" is similarly ambiguous, and also fails to indicate a clear (or even subtle) request to cease further messages.

46.     Moreover, even for consumer responses that provide the text of the inbound message, there is no reliable way to identify the outbound message or message text sent by Drips, to which the consumer is responding. This means that even individualized analysis of the content of consumer responses may not be able to reliably identify true DNC directives, since there is no context of the message to which they are responding.

47.     And since Verkhovskaya's methodology depends on identifying at least one DNC directive from the DO Not Call Files, it is clear that her Exhibit J class list is rife with telephone numbers that do NOT have any corresponding DNC directive or, at best, DNC directives that are ambiguous or subject to individualized interpretation. Moreover, in order to remedy this problem,

significant manual review of the DNC directives (if they even exist) for each of the 71,550 numbers in Exhibit J would be required in order to determine if such valid DNC directives exist. See Figure 4a below for a summary of the Telephone Numbers in Verkhovskaya's Exhibit J class list, showing that there are 43,745 numbers in Exhibit J for which no response from Drips exists that would indicate the verbiage of any DNC directive – and for which no review of that directive could be performed – based on the five DNC data sources used by Verkhovskaya.

|   | A | B | C |
|---|---|---|---|
| 1 | **Source of DNC Directive** | **TNs matching Ex J** | **TNs with DNC text** |
| 2 | DNC Part1, Part2, Part3, QuoteWizard__Mantha 000211 | 30,075 | 0 |
| 3 | Inbound Messages – 2021-05-18 | 27,805 | 27,805 |
| 4 | No DNC Source | 13,670 | 0 |
| 5 | Total | 71,550 | 27,805 |
| 6 | Ex J TNs without DNC text (B5 - C5) | 43,745 | |

Figure 4a – Summary of Exhibit J Telephone Numbers and related DNC directives

### **Opinion 4 – Verkhovskaya's methodology fails to determine if the individual receiving violative text messages was the same individual who registered the given number on the NDNCR**

48.    Subject to various exceptions and exemptions, 47 C.F.R. § 64.1200(c)(2) prohibits telephone solicitations to:

> A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

49.    It is my understanding that Plaintiff must identify calls in violation of the DNC rules as those that were placed to the subscriber who registered that number on the Registry.

50.    However, based on the AV Consumer Data that Verkhovskaya received from PacificEast, the majority of telephone numbers in the Exhibit J class data report that the consumer(s) associated with their number during the class period were NOT associated with that number at the time it was registered on the NDNCR.

51.    The AV Consumer Data that Verkhovskaya received from PacificEast identifies one or more records for each telephone number provided, which identify – according to PacificEast – the name of the consumer associated with the number, the consumer's address, city, state and zip, and the date range (known as firstseen and lastseen dates) during which that consumer was associated with that number.

52.    I was able to add the NDNCR registration dates provided by PacificEast (from the AV NDNCR Data) to the AV Consumer Data, and then determine which telephone numbers were identified as having the consumer associated with it on the NDNCR registration date, and which telephone numbers were identified as having a consumer associated with it at a date that did NOT include the NDNCR registration date.

53.    This analysis revealed that 48,812 of the 71,550 numbers in the Exhibit J class data **were registered by someone other than the individual associated with that number** during the class period. Based on my understanding of the relevant statute, this means that **68%** of the telephone numbers in Verkhovskaya's Exhibit J class data are not eligible for NDNCR protection.

54.    In Opinion 8 below, I provide a full discussion of Verkhovskaya's proposal to use the third-party lead data produced by Defendant in order to identify the names and addresses of the class members for class notification purposes. Verkhovskaya describes her proposal to identify class members associated with her Exhibit J class telephone numbers as "Using the consumer data produced in discovery by QuoteWizard, as supplemented as needed by commercially available databases connecting telephone numbers to the names and addresses of consumers, there is a reliable method of efficiently and effectively issuing notice to potential class members[.]" (AV Report Opinion 6). Verkhovskaya even describes the consumer data found in Defendant's third-party lead data as "Robust" (*Id.* ¶ 92).

55.     I was also able to compare the NDNCR registration dates of the telephone numbers appearing in Verkhovskaya's Exhibit J class data, with the date of birth ("DOB") of the individuals associated with those numbers, according to a subset of the third-party lead data produced by Defendant. This analysis revealed that thousands of calls that appear in Verkhovskaya's class data were registered on the NDNCR when the individuals identified by that third-party lead data were ten years old, or younger, or in some cases, not yet born. In other words, thousands of telephone numbers and calls in the Exhibit J class data were registered by some individual who could not possibly have been the individual who Verkhovskaya plans to identify as the class members associated with the given telephone number.

56.     For example, telephone number 937-603-4908 appears in the Exhibit J class data, which reflects two calls purportedly in violation of the NDNCR. According to PacificEast, 937-603-4908 was registered on the NDNCR on 11/30/2004. Telephone number 937-603-4908 also appears in the "Inbound XML 10 07 2022" set of third-party lead data produced by Defendant, from the lead vendor BlueInkDigital. According to this third-party lead data, 937-603-4908 is associated with an individual named David Cantrell at 4029 Parkview Rd, Mechanicsburg, OH. This name and address from Defendant's third-party lead data is also an exact match for the AV Consumer Data that Verkhovskaya received from PacificEast for telephone number 937-603-4908.

57.     However, the third-party lead data for this lead/consumer also identifies the lead's DOB as 12/5/1994. And when compared with the NDNCR registration date (11/30/2004) from PacificEast for this number, we discover that David Cantrell – whom Verkhovskaya would propose as the class member for this number – was only 9 years, 11 months, and 25 days old at the date of registration. Since it is highly unlikely than any child under the age of ten would have

registered their telephone number on the NDNCR, then 937-603-4908 was registered by some individual other than David Cantrell. Therefore, as Verkhovskaya's proposed class member, David Cantrell would not be eligible for TCPA damages, based on my understanding of the relevant statute.

58.    In another example, telephone number 602-708-9685 appears in the Exhibit J class data, which reflects four calls purportedly in violation of the NDNCR. According to PacificEast, 602-708-9685 was registered on the NDNCR on 10/23/2007. Telephone number 602-708-9685 also appears in the "Inbound XML 10 07 2022" set of third-party lead data produced by Defendant, from the lead vendor AvengeDigital. According to this third-party lead data, 602-708-9685 is associated with an individual named Christian RojasSalas at 2610 W Washington St,  Phoenix, AZ. This name and address from Defendant's third-party lead data is also an exact match for two of the records in the AV Consumer Data that Verkhovskaya received from PacificEast for telephone number 602-708-9685.

59.    However, the third-party lead data for this lead/consumer also identifies the lead's DOB as 10/25/2002. And when compared with the NDNCR registration date (10/23/2007) from PacificEast for this number, we discover that Christian RojasSalas – whom Verkhovskaya would propose as the class member for this number – was only 4 years, 11 months, and 28 days old at the date of registration. Since it is highly unlikely than any <u>child under the age of **five**</u> would have registered their telephone number on the NDNCR, then 602-708-9685 was registered by some individual other than Christian RojasSalas. Therefore, as Verkhovskaya's proposed class member, Christian RojasSalas would not be eligible for TCPA damages, based on my understanding of the relevant statute.

60.     And in this example, telephone number 951-805-3095 appears in the Exhibit J class data, which reflects six calls purportedly in violation of the NDNCR. According to PacificEast, 951-805-3095 was registered on the NDNCR on 4/10/2004. Telephone number 951-805-3095 also appears in the "Inbound XML 11 09 2022" set of third-party lead data produced by Defendant, from the lead vendor InsuredNation. According to this third-party lead data, 951-805-3095 is associated with an individual named Gloria Lopez at 602 Quail Dr, Riverside, CA. This name and address from Defendant's third-party lead data is also an exact match for one of the records in the AV Consumer Data that Verkhovskaya received from PacificEast for telephone number 602-708-9685.

61.     However, the third-party lead data for this lead/consumer also identifies the lead's DOB as 11/15/2002. And when compared with the NDNCR registration date (4/10/2004) from PacificEast for this number, we discover that Gloria Lopez – whom Verkhovskaya would propose as the class member for this number – was <u>less than 17 months old</u> at the date of registration. Since it is impossible than any <u>child less than a year-and-a-half old</u> would have registered their telephone number on the NDNCR, then 951-805-3095 was registered by some individual other than Gloria Lopez. Therefore, as Verkhovskaya's proposed class member, Gloria Lopez would not be eligible for TCPA damages, based on my understanding of the relevant statute.

62.     All told, my analysis revealed that Verkhovskaya's Exhibit J list of proposed class telephone numbers included nearly 4,500 calls, and 1,600 unique telephone numbers, for which the proposed class member – according to Verkhovskaya's methodology – would have been less than ten years old at the date of the NDNCR registration as reported by PacificEast. And these results are only based on the third-party lead data that happened to include a DOB for the consumer/lead.

63.     Moreover, it is my opinion that the task of identifying the true individual who registered any given number would require a highly labor intensive and manual investigation, which could include comparison of identification records from multiple sources (such as PacificEast, Defendant's own consent records, and other third-party reverse lookup vendors) as well as the likely requirement of contacting individual consumers (if possible) to verify the dates they were associated with any given number, and whether or not they were the individual who registered that number on the NDNCR.

### Opinion 5 – Verkhovskaya's methodology fails to accurately identify business telephone numbers to be removed from class eligibility

64.     In the AV Report, Plaintiff's expert states "I consider a telephone number as residential if it is identified as such even if it might occasionally be utilized for work or for home/small business." (AV Report ¶ 79). Verkhovskaya provides no evidence that this is a valid assumption. Moreover, she provides no evidence that PacificEast has the capacity to determine which telephone numbers are used only for business purposes. Her only criteria appear to be her unsupported statement that "PacificEast accesses various data sources to determine whether telephone numbers were subscribed as belonging to business entities. Business entities can be identified based upon various business telephone listings (yellow pages, white pages, other business directories, websites, etc.)." But that is exactly the same criteria that I used to identify numerous business telephones that PacificEast failed to identify as business-related.

65.     For example, telephone number 818-324-1807 appears in the Exhibit J class data, which means that PacificEast determined this to be a residential telephone number. However, in the First Kostyun report, I identified 818-324-1807 as a number that I found to be associated with the business of Therapist Suzanne Schuda in Agoura Hills, CA, and provided two websites advertising Schuda's business, and specifying the 818-324-1807 as her contact number. One of

those websites was at https://www.ehealthscores.com/ - a web-based location service for healthcare providers. And the second business listing for 818-324-1807 was found on https://www.b2byellowpages.com/ - exactly the type of business resource that Verkhovskaya claims PacificEast uses to identify business numbers. However, in this instance, PacificEast did NOT identify 818-324-1807 as a business number, but my individualized research did. See Figure 4 below for an image of the b2byellowpages listing that prominently displays 818-324-1807 as Schuda's business number.



Figure 4 – B2BYellowPages business listing for 818-324-1807

66. Since the production of the AV Report, I was able to search a small subset of the telephone numbers in Exhibit J, which were all purportedly identified as residential number by

Verkhovskaya through PacificEast. In this example, telephone number 407-590-8000 appears as a residential number in the Exhibit J class data. My individualized research for this number found it to be associated with the business Benson Hardwood Floor Refinishing in Orlando, FL, with two associated websites advertising that business and associating it with the 407-590-8000 number. One such website appeared on mapquest.com, and the second website appeared on Yellowpages.com – one of the specific web resources that Verhovskaya touts as a resource used by PacificEast, but one that PacificEast did not recognize when it incorrectly identified 407-590-8000 as a residential number. See Figure 5 below for an image of the YellowPages.com business listing for 407-590-8000.



Figure 5 - YellowPages.com business listing for 407-590-8000

67.     By manually investigating a small portion of the Exhibit J class telephone numbers, I was able to identify 20 numbers that appear in Plaintiff's proposed class, that had been incorrectly identified as residential numbers by PacificEast. See Figure 6 below for a listing of those 20 numbers, the business(es) associated with each number, and the website(s) associated with each number that advertise the business, and include the telephone numbers that are mistakenly included in Verkhovskaya's Exhibit J class list.

| TN | Business Name(s) | Website(s) |
|---|---|---|
| 2037150000 | Sassy Posy Florist | https://www.facebook.com/SassyPosy/ |
| 2086278000 | Sarah Rieper Real Estate | https://www.realtor.com/realestateagents/5680d9117e54f701001f3eb3 |
| 2197650000 | Gina Musolino - Real Estate Agent | https://www.yelp.com/biz/gina-musolino-coldwell-banker-residential-brokerage-schererville |
| | | https://www.coldwellbanker.com/in/schererville/agents/gina-musolino-aid-P00200000FSk21bA10WsKbjooX6WZtMQoMruUgXC |
| 3034120000 | Dr. Donald Witte MD | https://www.healthcare4ppl.com/physician/colorado/englewood/donald-e-witte-1932403243.html |
| | | https://www.yellowpages.com/englewood-co/mip/witte-donald-545367690 |
| | | https://doctor.webmd.com/doctor/donald-witte-bf841109-2d77-4ad1-8e66-44b43f1e881d-overview |
| 3057419000 | Lady Green Recycling | https://www.ladygreenmiami.com/ |
| | | https://www.chamberofcommerce.com/united-states/florida/miami/recycling-center/2013075226-lady-green-recycling |
| 4016781000 | Christopher Howard General Contractor | https://www.yelp.com/biz/christopher-m-howard-smithfield |
| | | https://www.manta.com/c/mb4lf4s/christopher-howard |
| | | https://www.bbb.org/us/ri/north-providence/profile/general-contractor/christopher-m-howard-0021-455377 |
| 4075908000 | Benson Hardwood Floor Refinishing | https://www.yellowpages.com/orlando-fl/mip/benson-hardwood-floor-refinishing-co-461844614 |
| | | https://www.mapquest.com/us/florida/benson-hardwood-floor-refinishing-co-432593720 |
| 5152910000 | St. Paul's Lutheran Church | http://stpaulschurchwilliams.com/ |
| 5178966886 | Arbonne International | https://www.dandb.com/businessdirectory/arbonneinternational-midland-mi-1976566.html |
| 5615721000 | East Coast Impact Shutters | https://www.bbb.org/us/fl/stuart/category/shutters |
| 5736827000 | J & J Applique Clothing | https://www.facebook.com/p/J-J-Applique-100063786983962/?paipv=0&eav=AfaI6Iwq0fosSsGxhmoP7v-APIFnUsy_cKpw89pb-BsOuWByTFWI3XpMDitg_jGf_i0&_rdr |
| 6128037000 | SaaS Wireless LLC | https://www.manta.com/c/mhqln8s/saas-wireless-llc |
| | | https://wireless2.fcc.gov/UlsApp/UlsSearch/license.jsp?licKey=3056623 |
| 6026898000 | Bendigo Custom Stone | https://www.buzzfile.com/business/Bendigo-Custom-Stone-Inc-602-689-8000 |
| | | https://www.manta.com/c/mtmzt5l/bendigo-custom-stone-inc |
| 7063934000 | Johnny Outlaw Advertising | https://www.yellowpages.com/columbus-ga/mip/outlaw-johnny-advertising-graphics-agency-464910234 |

| | | https://www.showmelocal.com/profile.aspx?bid=2246260 |
|---|---|---|
| 7406496000 | Punky's Seafood | https://www.facebook.com/punkyseafood/ |
| 8183241807 | Suzanne G Schuda Therapist | https://www.b2byellowpages.com/company-information/095140483-schuda-suzanne-g.html |
| | | https://www.ehealthscores.com/care-llpptxwtlw-suzanne-schuda-agoura-hills.html |
| | | https://npiprofile.com/npi/1144358318 |
| 8433306000 | Marie Fox Medical PhD | https://clustrmaps.com/person/Fox-5s6s7r |
| 8439100000 | 360 Communications | https://www.mapquest.com/us/south-carolina/360-communications-416199737 |
| 9042000000 | Beautiful Inventions Research | http://beautifulinventions.com/ |
| | Kelly B Kraftin Artist | https://www.facebook.com/Kelly.B.Kraftin/ |
| 9492029000 | Gold Depot LLC | https://www.buzzfile.com/business/Gold-Depot-LLC-949-202-9000 |

Figure 6 – Business telephone numbers appearing in Exhibit J class mistakenly identified as residential by PacificEast

68.     As seen with the websites advertising these businesses, they have been found on the type of business-related web resources that Verkhovskaya claims to be used by PacificEast, including B2BYellowPages; YellowPages.com; Yelp; Buzzfile (a company information database); Manta (an online marketing agency); various real estate websites; WebMD Care and other healthcare websites; the Better Business Bureau; dun & bradstreet; Facebook; and websites dedicated to the identified business.

69.     Moreover, recall from the First Kostyun Report (¶¶ 148-149) that PacificEast also failed to identify the telephone numbers of Plaintiff's counsel (Paronich and Broderick) as business telephone numbers, even though those two numbers appear on the signature page from Plaintiff's First Amended Complaint.

70.     Furthermore, the erroneous business entries that were found in Verkhovskaya's Exhibit J class list were not only missed by PacificEast, but they were also missed by Verkhovskaya and her team's manual attempt to identify additional business entries, based on the appearance of business keywords in the associated names provided by PacificEast. Verkhovskaya

provided a list of 380 keywords ("380-List") used to filter additional business entries as Exhibit I to the AV Report. However, Verkhovskaya provided no origin for those keywords, no rationale as to why those specific keywords were used, and no description of the method used to compare the keywords against the names provided by PacificEast. Nonetheless, even after filtering by PacificEast and Verkhovskaya's subsequent review of business keywords, the Exhibit J class results still demonstrate that a significant number of telephone numbers in the proposed class indicate a business purpose.

71.     Even more concerning, Verkhovskaya's attempt to identify class telephone numbers with PacificEast names that included business keywords was faulty for multiple reasons. Indeed, my analysis revealed that Verkhovskaya's methodology failed to filter more than 90 telephone numbers from her class results, because of either (1) business names that included business keywords from the 380-List, but Verkhovskaya's faulty filtering process failed to identify and remove the numbers with those business names, or (2) business names with a likely business identification (e.g. "Lending" or "Ctdefenselawyer"), that do not reflect any keywords in the 380-List, and Verkhovskaya's filtering methodology provides no accommodation to catch such business names, since individualized analysis would be required.

72.     For example, telephone number 203-536-5989 still appears in the Exhibit J class results, although PacificEast returned the name "ROBEKS CORPORATION" for that number, and "corporation" was among the 380 keywords purportedly used by Verkhovskaya to remove additional business numbers.

73.     In another example, telephone number 503-442-1699 still appears in the Exhibit J class results, although PacificEast returned the name "ROBERT GRIFFIN PLUMBING HEATING COMPANY" for that number, and at least two keywords – "Company", and "heating"

– appear in the PacificEast name, while being listed in the business keywords used by Verkhovskaya to filter business numbers.

74.     In this example, telephone number 281-772-9673 still appears in the Exhibit J class results, although PacificEast returned the name "Davis Service" for that number, the keyword "Service" appears in the PacificEast name, while being listed in those business keywords used by Verkhovskaya to filter business numbers.

75.     The results of my analysis of business names missed by Verkhovskaya's comparison with her list of keywords revealed that her methodology to identify and filter business names that included dozens of keywords from her 380-List, such as "School", "group", "LLC", "Businesses", "Company", "Construction", "Service", and many more.

76.     Telephone number 401-255-7800 still appears in the Exhibit J class results, although PacificEast returned the name "Biotechnology Integration" for that number. In this case, Verkhovskaya's 380-List of business identifiers does not appear to include any keyword that would identify "Biotechnology Integration" as a business. But manual analysis of this name clearly indicates the identification of a possible business, demonstrating that Verkhovskaya's business keywords are incomplete.

77.     Similarly, telephone number 916-541-2937 still appears in the Exhibit J class results, although PacificEast returned the name "Pacifica Lending" for that number. In this case, Verkhovskaya's 380-List of business identifiers does not appear include any keyword that would identify "Pacifica Lending" as a business. But manual analysis of this name clearly indicates the identification of a possible business, again demonstrating that Verkhovskaya's business keywords are incomplete.

78.    The results of my analysis of business names still appearing in the Exhibit J class list, for which no keyword appears in Verkhovskaya's 380-List, includes numerous business names returned from PacificEast, but missing from the 380-List, such as "Biotechnology Integration", "Pacifica Lending", "Ctdefenselawyer", "Ctdefenselawyersassoc", "Ruchardrichter Cancerfoundation", "Land Corps", "Carstar Collision", and many more.

79.    Clearly, Verkhovskaya's attempt to use a classwide resource such as PacificEast is incomplete and unreliable, as would be with the use of any other vendor that purports to identify all businesses based on telephone numbers. And it is also clear that the individualized research and analysis that I performed would be the only method to come close to accurately identifying the business telephone numbers that must be removed from Plaintiff's proposed class.

80.    Throughout the discussion of Opinions 2 through 5 above, my analysis demonstrated that Verkhovskaya's Exhibit J class results improperly include telephone numbers with the following DNC errors:

a.    Numbers that do not appear in the five DNC files used by Verkhovskaya to identify the receipt of DNC directives
b.    Numbers included in a DNC directive file, but without any text that would indicate a DNC request
c.    Numbers that include ambiguous DNC text that cannot be clearly interpreted to indicate a DNC directive
d.    Numbers with invalid NDNCR registration dates
e.    Numbers registered by an individual other than the consumer associated with the number at the time of the call
f.    Numbers associated with individuals who were less than ten years of age at the date of NDNCR registration

81.    My analysis of these errors further reveals that at least 93 % of the telephone numbers in Plaintiff's putative class list are not appropriate class members for one or more of the six reasons above. And the true total of inappropriate class members is undoubtedly higher, since

Plaintiff's class also includes some number of invalid business telephone numbers, which can only be determined by way of individualized analysis.

### Opinion 6 – Plaintiff's and Verkhovskaya's contention - that Onsite leads are trusted, but Inbound leads are not – is unfounded, and available consent data shows that Onsite and Inbound leads are equally reliable, and in some cases, identical

82.    Verkhovskaya's methodology relies on the premise that class members should include only telephone numbers that came from third party-generated leads (typically produced as "Inbound" leads), and that telephone numbers originating from QuoteWizard's own websites (typically produced as "Onsite" leads) should not be considered for class inclusion (AV Report ¶ 2).

83.    There is no explanation or evidence presented by Verkhovskaya as to why Inbound leads are somehow less reliable than Onsite leads – only the implication that Onsite leads can be trusted to represent true consent, while Inbound leads cannot.

84.    I analyzed the lead data presented with Inbound leads that appear in Verkhovskaya's Exhibit J class results, against the lead data presented with Onsite leads (which appear to be the *trusted* leads in Verkhovskaya's methodology) and found that the type of lead data appearing in both Inbound and Onsite leads is essentially identical.

85.    For example, telephone number 201-320-5748 appears in Verkhovskaya's Exhibit J class list, and is also found in one of the Inbound lead files produced as Inbound XML 11 09 2022, from which I extracted the lead-identifying XML markup language for 201-320-5748. I then compared that markup language with the equivalent data for telephone number 602-904-1147, which is found in the file named Onsite XML 11 09 2022, which, according to Verkhovskaya, is a *trusted* lead source.

86.     That comparison revealed that the type of lead data for the third-party Inbound lead (telephone number 201-320-5748) was virtually identical to the type of lead data for the Onsite lead (telephone number 602-904-1147). Both lead XML files include the same three major categories of lead data: General Info; Applicant Contact Info; and Auto Information.

87.     Figures 7 and 8 below indicate that the same General Info data appears for both the Inbound lead (201-320-5749) and the Onsite lead (602-904-1147):

```
<GeneralInfo
    <SourceId>BLUEINKDIGITAL</SourceId>
    <ConsumerIP>72.188.79.211</ConsumerIP>
    <PartnerId>10056</PartnerId>
    <PartnerLeadCreatedTime>2020-09-16T22:25:41Z</PartnerLeadCreatedTime>
    <LeadID>B7AD4843-900B-450C-9C2B-551513C1F83A</LeadID>
    <LeadId_Id>C7F674E9-5321-6068-8AAE-46B4A666A452</LeadId_Id>
    <SubSource>EBF316E8-3B35-4D69-AEB7-184F8157B972</SubSource>
    <Channel>Reseller</Channel>
    <QWSessionID>D372B8C6-1F48-48D3-A737-CE3561B0AAE7</QWSessionID?>
</GeneralInfo>
```

Figure 7 - General Info XML for 201-320-5749 from third-party Inbound XML 11 09 2022

```
<GeneralInfo>
    <SourceId>EXPENSECUTTER</SourceId>
    <ConsumerIP>174.22.210.163</ConsumerIP>
    <PartnerId>10056</PartnerId>
    <PartnerLeadCreatedTime>2020-12-08T05:24:47.057Z</PartnerLeadCreatedTime>
    <LeadID>91092E10-7B57-4D8A-9C54-5A3272AE8E8F</LeadID>
    <LeadId_Id>0FBE0375-A58A-BE49-CEFC-27F6A62B9F84</LeadId_Id>
    <SubSource>C30597</SubSource>
    <Channel>Affiliate</Channel>
    <QWSessionID>419A74B0-3915-11EB-9453-5DD41473E7C8</QWSessionID>
</GeneralInfo>
```

Figure 8 – General Info for 602-904-1147 from Onsite XML 11 09 2022

88.     Figures 7 and 8 indicate that both leads include the source name of the vendor responsible for producing the lead (SourceID); the IP address where the lead originated (ConsumerIP); a Partner ID, the date and time of lead capture (PartnerLeadCreatedTime); a

LeadID, ad LeadId_Id (which corresponds to a Jornaya Lead ID[6] that may be available); a SubSource; a Channel; and a QuoteWizard Session ID.

89.    Next, I compared the type of lead data appearing in the Applicant Contact Info section between both leads, and found those data types to be virtually identical, as seen in Figures 9 and 10 below:

```
<ApplicantContactInfo>
  <FirstName>NAPOLEON</FirstName>
  <LastName>FIALLOS</LastName>
  <Address1>4100 LONGBOW DRIVE</Address1>
  <Address2>4100 LONGBOW DRIVE</Address2>
  <City>Clermont</City>
  <County>LAKE</County>
  <State>FL</State>
  <ZipCode>34711</ZipCode>
  <EmailAddress>vivi74@aol.com</EmailAddress>
  <PrimaryPhoneNumber>2013205748</PrimaryPhoneNumber>
  <DayTimePhoneNumber>2013205748</DayTimePhoneNumber>
</ApplicantContactInfo>
```

Figure 9 – Applicant Contact Info for 201-320-5749 from third-party Inbound XML 11 09 2022

```
<ApplicantContactInfo>
  <FirstName>Amna</FirstName>
  <LastName>Leeandowski</LastName>
  <Address1>2233 E Behrend Dr Lot 254</Address1>
  <Address2>2233 E Behrend Dr Lot 254</Address2>
  <City>PHOENIX</City>
  <County>MARICOPA</County>
  <State>AZ</State>
  <ZipCode>85024</ZipCode>
  <EmailAddress>adamski24@yahoo.com</EmailAddress>
  <PrimaryPhoneNumber>6029041147</PrimaryPhoneNumber>
  <DayTimePhoneNumber>6029041147</DayTimePhoneNumber>
</ApplicantContactInfo>
```

Figure 10 – Applicant Contact Info for 602-904-1147 from Onsite XML 11 09 2022

---

[6] Jornaya Lead IDs were described in the First Kostyun Report, and identify leads that have been certified at the type of capture by Jornaya – a third party verification service.

90.    Figures 9 and 10 indicate that both leads include the applicant's First Name, Last Name, Address1, Address2, City, State, ZipCode, EmailAddress, Primary Phone Number, and DayTime Phone Number.

91.    Moreover, I compared the lead's Contact Info – from the purportedly untrusted third-party Inbound lead, against the AV Consumer Data retrieved by Verkhovskaya from PacificEast for the lead's telephone number (602-904-1147), and found that PacificEast returned a Last Name, Address, City, State and Zip that exactly matched the third-party Inbound contact data for this lead, as well as a firstseen and lastseen date range that includes the class period:

| AV Consumer Data Column from PacificEast | Value |
| --- | --- |
| CEGConsumerTelePhone | 2013205748 |
| First Name | AIDA |
| Last Name | FIALLOS |
| Address | 4100 LONGBOW DR |
| City | CLERMONT |
| State | FL |
| Zip | 34711 |
| FirstSeen | 20181030 |
| LastSeen | 20220418 |

Figure 11 - AV Consumer Data from PacificEast for third-party Inbound lead 201-320-5749

92.    Figure 11 indicates that PacificEast produced consumer data for 201-320-5749 which matches (other than First Name) the lead data from third-party Inbound file Inbound XML 11 09 2022, which Verkhovskaya purports to be untrustworthy.

93.    The next major category of lead data for both leads is the Auto Information, which includes the same sub-categories of lead data collected for both Inbound and Onsite leads. Those sub-categories include: HomeOwnerShip (Rent or Own); HomeLength – length of time at current residence; Persons (identifying marital status, FirstName, LastName, Gender and DOB); Drivers (identifying Education, Military service, Occupation, CreditRating, Bankruptcy history, First Licensed Age, License status, License State, and SR22 (minimum insurance status). *See* Exhibit

B below for the Auto Information Lead data for Inbound Lead 201-320-5748, *see also* Exhibit C below for the identical type of Auto Information Lead data for Onsite Lead 602-904-1147.

94.     I then checked the IP address from the lead data for each of the two telephone numbers, using the WhatsMyIP website. For telephone number 201-320-5748 (from the third-party Inbound lead), the IP address of 72.188.79.211 translates to Clermont, FL – which matches the City and State identified in the Inbound XML lead data. And for telephone number 602-904-1147 (from the Onsite lead), the IP address of 174.22.210.163 translated to Phoenix, AZ, also matching the City and State identified in the Onsite XML lead data,

95.     Finally, I compared the telephone numbers appearing in the Inbound XML 11 09 2022 third-party lead data against the numbers in the Onsite XML 11 09 2022 lead data, and found that there are more than 250,000 telephone numbers appearing in both sets of lead data, that would likely include the same type and categories of lead data as we saw in the comparison of 201-320-5748 and 602-904-1147. And when comparing the telephone numbers appearing in all Onsite lead data against those that also appear in all third-party lead data sources, I found that there are more than one million telephone numbers in both sets of lead data, that would likely include the same type and categories of lead data as we saw in the comparison of 201-320-5748 and 602-904-1147.

96.     Furthermore, I compared telephone numbers from Onsite lead data such as Onsite XML 11 09 2022 against third-party Inbound lead data, such as Inbound XML 11 09 2022, and found that there are more than 18,000 telephone numbers that appear in both Onsite lead data and third-party Inbound lead data, for which **both leads originated from the same vendor**. Moreover, there are also hundreds of telephone numbers that appear in both Onsite lead data and third-party Inbound lead data, **for which not only the originating vendor, but the entire set of lead data from both lead sources is exactly the same**.

-39-

97.    For example, telephone number 760-808-2206 appears in both the Onsite XML 11 09 2022 lead data, as well as the Inbound XML 11 09 2022. Verkhovskaya contends that the lead data from Onsite XML 11 09 2022 is trustworthy and reflects valid consent, and therefore those numbers are not eligible for class inclusion. She also contends that the lead data from Inbound XML 11 09 2022 is untrustworthy, and that, because those leads came from third-party sources, no valid consent exists, and those numbers are eligible for class inclusion.

98.    However, in this instance, telephone number 760-808-2206 is reflected to have **originated from the same vendor** – EINSURANCE – for both the lead that was produced in the Onsite XML 11 09 2022 lead data, as well as the Inbound XML 11 09 2022 lead data.

99.    Moreover, the full XML source code that appears for 760-808-2206 in the Onsite XML 11 09 2022 lead data file is **exactly the same** as the full XML source code that appears for 760-808-2206 in the Inbound XML 11 09 2022 lead data file. *See* Figure 12 below for the General Info and Applicant Info section of the Onsite XML 11 09 2022 lead data for 760-808-2206; *see also* Figure 13 for the identical data for those two sections of the Inbound XML 11 09 2022 lead data for 760-808-2206.

| |
|---|
| &lt;GeneralInfo&gt; |
| &lt;SourceId&gt;EINSURANCE&lt;/SourceId&gt; |
| &lt;ConsumerIP&gt;10.244.12.236&lt;/ConsumerIP&gt; |
| &lt;PartnerId&gt;10054&lt;/PartnerId&gt; |
| &lt;PartnerLeadCreatedTime&gt;2020-02-15T18:13:41.567Z&lt;/PartnerLeadCreatedTime&gt; |
| &lt;LeadID&gt;B7F8D198-AA08-4541-8AAB-924341E3C4C0&lt;/LeadID&gt; |
| &lt;LeadId_Id&gt;85C31FE6-C872-23F7-70B5-653EC181C41F&lt;/LeadId_Id&gt; |
| &lt;SubSource&gt;C20333&lt;/SubSource&gt; |
| &lt;QWSessionID&gt;071637D8-D90D-9F47-7DFC-C687E411FCE5&lt;/QWSessionID&gt; |
| &lt;/GeneralInfo&gt; |
| &lt;ApplicantContactInfo&gt; |
| &lt;FirstName&gt;Simone&lt;/FirstName&gt; |
| &lt;LastName&gt;Martinez&lt;/LastName&gt; |
| &lt;Address1&gt;31008 Waterton Ct&lt;/Address1&gt; |
| &lt;Address2&gt;31008 Waterton Ct&lt;/Address2&gt; |
| &lt;City&gt;MURRIETA&lt;/City&gt; |
| &lt;County&gt;RIVERSIDE&lt;/County&gt; |
| &lt;State&gt;CA&lt;/State&gt; |
| &lt;ZipCode&gt;92563&lt;/ZipCode&gt; |
| &lt;EmailAddress&gt;simone.garibaldii@gmail.com&lt;/EmailAddress&gt; |
| &lt;PrimaryPhoneNumber&gt;7608082206&lt;/PrimaryPhoneNumber&gt; |
| &lt;DayTimePhoneNumber&gt;7608082206&lt;/DayTimePhoneNumber&gt; |
| &lt;/ApplicantContactInfo&gt; |

Figure 12 - General Info and Applicant Info sections of the **Onsite** XML 11 09 2022 lead data for 760-808-2206

| |
|---|
| <GeneralInfo> |
| <SourceId>EINSURANCE</SourceId> |
| <ConsumerIP>10.244.12.236</ConsumerIP> |
| <PartnerId>10054</PartnerId> |
| <PartnerLeadCreatedTime>2020-02-15T18:13:41.567Z</PartnerLeadCreatedTime> |
| <LeadID>B7F8D198-AA08-4541-8AAB-924341E3C4C0</LeadID> |
| <LeadId_Id>85C31FE6-C872-23F7-70B5-653EC181C41F</LeadId_Id> |
| <SubSource>C20333</SubSource> |
| <QWSessionID>071637D8-D90D-9F47-7DFC-C687E411FCE5</QWSessionID> |
| </GeneralInfo> |
| <ApplicantContactInfo> |
| <FirstName>Simone</FirstName> |
| <LastName>Martinez</LastName> |
| <Address1>31008 Waterton Ct</Address1> |
| <Address2>31008 Waterton Ct</Address2> |
| <City>MURRIETA</City> |
| <County>RIVERSIDE</County> |
| <State>CA</State> |
| <ZipCode>92563</ZipCode> |
| <EmailAddress>simone.garibaldii@gmail.com</EmailAddress> |
| <PrimaryPhoneNumber>7608082206</PrimaryPhoneNumber> |
| <DayTimePhoneNumber>7608082206</DayTimePhoneNumber> |
| </ApplicantContactInfo> |

Figure 13 - General Info and Applicant Info sections of the **Inbound** XML 11 09 2022 lead data for 760-808-2206

100.    In comparing Figures 12 and 13, the Onsite and Inbound lead data are identical, including the source vendor, the consumer's IP address, date and time of lead creation, the LeadId_Id which reflects a Jornaya certified lead, the lead's first and last name, address, city, state, Zip, email address and telephone number.[7]

101.    This common data between Inbound third-party and Onsite leads provides significant evidence that Verkhovskaya's and Plaintiff's contention that Onsite leads are trustworthy, but third-party leads are not, is faulty and without merit.

---

[7] *See* Exhibit F for the full XML lead data for 760-808-2206, which shows identical lead data values from both Onsite and Inbound lead sources.

**Opinion 7 – Telephone numbers in Verkhovskaya's class reflect significant indicia of consent, including, without limitation, Trusted Form certificates**

102.    The First Kostyun Report described that the massive volume of consent data produced by QuoteWizard including, among other things, third-party confirmations that certified the creation of leads at the point in time of creation, confirmation of TCPA consent language that was presented to the lead at the time of creation, identification of the date, time and location the lead was captured, and video replays depicting the actions taken by the lead as they provided their personal lead data, and consented to be contacted.

103.    In the First Kostyun Report, I also described that evidence of consent was verified by two third party verification services: (i) Active Prospect's Trusted Form Certificates and (ii) Jornaya Compliance Reports. In analyzing the telephone numbers in the Exhibit J proposed class data, I identified numbers in that class data for which third-party verification had also been produced.

104.    For example, telephone number 256-276-3214 appears in Verkhovskaya's Exhibit J class data, with the implication that any lead data for this number was produced from untrustworthy sources. But telephone number 256-276-3214 also appears in a set of consent records produced by vendor Excel Impact. I received these records on or about 7/19/2023, and I understand that they were also produced to Plaintiff's counsel. Under Documents Reviewed in the First Kostyun Report, I identified the Excel Impact Subpoena Response – QuoteWizard.pdf, as well as nine csv files of consent data from Excel. Since leads from Excel Impact are not "Onsite" leads, this lead data is third-party lead data, according to Verkhovskaya's criteria.

105.    For telephone number 256-276-3214, the Excel files identified a Trusted Form Certificate, which appears in Figure 14 below:



Figure 14 – Third-party verification Trusted Form Certificate for 256-276-3214

106.     Once again, the existence of a Trusted Form Certificate constitutes verification from a respected[8] third-party service, which has been integrated into the website that collects the lead, and certifies that the lead was captured at the given date, time and location, and that TCPA consent language was presented to the lead as the data was submitted. Moreover, a video playback is provided depicting the actions taken by the lead as they provided their personal lead data, and consented to be contacted. For examples of several images captured from the video playback provided for 256-276-3214, see Figures 15, 16, and 17 below.

---

[8] Active Prospect advertises that their Trusted Form product offering has been used for nearly 20 years, currently certifies 200 million leads per month, serves 3,000 customers globally, and has been installed on some 40,000 websites. *See* https://activeprospect.com/ (last visited 10/19/2023).



Figure 15 – Video Playback capture for 256-276-3214



Figure 16 – Video Playback capture for 256-276-3214



Figure 17 – Video Playback capture for 256-276-3214

107.    As seen in Figures 15, 16 and 17, Active Prospect captured the action of the consumer lead providing numerous data points via the lead-generation website, including the lead's address, city, state and zip (Figure 15), first and last name, date of birth, and credit score (Figure 16), and gender, email and phone number (Figure 17).

108.    Furthermore, lead data was also produced for telephone number 256-276-3214 in anther consent file – Inbound XML 10 11 2022 and the Trusted Form certified lead data appearing in Figures 15, 16, and 17 also agrees with the lead data appearing in the Inbound XML 10 11 2022 for 256-276-3214.

109.    Finally, the AV Consumer Data from PacificEast includes two records for 256-276-3214, one of which also corroborates the Trusted Form Certificate data for this number, including a first and last name of Cheryl Jones, an email address of cjones36278@msn.com, and address, city, state and Zip values of 905 W 9th St, Oxford, AL, 36203.

110.    Telephone number 256-276-3214 appears to provide a significant amount of lead data, corroborated from multiple sources. This number appears in the Exhibit J class list based only on Verkhovskaya's assumption that third-party lead data is unreliable. But the evidence presented immediately above, based on the Trusted Form Certificate for this number, makes it clear that Verkhovskaya's assumption regarding the unreliability of third party leads is flawed, as is her inclusion of this number, and many others, in her proposed class.

111.    In this next example, telephone number 404-840-3732 appears in the Exhibit J proposed class data. But this number also includes a Trusted Form Certificate, found in the Excel Impact consent data. See Figure 18 below for an image of that certificate.



Figure 18 – Trusted Form certificate for 404-840-3732

112.    And in Figure 19 below, an image of the video replay appears for the lead capture of 404-840-3732, depicting the consent language presented to the consumer as they selected the submission button to provide their lead information, also including the lead's email and telephone number. An enhanced copy of the TCPA disclosure language appears in Figure 20 below.



Figure 19 – Video replay for 404-840-3732, depicting email, telephone number, and TCPA disclosure language

By clicking the Get My Free Quotes button and submitting this form, I agree that I am 18+ years old and I provide my signature expressly consenting to receive emails, calls, postal mail, text messages and other forms of marketing communication regarding Auto Insurance, or other offers from the listed companies and agents to the number(s) I provided, including a mobile phone, even if I am on a state or federal Do Not Call and/or Do Not Email registry. The list of companies participating are subject to change. I will receive calls and/or texts from multiple companies in the list. Such calls and text messages may use automated telephone dialing systems, artificial or pre-recorded voices. I understand my wireless carrier may impose charges for calls or texts. I understand that my consent to receive communications is not a condition of purchase and I may revoke my consent at any time by calling us at 833-637-0348.

Figure 20 – Video replay for 404-840-3732, depicting enhanced disclosure language

113.     In summary, although telephone number 404-840-3732 is referenced in multiple consent records, and includes third-party verification of data capture satisfying TCPA requirements, Verkhovskaya's methodology still erroneously includes it in her proposed class, simply because it originated with a third-party vendor.

114.     In another example, 541-680-3148 appears in Verkhovskaya Exhibit J class data, with 18 purportedly violative text messages. 541-680-3148 also appears in the consent data produced by way of the vendor HigherEd, which I received on or about 5/23/2023, and I understand was also produced to Plaintiff's counsel. Since leads from HigherEd are not "Onsite" leads, this lead data is third-party lead data, according to Verkhovskaya's criteria.

115.     The HigherEd consent data for 541-680-3148 also includes a Trusted Form Certificate, which appears in Figure 21 below, and provides third-party independent verification that Active Prospect's certification software has been integrated into the website that collects the given lead, and certifies that the lead was captured at the given date, time and location, and that TCPA consent language was presented to the lead as the data was submitted.



Figure 21 – Trusted Form certificate for 541-680-3148

116.    As seen in Figures 22 and 23 below, the Trusted Form video replay identifies the first and last name, email, and phone number provided by the lead, as well as the TCPA consent language presented to the lead as they submitted their information.



Figure 22 - Video replay for 541-680-3148, depicting first and last name, email, phone number, and TCPA disclosure language

117.    The foregoing examples represent just a small portion of the hundreds of telephone numbers in the Exhibit J class numbers that correspond to immediately accessible Trusted Form Certificates. Moreover, as described in the First Kostyun Report, there are more than 10.7 million Trusted Form Certificate IDs identified in the lead data produced that may be retrieved from Active

Prospect, as well as some 28 million Jornaya Lead IDs identified in the lead data, that may be retrieved from Jornaya, which can confirm that possibly thousands of numbers in Plaintiff's proposed class were also verified by third-party certifications.



Figure 23 - Video replay for 541-680-3148, depicting enhanced view of disclosure language

118.    Verkhovskaya's broad assumption that Onsite leads are the only trustworthy leads of telephone numbers to be filtered from her proposed class is flawed for at least two reasons: (i) onsite and third-party leads contain identical data and (ii) numerous third-party leads contain third-party verification of TCPA compliance.

**Opinion 8 – Verkhovskaya's proposal to use QuoteWizard's records to identify names and addresses of class members conflicts with her own assumption that such records are untrustworthy**

119.    At Opinion 6 of the AV Report, Plaintiff's expert declares that she can use "the consumer data produced in discovery by QuoteWizard, as supplemented as needed by commercially available databases connecting telephone numbers to the names and addresses of consumers" in order to issue "notice to potential class members[.]"

120.    Indeed, Verkhovskaya even refers to the third-party lead data as "robust" when discussing her proposed class notice process: "Although class member identification and notice is

simpler when robust name and address information is provided by the defendant, like it is in this case[.]" (AV Report ¶ 93).

121.    In other words, Verkhovskaya proposes to use the same inbound, third-party lead data that she deems untrustworthy and incapable of indicating consent, to identify the names, addresses and email addresses of proposed class members for the purpose of class notification. Naturally, this raises the question: If those third-party lead records are so untrustworthy that they cannot be used to identify consumers who provided consent, how can they be sufficiently robust to be used to identify consumers who belong in Plaintiff's proposed class?

122.    Verkhovskaya continues by stating that the *robust* third-party lead data may also need to be augmented by additional name and address data provided by reverse-lookup vendors such as PacificEast: "If it is determined that this data is in any way deficient or inaccurate, I would perform additional data enhancement to verify and/or identify, where missing, potential class members' names and addresses, including, but not limited to, performing a standard historical reverse append process" followed by "I have worked with various data processors, like PacificEast to establish protocol that can be used for identification of potential class members" (*Id.* ¶¶ 89, 97).

123.    But Verkhovskaya provides absolutely no explanation of how she would determine that the robust, third-party lead data for any given telephone number would somehow be "in any way deficient or inaccurate", and be replaced or augmented by reverse-lookup data from vendors like PacificEast. Verkhovskaya provides no parameters for how she would determine a deficient or inaccurate name or address from Defendant's third-party lead data. Moreover, Verkhovskaya provides no guidelines or rationale to explain why a name and address from PacificEast would somehow be more or less reliable than a name and address from the third-party leads. This opens the door for Verkhovskaya (or some other selected class administrator) to use subjective, black-

box criteria to decide when a given phone number receives notice based on data from the third-party lead data, or from Verkhovskaya's chosen reverse-lookup vendor – neither of which may be accurate.

124.     Verkhovskaya then argues that PacificEast is a reliable source of reverse-lookup for names and addresses. Verkhovskaya states: "I have found the PacificEast information to be accurate and reliable, and I have not found any reason to consider it unreliable" (*Id.* ¶ 98). Once again, Verkhovskaya has provided no documentation or evidence that PacificEast can reliably provide any of its services, and she provides no evidence or test results to support PacificEast's purported accuracy.

125.     Moreover, in the Declaration of Scott Rice on the Services Provided by PacificEast Research, Inc., in the matter of *Clarence Davis v. Capital One* ("PacificEast Decl."), PacificEast's Chief Operations Officer states that PacificEast's Reverse Phone Append service proposed by Verkhovskaya (1) "does not determine subscriber identity" due to the lack of any "authoritative consolidated data source known to identify such relationships"; (2) does not "identify whether and when an input telephone number was, in fact, reassigned from one person to another, or when the customary user of a phone number changed from one person to another"; (3) cannot reliably determine "definitively whether, and the dates, a particular person subscribed and/or stopped subscribing to or using an input telephone number"; and (4) "demonstrates only a ***possibility*** that the names identified by the service subscribed to a provided telephone number for a given date range" (PacificEast Decl., ¶¶ 20-23) (emphasis added). In other words, when PacificEast identifies an individual as being associated with a given telephone number using its Reverse Phone Append service, it is simply providing its best guess of who that individual is, and the timeframe at which they might have been associated with that number.

126.    These admissions from the vendor Verkhovskaya proposes to use to identify class members provide clear evidence that her suggested methodology cannot accurately determine the identity of any class member. They also cast significant doubt on Verkhovskaya's plan to use PacificEast's results to improve or correct the identification of class members based on those that appear in Defendant's third-party lead data, in cases where Verkhovskaya determines (without any objective criteria) that the third-party lead data is deficient or inaccurate.

127.    Finally, Verkhovskaya also suggests contacting potential class members by way of telephone calls and/or text messaging: "It is also possible to issue notice via a direct manual calling or text messaging process" (*Id.* ¶ 117). In other words, Plaintiff's expert proposes to contact class members using the same methods of communication that she deemed to be in violation of the TCPA.

### Opinion 9 – Every step of Verkhovskaya's methodology fails to identify Mantha as a class member

128.    In the first step of Verkhovskaya's class identification methodology, she attempts to identify the telephone numbers that: (1) were procured from third-party lead generators; (2) were sent to Drips (QuoteWizard's text vendor) with purported "authority" to send text messages; (3) received those text messages; and (4) responded to Drips with a Do Not Call ("DNC") directive, to produce the Step 1 output in the form of Exhibit E.

129.    As a result, this first step eliminates Mantha's telephone number from class eligibility, since there is no DNC directive from Mantha's telephone number that appears in any of the five DNC files used by Verkhovskaya to identify inbound messages that contained a DNC directive. Additionally, I checked all available DNC files that were produced, and was unable to find any evidence of a DNC directive in any form from Mantha's telephone number.

130.    The non-existence of a Mantha DNC directive is confirmed by Mantha's testimony, in which he admitted that he had submitted an inbound message to Drips asking how to get a quote, but never testified that had had responded to any text message asking for communications to cease:

Q. Now, on the right-hand side of the exhibit in green those are your responses; right?
A. Correct.
Q. So you, you physically texted those, those entries; right?
A. Yes.
Q. And so turning to the very top of page 1 of Exhibit 12, and I'll reference Exhibit 12 is a two-page exhibit. You wrote, "how do I get a quote;" right?
A. Yes.
Q. And what was the purpose of asking that question?
A. To find out who was texting me. (Deposition Testimony of Joseph Mantha, 7/27/2020, 65:5-16)

131.    In the second step of Verkhovskaya's class identification methodology, she attempted to identify telephone numbers from Step 1 in violation of the NDNCR by retrieving the NDNCR registration date from PacificEast, and comparing that date to the dates of text messages received. Since Mantha's telephone number did not appear in Step 1, it did not appear in the output of this second step (Exhibit F).

132.    However, Verkhovskaya never sent Mantha's telephone number to PacificEast for NDNCR registration identification, and, as such, made no attempt to demonstrate that her methodology might have identified the NDNCR registration date for Mantha's number.

133.    In the third step of Verkhovskaya's class identification methodology, she attempted to identify telephone numbers from Step 2 for which consumers did not express interest in receiving texts from Drips. Again, since Mantha's number does not appear in the Exhibit F output from Step 3, it also does not appear in the Exhibit G output from Step 3.

134.    Mantha's telephone number does not appear in the "Potential Customer File" (QUOTEWIZARD003653-QUOTEWIZARD003653.xlsx) that Verkhovskaya used in this step to determine consumers who responded by expressing interest in receiving additional text messages.

However, it is conceivable, if not likely, that his number would still have been eliminated at this step (even if it had passed the prior steps) based on Mantha's testimony that he had responded to Drips' text messages asking how he could get a quote.

135. In the fourth step of Verkhovskaya's class identification methodology, she attempted to identify telephone numbers from Step 3 for which QuoteWizard did not authorize Drips to send text messages, based on a set of *Authority* files produced by QuoteWizard.

136. Since Mantha's telephone number did not appear in the Exhibit G output from Step 3, it does not appear in the Exhibit H output from this step.

137. And in the fifth and final step of Verkhovskaya's class identification methodology, she attempted to identify telephone numbers from Step 4 that are residential numbers, based on the business/residential output from PacificEast, the reliability of which I have already called into question. *See* Opinion 5 above, and the First Kostyun Report. Since Mantha's telephone number does not appear in the Step 4 Exhibit H output, it also does not appear in the proposed class telephone number output from this step – Exhibit J.

138. However, Verkhovskaya never sent Mantha's telephone number to PacificEast for business identification, and, as such, made no attempt to demonstrate that her methodology might have identified the business/residential status for Mantha's number.

139. Moreover, Verkhovskaya admitted in the AV Report that her methodology failed to identify Mantha's telephone number as eligible for her Exhibit J class list of numbers, and also admitted that she (attempted to) manually add Mantha's number to that Exhibit J class list:

> Using this process, and after business related telephone numbers were removed from further analysis, I identified **71,549** non-business telephone numbers that received **345,526** texts. After adding Mr. Mantha to the list of potential class members, there were **71,550** telephone numbers that received **345,534** texts, also referenced to as the "Opinion 5 Numbers" and "Opinion 5 Texts" respectively, collectively, "Opinion 5 Records," listed on the attached hereto Exhibit J. (AV Report ¶ 85).

140.    However, even after admitting that her methodology failed to identify Mantha's number as part of her Exhibit J class list, and after admitting that she needed to manually add Mantha's number to said list, Mantha's 508-353-9690 telephone number still <u>does not appear</u> in that Exhibit J class list. See Figure 24 below for an excerpt of the file "Exhibit J Opinion 5.csv", which was produced with the AV Report, depicting Verkhovskaya's Exhibit J list of class eligible telephone numbers.



Figure 24 – Excerpt of "Exhibit J Opinion 5.csv" sorted by telephone number, reflecting that Mantha's 508-353-9690 telephone number does NOT appear in Plaintiff's proposed class list

141.     As shown in Figure 24 above, the Exhibit J class list, which is sorted by telephone number, includes telephone number 5083538334 (at row 26,964), and includes telephone number 5083602191 (at row 26,965), but does not include Mantha's telephone number 508-353-9690.

**Reservation of Right to Amend**

142.    I reserve the right to offer additional opinions and/or to amend this report subject to additional information I receive after issuance of the report. I also reserve the right to modify or supplement my report based on any expert report(s) presented on behalf of the Plaintiff.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 24th day of November, 2023 at Burlington, Connecticut.

_____

Jan Kostyun

**CERTIFICATE OF SERVICE**

I, the undersigned, of the law offices of Nelson Mullins Riley and Scarborough LLP, attorneys for Defendant QuoteWizard.com, LLC, do hereby certify that I have served all counsel of record with copies of the foregoing document by electronic mail on November 24, 2023:

*/s/ Daniel M. Curran*
Daniel M. Curran

**Exhibit A – Confirmation from the FTC that NDNCR registrations did not begin until 6/27/2003**

**Archived:** Tuesday, February 1, 2022 10:41:33 AM
**From:** National Do Not Call Registry Telemarketer Help Desk
**Sent:** Tuesday, February 1, 2022 10:16:24 AM
**To:** JAN.KOSTYUN@VERIZON.NET
**Subject:**   National Do Not Call Registry - Help Desk Case Number DNCTHD-10791: 10275769-87771 - Jan Kostyun LLC
**Sensitivity:** Normal

The National Do Not Call Registry started accepting registrations on 6/27/2003.

National Do Not Call Registry Telemarketer Help Desk
tmhelp@donotcall.gov

**<u>Exhibit B – Auto Information Lead data for Inbound Lead 201-320-5748</u>**

```
<AutoInformations>
  <HomeOwnerShip>Renter</HomeOwnerShip>
  <HomeLength>12</HomeLength>
  <Persons>
    <Person>
      <PersonID>1</PersonID>
      <RelationshipType>Self</RelationshipType>
      <MaritalStatus>Married</MaritalStatus>
      <FirstName>NAPOLEON</FirstName>
      <LastName>FIALLOS</LastName>
      <Gender>Male</Gender>
      <DateOfBirth>1953-11-16</DateOfBirth>
    </Person>
  </Persons>
  <Drivers>
    <Driver>
      <PersonID>1</PersonID>
      <DriverID>1</DriverID>
      <PrimaryVehicleID>1</PrimaryVehicleID>
      <Education>Bachelor</Education>
      <Military>No</Military>
      <Occupation>OtherNotListed</Occupation>
      <CreditRating>Good</CreditRating>
      <Bankruptcy>No</Bankruptcy>
      <FirstLicensedAge>16</FirstLicensedAge>
      <LicenseStatus>Active</LicenseStatus>
      <LicenseState>FL</LicenseState>
      <SR22>No</SR22>
    </Driver>
  </Drivers>
  <Vehicles>
    <Vehicle>
      <VehicleID>1</VehicleID>
      <Year>2020</Year>
      <Make>LEXUS</Make>
      <Model>RX 350</Model>
      <SubModel>RX-SPORT UTILITY VEHICL</SubModel>
      <VIN>2T2AZMAA0LC000000</VIN>
      <Alarm>No</Alarm>
      <VehiclePrimaryUsage>CommuteWork</VehiclePrimaryUsage>
      <PrimaryDriverID>1</PrimaryDriverID>
      <AverageDailyOneWayMileage>19</AverageDailyOneWayMileage>
      <CommuteDaysPerWeek>5</CommuteDaysPerWeek>
      <AnnualMileage>10000</AnnualMileage>
      <OwnerShip>Lease</OwnerShip>
```

```xml
        <CollisionDeductible>500</CollisionDeductible>
        <ComprehensiveDeductible>500</ComprehensiveDeductible>
    </Vehicle>
    <Vehicle>
        <VehicleID>2</VehicleID>
        <Year>2005</Year>
        <Make>TOYOTA</Make>
        <Model>TACOMA</Model>
        <SubModel>TACOMA-PICKUP</SubModel>
        <VIN>3TMJU62N05M000000</VIN>
        <Alarm>No</Alarm>
        <VehiclePrimaryUsage>CommuteWork</VehiclePrimaryUsage>
        <PrimaryDriverID>1</PrimaryDriverID>
        <AverageDailyOneWayMileage>19</AverageDailyOneWayMileage>
        <CommuteDaysPerWeek>5</CommuteDaysPerWeek>
        <AnnualMileage>10000</AnnualMileage>
        <OwnerShip>Lease</OwnerShip>
        <CollisionDeductible>500</CollisionDeductible>
        <ComprehensiveDeductible>500</ComprehensiveDeductible>
    </Vehicle>
</Vehicles>
<RequestedCoverage>
    <CoverageType>SuperiorProtection</CoverageType>
    <BiPerPerson>100000</BiPerPerson>
    <BiPerIncident>300000</BiPerIncident>
</RequestedCoverage>
<PriorInsurance>
    <CurrentlyInsured>Yes</CurrentlyInsured>
    <PriorInsuranceCompanyName>OTHER</PriorInsuranceCompanyName>
    <ContinouslyInsuredWithCurrentCompany>6</ContinouslyInsuredWithCurrentCompany>
    <ContinouslyInsuredInMonths>6</ContinouslyInsuredInMonths>
    <CurrentPolicyExpirationDate>2020-12-31</CurrentPolicyExpirationDate>
</PriorInsurance>
</AutoInformations>
```

-68-

**Exhibit C – Auto Information Lead data for Onsite Lead 602-904-1147**

```
<AutoInformations>
  <HomeOwnerShip>HomeOwner</HomeOwnerShip>
  <HomeLength>12</HomeLength>
  <Persons>
   <Person>
    <PersonID>1</PersonID>
    <RelationshipType>Self</RelationshipType>
    <MaritalStatus>Married</MaritalStatus>
    <FirstName>Amna</FirstName>
    <LastName>Leeandowski</LastName>
    <Gender>Female</Gender>
    <DateOfBirth>1951-06-15</DateOfBirth>
   </Person>
  </Persons>
  <Drivers>
   <Driver>
    <PersonID>1</PersonID>
    <DriverID>1</DriverID>
    <PrimaryVehicleID>1</PrimaryVehicleID>
    <Education>Unknown</Education>
    <Military>No</Military>
    <Occupation>OtherNonTechnical</Occupation>
    <CreditRating>Excellent</CreditRating>
    <Bankruptcy>No</Bankruptcy>
    <FirstLicensedAge>16</FirstLicensedAge>
    <LicenseStatus>Active</LicenseStatus>
    <LicenseState>AZ</LicenseState>
    <SR22>No</SR22>
   </Driver>
  </Drivers>
  <Vehicles>
   <Vehicle>
    <VehicleID>1</VehicleID>
    <Year>2017</Year>
    <Make>CHEVROLET</Make>
    <Model>EQUINOX L</Model>
    <SubModel>EQUINOX-SPORT UTILITY VEHICLE</SubModel>
    <VIN>2GNALAEK0H1000000</VIN>
    <Alarm>No</Alarm>
    <VehiclePrimaryUsage>CommuteWork</VehiclePrimaryUsage>
    <PrimaryDriverID>1</PrimaryDriverID>
    <AverageDailyOneWayMileage>9</AverageDailyOneWayMileage>
```

```
            <CommuteDaysPerWeek>5</CommuteDaysPerWeek>
            <AnnualMileage>15000</AnnualMileage>
            <OwnerShip>Own</OwnerShip>
            <CollisionDeductible>500</CollisionDeductible>
            <ComprehensiveDeductible>500</ComprehensiveDeductible>
          </Vehicle>
        </Vehicles>
        <RequestedCoverage>
          <CoverageType>SuperiorProtection</CoverageType>
          <BiPerPerson>50000</BiPerPerson>
          <BiPerIncident>100000</BiPerIncident>
          <IntentToBuyIn30Days>Yes</IntentToBuyIn30Days>
          <BuyerType>Primary</BuyerType>
        </RequestedCoverage>
        <PriorInsurance>
          <CurrentlyInsured>Yes</CurrentlyInsured>
          <PriorInsuranceCompanyName>STATEFARM</PriorInsuranceCompanyName>

<ContinouslyInsuredWithCurrentCompany>48</ContinouslyInsuredWithCurrentCompany>
          <ContinouslyInsuredInMonths>48</ContinouslyInsuredInMonths>
          <CurrentPolicyExpirationDate>2021-01-08</CurrentPolicyExpirationDate>
        </PriorInsurance>
      </AutoInformations>
```

**Exhibit D – Partial list of ambiguous consumer responses assumed by Verkhovskaya to be DNC directives**

| | |
|---|---|
| 1 | "no" |
| 2 | "no thanks" |
| 3 | "OK" |
| 4 | "not interested" |
| 5 | "yes" |
| 6 | "who is this" |
| 7 | "no thank you" |
| 8 | "Who is this?" |
| 9 | "now" |
| 10 | "I'm Driving - Sent from My Car" |
| 11 | " " |
| 12 | "who's this" |
| 13 | "thanks" |
| 14 | "thank you" |
| 15 | "ok" |
| 16 | "No thanks." |
| 17 | "Not interested." |
| 18 | "?" |
| 19 | "'no'" |
| 20 | "No." |
| 21 | "Who"s this?" |
| 22 | "Hello" |
| 23 | "'no'" |
| 24 | "nope" |
| 25 | "who this" |
| 26 | "call me" |
| 27 | "hi" |
| 28 | " No thanks" |
| 29 | "No thank you." |
| 30 | "K" |

**<u>Exhibit E – Full, identical XML lead data from Onsite XML 11 09 2022 and Inbound XML<br>11 09 2022 for telephone number 760-808-2206</u>**

| |
|---|
| <GeneralInfo> |
| <SourceId>EINSURANCE</SourceId> |
| <ConsumerIP>10.244.12.236</ConsumerIP> |
| <PartnerId>10054</PartnerId> |
| <PartnerLeadCreatedTime>2020-02-15T18:13:41.567Z</PartnerLeadCreatedTime> |
| <LeadID>B7F8D198-AA08-4541-8AAB-924341E3C4C0</LeadID> |
| <LeadId_Id>85C31FE6-C872-23F7-70B5-653EC181C41F</LeadId_Id> |
| <SubSource>C20333</SubSource> |
| <QWSessionID>071637D8-D90D-9F47-7DFC-C687E411FCE5</QWSessionID> |
| </GeneralInfo> |
| <ApplicantContactInfo> |
| <FirstName>Simone</FirstName> |
| <LastName>Martinez</LastName> |
| <Address1>31008 Waterton Ct</Address1> |
| <Address2>31008 Waterton Ct</Address2> |
| <City>MURRIETA</City> |
| <County>RIVERSIDE</County> |
| <State>CA</State> |
| <ZipCode>92563</ZipCode> |
| <EmailAddress>simone.garibaldii@gmail.com</EmailAddress> |
| <PrimaryPhoneNumber>7608082206</PrimaryPhoneNumber> |
| <DayTimePhoneNumber>7608082206</DayTimePhoneNumber> |
| </ApplicantContactInfo> |
| <AutoInformations> |
| <HomeOwnerShip>Renter</HomeOwnerShip> |
| <HomeLength>12</HomeLength> |
| <Persons> |
| <Person> |
| <PersonID>1</PersonID> |
| <RelationshipType>Self</RelationshipType> |
| <MaritalStatus>Married</MaritalStatus> |
| <FirstName>Simone</FirstName> |
| <LastName>Martinez</LastName> |
| <Gender>Female</Gender> |
| <DateOfBirth>1998-12-03</DateOfBirth> |
| </Person> |
| </Persons> |
| <Drivers> |
| <Driver> |
| <PersonID>1</PersonID> |
| <DriverID>1</DriverID> |
| <PrimaryVehicleID>1</PrimaryVehicleID> |
| <Education>Unknown</Education> |
| <Military>No</Military> |
| <Occupation>OtherNonTechnical</Occupation> |

-73-

```xml
<CreditRating>Good</CreditRating>
<Bankruptcy>No</Bankruptcy>
<FirstLicensedAge>16</FirstLicensedAge>
<LicenseStatus>Active</LicenseStatus>
<LicenseState>CA</LicenseState>
<SR22>No</SR22>
</Driver>
</Drivers>
<Vehicles>
<Vehicle>
<VehicleID>1</VehicleID>
<Year>2006</Year>
<Make>HONDA</Make>
<Model>CIVIC EX</Model>
<SubModel>CIVIC-SEDAN</SubModel>
<VIN>1HGFA15806L000000</VIN>
<Alarm>No</Alarm>
<VehiclePrimaryUsage>CommuteWork</VehiclePrimaryUsage>
<PrimaryDriverID>1</PrimaryDriverID>
<AverageDailyOneWayMileage>9</AverageDailyOneWayMileage>
<CommuteDaysPerWeek>5</CommuteDaysPerWeek>
<AnnualMileage>15000</AnnualMileage>
<OwnerShip>Own</OwnerShip>
<CollisionDeductible>500</CollisionDeductible>
<ComprehensiveDeductible>500</ComprehensiveDeductible>
</Vehicle>
</Vehicles>
<RequestedCoverage>
<CoverageType>SuperiorProtection</CoverageType>
<BiPerPerson>50000</BiPerPerson>
<BiPerIncident>100000</BiPerIncident>
</RequestedCoverage>
<PriorInsurance>
<CurrentlyInsured>Yes</CurrentlyInsured>
<PriorInsuranceCompanyName>OTHER</PriorInsuranceCompanyName>
<ContinouslyInsuredWithCurrentCompany>36</ContinouslyInsuredWithCurrentCompany>
<ContinouslyInsuredInMonths>36</ContinouslyInsuredInMonths>
<CurrentPolicyExpirationDate>2020-03-15</CurrentPolicyExpirationDate>
</PriorInsurance>
</AutoInformations>
</Lead>
```

Onsite XML 11 09 2022 for 760-808-2206

| |
|---|
| `<GeneralInfo>` |
| `<SourceId>EINSURANCE</SourceId>` |
| `<ConsumerIP>10.244.12.236</ConsumerIP>` |
| `<PartnerId>10054</PartnerId>` |
| `<PartnerLeadCreatedTime>2020-02-15T18:13:41.567Z</PartnerLeadCreatedTime>` |
| `<LeadID>B7F8D198-AA08-4541-8AAB-924341E3C4C0</LeadID>` |
| `<LeadId_Id>85C31FE6-C872-23F7-70B5-653EC181C41F</LeadId_Id>` |
| `<SubSource>C20333</SubSource>` |
| `<QWSessionID>071637D8-D90D-9F47-7DFC-C687E411FCE5</QWSessionID>` |
| `</GeneralInfo>` |
| `<ApplicantContactInfo>` |
| `<FirstName>Simone</FirstName>` |
| `<LastName>Martinez</LastName>` |
| `<Address1>31008 Waterton Ct</Address1>` |
| `<Address2>31008 Waterton Ct</Address2>` |
| `<City>MURRIETA</City>` |
| `<County>RIVERSIDE</County>` |
| `<State>CA</State>` |
| `<ZipCode>92563</ZipCode>` |
| `<EmailAddress>simone.garibaldii@gmail.com</EmailAddress>` |
| `<PrimaryPhoneNumber>7608082206</PrimaryPhoneNumber>` |
| `<DayTimePhoneNumber>7608082206</DayTimePhoneNumber>` |
| `</ApplicantContactInfo>` |
| `<AutoInformations>` |
| `<HomeOwnerShip>Renter</HomeOwnerShip>` |
| `<HomeLength>12</HomeLength>` |
| `<Persons>` |
| `<Person>` |
| `<PersonID>1</PersonID>` |
| `<RelationshipType>Self</RelationshipType>` |
| `<MaritalStatus>Married</MaritalStatus>` |
| `<FirstName>Simone</FirstName>` |
| `<LastName>Martinez</LastName>` |
| `<Gender>Female</Gender>` |
| `<DateOfBirth>1998-12-03</DateOfBirth>` |
| `</Person>` |
| `</Persons>` |
| `<Drivers>` |
| `<Driver>` |
| `<PersonID>1</PersonID>` |
| `<DriverID>1</DriverID>` |
| `<PrimaryVehicleID>1</PrimaryVehicleID>` |
| `<Education>Unknown</Education>` |
| `<Military>No</Military>` |
| `<Occupation>OtherNonTechnical</Occupation>` |

-75-

| |
|---|
| <CreditRating>Good</CreditRating> |
| <Bankruptcy>No</Bankruptcy> |
| <FirstLicensedAge>16</FirstLicensedAge> |
| <LicenseStatus>Active</LicenseStatus> |
| <LicenseState>CA</LicenseState> |
| <SR22>No</SR22> |
| </Driver> |
| </Drivers> |
| <Vehicles> |
| <Vehicle> |
| <VehicleID>1</VehicleID> |
| <Year>2006</Year> |
| <Make>HONDA</Make> |
| <Model>CIVIC EX</Model> |
| <SubModel>CIVIC-SEDAN</SubModel> |
| <VIN>1HGFA15806L000000</VIN> |
| <Alarm>No</Alarm> |
| <VehiclePrimaryUsage>CommuteWork</VehiclePrimaryUsage> |
| <PrimaryDriverID>1</PrimaryDriverID> |
| <AverageDailyOneWayMileage>9</AverageDailyOneWayMileage> |
| <CommuteDaysPerWeek>5</CommuteDaysPerWeek> |
| <AnnualMileage>15000</AnnualMileage> |
| <OwnerShip>Own</OwnerShip> |
| <CollisionDeductible>500</CollisionDeductible> |
| <ComprehensiveDeductible>500</ComprehensiveDeductible> |
| </Vehicle> |
| </Vehicles> |
| <RequestedCoverage> |
| <CoverageType>SuperiorProtection</CoverageType> |
| <BiPerPerson>50000</BiPerPerson> |
| <BiPerIncident>100000</BiPerIncident> |
| </RequestedCoverage> |
| <PriorInsurance> |
| <CurrentlyInsured>Yes</CurrentlyInsured> |
| <PriorInsuranceCompanyName>OTHER</PriorInsuranceCompanyName> |
| <ContinouslyInsuredWithCurrentCompany>36</ContinouslyInsuredWithCurrentCompany> |
| <ContinouslyInsuredInMonths>36</ContinouslyInsuredInMonths> |
| <CurrentPolicyExpirationDate>2020-03-15</CurrentPolicyExpirationDate> |
| </PriorInsurance> |
| </AutoInformations> |
| </Lead> |

Inbound XML 11 09 2022 for 760-808-2206