# EXHIBIT 7

Page 1

```
                                    Vol. I
                                    Pgs. 1-171
                                    Exs. 1-3
       UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS


   ---------------------------------------
   JOSEPH MANTHA, on behalf of himself
   And all others similarly situated,
                Plaintiff,
                                        Civil Action No.
                                        1:19-cv-12235-LTS
   V.
   QUOTEWIZARD.COM, LLC,
                Defendant.
   ---------------------------------------

             REMOTE DEPOSITION OF
             ANYA VERKHOVSKAYA
                 Via Zoom
             Friday, December 15, 2023
             9:33 a.m. - 4:38 p.m.


                 Lori J. Atkinson
                 Court Reporter
```

Page 34

1  Q. Your entire methodology does not account for the
2  possibility that a consumer was happily texting with
3  QuoteWizard, they got the quote that they wanted, and
4  then they asked that the text stop; correct?
5  A. Correct.
6  Q. So there may be many people on your class list,
7  who are only in the Do Not Call records, because they
8  requested that the text stop after they had already
9  gotten the insurance quotes that they wanted?
10  A. That's possible.
11  Q. I think you mentioned that you reviewed Mr.
12  Kostyun reports in this case; correct?
13  A. That's correct.
14      MR. SITTER: For the benefit of the court
15  reporter, Mr. Kostyun's name is, Jan, J-A-N, Kostyun,
16  K-O-S-T-Y-U-N.
17      (Document marked as Exhibit No. 1 for
18  identification.)
19  BY MR. SITTER:
20  Q. Do you recall in your review of those reports, a
21  part of his rebuttal in which he listed several text
22  responses that your analysis assumes are customer
23  complains, but which appear instead to be indications of
24  interest?

Page 35

1      I'm referencing, I believe, paragraphs 36 through
2  47. To be clear, this is of his rebuttal report.
3  A. Thank you.
4  Q. The specific examples I'm referring to are in a
5  chart in paragraph 40 on page 18 and 19.
6  A. Yes, I can see that.
7  Q. Some of the examples that he lists in this chart
8  as content of texts from consumers that appear to indicate
9  interest, not a complaint, were things like, quote, You
10  can call me now, if you want; quote, Please call again;
11  quote, Thank you for calling; quote, Can we continue
12  texting, because I can't talk right now; quote, Can you
13  please call me in the AM; quote, Can we continue
14  texting, because I can't talk right now.
15      Those are some, not all, but some of the examples
16  from this list. Correct?
17  A. Correct. He found 28 of those examples out of
18  hundreds of thousands of texts.
19  Q. But your team didn't do any analysis of the
20  content of these text messages; correct?
21  A. Not at this step that we are talking about.
22  Q. Is there another step at which they did do that
23  analysis?
24  A. The analysis was done by class counsel and it is

Page 36

1  described in my rebuttal report.
2  Q. Okay. So the analysis that your team did of the
3  content of the text message responses from consumers,
4  was actually counsel's analysis?
5  A. Well, it is my understanding that interpretation
6  of consent language is a legal matter and I'm not
7  qualified to make such interpretation.
8  Q. Your methodology does state that it was able to
9  identify those consumers who made a specific request
10  that the text cease. I'm actually not talking about the
11  legal issue of whether that qualifies as consent or not
12  under the TCPA. That's not what I'm talking about.
13      What I'm talking about is your stated methodology,
14  which says that you were able to identify those numbers
15  where consumers made a specific request that the text
16  cease. That was your step in this analysis. Correct?
17  A. Correct.
18  Q. But these are examples that Mr. Kostyun identifies of
19  individuals who appear not to be complaining, but to
20  actually be requesting further communications.
21      Would you agree with that?
22  A. Yes.
23  Q. Your team did not do any of its own independent
24  analysis of these text messages content to assess

Page 37

1  whether or not the words in their text qualified as a,
2  quote, specific request that the text cease. Is that
3  accurate?
4  A. It is. It was my understanding that in order to
5  be included on internal Do Not Call lists, you would
6  conduct a certain step that the company would determine
7  that you qualified to be on internal Do Not Call lists.
8  And out of many thousands of texts, 28 examples, that
9  what Mr. Kostyun found seemingly do not qualify.
10  Q. Are you -- scratch that.
11      Do you have any personal knowledge, one way or
12  the other, regarding all of the different reasons why
13  QuoteWizard might place a telephone number on its own
14  internal Do Not Call List?
15  A. I do not have any personal knowledge of how
16  QuoteWizard makes those determinations.
17  Q. Okay. It is fair to say your analysis presumes
18  that if a consumer's telephone number is on one their
19  internal Do Not Call lists that means that consumer made
20  a specific request that the text cease?
21  A. At this particular step, it does.
22  Q. Is there another step where that analysis is
23  impacted?
24  A. Yes.

Page 38

1  Q. Can you walk me through that, please?
2  A. It's in my rebuttal report.
3  Q. Can you explain it to me, please. If you need to
4  reference your report, that is fine.
5  A. Thank you.
6     So paragraph 59 of my rebuttal and 62 states that
7  (as read) On about November 2nd I received from
8  plaintiff's counsel a list of opt out requests listed on
9  Exhibit J that legally was interpreted or could be
10 interpreted as having expressed interest in Defendant's
11 services and those text and telephone numbers were
12 removed.
13 Q. Okay. If I understand you, counsel made a
14 determination regarding a set of individuals who may
15 have an expressed interest and told you to remove them
16 from the class list and you removed them from the class
17 list. Is that accurate?
18          MR. PARONICH: Objection.
19 A. It is.
20 Q. Did you or your team perform any of your own
21 independent analysis regarding those numbers before
22 removing them from your class list at the direction of
23 counsel?
24 A. Would you please clarify for which reason we

Page 39

1  would have been performing an independent analysis.
2  Q. I guess because you are the expert.
3     As I understand what you are telling me, I think
4  counsel said, Hey, these numbers don't -- these look
5  expressions of interest, so you should remove them from
6  the class list.
7     Is that part accurate?
8  A. Yes.
9  Q. You did, in fact, remove them from the class
10 list?
11 A. Correct.
12 Q. Between receiving the instruction from counsel
13 and between actually removing them from the class list,
14 did you or your team perform any analysis?
15 A. No.
16 Q. You mentioned that Mr. Kostyun had identified, I
17 believe, you number was 28 examples of responses from
18 consumers that appear to be indications of interest, not
19 a request that the telemarketing cease. Correct?
20 A. That's correct.
21 Q. Have you done any analysis to see how prevalent
22 that issue is among the individuals that are listed on
23 your class list?
24 A. I have not, because as I stated earlier, it is my

Page 40

1  understanding that interpretation of language that
2  constitutes interest or consent is a legal matter and it
3  is outside of the scope of my expertise.
4  Q. And I understand that you are not offering any
5  opinions one way or another regarding whether a particular
6  consumer gave consent that was valid under the TCPA.
7  That is not one of your opinions; correct?
8  A. Correct.
9  Q. But one of your stated opinions is, and I quoted
10 it several times, that you could identify people who
11 made a specific request that the telemarketing text
12 cease.
13    And what I'm trying to understand is how you were
14 able to do that apart from taking instruction from
15 counsel?
16 A. I took internal Do Not Call lists of the
17 defendant and used that data to make a determination,
18 which individuals made a request to be on that internal
19 Do Not Call List; hence, they expressed interest that
20 the telemarketing ceases.
21 Q. Let me try this a different way.
22    Your methodology was, by your own reckoning,
23 supposed to weed out, exclude, those individuals who,
24 quote, made a specific request that the text cease. Is

Page 41

1  that correct?
2  A. Correct.
3  Q. Mr. Kostyun identified at least 28 specific
4  examples of people who are on your class list, which
5  both you and I agree it does not look like they made a
6  specific request that the text cease; correct?
7  A. Correct.
8  Q. Do you have any idea how many others are out
9  there, who if you looked at their text it would also
10 reflect that they did not ask that the telemarketing
11 cease?
12 A. It is my understanding, based on paragraph 59,
13 that class counsel instructed me to remove all those
14 texts and telephone numbers.
15 Q. It is your understanding, maybe the original list
16 included some people who actually expressed interest not
17 that the calls stop, but once you got to your final list
18 with the help of counsel, that final list is of all
19 people who made requests that the text stop; is that
20 accurate?
21 A. That's correct.
22 Q. We agree that the 28 examples, which were from
23 the original list that Mr. Kostyun provided, are
24 examples in which the consumer did not make a request

11 (Pages 38 - 41)

Page 42

1  that the telemarketing cease; correct?
2     A.  Can I will review it one more time?
3     Q.  Sure.
4     A.  Correct.
5     Q.  Okay.  So it's your understanding that class
6  counsel has now identified all the numbers that needed
7  to be weeded out that were expressions of interest so
8  that your final list, corrected Exhibit 2, now only
9  includes people who actually express interest.  Is that
10 your testimony?
11      I'm sorry.  I said that completely backwards, and
12 I understand why you are confused.  Let me try that
13 again.
14      Is it your understanding that the final class
15 list, which by that I mean, I think you call it corrected
16 Exhibit 2, that was attached to your supplemental report
17 that that list now, with the help of counsel, has
18 excluded all individuals who expressed interest rather
19 than request that the calls stop?
20    A.  Correct.
21        MR. SITTER:  Now, we are going to test my
22 technological skills.  Let's go off the record.
23        (Break in the proceedings.)
24        MR. SITTER:  We are back from a break for

Page 43

1  counsel's hearing and now we are going to get back into
2  it.
3  BY MR. SITTER:
4     Q.  When we left off, we were discussing consumers who
5  were on your class list, but Mr. Kostyun had identified
6  as actually expressing interest in receiving text not
7  requesting that the text stop.  Do you recall that?
8     A.  Yes.
9     Q.  You looked at the 28 examples in his report, and
10 we agreed that those are examples of instances in which
11 those particular consumers expressed interest, not a
12 request that the texts stop; correct?
13    A.  We agreed that those texts did not express
14 requests to cease texting.
15    Q.  I believe it is your testimony, correct me if I'm
16 wrong, that that issue has now been addressed and
17 corrected in your final class list that now does exclude
18 all the folks who did not actually request that the text
19 cease.  Do I have that right?
20    A.  Yes.
21        MR. SITTER:  I'm going to try to bring up an
22 exhibit.  I believe it is copied into chat.  Does that
23 work?
24        Do you have an objection if I bring it up on

Page 44

1  my screen, I'm happy to share it with you later.
2        MR. PARONICH:  I just want the witness to be
3  able to have it, the whole document, in front of her.
4        MR. SITTER:  It is a two-page document.  It
5  is actually just a sample from Mr. Kostyun's report.
6        MR. PARONICH:  Anya, you have Mr. Kostyun's
7  report in front you of you, and we can identify the
8  document, that's fine with me as long as she is able to
9  access the document.
10       MR. SITTER:  Okay.
11 BY MR. SITTER:
12    Q.  Do you see this document?  Can everybody see it?
13 Ms. Verkhovskaya, can you see it?
14    A.  Yes.
15    Q.  I will -- you can see as I scroll through here
16 there are some page numbers 18 and 19.  This is an
17 excerpt of pages 18 and 19 from Mr. Kostyun's report.
18      What we have done here, I will represent to you,
19 is highlight phone numbers in his report that he
20 identified as not being a request that the text cease.
21 These are the examples that we were talking about
22 before.  What we have done is just highlight the ones
23 that are still in your final class list.
24      So we do agree that these numbers should not be

Page 45

1  on your final class list; correct?
2     A.  I believe that interpretation of the language was
3  done by counsel as a legal issue, and it's outside of
4  the scope of my opinion whether it should be on the
5  class list or not.
6     Q.  So you have no opinion one way or the other
7  whether these highlighted numbers on this document
8  should be included in the class list?
9     A.  I haven't verified if they are on the final class
10 list or not.  I rely on your presentation and I do not
11 have an opinion if these texts represent being interpreted
12 as interest or not.
13    Q.  Let's be clear about what your methodology was
14 supposed to identify and what I'm asking here.
15     I'm simply quoting back your own opinion to you,
16 which said that you had a reliable methodology to identify,
17 quote, Consumers who in response to their receipt of
18 QuoteWizard text messages, made a specific request that
19 the texts cease.
20     My question is:  Do you have an opinion one way
21 or the other about whether these folks made a specific
22 request that the texts cease?
23    A.  I believe that my methodology identifies individuals
24 who made this specific request and if the Court

Page 46

1 interprets these few telephone numbers that otherwise my
2 methodology would exclude them, so the methodology is
3 correct.  And as I stated, interpretation of the legal
4 implication of this text's language is outside of the
5 scope of my expertise.
6     Q.  Okay.  Let's break that down.
7         Are you saying that you would rely on the Court
8 to evaluate whether particular language qualifies as a
9 specific request that the texts cease?
10    A.  It can be done in either meet and confer and
11 stipulated by the parties or the Court can rule it.
12        All I'm saying is that a legal interpretation of
13 the language is not in the area of my expertise.
14    Q.  Finish, I'm sorry.
15    A.  I can only look at the data and see what
16 QuoteWizard decided to be on Do Not Call List, which I
17 did.  Then I followed directions of counsel to exclude
18 what counsel considered texts and telephone numbers that
19 should be removed.  I have not had a chance to verify
20 that these number are still part of the final class list.
21    Q.  You were relying, at this step of your methodology,
22 on counsel to tell you which numbers involved consumers
23 who made a specific request that the text cease and
24 which ones did not?

Page 47

1     A.  That's correct.
2     Q.  And your team, apart from receiving those
3 instructions from counsel, did not do any independent
4 evaluation or analysis to determine whether those
5 consumers made a specific request that the text cease.
6 Is that correct?
7     A.  That's correct.
8     Q.  Would you agree with me that it appears that
9 there's at least some degree of error in your class list
10 regarding the identification of people who made a specific
11 request that the text cease?
12        MR. PARONICH:  Objection.
13        You can answer.
14    A.  I would not consider it an error.  I would consider
15 it a point of disagreement that does not change my
16 methodology or my opinion and something that can easily
17 be resolved without changing the methodology.
18    Q.  Okay. So it is your opinion, even sitting here
19 today, after all of the reports, that your methodology
20 still reliably can identify consumers who in response to
21 their receipt of QuoteWizard text messages, made a
22 specific request that the text cease?
23    A.  That's correct.
24    Q.  But you do also agree that we have looked at 28

Page 48

1 examples from the original class list in which we agree
2 those people were not asking that the text cease;
3 correct?
4     A.  Seemingly.  But I also stated and testified earlier
5 that it is outside of the scope of my expertise to interpret
6 the text data.
7     Q.  Well, it may be outside the scope of your
8 expertise, but it doesn't appear to be outside of the
9 scope of the expert opinions that you are offering in
10 this case.
11        I'm reading back to you the opinions that you
12 yourself authored and signed several times what state
13 that you can identify, again, the consumers who in
14 response to their receipt of QuoteWizard text messages
15 made a specific request that the text cease.
16        Are you stating that you do not have the
17 expertise to make that determination?
18    A.  I do have the expertise.  So look at -- that's
19 what I did, I looked at Do Not Call List, internal Do
20 Not Call List, and also removed all the texts identified
21 by counsel as such and that methodology works regardless
22 whether there is a dispute about several texts.
23    Q.  What methodology did counsel employ to identify
24 those individuals who made a specific request that the

Page 49

1 texts cease?
2     A.  You would have to ask counsel.
3     Q.  You do not know; correct?
4     A.  I do not.
5     Q.  Did your team perform any testing on -- well, I
6 guess you didn't, because you didn't know their
7 methodology.  Scratch that.
8        Okay.  Mr. Kostyun identified another issue at
9 this step of your analysis, which was that -- this is in
10 your original report, I'm talking about your original
11 report -- that almost 14,000 of the numbers on your
12 original class list did not actually appear anywhere in
13 the Do Not Call records that you cited in your original
14 report; is that correct?
15    A.  That's correct.
16    Q.  Now, in your rebuttal report, you did not alter
17 the materials that you had reviewed regarding the issue
18 of people who appeared on Do Not Call files; is that
19 accurate?
20    A.  Yes.
21    Q.  In your supplemental report, you then did amend
22 that list of files that you had relied on; is that
23 accurate?
24    A.  That's correct.

Page 62

 1  Q. That's not stated in your report, is it?
 2  A. It is.
 3  Q. Where?
 4  A. I remember stating somewhere --
 5     (Technical difficulties.)
 6     MR. SITTER: I'm going to say for the record --
 7  Anthony, correct me if you disagree with anything -- we
 8  had a brief break there while the stenographer was
 9  disconnected. She is back on. The witness has been
10  reviewing a document. And we are picking up our
11  questioning there.
12  Q. Ms. Verkhovskaya, go ahead give us your answer,
13  please?
14     MR. PARONICH: Agreed.
15     Go ahead.
16  A. I remember stating somewhere that consent is a
17  legal issue and neither myself nor Mr. Kostyun is really
18  qualified -- are really qualified to opine on consent
19  issues. But I can't seem to locate this language at
20  this time.
21  Q. I don't take much issue with that concept. What
22  I'm really trying to address, Ms. Verkhovskaya, is not a
23  legal issue. It is the opinion that's stated in your
24  report. Or if you think it is a legal issue, then I

Page 63

 1  need you to tell me that, so I can stop continuing to
 2  ask you questions about it.
 3     The reason I'm asking questions is because these
 4  are the words that are actually in your stated opinion
 5  and I'm trying to understand the basis for them. I have
 6  read it several times now regarding your statement that
 7  you have a reliable methodology for identifying folks
 8  who made a specific request that the telemarketing
 9  cease.
10     Are you telling me those words in your report are
11  reflecting a legal opinion on which you are not qualified to
12  opine?
13  A. No.
14  Q. Then I'm going to continue asking you questions
15  about them, and you can speak with your attorney, but I
16  think we will move a lot faster if you stop telling me
17  it is a legal issue. I'm not asking about TPCA consent.
18  I'm simply asking about the basis for the stated words
19  in your original report. Okay?
20  A. As I testified earlier, and I'm going to testify
21  again, that the data that I relied on was internal Do
22  Not Call list. It is my understanding that in order to
23  appear on internal Do Not Call lists, you have to send a
24  request to the defendant in this case to cease further

Page 64

 1  texts. That is how usually internal Do Not Call lists
 2  are compiled.
 3     The data was provided to me and in the
 4  interrogatories, the fourth set of interrogatories that
 5  I relied on, clearly identify internal Do Not Call
 6  files. And the data that I worked with fits my
 7  methodology of excluding telephone numbers that were on
 8  internal Do Not Call lists. And I stand by that
 9  methodology.
10  Q. Okay. I think what you are telling me that what
11  you really did here is you identified the phone numbers
12  from the prior step that also appeared on one of the Do
13  Not Call files that was produced in this case. Is that
14  correct?
15  A. That's correct.
16  Q. So that analysis assumes that if a consumer's
17  phone number appears on one of the Do Not Call files
18  that is what you mean when you say that consumer, quote,
19  made a specific request that the texts cease?
20  A. That's correct.
21  Q. There is no actual analysis by your team of the
22  content of these texts; correct?
23  A. That's correct.
24  Q. You are simply saying, Hey, this was on one of

Page 65

 1  the Do Not Call files, so I'm assuming that means that
 2  the person made a request at the text cease; correct?
 3  A. Correct.
 4  Q. But as we discussed before, it is entirely
 5  possibly that people got what they wanted from
 6  QuoteWizard after happily texting with them and only
 7  made a request that the text cease after they had gotten
 8  everything they wanted. Correct?
 9  A. It is possible and I did not have an opinion on
10  legal implication of that scenario.
11  Q. I don't want your opinion on the legal implications.
12     I do want you to tell me factually whether you
13  agree with that as a possibility or not. I think you
14  have done that.
15     As a standing issue, Ms. Verkhovskaya, I'm not
16  interested in obtaining legal opinions from you. So if
17  you think that's what I'm asking for in a question, let
18  me know and I will try to rephrase it correctly.
19  A. Thank you.
20     MR. SITTER: I think this is a good place to
21  break. Let's go off the record.
22     (Lunch break in the proceedings.)
23  BY MR. SITTER:
24  Q. So we just took a short break for lunch. When we

Page 66

1  left, Ms. Verkhovskaya, we were discussing how you
2  identified consumers who had made a specific request
3  that the text cease. And you were talking about how it
4  was an assumption of your methodology that if a number
5  appeared on one of the Do Not Call files that meant that
6  that particular person had issued a specific request
7  that the text cease. Is that accurate?
8     A. Of the staff, yes.
9     Q. Do you have any personal knowledge of QuoteWizard's
10 policies or procedures regarding how a number gets added
11 to one of its internal Do Not Call lists?
12    A. I do not.
13    Q. You are not aware of what circumstance would lead
14 QuoteWizard to place a particular consumer's number on
15 its internal Do Not Call list, are you?
16    A. That's correct.
17       MR. SITTER: I have a brief housekeeping
18 matter. I realize I didn't introduce the exhibit that I
19 showed and I would like to do that. Anthony, any
20 objections to marking it retroactively and then
21 circulating it? Do you want me to circulate it now?
22       MR. PARONICH: With that short exhibit,
23 circulating that later is fine. If you run into a
24 longer one, I might want them before the questions.

Page 67

1        MR. SITTER: I understand. Thanks.
2  BY MR. SITTER:
3     Q. In the rebuttal report Mr. Kostyun noted that
4  many of texts in Verkhovskaya's class list could not
5  have been delivered that were sent to numbers that were
6  registered as landlines at the time.
7        Do you recall reviewing that?
8     A. Yes, I do.
9     Q. I know you had some responses to that as well.
10       I want to ask the question: Do you have any
11 training in landline telephone technology?
12    A. I do not.
13    Q. Do you have any training in landline telephones?
14    A. I do not.
15    Q. Do you have any personal knowledge of the
16 percentage of landlines in the United States that have
17 the capacity to receive text messages?
18    A. I do not.
19    Q. Would it surprise you to find that fewer than ten
20 percent of landline telephones have that capacity?
21       MR. PARONICH: Objection.
22    A. I have no opinion of that.
23    Q. If that were the case, that fewer than ten percent
24 of residential landlines have the capacity to receive or

Page 68

1  send text messages, would that have any impact on the
2  opinions that you offer in this case?
3     A. No.
4     Q. Before we closeout on this topic of the Do Not
5  Calls, every single telephone number on all of your
6  versions of the class list, has a corresponding Do Not
7  Call notations in one of the Do Not Call files except
8  for the named plaintiff in this case; correct?
9     A. That's correct.
10    Q. He is the only one?
11    A. That's correct.
12    Q. He is not like the others in that regard,
13 correct?
14    A. Correct.
15    Q. Okay. Let's move on to your second opinion,
16 which has to do with the ability to limit your list of
17 individuals to those who received two or more texts and
18 who would were registered on the national Do Not Call
19 Registry for 32 or more days; correct?
20    A. Correct.
21    Q. And it is your expert opinion that you have a
22 reliable methodology to identify just these individuals
23 and exclude those who do no fit these parameters;
24 correct?

Page 69

1     A. That's correct.
2     Q. To assist you in this step of your analysis, did
3  you use the services of any vendors?
4     A. Yes.
5     Q. Was that PacificEast that you are referring to?
6     A. Correct.
7     Q. Are there any other vendors whose services that
8  you used to completes this step of your analysis?
9     A. No.
10    Q. Is it fair to say you rely on PacificEast data
11 outputs at several steps of your analysis?
12    A. Yes.
13    Q. And how many, if any, output files did PacificEast
14 provide to you or your team?
15    A. For National Do Not Call Registry, they provided
16 us with one file. And for business lookup, they
17 provided us with one file.
18    Q. Those were in separate files?
19    A. Correct.
20    Q. Can you tell me about what PacificEast did on its
21 end to create the output file that you used in your
22 methodology?
23    A. Could you clarify for which step?
24    Q. Yes. So I'm still on your second opinion. Let

Page 118

1  A. From discussions at PacificEast.
2  Q. Who at PacificEast?
3  A. It was many years ago, I believe it was Mr. Rice.
4  Q. Scott Rice?
5  A. That sounds right.
6  Q. Let's move onto the second step in this part. We
7  talked about how you apply the outputs from PacificEast.
8  We talked about how you cross-reference those two lists.
9  Now, I want to talk about the second part where the
10 keywords come into play, are you with me?
11  A. Yes.
12  Q. You said that in your report, roughly, that --
13 feel free to correct any rough edges here -- your team
14 applied the keyword list of 380 keywords that were
15 associated with businesses and they checked the
16 PacificEast outputs as a backup to see if these were
17 really the business numbers had gotten through. Is that
18 accurate?
19  A. Either business numbers have gotten through or
20 there were any home businesses that could be identified.
21 That's correct.
22  Q. So part of your methodology sort of assumes that
23 there will be some error rate in the business numbers
24 that are returned from PacificEast. Is that accurate?

Page 119

1  A. Yes, that is.
2  Q. Now, at this stage, this list of 380 keywords
3  that are supposed to be associated with businesses, who
4  created that?
5  A. I created that list as some suggestions from my
6  team.
7  Q. Okay. How do you collect the specific words that
8  you decided to put on that list along with your team.
9  A. It was a combination of the common sense and
10 research of most used commonly -- most often used common
11 business names.
12  Q. You used your common sense and you did some
13 research on what the most common used business names
14 are?
15  A. Yes.
16  Q. Was it you who performed that research or some
17 other person on your team?
18  A. It was myself and Christina Peters and Irina
19 Verkhovskaia.
20  Q. Where did you perform those searches or look for
21 resources regarding commonly used business names?
22  A. Various directories.
23  Q. Can you tell me what they were?
24  A. Yelp. Google. Yellow pages. And various other

Page 120

1  search engines.
2  Q. Let's break them down. I'm not going to go
3  through them all. I want to be more targeted here.
4     Let's take Yelp, for example. When you say you
5  did searches on Yelp to identify common business names,
6  in what manner? What I mean by that is does Yelp have a
7  list somewhere of common business names or did you do it
8  by looking at a bunch different places on Yelp? How did
9  you go about doing that?
10  A. We started by looking at variations of Inc.,
11 incorporations, I-N-C, incorporated, which words we used
12 the most. Same thing for company, was it C-O, did they
13 use Comp? Did they use Company? Did they use
14 Companies. So it was very basic research.
15  Q. I'm trying to get an understanding of the mechanics
16 of this research. When you say "research," are you
17 saying somebody spent sometime on Yelp looking at
18 different businesses and decided which terms it thought
19 -- the person thought were common among business. Are
20 you saying that Yelp has some published list of common
21 business terms that you imported to your list? I'm
22 trying to understand the mechanics here.
23  A. Thank you for clarifying. The first.
24  Q. So you guys -- you and your team were sort of --

Page 121

1  I don't want to belittle it -- you were sort of poking
2  around on Yelp, looking at different sites, and I'm
3  saying All right, I'm seeing this term "Corp" come up a
4  lot on businesses, or "Inc.", or other variations on the
5  spelling. Is that sort of the process that led to the
6  generation of this 380 word list?
7  A. Correct.
8  Q. Who had final say as to whether a particular term
9  was business associated term or not?
10  A. I did.
11  Q. This list was created for purposes of this case
12 specifically; is that accurate?
13  A. No. We've had that list for many years and we
14 use it in many cases and that list is evolving as we get
15 more experience and do additional research.
16  Q. This is an evolved version of an older list that
17 you guys have honed through your experience. Is that
18 what you are telling me?
19  A. Yes.
20  Q. But apart from your people on your team poking
21 around on Yelp or Google or Yellow Pages and performing
22 their own subjective analysis of whether they think that
23 a term appears a lot in business names, is there more to
24 this creation of the list that I am leaving out?

31 (Pages 118 - 121)

Page 122

1  A. No.
2  Q. At this step you teams take the output from
3  PacificEast, they take the 380 keyword list, smash them
4  together, and if something from the PacificEast output
5  has one of your keywords on it, what happens next in
6  your methodology?
7  A. It gets removed from the potential class list.
8  Q. Automatically or with some human intervention?
9  A. We write a code to implement that.
10 Q. Was there a judgment call by a human or was this
11 simply they wrote the code and then the code applied to
12 the universe?
13 A. There is no judgment.
14 Q. You put the terms in and if a term appeared on
15 the outputs from PacificEast, your code was supposed to
16 pull those folks off of your class list; correct?
17 A. Correct.
18 Q. I understand, we have had several different
19 reports now, I think it is your testimony that there has
20 been some changes to that population. Is that accurate?
21    In your rebuttal, you note that your team
22 inadvertently, through human error, failed to actually
23 produce the list that had compared the keyword -- the
24 380 keywords to the output from PacificEast; correct?

Page 123

1  A. That's correct.
2  Q. That step, even though it is described in your
3  original report, it wasn't actually performed in conjunction
4  with the original class list, Exhibit J, to your
5  original report. Is that correct?
6  A. It was performed but the wrong file was attached.
7  Q. Whose responsibility in your group is it to
8  ensure that the correct file was attached?
9  A. The final responsibility lies with me.
10 Q. Okay. So we have this file with your original
11 class list that we both agree has numbers that are
12 associated with businesses and the reason is human error
13 and they shouldn't have been on that original list.
14    Do we agree on that?
15 A. Yes.
16 Q. Then many of those -- I guess many, if not all of
17 those team members, were still on the list when you
18 submitted your rebuttal report as well; is that
19 accurate?
20 A. Correct.
21 Q. Then after rebuttal reports had been submitted,
22 as you are preparing for your deposition, it is your
23 testimony that you realized that the wrong file had been
24 attached, and with your supplemental report, you and

Page 124

1  your team, used the correct file. Is that what you are
2  saying?
3  A. Correct.
4  Q. So now, in your final class list, anything that
5  hits on one of your 380 keyword list, should now be
6  excluded from your final class list; correct?
7  A. Correct.
8  Q. In his rebuttal report, Mr. Kostyun did identify
9  several examples of numbers that should have been
10 excluded based on the keyword list that you and your
11 team purported to use, but still appeared on the class
12 list.
13    Do you agree with that statement?
14 A. Yes.
15 Q. You said that you have Mr. Kostyun's report in
16 front of you, his rebuttal, specifically?
17 A. Yes.
18    MR. SITTER: I'm going to mark that as
19 Exhibit 2. Anthony, I take it you don't need a copy?
20    MR. PARONICH: I don't. Anya, you have a
21 rebuttal report. I'm good.
22    (Document marked as Exhibit No. 2 for
23 identification.)
24 BY MR. SITTER:

Page 125

1  Q. Okay. If you look at page 30, and feel free to
2  flip around before and after pages 30 and 31, of Mr.
3  Kostyun's rebuttal report, lists a number of telephone
4  numbers and he is expressing that these appear to be
5  business numbers even though they appeared on your
6  original class list, Exhibit J. Correct? Is that your
7  understanding as well?
8  A. Yes.
9  Q. At least to the degree that any of these numbers
10 contain any of your keywords, they should no longer be
11 on your final class list corrected Exhibit 2?
12 A. Correct.
13 Q. I will circle back on that. I will move on for
14 now.
15    Now, at this stage of your analysis -- now I'm
16 back to your original report. I apologize for jumping
17 around. In your original report at this stage, you
18 state (as read) Using this process and after business
19 related telephone numbers were removed from further
20 analysis, I identified 71,549 non-business telephone
21 numbers that received 345,526 texts. After adding Mr.
22 Mantha to the list of potential class members, there
23 were 71,550 telephone numbers that received 345,534
24 texts. Correct? That is in your report?

| | |
|---|---|
| Page 126<br>1  A. Could you please let me know which paragraph?<br>2  Q. Paragraph 85. I can find a page number, too.<br>3  There we go. Are you with me?<br>4  A. Yes, paragraph 85.<br>5  Q. And the part I want to ask you about is -- you<br>6  have gone through this whole methodology to get to this<br>7  list of people who meet your criteria. And we get to<br>8  the last step, and you go through the business number<br>9  analysis, then at that step, you added plaintiff's<br>10 telephone number to your list manually. Is that<br>11 accurate?<br>12 A. Yes.<br>13 Q. He does not meet the criteria that the other<br>14 folks on that class list meet; right?<br>15 A. I have not done that analysis for Mr. Mantha.<br>16 Q. In your work on this case, you have not done any<br>17 analysis to see whether the named plaintiff meets the<br>18 criteria to belong on your class list. Is that<br>19 accurate?<br>20      MR. PARONICH: Objection.<br>21      You can answer.<br>22 A. I was directed by class counsel to add<br>23 Mr. Mantha. And I did not do any specific analysis for<br>24 his telephone number. | Page 128<br>1  Q. Just so we close the loop, no one on your team<br>2  did either; correct?<br>3  A. I don't think so.<br>4  Q. You are in charge of the team; right?<br>5  A. That's correct.<br>6  Q. So you would know, right?<br>7  A. Yes.<br>8  Q. And his number didn't appear on the opinion 2<br>9  numbers, correct?<br>10 A. That's my understanding.<br>11 Q. Plaintiff's telephone number didn't appear on the<br>12 opinion 3 numbers; right?<br>13 A. That's my understanding.<br>14 Q. Or the opinion 4 numbers either, right?<br>15 A. That's my understanding.<br>16 Q. He didn't appear on the opinion 5 numbers either<br>17 until you manually added him; is that correct?<br>18 A. That's correct.<br>19 Q. Are you aware of any literature in your field<br>20 that supports manually adding the named class representative<br>21 to a class list as part of a viable methodology?<br>22 A. I know that it has been done in a number of cases<br>23 based on legal theories. Other than that, I am not<br>24 aware of any other legal literature. Legal literature |
| Page 127<br>1  Q. So you added him because counsel told you you<br>2  should add his number to the list; correct?<br>3  A. Correct.<br>4  Q. You did not do any independent analysis regarding<br>5  or Mr. Mantha or his telephone number to confirm whether<br>6  he met any of the other criteria to be on your class<br>7  list; is that also accurate?<br>8  A. That's correct.<br>9  Q. That means -- you have at your report different<br>10 points where you talk about opinion one numbers, opinion<br>11 two numbers, opinion three numbers.<br>12    Do you know what I'm referring to here?<br>13 A. Yes.<br>14 Q. Mr. Mantha's number would not be in your opinion<br>15 one numbers; correct?<br>16 A. As I said, I did not.<br>17 Q. You don't know one way or the other?<br>18 A. Well, common sense dictates that if he would be,<br>19 I wouldn't to be adding him here. But I did not do that<br>20 analysis.<br>21 Q. You have not checked specifically to see whether<br>22 plaintiff's telephone number appears in your opinion one<br>23 telephone numbers; correct?<br>24 A. I personally did not do that, no. | Page 129<br>1  is not the area of my expertise.<br>2  Q. Let's take legal step out of it.<br>3     Are you aware of any literature in your field,<br>4  apart from Court opinions, that supports the manual<br>5  addition of the named class representative to a class<br>6  list as a viable method for ascertaining class<br>7  membership?<br>8  A. I have no opinions on ascertainability issues.<br>9  Q. I shouldn't use that word. Because that starts<br>10 people thinking about legal stuff, that's not what I<br>11 intended.<br>12    I guess what I'm saying is, Are you aware of any<br>13 literature in the field of data analysis that would say<br>14 you can propose methodology, apply that methodology all<br>15 the way through to everybody, and then not apply it to<br>16 one person, but just manually add them in?<br>17 A. If there is a legal basis for doing that,<br>18 plaintiff's counsel would know better than I would, if<br>19 such legal basis exists.<br>20 Q. Okay. But you are not aware of publications,<br>21 non-legal publications, that support that as a viable or<br>22 reliable method of data analysis?<br>23 A. I'm aware of the basis of Court opinions where it<br>24 has been done before. Does it count as legal |

|  | Page 130 |  | Page 132 |
|---|---|---|---|
| 1 | publications? | 1 | Q. If there is a typo in the telephone number, it is |
| 2 | Q. You seemed uncomfortable to go there, that's why | 2 | not plaintiff's telephone number anymore; right? |
| 3 | I didn't want to push you to go there. That's why I was | 3 | A. Correct. |
| 4 | trying to I call out the legal stuff. So we could say, | 4 | Q. If you dial it, somebody might pick it up; right? |
| 5 | Okay, put the legal stuff aside. | 5 | A. If it exists, I don't know. I don't have |
| 6 | You said your fields are data analysis and I | 6 | knowledge one way or another. |
| 7 | believe notice administration. I am wondering if there | 7 | Q. The number that you added to your original class |
| 8 | any publications. Any published support I could go look | 8 | list, in an effort to add plaintiff's telephone number, |
| 9 | to, not a Court opinion, just whatever you guys use in | 9 | you don't know if that is a real telephone number or |
| 10 | your field that I could look at, and I could read it, | 10 | not? |
| 11 | and it would tell me, Yes, this is a viable approved | 11 | A. If I did, I wouldn't make the typo. |
| 12 | method for identifying these individuals? | 12 | Q. Was there any particular member of your team who |
| 13 | A. Because this was a legal decision, I cannot | 13 | was in charge of making sure that plaintiff's telephone |
| 14 | really point you out to non-legal publications. | 14 | number appeared on the original class list, Exhibit J? |
| 15 | Q. Okay. That's fine. Let's move on. | 15 | A. The final responsibility lies with me. |
| 16 | Now, you state in this part of your report that | 16 | Q. Can we agree that was a mistake then, one of your |
| 17 | at step 5, you did manually add plaintiff's telephone | 17 | mistakes or do you disagree with that statement? |
| 18 | number to Exhibit J, which was your original class list; | 18 | A. I do. |
| 19 | correct? | 19 | Q. Okay. Now, I'm going to zoom way out. Let's |
| 20 | A. Correct. | 20 | talk about before you even did your first step in the |
| 21 | Q. That didn't actually happen, right? Mr. Mantha's | 21 | analysis, you had a starting population of telephone |
| 22 | telephone number was not actually on your Exhibit J | 22 | numbers. Right? |
| 23 | class list, was it? | 23 | A. Correct. |
| 24 | A. There was a typo in the area code but it was. | 24 | Q. Then at the first step, you cut out a lot of |

|  | Page 131 |  | Page 133 |
|---|---|---|---|
| 1 | Q. I'm sorry, but if you get different numbers in a | 1 | those. But beginning with, you had a really large |
| 2 | telephone number, it is not the same number; is it? | 2 | number of telephone numbers; correct? |
| 3 | A. In the rebuttal report it was expressly stated | 3 | A. Correct. |
| 4 | that there was a typo and it was corrected. | 4 | Q. Was plaintiff's telephone number in that universe |
| 5 | Q. Right. I'm not talking about that yet. I will | 5 | of telephone numbers? |
| 6 | definitely give you an opportunity to talk about your | 6 | A. I did -- |
| 7 | rebuttal report as much as you want. | 7 | Q. Your starting -- go ahead. |
| 8 | Right now I'm talking about Exhibit J to your | 8 | A. I did not check but -- I don't think so, but I |
| 9 | original report. Your original report states, (as read) | 9 | not check. |
| 10 | I added plaintiff's telephone number to Exhibit J. | 10 | Q. So you are not sure one way or the other if |
| 11 | We can agree that Exhibit J, which is the exhibit | 11 | plaintiff's number was in the original starting |
| 12 | to your original report, does not actually have plaintiff's | 12 | population with which you began your analysis; correct? |
| 13 | real telephone number on that list; correct? | 13 | A. Correct. |
| 14 | A. Because of the typo, that's correct. | 14 | Q. If he were, let's assume he was, let's say his |
| 15 | Q. Now, let's talk about the typo. | 15 | telephone number is in your starting population. Would |
| 16 | You said in your rebuttal report, you changed the | 16 | you agree that your methodology would have eliminated |
| 17 | phone number to make sure that it was plaintiff's phone | 17 | plaintiff at the outset -- at very first step, because |
| 18 | number, and inserted that into your Exhibit 2 list; is | 18 | he did not have -- he was not in the Do Not Call |
| 19 | that accurate? | 19 | records? |
| 20 | A. Yes. | 20 | A. I would have to analyze various hypotheticals. |
| 21 | Q. And the number that you had included in your | 21 | Q. We are only doing it hypothetically, because you |
| 22 | list, in an attempt to include plaintiff's number, was | 22 | are not sure if it was in there. If you are sure, I |
| 23 | actually somebody else's telephone number; right? | 23 | would go with what you sure with. But you don't know. |
| 24 | A. Not to my knowledge. | 24 | I can represent to you, I think it was in that starting |