### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH MANTHA, *on behalf of himself and all others similarly situated*,<br><br>              Plaintiff,<br><br>      v.<br><br>QUOTEWIZARD.COM, LLC,<br><br>              Defendant. | Civil Action No. 1:19-cv-12235-LTS |

### QUOTEWIZARD.COM, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF <u>PLAINTIFF'S EXPERT ANYA VERKHOVSKAYA</u>

## I.     INTRODUCTION

This Court should reject the opinions of Plaintiff Joseph Mantha's ("Plaintiff") proposed expert on the issue of class member identification, as many courts have before.  Anya Verkhovskaya ("Verkhovskaya") asserts that her methodology can "reliably and efficiently" identify the members of Plaintiff's proposed class.  But she repeats many of the errors in this case that have led to her exclusion or the rejection of her opinions in other TCPA class action cases.  As before, her methodology fails to identify the named Plaintiff in this case as a potential class member, and he was not even on her original "Class List."  As before, she proposes using data from a third-party vendor to identify potential class members, even though the vendor itself has repeatedly testified that its data cannot be reliably used for that purpose.  As before, her proposed methodology results in an unacceptably high error rate – indeed, Defendant QuoteWizard.com, LLC's ("QuoteWizard") expert has opined that at least 93% of the individuals associated with the telephone numbers on Verkhovskaya's "Class List" are not appropriate class members, an error

rate of 93%.  In sum, Plaintiff has not met his burden to establish that Verkhovskaya's expert opinions should be admitted, and QuoteWizard respectfully requests that the Court exercise its gatekeeper function to exclude her opinions under Federal Rule of Evidence 702.

## II.    RELEVANT BACKGROUND

### A.    Verkhovskaya's Proposed Opinions and Methodology

The crux of Verkhovskaya's proffered expert opinion is that she believes there is "a reliable and efficient method by which it can be determined" which individuals fall into her proposed "Class List" using the materials produced in discovery in this case, "along with reliable commercially available databases."  *See* Exhibit 1 - *September 22, 2023 Expert Report of Anya Verkhovskaya* ("Report") ¶¶ 1-6.  Her proposed class definition in turn is:

> All persons within the United States (a) whose residential telephone numbers were listed on the National Do Not Call Registry, and (b) who received more than one telemarketing text within any twelve-month period at any time from Drips, (c) to promote the sale of QuoteWizard's good or services, and (d) the telephone numbers that meet the class list definition criteria in the Expert Report of Anya Verkhovskaya.

*Id.* ¶ 5.  Verkhovskaya performed the following tasks to arrive at her "Class List":

1.  Identify telephone numbers that were (i) secured from third-party lead generators; (ii) were sent to Drips with "authority" to text; where the individual (iii) received those text messages; and (iv) responded to Drips with a Do Not Call directive.

2.  Identify telephone numbers from Step 1 that received two or more text messages within any 12-month period, and had been registered on the NDNCR for at least 32 days, using data provided by third-party vendor PacificEast.

3.  Identify telephone numbers from Step 2 for which consumers did not express interest in receiving texts from Drips, and for which Quote Wizard paid Drips for that lead.

4.  Identify telephone numbers from Step 3 for which QuoteWizard did not authorize Drips to send text messages.

5.  Identify telephone numbers from Step 4 that are "residential" numbers.

*See* Exhibit 2 - *November 24, 2023 Expert Rebuttal Report of Jan Kostyun* ("Kostyun Rebuttal") ¶ 6.

In addition to materials produced during discovery by QuoteWizard and third parties, Verkhovskaya's methodology relies heavily on the accuracy of data outputs from third-party vendors like LexisNexis and, in this case, PacificEast Research, Inc. ("PacificEast"). *See, e.g.*, Report ¶ 77 ("To conduct the historical business record analysis, I relied upon the industry wide recognized services and records of PacificEast."). Specifically, Verkhovskaya sent a data file to PacificEast to perform a "standard data append" which involved providing and verifying personal information regarding the supposed user of each telephone number at issue as well as information about whether and when the telephone number was first registered on the NDNCR. Verkhovskaya also relied on PacificEast data outputs to evaluate whether particular numbers were business or residential numbers. *Id.* ¶¶ 82-83.

Verkhovskaya claims that PacificEast's "data append" service can reliably be used to identify the putative class, the key focus of her expert opinions. *Id.* ¶ 66 ("I have found PacificEast to be accurate and reliable, and I have not found any reason to consider it unreliable.… PacificEast provides accurate and reliable NDNCR information. I regularly rely upon PacificEast to perform the data append described in this Expert Report."). Verkhovskaya clearly states that "My methodology relies on the data processors like PacificEast to gather data from sources […] so if the person uses a telephone on a regular basis, my methodology will capture it." Report ¶ 102. Logically, the converse also follows – if the data append services that PacificEast offers cannot be used reliably for this purpose, then her methodology is unreliable.

### B.    Problems with Verkhovskaya's Proposed Opinions and Methodology

Notably, Verkhovskaya's proposed methodology, when applied, did not identify the named Plaintiff in this case, Mr. Mantha, as being one of the potential class members. According to Verkhovskaya, after completing the five steps in her process outlined above to identify putative

3

class members (a process that did not identify Plaintiff as a class member), Verkhovskaya simply "manually added" Plaintiff to her proposed class list.   Report ¶ 66 ("Using this process… I identified 71,549 non-business telephone numbers that received 345,526 texts.  ***After adding Mr. Mantha to the list of potential class members***, there were 71,550 telephone numbers that received 345,534 texts.") (emphasis added).  Moreover, although Verkhovskaya ***intended*** to manually add Plaintiff to her "Class List," she made an error and actually manually added the telephone number of someone else, unrelated to this case, a telephone number that was not even included in the documents she claimed to have reviewed in preparing her opinions.  Accordingly, Plaintiff's telephone number does not appear on Verkhovskaya's original "Class List" at all.[1]

Verkhovskaya's proposed methodology also suffers because, while she insists that the vendor data she relies on from PacificEast can conclusively establish class membership, PacificEast has provided sworn testimony in this and other cases stating the opposite.  Indeed, PacificEast has specifically rejected the notion that its services can be used for the purposes she proposes.

For example, Verkhovskaya proposes to use PacificEast's NDNCR output file as conclusive evidence of NDNCR registration status and dates (Report ¶¶ 61-68), but PacificEast "clearly states that it does not warrant the accuracy of specific data outputs for this service, nor does it warrant or guarantee that its services can be used for any particular purpose."  *See* Exhibit 4 - *December 27, 2023 Declaration of Scott Rice* ("Rice Decl.") ¶ 8.[2]  Verkhovskaya's proposal to use PacificEast outputs to identify and distinguish between business and residential telephone

---

[1] Recognizing her error, Verkhovskaya tried again to manually add (this time successfully) Plaintiff's telephone number in an exhibit to her rebuttal report.  A copy of Verkhovskaya's November 22, 2023 Rebuttal Report is attached hereto as Exhibit 3.

[2] Per the request of PacificEast, QuoteWizard is requesting that this declaration be filed under seal.

numbers is even more flawed. While Verkhovskaya proposes to rely on PacificEast outputs to determine whether a number is a "business" or a "residential" number, PacificEast's COO, Mr. Rice testified that "because there is no accepted definition of what constitutes a 'business' number as opposed to a 'residential' number, that is a question that cannot be authoritatively answered, nor is PacificEast's business lookup service intended to provide an authoritative answer to that question." *Id.* ¶ 14.

Moreover, while Verkhovskaya insists that she "relied upon the industry wide recognized services and records of PacificEast […] to conduct the historical business record analysis" and that PacificEast "provided an output file that indicated whether each telephone number status was identified as associated with a business and the timeframe of the association," Report ¶¶ 77, 83, PacificEast testified that it does not provide such information and lacks the capacity to do so. Specifically, COO Scott Rice testified:

> PacificEast (through its vendor) can only determine whether there is some association between a particular number and a business or consumer account, ***as of the date of the search***. Historical information about the identification of a telephone number as a "business" or "residential" number is not available from any source that I know, and it is not a service that PacificEast provides.

Rice Decl. ¶ 13 (emphasis in original).

Finally, while Verkhovskaya proposes to use yet another PacificEast output, the "historical reverse append process,"[3] at yet another step of her analysis to identify class members, Mr. Rice states that PacificEast's services cannot reliably be used for that purpose: "As a factual and practical matter, determining definitively whether, and the dates, a particular person subscribed

---

[3] Report ¶ 102 ("My methodology relies on the data processors like PacificEast … to perform the historical reverse append process.")

and/or stopped subscribing to or using an input telephone number cannot reliably be achieved using the Reverse Phone Append service PacificEast provides." Rice Decl. ¶ 24.[4]

QuoteWizard submitted two rebuttal reports by its own experts, which both identified additional problems with Verkhovskaya's proposed methodology. Jan Kostyun's report explained that Verkhovskaya's proposed methodology is faulty in several respects, including that:

- Verkhovskaya inappropriately relied on PacificEast for the purpose of providing identifying information regarding the users of particular phone numbers at particular times, when PacificEast has itself stated that its services cannot be used reliably for that purpose.

- Verkhovskaya's proposed methodology results in an unacceptably high rate of false positive results, such as false positives from misidentification of business numbers as residential numbers, false positives from misidentification of text messages as including DNC directives when they did not, false positives from assuming a DNC when no text information is available, a high percentage (68%) of sample putative class members who apparently did not register their own telephone numbers on the NDNCR.

- In all, Kostyun estimates that *93%* of the individuals listed on Verkhovskaya's proposed class list are not appropriate class members for one or more of the reasons listed above.

Kostyun Rebuttal ¶ 81 (emphasis added).

QuoteWizard's other expert, Harold Furchtgott-Roth, the former Commissioner of the Federal Communications Commission ("FCC"), which is tasked with enforcing the TCPA, opined that Verkhovskaya's proposed methodology was faulty for similar reasons. He noted that third-party vendor databases purporting to be able to identify telephone number subscriber information are notoriously unreliable because, among other reasons, the NDNCR does not provide reliable historical information (at least not for Verkhovskaya's purposes) and consumers switch their

---

[4] Mr. Rice offered nearly identical testimony regarding this service in the *Davis v. Capital One* case, which the court there relied on in concluding that Verkhovskaya's expert opinions should be excluded. *See Davis v. Capital One, N.A.*, No. 1:22-cv-00903 (AJT/IDD), October 20, 2023 Memorandum Opinion and Order [ECF No. 172], 15, 18. A copy of Mr. Rice's declaration in the *Davis* case is attached hereto as Exhibit 5.

telephone numbers frequently. *See* Exhibit 6 - *November 24, 2023 Expert Rebuttal Report of Harold Furchtgott-Roth* ("Furchtgott-Roth Rebuttal") ¶¶ 5-18.

Verkhovskaya submitted a rebuttal report of her own. Notably, she purported to modify the class list she originally submitted, removing almost 4,000 (roughly 6%) of the telephone numbers on her class list because: (1) she had erroneously included almost 3,000 consumers who she now concedes had, in fact, expressed interest in receiving quotes from QuoteWizard (even though her original methodology was supposed to have already excluded those individuals); and (2) she had erroneously included over 1,000 consumers who she now concedes had, based on documents produced by QuoteWizard in discovery, provided clear consent to be contacted (even though her original methodology was supposed to have already excluded those individuals). Verkhovskaya Rebuttal ¶ 61. Regarding Mr. Kostyun's critique of her inappropriate use of the NDNCR database for purposes for which it is not intended and is ill suited, Verkhovskaya demurred, claiming that is a "legal issue that is not relevant to my analysis." *Id.* ¶¶ 23-26. In response to Mr. Kostyun's criticism of her inappropriate use of PacificEast data outputs, Verkhovskaya doubled down on her original claim that data received from PacificEast can reliably be used for her purposes (even though PacificEast swore under oath it cannot). *Id.* ¶ 36.

Verkhovskaya was deposed on December 15, 2023, during which she disclosed certain other relevant facts not highlighted in her reports, such as the following:

- She considers her "field" to be "data analysis for complex litigation," but concedes that she has no formal training in data analysis, is not a member of any professional organizations in that field, and has published no works in the field. Her degrees are in nursing and a recent MBA with a specialization in "humanities." *See* Exhibit 7 *Transcript of December 15, 2023 Deposition of Anya Verkhovskaya* ("Depo.") at 9:22-13:9.

- Her original Report and the class list attached to it contain errors, including that it did not include Mr. Mantha and erroneously included 4,000 people who should not have been included under her own methodology. *Id.* at 51:22-52:1; 52:15-20; 122:21-123:20.

- Her Rebuttal Report and the revised class list attached to it contain errors requiring the removal of more than a thousand additional names that should not have been included under her own stated methodology. *Id.* at 52:18-20; 53:8-54:7. Notwithstanding these errors and her concession that she removed additional numbers from her "class list" in various "supplemental" or "corrected" reports, Verkhovskaya insists that her opinions have never changed and her methodology is sound. *Id.* at 57:8-58:17.

- Verkhovskaya's "methodology" largely consisted of following class counsel's instructions as to which telephone numbers should appear on the list, without any "independent analysis" from Verkhovskaya or her team, and she has no idea what "methodology" counsel used to make those determinations. *Id.* at 18:2-11; 19:5-20:9; 28:18-21; 30:4-9; 38:13-39:15, 46:21-47:7; 47:18-49:4; 91:11-92:8; 97:2-16.

- Her "entire methodology does not account for the possibility that a consumer was happily texting with QuoteWizard, they got the quote that they wanted, and then they asked that the texts stop," and she concedes there may be many such people on her class list. *Id.* 34:1-10; 64:10-65:10. In other words, her methodology includes people who were happy customers and never received an unwanted text from QuoteWizard.

- Many of the people on her list actually responded to QuoteWizard with expressions of interest in future communications, not requests that the communications stop (even though her methodology was supposed to exclude interested customers). *Id.* at 36:13-37:4; 40:22-41:42:4. Moreover, although Verkhovskaya initially testified that these issues were corrected in her final "Amended and Corrected Supplemental Report," when confronted with counterexamples at deposition, Verkhovskaya conceded that these errors persist. *Id.* at 42:14-20; 43:4-14; 44:18-47:7.

- Verkhovskaya agrees that "for a large percentage" of the people on her class list (she has no idea how large a percentage), there is no available data regarding the content of their text responses to QuoteWizard, yet her methodology assumes they responded with a request that the texts stop. *Id.* at 58:22-59:24.

- In response to the following question "Is it your testimony that even if one or more of the data files that you used in your analysis was completely wrong that would not impact the reliability of the opinions that you offer in this case?" she responded "Correct." *Id.* at 79:18:22; *see also id.* at 79:7-80:6; 82:6-83:6; 106:5-107:8 (even a 100% error rate in that data files she relied on would not impact her opinions).

- Verkhovskaya does "not actually have any information one way or the other regarding the degree of accuracy of the data outputs" that she received from PacificEast and which formed the basis for her opinions. *Id.* at 82:4-7; *see also id.* at 83:7-13 (no knowledge of "error rate" in data outputs from PacificEast); 100:10-13; 115:2-9. And, although she repeatedly states that such information is "reliable," she cannot quantify what that means,

and her only basis for that conclusion is her own "personal" experience. *Id.* at 100:20-101:6; 108:24-109:3; 111:11-18.[5]

- Her team generated a list of 380 "business" keywords that her team used to differentiate between residential numbers (to be included) and business numbers (to be excluded) ***solely*** through the following methodology: "poking around on Yelp or Google or Yellow Pages and performing their own subjective analysis of whether they think that a term appears a lot in business names." *Id.* at 121:20-122:1.

Plaintiff declined to depose either of QuoteWizard's rebuttal witnesses.

### C.    Courts Increasingly Reject Verkhovskaya's Proposals for Identifying Class Members in TCPA Class Actions

QuoterWizard's experts were not the first to point out deficiencies in Verkhovskaya's proposed methodology. A growing number of courts are rejecting Verkhovskaya's claims that she can reliably identify class members, especially in TCPA class actions where her proposed methodology fails to capture the named plaintiff or relies on third-party data sources for improper purposes:

> Most glaringly, Plaintiff's method would not even have discovered Plaintiff as a class member… In fact, this expert [Verkhovskaya] encountered a similar problem in another TCPA case, *Goins v. Palmer Recovery Attorneys, PLLC*, 6:17-cv-654-Orl-GAP-KRS. There, despite her stated ability to ascertain the plaintiff as a class member, an individualized inquiry based on Verkhovskaya's own knowledge about the case was necessary to identify the plaintiff as the called party. *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 457 (M.D. Fla. 2018).

> The parties' experts dispute whether it is possible to identify the individuals who actually received telephone calls from Boston Scientific on a class-wide basis. Defendant's expert emphasizes that there is no centralized database linking individual subscribers to phone numbers and that the private databases used by plaintiff's expert are inaccurate and unreliable. As evidence of such unreliability, defendant's expert submits that the reverse-append process [proposed by Verkhovskaya] does not even identify plaintiff as a class member. Indeed, the databases utilized by plaintiff's expert [Verkhovskaya] do not associate plaintiff with the telephone number called by Boston Scientific until after Boston Scientific's calls." *Sandoe v. Bos. Sci. Corp*., 333 F.R.D. 4, 8 (D. Mass. 2019).

---

[5] Moreover, even though Verkhovskaya concedes she has been criticized by courts and her opinions been excluded for improper use of PacificEast and other vendor data outputs, she didn't mention that in her reports because "I don't find the relevancy of it." *Id.* at 113:4-23.

> [T]he Court ultimately agrees with [Defendant] that Verkhovskaya's methodology is insufficiently reliable and of limited utility...  Based on the record before the Court, Verkhovskaya has not satisfied the requirements of Federal Rule of Evidence 702.  Her testimony is based on facts and data from databases including LexisNexis, which may be generally reliable, but has been expressly designated by the creator of the database as unsuitable for Verkhovskaya's purposes.  Whether Verkhovskaya's opinion is the result of reliable principles and methods is somewhat difficult to say, given that significant parts of her methodology are either not described at all or described simply as "judgment calls"... The United States Supreme Court has stated that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  In this case, Verkhovskaya's opinion that she can reliably determine potential class members using her methodology is not clearly supported by the data. *Carroll v. SGS Auto. Serv's, Inc*., 16-537-SDD-RLB, 2020 WL 7024477, *1 (M.D. La. Nov. 30, 2020).

> Verkhovskaya's declaration is of no utility to the issue of certification.  Her proposed reverse-append method is also of questionable reliability and validity.... It is instructive that other courts have found Verhovskaya's reverse-append approach to be doubtful. *Sapan v. Yelp*, No. 3:17-cv-03240-JD, 2021 WL 5302908, *1 (N.D. Cal. Nov. 15, 2021).

> [T]he extremely high potential rate of error that [defendant's expert] demonstrated weighs against the admissibility of Verkhovskaya's expert opinion.  In sum, Verkhovskaya has not demonstrated that use of the RND, [defendant's] internal database codes, the PacificEast database, or subpoenas, or some combination of those resources, will reliably identify those persons who are class members using her proposed methodology.  For all of the above reasons, the Court concludes that the proposed methodology has not been shown to identify class members of the proposed class with a sufficient – or any – degree of reliability or feasibility. Verkhovskaya's expert testimony is therefore not admissible under Rule 702. *Davis v. Capital One*, No. 1:22-cv-00903 (AJT/IDD), 2023 WL 6964051, *1 (E.D. Va. Oct. 20, 2023).

Notably, Verkhovskaya's proposed methodology here repeats many of the same errors that courts (including this Court, in *Sandoe*) have previously found problematic, including the failure of her proposed methodology to identify the named Plaintiff and her misplaced reliance on a third-party

vendor to identify class members, when that vendor has expressly disclaimed the use of its services for that purpose.[6]

## III.    Legal Standard

In this Circuit, "the proponent of the [Rule 702] evidence bears the burden of demonstrating its admissibility." *E.E.O.C. v. Kaplan Higher Educ. Corp*., 725 F.3d 1, 6 (1st Cir. 2013).  Where "expert testimony [is] offered to prove satisfaction of Rule 23's requirements," the court should conduct the *Daubert* inquiry prior to adjudicating class certification.  *In re Blood Reagents*, 783 F.3d 183, 187-88 n.8 (3rd Cir. 2015).[7]  Federal Rule of Evidence 702 provides that a qualified expert "may testify in the form of opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) the testimony is based on sufficient facts or data;
>
> c) the testimony is the product of reliable principles and methods; and
>
> d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[8]

---

[6] Still additional courts have criticized Verkhovskaya's opinions and denied class certification, although they did not have occasion to formally exclude her testimony.  *See, e.g., Shamblin v. Obama for America*, No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765, *7 n.2, (M.D. Fla. May 27, 2015) ("While the Court declines to exclude the expert reports of Verkhovskaya and Biggerstaff, the Court disagrees with their conclusions tending to suggest that classwide proof is available on these specific issues," *i.e.*, "whether (1) the telephone number dialed was assigned to a cellular telephone at the time of the call and (2) whether the subscriber consented to be called.").

[7] *See* Newberg & Rubenstein on Class Actions (6th ed.) at §7:24 ("[I]f an expert witness is to testify solely for purposes of certification—but that expert had nothing whatsoever to say about the merits of the case, then at the certification point, the court would need to determine whether the expert's testimony was admissible under the *Daubert* test and whether it was convincing as that is the point at which the expert is testifying.").

[8] Rule 702 was amended effective December 1, 2023 to eliminate any doubt that the offering party bears the burden of establishing each of these factors by a preponderance of the evidence.

Expert testimony should be excluded unless the party offering the testimony demonstrates it is sufficiently relevant and reliable to qualify as admissible expert testimony under Federal Rule of Evidence 702. *See Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and it is inappropriate to admit an expert's opinions that are "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV.    Argument

### A.    Verkhovskaya Proposes A Methodology For Identifying Class Members That Fails to Identify the Named Plaintiff… Again.

Perhaps the most glaring deficiency in Plaintiff's expert analysis is the simple fact that her proposed methodology fails to identify the named Plaintiff at every step (and even her initial attempt to manually add his number to her list failed). As Verkhovskaya confirmed in her deposition, Mr. Mantha is only on her (revised) list because she "was directed by class counsel to add Mr. Mantha [to her class list]," manually even though she "did not do any specific analysis for his telephone number." Depo. at 126:5-127:8. Courts routinely exclude expert testimony regarding a proposed methodology for identifying class members when that methodology fails to identify the named plaintiff as one of the potential class members, including in several TCPA class actions in which Verkhovskaya served as a plaintiff's expert.

Indeed, this is far from the first time that Verkhovskaya's proposed methodology has failed to identify the named plaintiff in a putative TCPA class action. In *Wilson v. Babcock Home Furniture*, the plaintiff moved to certify a class, relying on Verkhovskaya's proposed methodology to identify class members. However, the court concluded that she had failed to offer a reliable methodology for identifying class members, noting: "Most glaringly, Plaintiff's method would not

even have discovered Plaintiff as a class member[.]"  329 F.R.D. 454, 457 (M.D. Fla. 2018).  The

court also noted that was not the first time that Verkhovskaya proposed a methodology that would

not capture the named plaintiff:

> In fact, this expert encountered a similar problem in another TCPA case, *Goins v.*
> *Palmer Recovery Attorneys* [....] There, despite her stated ability to ascertain the
> plaintiff as a class member, an individualized inquiry based on Verkhovskaya's
> own knowledge about the case was necessary to identify the plaintiff as the called
> party.

*Id.*  Accordingly, the court in *Wilson,* unconvinced that Verkhovskaya's proposed methodology

could reliably identify class members, denied class certification.

This Court has also previously declined to rely on Verkhovskaya's opinions in the context

of class certification in a TCPA class action for the same reason.  In *Sandoe*, this Court found

Verkhovskaya's methodology unreliable because it failed to identify the named plaintiff in that

case, noting that Verkhovskaya only identified the named plaintiff on the proposed class list

through "application of the six-month fuzzy period and by virtue of individual testimony or

analysis of plaintiff's phone records."  *Sandoe* 333 F.R.D. at 8.  Even though it found her opinions

unreliable, however, this Court did not have occasion to exclude her opinions in that case, because

no motion to exclude her testimony was filed in that case.

Most recently, just in October 2023, yet another court declined to accept Verkhovskaya's

opinions for the same reason – again, Verkhovskaya's proposed methodology failed to identify the

named plaintiff without individual inquiry.  *Davis*, 2023 WL 6964051, at *1.   In the context of

denying the plaintiff's motion to certify a TCPA class, the court found "particularly persuasive"

this Court's analysis in *Sandoe* finding Verkhovskaya's methodology unreliable because "like the

present case, the reverse append process could not identify the named class representative without

individual inquiry, a fact which the district court [*i.e.*, this Court] found reflected on the reliability of Verkhovskaya's testimony." *Id.* at *10 n.17.

Here, Verkhovskaya's proposed methodology suffers from the same deficiency that caused her opinions to be excluded in courts around the country. Again, her methodology fails to identify the named plaintiff without individualized inquiries and examinations, and she only added Plaintiff to the class list because class counsel told her to, without performing any independent analysis:

> Q: [Y]ou have gone through this whole methodology to get to this list of people who meet your criteria. And we get to the last step, and you go through the business number analysis, then at that step, you added plaintiff's telephone number to your list manually. Is that correct?
>
> A: Yes.
>
> Q: He does not meet the criteria that the other folks on that class list meet, right?
>
> A: I have not done that analysis for Mr. Mantha.
>
> Q: In your work on this case, you have not done any analysis to see whether the named plaintiff meets the criteria to belong on your class list. Is that accurate?
>
> A: I was directed by class counsel to add Mr. Mantha. And I did not do any specific analysis for his telephone number.
>
> Q: So you added him because counsel told you you should add his number to the list, correct?
>
> A: Correct.
>
> Q: You did not do any independent analysis regarding Mr. Mantha or his telephone number to confirm whether he met any of the other criteria to be on your class list, is that also accurate?
>
> A: That's correct.

Depo. at 126:5-127:8.

Moreover, not only did Verkhovskaya's methodology fail to include Plaintiff, her methodology actively ***excluded*** him, as he was present in the data set she began with. As Mr. Kostyun has opined, "the first step [in Verkhovskaya's methodology] eliminates Mantha's telephone number from class eligibility, since there is no DNC directive from Mantha's telephone number that appears in any of the five DNC files used by Verkhovskaya to identify inbound

messages that contained a DNC directive." Kostyun Rebuttal ¶ 129.[9]  As Verkhovskaya confirmed

at her deposition, Mantha's telephone number also did not appear in the output data from any of

the others steps of her proposed methodology, which likewise would have excluded him:

> Q: [Plaintiff's] number didn't appear on the opinion 2 numbers, correct?
>
> A: That's my understanding.
>
> Q: Plaintiff's telephone number didn't appear in the opinion 3 numbers, right?
>
> A: That's my understanding.
>
> Q: Or the opinion 4 numbers either, right?
>
> A: That's my understanding.
>
> Q: He didn't appear on the opinion 5 numbers either until you manually added him, is that correct?
>
> A: Correct.

Depo. at 128:8-18.  A proposed methodology for identifying class members that fails to identify

the only named class representative is not a "reliable" methodology suitable for admission as an

expert opinion.  This Court should again reject Verkhovskaya's unreliable opinions in this TCPA

class action, as it did in *Sandoe*.

> **B.    Verkhovskaya Uses Unreliable Third-Party Vendor Data To Reach Unreliable Conclusions… Again.**

Verkhovskaya's proposed "process" involves submitting data to a vendor called

PacificEast, which, Verkhovskaya reports, "provides data enrichment and data verification, data

validation, data customization, fraud prevention, identify verification, telemarketing and other

industries [sic] compliance solutions."   Report ¶¶ 64, 98.   Verkhovskaya confirms that her

methodology relies on the accuracy of data she receives from PacificEast: "My methodology relies

on the data processors like PacificEast to gather data from sources [...] so if the person uses a

---

[9] In her deposition, Verkhovskaya testified that she did not know whether Plaintiff's telephone number was in her original data set (it was), but she conceded that if he had been, her methodology would have actively excluded him from her proposed class list.  *See* Depo. at 127:14-25; 133:4-135:1.

telephone on a regular basis, my methodology will capture it." *Id.* ¶ 102, 77 ("To conduct the historical business record analysis, I relied upon the industry wide recognized services and records of PacificEast."). At several points in her report, Verkhovskaya endeavors to bolster PacificEast's reliability. *See, e.g.*, *id.* ¶ 66 ("I have found PacificEast to be accurate and reliable, and I have not found any reason to consider it unreliable.… PacificEast provides accurate and reliable NDNCR information. I regularly rely upon PacificEast to perform the data append described in this Expert Report.").

At deposition, Verkovskaya conceded that she actually has no idea how accurate the PacificEast data outputs are beyond her own "personal" belief that they are "reliable," a standard she cannot quantify. Depo. at 82:4-7; 83:7-13 (no knowledge of "error rate" in data outputs from PacificEast); 100:10-13; 100:20-101:6; 108:24-109:3; 111:11-18; 115:2-9. She also took the untenable position that even if the PacificEast data files she relied upon for her report were "completely wrong," that would not impact her opinions at all in this case. *See, e.g*, *id.* at 79:18-22.

The principal issue with Verhovskaya's reliance on the accuracy of PacificEast's data outputs as a key part of her methodology is that her reliance is misplaced, as both courts and PacificEast itself have confirmed. In October 2023, a federal district court observed – in another TCPA class action in which Verkhovskaya proposed relying on data outputs from PacificEast to identify class members – that PacificEast's COO, Scott Rice, had submitted a sworn declaration in that case denying that PacificEast's data services could reliably be put to the use to which Verkhovskaya proposed. Specifically, Mr. Rice swore that "while the reverse append results identify possible subscribers to phone numbers based on associational relationships, this service

does not determine subscriber identity, because there is no authoritative consolidated source known to identify such relationships."  Exhibit 5 ¶¶ 4-16.

Persuaded, the court there excluded Verkhovskaya's proposed expert testimony as unreliable, noting that "[t]he third-party database PacificEast, which Verkhovskaya proposes be utilized for the reverse-append process, provided a declaration which states, 'Reverse Phone Append data provided by PacificEast demonstrates only a possibility that the names identified by the service subscribed to a provided telephone number for a given date range.' […] As a factual and practical matter, determining definitively whether, and the dates, a particular person subscribed and/or stopped subscribing to or using an input telephone number, cannot reliably be achieved using the Reverse Phone Append service PacificEast provides."  *Davis* at *15, n.14.  For these and other reasons, the court concluded that "Verkhovskaya's expert testimony is therefore not admissible under Rule 702."  *Id.* at *11.

Mr. Rice executed a second declaration for this case, in which he confirmed his prior testimony regarding the use of PacificEast's "Reverse Phone Append service" proposed by Verkhovskaya.  *See* Rice Decl. ¶¶ 18-24.  He also swore, contrary to Verkhovskaya's representations, that determining whether a number is a business or residential number "is a question that cannot be authoritatively answered, nor is PacificEast's business lookup service intended to provide an authoritative answer to that question."  *Id.* ¶ 14.

Here, Verkhovskaya likewise proposes to rely on PacificEast data outputs to identify class members here, even though PacificEast has itself disclaimed using its services for that purpose, and even though a court recently rejected her opinions for proposing this very same approach.[10]

---

[10] Notably, the FCC has generally called into question all commercial services that purport to track phone number assignments.  *See Hunter v. Time Warner Cable*, No. 15-CV-6445 (JPO), 2019 WL 3812063, at *11

Nor was that the only occasion on which Verkhovskaya's opinions have been rejected because of her improper use of vendor services. In another TCPA class action, *Carroll*, the court excluded Verkhovskaya's opinions employing a "historical append process" to "identify subscribers/users of a particular telephone at a certain period of time." *Carroll v. SGS Auto. Serv's, Inc*., No. 16-537-SDD-RLB, 2020 WL 7024477, *1 (M.D. La. Nov. 30, 2020). There, Verkhovskaya proposed to upload "files containing the unique telephone numbers to LexisNexis" after which "output files from LexisNexis would identify the customary users of the phone numbers at the time of the calls, where available." *Id.* at *4. Accordingly, Verkhovskaya assured the court, as she does here, that "it is feasible and administratively possible to verify class members' names" and addresses. *Id.*

The court disagreed. It noted that a LexisNexis representative had testified that the LexisNexis database "cannot be used to determine definitively the subscribers or customary users of a telephone number on a current or historical basis. Nor can [it] be used to identify when a telephone number was reassigned from one person to another, or when the customary user of a phone number changed." *Id.* at *11. The court found, therefore, that "[h]er testimony is based on facts and databases including LexisNexis, which may be generally reliable, but has been expressly designated by the creator of the database as unsuitable for Verkhovskaya's purposes." *Id.* The court concluded that "Verkhovskaya's opinion that she can reliably determine potential class members using her methodology is not clearly supported by the data," and it "exercise[d] its discretion as the gatekeeper of expert testimony to exclude Verkhovskaya's report." *Id.*

This Court should do the same. Not only does Verkhovskaya have a long record of proposing to use third-party databases for improper uses, but the provider of the specific service

---

(S.D.N.Y. Aug. 14, 2019) ("the FCC has expressly recognized that commercial databases that track phone number assignments are not comprehensive.").

she proposes to use here, PacificEast, has sworn under penalty of perjury that its services cannot reliably be used for her purposes.

### C.    Verkhovskaya Proposes A Methodology With Far Too Many False Positives To Be Reliable… Again.

Another key problem with Verkhovskaya's proposed methodology is that its application results in an exceedingly high error rate, a problem that appears to perennially dog her expert opinions.  For example, Mr. Kostyun has identified several groups of false positives that appear on Verkhovskaya's proposed class list, but who are not, in fact, appropriate class members:

- 20% of the individuals on Verkhovskaya's proposed class list do not appear in any of the "DNC files" produced in this case.  Kostyun Rebuttal ¶ 15.

- For 61% of the individuals on the class list, no data is available regarding the text of the purported DNC message they sent to QuoteWizard.  In other words, for this population, there is no text available to evaluate whether they requested the texts stop, but Verkhovskaya includes those individuals anyway.  *Id.* ¶ 47.

- For 68% of the class, the "output" data that Verkhovskaya used in her analysis indicates that someone other than these individuals registered the applicable phone number on the NDNCR.  In other words, at least 68% of the individuals on the class list lack standing to bring the claims at issue in this case.  And for thousands of the calls placed to the numbers on Verkhovskaya's list, the individuals were under the age of 10 (and some "not even born") when the number associated with them was registered on the NDNCR.  *Id.* ¶¶ 55-63.

- 22% of the individuals in the "class" were included based on ambiguous language that Verkhovskaya treats as a clear DNC.

- For 5% of the individuals in the "class," the DNC registration date provided by PacificEast (and on which Verkhovskaya's analysis relies) was "invalid," because they listed registration dates occurring before the NDNCR even existed.

In sum, Mr. Kostyun opines that ***over 93% of the individuals listed on Verkhovskaya's proposed class list are not appropriate class members***.  *See id.* ¶ 34.[11]

---

[11] The individual percentages for each exclusion category total more than 100% because many of the numbers on the "Class List" should be excluded for ***more than one*** of these reasons.

This figure does not even account for additional categories of individuals who are inappropriately included on Verkhovskaya's list because, even though it is clear they should not be included, it is not possible to reliably estimate their number  For example, although Kostyun identifies many specific examples of business telephone numbers that Verkhovskaya's methodology inappropriately logged as "residential," there is no easy way to determine the prevalence of this problem in Verkhovskaya's data, so those false positives are not even included in the 93% figure.  *See id*. ¶ 81 ("And the true total of inappropriate class members is undoubtedly higher, since Plaintiff's class also includes some number of invalid business telephone numbers, which can only be determined by way of individual analysis.").  Nor does that figure account for individuals on the class list for whom QuoteWizard has and/or has provided proof of consent, due to the difficulties and burden associated with making individual consent determinations.

This is a recurring problem for Verkhovskaya.  In *Davis*, the court rejected Verkhovskaya's proffered opinions, in part, because of the "extremely high potential rate of error rate" in her results, which "weigh[ed] heavily against the admissibility of Verkhovskaya's expert opinion." *Davis*, 2023 WL 6964051 at *11.  Similarly, in *Carroll*, the court rejected her opinions where she claimed "that her methodology has an error rate of plus or minus seven percent" although the court also noted that "there is literally zero proof or data supporting Verkhovskaya's claims of the accuracy of failure rates."  *Carroll*, 2020 WL 7024477 at *6.

One of the key factors in the *Daubert* analysis for evaluating an expert's proposed methodology is whether it has a high error rate.  *Samaan v. St. Joseph's Hosp*., 670 F. 3d 21, 32 (1st Cir. 2012).  While Kostyun has identified many sources and examples of error in Verkhovskaya's methods and conclusions and offered specific figures of those deficiencies where

possible, Verkhovskaya has no idea what the error rate is at any step of her methodology, or the error rate of the vendor data she relies on from PacificEast.

**D.    Verkhovskaya's Methodology Fails to Adequately Capture Consent Issues... Again.**

Verkhovskaya's proposed methodology openly ignores copious evidence that QuoteWizard produced establishing consent to text to the telephone numbers at issue. *See* Kostyun Rebuttal ¶¶ 102-118. Here, documents produced in discovery reflect over 300,000 telephone numbers with records of third-party confirmations of consent among other evidence of consent. In her rebuttal response, Verkhovskaya essentially argues that she does not need to consider the consent data and excluded it from her analysis, although she implicitly acknowledges her methodological flaw, as she removed over 1,000 class members from her original list after realizing that evidence of consent precluded their inclusion. Verkhovskaya Rebuttal ¶¶ 61-62.

Nor is this the first time that Verkhovskaya has failed to adequately address consent issues in her proposed methodology. Verkhovskaya proposed to use an almost identical methodology in another case, *Sapan v. Yelp*:

> In lieu of facts, Sapan relies on the declaration of Verkhovskaya, who holds "a Bachelor of Science degree from Molloy College in Long Island, New York," and represents that she has appeared in a number of TCPA cases on the topic of call identification. Verkhovskaya opines that it is possible to take a list of numbers that Yelp called and analyze them to determine which numbers belong to potential class members. Her proposed method would entail culling Yelp's call records to identify phone numbers that were on the Do Not Call Registry for at least 31 days before Yelp called the number. These numbers would be analyzed in a rather unclear fashion to see if any had been called twice within a twelve-month period. She would cross check those numbers against a Lexis-Nexis database to filter out business numbers. The resulting numbers would presumably constitute the class, and she would use commercial databases to connect a specific person to each number. She calls this process the "reverse-append" method of analyzing phone call data.

2021 WL 5302908, at *3.  However, the court found this proposed methodology lacking for several reasons, including, but not limited to, its failure to account for evidence of consent without the need for individualized inquiries.

> The crucial shortfall for Sapan's certification request is that he has not proposed a method of identifying class members without individualized inquiries along the lines Yelp described.  Even assuming that Verkhovskaya could identify phone numbers on the Do Not Call Registry that were called twice by Yelp in a twelve-month period -- a possibility that is not at all clear in her declaration -- her method does not account for people who consented to being called in the ways that the record documents.

*Id.* at *6.[12]  The court found her opinions unreliable and denied class certification.  *Id.*

Here too, Verkhovskaya's methodology "does not account for people who consented to being called in the ways that the record documents."  Here too, the Court should reject Verkhovskaya's proffered opinions.

## V.    CONCLUSION

Because Plaintiff has failed to carry his burden to show that Verkhovskaya's opinions meet the threshold requirements of Federal Rule of Evidence 702, as discussed above, QuoteWizard respectfully requests that the Court exclude Verkhovskaya's opinions in their entirety.

*Signatures on Following Page*

---

[12] Because no formal *Daubert* motion was filed, the court declined to formally strike Verkhovskaya's opinions in that case, but noted that her testimony "has carried no force in Sapan's favor."  *Id.* at *6.

Respectfully submitted,

QuoteWizard.com, LLC,
By its attorneys,

/s/ Kevin P. Polansky
Kevin P. Polansky (BBO #667229)
kevin.polansky@nelsonmullins.com
Daniel M. Curran (BBO #709082)
daniel.curran@nelsonmullins.com
Ben Sitter (*admitted pro hac vice*)
Ben.sitter@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02109
(t) (617)-217-4700
Dated: February 14, 2024                     (f) (617) 217-4710


CERTIFICATE OF SERVICE

    I, Kevin P. Polansky, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 14, 2024                     /s/ Kevin P. Polansky
                                             Kevin P. Polansky