# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | : | |
| JOSEPH MANTHA on behalf of himself | : | |
| and others similarly situated, | : | |
| | : | Case No. 1:19-cv-12235-LTS-PK |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| QUOTEWIZARD.COM, LLC | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | / | |

## EXPERT REPORT OF ANYA VERKHOVSKAYA

## SEPTEMBER 22, 2023

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 2

II.    SUMMARY OF OPINIONS ..................................................................................... 4

III.   EXPERIENCE AND QUALIFICATIONS ................................................................ 5

IV.    DATA AND DOCUMENTS RELIED ON ............................................................... 14

V.     SOURCE DATA STANDARDIZATION .................................................................. 17

VI.    OPINION 1: Using the data produced in discovery by QuoteWizard and in response to subpoena from various third parties, I was able to reliably limit the proposed class to consumers whose telephone numbers were purchased by QuoteWizard from third party lead generators; whose telephone numbers were sent to Drips by QuoteWizard with authority to text; to telephone numbers that received the texts at issue, and to consumers who responded to the texts with a request that the telemarketing cease. .. 19

VII.   OPINION 2: Using the data produced in discovery by Drips, Bandwidth and Twilio, and limiting the proposed class as instructed, there is a reliable and efficient method to determine whether two or more texts were delivered within any 12-month period to telephone numbers that had been on the NDNCR for 32 days or more. ................. 23

VIII.  OPINION 3: Using the data produced in discovery by QuoteWizard, Drips, Bandwidth and Twilio, there is a reliable and efficient method to remove from the proposed class the telephone numbers of consumers who responded to the QuoteWizard texts with an expression of interest and for which QuoteWizard paid Drips for the lead. ...................................................................................................... 25

IX.    OPINION 4: Using the data produced in discovery by QuoteWizard, Drips, Bandwidth and Twilio, there is a reliable and efficient method to remove from the proposed class the telephone numbers of consumers who QuoteWizard claims it did not authorize Drips to text. .......................................................................................... 26

X.     OPINION 5: Using the data produced in discovery along with reliable commercially available databases, there is a reliable and efficient method by which it can be determined whether Defendant and/or agents acting on its behalf texted business telephone numbers, if any, for those telephone numbers to be removed from the proposed class ........................................................................................................... 28

XI.    OPINION 6: Using the consumer data produced in discovery by QuoteWizard, as supplemented as needed by commercially available databases connecting telephone numbers to the names and addresses of consumers, there is a reliable method of efficiently and effectively issuing notice to potential class members in accordance with the standards of Federal Rules of Civil Procedure Rule 23 and due process requirements. .......................................................................................................... 32

XII.   CONCLUSION ....................................................................................................... 40

I, Anya Verkhovskaya, hereby state as follows:

## I.     INTRODUCTION

1.     Plaintiff's counsel ("counsel") asked me to analyze telemarketing telephone text records produced in the above-captioned matter by an entity called Drips, LLC ("Drips") acting on behalf of the defendant QuoteWizard.com, LLC ("QuoteWizard") in order to identify class members, in addition to plaintiff Joseph Mantha,[1] who all received text solicitations on behalf of QuoteWizard.

2.     Counsel also asked me to remove from the text record analysis telephone numbers that, as per counsel, QuoteWizard claimed were originally obtained via consumers' alleged visits to QuoteWizard's own websites, identified in QuoteWizard's production as "onsite" leads, and to focus my analysis solely on telephone numbers that QuoteWizard purchased from third party lead generators.

3.     Counsel also asked me to focus my text record analysis on those telephone numbers to which QuoteWizard made no claim that Drips did not have its authority to send telemarketing texts to that telephone number on its behalf, on texts that were sent to and received by the consumer, and on the telephone numbers of consumers who complained in response to their receipt of QuoteWizard telemarketing texts. Counsel also asked me to exclude from the analysis consumers who responded with interest to QuoteWizard's telemarketing texts, and to only include those for whom QuoteWizard paid Drips for the lead.

4.     It is my understanding that Plaintiff alleges that the texts transmitted to consumers by Drips on behalf of QuoteWizard violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 *et seq*., in that they were made to persons whose telephone numbers were listed

---

[1] This Court has already recognized that Mr. Mantha received text solicitations from QuoteWizard on his wireless number listed on the Do Not Call Registry, and that he did not consent to receive such texts. *See Mantha v. Quotewizard.com*, LLC, 2021 U.S. Dist. LEXIS 245059, * 23 (D. Mass. Dec. 3, 2021) (Report and Recommendation, adopted at 2022 U.S. Dist. LEXIS 19502 (Feb. 3, 2022).

on the National Do Not Call Registry (the "NDNCR"). Specifically, Plaintiff's counsel asked me to opine whether, at the time of the texts, I can:

    a.  Reliably limit the class to consumers whose telephone numbers were purchased by QuoteWizard from third party lead generators; whose telephone numbers were sent to Drips by QuoteWizard with authority to text; to telephone numbers that received the texts at issue; and to telephone numbers of consumers who responded to the texts with a request that the telemarketing cease;

    b.  After limiting the class per the above guidelines, reliably identify telephone numbers that received two or more texts from or on behalf of the Defendant, within any 12-month period, after being on the NDNCR for 32 days or more;

    c.  Limit the class to consumers who did not respond to QuoteWizard's texts expressing interest, and for whom QuoteWizard paid Drips for the lead;

    d.  Limit the class to consumers who are not subject to QuoteWizard's additional "authority" arguments;

    e.  Limit the class to consumers with telephone numbers that are not identified as business telephone numbers;

    f.  Identify the proposed class in accordance with the standards of Federal Rules of Civil Procedure Rule 23 and due process requirements.

5.      It is my understanding that Plaintiff's counsel is seeking for the Court to certify the following class:

    All persons within the United States (a) whose residential telephone numbers were listed on the National Do Not Call Registry, and (b) who received more than one telemarketing text within any twelve-month period at any time from Drips, (c) to promote the sale of QuoteWizard's goods or services, and d) the telephone numbers that meet the class list definition criteria in the Expert Report of Anya Verkhovskaya.

6.      I was responsible for the analysis that formed the basis of the opinions stated in this Expert Report. Contractors executed some aspects of this analysis working under my supervision and at my direction, all of whom are contracted by Class Experts Group, LLC (CEG).

7.      Plaintiff's counsel retained me at an hourly rate of $525.00 for analysis and $675.00 for testimony in deposition, at a hearing, or in trial. My compensation does not depend upon the opinions that I offer or on the outcome of this matter.

8.      In the past ten years, I have authored no publications.

9.      I am over the age of 21 and I am not a party to this action.

10.     I am not a member of any of the classes proposed for certification by Plaintiff.

11.     I have testified as an expert witness at deposition or trial in the last four years in the cases listed within Exhibit A.

## II.    SUMMARY OF OPINIONS

1.      **OPINION 1:** Using the data produced in discovery by QuoteWizard and in response to subpoena from various third parties, I was able to reliably limit the proposed class to consumers whose telephone numbers were purchased by QuoteWizard from third party lead generators; whose telephone numbers were sent to Drips by QuoteWizard with authority to text; to telephone numbers that received the texts at issue, and to consumers who responded to the texts with a request that the telemarketing cease.

2.      **OPINION 2:** Using the data produced in discovery in by Drips, Bandwidth and Twilio, and after limiting the proposed class as instructed, there is a reliable and efficient method to determine whether two or more texts were delivered within any 12-month period to telephone numbers that had been on the NDNCR for 32 days or more.

3.      **OPINION 3:** Using the data produced in discovery by QuoteWizard, Drips, Bandwidth and Twilio, there is a reliable and efficient method to remove from the proposed class the telephone numbers of consumers who responded to the QuoteWizard texts with an expression of interest, and for whom QuoteWizard paid Drips for the lead.

4.      **OPINION 4:** Using the data produced in discovery by QuoteWizard, Drips, Bandwidth and Twilio, there is a reliable and efficient method to remove from the proposed class the telephone numbers of consumers who QuoteWizard claims it did not authorize Drips to text.

5.      **OPINION 5:** Using the data produced in discovery along with reliable commercially available databases, there is a reliable and efficient method by which it can be

determined whether Defendant and/or agents acting on its behalf texted business telephone numbers, if any, for those telephone numbers to be removed from the proposed class.

6.      **OPINION 6:** Using the consumer data produced in discovery by QuoteWizard, as supplemented as needed by commercially available databases connecting telephone numbers to the names and addresses of consumers, there is a reliable method of efficiently and effectively issuing notice to potential class members in accordance with the standards of Federal Rules of Civil Procedure Rule 23 and due process requirements.

7.      My opinions are based on the data available to me as of today. I reserve the right to supplement or amend this Expert Report should new and/or additional data or information be provided by the Defendant.

## III.    EXPERIENCE AND QUALIFICATIONS

12.     I am the President and Chief Executive Officer of Class Experts Group, LLC , a firm that offers litigation support services, including as consulting or testifying experts, with a focus on data management and data analysis, particularly in the area of TCPA, consumer protection, human and civil rights class actions. CEG also provides class notification, claims administration, and consumer protection class action litigation support services.

13.     I have more than two decades of experience serving as an expert witness or court-approved administrator in various class action matters, including hundreds of TCPA cases and consumer protection, employment, antitrust, securities fraud, ERISA, human and civil rights, and other class action claims. My resumé describes my experience and qualifications in more detail and is attached within Exhibit A.

14.     In my professional experience, I have analyzed, overseen, and directed data analysis, and made determinations regarding sets of data containing billions of records, including but not limited to the analysis of telephone call/text records; credit card company records; governmental agency data files; life, automobile, medical, and title insurance records; medical

billing records; mortgage, securities, and other banking records; and other large-volume data sets from dozens of industries.

15.     As a result of this experience, I am familiar with numerous and diverse methods and systems that are commonly used to perform reliable record analysis on voluminous sets of data, including, but not limited to loading, standardizing, transformation, querying, and cross-referencing.

16.     I have extensive experience in identifying and locating class members in order to administer class actions and related programs, involving all aspects of direct, media, digital, email, and third-party notice programs, data management, claims administration, and settlement fund distribution, both domestically and internationally.

17.     I have overseen the administration, processing, and adjudication of millions of class action claims, including analysis, classification, processing of documentation (paper and digital) and related correspondence; issuance of payment; and assuring legal and tax settlement fund compliance.

18.     I regularly serve as an expert witness, providing opinions and testimony in state and federal court cases related to class member identification and location, class certification, notice adequacy, claims administration, and settlement disbursal.

19.     I also serve as an expert witness, providing opinions and testimony in TCPA cases concerning identification of wireless telephone numbers; telephone numbers registered on the NDNCR, tallying of telephone call/text dispositions; internal do-not-call list violations; reverse-append of names, mailing, and email addresses; historical and current telephone carrier identification; address updating; historical identification of telephone numbers as business or residential; and cross-referencing data points between two or more data sets in order to aggregate or compare information. For example, my team and I provided expert reports employing or describing many of these or similar methods, and offered either deposition and/or trial testimony, including but not limited to the following TCPA cases:

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, No. 15-cv-06314 (N.D. Cal.)

*Bakov v. Consolidated World Travel*, No. 15-cv-02980 (N.D. Ill.)

*Baldwin v. Miracle-Ear, Inc.*, No. 20-01502 (D. Minn.)

*Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)

*Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060 (N.D. Cal.)

*Biringer v. First Fam. Ins., Inc.*, No. 14-cv-00566 (N.D. Fla.)

*Brown v. DirecTV, LLC*, No. 13-cv-01170 (C.D. Cal.)

*Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-00728 (N. D. Tex.)

*Chinitz v. Intero Real Estate Services*, No. 18-cv-05623 (N.D. Cal.)

*Chinitz v. NRT West, Inc.*, No. 18-cv-06100 (N.D. Cal.)

*Cordoba v. DIRECTV, LLC*, No. 15-cv-03755 (N.D. Ga.)

*CS Wang & Assoc. v. Wells Fargo Bank, N.A.*, No. 16-11223 (N.D. Ill.)

*Drayton v. Toyota Motor Credit Corp.*, No. 16-cv-00046 (M.D. Fla.)

*Duchene v. Westlake Services, LLC*, No. 13-cv-01577 (W.D. Pa.)

*Fabricant v. AmeriSave Mortgage*, No. 19-04659 (C.D. Cal.)

*Fitzgerald v. Universal Pictures*, No. 16-cv-01193 (M.D. Fla.)

*Garcia v. Target Corp.*, No. 16-cv-20727 (S.D. Fla.)

*Gilmore v. USCB Corp.*, No. 17-cv-00119 (M.D. Ga.)

*Goins v. Palmer Recovery Attys., PLLC*, No. 17-cv-00654 (M.D. Fla.)

*Heidarpour v. Cent. Payment Co. LLC*, No. 15-cv-00139 (M.D. Ga.)

*Hennie v. ICOT Hearing Systems, LLC d/b/a ListenClear*, No. 18-02045 (N.D. Ga.)

*Hopkins v. Modernize, Inc.*, No. 17-cv-40087 (D. Mass.)

*Hossfeld v. Compass Bank*, No. 16-cv-02017 (N.D. Ala.)

*Jenkins v. National Grid USA*, No. 15-cv-01219 (E.D.N.Y.)

*Johansen v. One Planet Ops, Inc.*, No. 16-cv-00121 (S.D. Ohio)

*Johnson v. Comodo Group, Inc.*, No. 16-cv-04469 (D.N.J.)

*Johnson v. Navient Solutions, Inc.*, No. 15-cv-00716 (S.D. Ind.)

*Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.)

*Manopla v. Home Depot USA, Inc.*, No. 15-cv-01120 (D.N.J.)

*McMillion v. Rash Curtis & Assoc.*, No. 16-cv-03396 (N.D. Cal.)

*McCurley v. Royal Seas Cruises, Inc.*, No. 17-0986 (S.D. Cal.)

*Mey v. Frontier Commc'n Corp.*, No. 13-cv-01191 (D. Conn.)

*Mey v. Honeywell Int'l, Inc.*, No. 12-cv-01721 (S.D.W. Va.)

*In re Monitronics Int'l., Inc. TCPA Litig.*, No. 13-md-02493 (N.D. W. Va.)

*Morris v. SolarCity Corp.*, No. 15-cv-05107 (N.D. Cal.)

*Lennartson v. Papa Murphy's Int'l. LLC*, 15-cv-05307 (W.D. Wash.)

*Pieterson v. Wells Fargo Bank, N.A.*, No. 17-cv-02306 (N.D. Cal.)

*Reyes v. BCA Fin. Services, Inc.*, No. 16-cv-24077 (S.D. Fla.)

*Roberts v. Wyndham Int'l, Inc.*, No. 12-cv-05083 (N.D. Cal.)

*Samson v. United Health Care Services*, No. 19-cv-00175 (W.D. Wash.)

*Slovin v. Sunrun, Inc.*, No. 15-cv-05340 (N.D. Cal.)

*Trenz v. Volkswagen Grp of Am.*, No. 15-cv-08356 (C.D. Cal.)

*Youngman v. A&B Ins. & Fin.*, No. 16-cv-01478 (M.D. Fla.)

*West v. Cal. Service Bureau, Inc.*, No. 16-cv-0324 (N.D. Cal.)

*Williams v. PillPack, LLC*, No. 19-cv-05282 (W.D. Wash.)

*Winters v. Capital One Bank (USA) N.A.*, No. 17-cv-01178 (C.D. Cal.)

*Wright v. eXp Realty, LLC*, No. 18-cv-01851 (M.D. Fla.)

20.    I was the court-appointed settlement administrator and managed claims processing and the fund distribution and/or was a notice expert, including but not limited to the following TCPA cases:

*Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)

*Brey Corp v. Life Time Improv., Inc.*, No. 11-cv-00948 (D. Md.)

*Brieger v. Tellabs, Inc.*, No. 06-cv-1882 (N.D. Ill.)

*Brown v. Rita's Water Ice Franchise Co., LLC*, No. 15-cv-3509 (E.D. Pa.)

*Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-00728 (N.D. Tex.)

*Collins v. Am. Consumer Shows, Inc.*, No. 10-cv-11912 (D. Mass.)

*Desai v. ADT Security Services, Inc.*, No. 11-cv-1925 (N.D. Ill.)

*Duchene v. Westlake Services, LLC*, No. 13-cv-01577 (W.D. Pa.)

*Fray-Witzer v. Metropolitan Antiques, LLC*, No. 02-5827 (Mass. Super. Ct.)

*Fray-Witzer v. Olde Stone Land Survey Co.*, No. 08-cv-04175 (Mass. Super. Ct.)

*Heidarpour v. Cent. Payment Co., LLC*, No. 15-cv-00139 (M.D. Ga.)

*Horton v. Cavalry Portfolio Services, LLC*, No. 13-cv-00307 (S.D. Cal.)

*Ikuseghan v. MultiCare Health Sys.*, No. 14-cv-05539 (W.D. Wash.)

*Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.)

*LaVigne v. First Cmty. Bancshares, Inc.*, No. 15-cv-00934 (D.N.M.)

*Luster v. Green Tree Servicing, LLC*, No. 14-cv-01763 (N.D. Ga.)

*Mann & Co., PC v. C-Tech Ind., Inc.*, No. 08-cv-11312 (D. Mass.)

*Martin v. Dun & Bradstreet, Inc.*, No. 12-cv-00215 (N.D. Ill.)

*Mey v. Herbalife Int'l, Inc.*, No. 01-C-263 (W.Va. Cir. Ct.)

*Mey v. Interstate Nat'l Dealer Services, Inc.*, No. 14-cv-01846 (N.D. Ga.)

*Mey v. Venture Data, LLC*, No. 14-cv-00123 (N.D.W. Va.)

*Milford & Ford Assoc., Inc. v. Am. Consumer Shows*, No. 10-cv-11912 (D. Mass.)

*Milford & Ford Assoc., Inc. v. Cell-Tek, LLC*, No. 09-cv-11261 (D. Mass.)

*Mohamed v. Am. Motor Co., LLC,* No. 15-cv-23352 (S.D. Fla.)

*Munday v. Navy Fed. Credit Union,* No. 15-cv-01629 (C.D. Cal.)

*Nguyen v. Vantiv LLC,* No. 15-cv-02436 (N.D. Cal.)

*O'Neill v. Carrington Mortgage Serv.'s*, No. 19-cv-10643 (Mass. Super. Ct.)

*Peltier, et al., v. Bernhardt, et al.*, No. 1:20-cv-03775 (D. D.C.)

*Ward v. Flagship Credit Acceptance LLC,* No. 17-cv-02069 (E.D. Pa.)

21.     These cases collectively identified, notified, and/or issued payment to millions of persons who met the respective class definitions in each case. Identifying, locating, notifying class members, processing claims, and issuing payment are routine processes that claims administration firms have been completing under court supervision for decades.

22.     Many of the cases listed above involved classes comprised of persons for whom the defendants did not have name/address/email information. In each case, I used industry-standard best practices to identify class members' missing contact information and ultimately to ensure payment to settlement class members who submitted valid claim forms.

23.     Courts have admitted my expert opinions and testimony about my data analysis methods, notice programs' effectiveness and efficiency, and the reliability of claims administration determinations made under my direction, in dozens of cases.

24.     In *Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.), when defendants sought to exclude my report, the court noted that it had "reviewed a number of Ms. Verkhovskaya's reports and declarations during the course of these proceedings and heard her testify at trial… Based on its familiarity with her work over time and on its personal, in-court observations of her testimony, the Court finds her to be a credible witness and has no concerns about her honesty or integrity." The jury then weighed my testimony about initial data processing (call dispositions and durations), identification of telephone numbers on the NDNCR at a given point in time, and identification of residential and business telephone numbers. The jury entered a verdict in favor of the plaintiff and the class (with treble damages). In denying a later motion to set aside the verdict, the court stated that "Ms. Verkhovskaya provided clear, cogent testimony explaining her methodology and the bases for her opinions. To the extent there was conflicting evidence that questioned the validity, credibility, and weight of Ms. Verkhovskaya's opinions, the jury weighed that evidence and rejected Dish's evidence."

25.     Also, in the *Krakauer* matter, Defendant's expert opined that my method was unreliable. The court dismissed this testimony, stating that Defendant's expert "testified at some length that Ms. Verkhovskaya 'failed to apply the proper standards, the accepted standards of data analysis'" but that even "if the Court agreed that Ms. Verkhovskaya's evidence was shaky, ***which it does not***, Dish had a full opportunity to contest it and took advantage of that opportunity… The plaintiffs offered credible evidence that [the vendor] made thousands of telemarketing phone calls on Dish's behalf and as Dish's agent to residential numbers…in violation of federal law… [T]here was no miscarriage of justice." (emphasis added, citations omitted).

26.     In *McMillion v. Rash Curtis & Associates*, No. 16-cv-03396 (N.D. Cal.), a jury weighed my testimony about historical wireless identification of telephone numbers and historical reverse-append of users and/or subscribers names and addresses. The jury entered a verdict in favor of Plaintiff McMillion and the classes at $500 per each call I identified, resulting in a common fund award of $267,349,000.

27.     Several other courts have commented favorably on the record regarding my TCPA-related experience and expertise.

28.     In *Shamblin v. Obama for America*, No. 13-cv-2428 (S.D. Fla.), the court called me "amply qualified," saying that my "relevant experience, education, and training render [me] competent to offer expert testimony in TCPA cases." The court also noted that I "employ generally reliable methodologies … and utilization of LexisNexis data …"

29.     In *Reyes v. BCA Financial Services, Inc.*, No. 16-cv-24077 (S.D. Fla.), the court noted that "[s]everal other district courts have also relied on Verkhovskaya's expertise when deciding whether to certify TCPA and other classes," including *Shamblin* and *Krakauer*, before denying a *Daubert* motion to strike my expert report in that matter.

30.     In *Abante Rooter & Plumbing, Inc. v. Alarm.com*, No. 15-cv-06314 (N.D. Cal.), the court denied a motion to strike my expert report under *Daubert*, where defendant had argued that the data I relied on to identify business telephone numbers was not reliable. The court noted that the same argument had been made in Krakauer, and the court there had "rejected a similar challenge to her methodology … finding that Ms. Verkhovskaya properly used Lexis Nexis data to remove business numbers from her output list because it was the type of data reasonably relied upon by experts in the field" and the error rate in the data was normal for the field. Concurring, the court denied the *Daubert* motion and admitted my opinion into evidence.

31.     In *Chinitz v. Intero*, No. 18-cv-05623 (N.D. Cal.), the court denied a motion to strike my expert report under *Daubert*, because the defendant argued that the data I relied on to

identify business telephone numbers is not reliable. The court stated, "… Indeed, several courts have approved of Ms. Verkhovskaya's use of LexisNexis to remove business numbers from her output list as this is the type of data reasonably relied upon by experts in the field."

32.    In addition to the cases referenced above and, in my resumé, I have also overseen a number of complex, large-scale domestic and international administration programs.

33.    As the court-appointed notice administrator in the *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000), I played a key role in a worldwide Phase I notice program that resulted in the processing of more than 500,000 initial questionnaires relating to a $1.25 billion settlement. In Phase III of that matter, I coordinated delivering notice to more than 10,000 Jewish communities in 109 countries. In both Phases I and III of that matter, I administered international help and call centers that directly assisted more than 100,000 potential claimants, created a class-appropriate notice targeting members of the Romani community in 48 countries, directed hundreds of staff in communicating with Romani communities and individuals, and notified more than two million people of the settlement.

34.    I was appointed by the government of Germany to lead notice and claims collection efforts in the German Forced Labour Compensation Programme (GFLCP). Under my direction, the program located more than 43,000 Romani survivors in 17 countries in central and eastern Europe who were potentially eligible for humanitarian aid. I oversaw creation of a comprehensive database for the GFLCP and the Holocaust Victim Assets Programme and coordinated direct assistance with claim completion for more than 11,000 Romanies in eight central and eastern European countries.

35.    I was appointed by Chairman Lawrence Eagleburger, former U.S. Secretary of State, to serve as consultant to the International Commission on Holocaust Era Insurance Claims (ICHEIC) on notice and outreach strategies and supervised the notification of claimants and face-to-face assistance programs in eastern Europe and the former Soviet Union.

36.     I was appointed by the Israeli government as the administrative director of Project HEART (Holocaust Era Asset Restitution Taskforce) to provide essential tools, strategy, and information to enable Israel and its partners to secure restitution for eligible Jewish Holocaust victims and their heirs. Project HEART was one of the most comprehensive multilingual notice campaigns ever undertaken, covering 137 countries. I assisted in launching a multilingual, interactive website, establishing a 24-hour call center in 13 languages, distributing more than 500,000 documents to potentially eligible families of Holocaust victims, handling more than 80,000 telephone calls, conducting archival research, and creating the most comprehensive online database of nearly two million records looted Jewish property. In addition, under my supervision, Project HEART reached out to 15,000 non-governmental organizations (NGOs) to engage them in the project to provide personal assistance to thousands of Holocaust victims and their heirs in making their claims.

37.     I was appointed as the Settlement Administrator in the matter of *Leslie Ann Wilkie Peltier, et al. v. Deb Haaland, et al.*,[2] No. 20-cv-03775 (D. D.C.), a class action lawsuit to redress alleged breaches of trust by the United States Department of the Interior, the United States Department of the Treasury, and the United States of America with respect to the accounting and management of two Judgment Awards of the Indian Claims Commission (ICC). The $59 million settlement provides relief to several generations of tribal families. As part of this litigation, I worked over the course of several years to develop a novel class notification and claims adjudication process that would quickly and efficiently distribute settlement funds to surviving tribal members and their heirs, many of whom are ageing. At the preliminary approval hearing, the federal judge overseeing the settlement noted that CEG was "instrumental in helping to shape the deal…"

---

[2] Formerly known as *Leslie Ann Wilkie Peltier, et al. v. Scott de la Vega, et al.*, since under Federal Rule of Civil Procedure 25(d), a public officer's successor is automatically substituted as a party.

38.    At the final settlement approval fairness hearing, class counsel noted that CEG "made extensive efforts to identify and reach" the class and that CEG's class notification efforts "have met or gone beyond the Rule 23 and due process…requirements…The notice program here has been thorough…" In his order granting final class action settlement agreement approval, the court noted that CEG's class notification process provided "the best notice practicable under the circumstances…and it was reasonably calculated to reach the class members."

39.    As an indication of the notice adequacy and its expansive reach, claimants were reached beyond the USA and claims were filed by class members from six additional countries: Australia, Austria, Canada, The Netherlands, Norway, and South Korea.

## IV.    DATA AND DOCUMENTS RELIED ON

40.    In the course of my work on this matter, I relied on the following data files and documents produced in this case[3] in forming my opinions outlined in this Expert Report:

   a.  <u>Drips Text Records.</u>[4] It is my understanding that these records evidence the telemarketing texts made by Drips on behalf of QuoteWizard.

   • Outbound Set 1 [Privileged and confidential].csv
   • Outbound Set 2 [Privileged and confidential].csv

   b.  <u>Inbound Third Party Lead Data.</u>[5] It is my understanding that these are the files produced by QuoteWizard that evidence the leads that it purchased from third party lead generators that were used to carry out the telemarketing text campaign at issue.

   • An exhibit identifying these files is attached at Exhibit B.

---

[3] I handled all materials with due care and confidentiality; it is my understanding that there is a standing protective order, the Standing Order re: Default Protective Order in Complex Cases, which I have received and reviewed.

[4] When working with the Drips Text Records, I utilized "Phone" as the field containing consumer telephone numbers for my analysis described in this Expert Report.

[5] When working with the Inbound Third Party Lead Data, I utilized "lead.phone", "phone", "pingTransform.phone", "data.phone", "ApplicantContactInfoPrimaryPhoneNumber", "ApplicantContactInfoDayTimePhoneNumber", "PRIMARY_PHONE_NUMBER", "Phone", "sessioncontactprimary_phone" as the fields containing consumer telephone numbers for my analysis described in this Expert Report.

c. <u>Onsite Leads</u>.[6] It is my understanding that these are the files produced by QuoteWizard that evidence consumer lead data that it originated itself from its own websites and which were not purchased from third-party lead generators.

- An exhibit identifying these files is attached at Exhibit C.

d. <u>Drips API Data</u>.[7] It is my understanding that this is a file produced by Drips in discovery, along with a sworn declaration,[8] attesting that its API Data confirms whether a particular number was sent to Drips by QuoteWizard with authority to text. This file is entitled:

- API Post Logs [Privileged and confidential].zip which contained Exports.csv

e. <u>Bandwidth and Twilio Text Records</u>.[9] It is my understanding that these are partial telecommunications records of the entities used by Drips to physically transmit telemarketing texts to consumers on behalf of QuoteWizard. These files were produced in response to subpoena by Bandwidth and Twilio.

- BAND-202002-202112.csv
- BAND-202105-202112.csv
- Full_Quote_Wizard_Report.csv

f. <u>Do Not Call Files</u>.[10] It is my understanding that these are the files produced in discovery by QuoteWizard and Drips identifying consumers who responded to their receipt of QuoteWizard telemarketing texts with a demand that

---

[6] When working with the Onsite Leads, I utilized "lead.phone", "phone", "pingTransform.phone", "data.phone",                                        "ApplicantContactInfoPrimaryPhoneNumber", "ApplicantContactInfoDayTimePhoneNumber", "PRIMARY_PHONE_NUMBER", "Phone", "sessioncontactprimary_phone" as the fields containing consumer telephone numbers for my analysis described in this Expert Report.

[7] When working with the Drips API Data, I utilized "Phone" as the field containing consumer telephone numbers for my analysis described in this Expert Report.

[8] Declaration of Tom Martindale dated July 10, 2023.

[9] When working with the Bandwidth and Twilio Text Records, I utilized "CALLED_NUMBER" as the field containing consumer telephone numbers in files "BAND-202002-202112.csv" and "BAND-202105-202112.csv"; and "Called" as the field containing consumer telephone numbers in the file "Full_Quote_Wizard_Report.csv" for my analysis described in this Expert Report.

[10] When working with the Do Not Call Files, I utilized "Number" as the field containing consumer telephone numbers in files "DNC-Part1.csv", "DNC-Part2.csv", "DNC-Part3.csv", and "QuoteWizard__Mantha 000211 UNREDACTED.csv"; and "Phone" as the field containing consumer telephone numbers in the file "Inbound Messages - 2021-05-18.csv" for my analysis described in this Expert Report.

the telemarketing cease, and were designated by QuoteWizard as numbers to "Do Not Call."

- DNC-Part1.csv
- DNC-Part2.csv
- DNC-Part3.csv
- Inbound Messages – 2021-05-18.csv
- QuoteWizard__Mantha 000211 UNREDACTED.csv

g. <u>Potential Customer File.</u>[11] This file was produced in discovery by QuoteWizard in response to a discovery request asking QuoteWizard to identify the numbers of consumers who responded to QuoteWizard's telemarketing text campaign with an expression of interest, and resulted in a payment by QuoteWizard to Drips for generating a new lead.

- QUOTEWIZARD003653-QUOTEWIZARD003653.xlsx

h. <u>Authority Files.</u>[12] As explained in detail below, QuoteWizard produced in discovery hundreds of data files containing numbers for which it claimed, applying various arguments, that it did not authorize Drips to send telemarketing texts to such number.

- An exhibit identifying these files is attached at Exhibit D.

Collectively, the "Source Data." I also referred to the following sources.

i. Class Action Complaint;

j. Order on Discovery Schedule (Doc. Nos. 313, 316);

k. Defendant's Answers to Plaintiff's Fourth Set of Interrogatories;

l. QuoteWizard's Supplemental Answers to Plaintiff's Fourth Set of Interrogatories, June 21, 2023;

m. Order on Report and Recommendation dated February 3, 2022;

n. Declaration of Tom Martindale dated August 29, 2023, with relevant exhibits;

---

[11] When working with the Potential Customer File, I utilized "CONSUMER_ANI" on the sheet "Consumer ANIs" as the field containing consumer telephone numbers for my analysis described in this Expert Report.

[12] When working with the Authority Files, I utilized "PRIMARY_PHONE_NUMBER", "PRIMARY_PHONE", and "Phone" as the fields containing consumer telephone numbers for my analysis described in this Expert Report.

o.  Declaration of Tom Martindale dated July 10, 2023 with relevant exhibits;

p.  Standing Order re: Default Protective Order in Complex Cases;

q.  Transcript of Videotaped Deposition of Matthew Weeks, September 8, 2023, with relevant exhibits;

r.  Transcript of Videotaped Deposition of Joel Peterson, September 8, 2023, with relevant exhibits;

s.  Videotaped Deposition of Tricia Winkler, September 8, 2023, with relevant exhibits; and

t.  Mantha Text Chronology (00027393).

## V.    SOURCE DATA STANDARDIZATION

41.    In more than two decades of experience in data analysis, I have developed a method by which to use call and/or text record data to identify telephone calls and/or texts that have certain characteristics. This method has been validated repeatedly and has been accepted into evidence in a number of federal and state lawsuits alleging violations of the TCPA or TCPA related state statutes. In this section, I describe the method I used to prepare the data that I received for my data analysis.

42.    Over the years, I have processed many types of data received from various sources and in different formats. Part of this experience includes performing cross-comparisons of separate records and files from different sources.

43.    The first step in this cross-comparison is to ensure that each of the files in the Source Data includes the data points needed for analysis.

44.    Then, I completed a process of data mapping, standardization, and hygiene in order to produce data that was fit for further substantive analysis.

45.    To accomplish this, I first loaded the text records from the source data files into .SQL staging tables. Structured Query Language (or ".SQL," commonly called "Sequel") is a programming language that is used to create, modify, and analyze the contents of one or more

interaction with relational tables and/or database tables. Sequel allows queries to provide a syntax for inserting records into, modifying records in, deleting records from, or extracting data for an unlimited number of files. Sequel is commonly used across many industries to analyze mass structured data sets reliably and efficiently.

46.    For each file, I documented the number of records per file to ensure that the load was executed correctly. Loading raw data to a Sequel staging table enables queries to run efficiently across a large volume of data points in a short period of time. These queries increase the efficiency of data analysis in a mass data set that meet targeted criteria.

47.    I have overseen the writing and execution of Sequel commands and queries for more than 15 years. Almost every expert opinion I have offered in a TCPA case involved overseeing the development and implementation of Sequel commands and queries across telephone text record data.

48.    The source data records were loaded into Sequel master tables for further data hygiene and standardization. The goal of this process is to mark for exclusion from further analysis data points that are unnecessary, and/or to mark for exclusion from further analysis data records that have (or do not have) certain characteristics that make them inappropriate for such analysis.

49.    The steps I took as part of this data hygiene and standardization process were:

> d1    Removing non-numeric characters from telephone numbers, such as spaces and characters like open and closed parentheses or dashes;
>
> e1    Removing leading numbers from telephone numbers, including but not limited to "0," "1," or "9;"
>
> f1    Filtering out non-10-digit telephone numbers and numbers with repetitions (such as "0000000000," "1111111111," through to "9999999999");
>
> g1    Filtering out numbers that were inconsistent with the North American Numbering Plan Administration (NANPA), including area codes less than "201" or greater than "989," as well as telephone numbers associated with jurisdictions not in the U.S. or U.S. territories;[13]

---

[13] The North American Numbering Plan Administration ("NANPA") is a telephone numbering plan that encompasses 20 countries in North America and the Caribbean, including the United

h1    Filtering out from records with telephone texts to toll-free prefixes (e.g., "800," "833," "844," "855," "866," "877," and "888"); texts to U.S. government prefix "710," and records with telephone texts to premium paid service prefix "900;"

i1    Standardizing the date and time format; and

j1    Filtering out exact duplicate records.

50.    After completing these initial data hygiene steps, there were **15,842,632** unique telephone numbers and **48,451,776** texts remaining. These initial data hygiene steps were similarly applied to each of the data files that were processed in connection with the Expert Report.

**VI.    OPINION 1: Using the data produced in discovery by QuoteWizard and in response to subpoena from various third parties, I was able to reliably limit the proposed class to consumers whose telephone numbers were purchased by QuoteWizard from third party lead generators; whose telephone numbers were sent to Drips by QuoteWizard with authority to text; to telephone numbers that received the texts at issue, and to consumers who responded to the texts with a request that the telemarketing cease.**

51.    I was instructed at the outset of my analysis to remove specific categories of telephone numbers so as to remove from debate various anticipated arguments to be made by QuoteWizard in opposition to class certification. These steps are detailed below:

### *Limiting The Class To Consumers Whose Data Was Purchased By QuoteWizard From Third Party Data Brokers*

52.    It is my understanding that the consumer contact data used by QuoteWizard to send the telemarketing texts at issue originated from different sources. QuoteWizard claims that about one third to half of the lead data originated from sources owned by QuoteWizard itself.[14] This data was produced in excel files labelled "Onsite" and are referred to within the Source Data as the "Onsite Leads." The other two thirds to one half of the lead data utilized to conduct the telemarketing text campaign at issue was purchased by QuoteWizard from third party lead

---

States. NANPA divides the territories of its members into numbering plan areas delineated by three-digit codes known as area codes. NANPA administers numbering resources according to regulatory directives and consensus industry guidelines developed by the Industry Numbering Committee, a committee of the Alliance for Telecommunications Industry Services (ATIS). *See generally* nationalnanpa.com.

[14] Videotaped Deposition of Matthew Weeks, September 8, 2023, p. 33:10-34:34.

generators.[15] QuoteWizard admitted at deposition that it purchased such data from 180 different lead generators who, in turn, used sub-vendors and hundreds of thousands of websites, to purportedly generate this consumer data.[16] This data was produced in excel files labelled "Inbound" or "Non On-Site" and are referred to within the Source Data as the "Inbound Third Party Lead Data." QuoteWizard also admitted that it made no effort to vet the authenticity of the "Inbound Third Party Lead Data" and entirely relied on its lead vendors and sub-vendors to ensure consumers were providing TCPA compliant consent to receive QuoteWizard's telemarketing texts.[17] I was instructed by counsel for the Plaintiff that, for the purposes of this Expert Report, I was to limit my analysis solely to the consumer data purchased by QuoteWizard from third parties, and to exclude telephone numbers that QuoteWizard claimed to have originated from its own websites.

53.    Accordingly, I then matched the telephone numbers found in the Drips Text Records with the telephone numbers found in the third party "Inbound Third Party Lead Data." I also excluded any telephone numbers that appeared in the "Onsite Leads" which were purportedly obtained via QuoteWizard's own websites.[18]

54.    At this step, I identified **5,090,954** telephone numbers that were sent QuoteWizard telemarketing texts, as evidenced by the Drips Texts Records, and that were purchased by QuoteWizard from third-party lead generators, and were not generated by QuoteWizard itself.

### *Limiting The Class To Numbers That QuoteWizard Authorized Drips To Text As Confirmed by the Drips API Data*

55.    I was further made aware by Plaintiff's counsel that QuoteWizard was expected to claim that it never authorized Drips to send text messages to certain telephone numbers. To address this challenge, I first assessed what the parties refer to as the "Drips API Data." Drips has testified

---

[15] *Id, p. 23:21-27:3.*
[16] *Id.*
[17] *Id.*, p. 73:8-74:12.
[18] Videotaped Deposition of Tricia Winkler, September 8, 2023, p. 19:18-20.

that every time QuoteWizard sent it a telephone number with instructions to send text solicitations to that number, the transfer would be documented in the "Drips API Data."[19] QuoteWizard, at deposition, also admitted that the Drips API Data would confirm if, in fact, QuoteWizard sent Drips a particular telephone number for use in a QuoteWizard telemarketing campaign.[20] The Drips API Data was produced by Drips in discovery.

56.      I then conducted an analysis matching the remaining telephone numbers to the Drips API Data. I removed from the analysis any telephone number contained in the Drips Text Records that was not included in the Drips' API data. The telephone numbers that remained in the analysis at this stage all appear in the Drips Text Records; were purchased by QuoteWizard from third party lead generators, and match the Drips API Data confirming that QuoteWizard sent the numbers to QuoteWizard with authority to text.  At this stage, **4,753,586** unique telephone numbers and **23,350,839** texts remained in the analysis.

### Limiting The Class To Consumers Whose Receipt of QuoteWizard Telemarketing Texts Was Confirmed By Bandwidth or Twilio Text Records

57.      It is my understanding that the telemarketing texts sent by Drips on behalf of QuoteWizard were physically transmitted to consumers by telecommunications companies including Ytel, Bandwidth and Twilio. Due to preservation failures, Ytel produced no text records and Bandwidth and Twilio produced only partial text records, evidencing the successful delivery of QuoteWizard text messages to consumers.[21] These files are referred to in the Source Data description as the "Bandwidth and Twilio Text Records." I was instructed by Plaintiff's counsel to proceed with my analysis and to identify records from the Bandwidth and Twilio Text Records

---

[19] Declaration of Tom Martindale dated July 10, 2023, at para. 19.
[20] Videotaped Deposition of Tricia Winkler, September 8, 2023, p. 11:1-20:13.
[21] I have been informed that QuoteWizard did not place these companies on notice of this litigation at any time. Plaintiff's counsel placed these entities on notice but only several years after this litigation was filed, when QuoteWizard and Drips were ordered to identify the relevant telecommunications providers. By that late time, Ytel had disposed of all Drips text records. Bandwidth and Twilio only preserved partial text records.

that confirmed that the telemarketing text messages sent by QuoteWizard to consumers which were, in fact, received. Accordingly, I matched the telecommunications records of Bandwidth and Twilio to the Drips Text Records. I then included in my analysis going forward only telephone numbers whose receipt of QuoteWizard telemarketing texts was confirmed by the records[22] of Bandwidth or Twilio.

58.     I was able to confirm at this step that QuoteWizard sent **13,011,337** text messages to **2,506,469** unique telephone numbers, receipt of which was confirmed by the Bandwidth and Twilio Text Records. All of these telephone numbers were purchased by QuoteWizard from third party lead brokers, and Drips' authority to text to such telephone numbers was confirmed by the Drips API Data.

### *Limiting The Class To Consumers Who Complained After Receiving QuoteWizard's Telemarketing Texts*

59.     In response to QuoteWizard's telemarketing texts, **3,485,196** persons responded in a manner that was designated by Drips, acting on behalf of QuoteWizard, as a Do Not Call demand ("DNCs"). These records are referred to in the Source Data description as the "Do Not Call Files." To focus the class on those consumers who were most frustrated by QuoteWizard's text telemarketing campaign, I was then instructed by counsel to match the telephone numbers remaining at this step in my analysis to the telephone numbers of consumers who, in response to their receipt of QuoteWizard text messages, made a specific request that the texts cease, that was designated by Drips and QuoteWizard as a DNC and which appear in the Do Not Call Files.

60.     In total, I was able to identify **386,785** telephone numbers that received **1,309,545** text messages that 1) appeared in the Drips Text Records,  2) whose data was purchased by

---

[22] The texts were confirmed as outbound and delivered utilizing the following fields, per file: "MESSAGE_DIRECTION" with a value of "OUTBOUND" and, where available, "MESSAGE_STATUS" with a value of "DELIVERED" for the files "BAND-202002-202112.csv" and "BAND-202105-202112.csv"; the field "Status" with a value "DELIVERED" and the field "Flag Incoming" with a value "NO" for the file "Full_Quote_Wizard_Report.csv".

QuoteWizard from third party lead generators, 3) was sent to Drips by QuoteWizard as confirmed by the Drips API Data, 4) receipt of the texts to which were confirmed by the Bandwidth and Twilio Text Records, and 5) who responded in some way to the text solicitations requesting that future telemarketing cease and designated by Drips and QuoteWizard as a DNC, as evidenced by the Do Not Call Files. A listing of these telephone numbers is attached hereto as Exhibit E, also referenced to as the "Opinion 1 Numbers" and "Opinion 1 Texts" respectively, collectively "Opinion 1 Records."

### VII. OPINION 2: Using the data produced in discovery by Drips, Bandwidth and Twilio, and limiting the proposed class as instructed, there is a reliable and efficient method to determine whether two or more texts were delivered within any 12-month period to telephone numbers that had been on the NDNCR for 32 days or more.[23]

61.     I then proceeded to analyze the data, as limited above in Opinion 1, to identify which telephone numbers were listed on the National Do Not Call Registry prior to receipt of QuoteWizard telemarketing texts, and to determine exactly how many texts each consumer received during the time their telephone number was listed on the NDNCR.

62.     Over more than two decades, I have developed a method to identify telephone numbers that received two or more telephone calls and/or texts within a 12-month period after the telephone number was registered on the NDNCR for 32 days or more. This method does not require individualized review of telephone call and/or text records.

63.     I then identified any of the Opinion 1 Numbers that received two or more Opinion 1 Texts that were on the NDNCR and, if so, the most recent date the Opinion 1 Numbers were registered thereupon.

64.     To accomplish this, I work with the data provider PacificEast, which provides data enrichment and data verification, data validation, data customization, fraud prevention, identity

---

[23] I understand that the relevant statute of limitations is four years from the filing of the Complaint. All of the texts to all of the telephone numbers in the proposed class fall withing the statute of limitations.

verification, telemarketing and other industries compliance solutions.[24] For more than 30 years, PacificEast has provided data services to corporate, government, ecommerce, financial services, healthcare, benefits administration, utility service, telecom, and nonprofit sector clients. PacificEast is a U.S. General Services Administration schedule vendor in the Business Information Services category. I understand PacificEast obtains NDNCR information available from the Federal Trade Commission (FTC).

65.    Representative cases in which NDNCR information from the FTC has been utilized and which cases were certified through litigation or settlement include, but are not limited to:

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.,* No. 15-cv-06314 (N.D. Cal.)

*Baldwin v. Miracle-Ear, Inc.,* No. 20-cv-01502 (D. Minn.)

*Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)

*Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060 (N.D. Cal.)

*Biringer v. First Fam. Ins., Inc.*, No. 14-cv-00566 (N.D. Fla.)

*Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-00728 (N.D. Tex.)

*Charvat v. National Holdings, et al.,* No. 14-cv-02205 (S.D. Ohio)

*Chinitz v. Intero Real Estate Services*, No. 18-cv-06100 (N.D. Cal.)

*Chinitz v. NRT West, Inc.*, Case No. 18-cv-06100 (N.D. Cal.)

*Fitzgerald v. Universal Pictures*, No. 16-cv-01193 (M.D. Fla.)

*Flowers v. Twilio, Inc.*, No. RG16804363 (Cal. Super. Ct.)

*Hopkins v. Modernize, Inc.*, No. 17-cv-40087 (D. Mass.)

*Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.)

*Mey v. Frontier Commc'n Corp.*, No. 13-cv-01191 (D. Conn.)

*In re Monitronics Int'l, Inc. TCPA Litig.*, No. 13-md-02493 (N.D. W. Va.)

*Slovin v. Sunrun, Inc.*, No. 15-cv-05340 (N.D. Cal.)

*Youngman v. A&B Ins. & Fin.*, No. 16-cv-01478 (M.D. Fla.)

*Williams v. PillPack LLC*, No. 19-cv-05282 (W.D. Wash.)

*Wright v. EXP Realty, LLC*, No. 18-cv-1851 (M.D. Fla.)

---

[24] *See generally* PacificEast.com.

66.    CEG has an Organization ID and Subscription Account Number (SAN), issued by the FTC, that PacificEast uses to access NDNCR information about particular telephone numbers on CEG's behalf. Based upon my experience, PacificEast provides accurate and reliable NDNCR information. I regularly rely upon PacificEast to perform the data append described in this Expert Report.

67.    To initiate this analysis, I prepared an input file for PacificEast (the "PacificEast NDNCR Input"), which listed unique Opinion 1 Numbers that received two or more Opinion 1 Texts. The PacificEast NDNCR Input was transmitted via a secure interface.

68.    PacificEast performed a standard data append and provided an output file that indicated whether each telephone number was listed on the NDNCR and, if so, the most recent date the telephone number was added to the NDNCR (the "PacificEast NDNCR Output"). From the Opinion 1 Numbers, I then identified **77,135** telephone numbers that received **386,763** texts within a 12-month period after being on the NDNCR for 32 days or more. The telephone numbers remaining after the above analysis are referenced to as the "Opinion 2 Numbers" and "Opinion 2 Texts" respectively, collectively "Opinion 2 Records," a list of which is attached hereto at Exhibit F.

**VIII.    OPINION 3: Using the data produced in discovery by QuoteWizard, Drips, Bandwidth and Twilio, there is a reliable and efficient method to remove from the proposed class the telephone numbers of consumers who responded to the QuoteWizard texts with an expression of interest and for which QuoteWizard paid Drips for the lead.**

69.    It is my understanding that QuoteWizard has claimed during the course of this litigation that some consumers responded favorably to their texts and purchased insurance products. It is also my understanding that QuoteWizard has claimed it had an Established Business Relationship with such consumers. It is also expected to claim, as per counsel, that because these consumers were interested in its products, they were not harmed by the texts. In discovery, QuoteWizard produced a data file referred to in the Source Data description as the "Potential

Customer File" which QuoteWizard claimed identified the telephone numbers of all consumers who responded and indicated an interest in purchasing QuoteWizard's goods or services, and for which QuoteWizard paid Drips for generating a successful lead. I was instructed to remove any such telephone numbers from the class.[25]

70.    After the removal of such numbers, I was able to identify **76,441** consumer telephone numbers that received **381,429** texts that 1) appeared in the Drips Text Records, 2) whose data was purchased by QuoteWizard from third party lead generators, 3) appeared in the Drips API Data, 4) receipt of the texts to which were confirmed by the Bandwidth and Twilio Text Records, 5) who responded in some way to the text solicitations requesting that they cease as evidenced by the Do Not Call Files, 6) were listed on the NDNCR for 32 days prior to the receipt of multiple text messages from Drips on behalf of QuoteWizard, and 7) who did not respond indicating an interest in purchasing QuoteWizard's goods or services as evidenced by the QuoteWizard Potential Client File. A listing of these telephone numbers is attached hereto as Exhibit G, also referenced to as the "Opinion 3 Numbers" and "Opinion 3 Texts" respectively, collectively, "Opinion 3 Records."

**IX.    OPINION 4: Using the data produced in discovery by QuoteWizard, Drips, Bandwidth and Twilio, there is a reliable and efficient method to remove from the proposed class the telephone numbers of consumers who QuoteWizard claims it did not authorize Drips to text.**

71.    Counsel have informed me that QuoteWizard is expected to make additional arguments relating to Drips' authority to text certain telephone numbers on its behalf, and that it would persist in such arguments even if the Drips API Data confirmed that QuoteWizard, in fact, sent Drips a specific telephone number with authority to text. It is my understanding from Counsel

---

[25] I would note that QuoteWizard sent telemarketing texts to **15,842,632** unique telephone numbers. However, the data file produced by QuoteWizard identifying the telephone numbers of consumers who responded to its text telemarketing campaign expressing interest contains only **279,869** telephone numbers. It is my understanding that QuoteWizard maintains, however, that it only sent texts to consumers who consented to receive such texts and were specifically interested in QuoteWizard's offer.

that, in the discovery process, QuoteWizard produced several hundred excel data files containing the telephone numbers of consumers to which it claimed it did not authorize Drips to text on its behalf. These files are identified and described in the Source Data summary as the "Authority Files." Most of these files included telephone numbers that QuoteWizard noted were found in the Drips Text Records, but allegedly did not appear in QuoteWizard's consumer database.[26] Accordingly, QuoteWizard claimed that it never sent such phone numbers to Drips and could not be liable if such texts were sent in violation of the TCPA. QuoteWizard also claimed that although it admittedly sent some telephone numbers to Drips with instructions to text, QuoteWizard received some type of computer response claiming the lead had been rejected.[27] Although QuoteWizard admits that Drips did in fact send text messages to those numbers on QuoteWizard's behalf, QuoteWizard claims that it did not authorize texts to these telephone numbers as they were initially rejected by Drips.[28]

72.    QuoteWizard also produced excel data files containing telephone numbers of consumers that it claimed Drips did not have authority to text because the dates of texts to those telephone numbers allegedly did not correspond to the dates that QuoteWizard sent Drips those specific telephone numbers.[29]

73.    At deposition, QuoteWizard admitted that if a telephone number did not appear in the Authority Files produced by QuoteWizard challenging Drips' authority to text, then Drips did in fact have QuoteWizard's authority to text to that telephone number.[30]

74.    In an effort to simplify the analysis for class certification and trial, I was instructed to remove from the proposed class all telephone numbers listed in the Authority Files per which QuoteWizard claimed it did not authorize Drips to text.

---

[26] QuoteWizard's Supplemental Answers to Plaintiff's Fourth Set of Interrogatories, June 21, 2023.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] Videotaped Deposition of Joel Peterson, September 8, 2023, p. 71:9-24 and p. 74:10-75.

Page 27 of 42
Expert Report of Anya Verkhovskaya
*Mantha v. QuoteWizard.com LLC*, Case No. 1:19-cv-12235-LTS-PK (D. Mass)

75.    After the removal of such numbers, in total, I was able to identify **73,781** consumer telephone numbers that received **356,321** texts and that 1) appeared in the Drips Text Records, 2) whose data was purchased by QuoteWizard from third party lead generators, 3) appeared in the Drips API Data, 4) receipt of the texts to which were confirmed by the Bandwidth and Twilio Text Records, 5) who responded in some way to the text solicitations requesting that they cease as evidenced by the Do Not Call Files, 6) were listed on the NDNCR for 32 days prior to the receipt of multiple text messages from Drips on behalf of QuoteWizard, 7) who did not respond indicating an interest in purchasing QuoteWizard's goods or services, and 8) did not appear in the Authority Files, attached hereto as Exhibit H, also referenced to as the "Opinion 4 Numbers" and "Opinion 4 Texts" respectively, collectively, "Opinion 4 Records."

X.    **OPINION 5: Using the data produced in discovery along with reliable commercially available databases, there is a reliable and efficient method by which it can be determined whether Defendant and/or agents acting on its behalf texted business telephone numbers, if any, for those telephone numbers to be removed from the proposed class.**

76.    I was further informed that QuoteWizard is expected to argue that the telephone numbers it sent telemarketing texts to may all not have been 'residential' numbers entitled to the protections of the TCPA and the National DNC Registry. QuoteWizard is still expected to make this argument although it admitted at deposition that the purpose of its text telemarketing campaign was to contact consumers and not businesses.[31] Out of abundance of caution, however, I then performed an analysis to remove any telephone numbers from the Opinion 4 Numbers that were business telephone numbers at the time the text messages were placed to remove any claim made by QuoteWizard that the numbers that received its telemarketing texts were not 'residential' numbers.[32]

---

[31] Videotaped Deposition of Tricia Winkler, September 8, 2023, p. 17:13-17.

[32] I further note that although a number that is listed on the National DNC Registry is entitled to a presumption that it is 'residential,' and a telemarketing defendant bears the burden to prove to the contrary, s*ee Mantha v. Quotewizard.com*, LLC, 2021 U.S. Dist. LEXIS 245059 (D. Mass. Dec. 3, 2021) (Report and Recommendation, adopted at 2022 U.S. Dist. LEXIS 19502 (Feb. 3, 2022),

77.     To conduct the historical business record analysis, I relied upon the industry wide recognized services and records of PacificEast. PacificEast accesses various data sources to determine whether telephone numbers were subscribed as belonging to business entities. Business entities can be identified based upon various business telephone listings (yellow pages, white pages, other business directories, websites, etc.).

78.     I have analyzed telephone records in numerous TCPA cases where the business telephone number identification process was implemented. My experience with this process informs my opinion that, if a telephone number is intended to be used as a contact telephone number for a business, it will be listed at some point in one or more sources and thus will more likely than not appear accordingly in the sources accessed by the data processors, like PacificEast.

79.     Concerning dual-use telephone numbers, or those telephone numbers used for both residential and business purposes, it is my understanding, based upon the October 12, 2022, Opinion of the United States Court of Appeals for the Ninth Circuit in the matter of *Chennette, et al. v. Porch.com, Inc., et al.*, Case No. 20-35962, that "the majority of district courts have concluded that a telephone used for both personal and business purposes can still be regarded as residential within the meaning of § 227(c), depending upon the facts and circumstances." For this reason, I consider a telephone number as residential if it is identified as such even if it might occasionally be utilized for work or for home/small business.

80.     Additionally, the FCC has explicitly determined that the NDNCR applies to wireless telephone numbers. *See* 47 C.F.R. § 64.1200(e); see also In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14039, ¶ 36 (F.C.C. 2003) ("[W] will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'").

---

QuoteWizard failed to produce any evidence whatsoever that would indicate any of the specific numbers to which it sent telemarketing texts were business numbers

81.     Representative cases in which telephone number residential status information has been utilized and which cases were certified through litigation or settlement include, but are not limited to:

> *Abante Rooter v. Alarm.com, Inc.,* No. 15-cv-06314 (N.D. Cal.)
>
> *Baldwin v. Miracle-Ear, Inc.,* No. 20-cv-01502 (D. Minn.)
>
> *Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)
>
> *Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060 (N.D. Cal.)
>
> *Biringer v. First Fam. Ins., Inc.*, No. 14-cv-00566 (N.D. Fla.)
>
> *Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-00728 (N.D. Tex.)
>
> *Charvat v. National Holdings, et al.,* No. 14-cv-02205 (S.D. Ohio)
>
> *Chinitz v. Intero Real Estate Services*, No. 18-cv-06100 (N.D. Cal.)
>
> *Chinitz v. NRT West, Inc.*, Case No. 18-cv-06100 (N.D. Cal.)
>
> *Fitzgerald v. Universal Pictures*, No. 16-cv-01193 (M.D. Fla.)
>
> *Flowers v. Twilio, Inc.*, No. RG16804363 (Cal. Super. Ct.)
>
> *Hopkins v. Modernize, Inc.*, No. 17-cv-40087 (D. Mass.)
>
> *Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.)
>
> *Mey v. Frontier Commc'n Corp.*, No. 13-cv-01191 (D. Conn.)
>
> *In re Monitronics Int'l, Inc. TCPA Litig.*, No. 13-md-02493 (N.D. W. Va.)
>
> *Slovin v. Sunrun, Inc.*, No. 15-cv-05340 (N.D. Cal.)
>
> *Youngman v. A&B Ins. & Fin.*, No. 16-cv-01478 (M.D. Fla.)
>
> *Williams v. PillPack LLC*, No. 19-cv-05282 (W.D. Wash.)
>
> *Wright v. EXP Realty, LLC*, No. 18-cv-1851 (M.D. Fla.)

82.     To conduct the business record analysis in this case, I prepared an input file for PacificEast (the "PacificEast Business Input"), which listed the Opinion 4 Numbers. The PacificEast Business Input was transmitted via a secure interface.

83.     PacificEast then performed a standard data append and provided an output file that indicated whether each telephone number status was identified as associated with a business and the timeframe of the association (the "PacificEast Business Output"). Based on the PacificEast

Business Output, I identified and removed from further analysis those telephone numbers which had any value in the field "FullName-business," at any time from which indicates a business-registered or business-associated telephone number during the proposed class period of October 29, 2015, to December 1, 2021, inclusive.

84.    Next, in order to complete further due diligence and apply a conservative methodology, I directed my team to additionally review associated names in the PacificEast Business Output utilizing various keywords that are commonly associated with businesses (the "Keywords" and/or the "Keyword List," attached hereto as Exhibit I) and remove those telephone numbers from further analysis if such association was identified at any point during the proposed class period of October 29, 2015, to December 1, 2021, inclusive.

85.    Using this process, and after business related telephone numbers were removed from further analysis, I identified **71,549** non-business telephone numbers that received **345,526** texts. After adding Mr. Mantha to the list of potential class members, there were **71,550** telephone numbers that received **345,534** texts, also referenced to as the "Opinion 5 Numbers" and "Opinion 5 Texts" respectively, collectively, "Opinion 5 Records," listed on the attached hereto Exhibit J.

86.    The Opinion 5 Numbers 1) appeared in the Drips Text Records, 2) whose data was purchased by QuoteWizard from third party lead generators, 3) appeared in the Drips API Data, 4) receipt of the texts to which were confirmed by the Bandwidth and Twilio Text Records, 5) who responded in some way to the text solicitations requesting that they cease as evidenced by the Do Not Call Files, 6) were listed on the NDNCR for 32 days prior to the receipt of multiple text messages from Drips on behalf of QuoteWizard, 7) who did not respond indicating an interest in purchasing QuoteWizard's good or services, 8) whose telephone number did not appear in the Authority Files, and 9) are residential and non-business telephone numbers.

87.     The Opinion 5 Numbers and Opinion 5 Texts evidence the telephone numbers, and numbers of texts to those numbers that meet my proposed class list criteria and, in addition to Mr. Mantha's number, would comprise the members of the proposed class.

**XI.     OPINION 6: Using the consumer data produced in discovery by QuoteWizard, as supplemented as needed by commercially available databases connecting telephone numbers to the names and addresses of consumers, there is a reliable method of efficiently and effectively issuing notice to potential class members in accordance with the standards of Federal Rules of Civil Procedure Rule 23 and due process requirements.**

88.     To effectuate notice in this case, I would start with the Inbound Third Party Lead Data produced by QuoteWizard, which identifies every consumer to whom it sent telemarketing texts to by number, name, address, and email. This data alone may be sufficient to effectuate proposed class notice.

89.     If it is determined that this data is in any way deficient or inaccurate, I would perform additional data enhancement to verify and/or identify, where missing, potential class members' names and addresses, including, but not limited to, performing a standard historical reverse append process.

90.     This process gives an additional level of reliability to the names and addresses in the available data. This is useful, particularly for administering a notice. With the additional level of call-recipient verification, fewer notices are likely to be misdirected and fewer records are likely to have out-of-date or missing addresses.

91.     In many instances, TCPA cases do not have this type of information available, so that it is necessary to complete a historical reverse append process for each of the telephone numbers.  Historical reverse append is a process by which names, addresses, and other information can be identified based only on a telephone number at a particular point in time such as during the class period.

92.     Having robust initial contact data obtained directly from QuoteWizard allows for a similar approach to be taken, such as the one that I utilized in *Krakauer v. Dish Network, LLC*,

Case No. 14-cv-333 (M.D.N.C.). In *Krakauer*, I presented testimony at trial before a jury concerning the process, by which name and address data from the defendant was supplemented with name and address information that was obtained through the historical reverse append processes, among other topics; a jury weighed the testimony and entered a verdict in favor of the Plaintiff.

93.    Although class member identification and notice is simpler when robust name and address information is provided by the defendant, like it is in this case, even without such information I can use the historical reverse append process to identify names and addresses, which is reliable and regularly utilized in the field of class action notice administration. In the following cases, among others, I have proposed and/or utilized the historical reverse append process to identify names and addresses historically associated with telephone numbers in order to effectuate notice:

> *Fitzgerald v. Universal Pictures*, No. 16-01193 (M.D. Fla.)
>
> *Flowers v. Twilio, Inc.,* No. RG16804363 (Cal. Sup. Ct., Alameda County.)
>
> *Ikuseghan v. Multicare Health Sys*, No. 14-cv-5569 (W.D. Wash.)
>
> *McMillion v. Rash Curtis & Assocs.*, 16-03396 (N.D. Cal.)
>
> *West v. California Svc. Bureau, Inc.*, No. 16-03124 (N.D. Cal.)

94.    During my more than 20 years of experience conducting data analysis and serving as an expert and testifying witness, as well as notice and claims administrator in TCPA and other class action cases, I routinely analyze telephone call/text records to identify names, mailing addresses, and/or email addresses associated with the telephone numbers within a specific timeframe, using a historical reverse append methodology. Reverse append refers to the process of using one field of data to retrieve other related and relevant data fields.

95.    Over my decades of experience in the field of class action litigation support services, I have overseen and, myself, performed historical reverse append in the context of ongoing litigation and also, even more frequently, in the context of notice and settlement

administration. In fact, I have been involved in the historical reverse append process in more than one hundred cases. Because of this experience, I have extensive knowledge and familiarity with the appropriate processes and procedures required for the historical reverse append.

96.     It is my understanding that Rule 703 of the Federal Rules of Evidence allows an expert witness to base their opinion on facts or data in the case that the expert has been made aware of or personally observed. Courts have held that expert witnesses may rely on data and other information supplied by third parties. *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect"); *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 182 (4th Cir. 2010); *B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir. 1996).

97.     I have worked with various data processors, like PacificEast to establish protocol that can be used for identification of potential class members.

98.     PacificEast has provided, for more than 30 years, data enrichment and data verification, data validation, data customization, fraud prevention, identity verification, telemarketing and other industry compliance solutions.[33] PacificEast provides data services to corporate, government, ecommerce, financial services, healthcare, benefits administration, utility service, telecom, and nonprofit sector clients. PacificEast is a U.S. General Services Administration schedule vendor in the Business Information Services category. In my experience I have found the PacificEast information to be accurate and reliable, and I have not found any reason to consider it unreliable.

99.     Various courts have reviewed my utilization of data processors and found it acceptable. *See Abante Rooter & Plumbing, Inc. v. Alarm.com*, No. 15-CV-6314-YGR, 2017 WL 1806583, at *4 (N.D. Cal. May 5, 2017) (finding I had properly used  data processor information "because it was the type of data reasonably relied upon by experts in the field and the 14% error

---

[33] *See generally* PacificEast.com.

rate was not unreasonably high for these particular circumstances") (citing *Krakauer v. Dish Network, L.L.C*, 2015 WL 5227693, at \*8-9 (M.D.N.C. Sept. 8, 2015)).

100.    Under the jurisdiction of various courts, I have successfully used and/or proposed to use information from data processors like PacificEast in numerous TCPA and related cases for the historical reverse append process to identify names and mailing addresses based on telephone numbers and dates of the telephone calls/texts to those telephone numbers in cases that include, but are not limited to:

> *Bakov v. Consolidated World Travel*, Case No. 15-cv-02980 (N.D. Ill.)
>
> *Brown v. DirecTV, LLC*, Case No. 13-1170 (C.D. Cal.)
>
> *Buchanan v. Sirius XM Radio*, 17-00728 (N.D. Tex.)
>
> *Cortes v. National Credit Adjuster*, 17-02152 (S.D. Cal.)
>
> *Diaz-Lebel v. TD Bank USA, N.A.*, 17-01611 (D. N.J.)
>
> *Fitzgerald v. Universal Pictures*, 16-01193 (M.D. Fla.)
>
> *Flowers v. Twilio, Inc.*, No. RG16804363 (Cal. Sup. Ct., Alameda Cnty.)
>
> *In Re: Collecto, Inc., TCPA Litigation*, 14-02513 (D. Mass.)
>
> *Krakauer v. DISH Network, LLC*, 14-00333 (M.D. N.C.)
>
> *Kubacki v. Peapod, LLC*, No. 13-00729 (N.D. Ill.)
>
> *Lofton v. Verizon Wireless (VAW) LLC*, 13-05665 (N.D. Cal.)
>
> *McMillion v. Rash Curtis & Associates*, 16-03396 (N.D. Cal.)
>
> *Vance v. DirecTV, LLC*, Case No. 17-cv-00179 (N.D. W.Va.)
>
> *Ward v. Flagship Credit Acceptance LLC,* No. 17-cv-02069 (E.D. Pa.)
>
> *West v. California Service Bureau, Inc.*, 16-03124 (N.D. Cal.)

101.    The data processors like PacificEast access their respective databases of public and proprietary information to produce an output including the names, mailing addresses, and email addresses of the subscribers and/or users of those telephone numbers within the relevant

timeframe. The data processors track information over a historical period. In this way, a historical snapshot is captured and can be analyzed based upon timeframe and dates going back for years.

102.    My methodology relies on the data processors like PacificEast to gather data from sources including, but not limited to: the utility companies; credit bureaus; consumer data compilers; banking and loan applications; colleges; various surveys; political arena; tax rolls; voting and census data, etc., so if the person uses a telephone on a regular basis, my methodology will capture it.

103.    To perform the historical reverse append process, I would first begin with the names and mailing addresses and email addresses, if any, available within the source data which serves as the starting point of a waterfall process, similar to the one that I utilized in the *Krakauer* case.

104.    I would start by preparing a file of the telephone numbers that do not have complete name and/or mailing and/or email address information in the source data. I submit the data file to the PacificEast online batch interface from which a historical reverse data append process is performed. The only input field required for this process is a list of telephone numbers.

105.    PacificEast would use its algorithm to link name, mailing and email address information to each telephone number, specifying the timeline for each match. The output would be posted by PacificEast for download by CEG.

106.    If several individuals were the users of a telephone number in question due to telephone number porting from one individual to another, or any other reason, those two individuals would be listed as the users of those telephone numbers within the same and/or overlapping timeframe.

107.    Based upon decades of experience in designing and administering efficient and effective global and domestic notice programs, I have carefully considered the requirements of Federal Rule of Civil Procedure 23(c).

108.    Providing notice of class certification or of class settlement is a standard process that class action administrators have been performing for decades. I have overseen notice of class

certification, notice of class settlement claims adjudication, and fund distribution in more than 1,700 class action cases in my professional experience.

109.    It is a straightforward and administratively feasible process to provide notice of Class Certification to class members in TCPA cases. Once names, mailing and/or email addresses of class members associated with the telephone numbers in the file are identified, the notice can be easily provided.

110.    The most efficient and cost-effective way to do so is to email notice and/or mail via postcard a short-form notice to class members and make a long-form notice available via website. I have coordinated notice of Class Certification under court supervision in many TCPA cases.

EMAIL NOTICE

111.    Email is a reliable and effective way to reach consumers in a timely and cost-efficient way; email is a communication tool that consumers use regularly. According to a November 30, 2022, article by Katrina Kirsch, 99% of email users check their inbox every day, with some checking 20 times a day. The percentage of internet users in the United States who use email averages more than 90% per age group (with 85.53% of users age 65+ using email and 95.19% of users age 25-44 using email), according to a November 2021 Statista survey.

112.    Email notice sometimes presents challenges: (a) a number of email addresses may not be valid and will bounce; and (b) unless the email is opened, there is no way to know for sure if it was delivered to an email account that is not being used, but is still "open" and/or if the email was filtered out by a spam filter.

113.    To overcome the challenges, a potential email notice program would utilize multiple email addresses per potential class member. Using multiple email addresses would increase the notice program's effective reach by email, and therefore decrease the need for mailed notice. Among other benefits, email notice will result in a significant reduction of postage costs.

114.    If mailed postcard notice is preferred, I coordinate to update any addresses through the United States Postal Service ("USPS") National Change of Address ("NCOA") database,

which contains approximately 160 million records or 48 months of permanent address changes. NCOA is updated daily, and USPS regularly provides change-of-address information to NCOA licensees. NCOA helps reduce undeliverable-as-addressed ("UAA") mail by correcting input addresses prior to mailing. Additional address updating via Experian service would be coordinated for any addresses determined to be undeliverable. Further, I could coordinate with additional data vendors, such as Experian, to identify addresses based upon name and telephone number information for further supplementation of addresses or other information that has not yet been identified.

115.    I regularly use these processes to identify potential class members in class actions, as do other administration firms. In my experience, these processes are reliable, are reasonably relied upon by experts in the field, and are approved by courts charged with oversight of class actions, class notice, and settlement administration. Based on my review of and analysis of the information provided to me, the process detailed above could be applied here.

116.    In similar prior cases, CEG has utilized telephone numbers of those persons who should receive notice to match to digital social media users for targeting across social media platforms in such a manner that the publication notice, in the form of digital banners, will be seen by individuals believed to be potential class members. The paid social media program served digital banners across different platforms, such as mobile and desktop web, Facebook, and Instagram.

117.    It is also possible to issue notice via a direct manual calling or text messaging process. Following the call or text message campaign, the class action notice administrator could subsequently forward direct mail notice to the name and address the call/text message recipient provides.

118.    More than 3,000 organizations, including Amnesty International, Sierra Club, and the Human Rights Campaign, utilize peer-to-peer text messaging services such as CallHub.

119.    Utilizing two call center agents, it would be possible to text approximately 59,000 telephone numbers within two eight-hour workdays.[34]

120.    Peer-to-peer texting is now a commonly used method of reaching targeted populations. The below information comes from CallHub, a text message services provider:

> The campaign manager uploads the contact list and assigns a batch of contacts to each agent, who then reach out and engage people in one-to-one conversations. Each agent can send out around 3,500 texts in the span of an hour with data collected from conversations instantly syncing with your CRM. Since agents are manually hitting the send button for every text, with texts going out from a ten digit number, p2p texting stays compliant of texting regulations. https://callhub.io/peer-to-peer-texting-campaign/

121.    The notice and/or settlement administration, though standard, is an involved process which allows for verification of recipient, and or claimant, name, address, and telephone number as of a given point in time utilizing an affidavit and/or a claim form. Such affidavit and/or claim form is mailed to the potential class members and is made available on the case-related website for self-identification and self-attestation as to the facts of each class member and is completed under the penalty of perjury.

122.    I have overseen notice of class certification, notice of class settlement claims adjudication, and fund distribution in more than 1,700 class action cases in my professional experience.

123.    Further, in addition to sending out direct mail notice, to meet due process requirements of Rule 23(c), of the Federal Rules of Civil Procedures, it is the standard practice of notice administrators to issue a press release or some form of targeted publication notice and to establish a notice website and a call center.

---

[34] This calculation is done by assuming there are two agents making 3,500 texts in one hour over an 8-hour business day.

124.    Likewise, it is common to require that any judgment award be withheld until a claimant's information is validated via claim form or by submitting some other form of proof from the claimant's telephone records, bills, attestations, etc.

125.    In this matter, it would be possible, for example, to ask that potential class members provide sworn affidavits/attestations asking for any/all of the following, for example:

> What was their telephone number at that time;
> How long they have had the telephone number;
> Whether they share the telephone number with anyone;
> Whether they are or were a customer of Defendant; and
> Whether they share the account with anyone else.

126.    Claim Forms that are submitted during the claim administration process can then be verified against information from Defendant as well as against the information from the historical reverse append process, and the subpoena process in order to verify the validity of a claim.

127.    In a notice and claims administration process described above, it is also possible to have a list of preliminary-validated claims reviewed by the parties in order to remove, through a meet-and-confer process, any possible customers of Defendant as based upon the available information (name, address, telephone number). Further, a Special Master could be utilized to adjudicate disputes, if any, between the parties.

128.    I am aware of several administrative processes very similar to the one described herein, which were overseen and approved by various courts.

## XII.    CONCLUSION

129.    Considering the foregoing, I am offering the following opinions in this Expert Report:

130.    **OPINION 1:** Using the data produced in discovery by QuoteWizard and in response to subpoena from various third parties, I was able to reliably limit the proposed class to consumers whose telephone numbers were purchased by QuoteWizard from third party lead

generators; whose telephone numbers were sent to Drips by QuoteWizard with authority to text; to telephone numbers that received the texts at issue, and to consumers who responded to the texts with a request that the telemarketing cease.

131.    **OPINION 2:** Using the data produced in discovery in by Drips, Bandwidth and Twilio, and after limiting the proposed class as instructed, there is a reliable and efficient method to determine whether two or more texts were delivered within any 12-month period to telephone numbers that had been on the NDNCR for 32 days or more.

132.    **OPINION 3:** Using the data produced in discovery by QuoteWizard, Drips, Bandwidth and Twilio, there is a reliable and efficient method to remove from the proposed class the telephone numbers of consumers who responded to the QuoteWizard texts with an expression of interest.

133.    **OPINION 4:** Using the data produced in discovery by QuoteWizard, Drips, Bandwidth and Twilio, there is a reliable and efficient method to remove from the proposed class the telephone numbers of consumers who QuoteWizard claims it did not authorize Drips to text.

134.    **OPINION 5:** Using the data produced in discovery along with reliable commercially available databases, there is a reliable and efficient method by which it can be determined whether Defendant and/or agents acting on its behalf texted business telephone numbers, if any, for those telephone numbers to be removed from the proposed class.

135.    **OPINION 6:** Using the consumer data produced in discovery by QuoteWizard, as supplemented as needed by commercially available databases connecting telephone numbers to the names and addresses of consumers, there is a reliable method of efficiently and effectively issuing notice to potential class members in accordance with the standards of Federal Rules of Civil Procedure Rule 23 and due process requirements.

136.    I declare under the penalty of perjury that the above is true and correct.


Executed this 22 day of September 2023, at Milwaukee, Wisconsin.


Anya Verkhovskaya

# Exhibit A

<u>Verkhovskaya Expert Testimony at Deposition, Hearing or Trial (Past Four Years)</u>

*Abdullah v. FedEx Corp. Services, Inc.*, No. 16-cv-03967 (N.D. Ill.)

*Bilek v. National Congress of Employers, Inc., et al.*, No. 18-cv-03083 (N.D. Ill.)

*Brown v. DirecTV, LLC*, No. 13-cv-01170 (C.D. Cal.)

*Bumpus v. Realogy Holdings Corp.*, No. 19-cv-03309 (N.D. Cal.)

*Calhoun v. Invention Submission Corp.*, No. 18-1022 (W.D. Pa.)

*Carroll v. SGS N. Am., Inc.*, No. 16-cv-00537 (M.D. La.)

*Chinitz v. Intero Real Estate Services*, No. 16-537 (N.D. Cal.)

*Davis v. Capital One, N.A.*, No. 22-00903 (E.D. Va.)

*Galloway v. Valve Corp.*, No. 16-1941 (W.D. Wash.)

*Gruber v. Yelp, Inc.*, No. 16-cv-554784 (Sup. Ct. California, SF)

*Hobbs v. Randall-Reilly, LLC, et al.*, No. 19-cv-00009 (M.D. Ga.)

*Hurley v. Messer*, No. 16-cv-09949 (S.D.W. Va.)

*Iverson v. Advanced Disposal Services*, No. 18-cv-00867 (M.D. Fla.)

*Jenkins v. National Grid USA*, No. 15-cv-01219 (E.D.N.Y.)

*Johnson v. Comodo Group, Inc.*, No. 16-cv-04469 (D.N.J.)

*Mey v. Matrix Warranty Solutions, Inc.*, No. 21-cv-62 (N.D. Va.)

*Samson v. United Health Care Services*, No. 19-cv-00175 (W.D. Wash.)

*Starling v. KeyCity Capital, LLC*, No. 21-cv-818 (N.D. Tex.)

*Trenz v. Volkswagen Grp of Am.*, No. 15-cv-08356 (C.D. Cal.)

*Vance v. DirecTV*, No. 17-cv-00179 (N.D. W.V.)

*Walker v. CMRE Fin. Services, Inc.*, No. 20-cv-02218 (S.D. Cal.)

*Watson v. Lexus of Manhattan*, No. 20-cv-04572 (S.D.N.Y.)

*West v. Cal. Serv. Bureau, Inc.*, No. 16-cv-0324 (N.D. Cal.)

*Williams v. PillPack LLC*, No. 19-05282 (W.D. Wash.)

*Williams v. The Pisa Group, Inc.,* No. 18-cv-04752 (E.D. Pa.)

*Wright v. eXp Realty, LLC*, No. 18-cv-01851 (M.D. Fla.)

ANYA VERKHOVSKAYA

President and Chief Executive Officer
Class Experts Group, LLC

**Expert Witness
Claims Administrator**

**Resumé
2023**



11520 North Port Washington Road, Suite 215
Milwaukee, WI  53092

classexpertsgroup.com
anyav@classexpertsgroup.com
linkedin.com/in/anyaverkhovskaya
(262) 302-4443

**TABLE OF CONTENT**

**BIOGRAPHY** ........................................................................................................... 3

**REPRESENTATIVE CASES** ................................................................................... 5

   Telephone Consumer Protection Act Expert Witness Cases ............................................. 5

   Telephone Consumer Protection Act Claims Administration Cases ...................................... 10

   Consumer Claims Administration Cases ............................................................................ 11

   Civil Rights Claims Administration Cases ......................................................................... 14

   U.S. SEC Fairness Actions Claims Administration ............................................................ 15

   Antitrust Claims Administration Cases ............................................................................... 15

   Securities Claims Administration Cases ............................................................................. 16

   Other Claims Administration Cases .................................................................................... 18

**WORK HISTORY** ..................................................................................................... 20

**EDUCATION** ............................................................................................................. 22

# BIOGRAPHY

Anya Verkhovskaya is a nationally recognized expert witness who has provided expert analysis, testimony, and litigation support services in federal and state class actions relating to the Telephone Consumer Protection Act (TCPA), consumer protection, human and civil rights, securities fraud, ERISA, antitrust, pharmaceuticals, and insurance, as well as in fairness actions before the U.S. Securities and Exchange Commission, among others. As the President and Chief Executive Officer of Class Experts Group, LLC (CEG), Ms. Verkhovskaya leads a team of professionals with extensive experience in the management and analysis of large data sets and consumer records for class action litigations.

Ms. Verkhovskaya has been a pioneer in methods of analyzing mass consumer data, including telephone call and text message records and voice recordings numbering in the billions. Ms. Verkhovskaya has administered some of the largest class action settlements in history, involving all aspects of direct, media, digital, email, and third-party notice programs, data management, claims administration, and settlement fund distributions.

Ms. Verkhovskaya regularly provides expert opinions and testimony regarding methods for data analysis related to class member identification and location, class certification, notice adequacy, and the feasibility of claims management programs in connection with TCPA matters as well as a variety of other types of consumer class actions.

Ms. Verkhovskaya has testified at more than 70 depositions, hearings, and—uniquely in the field—at two jury trials, one of which led to one of the largest TCPA damages awards ever. Her expert testimony and data analysis methods have been admitted into evidence over *Daubert* and similar challenges in multiple class action lawsuits. Courts have repeatedly recognized her testimony as "clear" and "cogent" and acknowledged her "extensive experience" in identifying and notifying class members.

Ms. Verkhovskaya applies industry-leading methods to offer expert opinions on a variety of TCPA- and other consumer-related class action litigation topics, including but not limited to:
- discovery requirements
- class member location and identification
- numerosity
- ascertainability
- wireless status identification
- National Do Not Call Registry (NDNCR)
- residential telephone number status
- internal do not call registry (IDNCR)
- wrong number calls identification
- business/customer relationship
- telephone number reassignment
- porting between consumers, telephone companies, wireless to landline, and landline to wireless
- Voice over Internet Protocol (VoIP)
- ringless voice mail delivery
- Internet Protocol (IP)

- telephone number and keyword extraction from transcribed or freeform text
- large-scale automated transcription
- geocoding
- Social Security Death Index
- skip tracing
- historical reverse append of name, email, address, and other consumer information
- class list compilation
- class notice plan
- class notice adequacy analysis
- claims adjudication and auditing
- claims fraud prevention and identification
- plan of allocation application
- settlement fund distribution

Ms. Verkhovskaya has more than two decades of experience in managing, processing, and analyzing mass data sets that contain billions of records. This experience includes, but is not limited to, data drawn from:

- telephone call and voicemail logs
- text and fax records
- voice mail transcriptions
- free form text
- customer management records, including retailer databases, billing records, and sales lead files
- life, title, property, and other insurance records
- banking and credit card records
- medical records
- governmental agency data files
- mortgages files
- automotive sales contracts
- debt-collection agencies
- Customer Relations Management (CRM) records
- various other large-volume data sets across dozens of industries and in multiple forms and formats

Ms. Verkhovskaya has been an integral part of some of the largest worldwide audiovisual collection and settlement programs relating to documentation and restitution for Holocaust victims and their heirs. For more than seven years, she worked with director Steven Spielberg's Survivors of the Shoah Visual History Foundation (now the USC Shoah Foundation Institute), handling eastern European and middle Asian operations. Ms. Verkhovskaya was a notice administrator for the *In Re Holocaust Victim Assets Litigation*, the German Forced Labour Compensation Programme, consulted on notice and outreach for the International Commission on Holocaust Era Insurance Claims (ICHEIC), and was the managing director of Holocaust Era Asset Restitution Taskforce (Project HEART). She currently volunteers as the head of outreach for the Holocaust Insurance Accountability Act of 2022, being considered by the U.S. House of Representatives and Senate.

# REPRESENTATIVE CASES

## Telephone Consumer Protection Act Expert Witness Cases

***Krakauer v. Dish Network, LLC*, No. 1:14–CV–333 (M.D.N.C.)**
Submitted an expert report and rebuttal and provided live testimony at deposition and before a jury regarding analysis of more than 1.6 million telephone call records. The court admitted Ms. Verkhovskaya's expert opinion over a *Daubert* challenge in a case where exclusion of the report would have meant failure of the class. Later, in denying a motion to overturn the jury verdict awarding the class more than $20 million in relief, the court found that "Ms. Verkhovskaya provided clear, cogent testimony explaining her methodology and the bases for her opinions." Damages in the case were trebled to more than $61.5 million, and the award was upheld on appeal.

*McMillion v. Rash Curtis & Associates*, 4:16-cv-03396 (N.D. Cal.)
In a class action brought against a debt collector who used skip tracing to make more than half a million calls in violation of the TCPA, Ms. Verkhovskaya used reverse append and other industry-leading techniques to separate debtors from non-debtors in the defendant's telephone call data, and to identify telephone calls made to wireless telephone numbers. Verkhovskaya testified both at deposition and at a jury trial explaining her method. The class was awarded more than $267 million in damages, one of the largest TCPA damages awards ever.

***Chinitz v. Intero Real Estate Services*, 5:18-cv-05623 (N.D. Cal.)**
Submitted an expert report, rebuttal report, and deposition testimony concerning TCPA class identification and notification issues. The court overruled defendant's motion to strike/exclude and further denied the defendant's motion for summary judgment on plaintiff's TCPA claims. The parties subsequently reached a settlement regarding the TCPA class.

***Johnson v. Comodo Group, Inc.*, No. 16-4469 (D.N.J.)**
In a class action where Ms. Verkhovskaya's report identified more than 36,000 unique telephone numbers that received telephone calls in violation of the TCPA, the court overruled defendant's motion to exclude and relied on Verkhovskaya's analysis to certify the class. The court found that her "methodology is testable, reliable, and sufficiently capable of identifying putative class members" and that she "is clearly qualified to opine on TCPA issues," noting her "years of experience serving as an expert witness or court-approved administrator in class action lawsuits, including TCPA suits."

***Youngman v. A&B Insurance and Financial Services*, No. 6:16-cv-01478-CEM-GJK (M.D. Fla.)**
Submitted an expert report and rebuttal on class identification and notification issues. The court relied on Ms. Verkhovskaya's "extensive experience in identifying class members in TCPA class actions" in finding that more than 99 percent of class members had associated mailable addresses that could receive class notice. On this basis, the court found that the class was ascertainable, and notice was administratively feasible, and approved a class settlement of $4.25 million.

***Shamblin v. Obama for America*, No. 8:13–cv–2428–T–33TBM (M.D. Fla.)**
Testified at a *Daubert* hearing in support of her expert report analyzing several million call records. The court rejected the motion, finding that Ms. Verkhovskaya was "amply qualified," that her "relevant experience, education, and training render [her] competent to offer expert testimony in TCPA cases," and that she "employ[s] generally reliable methodologies which entail, *inter alia*, performance of detailed statistical analysis and utilization of LexisNexis data that has been independently verified by Verkhovskaya's company."

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.,* No. 15-cv-06314 (N.D. Cal.)

*Abdullah v. FedEx Corp. Services, Inc.*, No. 16-cv-03967 (N.D. Ill.)

*Bakov v. Consol. World Travel*, No. 15-cv-02980 (N.D. Ill.)

*Baldwin v. Miracle-Ear, Inc.*, No. 20-cv-01502 (D. Minn.)

*Balschmiter v. TD Auto Fin. LLC*, No. 13-cv-01186 (E.D. Wis.)

*Barron's Outfitters Inc. v. Deluxe Corp.*, No. 14-cv-01903 (D.S.C.)

*Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)

*Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060 (N.D. Cal.)

*Birchmeier v. Caribbean Cruise Line, Inc.*, No. 12-cv-04069 (N.D. Ill.)

*Biringer v. First Fam. Ins., Inc.*, No. 14-cv-00566 (N.D. Fla.)

*Brieger v. Tellabs, Inc.*, No. 06-cv-1882 (N.D. Ill.)

*Brinker v. Normandin's*, No. 14-cv-03007 (N.D. Cal.)

*Brown v. DIRECTV, LLC*, No. 13-cv-01170 (C.D. Cal.)

*Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-00728 (N.D. Tex.)

*Caldera v. Am. Med. Collection Agency*, No. 16-cv-00381 (C.D. Cal.)

*Carrese v. Yes Online, Inc.*, No. 16-cv-05301 (C.D. Cal.)

*Carroll v. SGS N. Am., Inc.*, No. 16-cv-00537 (M.D. La.)

*Charvat v FTR Energy Services, LLC*, No. 14-cv-00073 (D. Conn.)

*Charvat v ICOT Hearing Sys., LLC,* No. 17-cv-00245 (S.D. Ga.)

*Charvat v. Nat'l Holdings Corp.*, No. 14-cv-02205 (S.D. Ohio)

*Charvat v. Plymouth Rock Energy, LLC*, No. 15-cv-04106 (E.D.N.Y.)

*Charvat v. Santanna Natural Gas Corp.*, No. 18-cv-02310 (N.D. Ill.)

*Charvat v. The Southard Corp.*, No. 18-cv-00190 (E.D.N.Y.)

*Chinitz v. NRT West, Inc. d/b/a Coldwell Banker Residential Brokerage Co.*, No. 18-cv-06100 (N.D. Cal.)

*Clough v. Revenue Frontier, LLC*, No. 17-cv-00411 (D. N.H.)

*In re Collecto, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*, No. 14-md-02513 (D. Mass.)

*Cordoba v. DIRECTV, LLC*, No. 15-cv-03755 (N.D. Ga.)

*Cortez v. Nat'l Credit Adjusters, LLC*, No. 17-cv-02152 (S.D. Cal.)

*Davis v. Post University, Inc.*, No. 18-cv-81004 (S.D. Fla.)

*Deforest v. Royal Seas Cruises, Inc.*, No. 17-cv-01988 (S.D. Cal.)

*Dembski v. Dallas Morning News, Inc.*, No. 18-cv-02042 (N.D. Tex.)

*Desai v. ADT Security Services, Inc.*, No. 11-cv-1925 (N.D. Ill.)

*Diaz-Lebel v. TD Bank USA*, No. 17-cv-01611 (D.N.J.)

*Dipuglia v. US Coachways, Inc.*, No. 17-cv-23006 (S.D. Fla.)

*Donaca v. Dish Network, LLC,* No. 11-cv-02910 (D. Colo.)

*Drayton v. Toyota Motor Credit Corp.*, No. 16-cv-00046 (M.D. Fla.)

*Duchene v. Westlake Services, LLC,* No. 13-cv-01577 (W.D. Pa.)

*Edwards v. Conn's, Inc.*, No. 18-cv-01998 (D. Nev.)

*Elias v. Synchrony Bank*, No. 14-cv-08093 (C.D. Cal.)

*Fabricant v. Amerisave Mortgage Corp.*, No. 19-cv-04659 (C.D. Cal.)

*Fanning v. HSBC Card Services, Inc.*, No. 12-cv-00885 (C.D. Cal.)

*Fitzgerald v. Universal Pictures*, No. 16-cv-01193 (M.D. Fla.)

*Fitzhenry v. The ADT Corp. f/k/a ADT Security Services, Inc.*, No. 14-cv-80180 (S.D. Fla.)

*Flowers v. Twilio, Inc.*, No. RG16804363 (Cal. Super. Ct.)

*Fray-Witzer v. Metro. Antiques, LLC*, No. 02-5827 (Mass. Super. Ct.)

*Garcia v. Target Corp.*, No. 16-cv-20727 (S.D. Fla.)

*Gilmore v. USCB Corp.*, No. 17-cv-00119 (M.D. Ga.)

*Goins v. Palmer Recovery Attys., PLLC*, No. 17-cv-00654 (M.D. Fla.)

*Grogan v. Aaron's Inc.*, No. 18-cv-02821 (N.D. Ga.)

*Harrison v. Great Healthworks, Inc.*, No. 17-cv-00705 (S.D. Cal.)

*Heidarpour v. Central Payment Co., LLC*, No. 15-cv-00139 (M.D. Ga.)

*Hennie v. ICOT Hearing Sys., LLC*, No. 18-cv-02045 (N.D. Ga.)

*Hetherington v. Omaha Steaks, Inc.*, No. 13-cv-02152 (D. Or.)

*Hewlett v. Mnet Financial, Inc.*, No. 19-cv-00864 (E.D. Cal.)

*Hirsch v. USHealth Advisors, LLC*, No. 18-cv-0245 (N.D. Tex.)

*Hobbs v. Randall-Reilly, LLC*, No. 19-cv-00009 (M.D. Ga.)

*Hogaboom v. NCO Fin. Sys., Inc.*, No. 15-cv-06146 (E.D. Pa.)

*Hopkins v. Modernize, Inc.*, No. 17-cv-40087 (D. Mass.)

*Horton v. Cavalry Portfolio Services, LLC*, No. 13-cv-00307 (S.D. Cal.)

*Hossfeld v. Compass Bank*, No. 16-cv-02017 (N.D. Ala.)

*Hurley v. Messer*, No. 16-cv-09949 (S.D. W.Va.)

*Ikuseghan v. MultiCare Health Sys.*, No. 14-cv-05539 (W.D. Wash.)

*Iverson v. Advanced Disposal Services.*, No. 18-cv-00867 (M.D. Fla.)

*Jenkins v. National Grid USA*, No. 15-cv-01219 (E.D.N.Y.)

*Johansen v. Liberty Mutual Group, Inc.*, No. 15-cv-12920 (D. Mass.)

*Johansen v. Nationwide Mutual Ins. Co.*, No. 16-cv-03634 (N.D. Ga.)

*Johansen v. One Planet Ops, Inc.*, No. 16-cv-00121 (S.D. Ohio)

*Johnson v. Navient Solutions, Inc.*, No. 15-cv-00716 (S.D. Ind.)

*Johnson v. NPAS Solutions, LLC*, No. 17-cv-80393 (S.D. Fla.)

*Kleja v. Transworld Sys., Inc.,* No. 14-cv-00946 (N.D. Cal.)

*Knapper v. Cox Commc'n. Inc.*, No. 17-cv-00913 (D. Ariz.)

*Kubacki v. Peapod, LLC*, No. 13-cv-00729 (N.D. Ill.)

*LaVigne v. First Cmty. Bancshares, Inc.*, No. 15-cv-00934 (D. N.M.)

*Leeb v. Charter Commc'n., Inc*, No. 14-cv-02780 (E.D. Mo.)

*Lennartson v. Papa Murphy's Int'l., LLC*, No. 15-cv-05307 (W.D. Wash.)

*Lofton v. Verizon Wireless LLC*, No. 13-cv-05665 (N.D. Cal.)

*Lushe v. Verengo Inc.*, No. 13-cv-07632 (C.D. Cal.)

*Luster v. Green Tree Servicing, LLC*, No. 14-cv-01763 (N.D. Ga.)

*Manopla v. Home Depot USA, Inc.*, No. 15-cv-01120 (D.N.J.)

*Martin v. aaiPharma, Inc.*, No. 04-cv-27 (E.D.N.C.)

*Martin v. Global Tel\*Link Corp.*, No. 15-cv-03464 (C.D. Cal.)

*Mauthe v. Versa Cardio, LLC*, No. 15-cv-00657 (M.D. Pa.)

*Mendoza v. Storm Tight Windows of Tex., Inc.*, No. 19-cv-00225 (S.D. Tex.)

*Meredith v. United Collection Bureau, Inc.*, No. 16-cv-01102 (N.D. Ohio)

*Mey v. Direct Energy Services.*, No. 18-cv-182 (N.D. Ohio)

*Mey v. DirecTV, LLC*, No. 17-cv-00179 (N.D. W.Va.)

*Mey v. Frontier Commc'n Corp.*, No. 13-cv-01191 (D. Conn.)

*Mey v. Herbalife Int'l, Inc.*, No. 01-c-263 (W.Va. Cir. Ct.)

*Mey v. Honeywell Int'l, Inc.*, No. 12-cv-01721 (S.D. W.Va.)

*Mey v. Interstate Nat'l Dealer Services, Inc.*, No. 14-cv-01846 (N.D. Ga.)

*Mey v. Matrix Warranty Solutions, Inc.*, No. 21-cv-62 (N.D.W.V.)

*Mey v. Venture Data, LLC*, No. 14-cv-00123 (N.D. W.Va.)

*Mohamed v. Am. Motor Co., LLC*, No. 15-cv-23352 (S.D. Fla.)

*In re Monitronics Int'l, Inc. TCPA Litig.*, No. 13-md-02493 (N.D. W.Va.)

*Morgan v. Florida Hosp.*, No. 18-cv-0142 (M.D. Fla.)

*Morris v. Hornet Corp.*, No. 17-cv-00350 (E.D. Tex.)

*Morris v. SolarCity Corp.*, No. 15-cv-05107 (N.D. Cal.)

*Mulhern v. MacLeod*, 808 N.E.2d 778 (Mass. 2004)

*Naiman v. Total Merch. Services, Inc.*, No. 17-cv-03806 (N.D. Cal.)

*New Concept Dental v. Dental Resource Sys.., Inc.*, No. 17-cv-61411 (S.D. Fla.)

*Newhart v. Quicken Loans, Inc.*, No. 15-cv-81250 (S.D. Fla.)

*Nguyen v. Vantiv, LLC*, No. 15-cv-02436 (N.D. Cal.)

*Ott v. Mortgage Inv. Corp. of Ohio, Inc.*, No. 14-cv-000645 (D. Or.)

*Pieterson v Wells Fargo Bank, N.A.*, No. 17-cv-02306 (N.D. Cal.)

*Reyes v. BCA Fin. Services, Inc.*, No. 16-cv-24077 (S.D. Fla.)

*Rice-Redding v. Nationwide Mutual Ins. Co.*, No. 16-cv-03634 (N.D. Ga.)

*Roberts v. Wyndham Int'l, Inc.*, No. 12-cv-05083 (N.D. Cal.)

*Samson v. United Health Care Services*, No. 19-cv-00175 (W.D. Wash.)

*Sandoe v. Boston Scientific Corp.*, No. 18-cv-11826 (D. Mass.)

*Sapan v. Yelp, Inc.*, No. 17-cv-03240 (N.D. Cal.)

*Saunders v. Cabela's Wholesale, Inc.*, CGC-14-537095 (Cal. Super. Ct.)

*Schaevits v. Braman Hyundai, Inc.*, No. 17-cv-23890 (S.D. Fla.)

*Schaffer v. First Choice Payment Solutions*, No. 18-cv-01981 (C.D. Cal.)

*Sheean v. Convergent Outsourcing, Inc.*, No. 18-cv-11532 (E.D. Mich.)

*Shulruff v. Inter-Med, Inc.*, No. 16-cv-00999 (N.D. Ill.)

*Shuckett v. Dialamerica Marketing Inc.*, No. 17-cv-02073 (S.D. Cal.)

*Sivsubramanian v. DNC Health Corp.*, No. 10-cv-03522 (C.D. Cal.)

*Skulevold v. SD&A Teleservices, Inc.*, No. 20-cv-02771 (C.D. Cal.)

*Slovin v. Sunrun, Inc.*, No. 15-cv-05340 (N.D. Cal.)

*Spaner v. The Coca-Cola Co.*, No. 19-cv-22210 (S.D. Fla.)

*Southwell v. Mortgage Inv. Corp.*, No. 13-cv-01289 (W.D. Wash.)

*St. John v. Keller Williams Realty, Inc.*, No. 19-cv-01347-PGB-DCI (M.D. Fla.)

*Sundermann v. Rohlf*, No. 19-cv-00140 (S.D. Iowa)

*Tannlund v. Real Time Resolutions, Inc.*, No. 14-cv-05149 (N.D. Ill.)

*Thomas v. Fin. Corp. of America*, No. 19-cv-00152 (N.D. Tex.)

*Thomas v Peterson's Harley Davidson of Miami, LLC*, No. 18-cv-61723 (S.D. Fla.)

*Tomeo v. Citigroup Inc.*, No. 13-cv-04046 (N.D. Ill.)

*Tope v. Bankers Life & Cas. Co.*, No. 18-cv-01448 (N.D. Ill.)

*Trenz v. Volkswagen Group of Am.*, No. 15-cv-08356 (C.D. Cal.)

*Vizcarra v. Macys.com Inc.*, No. 14-cv-02041 (C.D. Cal.)

*Walker v. CMRE Financial Services, Inc.*, No. 20-cv-02218-BEN-JLB (S.D. Cal.)

*Warnick v. DISH Network, LLC*, No. 12-cv-01952 (D. Colo.)

*Watson v. Lexus of Manhattan*, No. 20-cv-04572 (S.D.N.Y.)

*West v. Cal. Services Bureau, Inc.*, No. 16-cv-0324 (N.D. Cal.)

*Williams v. PillPack, LLC*, No. 19-cv-05282 (W.D. Wash.)

*Williams v. The Pisa Group, Inc.*, No. 18-cv-04752 (E.D. Pa.)

*Wilson v. Badcock Home Furniture*, No. 17-cv-02739 (M.D. Fla.)

*Winters v. Capital One Bank (USA) N.A.*, No. 17-cv-01178 (C.D. Cal.)

*Wright v. eXp Realty, LLC*, No. 18-cv-01851 (M.D. Fla.)

*Wuest v. MyPillow, Inc.*, No. 18-cv-03658 (N.D. Cal.)

*Zeidel v. Mozeo, LLC*, No. 13-cv-06989 (N.D. Ill.)

## Telephone Consumer Protection Act Notice and Claims Administration Cases

### *Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-728 (N.D. Tex.)

Submitted an expert report and rebuttal report on class identification and notification issues. CEG was named as settlement administrator for the $25 million TCPA class action settlement. CEG coordinated reverse append processes, mailed more than 5.8 million postcards, and sent more than 41 million emails to potential class members. In addition, the company developed a digital marketing campaign that received more than 15 million impressions. Overall, as settlement administrator, CEG processed more than 437,500 claims.

*Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)

*Brey Corp v. Life Time Improv., Inc.*, No. 11-cv-00948 (D. Md.)

*Brieger v. Tellabs, Inc.*, No. 06-cv-1882 (N.D. Ill.)

*Brown v. Rita's Water Ice Franchise Co., LLC*, No. 15-cv-3509 (E.D. Pa.)

*Collins v. Am. Consumer Shows, Inc.*, No. 10-cv-11912 (D. Mass.)

*Desai v. ADT Security Services, Inc.*, No. 11-cv-1925 (N.D. Ill.)

*Duchene v. Westlake Services, LLC*, No. 13-cv-01577 (W.D. Pa.)

*Fray-Witzer v. Metropolitan Antiques, LLC*, No. 02-5827 (Mass. Super. Ct.)

*Fray-Witzer v. Olde Stone Land Survey Co., Inc.*, No. 08-cv-04175 (Mass. Super. Ct.)

*Heidarpour v. Cent. Payment Co., LLC*, No. 15-cv-00139 (M.D. Ga.)

*Horton v. Cavalry Portfolio Services*, LLC, No. 13-cv-00307 (S.D. Cal.)

*Ikuseghan v. MultiCare Health Sys.*, No. 14-cv-05539 (W.D. Wash.)

*Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.)

*LaVigne v. First Cmty. Bancshares, Inc.*, No. 15-cv-00934 (D.N.M.)

*Luster v. Green Tree Servicing, LLC*, No. 14-cv-01763 (N.D. Ga.)

*Mann & Co., PC v. C-Tech Ind., Inc.*, No. 08-cv-11312 (D. Mass.)

*Martin v. Dun & Bradstreet, Inc.*, No. 12-cv-00215 (N.D. Ill.)

*Mey v. Herbalife Int'l, Inc.*, No. 01-C-263 (W.Va. Cir. Ct.)

*Mey v. Interstate Nat'l Dealer Services, Inc.*, No. 14-cv-01846 (N.D. Ga.)

*Mey v. Venture Data, LLC*, No. 14-cv-00123 (N.D. W.Va.)

*Milford & Ford Assoc., Inc. v. Am. Consumer Shows, LLC*, No. 10-cv-11912 (D. Mass.)

*Milford & Ford Assoc., Inc. v. Cell-Tek, LLC*, No. 09-cv-11261 (D. Mass.)

*Mohamed v. Am. Motor Co., LLC*, No. 15-cv-23352 (S.D. Fla.)

*Munday v. Navy Fed. Credit Union,* No. 15-cv-01629 (C.D. Cal.)

*Nguyen v. Vantiv LLC,* No. 15-cv-02436 (N.D. Cal.)

*Ward v. Flagship Credit Acceptance LLC,* No. 17-cv-02069 (E.D. Pa.)

**Consumer Notice and Claims Administration Cases**

*Acevedo v. Lawyers Title Ins. Corp.*, No. 03-CH-07718 (Ill. Cir. Ct.)

*Allen v. HealthPort Tech., LLC*, No. 12-CA-013154 (Fla. Cir. Ct.)

*Alper v. Warnock Ford, Inc.*, No. MRS-L-1644-10 (N.J. Super. Ct.)

*Arias v. Award Homes, Inc.*, No. M54183 (Cal. Super. Ct.)

*Arteaga v. MODA Furniture, Inc.*, No. L-000980-05 (N.J. Super. Ct.)

*Black v. Metso Paper USA, Inc.*, No. 05-cv-1951 (M.D. Pa.)

*Blanco v. KeyBank USA, N.A.*, No. 03-cv-524 (N.D. Ohio)

*Bosland v. Warnock Dodge, Inc.*, No. MRS-L-844-06 (N.J. Super. Ct.)

*Bragg v. Bill Heard Chevrolet, Inc.-Plant City*, No. 02-cv-609-T-30EAJ (M.D. Fla.)

*Brown v. Hayt, Hayt & Landau, LLC*, No. L-7042-07 (N.J. Super. Ct.)

*Brumfield v. Countrywide Home Loans, Inc.*, No. 08-cv-93-HSO-JMR (S.D. Miss.)

*Burns v. First American Bank*, No. 04-cv-7682 (N.D. Ill.)

*Canning v. Concord EFS, Inc.*, No. L-6609-02 (N.J. Super. Ct.)

*Carlson v. State of Alaska, Commercial Fisheries Entry Comm'n*, No. 3AN-845790 CI (Alaska Super. Ct.)

*Cerda v. Associates First Capital Corp.*, No. M-03-146 (S.D. Tex.)

*Clearview Imaging, LLC v. Dairyland Ins.*, No. 04-11399 (Fla. Cir. Ct.)

*Clearview Imaging, LLC v. Mercury Ins. Co. of Fla.*, No. 035170 (Fla. Cir. Ct.)

*Clearview Imaging, LLC v. Nationwide Mutual Ins. Co.*, No. 0410396 (Fla. Cir. Ct.)

*Clearview Imaging, LLC v. Progressive Consumers Ins. Co.*, No. 034174 (Fla. Cir. Ct.)

*Clemons v. Thompson*, No. MON-L-001980-07 (E.D.N.Y.)

*Cohen v. JPMorgan Chase & Co.*, No. 04CV4098 (E.D.N.Y.)

*Coleman v. Lincoln Wood Products, Inc.*, No. 99-cv-1362 (N.J. Super. Ct.)

*Commonwealth of Massachusetts v. H&R Block, Inc.*, No. 08-2474-BLS1 (Mass. Super. Ct.)

*Coppess v. Healthways, Inc.*, No. 10-cv-00109 (M.D. Tenn.)

*Corsello v. Verizon New York, Inc.*, No. 39610/07 (N.Y. Super. Ct.)

*Cotton v. Ferman Mngmt. Services Corp.*, No. 02-cv-08115 (Fla. Cir. Ct.)

*Cottrell v. Gardner*, No. 02-cv-121(I), Super. Fin. Corp. Deriv. Action (Ark.)

*Croxall v. Tampa Hund L.P.*, No. 03-6201 (Fla. Cir. Ct.)

*Cruz v. Condor Capital Corp.*, No. MID-L-2108-06 (N.J. Super. Ct.)

*Curtis v. Northern Life Ins. Co.*, No. 01-2-18578-1 SEA, (Wash. Super. Ct.)

*Di Popolo v. Ramsey Nissan, Inc.*, No. BER-L-10319-09, (N.J. Super. Ct.)

*Dishkin v. Tire Kingdom, Inc.*, No. 08-2088 (Fla. Cir. Ct.)

*Drury v. Countrywide Home Loans, Inc.*, No. 08-cv-152-ORL-28 DAB (M.D. Fla.)

*Eisenberger v. Boston Service Co., Inc.*, No. MID-L-10366-09 (N.J. Super. Ct.)

*Epstein v. Sears, Roebuck and Co.*, No. UNN-L-1732-09 (N.J. Super. Ct.)

*Est. of Gary Robertson v. ADS Alliance Data Sys., Inc.*, No. 11-cv-1652 (M.D. Fla.)

*Est. of Mitchell Hampton v. Beverly Enterprises, Inc.*, No. 2004-95-3 (Ala. Cir. Ct.)

*Estep v. Smythe Volvo, Inc.*, No. UNN-L-004184-03 (N.J. Super. Ct.)

*Evans v. Stewart Title Guaranty Co.*, No. 04-06630-05 (Fla. Cir. Ct.)

*Family Open MRI, Inc. v. Direct Gen. Ins. Co.*, No. 03-4175 (Fla. Cir. Ct.)

*Fernando v. Neopost USA, Inc.*, No. BC439856 (Cal. Super. Ct.)

*Fernando v. Priority Mailing Sys.*, No. BC439857 (Cal. Super. Ct.)

*Ferro v. Florida Windstorm Underwriting Assoc.*, No. 00014808 (Fla. Cir. Ct.)

*Francis v. A&E Stores, Inc.*, No. 06-cv-1638 (S.D.N.Y.)

*Franco v. Ace Parking Management Inc.*, No. BC 392809 (Cal. Super. Ct.)

*Froumy v. Stark & Stark*, No. 09-cv-04890 (D.N.J.)

*FW Transportation, Inc. v. Associates Commercial Corp.*, No. C200000084 (Tex. Cir. Ct.)

*Gilley v. Ernie Haire Ford, Inc.*, No. 02-8101 (Fla. Cir. Ct.)

*Graham v. Town & Country Disposal of Western Missouri, Inc.*, No. 10-cv-00551 (W.D. Mo.)

*Greenstein v. Nations Title Agency of Florida, Inc.*, No. 07-014085 (Fla. Cir. Ct.)

*Gulf Coast Injury Center, LLC v. Nationwide Mutual Fire Ins. Co.*, No. 08-012621 (Fla. Cir. Ct.)

*Hamilton v. ATX Services Inc.*, No. 08-cv-0030 (W.D. Mo.)

*Haynes v. Baptist Health*, 240 S.W.3d 576 (Ark. 2006)

*Hellmers v. Countrywide Home Loans, Inc.*, No. 07-7703 (E.D. La.)

*Hill v. Am. Med. Sec. Life Ins. Co.*, C.A. No. 06-cv-00332 (W.D. Tex.)

*Hill v. Countrywide Home Loans, Inc.*, No. A-0178441 (E.D. Tex.)

*Hudson United Bank v. Chase*, No. L-235-05 (N.J. Super. Ct.)

*Hughley v. Md. Cas. Co.*, No. 06-21428-CIV-ALTONAGA (S.D. Fla.)

*Hutson v. Baptist Health*, No. CV 08-8221 (Ark. Cir. Ct.)

*Hutt v. Martha Stewart Living Omnimedia, Inc.*, N.Y. Slip. Op. 651249/2012 (N.Y. Super. Ct.)

*Kalow & Springut, LLP v. Commence Corp.*, No. 07-3443 (D.N.J.)

*Kay v. Wells Fargo & Co.*, No. 07-cv-01351 (N.D. Ca.)

*Lafayette Life Ins. Co. v. Cty. of Menasha*, No. 09-cv-64TLS-APR (N.D. Ind.)

*Mann v. Lawyers Title Ins. Corp.* No. 03 CH 15223 (Ill. Cir. Ct.)

*Mantzouris v. Scarritt Motor Grp., Inc.*, No. 03-cv-0015-T-30-MSS (M.D. Fla.)

*Martin v. Foster Wheeler Energy Corp.*, No. 06-cv-00878 (C.D. Cal.)

*Mayotte v. Assoc. Bank, N.A.*, No. 07-cv-00033 (N.D. Fla.)

*Meadows v. Clearwater Bay Mktg, LLC*, No. 49C01-0812-PL-054708 (Ind. Cir. Ct.)

*Means v. River Valley Fin. Bank*, No. 49D12-0704-PL016504 (Ind. Super. Ct.)

*Miller v. Weltman, Weinberg & Reis Co.*, L.P.A., No. MID-L-006248-07 (N.J. Super. Ct.)

*Monroy v. Citrus Cnty.*, No. 2004-CA-1840 (Fla. Cir. Ct.)

*Moore v. The Hertz Corp.*, No. 03-11772 (Fla. Cir. Ct.)

Mortgage Settlement Consumer Restit. Prog. (Foreclosure Restit. Prog. and BOA Victims Prog.)

*NSL Capital Mgmt. v. Gorman*, No. C-48-08 (N.J. Super. Ct.)

*Nthenge v. Pressler and Pressler, LLP*, No. C-00-1211-PH (N.D. Cal.)

*Obermeyer v. MarineMax East, Inc.*, No. 08-54007-CA-24 (Fla. Cir. Ct.)

*Olivo v. Homecomings Fin., LLC*, No. 06-4625 (N.Y. Super. Ct.)

*Open MRI of Pinellas, Inc. v. Atlanta Cas. Ins. Co.*, No. 03-7721 (Fla. Cir. Ct.)

*Ori v. Fifth Third Bank and Fiserv, Inc.*, No. 08-cv-00432-LA (E.D. Wis.)

*Ownby v. Citrus Cnty., Florida*, No. 04-CA-1840 (Fla. Cir. Ct.)

*Parker v. Am. Med. Sec. Grp., Inc.*, No. 04-1-1980-42 (Ga. Super. Ct.)

*Parthiban v. GMAC Mortgage Corp.*, SACV05-768-ODW (C.D. Cal.)

*Perez v. Rent-A-Center, Inc.*, No. 01-cv-7593 (N.J. Super. Ct.)

*Pettway v. Harmon Law Offices, P.C.*, No. 03-10932-RGS (D. Mass.)

*Pickett v. Triad Fin. Corp.*, No. MID-L-007727-05 (N.J. Super. Ct.)

*Pollitt v. DRS Towing, LLC*, No. 10-cv-1285 (D.N.J.)

*Premier Open MRI, LLC v. Progressive Am. Ins. Co.*, No. 04-00021 (Fla. Cir. Ct.)

*Puritan Budget Plan, Inc. v. Amstar Ins. Co.*, No. 04-10428 (Fla. Cir. Ct.)

*Ragsdale v. SanSai USA, Inc.*, No. 07-cv-1246 WQH (S.D. Cal.)

*S. Parker Hardware Mfg. Corp. v. AT&T Corp.*, No. BER-L-162-06 (N.J. Super. Ct.)

*Saint Pete MRI v. Auto Club South Ins. Co.*, No. 10-CA-013134 (Fla. Cir. Ct.)

*Saint Pete MRI v. Hartford*, No. 10-03925 (Fla. Cir. Ct.)

*Sam v. White*, No. 49D06-1006-PL-027492 (Ind. Super. Ct.)

*Santos v. Silver*, No. MID-L-08188-07 (N.J. Super. Ct.)

*Scher v. Oxford Health Plans, Inc.*, Am. Arbitration Ass'n, No. 11 193 00548 05

*Sheikh v. Maxon Hyundai, Inc.*, No. L-000476-09 (N.J. Super. Ct.)

*Silke v. Irwin Mortgage Corp.*, No. 49D03-0304-PL-000697 (Ind. Super. Ct.)

*Soden v. East Brunswick Buick*, Nos. L-2510-03, L-5617- 03 (N.J. Super. Ct.)

*Sokoloski v. Stewart Title Guar. Co.*, No. 08-cv-00236-AWT (D. Conn.)

*UltraOpen MRI Corp. v. Hartford Cas. Ins. Co.*, No. 07- CA009132 (Fla. Cir. Ct.)

*UltraOpen MRI Corp. v. Nationwide Assurance Co.*, No. 03-010725 (Fla. Cir. Ct.)

*United Cons. Fin. Ser. v. Carbo,* 982 A.2d 7 (N.J. Super. Ct. App. Div. 2009)

*Valley Nat'l Bank v. Cahn*, No. L-0504-04 (N.J. Super. Ct.)

*Veal v. Crown Auto Dealerships, Inc.*, No. 04-cv-0323-T-27 (M.D. Fla.)

*Walker v. Hill Wallack LLP*, No. MID-L-003480-08 (N.J. Super. Ct.)

*Wells v. DTD Enterprises, Inc.*, No. L-9012-07 (N.J. Super. Ct.)

*Wenger v. Cardo Inc.*, No. MID-L-4924-07 (N.J. Super. Ct.)

*Wenger v. Freehold Subaru, LLC*, No. MON-L-4003-10 (N.J. Super. Ct.)

*Williams v. CBE Grp.*, No. 11-cv-3680-PS (D.N.J.)

*Yarviv v. AT&T Corp.*, No. SOM-L-272-05 (N.J. Super. Ct.)

*Yingling v. eBay, Inc.*, 09-cv-01733 JW (N.D. Cal.)

### Civil Rights Notice and Claims Administration Cases

### *Leslie Ann Wilkie Peltier v. Debra Haaland, Secretary of the Interior*, No. 1:20-cv-03775-TFH (D.D.C.)

A class action lawsuit to redress alleged breaches of trust by the U.S. Department of the Interior, the U.S. Department of the Treasury, and the U.S. of America with respect to the accounting and management of two Judgment Awards of the Indian Claims Commission. The $59 million settlement provides relief to several generations of tribal families. Ms. Verkhovskaya developed a novel class notification and claims adjudication process that quickly and efficiently distributed settlement funds to surviving tribal members and their heirs. At the preliminary approval hearing, the federal judge overseeing the settlement noted that CEG was "instrumental in helping to shape the deal…"

At the final settlement approval fairness hearing, class counsel noted that CEG "made extensive efforts to identify and reach" the class and that CEG's class notification efforts "have met or gone beyond the Rule 23 and due process…requirements…The notice program here has been thorough…" In the order granting final settlement agreement approval, the court noted that CEG's class notification process provided "the best notice practicable under the circumstances…and it was reasonably calculated to reach the class members."

As an indication of the notice adequacy and its expansive reach, claimants were reached beyond the USA and claims were filed by class members from six additional countries: Australia, Austria, Canada, The Netherlands, Norway, and South Korea.

### German Forced Labour Compensation Programme (GFLCP)

Ms. Verkhovskaya was appointed by the government of Germany to lead notice and claims collection efforts in the GFLCP. Under Ms. Verkhovskaya's direction, the program located more than 43,000 Romani survivors in 17 countries in central and eastern Europe who were potentially eligible for humanitarian aid. Ms. Verkhovskaya oversaw creation of a comprehensive database for the GFLCP and the Holocaust Victim Assets Programme and coordinated direct assistance with claim completion for more than 11,000 Romanies in eight central and eastern European countries.

### *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000)

Ms. Verkhovskaya played a key role in a worldwide Phase I notice program that resulted in the processing of more than 500,000 initial questionnaires relating to a $1.25 billion settlement. In Phase III of that matter, Ms. Verkhovskaya coordinated delivering notice to more than 10,000 Jewish communities in 109 countries. In both Phases I and III of that matter, Ms. Verkhovskaya administered international help and call centers that directly assisted more than 100,000 potential claimants, created a class-appropriate notice targeting members of the Romani community in 48 countries, directed hundreds of staff in communicating with Romani communities and individuals, and notified more than two million people of the settlement.

**International Commission of Holocaust Era Insurance Claims (ICHEC)**

Ms. Verkhovskaya was appointed by Chairman Lawrence Eagleburger, former U.S. Secretary of State, to serve as consultant to ICHEIC on notice and outreach strategies and supervised the notification of claimants and face-to-face assistance programs in eastern Europe and the former Soviet Union.

**Project HEART: Holocaust Era Asset Restitution Taskforce**

Ms. Verkhovskaya was appointed by the Israeli government as the administrative director of Project HEART to provide essential tools, strategy, and information to enable Israel and its partners to secure restitution for eligible Jewish Holocaust victims and their heirs. Project HEART was one of the most comprehensive multilingual notice campaigns ever undertaken, covering 137 countries. Ms. Verkhovskaya assisted in launching a multilingual, interactive website, establishing a 24-hour call center in 13 languages, distributing more than 500,000 documents to potentially eligible families of Holocaust victims, handling more than 80,000 telephone calls, conducting archival research, and creating the most comprehensive online database of looted Jewish property in history. Ms. Verkhovskaya oversaw and directed the establishment of the largest and most complex data repository in the world, of nearly two million records identifying Jewish property stolen or looted during the Holocaust. In addition, under Ms. Verkhovskaya supervision, Project HEART reached out to 15,000 non-governmental organizations (NGOs) to engage them in the project and provide personal assistance to thousands of Holocaust victims and their heirs in making their claims.

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.,* 228 F.Supp.2d 348 (S.D.N.Y.)

*Austrian Banks Holocaust Litig.*, Nos. 01-3017, 01-3019, 01-3024, 01-3025 (S.D.N.Y.)

*Flood v. Dominguez*, No. 08-cv-153 (N.D. Ind.)

**U.S. SEC Fairness Actions Notice and Claims Administration**

*In re Morgan Asset Mgmt., Inc.*, SEC Admin. Proceeding File No. 3-13847

*SEC v. Anderson*, No. 05-1128 (D. Minn.)

*SEC v. The BISYS Grp., Inc.*, No. 07-cv-04010-KMK (S.D.N.Y.)

*SEC v. Gen-See Capital Corp.*, No. 09-cv-00014S (W.D.N.Y.)

*SEC v. RenaissanceRe Holdings Ltd.*, No. 07-cv-00865 RWS (S.D.N.Y.)

*SEC v. Rockford Funding Grp.*, No. 09-cv-10047-PGG (S.D.N.Y.)

*SEC v. Take-Two Interactive Software, Inc.*, No. 09-cv-03113 (S.D.N.Y.)

*SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340 (S.D.N.Y.)

*SEC v. Value Line, Inc.*, SEC Admin. Proceeding File No. 3-13675

*SEC v. WexTrust Capital, LLC*, No. 08-cv-7104 (S.D.N.Y.)

*SEC v. Zomax, Inc.*, No. 04-1155 (D. Minn.)

**Antitrust Notice and Claims Administration Cases**

*Ace Marine Rigging & Supply, Inc. v. Virginia Harbor Services, Inc.*, No. 11-cv-00436 (C.D. Cal.)

*Board of Commr.'s of the Port of New Orleans v. Virginia Harbor Services Inc.*, No. 11-cv-00437 (C.D. Cal.)

*In re DDAVP Indirect Purchaser Antitrust Litig.*, No. 05-2237 (S.D.N.Y.)

*In re Iowa Ready-Mixed Concrete Antitrust Litig.*, No. 10-004038-MWB (N.D. Iowa)

*In re Marine Hose Antitrust Litig.*, No. 08-1888 (S.D. Fla.)

*In re Platinum and Palladium Commodities Litig.*, No. Civ 3617-WHP (S.D.N.Y.)

*In re Potash Antitrust Litig. (II)*, No. 08-6910 (N.D. Ill.)

*In re Ready-Mixed Concrete Antitrust Litig.*, No. 05-cv-00979-SEB-VSS (S.D. Ind.)

### Securities Notice and Claims Administration Cases

*In re ACS S'holders Litig.*, No. 06-cv-1592-M (N.D. Tex.)

*In re Adolor Corp. S'holders Litig.*, No. 6997-VCN (Del. Ch.)

*In re Affiliated Computer Services ERISA Litig.*, No. 06-cv-1592-M (N.D. Tex.)

*In re AirGate PCS, Inc. Sec. Litig.*, No. 02-cv-1291-JOF (N.D. Ga.)

*In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-cv-0725-W-ODS (W.D. Mo.)

*In re Andrx Corp.*, 296 F.Supp.2d 1356 (S.D. Fla.)

*In re Atlas Energy, Inc. S'holders Litig.*, No. 5990-VCL (Del. Ch.)

*Bauman v. Super. Fin. Corp.*, No. 01-cv-00756 GH (E.D. Ark.)

*In re Beckman Coulter, Inc. Sec. Litig.*, No. 10-cv-1327-JST (C.D. Cal.)

*In re BigBand Networks, Inc. Sec. Litig.*, No. 07-cv-5101 (N.D. Cal.)

*In re BISYS Sec. Litig.*, No. 04-cv-3840 (JSR) (S.D.N.Y.)

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, No. C06-1505 (W.D. Wash.)

*Capovilla v. Lone Star Tech., Inc.*, No. 07-02979 (Tex. Dist. Ct.)

*In re Cbeyond, Inc. Sec. Litig.*, No. 08-cv-1666 (CC) (N.D. Ga.)

*Cement Masons & Plasterers Joint Pension Trust v. TNS, Inc.*, No. 06-cv-363 (E.D. Va.)

*In re CNX Gas Corp. S'holders Litig.*, No. 5377-VCL (Del. Ch.)

*In re Connetics Sec. Litig.*, No. C 07-02940 SI (N.D. Cal.)

*In re CP Ships Ltd. Sec. Litig.*, No. 05-md-1656-T-27TBM (M.D. Fla.)

*Dandong v. Pinnacle Performance Ltd.*, No. 10-cv-8086 (S.D.N.Y.)

*DeCario v. Lerner N. Y., Inc.*, No. BC 317954 (Cal. Super. Ct.)

*In re Del Monte Foods Co. S'holder Litig.*, No. 6027- VCL (Del. Ch.)

*In re Delphi Fin. Grp. S'holders Litig.*, No. 7144-VCG (Del. Ch.)

*In re Dura Pharm., Inc. Sec. Litig.*, No. 99-cv-0151-JLS (WMC) (S.D. Cal.)

*In re Emergent Grp., Inc. S'holder Litig.*, No. BC455715 (Cal. Super. Ct.)

*Friedman v. Rayovac Corp.*, No. 02-cv-0308-C (W.D. Wis.)

*Friewalde v. Boeing Aero. Operations, Inc.*, No. 06-Vcv-236 (W.D. Tex.)

*In re Gen. Electric Co. Sec. Litig.*, No. 09-cv-1951 (DLC) (S.D.N.Y.)

*In re Gilead Sci. Sec. Litig.*, No. C-03-4999-SI (N.D. Cal.)

*In re Goodrich S'holders Litig.*, No. 11-13699 (N.Y. Super. Ct.)

*Groen v. PolyMedica Corp.*, No. 07-3352 (Mass. Super. Ct.)

*Hall v. The Children's Place Retail Stores, Inc.*, No. 07-cv-08252-SAS (S.D.N.Y.)

*In re Hearst-Argyle S'holder Litig.*, No. 09-cv-600926 (N.Y. Super. Ct.)

*Hess v. Oriole Homes Corp.*, No. 07-7703 (Fla. Cir. Ct.)

*Holley v. Kitty Hawk, Inc.*, No. 00-cv-0828-P (N.D. Tex.)

*In re IBM Corp. Sec. Litig.*, No. 05-cv-6279 (S.D.N.Y.)

*In re ICG Commc'n, Inc. Sec. Litig.*, No. 00-cv-1864-REBBNB (D. Colo.)

*In re InfoSonics Sec. Litig.*, No. 06-cv-1231-JLS (S.D. Cal.)

*In re J. Crew Grp., Inc. S'holders Litig.*, No. 6043-CS (Del. Ch.)

*Kellman v. Forever 21 Retail, Inc.*, No. 12-32841 CA 05 (Fla. Cir. Ct.)

*In re King Pharm., Inc. Sec. Litig.*, No. 03-cv-77 (E.D. Tenn.)

*Kubota v. Walker*, No. 06-02446 (Tex. Dist. Ct.)

*In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA (N.D. Cal.)

*In re Lehman Bros. Equity/Debt Sec. Litig.*, No. 09-md-2017 (S.D.N.Y.)

*Lehmann v. Ivivi Tech., Inc.*, No. C-343-09 (N.J. Super. Ct.)

*In re Lernout & Hauspie Sec. Litig.,* Nos. 00-cv-11589, 04-cv-1738 (D. Mass.)

*In re Limelight Networks, Inc. Sec. Litig.*, No. CV07-01603 (D. Ariz.)

*Long v. Eschelon Telecom, Inc.*, No. 27-cv-07-6687 (Minn. Dist. Ct.)

*La. Mun. Police Employees Ret. Sys. v. Deloitte & Touche LLP*, No. 04-621 (E.D.N.Y.)

*In re Martek Biosciences Corp. Sec. Litig.*, No. MJG 05-1224 (D. Md.)

*In re Massey Energy Co. Sec. Litig.*, No. 10-cv-00689-ICB (N.D. Cal.)

*In re MBNA Corp. Sec. Litig.*, No. 05-cv-00272-GMS (D. Del.)

*In re Metavante Tech., Inc. S'holder Litig.*, No. 09-CV5325 (Wis. Cir. Ct.)

*In re Micromuse, Inc. Sec. Litig.*, No. C-04-0136 BZ (N.D. Cal.)

*In re MK Res. Co. S'holders Litig.*, Nos. 1692-VCS, 1598VCS (Del. Ch.)

*Montalvo v. Tripos, Inc.*, No. 03-cv-995SNL (E.D. Mo.)

*In re Motive, Inc. Sec. Litig.*, Nos. A-05-cv-923-LY, A06-CA-017-LY (W.D. Tex.)

*Mozenter v. Nalco Holding Co.*, No. 11-MR-001043 (Ill. Cir. Ct.)

*In re Novamed, Inc. S'holders Litig.*, No. 6151-VCP (Del. Ch.)

*In re NX Networks Sec. Litig.*, Nos. 00-cv-11850-JLT, 01- CV10377-JLT (D. Mass.)

*In re OSI Pharm., Inc. Sec. Litig.*, No. 04-cv-05505- JSWDW (E.D.N.Y.)

*In re Pacific Gateway Exch., Inc. Sec. Litig.*, No. 00-cv-1211 (N.D. Cal.)

*In re Par Pharm. Cos., Inc. S'holders Litig.*, No. 7715(VCP) (Del. Ch.)

*In re Par Pharm. Sec. Litig.*, No. 06-cv-03226 (D.N.J.)

*Paskowitz v. Ernst & Young, LLP*, No. A-08-CA-188-LY (W.D. Tex.)

*Pension Tr. Fund for Operating Eng'rs v. Assisted Living,* 943 F. Supp. 2d 913 (E.D. Wis.)

*Police & Fire Ret. Sys. of the Cty. of Detroit v. SafeNet, Inc*., No. 06-cv-05797 (S.D.N.Y.)

*Provo v. China Organic Ag., Inc.*, No. 08-cv-1081 (S.D.N.Y.)

*Quaak v. Dexia, S.A.*, No. 03-cv-11566 (D. Mass.)

*Raspante v. Harris Interactive*, No. 9148-VCP (Del. Ch.)

*Raul v. Western Liberty Bancorp*, No. A-12-668865-B (Nev. Dist. Ct.)

*In re Reliant Sec. Litig.*, No. H-02-1810 (S.D. Tex.)

*In re RenaissanceRe Holdings Ltd. Sec. Litig.*, No. 05-cv-06764-WHP (S.D.N.Y.)

*Rubin v. MF Global, Ltd.*, No. 08-cv-2233 (S.D.N.Y.)

*In re Scottish Re Grp. Sec. Litig.*, No. 06-cv-5853 (S.D.N.Y.)

*Serino v. Kenneth Lipper, et. al.*, No. 04/602106 (N.Y. Super. Ct.)

*In re Sexy Hair Concepts, LLC*, No. 10-bk-25919-GM (Bankr. C.D. Cal.)

*In re SFBC Intern'l Sec. & Deriv. Litig.*, No. 06-cv-000165-SRC (D.N.J.)

*In re SLM Corp. Sec. Litig.*, No. 08-cv-1029 (S.D.N.Y.)

*In re Supervalu, Inc. Sec. Litig.*, No. 02-cv-1738 (D. Minn.)

*In re Suprema Specialties, Inc. Sec. Litig.*, No. 02-168 (D.N.J.)

*In re Symbol Tech., Inc. Sec. Litig.*, No. 02-cv-1383 (E.D.N.Y.)

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y.)

*Taylor v. McKelvey (Monster Worldwide, Inc.)*, No. 06-cv-8322 (S.D.N.Y.)

*In re TD Banknorth S'holders Litig.*, No. 2557-VCL (Del. Ch.)

*In re Ticketmaster Ent. S'holder Litig.*, No. BC407677 (Cal. Super. Ct.)

*In re Tyson Foods, Inc. Sec. Litig.*, No. 01-425-SLR (D. Del.)

*Valuepoint Partners, Inc. v. ICN Pharm., Inc.*, No. 03-cv-989 DOC (C.D. Cal.)

*In re Vaso Active Pharm. Deriv. Litig.*, Nos. 04-10792, 04-10708 (D. Mass.)

*In re Viisage Tech., Inc. Sec. Litig.*, No. 05-cv-10438-MLW (D. Mass.)

*In re VisionAmerica, Inc. Sec. Litig.*, No. 00-0279 (M.D. Tenn.)

*In re Vonage IPO Sec. Litig.*, No. 07-cv-177 (D.N.J.)

*In re Warner Chilcott Ltd. Sec. Litig.*, No. 06-cv-11515 (S.D.N.Y.)

*Zametkin v. Fid. Mgmt. & Research Co.*, No. 08-cv-10960 (D. Mass.)

*In re Zomax, Inc. Sec. Litig.*, No. 05-cv-01128 (D. Minn.)

### Other Notice and Claims Administration Cases

*In re AIG ERISA Litig.*, No. 04-cv-9387 (S.D.N.Y.)

*Akins v. Worley Catastrophe Response, LLC*, 921 F. Supp. 2d 593 (E.D. La. 2013)

*Alakayak v. All Alaskan Seafoods, Inc.*, No. 3AN-95-4676 CIV (Alaska Super. Ct.)

*Baptista v. Mut. of Omaha Ins. Co.*, No. 10-467 ML (D.R.I.)

*In re Bear Stearns Cos., Inc. ERISA Litig.*, No. 08-MDL-1963 (S.D.N.Y.)

*In re Beazer Homes USA, Inc. ERISA Litig.*, No. 07-cv-00952 (N.D. Ga.)

*Brattain v. Richmond State Hosp.*, No. 49D11-0108-CP-1309 (Ind. Super. Ct.)

*In re Calpine Corp. ERISA Litig.*, No. C 03-cv-1685 (N.D. Cal.)

*In re Cardinal Health, Inc. ERISA Litig.*, No. C2-04-643 (S.D. Ohio)

*Carlson v. C.H. Robinson Worldwide, Inc.*, No. 02-cv-3780 (D. Minn.)

*Chao v. Slutsky*, No. 01-cv-7593 (E.D.N.Y.)

*Clayton v. Velociti, Inc.*, No. 08-cv-2298-CM/GLZ (D. Kan.)

*In re Consumers Trust*, No. 05–60155 (REG) (S.D.N.Y.)

*In re Diebold ERISA Litig.*, No. 06-cv-0170 (N.D. Ohio)

*In re Elec. Data Sys. Corp. ERISA Litig.*, 03-md-1512, 03cv-126 (E.D. Tex.)

*In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.,* No. 2056 (W.D. Pa.)

*In re Fannie Mae ERISA Litig.*, No. 04-cv-01784 (D.D.C.)

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-cv-3400 (S.D.N.Y.)

*In re Fremont Gen. Corp. Litig.*, 07-cv-02693 JHN (C.D. Cal.)

*Griffin v. Flagstar Bancorp, Inc*., No. 10-cv-10610 (E.D. Mich.)

*Hargrave v. TXU Corp.*, No. 02-cv-2573-K (N.D. Tex.)

*Harris v. First Reg'l Bancorp*, No. 10-cv-7164 (C.D. Cal.)

*Harris v. Koenig*, No. 02-cv-00618 (D.D.C.)

*In re Hartford Fin. Services Grp., Inc. ERISA Litig.*, No. 08-cv- 01708 (D. Conn.)

*Herrera v. Wyeth ERISA Litig.*, No. 08 Civ. 04688 (S.D.N.Y.)

*In re ING Grp., N.V. ERISA Litig.*, No. 09-cv-00400-JEC (N.D. Ga.)

*In re JDS Uniphase Corp. ERISA Litig.*, No. C 03-04743 CW (S.D. W.Va.)

*Johansen v. Liberty Mut. Grp. Inc.,* No. 15-cv-12920-ADB (D. Mass.)

*Kreher v. Cty. of Atlanta, Ga.*, No. 04-cv-2651 (N.D. Ga.)

*In re Marsh ERISA Litig.*, No. 04-cv-8157 (S.D.N.Y.)

*Mayer v. Smurfit-Stone Container Corp Ret. Plans Admin. Comm.*, No. 09-cv-02984 (N.D. Ill.)

*Mayes v. The Geo Grp., Inc.*, No. 08-cv-248/RS/EMT (N.D. Fla.)

*In re Merck & Co. Inc. Vytorin ERISA Litig.*, No. 08-cv-1974 (D.N.J.)

*Merrimon v. UNUM Life Ins. Co. of Am.*, No. 10-cv-00447-NT (D. Me.)

*Morrison v. MoneyGram Int'l, Inc.*, No. 08-cv-01121 (D. Minn.)

*In re Nat'l Cty. Corp. Sec., Deriv. & ERISA Litig.*, No. 08-nc-70000 (N.D. Ohio)

*N.Y. v. SKS Assoc., LLC*, No. 400908/12 (N.Y. Super. Ct.)

*Norflet v. John Hancock Life Ins. Co.*, No. 04-cv-1099 (D. Conn.)

*In re Ortiz v. Aurora Health Care, Inc.*, No. 12-cv-00295-LA (E.D. Wis.)

*Osborn v. EMC Corp.*, No. C 04-00336 JSW (N.D. Cal.)

*Otte v. Life Ins. Co. of N. Am.*, No. 09-cv-11537 (D.N.H.)

*Overby v. Tyco Int'l Ltd.*, No. 02-cv-1357-B (D.N.H.)

*Paliotto v. Johnny Rockets Grp., Inc.*, 06-cv-02253-RCL (D.D.C.)

*Patel v. Baluchi's Indian Rest.*, No. 08-cv-9985 (S.D.N.Y.)

*Payson v. Cap. One Home Loans, LLC*, No. 07-cv-2282 (D. Kan.)

*Pereira v. Foot Locker, Inc.*, No. 07-cv-2157 (E.D. Pa.)

*In re PFF Bancorp, Inc. ERISA Litig.*, No. 08-cv-01093 (C.D. Cal.)

*In re R.H. Donnelley Corp. ERISA Litig.*, No. 09-cv-07571 (N.D. Ill.)

*Ramirez v. GreenPoint Mortgage Funding, Inc.*, No. 08-cv-00369 (N.D. Cal.)

*In re RBC Dain Rauscher Overtime Litig.*, No. 06-cv-03093 (D. Minn.)

*In re RCN Corp. ERISA Litig.*, No. 04-cv-5068 (D.N.J.)

*In re Schering-Plough Corp. Enhance ERISA Litig.*, No. 08-cv-1432 (D.N.J.)

*Schmitz v. Liberty Mut. Ins. Co.*, No. 08-cv-02945 (S.D. Tex.)

*In re Sears, Roebuck & Co. ERISA Litig.*, No. 02-C-8324 (N.D. Ill.)

*Shane v. Edge*, No. 10-cv-50089 (N.D. Ill.)

*Walter v. Level 3 Commc'n, Inc.*, No. 09-cv-0658-REB-CBS (D. Colo.)

*Yost v. First Horizon*, No. 08-02293 (W.D. Tenn.)

*Young v. Heimbuch*, No. CV10-8914 ODW (C.D. Cal.)

*In re YRC Worldwide, Inc. ERISA Litig.*, No. 09-cv-02953 (D. Kan.)

## WORK HISTORY

**CLASS EXPERTS GROUP, LLC**

President and Chief Executive Officer                                        2017-present

Ms. Verkhovskaya leads a team of professionals providing expert litigation support services, data management and analysis, and class action administration in TCPA, consumer protection, and other class action litigation. Experts at CEG provide opinions in depositions and evidentiary hearings or at trial relating to ascertainability, numerosity, class member identification and location, class notice, claims adjudication, and fund distribution in TCPA and other class action cases.

**Data Management and Analysis** CEG has worked with forensically encrypted data, mainframe, proprietary systems, Oracle Linux, Microsoft Azure, Amazon Web Services (AWS), and Google's BigQuery.

CEG's expertise includes, but is not limited to:

**Operating Systems** such as Solaris, Solaris 10 Trusted Extensions (TX), OpenSolaris, Linux, Hewlett-Packard Unix (HP-UX), Advanced Interactive eXecutive (AIX), and Microsoft Windows.

**Languages** such as Java, JavaScript, HyperText Markup Language (HTML), Dynamic HyperText Markup Language (DHTML), Hypertext Markup Language revision 5 (HTML5), Lua, Indicore SDK 3, C, C++, Visual Basic, Assembler, Fortran, Pascal, COBOL, Unified Modeling language (UML), Structured Query Language (SQL), PL/SQL, shell scripting, Extensible Markup Language (XML), and AutoIt.

**Frameworks** such as Spring, Apache Struts, PrimeFaces, Angular JS, Bootstrap, Google Web Toolkit (GWT), Asynchronous JavaScript And XML (AJAX), jQuery, Maven, Hibernate, and MyBatis.

**Platforms, Systems, Software Architecture** such as Java 2 Platform, Enterprise Edition (J2EE), and Representational State Transfer (REST).

**Open-Source Relational Database Management System (RDBMS)** such as Access, Oracle, MySQL, Microsoft SQL (MS SQL), and DB2.

**Protocols** such as Transmission Control Protocol (TCP), User Datagram Protocol (UDP), Secure Sockets Layer (SSL), Simple Network Management Protocol (SNMP), Simple Network Management Protocol Trap (SNMP trap), Secure Shell (SSH), Telnet, Telnet protocol over TLS/SSL, Internet Control Message Protocol (ICMP), File Transfer Protocol (FTP), File Transfer Protocol over TLS/SSL (SFTP), Xerox Network Systems (XNS), Network Time Protocol (NTP), Internet Message Access Protocol (IMAP), Internet Message Access Protocol over TLS/SSL (IMAPS), Post Office Protocol version 3 (POP3), Simple Mail Transfer Protocol (SMTP), Authenticated SMTP over TLS/SSL (SMTPS), Transport Layer Security (TLS), Domain Name System (DNS), Remote Shell (RSH), Remote Procedure Call (RPC), IBM Systems Network Architecture (SNA), Extensible Messaging and Presence Protocol (XMPP), Remote Execution Protocol (REXEC), Lightweight Directory Access Protocol (LDAP), Lightweight Directory Access Protocol over TLS/SSL (LDAPS), HyperText Transfer Protocol (HTTP), HyperText Transfer Protocol over TLS/SSL (HTTPS), JavaScript Object Notation (JSON), Asynchronous JavaScript and XML (AJAX), Simple Object Access Protocol (SOAP), Web Processing Service (WPS), and Internet Relay Chat (IRC).

**Friends of Be an Angel, Inc.**
Director of the Board                                        2022-present
A nonprofit organization focused on raising funds in the U.S. and Canada to provide humanitarian aid in Ukraine and to evacuate Ukrainian refugees to EU countries.

**Be an Angel e.V.**
Member of the Board                                        2022-present
A nonprofit organization based in Germany and Moldova providing support to refugees in Europe, delivering and distributing humanitarian aid in Ukraine, and evacuating Ukrainian refugees to EU countries.

**DRRT**
Managing Director                                        2016-2017

DRRT works with institutional investors in the U.S. and around the world global securities litigation, loss recovery, and claims filing. Ms. Verkhovskaya conducted claims filing audits and process reviews and oversaw institutional client relations.

**A.B. DATA, LTD.**
Partner and Chief Operating Officer, Class Action Administration        1999-2016

Ms. Verkhovskaya founded and led A.B. Data, Ltd. to become a nationally recognized class action administration firm. Functioning as a Chief Executive Officer, as well as the Chief Operating Officer, she oversaw domestic and international operations. Under her leadership, the company managed more than $10 billion in distributions, reaching more than 150 million people worldwide. She implemented and managed numerous call centers including Vertical TeleVantage/Artifost, Fonality, Asterisk, Trixbox and i3, and databases such as SQLBase, dBase, imaging software and OCR programs.

Under Ms. Verkhovskaya's leadership, A.B. Data, Ltd. emerged as a court-approved subject-matter expert retained to administer complex matters for dozens of government agencies including state Attorneys General offices, Fortune 500 companies, the U.S. Department of Justice, and the U.S. Securities and Exchange Commission.

Ms. Verkhovskaya was a leader in class action claims fraud detection. She formed the Fraud Prevention and Detection Task Force in collaboration with Duke Law School, the FBI, the U.S. Secret Service, the IRS Criminal Investigative Division, the USPS, the Department of Justice, and other government organizations, developing class action industry guidelines on preventing fraud.

## EDUCATION

Executive Master of Business Administration
Brown University & IE Business School

Course Certificate, Data Science, Machine Learning and AI for Business
Course Certificate, Leadership in Times of Volatility and Uncertainty
Brown University & IE Business School

Bachelor of Science
Molloy College

# Exhibits B-J

Provided in native format.