# EXHIBIT 6

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH MANTHA, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>QUOTEWIZARD.COM LLC<br><br>        Defendant. | CASE NO. 1:19-cv-12235<br><br>**EXPERT REBUTTAL REPORT OF HAROLD FURCHTGOTT-ROTH** |

## SECOND EXPERT REPORT OF HAROLD FURCHTGOTT-ROTH IN RESPONSE TO THE SEPTEMBER 22, 2023 EXPERT REPORT OF ANYA VERKHOVSKAYA

## I.      Introduction, Assignment, and Summary of Opinions

1.      I submitted an expert report in this proceeding on September 22, 2023.[1] The same background information, statements, and qualifications described in paragraphs 1 through 11 of the First Furchtgott-Roth Report apply to this second report.

2.      I have been asked by counsel for QuoteWizard to consider and to evaluate the September 22, 2023 Expert Report of Anya Verkhovskaya ("Verkhovskaya Report"). I have also been asked by counsel for QuoteWizard, based on my professional knowledge and experience and

---

[1]     *See* Expert Report of Harold Furchtgott-Roth dated September 22, 2023 ("First Furchtgott-Roth Report").

the documents that I have reviewed in this proceeding, and my preparation of the First Furchtgott-Roth Report, the following question: What material errors and omissions, if any, does the Verkhovskaya Report commit in reaching its conclusions?

3.      Based on my review of the Verkhovskaya Report, and based on my review of other documents in this proceeding as well as based on my professional training and my professional experience, I reach the following conclusions:

a.      Opinion 2 of the Verkhovskaya Report is unreliable;

b.      Opinion 5 of the Verkhovskaya Report is unreliable;

c.      Opinion 6 of the Verkhovskaya Report is ineffective and unreliable;[2] and

d.      The Verkhovskaya Report omits the substantial expertise and incentives that outside vendors to QuoteWizard had to avoid sending any text messages that violate Section 227.

## II.    Opinion 2 of the Verkhovskaya Report is unreliable

4.      Opinion 2 of the Verkhovskaya Report states:

> Using the data produced in discovery in by Drips, Bandwidth and Twilio, and after limiting the proposed class as instructed, there is a reliable and efficient method to determine whether two or more texts were delivered within any 12-month period to telephone numbers that had been on the NDNCR for 32 days or more.[3]

At the very least, the Verkhovskaya Report does not explain exactly how it reaches this opinion.

It appears to rely upon an incorrect assumption that a phone number, once on the National Do

Not Call Registry (DNCR), remains on the DNCR.

---

[2] Although I only address opinions 2, 5, and 6 of the Verkhovskaya Report, no inference should be drawn that I find the other opinions in the Verkhovskaya Report to be reliable.
[3] Verkhovskaya Report, ¶¶ 2, 131.

**A.      Information received from the DNCR is limited to the date of the request**

5.      On behalf of Class Experts Group, LLC (CEG),[4] PacificEast requested information about specific phone numbers from the DNCR, presumably in 2022 or 2023:

> PacificEast performed a standard data append and provided an output file that indicated whether each telephone number was listed on the NDNCR and, if so, the most recent date the telephone number was added to the NDNCR (the "PacificEast NDNCR Output").[5]

The definition and contents of a "standard data append" are not explained in the Verkhovskaya Report, but this information apparently is not received directly from the DNCR.[6] The DNCR output files do not ordinarily specify whether a phone number was on the DNCR as of the specific dates on which QuoteWizard allegedly sent text messages to said number. The standard output file is a list of registered phone numbers.[7] The FTC has a "change list file" that has the initial date of registration, but only for changed information since the previous download.[8] To have actual initial registration dates from the DNCR, CEG would have had to have periodic downloads of the specific phone numbers throughout the claimed class period beginning in 2015. The Verkhovskaya Report does not indicate that CEG, or any other entity, made such downloads for the phone numbers in the proposed class.  In any event, the FTC does not ordinarily make information about initial dates of registration for specific phone numbers available to third parties such as CEG.[9]

---

[4] Anya Verkhovskaya is the President and Chief Executive Officer of Class Experts Group, LLC. Verkhovskaya Report, ¶ 12.
[5] Ibid, ¶ 68.
[6] "Data append" is a term used in several instances in the Verkhovskaya Report. It possibly may include the use of information collected and distributed on the internet about individuals without their knowledge or consent.
[7] Question 50, Q&A for Telemarketers & Sellers About DNC Provisions in TSR | Federal Trade Commission (ftc.gov).
[8] Question 50, Q&A for Telemarketers & Sellers About DNC Provisions in TSR | Federal Trade Commission (ftc.gov).
[9] It is hypothetically possible that CEG or PacificEast received the initial registration date directly from the FTC, but that fact is not specifically discussed in the Verkhovskaya Report.

6.      Nor does PacificEast appear to have made such periodic downloads throughout the claimed Class Period. PacificEast discusses how queries of a different federal database, the FCC's Reassigned Numbers Database (RND) are always made in hindsight, rather than on a daily basis.[10] The same limitation likely applies to the DNCR. PacificEast explains:

> In the absence of daily, real-time RND queries, there is no way to use the RND query service provided by PacificEast to clarify hindsight results of "Yes" to show that an input call was made after a particular unknown date of disconnection, because such dates are not provided in the RND's query results, and are not otherwise identifiable using the database, in hindsight.[11]

7.      The Verkhovskaya Report states that "CEG has an Organization ID and Subscription Account Number (SAN), issued by the FTC."[12] The Report does not mention, however, that *anyone* can obtain an Organization ID and SAN.[13] Although Ms. Verkhovskaya "regularly rel[ies] upon PacificEast to perform the data append described in this ExpertReport,"[14] PacificEast apparently used the CEG Organization Number to support the Verkhovskaya Report.[15]

8.      As PacificEast explained earlier this year,

> While the reverse append results identify possible subscribers to phones numbers based on associational relationships, this service does not determine subscriber identity, because there is no authoritative consolidated data source known to identify such relationships.

> Moreover, the Reverse Phone Append service provided by PacificEast does not identify whether and when an input telephone number was, in fact, reassigned from one person to another, or when the customary user of a phone number changed from one person to another.

> As a consequence, Reverse Phone Append data provided by PacificEast demonstrates only a possibility that the names identified by the service subscribed to a provided telephone number for a given date range.

---

[10] *Clarence Davis v. Capital One, N.A.*, United States District Court for the Eastern District of Virginia, Civil Action No. 1:22-cv-00903-AJT-IDD, ECF No. 77-6. April 21, 2023 Declaration of Scott Rice on the Services Provided by PacificEast Research, Inc,, ¶¶ 4-16.
[11] Ibid., ¶ 16.
[12] Verkhovskaya Expert Report, ¶ 66.
[13] See National Do Not Call Registry.
[14] Verkhovskaya Expert Report, ¶ 66.
[15] Ibid.

As a factual and practical matter, determining definitively whether, and the dates, a particular person subscribed and/or stopped subscribing to or using an input telephone number, cannot reliably be achieved using the Reverse Phone Append service PacificEast provides.[16]

9.     Access to the DNCR is for the limited purpose of "preventing telemarketing calls to the telephone numbers on the registry."[17] As the FTC explains in more detail:

> The registry may not be used for any purpose other than preventing telemarketing calls to the telephone numbers on the registry. Any entity that accesses the national registry will be required to certify, under penalty of law, that it is accessing the registry solely to comply with the TSR or to prevent calls to numbers on the registry. Use of the registry for purposes other than those set forth in the certificate could subject you to legal action.[18]

I can only assume that CEG and PacificEast access the DNCR in accordance with this instruction.

10.    In any event, one cannot reconstruct the steps that CEG used to create the information base for Opinion 1 from the description in the Verkhovskaya Report.

### B.    Numbers on the DNCR do not necessarily remain on the DNCR

11.    The DNCR does not keep numbers permanently.  In its "Frequently Asked Questions" section, the DNCR states: "The FTC will only remove your number from the Registry if it's disconnected and reassigned, or if you ask to remove it."[19] The FCC does not measure the number of phone numbers that are canceled in a year, and I am not aware that the FTC reports the number of canceled numbers that are removed from the NDNCR each year.

12.    The FCC reports the number of "aging" telephone numbers in its annual "Numbering Resource Utilization in the United States" reports. At the end of 2019, there were

---

[16] *Clarence Davis v. Capital One, N.A.*, United States District Court for the Eastern District of Virginia, Civil Action No. 1:22-cv-00903-AJT-IDD, ECF No. 77-6. April 21, 2023 Declaration of Scott Rice on the Services Provided by PacificEast Research, Inc,, ¶¶ 20-23.
[17] Question 13, Q&A for Telemarketers & Sellers About DNC Provisions in TSR | Federal Trade Commission (ftc.gov).
[18] Ibid.
[19] National Do Not Call Registry FAQs | Consumer Advice (ftc.gov)

35.8 million "aging" numbers in the United States.[20] "Aging" numbers are telephone numbers that are held out of service after an end user discontinues service.[21] The 35.8 million "aging" numbers at the end of 2019, approximately 7.7% of the 462 million total subscribers at the end of 2019,[22] are almost certainly disproportionately residential and wireless numbers which tend to have a higher churn rate than business grade lines. "Wireless and consumer grade" lines represent 89 percent of 462 million total lines.[23] With a 90-day maximum "aging period," these "wireless and consumer" grade numbers would have approximately four times as many "aging numbers" over the course of a year, or more than 120 million lines.

13.     Some care must be taken with the interpretation of these numbers. The highest rate of churn is for prepaid wireless phones, particularly disposable phones, and those phones account for more than 41 million lines in December 2019.[24] Much of the measured "aging numbers" may be for prepaid cell phones, but these numbers can be, and in many instances almost certainly are, registered with the DNCR.

14.     If one were to assume, conservatively, that 7.7% of numbers were aging each year, after four years, say from 2019-2023, approximately 27.5% would have left the system.[25] After eight years, say from 2015-2023, approximately 47.3% would have left the system.[26] If the aging rate were lower (higher), the number that would have left system would be lower (higher).

---

[20] FCC, "Numbering Resource Utilization in the United States: Status of December 31, 2019," released March 2022, Table 1. DOC-381124A1.pdf (fcc.gov)

[21] Ibid., p. 3. More precisely, "Aging numbers are disconnected numbers that are not available for assignment to another end user or customer for a specified period of time. Numbers previously assigned to residential customers may be aged for no less than 45 days and no more than 90 days. Numbers previously assigned to business customers may be aged for no less than 45 days and no more than 365 days." 47 CFR 52.15.

[22] FCC, VTS_subscriptions_hist, available in Zip file for Nationwide and State-Level Data for 2008-Present at Voice Telephone Services Report | Federal Communications Commission (fcc.gov).

[23] Ibid.

[24] FCC, VTS_subscriptions_hist, available in Zip file for Nationwide and State-Level Data for 2008-Present at https://www.fcc.gov/voice-telephone-services-report.

[25] $27.5\% = 1 - (1-0.077)^4$

[26] $47.3\% = 1 - (1-0.077)^8$

15.     I do not have available sufficient information to provide an exact calculation of the likelihood that a phone number with a specific subscriber that was on the DNCR in 2019 remains on the DNCR in late 2023 with the same subscriber, but I can point out the following factors that may lead to a number not remaining on the DNCR for four consecutive years from 2019-2023:

a.     2019 Subscriber requested that number be removed;[27]

b.     2019 Subscriber subsequently discontinued the number, and the number would have been:

c.     "aged"

d.     Returned to a carrier's inventory but unassigned;

e.     Available for assignment;

f.     Assigned to a new registrant who

    1.  May have registered with the DNCR; or
    2.  May not have registered with the DNCR.

Moreover, a number that was on the DNCR in 2019 may have been on the DNCR in 2023 but with a different registration if the 2019 subscriber canceled the subscription, and the number was later put in use by a different user in 2023 who registered with the DNCR.

16.     The Federal Trade Commission states that there are more than 221 million telephone numbers on the NDCR.[28] As shown in the second to last row of Table 1, in the past few years there have been approximately 400 million wireless subscriptions and consumer grade wireline subscriptions. Correspondingly, approximately 55 percent of such subscribers register their numbers on the DNCR.[29]  At the end of 2019, the most recent date for which the FCC has

---

[27] National Do Not Call Registry FAQs | Consumer Advice (ftc.gov)
[28] The Do Not Call Registry | Federal Trade Commission (ftc.gov), accessed September 27, 2023.
[29] 55% = 22/40.

published such data, there were more than 874 million numbers assigned in the United States.[30] In anticipation of new subscribers, carriers have more assigned numbers than subscribers.

Table 1

Number of subscriptions for various services

|  | Dec-18 | Jun-19 | Dec-19 | Jun-20 | Dec-20 | Jun-21 | Dec-21 | Jun-22 |
|---|---|---|---|---|---|---|---|---|
| Mobile telephony | 348,242 | 351,474 | 355,763 | 348,234 | 352,522 | 357,225 | 361,675 | 366,688 |
| LEC switched access |  |  |  |  |  |  |  |  |
|     consumer grade | 17,609 | 16,470 | 15,496 | 14,737 | 13,837 | 13,148 | 11,907 | 11,164 |
|     business and government | 25,906 | 24,755 | 23,245 | 22,059 | 20,585 | 19,323 | 17,592 | 16,043 |
| Interconnected VOIP |  |  |  |  |  |  |  |  |
|     consumer grade | 38,600 | 37,393 | 36,297 | 35,348 | 33,837 | 32,617 | 31,021 | 29,453 |
|     business and government | 28,217 | 29,139 | 31,734 | 32,489 | 33,541 | 34,501 | 36,695 | 38,582 |
| Total wireless and consumer grade service | 404,451 | 405,337 | 407,556 | 398,319 | 400,196 | 402,990 | 404,603 | 407,305 |
| total business and government grade service | 54,123 | 53,894 | 54,979 | 54,548 | 54,126 | 53,824 | 54,287 | 54,625 |
| Total | 458,574 | 459,231 | 462,535 | 452,867 | 454,322 | 456,814 | 458,890 | 461,930 |

Source: FCC, VTS_subscriptions_hist, available in Zip file for Nationwide and State-Level Data for 2008-Present at https://www.fcc.gov/voice-telephone-services-report

17.    It is hypothetically possible that Ms. Verkhovskaya has a method, without examining individual phone records, for determining whether two or more text messages were sent to a specific phone number that continuously remained on the DNCR.[31] However, she does not explain her method in her report. As explained above, a text to a specific phone number on DNCR does not necessarily correspond to the same number with the same registrant on DNCR a few months later.

18.    For these reasons, I do not find Opinion 2 of the Verkhovskaya Report to be reliable.

---

[30] FCC, "Numbering Resource Utilization in the United States: Status of December 31, 2019, released March 2022, Table 1, DOC-381124A1.pdf (fcc.gov). This is the most recent published information available from the FCC as of September 27, 2023. See Telephone Numbering Data | Federal Communications Commission (fcc.gov).
[31] Verkhovskaya Expert report, paragraph 62.

### III.     Opinion 5 of the Verkhovskaya Report is unreliable

19.     Above, I explain why I do not find Opinion 2 of the Verkhovskaya Report to be reliable. That opinion's unreliability may necessarily render subsequent opinions that rely on Opinion 2 equally unreliable. Suspending disbelief in the unreliability of Opinion 2—and by extension Opinions 3 and 4, I find Opinion 5 to be unreliable for independent reasons explained below.  Opinion 5 of the Verkhovskaya Report states:

> Using the data produced in discovery along with reliable commercially available databases, there is a reliable and efficient method by which it can be determined whether Defendant and/or agents acting on its behalf texted business telephone numbers, if any, for those telephone numbers to be removed from the proposed class.[32]

20.     To reach this opinion, the Verkhovskaya Report relies upon a series of assumptions that are unreliable. First, the Verkhovskaya Report states: "To conduct the historical business record analysis, I relied upon the industry[-]wide recognized services and records of PacificEast."[33] But the Verkhovskaya Report neither provides a description of, nor does it cite any documentation concerning, the "historical business record analysis" or of the "industry-wide recognized services and records of PacificEast." This statement does not inform the reader, much less provide a replicable method of "historical business record analysis."

21.     As discussed in paragraphs 8 and 9 above, PacificEast does not find its Reverse Phone Append method to be reliable for these purposes:

> As a consequence, Reverse Phone Append data provided by PacificEast demonstrates only a possibility that the names identified by the service subscribed to a provided telephone number for a given date range.
>
> As a factual and practical matter, determining definitively whether, and the dates, a particular person subscribed and/or stopped subscribing to or using an input

---

[32] Verkhovskaya Report, ¶¶ 5, 134.
[33] Ibid., ¶ 77.

telephone number, cannot reliably be achieved using the Reverse Phone Append service PacificEast provides.[34]

22.     Second, the next two sentences do not provide more detailed insight:

> PacificEast accesses various data sources to determine whether telephone numbers were subscribed as belonging to business entities. Business entities can be identified based upon various business telephone listings (yellow pages, white pages, other business directories, websites, etc.).[35]

The Verkhovskaya Report does not explain exactly which of the many possible "data sources" PacificEast actually used. Wireline carriers know who subscribed to a wireline phone, and that information can only be shared - with White Pages for residential customers and Yellow Pages for business customers – with consumer consent. But, as I explained in my initial report,[36] wireless numbers are not categorized by carriers as "business" or "residential." Information about the subscriber of a wireless number cannot generally be shared by the wireless carrier.  The information sources described in the Verkhovskaya Report, "(yellow pages, white pages, other business directories, websites, etc.)" cannot, by themselves, necessarily determine whether a wireless number is used for business or other uses.

23.     I agree with the following statement in the Verkhovskaya Report: "[I]f a telephone number is intended to be used as a contact telephone number for a business, it will be listed at some point in one or more sources and thus will more likely than not appear accordingly in the sources accessed by the data processors, like PacificEast."[37] But many business phone numbers might *not* be a "contact phone number" for outside parties.  For example, a technician such as a plumber, electrician, HVAC service technician, etc. working as an employee or even a

---

[34] *Clarence Davis v. Capital One, N.A.*, United States District Court for the Eastern District of Virginia, Civil Action No. 1:22-cv-00903-AJT-IDD, ECF No. 77-6, April 21, 2023 Declaration of Scott Rice on the Services Provided by PacificEast Research, Inc,, ¶¶ 22-23.
[35] Ibid.
[36] See, e.g., First Furchtgott-Roth Report, ¶¶ 21-24.
[37] Verkhovskaya Report, ¶ 78.

subcontractor to a larger company, likely has a wireless phone that enables a central office to contact the technician to monitor and to schedule appointments. Customers, however, are instructed to contact a central office number, not individual technicians. A phone may be primarily used for business purposes, yet be registered either to a business or to an individual. I discuss dual-use phones, and how the FCC has addressed them in enforcement actions, in my initial report.[38]

24.     The Verkhovskaya Report partially quotes a 2003 FCC Report,[39] stating that the Commission: "will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'"[40] But the Verkhovskaya Report fails to quote the very next sentence in the FCC report:

> Such a presumption, however, may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action.[41]

This second sentence lends itself to the entirely different interpretation that the presumption that a wireless number is a residential number is *not* sufficient in enforcement actions, and the status of a line should be verified in enforcement actions. As I explained in my initial report, that is exactly the verification standard that the FCC has followed in enforcement actions, at a step in the enforcement action that might be considered the equivalent of class certification.[42] Although the Verkhovskaya Report allegedly excluded phone numbers that are specifically registered to businesses,[43] I have seen nothing in the Verkhovskaya Report verifying that wireless numbers are

---

[38] First Furchtgott-Roth Report, ¶¶ 24-25.

[39] In re Rules & Regs.Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14039, ¶ 36 (F.C.C.2003).

[40] Verkhovskaya Report, ¶ 80.

[41] In re Rules & Regs.Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14039, ¶ 36 (F.C.C.2003).

[42] First Furchtgott-Roth Report at ¶¶ 28-29.

[43] Verkhovskaya Report, ¶¶ 76-77.

actually for residential use, as no such information was provided with the report or relied upon in the report.

25.     For these reasons, I do not find Opinion 5 of the Verkhovskaya Report to be reliable.

## IV.    Opinion 6 of the Verkhovskaya Report is ineffective and unreliable

26.     Above, I explain why I do not find Opinion 5 of the Verkhovskaya Report to be reliable. That opinion's reliability may necessarily render Opinion 6, which relies on Opinion 5, equally unreliable. Suspending disbelief in the unreliability of Opinion 5, I find Opinion 6 to be unreliable for independent reasons explained below. Opinion 6 of the Verkhovskaya Report states:

> **Using the consumer data produced in discovery by QuoteWizard, as supplemented as needed by commercially available databases connecting telephone numbers to the names and addresses of consumers, there is a reliable method of efficiently and effectively issuing notice to potential class members in accordance with the standards of Federal Rules of Civil Procedure Rule 23 and due process requirements.[44]**

27.     It strikes me that this opinion is primarily a legal opinion about "*reliable* method of *efficiently* and *effectively*" providing "notice to potential class members" under Federal Rules of Civil Procedure.  I am not a lawyer, and I am not offering an opinion about the legal aspects of Opinion 6.  Below, I simply comment on the lack of effectiveness and reliability of the methods proposed under Opinion 6.

28.     The Verkhovskaya Report begins the explanation of this opinion by stating it "would start with the Inbound Third Party Lead Data produced by QuoteWizard, which identifies every consumer to whom it sent telemarketing texts to by number, name, address, and email."[45] If

---

[44] See, e.g., Verkhovskaya Report, ¶¶ 6, 135, and Section XI.
[45] Ibid., ¶ 88.

such information is already available, it would seem that this information is not only the place to *start*, but also the place to *end* potential class notification.  Moreover, it is my understanding that QuoteWizard itself did not send "telemarketing texts," but instead third-party vendors—not QuoteWizard—sent texts.   The entire foundation for this part of Opinion 6 appears to be unfounded.

29.     The Verkhovskaya Report next describes steps that it would take if the "Inbound Third Party Lead Data" were inaccurate:

> If it is determined that this data is in any way deficient or inaccurate, I would perform additional data enhancement to verify and/or identify, where missing, potential class members' names and addresses, including, but not limited to, performing a standard historical reverse append process.[46]

If the "Inbound Third Party Lead Data" were inaccurate, how could one know that a text was actually received? The "additional data enhancement" is undefined. The "standard historical reverse append process" is defined by the Verkhovskaya Report as a "process by which names, addresses, and other information can be identified based only on a telephone number at a particular point in time such as during the class period,"[47]  but the Verkhovskaya Report does not explain in a replicable manner exactly how it would collect this information.[48] As explained above in the discussion of Opinions 2 and 5, phone numbers change frequently, and a single phone number may have been assigned to several different parties during the class period.  As explained in paragraphs 8 and 9 above, PacificEast does not find its Reverse Phone Append to be reliable.

30.     The Verkhovskaya Report admits that PacificEast and other data processors "access their respective databases of public and proprietary information to produce an output including the

---

[46] Ibid., ¶ 89.
[47] Ibid., ¶ 91. In ¶¶ 92-95, the Verkhovskaya Report states that it has used the "standard historical reverse append process "routinely" and "[o]ver decades" in other cases, but the Report does not describe exactly how this process is applied, much less in a manner that can be replicated by others.
[48] Ibid., ¶¶ 89-110.

names, mailing addresses, and email addresses of the subscribers and/or users of those telephone numbers within the relevant timeframe."[49] Without access to the same "proprietary information," an outside party, including the Court, could not replicate the PacificEast data collection, even if it knew PacificEast's exact methods, which the Verkhovskaya Report does not reveal.

31.     The Verkhovskaya Report further lists some of the data sources, some of which may have data privacy policies regarding access to, and dissemination of, information about individuals: "the utility companies; credit bureaus; consumer data compilers; banking and loan applications; colleges; various surveys; political arena; tax rolls; voting and census data, etc."[50] Ominously, the Verkhovskaya Report  warns: "if the person uses a telephone on a regular basis, my methodology will capture it."[51]

32.     I have several concerns about the reliability of this approach including the following:

a.     *Lack of specific methods and replicability.* The Verkhovskaya Report describes general types of methods and data bases that it would employ, but does not specify exactly which sequence of methods and exactly which data bases it would use.  If the Court or a third party sought to replicate the results of the methods proposed by the Verkhovskaya Report, it would be impossible to do so from the report's description.

b.     *Lack of consistent results.*     Even if the Verkhovskaya Report had reported a clear method, the results of matching phone numbers with users at specific points in time likely be inconsistent.  As noted above, phone numbers are recycled with

---

[49] Ibid., ¶ 101.
[50] Ibid., ¶ 102.
[51] Ibid.

great frequency, and consequently a phone number at a point in time may not be easily associated consistently with a single individual.

c. *Potential privacy violations in proposed data sets.* Use of some consumer information available on the Internet may be lawful; use of other consumer information may not. The FTC takes consumer privacy and the unlawful use of consumer information from the Internet seriously.[52] Just because information is collected on the Internet does not mean that it was lawfully obtained, much less with the consumer's consent. The FTC can impose substantial penalties for misuse of consumer confidential information.[53] For example, the FTC recently sued companies for misuse of credit report information,[54] one of the data sources cited in the Verkhovskaya Report. The FTC also has an entire section of its website dedicated to protecting consumer financial information collected by banks and financial service institutions,[55] another source cited by the Verkhovskaya Report. These are just a few examples of potential misuse of consumer information. The Verkhovskaya Report does not provide assurances that the "additional data

---

[52] "When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security." Privacy and Security Enforcement | Federal Trade Commission (ftc.gov)

[53] Lesley Fair, "Companies warned about consequences of loose use of consumers' confidential data," September 18, 2023, Companies warned about consequences of loose use of consumers' confidential data | Federal Trade Commission (ftc.gov)

[54] Seeana Gressin, "FTC lawsuit insists on FCRA compliance and transparency from background report providers," September 11, 2023, FTC lawsuit insists on FCRA compliance and transparency from background report providers | Federal Trade Commission.

[55] Financial Privacy | Federal Trade Commission (ftc.gov)

enhancement" or the "standard historical reverse append process"[56] are conducted with care regarding consumer privacy.

    d.    *The FTC seeks to reduce consumer surveillance; the Verkhovskaya Report would reward it.* The FTC has a rulemaking aimed at reducing consumer surveillance:

> The Federal Trade Commission today announced it is exploring rules to crack down on harmful commercial surveillance and lax data security. Commercial surveillance is the business of collecting, analyzing, and profiting from information about people. Mass surveillance has heightened the risks and stakes of data breaches, deception, manipulation, and other abuses.
>
> …
>
> The business of commercial surveillance can incentivize companies to collect vast troves of consumer information, only a small fraction of which consumers proactively share. Companies reportedly surveil consumers while they are connected to the internet – every aspect of their online activity, their family and friend networks, browsing and purchase histories, location and physical movements, and a wide range of other personal details.
>
> Companies use algorithms and automated systems to analyze the information they collect. And they make money by selling information through the massive, opaque market for consumer data, using it to place behavioral ads, or leveraging it to sell more products.[57]

The Verkhovskaya Report appears to be employing the exact consumer surveillance techniques that the FTC seeks to reduce or eliminate. CEG and PacificEast would presumably be compensated for surveilling individuals as part of a notice process for the claimed class. More troubling is the lack of consumer

---

[56] Verkhovskaya Report, ¶ 89.

[57] Federal Trade Commission, "FTC Explores Rules Cracking Down on Commercial Surveillance and Lax Data Security Practices," Press release, August 11, 2022, at FTC Explores Rules Cracking Down on Commercial Surveillance and Lax Data Security Practices | Federal Trade Commission. More recently, the FTC's head of the Consumer Protection Bureau has spoken publicly against consumer data brokers. Cristiano Lima and David DiMolfetta, "FTC consumer protection chief puts data brokers on notice," Washington Post, September 21, 2023, at FTC consumer protection chief puts data brokers on notice - The Washington Post.

privacy and consent in the PacificEast data collection methods. Consumers have little awareness of, and rarely have consented to the dissemination of the information about themselves available at "databases of public and proprietary information" that would be compiled by PacificEast.

e.    *Paradox of potentially abusing consumer information to notify class in case alleging abuse of consumer information.*   QuoteWizard is alleged to have used telephone number information to contact certain consumers without their consent. I find it paradoxical that the Verkhovskaya Report would propose a notice process based on information collected without safeguards for consumer consent to contact the same consumers that QuoteWizard allegedly unlawfully contacted.

33.    Part of the reason that the Verkhovskaya Report seeks to do a data append appears to be to collect email addresses.  The Verkhovskaya Report then proposes to contact potential class members by email.[58] The Verkhovskaya Report concedes that there are "challenges" with email notifications[59] but does not mention one of the biggest challenges: some federal agencies do not make initial contact with consumers via email. The FCC in its Section 227 enforcement actions places a phone call to a consumer. The FTC has a web page explaining that the IRS will never initiate contact a person via email, phone call, or text, and that such initial contacts from an entity claiming to be the IRS are almost certainly fraudulent.[60]  This is a dubious method to contact consumers initially in an official government proceeding.

---

[58] Verkhovskaya Report, ¶¶ 110-113.
[59] Ibid., ¶ 112.
[60] "Know that the IRS won't call, email or text to contact you for the first time. They'll always start by sending you a letter." Gema de las Heras, "No, that's not the IRS texting about a tax refund or rebate. It's a scam," November 23, 2022. No, that's not the IRS texting about a tax refund or rebate. It's a scam. | Consumer Advice (ftc.gov)

34.     Even worse, the Verkhovskaya Report proposes texting potential class members.[61] The Verkhovskaya Report gives examples of non-profit organizations that use text messages,[62] but these non-profits are specifically exempt organizations under FCC rules. A court could lawfully use text messages, but it is unclear whether that authority extends to private companies such as CEG or PacificEast acting on a court's behalf. Texting a phone number on the DNCR without consent would be the same violation that QuoteWizard is alleged to have done.

35.     For all of the above reasons, I do not find Opinion 6 of the Verkhovskaya Report to be either effective or reliable.

## V.    The Verkhovskaya Report omits the substantial expertise and incentives that outside vendors to QuoteWizard had to avoid sending text messages that violate Section 227

36.     The Verkhovskaya Report frequently mentions outside vendors—Drips, Bandwidth Inc., Twilio, and Ytel—as either the source or the recipient phone numbers to text on behalf of QuoteWizard. Drips, Bandwidth Inc., and Twilio are specifically mentioned in the Verkhovskaya Report in Opinions 2, 3, and 4.[63]

37.     These QuoteWizard vendors are frequent commenters in FCC proceedings, in part because the FCC regulates their services. Far more than their customers which do not routinely focus on FCC rules, these vendors follow, understand, and participate in FCC rulemakings because they are important to the success of the vendor businesses.

38.     These vendors also have represented to the FCC and to the public that they not only support and understand the FCC's efforts to block messages that are unlawful under TPCA but that they, the vendors, have the capabilities and the discretion to block such messages.  The

---

[61] Verkhovskaya Report, ¶¶ 117-120.
[62] Verkhovskaya Report, ¶ 118.
[63] See, e.g., Verkhovskaya Report, ¶¶ 2-4 on p. 4.

18

knowledge and capability to block unlawful texts are sometimes reflected in the marketing materials for these vendors. The Verkhovskaya Report, in contrast, does not address either the motivations or the capabilities of the vendors. Instead, the vendors are described as receiving or sending telephone numbers or text messages, as if they were passive actors, incapable of taking either actions or responsibilities for potentially unlawful texts. Below, I review how the Verkhovskaya Report characterizes each of these vendors and how these vendors have represented themselves to the FCC and to the public.

### A.    Drips

39.    The Verkhovskaya Report mentions Drips many times. The report repeatedly states that "telephone numbers were sent to Drips by QuoteWizard with authority to text."[64] In addition, the Verkhovskaya Report states "Drips' authority to text to such telephone numbers was confirmed by the Drips API Data."[65] In addition, the Verkhovskaya Report repeatedly discusses Drips' "authority to text" coming from QuoteWizard.[66] There is no mention in the Verkhovskaya Report that Drips was not only aware of TCPA but actively involved in monitoring TCPA and how best to comply with TCPA. A reader of the Verkhovskaya Report might infer incorrectly that Drips was a passive entity, fulfilling any and all requests to send text messages whether lawful or not.

40.    However, that is not how Drips represents itself to the FCC. In May 2023, Drips sent a letter to the FCC describing itself as follows:

---

[64] See, e.g., Verkhovskaya Report paragraphs 4a on page 3 (there appears to be repetition of paragraph numbers later in the text), paragraphs 1, 40d, 56, 130. See also Opinion 1 on page 20.
[65] Ibid., paragraph 58.
[66] Ibid., paragraphs 71, 72, and 73.

Drips is a conversational outreach platform that helps compliant businesses set appointments with consumers who have existing business relationships or provided express written consent to be contacted for specific purposes.[67]

41.    Drips has a "Product Sheet" available at its web site labeled "SMS Compliance by Drips."[68] The document states:

At Drips, we're at the forefront of best practices when it comes to compliance. We work with some of the biggest brands in the most heavily regulated and governed industries.[69]

and

Our team of highly skilled professionals is constantly reviewing and evaluating feedback for the optimal consumer experience. We have the tools to help you take a more proactive and thoughtful approach in ensuring compliance with telemarketing laws, proper dispositioning, and less consumer complaints or demands.[70]

The document further states:

At Drips, we're at the forefront of best practices when it comes to compliance. Our system takes a proactive approach to handling users who are disqualified and will not follow up with users who have expressly opted out, either via SMS or after they've answered a call.[71]

The document also states:

Our commitment to compliance allows companies to take a more proactive approach to ensure proper dispositioning and fewer consumer complaints or demands.[72]

Further,

Drips is proud to maintain a best-in-class database to support specific state-level and federal-level TCPA and similar communication guidelines. That means that we strive to comply with all changes and nuances associated with TCPA regulations.

---

[67] Comment of Drips, FCC Targeting and Eliminating Unlawful Text Messages, CG Dckt No. 21- 402; Implementing the Telephone Consumer Protection Act of 1991, CG Dckt No. 02-278, May 8, 2023, at FCC-Letter obo Drips.pdf.
[68] "SMS Compliance by Drips," available at SMS Compliance (drips.com), accessed October 6. 2023.
[69] Ibid.
[70] Ibid.
[71] Ibid.
[72] Ibid.

Our team works tirelessly to uphold TCPA and other telephonic communication guidelines and respect the compliance policies of our customers, as well as the privacy of our customers and their customers. We continue to evolve our best practices and methodologies to maintain our high standards of excellence and maintain our commitment to compliance.[73]

42.    Drips has a blog that states the following:

Drips is proud to maintain a best-in-class database to support specific state-level and federal-level TCPA and similar communication guidelines. That means that we strive to comply with all changes and nuances associated with TCPA regulations. Our team works tirelessly to uphold TCPA and other telephonic communication guidelines and respect the privacy of our customers and their customers. We continue to evolve our best practices and methodologies to maintain our high standards of excellence and maintain our commitment to compliance in conversational texting®. If you have questions about TCPA laws or our innovative technology, we encourage you to schedule a consultation with us.[74]

43.    These documents indicate that Drips is a reputable firm focused on complying with TCPA, and that Drips would know far more about TCPA compliance than clients such as QuoteWizard. The documents do not indicate that Drips would passively accept any requests for text messages.

44.    In earlier times during the class period proposed by Plaintiff, Drips represented to the public that it is compliant with relevant "Do Not Call" laws. Below are just a few examples.

a.    Why use multiple non-compliant systems independently when you can use one compliant system seamlessly designed for your specific needs?

At Drips, we tie together all available technologies into one unified effort with a simple goal: Get more calls and fewer complaints. Our talk times are through the roof and complaints stay at an industry low. Choose from one of our proven templates in your vertical, or design and split test your own drip campaign from scratch. Sign up below to explore one simple "set it and forget it" system while watching your DNC issues disappear and your conversions grow. [75]

---

[73] Ibid.
[74] Blog of Drips, Inc., available at The Top Four Facts About TCPA Compliance You Should Know | Drips, accessed October 6, 2023.
[75] Drips.com, November 15, 2015,  Home - Drips.com (archive.org)

    b.    Get more calls and less complaints with our compliant, tasteful, and effective drip marketing campaigns.[76]

    c.    Our platform is proven to improve lead-to-call conversion and reduce overall lead gen costs. Hundreds of customers rely on us and we are passionate about serving them with white glove service and the highest levels of security and compliance.[77]

    d.    Industry leading clients rely on us and we are passionate about serving them with white glove service and the highest levels of security and compliance.[78]

    e.    At Drips, our commitment to compliance allows companies to take a more proactive approach to ensuring proper dispositioning and fewer consumer complaints or demands.[79]

    f.    While new regulations may seem confusing, bothersome, or even annoying, this update may positively impact your campaigns. Carriers have visibility into the "who" and "what" of each messaging campaign which allows them, in turn, to provide a better quality of service for 10DLC messaging. That means brands can have confidence knowing that they are using an officially sanctioned messaging channel and may benefit from better service for their messaging campaigns.[80]

**B.    Bandwidth Inc. and Twilio**

45.    The Verkhovskaya Report mentions Bandwidth, presumably Bandwidth, Inc., and Twilio many times. Ms. Verkhovskaya states that it is her understanding that these are "the entities used by Drips to physically transmit telemarketing texts to consumers on behalf of QuoteWizard."[81] Also, "It is my understanding that the telemarketing texts sent by Drips on behalf of QuoteWizard were physically transmitted to consumers by telecommunications companies including Ytel, Bandwidth and Twilio."[82] A reader of the Verkhovskaya Report might infer incorrectly that Bandwidth and Twilio were passive entities, fulfilling any and all requests to send text messages whether lawful or not. There is no mention in the Verkhovskaya Report that

---

[76] Drips.com, January 12, 2016, Home - Drips.com (archive.org)
[77] Drips.com, November 16, 2018, Drips - Lead Follow-Up Performance Marketing Tool (archive.org)
[78] Drips.com, November 29, 2019, Drips - Lead Follow-Up Performance Marketing Tool (archive.org)
[79] "Disqualified by Drips," Drips.com/news, November 4, 2020, News | Drips (archive.org).
[80] Drips.com/blog/ September 24, 2021, What is 10 DLC and The Campaign Registry? | Drips (archive.org)
[81] Verkhovskaya Report, paragraph 40e.
[82] Ibid., paragraph 57.

Bandwidth and Twilio were not only aware of TCPA but represented to the FCC and to the public that they had substantial capabilities to detect and to block unlawful texts and that they were actively involved in monitoring TCPA and how best to comply with TCPA and taking steps to comply with TCPA. Far from being passive agents, Bandwidth and Twilio appear to have had the capabilities—and the incentives—to detect and to block unlawful text messages.

### 1. Bandwidth Inc.

46.     Both Bandwidth Inc. and Twilio signed a letter to the FCC to "support the USTelecom led Industry Traceback Group (ITG) continuing to serve as the registered Industry Traceback Consortium."[83] The letter further states:

> We respectfully look forward to continuing the fight against illegal robocalls by pursuing even more powerful and efficient traceback efforts in the years to come.[84]

47.     In November 2018, Bandwidth wrote to FCC Chairman Ajit Pai and explained its capabilities to prevent, detect, and mitigate illegal robocalling on its network.[85] It is worth quoting extensively from this letter:

> Bandwidth has adopted a three-pronged operational approach (prevent, detect, and mitigate) to stopping illegal robocalls. In keeping with the industry efforts and best practices, together with the Commission's guidance[,] Bandwidth's three-pronged operational procedures are summarized as follows:
>
> - Prevention: Bandwidth has a stringent on-boarding screening process designed to prevent potential robocalling companies from becoming Bandwidth customers at the outset. It also sends regular customer communications to remind, educate and clarify what constitute unlawful robocalls and encourage them to take all necessary steps to prevent these types of calls from originating from their networks.

---

[83] Letter, Re Enforcement Bureau Requests Comments on Selection of Registered Traceback Consortium, EB Docket No. 20-22, July 13, 2023, Registered Consortium Letter 7-12-23.pdf (fcc.gov).

[84] Ibid.

[85] Bandwidth Inc., Letter Re: Call Authentication Trust Anchor, WC Docket No. 17-97; Advanced Methods to Target and Eliminate Unlawful Robocalls, CG Docket No. 17-59, November 19, 2018, David Morken Response Letter to Chairman Pai re SHAKEN STIR Implementation(Final 11.19.18)-signed.pdf (fcc.gov).

.

- Detection: Bandwidth has implemented processes and procedures to detect and analyze campaigns on our network to determine if they are lawful or not. When unlawful robocall campaigns are detected, Bandwidth works to stop the unlawful activity as quickly as possible. Bandwidth is also consistently augmenting it's robocall detection technologies to improve our ability to rapidly detect and react to suspected robocall behaviors.

- Mitigation: Bandwidth currently manages call blocking tools that prevent calls with specific unlawful telephone number characteristics from traversing the Bandwidth network and has development projects to expand its capabilities more holistically too. Bandwidth personnel regularly analyze network traffic for unlawful robocall campaigns and utilize our call blocking capabilities when appropriate. Bandwidth initiates trouble tickets with customers that we've identified to be in the path of unlawful robocalls. Then we work diligently together with our customers to stop the unlawful robocall campaigns detected.[86]

48.     In April 2021, Bandwidth again wrote to the FCC and explained in some detail updated information about Bandwidth's efforts to adopt systems, processes and procedures to help protect its customers and the broader communications industry ecosystem from the harms of illegal robocalling.[87]  The April 2021 letter then listed the same three bullet points mentioned in the February 2020 letter but with the following introduction:

Together with these projects, Bandwidth also actively supports research efforts that are specifically designed to help develop robocalling data and solutions for call authentication and analytics to stop the transmission of illegal robocalling on its network and for the industry collectively. Further, Bandwidth continues to have fraud mitigation success with its three-pronged operational approach (prevent, detect, and mitigate) that incorporate industry best practices. Bandwidth's three-pronged operational procedures are summarized as follows:[88]

---

[86] Ibid. See also Bandwidth Inc. Letter from David Morken to Comm. G. Starks, July 19, 2019, at Morken Response to Commissioner Starks Request (071019).pdf (fcc.gov); Bandwidth Inc,. Letter Re: Advanced Methods to Target and Eliminate Unlawful Robocalls, CG Docket No. 17-59; Call Authentication Trust Anchor, WC Docket No. 17-97, February 28, 2020, Bandwidth Response to Consumer and Government Affairs Bureau (2.28.20).pdf (fcc.gov)

[87] Bandwidth Inc., Letter to FCC, re Re: Advanced Methods to Target and Eliminate Unlawful Robocalls, CG Docket No. 17-59; Call Authentication Trust Anchor, WC Docket No. 17-97, April 30, 2021, at Bandwidth Response to CGB Robocalling Status Request.pdf (fcc.gov).

[88] Ibid.

Bandwidth has represented to the FCC that it has the capabilities to prevent, detect, and mitigate "illegal robocalling on its network and for the industry collectively."[89]

### 2. Twilio

49.    Twilio has commented extensively and favorably on FCC efforts to have lawful communications with consumers and to reduce robocalls.[90] As it explained in 2020, Twilio has both motivations and capabilities to block unlawful calls and texts:

> As a company whose business depends on the public's confidence in the public telephone network, Twilio has a concrete interest in stopping unlawful robocalls. To that end, Twilio continues to work to support the Commission's anti-robocall efforts as well as industry-led efforts.[91]

---

[89] Ibid.

[90] See, e.g., Twilio Ex Parte, May 17, 2018, Twilio Ex Parte 05.16.2018.pdf (fcc.gov); Twilio Ex parte, re Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service, WT Docket No. 08-7, December 3, 2018, 2018-12-07 Twilio Ex Parte.pdf (fcc.gov); Twilio, re Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service, WT Docket No. 08-7, April 3, 2019, Twilio Comments - Final.pdf (fcc.gov); Nomorobo Twilio Joint Letter 042219 Final.pdf (fcc.gov); Nomorobo NYT Ad 041519.pdf (fcc.gov); Twilio ex parte - 5.30.2019.pdf (fcc.gov); Robocall Blocking Further Notice EP 06.12.19.pdf (fcc.gov); Twilio Call Blocking NPRM Comments vF072419.pdf (fcc.gov); Twilio Call Blocking Reply Comments vF022820.pdf (fcc.gov); 2020-05-15 Twilio STIR-SHAKEN Comments.pdf (fcc.gov); Twilio STIR-SHAKEN Reply Comments.pdf (fcc.gov); Comments of Twilio Inc., Advanced Methods to Target and Eliminate Unlawful Robocalls Alarm Industry Communications Committee Petition for Clarification or Reconsideration American Dental Association Petition for Clarification or Reconsideration, August 31, 2020, available at 8-31-2020 Twilio Fourth FNPRM Comments.pdf (fcc.gov); Comments of Twilio, in Implementing Section 10(a) of the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act (TRACED Act), February 3, 2021 at 2.3.2021 Twilio Inc. TRACED Act Robocall Portal NPRM Comments.pdf (fcc.gov); Twilio Comments on Gateway Provider FNPRM vF121021.pdf (fcc.gov); Registered Consortium Letter 7-20-22.pdf (fcc.gov); Registered Consortium Letter 7-22-2022.pdf (fcc.gov); Reply Comments of Twilio Inc., in re Targeting and Eliminating Unlawful Text Messages; and Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, June 6, 2023, at Twilio - Robotexting NPRM Reply Comments .pdf (fcc.gov); Reply Comments of Twilio Inc., in re Targeting and Eliminating Unlawful Text Messages; and Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, June 6, 2023, at Twilio Robotext Reply Comments.pdf (fcc.gov); and Reply Comments of Twilio, Inc., In re Advanced Methods to Target and Eliminate Unlawful Robocalls, September 8, 2023, at Twilio 8th FNPRM Robocall Reply Comments (9.8.23).pdf (fcc.gov).

[91] Comments of Twilio Inc., Advanced Methods to Target and Eliminate Unlawful Robocalls Alarm Industry Communications Committee Petition for Clarification or Reconsideration American Dental Association Petition for Clarification or Reconsideration, August 31, 2020, available at 8-31-2020 Twilio Fourth FNPRM Comments.pdf.

50.    Twilio further advises the FCC that it "continues to refine operational, technical, and contractual safeguards to prevent use of Twilio's platform to place illegal robocalls."[92] Reflecting those efforts, Twilio recently stated to the FCC:

> Twilio remains fully committed to the goals of protecting consumers from illegal text messaging and ensuring trust in the American text messaging ecosystem, both of which are vital to ensuring that ecosystem's ongoing success and long-term health. Twilio employs innovative solutions to combat fraudulent activities and partners with U.S. providers to combat the scourge of illegal text messages. Maintaining consumer trust in text messaging enhances the value and use of messaging by small and medium-sized businesses, larger enterprises, non-profit organizations, and governmental entities, all of whom constitute Twilio's customers.[93]

51.    For these reasons, I find that the Verkhovskaya Report omits the substantial expertise and incentives that outside vendors to QuoteWizard had to avoid sending any text messages that violate Section 227. Such substantial expertise and incentives would also render Opinions 2, 3, and 4 of the Verkhovskaya Report unreliable.

Respectfully submitted,

Harold Furchtgott-Roth
November 20, 2023

---

[92] Reply Comments of Twilio, Inc., In re Advanced Methods to Target and Eliminate Unlawful Robocalls, September 8, 2023, at Twilio 8th FNPRM Robocall Reply Comments (9.8.23).pdf (fcc.gov). See similar comments in Comments of Twilio, in Implementing Section 10(a) of the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act (TRACED Act), February 3, 2021 at 2.3.2021 Twilio Inc. TRACED Act Robocall Portal NPRM Comments.pdf (fcc.gov).

[93] Reply Comments of Twilio Inc., in re Targeting and Eliminating Unlawful Text Messages; and Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, June 6, 2023, at Twilio Robotext Reply Comments.pdf (fcc.gov).

## **CERTIFICATE OF SERVICE**

I, the undersigned, of the law offices of Nelson Mullins Riley and Scarborough LLP, attorneys for Defendant QuoteWizard.com, LLC, do hereby certify that I have served all counsel of record with copies of the foregoing document by electronic mail on November 24, 2023.


*/s/ Daniel M. Curran*
Daniel M. Curran