# EXHIBIT 7

Page 1

1                               Vol. I

                                Pgs. 1-171

2                               Exs. 1-3

3          UNITED STATES DISTRICT COURT

4        FOR THE DISTRICT OF MASSACHUSETTS

5

6     -------------------------------------

7     JOSEPH MANTHA, on behalf of himself

8     And all others similarly situated,

9                  Plaintiff,

10                                Civil Action No.

11                                1:19-cv-12235-LTS

12    V.

13    QUOTEWIZARD.COM, LLC,

14                  Defendant.

15    -------------------------------------

16

17                 REMOTE DEPOSITION OF

18                 ANYA VERKHOVSKAYA

19                    Via Zoom

20             Friday, December 15, 2023

21             9:33 a.m. - 4:38 p.m.

22

                       Lori J. Atkinson

23                     Court Reporter

24

Page 6

1  A. Christina Peters.
2  Q. Anyone else?
3  A. No.
4  Q. What is Christina Peters's role on your staff?
5  A. She is the vice president of class expert scope.
6  Q. She was involved in the work that you performed
7  in this case?
8  A. Yes.
9  Q. Were there other members of your team who were
10  involved in the work that you performed in this case
11  beyond Christina Peters?
12  A. Yes.
13  Q. Could you please tell me who those people are?
14  A. Andrey Niaitin.
15  Q. Is Andrey, A-N-D-R-E-I?
16  A. E-Y.
17  Q. I will let you spell the last name?
18  A. N-I-A-I-T-I-N.
19     And Irina, I-R-I-N-A, Verkhovskaia, spelled with
20  an "I" versus a "Y" at the end.
21  Q. V-E-R-K-H-O-V-S-K-A-I-A?
22  A. That's correct.
23  Q. Are there other members of your team who did work
24  on this case beyond the ones that we've discussed?

Page 7

1  A. No.
2  Q. Can you tell me what Andrey Niaitin's role was in
3  this case?
4  A. He is a data analyst and quality assurance
5  person.
6  Q. What kind of quality -- let's be more narrow.
7     What kind of quality assurance services did he
8  provide with respect to your assignment on this case?
9  A. He independently repeated some of the data
10  analysis and checked the code of the data analysis that
11  was conducted to make sure the code met my specifications.
12  Q. We will get into some more detail later. Right
13  now I want to understand what different people did.
14     So Christina Peters you mentioned was a VP of
15  class of notice or administration?
16  A. Class experts group.
17  Q. Experts group.
18     What was her role in the work done on this case?
19  A. She assisted in overseeing the data analysis as
20  well as proofreading the report.
21  Q. Who actually drafted the report?
22  A. I did.
23  Q. All of it?
24  A. Other than some template language that I used

Page 8

1  like my background and qualifications, I drafted the
2  rest.
3  Q. Christina Peters was involved in assisting and
4  overseeing the data analysis and then reviewing or --
5  was it reviewing your report, is that what you said?
6  A. Reviewing and proofreading.
7  Q. Proofreading. That's what you said. Thank you.
8  Did she have any other role in this case?
9  A. She also performed some of the quality assurance
10  work.
11  Q. How, if at all, did the quality assurance work
12  that she did differ from the quality assurance work that
13  Andrey Niaitin did?
14  A. Her work mainly consisted making sure that the
15  data results were interpreted correctly by the data team
16  and appeared properly in the reports.
17  Q. All right. Now you mentioned the data team. Who
18  is the data team?
19  A. Irina Verkhovskaia and Andrey Niaitin for this
20  case.
21  Q. Now let's talk about Irina Verkhovskaia. I
22  understand the spelling is different. Is she a relative
23  of yours?
24  A. She is.

Page 9

1  Q. What is her relationship to you?
2  A. She is my sister.
3  Q. What role did she play in the work that she
4  performed in this case?
5  A. She was our main data analyst.
6  Q. You mentioned several times data analysis or data
7  analyst, can you explain to me what specifically you
8  mean when you use those terms?
9  A. Yes. Data analysts write sequel code to meet the
10  criteria that I set forth to produce results that I request.
11  Q. They are trying to write computer code that will
12  meet criteria set by you to achieve results that you are
13  looking for?
14  A. Correct.
15  Q. Do you write any of the code yourself?
16  A. I do not.
17  Q. Is there anyone else who performed work in
18  conjunction with the opinions that you provided in this
19  case apart from the individuals on your team that we
20  have mentioned so far?
21  A. No.
22  Q. I would like to move on a bit to your
23  qualifications. If you could just walk me through what,
24  if any, formal training that you have that bears on the

Page 10

1 opinions that you offer in this case?
2       MR. PARONICH: I object to form.
3       You can answer.
4 BY MR. SITTER:
5   Q. You can answer the question.
6     Would you like me to repeat it?
7   A. No.
8     I do not have any formal training in data
9 analysis. I have 20 years of experience doing the work.
10  Q. You linked that specifically to data analysis. I
11 want to bring it a little broader. Is there any formal
12 training that you have had that bears on the opinions
13 that you've offered in this case at all?
14      MR. PARONICH: Same form objection.
15      You can answer.
16  A. Not formal training.
17  Q. Thank you.
18    Let's talk really quickly about your educational
19 experience. Did you go to college?
20  A. Yes, I did.
21  Q. Where did you go to college?
22  A. I went to Molloy College on Long Island and then
23 Brown University.
24  Q. Have you obtain a degree from Molloy College?

Page 11

1   A. Yes.
2   Q. What degree did you obtain?
3   A. Bachelor's of science degree, nursing.
4   Q. Then you mentioned that you went to Brown
5 University, was that immediately after going to
6 undergraduate?
7   A. No.
8   Q. So how much time was there between when you
9 finished your undergrad degree and when you went to
10 Brown?
11  A. Many years. I graduated from Brown last year
12 with an MBA.
13  Q. Was it a general MBA or was there any field of
14 specialization within the MBA?
15  A. Humanities.
16  Q. Can you explain to me a little about what that
17 degree work is? I'm not familiar with an MBA in
18 humanities.
19  A. It focuses on socioeconomics and business; how
20 business affects societies.
21  Q. The work that you did in this case, and I
22 understand you have done similar work in many cases in
23 the past. How, if at all, would you define the field of
24 people who do work like the work that you do?

Page 12

1       MR. PARONICH: Object to form.
2       You can answer.
3   A. There are several fields of expertise; data
4 analysis for complex litigation, in this particular case
5 a class action; as well as expertise in notice claims
6 and litigation support services.
7   Q. Okay. I want you to correct me if you don't
8 agree with this statement, I will put that out there
9 right now, I am trying to get an accurate sense of what
10 your testimony is.
11    Are you saying that your field to the extent that
12 there is one, involves data analysis, expertise,and
13 class notice expertise?
14      MR. PARONICH: Objection to form.
15      You can answer.
16 BY MR. SITTER:
17  Q. Let me try to reframe that, because it seems to
18 be confounding. And I'm not sure it was a good question.
19 Unfortunately, that is not the first or last time that
20 has happened.
21    I'm trying to get a sense of, do you consider
22 yourself part of any particular professional field?
23  A. There are two fields of expertise. One field is
24 data analysis for complex litigation. And another field

Page 13

1 is notice claims and a class action litigation support
2 services.
3   Q. Are there any professional organizations that you
4 are a member of that are associated with either of those
5 fields?
6   A. No.
7   Q. Have you published any work in either of those
8 fields?
9   A. No.
10  Q. Are there any professional guides or standards in
11 either of those fields that you use or -- let me be more
12 specific -- that you use in this case to reach the
13 opinions that you offer?
14      MR. PARONICH: Objection.
15      You can answer.
16  A. In my report, I cite some of the best practices
17 for notice reaching frequency. Other than that, no.
18  Q. Okay. So the only professional guide or standard
19 that informed the opinions in your case are the
20 resources that you cited in your report regarding best
21 standards and class notice; is that correct?
22  A. Correct.
23  Q. Can you explain to me your understanding of the
24 scope for which you were retained in this case?

4 (Pages 10 - 13)

Page 18

1  QuoteWizard from third-party lead generators.
2      Q.  Right.  My question is, I understand that was the
3  step, how did you accomplish that step?  What was your
4  methodology?
5      A.  It was my understanding that the data that was
6  provided to me was the leads data was separated in two
7  main categories.  One category was the leads that we
8  reference as onsite, those leads were created by
9  accessing the QuoteWizard's website.  And my instructions
10 were to exclude those leads and to limit the leads only
11 to non-onsite leads or inbound leads.
12     Q.  Okay.  Understood.  At this -- did I interrupt
13 you?
14     A.  I just want to say that we went through this data
15 analysis and all of the onsite telephone numbers were
16 removed from further analysis.
17     Q.  Understood.  So at this step the data was grouped
18 into onsite leads and I think you called them inbound
19 third-party lead data?  And at this step -- let me start
20 there.  Is that correct?
21     A.  Inbound or non-onsite.
22     Q.  Okay.  So we have two big categories.  What would
23 you like to call the first category?  Inbound?  Onsite?
24     A.  Onsite.

Page 19

1      Q.  We will call the first category onsite and the
2  second category we will call what?
3      A.  Non-onsite.
4      Q.  Non-onsite.  That's easy.  I'm writing it down.
5      So if I understand your testimony, I believe you
6  said that you were instructed to exclude the onsite
7  leads from your analysis.  Is that accurate?
8      A.  That's correct.
9      Q.  Who instructed you to exclude the onsite leads
10 from your analysis?
11     A.  Class counsel.
12     Q.  Were you given any reasons why you should exclude
13 those leads from your analysis?
14     A.  As stated in my report, it is my understanding
15 that those leads were created on QuoteWizard's website.
16 And there is a claim that those leads had originated, as
17 I stated in my report, originated from sources owned by
18 QuoteWizard itself.  So it originated from QuoteWizard.
19     Q.  Right.  And I understand the distinction that you
20 made between the onsite leads and the non-onsite leads.
21 I understand that you were instructed to exclude the
22 onsite leads.  I understand that you are saying that
23 those originated from QuoteWizard's website.
24     My question is:  Were you given a reason why

Page 20

1  those leads should be excluded from your analysis?
2      Was it simply because they were from the
3  QuoteWizard website?
4      A.  That's my understanding.
5      Q.  Was there any other explanation?
6      A.  I believe all other reasons are legal reasons.
7      Q.  Does that mean you are not familiar with what
8  they are?
9      A.  Correct.
10     Q.  Does your analysis assume that the accuracy of
11 the inbound data -- sorry -- non-onsite data is less
12 reliable, because it comes from third-party vendors?
13     A.  No.
14     Q.  Does it -- does your analysis assume that the
15 non-onsite data is less reliable than the onsite data?
16     A.  No.
17     Q.  Are you saying that your analysis does not make
18 any assumptions regarding the accuracy of the onsite
19 data compared to the non-onsite data?
20     A.  That's correct.
21     Q.  Beyond the fact that the onsite data was onsite
22 data, it came from the QuoteWizard website, you are not
23 aware of any other reason, apart from the fact that you
24 were instructed to do so, why you excluded that data

Page 21

1  from your analysis?
2      A.  That's correct.
3      Q.  Did you perform any testing to confirm whether
4  the onsite data was more reliable than the non-onsite
5  data?
6      A.  No.  I had no reasons to doubt the reliability of
7  any of the datasets provided to me.
8      Q.  Do you know if QuoteWizard did any testing on the
9  accuracy of its third-party lead data from vendors?
10     A.  I do not.
11     Q.  All right.  Let's talk about your methodology,
12 the second substep of this one.  You have a methodology
13 for trying to limit the class to people who the texts
14 were authorized?
15     A.  That's correct.
16     Q.  Okay.  And it sounds like what you are doing at
17 this step is really comparing the results from step one
18 with the Drips API data and then removing any numbers
19 that do not appear on both?
20     A.  That's correct.
21     Q.  Were there any other steps that you performed at
22 this stage of your analysis regarding identifying those
23 numbers that were sent to Drips by QuoteWizard with
24 authority to text?

6 (Pages 18 - 21)

Page 26

1  A. Not at this step.
2  Q. And apart from the fact that a particular number
3  appears in both sets of data, did you look at any other
4  evidence or factors before concluding that the text was
5  received by a particular consumer at that telephone
6  number?
7  A. We also looked at the message direction and
8  delivery status.
9  Q. Which is in the data I just referenced; correct?
10  A. Correct.
11  Q. Apart from looking at the data -- the numbers in
12  both sets of that data and the fields, as you indicate,
13  did you look at any other evidence or factors before
14  concluding that a particular text was received at a
15  particular number?
16  A. No.
17  Q. Have you considered any scenarios in which a
18  telephone number might appear in both sets of records,
19  but the consumer may not have actually received the
20  text?
21  A. Yes. That's why the methodology includes some of
22  the verification steps later on.
23  Q. You are talking about the fact that there is an
24  indication somebody responded to the text?

Page 27

1  A. That's correct.
2  Q. But at this step of the analysis, there wasn't
3  any method for trying to identify that; is that correct?
4  A. That's correct.
5  Q. In performing your analysis, did you see any
6  instances in which there was a discrepancy between the
7  Twilio and Bandwidth records for a particular telephone
8  number?
9  A. Not the telephone numbers that we worked with.
10  Q. It's your testimony that the telephone numbers
11  that appear on your class lists, as far as you are aware
12  there is no discrepancy between the Twilio data for that
13  number and the Bandwidth data for that number?
14  A. Not to my knowledge.
15  Q. Did you perform any quality control measures to
16  ensure that the Bandwidth and Twilio records --
17  actually, scratch that.
18  Did you perform any -- well, let's talk about
19  what if any quality control measures were applied at
20  this particular step of your methodology. If there are
21  any, could you please share them with me?
22  A. Yes. At this particular step we independently
23  checked the results of the analysis. We reviewed the
24  code by several individuals. We had discussions by

Page 28

1  phone between myself and the data team. And we made
2  sure that the results that appeared in sequel database
3  were the same that were included in the report.
4  Q. Okay. Did you perform quality control measures
5  to ensure that non-working telephone numbers were
6  removed from the list at this stage of your analysis?
7  A. Not at this stage.
8  Q. Are you saying that was done at some other stage?
9  A. Well, if individuals responded back then the
10  telephone numbers must be working.
11  Q. They must have been working at some point in
12  time; right?
13  A. Correct.
14  Q. Do you know when they were working and when they
15  were not working?
16  A. Well, they were working when they received the
17  text and when they responded to the texts.
18  Q. My question is did your team perform any analysis
19  to tell when a number was working and when it was not
20  working?
21  A. No.
22  Q. Next step in your methodology is to limit this
23  universe to folks who in response to their receipt of
24  QuoteWizard text messages made a specific request that

Page 29

1  the text cease; is that correct?
2  A. That's correct.
3  Q. I want to be clear, you can tell me if I'm wrong,
4  you are not offering an opinion that if a number appears
5  in the Do Not Call files that establishes that QuoteWizard
6  lacked valid consent under the TCPA to place the texts
7  at issue, are you?
8  A. I'm not offering that opinion.
9  Q. You not offering an opinion one way or the other
10  as to whether a particular consumer consented to
11  receiving a particular text, are you?
12  A. I'm not.
13  Q. Can you explain to me what your use of the Do Not
14  Call files was supposed to be a proxy for? If that is
15  accurate?
16  A. Yes.
17  Do Not Call files are defined in paragraph 4 of
18  my report. And, as stated in my amended report, the
19  definition of Do Not Call files missed two files, which
20  is, I believe, Drips 05 and 08.
21  Q. I guess, were you using these files to try to
22  identify consumers who had complained about receiving
23  the texts?
24  A. That's correct.

Page 30

1    Q. Did you personally review the text responses to
2  evaluate whether a customer was complaining or not?
3    A. At some step -- some stage, I did.
4    Q. Okay. Can you walk me through your methodology
5  for determining whether a particular consumer was
6  complaining about receiving a text?
7    A. My methodology was to have -- to work with class
8  counsel and receive a set of instructions from class
9  counsel which language should be removed.
10    Q. Okay. So at this step of the analysis you
11  received a list of terms or language from your
12  attorneys; is that correct?
13    A. Not at this step.
14    Q. Well, this is the step at which your methodology
15  is supposed to limit the class to those people who
16  requested that -- made a specific request that the text
17  cease; correct?
18    A. Correct. And at this step in my analysis, I
19  removed all telephone numbers that were on the Do Not
20  Call -- I'm sorry -- I removed all telephone numbers
21  that were not on the set of files.
22    Q. Okay. So is another way of saying that, again
23  tell me if I'm not right -- is another way of saying
24  that your analysis assumes that if somebody's number is

Page 31

1  on one of those Do Not Call files that means that that
2  particular consumer complained about -- made a specific
3  request that the text cease?
4    A. At this step, yes.
5    Q. That is an assumption that is built in at this
6  step?
7    A. Correct.
8    Q. Now, the actual content of those text messages
9  that were sent from the consumer to QuoteWizard is
10  available for some percentage of the people on your
11  list; correct?
12    A. That's correct.
13    Q. Did your methodology involve you or anyone on
14  your team reviewing the content of those texts from the
15  consumer to QuoteWizard?
16    A. Not at this step.
17    Q. Was there another step at which somebody, either
18  you or on your team, did that?
19    A. Yes.
20    Q. Where was that?
21    A. It is on the rebuttal report.
22    Q. We will break it down one-by-one to try to keep
23  things clean.
24    On this particular question, to be clear, I'm

Page 32

1  just talking about in your original report and in your
2  original report, is it fair to say that the opinion that
3  you were offering is that that -- or assumed that if a
4  number appeared on one of the Do Not Call files that
5  established that the consumer had made a specific
6  request that the text cease?
7    A. Correct.
8      MR. PARONICH: Ben, just to hop in here, we
9  are about two minutes away from when we need to take
10  that break for my hearing.
11      MR. SITTER: Would you like to do that now?
12  I'm fine with that.
13      MR. PARONICH: If it's a natural breaking
14  point.
15      MR. SITTER: Let's go off the record.
16      (Break in the proceedings.)
17      MR. SITTER: Let's go back on. So we took a
18  short break so plaintiff's counsel could attend a hearing.
19  We are going to take another break at 11 for that purpose
20  and instead we will go ahead and keep moving for now as
21  much as we can.
22  BY MR. SITTER:
23    Q. When we took a pause, Ms. Verkhovskaya, we were
24  talking about your first opinion, methodology, and

Page 33

1  specifically the part of it that dealt with identifying
2  those folks who had made a specific request that the
3  text cease.
4      Do you recall that?
5    A. Yes.
6    Q. Does your analysis on this point account for the
7  possibility that a consumer happily texted with QuoteWizard
8  to obtain an insurance quote, but then asked that the
9  text stop after receiving the quote?
10    A. At this point, I took the internal Do Not Call
11  records indication that those records were maintained
12  for consumers who requested not to be contacted at some
13  point.
14    Q. Right. I'm not pushing back on that at all. I'm
15  simply trying to ask whether in that step of your
16  analysis you account for the possibility that somebody
17  was happily texting with QuoteWizard for some period of
18  time, and then they got the insurance quote that they
19  wanted, and that's when they asked the text to stop,
20  because they had what they wanted?
21    A. Not at this step.
22    Q. Is there another step in which that analysis came
23  in or not?
24    A. No.

9 (Pages 30 - 33)

Page 34

1    Q. Your entire methodology does not account for the
2  possibility that a consumer was happily texting with
3  QuoteWizard, they got the quote that they wanted, and
4  then they asked that the text stop; correct?
5    A. Correct.
6    Q. So there may be many people on your class list,
7  who are only in the Do Not Call records, because they
8  requested that the text stop after they had already
9  gotten the insurance quotes that they wanted?
10   A. That's possible.
11   Q. I think you mentioned that you reviewed Mr.
12  Kostyun reports in this case; correct?
13   A. That's correct.
14      MR. SITTER: For the benefit of the court
15  reporter, Mr. Kostyun's name is, Jan, J-A-N, Kostyun,
16  K-O-S-T-Y-U-N.
17      (Document marked as Exhibit No. 1 for
18  identification.)
19  BY MR. SITTER:
20   Q. Do you recall in your review of those reports, a
21  part of his rebuttal in which he listed several text
22  responses that your analysis assumes are customer
23  complains, but which appear instead to be indications of
24  interest?

Page 35

1      I'm referencing, I believe, paragraphs 36 through
2  47. To be clear, this is of his rebuttal report.
3    A. Thank you.
4    Q. The specific examples I'm referring to are in a
5  chart in paragraph 40 on page 18 and 19.
6    A. Yes, I can see that.
7    Q. Some of the examples that he lists in this chart
8  as content of texts from consumers that appear to indicate
9  interest, not a complaint, were things like, quote, You
10  can call me now, if you want; quote, Please call again;
11  quote, Thank you for calling; quote, Can we continue
12  texting, because I can't talk right now; quote, Can you
13  please call me in the AM; quote, Can we continue
14  texting, because I can't talk right now.
15      Those are some, not all, but some of the examples
16  from this list. Correct?
17   A. Correct. He found 28 of those examples out of
18  hundreds of thousands of texts.
19   Q. But your team didn't do any analysis of the
20  content of these text messages; correct?
21   A. Not at this step that we are talking about.
22   Q. Is there another step at which they did do that
23  analysis?
24   A. The analysis was done by class counsel and it is

Page 36

1  described in my rebuttal report.
2    Q. Okay. So the analysis that your team did of the
3  content of the text message responses from consumers,
4  was actually counsel's analysis?
5    A. Well, it is my understanding that interpretation
6  of consent language is a legal matter and I'm not
7  qualified to make such interpretation.
8    Q. Your methodology does state that it was able to
9  identify those consumers who made a specific request
10  that the text cease. I'm actually not talking about the
11  legal issue of whether that qualifies as consent or not
12  under the TCPA. That's not what I'm talking about.
13      What I'm talking about is your stated methodology,
14  which says that you were able to identify those numbers
15  where consumers made a specific request that the text
16  cease. That was your step in this analysis. Correct?
17   A. Correct.
18   Q. But these are examples that Mr. Kostyun identifies of
19  individuals who appear not to be complaining, but to
20  actually be requesting further communications.
21      Would you agree with that?
22   A. Yes.
23   Q. Your team did not do any of its own independent
24  analysis of these text messages content to assess

Page 37

1  whether or not the words in their text qualified as a,
2  quote, specific request that the text cease. Is that
3  accurate?
4    A. It is. It was my understanding that in order to
5  be included on internal Do Not Call lists, you would
6  conduct a certain step that the company would determine
7  that you qualified to be on internal Do Not Call lists.
8  And out of many thousands of texts, 28 examples, that
9  what Mr. Kostyun found seemingly do not qualify.
10   Q. Are you -- scratch that.
11      Do you have any personal knowledge, one way or
12  the other, regarding all of the different reasons why
13  QuoteWizard might place a telephone number on its own
14  internal Do Not Call List?
15   A. I do not have any personal knowledge of how
16  QuoteWizard makes those determinations.
17   Q. Okay. It is fair to say your analysis presumes
18  that if a consumer's telephone number is on one their
19  internal Do Not Call lists that means that consumer made
20  a specific request that the text cease?
21   A. At this particular step, it does.
22   Q. Is there another step where that analysis is
23  impacted?
24   A. Yes.

10 (Pages 34 - 37)

Page 38

1  Q. Can you walk me through that, please?
2  A. It's in my rebuttal report.
3  Q. Can you explain it to me, please. If you need to
4  reference your report, that is fine.
5  A. Thank you.
6      So paragraph 59 of my rebuttal and 62 states that
7  (as read) On about November 2nd I received from
8  plaintiff's counsel a list of opt out requests listed on
9  Exhibit J that legally was interpreted or could be
10 interpreted as having expressed interest in Defendant's
11 services and those text and telephone numbers were
12 removed.
13 Q. Okay. If I understand you, counsel made a
14 determination regarding a set of individuals who may
15 have an expressed interest and told you to remove them
16 from the class list and you removed them from the class
17 list. Is that accurate?
18      MR. PARONICH: Objection.
19 A. It is.
20 Q. Did you or your team perform any of your own
21 independent analysis regarding those numbers before
22 removing them from your class list at the direction of
23 counsel?
24 A. Would you please clarify for which reason we

Page 39

1  would have been performing an independent analysis.
2  Q. I guess because you are the expert.
3      As I understand what you are telling me, I think
4  counsel said, Hey, these numbers don't -- these look
5  expressions of interest, so you should remove them from
6  the class list.
7      Is that part accurate?
8  A. Yes.
9  Q. You did, in fact, remove them from the class
10 list?
11 A. Correct.
12 Q. Between receiving the instruction from counsel
13 and between actually removing them from the class list,
14 did you or your team perform any analysis?
15 A. No.
16 Q. You mentioned that Mr. Kostyun had identified, I
17 believe, you number was 28 examples of responses from
18 consumers that appear to be indications of interest, not
19 a request that the telemarketing cease. Correct?
20 A. That's correct.
21 Q. Have you done any analysis to see how prevalent
22 that issue is among the individuals that are listed on
23 your class list?
24 A. I have not, because as I stated earlier, it is my

Page 40

1  understanding that interpretation of language that
2  constitutes interest or consent is a legal matter and it
3  is outside of the scope of my expertise.
4  Q. And I understand that you are not offering any
5  opinions one way or another regarding whether a particular
6  consumer gave consent that was valid under the TCPA.
7  That is not one of your opinions; correct?
8  A. Correct.
9  Q. But one of your stated opinions is, and I quoted
10 it several times, that you could identify people who
11 made a specific request that the telemarketing text
12 cease.
13      And what I'm trying to understand is how you were
14 able to do that apart from taking instruction from
15 counsel?
16 A. I took internal Do Not Call lists of the
17 defendant and used that data to make a determination,
18 which individuals made a request to be on that internal
19 Do Not Call List; hence, they expressed interest that
20 the telemarketing ceases.
21 Q. Let me try this a different way.
22      Your methodology was, by your own reckoning,
23 supposed to weed out, exclude, those individuals who,
24 quote, made a specific request that the text cease. Is

Page 41

1  that correct?
2  A. Correct.
3  Q. Mr. Kostyun identified at least 28 specific
4  examples of people who are on your class list, which
5  both you and I agree it does not look like they made a
6  specific request that the text cease; correct?
7  A. Correct.
8  Q. Do you have any idea how many others are out
9  there, who if you looked at their text it would also
10 reflect that they did not ask that the telemarketing
11 cease?
12 A. It is my understanding, based on paragraph 59,
13 that class counsel instructed me to remove all those
14 texts and telephone numbers.
15 Q. It is your understanding, maybe the original list
16 included some people who actually expressed interest not
17 that the calls stop, but once you got to your final list
18 with the help of counsel, that final list is of all
19 people who made requests that the text stop; is that
20 accurate?
21 A. That's correct.
22 Q. We agree that the 28 examples, which were from
23 the original list that Mr. Kostyun provided, are
24 examples in which the consumer did not make a request

Page 42

1  that the telemarketing cease; correct?
2      A. Can I will review it one more time?
3      Q. Sure.
4      A. Correct.
5      Q. Okay. So it's your understanding that class
6  counsel has now identified all the numbers that needed
7  to be weeded out that were expressions of interest so
8  that your final list, corrected Exhibit 2, now only
9  includes people who actually express interest. Is that
10  your testimony?
11      I'm sorry. I said that completely backwards, and
12  I understand why you are confused. Let me try that
13  again.
14      Is it your understanding that the final class
15  list, which by that I mean, I think you call it corrected
16  Exhibit 2, that was attached to your supplemental report
17  that that list now, with the help of counsel, has
18  excluded all individuals who expressed interest rather
19  than request that the calls stop?
20      A. Correct.
21      MR. SITTER: Now, we are going to test my
22  technological skills. Let's go off the record.
23      (Break in the proceedings.)
24      MR. SITTER: We are back from a break for

Page 43

1  counsel's hearing and now we are going to get back into
2  it.
3  BY MR. SITTER:
4      Q. When we left off, we were discussing consumers who
5  were on your class list, but Mr. Kostyun had identified
6  as actually expressing interest in receiving text not
7  requesting that the text stop. Do you recall that?
8      A. Yes.
9      Q. You looked at the 28 examples in his report, and
10  we agreed that those are examples of instances in which
11  those particular consumers expressed interest, not a
12  request that the texts stop; correct?
13      A. We agreed that those texts did not express
14  requests to cease texting.
15      Q. I believe it is your testimony, correct me if I'm
16  wrong, that that issue has now been addressed and
17  corrected in your final class list that now does exclude
18  all the folks who did not actually request that the text
19  cease. Do I have that right?
20      A. Yes.
21      MR. SITTER: I'm going to try to bring up an
22  exhibit. I believe it is copied into chat. Does that
23  work?
24      Do you have an objection if I bring it up on

Page 44

1  my screen, I'm happy to share it with you later.
2      MR. PARONICH: I just want the witness to be
3  able to have it, the whole document, in front of her.
4      MR. SITTER: It is a two-page document. It
5  is actually just a sample from Mr. Kostyun's report.
6      MR. PARONICH: Anya, you have Mr. Kostyun's
7  report in front you of you, and we can identify the
8  document, that's fine with me as long as she is able to
9  access the document.
10      MR. SITTER: Okay.
11  BY MR. SITTER:
12      Q. Do you see this document? Can everybody see it?
13  Ms. Verkhovskaya, can you see it?
14      A. Yes.
15      Q. I will -- you can see as I scroll through here
16  there are some page numbers 18 and 19. This is an
17  excerpt of pages 18 and 19 from Mr. Kostyun's report.
18      What we have done here, I will represent to you,
19  is highlight phone numbers in his report that he
20  identified as not being a request that the text cease.
21  These are the examples that we were talking about
22  before. What we have done is just highlight the ones
23  that are still in your final class list.
24      So we do agree that these numbers should not be

Page 45

1  on your final class list; correct?
2      A. I believe that interpretation of the language was
3  done by counsel as a legal issue, and it's outside of
4  the scope of my opinion whether it should be on the
5  class list or not.
6      Q. So you have no opinion one way or the other
7  whether these highlighted numbers on this document
8  should be included in the class list?
9      A. I haven't verified if they are on the final class
10  list or not. I rely on your presentation and I do not
11  have an opinion if these texts represent being interpreted
12  as interest or not.
13      Q. Let's be clear about what your methodology was
14  supposed to identify and what I'm asking here.
15      I'm simply quoting back your own opinion to you,
16  which said that you had a reliable methodology to identify,
17  quote, Consumers who in response to their receipt of
18  QuoteWizard text messages, made a specific request that
19  the texts cease.
20      My question is: Do you have an opinion one way
21  or the other about whether these folks made a specific
22  request that the texts cease?
23      A. I believe that my methodology identifies individuals
24  who made this specific request and if the Court

Page 46

1 interprets these few telephone numbers that otherwise my
2 methodology would exclude them, so the methodology is
3 correct. And as I stated, interpretation of the legal
4 implication of this text's language is outside of the
5 scope of my expertise.
6 Q. Okay. Let's break that down.
7 Are you saying that you would rely on the Court
8 to evaluate whether particular language qualifies as a
9 specific request that the texts cease?
10 A. It can be done in either meet and confer and
11 stipulated by the parties or the Court can rule it.
12 All I'm saying is that a legal interpretation of
13 the language is not in the area of my expertise.
14 Q. Finish, I'm sorry.
15 A. I can only look at the data and see what
16 QuoteWizard decided to be on Do Not Call List, which I
17 did. Then I followed directions of counsel to exclude
18 what counsel considered texts and telephone numbers that
19 should be removed. I have not had a chance to verify
20 that these number are still part of the final class list.
21 Q. You were relying, at this step of your methodology,
22 on counsel to tell you which numbers involved consumers
23 who made a specific request that the text cease and
24 which ones did not?

Page 47

1 A. That's correct.
2 Q. And your team, apart from receiving those
3 instructions from counsel, did not do any independent
4 evaluation or analysis to determine whether those
5 consumers made a specific request that the text cease.
6 Is that correct?
7 A. That's correct.
8 Q. Would you agree with me that it appears that
9 there's at least some degree of error in your class list
10 regarding the identification of people who made a specific
11 request that the text cease?
12 MR. PARONICH: Objection.
13 You can answer.
14 A. I would not consider it an error. I would consider
15 it a point of disagreement that does not change my
16 methodology or my opinion and something that can easily
17 be resolved without changing the methodology.
18 Q. Okay. So it is your opinion, even sitting here
19 today, after all of the reports, that your methodology
20 still reliably can identify consumers who in response to
21 their receipt of QuoteWizard text messages, made a
22 specific request that the text cease?
23 A. That's correct.
24 Q. But you do also agree that we have looked at 28

Page 48

1 examples from the original class list in which we agree
2 those people were not asking that the text cease;
3 correct?
4 A. Seemingly. But I also stated and testified earlier
5 that it is outside of the scope of my expertise to interpret
6 the text data.
7 Q. Well, it may be outside the scope of your
8 expertise, but it doesn't appear to be outside of the
9 scope of the expert opinions that you are offering in
10 this case.
11 I'm reading back to you the opinions that you
12 yourself authored and signed several times that state
13 that you can identify, again, the consumers who in
14 response to their receipt of QuoteWizard text messages
15 made a specific request that the text cease.
16 Are you stating that you do not have the
17 expertise to make that determination?
18 A. I do have the expertise. So look at -- that's
19 what I did, I looked at Do Not Call List, internal Do
20 Not Call List, and also removed all the texts identified
21 by counsel as such and that methodology works regardless
22 whether there is a dispute about several texts.
23 Q. What methodology did counsel employ to identify
24 those individuals who made a specific request that the

Page 49

1 texts cease?
2 A. You would have to ask counsel.
3 Q. You do not know; correct?
4 A. I do not.
5 Q. Did your team perform any testing on -- well, I
6 guess you didn't, because you didn't know their
7 methodology. Scratch that.
8 Okay. Mr. Kostyun identified another issue at
9 this step of your analysis, which was that -- this is in
10 your original report, I'm talking about your original
11 report -- that almost 14,000 of the numbers on your
12 original class list did not actually appear anywhere in
13 the Do Not Call records that you cited in your original
14 report; is that correct?
15 A. That's correct.
16 Q. Now, in your rebuttal report, you did not alter
17 the materials that you had reviewed regarding the issue
18 of people who appeared on Do Not Call files; is that
19 accurate?
20 A. Yes.
21 Q. In your supplemental report, you then did amend
22 that list of files that you had relied on; is that
23 accurate?
24 A. That's correct.

13 (Pages 46 - 49)

1    Q.  Specifically, you amended it to include two
2  additional files Drips 05 and Drips 08; is that correct?
3    A.  That's correct.
4    Q.  Now that have added those additional files to
5  your list of reviewed materials, are you aware one way
6  or the other, of whether all of the numbers on your
7  class list also appear in at least one of the Do Not
8  Call files.
9    A.  All but one.
10    Q.  All but one of the telephone numbers on your
11  final class list appears somewhere in the Do Not Call
12  files produced in discovery in this case; correct?
13    A.  Correct.
14    Q.  The one telephone number that does not appear in
15  those Do Not Call files, is whose number?
16    A.  Mr. Mantha.
17    Q.  The plaintiff in this case?
18    A.  That' correct.
19    Q.  So every single person on your class list appears
20  somewhere in the Do Not Call files except for the named
21  plaintiff in this class action; is that correct?
22    A.  That's correct.
23    Q.  I'm going to say something, with which you are
24  free to agree or disagree.

1    It appears to me that by identifying, at least on
2  your original class list according to your methodology
3  as originally stated, the fact that Mr. Kostyun identified
4  20 percent of your original class lists, who are not
5  actually reflected in the dataset you claim to rely on,
6  to me that indicates an error rate, at least in that
7  original analysis, of 20 percent.
8    Do you agree with that statement or do you not
9  agree with that statement?
10    MR. PARONICH:  Objection.
11    You can answer.
12    A.  I do not agree with the statement.
13    Q.  Can you explain to me why?
14    A.  The data work was performed correctly.  I omitted
15  these two files in my original expert report and that
16  was the only error.  So the data was absolutely correct,
17  there was no error in the data.
18    Q.  Okay.  But there was an error of some kind, maybe
19  not in the data?
20    A.  As I just stated, I omitted listing these two
21  files out of hundreds of files I listed on the report.
22    Q.  That omission was an error; correct?
23    A.  Yes.
24    Q.  This was your error or was it your team's error?

1    A.  It was my error.
2    Q.  Okay.  Let's talk about how you addressed that
3  error.  Do you have your supplemental report in front of
4  you?
5    A.  Yes.
6    Q.  Okay.  In your supplemental report you write, (as
7  read) On or about December 5th, 2023, as I prepared for
8  my deposition in this case, it was discovered that there
9  are two corrections.  Paragraph 40.E of my expert report
10  should have listed two additional files that I did
11  review and rely on.  Drips, I'm going to call it 5 for
12  short, and Drips 8.  This had no affect on the opinions
13  expressed in my expert report.  Is that accurate?
14    A.  Yes.
15    Q.  Okay.  So we do agree that on this point there
16  were errors in your original report; correct?
17    A.  Yes.
18    Q.  And those errors were still present in your
19  rebuttal report; correct?
20    A.  Yes.
21    Q.  And then later, a few weeks later, you submitted
22  yet another report in which you added those two files to
23  the list of materials that you relied on; correct?
24    A.  Not correct.

1    Q.  Correct me, please.
2    A.  It is not -- I didn't submit another report.  I
3  submitted an amendment and correction in the report.
4  There were no new opinions expressed.  And the data used
5  both in the Drips 5 and Drips 8 and the keywords list
6  were both discussed in my reports; therefore, it was an
7  obvious and transparent error that was more of a typo.
8    Q.  So it was an obvious and transparent error;
9  correct?
10    A.  Correct.
11    Q.  But one that neither you nor your team caught
12  before your first report went out; correct?
13    A.  That's correct.
14    Q.  Also one an obvious error that neither you nor
15  your team caught before you submitted your rebuttal
16  report either; correct?
17    A.  Correct.
18    Q.  Are you aware of any other obvious errors that
19  have yet to be addressed in connection with your opinions?
20    A.  I'm not.
21    Q.  So we discussed the error regarding the omission
22  of certain files that you had in fact reviewed, but were
23  not listed in your original report.  Were there any
24  other errors that you addressed in your supplemental

Page 54

1  report?
2    A. The number of records after removal of business
3  keywords accidentally included records with business
4  keywords.
5    Q. Okay. So now we've identified two errors that
6  you discuss in your supplemental report, are there any
7  others?
8    A. No.
9    Q. In your report you write, (as read) On or about
10 December 5th, 2023, as I prepared for my deposition in
11 this case, it was discovered that there are two
12 corrections. Correct?
13   A. Correct.
14   Q. When you say, "it was discovered that there were
15 corrections," who discovered these errors that needed
16 correcting?
17   A. I did.
18   Q. Personally?
19   A. Yes.
20   Q. Not a member of your team? Not counsel?
21   A. It was then verified by several members of my
22 team.
23   Q. Okay. Several members of your team verified it.
24 Who spotted it in the first place?

Page 55

1    A. I did.
2    Q. How did you spot it?
3    A. By looking at the data.
4    Q. These files? I'm sorry, "by looking at the data"
5  what data are you talking about?
6    A. By looking -- reviewing all of the data and all
7  of the processes and procedures and all of the reports
8  as I was preparing for the deposition.
9    Q. Was this when you were preparing for the
10 deposition with counsel or preparing by yourself?
11   A. By myself.
12   Q. Now, when we were going over the roles of
13 different members of your team performing in connection
14 with your work on this case, I believe you said for two
15 or three of them that part of their responsibility
16 included, was it, quality assurance?
17   A. That's correct.
18   Q. And yet none of those members of your team caught
19 either of these errors; correct?
20   A. Correct.
21   Q. All right. You also write at the end of that
22 paragraph that, (as read) This had no effect on the
23 opinions expressed in my report.
24     I want to unpack that a little bit. The opinion

Page 56

1  expressed in your original report was that you relied on
2  the files listed in your original report to, among other
3  things, limit your list of customers who responded to
4  texts with a request that the telemarketing cease.
5  Correct?
6    A. Correct.
7    Q. But these files, Drips 5 and Drips 8, we can
8  agree are not listed in your original report; correct?
9    A. Correct.
10   Q. Does Drips 5 contain Do Not Call records?
11   A. Yes.
12   Q. Does Drips 8 contain Do Not Call records?
13   A. Yes.
14   Q. And you're sure of that?
15   A. That's the information I had when I was
16 performing my analysis.
17   Q. Okay. I guess I'm a little confused and I invite
18 you to explain however you see best.
19     But you have a statement in your last report that
20 says your opinions have not changed. But at least in
21 terms of the materials relied on that were expressed in
22 your original report, those are different now; correct?
23   A. Incorrect.
24   Q. That Drips 5 and Drips 8 are listed in your

Page 57

1  original report?
2    A. They are listed in the data that was -- included
3  in the data that was analyzed. And Mr. Kostyun could
4  clearly see that from the data analysis that he performed.
5  So I think that a typo -- it is my opinion that a typo
6  in the list of files, does not represent any change in
7  my opinions.
8    Q. Okay. Your initial report stated that there was
9  a specific number of class members; correct?
10   A. Correct.
11   Q. And a specific number of texts associated with
12 those telephone numbers; correct?
13   A. Correct.
14   Q. Your rebuttal report said that there was a
15 different number of class members; correct?
16   A. Correct.
17   Q. And a different number of texts at issue,
18 correct?
19   A. Correct.
20   Q. Then your supplemental corrected report states
21 that there is yet a third number of class members;
22 correct?
23   A. Correct.
24   Q. And a third number of texts at issue; correct?

15 (Pages 54 - 57)

Page 58

1    A. Correct.
2    Q. Is it still your testimony that your opinions
3  have not changed between your original report and your
4  rebuttal or your supplemental report?
5    A. Yes.
6    Q. Even though the number of class members, the
7  number of texts have changed over that period of time;
8  correct?
9    A. Correct. Because it did not affect my
10  methodology or my opinions.
11    Q. Between your original report and your rebuttal
12  report, you did remove certain telephone numbers at the
13  direction of counsel; correct?
14    A. Correct.
15    Q. You don't believe that is a change of the expert
16  opinions that you are offering in this case?
17    A. Correct.
18    Q. Another point that Mr. Kostyun makes on this
19  issue is that there is a lot of missing data regarding
20  the content of certain text messages that, per your
21  analysis -- well let me back that up. Scratch that.
22    Mr. Kostyun identified another issue, which was
23  that a large percentage of the folks on your class list,
24  there is no available data regarding the content of the

Page 59

1  text messages that they sent to QuoteWizard. Did you
2  review that?
3    A. Yes.
4    Q. Do you agree with that statement that for a large
5  percentage of the folks on your class list, there is no
6  available data that you reviewed with the content of
7  their responses to QuoteWizard?
8    A. There was no available data to me, I agree with
9  that.
10    Q. And Mr. Kostyun quotes a round figure of around
11  30,000 or about 42 percent of the class for which this
12  is the case; do you have any reason to dispute that
13  figure?
14    A. Yes.
15    Q. Why?
16    A. I don't believe Mr. Kostyun included Drips 5 and
17  Drips 8 in his analysis.
18    Q. If those were included, do you have an opinion
19  regarding -- let me put it this way: Sitting here today,
20  with all of the data that you've reviewed and the reports
21  that you've prepared, do you know what percentage of the
22  folks on your class list, we do not have the content of
23  their text message responses to QuoteWizard?
24    A. I do not.

Page 60

1    Q. Okay. Two things seem at odds to me. My
2  question is regarding whether you can make them make
3  sense. One is your statement in your report that you
4  have a methodology for identifying those people who made
5  a specific request that the text cease. And then the
6  others that we just talked about how some large
7  percentage of -- for some large percentage of the folks
8  on your list, we actually don't have any of the texts
9  that they communicated to QuoteWizard.
10    How do you deal with that apparent contradiction?
11    A. I do not see it as a contradiction.
12    Q. Is this because, as we were talking about before,
13  you don't believe that you are actually offering an
14  opinion about whether someone made a specific request
15  that the texts cease?
16    MR. PARONICH: Objection to form.
17    You can answer.
18    A. I think that if additional data was provided by
19  the defendant about the text messages relevant to the
20  those records where it is currently missing, my
21  methodology would still apply.
22    And, additionally, I believe that if those text
23  messages are missing, it is a legal issue, which is
24  outside of the scope of my opinion. My data analysis

Page 61

1  was focused on what was available to me at the time,
2  which is a list internal Do Not Call list. And I relied
3  on that representation by both the defendant and
4  plaintiffs' counsel that the list was comprised by
5  mostly those individuals who requested that the messages
6  cease.
7    Q. That was an assumption that was built into your
8  analysis that the list that you used were people who had
9  requested that the text or calls cease?
10    A. That is based on my experience of expertise working
11  on hundreds of cases where I dealt with internal Do Not
12  Call lists, that's how companies put telephone numbers
13  on the Do Not Call lists. And usually when the telephone
14  numbers are placed on internal Do Not Call lists, the
15  telemarketing to these telephone numbers cease.
16    Q. Your methodology says that you can identify those
17  people whom made a specific request that the text cease.
18  Let's break that apart.
19    Is the determination of whether the consumer made
20  a specific request that the texts cease, is that a legal
21  issue in your mind or a factual issue that you are
22  prepared to address?
23    A. It is a combination. I can only do what the data
24  shows me and the rest is the legal issue.

16 (Pages 58 - 61)

Page 62

1  Q.  That's not stated in your report, is it?
2  A.  It is.
3  Q.  Where?
4  A.  I remember stating somewhere --
5      (Technical difficulties.)
6      MR. SITTER:  I'm going to say for the record --
7  Anthony, correct me if you disagree with anything -- we
8  had a brief break there while the stenographer was
9  disconnected.  She is back on.  The witness has been
10 reviewing a document.  And we are picking up our
11 questioning there.
12 Q.  Ms. Verkhovskaya, go ahead give us your answer,
13 please?
14     MR. PARONICH:  Agreed.
15     Go ahead.
16 A.  I remember stating somewhere that consent is a
17 legal issue and neither myself nor Mr. Kostyun is really
18 qualified -- are really qualified to opine on consent
19 issues.  But I can't seem to locate this language at
20 this time.
21 Q.  I don't take much issue with that concept.  What
22 I'm really trying to address, Ms. Verkhovskaya, is not a
23 legal issue.  It is the opinion that's stated in your
24 report.  Or if you think it is a legal issue, then I

Page 63

1  need you to tell me that, so I can stop continuing to
2  ask you questions about it.
3      The reason I'm asking questions is because these
4  are the words that are actually in your stated opinion
5  and I'm trying to understand the basis for them.  I have
6  read it several times now regarding your statement that
7  you have a reliable methodology for identifying folks
8  who made a specific request that the telemarketing
9  cease.
10     Are you telling me those words in your report are
11 reflecting a legal opinion on which you are not qualified to
12 opine?
13 A.  No.
14 Q.  Then I'm going to continue asking you questions
15 about them, and you can speak with your attorney, but I
16 think we will move a lot faster if you stop telling me
17 it is a legal issue.  I'm not asking about TPCA consent.
18 I'm simply asking about the basis for the stated words
19 in your original report.  Okay?
20 A.  As I testified earlier, and I'm going to testify
21 again, that the data that I relied on was internal Do
22 Not Call list.  It is my understanding that in order to
23 appear on internal Do Not Call lists, you have to send a
24 request to the defendant in this case to cease further

Page 64

1  texts.  That is how usually internal Do Not Call lists
2  are compiled.
3      The data was provided to me and in the
4  interrogatories, the fourth set of interrogatories that
5  I relied on, clearly identify internal Do Not Call
6  files.  And the data that I worked with fits my
7  methodology of excluding telephone numbers that were on
8  internal Do Not Call lists.  And I stand by that
9  methodology.
10 Q.  Okay.  I think what you are telling me that what
11 you really did here is you identified the phone numbers
12 from the prior step that also appeared on one of the Do
13 Not Call files that was produced in this case.  Is that
14 correct?
15 A.  That's correct.
16 Q.  So that analysis assumes that if a consumer's
17 phone number appears on one of the Do Not Call files
18 that is what you mean when you say that consumer, quote,
19 made a specific request that the texts cease?
20 A.  That's correct.
21 Q.  There is no actual analysis by your team of the
22 content of these texts; correct?
23 A.  That's correct.
24 Q.  You are simply saying, Hey, this was on one of

Page 65

1  the Do Not Call files, so I'm assuming that means that
2  the person made a request at the text cease; correct?
3  A.  Correct.
4  Q.  But as we discussed before, it is entirely
5  possibly that people got what they wanted from
6  QuoteWizard after happily texting with them and only
7  made a request that the text cease after they had gotten
8  everything they wanted.  Correct?
9  A.  It is possible and I did not have an opinion on
10 legal implication of that scenario.
11 Q.  I don't want your opinion on the legal implications.
12     I do want to tell me factually whether you
13 agree with that as a possibility or not.  I think you
14 have done that.
15     As a standing issue, Ms. Verkhovskaya, I'm not
16 interested in obtaining legal opinions from you.  So if
17 you think that's what I'm asking for in a question, let
18 me know and I will try to rephrase it correctly.
19 A.  Thank you.
20     MR. SITTER:  I think this is a good place to
21 break.  Let's go off the record.
22     (Lunch break in the proceedings.)
23 BY MR. SITTER:
24 Q.  So we just took a short break for lunch.  When we

17 (Pages 62 - 65)

Page 78

1  collating and comparing. Is that fair?
2      A. Yes.
3      Q. One of those outputs is the NDNCR output from
4  PacificEast, correct?
5      A. Correct.
6      Q. One of those is the output from PacificEast
7  regarding business telephone numbers; correct?
8      A. Correct.
9      Q. One of them is your assumption that the Do Not
10  Call files reflect a specific request by a consumer to
11  stop receiving texts, too. Correct?
12      A. At some point of my analysis, correct.
13      Q. And you are assuming that the data reflecting
14  landline telephone numbers, that it is accurate that
15  texts can be delivered to those telephone numbers. Is
16  that fair?
17      A. It is fair. Especially when those telephone numbers
18  reply with a text, which is part of consideration of my
19  methodology.
20      Q. You do employ that assumption, you are explaining
21  why, that is the assumption upon which your methodology
22  is based; correct?
23      A. Correct.
24      Q. If any one of those assumptions turns out to be

Page 79

1  incorrect or if any one of those datasets turns out to
2  be full of errors, that would have a commensurate effect
3  on the accuracy of the opinions that you offer in this
4  case; correct?
5      A. Incorrect.
6      Q. I want to you give a chance to explain that in a
7  minute. I do want to ask the question. Let's say
8  PacificEast gives you a completely garbage output, it is
9  just wrong, it is all wrong.
10      Is it your testimony that that would not have
11  impacted the opinions that you offered in this case?
12      A. Correct.
13      Q. Why not?
14      A. Because my opinions are about my methodology and
15  if one of the outputs have errors, it's not going to
16  affect the methodology. The errors could easily be
17  corrected, but the methodology will remain accurate.
18      Q. It is your testimony that even if one or more of
19  the data files that you used in your analysis was
20  completely wrong that would not impact the reliability
21  of the opinions that you offer in this case?
22      A. Correct.
23      Q. Are you aware of any literature in the field of
24  data analysis that supports your position?

Page 80

1      A. Not on top of my head.
2      Q. Sitting here today, during this deposition, you
3  are not prepared to tell me of any literature in the
4  field of data analysis that supports your position; is
5  that accurate?
6      A. Yes, it is.
7      Q. Do you have a contract with PacificEast for the
8  provision of its services to your company?
9      A. Yes.
10      Q. In that contract, does PacificEast promise that
11  its data outputs are one hundred percent accurate?
12      A. It does not.
13      Q. Doesn't it actually say something different?
14  Isn't their language in your contract that in which
15  PacificEast expressly disclaims any representations or
16  warrantees regarding the accuracy or completeness of its
17  data?
18      A. I don't recall if such disclaimer is on their
19  website or in the contract.
20      Q. You are familiar -- it is your understanding that
21  is a disclaimer that applies to the data outputs that
22  PacificEast provides; is that correct?
23      A. Such a disclaimer exists somewhere, yes.
24      Q. You understand that it is not PacificEast's

Page 81

1  position that these data outputs are one hundred percent
2  accurate; correct?
3      A. Correct.
4      Q. You do not actually have any information one way
5  or the other regarding the degree of accuracy of these
6  data outputs, do you?
7      A. I do not.
8      Q. If I wanted to test the accuracy of PacificEast's
9  data outputs, are you aware of any way in which I could
10  do that?
11      A. I would hire a team of experts and put together a
12  methodology of how to get it done.
13      Q. Okay. If I wanted to check the accuracy of
14  PacificEast's data outputs, I would need to hire a team
15  of experts and come up with some process for doing that;
16  is that your testimony?
17      A. Yes, it is.
18      Q. Is it your understanding -- scratch that.
19      Have you yourself hired a team of experts to
20  check the accuracy of PacificEast's data outputs?
21      A. No.
22      Q. Have you ever requested from PacificEast that it
23  provide a certification or warrantee as to the accuracy
24  of the data outputs that you used in this case?

21 (Pages 78 - 81)

Page 82

1  A. No.

2  Q. You're not aware of anyone who has actually

3  tested those outputs beyond the five manual numbers that

4  we discussed earlier in your testimony; is that accurate?

5  A. That's accurate for this case.

6  Q. If you discovered that PacificEast had tested its

7  data and concluded that 20 percent of the outputs

8  typically are erroneous, would that impact your opinions

9  in this case at all?

10  A. No.

11  Q. What if it was 50 percent?

12  A. In the hypothetical scenario that it is 50

13  percent, I still believe that the methodology was some

14  additional steps were valid.

15  Q. What if it was a hundred percent?

16  A. It is not possible but I still believe the

17  methodology is correct whether we use this vendor or go

18  directly to NDNCR, it is still correct methodology.

19  Q. I want to be clear. It is your testimony that if

20  you learned that the PacificEast data outputs from the

21  NDNCR are one hundred percent erroneous, that would not

22  impact your opinions in this case?

23  MR. PARONICH: Objection. Mischaracterizes

24  her testimony.

Page 83

1  You can answer.

2  MR. SITTER: That's why it is a question.

3  MR. PARONICH: It's a leading one, so it is

4  an objection as to form as well.

5  A. We would, as I stated, just find a different

6  vendor, but the methodology still stands.

7  Q. The truth is you don't know if it is 1 percent,

8  10 percent, 50 percent, hundred percent error rate in

9  the PacificEast data outputs that you used in this case,

10  because you did not verify it yourself; correct?

11  A. Not in this case.

12  Q. So that is correct?

13  A. That is correct.

14  Q. One of the data points that PacificEast provided

15  in its output to you was the date that a particular

16  number was registered on the NDNCR; is that accurate?

17  A. Yes, it is.

18  Q. These registration dates are central to your

19  opinions; correct?

20  A. That's correct.

21  Q. Your opinions rely on the accuracy of these

22  registration dates; correct?

23  A. My opinions rely on my methodology of those dates

24  is the focal point of the application of my methodology.

Page 84

1  Q. Okay. I may have asked the question a little bit

2  a different way.

3  So the registration dates are a data points that

4  you relied on to provide the opinions that you offer in

5  this case; correct?

6  A. The data points I relied on for compiling a list

7  of potential class members; that's correct.

8  Q. You did not pull any of these registration dates

9  from the NDNCR yourself, not you, not your team;

10  correct?

11  A. We verified a few as I mentioned.

12  Q. So apart from the five or so that we mentioned

13  before they didn't; correct?

14  A. That's correct.

15  Q. Do you know how PacificEast goes about collecting

16  the registration dates from the NDNCR and then putting

17  them into your data output, what is "its methodology"?

18  A. It takes the date from NDNCR and enters it on to

19  our output and that's it.

20  Q. It is your testimony that PacificEast goes directly

21  to the FTC website, pulls the data on the FTC website,

22  by that, I mean the NDNCR database, specifically, and

23  then it puts that information into a data output and

24  then it sends that data output to you. Is that

Page 85

1  accurate?

2  A. Whether -- it is my understanding whether

3  directly or through some other channels, that is what

4  they do, yes.

5  Q. You don't know any of the specifics about how

6  they go about getting the information from the NDNCR

7  database; is that accurate?

8  A. Yes, it is.

9  Q. So to be clear, because you don't have that

10  knowledge, is it fair to say you are not -- also not

11  expressing an opinion in this case regarding the steps

12  that PacificEast took to obtain those registration dates?

13  A. That's correct.

14  Q. To the extent that PacificEast used a vendor of

15  its own to perform the registration lookups on the NDNCR

16  database, you are not offering any opinions about the

17  steps that that vendor might have taken either, are you?

18  A. That's correct.

19  Q. And that's because you would have no idea what

20  that vendor had done, if there is one, correct?

21  A. Correct.

22  Q. Okay. So in his rebuttal report Mr. Kostyun

23  notes that he located approximately 3,500 -- 3,455

24  telephone numbers with invalid registration dates,

Page 90

1    (Break in the proceedings.)
2    BY MR. SITTER:
3    Q. We are back from a short break.
4        Ms. Verkhovskaya, your third opinion, which has
5    to do with the ability to exclude individuals who
6    express interest in receiving the text. Okay.
7        Specifically the opinion that you offered was (as
8    read) using the data produced in discovery by
9    QuoteWizard, Drips, Bandwidth, and Twilio, there is a
10   reliable and efficient method to remove from the
11   proposed class, the telephone numbers of consumers who
12   responded to the QuoteWizard text with an expression of
13   interest and for whom QuoteWizard paid Drips for the
14   lead.
15       So as I understand your methodology at this step,
16   and I invite you to correct me if I'm wrong, you took
17   the potential customer file and just cross referenced
18   that from your list. And if someone was on the
19   potential customer file, then you took them off of your
20   list. Is that accurate?
21   A. Yes, it is.
22   Q. Beyond that, is it fair to say you did not do any
23   additional analysis at this step?
24   A. That's correct.

Page 91

1    Q. Who perform the actual cross reference between
2    the potential customer files and the list that you had
3    up until that step in your analysis?
4    A. Irina.
5    Q. Your sister?
6    A. That's correct.
7    Q. What specifically did she do?
8    A. She wrote a sequel code that compared two
9    different sets of data and removed from further analysis
10   all records that appeared on the customer file.
11   Q. Okay. Is it accurate that it was your counsel
12   who instructed you to remove the individuals from your
13   class list who also appeared on the potential customer
14   file?
15   A. That's correct.
16   Q. You performed this step at the direction of your
17   counsel, correct?
18   A. That's correct.
19   Q. The scope of what was performed was a cross
20   reference that removed folks who appeared on one of
21   these files; is that fair?
22   A. Yes.
23   Q. That is what your sister did here; correct?
24   A. That's correct.

Page 92

1    Q. Okay. Is it fair to say that at this step of the
2    analysis, you are relying on the accuracy of
3    QuoteWizard's records regarding whether a particular
4    consumer was a potential customer; is that accurate?
5    A. That's correct.
6    Q. You did not do any sort of independent analysis
7    on that point; correct?
8    A. Correct.
9    Q. Okay. We talked a minute ago about some of the
10   examples that Mr. Kostyun identified from your class
11   list of individuals who appeared to express interest in
12   receiving calls. Do you recall that?
13   A. Yes.
14   Q. Okay. But you would agree that your methodology
15   at this step did not exclude those individuals from your
16   class list?
17   A. Unless they were on the customer list as well.
18   Q. Right. But the examples that Mr. Kostyun
19   identified were all from your class list. So those
20   individuals are all still on your class list. Is that
21   accurate?
22   A. I have not checked that information, so I don't
23   know.
24   Q. You are not sure, sitting here today, whether the

Page 93

1    folks who are in the 28 examples that we looked at in
2    the highlighted subset of those, are still on your class
3    list; is that your testimony?
4    A. That's correct.
5    Q. Assuming that those individuals are still on your
6    class list, does that raise any concerns for you regarding
7    the reliability or accuracy of the methodology that you
8    performed in connection with this case?
9    A. No.
10   Q. So the presence of individuals whose text
11   messages indicate that they expressed interest in
12   receiving text from QuoteWizard on your class list, does
13   not cause you to have any concerns regarding the
14   accuracy or reliability of your opinions in this case?
15   A. Not about reliability of opinions. If there are
16   records that are in dispute, those records could easily
17   be removed, but the same methodology and the same
18   opinions are going to be applicable.
19   Q. Including the number of class members?
20   A. The propose methodology and my opinions are
21   different from the execution of the methodology. So if
22   class counsel will meet with defendant and meet and
23   confer and agree and stipulate on removing certain other
24   records, my methodology and my opinions are not going to

Page 94

1  change.
2      The execution could be different based on that or
3  a Court orders or any other changes. Additional data
4  could be provided. And as I stat in both reports, I
5  have a right to amend the numbers should more information
6  or additional information become available.
7  Q. But you are not a lawyer, right?
8  A. That's correct.
9  Q. When you say you have the right to do that, I
10  understand that you put some words in your report that
11  say you reserve the right, but you are not saying that
12  you actually have the legal right to do that, are you?
13  A. I am saying that as an expert if more data is
14  available to me, I can append or amend the execution of
15  my methodology; that's all.
16  Q. Is that what you foresee doing in this case? Are
17  you planning to further amend or change your methodology
18  after this deposition?
19      MR. PARONICH: Objection.
20      You can answer?
21  A. Not at this time. But it often happens that
22  things change during litigation.
23  Q. Okay. I want to break that down a little bit. I
24  feel like you are drawing a distinction, if you are, I

Page 95

1  would like to clarify it. If you are not, I would like
2  to understand that.
3      It seems to me like you are trying to draw a
4  distinction between your opinion that a methodology -- a
5  reliable methodology exists to do these things. And
6  whether you and your team actually conducted that
7  methodology in a reliable way to date in this case.
8      Are you offering the first opinion? That there
9  is a methodology -- a reliable methodology to identify
10  people based on the available data that meet the
11  criteria announced in your expert report?
12  A. In both of my expert reports, that's correct.
13  Q. Are you also offering the opinion that your team
14  has actually conducted that methodology in a reliable
15  manner in this case in coming up with the list that
16  you've provided?
17  A. It is not part of my official opinions in the
18  report, but it is assumed that every expert tries to
19  conduct the methodology in the most reliable possible
20  way based on the data available at that time.
21  Q. What I'm trying to understand, are you saying you
22  have not yet done the methodology? Or are you saying
23  that you have already done the methodology?
24      MR. PARONICH: Objection.

Page 96

1      You can answer.
2  A. We have done the methodology based on the data
3  available today. Should more data or additional information
4  be provided, it is possible that the same methodology
5  could be executed a little bit different. I am not
6  aware of anything at this time, but as stated in my
7  report, it can happen.
8  Q. You are offering these various class lists and at
9  this point corrected Exhibit 2, in your expert opinion,
10  are the list of class members in this case. Is that
11  correct?
12  A. The list of potential class members in this case,
13  that's correct.
14  Q. You conducted your stated methodology in your
15  reports to arrive at that class list, correct?
16  A. That's correct.
17  Q. You are offering the expert opinion or you think
18  it is at least implied that you perform that methodology
19  in a reliable manner to arrive at the class list that
20  you are offering in this case. Is that fair?
21  A. Yes.
22  Q. All right. I would like to move onto your
23  opinion number 4. This has to do with the step to
24  exclude unauthorized texts from the class list. Is that

Page 97

1  fair?
2  A. Yes.
3  Q. At this step, you state that you were instructed
4  -- by counsel, I take it?
5  A. Yes.
6  Q. You were instructed by counsel to remove from the
7  proposed class all numbers listed on the, quote,
8  authority files. Is that accurate?
9  A. Correct.
10  Q. Breaking this down, counsel says, Ms. Verkhovskaya,
11  you should exclude all the numbers that are on the
12  authority files. And then you exclude those numbers
13  from your list.
14      Are there additional steps at this stage of your
15  methodology that I have left out?
16  A. No.
17  Q. Okay. Let's talk about opinion number 5. This
18  has to do with the ability to exclude business numbers.
19  And your opinion was, quote, (as read) Using the data
20  produced in discovery, along with reliable commercially
21  available databases, there is a reliable and efficient
22  method by which it can be determined whether defendant
23  and/or agents acting on its behalf texted business
24  numbers, if any, for those telephone numbers to be

Page 98

1  removed from the proposed class.
2      Is that the opinion that you are offering in this
3  case?
4      A. Yes.
5      Q. You use the word "reliable" several times in
6  here. You use it when referring to the commercially
7  available database. You also use it with respect to the
8  method of determining this information.
9      When you say "reliable," can you quantify that
10  for me at all?
11      A. My standard that I use is the standard of more
12  likely than not.
13      Q. Okay. So you are saying that your methodology
14  for any particular number on your list should indicate
15  with at least -- with 50 percent or greater certainty
16  that that person belongs on your list?
17      A. No. I'm stating something that when I'm
18  identifying a potential business telephone numbers at
19  this stage I'm not claiming a hundred percent accuracy
20  standard. I'm claiming that this is the best
21  methodology that is available out there right now.
22  To identify, more likely than not, together with a few
23  other steps that I describe in my report, each telephone
24  numbers, more likely than not, are business telephone

Page 99

1  numbers.
2      Q. Okay. So those are different. I want to break
3  that down. One time you said "best." The report says
4  "reliable." And those can be different. The best
5  method may not be a reliable method.
6      So I want to understand when you use the word
7  "reliable" here, do you just mean best available or do
8  you mean reliable in a quantifiable sense?
9      A. Both.
10      Q. Let's talk about the quantifiable sense. How do
11  we quantify that?
12      A. Based on my experience and expertise over many
13  years, the data processors gather information on
14  business records from reliable publically available
15  sources like yellow pages, advertisements, and other
16  sources that businesses use to self-identify as
17  businesses in order to attract customers.
18      And over the years, I have tested that data from
19  various vendors through claims processing where primarily
20  identified businesses were also identified as businesses
21  or non-businesses were also identified as residential
22  numbers during claims processing. And the accuracy rate
23  that I measured over many years from various data
24  processors were in upper 80s, mid 90s percentile, and I

Page 100

1  find it reliable.
2      Q. When you use the word "reliable," throughout your
3  report, are you trying to say that that means that there
4  is somewhere between 80 or 90 percent certainty that
5  thing is true?
6      A. No.
7      I'm saying that my experience over the period of
8  years suggests that this is possible accuracy rates.
9  But I have not personally tested this particular dataset.
10      Q. So you don't know how accurate this dataset is
11  that you are using in your opinions for this case;
12  correct?
13      A. Correct.
14      Q. And I know you said that you thought that this
15  data was reliable based on your own personal experience;
16  is that accurate?
17      A. My personal -- my professional experience, I
18  would say. As well as experience of the companies that
19  I worked for.
20      Q. But this also comes from Ms. Verkhovskaya's
21  personal, professional life, that you are asking us to
22  accept as the basis for knowing that this data is
23  reliable; is that fair?
24      A. Yes.

Page 101

1      Q. Apart from your own personal experience or
2  professional experience, is there any source that you
3  can point me to to confirm this is reliable, the data
4  from PacificEast regarding business numbers or
5  residential numbers?
6      A. No.
7      Q. If I understand it, please jump in if I'm getting
8  this wrong -- as I understand your methodology at this
9  step sort of involve two steps, one was giving an output
10  from PacificEast and then there was also a keyword cross
11  reference; is that accurate?
12      A. Yes.
13      Q. Let's talk about the first step, the output from
14  PacificEast. To obtain an output, you took a set of
15  telephone numbers and sent it to PacificEast and
16  requested that they return data about whether the
17  telephone number was residential or business; is that
18  accurate?
19      A. Yes.
20      Q. Apart from the telephone number, did you provide
21  any additional information to PacificEast at this step?
22      A. We provided them with a few dates.
23      Q. A few dates. Can you explain that to me a little
24  more, please?

Page 106

1    Q. You think it is less than ten, but you can't
2  point to any hard data to support that; is that
3  accurate?
4    A. Correct.
5    Q. Are you aware of any published statistics on the
6  accuracy of PacificEast's data outputs, regarding
7  business telephone numbers?
8    A. No.
9    Q. If there were published statistics that stated
10  that the error rate for PacificEast outputs on business
11  telephone numbers was 20 percent, would that impact your
12  opinions in this case?
13    A. With the other steps that we take into consideration,
14  I don't think so.
15    Q. Okay. If there were published statistics stating
16  that PacificEast's error rate on these business data
17  outputs -- business telephone number data outputs, was
18  50 percent, would that change your opinions in this
19  case?
20    MR. PARONICH: Objection as to form.
21    Go ahead.
22    A. With additional steps that we describe -- I
23  describe in my report, I don't think so.
24    Q. If there were a one hundred percent error rate

Page 107

1  from the PacificEast data outputs regarding the
2  identification of business telephone numbers, would that
3  impact your opinions in this case at all?
4    MR. PARONICH: Same objection.
5    Go ahead.
6    A. I don't think they would stay in business, but
7  the methodology would remain the same. We would just
8  use a different vendor.
9    Q. How would you know? Are you testing?
10    A. I would rely on published opinion that you just
11  stated would be stating that PacificEast is a hundred
12  percent inaccurate. If there was such a study and
13  published opinion, we would just use a different vendor.
14    Q. The fact is that you do know that there is some
15  error rate with respect to these outputs from PacificEast,
16  you just have no idea how large that error rate is; is
17  that fair?
18    MR. PARONICH: Objection, form.
19    You can answer.
20    A. Or how small it is.
21    Q. You don't know how great or how small, you have
22  no idea one way or the other; correct?
23    MR. PARONICH: Objection to form.
24    You can answer.

Page 108

1    A. As I said, over the years I have tested the data
2  through claims process and I found it reliable. So I do
3  know it is reliable, but I can't put a number to the
4  reliability, because I have not done that type of study
5  on that data.
6    Q. The entire basis for your conclusion that the
7  PacificEast data outputs are accurate, is your own
8  experience; is that fair?
9    A. In many cases where that methodology and
10  experience was approved by numerous Courts for multiple
11  reasons as well as the industry standard and standard by
12  a few government organizations that rely on PacificEast.
13    Q. Those Courts that allowed this method is based on
14  what you put in your report on those cases; correct?
15    A. Or other industry experts.
16    Q. I guess what I'm trying to get at is if somebody
17  wanted to see how reliable these data outputs were --
18  like the Court or my client in this case, or a jury, if
19  we get there -- how could they check that beyond just
20  taking your word for it that your experience establishes
21  that these are reliable?
22    A. If I'm retained to provide an opinion on how that
23  would be checked, I could formulate a methodology.
24    Q. But you are offering the opinion in this case

Page 109

1  that this data is reliable, right? You say that many
2  times in your report?
3    A. Absolutely.
4    Q. I'm trying to understand how do we know that? I
5  hear you telling me, "Because I have got experience, I
6  am telling you that is the case."
7    Beyond that, how else can I be sure that these
8  data points are accurate?
9    MR. PARONICH: Objection as to form.
10    You can answer.
11    A. As I testified earlier, we tested the accuracy
12  during cases that we have administered through the
13  claims process.
14    We have also worked with counsel who had other
15  colleagues in the industry administer cases where I was
16  an expert where the data was verified and checked. The
17  cases, the notice methodology and the claims, were
18  accurate enough for various Courts to approve the usage
19  of PacificEast for those purposes.
20    So it is not just my experience alone. In
21  addition, PacificEast does work for Federal Trades
22  Commission and many other very large companies and is
23  considered to be an industry standard. And if the data
24  was inaccurate, it wouldn't be positioned that way

28 (Pages 106 - 109)

Page 110

1  within the marketplace.
2      Q. So the fact that a Court has accepted in the past
3  your use of outputs from PacificEast as part of your
4  methodology is, in your view, strong evidence that those
5  reports are reliable for your purposes. Is that
6  accurate?
7      A. No.
8      Q. Okay. I'm back to square one.
9        I know you told me your experience tells me this
10  and then you also mentioned some Court opinions. I'm
11  trying to ask you, the Court opinions support this? And
12  you are saying, no.
13        It is fine if there is nothing else. I want to
14  close the whole loop so that I'm not finding new things
15  out later.
16        Is there anything beyond your personal experience
17  dealing with PacificEast that you could point to to
18  confirm the accuracy of the data outputs that they
19  provide?
20        MR. PARONICH: Objection, form. Asked and
21  answered.
22        Go ahead.
23      A. I will try to clarify using different words.
24        There are dozens and dozens of cases that were

Page 111

1  certified that labor used PacificEast for various
2  appends. And the claims data that came in corresponded
3  to the appends during the notice and claims and fund
4  distribution stages by numerous claims administrators,
5  not just my own experience, where the claims rate was
6  approved by the Court and the programs and the usage of
7  PacificEast was found reliable by the Courts, not just
8  in my cases doing expert opinions, but there is an
9  industry standard. And the industry standard is that
10  PacificEast data is reliable for multiple reasons.
11      Q. You are saying that the industry standard is that
12  PacificEast data is reliable for distinguishing between
13  residential and business telephone numbers?
14      A. Yes.
15      Q. When you say reliable, you can't tell me what
16  that means in terms of what percent are going to be
17  accurate and what percent are not, is that also true?
18      A. Correct.
19      Q. The way what we know it is reliable, is that you
20  are telling us it is reliable. And that you are telling
21  us that Courts have approved use of PacificEast in
22  claims administration notice procedures. Is that
23  accurate?
24      A. As well as in expert opinions.

Page 112

1      Q. What expert opinions?
2      A. The Courts found usage of PacificEast during
3  notice and claims administration as well as expert
4  opinions reliable.
5      Q. That is kind of the question I asked before. I
6  will try it again.
7        I asked the question: Are you telling me that
8  because you think that the fact that a Court approved
9  the use of PacificEast data outputs in the past, is
10  evidence that those outputs are reliable?
11      A. In addition to my own experience and expertise,
12  yes.
13      Q. If the Court had rejected the use of PacificEast
14  data for your purposes, would that also be an indication
15  that it was unreliable?
16      A. There are always exceptions to every standard.
17        I would consider it and issue my own expert
18  conclusion.
19      Q. The Courts have excluded your opinions on use of
20  PacificEast data outputs in the past, isn't that
21  accurate?
22      A. Once.
23      Q. They also declined to rely on your opinions in
24  other cases even if they didn't formally exclude them;

Page 113

1  isn't that also accurate?
2        MR. PARONICH: Objection.
3        Calls for speculation.
4      A. The usage of data processes have been criticized
5  in several cases.
6      Q. By Courts?
7      A. That's correct.
8      Q. Cases in which you've served as an expert?
9      A. That's correct.
10      Q. Is that something that you put in your expert
11  report?
12      A. I believe Mr. Kostyun did, so I did not have to
13  repeat it.
14      Q. Well, you issued your reports on the same day,
15  your initial reports, I don't recall seeing that in your
16  report?
17      A. I don't find the relevancy of it.
18      Q. Of your opinions using the same methodology and
19  vendors being excluded in the past by other Courts, you
20  don't see that as relevant to the work in this case?
21      A. The circumstances were very different in those
22  other cases; therefore, I did not feel it is relevant to
23  this particular case to include it.
24      Q. Okay. We were talking about the error rates in

Page 114

1 the PacificEast data outputs, right? There are really
2 two pieces to what they are providing you. One is this
3 either is or isn't a business number. That is one data
4 point. Right?
5    A. Correct.
6    Q. Was there also a data point where PacificEast
7 gave you a date range during which it believed a number
8 was or wasn't or could or couldn't have been a business
9 or residential number?
10    A. That's correct.
11    Q. So I know we talked about is it business, is it
12 not business? I now want to talk about the timeframe
13 issue.
14       Do you have any knowledge, one way or the other,
15 about the degree of accuracy of those time ranges that
16 PacificEast provides in its reports?
17    A. I don't have the actual percentage number that I
18 can cite.
19    Q. Do you have any information at all regarding the
20 accuracy of those timeframes that PacificEast provided?
21    A. My understanding is that as soon as the number
22 becomes publicly listed or advertised as business, it
23 gets picked up by data processors. Then when they stop
24 being listed or advertised, it is no longer associated

Page 115

1 with a business and that is the end date of the association.
2    Q. I understand that is what PacificEast is trying
3 to do. My question is a little bit different.
4       Do you have any knowledge about how well they
5 perform that task? Specifically, how often they are
6 right? How often they are wrong, anything like that,
7 about those dates?
8    A. I can't put the exact number of percentage of
9 accuracy.
10    Q. Okay. Is PacificEast aware that you are using
11 its services for the purposes of preparing expert
12 reports in this case?
13    A. They are aware that we usually use their services
14 for preparing expert reports. It is a standing
15 understanding and therefore we did make any special
16 arrangements for this particular case.
17    Q. So there was no specific disclosure to
18 PacificEast that these results would be used for these
19 purposes, but you are telling me you think there is a
20 general understanding that they knew that; is that
21 accurate?
22    A. That's correct.
23    Q. You mentioned how PacificEast is recognized in
24 the industry. That phrase, I think, is at several

Page 116

1 points in your report.
2       What industry are you referring to?
3    A. Litigation support services particularly class
4 action litigation.
5    Q. There are other vendors who perform these
6 services as well; correct?
7    A. Correct.
8    Q. You have used those other vendors in other cases
9 in the past, for this purpose, correct?
10    A. Yes.
11    Q. One of those vendors is LexisNexis, correct?
12    A. Yes.
13    Q. You stopped using LexisNexis and now you use
14 PacificEast; correct?
15    A. Correct.
16    Q. You stopped using LexisNexis around the time that
17 one of your opinions was rejected by a Court as
18 unreliable because of its reliance and usage of those
19 results for that purpose; is that accurate?
20       MR. PARONICH: Objection to form.
21       You can answer.
22    A. It is not accurate.
23    Q. Can you tell why you switched from LexisNexis to
24 PacificEast for this purpose?

Page 117

1    A. It was a business and relationship decision.
2    Q. What does that mean?
3    A. Business relationship with LexisNexis and
4 business relationship with PacificEast. We decided to
5 change our preferred provider to stay more competitive.
6    Q. Are you saying that it is cheaper to use
7 PacificEast?
8    A. Significantly.
9    Q. You are saying that you made the switch to reduce
10 your costs; is that accurate?
11    A. Well, reduce the cost for our clients.
12    Q. Sure. I wasn't suggesting you were running off
13 with the money, I just mean you are trying to reduce
14 costs, that was the reason for the change?
15    A. That's correct.
16    Q. The change had nothing to do with Lexis being
17 more or less accurate or PacificEast being more or less
18 accurate. Is that your testimony?
19    A. Yes, it is.
20    Q. You say that -- you said it was your understanding
21 that PacificEast pulls this information regarding
22 business telephone numbers from, I think you said
23 thousands, tens of thousands, of sources, can you tell
24 where that understanding comes from?

Page 118

1    A. From discussions at PacificEast.
2    Q. Who at PacificEast?
3    A. It was many years ago, I believe it was Mr. Rice.
4    Q. Scott Rice?
5    A. That sounds right.
6    Q. Let's move onto the second step in this part. We
7  talked about how you apply the outputs from PacificEast.
8  We talked about how you cross-reference those two lists.
9  Now, I want to talk about the second part where the
10  keywords come into play, are you with me?
11    A. Yes.
12    Q. You said that in your report, roughly, that --
13  feel free to correct any rough edges here -- your team
14  applied the keyword list of 380 keywords that were
15  associated with businesses and they checked the
16  PacificEast outputs as a backup to see if these were
17  really the business numbers had gotten through. Is that
18  accurate?
19    A. Either business numbers have gotten through or
20  there were any home businesses that could be identified.
21  That's correct.
22    Q. So part of your methodology sort of assumes that
23  there will be some error rate in the business numbers
24  that are returned from PacificEast. Is that accurate?

Page 119

1    A. Yes, that is.
2    Q. Now, at this stage, this list of 380 keywords
3  that are supposed to be associated with businesses, who
4  created that?
5    A. I created that list as some suggestions from my
6  team.
7    Q. Okay. How do you collect the specific words that
8  you decided to put on that list along with your team.
9    A. It was a combination of the common sense and
10  research of most used commonly -- most often used common
11  business names.
12    Q. You used your common sense and you did some
13  research on what the most common used business names
14  are?
15    A. Yes.
16    Q. Was it you who performed that research or some
17  other person on your team?
18    A. It was myself and Christina Peters and Irina
19  Verkhovskaia.
20    Q. Where did you perform those searches or look for
21  resources regarding commonly used business names?
22    A. Various directories.
23    Q. Can you tell me what they were?
24    A. Yelp. Google. Yellow pages. And various other

Page 120

1  search engines.
2    Q. Let's break them down. I'm not going to go
3  through them all. I want to be more targeted here.
4    Let's take Yelp, for example. When you say you
5  did searches on Yelp to identify common business names,
6  in what manner? What I mean by that is does Yelp have a
7  list somewhere of common business names or did you do it
8  by looking at a bunch different places on Yelp? How did
9  you go about doing that?
10    A. We started by looking at variations of Inc.,
11  incorporations, I-N-C, incorporated, which words we used
12  the most. Same thing for company, was it C-O, did they
13  use Comp? Did they use Company? Did they use
14  Companies. So it was very basic research.
15    Q. I'm trying to get an understanding of the mechanics
16  of this research. When you say "research," are you
17  saying somebody spent sometime on Yelp looking at
18  different businesses and decided which terms it thought
19  -- the person thought were common among business. Are
20  you saying that Yelp has some published list of common
21  business terms that you imported to your list? I'm
22  trying to understand the mechanics here.
23    A. Thank you for clarifying. The first.
24    Q. So you guys -- you and your team were sort of --

Page 121

1  I don't want to belittle it -- you were sort of poking
2  around on Yelp, looking at different sites, and I'm
3  saying All right, I'm seeing this term "Corp" come up a
4  lot on businesses, or "Inc.," or other variations on the
5  spelling. Is that sort of the process that led to the
6  generation of this 380 word list?
7    A. Correct.
8    Q. Who had final say as to whether a particular term
9  was business associated term or not?
10    A. I did.
11    Q. This list was created for purposes of this case
12  specifically; is that accurate?
13    A. No. We've had that list for many years and we
14  use it in many cases and that list is evolving as we get
15  more experience and do additional research.
16    Q. This is an evolved version of an older list that
17  you guys have honed through your experience. Is that
18  what you are telling me?
19    A. Yes.
20    Q. But apart from your people on your team poking
21  around on Yelp or Google or Yellow Pages and performing
22  their own subjective analysis of whether they think that
23  a term appears a lot in business names, is there more to
24  this creation of the list that I am leaving out?

31 (Pages 118 - 121)

Page 122

1    A. No.
2    Q. At this step you teams take the output from
3  PacificEast, they take the 380 keyword list, smash them
4  together, and if something from the PacificEast output
5  has one of your keywords on it, what happens next in
6  your methodology?
7    A. It gets removed from the potential class list.
8    Q. Automatically or with some human intervention?
9    A. We write a code to implement that.
10    Q. Was there a judgment call by a human or was this
11  simply they wrote the code and then the code applied to
12  the universe?
13    A. There is no judgment.
14    Q. You put the terms in and if a term appeared on
15  the outputs from PacificEast, your code was supposed to
16  pull those folks off of your class list; correct?
17    A. Correct.
18    Q. I understand, we have had several different
19  reports now, I think it is your testimony that there has
20  been some changes to that population. Is that accurate?
21    In your rebuttal, you note that your team
22  inadvertently, through human error, failed to actually
23  produce the list that had compared the keyword -- the
24  380 keywords to the output from PacificEast; correct?

Page 123

1    A. That's correct.
2    Q. That step, even though it is described in your
3  original report, it wasn't actually performed in conjunction
4  with the original class list, Exhibit J, to your
5  original report. Is that correct?
6    A. It was performed but the wrong file was attached.
7    Q. Whose responsibility in your group is it to
8  ensure that the correct file was attached?
9    A. The final responsibility lies with me.
10    Q. Okay. So we have this file with your original
11  class list that we both agree has numbers that are
12  associated with businesses and the reason is human error
13  and they shouldn't have been on that original list.
14    Do we agree on that?
15    A. Yes.
16    Q. Then many of those -- I guess many, if not all of
17  those team members, were still on the list when you
18  submitted your rebuttal report as well; is that
19  accurate?
20    A. Correct.
21    Q. Then after rebuttal reports had been submitted,
22  as you are preparing for your deposition, it is your
23  testimony that you realized that the wrong file had been
24  attached, and with your supplemental report, you and

Page 124

1  your team, used the correct file. Is that what you are
2  saying?
3    A. Correct.
4    Q. So now, in your final class list, anything that
5  hits on one of your 380 keyword list, should now be
6  excluded from your final class list; correct?
7    A. Correct.
8    Q. In his rebuttal report, Mr. Kostyun did identify
9  several examples of numbers that should have been
10  excluded based on the keyword list that you and your
11  team purported to use, but still appeared on the class
12  list.
13    Do you agree with that statement?
14    A. Yes.
15    Q. You said that you have Mr. Kostyun's report in
16  front of you, his rebuttal, specifically?
17    A. Yes.
18    MR. SITTER: I'm going to mark that as
19  Exhibit 2. Anthony, I take it you don't need a copy?
20    MR. PARONICH: I don't. Anya, you have a
21  rebuttal report. I'm good.
22    (Document marked as Exhibit No. 2 for
23  identification.)
24  BY MR. SITTER:

Page 125

1    Q. Okay. If you look at page 30, and feel free to
2  flip around before and after pages 30 and 31, of Mr.
3  Kostyun's rebuttal report, lists a number of telephone
4  numbers and he is expressing that these appear to be
5  business numbers even though they appeared on your
6  original class list, Exhibit J. Correct? Is that your
7  understanding as well?
8    A. Yes.
9    Q. At least to the degree that any of these numbers
10  contain any of your keywords, they should no longer be
11  on your final class list corrected Exhibit 2?
12    A. Correct.
13    Q. I will circle back on that. I will move on for
14  now.
15    Now, at this stage of your analysis -- now I'm
16  back to your original report. I apologize for jumping
17  around. In your original report at this stage, you
18  state (as read) Using this process and after business
19  related telephone numbers were removed from further
20  analysis, I identified 71,549 non-business telephone
21  numbers that received 345,526 texts. After adding Mr.
22  Mantha to the list of potential class members, there
23  were 71,550 telephone numbers that received 345,534
24  texts. Correct? That is in your report?

Page 126

1    A. Could you please let me know which paragraph?

2    Q. Paragraph 85. I can find a page number, too.

3  There we go. Are you with me?

4    A. Yes, paragraph 85.

5    Q. And the part I want to ask you about is -- you

6  have gone through this whole methodology to get to this

7  list of people who meet your criteria. And we get to

8  the last step, and you go through the business number

9  analysis, then at that step, you added plaintiff's

10  telephone number to your list manually. Is that

11  accurate?

12    A. Yes.

13    Q. He does not meet the criteria that the other

14  folks on that class list meet; right?

15    A. I have not done that analysis for Mr. Mantha.

16    Q. In your work on this case, you have not done any

17  analysis to see whether the named plaintiff meets the

18  criteria to belong on your class list. Is that

19  accurate?

20    MR. PARONICH: Objection.

21    You can answer.

22    A. I was directed by class counsel to add

23  Mr. Mantha. And I did not do any specific analysis for

24  his telephone number.

Page 127

1    Q. So you added him because counsel told you you

2  should add his number to the list; correct?

3    A. Correct.

4    Q. You did not do any independent analysis regarding

5  or Mr. Mantha or his telephone number to confirm whether

6  he met any of the other criteria to be on your class

7  list; is that also accurate?

8    A. That's correct.

9    Q. That means -- you have at your report different

10  points where you talk about opinion one numbers, opinion

11  two numbers, opinion three numbers.

12    Do you know what I'm referring to here?

13    A. Yes.

14    Q. Mr. Mantha's number would not be in your opinion

15  one numbers; correct?

16    A. As I said, I did not.

17    Q. You don't know one way or the other?

18    A. Well, common sense dictates that if he would be,

19  I wouldn't to be adding him here. But I did not do that

20  analysis.

21    Q. You have not checked specifically to see whether

22  plaintiff's telephone number appears in your opinion one

23  telephone numbers; correct?

24    A. I personally did not do that, no.

Page 128

1    Q. Just so we close the loop, no one on your team

2  did either; correct?

3    A. I don't think so.

4    Q. You are in charge of the team; right?

5    A. That's correct.

6    Q. So you would know, right?

7    A. Yes.

8    Q. And his number didn't appear on the opinion 2

9  numbers, correct?

10    A. That's my understanding.

11    Q. Plaintiff's telephone number didn't appear on the

12  opinion 3 numbers; right?

13    A. That's my understanding.

14    Q. Or the opinion 4 numbers either, right?

15    A. That's my understanding.

16    Q. He didn't appear on the opinion 5 numbers either

17  until you manually added him; is that correct?

18    A. That's correct.

19    Q. Are you aware of any literature in your field

20  that supports manually adding the named class representative

21  to a class list as part of a viable methodology?

22    A. I know that it has been done in a number of cases

23  based on legal theories. Other than that, I am not

24  aware of any other legal literature. Legal literature

Page 129

1  is not the area of my expertise.

2    Q. Let's take legal step out of it.

3    Are you aware of any literature in your field,

4  apart from Court opinions, that supports the manual

5  addition of the named class representative to a class

6  list as a viable method for ascertaining class

7  membership?

8    A. I have no opinions on ascertainability issues.

9    Q. I shouldn't use that word. Because that starts

10  people thinking about legal stuff, that's not what I

11  intended.

12    I guess what I'm saying is, Are you aware of any

13  literature in the field of data analysis that would say

14  you can propose methodology, apply that methodology all

15  the way through to everybody, and then not apply it to

16  one person, but just manually add them in?

17    A. If there is a legal basis for doing that,

18  plaintiff's counsel would know better than I would, if

19  such legal basis exists.

20    Q. Okay. But you are not aware of publications,

21  non-legal publications, that support that as a viable or

22  reliable method of data analysis?

23    A. I'm aware of the basis of Court opinions where it

24  has been done before. Does it count as legal

Page 130

1  publications?
2      Q.  You seemed uncomfortable to go there, that's why
3  I didn't want to push you to go there.  That's why I was
4  trying to I call out the legal stuff.  So we could say,
5  Okay, put the legal stuff aside.
6          You said your fields are data analysis and I
7  believe notice administration.  I am wondering if there
8  any publications.  Any published support I could go look
9  to, not a Court opinion, just whatever you guys use in
10  your field that I could look at, and I could read it,
11  and it would tell me, Yes, this is a viable approved
12  method for identifying these individuals?
13      A.  Because this was a legal decision, I cannot
14  really point you out to non-legal publications.
15      Q.  Okay.  That's fine.  Let's move on.
16          Now, you state in this part of your report that
17  at step 9, you did manually add plaintiff's telephone
18  number to Exhibit J, which was your original class list;
19  correct?
20      A.  Correct.
21      Q.  That didn't actually happen, right?  Mr. Mantha's
22  telephone number was not actually on your Exhibit J
23  class list, was it?
24      A.  There was a typo in the area code but it was.

Page 131

1      Q.  I'm sorry, but if you get different numbers in a
2  telephone number, it is not the same number; is it?
3      A.  In the rebuttal report it was expressly stated
4  that there was a typo and it was corrected.
5      Q.  Right.  I'm not talking about that yet.  I will
6  definitely give you an opportunity to talk about your
7  rebuttal report as much as you want.
8          Right now I'm talking about Exhibit J to your
9  original report.  Your original report states, (as read)
10  I added plaintiff's telephone number to Exhibit J.
11          We can agree that Exhibit J, which is the exhibit
12  to your original report, does not actually have plaintiff's
13  real telephone number on that list; correct?
14      A.  Because of the typo, that's correct.
15      Q.  Now, let's talk about the typo.
16          You said in your rebuttal report, you changed the
17  phone number to make sure that it was plaintiff's phone
18  number, and inserted that into your Exhibit 2 list; is
19  that accurate?
20      A.  Yes.
21      Q.  And the number that you had included in your
22  list, in an attempt to include plaintiff's number, was
23  actually somebody else's telephone number; right?
24      A.  Not to my knowledge.

Page 132

1      Q.  If there is a typo in the telephone number, it is
2  not plaintiff's telephone number anymore; right?
3      A.  Correct.
4      Q.  If you dial it, somebody might pick it up; right?
5      A.  If it exists, I don't know.  I don't have
6  knowledge one way or another.
7      Q.  The number that you added to your original class
8  list, in an effort to add plaintiff's telephone number,
9  you don't know if that is a real telephone number or
10  not?
11      A.  If I did, I wouldn't make the typo.
12      Q.  Was there any particular member of your team who
13  was in charge of making sure that plaintiff's telephone
14  number appeared on the original class list, Exhibit J?
15      A.  The final responsibility lies with me.
16      Q.  Can we agree that was a mistake then, one of your
17  mistakes or do you disagree with that statement?
18      A.  I do.
19      Q.  Okay.  Now, I'm going to zoom way out.  Let's
20  talk about before you even did your first step in the
21  analysis, you had a starting population of telephone
22  numbers.  Right?
23      A.  Correct.
24      Q.  Then at the first step, you cut out a lot of

Page 133

1  those.  But beginning with, you had a really large
2  number of telephone numbers; correct?
3      A.  Correct.
4      Q.  Was plaintiff's telephone number in that universe
5  of telephone numbers?
6      A.  I did --
7      Q.  Your starting -- go ahead.
8      A.  I did not check but -- I don't think so, but I
9  not check.
10      Q.  So you are not sure one way or the other if
11  plaintiff's number was in the original starting
12  population with which you began your analysis; correct?
13      A.  Correct.
14      Q.  If he were, let's assume he was, let's say his
15  telephone number is in your starting population.  Would
16  you agree that your methodology would have eliminated
17  plaintiff at the outset -- at very first step, because
18  he did not have -- he was not in the Do Not Call
19  records?
20      A.  I would have to analyze various hypotheticals.
21      Q.  We are only doing it hypothetically, because you
22  are not sure if it was in there.  If you are sure, I
23  would go with what you sure with.  But you don't know.
24  I can represent to you, I think it was in that starting

Page 134

1  population. I don't want to put words in your mouth.
2  If you disagree, you take it in a different direction.
3  I think it was in the starting population.
4       But your methodology is specifically geared
5  towards at the first step eliminating anyone who did not
6  appear in the Do Not Call files; correct?
7       A. Correct.
8       Q. If plaintiff's number is not in the Do Not Call
9  files, the first step in your methodology would have
10  eliminated him from the starting population; correct?
11       A. Unless there is a legal basis how he expressed
12  his desire to be on a Do Not Call Registry, which is
13  outside of the scope of my analysis.
14       Q. I'm not asking anything about a legal opinion.
15  I'm asking a mechanical data question regarding the
16  specific steps that you said you took in your expert
17  report.
18       You stated that one of the first steps that you
19  took was to eliminate numbers that appear in the Do Not
20  Call records. So if a number -- if it did not appear in
21  there -- if a number did not appear in the Do Not Call
22  files, it would have been pulled out as a mechanical
23  matter, not a legal matter, it would have been cut from
24  your list; correct?

Page 135

1       A. Correct.
2       Q. So to the degree that this is true for plaintiff;
3  i.e., that his number does not appear in one of the Do
4  Not Call files, your methodology would cut him from
5  potential class membership at the first step. Is that
6  accurate?
7       A. Without considering all of the different steps
8  that comprised the litigation, the mechanical step
9  would; correct.
10       Q. Okay. I want you to leave all those caveats in.
11  I want to be clear, you are saying that, yes, the first
12  step in your analysis would have cut plaintiff from the
13  population provided that he actually does not appear in
14  any of Do Not Call files. Accurate?
15       A. Correct.
16       MR. SITTER: Let's take a break here. Is
17  that all right with everyone?
18       MR. PARONICH: Sure. That's fine.
19       (Break in the proceedings.)
20       MR. SITTER: We are back on the record after
21  a short break.
22  BY MR. SITTER:
23       Q. Ms. Verkhovskaya, we have going for a while here.
24  I want to give you an opportunity, is anything about

Page 136

1  your prior testimony that you have given so far that you
2  would like to change or amend?
3       A. Not that I can think of at this time. But thank
4  you.
5       Q. Let's move onto your last opinion, opinion 6,
6  which has to do with issuing notice to -- in accordance
7  with the Federal Rule of Civil Procedure 23.
8       I think it begins on page 32 of your report,
9  paragraph 88.
10       I want to start broadly trying to understand the
11  relationship in your mind between your opinions, 1
12  through 5, and your opinion 6.
13       Specifically, I'm trying to understand is opinion
14  6 stating the notice method that you propose to apply to
15  give notice to the individuals identified in steps 1
16  through 5 -- or opinions 1 through 5 in your report?
17       A. Opinion 6 relates to methodology described in
18  opinions 1 through 5.
19       Q. Can you expand on that a little for me, please?
20       A. Sure. It is typical that while the methodology
21  of experts remain the same, the application of that
22  methodology may or may not be corrected during -- or
23  altered during the litigation stages, because additional
24  information becomes available or addition data or there

Page 137

1  are meetings between parties that decide to stipulate to
2  certain things.
3       So my opinion 6 is basically stating that with
4  the methodology that I described, through opinions 1
5  through 5, there is an efficient and effective way based
6  on the data produced in discovery to effectuate proper
7  notice protocol that is standard within the industry and
8  meets Federal Rules of Civil Procedure and due process
9  requirements.
10       Q. Okay. Federal Rule of Civil Procedure 23 is a
11  legal rule and due process is a legal concept. And we
12  talked several times today about how you are not a
13  lawyer. So I want to be clear, Are you offering a legal
14  opinion regarding your methodology complying with either
15  Federal Rule of Civil Procedure 23 or with due process
16  rights under the United States or any state's
17  constitution?
18       MR. PARONICH: Objection.
19       You can answer.
20       A. As a notice expert, my work as a notice
21  administrator is governed by Rule 23. And Rule 23
22  outlines certain steps and certain criteria that all
23  notice administrators have to meet to prepare a notice
24  plan and a notice expert report upon effectuation of the