UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH MANTHA, *on behalf of himself and all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>QUOTEWIZARD.COM, LLC,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil No. 19-12235-LTS<br>)<br>)<br>)<br>)<br>) |

ORDER ON MOTION TO CERTIFY CLASS (DOC. NO. 339) AND MOTION
TO EXCLUDE TESTIMONY OF ANYA VERKHOVSKAYA (DOC. NO. 349)

August 16, 2024

SOROKIN, J.

This is a putative class-action dispute over telemarketing messages allegedly sent by

Defendant QuoteWizard.com, LLC ("QuoteWizard"), in violation of the Telephone Consumer

Protection Act ("TCPA"), 47 U.S.C. § 227. Doc. No. 1.[1] Presently before the Court are two

motions: Plaintiff Joseph Mantha's Motion for Class Certification, Doc. No. 339, and

QuoteWizard's Motion to Exclude the Testimony of Anya Verkhovskaya, Mantha's expert

witness. Doc. No. 349. For the following reasons, the Court ALLOWS Mantha's Motion and

DENIES QuoteWizard's Motion.

I.    BACKGROUND

Congress enacted the TCPA to mitigate intrusive telemarketing practices. The TCPA

"prohibits calls to numbers on the national Do-Not-Call registry ["NDNCR"]." Krakauer v. Dish

---

[1] Citations to "Doc. No. __" reference documents appearing on the Court's electronic docketing
system. Pincites are to the page numbers in the ECF header or, where applicable, to numbered
paragraphs within the document.

Network, LLC, 925 F.3d 643, 648 (4th Cir. 2019). To help combat telemarketing calls to numbers on the NDNCR, a database that lists the telephone numbers of individuals who have requested that telemarketers not contact them, the TCPA created a "consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes." Id. at 649. That process includes the following right of action:

> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may . . . bring in an appropriate court of that State . . . an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater . . . .

47 U.S.C. § 227(c)(5)(B).

This case began when QuoteWizard sent Mantha multiple, unsolicited text messages to his cellular phone number from August 9 to August 23, 2019. Doc. No. 340 at 3. QuoteWizard generates leads (or contact information for potential customers), which it sells to insurance companies, though it is not an insurance company. Doc. No. 220-1 ¶ 144. Mantha had previously listed his number on the NDNCR.[2] Doc. No. 225 ¶ 30; Doc. No. 340 at 3; Doc. No. 210-14 ¶ 10.

---

[2] At summary judgment, the Court determined this fact was undisputed. Doc. No. 268 at 11. This determination arose because Mantha asserted this fact in his Statement of Material Facts. Doc. No. 225 ¶ 30. QuoteWizard made no objection to this factual assertion. Id. Thus, the fact was undisputed at summary judgment. The Court relied upon this fact in concluding that Mantha and his number enjoyed the protections of the TCPA. See Doc. No. 268 at 11. In these circumstances, waiver applies in the absence of some explanation for the shift in position; QuoteWizard offers no such explanation. Notably, while asserting the contrary fact in opposition to class certification by reference to their expert's report, Doc. No. 348 at 21; Doc. No. 348-5 ¶ 131, QuoteWizard has not sought to be relieved from its concession, nor explained a basis for such a result. Cf. Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.") (emphasis added). In any event, for the reasons described below in the text, the protections of the TCPA reach beyond the person who actually registered a number on the NDNCR to include the user of the phone; thus, the possible disputed issue of fact is immaterial.

On October 29, 2019, Mantha brought a class action lawsuit against QuoteWizard in this Court, alleging violations of the TCPA. Doc. No. 1. The TCPA prohibits telephone solicitations to a "residential telephone subscriber who has registered his or her number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). Mantha, on behalf of the putative class, alleges a single claim: "by sending more than one call in a 12-month period to a residential telephone number listed on the [NDNCR] without express written consent, QuoteWizard violated the TCPA's do-not-call registry provisions."[3] Doc. No. 340 at 4.

The case proceeded under a bifurcated discovery schedule, with litigation over Mantha's individual claims preceding all other discovery. Doc. No. 39. After various extensions and the resolution of many discovery disputes, discovery on Mantha's individual claims concluded on June 9, 2021. Doc. Nos. 188, 191. On July 14, 2021, QuoteWizard moved for summary judgment, Doc. No. 201, and Mantha moved for partial summary judgment, Doc. No. 205. Pursuant to a referral, Magistrate Judge Kelley recommended denying QuoteWizard's motion and allowing Mantha's motion. Doc. No. 253.

Upon review, the Court issued an Order approving and adopting Judge Kelley's Report and Recommendation. Doc. No. 268. In the portion of its Order denying QuoteWizard's motion, the Court explained that the undisputed facts supported a finding that Mantha had Article III standing, id. at 4-5; that the TCPA's protections apply to cellular phone numbers, id. at 8; that Mantha's phone was a residential number for purposes of the TCPA, id. at 12-13; that the messages QuoteWizard sent Mantha were telemarketing messages, id. at 14; and that QuoteWizard's good-faith defense failed, id. at 15. Additionally, in the portion of its Order

---

[3] Mantha initially alleged two claims in his Complaint, but later agreed to dismiss Count I, which had alleged a violation of the TCPA's automated calling provisions. Doc. No. 187; see also Doc. No. 80 ¶¶ 73-77.

allowing Mantha's Motion, the Court explained that the undisputed facts supported a finding that Mantha's cellular phone number was "residential" for purposes of the TCPA, id. at 19; and that QuoteWizard's consent defense failed as to Mantha, id. at 21. Thus, the Court resolved these two issues in Martha's favor.

With litigation over Mantha's individual claims concluded, the parties (and the Court) turned their attention to all other discovery with the related motion practice. The unified schedule provided that the parties would conduct all further class and merits discovery, including the preparation of expert reports, in anticipation of a motion for class certification after the conclusion of all discovery. See Doc. Nos. 270, 271. On June 28, 2022, the Court "clarified some confusion among the parties, explaining that the current phase of discovery 'encompasses all other discovery in this proposed class action. The current phase . . . is not limited to the so-called class discovery.'" Doc. No. 319 at 1 (quoting Doc. No. 279). As the Court further explained: "The parties have been on notice at least since June 28, 2022, that this phase of fact discovery is the last phase and encompasses everything." Id. at 3. On December 18, 2023, all discovery concluded, again after various extensions and disputes. See Doc. Nos. 336, 337.

On January 12, 2024, Mantha moved for class certification. Doc. No. 339. QuoteWizard opposed the motion, and Mantha replied. Doc. Nos. 348, 358.

On February 14, 2024, QuoteWizard moved to strike the supplemental report of Mantha's expert, Anya Verkhovskaya. Doc. No. 346. Mantha opposed the motion. Doc. No. 357. On April 5, 2024, the Court denied QuoteWizard's motion. Doc. No. 361.

Also on February 14, 2024, QuoteWizard moved to exclude the testimony of Verkhovskaya. Doc. No. 349. Mantha opposed the motion, and QuoteWizard replied. Doc. Nos. 359, 360.

The Court heard argument on both the Motion to Exclude and the Motion for Class Certification on July 17, 2024. Doc. No. 367. Both Motions are now ripe. Subsequent to the hearing, no party has made any additional filings, nor sought to make any such filings.

## II.   LEGAL STANDARD

### A.   Expert Testimony

Under Rule 702 of the Federal Rules of Evidence, a court may permit opinion testimony by a witness "qualified as an expert by knowledge, skill, experience, training, or education," if:

> The proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The "preliminary question of 'whether a witness is qualified' to testify as an expert pursuant to Rule 702 is one reserved for the Court." United States v. Sampson, No. 01-10384-LTS, 2016 WL 11726919, at *3 (D. Mass. Sept. 2, 2016) (quoting Fed. R. Evid. 104(a)); see Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93 (1993) (requiring a trial judge to "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue"). The Court must "act as gatekeeper[], ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 (1st Cir. 2012) (quoting Daubert, 509 U.S. at 597). While the party proffering the expert testimony has the burden to prove, by a preponderance of the evidence, that the expert reached their conclusions in a scientifically sound and methodologically reliable way, they need not show that the expert's conclusions are correct. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit

Suisse Secs., 752 F.3d 82, 96 (1st Cir. 2014) (citing Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998)).

Accordingly, Rule 702 "necessitates an inquiry into the methodology and the basis for an expert's opinion." Samaan, 670 F.3d at 31. The "central focus of a Daubert inquiry" is normally whether an expert's testimony is based on reliable methods. Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998). However, Rule 702 also requires an examination of whether the expert's methods have been reliably applied such that there is an "adequate fit between the expert's methods and his conclusions." Samaan, 670 F.3d at 32 (citing Daubert, 509 U.S. at 591). In Daubert, the Supreme Court provided a "non-exhaustive" list of factors for a court to consider when analyzing the reliability of an expert's testimony, including:

> [W]hether the theory or technique at issue 'can be (and has been) tested'; whether it 'has been subjected to peer review and publication'; 'the known or potential rate of error'; 'the existence and maintenance of standards controlling the technique's operation'; and the degree of acceptance within a relevant scientific community.

Sampson, 2016 WL 11726919, at *4 (quoting Daubert, 509 U.S. at 593-94). The Court considers these factors while recognizing that "[t]he focus . . . must be solely on principles and methodology." Daubert, 509 U.S. at 595.

Therefore, "a trial court's assessment is not primarily concerned with a proposed expert's conclusions." Sampson, 2016 WL 11726919, at *4 (citing Daubert, 509 U.S. at 595). Rather, "the trial court is tasked with making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. (quoting Daubert, 509 U.S. at 592-93). This follows because "Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a

6

scientifically sound and methodologically reliable fashion." Ruiz-Troche, 161 F.3d at 85. "So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process." Milward v. Acuity Specialty Prods. Grp., 639 F.3d 11, 15 (1st Cir. 2011) (quoting Daubert, 509 U.S. at 590).

B.    Class Certification

This Court may certify a class under Federal Rule of Civil Procedure 23 if it determines, after a "rigorous analysis," that all the requirements of Rule 23(a) are met, and class-wide adjudication is appropriate under Rule 23(b). Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 38 (1st Cir. 2003) (citing Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982)). In conducting this analysis, the Court "may look behind the pleadings, predict how specific issues will become relevant to facts in dispute and conduct a merits inquiry only to the extent that the merits overlap with the Rule 23 criteria." In re Ranbaxy Generic Drug Application Antitrust Litig., 338 F.R.D. 294, 300 (D. Mass. 2021) (citing In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008)).

As the party seeking class certification, Mantha bears the burden of "affirmatively demonstrating" that his proposed class, "in fact," meets all the requirements of Rule 23. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). Specifically, because Mantha seeks to certify a Rule 23(b)(3) class, this Court must perform a rigorous analysis to determine whether Mantha has proven that the proposed class meets the four "threshold" requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and Rule 23(b)(3)'s two additional requirements of predominance and superiority. In re Nexium Antitrust Litig., 777 F.3d 9, 17 (1st Cir. 2015) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013)). Finally, Mantha must also satisfy the implicit Rule 23 requirement that he demonstrate,

by a preponderance of the evidence, that the class is "currently and readily ascertainable based on objective criteria." Id. at 19 (citing Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013)).

III.   DISCUSSION

A.   Motion to Exclude

Mantha proposes a Class defined as follows:

> All persons within the United States (a) whose residential telephone numbers were listed on the National Do Not Call Registry, and (b) who received more than one telemarketing text within any twelve-month period at any time from Drips,[4] (c) to promote the sale of QuoteWizard's goods or services, and (d) whose numbers are included on the Class List.

Doc. No. 340 at 8.

Mantha's expert, Verkhovskaya, prepared the "Class List" described in the proposed Class Definition. See generally Doc. No. 339-2. Her analysis was not an attempt to identify, via a scientific inquiry, all possible phone numbers satisfying subparts (a) to (c) of the proposed Class Definition. Rather, using standard data analysis techniques, she prepared a list, substantially at the direction of counsel for Mantha, of a subset of persons who satisfy the proposed Class Definition, while eliminating potential legal or factual issues by narrowing the Class. The data analysis techniques she utilized are well-established, fairly unremarkable, and plainly appropriate for use by an expert witness. Indeed, QuoteWizard, despite the vigorous defense at every stage of this case, makes no challenge to those techniques. The same is true of the standard software tools Verkhovskaya employed.

With this framework established, the Court turns first to the steps Verkhovskaya undertook to apply this methodology, followed by discussion of the various objections lodged by

---

[4] Drips is the entity that transmitted QuoteWizard's telemarketing texts to consumers nationwide. See Doc. No. 340 at 5.

QuoteWizard.[5] To arrive at the proposed Class List in its present form, Verkhovskaya started with the list of numbers contacted by QuoteWizard via Drips. Doc. No. 340 at 6. She used a four-step process to narrow this list down to the proposed Class List.

Step 1: She eliminated from the call records all phone numbers that QuoteWizard obtained from its own websites. What remained were 5,090,954 sales leads/phone numbers, all of which QuoteWizard purchased from lead sources—entities that may, in turn, have purchased the numbers from other sources. Id.

Step 2: Counsel for Mantha directed Verkhovskaya to exclude from the Step 1 list all numbers except those which QuoteWizard expressly authorized Drips to contact. Id. at 7. This was done, according to Mantha, because QuoteWizard claimed that Drips had sent some texts to consumers without authorization. Id.

Step 3: Verkhovskaya took the Step 2 list and (a) excluded all numbers except those which records from Bandwidth and Twilio confirmed had received QuoteWizard's texts via Drips;[6] then (b) excluded all numbers except those that had replied to the texts requesting that the messages cease. Id. Initially, Verkhovskaya identified the numbers described in Step 3(b) using a list created by Drips for QuoteWizard ("the Drips DNC list").[7,8] Doc. No. 339-2 ¶ 59.

---

[5] The Court addresses the various arguments raised by the parties in their briefs. Objections, critiques, or challenges set forth in the voluminous expert reports or other exhibits submitted with the Motions, but not discussed by the parties, are waived as to the pending Motions.
[6] Bandwidth and Twilio are the entities that Drips used to "facilitate the physical transmission of QuoteWizard's telemarketing texts to consumers nationwide, and [whose] records evidenced consumers' receipt of QuoteWizard's telemarketing texts." Doc. No. 340 at 7.
[7] The Drips DNC List is comprised of seven files containing those telephone numbers, contacted by Drips on QuoteWizard's behalf, that replied to Drips requested further communications cease. See Doc. No. 339-2 ¶ 40; Doc. No. 339-4 at 3; Doc. No. 359 at 23-24.
[8] At the hearing on July 18, 2024, QuoteWizard raised the argument, for the first time, that the Drips DNC list contained all of the numbers that had asked to not be contacted across all of Drips' clients, such that it was impossible to determine if a number was on that list because its user had requested that it not receive any further texts from QuoteWizard specifically. That is,

Step 4: Verkhovskaya (a) verified that all remaining numbers were on the NDNCR before the consumer received a QuoteWizard text, and that the numbers received two texts in a twelve-month period; (b) removed the few numbers that responded to QuoteWizard's texts with an expression of interest, for whom QuoteWizard paid Drips for generating a successful lead; and (c) verified the remaining numbers were residential. Doc. No. 340 at 7-8. As to Step 4(b), she identified the numbers to exclude by reviewing text message responses preserved by QuoteWizard. Id. at 7. As to Step 4(c), she ran the numbers through the PacificEast database of known business numbers, removed any that were business-identified, and further applied a business keyword analysis to remove numbers associated with business names. Id. at 8.

From this process, Verkhovskaya found that QuoteWizard had sent 314,828 text messages to 66,693 telephone numbers that "satisfied the [NDNCR] requirements of having

---

QuoteWizard asserted that Drips maintained only a single DNC list that did not differentiate among its clients. QuoteWizard cited no evidence in support of this assertion, nor did it include this argument in its briefs. This assertion is not borne out by the record, nor is such a practice permitted by the TCPA's regulations. At Verkhovskaya's deposition, counsel for QuoteWizard asked: "Do you have any personal knowledge, one way or the other, regarding all of the different reasons why QuoteWizard might place a telephone number on its own internal Do Not Call List?" Doc. No. 350-7 at 8 (emphasis added). She answered: "I took internal Do Not Call lists of the defendant . . . ." Id. at 9 (emphasis added). Her statement was not corrected by defense counsel. See id. Moreover, when discussing Drips' DNC practices in his Report, QuoteWizard's expert, Jan Kostyun, stated: "When Drips makes such a determination, it characterizes the consumer as 'disqualified,' and provides that information to the Drips customer that engaged Drips to send the text messages." Doc. No. 348-5 ¶ 201 (emphasis added). Finally, the TCPA's regulations require a client-specific DNC list. See 47 C.F.R. § 64.1200(d) ("No person or entity shall initiate . . . any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity.") (emphasis added); see also 47 C.F.R. § 64.1200(d)(3) ("If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request."). Therefore, the Court rejects QuoteWizard's last-minute argument, which is not supported by the record.

received, on a residential number listed on the national do-not-call registry, more than one text message[] in a 12-month period."[9] Id.

In challenging the proposed Class List and seeking to exclude Verkhovskaya's analysis, QuoteWizard raises several criticisms.[10] The Court addresses them in turn.

### 1.    Verkhovskaya's Methodology Does Not Identify Mantha

QuoteWizard alleges that Verkhovskaya's testimony should be rejected because her process failed to identify Mantha, whom she manually added to the Class List. Doc. No. 350 at 12. Specifically, QuoteWizard alleges that Verkhovskaya's methodology "exclude[s] him, as he was present in the data set she began with." Id. at 14. This challenge fails for two reasons.

First, she was not trying to identify him. See Doc. No. 350-1 ¶ 1 ("Plaintiff's counsel . . . asked me to analyze telemarketing telephone text records . . . to identify class members, in addition to plaintiff Joseph Mantha, who all received text solicitations on behalf of QuoteWizard.") (emphasis added). This Court already found that (i) Mantha listed his number on the NDNCR, (ii) his number is residential, (iii) QuoteWizard sent him eight text messages in ten days, and (iv) the texts from QuoteWizard amounted to "telephone solicitations" within the meaning of the TCPA. Doc. No. 268 at 3, 5-8, 11-14, 17-19; see also Doc. No. 233-2 ¶¶ 32-33, 35, 37, 39, 41, 43, 45, 47. Thus, Mantha has met parts (a) through (c) of the proposed Class

---

[9] After Verkhovskaya submitted both her Expert Report and Rebuttal Report, but prior to her deposition, she discovered that she had attached to those Reports the same file (representing the list of telephone numbers before she had removed the business-related numbers described above) as both the input and output file. Doc. No. 340 at 8. This yielded findings slightly greater than the numbers cited above. Doc. No. 339-3 ¶ 62. Realizing this error when preparing for her deposition, she submitted a Supplemental Report, Doc. No. 339-4, that attached the correct output file and gave the revised numbers recounted in the text. Doc. No. 340 at 8. The Court approved this supplementation in an earlier Order. Doc. No. 361 at 3-5.

[10] Although QuoteWizard raises arguments around issues of consent in its Motion to Exclude, Doc. No. 350 at 21-22, the Court finds such challenges are more accurately characterized as arguments to deny class certification. Accordingly, the Court addresses them in its discussion of Mantha's Motion for Class Certification below.

Definition. He met part (d) when Verkhovskaya added him to the proposed Class List. Nothing more is legally required.[11]

Second, Verkhovskaya has not represented that her methodology identifies everyone from the files obtained from QuoteWizard who could possibly fit within the proposed Class Definition. Rather, she offers her data analysis as a means of identifying a subset of all possible class members for certification as a class. It is, therefore, irrelevant for Daubert purposes that she manually added Mantha to the Class List. A simple example illustrates the point. In Step 3(b), Verkhovskaya removed all numbers from the proposed Class List except those appearing on the Drips DNC list. Doc. No. 340 at 7; Doc. No. 350-1 ¶ 59-60. Of course, Mantha did not send such a text. He nevertheless falls within the proposed Class Definition and, as explained below, qualifies as a proper representative party.

### 2.    Decisions of Other Courts Considering Verkhovskaya's Reports

QuoteWizard urges this Court to exclude Verkhovskaya based on the rulings of other courts. The Court has reviewed the various cases cited by QuoteWizard where other courts have excluded Verkhovskaya's methodology, as well as other cases cited by Mantha. See Doc. No. 350 at 12-15. The decisions QuoteWizard cites do not warrant exclusion. QuoteWizard relies principally upon two cases arising under different sections of the TCPA which, necessarily, entailed different analyses by Verkhovskaya. See Davis v. Cap. One, N.A., No. 1:22-cv-00903,

---

[11] QuoteWizard cites Sandoe v. Boston Scientific Corp., 333 F.R.D. 4 (D. Mass. 2019), to support its argument that failing to identify Mantha undermines Verkhovskaya's analysis. See Doc. No. 350 at 9. The court in Sandoe did not strike or exclude Verkhovskaya's methodology. Moreover, Sandoe concerned whether Verkhovskaya could reliably identify the name of the person called by the defendant as part of the determination of whether the defendant had called the "wrong number." See Sandoe, 333 F.R.D. at 6-7. Accordingly, the failure to identify the named plaintiff in Sandoe demonstrated a seemingly unexplained shortcoming in Verkhovskaya's methodology in that case. Id. at 8-9. This Court is presented with a different question and a different context.

2023 WL 6964051, at *8 (E.D. Va. Oct. 20, 2023) (distinguishing Verkhovskaya's methodology in reassigned number case from simpler methodology required in § 227(c)(5) case); Carroll v. SGS Auto. Servs., Inc., No. 16-537-SDD-RLB, 2020 WL 7024477, at *7 (M.D. La. Nov. 30, 2020) (excluding Verkhovskaya's methodology in § 227(b) case involving different data provider, in part because, at class certification stage, she had not yet actually utilized her methodology). These cases are not persuasive here.

As to the other cases cited by QuoteWizard in its Motion, they either involved the denial of Daubert motions to exclude Verkhovskaya's testimony or did not involve Daubert motions at all. See Wilson v. Badcock Home Furniture, 329 F.R.D. 454, 461 (M.D. Fla. 2019) (denying Daubert motion to exclude Verkhovskaya in wrong number case); Sandoe, 333 F.R.D. at 8-10 (addressing § 227(b) case not involving Daubert motion); Sapan v. Yelp, Inc., No. 3:17-cv-03240-DJ, 2021 WL 5302908, at *3 (N.D. Cal. Nov. 15, 2021) (denying class certification in wrong number case, in part, because of numerosity issues, where Verkhovskaya was unable to perform her methodology because she had received no call records to analyze). Such cases are inapposite.

Finally, Krakauer v. Dish Network, L.L.C.—a case cited by Mantha and cited positively in Davis—is persuasive. It involves a § 227(c)(5) claim and testimony by Verkhovskaya nearly identical to that offered here. See No. 1:14-cv-333, 2015 WL 5227693, at *11-12 (M.D.N.C. Sept. 8, 2015) (denying Daubert motion, in part, because challenge went to "soundness" of Verkhovskaya's conclusions, not reliability of her methodology). Therefore, the Court declines to exclude Verkhovskaya's testimony based on any of the cases cited by QuoteWizard.

3.    *Reliability of the PacificEast Data*

QuoteWizard next alleges that Verkhovskaya's testimony should be rejected because she used "unreliable" data from PacificEast in formulating her opinions. See Doc. No. 350 at 15.

13

QuoteWizard supports this attack with affidavits from PacificEast's COO, Scott Rice. This challenge fails.

PacificEast is a "data processing service provider." Doc. No. 348-12 ¶ 2. It has been in business for over twenty years. Id. One service it offers, labeled the "NDNCR Lookup Service," provides information about whether a phone number appears on the NDNCR. Id. ¶ 4. Verkhovskaya retained PacificEast to perform this service. Doc. No. 339-2 ¶¶ 61-68. This is how she determined whether a phone number appears on the NDNCR. Id. ¶ 68. As part of the same service, PacificEast also reports a date of registration on the NDNCR for each specific phone number. See id. ¶ 68; Doc. No. 350-2 ¶ 31. Verkhovskaya used that information to develop the proposed Class List and formulate her opinions. Doc. No. 339-2 ¶ 68. Using a widely available, long-standing, commercial service to run a database check is a perfectly normal and reasonable methodology. That Rice concedes his company does virtually nothing in this process—for, in his words, PacificEast subcontracts with Contact Center Compliance and "merely passes the data it receives from its vendor to the customer"—says nothing about the reliability of the methodology. Doc. No. 348-12 ¶ 7. Rice also notes that PacificEast does not "warrant the accuracy of specific data outputs for this service." Id. ¶ 8. That, too, is insignificant here. Experts generally do not warrant or guarantee their opinions, nor need they. One further fact confirms this conclusion: QuoteWizard fails to identify even a single number on the proposed Class List not also appearing on the NDNCR.

Next, Verkhovskaya used the "Business Number Lookup"—another service offered commercially by PacificEast. Doc. No. 348-12 ¶ 9. As part of this service, PacificEast reports whether a number is a "business" or "residential" number. Id. This determination, along with all the searches supporting the designations, are performed by a third-party vendor—although, in

contrast to the NDNCR Lookup Service, PacificEast does do something with this data (per Rice, it "format[s] the data"). Id. ¶ 11. QuoteWizard makes much of Rice's opinion that "there is no accepted definition of what constitutes a 'business' as opposed to a 'residential number,'" and that the service is "not intended to conclusively establish" the categorization of a phone number. Id. ¶¶ 14-15. These arguments miss the mark.

The Court is not now evaluating the correctness of Verkhovskaya's opinions, only their admissibility. The service and the method are reliable. And, in this case, Verkhovskaya was not using this service to conclusively determine whether a number was "residential." Rather, it aided her in narrowing the proposed Class List to numbers that are more likely to be residential. This limited purpose further enhances her method's reliability.

Finally, to the extent QuoteWizard challenges more generally the "residential" determination Verkhovskaya did make, her opinions withstand the exclusion motion. Numbers on the NDNCR are presumed residential. Doc. No. 268 at 11 (discussing "residential" presumption). Of course, QuoteWizard itself is the source of the original list of numbers, and the fact that it was aiming its telemarketing campaign at consumers tends to suggest the original list is comprised of residential numbers. Doc. No. 339-2 ¶¶ 50-51. Moreover, Verkhovskaya eliminated numbers with current business associations. Id. ¶¶ 83-85. She used PacificEast data to "weed out any remaining business-associated numbers . . . [which] resulted in a small reduction of class size – just 3%." Doc. No. 359 at 20; see also Chinitz v. Intero Real Estate Servs., No. 18-cv-05623-BLF, 2020 WL 7391299, at *6 (N.D. Cal. July 22, 2020) (rejecting challenge to Verkhovskaya's use of LexisNexis to remove business numbers because she also had benefit of residential presumption); Krakauer, 2015 WL 5227693, at *10-11 (rejecting challenge to

Verkhovskaya's use of LexisNexis to remove business numbers because of residential presumption and her years of experience working with LexisNexis).

Of course, even if her use of PacificEast has left some errors in her proposed Class List, such that some of the members of the proposed Class List do not meet the Class Definition, this does not warrant exclusion of her testimony. As this Court has previously stated, the focus in a Daubert challenge is not "primarily concerned with a proposed expert's conclusions," but with "making a 'preliminary assessment of whether the . . . methodology underlying the testimony is scientifically valid and of whether that . . . methodology properly can be applied to the facts in issue.'" Sampson, 2016 WL 11726919, at *4 (quoting Daubert, 509 U.S. at 592-93); see also Krakauer, 2015 WL 5227693, at *11 ("To the extent Ms. Verkhovskaya missed a few business numbers out of more than 28,000 . . . that is insufficient to establish that she has not reliably applied her methodology to the data."). Thus, although the accuracy of Verkhovskaya's opinions may be relevant to class certification, and is discussed in that context below, the Court declines to exclude her testimony on these grounds.

### 4.    QuoteWizard's "False Positives" Challenge

QuoteWizard next alleges that Verkhovskaya's testimony should be excluded because her methodology has a high error rate, illustrated by a number of "false positives" or phone numbers presently on the proposed Class List that should not be. See Doc. No. 350 at 19. In raising this challenge, QuoteWizard principally relies on the analysis of its own expert, Kostyun. See Doc. No. 350-2.

First, at Step 3(b), Verkhovskaya narrowed the proposed Class List to only those numbers appearing on the Drips DNC List. Doc. No. 339-2 ¶¶ 59-60. QuoteWizard alleges that 20% of the numbers on the proposed Class List do not appear in any of the five DNC files that Verkhovskaya listed that she analyzed at Step 3(b). Doc. No. 350 at 19; Doc. No. 350-2 ¶¶ 14-

15. However, Verkhovskaya explained in her Supplemental Report that she, in fact, analyzed seven DNC files, having initially (and unintentionally) omitted listing two of these file names in her initial Expert Report. Doc. No. 339-4 at 3. Of course, QuoteWizard has all these files; it created them and produced them in discovery. Doc. No. 359 at 24. It made no response to Verkhovskaya's explanation in its Reply. See generally Doc. No. 360. Accordingly, this "false positive" is not a basis for exclusion.

Second, for many of the numbers QuoteWizard noted it should not call (compiled into its DNC files), QuoteWizard did not preserve the text communication from the phone number asking QuoteWizard's marketing to cease or otherwise objecting to receiving further text messages. This provides the backdrop for QuoteWizard's allegation that, for 61% of the phone numbers on the proposed Class List, there are no associated texts indicating that the individual requested further telemarketing texts cease. Doc. No. 350 at 19; see also Doc. No. 350-2 ¶ 47. From this, QuoteWizard concludes that Verkhovskaya's method is flawed. Not so. The method at issue reflects the choice by Verkhovskaya to limit the proposed Class List to numbers appearing in QuoteWizard's DNC files on the theory that QuoteWizard had the incentive to put numbers on the DNC list only if the user had actually complained. That is a reliable method. The remainder of this objection, as is true for many of QuoteWizard's objections, goes to the weight, not admissibility, of expert testimony.[12]

---

[12] In any event, upon learning that some numbers on the proposed Class List had expressed interest in receiving further telemarketing texts from QuoteWizard, Verkhovskaya conducted a manual review of the available text responses. Doc. No. 339-2 ¶¶ 69-70. She removed 2,678 numbers from the proposed Class List as a result. Id.; see also Doc. No. 359 at 25. Nothing before the Court suggests that all the numbers on QuoteWizard's DNC list for which there are no preserved texts wished to keep receiving marketing texts from QuoteWizard. This is a key (but unsupported) assumption underlying Kostyun's 61% figure.

Third, QuoteWizard alleges that 22% of the proposed Class List was improperly included because texts sent by those numbers to QuoteWizard are ambiguous about whether they desired further contact. Doc. No. 350 at 19. This objection fails for the reasons expressed in the preceding paragraph.

Fourth, QuoteWizard complains that for 68% of the numbers on the proposed Class List, the person using the number, according to Verkhovskaya, was not the person who registered the number on the NDNCR. Id. at 19. This is not a challenge to Verkhovskaya's method or a basis to exclude her testimony. Verkhovskaya did not purport to determine whether the user of the phone was the person registering it on the NDNCR.

Insofar as QuoteWizard contends, in connection with either pending motion, that 68% of the users on the proposed Class List lack standing to bring a TCPA claim because they did not register their numbers on the NDNCR, the Court disagrees. There is no statutory requirement that the phone number's user—as opposed to the subscriber—register the number. Rather, the TCPA affords a private right of action to a "person who has received" calls placed "in violation of" the statute's regulations. 47 U.S.C. § 227(c)(5); accord Krakauer, 925 F.3d at 656-57. Elsewhere in the statute, Congress used the term "subscriber." See § 227(c)(3)-(4). Congress clearly knew the difference. A plain reading of the statute dictates that the right of action contained in § 227(c)(5) belongs to any person using the number, not just the subscriber.

Fifth, at Step 4(a), Verkhovskaya used PacificEast to identify the date on which a number appeared on the NDNCR, so that she could ascertain whether QuoteWizard sent texts to that number at least thirty days thereafter. Doc. No. 339-2 ¶ 63. QuoteWizard asserts that 5% of the numbers on the proposed Class List are "invalid," Doc. No. 350 at 19, because (a) PacificEast is not a reliable source of information for determining the registration date; (b) an email from the

NDNCR Help Desk stated that the NDNCR "started accepting registrations on 6/27/2003," Doc. No. 350-2 at 66; and (c) the NDNCR registration date PacificEast provided for almost five percent of the numbers on the proposed Class List was June 1, 2003 (i.e., before the date stated in the email).

Again, the method Verkhovskaya selected—using a commercially available service for its intended purpose—is a reliable one. Doc. No. 348-12 ¶ 4. This date-focused challenge rests on speculative inferences arising from an unexplained email. Even assuming, for purposes of this Motion only, that the June 1, 2003, date reflects an error or problem in the data—rather than the FTC intentionally entering that date to reflect, for example, requests received in advance of the first date of registration—the error is a weight, not admissibility, issue. It would also affect only the relatively small percentage of numbers with the June 1, 2003, date.[13]

In sum, none of QuoteWizard's series of challenges warrant exclusion here. The Court, therefore, DENIES QuoteWizard's Motion to Exclude.[14]

B.   Mantha's Motion for Class Certification

With QuoteWizard's Motion to Exclude resolved, the Court turns to Mantha's Motion for Class Certification. Doc. No. 339. Again, Mantha proposes the following class definition:

> All persons within the United States (a) whose residential telephone numbers were listed on the National Do Not Call Registry, and (b) who received more than one telemarketing text within any twelve-month period at any time from Drips, (c) to

---

[13] QuoteWizard advances the additional argument that 93% of the individuals on the proposed Class List should be excluded because they fall into one or more of the other "false positive" groups described above. Doc. No. 350 at 19; see also Doc. No. 350-2 ¶ 81. Because the Court finds that none of the individual arguments warrants exclusion, it declines to exclude Verkhovskaya's testimony based on this aggregate number.

[14] Whether any of the "opinions" offered in Verkhovskaya's Expert Report are subject to exclusion or limitation (an issue raised briefly by QuoteWizard at the hearing) is a question beyond the scope of the briefing on the instant Motions. It is also, at least in this case, more of an evidentiary issue than a Daubert issue. Accordingly, QuoteWizard may pursue any such discrete challenges via a motion in limine filed in advance of trial pursuant to the pretrial order which the Court will issue when scheduling the trial date.

promote the sale of QuoteWizard's goods or services, and (d) whose numbers are included on the Class List.

Doc. No. 340 at 8.

Mantha bears the burden of showing that the proposed Class satisfies the implicit Rule 23 requirement of ascertainability, as well as the explicit Rule 23 requirements of numerosity, commonality, typicality, and adequacy. In re Nexium, 777 F.3d at 19, 27; see also Fed. R. Civ. P. 23(a)(1)-(4). Because he seeks to certify a Rule 23(b)(3) class, Mantha must also show that the proposed Class satisfies that Rule's predominance and superiority requirements. In re Nexium, 777 F.3d at 17.

QuoteWizard challenges Mantha's showings as to each requirement, advancing many challenges that go to more than one area of the analysis. The Court analyzes each requirement in turn, addressing each of QuoteWizard's challenges in the most relevant section.

### 1.   Ascertainability

Rule 23 has an implicit requirement that "a putative class be ascertainable with reference to objective criteria." Muniz v. XPO Last Mile, Inc., 342 F.R.D. 189, 199 (D. Mass. 2022). To be ascertainable, class membership "must be based on objective terms that do not rely on the merits of the claim itself, lest it be a 'fail-safe class.'" Ruiz v. NEI Gen. Contracting., Inc., No. 21-11722-WGY, 2024 WL 869445, at *4 (D. Mass. Feb. 29, 2024) (citing In re Nexium, 777 F.3d at 22); see In re Nexium, 777 F.3d at 19 ("[T]he definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable."); Hebert v. Vantage Travel Serv., Inc., 334 F.R.D. 362, 370 (D. Mass. 2019) ("[T]he Court must determine 'whether the scope of the class . . . is appropriate, i.e., whether it is administratively feasible.'" (quoting Kent v. SunAmerica Life Ins. Co., 190 F.R.D. 271, 278 (D. Mass. 2000))). Although a putative class must be determinable by "'stable and objective factors' . . . not every class member must be

identified"; rather "the class must be sufficiently ascertainable to permit a court to 'decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment.'" Hebert, 334 F.R.D. at 370 (quoting Kent, 190 F.R.D. at 278).

A putative class is an "impermissible fail-safe when defined based on terms which depend on the outcome of the subsequent litigation, i.e., 'a class defined in terms of the legal injury.'" Ruiz, 2024 WL 869445, at *4 (quoting In re Nexium, 777 F.3d at 22). A class definition that "run[s] afoul to the proscription on fail-safe classes 'can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis.'" Costa v. Divinci Energy, Inc., 342 F.R.D. 38, 40 (D. Mass. 2022) (quoting O'Hara v. Diageo-Guinness, USA, Inc., 306 F. Supp. 3d 441, 468 (D. Mass. 2018)); see also Campbell v. First Am. Title Ins. Co., 269 F.R.D. 68, 74 (D. Me. 2010) ("A court may, in an exercise of its discretion, revise a proposed class definition to avoid the problem of a fail-safe class.").

Here, the Court makes just such a refinement. To avoid the need to make a legal determination as to whether a particular telephone number is residential prior to its inclusion in the putative Class, the Court refines the proposed Class Definition by removing the word "residential," such that the Class Definition is now:

> All persons within the United States (a) whose telephone numbers were listed on the National Do Not Call Registry, and (b) who received more than one telemarketing text within any twelve-month period at any time from Drips, (c) to promote the sale of QuoteWizard's goods or services, and (d) whose numbers are included on the Class List.

This refinement also resolves the challenges QuoteWizard asserts as to ascertainability, which focused on the term "residential" in the original Class Definition. See Doc. No. 348 at 13-14. With the refined Class Definition, there is no need to make the "residential" determination at

this step in the class analysis, nor is there any risk that the Class is an impermissible fail-safe class.[15]

Moreover, the Court finds that the refined Class Definition satisfies the ascertainability requirements that class membership be "administratively feasible," Hebert, 334 F.R.D. at 370 (quoting Kent, 190 F.R.D. at 278), "definite," Ruiz, 2024 WL 869445, at *4, and based on "objective terms," id. First, Mantha is not required to identify every potential class member precisely to satisfy the ascertainability requirements. He need only put forward objective criteria that makes the identification of the putative Class administratively feasible. Bee, Denning, Inc. v. Cap. All. Grp., 310 F.R.D. 614, 623 (S.D. Cal. 2015); Hebert, 334 F.R.D. at 370. Mantha has done this by proposing a Class Definition that (upon refinement) hews closely to the TCPA, thereby clearly indicating whether an individual fits within the Class.

Second, the refined Class Definition renders the putative Class ascertainable based on the internal records provided by QuoteWizard in discovery—records which QuoteWizard amassed as part of its campaign to sell consumer insurance. See Doc. No. 339-5 at 66-67; Doc. No. 358 at 8. These records reflect the total possible population from which the Class can be drawn. From this total population, Mantha can use the Class Definition to narrow down the appropriate Class.

Finally, Mantha offers Verkhovskaya's methodology as an objective approach to culling the putative Class from the total population. As described above, Verkhovskaya's four-step methodology uses QuoteWizard's internal DNC files, third-party databases, and keyword searches to provide an administratively feasible method for ascertaining the Class List. See Doc. No. 340 at 6-8; see also Krakauer, 311 F.R.D. at 393-94 (finding class ascertainable after

---

[15] At the hearing, counsel for Mantha agreed the Court could strike the word "residential" from the Class Definition.

Verkhovskaya used similar methodology in § 227(c)(5) case). Although QuoteWizard disputes

the accuracy of Verkhovskaya's methodology, it is enough, for ascertainability purposes, that

Mantha has offered an objective means to ascertain the Class. See Hebert, 334 F.RD. at 370.

Therefore, the Court finds the proposed Class, as refined, is ascertainable.

### 2. Numerosity

Numerosity requires that "the class is so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). Although Rule 23 does not state a numerical threshold,

courts have generally found the numerosity requirement satisfied if the proposed class exceeds

forty members. See DeRosa v. Mass. Bay Commuter Rail Co., 694 F. Supp. 2d 87, 98 (D. Mass.

2010). Here, there are over 66,000 potential class members, easily satisfying the numerosity

requirement.

### 3. Commonality

Commonality requires that "there are questions of law or fact common to the class." Fed.

R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members

'have suffered the same injury.'" Wal-Mart Stores, 564 U.S. at 349-50 (quoting Gen. Tel. Co. of

Sw. v. Falcon, 457 U.S. 147, 157 (1982)). Moreover, the class members' claims must "depend

upon a common contention . . . of such a nature that it is capable of classwide resolution—which

means that determination of its truth or falsity will resolve an issue that is central to the validity

of each one of the claims in one stroke." Id. at 350. Therefore, "[w]hat matters to class

certification . . . is not the raising of common 'questions'—even in droves—but rather, the

capacity of a class-wide proceeding to generate common answers apt to drive the resolution of

the litigation." Id. (quoting Richard Nagareda, Class Certification in the Age of the Aggregate

Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)); see also In Re New Motor Vehicles Canadian Exp.

Antitrust Litig., 522 F.3d at 19 (stating that courts have typically characterized the commonality

23

requirement as a "low bar" and given it a "permissive application" (quoting 7A Charles Wright & Arthur Miller, <u>Federal Practice & Procedure</u> § 1763 (4th ed. 2024))).

To satisfy his burden as to commonality, Mantha need not demonstrate that "<u>every</u> question [is] common." <u>Swack v. Credit Suisse First Bos.</u>, 230 F.R.D. 250, 259 (D. Mass. 2005) (quoting <u>In re PolyMedica Corp. Sec. Litig.</u>, 224 F.R.D. 27, 35 (D. Mass. 2004)). Satisfying commonality is seen as a low bar because a "<u>single</u> common legal or factual issue can suffice." <u>Payne v. Goodyear Tire & Rubber Co.</u>, 216 F.R.D. 21, 25 (D. Mass. 2003).

Mantha has sufficiently shown that all the putative Class members have allegedly suffered the same injury and advance claims based on the same contention: that QuoteWizard violated § 227(c)(5) of the TCPA when it sent each putative Class member two or more telemarketing texts to numbers registered on the NDNCR in a twelve-month period. <u>See</u> Doc. No. 340 at 11-12. Moreover, Mantha supplies a list of questions of law or fact that are common to the putative Class, including:

- Were the phone numbers of all class members listed on the DNC Registry for the required amount of time at the time of the text campaign?
- Were the texts received?
- Were the texts sent to residential numbers?
- Did class members receive two or more calls in a 12-month period?
- Can QuoteWizard show that any class member provided their prior express consent signed in writing to receive the telemarketing texts at issue specifically from QuoteWizard itself?
- Do the purported internet-based "opt ins" offered by QuoteWizard as a proof of consent satisfy the E-Sign Act?
- Did QuoteWizard authorize Drips to text class members on its behalf?
- Are class members entitled to recover statutory damages of up to $500 per violation of § 227(c)?

<u>Id.</u> at 12.

These common questions identified by Mantha are essential to the claims of all the members of the putative Class. They are also of the type of questions that other sessions of this

Court have found satisfy the commonality requirement under Rule 23(a)(2). <u>See, e.g.</u>, <u>Swack</u>, 230 F.R.D. at 260; <u>In re Credit Suisse-AOL Sec. Litig.</u>, 253 F.R.D. 17, 22 (D. Mass. 2008). Moreover, the answers to many, if not all, of those questions will be provided via the same sources of common proof for the entire putative Class. <u>See</u> Doc. No. 358 at 7-9 (listing forms of common proof, such as (i) NDNCR residential number presumption, (ii) the nature of QuoteWizard's own records, and (iii) Verkhovskaya's testimony). This is enough to satisfy the commonality requirement.

QuoteWizard's two challenges to commonality—relating to issues of consent and whether a number is "residential"—do not undermine the foregoing because they are, in reality, challenges to predominance. <u>See</u> Doc. No. 348 at 24-32. Accordingly, the Court addresses them below. <u>See</u> discussion <u>infra</u> § III.B.6.

### 4. *Typicality*

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Although "[t]ypicality does not require that all putative class members share 'identical claims,'" <u>Tracey v. MIT</u>, No. 16-11620-NMG, 2018 WL 5114167, at *4 (D. Mass. Oct. 19, 2018) (quoting <u>Garcia v. E.J. Amusements of N.H., Inc.</u>, 98 F. Supp. 3d 277, 289 (D. Mass. 2015)), the class representative's injuries must "arise from the same events or course of conduct" as the class's injuries, and the class representative's claims must be "based on the same legal theory." <u>In re Credit Suisse-AOL Sec. Litig.</u>, 253 F.R.D. at 23.

Mantha readily satisfies the typicality requirement. His injuries arose from the same course of conduct as the rest of the proposed Class: He received multiple telemarketing texts from QuoteWizard while his residential phone number was on the NDNCR. Doc. No. 340 at 3.

He, like the rest of the Class, seeks statutory relief under 47 U.S.C. § 227(c)(5). Doc. No. 1. Nothing more is required.

None of QuoteWizard's challenges to typicality alter these conclusions. Mantha fits within the proposed Class Definition because (a) his telephone number was listed on the NDNCR, (b) he received more than one telemarketing text within a twelve-month period from Drips, (c) to promote the sale of QuoteWizard's goods or services, and (d) his number is on the Class List. See Doc. No. 340 at 3, 8; Doc. No. 1 ¶¶ 29-38. It is irrelevant, for typicality purposes, that he was added to the Class List manually (and not through Verkhovskaya's methodology) if he otherwise satisfies the Class Definition. Cf. In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. at 23 (finding typicality satisfied if class representative's injuries arose from "same events or course of conduct" and his claims are "based on the same legal theory"). QuoteWizard conflates the proposed Class Definition with the methodology Verkhovskaya used to narrow the Class List. See Doc. No. 348 at 16-17. Nor is Mantha "atypical." Though his number was not in QuoteWizard's DNC files, that is because he expressed his desire for the texts to cease by suing, rather than texting back.

Likewise, it does not matter that QuoteWizard purchased Mantha's lead from a different source.[16] The only relevant considerations, for typicality purposes, are whether Mantha's claims originate from the same course of conduct and are based on the same legal theory as the rest of the class. Hochstadt v. Bos. Sci. Corp., 708 F. Supp. 2d 95, 103 (D. Mass. 2010). They do, and they are.

---

[16] The Court addresses the consent issue and its relation to class certification below. See discussion infra § III.B.6.

QuoteWizard's claim that Mantha does not satisfy typicality because he allegedly did not register his own number on the NDNCR holds no weight. Relying on facts that were undisputed at summary judgment, the Court already found that Mantha listed his cellular phone number on the NDNCR. Doc. No. 268 at 11; see also Doc. No. 210-14 ¶ 10. QuoteWizard supplies no evidentiary or legal basis for revisiting that finding now. Moreover, the TCPA prohibits calls to all phone numbers listed on the NDNCR, irrespective of who listed the number there. See Krakauer, 925 F.3d at 657 (rejecting argument that § 227(c)(5)'s private right of action is limited to "subscribers" and finding "no reason that the private right of action should be limited only to those who can list their numbers on the registry"). QuoteWizard has cited no binding or persuasive authority for the proposition that, because a telephone number on the NDNCR may have been listed by another party, the person receiving telemarketing calls cannot pursue the relief afforded by the TCPA.[17]

Finally, QuoteWizard claims that Mantha is unlike the rest of the proposed Class because he has already established his Article III standing. Thus, QuoteWizard claims it has a defense to which only the class representative is not susceptible. Yet, § 227(c)(5) confers standing because, as the Krakauer court found, "Congress responded to the harms of actual people by creating a cause of action that protects their particular and concrete privacy interest." 925 F.3d at 653; see also Davis, 2023 WL 6964051, at *4 (finding § 227(c)(5) to be limited in its application to

---

[17] QuoteWizard's reliance on 47 C.F.R. § 64.1200(c)(2) does not change this analysis. Although that regulation does use the term "residential telephone subscriber," the statutory, private right of action Mantha (and, in turn, the putative Class) sues under uses the broader term "person." Compare 47 U.S.C. § 227(c)(5) ("A person who has received more than one telephone call within any 12-month period . . . .") with 47 C.F.R. § 64.1200(c)(2) ("A residential telephone subscriber who has registered . . . ."). Although an agency's interpretation of a statute may be informative, it "cannot bind a court," especially when the meaning of the statute is facially clear. Loper Bright Enters. v. Raimondo, 144 S. Ct. 2244, 2267 (2024) (quoting Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, 98 n.8 (1983)).

"persons who would have sustained a concrete injury"). So long as the remaining Class members received at least two telemarketing texts to a residential number on the NDNCR, they satisfy the Article III requirements, just as Mantha does—in the absence of QuoteWizard establishing the affirmative defense of consent.

Indeed, <u>Krakauer</u> is not alone. Other courts have "held that a mere technical violation of the TCPA is, by itself, a concrete injury sufficient to confer standing. <u>Gibbs v. SolarCity Corp.</u>, 239 F. Supp. 3d 391, 395 (D. Mass. 2017); <u>see</u> <u>Van Patten v. Vertical Fitness Grp.</u>, 847 F.3d 1037, 1043 (9th Cir. 2017) ("A plaintiff alleging a violation under the TCPA 'need not allege any <u>additional</u> harm beyond the one Congress has identified.'" (quoting <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 342 (2016))); <u>Wilkes v. CareSource Mgmt. Grp. Co.</u>, No. 4:16-CV-038 JD, 2016 WL 7179298, at *3 (N.D. Ind. Dec. 9, 2016) ("Of the district courts within the Seventh Circuit that have addressed this issue, all have held that a violation of the TCPA gives rise to a concrete injury under Article III."); <u>LaVigne v. First Cmty. Bancshares, Inc.</u>, 215 F. Supp. 3d 1138, 1147 (D.N.M. 2016) (finding a violation of the TCPA constitutes a "concrete" harm for an Article III injury-in-fact requirement, noting "the TCPA contains a congressionally-identified concrete injury in its language prohibiting certain kinds of telephone calls")

QuoteWizard's primary response is citation to <u>Elzen v. Advisors Ignite USA, LLC</u>, No. 22-C-859, 2024 WL 195473 (E.D. Wis. Jan. 18, 2024). But that case involved a different statutory provision, 47 U.S.C. § 227(b)(1)(A)(iii), which merely "attaches liability to a procedural violation of the statute," in contrast to § 227(c)(5), which "limits its application to persons who would have sustained a concrete injury. <u>Davis</u>, 2023 WL 6964051, at *4; <u>see</u> <u>Krakauer</u>, 925 F.3d at 656-57 (finding a claim under § 227(c)(5) to "accrue[] only once a telemarketer disregards the registry and actually places multiple calls," which is a harm

"particular to each person and imposes a concrete burden on his privacy" so as to confer

standing). In any event, the proposed Class List contains only those individuals who satisfy the

requirements of § 227(c)(5) and further meet the narrowing criteria applied by Mantha's expert.

Thus, because the individuals on the list suffered the same injury-in-fact as Mantha does, Mantha

has established typicality.

> ### 5. Adequacy

Adequacy of representation is satisfied when "the representative parties will fairly and

adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). While a class representative

will be found "not adequate if 'there are conflicts of interest between the proposed representative

and the class,'" Ruiz, 2024 WL 869445, at *5 (quoting William Rubenstein et al., Introduction to

Adequacy Standard, 1 Newberg & Rubenstein on Class Actions § 3:54 (6th ed. 2024)), "[m]erely

lacking identical interest[s] . . . is not enough for a representative party to be found inadequate."

Id. (citing Murray v. Grocery Delivery E-Servs. USA, Inc., 55 F.4th 340, 345-46 (1st Cir.

2022)). The class representative's interests must create conflicts which "'are fundamental to the

suit and . . . go to the heart of the litigation' [to] breach the adequacy-of-representation standard."

Murray, 55 F.4th at 346 (quoting Cohen v. Brown Univ., 16 F.4th 935, 945 (1st Cir. 2021)).

Moreover, the adequacy requirement "tend[s] to merge" with the commonality and typicality

requirements such that a court's analysis as to all three requirements will often overlap. Falcon,

457 U.S. at 157 n.13.

Mantha has sufficiently demonstrated that he will be an adequate class representative for

largely the same reasons discussed by the Court in its commonality and typicality analyses.[18] See

---

[18] Though the adequacy inquiry often requires consideration of class counsel's qualifications, see DaSilva v. Border Tr. of Mass., Inc., 296 F. Supp. 3d 389, 405 (D. Mass. 2017), QuoteWizard raises no such challenge. Therefore, the Court finds class counsel's adequacy undisputed.

discussion <u>supra</u> § III.B.3-4. Apart from those challenges addressed already, QuoteWizard raises

no adequacy-specific arguments. Therefore, the Court finds that Mantha has sufficiently shown

he will be an adequate class representative.

### 6. Predominance

The predominance inquiry is satisfied if a court "finds that the questions of law or fact

common to class members predominate over any questions affecting only individual members."

Fed. R. Civ. P. 23(b)(3); <u>see</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 623 (1997) ("The

Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation."). This inquiry requires "courts to give careful scrutiny to

the relation between common and individual questions in a case." <u>Tyson Foods, Inc. v.</u>

<u>Bouaphakeo</u>, 577 U.S. 442, 453 (2016). Although the predominance inquiry may overlap with

the commonality and typicality analyses, it is a "far more demanding" one. <u>In re New Motor</u>

<u>Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d at 20 (quoting <u>Amchem</u>, 521 U.S. at 624). Its

"aim . . . is to test whether any dissimilarity among the claims of class members can be dealt with

in a manner that is not 'inefficient or unfair.'" <u>In re Asacol Antitrust Litig.</u>, 907 F.3d 42, 51 (1st

Cir. 2018) (quoting <u>Amgen Inc. v. Conn. Ret. Plans & Tr. Funds</u>, 568 U.S. 455, 469 (2013)).

When a court performs the predominance inquiry, it "must not rely on mere speculation

that individual issues may arise." <u>Bais Yaakov of Spring Valley v. ACT, Inc.</u>, 12 F.4th 81, 89

(1st Cir. 2021). Instead, it must consider "'the probable course of litigation' so as to 'formulate

some prediction as to how specific issues will play out in order to determine whether common or

individual issues predominate.'" <u>Id.</u> (quoting <u>Waste Mgmt. Holdings, Inc. v. Mowbray</u>, 208 F.3d

288, 298 (1st Cir. 2000)). However, Rule 23(b)(3) does not demand the class representative

"prove that each element of the claim is susceptible to class-wide proof." <u>Muniz</u>, 342 F.R.D. at

198 (citing <u>Amgen</u>, 568 U.S. at 469). An action can still satisfy Rule 23(b)(3) "[w]hen 'one or

more of the central issues . . . are common to the class and can be said to predominate . . . even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" Tyson Foods, 577 U.S. at 453 (quoting 7AA Charles Wright & Arthur Miller, Federal Practice & Procedure § 1778 (3d ed. 2005)).

The Court finds that Mantha has made a sufficient showing that issues common to the Class predominate over individual issues. Mantha has shown that all major issues in this case can be answered through class-wide proof. He offers a combination of Verkhovskaya's testimony, the NDNCR residential presumption, and QuoteWizard's telemarketing goals and internal DNC files to demonstrate the major aspects of the Class Definition, namely: (a) that the telephone numbers on the Class List were on the NDNCR; (b) that they received two or more texts within a twelve-month period from Drips for QuoteWizard; and (c) that the texts promoted the sale of QuoteWizard's goods or services. See Doc. No. 340 at 15-17; Doc. No. 358 at 7-16.

QuoteWizard does not meaningfully contest these showings. See Doc. No. 348 at 32-39. Instead, it raises several specific challenges to Mantha's predominance showing that it argues will require individualized inquiries as to each potential Class member. First, QuoteWizard argues that the determination of whether the individuals on the proposed Class List consented to be contacted by QuoteWizard will require a fact-specific, individualized inquiry. Doc. No. 348 at 33. Consent is a complete defense under the TCPA. See Gaker v. Citizens Disability, LLC, 654 F. Supp. 3d 66, 71-72 (D. Mass. 2023) (citing Rosenberg v. LoanDepot.com LLC, 435 F. Supp. 3d 308, 314-15 (D. Mass. 2020)); see also 47 C.F.R. § 64.1200(c)(2)(ii) ("Any . . . entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable . . . if . . . [i]t has obtained the subscriber's prior express invitation or permission.").

Consent is an affirmative defense for which QuoteWizard bears the burden of proof. <u>Gaker</u>, 654

F. Supp. 3d at 72 (citing <u>Breda v. Cellco P'ship</u>, 934 F.3d 1, 4 n.4 (1st Cir. 2019)).

Mantha does not dispute that some (or, likely, virtually all) of the individuals on the

proposed Class List may have signed or clicked a digital consent form or webpage as

QuoteWizard asserts.[19] Instead, Mantha argues that all of the consent forms proffered by

QuoteWizard, including those QuoteWizard uses as examples in its Motion, <u>see</u> Doc. No. 348 at

35-36, suffer from the same dispositive legal defect—each fails to mention QuoteWizard by

name, as Mantha alleges is required under the TCPA. <u>See</u> Doc. No. 358 at 10-11. Mantha

concedes that the question of consent turns entirely on this single, class-wide legal

determination. Accordingly, the Court finds that Mantha has satisfied the Rule 23(a)(3)

predominance requirement as to the consent issue, because either (i) Mantha is correct that the

law requires QuoteWizard to be mentioned by name on the consent forms (thereby defeating

QuoteWizard's defense), or (ii) Mantha is incorrect about this level of specificity (thereby

allowing QuoteWizard to demonstrate consent as it claims). Consent presents no other issues in

this case as to the Class. In either scenario, QuoteWizard's consent defense can be resolved

through a single ruling.

At the hearing, QuoteWizard advanced a fallback consent argument. It contends that even

if the consent forms are invalid as a matter of law, the Class members' approval of the forms

deprives them of standing. More specifically, QuoteWizard argues that the Class members

"wanted" to be contacted, so they were not injured. This argument fails. Congress established a

statutory violation sufficient to support Article III standing, unless the caller (here, QuoteWizard)

proves the affirmative defense of consent. If QuoteWizard cannot prevail on its consent defense,

---

[19] No party has indicated that there are any non-digital forms of consent at issue in this case.

each class member necessarily has sufficient injury under Article III. See Krakauer, 925 F.3d at 654 (explaining a "claim under § 227(c)(5) accrues only once a telemarketer disregards the registry and actually places multiple calls," conduct which confers standing because it causes "harm [that] is both particular to each person and imposes a concrete burden on his privacy").

In addition, the theory rests on speculation. Two examples illustrate the point. First, consent to receive texts from Chevrolet is not consent to receive texts from Mercedes. The latter texts would suffice to establish constitutional injury. Second, consent to a text from one auto manufacturer (or several)—which is akin to what occurred here, where many of the alleged consent forms purport to authorize calls by unidentified entities of a particular type (e.g., insurance companies)—is of no assistance. QuoteWizard did not obtain the forms directly from the consumers; they purchased them from vendors, many, if not most, of which purchased them from still other vendors. See Doc. No. 348 at 34-37. The province, as well as the intended use, of these documents is unknown. As such, QuoteWizard, at least on the present record, cannot establish (without speculation or guesswork) that only the specified number of companies relied on the form.

QuoteWizard's next challenge fares no better. It alleges that the determination of whether the proposed Class Members' telephone numbers are "residential"—as required by § 227(c)(5)— is too individualized of an inquiry to permit a finding of predominance. See Doc. No. 348 at 38-39. As support for this contention, QuoteWizard points to the Court's prior Order on summary judgment, where the Court described several factors it considered "particularly relevant" to determining if a phone number has a residential purpose. See Doc. No. 268 at 11 (listing factors including whether "the phone number is subscribed in the individual's name at their residence" and whether it is the "primary means of reaching the individual at their residence").

Importantly, however, the Court also stated that numbers on the NDNCR benefit from the "presumption that [their] cellular phone number constitutes a 'residential telephone subscriber'" when that number is on the NDNCR. Id. Here, Mantha has shown, using Verkhovskaya's testimony, that every number in the proposed Class List is on the NRDC. See Doc. No. 358 at 7; see also Doc. No. 339-2 ¶¶ 61-68. QuoteWizard identifies no proffered or forthcoming evidence indicating otherwise (i.e., that any number on the proposed Class List is not also on the NDNCR). See Doc. No. 348 at 38. To the extent QuoteWizard points to the work of its expert, it does so only for the proposition that some of the numbers on the proposed Class List are allegedly "business," as opposed to "residential," numbers—not that they failed to appear on the NDNCR. See Doc. No. 348 at 14-15; see also Doc. No. 350-2 ¶¶ 64-79. Even if a handful of numbers—QuoteWizard does not indicate how many—are not, in fact, residential, that does not warrant denial of class certification. See Krakauer, 311 F.R.D. at 396 ("The fact that a class list contains members who claims may fail on the merits does not mean that the class cannot be certified."); In re Nexium, 777 F.3d at 22 ("[E]xcluding all uninjured class members at the certification stage is almost impossible in many cases, given the inappropriateness of certifying what is known as a 'fail-safe class'—a class defined in terms of the legal injury.").

Moreover, Mantha does not rely solely on the residential presumption to show that the numbers on the proposed Class List are residential. He also points to QuoteWizard's repeated statements that it "only intended to purchase lead information associated with individual consumers rather than businesses." Doc. No. 358-2 at 8 (emphasis added); see also Doc. No. 348 at 2 ("QuoteWizard . . . attempts only to contact individual consumers who have expressed interest in hearing more about insurance products and who have expressly consented to being contacted for that purpose.") (emphasis added); Doc. No 339-5 at 66 (reflecting Mr. Weeks,

QuoteWizard's director of media partnerships, testified at his deposition that "the purpose is to buy leads of <u>consumers</u> who are looking for insurance") (emphasis added); Doc. No. 358-1 at 17 (reflecting that Ms. Winkler, QuoteWizard's vice president of call programs, agreed during her deposition that QuoteWizard only intended to purchase lead information for individual consumers). Additionally, Mantha relies on Verkhovskaya's methodology, which involved her use of third-party data and business keyword searches to "identif[y] whether a class telephone number was a business-registered or -associated number." Doc. No. 358 at 8.

Finally, QuoteWizard suggests that the residential determination will necessarily involve mini-trials as to each, or at least many, of the numbers on the proposed Class List. <u>See</u> Doc. No. 348 at 38. Not so in this case. Mantha has advanced sufficient evidence to permit a class-wide determination, up or down. While one could easily envision mini-trials on the residential question, for such mini-trials to occur, QuoteWizard would need evidence. It disclosed no evidence or witnesses to support such mini-trials as to even one of the numbers on the Class List. For example, QuoteWizard's initial and supplemental Rule 26 disclosures contained no such information. In litigating class certification, it made no proffer of the evidence it would offer, how or when such evidence would be obtained, or why such evidence is admissible.

The Court need go no further to resolve this objection at the present stage, but it nonetheless notes the following. First, all discovery is closed. <u>See</u> Doc. Nos. 336, 337; Doc. No. 319 at 1, 3. Second, new witnesses or documents to support mini-trials would require supplementation of the Rule 26 disclosures (if not also discovery responses), and Rule 26(a)(1)(E) states that "[a] party is not excused from making its disclosures because it has not fully investigated the case." Third, in civil cases like this one, the subpoena power of the Court reaches only the state in which the Court sits, as well as locations within one hundred miles of

the courthouse, which limits the sources of testimony QuoteWizard could procure at trial. See

Fed. R. Civ. P. 45(c)(1). And fourth, Kostyun's Expert Report fails to provide the basis for a

meaningful number of mini-trials (if any) on the residential determinations in light of the Court's

discussion above. See Doc. No. 348-5 ¶¶ 135-50. QuoteWizard fails to engage at all with any of

these issues, let alone provide a reasoned explanation. In short, the Court presently sees no

likelihood or reasonable possibility of mini-trials on the residential issue.

 Considering all this evidence, the Court finds that Mantha has sufficiently shown that the

residential determination is a class-wide question. Accordingly, the Court finds that Mantha has

made a sufficient showing that the central issues in this case are "common to the class and can be

said to predominate." Tyson Foods, 577 U.S. at 453.

  *7. Superiority*

 Rule 23(b)(3) also requires a finding "that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." As to the superiority inquiry, a

court will often consider four factors:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

 A court will also consider the alternatives to a class action, because "[t]he policy at the

very core of the class action mechanism is to overcome the problem that small recoveries do not

provide the incentive for an individual to bring a solo action prosecuting his or her rights."

Amchem, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir.

1997)). This inquiry ensures that class actions will "achieve economies of time, effort, and

expense, and promote . . . uniformity of decision as to persons similarly situated, without

sacrificing procedural fairness or brining about other undesirable results." Id. (quoting Fed. R.

Civ. P. 23(b)(3) advisory committee's note to 1966 amendment).

Mantha has sufficiently established that a class action is superior to other methods for

resolving this dispute. The potential statutory recovery is relatively low, see 47 U.S.C.

§ 227(c)(5), and thus it is unlikely other Class members have an interest in controlling the

litigation. See Fed. R. Civ. P. 23(b)(3)(A); Bee, Denning, 310 F.R.D. at 630 ("A statute such as

the TCPA, which provides for a relatively small recovery for individual violations but is

designed to deter conduct directed against a large number of individuals, can be effectively

enforced only if consumers have available a mechanism that makes it economically feasible to

bring their claims."). There is no evidence of any ongoing litigation by or against any Class

members concerning this controversy. See Fed. R. Civ. P. 23(b)(3)(B). Resolving these claims in

a single forum would also provide "flexibility, control, and consistency that would not exist with

individual litigation." Krakauer, 311 F.R.D. at 400 (citing Fed. R. Civ. P. 23(b)(3)(C)). There are

additionally no great difficulties in managing this class action, as the foregoing discussion

indicates. See Fed. R. Civ. P. 23(b)(3)(D).

Other courts have also found claims brought under § 227(c)(5) to be particularly well-

suited to class actions. As the Fourth Circuit persuasively stated in Krakauer:

> The private right of action in § 227(c)(5) offers many advantages for class-wide
> adjudication. It requires a plaintiff to initially show two things: a number on the
> Do-Not-Call registry, and two calls made to that number in a year . . . . The
> problems that so often plague class actions under Rule 23(b)(3) are wholly absent
> from this scheme. The liability determinations involve no questions of individual
> reliance . . . no complicated contractual obligations . . . and no theories of
> probabilistic injury . . . . The damages calculations do not turn on individual
> evidence . . . nor are they difficult to connect to the underlying harm . . . . Put
> simply, a plaintiff suing under § 227(c)(5) is likely to be in the same position as a
> great many other people and can rely largely on common proof to make out his
> claim.

925 F.3d at 655; see also Watson v. Manhattan Luxury Autos., Inc., 20 Civ. 4572, 2022 WL 4586407, at *11 (S.D.N.Y. Sept. 29, 2022) (finding superiority met in § 227(c)(5) case because potential damages were low, expense and judicial burden were reduced by class action, and other methods of resolution were not viable).

    QuoteWizard raises no arguments to the contrary, besides repeating arguments made in its challenges to commonality and predominance which the Court has already rejected. See Doc. No. 348 at 39. Therefore, the Court finds that Mantha has sufficiently shown that a class action is a superior method for resolving the instant controversy.

IV.    CONCLUSION

    For the foregoing reasons, the Motion to Exclude (Doc. No. 349) is DENIED, and the Motion for Class Certification (Doc. No. 339) is ALLOWED. The Court certifies the following class:

> All persons within the United States (a) whose telephone numbers were listed on the National Do Not Call Registry, and (b) who received more than one telemarketing text within any twelve-month period at any time from Drips, (c) to promote the sale of QuoteWizard's goods or services, and (d) whose numbers are included on the Class List.

    With all discovery concluded and the class certified, the parties shall file a joint status report setting forth their joint or separate positions regarding (a) when the Court should schedule trial; (b) how long the parties anticipate for trial; (c) a schedule for the dispositive motion on consent; (d) any other summary judgment issues; (e) a schedule for notice to the Class along with any related procedures or proceedings; (f) whether the parties wish to participate in the Court's mediation program and, if so, when in the course of the remainder of the schedule that should

occur; and (g) any other matter the Court should account for in setting the schedule for this case.

The parties shall file the joint status report by September 9, 2024.

SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge