```
 1                      UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF MASSACHUSETTS

 3                                    )
 4   JOSEPH MANTHA, on behalf of      )
     himself and all others          )
 5   similarly situated              )
                                      )
 6          Plaintiff,               )
                                      )   Civil Action
 7   v.                              )   No. 1:19-cv-12235-LTS
                                      )   Pages 1 to 73
 8   QUOTEWIZARD.COM, LLC,           )
                                      )
 9          Defendant.               )
                                      )
10

11              BEFORE THE HONORABLE LEO T. SOROKIN,
12                 UNITED STATES DISTRICT JUDGE

13

                          MOTION HEARING
14

15

                           JULY 17, 2024
16                          3:00 p.m.

17

              John J. Moakley United States Courthouse
18                      Courtroom No. 13
                       One Courthouse Way
19                  Boston, Massachusetts 02210

20

21

22

                  Jessica M. Leonard, CSR, FCRR
23                   Official Court Reporter
              John J. Moakley United States Courthouse
24                      One Courthouse Way
                   Boston, Massachusetts 02210
25                 JessicaMichaelLeonard@gmail.com
```

1    APPEARANCES:

2    On Behalf of the Plaintiff:

3         LAW OFFICE OF MATTHEW P. McCUE
          By: Matthew P. McCue
4         One South Avenue
          Third Floor
5         Natick, MA 01760
          508-655-1415
6         mmccue@massattorneys.net

7         BRODERICK LAW, P.C.
          By: Edward A. Broderick
8         176 Federal Street
          Fifth Floor
9         Boston, MA 02110
          617-738-7080
10        ted@broderick-law.com

11

     On Behalf of the Defendant:
12
          NELSON MULLINS RILEY & SCARBOROUGH LLP
13        By: Benjamin J. Sitter
          Six PPG Place
14        Suite 700
          Pittsburgh, PA 15222
15        412-730-3244
          412-567-9241 (fax)
16        ben.sitter@nelsonmullins.com

17        NELSON MULLINS RILEY & SCARBOROUGH LLP
          By: Kevin Polansky
18        One Financial Center
          Suite 3500
19        Boston, MA 02111
          617-217-4700
20        617-217-4710 (fax)
          kevin.polansky@nelsonmullins.com
21

22

23

24                   Proceedings reported and produced
                      by computer-aided stenography.
25

1                P R O C E E D I N G S

2          THE CLERK:  Today is Wednesday, July 17, 2024, and we

3    are on the record in civil case number 1:19-cv-12235, *Joseph*

4    *Mantha v. QuoteWizard.com, LLC.*

5          Will Counsel please state your name for the Record?

6          MR. McCUE:  Good afternoon, Your Honor.  Matthew McCue

7    for the plaintiff.

8          MR. BRODERICK:  Good afternoon, Your Honor.  Edward

9    Broderick for the plaintiff.

10          MR. PARONICH:  Good afternoon, Your Honor.  Anthony

11    Paronich, also for the plaintiff.

12          THE COURT:  What's your name?

13          MR. PARONICH:  Anthony Paronich, Your Honor.

14          MR. BARRETT:  And, Your Honor, I'm John Barrett, also

15    for the plaintiff.

16          THE COURT:  Good afternoon to all of you.

17          MR. POLANSKY:  Good afternoon, Your Honor.  Attorney

18    Kevin Polansky for the defendant, QuoteWizard.com.

19          THE COURT:  Good afternoon.

20          MR. SITTER:  Good afternoon, Your Honor.  Ben Sitter,

21    also for the defendant.

22          MR. CURRAN:  Good afternoon, Your Honor.  Daniel

23    Curran, also for the defendant.

24          THE COURT:  All right.  Sorry it's taken so long to

25    get here generally and with respect to the particular motions.

1          I have read all the papers.  I'm familiar with both

2    the motion for class certification and the motion to exclude

3    Ms. --

4          MR. McCUE:  Verkhovskaya.

5          THE COURT:  Verkhovskaya.

6          So just a couple, sort of, maybe, just ground rules,

7    so to speak, to make this run smoothly.  You can address the

8    two motions together rather than separately, because I think

9    many arguments QuoteWizard makes with respect to exclude the

10   expert also are arguments with respect to class certification,

11   which makes sense; but it makes it appropriate to sort of talk

12   about together.

13         Second, if you were to walk out right now -- I say

14   this in every case, but just to be clear, because I understand

15   words are cautious by nature; I'm a lawyer, too.  If you walked

16   out right now, you've waived nothing.  Everything you have in

17   your papers, I will consider it; I will address it; it is

18   preserved.

19         You will not waive anything by your silence.  You

20   won't waive anything if you only address one of your five

21   points.  The only way you will waive something is if you say "I

22   waive," everything that follows is waived.  Short of that, you

23   don't waive anything.

24         And I say that to you -- you're welcome to address

25   everything, if you wish, but you don't have to.  You can

1   address whatever it is -- either that you want or to the extent

2   you have questions responding to that -- and you don't have to

3   walk out feeling, Oh, I didn't mention that so it's gone.

4           It's not gone.  It's here in the papers, and so it's

5   fine.

6           So, that said, I think the thing to think about is,

7   just to organize our time, probably what makes sense is, sort

8   of, like, a half hour for each side, and then maybe there will

9   be a little more after that so each side can respond to what

10  the other said and something like that.

11          So, ordinarily, I start with the moving party, but

12  here you're each the moving party; so it doesn't matter to me.

13  But I think, in a way, it makes more sense -- well, it doesn't

14  really matter.

15          Why don't we start with the plaintiffs because it's

16  your case.  So take a half hour, or up to a half hour, and the

17  things that I'm interested in are these things:

18          Essentially, QuoteWizard is saying, both with respect

19  to excluding the expert and with respect to class cert, that

20  there are all sorts of either problems -- that's one argument:

21  Problems in various ways with her analysis.

22          Things that manifest themselves to the extent that

23  there isn't problems with her analysis and that there are

24  various issues that are individualized -- in the end, this

25  would be a nightmare.

1          They didn't use that word.  That's my word, but a

2     nightmare if it were -- because in the end we would never be

3     able to sustain class certification because there'd be too many

4     minitrials and various issues, and it's too many problems with

5     all the type that they'd raise.

6          So that's what I'm interested in.  I'm not really

7     interested in numerosity.

8          And so those are the things that I've engaged with as

9     to how you, on class cert, meet your burden for the various

10     issues with respect to the various arguments that they've

11     raised.  And, obviously for you, I'm interested in their

12     answers, and also why those are what you say they are.

13          Go ahead.

14          MR. McCUE:  Thank you, Your Honor.  Matthew McCue for

15     the plaintiffs.  Attorney Broderick is going to handle the

16     motion to strike; so I'll do my best on both and then

17     whatever --

18          THE COURT:  That's fine.  And, if you want to do part

19     of it and then have him talk about part, that's fine, too.  I

20     don't care how you divide up.

21          MR. McCUE:  So, Your Honor, I'm going to refer

22     repeatedly to the report of Ms. Verkhovskaya.

23          THE COURT:  When you say "the report," which one?

24          MR. McCUE:  The primary report, expert report.

25          THE COURT:  The initial one.

1          MR. McCUE:  Yes.  The initial report.

2          THE COURT:  I have that.

3          MR. McCUE:  Okay.

4          Your Honor, this is a unique case for several reasons.

5   Number one, we're five years into this litigation.  The

6   individual claim is bifurcated.  We had extensive litigation

7   over Mr. Mantha's individual claims that preceded summary

8   judgment.  We have rulings on that.

9          That leads us now into the class motion.  So

10  Mr. Mantha's individual TCPA claims have been primarily all

11  resolved.  The challenge now is to identify absent class

12  members who, in addition to Mr. Mantha, have a claim.  So

13  that's unique.  It's a unique posture.  Many cases don't end up

14  like this because the class certification motion ends up being

15  litigated earlier.

16         Second reason why this is unique is that you'll see in

17  the briefing repeated reference to a case called *Krakauer v.*

18  *Dish Network*.  That is a case that this team here, including

19  Mr. Barrett, tried to a jury verdict in North Carolina five or

20  six years ago.

21         THE COURT:  I know you liked that case.

22         MR. McCUE:  This case, Your Honor, tracks almost

23  identically -- a TCPA do-not-call case raising many of the same

24  exact issues.  And in *Dish* what we did is we went through the

25  data, and we defined the class list in a way that removed many

1   of the arguments that we expected Dish to make that would

2   complicate class certification for trial.

3        We did that strategically.  So we took out, for

4   example, numbers in the class that were Dish customers; we took

5   out numbers that showed up in the data with a zero timestamp

6   indicating maybe it didn't go through; took out numbers

7   connected to businesses; took out numbers connected with

8   government numbers.

9        We did that as part of the class certification process

10  to make it easy to try the case.  So we're not just talking

11  certification, we're talking trial.  And, in the *Dish* case, we

12  tried that case in five days before a jury.  Five days.  Came

13  back with a verdict in favor of the plaintiff.

14       THE COURT:  So if you prevail on the two pending

15  motions, is your vision, then -- I haven't looked back at the

16  schedule, but is there another round of summary judgment with

17  respect to class, or no?

18       MR. McCUE:  The schedule basically ends with this

19  process.  What I would suggest to you is that, if it's

20  certified, it would go through a notice process, and then,

21  because of the unique posture of this case, there will be

22  summary judgment motions on consent.  We'll challenge the

23  consent defense, and we'll challenge the residential line

24  defense -- all pretrial.

25       If we prevail on those two motions, then the issues

1    that are actually litigated for a jury are very, very simple:

2    Were these calls received?  Were they on a DMC?  How many calls

3    did they receive?

4            The DNC is a little unique in a TCPA because the

5    damages are up to $500 -- so the jury has to make an award.

6    The *Dish* jury came back at $400 -- and then there's a willful

7    process.  Was the conduct knowing and willful?  And we submit,

8    in this case, it absolutely was.

9            So there would be an additional process --

10            THE COURT:  That's for me, though, not the jury.

11            MR. McCUE:  That is for you.

12            THE COURT:  So your vision is, notice -- if you

13    prevail -- notice; summary judgment process with respect to

14    those two issues.

15            You would move for summary judgment on those two

16    issues?

17            MR. McCUE:  Yes.

18            THE COURT:  And so, presumably, they might cross-move,

19    and they might move on other issues.

20            MR. McCUE:  Sure.

21            THE COURT:  So we have summary judgment, and then, in

22    your view, even if you prevail, there's still a trial.

23            MR. McCUE:  Absolutely.

24            THE COURT:  And then the trial is Mr. Mantha; your

25    expert.  That's the primary -- presumably, they would have a

1    rebuttal expert or -- but, in terms of your case, those two

2    witnesses are your primary evidence in the case.

3              MR. McCUE:  And then the willful would be a separate

4    evidentiary presentation.

5              THE COURT:  Right.  That's after the --

6              MR. McCUE:  Right.  Correct.

7              THE COURT:  Okay.  I understand.  Go ahead.

8              MR. McCUE:  Like *Dish*, this doesn't have to be a super

9    complicated case.  What I want to emphasize is that the reason

10   it's not complicated is because decisions that we've made as

11   trial counsel to simplify the case.  And that's exactly what

12   we're doing in this case.

13             So QuoteWizard says, Oh, Ms. Verkhovskaya, she was

14   told what to do from Plaintiff's counsel -- they make these

15   allegations.  No.  We are trial counsel.  We are making

16   strategic decisions -- not to identify everybody with a

17   potential claim, because that would be massive, massive.

18             We're trying to identify consumers whose claims can be

19   proven not only with common proof but simply and efficiently

20   before a jury trial.  And that's what we've tried to do in

21   setting forth our class list.

22             So we have Mr. Mantha's claim for summary judgment.

23   He's off to one side.

24             We then say to Ms. Verkhovskaya, Help us identify a

25   class whose claims can be simply proven.  So, walking through

```
 1    her expert report, we start at paragraph 50.  First she took
 2    the telemarketing data, all of the texts that QuoteWizard sent
 3    to consumers.
 4         There is over 48 million telemarketing texts in this
 5    case, Your Honor, to 15 million numbers.  So the scope of the
 6    telemarketing here is absolutely massive.  But -- so we knew,
 7    though, that, how can you litigate a case that is that big?
 8    It's too big.  Their conduct has made it almost too big.
 9         THE COURT:  Well, that doesn't -- fine.  But that they
10    sent that many texts doesn't really -- that just proves they
11    sent that many texts.
12         MR. McCUE:  Absolutely.  So we made strategic
13    decisions to whittle this down to violations that can be
14    proven.  So the first thing we do is we say to QuoteWizard,
15    Where did that data come from?
16         And they say, Well, some of it came from our own
17    websites, and some of it came from third-party data brokers who
18    purchased the data from other brokers who purchased the data
19    from other brokers.  And, ultimately, it came from thousands
20    and thousands of different sources.
21         So right away, simplifying this case, we say, Okay.
22    QuoteWizard --
23         THE COURT:  What do you say to their argument that --
24    two part -- either, a, your client is not atypical, because
25    he's the only one who came from the pirated website and so
```

1    forth; and, b, that they have all sorts of different types of

2    consent evidence.

3          And that -- from a lot of different websites because

4    they were buying numbers from different places, each with

5    different forms.  And I think their position is there were 699

6    different forms.  And so how does that lend itself to common --

7    well, predominantly common issues?

8          MR. McCUE:  We attacked it in a number of ways.

9    Number one, they admit where this information came from, they

10   ultimately do not even know.  They haven't even identified all

11   of the original sources of this data.  This data was sold to

12   brokers, cut and pasted into thousands of Excel spreadsheets,

13   and produced as consent data.

14         None of it is ultimately admissible.  They've made no

15   effort whatsoever during five years to authenticate any of this

16   data to show that it's reliable, that it's true.  They can't

17   even tell where you say it came from.  So, number one, it's

18   inadmissible, the consent defense is gone.

19         Number two, you look at all their data, even assuming

20   it's true, authentic, reliable, admissible, none of it

21   identifies QuoteWizard as the telemarketer who's going to text

22   the consumer.  So, commonly, if you look at all this data --

23         THE COURT:  So if I decide -- if it gets there, if you

24   win these two motions, and, on summary judgment, they move for

25   summary judgment saying those consent forms are sufficient --

1    I'm sure that's what they're going to tell me.  And you're

2    going to tell me, I'm sure, that those forms are not good

3    enough because they don't mention QuoteWizard.

4            MR. McCUE:  Absolutely.

5            THE COURT:  So, if they win, that's the end, isn't it?

6            MR. McCUE:  Not only do they win, they get a class

7    judgment because the case is certified.

8            THE COURT:  If they win, that's the end on that issue.

9            MR. McCUE:  That's why class certification is supposed

10   to be, really, an administrative process to simplify and

11   consolidate.  Sometimes defense wins class actions; sometimes

12   plaintiff wins class actions.

13           We submit the common evidence is going to show,

14   without question, their consent failed.  And, referring back to

15   your own opinion and Judge Kelley's opinion, when she looked at

16   the elements of TCPA consent, they didn't meet it for

17   Mr. Mantha.  They don't come close to meeting it for a single

18   class.

19           Number one, it's inadmissible.

20           Number two, there's no mention of QuoteWizard in any

21   of this data.  That's required in the TCPA.

22           Number three, the TCPA requires consent to be signed

23   and in writing.  There's no suggestion in this case that they

24   have a signature of anyone.  They got it electronically off the

25   internet -- allegedly -- through all these thousands of data

1    brokers.

2           When you do that, you have to comply with the E-Sign

3    Act.  The E-Sign Act acts as a substitution for a signed

4    writing.  If you're going to get it off the internet, you have

5    to comply with the TCPA and the E-Sign's -- all these different

6    disclosure requirements.

7           E-Sign requires disclosures to consumers about the

8    significance of what they're going to do.  It also requires

9    them to be provided with a mechanism to opt out, to withdraw

10   their consent.  None of the consent data in this case is

11   e-signed.

12          So we have three independent grounds commonly -- based

13   upon common evidence -- as to all class members that their

14   consent defense will not prevail.

15          So, Your Honor, if I go back to my report, I'm trying

16   to explain to you why we made certain decisions.

17          THE COURT:  Well, I understand that the purpose of the

18   class list in your class definition is to narrow the scope,

19   from all conceivable people who, in your view, might have a

20   claim, to a subset of people who you think either it's common

21   evidence -- it's clear, it's stronger -- or you're cutting out

22   people who you think they might have -- it's an argument you'd

23   rather not engage with; so you cut that group of people out.

24          And you end up -- at the end of this, she has a

25   funneling process.  And, at the end of the funnel, you end up

1    with a smaller group of people -- not small, but a smaller

2    group of numbers and names -- and that the purpose of that is

3    to -- I get the purpose.

4        MR. McCUE:  So I won't go through the funnel.  But

5    what I want you to understand -- and, obviously, you do -- is

6    that these are strategic decisions we're making.  We're not

7    conceding these folks don't have TCPA claims.  We're putting

8    forth a class list that can be simply proven.

9        So let me, then, turn to their primary arguments.

10   We've talked about consent; I won't go over that again.  The

11   other one I may go over and over is that Mantha is a class of

12   one.  And you touched on that briefly.  So they say Mantha is

13   not in the class methodology.  He's not identified in the class

14   methodology; so therefore, he's atypical.

15       As I mentioned, his claims have already been

16   established.  There's no need to establish his claims again

17   through Ms. Verkhovskaya.  What her job was is to identify

18   absent class members.

19       In the first paragraph of her expert report, she says

20   exactly that.  She says, this is what I'm doing:  Mr. Mantha's

21   claims have been subject to summary judgment.  My job is to

22   identify absent class members.

23       So this concept of class of one -- he doesn't appear

24   in there; so therefore, he's not in the class definition --

25   it's just inaccurate, Your Honor.  The class definition, as set

1    forth in our memorandum:

2            All persons within the United States, a, whose

3    residential telephone number was listed on the National

4    Do Not Call Registry -- we've already established Mr. Mantha's

5    number was listed on the registry.

6            B, received more than one text within any 12-month

7    period -- in summary judgment, it was undisputed he received

8    eight texts.

9            C, to promote the sale of QuoteWizard's business

10   services -- undisputed.

11           D, on the class list -- undisputed.  He's on the class

12   list.

13           He satisfies every single element of the class

14   definition.  What they're confusing is they're saying --

15   they're confusing methodology to identify absent class members

16   with the class definition.  They're two completely distinct

17   things.

18           THE COURT:  In order to prevail at the end of the day,

19   you need to prove that -- assuming they overcome their

20   affirmative defense of consent and that it was a residential

21   number that received --

22           MR. McCUE:  Correct.

23           THE COURT:  Right.  So does putting the word

24   "residential" in the class definition create problems for you?

25           MR. McCUE:  It doesn't, Your Honor, and two responses

1    to that:  We could strike that word from the class definition

2    and we could still proceed with the class.  It's not necessary

3    to be in that class definition, but just because it's in there

4    doesn't make the class fail-safe.  Fail-safe classes, everyone

5    in there has a valid claim per the definition.

6         THE COURT:  How does she determine, your expert, that

7    the numbers are residential?

8         MR. McCUE:  How did she determine that?

9         THE COURT:  How is that going to be determined in

10   terms of the class definition?  I understand how you -- I think

11   I understand how you seek to prove it at trial.  But in terms

12   of the class definition.

13        MR. McCUE:  Let me answer two questions.  One, that

14   you mentioned fail-safe.  The reason why it's not fail-safe is

15   because we still have to show that none of these consumers in

16   the class consented to receive a call.  So just because --

17        THE COURT:  Is that your burden or their burden?

18        MR. McCUE:  It's their burden to prove consent.  So

19   it's not fail-safe because one key defense's consent -- they

20   could come forth with consent that might be valid as to some

21   people, and they wouldn't prevail.  We don't think they will.

22        Now let me turn to your primary question:  residential

23   lines.  How can we identify the calls and the numbers in the

24   class are residential using common proof?  Now, you've already

25   done that with respect to Mr. Mantha, and you had the benefit

1    of subpoenaed records and deposition and his individual

2    testimony.

3           How do we do that as to the class?  The way we do that

4    and the way other Courts that have certified do-not-call

5    classes do it is they look at the common evidence that points

6    to are the lines residential or not?

7           So, number one, we start with the Do Not Call

8    Registry.  The registry rules provide you can only put your

9    number on the registry if it's your residential number.  You

10   can't put your employer's number on the registry; you can't put

11   a business number on the registry.

12          So consumers are told these are the rules.  Is it more

13   likely than not consumers are going to follow the rules?  I

14   would submit to you yes.  So, number one, you have common

15   sense.  The FCC has recognized that same common sense, and they

16   have adopted a presumption that if a resident -- if a number is

17   listed on the registry, it will be presumed residential.

18          So you have a presumption.  That's rebuttable.  In

19   this case, though, we're not just saying, Oh, it's a rebuttable

20   presumption.  We've gone further, and we've gotten testimony

21   from QuoteWizard where QuoteWizard admitted the third-party

22   data it purchased was consumer data.

23          THE COURT:  Do you have to sign anything when you

24   submit your number to the National Do Not Call Registry list?

25          MR. McCUE:  It's all electronically.

1          THE COURT:  Do you have to make any certification or
2    any under-the-oath statement?
3          MR. McCUE:  I don't believe so, Your Honor.
4          THE COURT:  You just fill out a form and submit it?
5    You're asking for this number to be registered, but you're not
6    signing under oath or making any web certification or
7    representation?
8          MR. McCUE:  Correct, Your Honor.
9          THE COURT:  Okay.
10         MR. McCUE:  Keep in mind here, the burden of proof
11   that we have is that more likely than not these numbers are
12   residential; so that goes throughout this whole process.
13         So the FCC has recognized a presumption.  You've
14   recognized a presumption in your prior orders.  That's
15   rebuttable.  We're not relying just on the rebuttable
16   presumption.  We've gone further.
17         We've got sworn testimony from QuoteWizard where they
18   admit the data they purchased was not business data, it was
19   consumer data.  That data they're purchasing:  the names of
20   consumers, their residential addresses, and their phone
21   numbers.
22         That's what they're purchasing.  In addition, they get
23   all this data that they claim evidences consent.  But the
24   primary data they're purchasing is consumer contact data.
25   Again, is it more likely than not these are residential

1  numbers?  The purpose of them acquiring this contact data is to

2  buy consumer data.

3          Number two, they've admitted under oath, repeatedly,

4  the intention of their telemarketing campaign was not to call

5  businesses, it was to call consumers at their home.  Again,

6  throw that into the mix.  Is it more likely than not that these

7  numbers are residential?  I submit to you:  Absolutely.

8          We go further.  We say to Ms. Verkhovskaya, Take this

9  data, identify consumers on the do-not-call list, and also

10  apply a scrub against that of a commercially recognized

11  database of numbers associated with businesses.

12          And she does that.  She finds a very small number that

13  match.  She takes them off the class list.

14          She goes even further.  She comes up with a

15  commonsense business-oriented keyword search -- Inc.; Corp.;

16  Org. -- she applies it to the consumer data to identify are

17  there any other hits in that?  She's going above and beyond.

18          Now, they come back and say, Oh, well, this database,

19  we have a declaration from the database people that says it's

20  not reliable.

21          That's not what the declaration says.  The declaration

22  says it's not --

23          MR. BRODERICK:  -- authoritative.

24          MR. McCUE:  -- authoritative proof.  We're not using

25  that for authoritative proof.  We're using it to confirm what

1    we've already done -- this long series of checks -- to make

2    sure, to the best of our ability, that, beyond a preponderance

3    of the evidence, the numbers are residential.

4         Last, the presumption is rebuttable.  In discovery, we

5    said to QuoteWizard, Here is the data.  Here is your calling

6    data.  Tell us, are there any business numbers in this class?

7         They identified no one.  Zero.  So they declined to

8    exercise the rebuttable presumption.

9         So all of these arguments are made over and over and

10   over again, both in opposition to class cert and to strike.

11   None of them preclude this case from being certified, and I

12   submit to Your Honor that, once we get certified, there is an

13   efficient way forward to try this case before a jury.

14        I'm happy to answer any other questions you may have.

15        THE COURT:  What about exclusion?

16        MR. McCUE:  I'm sorry, Your Honor?

17        THE COURT:  Exclusion.

18        MR. McCUE:  Excluding Anya?

19        THE COURT:  Yes.

20        MR. BRODERICK:  Yes, Your Honor, all of their

21   arguments for exclusion really go to the weight to be accorded

22   her testimony, not its admissibility.  Saying she's relying on

23   data that's not authoritative or conclusive, that's exactly how

24   you cross-examine an expert witness and say you shouldn't be

25   affording too much weight to this expert's testimony.

1          But it doesn't -- an expert is not limited to

2    testifying to an existential certainty on anything.  The

3    question under *Daubert* is would this be helpful to the jury and

4    is it so -- is it not -- so inherently unreliable that it

5    wouldn't be?

6          And Ms. Verkhovskaya has never been excluded in a

7    do-not-call case.  The cases that they cite are wrong-number

8    cases.  And that's a very different question where they have

9    consent for the person they intended to call, their number got

10   reassigned at some point in time to someone for whom they did

11   not have consent, and the question was how do we identify who

12   these unintended recipients were?

13         THE COURT:  What about their arguments that there may

14   be -- or do you say these all go to weight, and why if they

15   do? -- there may be people on the do-not-call list of

16   QuoteWizard that actually expressed interest or might have

17   expressed interest -- received texts, expressed interest -- and

18   then they got their insurance, and then they're like, Okay, I

19   don't want any more texts from you.  Go away.

20         And then they said they don't; so then they got put on

21   the do-not-call list by QuoteWizard.  But the do-not-call list

22   from QuoteWizard, as I understand it, doesn't have dates.  It

23   just has numbers.

24         And so there could be timing questions like that,

25   about what meaning to attribute as to specific points in time

1  to an appearance on the do-not-call list or -- the QuoteWizard

2  do-not-call-list.

3          Or there could be people -- maybe the general argument

4  Mr. McCue made.  Numbers are on the do-not-call list.  I don't

5  think they're going to dispute that they were trying to focus

6  on consumers.  They weren't looking for procurement managers at

7  Fortune 500 companies.

8          And so -- but there might be evidence that some of

9  these numbers were at different times land lines or some of

10 these numbers -- as their expert points out, or that some of

11 these numbers could be, nonetheless, business numbers,

12 notwithstanding the further scrubbing that your expert did.

13         What are the -- what do all of those do to --

14 collectively?  Is that all still just weight rather than

15 anything else?

16         MR. BRODERICK:  I do believe it's weight, Your Honor.

17 We also have -- you know, she disagrees.  Again, the *Daubert*

18 standard is not, You have an expert that we can't hire an

19 expert to disagree with.  It's, Is the methodology that she

20 uses sufficiently reliable?

21         And all these Courts have done so.  There was a

22 *Daubert* motion in *Krakauer*.  She was not excluded; testified at

23 trial.  The Fourth Circuit noted that the district court had

24 justly rejected the *Daubert* challenge, and the case was -- even

25 a petition for certiorari was denied in the case.  So those all

1    are weight questions.

2            And, as to the DNC, I'd just like to make one point.

3    This is not like an internal do-not-call case where it's a

4    violation for a company not to honor an internal do-not-call

5    request, where the timing of the do-not-call request matters.

6            It's not actually an element of the claim here.

7    That -- you know, if you don't have consent to call that

8    person, sending them texts, whether they respond or not, is

9    legally irrelevant.  And they haven't shown that they -- you

10   know, our position is they haven't shown any valid consent for

11   any of these folks.

12           So the do-not-call element is a little bit of a red

13   herring in that it's -- you know, what it shows, and the reason

14   we included it, it shows receipt, and it's also something

15   that's very important for damages, because, as Mr. McCue said,

16   the jury is setting what the damages are.

17           And these are folks who took the time to respond to

18   the text saying, Stop.  Or, you know, more colorful language.

19   So it's not -- that's just not something that can -- that

20   creates an issue of admissibility for Ms. Verkhovskaya.

21           If you're -- if the *Bumpus* Court said in the Northern

22   District of California her methodology is not complicated --

23   she's comparing data sets and saying, This is who's left.  You

24   know?

25           And, in the spirit of not waiving any arguments that

1    are already in the brief, one thing I did notice when I was

2    rereading the brief:  In the *Sandoe* case, which they rely on

3    pretty heavily, from Judge Gorton, a point we didn't make

4    that's, sort of, notable is there was no -- and we did note

5    that there was no motion to strike Ms. Verkhovskaya's

6    testimony --

7            THE COURT:  In *Sandoe*.

8            MR. BRODERICK:  In *Sandoe*.

9            -- but there was a motion to strike Mr. Kostyun's

10   testimony, which Judge Gorton denied.  And one of the reasons

11   he said he was denying it is because he applied exactly the

12   same methodology that Ms. Verkhovskaya applied, and he came to

13   a different conclusion.

14           The reason he denied certification was not that her

15   testimony was inadmissible; it was that he saw no way to

16   identify these unintended recipients of phone numbers from the

17   call records in that case, the customer records in that case as

18   well as the reassigned number database.

19           Here the violation is complete once you say:  This

20   person is on the do-not-call list; it's a residential number;

21   you got two or more texts in a 12-month period; it was on the

22   do-not-call list for more than 30 days.  And, at that point, we

23   have established a TCPA violation.

24           THE COURT:  What about the registration date?

25           MR. BRODERICK:  Well, they make an odd argument about

1    the initial registration date.

2          THE COURT:  And the 5 percent who are June 1 --

3          MR. BRODERICK:  That's right.  And the reason for that

4    is because the FCC opened the database for people to put their

5    number on before it went into effect.  Everybody got loaded in.

6          THE COURT:  I know they've submitted an e-mail

7    responding to -- I'm not sure what, except something from their

8    expert that says they started registering people on June 27 of

9    that year.  You say that --

10          MR. BRODERICK:  We've seen an e-mail saying, We

11    registered -- We accepted them before that.  But the reason I

12    think it's legally insignificant is because there's no question

13    it was on the DNC for more than 30 days before --

14          THE COURT:  How do I know that?

15          MR. BRODERICK:  Because the date is June 5 --

16          THE COURT:  June 1.

17          MR. BRODERICK:  June 1, 1991, or whatever it is.  But

18    that's more than 30 days before the start of the class period.

19          THE COURT:  So you say I should just treat that as an

20    accurate date?

21          MR. BRODERICK:  You could.  Or I don't think it

22    carries any legal significance either way.

23          THE COURT:  Well, isn't one potential inference that

24    it's an -- if they opened registration on June 27, that's

25    certainly -- one inference is people wrote to them before

1    June 27 because they heard about it.

2         This was, I presume, the product of a federal register

3    process, and some people wrote to them, and maybe they

4    collected all the names, and maybe they just read -- all the

5    people who applied earlier were punched in as June 1 for

6    whatever reason.

7         Or maybe it's error; I don't know.  Nobody -- there

8    isn't expert opinion on that.  I don't know that they kept

9    things, that they took things early and gave them and held them

10   until a different date.

11        MR. BRODERICK:  Right, but for purposes of --

12        THE COURT:  So you're saying, For purposes of

13   exclusion, it doesn't matter.

14        MR. BRODERICK:  It doesn't matter, no.  Not at all.

15   And the other -- there's sort of a laundry list of false

16   positives, none of which compel exclusion.

17        They say that -- they say that there's -- well, the

18   first is they say, I think, 20 percent of people are not in the

19   DNC files.  And what she didn't do is she didn't list two of

20   the DNC files.  And those are files, by the way, that the

21   defendant produced.

22        So Mr. Kostyun could have known that they were but,

23   understandably, looked at the documents that she had analyzed,

24   and that error was corrected -- that she listed, that she

25   listed as having analyzed.

1          So that was an error -- you know, a clerical error,
2    but it doesn't actually change the fact that they were in the
3    DNC files.
4          Secondly, they say that 61 percent of the substance of
5    the DNC responses are not preserved, and, therefore, we don't
6    know.  That's the defendant trying to take the benefit of not
7    preserving the text responses, for one thing.  And, as I said,
8    it's not an internal do-not-call case; so I don't think that at
9    the end of the day it matters to whether you can prove that we
10   have a TCPA violation.
11         And the argument that an expert has to testify that an
12   individual -- who put their number on the do-not-call registry
13   -- is just legally incorrect.  And it ignores that regular
14   users of a phone have standing to enforce the TCPA.
15         I don't have anything further unless you have
16   questions, Your Honor.
17         THE COURT:  Let me see what the defendants have to
18   say.
19         MR. SITTER:  Thank you, Your Honor.  I will start by
20   addressing the exclusion motion and then hand it off to my
21   colleague here to address some of the other class certification
22   points.
23         So I think what we heard, from the plaintiff there, is
24   that the key to this case moving forward is all about this
25   class list.  We have this large group of folks, and they've

1    made strategic decisions to whittle it down -- not our

2    decisions, not based on the facts in the case, based on how

3    they want to proceed; and they have used Ms. Verkhovskaya to

4    try to bless that with her own methodology.

5         So I think, before we get into this question of

6    whether it's the weight of the testimony, we need to return to

7    first principles:

8         That this motion is governed by Federal Rule of

9    Evidence 702, which sets forth four specific factors; it gives

10   Your Honor a role as the gatekeeper function; and it requires

11   of the plaintiff that they carry that burden to get this expert

12   admitted before we can even move forward with this list that is

13   necessary for their strategy here.

14        There's four factors; three of them are at issue, and

15   I'll just speak briefly about each of those.

16        The first is that the testimony must be based on

17   sufficient facts or data, and, as is addressed in our briefing,

18   Your Honor, the fact that Ms. Verkhovskaya relied heavily on

19   PacificEast, the vendor, to generate the data that she would

20   then use for her opinions is critical here, given that we have

21   testimony from PacificEast that says its data cannot reliably

22   be used for that purpose.

23            THE COURT:  Which purpose?

24            MR. SITTER:  Yes, Your Honor?

25            THE COURT:  Which purpose?

1          MR. SITTER:  Well, there's a few.  There's the

2    question of how the numbers were pulled from the NDNCR, the

3    National Do Not Call Registry.

4          THE COURT:  So he's stating it can't be used to rely

5    on or determine whether or not a number is on the NDNCR?

6          MR. SITTER:  So for that one -- it says that it is --

7    that's the language that Counsel quoted to you, that it's

8    not --

9          THE COURT:  I'm not asking what he quoted.  I'm asking

10   you what Scott Rice said.

11         MR. SITTER:  Sure.  Let me pull that for Your Honor.

12   So Mr. Rice says -- his declaration is split up into three

13   sections.  The first has to do with the NDNCR lookup service,

14   and he states that PacificEast does not warrant the accuracy of

15   specific data outputs for this service.

16         THE COURT:  Right.  But, like, for example, you're

17   retained here, right?  This is a question I ask -- not just

18   specific to you.  I bring this up a lot with lawyers in a

19   different context, but it's applicable here.

20         I'm reasonably confident, I would say

21   beyond-a-preponderance confident that Plaintiffs have not given

22   a guarantee to Mr. Mantha that he will win this case or they

23   will make good on the judgment that they promised that they

24   could get.

25         And I'm likely equally confident that you have not

1    given your client an indemnification agreement that says if it

2    doesn't work out as well as you think it could work out, no

3    worries, you or your law firm will cover the judgment.

4           MR. SITTER:  Correct, Your Honor.

5           THE COURT:  So you would likely file an affidavit that

6    says you haven't guaranteed outcomes and you haven't

7    warranted -- you probably, because the law says this, would

8    warrant that your work meets the standard of care for lawyers

9    in the field of which you're practicing, which it appears that

10   it does, to me.

11          But beyond that you wouldn't warrant its reliability

12   like, Your results may differ; outcomes are uncertain.

13          What's the difference between that and what Scott Rice

14   says.

15          MR. SITTER:  What I would do, however, Your Honor, is

16   if it were outsourcing my services and hiring another attorney

17   to perform them for me, that's something I would tell my client

18   and would be ethically bound to do; and that's what's actually

19   going on here with PacificEast.

20          They're not pooling the data from a national registry.

21   They hire a vendor that does that.  PacificEast has not

22   published statistics on the reliability of this vendor's work.

23   Ms. Verkhovskaya has no idea what the reliability is, and,

24   based on her testimony at deposition, it sounded like she

25   didn't even know that that was the case.

1          So, while Counsel states, Well, it's not the national

2    registry -- we don't know that, and the fact that we are having

3    dates like June 1, when the registry wasn't open until the

4    27th, filtered first through a vendor --

5          THE COURT:  Right.  But here's my question.

6          MR. SITTER:  Yes.

7          THE COURT:  PacificEast, if I read Mr. Rice's

8    affidavit correctly, is 20 years in the business of selling

9    data, right?  They regularly, I infer, sell data to companies

10   in the marketplace that -- as to whether a number is on the

11   national do-not-call list.

12         They do that because people don't want to --

13   understandably, they don't want to call or text numbers on the

14   do-not-call list because that's a violation -- potentially a

15   violation of the law and exposes all sorts of problems, right?

16         So they check either with PacificEast or companies

17   that are competitors of PacificEast.  I assume there are

18   competitors.  So it's a generally available commercial service

19   that served -- this is the very purpose for which PacificEast

20   sells this is data for:  to see whether someone is on the

21   do-not-call list.

22         So why doesn't that provide -- is that a guarantee?

23   No.  Is he warranting it against consequential damages?  Nope.

24   Does that surprise me?  No.  Very few people like to guarantee

25   or warranty anything, especially against consequential damages.

1   So that doesn't really speak -- so the question to me would be:

2   They're in the business.  Why doesn't that create reasonable

3   reliability?

4            And then, this is an adversarial process.  You have

5   all the -- 66,000 or so numbers, when you're all done with her

6   final ink, and a battery of at least three -- but I'm guessing

7   more than three -- lawyers.  And there's no indication that any

8   of these numbers aren't on the national do-not-call list before

9   me.

10            And I will tell you that I would think that, if they

11   were -- if you had one, or, if you had 100, if you did a

12   sampling of 50 -- so I'm just not -- does that mean she's

13   persuasive to a jury? -- totally different question --

14            MR. SITTER:  Sure.

15            THE COURT:  -- but I'm just wondering, like, how does

16   that really exclude here?

17            MR. SITTER:  I don't think it does by itself, Your

18   Honor.  And, as I said, there's, sort of, layers to this

19   declaration and to the problems with the data that she relied

20   on.  This is simply the first.

21            THE COURT:  Go ahead.

22            MR. SITTER:  The next would be the business lookup

23   service where I think that PacificEast is much clearer that

24   this is not a service, they are intending to be used for this

25   purpose.  And I think potentially the most telling part of this

1    is that Ms. Verkhovskaya's report states the outputs she

2    received from PacificEast included historical information so

3    that she could confirm whether a particular number was

4    residential or business during the class period.

5         Mr. Rice's declaration says that is not a service that

6    they offer.  So he is essentially saying she is lying about

7    what we can provide.  And he also says, I'm not aware of any

8    source from which that is available.

9         THE COURT:  Authoritatively?

10        MR. SITTER:  No -- they don't offer the service at

11   all.  They do not provide historical information.  He writes in

12   paragraph 13:  Historical information about the identification

13   of a telephone number as a business or residential number is

14   not available from any source that I know, and it is not a

15   service that PacificEast provides.

16        So it's not simply a matter -- the NDNCR, I concede,

17   Your Honor, there's probably a business assumption you could

18   make.  It would still be a leap, but it's a rational leap,

19   right, to say businesses keep coming back; they keep paying for

20   the service.  It's probably got some degree of liability.  She

21   doesn't know what it is, but, okay, I'm willing to let that

22   slide.

23        But the fact that she claims that PacificEast offers a

24   service --

25        THE COURT:  It doesn't seem that different than if

1    you're old enough to remember the white pages -- like, with

2    respect to the do-not-call list.  People used the white pages.

3    It wasn't 100 percent accurate, the white pages, if you

4    remember what they are or were.  They used to get dropped off

5    at our houses.

6         And it's a service provided by a company that was

7    provided, ostensibly, free.  People used it all the time.  It

8    was reliable; it wasn't perfect; it had errors in it.  But I

9    think an expert who said a number was or wasn't in there or

10   used it for some purpose related to finding numbers in there --

11   that's what its purpose was.

12        MR. SITTER:  Right, but if --

13        THE COURT:  But --

14        MR. SITTER:  Sorry, Your Honor.

15        THE COURT:  Go ahead.

16        MR. SITTER:  But if the expert says, You know what

17   else the white page has?  It has the business listings from

18   this telephone number from 17 years ago.  And then you ask the

19   publishers of the white pages, and they say, Actually, that's

20   not true; we don't do that -- that's what's going on with the

21   historical business information, and that's a critical point

22   not to lose sight of.

23        So there's also the data that she relies upon -- so

24   she has no knowledge, personal or otherwise, regarding error

25   rates.  Her reliance is simply based on her personal experience

1    and other data that is missing to reach the conclusions that

2    she offers.

3        So one of her opinions -- one of the funneling

4    mechanisms was to limit and exclude those individuals who had

5    made a do-not-call request to QuoteWizard.  She doesn't have

6    data for 61 percent of the people on her list for whom she

7    concluded they had made a do-not-call request.

8        THE COURT:  But if I -- maybe I don't understand it,

9    but I thought what she did was determined that numbers -- the

10   100 percent, of which the 61 are a part -- that 100 percent,

11   she determined whether numbers were on QuoteWizard's

12   do-not-call list.

13       And, if they were, in the funneling process those

14   numbers kept going.  And, if they weren't on that list, then

15   they got trashed, so to speak; they got put aside.  That's my

16   understanding of how she did it.

17       MR. SITTER:  With one caveat, Your Honor, which is

18   that it's not QuoteWizard's list.  These are determinations

19   made by Drips.  I think I'm getting that right.  These are

20   decisions made by a third-party vendor.  So it's not something

21   that QuoteWizard has blessed.  It's just, sort of, a business

22   operation.

23       THE COURT:  So Drips did that, and, if it was on

24   Drips' list, then she put them out.  So she was not determining

25   that these people, as I understood it -- in the first cut, she

1    wasn't determining whether the individual made a request; she

2    was determining whether Drips put the number on its --

3    designated as a number do-not-call.  That's what I understand

4    she was determining.

5         MR. SITTER:  But the opinions she offers is that these

6    individuals had made a do-not-call request, and the data

7    doesn't necessarily support that conclusion.  She lacks

8    sufficient data to reach that conclusion.

9         THE COURT:  And she can't reach that conclusion from

10   the fact that Drips put the number on there?

11        MR. SITTER:  Right.  And there are counterexamples

12   that were pointed out, by our expert, of numbers that she

13   claimed had issued do-not-call requests, but where we do have

14   the text data, and you look at it --

15        THE COURT:  But that doesn't prove that the person

16   didn't make a do-not-call request.  That proves that they might

17   have also made a positive request.  In other words, if your

18   point is -- everyone agrees the numbers she found are on the

19   list, right?  That, I think, is not in dispute.

20        MR. SITTER:  Yes, Your Honor.

21        THE COURT:  So her opinion is these people made a

22   do-not-call request.  She can't support that, if I understand

23   that right, with a text for each of those phone numbers,

24   because at least 61 percent of the numbers, there's no text.

25   So no one now possesses a text that led to its designation on

 1    that list.

 2              MR. SITTER:  Right, with -- sorry.

 3              THE COURT:  And so, of the ones that there are texts,

 4    your expert points out there are texts affiliated with some of

 5    these numbers that show people wanting information.

 6              MR. SITTER:  Right.

 7              THE COURT:  But I doubt your expert is going to come

 8    here and raise his right hand and say that means it's

 9    impossible those people ever sent a text that says, Don't call

10    me.

11              MR. SITTER:  My understanding is that this is the

12    content of a text associated with the incident that landed that

13    number on the do-not-call list in the first place.  So this is

14    the --

15              THE COURT:  Okay.  So there's potentially testimony

16    from Drips or somebody else that there aren't other texts.

17              MR. SITTER:  Yes, Your Honor, is my understanding.

18              MR. POLANSKY:  The reason this is important is because

19    it's the plaintiff's burden to show that the texts were

20    received.  And so the reason they came up with this list the

21    way they did is because they want to identify the people that

22    received it.  And the import is, If we received it, and we show

23    they sent a text back, then they received it.

24              Because the testimony from Bandwidth and Twilio was,

25    We don't know if they got it.

1           THE COURT:  Well, they know if the carrier got it.

2           MR. POLANSKY:  Well, we know the carrier got it, but

3    we don't know if they sent it, and there's a lot of issues.  So

4    the way they worked around it was, If we know these consumers

5    texted back, then they received it.  And that's the point -- is

6    that there's 61 percent that we have no text messages for.  So

7    they may have ended up on a list for whatever reason.

8           THE COURT:  But we don't have -- so in other words

9    their argument is Drips or QuoteWizard, whomever maintained the

10   list, created this list and is -- are you saying there's no

11   evidence as to the basis of what Drips or QuoteWizard did to

12   create that list?  There is somebody named in a do-not-call

13   list, right?

14          MR. POLANSKY:  It's Drips' do-not-call list, and they

15   have a list which they put individuals on.  And we don't have

16   any evidence of why these 61 people were on that list --

17          THE COURT:  61 percent.

18          MR. POLANSKY:  61 percent.

19          We don't have any evidence of that.  The plaintiffs

20   put together a list to show, Here are the people that sent

21   texts.  That's their import.

22          THE COURT:  So they're drawing the inference that, by

23   virtue of being on the list, they must have sent a response

24   that Drips read that caused Drips to put them on the list.

25          MR. POLANSKY:  Right.  And they're missing that one

1    piece of evidence, which is the text.  They have the other

2    texts, but not the 61 percent.

3            THE COURT:  Correct.  They have 39 percent of the

4    texts.

5            MR. POLANSKY:  Right.

6            THE COURT:  And, among the 39 percent, some -- on a

7    manual review, some suggest that the text that -- texts that

8    came back was something other than, Don't call me.

9            MR. POLANSKY:  Correct.  Reschedule or --

10           THE COURT:  And there's testimony that it's those

11   texts that caused -- that were the ones that led to the putting

12   the person on the list.

13           MR. POLANSKY:  That's right.

14           THE COURT:  Is there any testimony as to how Drips

15   created this list?

16           MR. POLANSKY:  There is some testimony as to how they

17   created the list generally.

18           THE COURT:  What I would infer from the name -- but I

19   don't know -- is that they created the list based on

20   information they received that suggested these people didn't

21   want to receive texts from them.

22           MR. POLANSKY:  Right.  But they also have a lot of

23   clients.  So, if they have a client that's other than

24   QuoteWizard and they received a number that's on their -- a do

25   not -- you know, Never send me -- I don't want to receive text

1   messages, they would also put that in the list.

2           So it doesn't mean it relates directly to QuoteWizard.

3   It could be one of their many clients, in which they're saying,

4   Wait, we're not going to put ourselves at risk.

5           THE COURT:  But they could have sent them a text

6   message for DraftKings.

7           MR. POLANSKY:  Exactly.

8           THE COURT:  Or some other person, and that person

9   wrote back in response to the DraftKings text message and said,

10  Stop bothering me.

11          MR. POLANSKY:  Correct.

12          THE COURT:  And then, possibly, Drips would have put

13  them on this list rather than a DraftKings list.

14          MR. POLANSKY:  That's exactly right.

15          THE COURT:  Is there testimony about that?

16          MR. POLANSKY:  Yes.  They have other clients that they

17  would --

18          THE COURT:  I assume they have other clients.  But

19  that they didn't maintain separate lists for each client?

20          MR. POLANSKY:  My understanding, at least from the

21  evidence, is they maintained one list, not specific lists of

22  each client.  And, certainly, Drips could testify at trial

23  regarding, you know, that one list they maintained for all

24  their clients.

25          But, again, this is the burden to show receipt, and,

1    without these 61 percent, they can't show the receipt of those

2    text messages.  So those are factual issues that are going to

3    have to be reviewed at trial.

4         Not to mention the individual messages.  If they had

5    some sort of administrative process, how would the individual

6    maintaining that administrative process say whether --

7         THE COURT:  As a practical matter, though, why

8    wouldn't this be -- so suppose, for sake of discussion, that I

9    overrule the objection and we go forward; and you lost both

10   motions.  And so then we come along to trial -- assuming that

11   nobody gets summary judgment, just to make the hypothetical

12   simple.

13        And, as to this 61 percent, let's say the trial

14   testimony from Drips is unequivocally clear:  In response to

15   DraftKings or any of our other clients, when we got someone, we

16   maintained one list; when we got somebody to respond who said,

17   No, don't bother me, we put them on this central list; and

18   that's the central list we produced in this case.

19        Then it seems like that would lead to a couple

20   possibilities.  The 61 percent of the people might no longer --

21   the plaintiffs would have to think about what that meant for

22   their liability claims.

23        And, in terms of receipt, the question would then be:

24   Is the evidence from Bandwidth and Twilio enough to support an

25   inference -- to get to a jury -- for receipt?  And then it

 1    would be a question of:  Even if it is, whether the jury is

 2    persuaded, given whatever other evidence there is about

 3    carriers and so forth.

 4           And, with respect to the 61 percent, there wouldn't --

 5    that would be not likely that supportive of an inference of

 6    receipt, because there isn't anything tying it to QuoteWizard.

 7           MR. POLANSKY:  Correct.  And that puts aside the

 8    residential and consent issues.

 9           THE COURT:  Yes, but just as to that issue.

10           MR. SITTER:  Exactly.

11           THE COURT:  Yes.  Okay.

12           Okay.  Go ahead.

13           MR. SITTER:  So I'd like to move on to the second

14    factor which is the use of reliable principles and methods.

15    So, in describing her own methodology, Ms. Verkhovskaya was

16    clear at many points that all she did was follow the

17    instructions of Counsel.  It's not a scientific methodology;

18    that is not a defensible methodology.

19           In regards to the last step of the business numbers

20    analysis, she and her team came up with a list of 380 words to

21    use, to try to identify business numbers.  She said they came

22    up with this list by poking around on Yelp and Google -- that

23    was it -- and that they used their subjective assessment to

24    determine whether they thought a particular term was likely to

25    be used with businesses or not.

1          I think perhaps one of the most damning aspects of her

2     testimony is that, when confronted with the fact or even the

3     hypothetical that there were errors in the underlying data sets

4     that she used to reach her conclusions -- I asked her the

5     question, Well, what if there was a 100 percent error rate in

6     the underlying data?  Would that have any impact on your

7     methodology or your conclusions?

8          And her answer was no.  That is the opposite of the

9     scientific method, which is to allow the data to drive the

10    hypothesis.  In a same vein, even though she conceded there

11    were over 4,000 numbers that needed to be removed due to errors

12    on her part, she said her opinions never changed.

13         So, in exercising your gatekeeper function, Your

14    Honor, it's important to look at the data that's being analyzed

15    and what are the methods that she is actually purporting to

16    use?  And, to the extent that she is relying on Counsel's

17    instructions, we didn't have a chance to cross-examine her on

18    those.  She said, You have to ask Counsel.  We don't have

19    visibility in what's going on there.

20         In terms of the issue you raised as well, Your Honor,

21    she conceded at deposition that her methodology does not

22    account for the possibility that somebody was happily engaged

23    in text exchange with QuoteWizard, that they got the quote they

24    wanted and they said, Thanks, that's enough, and QuoteWizard

25    stopped texting them.

1          So that person would still be on her list.  Should

2    that person be a class member?  I don't think so.  They don't

3    have any standing; they don't have any injury; they've given

4    consent.

5          THE COURT:  It depends when the text came.

6          MR. SITTER:  Which her analysis does not attempt to

7    address.  And that's my point, Your Honor.

8          And then, finally, whether she actually applied these

9    methods -- such as they are -- reliably.  Even things like the

10   380-word list, she's still making mistakes.  Yes, there were

11   several iterations, and some of them were corrected.

12         But, even after that, on the final list that is before

13   Your Honor, there are business numbers.  There are people who

14   have expressed interest in the products and not issued a

15   do-not-call request that are evidence.  I'm not talking about

16   the missing 61 percent.  I'm talking about specific examples

17   that our expert identified.  And there are additional ones that

18   we can point to.

19         But with that, unless you have any questions, I'm

20   going to turn it over to my colleague.  Thank you, Your Honor.

21         MR. POLANSKY:  Your Honor, I'm just going to address a

22   couple of points.  I know we took up a lot of time, and we may

23   be coming close to the 30 minutes.  But, first, a couple of

24   issues.

25         With respect to the residential nature of the phone

1  numbers, just because QuoteWizard may have -- their intent was

2  to call consumers doesn't mean they received a consumer number.

3  For instance, when I first registered my own phone number, I

4  wasn't a lawyer; I didn't hold my number out as being a lawyer.

5  I use 99.9 percent of my phone for my legal job, but I

6  registered it at the time when I was not even in law school.

7        And so now it's changed.  So the dynamic has changed.

8  And so when you look at, sort of, the

9  residential-versus-business nature of these numbers, there's a

10  fact-intensive inquiry.

11        Even our expert identified two of the plaintiff's

12  counsels' numbers on the pleadings, holding themselves out as

13  residential do-not-call list members, which they are.  But

14  those are the numbers that hold themselves out on a

15  business-wise.  So that is a fact-intensive inquiry.

16        And, when they say it's not a fail-safe definition, it

17  is.  Let's assume that I am part of this class list, and you

18  certify the class, and, ultimately, QuoteWizard wins on the

19  consent issue.  I can say, I didn't use my phone for

20  residential purposes; this is now a business --

21        THE COURT:  What about his offer to strike the word

22  "residential" from the definition?

23        MR. POLANSKY:  I don't think it saves it.  I mean,

24  they still have to show --

25        THE COURT:  But then you wouldn't be in the class.

1    Well -- I'm sorry.  Then you would be in the class either way.

2              MR. POLANSKY:  But then how do they certify the class?

3    Because it has to be based on residential numbers.  How would

4    they get there?  That's their burden.

5              THE COURT:  But they don't have to prove conclusively

6    every element of the definition at class certification.  They

7    get there, they would say -- by saying, Okay, there's either a

8    presumption, or, even if there isn't a presumption, there's an

9    inference that:  You're on the list, it's residential.  You

10   could draw that inference.

11             That's augmented, they say, by the fact that you were

12   aiming at residential consumers.  And so that doesn't guarantee

13   that everybody you contacted was a residential phone number,

14   but it's a fact that tends to strengthen the position.  And

15   they'd say, That's enough for class certification.

16             Trial might be different.  That doesn't mean they win

17   but --

18             MR. POLANSKY:  But then it becomes a fact-intensive --

19   how do you administratively put those people on the list,

20   right?  How do you determine whether they were residential or

21   not, right?

22             I mean, every number is going to be fact intensive at

23   trial.  There's going to be many trials.  I mean, our expert

24   identified, in just a small sample, all of the businesses that

25   are on that list that Ms. Verkhovskaya doesn't even remove.

1    And that's just a small sample size.

2         Before you start getting into how these numbers are

3    held out to the public, under your analysis at summary judgment

4    it's so fact intensive.  And the cases we've cited show that

5    it's fact intensive.  That's one issue that predominates.

6         The other issue that they raised is consent.  Well,

7    they have no issues with consent, but we have produced volumes

8    and volumes of consent data.  They dispute it, but they still

9    have to address each consent for each individual consumer.  So

10   they're --

11        THE COURT:  Why is that actually an individual issue?

12   They say -- if I read the papers correctly, essentially -- they

13   don't use the word "concede" -- but, essentially, they seem to

14   say QuoteWizard has a consent document for everybody -- or

15   virtually everybody.  And they're not factually disputing that.

16   What they say is all of your documents suffer from one -- what

17   they say is a defect.

18        MR. POLANSKY:  Right.

19        THE COURT:  Right.  And so they might be right and

20   they might be wrong.  And if they're wrong, you get -- if I

21   certify the class, that issue seems like it would be joined on

22   summary judgment by cross-motions.  I assume you would move on

23   that, too.  And they say they're going to move on it.

24        If I decide you're right -- that it doesn't have to

25   say QuoteWizard the way they say it does -- that's the end,

1    right?  You get a judgment in your favor; it binds the whole

2    class; case over.  If they win that issue at summary judgment,

3    then there might be these other issues.  There might be

4    minitrials on residential or whatever.

5         But that issue -- it seems that and the e-sign are

6    really the only issues with respect to consent.  Not to say

7    consent couldn't be individual in another case.  But in this

8    case.  Given what the facts are and what they're claiming in

9    your argument.

10        MR. POLANSKY:  Because it would require this Court to

11   look at every single consent disclosure, which are different.

12   These are all different from the Snappy auto disclosure.  These

13   consent disclosures, of which there are at least 677, are going

14   to be litigated at a summary judgment motion.  They're all

15   different.  The seller identified in each disclosure is

16   different.

17        And in cases like this, I mean, the most recent that I

18   know of is this *Kearns* case out of California, in which the

19   Court says, Well, your disclosure -- which didn't identify the

20   party, by the way -- says up to five mortgage providers.  And

21   the Court said, That's a fact issue; that goes to the jury.

22        That was one consent.

23        THE COURT:  "A fact issue" as to what?

24        MR. POLANSKY:  As to whether that consent was valid.

25   And that goes to the jury.

1          That was one single consent.  We have at least 677

2     different consents that we're going to put in front of this

3     Court to address whether those are valid or invalid?  I mean,

4     that in and of itself is --

5          THE COURT:  But my question is still the same, in a

6     way.  If the contention -- their contention seems to be that it

7     has to -- one of the two contentions is it has to name

8     QuoteWizard.

9          So that mortgage example, their contention would be,

10    That's no good.  I don't know if they're right, but that -- but

11    resolving that -- and I take it your position is it doesn't

12    have to say "QuoteWizard."

13         I could imagine a different argument that said -- or a

14    different dispute where, you know, it says five mortgage

15    brokers, and it says, Mortgage brokers and five.  And maybe it

16    has different other limitations and it doesn't mention other

17    specific mortgage brokers.

18         And I could imagine there could be disputes about

19    whether that's sufficient or not, and that would present

20    different kinds of disputes, and then you have other ones that

21    say "three," and you have other ones that say "nine," and those

22    would require individual adjudication.

23         But, if the whole question is reduced by their

24    argument -- that either, if it doesn't mention QuoteWizard, we

25    win or we lose, nonetheless, I mean, there's no fact dispute

1    that is -- it appears that none of the 677 mentioned

2    QuoteWizard.

3         So then, there may be other arguments with respect to

4    all those disclosures, but they're not -- and then, so why

5    wouldn't, a, that be enough?  And, b, if I got there, and

6    suppose I decided, You know what?  This is a fact issue.

7         And from the few that you gave me I can see there's a

8    similarity, but there are -- they're different words, and the

9    words matter, right?

10        But if I, at summary judgment, look at this and say,

11   Wow, actually, this is a fact issue, and it matters -- like,

12   it's not just up or down on the naming, but it's actually, This

13   one might be no good, but this one might be good because, even

14   though it doesn't name it, it has other things that would be

15   sufficient -- I'm not sure because I'm not an expert on that

16   area of the law right now but -- and there are too many fact

17   issues, then don't I decertify the class if it can't be tried?

18        MR. POLANSKY:  Well, you could.  That's certainly an

19   option.  But we think it's so individualized now.  We think the

20   consent -- you have to look at each consent to see who it's

21   identifying, who the seller is.  And maybe you say, well, who

22   it by name?

23        But that's not enough.  You have to look at the

24   definition of "seller" under the TCPA.  And "seller" could be

25   either that individual or someone on their behalf.  So it's not

1    enough just to say it's QuoteWizard or nothing.  You have to

2    look at every individual consent to see whether it is a

3    particular issue.

4         Now, let's assume, for instance -- let me take this

5    issue just a little bit further.  Let's assume for the moment

6    that they're right.  And you were to look at this issue, and it

7    goes in their favor:  We didn't have valid consent.  Not

8    because they didn't sign up but because -- the consent is

9    invalid because it wasn't in QuoteWizard.

10        Now we have a different issue.  That different issue

11   is Article III standing:  Have they been harmed?  Because these

12   are all individuals that attempted to give consent to receive

13   insurance quotes, but now the consent issue is actually

14   invalid.  The disclosure they signed is invalid.

15        So they have a whole different issue on their hands,

16   which is how have they been harmed when they signed up -- based

17   on all of the data we have to show who signed up, when, where;

18   the information they provided -- to receive this information?

19   Even though this Court may, under its hypothetical, find in the

20   plaintiff's favor, that is a different issue.

21        And then, this E-Sign Act -- it's not applicable.  The

22   E-Sign Act isn't applicable whatsoever.  Let's think about

23   this --

24        THE COURT:  Wait.  I want to think about your standing

25   argument for a minute.  So somebody signs a form saying, I'm

1    okay with insurance quotes from three or five unnamed insurance

2    companies --

3         Just something along those lines, which seems somewhat

4    like some of the consent forms here.  Is that roughly fair?

5    Some of them?

6         MR. POLANSKY:  Yes, that's fair.

7         THE COURT:  -- and, if it's determined as a matter of

8    law that that's not valid consent, and, if they received

9    subsequent texts, you're saying, Well, they're not really

10   injured because they won it.

11        MR. POLANSKY:  Correct.

12        THE COURT:  But how do we know they really wanted it

13   because they didn't really -- you're saying there's no -- as a

14   fact question, they wanted to receive insurance quotes and,

15   even though their consent was not valid, it's not -- they're

16   not injured.

17        MR. POLANSKY:  Correct.  This is different than the

18   case in which -- it's a different business practice than

19   QuoteWizard.  QuoteWizard's business practice is to reach out

20   to consumers who are interested, interested in receiving

21   insurance quotes.

22        This is different than *Krakauer* where they weren't

23   Dish customers.  In fact, Dish was trying to reach out to

24   non-Dish customers and to get them to sign up.  And the Court

25   said, Well, there's Article III standing because they're in the

1    DNC; they didn't sign up for this.

2          That's different.  Here they did sign up.  They signed

3    up to receive the insurance quotes, but -- and I'm not

4    conceding this whatsoever -- for some reason, maybe their

5    consent was invalid.  You would then -- so each of those people

6    would have to be looked on at their own.

7          Now, some of the data that the plaintiffs put forth is

8    this class list.  And they have text messages.  So we have to

9    look back -- well, who has a text message?  What do they say?

10   We pointed out just a handful -- I think even 20, 25

11   messages -- in which they're inviting further inquiry.

12         Were they harmed?  They said, No, please call me

13   Tuesday.  Or, I'm at work, or something along that nature.

14   Now, when they put all of their communications, are they

15   possibly been harmed?  Have they been harmed?

16         I mean, so it is such an individualized inquiry.  You

17   can't just say it's because they're on the DNC.  We don't know

18   when they're added to the DNC.  Just because their number is on

19   the DNC doesn't mean they're on the DNC when the text was sent.

20   That's also one of the faulty issues with Anya Verkhovskaya's

21   methodology.

22         But I do want to turn to E-Sign because I think I am

23   running low on time.  Nowhere in the regulations does it say

24   that the consent must be compliant with E-Sign.  It doesn't say

25   that.

 1          The place where the plaintiff tries to undertake that
 2   E-Sign language is in a 2012 opinion by the FCC.  And in that
 3   opinion it says:  If you have a compliant e-sign at consent,
 4   that complies with the TCPA.
 5          It's permissive; it's not mandatory.
 6          More importantly, that opinion is no longer given
 7   deferential treatment after post-*Chevron*.  So even assume, for
 8   a second, that opinion in 2012 was mandatory, that it made it
 9   be compliant with E-Sign.  It's no longer given that same
10   deference post-*Chevron*.
11          But, again, if you read that opinion, it's permissive.
12   It says, If you have complied, then you have complied with the
13   TCPA.
14          THE COURT:  But, also, the recent Supreme Court
15   decision means I just read the E-Sign Act and I interpret it.
16   And I haven't gone back and reread the E-Sign Act, but I just
17   don't give deference to the FCC's conclusion.
18          Then the arguments all of you would be making is, This
19   is what the statute says; This is what it should mean; The FCC
20   said this.  That's a data point but not something to defer to.
21          MR. POLANSKY:  Absolutely.  And then, if you go back
22   to actually the statute or regulation, and then you say, Well,
23   where the E-Sign Act referenced?  Where is 7001-c referenced?
24          Nowhere.
25          THE COURT:  Well I'm not sure, after the demise of

1   *Chevron*, that that matters.  Because that would be if they

2   don't mention it.  But I don't defer to them anyway.

3            MR. POLANSKY:  You don't.

4            THE COURT:  So, if the E-Sign Act applies -- if the

5   Circuit's or the Supreme Court's interpretation is the E-Sign

6   Act applies to these particular consent forms, given the way

7   they're acquired and what they are, that's the conclusion I

8   read in the statute, then that's it.  It doesn't matter that

9   the regulations don't mention it, and I wouldn't give deference

10  to that.

11           If my read of the E-Sign Act says it doesn't apply to

12  these, then it doesn't apply.  I think that's how it would

13  work.

14           MR. POLANSKY:  Sure enough.  You don't have to give

15  any deference.  I understand.  But the E-Sign Act doesn't say

16  it does apply.  The E-Sign Act relates to consent to electronic

17  records.  It has nothing to do with the TCPA.

18           In fact, under the E-Sign's electronic signature

19  provision, it says the electronic signature means "an

20  electronic sound, a symbol, or process, attached to or

21  logically associated with a contract or other record and

22  executed or adopted by a person with the intent to sign the

23  record."  That's all it requires.

24           And, when the FCC was given deference and said, Hey,

25  if it complies with the E-Sign Act," which can be, like, done

1    by a sound, that's all they're referring to.  The TCPA has

2    nothing to do with electronic records.  And to so read that

3    into the statute is just impermissible.  It has nothing to do

4    with electronic records.

5          And we submit that the E-Sign Act relating to the

6    various consumer disclosures regarding electronic records is

7    inapplicable because we're not storing their records like

8    medical records.  We're not storing their electronic records

9    like buying a car or leasing.  That's not here.

10          And, in fact, it says under the E-Sign Act, you know,

11   If the statute or law that you're interpreting requires it.

12          TCPA doesn't make any mention of it.

13          And I think those are the points that I wanted to

14   address, but we do believe that the individual issues

15   predominate.

16          THE COURT:  Okay.  Thank you.

17          MR. McCUE:  If I may, just briefly, starting where

18   Mr. Polansky ends.

19          E-Sign Act applies where a consumer's signature is

20   required but it's absent, and what E-Sign says is, In that

21   situation we're going to excuse the signature if you comply

22   with all these different disclosure provisions.

23          Now, they could have gotten consent from consumers and

24   gotten their signatures.  That would have been TCPA compliant.

25   They chose not to.  They say they got consent over the internet

1    electronically via web forms.  So, if you're going to get

2    consent electronically in a consumer transaction, which this

3    is, you need to comply with the E-Sign Act.

4         So *Chevron* is, frankly, irrelevant.  You look at the

5    E-Sign Act; you look at the TCPA.  TCPA requires a signature;

6    E-Sign Act gives an exception to that if you satisfy.  Last

7    week we supplemented with a case called *Dentalplans* from

8    Maryland that walks through this exact analysis in a DNC/TCPA

9    class action.  Not only does the Court certify the class, it

10   recognizes the importance of e-sign disclosures.

11        The other issue I wanted to touch on just briefly is

12   the issue of do-not-call complaints, and I think you understand

13   this, Your Honor.  And I didn't go through the whole funnel.

14   We did a funnel at one point to identify people who not only

15   are -- were on the do-not-call list when they got these texts

16   but also made a complaint that they designated do-not-call.

17        We did that for purposes of focusing on consumers who

18   unquestionably received the texts and articulated that they are

19   upset.  That has nothing to do with the elements of the DNC

20   claim.

21        THE COURT:  So the funnel was one, and the number --

22   is the number on -- is it Drips' or QuoteWizard's, in your

23   view?

24        MR. McCUE:  This is the DNC list that Drips created at

25   QuoteWizard's request for quotes.

1          THE COURT:  So on this -- I'll call it an internal --

2     this internal do-not-call list, one step in the funnel is, if

3     the number's on there, it proceeds through to the next stage;

4     if the number is not on that list, it gets thrown aside.

5          MR. McCUE:  Correct.  But that's not relevant to, Do

6     they have a DNC claim or not?  What it's relevant to is us

7     dealing with other issues --

8          THE COURT:  I understand.  That doesn't change

9     whether -- both numbers might have been on the national

10     do-not-call list.  My question is then, will that list, a list

11     in your -- the purpose and creation and metric by which that

12     list was created and maintained, putting aside that there might

13     be errors in it, for people who responded to QuoteWizard texts

14     only?  Or was -- if Drips had other customers and someone

15     responded to the DraftKings text, Don't bother me, did they put

16     that on this one?

17          MR. McCUE:  This testimony came up in the depositions

18     of Drips, who is attached at the hip to QuoteWizard.  When we

19     requested the do-not-call list for QuoteWizard, this is what

20     was produced.

21          It wasn't produced and they said, This is QuoteWizard

22     plus DraftKings.  They said, It is QuoteWizard.  And the fact

23     that they didn't save all the do-not-call texts themselves to

24     now go through them -- that's on them.  They didn't save their

25     own records.

1           And let me just review for you, Your Honor, the

2    history of this case.  When we first asked for do-not-call

3    complaints, their response is, We have no documents.  Nothing.

4           That's what they said in discovery.

5           We pushed further, ended up before you, Your Honor,

6    and they finally said, Oh, you mean do-not-call requests.

7    Those aren't complaints; those are requests.

8           So that is the semantics that were used.

9           So then we finally got disclosure from them.

10   2.5 million people responded to QuoteWizard's telemarketing

11   texts in a manner that was designated by Drips on behalf of

12   QuoteWizard as a do-not-call request.

13          Also, remember the history of this case -- that

14   QuoteWizard agreed to use artificial intelligence.  QuoteWizard

15   instructed Drips.  They didn't even want to review the

16   substance of these requests because there were so many.  They

17   had them reviewed by artificial intelligence and then tiered

18   into ones, twos and threes.  And Tier One were the screamers.

19   That's how they dealt with these complaints.

20          The volume of these telemarketing complaints -- this

21   is the willfulness case.  They have 2.5 million complaints, and

22   they kept on going.  And when Mr. Mantha sued them, they

23   responded by attacking Mr. Mantha, accusing him of fraud,

24   coming into court saying they're going to move for summary

25   judgment because he's going to be frauded in 60 days, if you

1    remember.

2              THE COURT:  I do remember.

3              MR. McCUE:  That's how they responded to this case.

4    And they kept telemarketing.  After we sued them, they kept on

5    going.

6              THE COURT:  But so, on the funneling, one part of the

7    funneling is on this do-not-call list or not.  This internal

8    do-not-call list.

9              MR. McCUE:  Correct.

10             THE COURT:  Was there also a review of -- a separate

11   review of text messages?  I understand that later, after there

12   was an identification that some people were positive, your

13   expert reviewed texts.  I assume what she reviewed was the

14   39 percent.

15             MR. McCUE:  Right.  We got their do-not-call list, and

16   we relied on that as accurate --

17             THE COURT:  I understand.

18             MR. McCUE:  Sorry, Your Honor.

19             THE COURT:  Then you had her review the substantive

20   responses that caused people to be put on that list.

21             MR. McCUE:  Correct.  When their expert came back and

22   said, Some of these folks on our do-not-call list actually

23   expressed interest, then we actually looked at the substance of

24   the ones that we did have, and we did an additional

25   carve-out --

1          THE COURT:  That's when it got carved out into the

2     6600 or --

3          MR. McCUE:  -- that those that were -- that were

4     expressing interest, we carved them out.  They say we didn't

5     get everybody; there's still a tiny bit.  We're talking about

6     dancing around the margins of a class list, Your Honor.

7          THE COURT:  So that step of the funneling is two

8     parts.  One part is just:  Are they on the list?

9          And the other part is then a review of the ones that

10    there are text messages for dropping out, ones that your expert

11    reviewed and decided those looked like expressions of interest.

12         MR. McCUE:  Correct, Your Honor.  And, just to

13    reiterate, we did this based on reliance of the accuracy of

14    their own records.  So now they're saying this case should be

15    certified because numbers that we put in the do-not-call list

16    shouldn't have been.  Well, that's seeking to take advantage --

17    for QuoteWizard -- of their own poor recordkeeping, which, I

18    submit to you, is just unfair.

19         THE COURT:  Do you see if -- suppose I deny the motion

20    to exclude, allow the cert.  They come along, and there's

21    evidence at trial that Drips had one do-not-call list rather

22    than one for QuoteWizard.  And then what happens?

23         MR. McCUE:  It, frankly, doesn't matter because it's

24    not relevant to the TCPA claims.  The TCPA claims -- the DNC

25    claim is, Were you on the list and did you get two texts within

1    the same period of time?  That's --

2         THE COURT:  So you have a person who responded to the

3    DraftKings texts and said, Stop it, and didn't respond at all,

4    potentially, to the QuoteWizard texts.

5         MR. McCUE:  Right.

6         THE COURT:  What you're saying is they were on the

7    national do-not-call list, they got the two text messages; so

8    many other things were met.  And so -- so are there any

9    commonality, typicality issues for you in terms of you have a

10   class composed of primarily people who you think expressed some

11   feeling of not wanting to receive the text?

12        MR. McCUE:  I submit to you no, Your Honor, because we

13   don't need to go there.  For standing, all we need to show is

14   they're on the list and got these calls.  Courts have

15   repeatedly found that, alone, is evidence --

16        THE COURT:  Suppose, in the end, at summary judgment

17   you persuade me you're correct on consent, that the absence of

18   QuoteWizard's name, specific authorization for QuoteWizard

19   makes the consent no good.

20        MR. McCUE:  Yes.

21        THE COURT:  Then, do those people -- almost everybody

22   other than Mr. Mantha signed one of those -- not signed.  In

23   some way authorized, indicated some sort of assent to one of

24   those forms.  That's what their evidence is, right?

25        MR. McCUE:  Still no standing issue, Your Honor,

1    because they have not proven that this data is truthful,

2    authentic, reliable, admissible.  All they're doing is throwing

3    thousands of Excel spreadsheets at us saying, This isn't what

4    it represents.

5         And this comes back to my point at the beginning.

6    Five years into this litigation, they have not deposed a single

7    data broker, a single website owner from this which they say

8    they got this data.  So this whole theoretical standing

9    argument is based on a house of cards.

10         THE COURT:  Well, why couldn't they get affidavits to

11    just call them at trial?

12         MR. McCUE:  Well, discovery is closed.  They could

13    have done that; they should have done that.  They didn't do

14    that.

15         THE COURT:  But what would preclude them from

16    submitting affidavits at summary judgment or calling the

17    witnesses at trial?

18         MR. McCUE:  Yes, Your Honor, I guess, theoretically,

19    they could do that.  They haven't done that.  They've actually

20    admitted they don't even know who some of these brokers are.

21    So how do you get past this admissibility problem?  They made

22    no effort to do it.

23         So, until they show an ability to do that, they

24    certainly shouldn't be given deference on that argument that

25    somehow they're going to come in with all these reliable,

 1    authentic witnesses --

 2            THE COURT:  What about their argument about minitrials

 3    on residential?  As I understand your theory, you have common

 4    evidence from which a jury could infer or I should at present

 5    purposes find is enough to have -- drive the predominance

 6    question.

 7            But they say -- what I hear them saying is, Look, if

 8    this goes forward, when we get to trial, we're going to have --

 9    we already have some examples, we'll have more, and on each one

10    we're going to have evidence -- or maybe not every single one

11    but a lot of them -- we're going to have evidence -- specific,

12    factual evidence that calls into question whether those facts

13    that you identify that support the inference are sufficient to

14    draw the inference or are counter -- you shouldn't draw the

15    inference -- and it will devolve into minitrials over

16    residential on many numbers.

17            MR. McCUE:  Discovery is over, Your Honor.  And it was

18    extended over and over and over.  They've had every opportunity

19    to rebut their presumption on those lines.  They haven't done

20    it.

21            But now they have their experts go up and do digging

22    and come up with examples that our expert says are mostly

23    at-home businesses, which, by the way, can be on the

24    do-not-call list.

25            So now they're trying to get around their discovery

1  obligations by having their expert hunt and peck for certain

2  examples.  So it's inappropriate.

3        But, even if you allow that, that does not mean that

4  individual issues predominate in this case.

5        THE COURT:  So you're saying if number 52,000 of

6  66,000 on the list -- if they wanted to call that person as a

7  witness, that person's not on their Rule 26 disclosures?

8        If they want to call that person to the stand and say,

9  This is my phone number, I got it -- for the example -- before

10  I went to law school when it was my primary number.  It might

11  have been my residential number.  Now it's my business number.

12  I have a landline phone at home.  It's not the way to reach me

13  at home; it's a number I use for work -- and so forth,

14  whatever.  You can fill out the facts.

15        And it either creates at least a fact issue as to what

16  it is or -- let's just say -- you're saying, And of all that,

17  it's too late, because they didn't disclose that person as a

18  witness to support their claims or defenses.

19        MR. McCUE:  Certainly that's one argument, Your Honor.

20  But say, theoretically, you do allow them to do that.

21        THE COURT:  Are there discovery requests that they

22  would have to supplement on?

23        MR. McCUE:  Sure, Your Honor.  I asked them in

24  discovery years ago, If you think these are residential lines,

25  tell us.  They didn't identify a single one.  They sought

1  extensions on discovery for consent over and over and over

2  again.  And then discovery ended.  And we proceed based upon

3  the -- relying upon the evidence that's produced in discovery,

4  as we should per the rules.

5       But if you -- say you did allow this to happen.  That

6  doesn't mean individual issues predominate, certainly not for

7  class certification and even for trial.  We don't have to win

8  on every single class member's claim at trial.  That's not our

9  burden.

10      So, theoretically, at trial, say they come forth with

11  20, 30, 100 people, and they have evidence that, somehow, you

12  allow that shows these are not residential numbers.  Okay.

13  Well, then the jury is presented with a verdict form that

14  allows them the opportunity to look at the evidence, and that's

15  exactly what happened in the *Krakauer* case.

16      The jury's verdict form in *Krakauer* gave the jury six

17  or seven options to find that all the numbers were residential

18  on the DNC or to find that certain categories were not

19  residential and on the DNC.  The jury came back and found that

20  every single number was residential.

21      Using your discretion on Rule 23, after this case is

22  certified you have extensive discretion to identify individual

23  issues that don't predominate but that create individual issues

24  that we can manage and figure out how to either take them out

25  of the class or how to let the jury decide the merits of their

1    claims without denying class certification.

2          And rather than focusing on these, you know -- the

3    margins of the class list and, Here's a little example -- let's

4    focus on the overwhelming majority of the people in the class

5    who no doubt were on the DNC, were residential lines,

6    complained of these calls, QuoteWizard ignored their

7    complaints; they continued telemarketing; they did it over and

8    over and over again to millions of people.

9          Remember, this is only a small subsection of the

10   universe of texting that happened in this case, and I would

11   submit to you that it's, frankly, just unfair to the class, who

12   have thousands and thousands of valid claims that aren't

13   subject to any of these peripheral defenses.

14         THE COURT:  Okay.  Thanks.

15         Any last point?

16         MR. McCUE:  No, your Honor.

17         THE COURT:  One question.  Suppose -- can you -- other

18   than what you have in your expert's report -- so your expert's

19   report creates some issues with respect to the residential

20   that, if we got to trial, I assume that would be a basis for

21   you to argue either just to not rely upon their expert at

22   all -- and that might defeat their whole case.

23         It would also potentially be an argument as to those

24   individual examples as to not -- as to strike them out of the

25   class or that they don't prevail or what have you.

1          But what is available -- what is left or available to

2     you to otherwise challenge the residential status of other

3     numbers?

4          MR. POLANSKY:  Right, well, one, we could review the

5     list.  I mean, the list is something that was just provided to

6     us.  We can review the list to determine their residential

7     status just like our expert has.  So the fact that, you know,

8     my client stores these numbers and didn't identify them as

9     being business doesn't make them residential either.

10          THE COURT:  I understand.  But suppose you look at

11     that -- suppose trial were next Monday.  And suppose you look

12     at number 52,328 on the list of 1 to 66,000.  And so you

13     investigate it -- you, your client, your expert, what have you.

14     It's going to be difficult for your expert to amend his report.

15     That whole process is over.

16          MR. POLANSKY:  Right.

17          THE COURT:  You identify information that you think is

18     relevant that you think would be supportive of the argument

19     that that particular number is not residential.  It could be

20     listings on -- it could be LinkedIn listings or all sorts of

21     different pieces of information.

22          Can you -- how can you -- I'm not saying "how" in the

23     sense that you can't, but what is the method by which, at this

24     stage, you could gather that, you could make that information

25     usable for you?

1         MR. POLANSKY:  Sure.  We could subpoena those

2    individuals at trial and ask them, question them.  I mean,

3    we're not prevented from calling parties at trial.

4         THE COURT:  And would you have to supplement any of

5    your disclosures?

6         MR. POLANSKY:  I'd have to look back.  I mean, we may

7    and we may not.  A lot of that is work product at this point.

8    So if we were to determine that, you know, Joe Smith, who's

9    5,200, is a lawyer and has been putting his phone number out on

10   the list, we could subpoena him and have him discuss his

11   information, his telephone number being on the DNC.

12        THE COURT:  So we'd certainly have to supplement 26(a)

13   (1)(A)(i).

14        MR. POLANSKY:  Sure.  I mean, we haven't submitted a

15   pretrial report yet, so we'd have to --

16        THE COURT:  No, but you presumably did your initial

17   disclosures already.

18        MR. POLANSKY:  Right.  So we could supplement initial

19   disclosures, but we'd certainly add them to the pretrial

20   witness report, which is not due yet.

21        THE COURT:  Right.

22        MR. POLANSKY:  Right.  And we would list everyone who

23   would have a -- any association with their business using their

24   telephone number.

25        THE COURT:  And you'd have to supplement, probably,

1  (A)(i), too.  Because, presumably, even if you called the

2  witness, you'd have documents.

3          MR. POLANSKY:  Mm-hmm.

4          I mean, presumably, we could call the entire list and

5  ask them on the stand if they used their phone number and go

6  through the analysis that the Court laid out in the summary

7  judgment motion.

8          THE COURT:  But you'd also -- I assume they would

9  object to the timing of your disclosures?  I don't know, but --

10  and it does say in 26(a)(1)(E), "A party will make its initial

11  disclosures based on the information then reasonably available

12  to it."  It probably wasn't reasonably available to you on the

13  day you got your initial disclosures, though.

14          MR. POLANSKY:  We just got the class list.

15          THE COURT:  "A party is not excused from making its

16  disclosures because it has not fully investigated the case or

17  because it challenges the sufficiency of another party's

18  disclosures."

19          Okay.  I understand.

20          MR. POLANSKY:  Thank you, Your Honor.  Thank you very

21  much for your time.

22          THE COURT:  Have a good day.  I promise you this.  I

23  can't promise you when I will issue a decision.  I wish I

24  could, but I will promise you this:  It will be a lot quicker

25  than it took me to get to the hearing.  I'm sorry it's taken me

1   as long as it has to get to the hearing.

2              And -- okay.  Thanks.  Very helpful discussion.

3              (Whereupon the hearing was adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, Jessica Leonard, Certified Shorthand Reporter

 4    and Federal Certified Realtime Reporter for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter, to the best of my skill and ability.

 9            Dated this 26th of August, 2024.

10

11

12            /s/ Jessica M. Leonard

13            Jessica M. Leonard, CSR, FCRR

14            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```