# **Attachment B**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
JOSEPH MANTHA, *on behalf of himself*  )
*and others similarly situated*,         )
                                )
        Plaintiff,              )
                                )
v.                              )        Civil No. 19-12235-LTS
                                )
QUOTEWIZARD.COM, LLC,           )
                                )
        Defendant.              )
_____)

ORDER ON REPORT AND RECOMMENDATION (DOC. NOS. 253, 258)

February 3, 2022

SOROKIN, J.

Plaintiff Joseph Mantha brought a class action lawsuit on October 29, 2019 against

Defendant QuoteWizard.com, LLC ("QuoteWizard") alleging violations of the Telephone

Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Doc. No. 1. QuoteWizard moved for

summary judgment (Doc. No. 201) on the only live claim in Mantha's Amended Complaint—

Count II alleging a violation of one provision of the TCPA.[1] Mantha opposed that motion (Doc.

No. 221) and cross-moved for partial summary judgment (Doc. No. 205) on two issues: (1) that

Mantha did not provide QuoteWizard prior express consent to send him telemarketing texts and

(2) that the protections of the TCPA and the federal Do Not Call ("DNC") Registry encompass

his wireless phone number. QuoteWizard opposed the cross-motion. Doc. No. 223. Pursuant to

a referral, Chief Magistrate Judge Kelley recommends that the Court deny QuoteWizard's

_____
[1] The parties stipulated to dismissal with prejudice of Count I in the First Amended Complaint.
Doc. No. 187.

Motion for Summary Judgment (Doc. No. 201) and allow Mantha's Partial Cross-Motion for

Summary Judgment (Doc. No. 205) as to both issues.  Doc. No. 253 (unredacted version

appearing on the public docket as No. 258).  QuoteWizard filed a timely Objection to the Report

and Recommendation, and Mantha filed a Reply.  Doc. Nos. 264, 267.  The Court now turns to

resolve the pending motions de novo and considers the Report and Recommendation, which is

also subject to de novo review, in light of the Objection filed.[2]  The factual background, charted

in the Report and Recommendation in detail, Doc. No. 253, is not repeated here, and the Court

sets out further facts as necessary in the course of discussing the individual claims.

   The Court adjudicates the two summary judgment motions applying the familiar legal

standard governing summary judgment.  The Court turns to QuoteWizard's motion first, and as

to this motion, resolves all disputed issues of material fact and draws all reasonable inferences in

favor of Mantha.  The Court addresses each of QuoteWizard's objections in turn, though in a

somewhat different order.

---

[2] Before turning to the merits, one procedural matter requires clarification.  QuoteWizard states
in its objection that it "incorporates its summary judgment briefing" into its Objection to the
Report and Recommendation.  Doc. No. 264 at 1 n.2.  This QuoteWizard cannot do.  Court rules
limit memoranda to twenty pages, absent leave of Court.  L.R. 7.1(b)(4).  QuoteWizard sought
leave to file a lengthy memo of thirty-four pages.  Doc. No. 262.  The Court allowed that request.
Doc. No. 263.  The Court considers the arguments advanced in that memoranda in ruling on the
two pending motions.  Insofar as QuoteWizard is seeking to put before the Court arguments that
were advanced in its summary judgment memoranda but not set forth in the Objection, the Court
deems that an impermissible attempt to disregard the rules on page limits.  Any such arguments
are deemed waived.  There are, however, instances where the objecting party's prior memoranda
on a summary judgment motion might be relevant.  For example, if the Magistrate Judge
concluded a party had waived an argument by not making it, the objecting party might fairly
object to that recommendation asserting that its prior memoranda had advanced the argument.
Chief Judge Kelley made no such rulings in this case so that type of example has no application
here.

I.      QUOTEWIZARD'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 201)

        A.   Standing

        Standing is foundational to the subject matter jurisdiction of the Court, Lujan v. Defs. of

Wildlife, so the Court first considers QuoteWizard's argument that Mantha has not sufficiently

established Article III standing.  504 U.S. 555, 561 (1992).  Under Article III, "the 'irreducible

constitutional minimum' of standing consists of three elements.  The plaintiff must have (1)

suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins,

578 U.S. 330, 338 (2016) (citation omitted).  "Article III standing requires a concrete injury even

in the context of a statutory violation."  Id. at 341.  "Although tangible injuries are perhaps easier

to recognize," the Supreme Court has "confirmed in many of [its] previous cases that intangible

injuries can nevertheless be concrete."  Id. at 340.

        QuoteWizard contends Mantha failed to establish injury-in-fact for purposes of summary

judgment.  Doc. No. 264 at 12-13.  QuoteWizard is wrong.  The undisputed evidence establishes

that QuoteWizard sent to Mantha's wireless phone number a series of text messages.  See, e.g.,

Doc. No. 210-14 ¶ 7.  Mantha in a sworn declaration stated he "find[s] unsolicited telemarketing

irritating and a violation of [his] privacy rights[,]"[3] and that he listed his number on the DNC

Registry to alert "telemarketers that [he] was not interested in their calls or their goods or

services."  Id. ¶¶ 9-10.  These statements appear in his declaration immediately after he stated

that he received text messages from QuoteWizard on his cellular phone number listed on the

_____

[3] For purposes of determining standing and standing only, the Court assumes that the text
messages were unsolicited (an assumption impliedly adopted by QuoteWizard's argument as
well).  The Court's assumption here has no bearing whatsoever on the Court's determination of
the question of consent addressed later in this Order.

3

DNC Registry and that he "did not consent to receive these text messages." Id. ¶¶ 7-8.

QuoteWizard asserts that these statements fail to show injury-in-fact because Mantha did not say

that "QuoteWizard's text messages caused him any specific harm or injury whatsoever." Doc.

No. 264 at 13 (emphasis in original). Even without the benefit of the summary judgment

standard, Mantha's declaration, fairly read, states that Mantha found QuoteWizard's text

messages irritating and an invasion of his privacy, as he finds all such unsolicited text messages.

Of course, drawing all reasonable inferences in Mantha's favor as the law requires in

determining QuoteWizard's motion, the declaration establishes injury-in-fact. QuoteWizard's

Objection (Doc. No. 264) to the recommendation that Mantha established Article III standing is

OVERRULED, and the Court ADOPTS Chief Judge Kelley's recommendation on this issue.[4]

Next, QuoteWizard contends that Mantha failed to establish prudential standing. "In

addition to these Article III prerequisites, prudential concerns ordinarily require a plaintiff to

show that his claim is premised on his own legal rights (as opposed to those of a third party), that

his claim is not merely a generalized grievance, and that it falls within the zone of interests

protected by the law invoked." Pagan v. Calderon, 448 F.3d 16, 27 (1st Cir. 2006). "These

---

[4] Insofar as QuoteWizard suggests that a portion of Mantha's subsequent deposition testimony contradicts his sworn declaration thereby resulting in the disregard of the declaration under the auspicious of the so-called sham affidavit doctrine, see Doc. No. 264 at 14 (quoting Doc. No. 208-3 at 70:12-24), the Court rejects that suggestion. The cited disparity between the declaration and deposition testimony is not such that the Court must regard it as "clearly contradictory." Cf. Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."). In addition, QuoteWizard's seeming contention that the absence of a claim for actual damages is proof of a lack of an actual injury, see Doc. No. 264 at 15, is wrong; it merely reflects that Mantha made the election Congress provided—to seek statutory damages in lieu of proving the value of his actual damages.

prudential considerations, though important, are not as inexorable as their Article III counterparts."  Id.

QuoteWizard argues on this issue that "when Mantha received the initial text message from QuoteWizard, he admittedly had but one thing on his mind: setting QuoteWizard up for liability."  Doc. No. 264 at 16.  QuoteWizard then proceeds to make arguments from how Mantha did or did not respond to the initial and later text messages concluding that Mantha "manufactured his TCPA claim in real-time with the help of an experienced TCPA claimant and his eventual attorney."  Id. at 17 n.9.  Drawing all reasonable inferences in Mantha's favor here as the law requires, he has established prudential standing for at least two reasons: First, the initial unsolicited text messages, see supra note 3, that Mantha received on his cellular number listed on the DNC Registry gave rise to Article III standing.  Second, that in responding to this allegedly illegal act he consulted with others more experienced in the law to preserve a claim in response to QuoteWizard's act reflects a "measure of common sense."  Doc. No. 264 at 17.  These reasons demonstrate that Mantha alleged a particularized and specific harm that falls within the "zone of interests" protected by the TCPA.  See Pagan, 448 F.3d at 27.

Therefore, the Court OVERRULES QuoteWizard's Objection (Doc. No. 264) to the determination of prudential standing and ADOPTS the finding in the Report and Recommendation (Doc. No. 253) that Mantha established prudential standing.  Insofar as QuoteWizard argues Mantha is outside the protection of the statute, the Court addresses that argument later in this Order.

### B.  DNC Protection of Cellular Phone Numbers

In Count II Mantha asserts a claim for a violation of the TCPA which prohibits "any person from making or transmitting a telephone solicitation to the telephone number of any

subscriber included in such database[.]"  47 U.S.C. § 277(c)(3)(F).  The Federal

Communications Commission ("FCC") created this database at the direction of Congress, id. at

(c)(3), to "protect residential telephone subscribers' privacy rights to avoid receiving telephone

solicitations to which they object."  Id. at (c)(1).  The statute delegates authority to the FCC to

implement these provisions and promulgate appropriate regulations.  See, e.g., id. at (c)(1)-(4).

The FCC then established a national DNC Registry for "residential telephone subscriber[s]."  47

C.F.R. § 64.1200(c)(2).

Chief Judge Kelley concluded that the TCPA's DNC protections apply to cellular phone

numbers, Doc. No. 253 at 8-9, and QuoteWizard contends Chief Judge Kelley erred in so

concluding.  Doc. No. 264 at 2.  The Court rejects this contention for several reasons.

First, the Court, as always, starts with the text of the statute.  It provides one type of

protection for "residential telephone subscribers."  47 U.S.C. § 277(c)(1), (c)(3)(F).  Congress

did not expressly define that term.  Canons of statutory construction direct the Court to give the

term its plain and ordinary meaning.  United States v. Gordon, 875 F.3d 26, 33 (1st Cir. 2017)

(describing that "[t]o the extent that Congress chose words that it did not define, we assume

those words 'carry their plain and ordinary meaning.'") (citation omitted).  The word

"residential" is defined as "used as a residence or by residents," with residence being defined as

"the act or fact of dwelling in a place for some time," and resident as "living in a place for some

length of time."[5]

---

[5] Residential, MERRIAM-WEBSTER.COM, https://www.merriam-
webster.com/dictionary/residential; Residence, https://www.merriam-
webster.com/dictionary/residence; Resident, MERRIAM-WEBSTER.COM,
https://www.merriam-webster.com/dictionary/residents.

Notably, the term describes certain attributes—residential, telephone, and subscriber. This stands in contrast with other terms used in the statute which by their nature are technical— "telephone facsimile machine" or "cellular telephone service" for example.  See, e.g., 47 U.S.C. § 227 (d)(2), (b)(2)(c).  Nothing in the text of the statute at issue here exclusively prevents a "residential telephone subscriber" from including a wireless or cellular telephone number.  For these reasons, QuoteWizard's contention that the statute divides cellular phones and residential phones into two discrete and exclusive worlds is unpersuasive; it simply runs counter to the text enacted by Congress.  Instead, the Court determines that "residential telephone subscriber" is a functional term not tethered to a particular technology; it encompasses those telephone services fitting the ordinary meaning of that term.  Indeed, the technical language cited by QuoteWizard demonstrates Congress understood how to use such language and intentionally eschewed technical language such as "landline" and opted for a functional term of "residential telephone subscriber" in (c)(1).

Second, the FCC—the agency tasked with interpreting, applying and implementing the statute, see, e.g., id. at (c)(1)-(4),—has concluded that wireless or cellular telephones may qualify under the term "residential telephone subscriber."  In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14039 (2003) (describing that "it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections . . . [and] [t]herefore . . . wireless subscribers may participate in the national do-not-call list.").  Moreover, the FCC's implementing regulations interpret the term "residential telephone" to encompass, in certain circumstances, wireless phone numbers. 47 C.F.R. § 64.1200(c)(2), (e) ("No person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the

national do-not-call registry . . . . The rules set forth . . . are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers . . . ."); cf. Shelton v. Fast Advance Funding, LLC, 805 F. App'x 156, 159 (3d Cir. 2020) (holding that a cellular phone subscriber can have standing to sue under TCPA for a DNC violation).

Third, several other sessions of this Court have concluded that cellular phones may qualify for protection as "residential telephone subscribers." Barton v. Temescal Wellness, LLC, 525 F. Supp. 3d 195, 202 (D. Mass. 2021) (Hillman, J.) (noting that under the TCPA, wireless subscribers using cellular phones can qualify as residential subscribers); Rosenberg v. LoanDepot.com LLC, 435 F. Supp. 3d 308, 324 (D. Mass. 2020) (Gorton, J.) (same); McDermet v. DirecTV, LLC, No. CV 19-11322-FDS, 2021 WL 217336, at *12 (D. Mass. Jan. 21, 2021) Saylor, J.) (noting on summary judgment that the TCPA's DNC protections includes cellular phone owners).[6]  It follows that the term "residential telephone subscriber" can encompass wireless or cellular phone users, and therefore the TCPA's DNC protections can extend to such users.  The Court thus DENIES QuoteWizard's Objection (Doc. No. 264) and ADOPTS the Report and Recommendation (Doc. No. 253) on this ground.

---

[6] In Sandoe v. Bos. Sci. Corp., another judge of this Court entered summary judgment without elaboration in favor of a defendant on a TCPA claim because the plaintiff in that case "concedes that he received the calls . . . on his cell phone and not a residential line. Consequently, . . . summary judgment will be entered [in] favor of defendant on plaintiff's claim under § 277(b)(1)(B)."  No. CV 18-11826-NMG, 2020 WL 94064, at *4 (D. Mass. Jan. 8, 2020).  This interpretation, however, concerns a "different portion of the statute, that uses different language" and does not inform the interpretation of § 277(c).  See Morgan v. U.S. Xpress, Inc., No. 3:17-CV-00085, 2018 WL 3580775, at *8 (W.D. Va. July 25, 2018) (distinguishing between § 277(b)(1) and (c)(5)).

C.  Residential Telephone Subscriber

Next, QuoteWizard argues that that even if the TCPA's DNC protections extend to wireless or cellular telephone numbers, that protection does not extend to Mantha's telephone number because he uses it for business purposes.  Doc. No. 264 at 5.  Mantha bears the burden of proof on this issue to show that his cellular phone number qualifies as a "residential telephone subscriber" pursuant to 47 U.S.C. § 277(c).  For QuoteWizard to prevail on its summary judgment motion, it must essentially show that under the law no reasonable jury could conclude otherwise while resolving all genuine material factual disputes and drawing all reasonable inferences in Mantha's favor.

QuoteWizard encourages the Court to find essentially that a phone number must fit into a binary of either a residential or business purpose.  See, e.g., Doc. No. 264 at 11 (arguing that "the complete absence of any evidence of 'residential' use of the cell phone" shows that Mantha is not a residential telephone subscriber).  The text of the statute, however, does not say a residential telephone has only or exclusively the qualities of a residential telephone to the exclusion of any other purpose.  As the Court has already described, the term "residential telephone subscriber" is a functional term in comparison to other, more technical terms, and therefore encompasses those telephone services fitting the ordinary meaning of that term.  Congress attached to the phrase no words of limitation or exclusivity.

The Court considers the ordinary meaning of the term "residential telephone subscriber" at the time of enactment by orienting to 1991 when Congress passed the TCPA.  See Bostock v. Clayton Cty, 140 S. Ct. 1731, 1738 (2020) (Gorsuch, J.) (describing that the Supreme Court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment").  Indeed, no doubt Congress was well aware in 1991 that many residential

telephone subscribers then had one telephone line in their homes that they used to make and receive work or business calls at home at night or weekends. Even if that use far exceeded the "personal" or "residential" use of the phone, the term "residential telephone subscriber" encompassed those phones notwithstanding any business or work use because the purpose of the phone was residential. Nothing in the TCPA supports the conclusion that such business or work use divested those phones of the protection of § 227(c). The text of the statute confirms this point. It does not limit the protection to a certain type of use, nor does it limit the protection to phones that are exclusively or only residential in character or to those phones whose use is predominately residential. On the other hand, a person cannot qualify as a "residential telephone subscriber" for a phone that an employer owns, supplies, and funds under the employer's own account because that phone lacks the required functional qualifications. These examples demonstrate that although a phone's use can be a relevant factor in the mix, it is generally neither dispositive nor the lynchpin of the analysis.[7] Rather the inquiry to determine whether a phone number qualifies as a "residential telephone subscriber" focuses on whether the subscriber has and uses the phone for residential purposes, regardless of if the subscriber also uses the phone for other purposes. Not only is this the necessary conclusion stemming from the ordinary meaning

---

[7] The Court acknowledges the cases which have assessed a phone's use to determine the question of whether a phone number constitutes a "residential telephone subscriber," as well as those that have occasionally held that fact questions exist regarding usage. See, e.g., Smith v. Truman Rd. Dev., LLC, No. 4:18-CV-00670-NKL, 2020 WL 2044730 (W.D. Mo. Apr. 28, 2020), at *11 (citing to Mattson v. Quicken Loans Inc., No. 3:18-CV-00989-YY, 2019 WL 7630856, at *5 (D. Or. Nov. 7, 2019)) (describing, for example, that "[w]here there is clear evidence that a cell phone line is used only or primarily as a business line, courts have granted summary judgment to defendants."); Cunningham v. Cap. Advance Sols., LLC, No. CV 17-13050 (FLW), 2018 WL 6061405, at *1 (D.N.J. Nov. 20, 2018), at *2 ("Plaintiff has failed to sufficiently allege that the primary use of his cellular phone is for non-business purposes."). After careful consideration, the Court is not persuaded by these cases in light of the plain language of the statute and canons of interpretation the Court is directed to apply.

of "residential telephone subscriber" in 1991, it is also the sensible approach in conformity with the language and purpose of the statute. See infra note 12.

It follows that in determining if a phone number has a residential purpose, the Court considers the following particularly relevant: First, the precondition that the phone number is a "residential telephone subscriber"—that is, the phone number is subscribed in the individual's name at their residence.  If that precondition is met, the Court then considers material whether the phone number at issue is the primary means of reaching the individual at their residence— that is, there is no other landline or phone at their residence which is instead the primary means of reaching them.[8]

Turning now to the facts, Mantha begins with the benefit of the presumption that his cellular phone number constitutes a "residential telephone subscriber" because the undisputed facts establish Mantha listed his cellular phone number on the National DNC Registry.  See, e.g., Doc. No. 210-14 ¶¶ 7, 10; Barton, 525 F. Supp. 3d at 202 (explaining that the FCC "presumes that wireless subscribers who ask to be put on the National Do Not Call Registry are residential subscribers").

There is, however, substantially more.  Ordinarily, of course, presumptions are rebuttable which is how the FCC treats this presumption in FCC enforcement actions.  Doc. No. 253 at 9 n.10 (citing In Re Rules 2003 ¶ 36).  Even assuming, without deciding, that this principle applies in a private enforcement action as QuoteWizard contends, QuoteWizard's motion fails drawing all reasonable inferences in favor of Mantha.  The undisputed evidence establishes the following

---

[8] Whether or not there could be a case where the combination of (1) an individual holding out their phone number to the public for work or business and (2) such extensive business use that so eviscerates the phone number of its residential qualities, the Court need not consider.  Such facts are not before the Court in this case.

facts: (1) the telephone number at issue is a cellular phone number subscribed to by Mantha in his name as part of a plan including a cellular phone number for his wife; (2) this cellular phone number "is used by Mr. Mantha for personal purposes"[9]; (3) Mantha "has no home phone"; (4) Mantha lives with his wife and children in their home; (5) Mantha does not live at the residential school at which he works; and (6) the bill for the cellular phone number is addressed to Mantha at his home.  Doc. No. 225 ¶¶ 27-29, 87-88, 90, 93.

Considering the totality of circumstances, and even these facts alone, establishes that Mantha meets not only (1) the precondition as a residential subscriber but also the material factor that (2) the cellular number is the primary means of reaching him at his residence.[10]  Mantha's cellular phone number has a residential quality to it and he uses it for residential purposes,[11] and therefore the Court concludes on this motion that Mantha's cellular phone number is a "residential telephone subscriber."  That Mantha, undisputedly, also uses his cellular phone number to receive calls regarding his employment during the workday as well as outside of normal business hours does not eradicate the residential use and qualities of his cellular phone as

---

[9] QuoteWizard "disputes that Mantha uses the cell phone only or even primarily for undefined 'personal purposes' or that his cell phone is a 'personal' one."  Doc. No. 225 ¶ 27.  This statement <u>concedes</u> that Mantha does use the cellular phone for at least some personal purposes.  As evidentiary support for its assertion, QuoteWizard cites an analysis of Mantha's cellular phone bill "reflecting that 48.6% of all calls to or from Mantha's cell phone in 2019 were to or from telephone numbers from/connected to the Perkins School or its employees[.]"  <u>Id.</u>  That evidence, on QuoteWizard's motion, does not change the Court's conclusion that Mantha's phone number qualifies as a "residential telephone subscriber" given that it has the attributes of one.

[10] Both of the material factors the Court defined previously in determining whether an individual qualifies as a "residential telephone subscriber" are met here.  Accordingly, the Court does not address situations where only some of these factors are met, which may present fact questions.  Such is not the case here.

[11] The Court has considered whether the presence of two cellular phones in the household means, without more evidence, that only one might have a residential quality or residential use.  QuoteWizard advanced no such argument in its Objection, thus the argument is waived.  In any event, it is without merit in the face of the presumption as well as the evidence discussed.

QuoteWizard appears to contend. Thus, the Court OVERRULES QuoteWizard's Objection (Doc. No. 264) and ADOPTS the determinations and findings of the Report and Recommendation (Doc. No. 253) on these points.[12]

D. Solicitation

Telephone solicitation is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). QuoteWizard's first text message to Mantha's cellular phone stated: "I'm Amanda with QuoteWizard messaging you about your car insurance coverage. Did you still need help? We can go over the choices once you get time to spare!" Doc. No. 225 ¶ 33. QuoteWizard sent this message on August 9, 2019, id., and it was the first in a series of seven generally similar text messages QuoteWizard sent between August 9, 2019 and August 13, 2019. Doc. No. 210-10. Mantha replied to none of those messages. Id. Six days later, on August 19, 2019 QuoteWizard sent an eighth message. Id. That same evening Mantha responded saying "How do I get a quote?". Id. QuoteWizard

---

[12] Two more points bear mention. QuoteWizard argues exclusively that Mantha failed to meet his burden to show he "used his cell phone for residential purposes." Doc. No. 264 at 8-9 (arguing that the relevant issue is "use" of the cellular phone and discussing evidence regarding "use of Mantha's cell phone"). For reasons described previously, use, although relevant, is ordinarily neither dispositive nor the lynchpin of this analysis. As long as a phone number meets the functional attributes of a "residential telephone subscriber," it qualifies as one. Second, there is the fairly obvious question in the present era of whether a cellular phone with both residential and non-residential uses is entitled to the TCPA's DNC protections. QuoteWizard has made no such argument in its Objection so it is waived. See id. at 11 (QuoteWizard argues there is a "complete absence of any evidence of 'residential' use of the cell phone," and electing not to engage in an analysis of whether a phone with mixed uses can be protected under the TCPA's DNC protections). In any event, the Court's construction of the statute resolves the question. A telephone phone number with functional characteristics qualifying it as a "residential telephone subscriber" phone so qualifies even if that status is not exclusive, i.e., even if the phone has other characteristics such as serving a personal communication device for reaching the subscriber wherever they are located.

responded two minutes later: "I can give you a quote for a variety of plans for auto insurance to fit your needs—When can we have a quick call?". Id. Further exchanges ensued. Id.

Drawing all reasonable inferences in Mantha's favor for this motion, QuoteWizard's numerous text messages were plainly sent "for the purpose of encouraging the purchase . . . of . . . services," specifically auto insurance. See 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). Indeed, QuoteWizard's Objection (Doc. No. 264) effectively concedes the point. QuoteWizard asserts that it "contacted Mantha for the purposes of helping him obtain an informational insurance quote." Doc. No. 264 at 25. Even if QuoteWizard's purpose was that narrow to the exclusion of all other purposes—something the Court need not decide—the relevant legal question concerns the purpose of the text message. Here, the text messages were sent to encourage the purchase of a service. The purpose of helping someone obtain an informational quote for a service, at least in the context of a business generating leads for a business that sells services, is, on this factual record, to encourage the purchase of the service. QuoteWizard's Objection (Doc. No. 264) is OVERRULED, and the finding of the Report and Recommendation (Doc. No. 253) on this ground is ADOPTED.

E. Good Faith Defense

QuoteWizard's Motion for Summary Judgment (Doc. No. 201) did not seek judgment on the question of consent. Doc. No. 264 at 17. The Motion and Objection, however, did seek judgment on the grounds of good faith. Id. at 32-33; Doc. No. 201 at 26-28. For purposes of this issue, the Court assumes without deciding that Mantha did not consent to contact for three reasons: (1) QuoteWizard did not seek judgment on the ground that it had obtained consent, Doc. No. 264 at 17; (2) Mantha declared he did not consent, Doc. No. 210-14 ¶ 8; and (3) drawing all

14

reasonable inferences in Mantha's favor results in the conclusion that, for purposes of QuoteWizard's motion, Mantha did not consent.[13]

Chief Judge Kelley recommends not recognizing a good faith defense as relief from liability for a defendant in violation of the TCPA based on the reasoning of various cases cited by Plaintiff. Doc. No. 253 at 19. As a general matter, that is a correct statement of law as the First Circuit has held that the "TCPA is a strict liability statute" in an automatic dialing case.[14] Breda v. Cellco P'ship, 934 F.3d 1, 5 (1st Cir. 2019); see also Davis v. Diversified Consultants, Inc., 36 F. Supp. 3d 217, 223 (D. Mass. 2014) (quoting Alea London Ltd. v. Am. Home Servs., Inc., 638 F.3d 768, 776 (11th Cir. 2011)) ("'The TCPA is essentially a strict liability statute' and 'does not require any intent for liability except when awarding treble damages.'"); Doc. No. 253 at 19 (citing Doc. No. 221-2 at 27-28) (collecting cases).

In objecting to Chief Judge Kelley's recommended ruling, QuoteWizard cites no statutes, regulations, or caselaw from the First Circuit or any other Court of Appeals. Rather, it relies exclusively on one unpublished decision from another session of this Court discussed in the Report and Recommendation. Doc. No. 264 at 32-33 (citing to Sandoe, 2020 WL 94064, at *12).

---

[13] Of course, a court in a case such as this one ordinarily need not consider the question of a defendant's good faith unless the plaintiff did not consent, or the question is sufficiently unclear that it must be resolved in favor of Plaintiff at this stage.

[14] QuoteWizard has not argued, nor is the Court aware of any argument, that the TCPA is a strict liability statute only insofar as it applies to automatic dialing cases. Instead, QuoteWizard relies on Sandoe, an automatic dialing case, in objecting to the Report and Recommendation. Accordingly, the Court does not consider this argument as it is waived, and in any event, the Court is not aware of any reasons why only the automatic dialing section of the TCPA would be considered strict liability to the exclusion of other sections.

Sandoe, however, is not to the contrary.[15]  There are several material differences not the least of which the plaintiff there did not raise a claim under § 227(c).  See supra note 5.  Next, this is not a reassigned-number case.  Moreover, in Sandoe, the defendant obtained valid consent prior to calling the plaintiff.  There, Judge Gorton found the calls made to the plaintiff were within the scope of the consent, i.e., that the defendant reasonably relied upon the consent obtained even though post-consent and pre-calling, the phone number had been reassigned to the plaintiff, a party completely unrelated to the person giving consent (the former owner of the phone number).  Sandoe, 2020 WL 94064, at *5.  That decision does not hold that a defendant, in the absence of any valid consent, as the Court assumes without deciding for the purpose of this point, may nonetheless call a telephone number and wholly defeat liability (as opposed to mitigate damages) based upon a good faith albeit erroneous belief that it had obtained valid consent.  QuoteWizard's claim to a defense of good faith reliance is even more suspect in this case where its lead vendor RevPoint had "no independent means of verifying the TCPA-compliance of its data."  Doc. No. 253 at 18.[16]

---

[15] Notably, several Circuits have held differently than Sandoe by concluding that a caller cannot avoid liability simply because the person it intended to call had consented.  N. L. by Lemos v. Credit One Bank, N.A., 960 F.3d 1164, 1167 (9th Cir. 2020); Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1251 (11th Cir. 2014); Soppet v. Enhanced Recovery Co., LLC, 679 F.3d 637, 639 (7th Cir. 2012); see also ACA Int'l v. Fed. Commc'ns Comm'n, 885 F.3d 687, 706 (D.C. Cir. 2018).

[16] Even if the Court recognized a good faith defense to liability in this case, which is contrary to applicable caselaw, it would be an affirmative defense for which QuoteWizard bears the burden. It has not met this burden.  Mere contractual guarantees on their own are hardly sufficient proof of a good faith affirmative defense on a motion for summary judgment filed by the party with the burden of proving the affirmative defense.  QuoteWizard also argues that "Mantha ultimately responded and solicited further contact."  Doc. No. 264 at 33.  That Mantha responded after the eighth message in a series of unsolicited messages does not bolster QuoteWizard's good faith defense.

Accordingly, the Court OVERRULES QuoteWizard's Objection (Doc. No. 264) and ADOPTS the conclusion recommended in the Report and Recommendation (Doc. No. 253) on this ground.

F.   Conclusion

For the foregoing reasons, the Court OVERRULES QuoteWizard's Objection (Doc. No. 264) to the Report and Recommendation and ADOPTS the Recommendation (Doc. No. 253) to DENY QuoteWizard's Motion for Summary Judgment (Doc. No. 201).

II.   MANTHA'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
       (Doc. No. 205)

The Court now turns to Mantha's Motion for Partial Summary Judgment (Doc. No. 205) as to two issues: (1) that Mantha did not provide QuoteWizard consent to send him telemarketing texts and (2) that the protections of the TCPA and the DNC Registry encompass his wireless phone number.  On Mantha's Motion for Partial Summary Judgment (Doc. No. 205), the Court resolves all disputed issues of material fact and draws all reasonable inferences in favor of QuoteWizard.

A.   DNC Protections of Mantha's Cellular Phone Number

Turning to the second issue first, the Court has determined that the TCPA does encompass wireless phone numbers for the reasons already stated.  See supra Part I, Section B. That is a legal determination that does not shift as the Court resolves each of the two pending motions.

The Court has also resolved the law on determining whether a phone number qualifies as a "residential telephone subscriber."  See supra Part I, Section C.  Mantha similarly bears the burden of proof on this issue to show that his cellular phone number qualifies as a "residential telephone subscriber" pursuant to 47 U.S.C. § 277(c).  For Mantha to prevail on his summary

judgment motion, he must essentially show that under the law no reasonable jury could conclude otherwise while resolving all genuine material factual disputes and drawing all reasonable inferences in QuoteWizard's favor.

Mantha again starts with the benefit of a presumption arising from his registration of the cellular phone number in the DNC Registry. Barton, 525 F. Supp. 3d at 202. This presumption is augmented by other relevant and significant facts.[17] The undisputed facts show that Mantha meets the precondition as a "residential telephone subscriber" because his cellular phone number is subscribed to his name as part of a plan including his wife, and the bill is addressed to Mantha's residence. See, e.g., Doc. No. 225 ¶¶ 28-29, 87-88, 93. The cellular phone number is not subscribed to his employer, see, e.g., id. ¶ 89, although his employer gives him a partial reimbursement of $30 monthly. Id. ¶ 97. Mantha has no alternative home phone, and so his cellular phone number is the primary means of reaching him at his residence. See, e.g., id. ¶ 88. All of these undisputed facts establish that Mantha's cellular phone number is a "residential telephone subscriber."[18]

Nonetheless, QuoteWizard contends that Mantha's use of the cellular phone number shows that "48.6% of all calls to or from Mantha's cell phone in 2019 were to or from telephone

---

[17] Many of these facts have been described previously, see supra Part I, Section C, but the Court now views these facts drawing all reasonable inferences and resolving all genuine disputes of material fact in QuoteWizard's favor for this motion. Viewing the facts in this light shows that his cellular phone number certainly has purposes beyond residential, but such additional purposes do not strip Mantha's cellular phone of its "residential telephone subscriber" attributes.

[18] The Court acknowledges QuoteWizard's contention that Mantha's cellular phone number is listed on his employer's on-call lists and his HR records. Doc. No. 225 ¶ 90. Even drawing all reasonable inferences in QuoteWizard's favor on this motion, the latter fact is irrelevant given that internal HR records typically include all relevant contact information for employees. Accordingly, that the HR records include Mantha's cellular number says nothing significant about whether that number is not a "residential telephone subscriber." The Court considers the former fact, however, in the mix, but on the record before the Court it is immaterial to the functional attributes established by the statute.

numbers" connected to his employer or other employees and argues that use is an important factor.  Id. ¶ 27; Doc. No. 264 at 8-10.  These facts, stronger on this motion given the standard applicable here, along with the list of facts at Doc. No. 264 at 10-11, are still of no assistance to QuoteWizard.  The legal test Congress framed was not one of use, but one of whether the telephone had the non-exclusive qualities sufficiently rendering it as a "residential telephone subscriber."  Drawing all reasonable inferences in QuoteWizard's favor, the business or work use of this phone does not create a genuine issue of material fact as to the material issues or strip the telephone of the attributes that qualify it a residential telephone subscriber.  Cf. Mattson, 2019 WL 7630856, at *6 (explaining that in the reverse scenario, plaintiff's "use of the subject number for personal calls does not automatically transform it into a residential line for purposes of the TCPA" when the facts showed that it was a business phone).  Mantha has met his burden of proof in showing that his cellular phone number qualifies as a "residential telephone subscriber."

The Court need go no further.  The undisputed facts establish the statue protects Mantha's phone.  Accordingly, even after drawing all reasonable inferences in QuoteWizard's favor, the Court ADOPTS the Report and Recommendation (Doc. No. 253) and ALLOWS Mantha's Motion for Summary Judgment (Doc. No. 205) on this issue.

      B.  Express Consent

Next, Mantha moves for partial summary judgment on the question of whether he consented to the text messages sent by QuoteWizard.  "Consent is an affirmative defense to a TCPA claim." Sagar v. Kelly Auto. Grp., Inc., No. 21-CV-10540-PBS, 2021 WL 5567408, at *7 (D. Mass. Nov. 29, 2021); see also Rosenberg v. LoanDepot.com LLC, 435 F. Supp. 3d 308, 318 (D. Mass. 2020) (referencing consent as an affirmative defense).  "Express consent is not an

element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof."  Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1044 (9th Cir. 2017); see Momient v. Nw. Collectors, Inc., 666 F. App'x 531, 537 (7th Cir. 2016).

QuoteWizard bases its consent defense on the argument that Fenix obtained consent from Mantha when he visited the Snappy Auto website and sold the lead to QuoteWizard through a series of sales.  Doc. No. 264 at 30-31.  Even drawing all reasonable inferences in favor of QuoteWizard, Mantha is entitled to summary judgment as a matter of law on the question of consent.  The undisputed evidence establishes the following facts: Fenix Media is based in Bosnia and says it operates the Snappy Auto website.[19]  Doc. No. 225 ¶ 55; Doc. No. 208-16.  Plural bought Mantha's lead from Fenix, RevPoint purchased the lead from Plural, and QuoteWizard purchased it from RevPoint.  Doc. No. 233-2 ¶¶ 106-109.  Each entity provided contractual guarantees that the lead was TCPA-compliant.  Doc. No. 225 ¶¶ 104-109.  RevPoint provided to QuoteWizard information relevant to Mantha which included that the source lead was the Snappy Auto website.  Id. ¶ 50.  Two IP addresses were made known through discovery as the IP addresses associated with the giving of consent by Mantha, with one belonging to a New Jersey customer and the other to a Massachusetts customer.  Id. ¶¶ 72-76.  They, or family members with access to those IP addresses,[20] denied under oath having any association with Mantha or ever visiting the Snappy Auto website.  Id.  The information provided to QuoteWizard also included an identification number called a "Jornaya LeadiD."[21]  Id. ¶ 63.  Jornaya is a

---

[19] Although the parties dispute some facts surrounding the ownership and operation of the Snappy Auto website, such disputes are not relevant to the Court's conclusion and therefore do not affect the conclusion.

[20] The Massachusetts customer was himself unable to be deposed due to health issues, but his niece, who had access to the IP address, was deposed.  Doc. No. 225 ¶ 76.

[21] For present purposes whether the LeadiD was provided to QuoteWizard with the lead or only at some later point is irrelevant.

company providing lead verification services and is used to help verify consent. Id. ¶¶ 64-66. A Jornaya representative testified under oath that the LeadiD number allegedly associated with Mantha was not connected to the Snappy Auto website or to Mantha.[22] Id. ¶¶ 67-68.

QuoteWizard has no other significant facts tending to establish its affirmative defense.[23] These facts, even drawing all reasonable inferences in QuoteWizard's favor, are insufficient to carry its burden of proof—more so when considered in light of the further undisputed fact that Mantha says he never consented to the contact and denies ever having visited the Snappy Auto website.[24] See, e.g., Doc. No. 210-14 ¶ 8.

Accordingly, the Court ALLOWS Mantha's Partial Motion for Summary Judgment (Doc. No. 205) and ADOPTS the Report and Recommendation (Doc. No. 253) on this ground.

III.   CONCLUSION

For the foregoing reasons, the Court APPROVES and ADOPTS Chief Judge Kelley's Report and Recommendation (Doc. No. 253) insofar as described herein, DENIES QuoteWizard's Motion for Summary Judgment (Doc. No. 201), and ALLOWS Mantha's Partial Motion for Summary Judgment (Doc. No. 205). Within fourteen days, the parties shall file a

---

[22] QuoteWizard attributes this discrepancy to Plural inadvertently linking the Jornaya LeadiD to Mantha's lead. Id. ¶ 68.

[23] QuoteWizard additionally argues that Mantha consented because he responded after the eighth text message. Doc. No. 202 at 28. Even if true for the communications Mantha engaged in after the eighth message, this does not change the conclusion that there was no express consent for the eight messages sent prior to Mantha's response.

[24] QuoteWizard asks the Court to draw an adverse inference because Mantha was unable to provide his browser history for the relevant time period despite being under a duty to preserve. Doc. No. 223 at 20-21. Even if the Court draws an adverse inference that Mantha did visit the Snappy Auto website, QuoteWizard still does not meet its burden of proving consent, even drawing all reasonable inferences in favor of it. All QuoteWizard contends is that "*someone*, *somewhere*, entered Mantha's actual personal information" on the website." Doc. No. 223 at 15 (emphasis in original). Such a statement falls short of meeting the burden to establish that Mantha himself consented.

joint status report setting forth their joint or separate positions as to the schedule governing the further proceedings in this matter as well as any other case management issues either party wishes to raise.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge